**Lauren F. Blaesing, OSB #113305**
LaurenBlaesing@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Alexandra L. Rhee, OSB #230770**
AlexRhee@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
*Special Assistant Attorneys General for State Defendants*
*and Third-Party Plaintiff*
*Additional Counsel of Record Listed on Signature Page*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>        Plaintiff,<br><br>    v.<br><br>KIM CHAPMAN, in her individual capacity; ANASTASIA TIBBETTS, in her individual capacity; KASSIDY O'BRIEN, in her individual capacity; ERIN LANE, in her individual capacity; THE OREGON DEPARTMENT OF HUMAN SERVICES, a government agency; and JANE and JOHN DOES 1-5; in their individual and/or official capacities,<br><br>                  State defendants.<br>OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>        Third-Party Plaintiff,<br><br>    v.<br><br>JOE ALBERT RAYGOSA,<br><br>        Third-Party Defendant. | Case No. 6:22-cv-01813-MK<br><br>**JOINT STATUS REPORT** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

PLAINTIFF'S UPDATE ........................................................................................................1

I.    Duncan/Raygosa Certification File Inspection Revealed Withheld
Documents ..................................................................................................................1

II.    Defendants' Compliance with Prior Orders.................................................................3

    A.    Care and Condition Records Remain Outstanding ......................................3

    B.    ESI - Email Communications in Production.................................................5

    C.    ESI - Cellular Device Data – the Defendants Likely Destroyed
Relevant Records .........................................................................................6

        i.    Phone Lists/Numbers for Times Material Remain
Outstanding ....................................................................................7

        ii.    State-Issued Cellular Device Forms Are Missing...........................8

        iii.    Defendants' August 31 Letter Does Not Excuse Erasure ................8

    D.    Defendants' Supplemental Response to the First Set of
Interrogatories Remains Deficient ..............................................................10

III.    Improper Designations and Redactions .....................................................................13

    A.    Attorneys' Eyes Only ("AEO") Designations ...........................................13

    B.    Confidential Reporter Information Redactions............................................15

IV.    Defendants' Failure to Answer Plaintiff's Second Set of Interrogatories .............17

V.    Defendants' Response to Plaintiff's Fourth Request for Production.....................18

VI.    Response to the Defendant's Motion to Compel .....................................................19

VII.    Plaintiff's Proposed Case Scheduling Order............................................................24

STATE DEFENDANTS' POSITION ....................................................................................26

I.    The parties have agreed upon intermediary discovery deadlines. .........................28

II.    State defendants have substantially completed email production from
plaintiff's identified custodians..............................................................................29

III.    State defendants have agreed to redesignate certain documents pursuant to
the terms of the protective order (ECF 44) entered in this case.............................30

IV.    State defendants are searching for and collecting any responsive text
messages and cell phone data from plaintiff's identified custodians.....................31

V.    State defendants disagree that a records custodian deposition is necessary
or relevant to the claims.........................................................................................35

VI.    State defendants will produce files related to the care and condition of J.H., R.H., and the additional seven foster children in the Duncan/Raygosa home...................................................................................................35

VII.    Oregon law requires state defendants to redact information about confidential reporters. ...........................................................................37

VIII.    The parties have conferred on state defendants' responses to plaintiff's interrogatories. ...............................................................................38

IX.    Plaintiff's Fourth Request for Production..................................................39

X.    Extension of discovery deadline ...............................................................40

XI.    Plaintiff should be ordered to produce relevant documents obtained by subpoenas to third parties in the related probate case, as requested in State Defendants' First Request for Production................................................40

XII.    OR-Kids Metadata Reports.......................................................................42

## INTRODUCTION

In advance of the hearing and status conference set on September 8, 2023, and pursuant to the Court's August 3, 2023, minute order (ECF 65), the parties submit the following joint status report regarding outstanding discovery issues.

## PLAINTIFF'S UPDATE

### I.    Duncan/Raygosa Certification File Inspection Revealed Withheld Documents

Plaintiff served the First Request for Production and Inspection ("First RFP/RFI") to the defendants on March 3, 2023 Plaintiff requested in pertinent part to inspect the OR-Kids case and provider files specific to Duncan/Raygosa and J.C.,[1] as well as the hard-copy certification file for the Duncan/Raygosa foster home. (Decl., Ex. 1-2). On April 20, 2023, DHS produced a *copy* of the hard-copy certification file in response to the Conservator's November 17, 2022 subpoena, following the probate court's denial of DHS's motion to quash. (Bates ranges: DHS in RE JC SDT 0000581 – DHS in RE JC SDT 0001000).

The Court held discovery hearings on July 5, 2023 and August 3, 2023, and ordered – repeatedly – that DHS produce documents relating to the care and condition of children in the Duncan/Raygosa foster home, whom the defendants had characterized as "non-parties."[2] (*See* ECF 56, ECF 65).

Following these rulings, on August 10, 2023, the defendants inexplicably re-produced the *copy* of the hard-copy Duncan/Raygosa certification file that DHS had previously produced in the probate proceeding.[3] The defendants' reproduction made only two adjustments: they applied

---

[1] The OR-Kids portion of the inspection is the subject of the defendants' motion for reconsideration. (*See* ECF 60-64, 68-72).

[2] "My order did require that materials relating to care and condition be produced." (Decl., Ex. 3 at 6).

[3] This file, and other documents produced by their client DHS in connection with subpoena(s) in the probate matter, are the subject of Defendants' First Request for Production ("DFRP"), to which Plaintiff – for obvious reasons – objects as needless.

**Page 1 –    JOINT STATUS REPORT**

additional bates numbers (Bates ranges: DHS_LEVI_049248 – DHS_LEVI_049667) and they redesignated most of the pages as Attorney's Eyes Only ("AEO").[4]

Plaintiff's counsel inspected the *original* hard-copy certification file on August 22, 2023.[5] That original file contained a 09/28/2016 child abuse hotline screening report relating to JH/RH, i.e., Duncan/ Raygosa's purported niece and nephew. (Decl., Ex. 4). That report relates concerns of Duncan/Raygosa's medical neglect of J.H. (*Id.*). The report was not found in the electronic *copy* of the certification file produced by DHS in the probate proceeding or in the defendants' AEO re-marked *copy* of that file. To be clear, that report was only found during the inspection of the *original* hard-copy certification file – which the defendants had opposed.

The defendants' failure to include this screening report with their August 10 reproduction of the certification file copy called into question the defendants' adherence to the Court's rulings on the discoverability of documents relating to the "care and condition" of children in the Duncan/Raygosa foster home. In attempting to explain the discrepancy, the defendants offered their "understand[ing] that the portions of the certification file that plaintiff received in the state court probate case in response to a subpoena to ODHS was subject to a different protective order and scope of production." (Decl., Ex. 5 at 26). And that, "[b]ased on the Court's Aug. 3 *clarification*…[the defendants] did not *redact* portions of the hard copy certification files relating to J.H. and R.H. that [Plaintiff] reviewed in person." (*Id.*) (emphasis added).

But the Court's July 5 and August 3 rulings were clear. Yet, the defendants' August 10 production entirely omitted – not redacted – the screening report that was discovered in the original file. The defendants made no effort to inform Plaintiff prior to the August 22 inspection about their apparent decision to not "redact" the screening report. Indeed, consistent with their ongoing refusal to disclose the identity of individuals who contacted the hotline, the defendants had also inserted

---

[4] Defendants marked 751 of the 797 pages of this re-produced certification file as "AEO," when the probate production of those exact materials had a designation of "Confidential," highlighting Plaintiffs' concern of the defendants' over-designation.

[5] The inspection occurred at the offices of counsel for the defendants, Markowitz Herbold (1455 SW Broadway Suite 1900).

**Page 2 – JOINT STATUS REPORT**

a slipsheet into the original file in place of the page of the screening report which obscured the reporter's identity. (Decl., Ex. 4 at 8). Moreover, the defendants have continued to withhold production of documents pertaining to RH and JH – which Plaintiff requested in the First RFP/RFI. (Decl., Ex. 1 at 8).

The defendant' attempt to explain the discrepancy cuts against their longstanding strategy to hide the fact that other children were abused and neglected in the home by dubbing them as "non-parties" and to otherwise make efforts to impede Plaintiff's ability to discover the identity of percipient witnesses. At a minimum, what unfolded with the certification file inspection underscores Plaintiff's need to inspect the OR-Kids files.

## II.    Defendants' Compliance with Prior Orders

### A.    Care and Condition Records Remain Outstanding

As of the parties' August 22, 2023 conferral, the defendants maintained that the Court's July 5 order requiring production of documents relating to the care and condition of children in the Duncan/Raygosa foster home was only limited to ESI. Defendants held to this position despite the Court's August 3 directive to the contrary. (Decl., Ex. 5 at 25). On August 29, 2023, one week after Plaintiff discovered the 9/28/2016 screening report, the defendants changed position abruptly and agreed to produce certain materials:

- Relevant Child Welfare CPS files for J.H. and R.H.-- the niece/nephew that lived with Duncan and Raygosa at the same time as J.C. and Z.C.
- For the other 7 children in ODHS custody that were, for even a short time, placed in the Duncan Raygosa home, relevant documents or document excerpts from the Child Welfare files for the time period when they were placed in the Duncan Raygosa or for the period thereafter if the document references their care and condition when they were placed in the Duncan Raygosa home.

(*Id.*). Due to the recency of this development, parties have yet to confer on the nature and scope of the documents that defendants state they will now produce, and the defendants have not yet provided a firm timetable for the production.

**Page 3 –    JOINT STATUS REPORT**

As to the files of JH/RH, Plaintiff contends that the "entirety of their files is invariably relevant to the case." (*Id*.). Plaintiff's discovery of the screening report only reinforces that position: not only did a person in the medical community believe that J.H.'s care and condition rose to the level of "neglect," but the defendants were also aware that the parents of J.H. may have "want[ed] him back."[6] (Decl., Ex. 4). This information relates to many of Plaintiff's allegations, particularly DHS's choice in late 2016 to "let Duncan-Raygosa take J.C. with them on an unsupervised two-week 'vacation' away from the home." J.C.'s condition following that period "further deteriorated: she began exhibiting signs of severe emotional distress and abuse, which included eating problems and hair loss." (ECF 1 ¶¶ 48-9).

After J.C.'s disclosure in approximately October 2017, DHS apparently "put a protective action [plan] into place" for J.H./R.H., at which point Duncan/Raygosa "ran with the children to [O]klahoma and hid out with the tribe until the warrant was issued." (Decl., Ex. 6 at 2). DHS worker(s) believed in March 2018 that these "non-verbal children" were also Raygosa's victims; they contacted "[O]klahoma DHS," seeking protective services intervention in that state. (*Id*.). These follow-up contacts; the information gathered from Oklahoma and/or California; DHS actions during Duncan/Raygosa's flight, throughout his prosecution and in its aftermath; and any communications with other states regarding these children, appear to remain outstanding.[7]

Regardless whether defendants may or may not have treated this 9/28/2016 hotline report as a formal "report of abuse," they should not be permitted to withhold documents regarding

---

[6] Nothing in the document production to date indicates that DHS workers ever made contact with the parents of J.H./R.H. *But see* ORS 163.225(1) ("A person commits the crime of kidnapping in the second degree if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person (a) Takes the person from one place to another; or (b) Secretly confines the person in a place where the person is not likely to be found."); ORS 163.245(1) ("A person commits the crime of custodial interference in the second degree if, knowing or having reason to know that the person has no legal right to do so, the person takes, entices or keeps another person from the other person's lawful custodian…with intent to hold the other person permanently or for a protracted period.").

[7] Meanwhile, the defendants waited until August 31 before informing Plaintiff that the cellular devices of the investigating workers were apparently erased.

**Page 4 –    JOINT STATUS REPORT**

J.H./R.H. (e.g., educational and medical records, voluntary service agreements, safety plans, interviews with medical providers and other collateral contacts, police reports, etc.) simply because they were not placed or kept in the referenced "Child Welfare CPS files for JH and RH." Plaintiff seeks those documents, i.e. "the entirety of their files," because they are relevant.

As to Child Welfare files for foster children in the Duncan/Raygosa home, Plaintiff agrees to production of the following materials: (1) all OR-Kids case notes regarding these children for the duration of their placement in the Duncan/Raygosa foster home, and for six months thereafter; and (2) documents relating to any reference to their care and condition in the Duncan/Raygosa home following a diligent review of medical, mental health and other third-party records. Plaintiff does not understand the need to redact or omit information when Defendants insist on the AEO designations.

### B.    ESI - Email Communications in Production

Defendants have applied Plaintiff's search terms across the email communications of Plaintiff's proposed custodians, and agreed to produce responsive, non-privileged communications by September 1. Defendants have withheld approximately 3000 email communications to review for privilege/work product protection, which are being reviewed by a contract attorney. They have promised to deliver a privilege log by October 15, 2023. Based on experience, Plaintiff anticipates that the defendants will identify many responsive and non-privileged communications while preparing the log.

The Court overruled the defendants' objection to producing email communications relating to the "care and condition" of other children placed in the Duncan/Raygosa foster home on July 5. The defendants are now searching and producing these responsive communications. However, the defendants have encountered technical difficulties with the email communications of one custodian, Emily Williams. Ms. Williams was assigned to the Child Protective Services ("CPS") investigation into the 9/28/2016 screening report.  (Decl., Ex. 7). According to the defendants, Ms.

Williams no longer works for DHS, but they have not provided the former employee's contact information and the defendants have not yet contacted her.

Regarding the technical difficulties: "[A]pproximately half of the documents were encrypted and could not be unencrypted," according to the defendants. The defendants "have tried re-collecting and re-exporting Ms. Williams' emails, which did not seem to resolve the issue," and they "can only see the dates sent and received for the encrypted emails, no other content," rendering search or analysis of their contents impossible. (Decl., Ex. 5 at 11). The defendants' apparent inability to access Ms. Williams' emails underscores Plaintiff's need to review critical documents and case file materials for J.H. and R.H., including emails and text messages attributed to and/or involving Ms. Williams, whose proprietary cellular data has been rendered irretrievable.

### C.     ESI - Cellular Device Data – the Defendants Likely Destroyed Relevant Records

Plaintiff has been seeking relevant text messages for many years – starting with her February 4, 2020 Tort Claim Notice, which specifically requested preservation of relevant documents, including text messages. (Decl. ¶ 9). Plaintiff's First RFP included "text messages" in the definition of "Document(s)," and also sought "communications" in myriad requests.[8] (Decl., Ex. 1 at 7-8). On April 11, 2023, the defendants' Response was rife with objections. Plaintiff brought these to the attention of the Court through letter on June 9, 2023.

Specific to cellular devices, Plaintiff expressed the concerns that (a) The defendants' withholding of the workers' DHS-issued cell phone and/or personal cell phone numbers precludes Plaintiff from seeking and/or subpoenaing phone records to discover the workers' communications

---

[8] *See* e.g., communications with Duncan/Raygosa household members or biological families (#19), with counselors/medical providers (#23), regarding the Duncan/Raygosa foster care home study (#24), relating to complaints or reports of suspected child abuse or neglect in the Duncan/Raygosa home (#29),  relating to the care and condition of any child in the Duncan Raygosa foster home (#30), evincing a reasonable cause to believe that any child was abused or neglected in the Duncan/Raygosa foster home (#32), evincing any DHS worker's belief, knowledge or suspicion that Duncan/Raygosa failed to maintain appropriate boundaries, adhere to rules and requirements, manipulated children or were otherwise abuse/neglectful in any way toward any children in the home (#33).

**Page 6 –     JOINT STATUS REPORT**

with Duncan/Raygosa as well as with other workers and supervisors, and other witnesses; and (b) that the defendants' intent to limit the search for cellular phone ESI only to the *extent* that – citing the possibility of erasure – such a search would not be unduly burdensome, while simultaneously "refus[ing] to produce a litigation hold," ran afoul of "LR-26-1(2)(C)'s requirement that parties confer on 'the steps to ensure that discoverable ESI is not deleted, altered, or otherwise made inaccessible.'" (*See* Plf's June 9, 2023 Letter at 3, 5).

###### i.     *Phone Lists/Numbers for Times Material Remain Outstanding*

At the July 5, 2023 discovery hearing, Plaintiff indicated what initial documents would prove most helpful and responsive: "phone lists that were kept in the ordinary course" as well as "State-issued cell phone numbers, which should be in their personnel files." (Decl., Ex. 8). After briefing and argument on these issues, the Court instructed on July 5, 2023:

> At a very minimum, I expect that the cell phone numbers and other contact information of the named defendants be provided and then confirm that the -- or that if organizational charts exist as -- as part of the normal production of, I don't know, organizational literature, that that be confirmed whether they exist or not, so we don't have to return to this issue in the future.

(*Id.*). In response, the defendants produced another excel spreadsheet (no phone lists or other organizational charts/literature) to Plaintiffs on August 2, 2023. This time, the table *did* include telephone numbers. (Decl., Ex. 9). Not all defendants appear on this chart; Defendant Lane does not. And other key custodians are missing as well: For instance, Ms. Williams, described above as investigating concerns for medical neglect of JH/RH (and whose emails are now unretrievable) does not appear on the list, presumably because she has left the agency. During the August 22 conferral, the defendants conceded that the numbers appearing on the spreadsheet were *current* cellular device numbers, not necessarily the telephone numbers for the workers at times material. Plaintiff believes that the defendants' failure to provide the material phone numbers does not conform with the Court's order, and this continuing failure frustrates Plaintiff's ability to independently investigate facts.

**Page 7 –     JOINT STATUS REPORT**

### ii.    *State-Issued Cellular Device Forms Are Missing*

Nor was Plaintiff's optimism borne out that the forms relating to state-issued cellular devices would be found in the defendants' personnel files. They were not.

As background, DHS has very specific and instructive policies regarding the issuance, assignment, maintenance and replacement of "portable electronic devices such as cell phones…," or otherwise referred to as "mobile communication devices." (Decl., Ex. 10). These policies provide that "[e]very employee assigned agency property shall complete MSC 0050, within two business days of receiving the property." (*Id*.). DHS "shall issue, replace or upgrade agency-owned mobile communication devices in accordance with business need," and "shall issue mobile communication devices to an approved individual when the individual completes form MSC 1496." (*Id*.). Both of the referenced forms are available online. (Decl., Ex. 11). Neither of the forms were contained in the personnel files. Defendants refuse to look for these forms outside the personnel files, now demanding that Plaintiff serve a separate discovery request, which is needless.

### iii.    *Defendants' August 31 Letter Does Not Excuse Erasure*

The defendants made repeated assurances that they would provide answers and that a records custodian or 30(b)(6) deposition was unnecessary. At the August 3, hearing, the defendants reported that they were "making diligent efforts to -- to understand who the relevant potential custodians are for text messages…that work [was] underway …[they] been interviewing folks, getting [their] arms around what exists and what's been preserved, and it's not yet complete." The defendants did not have a "firm production deadline," but did agree to "produce whatever text messages that are relevant that [they] do collect." (Decl., Ex. 3 at 2). On August 17, 2023, the defendants wrote that they had "now interviewed all relevant custodians about their cell phone usage and device changes and will be sending [Plaintiff] a letter with the relevant information." (Decl., Ex. 5 at 13).

After close of business on August 31, 2023, the promised letter arrived along with the defendants' draft of a Joint Status Report. Nothing was preserved: "it is *unlikely that state defendants possess responsive text messages from the relevant time period* between April 2016,

**Page 8 –    JOINT STATUS REPORT**

when Duncan and Raygosa applied to be foster parents, and August 14, 2018, when Raygosa was convicted." (Decl., Ex. 12). Rather than provide answers, the letter raises serious questions.

First, the defendants do not state that relevant text messages *never* existed on these devices, only that "most of the relevant custodians…upgraded their devices," at which time "ODHS delete[d] all data on the device[s] before returning it to the vendor…" (*Id.* at 1-2). Defendant O'Brien, in particular, appears to have frequently utilized her cellular device for substantive work purposes. (Decl., Ex. 13). By policy, these were public records requiring preservation and retention in the normal course.[9]

Second, the defendants' letter provides an incomplete list of custodians. For example, the defendants omit mention of defendant Kim Chapman, which is inexplicable. For Chapman and a handful of other custodians, the defendants do not even begin to answer whether they were issued and/or may retain a state-issued device, whether they used a personal cellular device for work purposes, whether they remain in possession of such device(s) or whether, like the others, the devices were erased, but after the issuance of a tort claim notice and litigation hold.

Third, the defendants apparently believe that the timing of their receipt of the Tort Claim Notice and placement of the litigation hold on February 10, 2020 excuses their "planful" destruction of the workers' phone data prior thereto. That is a mistake: Communications discovered to Plaintiff in the very recent production reveal a clear belief among DHS workers and supervisors that they would likely be sued for J.C.'s sexual abuse. This recognition and anticipation of a lawsuit dates back to summer 2018 - a period of time well before the erasure and while J.C. and Z.C. were still in care. (Decl., Ex. 15). The defendants had ample "notice that the documents

---

[9] (*See eg.* Decl., Ex. 14) ("A public record (hereafter, record or records) is a document, book, paper, file, sound recording, machine readable electronic record or other material, regardless of form or characteristic, technology or medium, prepared, owned, used or retained by DHS and OHA in connection with the transaction of the public's business…Use of instant messaging or text messaging in a manner that requires documentation and retention shall be immediately converted from the messaging format to a separate public record format and stored in accordance with agency retention schedules.").

**Page 9 –    JOINT STATUS REPORT**

were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (simplified); see also *Gililland v. Sw. Or. Cmty. Coll. Dist.*, No. 6:19-cv-00283-MK, 2021 U.S. Dist. LEXIS 231873 (D. Or. Dec. 3, 2021).

Finally, Plaintiff's proposed parameters have always requested ESI search for the timeframe between January 2016 – January 2020. (Decl., Ex. 16). Yet, the defendants inexplicably chose to limit the timeframe to "between April 2016, when Duncan and Raygosa applied to be foster parents, and August 14, 2018, when Raygosa was convicted." (Decl., Ex. 12). As such, the defendants evade a search for relevant text communications between and among themselves, J.C.'s family, her (subsequent) foster placement, medical and therapeutic providers, etc. about J.C., Z.C., and Duncan/Raygosa occurring in connection with Raygosa's criminal trial and its fallout within DHS and the juvenile court – while J.C. and Z.C. were still in care.

Plaintiff asks the Court to consider a further order as follows:

(1)  That the defendants produce forthwith the MSC 1496 and MSC0050 forms relating to any request and/or issuance or use of any mobile device for the requested custodians, including any supervisor or other responsible individual who authorized any replacement;

(2)  That the defendants produce forthwith a list of telephone numbers and associated carriers for the devices used by the custodians between January 2016-January 2020; and

(3)  That the defendants cooperate with a forthcoming request for a Records Custodian and a Rule 30(b)(6) deposition on this topic.

Plaintiff reserves the right to seek sanctions for the destruction of this evidence.

### D.      *Defendants' Supplemental Response to the First Set of Interrogatories Remains Deficient*

The Court ordered the defendants to answer Plaintiff's interrogatory # 3 as follows: "(1) identify to Plaintiff the concerns, including but not limited to concerns about abuse, in the Duncan-Raygosa home; and (2) identify to Plaintiff all DHS workers and supervisors who knew of any

**Page 10 –    JOINT STATUS REPORT**

such concerns." (ECF 56). The defendants' answer does not fully comport with the order. (*See* Decl., Ex. 17).

In summary, the defendants list four (4) Child Protective Services ("CPS") Assessments. The October 10, 2017 Assessment (Sexual Abuse/Exploitation – 048952) and May 29, 2018 Assessment (Sexual Abuse/Exploitation – 048933) pertain to J.C. The December 13, 2016 Assessment (Neglect - 048977) and May 16, 2017 Assessment (Physical Abuse - 048897) pertain to other children in the home. These types of Summaries are created only when DHS treats a concern as a formal "abuse report." The defendants fail to even mention the fact of 9/28/2016 Screening Report and investigation regarding J.H./R.H. The defendants did not produce (or "refer" Plaintiff) to case notes pertaining to these children, other children in the home, and related documents such as emails and text messages. The May 18, 2017 email exchange between numerous DHS workers, including defendants Chapman, O'Brien, and Tibbetts does reflect "concerns about abuse" to other children in the home. This is the only responsive email between and among these workers. The defendants indicate vaguely that DHS employees "documented their questions and observations in case notes in OR-Kids," and mention that DHS "has produced copies of case notes" in the ("related") probate proceeding. But the defendants omit mention that the "case notes" were produced to probate parties – and pertain only to J.C./Z.C. The "case notes" do not reflect concerns about abuse regarding other children in the home. Similarly, other materials that the defendants referred Plaintiff to also pertain primarily to J.C. and Z.C., and Duncan/Raygosa.[10]

The defendants "interpret[ed]" the Court's order to permit them to object to disclosing the identity of percipient witnesses based on OAR 407-047-0500. The rule provides that "information gathered and records and reports compiled during an OTIS investigation are *confidential* and may

---

[10] *E.g.*, 9/5/2018 case note regarding Mother  (022798); 6/12/2018 case note regarding Mother (026602); 2017 case notes regarding J.C. and Z.C., (027786); 2018 case notes dealing with J.C.'s biological parents (027862); 2018 case notes regarding Mother, J.C., and Z.C. (027891); 2017 case notes regarding J.C. and Z.C. (beginning at 027954); case notes dealing with J.C.'s biological parents (028010); and copies of the Duncan/Raygosa certification file (053541).

**Page 11 –    JOINT STATUS REPORT**

be disclosed only as provided in ORS 419B.035." *Id.* (emphasis added).[11] The rule also provides that the "identity of the person reporting abuse *may not* be disclosed." *Id.* (same). But there is no evidence showing either that OTIS investigated (or that DHS requested OTIS to investigate) the circumstances regarding the DHS-certified Duncan/Raygosa foster home. The defendants object because they want to conceal the identity of the individuals who contacted the hotline regarding concerns about abuse in the home. Such individuals include or may include neighbors, physicians, relatives, and others. Plaintiff has reason to believe that many of the reporters were DHS workers, including the apparent supervisor, Sue Kauzlarich. (Decl., Ex. 18).

The Court should overrule the objection. Again, Rule 26 provides that parties may obtain discovery "regarding any non-privileged information that is relevant to any party's claim or defense[]." *Id.* DHS's confidentiality provision does not establish a privilege, and defendants' reliance on state law provisions to impair Plaintiff's ability to discover her claims in this civil rights action is disfavored.[12] Further, the information sought is relevant: the individuals who contacted the hotline have personal knowledge. Also, there is a Protective Order on file, and the Court has already ruled that information bearing on the care and condition of children in the home is discoverable. The defendants' purported "reservation of right" to "continue to supplement discovery as additional information is learned" fails to explain their failure to produce information they already know, and would merely perpetuate their non-responsiveness. *See Yeti by Molly, Ltd.*

---

[11] "OTIS" stands for the Office of Training, Investigations, and Safety. *See https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn=291875.* There is no evidence that OTIS conducted any of the CPS Assessments regarding the Duncan/Raygosa home, or that DHS follows – or adheres to – OTIS investigation requirements and standards. *See e.g., OAR 407-046-0150 et seq.*

[12] *See ACLU v. Finch*, 638 F.2d 1336, 1343-44 (5th Cir. 1981) ("The purpose of enacting § 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; . . . there is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged."); *Burka v. New York City Transit Authority*, 110 F.R.D. 660, 666 (S.D.N.Y. 1986) ("Because the [federal] civil rights laws are in part designed to protect individuals against illegal state action, it would be anomalous to permit state law privileges to interfere with their enforcement.").

**Page 12 –    JOINT STATUS REPORT**

*V. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) (noting that The Advisory Committee Notes (1993) explain that Rule 37 "provides a strong inducement for disclosure of material….")

## III.    Improper Designations and Redactions

### A.    *Attorneys' Eyes Only ("AEO") Designations*

As the Court is aware, Plaintiff reserved the right to contest the defendants' usage of AEO in the protective order. Plaintiff inquired with the defendants ahead of filing the protective order as to "whether [defendants] had concerns about any documents in particular that [Plaintiffs' counsel] should not be able to show the clients, experts, treating medical providers, etc." In response, the defendants offered no such examples. (Decl., Ex. 21). Plaintiff agreed to "reserve[] the right to challenge the use (if any) of AEO going forward, without waiving the right to do [so] by not forcing the issue at this juncture." (*Id.*).

As Plaintiff's August 2 letter describes, the vast majority of the documents produced by the defendants to date are AEO-designated. The defendants wrote to Plaintiff on the eve of the August 3 hearing:

> We are designating documents solely relating to J.C. and Z.C. as Confidential.  If documents include identities or protected health information about other children or adults (outside the [J.C./Z.C.] family) involved with ODHS Child Welfare, we will continue to designate those documents as AEO.

(Decl., Ex. 5 at 13-14). Based on this statement, Plaintiff represented at the hearing that "Ms. Blaesing has agreed to re[-]mark some of the documents, particularly those that regard J.C., our client, and her brother, Z.C., but my understanding is that they intend to use 'Attorneys Eyes Only' for any other documents regarding non-party children." (Decl., Ex. 3 at 4). Then, the defendants walked back that agreement: "I don't think I have represented that we are going to redesignate things…." (Decl., Ex. 5 at 5).

On August 10, the defendants offered a different version: "After reviewing the protective order and consulting with my team and client, I wrote to you on August 2 to clarify our position

**Page 13 –    JOINT STATUS REPORT**

on what we were designating.  I did not commit to re-designate documents." (Decl., Ex. 5 at 14). That statement did not clarify anything.

The defendants made no effort to modify their designation approach subsequent to the August 3 hearing. By Plaintiff's calculation, of the 8,409 pages of documents produced after August 3, 6,024 bear the AEO designation. Below is sampling of the excessive use of AEO by the defendants:

- Nearly all of the Duncan/Raygosa OR-Kids provider file (DHS_LEVI_048668-048999), including their application materials, home study, reports of abuse/neglect, staffings, and all of the OR-Kids provider notes, etc. (Note: This is an exact replica of what DHS produced in response to a subpoena in the probate court – which was marked merely "Confidential"). (See e.g., Decl. Ex. 20). Produced August 10.
- Structured Analysis Family Evaluation ("SAFE") Home Study Interview training materials from 2009 (DHS_LEVI_052367-52425), which contain no sensitive or private information regarding any real individual, but serve as instructional materials "to determine if a family is ready, willing, appropriate and able to become a viable and safe placement resource for a child..." (*see e.g*. Decl., Ex. 21). Produced August 21.
- Scores of email communications, many of which relate only to JC/ZC and their biological family. *See e.g.* (Decl., Exs. 6, 7, 18, 31). Produced July - August 31.

Plaintiff explained to the defendants in detail how the over-designation interferes with the attorney-client relationship and appears calculated to hamper Plaintiff's litigation efforts by precluding counsel from sharing with the Conservator (and/or J.C.) "information derived []from" documents that include – to any degree – "identity and protected health information" of non-parties. In other words, Plaintiff's counsel could not inform Mr. Levi  about the abuse occurring to other children in the Raygosa/Duncan home, or confirm with J.C. information about the care and condition of other foster children placed with her. (Decl., Ex. 5 at 27). Plaintiff also made clear that "marking voluminous documents AEO and then attempting to shift the burden to [Plaintiff to identify] those that do not merit AEO is both unnecessary as well as time-consuming, and we may seek the court's input." (*Id.*). Defendants made no effort to change their practice, except that they may adjust their prior designations on the eve of this submission.

Now, with tens of thousands of pages improperly marked, the defendants' submission describes an agreement to redesignate. In the meantime, Plaintiff has expended hundreds of hours

**Page 14 –    JOINT STATUS REPORT**

of attorney and staff time uploading, organizing, analyzing, and coding the nearly 60,000 pages of documents in their electronic system, linking the documents to timelines and identifying exhibits. All of this work will need to be redone, at significant expense. In agreeing to the form of protective order, Plaintiff relied on the defendants' representation that the AEO designation would not be misused. However, the defendants have weaponized this provision to create unnecessary work, hamstring Plaintiffs' litigation position, and drive up costs. Plaintiff believes that under the circumstances, the Court should withdraw the AEO designation from the Protective Order

The confidentiality provisions extant in the protective order are sufficient to serve the true purposes of child welfare confidentiality: "the interest of family privacy and for the protection of children, families and other recipients of services." ORS 409.225(1). Plaintiff has no interest in exposing the secrets of the children who suffered in the Duncan/Raygosa home, only the "information related to the department's activities and responsibilities in a case where child abuse or neglect has resulted in a child fatality or near fatality or where an adult has been charged with a crime related to child abuse or neglect." ORS 409.225(6). The defendants' overuse of AEO designations does not advance the legislature's intent, and it is merely self-serving.

### B. *Confidential Reporter Information Redactions*

Rule 26 provides that parties may obtain discovery "regarding any non-privileged information that is relevant to any party's claim or defense[]." *Id.* The Court has already ruled that the defendants are required to produce documents regarding concerns about abuse in the DHS-certified Duncan/Raygosa foster home, and there is a Protective Order on file that protects confidentiality. Such individuals include neighbors, physicians, relatives, and others who observed the maltreatment and neglect occurring in the home. Plaintiff also has reason to believe that the reporters included DHS employees. (*See e.g.* Decl., Ex. 18).

Yet, the defendants still object to producing any documents that identify the percipient witnesses who contacted the child abuse hotline to report concerns about abuse in the home. Having been overruled on their "non-parties" objections on grounds of "non-parties," the

**Page 15 –     JOINT STATUS REPORT**

defendants now attempt to invoke OAR 407-047-0500. But that rule (which is promulgated by DHS) provides that "information gathered and records and reports compiled during an OTIS investigation are *confidential* and may be disclosed only as provided in ORS 419B.035." *Id.* (emphasis added).[13] It also states that the "identity of the person reporting abuse *may not* be disclosed." *Id.* (same).

The rule is in apposite here because there is no evidence showing that OTIS investigated any concerns about abuse in the DHS-certified Duncan/Raygosa foster home. Also, one may assume that DHS would have no hesitation providing the reporter's identity when necessary to further DHS's interest in terminating parental rights. Here, however, DHS is weaponizing the rule to conceal the reporter's identity out of fear that the reporter's information will implicate the defendants' deliberate indifference.

The Court should overrule the objection. The information sought is relevant: the individuals who contacted the hotline have personal knowledge. OAR 407-047-0500 does not establish privilege, and defendants' attempt to rely on state law to as a bar to Plaintiff's ability to discover her claims in this civil rights action is untenable.[14]

---

[13] "OTIS" stands for the Office of Training, Investigations, and Safety. *See https://secure.sos.state.or.us/oard/viewSingleRule.action?ruleVrsnRsn=291875.* There is no evidence that OTIS conducted any of the CPS Assessments regarding the Duncan/Raygosa home, or that DHS follows – or adheres to – OTIS investigation requirements and standards. *See e.g.,* OAR 407-046-0150 *et seq.*

[14] *See ACLU v. Finch*, 638 F.2d 1336, 1343-44 (5th Cir. 1981) ("The purpose of enacting § 1983 was to ensure an independent federal forum for adjudication of alleged constitutional violations by state officials; . . . there is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged."); *Burka v. New York City Transit Authority*, 110 F.R.D. 660, 666 (S.D.N.Y. 1986) ("Because the [federal] civil rights laws are in part designed to protect individuals against illegal state action, it would be anomalous to permit state law privileges to interfere with their enforcement.").

**Page 16 – JOINT STATUS REPORT**

**IV.    Defendants' Failure to Answer Plaintiff's Second Set of Interrogatories**

To be clear, there is no "agreement" with Plaintiff to allow the defendants to drop their Fifth Affirmative Defense in lieu of answering Plaintiff's interrogatory # 9. Plaintiff did not "agree" with the defendants to be surprised at trial with a resurrected affirmative defense.

Rule 26(b) provides that parties may obtain discovery of non-privileged information that is "relevant to any party's claim or defense…." *Id.* The defendants' Fifth Affirmative Defense alleges that Plaintiff "fails to state a claim upon which relief can be granted." (ECF 19 at ¶ 42). Plaintiff's interrogatory # 9 requests the defendants to (1) identify the claim(s) at issue; and (2) explain why such claim(s) fail to state a claim." (Decl., Ex. 22).

The defendants' Response is laden with nine General Objections ("the GOs"). The third GO, styled as "Scope of Discovery," is of particular concern going forward because the defendants warn that they "do not concede that the information" they provide in response to sworn interrogatories "is relevant, material, competent, or admissible." The Court should disregard the defendants' persistent use of disfavored GOs. *Clark, supra.*

In their response to Plaintiff's interrogatory # 9, the defendants incorporate all of the GOs, "further object" on grounds of privilege or work product, (which creates ambiguity), "further object" if the interrogatory seeks "a legal conclusion or analysis," and "further object" that the interrogatory "seeks no facts." Sandwiched between the approximately 13-14 objections, the defendants assert that the interrogatory (or "request") "seeks pure legal interpretation." The defendants conclude that that they "will not respond to this request."

None of the defendants' citations support their objection-infused response to interrogatory # 9. *SelectMetrics* found that the interrogatory at issue which sought "all acts" supporting the defendant's affirmative defenses was "practically indistinguishable from an interrogatory that requests 'all facts' that support a contention." *See* 2005 U.S. Dist LEXIS 56883 * 3 | 2005 WL 817024 (D. Or. 2005). Plaintiff's interrogatory # 9 simply seeks to find out what claim(s) allegedly fails to state a claim for relief, and the reason for the alleged failure. Not "all acts" or "all facts."

**Page 17 –    JOINT STATUS REPORT**

The interrogatory in *Everest Nat'l Ins. Co.* was framed as "What do YOU contend is the meaning of the term 'promoting any security' in the SECURITIES UNDERWRITING EXCLUSION as that term is used in the SECURITIES UNDERWRITING EXCLUSION?"  The court found the interrogatory posed a pure question of law and could simply have asked instead what the plaintiff contended the terms meant with respect with respect to the particular claims at issue. *See* 2016 U.S. Dist. LEXIS. 149975 * 11 | 2016 WL 6311876 (N.D. Cal. 2016). Plaintiff's interrogatory # 9 does not ask the defendants to interpret anything – it simply asks them to identify the claim(s) that they allege fail to state a claim for relief and explain the reason(s) why.  The interrogatories at issue in *Kendrick* likewise do not resemble Plaintiff's interrogatory # 9. *E.g.,*125 F.R.D. 1. *2  ("The interrogatories [at issue] ask[ed] whether it is the plaintiffs' 'contention' that grants which might mirror these factual scenarios are 'unlawful' . . . identify all past or current grantees which may be operating in violation of the First Amendment, to state their position with respect to the [Adolescent Family Life Act, 42 U.S.C. § 300z *et seq*.] program as a whole"). Again, Plaintiff's interrogatory # 9 does not ask the defendants to interpret the law.

Although the defendants may have perhaps overlooked it, the court in *SelectMetrics* noted under Fed. R. Civ. P. 33(c) "an interrogatory seeking the 'factual and legal basis of an affirmative defense falls within the permissible ambits of" LR 33 and Rule 33(c). *Id.* at * 4. That is precisely the type of information that is requested by interrogatory # 9. Accordingly, the Court should require the defendants to answer interrogatory # 9 before they decide to shelve the defense.

## V.    Defendants' Response to Plaintiff's Fourth Request for Production

Plaintiff's 4th RFP sought two categories of information: (1) the materials reviewed/relied upon by Payne, Miles, and Bunnell, and (2) the defendants' communications with these employees regarding their testimonies. (Decl., Ex. 23). Plaintiff seeks production of the documents that were reviewed by these employee-witnesses in connection with providing their respective Declarations, which the defendants relied upon as support for their motion for reconsideration. *See* FRE 612; *see also e.g., Heron Interact, Inc. v. Guidelines, Inc.*, 244 F.R.D. 75, 77 (D. Mass.

2007) (discussing the need to balance a party's need to see the documents to test the witness's credibility against the opposing party's interest in protecting privileged information).

In their Response, the defendants made manifold General Objections ("GOs") and further objected on grounds of privilege and work product. Without intending to waive these objections apparently, the defendants responded that they "have no non-privileged documents." (Decl., Ex. 24). As the party asserting a privilege, the defendants have the burden to establish the applicable privilege. *See Kelser v. Puget Sound & Pac. R.R*., 2021 U.S. Dist LEXIS 146211 * 2-3 | 2021 WL 3403546 (W.D. Wash. 2021). And the defendants have failed to supply a privilege log that reflect the non-privileged documents that the witnesses were shown. Accordingly, in applying *Heron,* the Court may conduct an *in camera* review or require the defendants to prepare a privilege log consistent with *Burlington Northern & Santa Fe Ry v. United States Dist. Court*, 408 F.3d 1142, 1148 (9th Cir 2005).

## VI.     Response to the Defendant's Motion to Compel

The defendants remark about a "due" date deserves brief comment. The defendants served their First RFP on July 26, 2023, by mail. (Decl., Ex. 25). They have declined email service. Plaintiff responded on August 28, and produced additional responsive documents tht Plaintiff subpoenaed from third parties in this action. (Decl., Ex. 26). Parties conferred by phone on the morning of August 31. The defendants presented their motion after close of business that same day.

Whereas the defendants' motion now seeks an order compelling "relevant" documents obtained by parties in the "related" probate proceeding, their First RFP demanded "All documents" obtained by parties in the probate proceeding. The First RFP was directed ostensibly to "plaintiff Ethan Levi;" yet, it strayed off course by defining "Plaintiff" and "You" to mean "J.C." and "J.C.'s attorneys of record," including "legal counsel," "any agents in possession, custody, or control of responsive documents," etc. Plaintiff objected on grounds of vagueness and overbreadth.

Mr. Levi (OSB #994255) is the Plaintiff in this action. In the probate proceeding, Mr. Levi acted in his capacity as the Petitioner and appointed Conservator of J.C.'s estate. He was represented there by Ms. Maite Uranga (OSB #065302). J.C. was represented there by Ms. Michelle Johannson (OSB # 054771). As intervenor, Z.C. was represented there by Ms. Bonnie Richardson (OSB #98331). The undersigned Plaintiff attorneys associated with Ms. Uranga as counsel for Mr. Levi to assist in the investigation of potential claims.

The First RFP also demanded nothing less than that the members of the collective "You" produce "[a]ll documents" obtained from "Your" subpoenas issued to KC, LCJC,  and DHS, and "any persons or entities." The request to identify and produce documents obtained from "any persons or entities" invited a waiver of privilege and invaded work product. The request to reproduce DHS's documents was needless and has never been explained. There is nothing which prevents the defendants from preparing subpoenas to KC and LCJC. But the defendants purport to excuse their inactivity by declaring that they "do not have an obligation" to prepare any subpoena they regard as "duplicative" of a "You" subpoena. That is not the Plaintiff's fault, however.

The Conservatorship allowed probate parties to investigate potential claims in anticipation of litigation against DHS and others arising from J.C.'s abuse in the DHS-certified Duncan/Raygosa foster home. Accordingly, the parties' investigation is protected work product.[15] The parties exercised subpoena power to move past DHS's delay and its use of labyrinth Public Records Law provisions to avoid providing information in response to written releases.

The defendants maintain – without citation to authority – that any document obtained from "any persons and entities" subpoenaed by "You" is ripe for the picking, claiming that "plaintiff's counsel (or any person) [did not] prepare or create the requested documents for the purpose of litigation." That is incorrect: *See In re Grand Jury Subpoenas,* 357 F.3d 900, 907 (9th Cir. 2018) ("A document should be considered prepared in anticipation of litigation if in light of the nature

---

[15] *See Admiral Ins. Co. v. United States District Court,* 881 F.2d 1486, 1494 (9th Cir. 1989) ("The work product doctrine, codified in [Rule 26(b)(3)], protects from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation.").

**Page 20 –    JOINT STATUS REPORT**

of the document and the factual situation in the particular case, the document can be fairly said to have been *prepared or obtained because of the prospect of litigation.*") (internal use of quotations and citations omitted). In sum, the defendants have no basis to compel production of probate parties' (including the Conservator's) work product, and they have failed to raise (much less establish) substantial need and undue hardship. Likewise, the defendants have no basis to require Plaintiff to pry into client files of Ms. Uranga, Ms. Johansson, Ms. Richardson, or the undersigned's client files in the probate proceeding because they are privileged and confidential to the clients.

Further, in Plaintiff's Response to the First RFP, Plaintiff informed the defendants that the requested documents were subject to protective orders entered by the probate court. Without citation to the orders, the defendants' motion asserts *ipse dixit* that the "probate court['s] orders do not prevent plaintiff from producing the requested documents as part of discovery in this case." To support this self-adjudication, the defendants posture that, on the morning of August 31, Plaintiff's counsel did not "identify" – to their satisfaction – "any provision in the protective orders that would preclude release of these documents." When properly framed, the issue is whether the defendants are *permitted to access* the documents which are subject to the protective orders. Not whether Plaintiff's counsel thinks that the protective orders *prevent* Plaintiff *from producing* such documents *as part of discovery* in this action. The defendants were disinclined to confer on this subject. Their motion studiously avoids that subject as well, and it ignores important distinctions between the documents which are subject to the orders.

*Kids FIRST Records*. To provide context, Ms. Uranga served a subpoena to KF in the probate court on May 24, 2021. Her subpoena sought KF's records and files dealing with J.C.'s abuse assessments, evaluations and interviews. KF was represented by Alexandra Hilsher (OSB #114218). In response to the subpoena, the parties negotiated and the probate court entered the

**Page 21 –    JOINT STATUS REPORT**

March 8, 2023 Supplemental Stipulated Protective Order ("the SSPO") which covers the production of confidential KF records. (Decl., Ex. 27).[16]

The SSPO has been readily available for defendants' review. It "addresses limitations on access, use and retention" of KF documents produced to parties in the probate proceeding. In pertinent part, the SSPO provides that "[u]nless otherwise ordered by this Court, [KF] shall produce all SSPO-designated documents only to counsel for Conservator and J.C." The SSPO-designated documents "shall be used only in connection with Conservator's appointment authority to analyze and assert claims arising out of the abuse of J.C. in DHS foster care." Further, "[u]se of [such] documents shall be limited to the persons described in ¶ 4," i.e., the Conservator and J.C. A fair reading of the SSPO demonstrates that, absent modification of the probate court's order, the defendants are not entitled to access the SSPO-designated documents obtained by "You." Plaintiff risks violation of the SSPO by succumbing to defendants' unreasonable demand to produce the KF documents which are subject to the order. Further, the conclusory nature of defendants' motion to compel implicates the *Rooker-Feldman* doctrine, which "applies to both final and interlocutory decisions from a state court." *See Kincaid v. Cnty. of Los Angeles,* 2023 U.S. Dist. LEXIS. 128019 * 28-29 (C.D. Calif. 2023) *apprv'd* 2023 U.S. Dist. LEXIS 140691 ǀ 2023 WL 5154472.

*LCJC documents.* The Court is aware that J.C. and Z.C. and their biological parents were parties to the dependency proceeding. DHS was also a party, and was represented by DOJ ChAS Division attorneys. Plaintiff believes therefore that DHS maintains (or may maintain) copies of the following records and files: (1) "the record of the case" under ORS 419A.252(4), also known as "the legal file"; (2) "the supplemental confidential file," i.e., confidential to the child under ORS 419A.252(5), informally referred to as "the social file."

In response to the Conservator's LCJC subpoena, DOJ AAG Ms. Elleanor Chin appeared on behalf of the Lane County Trial Court Administrator ("TCA"). Ms. Chin and DOJ AAG Jill

---

[16] The protective order does not appear to preclude defendants from attempting to subpoena KF, if they choose to do so. *See e.g.,* ORS 418.794.

**Page 22 –     JOINT STATUS REPORT**

Schneider are DOJ Trial Division ("DOJ-TD") colleagues. Both DOJ lawyers regularly appear and defend foster care abuse cases brought against DHS. Acting on behalf of TCA, Ms. Chin objected to the subpoena and filed a motion to quash. TCA argued *inter alia* that the Conservator did not stand in the shoes of the child under ORS 419.255(1)(b)(B), and refused to allow the Conservator and Z.C. to inspect and copy the requested LCJC records. After lengthy motions practice, the probate court rejected TCA's argument and denied TCA's motion to quash. The court entered an order compelling production of the LCJC legal file, the social file, and the FTRs. (Decl., Ex. 28).

During the course of Ms. Chin's representation of TCA, the Conservator learned that Ms. Chin had received the FTRs from the TCA, and that DOJ-TD paralegals had transcribed these recordings. This was concerning because the FTRs were privileged and confidential to J.C. and DOJ-TD, which normally represents DHS as opposed to juvenile courts, had the ability to use the privileged materials against J.C. and her family members in litigation involving DHS. Accordingly, J.C. and the Conservator moved for a protective order to seek necessary access and use limitations regarding DOJ-TD's ability to access and use the LCJC documents in subsequent litigation. (Decl., Ex. 29).

The probate court entered a Stipulated Protective Order ("the SPO") on January 31, 2023. (Decl., Ex. 30). SPO parties include the Conservator, DAS, DOJ, and DHS. In summary, the SPO – which has also been readily available for defendants' review – limits access to all of the LCJC documents that DOJ-TD fortuitously accessed by and through its representation of the TCA. The SPO provides that DOJ-TD shall sequester the materials in a file server folder. The "only users with access to the folder" include Ms. Chin, DOJ-TD paralegal Ms. Pelletier, two DOJ-TD administrators and DOJ IT, e.g., Payne. Further, the SPO provides – plain as day – that DOJ "shall not disclose the **documents** and any information derived therefrom to any other person or entity, including DAS and DHS, or to any third party." The level of the Conservator's concern was such that the court approved language in the SPO which provides that "**Parties** reserve the right to

**Page 23 –    JOINT STATUS REPORT**

challenge and/or object to []DOJ's ability to represent DHS an any employee thereof in connection with litigation pending or to be brought in other forums." (*Id*. at 3).

Notwithstanding DOJ-TD's involvement in the probate proceeding and the fact that the SPO parties had stipulated to the access and use restrictions of LCJC documents, the defendants – including DHS – saw fit to request Plaintiff to produce LCJC documents that they knew were protected, absent modification of the SPO, and file a citationless motion to compel. As presented, the First RFP was designed to "encourage" Plaintiff to violate the SPO and waive J.C.'s privilege to the LCJC documents.

*DHS Possesses the Requested Documents.* As the Court is aware, the defendants have refused to allow Plaintiff to inspect the extent to which the legal file and the social file are uploaded in J.C.'s file in OR-Kids, claiming that the inspection would violate an FBI CJIS Security Policy. Regardless, DHS – at a minimum – must be in possession of the documents that it produced in the probate case, particularly where the defendants have re-produced those exact documents. Based on communications recently produced by the defendants, it appears that the defendants were also in possession of the FTRs that the Conservator sought in the probate matter, which the DOJ-TD resisted. (Decl., Ex. 31). Remarkably, the defendants have not produced these documents pursuant to a request, presumably claiming "privilege," notwithstanding the SPO and *In re S.J.* (Decl., Ex. 32). In other words, the defendants are potentially claiming privilege over materials that they have no right to possess, access, or use against J.C. in this civil rights action. The defendants' access to and possession of these recordings – and the fact that they have already reviewed them – raise issues concerning DOJ's ability to represent the defendants in this action.

## VII.    Plaintiff's Proposed Case Scheduling Order

Under the circumstances, Plaintiff is resigned to the fact that discovery cannot be completed on or before November 15, 2023. There are several pending discovery disputes, documents reflecting concerns about abuse involving other children have yet to be produced by the defendants, and analyzed by Plaintiff. The defendants have marked thousands of documents

**Page 24 –    JOINT STATUS REPORT**

AEO – compromising Plaintiff's ability to even show them to DHS workers. The defendants are marking thousands of emails for privilege. Plaintiff will not receive a privilege log until October 15, which defendants believe is per "agreement" by the parties.

The defendants' proposed March 1, 2024, as a new date for close of discovery, is unworkable. Markowitz Herbold works often and closely with DOJ and DHS. Plaintiff therefore presumes that the defendants are aware that Plaintiff's counsel starts a three week trial on April 1, 2024, in *J.M. et al v. Major et. al.*, 6:18-cv-00739-AN, which is also a foster care abuse case involving DHS. Plaintiff believes that the discovery close should be moved into July 2024. Plaintiff requested the defendants' input on this topic and awaits a response.

**Page 25 –    JOINT STATUS REPORT**

**STATE DEFENDANTS' POSITION**

State defendants have been working diligently to make headway on plaintiff's voluminous discovery requests and have made every reasonable effort to move discovery forward expediently.  State defendants summarize below the completed production, the production activities in progress, the efforts to confer, and the areas remaining in dispute, including new discovery plaintiff has requested.

State defendants recognize that plaintiff has a different view of these issues but the fact the parties do not have complete agreement is a normal consequence of litigation, not lack of good faith or diligent attempts to resolve disputes on the part of state defendants.

     A.     <u>Completed production and agreements</u>

- Total production to date: 12,721 documents (57,077 pages) from all 17 custodians plaintiff requested.  Discussed in more detail in Section II below.

- Production since August 3 status conference (included in total above): 1,141 documents (8,409 pages).

- State defendants provided plaintiff's counsel access to the hard-copy Duncan/Raygosa provider file on August 22 at the Markowitz Herbold office, with unimpeded access to a private conference room for nearly five hours.

- State defendants conducted an in-depth evaluation of mobile data issues, detailed for plaintiff in correspondence on August 31, 2023 (attached as Exhibit 7);

- State defendants agreed to produce by September 1, 2023 (and produced on August 31, 2023) all responsive, non-privileged emails and attachments (requested by plaintiff prior to August 1), all responsive tort claim notices and complaints, J.C. and Z.C's permanency file (*i.e.*, their biological parent file), the Duncan/Raygosa certification[17] and Child Protection Services ("CPS")

---

[17] Plaintiff's counsel raises a concern in their section I above that the Duncan/Raygosa certification file was produced in the state court probate matter with pages related to J.H. and R.H omitted and/or redacted.  This issue is moot because those unredacted pages were provided to plaintiff's counsel at the August 22, 2023, in-person inspection and produced to plaintiff on August 31, 2023.

**Page 26 –    JOINT STATUS REPORT**

provider files, and the CPS provider file for the foster home where J.C. was placed when she reported the abuse.

- State defendants have agreed to change AEO designations on certain documents and the process is ongoing (detailed in Section III below).

- State defendants have agreed to produce responsive documents relating to non-party children (detailed in Section VI below).

- The parties have agreed on intermediary deadlines for privilege logs.

- State defendants have agreed to withdraw their Fifth Affirmative Defense, in an effort to resolve an issue in plaintiff's Second Interrogatories (Section VIII below).

B.    Discovery in progress

- Confirmation of privilege and work product designations. Documents determined not to be privileged or work product will be produced on a rolling basis, to be completed and produced with a privilege log for non-email documents on September 15, 2023 and a privilege log for email documents on October 15, 2023.

- Collection, review, and production of Holly Steer's emails, requested by plaintiff on August 24, 2023.

- Supplemental response to Plaintiff's First Interrogatories.

- Production of metadata reports relating to OR-Kids notes revision history.

- Production of responsive text messages, in existence, by October 15, 2023.

C.    Plaintiff's additional requests and open issues

- The parties agree an amendment to the fact discovery deadline is necessary. Plaintiff objects to state defendants' proposal of March 1, 2024 date (Section X below).

- The parties disagree on ODHS's duty to protect the identity of confidential reporters pursuant to OAR 413-010-0035 (detailed in Section VII below).

- Plaintiff's response to state defendants' First Request for Production was due on August 28. Plaintiff objected to producing any documents subpoenaed in the related Lane County probate matter but produced the documents subpoenaed in this federal lawsuit. The parties have conferred on plaintiff's objections, as set out below in Section IX.

**Page 27 –    JOINT STATUS REPORT**

      D.      <u>Ongoing conferrals since previous status conference</u>

- Counsel have exchanged lengthy substantive emails on discovery issues on Aug. 2, 10, 17, 24, and 29 (attached as Exhibits 1 through 6).

- Counsel conferred orally on August 22 and 31. In addition, at plaintiff's request, state defendants scheduled a conferral for Aug. 11, which plaintiff cancelled.

For each lengthy conferral email from plaintiff, state defendants spent time thoughtfully reviewing, consulting with client representatives, and investigating the issues to answer plaintiff's questions (that could be answered) and tried to offer compromises. State defendants' good faith efforts are evidenced by the fact counsel agreed to produce several types of additional discovery plaintiff requested and to re-designate certain documents under the protective order. State defendants acknowledge they initially estimated an earlier date for providing counsel a letter outlining cell phone and text message preservation and collection; the letter has taken longer than expected because that issue has been factually complex.

The parties have a few outstanding issues on which the Court's input is necessary for resolution:

## I.    The parties have agreed upon intermediary discovery deadlines.

For the Court's reference, the parties have agreed to the following deadlines, all of which state defendants are on track to meet:

<u>September 15</u>: State defendants will provide a privilege log for non-email documents.

<u>October 15</u>: State defendants will provide a privilege log for email documents.

The current discovery deadline is <u>November 15</u>. As set out further below, the parties agree that an extension of that deadline is appropriate.

**Page 28 –   JOINT STATUS REPORT**

**II.     State defendants have substantially completed email production from plaintiff's identified custodians.**

State defendants substantially completed their email production for 17 custodians on September 1, 2023, having produced a total of 12,721 emails and attachments (from a total collection of approximately 63,525 documents).  The following small subset of emails remain to be produced:

**Emily Williams**:  Ms. Williams is an ODHS employee who investigated a concern of medical neglect related to Duncan and Raygosa's niece and nephew, J.H. and R.H.  State defendants collected and searched her emails for responsive documents.  The recoverable portion of Ms. Williams' responsive emails were produced on August 31, 2023.

In the course of processing Ms. Williams' emails, state defendants discovered that some emails are blank and inaccessible, other than date sent and date received.  ODHS determined that these emails were encrypted.  State defendants have tried to retrieve these emails, including re-collecting and re-exporting them, without success.  State defendants have made repeated attempts to contact Ms. Williams, who no longer works for ODHS, but she has not yet responded.  ODHS is now coordinating with the software provider to determine whether there is some other means to access Ms. Williams' encrypted emails.  State defendants will produce the encrypted emails if they are recoverable, but state defendants cannot represent to the Court at this time that there is a likely means of recovering these emails.

**Holly Steer**:  Plaintiff identified Ms. Steer as an additional custodian on August 24, 2023.  Plaintiff indicates Ms. Steer may have responsive communications relating to the background-check process for Duncan and Raygosa.

State defendants previously produced responsive emails on August 21 for Sharon Van Buren (requested by plaintiff on August 1), who provided the relevant paperwork to the

 **Page 29 –    JOINT STATUS REPORT**

necessary California agencies that ODHS coordinated with to perform a background check on Duncan and Raygosa.

The search for Ms. Van Buren's emails yielded few responsive documents, and plaintiff requested on August 24 that state defendants run an identical search on Ms. Steer's emails. State defendants agreed to do so on August 29, and the email collection is underway.

Emails subject to further privilege review: State defendants are in the process of reviewing and redacting emails that have been identified and withheld as potentially privileged or work product. State defendants will be producing any email documents determined not to be privileged or work product or that can be produced with redactions. State defendants will make these productions on a rolling basis and complete production no later than October 15, when they provide the privilege log for email documents.

**III.    State defendants have agreed to redesignate certain documents pursuant to the terms of the protective order (ECF 44) entered in this case.**

This case involves the claims of a single plaintiff, but discovery has been expanded to include highly sensitive, confidential records about non-party minor children, their biological families, and resource (foster) parents. Accordingly, state defendants have been diligent about protecting the confidentiality of non-parties' personal information and protected health information. Pursuant to the terms of the protective order, state defendants have marked as Attorneys' Eyes Only ("AEO") any documents that name children other than J.C. and sibling Z.C., any foster parents other than third-party defendant Joe Raygosa, and either of J.C.'s biological parents. Plaintiff disputes that AEO designations are necessary for all these categories of documents, and the parties have conferred both in person and via email regarding state defendants' designations. As a result of those conferrals, state defendants agreed on August 29

**Page 30 –    JOINT STATUS REPORT**

to re-review approximately 3,750 documents to consider downgrading them from AEO to Confidential, according to the following criteria:

- Documents pertaining only to J.C. and/or Z.C. will be designated Confidential (not AEO), even if they include personal health information about J.C. or Z.C.;

- Documents containing personal health information about Duncan or Raygosa will be designated Confidential (not AEO);

- Documents containing personal health information or mention of J.C.'s biological parents will be designated Confidential (not AEO);

- Documents containing the identities or personal health information of children other than J.C. and Z.C. will still be designated AEO (no change); and

- Documents that refer to either J.C. and/or Z.C. and another child or children placed in the Duncan/Raygosa home, such as J.H. or R.H. (including their personal health information), will still be designated AEO (no change), but state defendants will also produce a redacted copy designated Confidential.

State defendants had been aiming to begin the rolling production of these re-designated documents by September 1, but the re-review has been taking longer than expected, so state defendants now anticipate producing the re-designated documents by September 15.

State defendants dispute plaintiff counsel's contention that re-designation of these documents will cause them to have to recode documents they have already reviewed. State defendants will produce an overlay file for plaintiff's document database to update the prior productions.

**IV.    State defendants are searching for and collecting any responsive text messages and cell phone data from plaintiff's identified custodians.**

State defendants are in the process of determining the existence of possibly responsive mobile data from the identified custodians in this case. State defendants have provided a letter to plaintiff with an update of those collection efforts. (Exhibit 7) A summary of mobile data discovery is as follows:

 **Page 31 –    JOINT STATUS REPORT**

State defendants' collection efforts have shown that it is unlikely that state defendants possess responsive text messages from the relevant time period between April 2016, when Duncan and Raygosa applied to be foster parents, and August 14, 2018, when Raygosa was convicted.  Moreover, the majority of devices presently in service are unlikely to have ever had any responsive information on them.

Based on information learned to date, most of the relevant custodians who had state-issued devices during the relevant period (2016-2018) upgraded their devices before ODHS received plaintiff's tort claim notice in February 2020.  Data on a device, including text message history, does not transfer when ODHS upgrades an employee's device.  Data that is not local to the device (such as email) is not affected.  When a state employee upgrades a cellular device, ODHS deletes all data on the device before returning it to the vendor.  For this reason, most mobile devices that could, at some point in the past, have had responsive data on them are no longer in service and have not been since before ODHS received plaintiff's tort claim notice.[18]

State defendants' review shows that the following custodians obtained a new device after or near the close of the relevant time period and before ODHS received plaintiff's tort claim notice:[19]

| Custodian | | New device date |
| --- | --- | --- |
| Anastasia | Brooks | 1/30/2019 |
| Mykael | Burford | 6/11/2019 |
| Brenda | Johnson | 3/20/2019 |

---

[18] State defendants disagree with plaintiff's contention that failure to retain text messages from 2016 and 2017 violates public records law.

[19] State defendants are still investigating the cell phone history of any custodians not listed here.

**Page 32 –    JOINT STATUS REPORT**

| Sue | Kauzlarich | 11/6/2019 |
| Erin | Lane | 12/11/2019 |
| Kassidy | O'Brien | 11/9/2019 |
| Julie | Spencer | 7/13/2019 |
| Brent | Klabo | 12/17/2019 |
| Kelly | Henson | 8/6/2018 |
| Stephen | Hammond | 1/24/2020 |
| Lene | Farrari | 10/25/2019 |

As noted above, an additional custodian, Emily Williams, left ODHS before ODHS received the tort claim notice.  Her device was taken out of service on August 12, 2019 and was not retained.  State defendants are continuing to investigate when the additional custodians first obtained state-issued devices and will provide an update to plaintiff.

Despite the limited likelihood of any existing device having discoverable information on it, state defendants are collecting from all the agreed custodians who presently have cell phones, in order to avoid further dispute on this issue.[20]  ODHS issues state-owned mobile devices to employees who need them to do their jobs, and the collection therefore must take into account the need for ODHS workers to continue to conduct their ordinary duties without interruption. This may require issuing a completely new phone to the employee.  Accordingly, replacement devices were provided to some custodians beginning on August 16.  State defendants began collecting those custodians' devices immediately.

---

[20] ODHS utilizes a third-party vendor, Wireless Watchdogs, to assist with management and utilization of cellular devices.  Wireless Watchdogs provides ODHS with cellular devices for its employees, and ODHS returns devices to Wireless Watchdogs when the employee leaves ODHS or upgrades their device.

**Page 33 –    JOINT STATUS REPORT**

Custodians Lene Ferrari and Ms. Williams are no longer with ODHS.  Sharon Van Buren has not been issued a state phone.  Aside from these three individuals, state defendants have collected all custodians' phones, as of August 31, 2023.

State defendants are currently processing the collected devices.  They will search text messages and cell phone records for the same terms they applied to custodians' emails.  For the reasons described above, state defendants do not expect devices collected to have text message records that predate the issuance of the device to the employee.  Any responsive text messages will be produced by October 15.

Regarding plaintiff's contention that state defendants have not produced phone lists or phone numbers, state defendants have searched for and produced what responsive documents exist.  State defendants have produced three organizational charts (DHS_LEVI_013519, DHS_LEVI_013520, DHS_LEVI_052124), as well as a current phone list, and they have produced personnel files for each named defendant, which have those individuals' phone numbers in them.  To the best of state defendants' knowledge, if ODHS kept phone lists during the relevant time period, those records have not been located, and state defendants have no obligation under the Federal Rules of Civil Procedure to create documents that otherwise do not exist in the normal course of business.  State defendants will produce historical phone lists if they locate them in the future, as required by the federal Rules.  Likewise, if plaintiff cannot find a specific defendant's cell phone number in the documents already produced, state defendants are willing to confer and locate that number if possible.  State defendants are not withholding any document related to plaintiff's request for a historical phone list.

Likewise, state defendants are not withholding the personal property forms that plaintiff has identified above (forms MSC 0050 and MSC 1496).  State defendants conferred with

**Page 34 –   JOINT STATUS REPORT**

plaintiff on the subject of those forms and subsequently conducted a search. They did not find copies in their records. State defendants have produced all non-privileged documents from the named defendants' personnel files and have not withheld these forms or any similar document. To the extent they exist, state defendants have been unable to locate them but will produce them if state defendants locate them in the future. As with the historical phone lists, state defendants believe that the information contained in these forms has been produced elsewhere and are willing to confer regarding any information plaintiff is seeking from these forms that is not available elsewhere.

**V.    State defendants disagree that a records custodian deposition is necessary or relevant to the claims.**

During the course of conferrals, plaintiff has taken the position that a records custodian deposition is necessary in order to understand state defendants' efforts to preserve text messages, the contents of personnel files, and other documents in this case. Such a deposition is both premature and unlikely to yield relevant information. Counsel for state defendants have been transparent about preservation efforts, and there is no evidence of any record having been willfully destroyed or lost in this case. State defendants have not yet produced text messages and other cell phone data. Any deposition of a records custodian at this point in discovery would not be relevant to any claim or defense and be speculative, premature, and/or duplicative of information plaintiff has received through the conferral process. Plaintiff's request for a records custodian deposition should be denied.

**VI.    State defendants will produce files related to the care and condition of J.H., R.H., and the additional seven foster children in the Duncan/Raygosa home.**

State defendants have been working diligently to comply with the Court's order to produce documents related to the care and condition of children other than J.C. and Z.C. in the

**Page 35 –    JOINT STATUS REPORT**

Duncan/Raygosa home.  Accordingly, state defendants' email productions have included

documents related to other children that were living in or placed by ODHS in the Ducan/Raygosa

home. [21]  Additionally, in light of the Court's statements at the August 3 status conference and

based on subsequent conferral with plaintiff's counsel, state defendants have agreed to collect

and produce the following:

- R.H. and J.H.:  Duncan and Raygosa's niece and nephew who lived in the home during

  the same time as J.C. and Z.C.  State defendants will produce relevant Child Welfare CPS

  files for both children.  Neither child was in ODHS custody.

- Additional seven children:  Duncan and Raygosa served as foster parents for seven

  additional children, some for very short periods of time.  For these children, state

  defendants will produce relevant documents or document excerpts from the Child

  Welfare files for the time periods when these children were placed in the

  Duncan/Raygosa home or for the period thereafter, if the document references their care

  and condition when they were placed in the Duncan/Raygosa home (*e.g.*, case notes,

  visitation notes, CPS investigations, and medical records).[22]  Non-relevant portions of the

  files will not be produced or will be redacted (*e.g.*, documents and notes related to why

---

[21] As noted above, state defendants have also produced any portions of the Duncan/Raygosa certification file related to J.H. and R.H that were omitted and/or redacted from ODHS's production in the state court probate case.

[22] Plaintiff's counsel proposes slightly different production parameters in their Section II.A. above.  State defendants maintain that the relevant information would be any documents in the seven children's Child Welfare files from the time periods when these children were placed in the Duncan/Raygosa home or any later documents that reference or relate to their care and condition when they were placed in the Duncan/Raygosa home (not an arbitrary period of six months of subsequent case notes, as plaintiff proposes).  State defendants' proposal is more targeted and likely to lead to relevant documents.

**Page 36 –  JOINT STATUS REPORT**

the children came into ODHS care, cases notes about services received by the biological parents, etc.).

State defendants do not yet have a projected date for production.  ODHS is in the process of collecting the files, which state defendants will then review for responsiveness and privilege. State defendants intend to produce the J.H. and R.H. files first and will update plaintiff with a timeline for that production when state defendants are able to provide an accurate estimate of the time necessary for review and production.

## VII.    Oregon law requires state defendants to redact information about confidential reporters.

State law requires state defendants to keep confidential certain information, absent a court order, including the identities of mandatory reporters.  ORS 419B.035(1) requires ODHS to keep reports of abuse compiled under ORS 419B.010 to 419B.050 (pertaining to child abuse reporting) confidential.  *See also* 42 USC § 5104(2).  Even if disclosure is required or authorized by ORS 419B.035, the names, addresses, and identifying information about persons who report child abuse remain confidential.  ORS 4196.035(3); OAR 413-010-0035(9).  Disclosure of child abuse reports to a child's attorney is limited to the child's attorney in the juvenile court proceeding, ORS 419B.035(l)(c), and disclosure of child abuse assessments is similarly limited to the child's attorney in the juvenile court proceeding and only for use in that proceeding, OAR 413-010-0035(10)(d)(A).

In compliance with this statute and rule, state defendants have been redacting confidential reporter information in the documents produced in this case.

Plaintiff disputes that these redactions are necessary.  State defendants believe that the state law is clear and that the identities of these mandatory reporters cannot be disclosed absent a court order.  OAR 413-010-0035(1).  State defendants ask that the Court order either (1) that

**Page 37 –    JOINT STATUS REPORT**

redactions of mandatory reporters are acceptable, as they do not prejudice plaintiff in any way, given that plaintiff can depose agency employees about whether they personally made reports, and J.C. herself disclosed the abuse at issue in this case, or (2) order disclosure in an order entered into the court's docket.

## VIII.    The parties have conferred on state defendants' responses to plaintiff's interrogatories.

Plaintiff has served state defendants with two sets of interrogatories.  State defendants have already served their answers to both interrogatories, but the parties have continued to confer on some aspects of each of them and have reached the following resolutions or agreements:

- Plaintiff's First Set of Interrogatories:  Two requests within the first set of interrogatories remain at issue between the parties.

  o First is Interrogatory No. 3, which asked state defendants to describe the basis for ¶ 61 in the Complaint, which state defendants admitted in their answer.  (Answer, Aff. Defs., and Third-Party Compl. (ECF 19) ¶ 26.)  As a condition of granting state defendants' motion for leave to file an amended answer, the Court ordered state defendants to provide information similar to the questions in Interrogatory No. 3.  (ECF 55.)  State defendants undertook additional internal fact-finding and supplemented their response to Interrogatory No. 3. on September 1.  If plaintiff wants to further question what is contained in the documents and who had knowledge at what time, those issues can be explored in facts depositions.  State defendants request that the Court now grant their motion for leave to file an amended answer.

  o Second, Interrogatory No. 5 sought the basis for state defendants' first affirmative defense for discretionary immunity.  (ECF 19 ¶ 39.)  State defendants responded

Page 38 –    JOINT STATUS REPORT

to this request as it was stated.  The parties have conferred on this response, and plaintiff has requested additional information, contending that state defendants failed to sufficiently respond to the interrogatory.  State defendants disagree; they have to responded to the interrogatory as stated and the additional information plaintiff seeks was not requested in the interrogatory.  State defendants served an amended response and objections to plaintiff on Friday, September 1.

- Plaintiff's Second Set of Interrogatories:  Plaintiff's concerns with this interrogatory response are moot because state defendants will be withdrawing their affirmative defense at issue in this interrogatory, and the interrogatory does not seek any factual information. Plaintiff requested that state defendants explain the basis for why each of plaintiff's claims fails to state a claim upon which relief can be granted, as alleged in state defendants' Fifth Affirmative Defense.  (ECF 19 ¶ 43.)  State defendants objected to those requests on the basis that they sought pure legal analysis, not any factual information.  Although state defendants maintain that their objections are correct and preclude state defendants from any obligation to answer plaintiff's requests, the parties have conferred, and state defendants will withdraw their fifth affirmative defense in their subsequently filed amended answer.

## IX. Plaintiff's Fourth Request for Production

State defendants objected to plaintiff's document requests for their attorney-client privileged and work product-protected communications with ODHS clients related to preparing the motion for reconsideration for inspection of the OR-Kids database.  This issue is clear-cut and there is so little room for dispute: a lawyer may have privileged and work product protected communications with their client in order to facilitate motion practice in litigation.  Plaintiff's

**Page 39 –    JOINT STATUS REPORT**

request for these documents in the first instance is inappropriate.  Plaintiff's further request that state defendants produce a privilege log for these documents, that are unquestionably privileged and work product, serves no purpose other than to increase expense and burden on state defendants.  *See* Fed. R. Civ. P. 1.

**X.      Extension of discovery deadline**

The parties' current deadline to complete discovery is November 15, 2023.  State defendants are on track to complete document production by early October, but the parties have not begun depositions and are in agreement that deposition testimony from multiple witnesses will be necessary in this case.  Plaintiff will need time after document production is complete to review the productions, and both sides will need several weeks to prepare for taking and defending fact witness depositions.  The foregoing outstanding issues will also take time to resolve, before the court and through additional conferrals between the parties.

In light of the significant work that remains before completion of discovery, the parties are in agreement that an extension of the discovery deadline is appropriate.  State defendants have proposed resetting the deadline to **March 1, 2024**.  State defendants believe this extension will accommodate additional time necessary to complete document productions, prepare for depositions, and account for the winter holidays, during which time some (or many) witnesses may be unavailable to sit for depositions.  Plaintiff opposes this proposed deadline.

**XI.     Plaintiff should be ordered to produce relevant documents obtained by subpoenas to third parties in the related probate case, as requested in State Defendants' First Request for Production.**

Plaintiff's response to state defendants' First Request for Production was due August 28. In that response, plaintiff objected to producing the documents the same plaintiff subpoenaed in the related Lane County probate case (*In the Matter of the Conservatorship of J.C.*), in which

**Page 40 –    JOINT STATUS REPORT**

J.C. sought to have appointed the conservator who then brought this action.  The requested

documents were subpoenaed from Lane County Juvenile Court, Kids FIRST, ODHS, and at least

one tribal entity.  Plaintiff objected on the basis that state defendants' definition of "you" was

vague and overbroad and that it could not encompass plaintiff and counsel in this case; that the

records are privileged and protected work product; and that the protective orders entered in the

probate matter preclude production in this case.  Plaintiff is relying on those objections to refuse

to produce the requested documents.

The parties conferred about this issue on August 31.  Plaintiff's counsel could not explain

why the requested documents were not in plaintiff's possession or why plaintiff was not the

proper party to request them from, given that plaintiff's counsel here also represents plaintiff in

the probate matter.  Plaintiff's counsel could not provide any authority for why documents

created and produced by third parties with no privileged relationship with plaintiff's attorneys

would be subject to the attorney-client privilege or work product doctrine.  Given that state

defendants are not seeking a subset of documents curated by counsel or any documents

specifically related to legal analysis, it is hard to see how production of the subpoenaed

documents could amount to "work product."

Finally, plaintiff's counsel was unable to identify any provision in the probate-matter

protective orders that would preclude release of these documents, stating instead that the orders

"speak for themselves."  If plaintiff is concerned that the protective orders entered in the probate

matter prevent disclosure, state defendants are willing to confer on modifying those protective

orders.  The purpose of protective orders is to allow the exchange of documents in discovery, and

between the probate protective orders and the protective order in this case, state defendants

**Page 41 –   JOINT STATUS REPORT**

believe it is possible to preserve the confidentiality of these documents in light of their sensitive nature.

State defendants request that the Court order plaintiff to produce the subpoenaed documents. First, the parties and counsel are common across both matters—which are clearly related—and the documents are in the possession of plaintiff Levi and/or J.C. and their counsel in this matter. State defendants do not have an obligation to serve duplicative subpoenas when the relevant documents are already in plaintiff's possession, custody, or control and plaintiff has an obligation under FRCP 26 and 34 to produce them. Second, the third parties who created and produced these documents have no privileged relationship with plaintiff's counsel, nor did plaintiff's counsel (or any person) prepare or create the requested documents for the purpose of litigation. They are neither privileged nor are they work product. Finally, the probate matter protective orders do not prevent plaintiff from producing these documents as part of discovery in this case, and plaintiff has failed to identify any provision of those orders that does so. The documents can retain their confidentiality under the protective order entered in *this* case, which is the purpose of that protective order.

Defendants are happy to provide the court with additional briefing or argument on these issues. Plaintiff has provided no reason sufficient to justify refusal to produce the documents, and the Court should order plaintiff to do so.

## XII.    OR-Kids Metadata Reports

As set out in state defendants' reply brief in support of their motion for reconsideration, state defendants have agreed to produce the underlying metadata showing the contents of the OR-Kids file as it relates to J.C. and Z.C. This data provides the information contained in OR-Kids without the necessity of providing log-in access information. There is one ODHS

**Page 42 –    JOINT STATUS REPORT**

employee with the necessary technical skills and security access to prepare the reports and he has been traveling.  State defendants anticipate beginning a rolling production of reports during the week of September 5.

DATED: September 5, 2023

RIZZO BOSWORTH ERAUT PC

By:     *s/ Steven V. Rizzo*

Steven V. Rizzo, OSB #840853
srizzo@rizzopc.com
Mary D. Skjelset, OSB #075840
mskjelset@rizzopc.com
*Attorneys for Plaintiff*

MARKOWITZ HERBOLD PC

By:     *s/ Lauren F. Blaesing*

Lauren F. Blaesing, OSB #113305
LaurenBlaesing@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Alexandra L. Rhee, OSB #230770
AlexRhee@MarkowitzHerbold.com
*Special Assistant Attorneys General for State Defendants and Third-Party Plaintiff*

Jill Schneider, OSB #001619
Jill.Schneider@doj.state.or.us
Nicholas Mancuso, OSB #151262
Nicholas.Mancuso@doj.state.or.us
*Of Attorneys for State Defendants and Third-Party Plaintiff*

2036978.11

**Page 43 –     JOINT STATUS REPORT**