IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| ETHAN LEVI, | ) | |
| Plaintiff, | ) | No. 6:22-cv-01813-MK |
| v. | ) | July 5, 2023 |
| KIM CHAPMAN, et al., | ) | Eugene, Oregon |
| Defendants. | ) | |
| _____ | ) | |
| OREGON DEPARTMENT OF HUMAN SERVICES, | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| JOE ALBERT RAYGOSA, | ) | |
| Third-Party Defendant. | ) | |

**DIGITALLY-RECORDED TRANSCRIPT OF PROCEEDINGS**
(Discovery Hearing by teleconference)

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

RIZZO MATTINGLY BOSWORTH
By:  Steven V. Rizzo
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE PLAINTIFF:

RIZZO MATTINGLY BOSWORTH
By:  Mary Skjelset
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE DEFENDANT:

OREGON DEPARTMENT OF JUSTICE
By:  Jill Schneider
100 SW Market Street
Portland, OR 97201

FOR THE DEFENDANT:

MARKOWITZ HERBOLD
By:  Lauren F. Blaesing
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT:

MARKOWITZ HERBOLD
By:  Harry B. Wilson
1455 SW Broadway
Suite 1900
Portland, OR 97201

(July 5, 2023, 4:00 p.m.)

**P R O C E E D I N G S**

THE COURT:  This is Judge Kasubhai.  If we have plaintiff and defendant, I'm ready to begin.  I don't know if the third-party defendant, Mr. Raygosa, is going to be appearing.

MS. SKJELSET:  That's what --

MR. RIZZO:  That is my understanding.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  Do you want me to call the case, Judge?

THE COURT:  Yes.  Please go ahead.

THE COURTROOM DEPUTY:  Now is the time set for civil case 22-01813, Levi vs. Chapman, et al., discovery hearing.

THE COURT:  Good afternoon.  If everyone could please introduce themselves.  We'll start with plaintiff's counsel first.  Please give me your full name and your honorific, such as Mr., Ms., or Mx.  Who's here for the plaintiff?

MR. RIZZO:  Good afternoon.  This is Mr. Steven Rizzo for the plaintiff, Your Honor.

THE COURT:  Hello, Mr. Rizzo.  And anyone else?

MS. SKJELSET:  Yes, Your Honor.  Ms. Skjelset is also here for plaintiff.

THE COURT:  Thank you, Ms. Skjelset.

And for the defendant?

MS. SCHNEIDER:  This is Jill Schneider from the Department of Justice on behalf of the State defendants.

THE COURT:  Thank you, Ms. Schneider.  Anyone else?

MS. BLAESING:  Yes, Your Honor.  Lauren Blaesing from the Markowitz Herbold law firm.  I'm a special appointed assistant attorney general.

THE COURT:  Okay.  Thank you, Ms. Blaesing.  Anyone else appearing -- oh, I think I hear someone else.  Go ahead.

MR. WILSON:  Yes.  Harry Wilson, also from the Markowitz firm, also special assistant attorney general.

THE COURT:  Okay.  Is that everyone that was planning on appearing?  Is that right?

MR. RIZZO:  I believe so.

THE COURT:  All right.

MS. SKJELSET:  Yes.

THE COURT:  All right.  Why don't we start with Ms. Skjelset or Mr. Rizzo.  Do you mind summarizing what the issues are that we need to take up, and then once we have our agenda, we can tackle them.  And if you want to summarize them in the order in which you prefer to have them addressed, that would be great.

MS. SKJELSET:  Yes, Your Honor.  I believe that I can do that.  The topics for discussion today, if we have them all, are the objections to discovery that were issued by the defendant.  And the (indiscernible), which we wrote to you about

on June 9th and June 14th.  And we (indiscernible) the scheduling order.  We went into some detail regarding their request for production as well as the request for inspection.

And then the second topic is the modification of the protective order, which Mr. Rizzo will discuss with you regarding specific language that the plaintiff finds not particularly agreeable.

And the third topic for this discussion regards the failure of defendants to fully answer the interrogatories and this relationship to the recent motion to amend their answer to the complaint.

THE COURT:  Okay.  And who's going to be leading the discussion on the defense?

MS. SCHNEIDER:  This is Jill Schneider.  I will be leading the discussion regarding our past attempts at discovery.  And then when we start talking about how we are going to proceed, then counsel for -- the special attorney generals will take over.

THE COURT:  All right.  So it sounds like it might be a blending of somebody tag-teaming, depending on how these issues all are kind of interrelated.

MS. SCHNEIDER:  I think so.

THE COURT:  All right.

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  All right.  So Ms. Schneider, you're going to start off, and then we'll see when Ms. Blaesing and Mr. Wilson

step in.

All right.  So we don't we go in that order.  The objection to discovery, tell me what's going on with that, Ms. Skjelset.

MS. SKJELSET:  Well, Your Honor, to give you a little bit of background (indiscernible) in our submission, we provided a draft request for production with the defendants on February 7th, 2023.  We provided search terms and parameters for ESI two days later on February 9th, 2023.  We conferred on March 3rd regarding those -- that draft request for production as well as the search terms.  We did not believe that there would be significant objections based on that conferral, and we served RFPs that day of drafts.  We also supplied additional specificity with regard to the particular meaning of the search terms within the context of this case, as requested by the defendant.

When we received the response on April 11th to the first request for production, there were, let's just say, more objections than we had anticipated, both general and specific to certain items.

And then subsequently, before we had an opportunity to confer on those objections, on May 9th, 2023, at the Rule 16 conference with the Court, we set a scheduling order for this case, which had fact discovery complete on November 15th, 2023.

We pulled a transcript from that hearing.  And when the Court asked specifically whether Ms. Schneider on behalf of

defendants believed that that was appropriate, she said, "I think that's doable."  There was no mention of any delay in production. And that's at the transcript page 9, line 9 through 14, if the Court has it.

Subsequently, we learned that the ESI would not be produced for at least 60 days.  We know that in the order, the Court requested that we discuss the scheduling order with regards specifically to expert discovery.  And because we were unable to get a timeline for when we would get document discovery, including ESI, we couldn't even (indiscernible) count a scheduling order with regard to expert discovery, so we wrote a letter to the Court asking for assistance with regard to this discovery dispute.

THE COURT:  Okay.  And does that also address the topic of the delay in production and request for inspection, or is the request for --

MS. SKJELSET:  Exactly.  That is essential to the dispute.  It is not only that the request for production that we were -- that we had served on the defendants had many objections, and we are unclear based on their use of language in their objections whether they're actually going to produce responsive documents, both generally and specific objections, but not only that, but we were told for certain that there would be a delay in the -- in the ESI production even though we provided them with search terms and parameters, well, now it's been five months ago.

THE COURT:  Okay.  All right.

MS. SKJELSET:  So I'm happy to go line by line on the request for productions.

THE COURT:  Well, let me get a general sense of the parameters first.

Let me ask Ms. Schneider, so objections have been made to the request for production, but I also understand that the parties had discussed and generally agreed on the use of certain search terms?

MS. SCHNEIDER:  That is correct.  And all of the search terms have been applied and all of the custodians requested by plaintiffs have been solicited.

THE COURT:  Okay.  And -- and so what -- what's the delay, then, now in providing the discovery?

MS. SCHNEIDER:  When we provided the custodians and the search terms to the agency, it takes forever to get all the documents over all of the databases the agency has to review.  We did not get that information from the agency until approximately seven weeks after they were submitted.  Not ideal.  We don't like it.  We get the same response on a regular basis.  They don't like it either, but that is what it is.  Those documents, that compilation totaled over a million documents at that time.

We have since that time engaged a vendor to help with the culling of information.  I'm not sure the exact number, but it's something down to about 30,000 documents which still need to

be reviewed for privilege, et cetera.

When faced with all of this, we had to figure out what to do.  We just don't have the staffing to do it in a timely manner.  I understand that plaintiffs are not happy.  We're not happy either.  And so we have engaged special assistant attorney generals to assist with this matter, because we simply do not have the staffing to address the discovery demands in this case.  It's not that we don't want to, but what we're doing is everything we can in our power.

THE COURT:  And is the issue now just simply reviewing these documents for the -- for culling out that which might be privileged?

MS. SCHNEIDER:  That is my understanding.  At this point, even this morning, there were certain databases that were not available for review.  So we always have the technical issues along with that kind of review, but my understanding right now, and Ms. Blaesing may be able to fill you in more, is that the documents have been downloaded, they are available, and have -- and we have started to review and certainly we have produced a limited number.

THE COURT:  Ms. Blaesing, did you want to add any additional context to the issue?

MS. BLAESING:  Yes, Your Honor.  Thank you.  So I -- myself and Harry Wilson filed our notices of appearance last week on this case.  So we're -- we're new counsel and transitioning to

get up to speed, and specifically on the discovery, so we can move things ahead as efficiently and timely as possible.

And as Ms. Schneider said, you know, we share plaintiff's goal to get these documents produced so there's sufficient time for other discovery. And my understanding is that defendants have started a rolling production of documents. There were, I believe, nearly a thousand pages produced on June 1st. And then as Ms. Schneider was describing, there's been a significant ESI e-mail collection, and that consists of, I believe, 14 or 16 custodians that plaintiffs selected and their search terms. And that review set is somewhere in the range of 28 to 30,000 documents, so it's been culled down to.

And to answer your question, Your Honor, I -- I believe that those documents need to be reviewed not only for privilege, but also for responsiveness and for confidentiality issues under the protective order.

So what we are doing is defendants are engaging with a contract review team that specializes in doing this kind of document review. Myself, my firm, DOJ have worked with vendors like this on a number of cases. It can be a very efficient way to get a large number of documents reviewed and produced in a timely manner.

So that's -- that's where we're at. It's going to take us a week or two to get our review team stood up and running. We will start rolling production in the meantime. I understand

there are some documents other than e-mails that we can review and start producing.  And if there's additional things, additional documents that then plaintiff's counsel needs, we can confer with counsel and collect those additional things or come back to Your Honor to help us resolve any disputes there.

THE COURT:  Okay.  So there were several -- as Ms. Skjelset describes, several objections, some general, some specific.  I'm not hearing that those objections are in play at this point; that you and Mr. Wilson are on board helping with ESI, that you're going to be reviewing for confidentiality, pursuant to the protective order, as well as privilege and then responsiveness.  Is that right?

MS. BLAESING:  Yes.  I -- my understanding to the specific objections that plaintiff's counsel raised in their letter, I think some of these, there are categorical objections that defendants have and for some there are not.

THE COURT:  All right.  And Ms. Skjelset, the date of that letter is -- is that the June 14th letter?

MS. SKJELSET:  So, Your Honor, we could use the June 14th letter, because the June 14th letter is the same as the June 9th letter.  It just adds the additional topic that Mr. Rizzo will be addressing later with regard to the interrogatories.

THE COURT:  Okay.  So (pause) --

MS. SKJELSET:  And -- and, Your Honor, if I may,

Ms. Schneider's June 21st letter, I think on pages 2 and 3, have bullet points addressing those substantive areas of specific objections.

THE COURT:  Okay.  Well, Ms. Skjelset, what do you want me to do -- let's break it down.  What do you want me to do with these general objections?  I mean, I think they're -- I mean, I'm not sure I'm -- I'm going to take them -- take them well.  I'm not inclined to sustain such general objections.

So maybe I can ask Ms. Blaesing.  Is there something specifically that you want me to conclude with respect to those?

MS. SCHNEIDER:  This is Jill Schneider.  May I respond, Your Honor?

THE COURT:  Go ahead.

MS. SCHNEIDER:  My understanding is that the general objections that we have raised are confusing, or at least it has been expressed to us they are confusing to plaintiff's counsel, because they're not sure if we are going to categorically withhold documents.

My position is we have a right to assert those objections, but we have not said we are not going to produce them period.

What we've said is these are the objections that we are preserving, but we are going to produce all responsive documents that we find.  We want to preserve the objections, for example, that it's vague in the event that plaintiff's counsel think that

something else should be there that we haven't thought of.

We are responding to the requests and are producing responsive documents.  And until plaintiff gets what we are producing and says, "But you don't -- you didn't produce X," we're not sure how else to respond.

THE COURT:  Okay.  Well, then just -- just to make sure that it's clear, I'm -- you know, I'm not sustaining the objections.  You've reserved it, and you're otherwise ordered to produce that which has been requested.  The general objections --

MS. SCHNEIDER:  Right.

THE COURT:  -- are not something that I'm going to -- I'm going to take up or consider unless they have -- have some other legal basis other than sort of a protective sort of, I don't know, a prophylactic of some kind.

MS. SCHNEIDER:  Right.

THE COURT:  So the minute order will reflect that the general objections are not well taken and the State is ordered to produce those documents in any event.

Now, with respect to the specific objections, Ms. Skel- -- well, let me ask, Ms. -- is it Ms. Schneider or Ms. Blaesing that will be telling me what you want -- or what you intend on doing with these specific objections?

MS. SCHNEIDER:  I wrote the letter of January 21st, 2023 -- this is Jill Schneider -- so I will be responding to those, as I said, substantive areas of dispute.

THE COURT:  Okay.  So that's item 4 on your June 21 letter?

MS. SCHNEIDER:  Correct.

THE COURT:  Ms. Skjelset, do you want to first summarize what your position is so that I can make sure I understand what the scope of my decision needs to be?

MS. SKJELSET:  Yes, Your Honor.  We can go line by line, but one thing that I wanted to say, because this was a -- to the ESI search and the general objections, and I understand that Your Honor is saying that the general objections were not well taken, there was a general objection with regard to discovery of documents related to non-parties, which also was asserted in -- specifically as to individual requests for production as well.

I think plaintiff has an extraordinary concern that that objection to non-parties will be a way of the defendants culling documents that might relate to other children who were -- potentially suffered abuse in the foster home of the Duncan-Raygosas, and we believe that that information is relevant.

The reason that that relates to ESI, and this is a question that I posed to Ms. Schneider previously during our conferral, but -- and I don't know whether or not they are using the TAR method of identifying responsive documents, but in the event that they are -- that the defendants are excluding from

production documents relating to other children in the home as non-responsive because they have an objection as to non-parties, that needs to be taken out prior to the identification of the responsive documents.

THE COURT:  Okay.

MS. SKJELSET:  If that makes sense, because as I understand the way TAR works, people (indiscernible) something as responsive and then the computer system brings up more documents like that.  So if they're weeding out documents relating to concerns of other children in the home, then the computer will assist them in doing that as well.

THE COURT:  And so you're looking at for -- at discovery associated with third-party -- non -- non-parties, particularly complaints that may have surfaced with respect to other children placed in the home?

MS. SKJELSET:  Yes, Your Honor.  We believe that that is relevant to DHS as an individual actor's notice and knowledge of concern of maltreatment in the home.

THE COURT:  Ms. Schneider?

MS. SCHNEIDER:  Well, as noted in the bullet points, all of this information is highly confidential, but we have committed to producing the Child Protective Service records for any of -- records regarding the plaintiff and her sibling.  We will also produce any reports or complaints of abuse or injury to any child while in the Duncan-Raygosa home.

What we're not going to do, we don't believe that we are required or authorized to produce records of people in the home that don't bear on abuse.  For example, there are two children that were in the home for a very short time period, and any reports of those children in that home will be produced; but records for those children that date back ten years ago or five years hence, those are confidential, and we don't believe we are allowed under law to produce them.

THE COURT:  I think I might be failing to appreciate the distinction.  I'm not -- is it -- is it just simply evidence of any children in the home discovery or is it just with respect to those that -- that furnished a complaint of some kind of abuse (indiscernible)?

MS. SCHNEIDER:  Yeah.  If there is any report of abuse of a child in the Raygosa home, we will produce it.

THE COURT:  Okay.

MS. SCHNEIDER:  And if there's any concern about it --

THE COURT:  So let me ask Ms. Skjelset, then, I want to make sure I understand what it is that you're asking for.  How is that different than that which Ms. Schneider just indicated she will produce?

MS. SKJELSET:  Well, Your Honor, my understanding prior to now was that the production would be extraordinarily narrow. And so if I'm hearing Ms. Schneider correctly, the defendants are willing to produce documents relating to the care and condition

of other children in the Duncan-Raygosa foster home.

MS. SCHNEIDER:  That's not quite correct.  We are prepared to produce records of any reports, concerns, discussions regarding abuse, injury to children in the Raygosa home.

THE COURT:  And Ms. Skjelset, you used the term "care," any -- any documents relating to care of children in the home, which is broader than, you know, any evidence of documents associated with abuse, neglect, or those variants, of children in the home.  Which one is it that you're -- you're seeking?

MS. SKJELSET:  Well, Your Honor, I think that it would make most sense for us to obtain documents relating to the care and conditions of children in the foster home, which would get at -- at the ESI, the e-mail exchanges between the certifier and various caseworkers for the children who were living in the home at that time.  There is -- otherwise, we -- we are --

THE COURT:  (Indiscernible) the days that to the relevant dates in the complaint?  What --

MS. SKJELSET:  Your Honor, they were certified for two years.  I imagine it would be during that period of time.  If there was a report of abuse that occurred afterwards, I would expect that that report would be provided to us as well, but the -- the e-mail exchanges and the case notes regarding the care and condition of those children while they were in that home, I believe, is pertinent and relevant to the case.

THE COURT:  I'm just trying to make sure I understand

what "care and condition" might mean to you.  I mean, so without -- without much more context in litigating cases like this, I need to understand what it is that really gets at that.

MS. SKJELSET:  I can give you an example, Your Honor. Because of the work that we did to discover documents prior to receiving any ESI from the -- the trial division, we did uncover an e-mail regarding another child who was in the home who was for a brief period of time.  And in that e-mail, the caseworker is saying, "I don't want my -- I don't want my child to go back there.  I don't want this child on my case to return to this home, because the child has -- now has their nails clipped and the rashes are gone."

So the care and condition, even though I believe that that might -- that a jury might find that that relates to neglect, I don't know if I can trust that the Department of Justice trial division will make that determination in its production.

THE COURT:  Okay.  So you want it to be necessarily broad to capture anything that -- that people other than the defense team might consider to be neglect or abuse?

MS. SKJELSET:  Yes, Your Honor.  I believe it should capture the care and condition of children in the home, particularly when it might be that somebody does not make a child abuse report and, therefore, it wouldn't be deemed an official child abuse report, if that makes sense.

THE COURT:  Okay.  Anything else, Ms. Schneider?

MS. SCHNEIDER:  We have said repeatedly that we will produce any records of care or concern of children in the -- in the Raygosa home.  If it's somebody who says I have concerns ten years later about the way my children were treated in the Raygosa home, that is relevant, but that is not what we're talking about.

Our objection is to the case files, the work that was done years before children were in the Raygosa home or years after they were in the Raygosa home.

THE COURT:  I'm going to order that production as described by plaintiff's counsel.  And I will use the language that is laid out in their June 14th, 2023, letter to clarify my -- my meaning.  And that covers the -- the specifics with respect to the information relating to non-parties.

What about workers' cell phone numbers?  Ms. Skjelset?

MS. SKJELSET:  Your Honor, I'm hopeful that we can reach an agreement on the workers' cell phone numbers.  That was an issue that arose just as I was preparing this letter.

Typically the organizational charts that I receive from DHS are -- are documents that are not derived from other documents.  This appears to be a cell phone list, and perhaps it was in meta form from the agency, I don't know, but it did not have their cell phone numbers.

And the problem with not having their cell phone numbers is that we're not able to do follow-up discovery

regarding who they were communicating with at various times, especially when we've not received any text messages and it's unclear whether or not there were preservation attempts with regard to text messages between and among workers and the Raygosas, as well as third parties such as policemen.

THE COURT:  So you're saying you're confident that issue can be resolved.  Why are you confident, and is that something now that I need to address or is it something that the parties are going to figure out on your own without my assistance?

MS. SKJELSET:  Well, Your Honor, it's -- I will wait for Ms. Schneider to respond; however, I would trust that they will be providing us the cell phone number for the named defendants, the State-issued cell phone numbers for the named defendants quickly.  We've been unable to confer on this topic since I wrote the letter.

THE COURT:  Ms. Schneider.

MS. SKJELSET:  And if they object to it, then I would ask that it be ordered.

MS. SCHNEIDER:  Well, I did respond.  We don't object to producing cell phone numbers if they are requested.  The requests were not for cell phone numbers.  They were for agency organizational charts.  And we produced what the agency produced to us.  We didn't manufacture anything.

Plaintiff is -- Ms. Skjelset is nervous that we somehow

put together a chart and eliminated the cell phone numbers.  We did not.

If we get a request for cell phone numbers of specific workers, we will provide those.

THE COURT:  And are we on the same page?  I get the impression that there's some nuance here that I might not be catching.

Ms. Skjelset, does that cover that which you are requesting?

MS. SKJELSET:  No, Your Honor.  We did ask for contact information in connection with the organizational charts, and that was in RFP Number 2.

THE COURT:  Okay.  So you're asking --

MS. SKJELSET:  And (indiscernible) that --

THE COURT:  -- you're asking for cell phone numbers and what else?

MS. SKJELSET:  Well, if there are phone lists that were kept in the ordinary course, that would be the most helpful, if they are the ones that I've normally seen when I've received production in these cases, but -- but since it's their State-issued cell phone numbers, which should be in their personnel files, if we could get those, that would also be helpful.

THE COURT:  I'm sorry.  I'm not sure I followed.  You're asking for cell phone numbers that are in the personnel

files that are different from --

MS. SKJELSET:  I'm sorry, Your Honor.  I went a bit astray.  We want the cell -- the State-issued cellular device numbers for the named defendants.

THE COURT:  And -- and that's it?  Are you --

MS. SKJELSET:  I think that would be --

THE COURT:  You're asking --

MS. SKJELSET:  (Indiscernible).

THE COURT:  -- (indiscernible) the production of that which is listed in, is it RFP Number 2?

MS. SKJELSET:  Yes, Your Honor, including contact information for the named defendants.  Yes.

THE COURT:  Okay.  I -- you know, I'm -- I'm failing to appreciate what the dispute is.  Ms. -- Ms. Schneider, why wouldn't those be produced?

MS. SCHNEIDER:  Yeah.  We would produce them.  That's not what was requested.  We provided what was requested, which was agency organizational charts.  We provided lists of the employees.  If it didn't have a cell phone number -- if it did have a cell phone number, it was included; if it didn't, we didn't -- we didn't take it out or add it in.

Now that it's specific "We want the cell phone numbers for the named State defendants," we will go back to the agency and ask for that.  We just don't have to create new documents.  That's what I'm saying.

THE COURT:  Okay.  I'm -- I'm, again, failing to appreciate any material dispute here other than perhaps the parties need to sit down and talk through these things with a little bit more clarity, but now that you have me here, I'm going to get into the middle of it.

So as I understand it, Ms. Skjelset, you're asking for the names and -- well, the cell phone numbers and contact information for the named defendants, and that would be responsive --

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  -- that would be responsive to your RFP Number 1 and 2?

MS. SKJELSET:  Yes, Your Honor.  If -- and if there are organizational charts that include such information and -- those should be produced.

THE COURT:  Are there organizational charts that -- that do not have to be created for this purpose but already exist, Ms. Schneider?

MS. SCHNEIDER:  I have not seen any.

THE COURT:  Well, does -- all right.  So then you'll need to go find out and then produce them.

MS. SCHNEIDER:  Exactly.  And we -- that's what we did.  We requested them from the agency.  The agency did not say -- did not return any organizational charts with phone numbers on them.  They produced what they had.

I will certainly go back and ask again, but what we asked for is exactly what the request for production stated.

THE COURT:  All right.  At a very minimum, I expect that the cell phone numbers and other contact information of the named defendants be provided and then confirm that the -- or that if organizational charts exist as -- as part of the normal production of, I don't know, organizational literature, that that be confirmed whether they exist or not, so we don't have to return to this issue in the future.  All right.

All right.  What else, Ms. Skjelset?

MS. SKJELSET:  Your Honor, they have objected to tort claim notices and complaints regarding injury to and abuse to other foster children in homes certified by Lane County Child Welfare branch.

To plaintiff, this is prior notice of a potential for a system of certification that is not functioning and a pattern of errors in the branch.  It would be akin to a car manufacturer having prior notice of failure to inspect seatbelts.

THE COURT:  Where -- where is this item in your -- in your letter?

MS. SKJELSET:  It is under "Information Related to Non-Parties".  There are bullet points underneath, and "Tort Claim Notice" and --

THE COURT:  Okay.

MS. SKJELSET:  -- "Foster Care Abuse Complaints" are

the first two.

THE COURT:  Okay.  So this next item that you're describing is laid out in the first two dashes.  Is that correct?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  Ms. Schneider?

MS. SCHNEIDER:  Well, we said we would produce the tort claim notices for the plaintiff and for her sibling brother.  We will produce any tort claim notice that we receive from any child who was in the Raygosa home, but the idea of the entire universe of tort claim notices from Lane County agency is way abusive, we believe, and it would -- it requires a great deal of research to -- to compile, and it also does not go to notice that the system is broken.  We get tort claim notices for a number of things that may or may not show a deficiency in -- in care.

THE COURT:  Remind me of --

MS. SCHNEIDER:  Anything -- anything to do with the Raygosa home, yes, we will produce those.

THE COURT:  Ms. Skjelset, does your complaint allege something to the effect of the system is broken, or is it specific to just simply the failure -- the failure of the requirements of care associated with the abuse in the Raygosa home?

MS. SKJELSET:  Your Honor, our complaint alleges deliberate indifference to a known or obvious safety risk to my client, JC.  And if the agency, particularly that branch, we did

narrow it to that branch, was on notice of repeated injuries to foster children subsequent to poor vetting of foster families, then I believe that would potentially go to the deliberate indifference, especially as it regards a specific certifier or certification supervisor against whom we've made allegations.

THE COURT:  Okay.  I agree.  As it relates to deliberate indifference, this information is relevant.  I'll order items -- the two dashes on tort claim notices on Lane County and foster abuse complaints as it relates to Lane County.

Next, Ms. Skjelset?

MS. SKJELSET:  Yes, Your Honor.  Next in my letter was the -- also under information regarding other parties (indiscernible) litigation holds specific to -- and preservation efforts specific to this case, and it relates also to the workers' cell phone numbers and our lack of ESI.

We have not seen any text messages produced in discovery in this case even though we have made many efforts in the probate also to obtain responsive documents.  I have on good information that caseworkers regularly text, and believe that there would have been at some point responsive documents.

We asked for litigation holds when it was put in place regarding these -- regarding ESI, not only e-mail, but also text messages.  And they're objecting to informing us when the litigation hold was put in place, what the scope of the litigation hold would be, and to providing the litigation hold

itself.

And we believe that under Local Rule 26-1 sub (2)(c), I believe, that preservation efforts are -- regarding ESI is information that is required by parties --

THE COURT:  Ms. Schneider --

MS. SKJELSET:  -- related to support --

THE COURT:  -- I'm looking to your response, Ms. Schneider, on litigation hold.

MS. SCHNEIDER:  Yeah.  Litigation -- yes.  We believe that litigation hold notices are not relevant to the plaintiff's claims.

We understand that there is a duty for preservation, and we take that duty seriously, but the litigation hold notices go into what an attorney believes the claims are.  That is work product.  They're done in anticipation of litigation, and that is not discoverable.

THE COURT:  So I want to make sure I understand it, Ms. Skjelset.  You're asking for the communications from counsel to defendants and other employees notice -- noticing those individuals about preservation?

MS. SKJELSET:  Well, Your Honor, it is not my understanding that it is counsel who sends litigation holds in these cases.  Typically, it's my understanding, that DHS sends the litigation holds, not an attorney.

So my request -- our request was not for communications

with counsel; however, if we could -- if they are objecting as to work product and/or privilege, it would be most helpful if we could have a privilege log timely in order to evaluate that.

THE COURT:  All right.  Ms. -- Ms. Schneider, is that the one issue in these notices?

MS. SCHNEIDER:  It is an issue in these cases.  They are produced by legal counsel.  Litigation hold notices are produced by the legal department of the agent.  They're the ones that send out the litigation hold notices.

THE COURT:  All right.  Well, then produce a privilege log so we can take it up in some more formal manner than the (pause) --

MS. SCHNEIDER:  Yes.  The privilege log is a separate issue.

THE COURT:  To -- well, I take it that these notices are -- you're claiming these notices are privileged because they're conducted in the course of or in anticipation and preparation of litigation, correct?

MS. SCHNEIDER:  Correct.  Correct.

THE COURT:  And so I think a privilege log identifying them as such, then, at least gives us something to chew on in the event that the plaintiff is going to move to compel.  There may be an issue at that point where I won't be able to take it up informally, and we'll have to address it through a briefing schedule for -- on a motion to compel, but I --

MS. SCHNEIDER:  I -- that's appropriate.

THE COURT:  Okay.  Personnel files of (indiscernible) employees?

MS. SCHNEIDER:  We are producing --

MS. SKJELSET:  Your Honor (pause) --

THE COURT:  Go ahead.  First Ms. Skjelset, I just want to make sure that you've framed the issue, and then I think I heard Ms. Schneider say that they're producing it.  I just want to make sure I understand what it is you're asking for, Ms. Skjelset.

MS. SKJELSET:  Yes, Your Honor.  Our concern with regard to this specific request for production was that the -- one of the objections was with regard to confidential information relating to non-parties, and our concern was that the Department of Justice or DHS might seek to remove information relating to potentially other children who had been abused in foster care who may have made a complaint against an individual, or otherwise removed information from a personnel file because they were objecting in this way.  And we wanted to ensure we received the complete personnel file, including confidential materials.

THE COURT:  Ms. Schneider.

MS. SCHNEIDER:  We will produce the complete personnel files of the named defendants.

THE COURT:  Does that cover it, Ms. Skjelset?

MS. SKJELSET:  Yes, Your Honor.  If it is complete,

then, yes, I believe so.

THE COURT:  With the operative term being "complete," I think we're all in agreement.  And I want to make sure that it is with respect to the named defendants and no one else.  Correct, Ms. Skjelset?

MS. SKJELSET:  I believe that we have only requested personnel files relating to the named defendants.

THE COURT:  All right.  We have a hundred percent agreement on this one.  I'd like to chalk that one up as a little victory.  We're doing -- we're doing well here.

All right.  Other children in the home, I think we've already addressed that, Ms. Skjelset.

MS. SKJELSET:  Yes, Your Honor.  I believe we addressed that earlier.

THE COURT:  All right.  And so moving on, DOJ defense contract.

MS. SKJELSET:  So, Your Honor, this is a very interesting contract that occurs prior to a caseworker obtaining a defense from the Department of Justice, and it sets the parameters for how the defense will occur.

And in our experience, it shows a lack of confidentiality between the -- the worker and the DOJ attorney, the possibility of sanctions if they don't cooperate, a lack of loyalty on behalf of the DOJ attorney to the worker.  And in our opinion, which we've received these in the past and we have used

them in depositions previously, the information is relevant to their motive for testifying in one way or another.

THE COURT:  Okay.

MS. SKJELSET:  And I believe Steve Rizzo might want to speak on this one.

THE COURT:  Well, before Mr. Rizzo, I do want to hear from Ms. Schneider, and also just respond to the fact that it looks to me, at least by the letter Ms. Skjelset submitted, that both Judge Acosta and Judge Mosman have both ordered production. Is that correct?  Ms. Skjelset?

MS. SKJELSET:  It was Judge Youlee You actually, Your Honor, and Judge Acosta who ordered those to be produced previously, yes.

THE COURT:  Okay.  Ms. -- Ms. Schneider?

MS. SCHNEIDER:  Yes.  The State provides a defense to all State employees under certain conditions.  If an employee is found to be exceeding the scope of his responsibilities, then DOJ can withhold representation, because clearly the State's not going to authorize employees to act outside of the scope of their authority, but the fact that they -- that a State employee is entitled to a defense when they are doing the work that they have been hired to do is a matter of a contractual relationship that is required oftentimes by union contracts.  It has nothing to do with forcing somebody to -- to refrain from saying something or to go ahead and say something that is not allowed.  It is just a

simple matter of who is going to pay for the defense of work that's done while you're an employee.

THE COURT:  The DOJ defense contract as described on page 4 of plaintiff's June 14th letter is ordered to be produced.

Oregon-Kids metadata?

MS. SCHNEIDER:  Yeah.  This is -- this is --

MS. SKJELSET:  Your Honor --

MS. SCHNEIDER:  This is the --

THE COURT:  Let's hear from Ms. Skjelset.  Well, first, is there agreement or disagreement about it?  Ms. Schneider?

MS. SKJELSET:  Your Honor, I can --

MS. SCHNEIDER:  (Indiscernible) this.

THE COURT:  All right.  Let me hear from Ms. Skjelset first.  I'm not sure I -- I want to make sure we've received the information in sort of an ordered fashion.  So Ms. Skjelset, what's the issue?

MS. SKJELSET:  So, Your Honor, most of the information regarding child welfare activity is stored in what's called OR-Kids.  It's a database that has different files.  There is a provider file for the certified foster family; there are Child Protective Services files relating to those types of investigations; there is a case file relating to the child, for instance, JC, which may be designated under specific adults' names.  Those files include notations that are placed in the database, such as case notes in the child's file.  These case

notes are meant to memorialize case man- -- case activities, such as home visits, the caseworker went to the home and reports what happened there; or CPS assessment activities, somebody interviewed a child and described what the child said; or provider notes, a certifier goes to the home and describes what happened in that home visit as well.

What is interesting about what is produced in discovery in these files is that it has a date of occurrence and the time. And the caseworker is able to put that in manually.  It doesn't automatically populate what -- when the note is being made.  So these notes can be made well into the future and can be retroactive as well to the past.

THE COURT:  And are you saying that you would be able to evaluate the metadata to determine if any notes have been changed, updated, revised after the fact, after the initial notes --

MS. SKJELSET:  So there's -- yes.  We have had that ordered previously for certain case notes and provider notes, but even prior to that step, we believe and -- that there is a drop-down, it's just simply a drop-down menu that has case notes, and when you click on it, it says when it was supposed to have occurred and when it was created.  And starting -- launching from that position would be incredibly helpful in understanding how this official narrative came to be, when, and why, essentially.

THE COURT:  And you're -- you're seeking this metadata

only as it relates to the provider file for Duncan-Raygosa and the case file for the plaintiff?

MS. SKJELSET:  Yes, Your Honor, with regard to the provider notes and to the case notes for the -- for the -- for JC.

THE COURT:  And how is -- how would this file be presented to you in the absence of these, I guess the primary -- or the original application from which these drop-down menus would appear?

MS. SKJELSET:  So, Your Honor, they typically produce us the OR-Kids provider file in discovery; they just don't drop down that portion of the case notes or provider notes so that we can see when it occurred and when it did not.

It is also my belief, although I don't know if this is (indiscernible) founded, that the provider notes and case notes can be produced in a way that -- that shows when it was actually created.

THE COURT:  And does this also dovetail, then, with your -- the following request there with respect to the provider file inspection?

MS. SKJELSET:  Yes, Your Honor, it does.

THE COURT:  Okay.  So there -- both of these are related?

MS. SKJELSET:  Yes.

THE COURT:  Ms. Schneider?

MS. SCHNEIDER:  Yes.  It is not my understanding that the provider notes can be provided with that drop-down file prepared.

In order to get the metadata that they want, they want to show the date that the notes have been entered, and that information is -- does not come to us.  The provider notes are produced in their entirety.

The way to get to that information is only by allowing the plaintiffs to go in and look at OR-Kids' entire database, which is -- it's full of confidential material.  Now, if the request is any information regarding what dates these notes were entered, we can go back and ask if that information can be produced.

What we don't want is for plaintiff to have the key, the code to the database file for OR-Kids for the State of Oregon.

THE COURT:  So the material that is being sought is ordered to be produced.  And it would appear to me that an inspection, or even if it were to be an onsite inspection of the database with somebody from either the Department of Justice -- well, maybe not "either" -- the Department of Justice and somebody from the agency may supervise and manage the way in which the information is accessed so no other -- no other file is reviewed onsite other than those relating to the provider file or the Duncan-Raygosa home and the case file for the plaintiff.

So I'll leave it to both -- both counsel to coordinate a way to do -- to take the necessary inspection of that -- that active database, again, only as it relates to those two limiting factors, the Duncan-Raygosa file and the case file for the plaintiff.

I should also mention that we haven't talked about deadlines yet, but I expect that -- that the defendants work very quickly to coordinate a time in which that can be -- that can be completed.  The plaintiffs will have a right to bring an expert to observe and take notes or do whatever else in the course of reporting that information that they are able to observe as necessary.

Is there anything else that I need to specify to make sure that we don't come back on this issue?  Ms. Skjelset?

MS. SKJELSET:  No, Your Honor.  I believe you discussed the time frame being relatively quick.  There can be somebody to shepherd, it can happen at the DHS office, and -- and we will confer on how that best should occur.

THE COURT:  Okay.  Producing ESI generally, do you want to summarize what it is you're asking me to do, Ms. Skjelset?

MS. SKJELSET:  Well, Your Honor, ESI we touched on a little bit earlier, so I think that had to do partly with regard to producing documents relating to the other children in the home, which -- which I think that the Court has already addressed.

I would like to confer on search terms. In the event that the State finds that our search terms are somewhat problematic, I would -- and identify too many documents, I'm more than happy to address and troubleshoot that issue. It appears that they have applied all of it.

I am a little bit concerned now that they've culled the documents down to 30,000 as to whether or not they've already eliminated communications relating to the care and condition of other children in the home.

We would like a specific date for production of the relevant ESI and then a new scheduling order that flows from that, as well as a privilege log -- a date for production of a privilege log that flows from that as well.

THE COURT: Ms. Schneider?

MS. SCHNEIDER: Well, I can just address briefly. What I can say is that we have applied all of the search terms that plaintiff had requested. It has produced all of the electronically -- the electronic material that we have, includes things that are not responsive at all. And what we've attempted to do is get things that are not responsive at all to any of these claims, meaning any -- any children in the Raygosa home, any of the Raygosas, any of the named plaintiffs, any of that sort of thing. You know, if somebody says, "I'm going to lunch," that kind of e-mail is not -- we have attempted to dismiss as not responsive.

The timing is something that I cannot provide.  Again, that would be Ms. Blaesing who would be able to respond to that.

THE COURT:  Okay.  I think somebody just joined the call.

MS. BLAESING:  Yes, Your Honor.

THE COURT:  Oh, before we proceed, did somebody just join the call?

MS. SKJELSET:  Your Honor, this is Mary Skjelset.  I apologize.  I went to hit the mute button and I turned off my phone.

THE COURT:  Oh, I got it.  So you rejoined.

MS. SKJELSET:  I did.

THE COURT:  Okay.  Well, maybe to summarize that -- that which Ms. Schneider just relayed, all of the search terms that plaintiff provided were applied, and that's what netted the -- the number of files that our earlier discussion -- the 30-some-odd thousand, and I think I understood.  So I don't think it was culled to eliminate the non-party care terms, but I've already made it clear that that information would be producible.

So if the parties, after conferring, realize that there may need to be a modification of -- of the key words for the search, then -- then I expect that the parties coordinate that effort consistent with my order.

Then the other issue is --

MS. BLAESING:  Your Honor --

THE COURT:  Oh, Ms. Skjelset, what were you going to say?

MS. BLAESING:  Oh, sorry.  Your Honor, this is Lauren Blaesing.

THE COURT:  Oh, okay.

MS. BLAESING:  I was going to speak to the timing piece, but I'm sorry for interrupting if you're summarizing what Ms. Schneider said.

THE COURT:  I think I just finished summarizing, I think, everything that needed to be clarified, but then the issue was timing.  And Ms. Schneider had mentioned that she didn't have control over that, and I wanted to take that issue up next.  So Ms. Blaesing, do you want in on this -- on this part of the conversation?

MS. BLAESING:  Yes, Your Honor.

THE COURT:  All right.  You're in the hot seat.

MS. BLAESING:  And -- yes.  I'll speak to timing, and then I also want to add one -- one piece to what Ms. Schneider was describing regarding plaintiff's proposed search terms.  And I'm still getting my hands around what's in the database and -- and what all was searched and culled to get to this step.  We have -- and my understanding is there may be some search terms that plaintiff proposed that resulted in very overbroad hits, and there are a few that we named a little further on.  So I just -- I want to add that caveat to the record.  I think there may be

some that we still need to do some further conferral to narrow down.

But as to timing, Your Honor, as I referenced earlier, we're engaging in a contract review team to help us do this review. Our goal is to do this as efficiently as possible and -- and in the time limit.

And I sitting here today cannot predict, you know, what date we're going to be producing the e-mail documents. I know we're going to be working right away on some of these non-email documents that have been discussed today. It's going to take a little bit of time to get the review team stood up and then project out an estimated timeline to do rolling productions.

So I would propose, Your Honor, that we come back for a status conference in, say, three, four weeks, and we will then have a projected production schedule and we could also propose a date then for production of the privilege log, which we think would be most efficient to produce that after we've produced the (indiscernible) documents, and then as has been discussed with plaintiff's counsel, Your Honor, whether any modification of the discovery deadline would be necessary or appropriate.

THE COURT: All right. Ms. Skjelset, we're dealing with a pretty large amount of documents and content. So at least at first glance, it appears to be a reasonable approach, which is to set a status conference, check in, make sure that we've nailed down some dates. I don't want the status conference to be a time

in which we have to start looking forward to set a new deadline. I expect, Ms. Blaesing, that there would be substantial work conducted in the acquisition of a final -- a final set of documents to produce.  So I just want to make sure that we're all on the same page with respect to what we -- what we're going to be talking about on -- in 30 days from now.

So Ms. Skjelset, initially, while I know it's not ideal for you to have to wait an additional amount of time, do you have something different to propose that might be workable?

MS. SKJELSET:  Your Honor, I think that that proposal is reasonable.

THE COURT:  All right.  Then I will set a status conference in just a moment.  Actually, let's just do that now so we're all on the same page.  I think August 2nd is four weeks out.  So we could do -- let's do August 3rd, 9:00 in the morning. Is everyone available?

MS. BLAESING:  Yes.  This is Lauren Blaesing for defendants.  I'm available then.

THE COURT:  Okay.  Ms. Skjelset?

MS. SKJELSET:  Yes, Your Honor, I'm available.  Thank you.

THE COURT:  At that conference, we will make more certain all the deadlines going forward.  I appreciate that we'll probably need to revise the discovery deadline at that point, but also at that conference, I would expect that conferral has

happened and search terms resolved and been applied to the data set and documents have been culled to some final number. I also understand a privilege log will also have been introduced by then. Is that right, Ms. Blaesing?

MS. BLAESING: Your Honor, I -- I cannot commit that we would have a privilege log produced by then. I anticipate that we will be -- have begun our rolling document productions by then and have a projected timeline by which we will substantially complete production. And then typically the privilege logs are something we then create and produce after we substantially review the documents, but we can certainly come -- confer with plaintiffs in advance and come to that status conference with a proposed date by which we will have the privilege log produced.

THE COURT: Well, we'll have a proposed date for the privilege log at the status conference, a rolling production of documents, and -- and I want to hear substantial progress towards being able to complete this discovery. So I'll need to have some reports back that will give me confidence that we're going to -- we're going to see a light at the end of the tunnel.

All right. Let's keep chipping away. And was there anything else with the ESI, Ms. Skjelset?

MS. SKJELSET: Your Honor, I think we've addressed the bulk of the issues. If there are any additional objections, I'm hopeful that Ms. Blaesing and I can resolve them in our conferral.

THE COURT:  What about interrogatories that you had raised?  Are you saying that you can resolve those with Ms. Blaesing as well?

MS. SKJELSET:  That is an issue that Mr. Rizzo is going to argue -- or discuss.

THE COURT:  All right.  So I want to make -- I want to get a sense of how much more I've got to deal with.  So is it -- so the interrogatories and then the motion to amend the answer, is that -- oh, no.  And then there's also a protective order.  So we only dealt with subject Number 1?  Is that it?

MS. SKJELSET:  Yes, Your Honor, but it was a big one. It was a big part of our -- of our discussion today.

THE COURT:  Well, I'm hoping topic 1 was 66 percent of everything we needed to discuss.  Let's see what else is on -- on the plate.  What do you want -- so is Mr. Rizzo handling the rest of them?

MR. RIZZO:  I believe that's right, Your Honor.

MS. SKJELSET:  Yes.

THE COURT:  Okay.  Mr. Rizzo, how about interrogatories?  I don't want to deal with the protective order until the end.

MR. RIZZO:  Okay.  The -- the response to interrogatories essentially ties in, was intertwined with the defendants' motion to amend, Your Honor.  And in summary, based on the initial admissions in the answer --

THE COURT:  Right.

MR. RIZZO:  -- that I outlined in the motion to strike and that I outlined in my --

THE COURT:  I'm going to interrupt, and I apologize, now.  Let me ask you this, Mr. Rizzo:  In your conclusion -- so first of all, I'm inclined to allow the motion to amend with -- with your -- with your conditions subject to telling the defendants and identifying the concerns in the Duncan-Raygosa home, identify all DHS workers and supervisors (indiscernible) concerns regardless of whether the defendants (indiscernible) contended that DHS did not fail to disclose (indiscernible) notice and knowledge.

So if -- if those conditions are met, then -- and given that I'm inclined to allow the MTA, is there anything else that I need to hear from you until I hear from, whether it be Ms. Blaesing or Ms. Schneider?

MR. RIZZO:  I don't think so, Your Honor.  That -- that was my request to Ms. Schneider, that they can have their amendment but just answer as to the concerns as they knew about them.

THE COURT:  Okay.  Ms. Blaesing or Ms. Schneider, who is responding there?

MS. SCHNEIDER:  I am responding to this.  Yeah.  The answer -- the response is there was a concern that arose during the care of the children in the Raygosa home that is documented

in various case notes and assessments. Those, we have committed to producing, but the concept that we knew that Raygosa was hiding information is not true. We did not and we do -- and it was an error to admit that we knew that -- that we knew that they were hiding the information.

It is true that concerns were raised and they were documented and they were acted upon, but we could not say affirmative -- in fact, that was why the agency moved to remove the children from the home, but we cannot say that we -- that DHS affirmatively believed the information was hiding as a formal admission, and that's why the complaint needs to be amended.

THE COURT: Mr. Rizzo.

MR. RIZZO: Again, Your Honor, so long as they address the concerns concerning the care and condition of the children in that home and identify who knew or had notice of those concerns, that satisfies my request.

THE COURT: So it sounds to me that there is agreement about that. I didn't hear anything that Ms. Schneider said to be inconsistent with what you just identified.

MR. RIZZO: I thought I may have heard her to be specific to abuse reports.

MS. SCHNEIDER: No. That is not correct. What -- what I said in the response to the interrogatories is true. We have identified what we knew, how we knew it, how it was documented. That has already been produced to you.

THE COURT:  And I think the difference and the distinction between what I think Mr. Rizzo is bringing up is -- and you have any concerns, but that goes beyond abuse.  Is that right, Mr. Rizzo?

MR. RIZZO:  Yes, Your Honor.

THE COURT:  Okay.  So, I mean, that --

MS. SCHNEIDER:  Any concern -- yeah.  Any concerns about the Raygosa home or any documentation regarding any concerns will be produced.

THE COURT:  Did -- is that satisfactory, Mr. Rizzo?

MR. RIZZO:  That, along with the identity, yes, Your Honor.

THE COURT:  The identity of the DHS workers?

MR. RIZZO:  Correct.

MS. SCHNEIDER:  And we have produced that.

THE COURT:  Okay.  So --

MR. RIZZO:  If --

THE COURT:  I know I'm -- I'm tilling over already turned-over soil, but I just want to be sure I'm not missing something here in any of the disagreements the parties have had -- that counsel have had before.  Is there something else I'm missing that I need to clarify on this issue, Mr. Rizzo?

MR. RIZZO:  Judge, I -- I have to confess, I don't understand Ms. Schneider now saying she has produced the responses or documents that are responsive to the

interrogatories, especially when in the interrogatory response itself, Ms. Schneider is objecting to answering it in its entirety, and that's where the record stands currently.

So perhaps I'm missing something in what Ms. Schneider is attempting to state, but I can tell the Court I don't feel that I have an answer in any way to that interrogatory.

MS. SCHNEIDER:  Then I will amplify it to make sure that you understand our position, which is all documents concerning any notice regarding concerns over the children's welfare, over any reports of abuse, all documents that show who knew it, who raised the concern will be produced, and the people who knew have already been identified to you.

THE COURT:  And I did want to make sure that I understood these are concerns about not just abuse.  So it's a broader term.

So, I mean, I suppose what -- this is what I can do right now, is that -- well, so, first, the -- with respect to plaintiff's response to defendants' motion to amend, I -- I -- it is well taken.  I mean, I'll put it in the active terms -- active tense.

I -- I accept the plaintiff's proposed solution to the conclusion such that I will allow the motion to amend as otherwise proposed by the defendants provided that these conditions that have been described in that conclusion, which is on page 7, are met.

I'm not sure I'm in the -- either in the mood or in the position at this point to help you both wordsmith this, but, you know, once those conditions have been satisfied, then I will -- I'll go ahead and enter the motion -- grant the motion to amend, but I need -- I need the parties to confer, discuss how you want to coordinate communicating to me that everyone is now satisfied, the conditions are met, and then the motion to amend will be granted.

MR. RIZZO:  Thank you, Judge.

THE COURT:  Beyond that, I'm not sure what else I can do at this moment until the two of you have probably hashed it out a little more clearly.

MR. RIZZO:  Okay.

THE COURT:  Well, my minute order will reflect that I will grant the motion to amend provided that the defendants have satisfied the conditions laid out in plaintiff's response.

All right.  That resolves the interrogatories, then, the motion to amend, correct, Mr. Rizzo?

MR. RIZZO:  I think it does, Your Honor.

THE COURT:  All right.

MR. RIZZO:  At least -- at least that interrogatory. There are other -- I had written to Ms. Schneider about other issues with the interrogatories, and I -- if permitted, I'd like to confer with her by phone, and/or the Markowitz folks by phone, and address those issues, because I sent the letter some time

ago.

THE COURT:  Perfect.  I'll let -- I'll be happy to let you confer.

MR. RIZZO:  Okay.

THE COURT:  And then we can take it up at our status conference in August if it's not otherwise resolved.

Okay.  I think our last issue is the protective order?

MR. RIZZO:  Yes.

THE COURT:  All right.

MR. RIZZO:  Okay.  So just to recap, Judge, I worked out a form of order, and we traded e-mails about that. Ms. Schneider worked out a form of order, we traded e-mails about that.  We didn't come to an agreement.  We even talked on the phone.  And I filed a motion, and Ms. Schneider filed a response which essentially attached her form of order.  We had the hearing, the Court issued a ruling, and then she and I traded e-mails on what the, quote, protective order should look like.

In my May 12 e-mail when I addressed Ms. Schneider's form of order, I used blue highlights to address what I thought were some of my concerns.  And in one of those concerns that I highlighted in blue was that I put a strike-through through the parenthetical that says, "such as future clients", and I put a comment in the Word document, because the Tier 1 form of order doesn't have language at that juncture, Your Honor, that says to insert this or that, and I also felt that in light of the

discussion we had, the parenthetical language is not only vague, it was inconsistent with what the Court had ruled.

Subsequently, Ms. Schneider and Mr. Mancuso sent their draft back also highlighting in blue the areas of concern.  And for whatever reason, the parenthetical "such as future clients" was not highlighted.  It was in black.  And I overlooked it when we were addressing the remaining points, which was the "Attorneys Eyes Only", whether to include the name of the *Folks v. State Farm* lawsuit, and the issue about archival copies.

Subsequently, when I realized my error that I had not read it as closely as I probably should have to see if that language had found its way back in, I asked Ms. Schneider by e-mail -- I sent her an e-mail on June 16 stating that I overlooked it.  And she refused to amend it out.

THE COURT:  So Mr. Rizzo, if I might ask, you're seeking court intervention on just that parenthetical?

MR. RIZZO:  Yes, Your Honor, pursuant to paragraph 16 of the protective order, which allows the parties to seek a modification.

THE COURT:  Paragraph 16.  Hold on a minute here. Okay.  So -- and the parenthetical seems to maybe provide some context to "competitive purpose", correct?

MR. RIZZO:  I'm not exactly sure what the purpose of it is other than it's a slight on other children who were harmed in the home who may or could have potential claims, and it just --

it just has no place in this protective order.

THE COURT:  Ms. Schneider?

MS. SCHNEIDER:  Yeah.  We believe it absolutely has a place in the protective order.  We do not believe it is a slight on anyone.

What it is is a full, complete explanation of what "commercial use" is.  This protective order is meant to limit the universe to -- of people to whom these documents can be provided.  "Future clients" are not named in that universe.  If a future client is discovered through discovery and brings a claim of his own or her own, then the information -- that person becomes a party and could be subjected to this protective order.  If anybody else is not named in the protective order, they're not allowed to look at the documents that are by their very definition protected.

And that's all that we're doing, is saying we are limiting this protective order to the specific designated list.  And it was what we submitted.  We didn't hide it.  It was submitted to you.  You said this is the order that we are going to use except for these additional provisions, which the parties negotiated.

We do not believe that the protective order should be modified further to expand the universe of people who are not parties to this litigation.

THE COURT:  Well, how is that not achieved in the

absence of that -- that parenthetical?

MS. SCHNEIDER: Well, in the absence of that parenthetical, our experience is there have been some counsel who don't understand what that means, and they believe that they are entitled to show these documents to people who might have an interest even though they are not parties.

And we want to make sure very clearly that the universe of people to whom this protective order applies is specified as it is stated and it doesn't include people who are not named in that protective order, even if a plaintiff's counsel thinks that there might be a claim here.

THE COURT: Well, and paragraph 2 sets out quite clearly, as well as other paragraphs, that this is "Attorneys Eyes Only", so, I mean, I don't see how this protective order will allow the disclosure of any of the materials subject to the protective order to anyone than the attorneys themselves.

So I'm -- Mr. -- Mr. Rizzo, what else is going on here that I'm not -- I'm not appreciating?

MR. RIZZO: I'm not sure exactly what Ms. Schneider is implying, Your Honor. I'm in the habit of following protective orders. And the Court has ruled as to who could see the information, who we can share information with in paragraph 7, and that's the universe.

And I think -- I think what Ms. Schneider and her agency client is always worried about is that, for example, the

child that was beaten with the hanger in this case, correct, who was mentioned in our pleadings, their worry is that if that child is contacted and/or its parents, for example, were interviewed or police officers were interviewed, and ultimately that child recognizes that she or he had a claim, the knowledge of which was withheld from that child by the DHS personnel, Ms. Schneider is worried about that, that that child that we may discuss information with in the records as set out in paragraph 7 might file a claim later on.  And if that were to happen, that would result, in an oddball kind of way, in a violation of the order, because that kid would become somebody's future client.

I don't know who -- who the "future clients" is referring to, but I think that's the gist of what this parenthetical is trying to -- to add into the order that we've already covered.

MS. SCHNEIDER:  That is not correct.

THE COURT:  So what is correct, then, Ms. Schneider?

MS. SCHNEIDER:  What is correct is that the -- the protective order sets out who the documents can be shared with.  And we want to make sure that when you talk about "commercial use" in a protective order, "commercial use" includes going and contacting people and saying, "You know, you were in the Raygosa home," for example.  "You might have a claim.  Did this ever happen to you?," and showing that person a document.

If the person has a legitimate -- or has even an

illegitimate claim, if that person is -- is contacted, he's not allowed to see documents for a reason that an attorney believes that he might have a claim to be hired.

It does not protect against people from raising claims. What it does is protect the document from wide, wide dissemination. It protects the -- the universe of very confidential material from being expanded any further than what is specifically delineated out.

That's all that "commercial use" is intended to say, to make it clear that "commercial use" means extending it to people who are not parties, who are not named in the -- in the list. It includes those people, too. You may not send the material, the disclosing material to those people.

THE COURT: Well, it seems to me that paragraph 7 addresses that concern. I mean, it identifies, as Mr. Rizzo used the term, the universe of people who are allowed to view any of these documents. And if I understood Mr. Rizzo, or somebody had explained to me earlier, and it might have been in your -- in the letter, that the issue of -- that the concern around including it -- including "such as future clients", the parenthetical in paragraph 2, it maybe can be used as (indiscernible) against potential claimants finding counsel. Is that --

MR. RIZZO: Right.

THE COURT: Okay. So why not just simply draft language that clarifies that? Because I can appreciate you

shouldn't -- or anybody -- well, in this case, it's you as the plaintiff's counsel here subject to the protective order can't show these documents to prospective clients, but apparently there is no prohibition, at least as a result of this protective order, that would keep you from contacting somebody who you -- you are able to identify through these documents as having a potential claim.  You just can't -- you can't -- you can't disclose these documents to them.  There may be other prohibitions about -- about, you know, recruiting clients, but that's not the subject of this protective order.

MR. RIZZO:  My -- my concern is focused, Judge, on, if you think about paragraph 7, is persons who are mentioned in and referenced in the documents that -- that at some point were going to receive, and if we go to that person who is a person, as defined, and also a witness, what my concern is that that person may have a claim and that person may decide to seek legal representation.  And if that person becomes a client in the future, I will have violated the order by following the order. So that's my dilemma.

THE COURT:  But only if you showed a doc- -- any documents to that client prior to -- prior to that case being initiated and -- and documents produced in discovery in its normal course.

MR. RIZZO:  Well, Your Honor, as I --

MS. SKJELSET:  If I may, this is --

THE COURT:  Who's that?

MS. SKJELSET:  I'm sorry.  This is Mary Skjelset.  I've had this issue on another case, and I just want to point out it's -- that paragraph that's referencing "future clients" is not with regard to -- is not only with regard to showing a document, it's also with regard to any information derived therefrom.

THE COURT:  Okay.  So it is broader than simply showing the document.  And is that -- is that concern present in the language in this PO?

MR. RIZZO:  From the State's perspective, evidently.

MS. SCHNEIDER:  We submitted the order to you specifically with that included because we feel it's important to delineate what "commercial use" means.  It was submitted to the Court.  Both parties had a chance to brief the issue.  We don't believe that the order -- that the briefing needs to be reopened, and -- but we are apparently doing it now, and we don't think the order needs to be amended.

If Mr. Rizzo is not going to be showing or disclosing this material for commercial purposes, there is no problem with that, but commercial purposes means soliciting for future clients.

THE COURT:  Let me speak on this.  We have a status -- is there any issue about this being in effect at least until our status conference in August, Mr. -- Mr. Rizzo?

MR. RIZZO:  No, Your Honor.

THE COURT: All right. Well, let me think on this, and maybe we'll revisit it or maybe you'll just get my answer straight -- straight away when we get -- when we get together in August, but I'll give you -- I'll give you an answer either way, you know, when we meet up again.

Okay. Anything else that we need to take up, Mr. -- Mr. Rizzo, Ms. Skjelset?

MR. RIZZO: Not from me, Your Honor. Mr. Rizzo.

MS. SKJELSET: Nor from me, Ms. Skjelset, either. Thank you, Your Honor, for your time.

THE COURT: And then Ms. Schneider and Ms. Blaesing?

MS. SCHNEIDER: No. I think we're okay on this.

THE COURT: Okay. Ms. Blaesing?

MS. BLAESING: No, Your Honor. Thank you.

THE COURT: All right. I'll -- I will take my -- make my best effort in summarizing in a minute order that which I've ordered. And then I also expect that even without my minute order in place, that the parties get to work as quickly as you can to get this moving along, because by the time we meet again next, I'm hoping to get some -- some positive updates as to the progress of discovery, and then we'll identify the new deadline at that time.

All right. Thank you all very much. Have a good night.

MR. RIZZO: Thank you, Your Honor.

MS. SCHNEIDER:  Bye.

MR. WILSON:  Thanks, Your Honor.

MS. BLAESING:  Thank you.

MS. SKJELSET:  Thank you, Your Honor.

(Proceedings adjourned at 5:28 p.m.)

**C E R T I F I C A T E**

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause.

Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous cross-talk, fast speaking, mumbling, or other room noises overriding what was being said.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 15th day of July 2023.

/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Transcriber
Official Court Reporter
Certificates Expire:  9/2024

## /

**/s** [1] - 59:17

## 1

**1** [4] - 23:12, 43:10, 43:13, 49:23
**100** [1] - 2:12
**11th** [1] - 6:16
**12** [1] - 49:18
**1300** [2] - 2:4, 2:8
**14** [2] - 7:3, 10:10
**1455** [2] - 2:16, 2:20
**14th** [6] - 5:1, 11:18, 11:20, 19:12, 32:4
**15th** [2] - 6:23, 59:14
**16** [5] - 6:21, 10:10, 50:13, 50:17, 50:20
**1900** [2] - 2:17, 2:21
**1st** [1] - 10:8

## 2

**2** [6] - 12:1, 21:12, 22:10, 23:12, 52:12, 54:21
**2)(c** [1] - 27:2
**2023** [9] - 1:7, 3:1, 6:8, 6:9, 6:21, 6:23, 13:24, 19:12, 59:14
**21** [1] - 14:1
**21st** [2] - 12:1, 13:23
**22-01813** [1] - 3:14
**26-1** [1] - 27:2
**28** [1] - 10:12
**2nd** [1] - 41:14

## 3

**3** [1] - 12:1
**30** [1] - 41:6
**30,000** [3] - 8:25, 10:12, 37:7
**30-some-odd** [1] - 38:17
**326-8186** [1] - 1:24
**330** [2] - 2:5, 2:9
**3rd** [2] - 6:10, 41:15

## 4

**4** [2] - 14:1, 32:4
**4:00** [1] - 3:1

## 5

**5** [2] - 1:7, 3:1
**503** [1] - 1:24
**5:28** [1] - 58:5

## 6

**60** [1] - 7:6
**66** [1] - 43:13
**6:22-cv-01813-MK** [1] - 1:6

## 7

**7** [5] - 47:25, 52:22, 53:8, 54:14, 55:12
**7th** [1] - 6:8

## 9

**9** [2] - 7:3
**9/2024** [1] - 59:19
**97201** [5] - 2:5, 2:9, 2:13, 2:17, 2:21
**9:00** [1] - 41:15
**9th** [4] - 5:1, 6:9, 6:21, 11:21

## A

**able** [9] - 9:17, 19:25, 28:23, 33:9, 33:13, 36:11, 38:2, 42:17, 55:6
**above-entitled** [1] - 59:5
**absence** [3] - 34:7, 52:1, 52:2
**absolutely** [1] - 51:3
**abuse** [18] - 14:18, 15:24, 16:3, 16:12, 16:14, 17:4, 17:8, 17:20, 18:20, 18:24, 18:25, 24:12, 25:21, 26:9, 45:21, 46:3, 47:10, 47:14
**Abuse** [1] - 24:25
**abused** [1] - 29:16
**abusive** [1] - 25:10
**accept** [1] - 47:21
**accessed** [1] - 35:23
**achieved** [1] - 51:25
**Acosta** [2] - 31:9, 31:12
**acquisition** [1] - 41:3
**act** [1] - 31:19
**acted** [1] - 45:7
**active** [3] - 36:3, 47:19
**activities** [2] - 33:1, 33:3
**activity** [1] - 32:18
**actor's** [1] - 15:17
**add** [5] - 9:21, 22:21, 39:18, 39:25, 53:14
**additional** [9] - 6:13,

9:22, 11:2, 11:3, 11:4, 11:21, 41:8, 42:23, 51:20
**address** [9] - 7:14, 9:7, 20:8, 28:24, 37:4, 37:15, 45:13, 48:25, 49:19
**addressed** [6] - 4:20, 30:12, 30:13, 36:25, 42:22, 49:18
**addresses** [1] - 54:15
**addressing** [3] - 11:22, 12:2, 50:7
**adds** [1] - 11:21
**adjourned** [1] - 58:5
**admission** [1] - 45:11
**admissions** [1] - 43:25
**admit** [1] - 45:4
**adults'** [1] - 32:23
**advance** [1] - 42:12
**affirmatively** [1] - 45:10
**afternoon** [2] - 3:15, 3:19
**afterwards** [1] - 17:20
**agency** [15] - 8:16, 8:17, 8:18, 19:22, 20:22, 20:23, 22:18, 22:23, 23:23, 25:10, 25:25, 35:22, 45:8, 52:25
**agenda** [1] - 4:19
**agent** [1] - 28:8
**ago** [3] - 7:25, 16:6, 49:1
**agree** [1] - 26:6
**agreeable** [1] - 5:7
**agreed** [1] - 8:8
**agreement** [6] - 19:17, 30:3, 30:9, 32:10, 45:17, 49:13
**ahead** [7] - 3:12, 4:8, 10:2, 12:13, 29:6, 31:25, 48:4
**akin** [1] - 24:17
**al** [2] - 1:8, 3:14
**ALBERT** [1] - 1:14
**allegations** [1] - 26:5
**allege** [1] - 25:18
**alleges** [1] - 25:23
**allow** [4] - 44:6, 44:14, 47:22, 52:15
**allowed** [5] - 16:8, 31:25, 51:14, 54:2, 54:16
**allowing** [1] - 35:8
**allows** [1] - 50:18
**amend** [11] - 5:10, 43:8, 43:24, 44:6,

47:18, 47:22, 48:4, 48:7, 48:15, 48:18, 50:14
**amended** [2] - 45:11, 56:17
**amendment** [1] - 44:19
**amount** [2] - 40:22, 41:8
**amplify** [1] - 47:7
**answer** [10] - 5:9, 5:10, 10:13, 43:8, 43:25, 44:19, 44:24, 47:6, 57:2, 57:4
**answering** [1] - 47:2
**anticipate** [1] - 42:6
**anticipated** [1] - 6:18
**anticipation** [2] - 27:15, 28:17
**apologize** [2] - 38:9, 44:4
**appear** [2] - 34:9, 35:18
**appearance** [1] - 9:24
**appearing** [3] - 3:6, 4:8, 4:12
**application** [1] - 34:8
**applied** [5] - 8:11, 37:5, 37:16, 38:15, 42:1
**applies** [1] - 52:8
**appointed** [1] - 4:5
**appreciate** [5] - 16:9, 22:14, 23:2, 41:23, 54:25
**appreciating** [1] - 52:18
**approach** [1] - 40:23
**appropriate** [3] - 7:1, 29:1, 40:20
**April** [1] - 6:16
**archival** [1] - 50:9
**areas** [3] - 12:2, 13:25, 50:4
**argue** [1] - 43:5
**arose** [2] - 19:18, 44:24
**assert** [1] - 12:19
**asserted** [1] - 14:13
**assessment** [1] - 33:3
**assessments** [1] - 45:1
**assist** [2] - 9:6, 15:11
**assistance** [2] - 7:12, 20:10
**assistant** [3] - 4:6, 4:10, 9:5
**associated** [3] - 15:13, 17:8, 25:21
**astray** [1] - 22:3

**attached** [1] - 49:15
**attempted** [2] - 37:19, 37:24
**attempting** [1] - 47:5
**attempts** [2] - 5:15, 20:3
**attorney** [9] - 4:6, 4:10, 5:17, 9:5, 27:14, 27:24, 30:22, 30:24, 54:2
**attorneys** [1] - 52:16
**Attorneys** [2] - 50:7, 52:13
**audio** [1] - 59:7
**August** [5] - 41:14, 41:15, 49:6, 56:24, 57:4
**authority** [1] - 31:20
**authorize** [1] - 31:19
**authorized** [1] - 16:2
**automatically** [1] - 33:10
**available** [5] - 9:15, 9:18, 41:16, 41:18, 41:20
**Avenue** [2] - 2:4, 2:8

## B

**background** [1] - 6:6
**based** [3] - 6:12, 7:20, 43:24
**basis** [2] - 8:20, 13:13
**bear** [1] - 16:3
**beaten** [1] - 53:1
**become** [1] - 53:11
**becomes** [2] - 51:11, 55:17
**BEFORE** [1] - 1:20
**begin** [1] - 3:5
**begun** [1] - 42:7
**behalf** [3] - 4:2, 6:25, 30:24
**belief** [1] - 34:14
**believes** [2] - 27:14, 54:2
**below** [1] - 59:3
**best** [2] - 36:18, 57:16
**between** [4] - 17:13, 20:4, 30:22, 46:2
**beyond** [2] - 46:3, 48:10
**big** [2] - 43:11, 43:12
**bit** [6] - 6:6, 22:2, 23:4, 36:22, 37:6, 40:11
**black** [1] - 50:6
**Blaesing** [20] - 2:16, 4:4, 4:7, 5:25, 9:17, 9:21, 12:9, 13:21, 38:2, 39:4, 39:13,

2

41:2, 41:17, 42:4, 42:24, 43:3, 44:16, 44:21, 57:11, 57:13
**BLAESING** [12] - 4:4, 9:23, 11:13, 38:5, 39:3, 39:6, 39:15, 39:17, 41:17, 42:5, 57:14, 58:3
**bLAESING** [1] - 38:25
**blending** [1] - 5:19
**blue** [3] - 49:19, 49:21, 50:4
**board** [1] - 11:9
**BOSWORTH** [2] - 2:3, 2:7
**branch** [4] - 24:14, 24:17, 25:25, 26:1
**break** [1] - 12:5
**brief** [2] - 18:8, 56:14
**briefing** [2] - 28:24, 56:15
**briefly** [1] - 37:15
**bring** [1] - 36:9
**bringing** [1] - 46:2
**brings** [2] - 15:8, 51:10
**broad** [1] - 18:19
**broader** [3] - 17:7, 47:15, 56:7
**Broadway** [2] - 2:16, 2:20
**broken** [2] - 25:13, 25:19
**brother** [1] - 25:7
**bulk** [1] - 42:23
**bullet** [3] - 12:2, 15:20, 24:22
**button** [1] - 38:9
**bye** [1] - 58:1

---

# C

**cannot** [4] - 38:1, 40:7, 42:5, 45:9
**capture** [2] - 18:19, 18:22
**car** [1] - 24:17
**care** [16] - 16:25, 17:5, 17:6, 17:11, 17:22, 18:1, 18:13, 18:22, 19:3, 25:14, 25:21, 29:16, 37:8, 38:18, 44:25, 45:14
**Care** [1] - 24:25
**case** [30] - 3:10, 3:14, 6:15, 6:23, 9:7, 9:25, 17:22, 17:24, 18:10, 19:7, 26:14, 26:17, 32:22, 32:25, 33:1, 33:18, 33:20, 34:2,

34:4, 34:12, 34:15, 35:25, 36:4, 45:1, 53:1, 55:1, 55:21, 56:3
**cases** [5] - 10:20, 18:2, 21:20, 27:23, 28:6
**caseworker** [4] - 18:8, 30:18, 33:2, 33:9
**caseworkers** [2] - 17:14, 26:19
**catching** [1] - 21:7
**categorical** [1] - 11:15
**categorically** [1] - 12:17
**caveat** [1] - 39:25
**cell** [21] - 19:15, 19:17, 19:21, 19:23, 19:24, 20:13, 20:14, 20:21, 20:22, 21:1, 21:3, 21:15, 21:21, 21:25, 22:3, 22:19, 22:20, 22:22, 23:7, 24:4, 26:15
**cellular** [1] - 22:3
**certain** [7] - 6:19, 7:23, 8:8, 9:14, 31:16, 33:18, 41:23
**certainly** [3] - 9:19, 24:1, 42:11
**Certificates** [1] - 59:19
**certification** [2] - 24:16, 26:5
**certified** [4] - 17:18, 24:13, 32:20, 59:12
**certifier** [3] - 17:13, 26:4, 33:5
**certify** [1] - 59:3
**cetera** [1] - 9:1
**chalk** [1] - 30:9
**chance** [1] - 56:14
**changed** [1] - 33:15
**Chapman** [1] - 3:14
**CHAPMAN** [1] - 1:8
**chart** [1] - 21:1
**charts** [8] - 19:19, 20:23, 21:11, 22:18, 23:14, 23:16, 23:24, 24:6
**check** [1] - 40:24
**chew** [1] - 28:21
**Child** [3] - 15:22, 24:13, 32:20
**child** [18] - 15:25, 16:15, 18:7, 18:9, 18:10, 18:11, 18:23, 18:25, 25:8, 32:18, 32:22, 33:4, 53:1, 53:2, 53:4, 53:6, 53:7

**child's** [1] - 32:25
**children** [30] - 14:17, 15:1, 15:10, 15:15, 16:4, 16:5, 16:6, 16:11, 17:1, 17:4, 17:6, 17:8, 17:12, 17:14, 17:23, 18:22, 19:3, 19:5, 19:8, 24:13, 26:2, 29:16, 30:11, 36:23, 37:9, 37:21, 44:25, 45:9, 45:14, 50:24
**children's** [1] - 47:9
**chipping** [1] - 42:20
**civil** [1] - 3:13
**Claim** [1] - 24:23
**claim** [15] - 24:12, 25:7, 25:8, 25:10, 25:13, 26:8, 51:10, 52:11, 53:5, 53:9, 53:23, 54:1, 54:3, 55:7, 55:16
**claimants** [1] - 54:22
**claiming** [1] - 28:16
**claims** [5] - 27:11, 27:14, 37:21, 50:25, 54:4
**clarified** [1] - 39:10
**clarifies** [1] - 54:25
**clarify** [2] - 19:12, 46:22
**clarity** [1] - 23:4
**clear** [3] - 13:7, 38:19, 54:10
**clearly** [4] - 31:18, 48:12, 52:7, 52:13
**click** [1] - 33:21
**client** [6] - 25:25, 51:10, 52:25, 53:11, 55:17, 55:21
**clients** [9] - 49:22, 50:5, 51:9, 53:12, 54:20, 55:3, 55:9, 56:4, 56:21
**clipped** [1] - 18:11
**closely** [1] - 50:11
**code** [1] - 35:15
**collect** [1] - 11:4
**collection** [1] - 10:9
**comment** [1] - 49:23
**commercial** [8] - 51:7, 53:20, 53:21, 54:9, 54:10, 56:13, 56:19, 56:20
**commit** [1] - 42:5
**committed** [2] - 15:22, 45:1
**communicating** [2] - 20:1, 48:6
**communications** [3] -

27:18, 27:25, 37:8
**compel** [2] - 28:22, 28:25
**competitive** [1] - 50:22
**compilation** [1] - 8:22
**compile** [1] - 25:12
**complaint** [7] - 5:11, 16:12, 17:17, 25:18, 25:23, 29:17, 45:11
**complaints** [4] - 15:14, 15:24, 24:12, 26:9
**Complaints** [1] - 24:25
**complete** [8] - 6:23, 29:20, 29:22, 29:25, 30:2, 42:9, 42:17, 51:6
**completed** [1] - 36:9
**computer** [2] - 15:8, 15:10
**concept** [1] - 45:2
**concern** [15] - 14:15, 15:18, 16:17, 19:3, 29:11, 29:14, 44:24, 46:7, 47:11, 50:4, 54:15, 54:19, 55:11, 55:15, 56:8
**concerned** [1] - 37:6
**concerning** [2] - 45:14, 47:9
**concerns** [16] - 15:10, 17:3, 19:4, 44:8, 44:10, 44:19, 45:6, 45:14, 45:15, 46:3, 46:7, 46:9, 47:9, 47:14, 49:20
**conclude** [1] - 12:10
**conclusion** [3] - 44:5, 47:22, 47:24
**condition** [7] - 16:25, 17:23, 18:1, 18:13, 18:22, 37:8, 45:14
**conditions** [8] - 17:12, 31:16, 44:7, 44:13, 47:24, 48:3, 48:7, 48:16
**conducted** [2] - 28:17, 41:3
**confer** [9] - 6:21, 11:4, 20:15, 36:18, 37:1, 42:11, 48:5, 48:24, 49:3
**conference** [11] - 6:22, 40:14, 40:24, 40:25, 41:13, 41:22, 41:25, 42:12, 42:15, 49:6, 56:24
**conferral** [5] - 6:12,

14:23, 40:1, 41:25, 42:25
**conferred** [1] - 6:9
**conferring** [1] - 38:20
**confess** [1] - 46:23
**confidence** [1] - 42:18
**confident** [2] - 20:6, 20:7
**confidential** [6] - 15:21, 16:7, 29:13, 29:20, 35:10, 54:7
**confidentiality** [3] - 10:15, 11:10, 30:22
**confirm** [1] - 24:5
**confirmed** [1] - 24:8
**conformed** [1] - 59:11
**confusing** [2] - 12:15, 12:16
**connection** [1] - 21:11
**consider** [2] - 13:12, 18:20
**consistent** [1] - 38:23
**consists** [1] - 10:9
**contact** [4] - 21:10, 22:11, 23:7, 24:4
**contacted** [2] - 53:3, 54:1
**contacting** [2] - 53:22, 55:5
**contended** [1] - 44:11
**content** [1] - 40:22
**context** [4] - 6:15, 9:22, 18:2, 50:22
**contract** [5] - 10:18, 30:16, 30:18, 32:3, 40:4
**contracts** [1] - 31:23
**contractual** [1] - 31:22
**control** [1] - 39:12
**conversation** [1] - 39:14
**cooperate** [1] - 30:23
**coordinate** [4] - 36:1, 36:8, 38:22, 48:6
**copies** [1] - 50:9
**correct** [18] - 8:10, 14:3, 17:2, 25:3, 28:18, 28:19, 30:4, 31:10, 45:22, 46:14, 48:18, 50:22, 53:1, 53:16, 53:17, 53:18, 59:4
**correctly** [1] - 16:24
**counsel** [20] - 3:16, 5:17, 9:25, 11:3, 11:4, 11:14, 12:16, 12:25, 19:11, 27:18, 27:22, 28:1, 28:7, 36:1, 40:19, 46:21, 52:3, 52:10, 54:22,

55:2

**count** [1] - 7:10
**County** [4] - 24:13, 25:10, 26:9
**course** [4] - 21:18, 28:17, 36:10, 55:23
**COURT** [148] - 1:1, 1:21, 1:23, 3:4, 3:9, 3:12, 3:15, 3:21, 3:24, 4:3, 4:7, 4:11, 4:14, 4:16, 5:12, 5:18, 5:22, 5:24, 7:14, 8:1, 8:4, 8:13, 9:10, 9:21, 11:6, 11:17, 11:24, 12:4, 12:13, 13:6, 13:11, 13:16, 14:1, 14:4, 15:5, 15:12, 15:19, 16:9, 16:16, 16:18, 17:5, 17:16, 17:25, 18:18, 19:1, 19:10, 20:6, 20:17, 21:5, 21:13, 21:15, 21:24, 22:5, 22:7, 22:9, 22:13, 23:1, 23:11, 23:16, 23:20, 24:3, 24:19, 24:24, 25:2, 25:5, 25:15, 25:18, 26:6, 27:5, 27:7, 27:17, 28:4, 28:10, 28:15, 28:20, 29:2, 29:6, 29:21, 29:24, 30:2, 30:8, 30:15, 31:3, 31:6, 31:14, 32:3, 32:9, 32:13, 33:13, 33:25, 34:6, 34:18, 34:22, 34:25, 35:17, 36:19, 37:14, 38:3, 38:6, 38:11, 38:13, 39:1, 39:5, 39:9, 39:16, 40:21, 41:12, 41:19, 41:22, 42:14, 43:1, 43:6, 43:13, 43:19, 44:1, 44:4, 44:21, 45:12, 45:17, 46:1, 46:6, 46:10, 46:13, 46:16, 46:18, 47:13, 48:10, 48:14, 48:20, 49:2, 49:5, 49:9, 50:15, 50:20, 51:2, 51:25, 52:12, 53:17, 54:14, 54:24, 55:20, 56:1, 56:7, 56:22, 57:1, 57:11, 57:13, 57:15
**Court** [12] - 6:22, 6:25, 7:4, 7:7, 7:12, 36:24, 47:5, 49:16, 50:2, 52:21, 56:14, 59:19
**court** [1] - 50:16

**COURTROOM** [2] - 3:10, 3:13
**cover** [2] - 21:8, 29:24
**covered** [1] - 53:15
**covers** [1] - 19:13
**CPS** [1] - 33:3
**create** [2] - 22:24, 42:10
**created** [3] - 23:17, 33:22, 34:17
**cross** [1] - 59:8
**cross-talk** [1] - 59:8
**CRR** [2] - 1:24, 59:18
**culled** [5] - 10:12, 37:6, 38:18, 39:21, 42:2
**culling** [3] - 8:24, 9:11, 14:17
**custodians** [3] - 8:11, 8:15, 10:10

## D

**dashes** [2] - 25:3, 26:8
**data** [1] - 42:1
**database** [7] - 32:19, 32:25, 35:9, 35:15, 35:20, 36:3, 39:20
**databases** [2] - 8:17, 9:14
**date** [10] - 11:17, 16:6, 33:8, 35:5, 37:10, 37:12, 40:8, 40:16, 42:13, 42:14
**DATED** [1] - 59:14
**dates** [3] - 17:17, 35:11, 40:25
**days** [4] - 6:9, 7:6, 17:16, 41:6
**deadline** [4] - 40:20, 41:1, 41:24, 57:21
**deadlines** [2] - 36:7, 41:23
**deal** [3] - 25:11, 43:7, 43:20
**dealing** [1] - 40:21
**dealt** [1] - 43:10
**decide** [1] - 55:16
**decision** [1] - 14:6
**deemed** [1] - 18:24
**DEFENDANT** [3] - 2:11, 2:15, 2:19
**Defendant** [1] - 1:15
**defendant** [5] - 3:5, 3:6, 3:25, 4:25, 6:15
**Defendants** [1] - 1:9
**defendants** [28] - 4:2, 5:9, 6:7, 7:1, 7:19, 10:6, 10:17, 11:16, 14:16, 14:25, 16:24,

20:14, 20:15, 22:4, 22:12, 22:23, 23:8, 24:5, 27:19, 29:23, 30:4, 30:7, 36:7, 41:18, 44:8, 44:10, 47:23, 48:15
**defendants'** [2] - 43:24, 47:18
**defense** [9] - 5:13, 18:20, 30:15, 30:19, 30:20, 31:15, 31:21, 32:1, 32:3
**deficiency** [1] - 25:14
**defined** [1] - 55:15
**definition** [1] - 51:15
**delay** [4] - 7:2, 7:15, 7:23, 8:14
**deliberate** [3] - 25:24, 26:3, 26:7
**delineate** [1] - 56:13
**delineated** [1] - 54:8
**demands** [1] - 9:7
**department** [1] - 28:8
**Department** [6] - 4:2, 18:15, 29:14, 30:19, 35:20, 35:21
**DEPARTMENT** [2] - 1:11, 2:11
**depositions** [1] - 31:1
**DEPUTY** [2] - 3:10, 3:13
**derived** [2] - 19:20, 56:6
**described** [4] - 19:11, 32:3, 33:4, 47:24
**describes** [2] - 11:7, 33:5
**describing** [3] - 10:8, 25:3, 39:19
**designated** [2] - 32:23, 51:17
**detail** [1] - 5:2
**determination** [1] - 18:16
**determine** [1] - 33:14
**device** [1] - 22:3
**DHS** [10] - 15:17, 19:20, 27:23, 29:15, 36:17, 44:9, 44:11, 45:9, 46:13, 53:6
**difference** [1] - 46:1
**different** [4] - 16:20, 22:1, 32:19, 41:9
**DIGITALLY** [1] - 1:17
**digitally** [1] - 59:11
**DIGITALLY-RECORDED** [1] - 1:17
**dilemma** [1] - 55:19
**disagreement** [1] -

32:10
**disagreements** [1] - 46:20
**disclose** [2] - 44:11, 55:7
**disclosing** [2] - 54:13, 56:18
**disclosure** [1] - 52:15
**discover** [1] - 18:5
**discoverable** [1] - 27:16
**discovered** [1] - 51:10
**discovery** [27] - 1:18, 3:14, 4:24, 5:15, 6:3, 6:23, 7:8, 7:9, 7:11, 7:13, 8:14, 9:7, 10:1, 10:5, 14:12, 15:13, 16:11, 19:25, 26:17, 33:7, 34:11, 40:20, 41:24, 42:17, 51:10, 55:22, 57:21
**discuss** [6] - 5:5, 7:7, 43:5, 43:14, 48:5, 53:7
**discussed** [4] - 8:8, 36:15, 40:10, 40:18
**discussion** [7] - 4:23, 5:8, 5:13, 5:15, 38:16, 43:12, 50:1
**discussions** [1] - 17:3
**dismiss** [1] - 37:24
**dispute** [5] - 7:13, 7:18, 13:25, 22:14, 23:2
**disputes** [1] - 11:5
**dissemination** [1] - 54:6
**distinction** [2] - 16:10, 46:2
**DISTRICT** [3] - 1:1, 1:2, 1:21
**division** [2] - 18:6, 18:16
**DIVISION** [1] - 1:3
**doable** [1] - 7:2
**doc** [1] - 55:20
**document** [8] - 7:9, 10:19, 42:7, 49:23, 53:24, 54:5, 56:5, 56:8
**documentation** [1] - 46:8
**documented** [3] - 44:25, 45:7, 45:24
**documents** [61] - 7:22, 8:17, 8:21, 8:22, 8:25, 9:11, 9:18, 10:4, 10:6, 10:12, 10:14, 10:21, 11:1, 11:3, 12:18,

12:23, 13:3, 13:18, 14:12, 14:17, 14:24, 15:1, 15:4, 15:8, 15:9, 16:25, 17:6, 17:7, 17:11, 18:5, 19:20, 19:21, 22:24, 26:18, 26:20, 36:23, 37:3, 37:7, 40:8, 40:10, 40:18, 40:22, 41:4, 42:2, 42:11, 42:16, 46:25, 47:8, 47:10, 51:8, 51:14, 52:5, 53:19, 54:2, 54:17, 55:3, 55:6, 55:8, 55:13, 55:21, 55:22
**DOJ** [6] - 10:19, 30:15, 30:22, 30:24, 31:17, 32:3
**done** [3] - 19:8, 27:15, 32:2
**dovetail** [1] - 34:18
**down** [12] - 8:25, 10:12, 12:5, 23:3, 33:20, 34:8, 34:12, 35:2, 37:7, 40:2, 40:25
**downloaded** [1] - 9:18
**draft** [4] - 6:7, 6:10, 50:4, 54:24
**drafts** [1] - 6:13
**drop** [5] - 33:20, 34:8, 34:11, 35:2
**drop-down** [4] - 33:20, 34:8, 35:2
**due** [1] - 59:8
**Duncan** [7] - 14:19, 15:25, 17:1, 34:1, 35:25, 36:4, 44:8
**Duncan-Raygosa** [6] - 15:25, 17:1, 34:1, 35:25, 36:4, 44:8
**Duncan-Raygosas** [1] - 14:19
**during** [3] - 14:22, 17:19, 44:24
**duty** [2] - 27:12, 27:13

## E

**e-mail** [11] - 10:9, 17:13, 17:22, 18:7, 18:8, 26:22, 37:24, 40:8, 49:18, 50:13
**e-mails** [4] - 11:1, 49:11, 49:12, 49:17
**effect** [2] - 25:19, 56:23
**efficient** [2] - 10:20, 40:17

4

**efficiently** [2] - 10:2, 40:5
**effort** [2] - 38:23, 57:16
**efforts** [3] - 26:14, 26:17, 27:3
**either** [7] - 8:21, 9:5, 35:20, 35:21, 48:1, 57:4, 57:9
**electronic** [1] - 37:18
**electronically** [1] - 37:18
**eliminate** [1] - 38:18
**eliminated** [2] - 21:1, 37:8
**email** [1] - 40:9
**employee** [3] - 31:16, 31:20, 32:2
**employees** [5] - 22:19, 27:19, 29:3, 31:16, 31:19
**end** [2] - 42:19, 43:21
**engaged** [2] - 8:23, 9:5
**engaging** [2] - 10:17, 40:4
**ensure** [1] - 29:19
**enter** [1] - 48:4
**entered** [2] - 35:5, 35:12
**entire** [2] - 25:9, 35:9
**entirety** [2] - 35:7, 47:3
**entitled** [3] - 31:21, 52:5, 59:5
**error** [2] - 45:4, 50:10
**errors** [1] - 24:17
**ESI** [17] - 6:9, 7:5, 7:10, 7:24, 10:9, 11:10, 14:9, 14:21, 17:13, 18:6, 26:15, 26:22, 27:3, 36:19, 36:21, 37:11, 42:21
**especially** [3] - 20:2, 26:4, 47:1
**essential** [1] - 7:17
**essentially** [3] - 33:24, 43:23, 49:15
**estimated** [1] - 40:12
**et** [3] - 1:8, 3:14, 9:1
**ETHAN** [1] - 1:5
**EUGENE** [1] - 1:3
**Eugene** [1] - 1:8
**evaluate** [2] - 28:3, 33:14
**event** [5] - 12:25, 13:18, 14:25, 28:22, 37:1
**evidence** [2] - 16:10, 17:7

**evidently** [1] - 56:10
**exact** [1] - 8:24
**exactly** [5] - 7:17, 23:22, 24:2, 50:23, 52:19
**example** [6] - 12:24, 16:3, 18:4, 52:25, 53:3, 53:23
**exceeding** [1] - 31:17
**except** [1] - 51:20
**exchanges** [2] - 17:13, 17:22
**excluding** [1] - 14:25
**exist** [3] - 23:18, 24:6, 24:8
**expand** [1] - 51:23
**expanded** [1] - 54:7
**expect** [7] - 17:21, 24:3, 36:7, 38:22, 41:2, 41:25, 57:17
**experience** [2] - 30:21, 52:3
**expert** [3] - 7:8, 7:11, 36:9
**Expire** [1] - 59:19
**explained** [1] - 54:18
**explanation** [1] - 51:6
**expressed** [1] - 12:16
**extending** [1] - 54:10
**extraordinarily** [1] - 16:23
**extraordinary** [1] - 14:15
**Eyes** [2] - 50:8, 52:14

## F

**faced** [1] - 9:2
**fact** [5] - 6:23, 31:7, 31:20, 33:15, 45:8
**factors** [1] - 36:4
**fail** [1] - 44:11
**failing** [3] - 16:9, 22:13, 23:1
**failure** [4] - 5:9, 24:18, 25:20
**families** [1] - 26:2
**family** [1] - 32:20
**Farm** [1] - 50:9
**fashion** [1] - 32:15
**fast** [1] - 59:8
**February** [2] - 6:8, 6:9
**felt** [1] - 49:25
**few** [1] - 39:24
**figure** [2] - 9:2, 20:9
**file** [19] - 29:18, 29:20, 32:20, 32:22, 32:25, 34:1, 34:2, 34:6, 34:11, 34:20, 35:2, 35:15, 35:23, 35:24,

35:25, 36:4, 53:9, 59:7
**filed** [3] - 9:24, 49:14
**files** [11] - 19:7, 21:22, 22:1, 29:2, 29:23, 30:7, 32:19, 32:21, 32:24, 33:8, 38:16
**fill** [1] - 9:17
**final** [3] - 41:3, 42:2
**finished** [1] - 39:9
**firm** [3] - 4:5, 4:10, 10:19
**first** [12] - 3:17, 6:17, 8:5, 14:4, 25:1, 25:3, 29:6, 32:9, 32:14, 40:23, 44:6, 47:17
**five** [2] - 7:25, 16:6
**flows** [2] - 37:11, 37:13
**focused** [1] - 55:11
**folks** [1] - 48:24
**Folks** [1] - 50:8
**follow** [1] - 19:25
**follow-up** [1] - 19:25
**followed** [1] - 21:24
**following** [3] - 34:19, 52:20, 55:18
**FOR** [6] - 1:2, 2:3, 2:7, 2:11, 2:15, 2:19
**forcing** [1] - 31:24
**foregoing** [1] - 59:3
**forever** [1] - 8:16
**form** [6] - 19:22, 49:11, 49:12, 49:15, 49:19, 49:23
**formal** [2] - 28:11, 45:10
**forward** [2] - 41:1, 41:23
**foster** [9] - 14:18, 17:1, 17:12, 24:13, 26:2, 26:9, 29:16, 32:20
**Foster** [1] - 24:25
**founded** [1] - 34:15
**four** [2] - 40:14, 41:14
**frame** [1] - 36:16
**framed** [1] - 29:7
**FTR** [1] - 59:5
**FTR-recorded** [1] - 59:5
**full** [3] - 3:17, 35:10, 51:6
**fully** [1] - 5:9
**functioning** [1] - 24:16
**furnished** [1] - 16:12
**future** [12] - 24:9, 33:11, 49:22, 50:5, 51:9, 53:11, 53:12,

54:20, 55:18, 56:4, 56:20

## G

**general** [13] - 4:6, 4:10, 6:18, 8:4, 11:7, 12:6, 12:8, 12:14, 13:9, 13:17, 14:9, 14:10, 14:11
**generally** [3] - 7:22, 8:8, 36:19
**generals** [2] - 5:17, 9:6
**gist** [1] - 53:13
**given** [1] - 44:13
**glance** [1] - 40:23
**goal** [2] - 10:4, 40:5
**grant** [2] - 48:4, 48:15
**granted** [1] - 48:8
**great** [2] - 4:21, 25:11
**guess** [1] - 34:7

## H

**habit** [1] - 52:20
**handling** [1] - 43:15
**hands** [1] - 39:20
**hanger** [1] - 53:1
**happy** [5] - 8:2, 9:4, 9:5, 37:4, 49:2
**harmed** [1] - 50:24
**Harry** [3] - 2:20, 4:9, 9:24
**hashed** [1] - 48:11
**hear** [8] - 4:8, 31:6, 32:9, 32:13, 42:16, 44:15, 45:18
**heard** [3] - 29:8, 45:20, 59:8
**hearing** [5] - 3:14, 6:24, 11:8, 16:24, 49:16
**Hearing** [1] - 1:18
**hello** [1] - 3:21
**help** [4] - 8:23, 11:5, 40:4, 48:2
**helpful** [4] - 21:18, 21:23, 28:2, 33:23
**helping** [1] - 11:9
**hence** [1] - 16:7
**Herbold** [1] - 4:5
**HERBOLD** [2] - 2:15, 2:19
**hide** [1] - 51:18
**hiding** [3] - 45:3, 45:5, 45:10
**highlighted** [2] - 49:21, 50:6
**highlighting** [1] - 50:4

**highlights** [1] - 49:19
**highly** [1] - 15:21
**hired** [2] - 31:22, 54:3
**hit** [1] - 38:9
**hits** [1] - 39:23
**hold** [9] - 26:24, 26:25, 27:8, 27:10, 27:13, 28:7, 28:9, 50:20
**holds** [4] - 26:13, 26:21, 27:22, 27:24
**home** [44] - 14:18, 15:1, 15:10, 15:15, 15:18, 15:25, 16:3, 16:4, 16:5, 16:11, 16:15, 17:1, 17:4, 17:6, 17:9, 17:12, 17:14, 17:23, 18:7, 18:11, 18:22, 19:4, 19:6, 19:8, 19:9, 25:9, 25:17, 25:22, 30:11, 33:2, 33:5, 33:6, 35:25, 36:24, 37:9, 37:21, 44:9, 44:25, 45:9, 45:15, 46:8, 50:25, 53:23
**homes** [1] - 24:13
**Honor** [77] - 3:20, 3:22, 4:4, 4:22, 5:23, 6:5, 9:23, 10:13, 11:5, 11:19, 11:25, 12:12, 14:7, 14:10, 15:16, 16:22, 17:10, 17:18, 18:4, 18:21, 19:16, 20:11, 21:10, 22:2, 22:11, 23:10, 23:13, 24:11, 25:4, 25:23, 26:11, 27:21, 29:5, 29:11, 29:25, 30:13, 30:17, 31:12, 32:7, 32:11, 32:17, 34:3, 34:10, 34:21, 36:15, 36:21, 38:5, 38:8, 38:25, 39:3, 39:15, 40:3, 40:13, 40:19, 41:10, 41:20, 42:5, 42:22, 43:11, 43:17, 43:24, 44:17, 45:13, 46:5, 46:12, 48:19, 49:24, 50:17, 52:20, 55:24, 56:25, 57:8, 57:10, 57:14, 57:25, 58:2, 58:4
**HONORABLE** [1] - 1:20
**honorific** [1] - 3:17
**hopeful** [2] - 19:16, 42:24
**hoping** [2] - 43:13, 57:20

**hot** [1] - 39:16
**HUMAN** [1] - 1:11
**Humiston** [3] - 1:24, 59:17, 59:18
**hundred** [1] - 30:8

# I

**idea** [1] - 25:9
**ideal** [2] - 8:19, 41:7
**identification** [1] - 15:3
**identified** [3] - 45:19, 45:24, 47:12
**identifies** [1] - 54:15
**identify** [5] - 37:3, 44:9, 45:15, 55:6, 57:21
**identifying** [3] - 14:24, 28:20, 44:8
**identity** [2] - 46:11, 46:13
**illegitimate** [1] - 54:1
**imagine** [1] - 17:19
**implying** [1] - 52:20
**important** [1] - 56:12
**impression** [1] - 21:6
**IN** [1] - 1:1
**inclined** [3] - 12:8, 44:6, 44:14
**include** [4] - 23:14, 32:24, 50:8, 52:9
**included** [2] - 22:20, 56:12
**includes** [3] - 37:18, 53:21, 54:12
**including** [5] - 7:10, 22:11, 29:20, 54:19, 54:20
**inconsistent** [2] - 45:19, 50:2
**incredibly** [1] - 33:23
**indicated** [2] - 16:20, 59:7
**indifference** [3] - 25:24, 26:4, 26:7
**indiscernible** [19] - 4:25, 5:1, 6:6, 7:10, 15:7, 16:13, 17:16, 21:14, 22:9, 26:13, 29:2, 32:12, 34:15, 40:18, 44:9, 44:10, 44:11, 54:21, 59:7
**indiscernible)** [1] - 22:8
**individual** [3] - 14:13, 15:17, 29:17
**individuals** [1] - 27:20
**informally** [1] - 28:24
**information** [35] -

8:18, 8:24, 14:19, 15:21, 19:14, 21:11, 22:12, 23:8, 23:14, 24:4, 26:7, 26:12, 26:19, 27:4, 29:13, 29:15, 29:18, 31:1, 32:15, 32:17, 35:6, 35:8, 35:11, 35:12, 35:23, 36:11, 38:19, 45:3, 45:5, 45:10, 51:11, 52:22, 53:8, 56:6
**Information** [1] - 24:21
**informing** [1] - 26:23
**initial** [2] - 33:15, 43:25
**initiated** [1] - 55:22
**injuries** [1] - 26:1
**injury** [3] - 15:24, 17:4, 24:12
**insert** [1] - 49:25
**inspect** [1] - 24:18
**inspection** [6] - 5:3, 7:15, 34:20, 35:19, 36:2
**instance** [1] - 32:23
**intend** [1] - 13:22
**intended** [1] - 54:9
**interest** [1] - 52:6
**interesting** [2] - 30:18, 33:7
**interrelated** [1] - 5:20
**interrogatories** [10] - 5:9, 11:23, 43:1, 43:8, 43:20, 43:23, 45:23, 47:1, 48:17, 48:23
**interrogatory** [3] - 47:1, 47:6, 48:21
**interrupt** [1] - 44:4
**interrupting** [1] - 39:7
**intertwined** [1] - 43:23
**intervention** [1] - 50:16
**interviewed** [3] - 33:4, 53:3, 53:4
**introduce** [1] - 3:16
**introduced** [1] - 42:3
**investigations** [1] - 32:22
**issue** [24] - 9:10, 9:22, 19:18, 20:7, 24:9, 28:5, 28:6, 28:14, 28:23, 29:7, 32:16, 36:14, 37:4, 38:24, 39:10, 39:12, 43:4, 46:22, 49:7, 50:9, 54:19, 56:3, 56:14, 56:23

**issued** [5] - 4:24, 20:14, 21:21, 22:3, 49:16
**issues** [7] - 4:18, 5:19, 9:15, 10:15, 42:23, 48:23, 48:25
**item** [3] - 14:1, 24:19, 25:2
**items** [2] - 6:19, 26:8
**itself** [2] - 27:1, 47:2

# J

**January** [1] - 13:23
**JC** [3] - 25:25, 32:23, 34:5
**Jill** [4] - 4:1, 5:14, 12:11, 13:24
**jill** [1] - 2:12
**JOE** [1] - 1:14
**join** [1] - 38:7
**joined** [1] - 38:3
**judge** [1] - 46:23
**JUDGE** [1] - 1:21
**Judge** [9] - 3:4, 3:11, 31:9, 31:11, 31:12, 48:9, 49:10, 55:11
**July** [3] - 1:7, 3:1, 59:14
**juncture** [1] - 49:24
**June** [12] - 5:1, 10:8, 11:18, 11:20, 11:21, 12:1, 14:1, 19:12, 32:4, 50:13
**jury** [1] - 18:14
**JUSTICE** [1] - 2:11
**Justice** [6] - 4:2, 18:16, 29:15, 30:19, 35:20, 35:21

# K

**KASUBHAI** [1] - 1:20
**Kasubhai** [1] - 3:4
**keep** [2] - 42:20, 55:5
**Kellie** [3] - 1:24, 59:17, 59:18
**Kellie_Humiston@ ord.uscourts.gov** [1] - 1:25
**kept** [1] - 21:18
**key** [2] - 35:14, 38:21
**kid** [1] - 53:11
**Kids** [4] - 32:5, 32:19, 34:11, 35:15
**Kids'** [1] - 35:9
**KIM** [1] - 1:8
**kind** [7] - 5:20, 9:16, 10:18, 13:14, 16:12, 37:24, 53:10

**knowledge** [3] - 15:17, 44:12, 53:5
**known** [1] - 25:24

# L

**lack** [3] - 26:15, 30:21, 30:23
**laid** [3] - 19:12, 25:3, 48:16
**Lane** [4] - 24:13, 25:10, 26:8, 26:9
**language** [8] - 5:6, 7:20, 19:11, 49:24, 50:1, 50:12, 54:25, 56:9
**large** [2] - 10:21, 40:22
**last** [2] - 9:24, 49:7
**launching** [1] - 33:22
**Lauren** [4] - 2:16, 4:4, 39:3, 41:17
**law** [2] - 4:5, 16:8
**lawsuit** [1] - 50:9
**leading** [2] - 5:12, 5:15
**learned** [1] - 7:5
**least** [9] - 7:6, 12:15, 28:21, 31:8, 40:22, 48:21, 55:4, 56:23
**leave** [1] - 36:1
**legal** [4] - 13:13, 28:7, 28:8, 55:16
**legitimate** [1] - 53:25
**letter** [19] - 7:12, 11:15, 11:18, 11:20, 11:21, 12:1, 13:23, 14:2, 19:12, 19:18, 20:16, 24:20, 26:11, 31:8, 32:4, 48:25, 54:19
**Levi** [1] - 3:14
**LEVI** [1] - 1:5
**light** [2] - 42:19, 49:25
**limit** [2] - 40:6, 51:7
**limited** [1] - 9:20
**limiting** [2] - 36:3, 51:17
**line** [5] - 7:3, 8:2, 14:7, 14:8
**list** [3] - 19:21, 51:17, 54:11
**listed** [1] - 22:10
**lists** [2] - 21:17, 22:18
**literature** [1] - 24:7
**litigating** [1] - 18:2
**litigation** [16] - 26:13, 26:21, 26:24, 26:25, 27:8, 27:9, 27:10, 27:13, 27:15, 27:22,

27:24, 28:7, 28:9, 28:18, 51:24
**living** [1] - 17:14
**Local** [1] - 27:2
**log** [11] - 28:3, 28:11, 28:13, 28:20, 37:12, 37:13, 40:16, 42:3, 42:6, 42:13, 42:15
**logs** [1] - 42:9
**look** [3] - 35:9, 49:17, 51:14
**looking** [3] - 15:12, 27:7, 41:1
**looks** [1] - 31:8
**loyalty** [1] - 30:24
**lunch** [1] - 37:23

# M

**MAGISTRATE** [1] - 1:21
**mail** [11] - 10:9, 17:13, 17:22, 18:7, 18:8, 26:22, 37:24, 40:8, 49:18, 50:13
**mails** [4] - 11:1, 49:11, 49:12, 49:17
**maltreatment** [1] - 15:18
**man** [1] - 33:1
**manage** [1] - 35:22
**Mancuso** [1] - 50:3
**manner** [3] - 9:4, 10:22, 28:11
**manually** [1] - 33:9
**manufacture** [1] - 20:24
**manufacturer** [1] - 24:17
**March** [1] - 6:10
**Market** [1] - 2:12
**Markowitz** [3] - 4:5, 4:10, 48:24
**MARKOWITZ** [2] - 2:15, 2:19
**Mary** [2] - 38:8, 56:2
**mary** [1] - 2:8
**material** [8] - 23:2, 35:10, 35:17, 37:18, 54:7, 54:12, 54:13, 56:19
**materials** [2] - 29:20, 52:15
**matter** [3] - 9:6, 31:22, 32:1
**MATTINGLY** [2] - 2:3, 2:7
**mean** [9] - 12:6, 18:1, 46:6, 47:16, 47:19, 52:14, 54:15

**meaning** [3] - 6:14, 19:13, 37:21
**means** [5] - 52:4, 54:10, 56:13, 56:20, 59:5
**meant** [2] - 33:1, 51:7
**meantime** [1] - 10:25
**meet** [2] - 57:5, 57:19
**memorialize** [1] - 33:1
**mention** [2] - 7:2, 36:6
**mentioned** [3] - 39:11, 53:2, 55:12
**menu** [1] - 33:20
**menus** [1] - 34:8
**messages** [4] - 20:2, 20:4, 26:16, 26:23
**met** [3] - 44:13, 47:25, 48:7
**meta** [1] - 19:22
**metadata** [4] - 32:5, 33:14, 33:25, 35:4
**method** [1] - 14:24
**middle** [1] - 23:5
**might** [20] - 5:18, 9:11, 14:17, 16:9, 18:1, 18:14, 18:20, 18:23, 21:6, 29:15, 31:4, 41:9, 50:15, 52:5, 52:11, 53:8, 53:23, 54:3, 54:18
**million** [1] - 8:22
**mind** [1] - 4:17
**minimum** [1] - 24:3
**minute** [5] - 13:16, 48:14, 50:20, 57:16, 57:17
**missing** [3] - 46:19, 46:22, 47:4
**modification** [4] - 5:4, 38:21, 40:19, 50:19
**modified** [1] - 51:23
**moment** [2] - 41:13, 48:11
**months** [1] - 7:25
**mood** [1] - 48:1
**morning** [2] - 9:14, 41:15
**Mosman** [1] - 31:9
**most** [5] - 17:11, 21:18, 28:2, 32:17, 40:17
**motion** [14] - 5:10, 28:25, 43:8, 43:24, 44:2, 44:6, 47:18, 47:22, 48:4, 48:7, 48:15, 48:18, 49:14
**motive** [1] - 31:2
**move** [2] - 10:2, 28:22
**moved** [1] - 45:8
**moving** [2] - 30:15,

57:19
**MR** [33] - 3:8, 3:19, 4:9, 4:13, 43:17, 43:22, 44:2, 44:17, 45:13, 45:20, 46:5, 46:11, 46:14, 46:17, 46:23, 48:9, 48:13, 48:19, 48:21, 49:4, 49:8, 49:10, 50:17, 50:23, 52:19, 54:23, 55:11, 55:24, 56:10, 56:25, 57:8, 57:25, 58:2
**MS** [129] - 3:7, 3:22, 4:1, 4:4, 4:15, 4:22, 5:14, 5:21, 5:23, 6:5, 7:17, 8:2, 8:10, 8:15, 9:13, 9:23, 11:13, 11:19, 11:25, 12:11, 12:14, 13:10, 13:15, 13:23, 14:3, 14:7, 15:6, 15:16, 15:20, 16:14, 16:17, 16:22, 17:2, 17:10, 17:18, 18:4, 18:21, 19:2, 19:16, 20:11, 20:18, 20:20, 21:10, 21:14, 21:17, 22:2, 22:6, 22:8, 22:11, 22:16, 23:10, 23:13, 23:19, 23:22, 24:11, 24:21, 24:25, 25:4, 25:6, 25:16, 25:23, 26:11, 27:6, 27:9, 27:21, 28:6, 28:13, 28:19, 29:1, 29:4, 29:5, 29:11, 29:22, 29:25, 30:6, 30:13, 30:17, 31:4, 31:11, 31:15, 32:6, 32:7, 32:8, 32:11, 32:12, 32:17, 33:17, 34:3, 34:10, 34:21, 34:24, 35:1, 36:15, 36:21, 37:15, 38:5, 38:8, 38:12, 38:25, 39:3, 39:6, 39:15, 39:17, 41:10, 41:17, 41:20, 42:5, 42:22, 43:4, 43:11, 43:18, 44:23, 45:22, 46:7, 46:15, 47:7, 51:3, 52:2, 53:16, 53:18, 55:25, 56:2, 56:11, 57:9, 57:12, 57:14, 58:1, 58:3, 58:4
**MTA** [1] - 44:14
**mumbling** [1] - 59:9
**MUSTAFA** [1] - 1:20
**mute** [1] - 38:9

**Mx** [1] - 3:18

# N

**nailed** [1] - 40:24
**nails** [1] - 18:11
**name** [2] - 3:17, 50:8
**named** [16] - 20:13, 20:14, 22:4, 22:12, 22:23, 23:8, 24:5, 29:23, 30:4, 30:7, 37:22, 39:24, 51:9, 51:13, 52:9, 54:11
**names** [2] - 23:7, 32:24
**narrative** [1] - 33:24
**narrow** [3] - 16:23, 26:1, 40:1
**nearly** [1] - 10:7
**necessarily** [1] - 18:18
**necessary** [3] - 36:2, 36:12, 40:20
**need** [17] - 4:18, 8:25, 10:14, 18:3, 20:8, 23:3, 23:21, 36:13, 38:21, 40:1, 41:24, 42:17, 44:15, 46:22, 48:5, 57:6
**needed** [2] - 39:10, 43:14
**needs** [6] - 11:3, 14:6, 15:3, 45:11, 56:15, 56:17
**neglect** [3] - 17:8, 18:15, 18:20
**negotiated** [1] - 51:21
**nervous** [1] - 20:25
**netted** [1] - 38:15
**new** [5] - 9:25, 22:24, 37:11, 41:1, 57:21
**next** [5] - 25:2, 26:10, 26:11, 39:12, 57:20
**night** [1] - 57:24
**noises** [1] - 59:9
**non** [10] - 14:12, 14:16, 15:2, 15:13, 19:14, 29:14, 38:18, 40:9
**Non** [1] - 24:22
**non-email** [1] - 40:9
**non-parties** [6] - 14:12, 14:16, 15:2, 15:13, 19:14, 29:14
**Non-Parties"** [1] - 24:22
**non-party** [1] - 38:18
**non-responsive** [1] - 15:2
**normal** [2] - 24:6, 55:23

**normally** [1] - 21:19
**notations** [1] - 32:24
**note** [1] - 33:10
**noted** [1] - 15:20
**notes** [22] - 17:22, 32:25, 33:1, 33:5, 33:11, 33:14, 33:16, 33:18, 33:20, 34:4, 34:12, 34:15, 35:2, 35:5, 35:6, 35:11, 36:10, 45:1
**nothing** [1] - 31:23
**notice** [10] - 15:17, 24:15, 24:18, 25:8, 25:12, 26:1, 27:19, 44:12, 45:15, 47:9
**Notice** [1] - 24:23
**notices** [13] - 9:24, 24:12, 25:7, 25:10, 25:13, 26:8, 27:10, 27:13, 28:5, 28:7, 28:9, 28:15, 28:16
**noticing** [1] - 27:19
**November** [1] - 6:23
**nuance** [1] - 21:6
**number** [10] - 8:24, 9:20, 10:20, 10:21, 20:13, 22:19, 22:20, 25:13, 38:16, 42:2
**Number** [4] - 21:12, 22:10, 23:12, 43:10
**numbers** [18] - 19:15, 19:17, 19:23, 19:25, 20:14, 20:21, 20:22, 21:1, 21:3, 21:15, 21:21, 21:25, 22:4, 22:22, 23:7, 23:24, 24:4, 26:15

# O

**object** [2] - 20:18, 20:20
**objected** [1] - 24:11
**objecting** [4] - 26:23, 28:1, 29:19, 47:2
**objection** [5] - 6:3, 14:11, 14:16, 15:2, 19:7
**objections** [28] - 4:24, 6:12, 6:18, 6:21, 7:19, 7:21, 7:22, 8:6, 11:7, 11:8, 11:14, 11:15, 12:3, 12:6, 12:8, 12:15, 12:20, 12:22, 12:24, 13:8, 13:9, 13:17, 13:19, 13:22, 14:9, 14:10, 29:13, 42:23
**observe** [2] - 36:10,

36:11
**obtain** [2] - 17:11, 26:18
**obtaining** [1] - 30:18
**obvious** [1] - 25:24
**occur** [2] - 30:20, 36:18
**occurred** [3] - 17:20, 33:22, 34:13
**occurrence** [1] - 33:8
**occurs** [1] - 30:18
**oddball** [1] - 53:10
**OF** [4] - 1:2, 1:11, 1:17, 2:11
**office** [1] - 36:17
**officers** [1] - 53:4
**Official** [1] - 59:19
**official** [2] - 18:24, 33:24
**oftentimes** [1] - 31:23
**once** [2] - 4:18, 48:3
**one** [13] - 14:8, 17:9, 28:5, 29:13, 30:4, 30:9, 31:2, 31:5, 39:18, 43:11, 49:20
**ones** [2] - 21:19, 28:8
**onsite** [2] - 35:19, 35:24
**operative** [1] - 30:2
**opinion** [1] - 30:25
**opportunity** [1] - 6:20
**OR** [9] - 2:5, 2:9, 2:13, 2:17, 2:21, 32:19, 34:11, 35:9, 35:15
**OR-Kids** [3] - 32:19, 34:11, 35:15
**OR-Kids'** [1] - 35:9
**order** [54] - 4:20, 5:2, 5:5, 6:2, 6:22, 7:6, 7:7, 7:11, 10:16, 11:11, 13:16, 19:10, 26:8, 28:3, 35:4, 37:11, 38:23, 43:9, 43:20, 48:14, 49:7, 49:11, 49:12, 49:15, 49:17, 49:19, 49:23, 50:18, 51:1, 51:4, 51:7, 51:12, 51:13, 51:17, 51:19, 51:22, 52:8, 52:10, 52:14, 52:16, 53:10, 53:14, 53:19, 53:21, 55:2, 55:4, 55:10, 55:18, 56:11, 56:15, 56:17, 57:16, 57:18
**ordered** [10] - 13:8, 13:17, 20:19, 31:9, 31:12, 32:4, 32:15, 33:18, 35:18, 57:17
**orders** [1] - 52:21

**ordinary** [1] - 21:18
**OREGON** [3] - 1:2, 1:11, 2:11
**Oregon** [3] - 1:8, 32:5, 35:16
**Oregon-Kids** [1] - 32:5
**organizational** [9] - 19:19, 20:23, 21:11, 22:18, 23:14, 23:16, 23:24, 24:6, 24:7
**original** [2] - 34:8, 59:10
**otherwise** [5] - 13:8, 17:15, 29:17, 47:23, 49:6
**outlined** [2] - 44:2, 44:3
**outside** [1] - 31:19
**overbroad** [1] - 39:23
**overlooked** [2] - 50:6, 50:14
**overriding** [1] - 59:9
**own** [3] - 20:9, 51:11

**P**

**p.m** [2] - 3:1, 58:5
**page** [6] - 7:3, 21:5, 32:4, 41:5, 41:14, 47:25
**pages** [2] - 10:7, 12:1
**paragraph** [9] - 50:17, 50:20, 52:12, 52:22, 53:8, 54:14, 54:21, 55:12, 56:4
**paragraphs** [1] - 52:13
**parameters** [4] - 6:8, 7:25, 8:5, 30:20
**parenthetical** [9] - 49:22, 50:1, 50:5, 50:16, 50:21, 52:1, 52:3, 53:14, 54:20
**parents** [1] - 53:3
**part** [3] - 24:6, 39:13, 43:12
**particular** [1] - 6:14
**particularly** [4] - 5:6, 15:14, 18:23, 25:25
**parties** [23] - 8:8, 14:12, 14:16, 15:2, 15:13, 19:14, 20:5, 20:9, 23:3, 26:12, 27:4, 29:14, 38:20, 38:22, 46:20, 48:5, 50:18, 51:20, 51:24, 52:6, 54:11, 56:14, 57:18
**Parties"** [1] - 24:22
**partly** [1] - 36:22

**Party** [2] - 1:12, 1:15
**party** [4] - 3:6, 15:13, 38:18, 51:12
**past** [3] - 5:15, 30:25, 33:12
**pattern** [1] - 24:16
**pause** [3] - 11:24, 28:12, 29:5
**pay** [1] - 32:1
**people** [15] - 15:7, 16:2, 18:19, 47:11, 51:8, 51:23, 52:5, 52:8, 52:9, 53:22, 54:4, 54:10, 54:12, 54:13, 54:16
**percent** [2] - 30:8, 43:13
**perfect** [1] - 49:2
**perhaps** [3] - 19:21, 23:2, 47:4
**period** [4] - 12:21, 16:4, 17:19, 18:8
**permitted** [1] - 48:23
**person** [9] - 51:11, 53:24, 53:25, 54:1, 55:14, 55:15, 55:16, 55:17
**personnel** [8] - 21:22, 21:25, 29:2, 29:18, 29:20, 29:22, 30:7, 53:6
**persons** [1] - 55:12
**perspective** [1] - 56:10
**pertinent** [1] - 17:24
**phone** [26] - 19:15, 19:17, 19:21, 19:23, 19:24, 20:13, 20:14, 20:21, 20:22, 21:1, 21:3, 21:15, 21:17, 21:21, 21:25, 22:19, 22:20, 22:22, 23:7, 23:24, 24:4, 26:15, 38:10, 48:24, 49:14
**piece** [2] - 39:7, 39:18
**place** [5] - 26:21, 26:24, 51:1, 51:4, 57:18
**placed** [2] - 15:15, 32:24
**plaintiff** [19] - 3:5, 3:18, 3:20, 3:23, 5:6, 13:3, 14:15, 15:23, 20:25, 24:15, 25:7, 28:22, 34:2, 35:14, 35:25, 36:5, 37:17, 38:15, 39:23
**Plaintiff** [2] - 1:6, 1:12
**PLAINTIFF** [2] - 2:3, 2:7

**plaintiff's** [16] - 3:16, 10:4, 11:3, 11:14, 12:16, 12:25, 19:11, 27:10, 32:4, 39:19, 40:19, 47:18, 47:21, 48:16, 52:10, 55:2
**plaintiffs** [7] - 8:12, 9:4, 10:10, 35:9, 36:9, 37:22, 42:12
**planning** [1] - 4:11
**plate** [1] - 43:15
**play** [1] - 11:8
**pleadings** [1] - 53:2
**PO** [1] - 56:9
**point** [8] - 9:14, 11:9, 26:20, 28:23, 41:24, 48:2, 55:13, 56:3
**points** [4] - 12:2, 15:20, 24:22, 50:7
**police** [1] - 53:4
**policemen** [1] - 20:5
**poor** [1] - 26:2
**populate** [1] - 33:10
**portion** [1] - 34:12
**Portland** [5] - 2:5, 2:9, 2:13, 2:17, 2:21
**posed** [1] - 14:22
**position** [5] - 12:19, 14:5, 33:23, 47:8, 48:2
**positive** [1] - 57:20
**possibility** [1] - 30:23
**possible** [2] - 10:2, 40:5
**potential** [4] - 24:15, 50:25, 54:22, 55:6
**potentially** [3] - 14:18, 26:3, 29:16
**power** [1] - 9:9
**predict** [1] - 40:7
**prefer** [1] - 4:20
**preparation** [1] - 28:18
**prepared** [2] - 17:3, 35:3
**preparing** [1] - 19:18
**present** [1] - 56:8
**presented** [1] - 34:7
**preservation** [5] - 20:3, 26:13, 27:3, 27:12, 27:20
**preserve** [1] - 12:24
**preserving** [1] - 12:23
**pretty** [1] - 40:22
**previously** [4] - 14:22, 31:1, 31:13, 33:18
**primary** [1] - 34:7
**privilege** [16] - 9:1, 10:14, 11:11, 28:2, 28:3, 28:10, 28:13,

28:20, 37:12, 37:13, 40:16, 42:3, 42:6, 42:9, 42:13, 42:15
**privileged** [2] - 9:12, 28:16
**probate** [1] - 26:18
**problem** [2] - 19:24, 56:19
**problematic** [1] - 37:3
**proceed** [2] - 5:16, 38:6
**proceedings** [2] - 58:5, 59:5
**PROCEEDINGS** [1] - 1:17
**produce** [25] - 7:21, 12:20, 12:23, 13:4, 13:9, 13:18, 15:24, 16:2, 16:8, 16:15, 16:21, 16:25, 17:3, 19:3, 22:16, 23:21, 25:6, 25:8, 25:17, 28:10, 29:22, 34:10, 40:17, 41:4, 42:10
**produced** [31] - 7:6, 9:19, 10:4, 10:7, 10:21, 16:5, 20:23, 22:15, 23:15, 23:25, 26:16, 28:7, 28:8, 31:12, 32:4, 33:7, 34:16, 35:7, 35:13, 35:18, 37:17, 40:17, 42:6, 42:13, 45:25, 46:9, 46:15, 46:24, 47:11, 55:22
**producible** [1] - 38:19
**producing** [11] - 11:2, 13:2, 13:4, 15:22, 20:21, 29:4, 29:8, 36:19, 36:23, 40:8, 45:2
**product** [2] - 27:15, 28:2
**production** [28] - 5:3, 6:7, 6:10, 6:17, 7:2, 7:15, 7:18, 7:24, 8:7, 10:6, 10:25, 14:14, 15:1, 16:23, 18:17, 19:10, 21:20, 22:9, 24:2, 24:7, 29:12, 31:9, 37:10, 37:12, 40:15, 40:16, 42:9, 42:15
**productions** [3] - 8:3, 40:12, 42:7
**progress** [2] - 42:16, 57:21
**prohibition** [1] - 55:4
**prohibitions** [1] - 55:8
**project** [1] - 40:12

**projected** [2] - 40:15, 42:8
**prophylactic** [1] - 13:14
**proposal** [1] - 41:10
**propose** [3] - 40:13, 40:15, 41:9
**proposed** [6] - 39:19, 39:23, 42:13, 42:14, 47:21, 47:23
**prospective** [1] - 55:3
**protect** [2] - 54:4, 54:5
**protected** [1] - 51:15
**Protective** [2] - 15:22, 32:21
**protective** [26] - 5:5, 10:16, 11:11, 13:13, 43:9, 43:20, 49:7, 49:17, 50:18, 51:1, 51:4, 51:7, 51:12, 51:13, 51:17, 51:22, 52:8, 52:10, 52:14, 52:16, 52:20, 53:19, 53:21, 55:2, 55:4, 55:10
**protects** [1] - 54:6
**provide** [3] - 21:4, 38:1, 50:21
**provided** [13] - 6:6, 6:8, 7:24, 8:15, 17:21, 22:17, 22:18, 24:5, 35:2, 38:15, 47:23, 48:15, 51:8
**provider** [12] - 32:20, 33:5, 33:18, 34:1, 34:4, 34:11, 34:12, 34:15, 34:19, 35:2, 35:6, 35:24
**provides** [1] - 31:15
**providing** [3] - 8:14, 20:13, 26:25
**provisions** [1] - 51:20
**pulled** [1] - 6:24
**purpose** [3] - 23:17, 50:22, 50:23
**purposes** [2] - 56:19, 56:20
**pursuant** [2] - 11:11, 50:17
**put** [7] - 21:1, 26:21, 26:24, 33:9, 47:19, 49:21, 49:22

**Q**

**quick** [1] - 36:16
**quickly** [3] - 20:15, 36:8, 57:18
**quite** [2] - 17:2, 52:12
**quote** [1] - 49:17

## R

**raised** [5] - 11:14, 12:15, 43:2, 45:6, 47:11
**raising** [1] - 54:4
**range** [1] - 10:11
**rashes** [1] - 18:12
**Raygosa** [21] - 3:6, 15:25, 16:15, 17:1, 17:4, 19:4, 19:5, 19:8, 19:9, 25:9, 25:17, 25:21, 34:1, 35:25, 36:4, 37:21, 44:8, 44:25, 45:2, 46:8, 53:22
**RAYGOSA** [1] - 1:14
**Raygosas** [3] - 14:19, 20:5, 37:22
**reach** [1] - 19:17
**read** [1] - 50:11
**ready** [1] - 3:5
**realize** [1] - 38:20
**realized** [1] - 50:10
**really** [1] - 18:3
**reason** [3] - 14:21, 50:5, 54:2
**reasonable** [2] - 40:23, 41:11
**recap** [1] - 49:10
**receive** [3] - 19:19, 25:8, 55:14
**received** [6] - 6:16, 20:2, 21:19, 29:19, 30:25, 32:14
**receiving** [1] - 18:6
**recent** [1] - 5:10
**recognizes** [1] - 53:5
**record** [3] - 39:25, 47:3, 59:4
**recorded** [1] - 59:5
**RECORDED** [1] - 1:17
**records** [7] - 15:22, 15:23, 16:2, 16:6, 17:3, 19:3, 53:8
**recruiting** [1] - 55:9
**referenced** [2] - 40:3, 55:13
**referencing** [1] - 56:4
**referring** [1] - 53:13
**reflect** [2] - 13:16, 48:14
**refrain** [1] - 31:24
**refused** [1] - 50:14
**regard** [13] - 6:14, 7:11, 7:12, 11:22, 14:11, 20:4, 29:12, 29:13, 34:3, 36:22, 56:5, 56:6
**regarding** [19] - 5:2,

5:5, 5:15, 6:10, 15:23, 17:4, 17:22, 18:7, 20:1, 24:12, 26:12, 26:22, 27:3, 32:18, 35:11, 39:19, 46:8, 47:9
**regardless** [1] - 44:10
**regards** [3] - 5:8, 7:7, 26:4
**regular** [1] - 8:20
**regularly** [1] - 26:19
**rejoined** [1] - 38:11
**relate** [1] - 14:17
**Related** [1] - 24:21
**related** [3] - 14:12, 27:6, 34:23
**relates** [7] - 14:21, 18:14, 26:6, 26:9, 26:14, 34:1, 36:3
**relating** [14] - 15:1, 15:9, 16:25, 17:6, 17:11, 19:14, 29:14, 29:15, 30:7, 32:21, 32:22, 35:24, 36:23, 37:8
**relationship** [2] - 5:10, 31:22
**relatively** [1] - 36:16
**relayed** [1] - 38:14
**relevant** [9] - 14:20, 15:17, 17:17, 17:24, 19:6, 26:7, 27:10, 31:1, 37:11
**remaining** [1] - 50:7
**remind** [1] - 25:15
**remove** [2] - 29:15, 45:8
**removed** [1] - 29:18
**reopened** [1] - 56:15
**repeated** [1] - 26:1
**repeatedly** [1] - 19:2
**report** [5] - 16:14, 17:20, 17:21, 18:24, 18:25
**Reporter** [1] - 59:19
**REPORTER** [1] - 1:23
**reporting** [1] - 36:11
**reports** [7] - 15:24, 16:5, 17:3, 33:2, 42:18, 45:21, 47:10
**representation** [2] - 31:18, 55:17
**request** [19] - 5:2, 5:3, 6:7, 6:10, 6:17, 7:15, 7:16, 7:18, 8:3, 8:7, 21:3, 24:2, 27:25, 29:12, 34:19, 35:11, 44:18, 45:16
**requested** [10] - 6:15, 7:7, 8:11, 13:9,

20:21, 22:17, 23:23, 30:6, 37:17
**requesting** [1] - 21:9
**requests** [3] - 13:2, 14:13, 20:22
**required** [3] - 16:2, 27:4, 31:23
**requirements** [1] - 25:21
**requires** [1] - 25:11
**research** [1] - 25:11
**reserved** [1] - 13:8
**resolve** [3] - 11:5, 42:24, 43:2
**resolved** [3] - 20:7, 42:1, 49:6
**resolves** [1] - 48:17
**respect** [9] - 12:10, 13:19, 15:14, 16:11, 19:14, 30:4, 34:19, 41:5, 47:17
**respond** [6] - 12:11, 13:5, 20:12, 20:20, 31:7, 38:2
**responding** [4] - 13:2, 13:24, 44:22, 44:23
**response** [10] - 6:16, 8:20, 27:7, 43:22, 44:24, 45:23, 47:1, 47:18, 48:16, 49:14
**responses** [1] - 46:25
**responsibilities** [1] - 31:17
**responsive** [15] - 7:21, 12:23, 13:3, 14:24, 15:2, 15:4, 15:8, 23:9, 23:11, 26:18, 26:20, 37:19, 37:20, 37:25, 46:25
**responsiveness** [2] - 10:15, 11:12
**rest** [1] - 43:15
**result** [2] - 53:10, 55:4
**resulted** [1] - 39:23
**retroactive** [1] - 33:12
**return** [3] - 18:10, 23:24, 24:9
**review** [13] - 8:17, 9:15, 9:16, 9:19, 10:11, 10:18, 10:19, 10:24, 11:1, 40:4, 40:5, 40:11, 42:11
**reviewed** [4] - 9:1, 10:14, 10:21, 35:24
**reviewing** [2] - 9:10, 11:10
**revise** [1] - 41:24
**revised** [1] - 33:15
**revisit** [1] - 57:2
**RFP** [3] - 21:12, 22:10,

23:11
**RFPs** [1] - 6:13
**risk** [1] - 25:24
**Rizzo** [26] - 2:4, 3:19, 3:21, 4:17, 5:5, 11:22, 31:4, 31:6, 43:4, 43:15, 43:19, 44:5, 45:12, 46:2, 46:4, 46:10, 46:22, 48:18, 50:15, 52:17, 54:15, 54:17, 56:18, 56:24, 57:7, 57:8
**RIZZO** [33] - 2:3, 2:7, 3:8, 3:19, 4:13, 43:17, 43:22, 44:2, 44:17, 45:13, 45:20, 46:5, 46:11, 46:14, 46:17, 46:23, 48:9, 48:13, 48:19, 48:21, 49:4, 49:8, 49:10, 50:17, 50:23, 52:19, 54:23, 55:11, 55:24, 56:10, 56:25, 57:8, 57:25
**RMR** [2] - 1:24, 59:18
**rolling** [5] - 10:6, 10:25, 40:12, 42:7, 42:15
**room** [1] - 59:9
**Rule** [2] - 6:21, 27:2
**ruled** [2] - 50:2, 52:21
**ruling** [1] - 49:16
**running** [1] - 10:24

## S

**safety** [1] - 25:24
**sanctions** [1] - 30:23
**satisfactory** [1] - 46:10
**satisfied** [3] - 48:3, 48:6, 48:16
**satisfies** [1] - 45:16
**schedule** [2] - 28:25, 40:15
**scheduling** [5] - 5:1, 6:22, 7:7, 7:11, 37:11
**Schneider** [54] - 2:12, 4:1, 4:3, 5:14, 5:24, 6:25, 8:6, 10:3, 10:8, 12:11, 13:20, 13:24, 14:22, 15:19, 16:20, 16:24, 19:1, 20:12, 20:17, 22:14, 23:18, 25:5, 27:5, 27:8, 28:4, 29:8, 29:21, 31:7, 31:14, 32:10, 34:25, 37:14, 38:14, 39:8, 39:11, 39:18,

44:16, 44:18, 44:21, 45:18, 46:24, 47:2, 47:4, 48:22, 49:12, 49:14, 50:3, 50:12, 51:2, 52:19, 52:24, 53:6, 53:17, 57:11
**SCHNEIDER** [48] - 4:1, 5:14, 5:21, 8:10, 8:15, 9:13, 12:11, 12:14, 13:10, 13:15, 13:23, 14:3, 15:20, 16:14, 16:17, 17:2, 19:2, 20:20, 22:16, 23:19, 23:22, 25:6, 25:16, 27:9, 28:6, 28:13, 28:19, 29:1, 29:4, 29:22, 31:15, 32:6, 32:8, 32:12, 35:1, 37:15, 44:23, 45:22, 46:7, 46:15, 47:7, 51:3, 52:2, 53:16, 53:18, 56:11, 57:12, 58:1
**Schneider's** [2] - 12:1, 49:18
**scope** [4] - 14:6, 26:24, 31:17, 31:19
**search** [17] - 6:8, 6:11, 6:14, 7:25, 8:9, 8:10, 8:16, 10:11, 14:9, 37:1, 37:2, 37:16, 38:14, 38:22, 39:19, 39:22, 42:1
**searched** [1] - 39:21
**seat** [1] - 39:16
**seatbelts** [1] - 24:18
**second** [1] - 5:4
**see** [8] - 5:25, 34:13, 42:19, 43:14, 50:11, 52:14, 52:21, 54:2
**seek** [3] - 29:15, 50:18, 55:16
**seeking** [3] - 17:9, 33:25, 50:16
**selected** [1] - 10:10
**send** [2] - 28:9, 54:12
**sends** [2] - 27:22, 27:23
**sense** [5] - 8:4, 15:6, 17:11, 18:25, 43:7
**sent** [3] - 48:25, 50:3, 50:13
**separate** [1] - 28:13
**seriously** [1] - 27:13
**served** [2] - 6:12, 7:19
**Service** [1] - 15:22
**SERVICES** [1] - 1:11
**Services** [1] - 32:21
**set** [9] - 3:13, 6:22, 10:11, 40:24, 41:1,

41:3, 41:12, 42:2, 53:8
**sets** [3] - 30:19, 52:12, 53:19
**seven** [1] - 8:19
**several** [2] - 11:6, 11:7
**share** [2] - 10:3, 52:22
**shared** [1] - 53:19
**shepherd** [1] - 36:17
**short** [1] - 16:4
**show** [5] - 25:14, 35:5, 47:10, 52:5, 55:3
**showed** [1] - 55:20
**showing** [4] - 53:24, 56:5, 56:7, 56:18
**shows** [2] - 30:21, 34:16
**sibling** [2] - 15:23, 25:7
**signature** [3] - 59:10, 59:11
**signed** [1] - 59:11
**significant** [2] - 6:12, 10:9
**signing** [1] - 59:3
**simple** [1] - 32:1
**simply** [7] - 9:6, 9:10, 16:10, 25:20, 33:20, 54:24, 56:7
**simultaneous** [1] - 59:8
**sit** [1] - 23:3
**sitting** [1] - 40:7
**Sixth** [2] - 2:4, 2:8
**Skel** [1] - 13:20
**Skjelset** [40] - 2:8, 3:22, 3:24, 4:17, 6:4, 11:7, 11:17, 12:4, 14:4, 16:18, 17:5, 19:15, 20:25, 21:8, 23:6, 24:10, 25:18, 26:10, 27:18, 29:6, 29:10, 29:24, 30:5, 30:12, 31:8, 31:10, 32:9, 32:13, 32:15, 36:14, 36:20, 38:8, 39:1, 40:21, 41:7, 41:19, 42:21, 56:2, 57:7, 57:9
**SKJELSET** [68] - 3:7, 3:22, 4:15, 4:22, 5:23, 6:5, 7:17, 8:2, 11:19, 11:25, 14:7, 15:6, 15:16, 16:22, 17:10, 17:18, 18:4, 18:21, 19:16, 20:11, 20:18, 21:10, 21:14, 21:17, 22:2, 22:6, 22:8, 22:11, 23:10, 23:13, 24:11, 24:21,

24:25, 25:4, 25:23, 26:11, 27:6, 27:21, 29:5, 29:11, 29:25, 30:6, 30:13, 30:17, 31:4, 31:11, 32:7, 32:11, 32:17, 33:17, 34:3, 34:10, 34:21, 34:24, 36:15, 36:21, 38:8, 38:12, 41:10, 41:20, 42:22, 43:4, 43:11, 43:18, 55:25, 56:2, 57:9, 58:4
**slight** [2] - 50:24, 51:4
**soil** [1] - 46:19
**solicited** [1] - 8:12
**soliciting** [1] - 56:20
**solution** [1] - 47:21
**someone** [1] - 4:8
**somewhat** [1] - 37:2
**somewhere** [1] - 10:11
**sorry** [5] - 21:24, 22:2, 39:3, 39:7, 56:2
**sort** [4] - 13:13, 32:15, 37:23
**sought** [1] - 35:17
**sounds** [2] - 5:18, 45:17
**speaking** [1] - 59:8
**special** [4] - 4:5, 4:10, 5:17, 9:5
**specializes** [1] - 10:18
**specific** [19] - 5:6, 6:18, 7:22, 11:8, 11:14, 12:2, 13:19, 13:22, 21:3, 22:22, 25:20, 26:4, 26:13, 26:14, 29:12, 32:23, 37:10, 45:21, 51:17
**specifically** [7] - 6:25, 7:8, 10:1, 12:10, 14:13, 54:8, 56:12
**specificity** [1] - 6:13
**specifics** [1] - 19:13
**specified** [1] - 52:8
**specify** [1] - 36:13
**speed** [1] - 10:1
**staffing** [2] - 9:3, 9:7
**stands** [1] - 47:3
**start** [7] - 3:16, 4:16, 5:16, 5:25, 10:25, 11:2, 41:1
**started** [2] - 9:19, 10:6
**starting** [1] - 33:22
**state** [1] - 47:5
**State** [12] - 4:2, 13:17, 20:14, 21:21, 22:3, 22:23, 31:15, 31:16, 31:20, 35:15, 37:2, 50:8

**State's** [2] - 31:18, 56:10
**State-issued** [3] - 20:14, 21:21, 22:3
**STATES** [2] - 1:1, 1:21
**stating** [1] - 50:13
**status** [9] - 40:14, 40:24, 40:25, 41:12, 42:12, 42:15, 49:5, 56:22, 56:24
**stenographic** [1] - 59:4
**step** [3] - 6:1, 33:19, 39:21
**Steve** [1] - 31:4
**Steven** [2] - 2:4, 3:19
**still** [3] - 8:25, 39:20, 40:1
**stood** [2] - 10:24, 40:11
**stored** [1] - 32:18
**straight** [2] - 57:3
**Street** [1] - 2:12
**strike** [2] - 44:2, 49:21
**strike-through** [1] - 49:21
**sub** [1] - 27:2
**subject** [5] - 43:10, 44:7, 52:15, 55:2, 55:9
**subjected** [1] - 51:12
**submission** [1] - 6:6
**submitted** [6] - 8:19, 31:8, 51:18, 51:19, 56:11, 56:13
**subsequent** [1] - 26:2
**subsequently** [4] - 6:20, 7:5, 50:3, 50:10
**substantial** [2] - 41:2, 42:16
**substantially** [2] - 42:8, 42:10
**substantive** [2] - 12:2, 13:25
**suffered** [1] - 14:18
**sufficient** [1] - 10:5
**Suite** [4] - 2:5, 2:9, 2:17, 2:21
**summarize** [4] - 4:19, 14:5, 36:20, 38:13
**summarizing** [4] - 4:17, 39:7, 39:9, 57:16
**summary** [1] - 43:24
**supervise** [1] - 35:22
**supervisor** [1] - 26:5
**supervisors** [1] - 44:9
**supplied** [1] - 6:13
**support** [1] - 27:6

**suppose** [1] - 47:16
**supposed** [1] - 33:21
**surfaced** [1] - 15:14
**sustain** [1] - 12:8
**sustaining** [1] - 13:7
**SW** [5] - 2:4, 2:8, 2:12, 2:16, 2:20
**system** [4] - 15:8, 24:16, 25:13, 25:19

## T

**tackle** [1] - 4:19
**tag** [1] - 5:19
**tag-teaming** [1] - 5:19
**TAR** [2] - 14:24, 15:7
**team** [5] - 10:18, 10:24, 18:20, 40:4, 40:11
**teaming** [1] - 5:19
**technical** [1] - 9:15
**teleconference** [1] - 1:18
**ten** [2] - 16:6, 19:4
**tense** [1] - 47:20
**term** [4] - 17:5, 30:2, 47:15, 54:16
**terms** [17] - 6:8, 6:11, 6:14, 7:25, 8:9, 8:11, 8:16, 10:11, 37:1, 37:2, 37:16, 38:14, 38:18, 39:19, 39:22, 42:1, 47:19
**testifying** [1] - 31:2
**text** [5] - 20:2, 20:4, 26:16, 26:19, 26:22
**THE** [155] - 1:1, 1:2, 1:20, 2:3, 2:7, 2:11, 2:15, 2:19, 3:4, 3:9, 3:10, 3:12, 3:13, 3:15, 3:21, 3:24, 4:3, 4:7, 4:11, 4:14, 4:16, 5:12, 5:18, 5:22, 5:24, 7:14, 8:1, 8:4, 8:13, 9:10, 9:21, 11:6, 11:17, 11:24, 12:4, 12:13, 13:6, 13:11, 13:16, 14:1, 14:4, 15:5, 15:12, 15:19, 16:9, 16:16, 16:18, 17:5, 17:16, 17:25, 18:18, 19:1, 19:10, 20:6, 20:17, 21:5, 21:13, 21:15, 21:24, 22:5, 22:7, 22:9, 22:13, 23:1, 23:11, 23:16, 23:20, 24:3, 24:19, 24:24, 25:2, 25:5, 25:15, 25:18, 26:6, 27:5,

27:7, 27:17, 28:4, 28:10, 28:15, 28:20, 29:2, 29:6, 29:21, 29:24, 30:2, 30:8, 30:15, 31:3, 31:6, 31:14, 32:3, 32:9, 32:13, 33:13, 33:25, 34:6, 34:18, 34:22, 34:25, 35:17, 36:19, 37:14, 38:3, 38:6, 38:11, 38:13, 39:1, 39:5, 39:9, 39:16, 40:21, 41:12, 41:19, 41:22, 42:14, 43:1, 43:6, 43:13, 43:19, 44:1, 44:4, 44:21, 45:12, 45:17, 46:1, 46:6, 46:10, 46:13, 46:16, 46:18, 47:13, 48:10, 48:14, 48:20, 49:2, 49:5, 49:9, 50:15, 50:20, 51:2, 51:25, 52:12, 53:17, 54:14, 54:24, 55:20, 56:1, 56:7, 56:22, 57:1, 57:11, 57:13, 57:15
**themselves** [2] - 3:16, 52:16
**therefore** [1] - 18:24
**therefrom** [1] - 56:6
**they've** [2] - 37:6, 37:7
**thinks** [1] - 52:10
**Third** [1] - 1:12
**third** [5] - 1:15, 3:6, 5:8, 15:13, 20:5
**Third-Party** [1] - 1:12
**third-party** [3] - 1:15, 3:6, 15:13
**thousand** [2] - 10:7, 38:17
**three** [1] - 40:14
**Tier** [1] - 49:23
**ties** [1] - 43:23
**tilling** [1] - 46:18
**timeline** [3] - 7:9, 40:12, 42:8
**timely** [4] - 9:3, 10:2, 10:22, 28:3
**timing** [5] - 38:1, 39:6, 39:11, 39:17, 40:3
**today** [4] - 4:23, 40:7, 40:10, 43:12
**together** [2] - 21:1, 57:3
**topic** [6] - 5:4, 5:8, 7:14, 11:21, 20:15, 43:13
**topics** [1] - 4:23
**tort** [6] - 24:11, 25:6,

25:8, 25:10, 25:13, 26:8
**Tort** [1] - 24:22
**totaled** [1] - 8:22
**touched** [1] - 36:21
**towards** [1] - 42:16
**traded** [3] - 49:11, 49:12, 49:16
**Transcriber** [1] - 59:18
**transcript** [4] - 6:24, 7:3, 59:4, 59:10
**TRANSCRIPT** [1] - 1:17
**transitioning** [1] - 9:25
**treated** [1] - 19:5
**trial** [2] - 18:6, 18:16
**troubleshoot** [1] - 37:4
**true** [4] - 45:3, 45:6, 45:23, 59:4
**trust** [2] - 18:15, 20:12
**trying** [2] - 17:25, 53:14
**tunnel** [1] - 42:19
**turned** [2] - 38:9, 46:19
**turned-over** [1] - 46:19
**two** [9] - 6:9, 10:24, 16:3, 17:18, 25:1, 25:3, 26:8, 36:3, 48:11
**types** [1] - 32:21
**typically** [4] - 19:19, 27:23, 34:10, 42:9

## U

**ultimately** [1] - 53:4
**unable** [3] - 7:8, 20:15, 59:8
**unclear** [2] - 7:20, 20:3
**uncover** [1] - 18:6
**under** [7] - 10:15, 16:8, 24:21, 26:12, 27:2, 31:16, 32:23
**underneath** [1] - 24:22
**understood** [3] - 38:17, 47:14, 54:17
**union** [1] - 31:23
**UNITED** [2] - 1:1, 1:21
**universe** [8] - 25:9, 51:8, 51:9, 51:23, 52:7, 52:23, 54:6, 54:16
**unless** [1] - 13:12

**up** [15] - 4:18, 10:1, 10:24, 13:12, 15:8, 19:25, 28:11, 28:23, 30:9, 39:12, 40:11, 46:2, 49:5, 57:5, 57:6
**updated** [1] - 33:15
**updates** [1] - 57:20

## V

**vague** [2] - 12:25, 50:1
**variants** [1] - 17:8
**various** [3] - 17:14, 20:1, 45:1
**vendor** [1] - 8:23
**vendors** [1] - 10:19
**vetting** [1] - 26:2
**victory** [1] - 30:10
**view** [1] - 54:16
**violated** [1] - 55:18
**violation** [1] - 53:10
**visit** [1] - 33:6
**visits** [1] - 33:2
**vs** [1] - 3:14

## W

**wait** [2] - 20:11, 41:8
**weeding** [1] - 15:9
**week** [2] - 9:24, 10:24
**weeks** [3] - 8:19, 40:14, 41:14
**welfare** [2] - 32:18, 47:10
**Welfare** [1] - 24:14
**wide** [2] - 54:5
**willing** [1] - 16:25
**WILSON** [2] - 4:9, 58:2
**Wilson** [5] - 2:20, 4:9, 5:25, 9:24, 11:9
**withheld** [1] - 53:6
**withhold** [2] - 12:18, 31:18
**witness** [1] - 55:15
**Word** [1] - 49:23
**words** [1] - 38:21
**wordsmith** [1] - 48:2
**workable** [1] - 41:9
**worker** [2] - 30:22, 30:24
**workers** [4] - 20:4, 21:4, 44:9, 46:13
**workers'** [3] - 19:15, 19:17, 26:15
**works** [1] - 15:7
**worried** [2] - 52:25, 53:7
**worry** [1] - 53:2
**written** [1] - 48:22

**wrote** [4] - 4:25, 7:11, 13:23, 20:16

## Y

**years** [6] - 16:6, 16:7, 17:19, 19:5, 19:8
**Youlee** [1] - 31:11