IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                              )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )   No. 6:22-cv-01813-MK
                                         )
KIM CHAPMAN, in her individual           )
capacity; ANASTASIA TIBBETTS, in         )
her individual capacity; KASSIDY         )
O'BRIEN, in her individual               )
capacity; ERIN LANE, in her              )
individual capacity; THE OREGON          )
DEPARTMENT OF HUMAN SERVICES, a          )
government agency; and JANE and          )
JOHN DOES 1-5; in their individual       )
and/or official capacities,             )
                                         )
        Defendants.                      )
_____  )
                                         )
OREGON DEPARTMENT OF HUMAN               )
SERVICES,                                )
                                         )
        Third-Party Plaintiff,           )
                                         )
        v.                               )
                                         )
JOE ALBERT RAYGOSA,                      )
                                         )
        Third-Party Defendant.           )
_____  )

Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

August 6, 2024

APPEARANCES


FOR THE PLAINTIFF:

         MARY SKJELSET
         Rizzo Bosworth Eraut PC
         1300 S.W. 6th Avenue
         Suite 330
         Portland, Oregon 97201

FOR THE PLAINTIFF:

         STEVEN V. RIZZO
         Rizzo Bosworth Eraut PC
         1300 S.W. 6th Avenue
         Suite 330
         Portland, Oregon 97201

FOR THE DEFENDANTS:

         HANNAH HOFFMAN
         Markowitz Herbold PC
         1455 S.W. Broadway
         Suite 1900
         Portland, Oregon 97201

FOR THE DEFENDANTS:

         LAUREN BLAESING
         Markowitz Herbold PC
         1455 S.W. Broadway
         Suite 1900
         Portland, Oregon 97201

FOR THE DEFENDANTS:

         JEFFREY M. EDELSON
         Markowitz Herbold PC
         1455 S.W. Broadway
         Suite 1900
         Portland, Oregon 97201

COURT REPORTER:  Lindsey A. Weresch, RMR, CRR, CSR
                 United States District Courthouse
                 1000 S.W. Third Avenue, Room 301
                 Portland, Oregon 97204
                 (503)326-8047

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator for      )
Z.C., a minor,                       )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    No. 6:23-cv-01353-MK
                                     )
KIM CHAPMAN, ANASTASIA BROOKS,       )
KASSIDY O'BRIEN, ERIN LANE,          )
MARGARET RAMIREZ, in their           )
individual capacities,               )
                                     )
        Defendants.                  )


Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

August 6, 2024

APPEARANCES


FOR THE PLAINTIFF:

          BONNIE RICHARDSON
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE PLAINTIFF:

          MANUELLA M. TSHALA
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE DEFENDANTS:

          HANNAH HOFFMAN
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          LAUREN BLAESING
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          JEFFREY M. EDELSON
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                  United States District Courthouse
                  1000 S.W. Third Avenue, Room 301
                  Portland, Oregon 97204
                  (503)326-8047

(Tuesday, August 6, 2024, 9:36 a.m.)

**P R O C E E D I N G S**

(Whereupon, the following proceedings were held in open court:)

THE COURTROOM DEPUTY CLERK:  Please remain seated.

United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT:  Good morning.

Please call the case.

THE COURTROOM DEPUTY CLERK:  Now is the time set for Civil Case Number 22-cv-1813, Levi versus Chapman, et al., and 23-1353, Conley versus Chapman, et al., for a status conference.

THE COURT:  All right.  Well, good morning, everyone. Thank you for making yourselves available in person.  It looks like I can see you on the video screen, too.  Is there anyone else appearing remotely that we --

THE COURTROOM DEPUTY CLERK:  Just our court reporter, Your Honor --

THE COURT:  Okay.  All right.

THE COURTROOM DEPUTY CLERK:  -- at this time.

THE COURT:  So I'll try to look at you in your eyes, as opposed to the video screen, as I'm so used to doing these days.  I'd like counsel to please introduce themselves.  We'll

start with the Levi plaintiffs and then the Conley plaintiffs and then defense counsel.  If you'd be kind enough to give me your full name and your honorifics, such as Mr., Ms. or Mx.

Levi plaintiffs.

MS. SKJELSET:  Your Honor, Ms. Mary Skjelset, attorney for Mr. Levi.

THE COURT:  Good morning, Ms. Skjelset.

MR. RIZZO:  Good morning, Your Honor.  Mr. Steven Rizzo, attorney for Mr. Levi as well.

THE COURT:  Mr. Rizzo.

For Conley.

MS. TSHALA:  Good morning, Your Honor.  Ms. Manuella Tshala, attorney for Plaintiff Conley.

THE COURT:  Thank you, Ms. Tshala.

MS. RICHARDSON:  Ms. Bonnie Richardson for Shannon Conley, conservator for Z.C.

THE COURT:  Thank you, Ms. Richardson.

MR. EDELSON:  Good morning, Your Honor.  Jeff Edelson, special assistant attorney general on behalf of defendants.  I use he/him pronouns, so I'm a Mr.

And why don't you guys introduce yourselves.

MS. BLAESING:  Sure.  Good morning, Your Honor.  Ms. Lauren Blaesing for state defendants.

MS. HOFFMAN:  Good morning, Your Honor.  Ms. Hannah Hoffman on behalf of state defendants.

THE COURT:  All right.  And, again, nobody from either party is appearing remotely today; is that right? Everyone -- everyone who needs to be here is here?

MR. EDELSON:  Yes.

THE COURT:  All right.  Thank you.  Well, I received quite a few submissions in the last 24 hours or less or something to that effect.  I -- it seemed to me that -- well, I'm looking at Ms. Hoffman first, so -- but if somebody else is supposed to speak to answer the questions, then feel free to do so.

I received a letter, correspondence outlining several issues, from the Markowitz firm either last night or this morning.  Actually, I saw it this morning.  Is that a checklist of everything that needs to be identified -- addressed, as you understand it, that was also included in the -- the status report?

MS. RICHARDSON:  Just a little thing here.  Sorry. There's feedback on that laptop, probably when it got disconnected.  So we can hear double your voice.  It's kind of distracting.

THE COURT:  Let's see if we can get that cleared up. We want everyone to be able to only hear me once.

MS. RICHARDSON:  I don't have a copy of what they sent last night because we stayed here.

THE COURT:  Oh, you do not have a copy of this?

MS. RICHARDSON:  No, 'cause it was sent --

THE COURT:  Does anyone else need a copy?

Oh, it looks like Ms. Blaesing --

MS. RICHARDSON:  Yes.  I'm sorry.  And the plaintiff -- oh, thank you.  And then plaintiff -- Plaintiff Conley sent over to the Court on Friday a list.

THE COURT:  I'll take a look and see.  I believe I have that as well.

MS. RICHARDSON:  But I need to look at this.

THE COURT:  Yes.  On Allegiant letterhead?

MS. RICHARDSON:  Correct.

THE COURT:  This right here?

MS. SKJELSET:  Your Honor, we also do not have a copy.  It was sent to us at 8:00 p.m. last night.  We were already en route.

THE COURT:  That being the Markowitz --

MS. SKJELSET:  The Markowitz submission from last night.

THE COURT:  We'll make a couple copies.

MR. EDELSON:  And just to be clear, Your Honor, the items on that letter are the issues that we intend to speak about, but maybe there are some other items that --

THE COURT:  Right.  And I also -- as I reviewed the letter from you, they seemed to overlap quite a bit with the status report -- the defendants' -- the state defendants'

status report.  So I'm -- correct me if I'm wrong, but the letter that you sent last night is a summary of the status report issues?

MR. EDELSON:  It's a summary of the issues that we intend to talk about today.

THE COURT:  As distilled from the status report?

MR. EDELSON:  I believe so.

THE COURT:  Okay.  And I understand there may be other additional issues, but I just wanted to -- what I'm looking for is how do I compile a master checklist of all the issues that need to be addressed.  And if I can use your letter from last night as the checklist, with the understanding that the status report that -- that you filed is sort of -- provides some additional context, and the red lining also provides additional context, from the plaintiffs' perspectives, I'm just -- what I'm doing, I'm -- this is sort of, like, the dumbed-down -- I'm looking for the checklist.

MR. EDELSON:  Yeah.  No.  And I can just recite to you, 'cause I have my own notes that, I think, have the -- what I think are 10 or 11 issues that we're probably going to talk about today.

THE COURT:  Okay.

MR. EDELSON:  Some, you may defer for later.  Some, you may need more.  Others, you might be in a position to rule on.  So if it would be helpful, I'm happy to run through my

checklist and help -- and let you know who among us is going to be the principal speaker on those items.

THE COURT:  Okay.  Let me hand the -- your letter from August 5th.  I think Ms. Skjelset needed a copy.  Did anyone else need copies of any correspondence that -- that people have shared with the Court from the last couple of days?

MS. RICHARDSON:  There was an e-mail that you sent last night that we didn't get last night.

MS. SKJELSET:  I can give Ms. Richardson my copy.

MR. EDELSON:  So the two things that went out yesterday, we sent out this -- the list of items, and we also sent a request to take the depositions of the plaintiffs.

MS. RICHARDSON:  So that is something I need to make a clarification to Mr. Edelson.  For the first time last night --

(Discussion off the record, 9:43 a.m.)

MS. RICHARDSON:  So just a correction to Mr. Edelson. It appears that yesterday is the first time that defendants have requested the depositions of the children in this case.

THE COURT:  Yes.  I saw that in the letter.

MS. RICHARDSON:  That was not part of the status conference report.  It's the first time we ever heard that request.

THE COURT:  Okay.  So -- and I appreciate that additional piece of information.  My goal is to try to address

as universally as possible everything you can throw at me today.

MR. EDELSON: Yeah. And you may decide it's premature. We haven't really discussed it. And it may be --

THE COURT: Fair enough. And maybe there needs to be some conferral. But if I can provide some boundaries or give you a heads-up as to what I might think about these things to help inform your conferral with one another, then I'll be happy to do that, too.

But I -- I want to leave as few loose ends after today as possible. If I've called -- invited all of you to come down to the outskirts of Oregon, from the city on the hill, I'd like to make it worth your while, so you don't have to get stuck in some kind of dirt road rut with your wagon wheels on the way back.

MS. RICHARDSON: Well, it's so nice here. It's the first time for me to be in this courthouse, I'm embarrassed to say, but it's really nice.

THE COURT: Well, then we'll make it worth your while by keeping you here as long as possible then.

All right. So, just to confirm, I have the -- I'm going to call it the Markowitz letter, and I have an Allegiant letter, that outlines several of the issues that I understand, for the most part, address the items identified in the state defendants' status report that I asked it to file some several

weeks ago.

I recognize that there may be additional issues. They're not off the table if they have not been identified. If we can resolve issues, my goal is to resolve them. If the parties, for whatever reason, share with me that they need to either confer first or -- you know, or it might just simply be resolved by conferring -- or it needs to be briefed, we'll talk about that. But I want to at least touch on them, so we know what we're heading into after -- after you all head home at the end of the day today.

All right. So -- and then for the Levi plaintiffs, do you have a letter? Your -- your red lining of the status report had quite a bit of detail, so I assume that's probably what we'd look to, to address whatever issues or concerns you have.

MS. SKJELSET: As we have done in most of this litigation, we collaborated with Plaintiff Conley on their letter. Some of our issues are identified in their letter.

THE COURT: Again -- and I want to provide structure here, but I don't want to be so rigid that we aren't taking up matters that we ought to simply get done and resolved, so, you know, again, you have whatever you need to keep this going, which leads me to, I think, a point that I want to take up, before we jump into the substance.

We are going to talk to -- I think Ms. Creighton is

going to be on the phone at 10 o'clock to deal with the Ferrari witness; is that correct?

MR. EDELSON:  Correct.

THE COURT:  Okay.  So while we have a few minutes, before we take that up, trial dates.  Was it the Levi firm or the Conley case -- Levi case or the Conley case for which we have consent but for Raygosa?

MS. SKJELSET:  Your Honor, it's our case, the Levi case.

THE COURT:  Okay.  And I'm sorry.  I've been pronouncing it Levi, but it's Levi?

MS. SKJELSET:  I don't think he would be offended, but that's my understanding.  The pronunciation is Levi.

THE COURT:  That's a very low bar.  I want to try to meet a higher expectation than just I'm not offending.  But it's Levi?

MS. SKJELSET:  I think there was a decade that I pronounced it as Levi before finally pronouncing it --

THE COURT:  Okay.  All right.  So --

MR. RIZZO:  Judge?

THE COURT:  Yes.

MR. RIZZO:  Mr. Raygosa's in default.

THE COURT:  So default has been taken?

MR. RIZZO:  Yes.

THE COURT:  Okay.

MR. RIZZO:  It was an order.

THE COURT:  And so that's on the Levi matter?

MR. RIZZO:  Yeah.

THE COURT:  And with respect to -- is Raygosa a named defendant in the Conley matter?

MS. RICHARDSON:  No.

THE COURT:  All right.  So, with Raygosa in default, then I think we have all the parties in the Levi case that are still active now consenting.

MR. RIZZO:  Right.  And, for further clarity, he was a third-party defendant sued by DHS in Levi.

THE COURT:  Okay.  Thank you.

And then on the Conley matter, I don't believe I have full consent at this point.  Is that -- is that everyone's understanding?

MS. RICHARDSON:  Right.

THE COURT:  Okay.  And, again, I don't take it personally.  I just want to make sure I understand what the lay of the land is, so we know how to address some of these matters.

This is what we're going to do.  We're going to set trial dates right now and -- and we're going to set trial dates in both cases on my calendar.  They're not consolidated cases.  They're going to be tried separately.  Is that everyone's understanding?

MR. EDELSON:  Yes.

MS. RICHARDSON:  Well, we were in discussion, actually, and haven't fully conferred as to whether or not we should have them in the same trial, so that was actually still on the table.

THE COURT:  Okay.  All right.  Is -- from what you've said, I'm interpreting then that the plaintiffs in Levi and Conley want to try this together?

MS. RICHARDSON:  Yeah.  I think that would be best and most efficient for the Court.

MS. SKJELSET:  I think it makes good sense, Your Honor.

THE COURT:  How long -- well, let me ask then Levi. Ms. Skjelset and Mr. Rizzo, how long -- assuming not -- no consolidation, how long would the Levi case take to try?

MR. RIZZO:  For us to put on our evidence, Judge, I would say roughly a week --

THE COURT:  All right.  And then --

MR. RIZZO:  -- to be safe.

THE COURT:  I always -- there's at least a coefficient of 1.5 to whatever you tell me, at least.

MR. RIZZO:  Right.

THE COURT:  You don't make me happier by giving me an aggressive estimate.  I'd rather have a conservative estimate. That way if we have to take a day off afterwards, because we

got done earlier, that's always a better place for us to end.

On the defense side, on the Levi case, how long would you take to present your defense case?

MR. EDELSON:  Yeah.  We think about the same time, a week times 1.5.

THE COURT:  All right.  So it looks like three weeks for a trial, you know, between -- you know, I just recognize jury selection's going to take time.  Our pretrial conference is going to resolve most of the evidentiary matters.  But I -- you know, given just how well-argued this case has been to date, then I will operate under the idea that there will be quite a bit of conversation and discussion taken up outside of the presence of the jury, and I imagine jury instructions as well.  So there's a lot that's going to happen in between the presentation of evidence.  So we'll look at a three-week block.

If this case were to be tried -- these cases were to be tried together, how much more time would that add to three weeks?

MS. RICHARDSON:  I would say it would add maybe a day.

THE COURT:  Okay.

MS. RICHARDSON:  'Cause we would make sure that we didn't overlap and share on all of the witnesses, which are pretty consistent.

THE COURT:  Mr. Edelson.

MR. EDELSON:  I just so instinctively stand when I'm addressing the Court.

THE COURT:  Do you need me to order you to stay seated?

MR. EDELSON:  You can order me, but I can't --

THE COURT:  Yeah.  So, yeah, the sitting is -- it is my practice in this court for the norm to remain seated.  But it also appears that it is of additional benefit for our court reporter, who is not here, for people to remain seated.

MR. EDELSON:  I'll do my best.  Please remind me.

THE COURT:  Yeah.

MR. EDELSON:  Okay.  So the -- we think it would probably take two or three extra days probably to put them together.  That would be my best guess, sitting here now, getting that question for the first time.  Now, but the problem is this is -- this is really the first time we have a clear message from the plaintiffs that they want to consolidate for trial.

The decision is a big decision on our side, as you would expect, and the three of us here can't make that decision at this moment.  So I think we should go ahead, if we're going to set trial dates, set two of them right now; or put off the decision of when to do it until we can give you a reasoned decision on what we're going to be doing on consolidation.  So there's a lot to think about.  There's a lot of people to

consult.

THE COURT: All right.

MR. EDELSON: It wasn't on my list of 10 or 11 things I wanted to talk about, so I'm just not prepared on it. I apologize.

THE COURT: That's all right. We're going to work through it. And I do want to identify dates, so at least with -- Levi was filed first, Conley second. Levi gets to try their case first. We're going to -- we're going to find a three-week block plus a week because, in the event we consolidate, then we'll try them together in that four-week time frame. If, if, if. But then we'll also identify a separate three-week block soon after the Levi case, so the Conley case can be tried.

MR. EDELSON: So that makes sense. But I also heard you say -- I understand we don't have the full consent on the Conley case, so I don't think we can consolidate 'til we have full consent.

THE COURT: Agreed. So consolidation really isn't going to be decided today. We're going to -- but I'm setting the trial -- I'm going to set both cases for trial on my calendar for at least one of -- well, there's two reasons. One is if -- and, again, I'm not going to presume or suggest or require that anybody consent.

And, frankly, I don't know who didn't consent at this

point, and I don't need to know, on the Conley side.  But if consent -- full consent happens, then problem solved.  If the other thing that's happening out there in my world happens, then I'm going to keep the case and I'll try it.

So -- so, with that in mind, it makes sense for us to get these on the calendar.  If I end up not trying the Conley matter, then it'll -- it'll get -- it'll be sent over to another one of the judges in -- in -- in District Court here in Eugene to put it on their calendar.  Okay.

MR. RIZZO:  Judge, one thing from -- from -- picking up on what Mr. Edelson said, if the Court would maybe think about imposing a date for them to get back to the parties so that we can be informed about what type of motion for consolidation, for example, we may need to bring.

THE COURT:  Well -- and, you know, I -- so if I -- if I give you a date to consent, then I'm just going to assume you're not going to consent, whoever it is that's not consenting.  So I really -- look, I'm going to operate on the idea that if I don't have consent, I don't have consent.  And we're just going to move along with that because, otherwise, I'm -- I'm --

MS. RICHARDSON:  How about just a motion to consolidate?

THE COURT:  Well, I think that the defense to a motion to consolidate is there isn't a full consent, so it's

going to be a quick deny to consolidate.

MS. RICHARDSON:  Okay.

THE COURT:  Any other fun hypotheticals that I can -- I can whop right back down, whack-a-mole down?

I appreciate the creativity.  I just think at this stage let's get the dates down.  And once we have that scaffolding in place, then I'll let parties figure out what they want to do with consent or not consent.  But we'll operate with the idea that until there's a time that I'm trying both cases with full authority, then we won't -- we won't take up consolidation.

But we're building in an extra week for -- on the Levi case in the event that I do decide to consolidate or the parties agree that it ought to be consolidated.  I'm a belt-and-suspenders kind of person.

MR. RIZZO:  Sounds good.

THE COURT:  All right.  I'm pulling up my calendar, just so you know what I'm doing with this little contraption here.

All right.  So we still have discovery, depositions, dispositive motions.  So we're looking at spring sometime?

MS. RICHARDSON:  I think early February.

THE COURT:  Okay.

MS. SKJELSET:  We had understood from the initial conference that the Court was setting aside time in -- this is

Mary Skjelset, for the court reporter -- setting aside time in -- in early 2025 for this case, and we had hoped that we could have a trial date as soon as possible under the constraints of the Court's schedule.

THE COURT: Yeah. It looks like I actually have a hold for possible trial on January 20th through the 31st. I think that was something we talked about, right?

MS. SKJELSET: Almost a year ago, Your Honor, I believe.

THE COURT: And Mr. Edelson is looking like he's already got a conflict on it.

MR. EDELSON: Yeah. I -- you know, there's a lot to be done still in this case, as you'll see as we go through this discussion through the day. We just think January, February, although that would be wonderful, is very aggressive. And we'd rather choose a date we know we can make, rather than come back and beg for more time. And one of the things we're going to discuss --

THE COURT: Can I ask you then: The other block of time that I have is February 10th.

MR. EDELSON: Well, I think we're probably really looking at March at the soonest. And we can start in the beginning of March, if that opportunity is on your calendar. Any sooner than that, we're going to be -- we're going to be having unnecessary fights over other things that have to happen

beforehand.

MS. RICHARDSON:  Well, we disagree with that.  I feel -- well, fights shouldn't happen in this case.  So I think we should work really hard not to have fights.  And that date in February, I believe, works for all of us.  The problem with some of us is that we've got kids, and that last week in March is not going to work because of spring break.

THE COURT:  The last week in March?

MS. RICHARDSON:  Right.  So we'd like to get it tried before that date.

THE COURT:  And, Mr. Edelson, you indicated that you feel like a February date would be far too aggressive.  Tell me a little bit more about why you think so.

MR. EDELSON:  Well, you know, just based on my experience with these things, I mean, you go in earnest and you hope and you pick a date; and then things just get in the way.  You know, we don't get things completed.  We come back to you because we need more time for one thing or another.  And before we know it, you're up against it with a summary judgment motion.

So, to give an example, there'll be summary judgment motions in these cases, for sure, right?  So you want to have time to be able to consider them.  At the same time, we don't want to be preparing for trial before we get a ruling from Your Honor.

THE COURT:  Understood.

MR. EDELSON:  So the ideal thing is to avoid that conflict.  And so, you know, in some --

THE COURT:  Did we vacate dispositive motion deadlines in this matter?  Do we still have them on --

MS. SKJELSET:  Yes, Your Honor.  You rescheduled them.

MR. EDELSON:  One of the issues we might talk about today is the date for the initial expert disclosures, and that could very --

THE COURT:  And you're going to require expert disclosures -- you're going to need expert disclosures before the dispositive motions are filed?

MR. EDELSON:  And probably depositions to follow.  And so there's just a lot that needs to be done.

THE COURT:  And how many experts are people anticipating needing to call into this case?

MR. EDELSON:  Well, we know -- we know we will need at least one.  We haven't seen what they'll do with their experts.  It might generate a need for another expert.  I --

THE COURT:  Do you have a sense for how many experts you're going to be calling on?

MR. RIZZO:  We may have up to three, Your Honor.

THE COURT:  Okay.  All right.  So four, maybe five experts.  Does anyone remember offhand when dispositive motions

were scheduled?

MR. EDELSON:  November 27th.

THE COURT:  Okay.  And we don't have an expert discovery deadline schedule yet?

MR. EDELSON:  We do.

MS. SKJELSET:  We do, Your Honor.

THE COURT:  Oh.

MR. EDELSON:  We should stick to it.

MS. SKJELSET:  It seems doable.

MS. RICHARDSON:  Even with a little bit of an extension on it, it's fine.  We can just get the depositions done in October.

THE COURT:  All right.  February 10th through March 7th, block that time out.  And I know my staff are going to tell me that I have a trial scheduled on the 3rd through the 7th of March, but I'm willing to live dangerously.  All right.

MR. EDELSON:  Your Honor, I just would appreciate if we could have an opportunity to get a client approval on this, or a client response.  There may be other conflicts that we don't even know about, so --

THE COURT:  I hear you.  And I want to make sure everyone understands that it better be a darn good reason why we've got to move this date anymore because, you know, we got to do it.  I mean, this -- I mean, I think everybody's complained at one stage or another about why this case is

taking so long.  I mean, that includes the defendants.  So, you know, you let the genie out of the bottle.  Well -- yeah, everyone let the genie out of the bottle.  Now you've got to deal with it.  Now you've got to deal with it.

MR. EDELSON:  We'll review this with your client as soon as we return.

THE COURT:  Let them know that I'm not inclined to move it, so they need to come back with some really darn good explanations.

Okay.  All right.  So we've got our -- we've got our trial date.

MR. RIZZO:  Thank you, Judge.

THE COURTROOM DEPUTY CLERK:  We have Attorney Creighton on the line when you're ready.

THE COURT:  Yes.  Thank you so much.

So I blocked out four weeks with the idea that, again, if we consolidate, then we'll have four weeks to try the case.  The next set of dates would be with the Conley case, and I have April 7th through the 25th as my next available three-week block.

MS. RICHARDSON:  I have a trip out of town scheduled the -- April 7th, the week of April 7th.

THE COURT:  Okay.  April 14th through the 2nd. That'll be three weeks.

MS. RICHARDSON:  Yes, that works for --

THE COURT: Okay. Let me also -- does April 21st through the 9th have any issues? And I know you'll have to talk to your clients.

MR. EDELSON: Not to us sitting at the table.

THE COURT: Okay.

MS. RICHARDSON: That's fine.

THE COURT: Why don't we do that, April 21st through the 9th.

MS. RICHARDSON: That would be wonderful. Thank you.

THE COURT: Okay. All right. Let's -- let's move -- let's move to the -- we'll need to set pretrial conference dates, but we'll take up that in a little bit. But I want -- I want -- since we have Ms. Creighton on the line -- Ms. Creighton, are you there? This is Judge Kasubhai.

MS. CREIGHTON: Yes.

THE COURT: All right. Thank you. And you represent Ms. Ferrari?

MS. CREIGHTON: Yes.

THE COURT: All right. And, as I understand the issue, you've asked for documents, so you can review documents -- certain documents with your client before -- before she proceeds to a deposition; is that right?

MS. CREIGHTON: Correct. The client asked for the documents, just to --

THE COURT: I'm sorry, Ms. Creighton. The audio's

coming in a bit choppy.  Is there a way to either reposition the microphone or do something a little -- do something different to bring you in clearer?

MS. CREIGHTON:  Okay.  How about over here?  Any better?

THE COURT:  That seems good.

MS. CREIGHTON:  Okay.  So the client asked for the documents to refresh her memory prior to the deposition.  There didn't seem to be any issue with giving her the documents.  The issue seems to be with me having access to the documents to prepare her with that.

THE COURT:  Okay.  So let me inquire of counsel at the table -- well, let me ask you this.  Does everyone have a common understanding about what documents we're talking about?

Ms. Hoffman, you're about ready to tell me something.

MS. HOFFMAN:  Yes, Your Honor.  We understand what Ms. Creighton has asked for.

THE COURT:  And does everyone at the table here, all the attorneys, have those documents, obviously, under a protective order?

MS. RICHARDSON:  I believe so.

MS. HOFFMAN:  Yes, to my knowledge, we do.

THE COURT:  So there's no confusion about what -- and how many documents are we talking about, Ms. Hoffman?

MS. HOFFMAN:  I don't have an exact number.  My best

estimate would be fewer than 50.

THE COURT:  Okay.  And so then I further understand, I think, from some of the e-mail or letter correspondence, that state defendants are objecting to providing them to Ms. Creighton in -- in advance of the deposition or at all?

MS. HOFFMAN:  That's correct, Your Honor.  The first part of what you said is accurate.  We object to providing these documents to Ms. Creighton in advance of the deposition. The protective order that we've entered allows the attorneys for the parties to see documents.

It does not allow attorneys for third-party -- you know, third-party witnesses, who are not a party to this case, to see them.  We understand that during the deposition if we show documents to Ms. Ferrari that Ms. Creighton will see them during the deposition.  And I think we're all willing to stipulate to that, but we --

THE COURT:  And would she be expected -- would Ms. Creighton be expected to comply with the protective order at that point, once -- once those documents are presented at the deposition?

MS. HOFFMAN:  She would, Your Honor.

THE COURT:  Is that by the terms of the protective order, or is there some other expectation or understanding about what -- what Ms. Creighton's obligations or responsibilities would be to maintaining the confidentiality of

those documents?

MS. HOFFMAN:  Because Ms. Creighton is not a party to the protective order and she's not contemplated by the protective order, I think we would need a separate agreement, but I imagine that's something we can all work out informally.

THE COURT:  Is there any reason why that separate agreement cannot be entered into now, to provide those documents to Ms. Creighton in advance of the deposition?

MS. HOFFMAN:  Your Honor, our --

THE COURT:  I'll -- let me show you my cards.  This is what I see happening.  A document's going to be presented to Ms. Ferrari at the deposition.  Ms. Creighton is going to say, "I need to review this.  I need to now take another 20- or 30-minute break to go talk to my client about this document, and understand more about this document and my client's testimony about it, before we can continue with the deposition."

Every time you're going to show her a new document, I anticipate -- well, I'm -- I would not be surprised if Ms. Creighton said, "I need to review this document.  We need to take a break."  This deposition will take forever.

MS. HOFFMAN:  Your Honor, I -- I understand that concern.  I -- I will be honest:  I don't -- I don't share that particular concern for a couple of reasons.  One is that most of -- so, first of all, we have offered to allow Ms. Ferrari,

herself, to go review the documents and refresh her memory and understand what she had to do with this case.

She's in no way -- she has no legal liability here. If she doesn't remember anything, I mean, that's -- that's our cross to bear. We're the ones who want to depose her. And if she tells me, "I don't remember," during her entire deposition, that is sort of my problem. She's not obligated to know anything. She's not a 30(b)(6) witness.

So we've offered to let her come because, per the terms of the protective order, she's an author or recipient of, I think, all of these documents,and so she can see them. If she would do that and come take a look, she can have this conversation with Ms. Creighton ahead of time and sort of tell her everything that's in there, everything she remembers. They can talk together.

She's a nonparty. She isn't entitled to discovery. And discovery is a different thing than seeing documents at a deposition. And Ms. Creighton and Ms. Ferrari are not entitled to that discovery. They're not entitled to have these documents in their possession, which is different than how this works at the deposition, where they'll see them, but they won't keep them.

And one of the reasons why I don't necessarily share your concern, although it's well-taken, is that this sort of thing happens at depositions all the time. My witnesses have

been shown documents that I have never seen before, and we have not taken a break to go talk about every single one of them.

They are prepared. They understand how to give a deposition, and we have -- we have, you know, proceeded accordingly. And it will not be a particularly long deposition. I will not go seven hours with Ms. Ferrari. At least I certainly don't anticipate it. So if it turns out that she and Ms. Creighton need, you know, an hour-long break in the middle to regroup, that's probably going to be fine. But they aren't entitled to discovery. They're not entitled to a copy of all these documents.

THE COURT: Okay. Before I hear back from -- before I hear back from Ms. Creighton, any other counsel at table want to --

MS. RICHARDSON: I'm more than happy to speak to that --

THE COURT: Go ahead.

MS. RICHARDSON: -- if that would be helpful. I'm sure Ms. Creighton could as well. But it's my understanding that there are several witnesses that have been deposed that are no longer under the control of the defendants, which this seems to be more about them controlling these witnesses.

And in those they were given documents ahead of the deposition, and they had a different attorney. I don't know what they did with respect to all of that, but none of that

makes any sense in order for us to have an efficient deposition. And just like they have prepared other witnesses by showing them records, so they could have their memories refreshed, the same should be for this particular witness.

And Ms. Creighton is just an attorney, an extension of her. She's going to abide by that protective order. And they're just going to make sure -- this is not about them trying to obtain discovery. She's just going to look at specifically requested documents. And Ms. Creighton is an attorney of her word. She's going to make sure that those documents don't leave her control.

THE COURT: Do you have -- I mean, does everyone know what these documents are? Or are you just anticipating that, because you have discovery, you probably will have these documents?

I mean, are we talking about -- you said 50 documents, Ms. Hoffman? Up to, maximum?

MS. HOFFMAN: That's my best estimate. I have not -- we haven't gone through and created an exact list of what they would be.

THE COURT: And I just want to get an idea. We're talking maybe a binder worth of documents?

MS. HOFFMAN: I think that's what we're picturing, yes. And plaintiffs have seen those documents, and the events at issue in them have been the subject of questioning in

deposition so far. So I believe they've seen most of what I imagine this set of documents would entail.

THE COURT: Ms. Richardson, anything else that you want me to know?

MS. RICHARDSON: No. That's pretty much it.

THE COURT: Ms. Skjelset or Mr. Rizzo?

MR. RIZZO: My only point is I think I heard Ms. Hoffman say that her witnesses have been deposed on documents that she hasn't seen, but -- and I have not been at all the depositions; but the ones I have attended and taken, the documents I used to depose the DHS witnesses were produced by DHS.

THE COURT: And I understood Ms. Hoffman to say something more generally, not necessarily specific to this case, but that you have had -- in the course of your legal profession, dealt with this situation before.

MS. HOFFMAN: Both are actually correct, Your Honor, so in general and also in this case. Plaintiffs have occasionally used -- Mr. Rizzo is generally correct that most of what plaintiffs have shown my witnesses have been documents we've produced; but they've also shown my witnesses some documents like newspaper articles, things like that, some videos that I had not previously seen. And it was -- it was fine. I mean, that happens in depositions all the time.

And, to Ms. Richardson's point, she's thinking of one

particular witness who, like Ms. Ferrari, is a former employee of ODHS; and that former employee chose to have us represent her for the purposes of her deposition.

So the reason why we were able to show her documents and prepare her is that, like Ms. Ferrari, she is personally entitled to see the documents; and, because we're attorneys for a party in this case, we are also entitled to see them.  That's the distinction.

Ms. Ferrari did not make the same choice.  We don't have the same relationship with her.  And we're taking her deposition, instead of defending it, which is the other distinction.  We were defending in -- in that case.

THE COURT:  And she's not a defendant in the case, the other, right?

MS. HOFFMAN:  Correct.  They're equivalent -- they have an equivalent relationship to this case:  Former -- former ODHS employees who are not parties and who are being deposed for purposes of some fact discovery.

THE COURT:  Ms. Creighton, anything else?

MS. CREIGHTON:  Just that the suggestion by defense counsel that my client go to their offices is not feasible because my client is in Roseburg, and she's not going to drive up -- and she's got a small baby, and she's not going to drive up five hours to go look at documents and come back.  So basically that solution is not a solution at all.

THE COURT:  Is there a deposition scheduled -- deposition date scheduled for Ms. Ferrari?

MS. HOFFMAN:  We haven't set a date because we've been addressing this.  And I will say, Your Honor, the logistical issue is one I'm very happy to work with.  I will bring a binder of documents to Ms. Ferrari, if she'd like.  I'd be happy to do it.

THE COURT:  Okay.  Please prepare a protective order that would cover and oblige Ms. Creighton to comply with the same level of -- of confidentiality that everyone else here has, provide the documents in advance of the -- of the -- of the deposition date, so they can be reviewed.

I'm not -- I'm not characterizing this as a production for discovery purposes.  But I mean, you know, in the interest of making sure that depositions are full and complete and discovery -- well, the deposition discovery, you know, is -- is founded on as much of the known information that the parties already have available to them, then let's make sure that -- that the third-party witnesses who are being deposed have -- have that -- that opportunity as well.

You know, if -- and given that Ms. Creighton is representing Ms. Ferrari, she's entitled to be able to review and prepare her client in anticipation of that deposition as fully as any other lawyer would and should be able to, given that we already know that these documents are going to be

presented or discussed at the time of this deposition.

MS. HOFFMAN:  Your Honor, one --

THE COURT:  Ms. --

MS. HOFFMAN:  May I ask a clarifying question?

THE COURT:  Go ahead.

MS. HOFFMAN:  Does Your Honor -- I understand your order.  Do you have any guidance as far as how far in advance of the deposition?  Once we set a date, do you have a deadline?

THE COURT:  Well, I mean, you tell me what you -- tell me what you think is reasonable and what you would like and need.  And let me hear from Ms. Creighton, too.  How quickly can this deposition be scheduled?

MS. HOFFMAN:  I'm sure we could probably work out a date by the end of the week.  We've had -- you know, we're scheduling a lot of depositions.  It sometimes takes some doing, but I'm sure we could find a date by Friday.

THE COURT:  Ms. Creighton, how much time would you like to have the documents available for your review to discuss with your client?

MS. CREIGHTON:  Two weeks would be ideal, but I could do as little as one.

THE COURT:  Let's do one week, so we have a small window; the documents aren't out there for any longer than necessary.  And -- and so you'll have the -- whatever the amendment -- or supplemental protective order drafted,

Ms. Hoffman?

MS. HOFFMAN: (No audible response.)

THE COURT: All right. And that was a nod, just to make sure that --

MS. HOFFMAN: Yes, Your Honor, we will.

THE COURT: Okay.

MS. HOFFMAN: And I think I understood Your Honor to say it would be a letter. Do you actually want a supplemental protective order that would need to be entered in the case?

THE COURT: Well, I understood that the existing protective orders didn't include or cover Ms. Creighton, so I'm -- I'm happy to do whatever it is that helps everyone paper their file. I mean, if you need me to order it, and I'm ordering it here on the record, then so -- you know, so be it. Let it be done. But I assume that everybody wants a signed protective order, so that way you've got it -- you've got it ready to, you know, remind people.

MS. HOFFMAN: We will do a supplemental protective order.

THE COURT: Okay.

MS. HOFFMAN: Thank you.

THE COURT: All right. Thank you.

Ms. Creighton, was there anything else?

MS. CREIGHTON: No. Thank you, Your Honor.

THE COURT: Okay. And I take it then everybody's

going to be able to figure out the date for the deposition without much difficulty.

Ms. Creighton, you -- I mean, any -- is there any hiccups along the way on that topic?

MS. CREIGHTON:  Yeah.  I'm just out of the office for the rest of the week, so we'll probably be able to schedule it early next week -- I mean, get a schedule -- get a date early next week.

THE COURT:  All right.  Sounds good.  Thank you, Ms. Creighton.

MS. CREIGHTON:  Okay.  Thank you.  Bye.

THE COURT:  Bye-bye.

All right.  So we have trial dates.  We've taken care of Ms. Ferrari's -- the deposition and the documents that Ms. Ferrari and her client -- or her attorney will need.  There was the other issue about Attorney Smith and her deposition.  I've reviewed the briefs.  I've reviewed the brief from her attorney as well.  I'm going to include a minute order that -- that orders that she participate in the deposition and answer the questions that are not otherwise privileged communications between her and her client.

MS. RICHARDSON:  Yes.  So I think that was the one distinction, was she would get to testify about matters that involved the juvenile proceedings, but she would not be compelled to testify regarding attorney-client privilege with

her attorney.

THE COURT:  Yeah.  As far as I'm concerned, there's been no -- I don't have any -- no one's argued that she -- that the client has waived the privilege.  So if everyone -- if everyone is on the same page with that, then, again, she will be -- Ms. Smith will be ordered to testify at deposition, answer questions, as long as any -- and no responses will be required -- will be required that -- that violate the attorney-client privilege.

Mr. Rizzo.

MR. RIZZO:  Judge, if I may, just to provide some context about the Smith deposition, there is a motion pending in the juvenile court in Lane County that was filed by the defendants.  And Judge Love, we understand, has issued a tentative ruling where she is prepared to rule.  And both sides have submitted their respective protective order.

THE COURT:  Oh, no.  This was an issue that we took up during a phone call, and everyone was waiting for something from Judge Love about this?

MR. RIZZO:  So my point about the Smith deposition -- and I'm not intending to comment on the ruling at all -- it's just it's almost like, in a way, if this Court is going to allow the state court to make a ruling as to what materials will be available to the parties, it's almost like the deposition of Smith is outpacing that court's ruling that the

defendants sought.

And that's been a -- it's been a lingering concern by balancing both courts and trying to be respectful to Your Honor and also trying to be respectful to Judge Love, even though that's taken more time than -- than we had anticipated.  But I just want to put that out there for the judge.

THE COURT:  I'm feeling a bit dense at the moment. Help me understand why I care or why -- why you should care or why anyone cares about what's happening on that side with respect to the -- the Smith deposition.

MR. RIZZO:  Right.  It's because, for example, if she is asked questions about what happened in juvenile court, that's going to necessarily lead to, if not be a part of, the juvenile court records and files that have yet to be discovered to the parties by Judge Love.  But also --

THE COURT:  Are we talking about social file?

MR. RIZZO:  The whole record, the FTRs --

THE COURT:  Okay.

MR. RIZZO:  -- the records and the supplemental confidential file.  I don't know exactly --

THE COURT:  Well, I mean, would any of the questions put to Ms. Smith be something to the effect of "Please describe what happened on such-and-such a hearing," you know, that -- or "Please describe what the transcript would -- would reveal about that hearing"?

I mean, I -- she's going to be describing from her own percipient -- her observations about -- about what it is that she saw or heard or said or did that don't violate attorney-client privilege, right?

MR. RIZZO:  Right.  But, again, that's within the juvenile law privilege and -- and I don't -- again, I don't know what questions she's going to be asked.  I have a sense where they want to take the deposition, but my point is it's going to open up the juvenile court record that has yet to be decided upon by Judge Love.

THE COURT:  All right.  So the way that I view this is that -- well, whether the -- whether the juvenile court opens -- or unseals the record, to the extent that it's been -- do we all agree that that record was sealed, that all parts of the juvenile proceedings are sealed?

MS. RICHARDSON:  Well, it's subject to a privilege.  But I think it's important to kind of go back into the procedure of this whole issue because it was my understanding that, when it was first brought to this Court's attention, it was brought by the defendants to Your Honor, where they were moving to compel us because we, the plaintiffs, have possession of that juvenile court record that we obtained at great expense.

THE COURT:  I remember the conversation from some time ago.  50,000-plus dollars or something like that.

MS. RICHARDSON:  It was a great expense that we had to go, because it was fought by DHS -- or State of Oregon.

THE COURT:  And DHS -- and I know you all are going to say --

MS. RICHARDSON:  DOJ.  Sorry.

THE COURT:  -- you will say -- that's a separate part of the state.

MS. RICHARDSON:  Okay.

THE COURT:  We don't need to really --

MS. RICHARDSON:  Yeah.  Sorry.  So, anyway -- sorry.  But what happened was we got that at great expense.  They came before you, asked you to compel it, wanted us to discuss sharing of those costs.  Defendants then said, "We don't -- never mind.  We don't want it from you."

The defendants here then went to the juvenile court.  And, again, at great expense to us, we argued a full day.  I went down there with Ms. Skjelset.  We argued with all of the other juvenile attorneys for the various people, because it was such a broad request.  And the court -- Judge Love said she had a concern that they were also going after the parents, the biological parents' information.

So what was requested of Judge Love by the defendants was for her to go through and to figure out what it was that she would allow to be produced out of the juvenile court proceedings, because they're subject to that state privilege.

THE COURT:  Well -- and I see this as two separate matters.  One is the deposition of Ms. Smith, and then two is the disclosure or the obtaining of the entire juvenile court record.  There may very well be some overlap, in terms of what Ms. Smith might testify about; but, again, it'll be through her percipient -- you know, her observations and perceptions of the things that have happened and the responsiveness -- and she'll be responsive to the questions that are put to her, as I've already described.

You know, in reading the briefs, in particular Ms. Smith's brief on this matter, is she needs a court order before she'll open her mouth.  And in state court I can't tell you how many times I've had a case where people come to the witness stand and read a statement that says, you know, "By operation of law," et cetera, et cetera, "I cannot answer any questions about the confidentiality of these particular documents or this particular case absent a court order."  And I say, "You are hereby ordered."

MS. RICHARDSON:  Okay.

THE COURT:  And there was nothing -- there was nothing substantively different about the briefing that Ms. Smith's attorney provided than what I have seen countless times when I was on the state court bench about requiring a court order for -- for a state defendant -- or state witnesses to testify.

If there was something more substantive than what I observed, I would've been happy to consider it. But the briefing was pretty clear that they needed me to go through the motions to require her testimony. And, you know, whatever happens with the disclosure of that entire record, that's been between Judge -- you and Judge Love.

I mean, I'm not passing judgment. I'm not -- and please do not in any way convey to Judge Love, if you have the opportunity to argue this matter any further with her, that -- that my order is in some way commenting or instructing or characterizing the way in which Judge Love has the full authority to order the disclosure or the nondisclosure of whatever else is in that juvenile court record. My ruling is specifically limited very, very closely to just testimony from Ms. Smith.

MS. RICHARDSON: Got it.

MR. RIZZO: Thank you, Judge.

THE COURT: All right. Thank you.

Well, we're moving at a pretty decent pace.

Have we touched on any of those 11 or 12 or 15 now items, Mr. Edelson?

MR. EDELSON: Trial was not on my list.

MS. RICHARDSON: We've also got the motion to compel and motion to quash, which are pretty substantive.

THE COURT: Yes. I was hoping to save that for

later, when everyone's exhausted and doesn't have anything else left they can say.

So I did mention -- or I believe it was communicated to all of you that I do have to break at 10:45, and we'll come back at 12:15. Did everyone get that memo, message?

MS. SKJELSET: Yes.

THE COURT: All right. Thank you.

So we're going to take an early lunch. So hopefully you had an early breakfast, so you'll be hungry enough for lunch. Otherwise, it's going to be a very long afternoon because we won't be breaking for lunch again. All right.

MS. RICHARDSON: I have some things to add to the motion to compel, which is involving a personal phone -- cell phone. We have some depositions that were taken since the time that we filed that motion, and so we'd want to add to that motion to compel.

THE COURT: Is it listed in -- is it listed in your letter?

MS. RICHARDSON: Ms. Tshala's letter.

THE COURT: The Allegiant -- yeah, the Allegiant letter.

MS. RICHARDSON: Let me look at that. Well, so the motion to compel includes compelling one of the defendants to put forth their cell phone for discovery because that was never searched, but we learned since then --

THE COURT:  Which one is that, O'Brien or Hammond?

MS. RICHARDSON:  O'Brien.

THE COURT:  Okay.

MS. RICHARDSON:  And since then, Ms. Chapman's second deposition was taken.  Ms. Chapman is also a defendant.  And Ms. Chapman stated that she used her personal phone extensively for work purposes.  And so we also need to include the search of that phone as well.

THE COURT:  So along with the motion to compel Ms. O'Brien's --

MS. RICHARDSON:  Chapman.

THE COURT:  But along with Ms. O'Brien's is -- you also want to include a discussion about Chapman's personal phone?

MS. RICHARDSON:  Ms. Chapman.  And then also there was Mr. Hammond --

THE COURT:  Okay.

MS. RICHARDSON:  -- who was also deposed recently, and they would not allow him to talk about his personal cell phone.

THE COURT:  Okay.  So I believe -- wasn't it this Friday Ms. -- I got a phone call from Ms. -- is it Korbel? -- relating an issue that needed to be taken up with somebody's deposition.  Was that O'Brien's deposition or Hammond's deposition?

MS. HOFFMAN:  Your Honor, that was Mr. Hammond's deposition.  It was Ms. Skjelset who called you.

THE COURT:  Yes.

MS. HOFFMAN:  And we --

THE COURT:  Well, technically it was Ms. Korbel --

MS. HOFFMAN:  Oh, that's right.  It was.

THE COURT:  -- that connected Ms. Skjelset to the call.

MS. HOFFMAN:  That's right.  And we -- you gave us a ruling.  And Ms. Skjelset asked Mr. Hammond the question that you -- we looked at his phone for text messages with Ms. O'Brien.  Ms. Skjelset asked him if he had any on his phone.  And he testified, no, he doesn't.  And his testimony was very clear on that point.  And I've looked at his phone.  I can confirm that's correct.  So there's nothing on his phone.  So I think that issue is moot at this point.

THE COURT:  Ms. Skjelset, you're satisfied that that issue -- that isolated issue is moot?

MS. SKJELSET:  While he may not have any text messages currently on his phone, the question was whether he ever did have relevant text messages and other communications, which I was remiss in not asking if he had any Snapchat or WhatsApp messages or Facebook or social media messages on his device with Ms. O'Brien.  Apparently they were communicating pretty regularly on their personal devices and --

THE COURT: With just standard text messaging or -- I mean, you just identified, like, Snapchat or WhatsApp or some of these other things. But I understand that you didn't ask him about those things.

MS. SKJELSET: You know how it goes after a deposition. You look back, Your Honor, and you think, "What did I miss regarding social media?" But what he did not answer was what his personal cell phone number was. So the Conley plaintiffs --

THE COURT: Remind me: Did I -- did I direct him to provide that personal cell phone number?

MS. SKJELSET: You did not. And, Your Honor, I think we made it pretty clear during the deposition, in the testimony that Mr. Hammond provided, that he and Ms. O'Brien were communicating regularly on their personal devices. I think he minimized the extent to which it involved work, but I think a jury could question that -- that testimony and --

THE COURT: We're a bit untethered at the moment in terms of the topics I'd like to go through. So I'd like to hold off on the issue of the -- either the subpoenas or the motions to compel because I think that is a much larger piece that we'll need to take up, for which we don't have the time right now to dive into it and make much progress.

So I want to try to tackle low-hanging fruit, recognizing that really what we're doing is harvesting

blackberries today.  And if you've ever done that, you know that there's a lot of thorns that just make it painful.  So maybe there isn't anything that's easy today that we're going to be harvesting, but let's try.

So can anyone identify the lower hanging fruit that needs some fairly straightforward discussion, argument and clarification?

MR. EDELSON:  I can, Your Honor.  I think that probably the easiest thing is there's an outstanding issue of privileged documents that Your Honor was --

THE COURT:  The in-camera documents?

MR. EDELSON:  The in-camera.

THE COURT:  Yeah.

MR. EDELSON:  You can tell us you've done it and here's what you've decided, or you can tell us you haven't done it --

THE COURT:  I haven't done it.

MR. EDELSON:  All right.  So we can check that off the list for now.

THE COURT:  Was that on your list?

MR. EDELSON:  It was.

THE COURT:  I'm glad we're finally tackling the meat of it then.

MR. EDELSON:  Yeah.

THE COURT:  Okay.

MR. EDELSON:  I think we can --

THE COURT:  Maybe before we move off -- move from that topic, is there anything about the in-camera review documents that anyone needs to bring to my attention before I jump into them, that I'm supposed to be either thinking about, looking at, or considering your argument about, before we move away from this?

Ms. Skjelset, you seem to have something you'd like to say.

MS. SKJELSET:  Your Honor, I very much appreciate that question because there were.  There was a document that was provided -- let me turn to this section of my binder -- to the Court; and I think I misidentified the log number in the Conley letter, which I assisted in preparing.  I believe it was actually log number 147.  There was a letter provided to you by Ms. Blaesing on July 29th of 2024 that identified the document at issue.

We worked together.  I was really appreciative of the defendants providing additional information about some of the communications in the log, because they appeared to be duplicative.  And they gave us information about how many e-mails were in each, and I really appreciated that.  It helped me zero in on the documents that I selected for the Court.

But one of the documents that I selected for the Court, which is log number 147, apparently was then produced to

the Conley plaintiffs in redacted form after the Court had ruled on the issue. And so the document that is coming to Your Honor now has been produced to us with redactions.

And the -- what I'm hopeful that the Court will do with this information is that the -- that document was at issue in our multiple correspondence. It was at issue in the tables that we provided. We asked them to look at it again in the -- our communications and conferrals in early 2024. And they continued to withhold its entirety until after the Court had ruled on it.

So the fact that they have now redacted it, I don't think they get the -- the benefit of the doubt with the application of their review of privileged material as it applies to the remaining 1,000 documents that they are withholding as privileged. And I want the Court to be aware that that redaction and production occurred after the Court's ruling.

THE COURT: Okay. I want to make sure I understand then the -- if there's something I'm looking at any differently in the unredacted document that I have for in-camera review, given this information that you've just shared with me. I understand that they've provided it to you now, after I -- I instructed them to provide the unredacted in-camera documents to me for review, that the defendants then provided a redacted copy that they believe is consistent with whatever privileges

that were --

MS. SKJELSET:  Right.

THE COURT:  And prior -- and prior to this, my direction and decision to review these documents in camera, they were not being produced at all?

MS. SKJELSET:  It was withheld in its entirety, all of the facts, information.

THE COURT:  And what does that imply to you?  I guess I want to make sure that I'm not just -- I don't want to read between the lines.  So what does it mean when you tell me this?  Why is that -- why does that matter?

MS. SKJELSET:  The reason that it matters, Your Honor, is because while it may appear through the redacted production that they're giving you at this juncture, because they -- Ms. Blaesing attached it to the Court's order, I don't think it informs what their analysis was for the remainder of the documents.

THE COURT:  Got it.  So I mean -- so why -- so then the question that you're really putting to me, or raising, is why haven't they produced all the other 1,000 documents in a redacted form, as opposed to withholding them in their entirety?

MS. SKJELSET:  Precisely, Your Honor.  And there may be information in the portions of the e-mail that are redacted that you find are not attorney-client privileged and should be

conveyed in this hearing -- I mean, in this --

THE COURT:  Well, you know, it might be important for me to take a look at redacted copies of the documents that you submitted to me, so I can -- maybe I'll be able to understand what the rules were that were being applied in such a way that may or may not be appropriate.

MS. SKJELSET:  And it was attached, Your Honor, to Ms. Blaesing's July 29th, 2024, letter to the Court.

THE COURT:  The redacted copy?

MS. SKJELSET:  The redacted version.

THE COURT:  Okay.

MS. SKJELSET:  We, of course, have not seen the unredacted version, but --

THE COURT:  All right.

MS. SKJELSET:  Because we don't understand what happened in the interim between their repeated withholding of this document and then their sudden production of it.  We don't understand whether their approach to privilege or their analysis, in fact, changed; or it was simply that they were called to task and documents were identified.  So --

THE COURT:  All right.

MS. RICHARDSON:  I just had a correction for Ms. Skjelset.

I think you said 147.  Did you mean 117?

MS. SKJELSET:  I didn't.  I misstated it in the

letter, in the Conley letter that we gave to the Court. I believe it was actually 147.

THE COURT: So the real log number is 147?

MS. SKJELSET: Am I --

MS. RICHARDSON: I think in your e-mail you also mentioned 117.

MS. SKJELSET: 117?

MS. RICHARDSON: Yeah.

MS. SKJELSET: I just want to make sure.

It is 147.

THE COURT: I should only look at -- I'm only looking at 147 for this point that you've raised?

MS. SKJELSET: Yes, Your Honor. And the remainder of the documents that they've provided to you. But I just want the Court to be aware that these redactions were applied after the ruling.

THE COURT: I'm going to give you a minute -- in a minute -- is it you, Ms. Hoffman, on the --

MS. HOFFMAN: It is.

THE COURT: All right. Just give me a moment.

(Pause in proceedings, 10:38 a.m.)

THE COURT: All right. Ms. Hoffman, I -- if there's a question that I would put to you, is there any reason that redacted copies of these documents, that had previously been completely withheld, provided? And what was the consideration

in providing those redacted copies?

MS. HOFFMAN:  What was the consideration in producing the one redacted copy that Ms. Skjelset's been discussing or --

THE COURT:  147.  We'll start with 147.  Maybe we'll go broader.

MS. HOFFMAN:  So with 147, Your Honor, what happened was it -- I'm just going to turn to it, so that I can -- oh, no.  That's fine, not looking at it.  Sorry.

So this is -- this e-mail is a close call on the privilege issue.  So, for a little bit of broader context, that I promise is relevant, our -- our general approach to our privilege designations have been if it's an e-mail chain where redacting the privileged material would then render the unredacted portion unresponsive, we have just withheld those because then there's no reason to produce them.

That has generally -- that has been our protocol when the redaction just renders it an unresponsive document, and this --

THE COURT:  Does it become unresponsive because the only things not redacted would be an asterisk or an open and closed parentheses?  I'm exaggerating.  It's hyperbole for the point of just trying to understand what --

MS. HOFFMAN:  Right.  So, for example, if it's an e-mail chain where the beginning of the e-mail is, say, an e-mail from the attorney saying, you know, "Here are my notes

about XYZ," that is clearly privileged.  And then the recipients on the e-mail chain continue to talk, and it veers off into -- this is a complete hypothetical, but say they decide to schedule lunch.  And somebody says, "Do you want to go to Subway?"

And somebody else says, "I want Chipotle."  That isn't responsive, and so we've just withheld the whole thing because lunch conversations, for example, wouldn't be responsive.  So then the document just becomes nonresponsive; and we put it on the privilege log, instead of redacting and producing.  That's been the protocol.

THE COURT:  So, I mean --

MS. HOFFMAN:  Right.  So this --

THE COURT:  Let's also assume -- I just wanted to ask:  Would your analysis for redacting and then maybe withholding documents also be in the reverse?  So, for example, if -- if a document had appropriately discoverable information, would you -- and there was no other reason to withhold it, would you provide it to them with the discussion about lunch redacted?

MS. HOFFMAN:  No.  If there was discoverable relevant or responsive material, we would just produce anything that wasn't privileged.  And we've produced many documents that are partially redacted for privilege; and then the remainder is responsive or some portion of the remainder is responsive, and

we produce it.

This -- this document, that is attached to Ms. Blaesing's letter, was a close call on that front, where the portion that is unredacted is arguably so out of context that it isn't responsive.

And so what happened was when -- when our team did their initial privilege review, they made the call that this became unresponsive once it would redacted, so it was withheld. We did another review of documents because, in the Conley matter, Ms. Ramirez was added as a defendant. And we then needed to produce documents relevant to Ms. Ramirez or in which she was the custodian.

So we did that, and we did a separate review. And then the review team who did that review made a different call -- it's a really close call -- and made a different decision to redact and then produce, because that team decided that the unredacted remainder would be at least somewhat responsive.

And once we realized that we had produced that in Conley, we, of course, are not going to withhold in one case and, you know -- like, on that basis. And so we produced the redacted version, which is what we produced in Conley. That's the reason for the different --

THE COURT:  Okay.

MS. HOFFMAN:  And I think that didn't come to our

attention until we did -- we took a look at these documents when we were getting them ready for Your Honor for in-camera review.  We looked and we thought, "Oh, we've produced this in Conley."  So we made the change.  That was why.  And Ms. Skjelset's right:  It was after.  It was prompted by us looking at this in the course of engaging with the in-camera review.

THE COURT:  Okay.  Anything else, Ms. Skjelset, on that point?

MS. SKJELSET:  Ah --

THE COURT:  It sounds to me like a very reasonable explanation for why these things sometimes appear fluid when you -- you actually have an opportunity to do it a second time.

MS. SKJELSET:  It does, Your Honor.  But if you look at the e-mail that was -- the unredacted portion is -- there's no question as to whether it's responsive.

THE COURT:  Okay.  So -- and I haven't looked at the document.  So I'll have to look at 147 to have a better idea.  But I'll need to do the in-camera review to understand these issues.  So if there's some particular rule that you want me to think about, as I'm reviewing these documents, that's probably going to be helpful for -- any of this discussion will only be helpful in helping me to understand what rule it is that you think I should be thinking of when reviewing these documents.

MS. SKJELSET:  Well, as --

THE COURT:  And I will be looking at the redacted version and the in-camera documents together, just to help me understand some of the context.

MS. SKJELSET:  And I think Ms. Tshala has some additional concerns that have been raised by Conley in the production that has come to them.  But I think the concern, from Levi's standpoint, is that privilege is currently being used as a shield and a sword.  And we suspect that's exactly what has happened in this e-mail that's --

THE COURT:  It can always be used as a shield, but you're saying it's being used as a sword now?

MS. SKJELSET:  Yes.  So there are documents that they have, for instance, waived privilege for, that make them look like they're conscientious and concerned about child safety, while -- whereas there are other portions of the communication that are redacted, that we suspect --

THE COURT:  So that probably is -- I mean, they're tactically allowed to do that, wouldn't they be?

MS. SKJELSET:  I respectfully disagree, Your Honor. I think --

THE COURT:  Okay.  Well, let's bookmark this and -- and come back with a full stomach and argument in about an hour and 30 minutes.  It raises a very interesting issue.  I mean, privilege is privilege.  I mean, at the end of the day, I suppose a shield can be used as a sword.  I mean, you raise an

interesting point.

And if you're asking me to do something different if -- I mean, I think -- I think your argument might be that -- that the waiver of -- of privilege goes beyond any one document if they waive privilege, and so that -- that's a -- that's a -- that's an oil-slick slope.  Can you say that ten times fast?

Let's go ahead and take our break, and then we'll talk more about this in a bit.  Thank you, all.

THE COURTROOM DEPUTY CLERK:  This court is in recess.

(Recess taken, 10:46 a.m. - 12:29 p.m.)

THE COURTROOM DEPUTY CLERK:  Please remain seated.

United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT:  Good afternoon, everyone.  I understand some copies are being printed of some document.  Whose --

MR. EDELSON:  We've made the request, and Ms. Davies has been kind enough to accommodate us.  This applies to the point raised by counsel that Ms. Chapman testified that she had used her personal phone for DHS work.  And I want Your Honor to have the full context of that.  I think you'll see that it doesn't move the ball for them.

THE COURT:  All right.  I want to -- I need to bring back some structure 'cause I know that it's going to be really easy -- I'm in a room full of cats, and I say that with --

actually, I'm a cat person myself, so I have an affinity for cats. But if you let them run, they just keep running. So this is what we're going to do.

I'm going to use somebody's -- we're going to start with somebody's list. We're going to work through it -- strictly get through it. We'll move on to the next list, make sure we get that covered. And then we -- I know you might want to try to -- there'll be a tendency to try to make everything connected.

And on a -- sort of a philosophical level, I get it. Everything's connected. But, for the purposes of getting through our checklist, I want to make sure we get these things crossed off. So I'll ask you to focus just on the issue that I'm bringing up without the urge to say, "Oh, and there's this other thing that we could resolve quickly if we bring it up, too," because there's never going to be a chance we'll resolve it -- a second thing quickly.

So we'll give everything its due and move through it. That way we'll have some coordinated structure to all of this. Let's start with the Allegiant Law document, and then we'll go through those. Then we'll take up the Markowitz letter and go in -- go in kind.

And then I know that the red-lined document that the Levi folks provided -- well, actually the red line copy of the status report, we'll also turn to, to see if there's anything

else there.  But I think I'd like to tackle the Allegiant Law cover letter first.

All right.  The Conley's motion to compel O'Brien's phone search and deposition and Brooks' deposition, has that now been fully briefed?  Have the responses been filed?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  So Ms. Richardson.

MS. RICHARDSON:  Yes.

THE COURT:  Talk to me.

MS. RICHARDSON:  Okay.  So it's pretty much all in the brief, so I don't want to -- you know, I'll let you guide me how you want to have more clarification, but I'll just summarize it.  Unfortunately, we had to file this motion to compel because Ms. O'Brien had a personal cell phone that she did use, that we have evidence of, where she called it her "real phone" and asked somebody to text her on it.  And she's refused -- they have refused to provide that.

THE COURT:  And this is different than the e-mail that I -- the e-mail correspondence between Hammond and O'Brien sharing her -- giving him her personal e-mail in the event they wanted to chat?  There's something else?

MS. RICHARDSON:  That's how we know she did use it, because their argument -- the defense argument on this is that she says she's never used her personal phone ever for work. But we know from an e-mail that they tried to hold back, but

was ordered to be produced, that she asked Mr. Hammond -- told Mr. Hammond to text her on her real phone. And she used the word --

THE COURT: As I recall the e-mail, the e-mail says something like, "If you need to reach me, use my -- use my personal e-mail." But I don't remember the e-mail saying that they did, in fact, communicate on that.

MS. RICHARDSON: It's in our -- let me point it out to you. If you look at Ms. Korbel's declaration to our motion to compel, number -- Exhibit No. 5, if you go to the second page.

THE COURT: David, do you have those exhibits?

Okay. And Ms. Korbel's declaration provides what?

MS. RICHARDSON: The declaration to the motion to compel, Exhibit No. 5, third page -- sorry -- third page, where it's an e-mail from Ms. O'Brien to Mr. Hammond. And in the last paragraph, after talking about various things -- and this is dated May 24th, 2018, when they knew that an investigator was looking at civil rights violations for these children.

She writes, "My real phone is 54" -- put some number -- "Normally I have strict rules against doing work on it. But, for you, I'd touch base tomorrow if it's helpful. Thanks again for having my back on this. It means a lot," and then some other words about cocktails. So --

THE COURT: Yeah. I think that was the e-mail that I

was referring to.  I mean, so there was a sharing of an e-mail -- or excuse me -- of the phone number.  But is there any evidence that they actually communicated using those phone numbers?

MS. RICHARDSON:  So they prohibited us from asking any questions at all or even looking at or doing a search of her personal phone to see what text message or calls they made between each other.

THE COURT:  Okay.

MS. RICHARDSON:  And --

THE COURT:  So at this point you don't have any evidence and -- and the argument is -- the argument is that they've basically firewalled any -- any ability to confirm whether there were communications via the phone number that she provided to Mr. Hammond?

MS. RICHARDSON:  Yes.  Well, what I'm -- what I'm looking at here is a very big concern because when we have discovery and there's been a request to maintain all ESI, which was sent by my colleagues over here back in 2020 -- and they were clearly aware that there was at least an investigation into a civil rights claim in 2018, and that there was apparently a litigation hold sent by DHS.

It's on -- we only know that because it's on a privilege log, which I'm going to get to in a second.  That was in 2020.  There should have been an effort to take ESI

belonging to these individuals who work for DHS and to segregate or at least keep that information and then to search it.

So that's what we want to do.  We want to have an independent third party who searches the phone with -- you know, we have search terms that we would use on any phone.  But if it's her personal phone, people oftentimes, in all litigation, all -- all the time, they'll use their personal phone.

THE COURT:  And is this in lieu of getting records from the subpoenas that -- for which there's a motion to quash?

MS. RICHARDSON:  So in those subpoenas for the motion to quash, we were not asking for the content of the --

THE COURT:  Just the headers?

MS. RICHARDSON:  Just the headers, you know, so we can see, like, what's happening here.

THE COURT:  So in your motion to compel O'Brien's phone and potentially having a third-party vendor, you know, filter that information, are you seeking just phone log information about whether there were any communications between certain phone numbers?

MS. RICHARDSON:  We want to have a -- we want all of the personal phone to be searched for our search terms, just like any other phone.

THE COURT:  Okay.

MS. RICHARDSON:  And then what we're also doing is, because of Ms. Chapman -- and Mr. Edelson has now handed a deposition excerpt about that -- Ms. Chapman is another named defendant who was deposed recently.

THE COURT:  And before we get to Ms. Chapman, I want to make sure I just wrap my head around what we're dealing with with Ms. O'Brien's phone.  You want the phone to be searched for text messages between her and any -- anyone else that worked for DHS?

MS. RICHARDSON:  Yes.

THE COURT:  Or -- would that include even the -- the foster parents?

MS. RICHARDSON:  Potentially, yes.

THE COURT:  Okay.  So any --

MS. RICHARDSON:  A list of people, yeah, that are relevant.  We're not just going to have everything searched. It would be to look for those names.

THE COURT:  Okay.

MS. RICHARDSON:  And we have a number of phone numbers, but we don't have everybody's phone number.

THE COURT:  Okay.  Well, I imagine then your search terms would be searching for references to people's names?

MS. RICHARDSON:  Right.

THE COURT:  And maybe some of the phone numbers?

MS. RICHARDSON:  Yes.

THE COURT:  And then searching the contents then of the text messages, once you've identified certain phone numbers, to see if they would be relevant and associated with this case?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  So that's your motion to compel. And then the motion -- the subpoenas for which the defendants have filed a motion to quash, I think it was Google and a few other tech --

MS. RICHARDSON:  Right.

THE COURT:  -- tech cloud-type servers, this was with respect to e-mail correspondence and seeking header information?

MS. RICHARDSON:  I'm just confirming.

If it's Verizon, it would also not just be e-mail, but it would be in addition to -- the phones, like calls that were made, and we just want to search for certain phone numbers and --

THE COURT:  But for what?  So let's take up Verizon. I mean, this is relating to the -- to Ms. O'Brien's personal phone number, right?

MS. RICHARDSON:  Right.

THE COURT:  Okay.  And is it your understanding that Verizon would keep copies of the text messages themselves, the content of those text messages?

MS. RICHARDSON: They might have copies of the text message. We didn't initially include that as the content for what we were requesting. It could be, though, that if she has intentionally deleted and they failed to preserve her phone, despite that they should have preserved it, then that might be another question as to whether or not --

THE COURT: And that goes to the issue of the spoliation claims that I think I understand the plaintiffs are wanting to make. Just I'm really focusing on just whether to order production or -- or to -- to deny the motion to quash, and I understood that -- that the subpoenas were -- were really directed at e-mails, because I'm not sure there's header information in other kinds of electronic correspondence, other than e-mail formats.

Is that -- unless there's something else that you were looking for that was appropriately described in your subpoenas?

MS. RICHARDSON: So, just to make sure, on the phone, on Verizon, it would be the call records for certain phone numbers that we've identified to have searched, to see what phone numbers and how long they were talking, but not the content.

THE COURT: Okay. So with Verizon, the call log relating to certain phone numbers. And those phone numbers were discretely described in your subpoena?

MS. RICHARDSON:  Yes.

THE COURT:  All right.  And then, with respect to the other tech servers, technology servers -- I think Google or something else -- it was e-mail?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  And just the headers, not the content?

MS. RICHARDSON:  Exactly.

THE COURT:  Okay.  All right.

MR. EDELSON:  Let me -- for the court reporter, this is Jeff Edelson.  Your Honor, I want to first emphasize how this is an extraordinarily important issue for every employee working for DHS and any -- any Oregon state office.  The -- what I know about DHS, and what we know from the depositions, is that they are issued state cell phones, and they are instructed to use them only for their state-related work.

They -- and in the case of Kat O'Brien, in the case of Kim Chapman, in the case of Stephen Hammond, the people whose depositions I've attended, they've reported that they all, at their own expense, buy their own personal phones so that they may keep their real life and their work life separate.  It's very important for them to keep it separate.

And, you know, you've been around these cases a bit when you were a trial court judge -- a state court judge.  You understand how just emotionally draining these cases are and

what these caseworkers and other DHS people have to deal with day in and day out.

So, for them, keeping those two worlds separate is not just fundamental, it's become instinctive for them. Now, when you look at the e-mail that counsel references -- there really are two. One was the one that you just discussed. And it actually says exactly what I'm saying right there in that important paragraph.

She says to Mr. Hammond, "My real phone number is (541)279" -- or whatever -- "Normally I have strict rules against doing work on it. But, for you, I'd touch base tomorrow if it's helpful." That's what she said. Now, what we know, because Stephen Hammond testified that he did not take her up on her offer at all.

So there is no call, there is no e-mail, there is no text that was sent to a personal device as a result of this e-mail that was sent through the DHS system. We also know that this was a three-day weekend over Memorial Day, and there were some very important things going on that Mr. Hammond had stepped in to take over.

And it had to do with the reporting of abuse by J.C. and the investigation that -- that would follow. So, to put this in context, this happened well after J.C. reported for the first time that she had been abused by one of the foster care parents, the -- the resource parents.

This is not -- in other words, it didn't happen at a critical period when it -- for example, there might be some discussion about what Ms. O'Brien learned while she was serving those children during this critical period.  It's after.

And despite trying to -- counsel trying to connect together the knowledge that some investigator was doing some investigation outside, that has nothing to do with this -- with this e-mail and the need to make sure that, while Mr. Hammond on a three-day weekend was going to do his work, Ms. O'Brien said essentially, "My work phone's off; but if you need me, 'cause this is important, I'll be available."  And he didn't need her.  That's the evidence.  So we have zero evidence that --

THE COURT:  Is it policy to keep your work phone off when you're --

MR. EDELSON:  I can't speak to whether that's policy, and I don't know if the question was asked.  But that's clearly what was happening here and certainly what they did.  And I get back to having to keep your work life and your home life separate, making sure that there's -- that they don't cross over, because if you let things cross over, that's where you get into dangerous territory emotionally.

Now, the other e-mail --

THE COURT:  So what you describe is a very important principle that ought to be applied strictly -- I mean, quite --

maybe more -- very religiously, but -- but I'm also seeing the evidence that -- from this e-mail, that she shared her personal e-mail -- a personal phone number.  So these lines are getting blurred because, frankly, on -- on some level, human nature probably causes blurring to happen, no matter how strict people want to conduct themselves -- how strictly people would want to conduct themselves professionally.

So I can appreciate that you'd like me to accept that this is what is done, this is how it's done, this is how it's always done, and there is no variation or deviation from it. But I have an e-mail that says that she -- that shows that she shared the phone number.

MR. EDELSON:  Well, I -- and that's important because it demonstrates how forthcoming we've been in our discovery.  I mean, we --

THE COURT:  So let's clear some things up.  I'm not really questioning whether people are forthcoming or not.  I'm just simply wanting to make sure at this stage people have the discovery they need to prosecute and defend the case.  And so really, at the end of the day, ideas about hiding documents is less important to me.

I'm not finding that any one of you are playing those kinds of games.  So that's not even a part of my consideration. But I also don't want that argument to be presented as a shield from considering whether documents ought to be produced in

discovery during this phase of trial.

So I'm not interested in what -- the policy -- if there's a policy about complete sequestration of personal phones and professional phones, great.  I get it.  It's probative that that is the expectation.  But I also have evidence that disposes or weakens that strict firewall when somebody, Ms. O'Brien, says, "Here's my personal phone number."

MR. EDELSON:  Well, she said more than that.  She said, "I -- this violates my -- the policy that I follow, but I'll do it for you on this occasion, on a three-day weekend, when we're trying to deal with this important -- you're trying to deal with this important matter and you may need me."  And the second thing that's so important is he didn't.

THE COURT:  And that's -- that may be very well fine, but it opens the door to questioning whether this policy is strictly complied with.  And I think that's part of the challenge that the plaintiffs are putting out here, is that, all right, we have a piece of evidence that says that they -- they say that it's supposed to be strictly kept separate, and yet there's evidence that they still shared this information, I mean, on this one instance.  So what do I make of that?

Now, let me -- I'm going to give you my cards.  I know I'm taking -- you know, I'm taking some of the time away from your argument, but I just want to make sure you understand that there's been much said -- and I remember, Ms. Hoffman,

last Friday you indicated this much, you previewed that, "Hey, this has far-reaching implications for everyone that works at DHS."

Well, I mean, yes, and they shouldn't be -- and they shouldn't be messing with splitting -- or sharing personal phone numbers within the professional context.  There's a reason why.  And yet there's evidence that -- that, at least in this one instance, there was a transgression.

Now, the far-reaching implications associated with having to produce this information has to be balanced against the allegations of the significant amount of harm that's been caused for which the plaintiffs are prosecuting.  So I'm not just concerned about what the -- the employees -- what the ramifications are for public servants who are employees of DHS.

It needs to be balanced against what harm has been -- has been alleged and -- and I don't think there's much of a dispute about what happened to these children.  And so when you're talking about whether these things should be disclosed or produced, I'm looking at that part of the picture, too.

All right.  So I've shown you a few of my cards, so that way you know where I'm coming from, as I'm trying to evaluate why shouldn't it be produced for the purposes of having a third-party vendor confirm that there isn't anything there.  But, frankly, at the end of the day, it raises questions about the spoliation issue, too, that I see coming

down the road.

I'm -- they have the burden if they're going to move forward on a motion to -- motion for sanctions on spoliation, but we're going to run up against this issue again at another time.

MR. EDELSON:  So the only time I ever see these motions being successful to get this kind of information is if there is clear holes in production, where something is missing. And one thing we've never heard from these plaintiffs is what do they expect to find in there, what didn't they get.

And I'll tell you -- and I think the e-mail -- or the transcript that I -- that Ms. Davies printed out for us gives us some insight into the -- into the whole thing.  So that is a -- that is a clear -- this is the only real example of -- that we have in this case of any DHS worker using their cell phone for personal -- their personal cell phone for business. This is the only example, in Ms. Chapman.  And when she testified, you can see in the transcript --

THE COURT:  And I haven't had a chance to read it. But if your argument is going to turn on the contents, it might be helpful for me to probably look to it.

MR. EDELSON:  It might be worth a couple seconds here to read --

THE COURT:  Let's do that.  So I know there's -- should I read all four or five pages?

MR. EDELSON:  Please.

I don't think I have one.

(Whispered discussion, off the record, 12:52 p.m.)

(Pause in proceedings, 12:52 p.m. - 12:54 p.m.)

THE COURT:  Okay.  Thank you.

MR. EDELSON:  So the significant things that this transcript tells us --

THE COURT:  I was just handed some e-mails.  Let me take a look at what those were as well.  This is to Kassidy O'Brien.  This is Exhibit 5 of Ms. Korbel's declaration.  Okay. So that was referred to a bit earlier.  Hold on a moment.

Yes, Ms. Hoffman, I can appreciate why you would want to redact to not eat at a restaurant with fake indoor trees. It has nothing to do with anything.  Okay.

(Pause in proceedings, 12:54 p.m. - 12:55 p.m.)

THE COURT:  And what was Lang Perkins -- I mean, what was her -- I mean, so I'm seeing an e-mail from Lang Perkins. What was -- this is the first time I've seen her name in the mix.

MR. EDELSON:  She's a DHS court worker.

THE COURT:  At that time?

MR. EDELSON:  And had a personal friendship with Ms. O'Brien.  And I -- I think that it helps us understand the three examples that are out there.  One is just, "Hey, let's meet for lunch 'cause we're friends, and use my personal number

because it's not DHS business."  So that's an easy one.  That doesn't reflect any suggestion whatsoever that -- that cell phones were being used for work, personal cell phones.

MS. SKJELSET:  Your Honor, I'm not sure I'm privy to what you're looking at, but I do have some information about Ms. Lang Perkins and --

THE COURT:  This is Exhibit 5 of Ms. Korbel's declaration, and it's an e-mail thread from Jennifer Lang Perkins to Kassidy O'Brien.

Okay.  All right.  And was it you, Mr. Edelson, that referred to Ms. -- or was it Ms. Richardson?

You were referring to Ms. Korbel's declaration?

MS. RICHARDSON:  Yes.  I think Mr. Edelson is pointing to a deposition transcript of Ms. Chapman.

THE COURT:  Yes.  And that, I've reviewed.  I mean, I just pulled these now and -- so I -- maybe we'll set those aside.  I don't know if they need to be --

MR. EDELSON:  And that's a pretty weak smoking gun, I mean, if that's the best evidence they have that there was use of personal phones for DHS work.  And what we can see from the communication with Ms. Perkins is that the phone number trade was to make plans to have lunch together, and that's clearly personal.

THE COURT:  And that was an e-mail?

MR. EDELSON:  That was in an e-mail that she provided

that information, "Here's my phone number.  I've got yours.  We can make plans for lunch."  I don't think that anyone can make an argument with a straight face that that equals work or --

THE COURT:  And do we know whether the cell phone is a personal or -- or a professional e-mail?

MR. EDELSON:  Yeah, she says -- in the e-mail Lang writes, "Saving your number" --

THE COURT:  Oh, okay.

MR. EDELSON:  -- "in my personal phone."

THE COURT:  There we go.

MR. EDELSON:  "My personal number is this."

So this is, you know, workers having personal time together, which that doesn't open up the world of discovery because two people, who seem to connect as coworkers, decide to explore a personal relationship or -- or maybe I'm making it too weird -- but to have a -- to have a friendship that is outside of the office.  So that's what that e-mail is.

The -- the Kim Chapman testimony, "Yes, my work phone was out of commission for some period of time.  I don't remember exactly when it was."  And during that period of time she testified, candidly, "I had communications with my cell phone with" -- regarding even this case.  I think she testified that she believed she spoke with the Spicer-McCool family.

So clearly she admits, "I used my personal phone for work."  But what she also says that's so important is she said

that anything important, anything substantive, went into the OR-Kids system.  In other words, if she had a communication on her personal device during that brief period of time when her work phone was out of commission, she'd document the substance of that information, which is a heck of a lot more than a header and how long a call was, she'd document it in the OR-Kids system.

And really that's where everything is documented. This whole case is documented in the OR-Kids system almost. There's some other places as well.  All have been produced. And we're going to talk a little bit more about case notes and things like that in a moment.

But she said, number one, "It was this strange time when I didn't have a work phone."  Two, "I documented everything in OR-Kids."  And, three, "Those communications no longer exist.  They've been deleted."  That's it.  Now, there's --

THE COURT:  Let me also add, I mean, she also said she doesn't remember certain things about it.

MR. EDELSON:  She doesn't remember the details.  But I'll remind you, Your Honor, they were not sharing with her the case notes during the deposition.  They were not --

THE COURT:  "They" being who?

MR. EDELSON:  The plaintiffs.  They weren't saying, "Here's a case note from this date.  What happened on that

date?  What did you do?  Why did you do it?  Who did you talk to?  Tell me more about the conversation."  And I'm straying into some of the other arguments.

Largely, some of these depositions, the portions were just weird memory tests.  "Do you remember this?  Do you remember that?"  And yet there are documents.  It's all documented.  There's no need to go look at cell phone records when all the substantive information is documented in the official policy of what they were supposed to do, what they did do.  And they understood work is work; personal is personal.

THE COURT:  Well, at the risk of playing the devil's advocate here -- and I'm not trying to make the plaintiffs' argument, but perhaps just cut you out of the argument, so you don't take any more time than I need to figure out what to do here, Counsel, which is, I mean, I get -- I mean, this goes back to the same issue about, you know, in theory, this is how it's supposed to work.

But I'm also dealing with human systems, where people aren't doing everything that they're supposed to do in theory.  And so the fact that either Ms. O'Brien or Ms. Chapman say, "Oh, we would -- we would document this in a case note," in the absence of the actual underlying physical document themselves, text messages, there's no way to compare or consider whether that is, in fact, true.

MR. EDELSON:  I don't think we'll ever get text

messages from any source, subpoena or otherwise. They don't exist. They were either deleted from the devices, or the devices have been exchanged for new devices. The cell phone companies don't retain the substance. I think it's not likely we'll ever see them, even if we needed to, but I don't think we need to.

THE COURT: Well, I'm not interested in that question or the answer to that. I'm -- my first focus is on whether I should be ordering production of these documents.

MR. EDELSON: I --

THE COURT: So whether -- again, maybe -- and now I'm actually reversing my whole notion about theory versus practice. Whether practically you can tell me they don't exist, I think the question is whether theoretically it's appropriate and -- it's appropriate for me to order the production or at least for you to respond.

If you're going to end up responding, "They don't exist," then the question is do they have a right to have these phones searched for these particular -- these search terms to -- to put this matter to rest once and for all.

MR. EDELSON: And on that point I think this kind of discovery is extraordinarily Draconian and extraordinarily unfair to these individual people, who dedicate their lives to looking after these children and put their emotional energy into these cases, to then -- suddenly their personal life has

to be introduced into a lawsuit, when they have -- they lose all control over everything.  It's just abundantly unfair.

THE COURT:  And I understand the mechanism is not for any one of these individuals -- the attorneys or staff to be reviewing each and every single one of their e-mails or texts, or whatever it is that that would be -- whatever that universe would be.  But that it would be a third-party vendor that would -- would exercise a limited set of search terms to determine if there are hits that -- that meet those search term parameters.  So --

MR. EDELSON:  It may seem innocuous, but it's not. They're going to have to -- there would have to be a vendor secured.  The vendor would have to take physical possession of these individuals' or an individual's cell phone, which is -- which is -- I know for a lot of us it's almost like our safety blanket.  We don't want to give those up.

The level of intrusion there is extraordinary. Whether it's done by these anonymous people in back rooms or whether it's done by lawyers or whether it's done by their employer or the other side, it's incredibly intrusive.

And when you look at the case law -- I reviewed it all, the cases that we cited in the briefs, last evening -- there's a strong presumption against this, in the absence of meaningful evidence that they might find something, that there's something missing, that there's holes in discovery.

It doesn't exist.  I have not even heard counsel articulate what they think they might find.  What's the -- what's the gold nugget that could possibly be -- that they could learn because there were communications between people -- between a DHS worker and another DHS worker on a certain date, for a certain length of time, without any content?  What's that worth?

It's -- and even if it had content, what content are they looking for?  It's like this -- I mean, this is a classic fishing expedition that has gone way beyond the discovery obligations.  This isn't a situation where we've seen "Why aren't there any communications?  You said you were supposed to be communicating regularly with this person or that person, but you haven't produced any of that.  Where is that?"

Where is the stray document that -- that hints that there is -- or that is -- actually, one of these exhibits that made their way into discovery -- that we're -- you know, we're holding these things back?  There's nothing like that.  This is a complete fishing expedition for, honestly, God knows what.  They've taken extensive -- Kat O'Brien sat for over 13 hours of deposition.  13 hours of deposition.

I was there as the lawyer, and it was exhausting.  I didn't have to answer any questions.  That is a lot to ask someone to do under any circumstances.  And, you know, she's just a caseworker trying to do the best job she can for these

kids.  And what are we going to find?

THE COURT:  I do want to make clear to everyone here it's -- it's been my observation and my experience on the bench to allow for full-throated and full-fledged discovery on both sides.  I mean, I've -- I've considered the burden that everybody's had to bear by virtue of my rulings.

But -- and -- not "but" -- and I continue to be committed to the ideal that, in our system of justice, it only begins with the kind of transparency necessary for both sides to prosecute and defend their cases fully.

So, Mr. Edelson, you've had a chance to make your argument.  And some of it, I -- and there's a balance of it that I want to consider in weighing against the -- as you've described the intrusiveness, which I agree is, but I'm also considering the harm that's been alleged to have been committed in determining how far we go to ensuring that full transparency is available to everybody in this case to defend and prosecute.

Ms. Skjelset, last Friday you said something about how you believe that documents in other cases reflecting sharing of e-mails or personal phones seem to have been something that you've obtained.  I may have misunderstood it in the course of the -- of the remote telephone communications.  What was it that you meant by that, if I understood you correctly?

MS. SKJELSET:  So, just as a little background,

Your Honor, in prosecuting these cases against DHS, we've put the DOJ on notice on numerous occasions that we wanted text messages that were transmitted between caseworkers.  And in each case they have almost always been deleted from the state devices.

THE COURT:  Before or after the litigation hold notice?

MS. SKJELSET:  Well, I have a current case where it has occurred after the litigation hold notice.

THE COURT:  That the deleting occurred after?

MS. SKJELSET:  The deletion occurred after.  In this case the deletions appear to have occurred both before and after the litigation hold notice.  But we've developed evidence over time that the -- that the individual actors who -- whom we have sued for civil rights violations, in particular Ms. O'Brien, was aware of the prospect of a lawsuit, was aware that there was an investigator looking into what was happening.

THE COURT:  But prior to your -- your hold notice?

MS. SKJELSET:  Exactly.  More than a year prior, in October of 2018.  And that's part of the foundation, which was transmitted to a supervisor.

THE COURT:  Is there any evidence of any policies that DHS has with respect to the deleting of text messages?

MS. SKJELSET:  We have to continue to analyze those.

THE COURT:  Meaning what?

MS. SKJELSET:  I think that they -- they assume that their -- that all relevant information is uploaded into OR-Kids.  It's the presumption.  So they have a policy of deleting and wiping all phones that are handed in.

THE COURT:  I'm sorry.  I wasn't following.  I want to make sure I understood what you said.  Is there or is there not a policy with respect to deleting text messages on DHS employees' work phones?

MS. SKJELSET:  I think that that is a -- that is an issue that needs to be briefed, because I believe that they would disagree with our reading of the policy.  There's a presumption in the policy --

THE COURT:  Is it a written policy, or is it a verbal policy that you've been able to construct from testimony and other evidence?

MS. SKJELSET:  Again, I feel like it requires some briefing because there is a policy -- there's a practice of deleting phones that are turned in for an upgrade, right? There is a Public Records Law that governs substantive information regarding case activity, and it is our position that it should govern the text messages on cellular devices.

I understand that DOJ attorneys, and the Markowitz Herbold attorneys in their place, may disagree with that.  And that's an issue for briefing.  But, regardless, it is the destruction of relevant evidence because we have found text

messages, few and far between, that were highly probative.  And more --

THE COURT:  Not in this case, but in other cases?

MS. SKJELSET:  Not in this case.

THE COURT:  And it's -- these other -- these other cases in which you've litigated or prosecuted, are you saying that you had -- you were able to have confirming evidence that caseworkers shared their -- or used their personal phones?  Or was it just their -- their professional phones that text messages were deleted?

MS. SKJELSET:  It was simply that the professional phones -- this is the first case that we've had such significant evidence that they were using their personal devices with each other.

For instance -- it was not shown to you -- but in my deposition of Stephen Hammond, there was a discussion about how they arranged -- likely arranged for a meeting to discuss how Ms. O'Brien felt she was -- like she was being thrown under the bus for -- with her casework in this case after work.  And that would've occurred on her personal device and his personal device as well, which number we still don't know fully.

THE COURT:  I want you to repeat it again, because I want to make sure I followed.  You're saying that in a deposition of?

MS. SKJELSET:  Mr. Hammond.

THE COURT:  He testified?

MS. SKJELSET:  He testified that they had a meeting.

THE COURT:  "They" being O'Brien?

MS. SKJELSET:  He and Ms. O'Brien, after hours they met, potentially for drinks -- I can highlight the pages -- but to discuss how she felt like she was being thrown under the bus for her casework on this case, in this case.

THE COURT:  All right.  So -- and where was the use of personal phones implicated in that testimony?

MS. SKJELSET:  He said the arrangement of that meeting would've occurred over their personal cellular devices. He testified to that.

THE COURT:  And you don't have text messages from either of their personal devices reflecting that scheduling of a meeting?

MS. SKJELSET:  No.  Simply his testimony that that would've occurred.  We don't even know what his number is.  So, in the event that the Conley plaintiffs succeed in obtaining simply the phone records, we would not even be able to compare his number against the phone records to determine whether or not they were actually in communication.

And, just from J.C.'s perspective, I know that Mr. Edelson is saying that there's not a whiff of evidence that -- that we need to present that there's something that would be there.  But, from J.C.'s perspective, this is a child

who we know legally was -- because there was a conviction, was sexually abused over a long period of time and sodomized in a foster home.

And in the context of that trial, Ms. O'Brien testified against J.C.  She was called by the defense to testify against J.C.  And there's no --

THE COURT:  In the criminal case?

MS. SKJELSET:  In the criminal case.  And we have records that she was undermining this child's disclosure, undermining her credibility throughout the course of the criminal prosecution and beyond with her providers.  So we have reason to believe she was likely doing that on her personal device as well.  And we have no understanding of how she ended up being called by the defense because it's --

THE COURT:  And why do you have reason to believe it was being -- any communications that you've described were being done on the personal device?

MS. SKJELSET:  We don't know how she was called to testify by the defense attorney.  There's no indication in the phone records that we received.  We received the DHS phone records.  There's no communications with the defense attorney.

MR. RIZZO:  And she claims a complete lack of memory.

MS. SKJELSET:  She claims a complete lack of memory of the testimony whatsoever.

THE COURT:  Of the testimony in the criminal case?

MS. SKJELSET:  Yes.

MR. RIZZO:  Who called her, what she said, how she got to the courthouse, et cetera.

THE COURT:  Okay.

MR. EDELSON:  Your Honor, I just want it to be clear that it's undisputed she was subpoenaed to testify by the defense.  We don't know what she testified to.  We don't know the subject matter specifically.

Oh, we do?  Oh, sorry.

MS. BLAESING:  We have that.  We know that.

MR. EDELSON:  We have the transcript?

MS. BLAESING:  Yeah, we have the transcript.

MR. EDELSON:  Oh, so we have the transcript.

THE COURT:  Of the criminal case?

MR. EDELSON:  So we know -- we can identify what she said.  We're not in the head of the defense attorney about why they decided -- they can call anyone they want.  They called the caseworker.  And I think -- I'm going to take a moment here to just -- 'cause I think this particular issue is so significant in terms of how it exemplifies the way this case is being prosecuted.

Ms. O'Brien is being criticized, and you just heard it just here, for having doubts and possibly not believing the disclosure by J.C., okay, that this was some horrible offense.  Now, here's what's so important.  And it may be true that she,

being the DHS worker, who probably knew the child the best, was skeptical about her -- her revelation.

The child initially said it was her bio father and then changed her testimony that it was the resource parent father. And we know that much. And we also know that Ms. O'Brien was skeptical about this sudden revelation that happened after the children had already left the Raygosa home and that, even today, may have some doubts, despite the fact that we have to accept that there's been a conviction.

But I think so important is that what happened here is, despite the caseworker having doubts about the revelation, everything happened the way it was supposed to. The case was assigned to an -- to investigators. It was assigned to a -- it was -- it was presented to the -- to the prosecution.

The guy was prosecuted. He was convicted. Everything happened the way it's supposed to happen. The fact that she had doubts about it is entirely, entirely irrelevant. It doesn't tell us that she -- I mean, in fact, it goes to the opposite. To whether or not she knew about this abuse, she clearly didn't know about the abuse and didn't even -- wasn't even convinced that it was true when it was revealed.

So, you know, when we talk about this 1983 claim, we talk about this negligence claim, you know, how does that help their case that Ms. O'Brien, the person who knew her best, didn't even think that these things were true? How does that

help their case?

And despite that person not -- not really certain it was true, it still went through.  It was -- it was assigned to a different person and a different department, and it was fully prosecuted based on what the child said.  And it was the child's testimony that convicted Mr. Raygosa.

So I have not read the testimony of Ms. O'Brien.  I have serious doubts that she undermined the child in her testimony.  But that's -- it is what it is.  But it doesn't matter, because the man was prosecuted.  DHS did what it was supposed to do.

And Ms. O'Brien is free to have her own opinions about her own observations, based on the relationships that she's had, the people that she's seen, the people that she's met, the people that she's worked with.

But it doesn't matter.  It doesn't matter.  The abuse happened, nonetheless.  The abuse happened.  There was a conviction.  And what Ms. O'Brien thought about it, thought about the conviction, thought about being thrown under a bus, any of those things, none of that matters.

And, frankly, I'd be surprised if Your Honor would ever let that evidence in to a jury trial about whether or not the department and Ms. O'Brien were negligent or -- or deliberately indifferent.  So it's just -- it baffles my mind why this particular issue is so important or it means anything

whatsoever.

But the -- but, nonetheless, there's been testimony. Mr. Hammond spoke very openly about some of the things that -- about the opinions that Ms. O'Brien shared with him. There's -- there's -- I'm not hearing that he was hiding evidence or holding back evidence.

But he also testified that his personal cell phone number and his home are -- he has to protect, because he has been threatened. He has received -- he has received threats at his home. He has received threats on his cell phone. He is very, very protective.

And the reason he has threats is because they do this -- they're in this -- do this work that's just -- I mean, it's really in the trenches. And they have to do things that not everybody likes, and they make enemies along the way. And he has to protect his family.

If DHS workers think -- and I totally appreciate Your Honor saying, "Hey, it would be a third party. It would be subject to orders. It would be all very protected." I get that. But I also get that the message to DHS workers would be like, "Even our -- our personal lives are open to the -- are open to lawsuits. We have to open them up, 'cause that's what -- that's what the judge ordered."

They're not going to appreciate the nuance of some unrelated third-party technical person going through a -- going

through and looking for phone numbers and looking for -- they're not going to appreciate that.  This is why I say it's so important to DHS workers that they are able to keep personal and business separate and that this -- and it starts with their -- their home versus office, and then it goes to their cell phone versus their work phone.  These are sacred distinctions for them.  And I think it's a real slippery slope to say, "Well, we can put enough safeguards in place to protect the sanctity of it," because it won't be perceived that way.

And -- and in a case where the evidence that there was actual use that was -- that was relevant and meaningful here or -- and -- and missing information somewhere else, in the absence of that, I just -- I just can't understand how we can allow such a significant intrusion into people's personal lives.  So I -- you know, I --

THE COURT:  Where in the case law does it discuss that balancing test that you are describing to me right now?

MR. EDELSON:  All right.  Give me a few moments to find --

MR. RIZZO:  Judge, I had a particular thing for lunch.  May I step out just for a moment?

THE COURT:  Oh, yes, go ahead.

MR. RIZZO:  It didn't quite agree.

THE COURT:  Are you satisfied that you don't need to be here for this potential -- this argument?

MR. RIZZO:  Yeah.  I'll be back.

THE COURT:  Okay.

MR. EDELSON:  So one of the things I remember -- and I'll find the case on it -- is one where the court says --

THE COURT:  Is it an appellate decision or a District Court opinion?

MR. EDELSON:  I don't remember, honestly, Your Honor. I apologize.  But Ms. Blaesing's going to dig through here and see if she can help me find it.  But, you know, we don't treat civil cases as crime scenes.  And remember Ms. O'Brien --

THE COURT:  Focus on my -- my question.  I mean, I --

MR. EDELSON:  Well, I'm just trying to give you some cases that -- you're talking about the balancing test.  I get that.

THE COURT:  Right.  But by leading off by -- by juxtaposing crime scenes with a civil case is not availing to me.  I'm interested in why you think there's -- hold on a minute -- if there is a balancing test and if you think that there's an appellate -- an appellate instruction about this balancing test, that will help me understand and appreciate the arguments that you're making, so I can make a decision consistent with our Ninth Circuit.

MR. EDELSON:  Well, one of the key cases to me is a case -- and it's not an appellate case.  I apologize.  It's from the Southern District of Texas, the Houston Division --

where they say that the allegations are pure speculations and repeated motions have been both an impermissible fishing expedition and harassment.

Discrepancies or inconsistencies in the responding party's discovery responses may justify -- and that's where I, you know, talk about the balancing test -- may justify a party's request to create and examine a mirror image of the hard drive. So that was in the -- that wasn't a cell phone. It was an issue of looking at a computer hard drive that --

THE COURT: So, just to make sure that we're comparing apples and apples, I don't know what the difference is between a cell phone and a hard drive, other than the fact that I think it'd be a search of the hard drive, at least as it relates to text messages, and not necessarily any other apps or memory involved. So it's hard drive to hard drive, is what I understand, unless somebody's going to argue something broader than that which is in a cell phone.

MR. EDELSON: The best case on the balancing concept really comes out of an Oregon state court case -- Oregon Supreme Court case, State v. Campbell, 306 Or 157, 1988, where it talks about the right of a private citizen to be free from certain scrutiny into private places. And I -- you know, there are very few things that I think would be more --

THE COURT: And it would be -- are you -- I recognize that our public servants, and in this case DHS employees, are

both private and public, depending on the context in which they are conducting whatever -- the behavior or conduct in question. In this instance, is it -- are they acting completely in a private -- in a -- sort of in a private setting or -- or is there a mix here, when people are using phones that are personal use for -- or sharing personal phone numbers within the -- within the professional context?

MR. EDELSON:  I think -- to answer that question directly, I think Kim Chapman, there's evidence that she used her personal phone for business.  There's evidence that she did it, and she acknowledged it.  Now, I've argued that just because she used it doesn't open up her personal cell phone to an investigation, when she also said that she had downloaded all of the important information into OR-Kids.  But --

THE COURT:  No.  She said that she would have if -- if there was something of significance, but it -- but she didn't say she did, in fact, do it.  I mean, there's a difference between relying on somebody's, "Well, this is what I -- my general practice is," but can't independently recall that she, in fact, did so.

MR. EDELSON:  You know, I appreciate the possible ambiguity there.  Contextually, I -- some people say "I would have" meaning "I did," and you've probably heard that.  It's -- it's confusing, but that's the testimony.  I acknowledge an ambiguity there.  But the -- my point is that -- that this is a

private place, their personal cell phone.

And for Kat O'Brien, for Stephen Hammond, there is no evidence that they used their -- their personal phones for business work.  There's just these really obscure anecdotes, and the one -- perhaps the best one is "You can call me over this Memorial weekend, even though I don't normally allow that."

And then we have the corresponding testimony that it never happened, that there was no communication.  So that just becomes a red herring, and it sort of disappears.  There is no ongoing practice of using their personal phones, with the exception of Kim Chapman for that brief period of time when she had --

THE COURT:  2016 to 2019?

MR. EDELSON:  No.  I think it's a far shorter period of time, a much smaller window than 2016 to 2019, though.

THE COURT:  I'm just looking at the dates here in the deposition transcript.

MR. EDELSON:  I get that.  But even a week in those periods would've probably gotten a "yes" answer to that question.  It -- again, I'm just reporting what I -- what I interpreted from what I heard.  It sounded like it was a short period of time, and she doesn't even remember when it was, when she knows she -- she used a personal phone.

And it's interesting because the fact that she even

remembers that is a strong suggestion that it's very unusual for anyone at DHS to be using their personal phone for business work. So then -- all right. So Taylor v. Horizon Distributors, 398 F. App'x 306, 2010, Ninth Circuit, the standard to deny discovery of marginal relevance. And I think that's -- at most, we're at marginal relevance, but I think we're even below that level of marginal relevance. I don't think --

THE COURT: Why are you describing this as marginal evidence -- marginal relevance, I think, is what you said, right?

MR. EDELSON: Relevance. Right. Right. And, again, I -- I've given them many chances to tell us what is it they expect to find there, what could possibly be in -- even if they had the content of e-mails and -- and even if there was some accidental breach of, or even intentional breach of, their standard, their rule, what's the best case? What are they going to find that they don't already have? What are they going to find?

They know Kat O'Brien was not -- did not fully believe J.C. It's well-documented. It's been admitted. Others have observed it. There's -- there's -- apparently the --

THE COURT: So what you're suggesting is if they find anything, it would just be duplicative of the things that's

already in play?

MR. EDELSON:  Maybe.  But they haven't -- they haven't given us any examples of what else they might -- what they might find.  I --

THE COURT:  Okay.

MR. EDELSON:  What is -- what is it that they're looking for?  I mean --

THE COURT:  I mean, the challenge with your logic is that, you know, proving -- proving something for which they haven't had access, to even consider making the argument for the marginal relevance, is almost impossible, unless they -- unless they had an accidental leak, which, frankly, is what occurred with that e-mail between Hammond and O'Brien.  So, I mean, how do they prove the existence of something for which they're completely --

MR. EDELSON:  I don't know that that was an accidental leak.  We produced documents that they asked for that --

THE COURT:  Well, you moved -- actually, there was a motion for clawback.

So let me turn to the plaintiffs now and give you an opportunity to respond.

MS. RICHARDSON:  Thank you.  So I'm not sure where to start on all that, and I don't know that it's --

THE COURT:  If you want to keep it straightforward

and to the point and try to hit a bull's eye, that would be great --

MS. RICHARDSON:  Right.

THE COURT:  -- like -- just, like, straight down the line.

MS. RICHARDSON:  What's hard is that he's brought up the rendition of Ms. O'Brien and the relevance of her not believing the child, but what she has also done -- and this will go, again, to the deposition testimony, which is the next argument that we're going to go into -- but, as part of that, when I took her deposition, what was revealed was that she would characterize the child as manipulative; and yet she would not look at the Raygosa family, the foster family, and look at them to see that they were the ones that were manipulative.

So it's the -- her indifference in -- in not doing her job that she should've done with regard to the foster family.  But I don't want to digress into that right now.  This is not what's before the Court.  What I want to do is just address Mr. Edelson's -- and, by the way, this is Bonnie Richardson.  I forgot to tell the court reporter that.

THE COURT:  I'm sorry.  Say again?

MS. RICHARDSON:  Bonnie Richardson, for the court reporter.  Sorry.

So what I heard Mr. Edelson say was that big diatribe about DHS workers and something special about them and -- but

there's no case, no statute, nothing, that says that they should receive special treatment in the civil setting, when we have a situation where there are -- there is ESI that we have asked to be preserved, and we would like to have them searched with specific search terms.

And, in particular, when I hear somebody say "in my experience," it's hard for me 'cause I think, well, I can also talk about, whenever I look at all the discovery that we do in all these other cases, that are really no different here, you also have employees, even ones in which I've been involved with, with Markowitz on the other side.

And in those, for example -- they're civil cases. And what you have is a business that has a policy that says, "Do everything here.  Don't use your personal cell phones." And people, by human nature, will communicate that way.  So what often happens all the time is they do turn in those personal cell phones.  They are searched.  There's a limitation.  And we can have it done by a third party.  And if there's going to be --

THE COURT:  A third-party vendor?

MS. RICHARDSON:  Third-party vendor.

THE COURT:  Who is qualified to conduct discrete searches and who would also have the professional, I guess, guardrails set up for ensuring confidentiality and -- and, you know, the destruction of any -- any copies after a search has

been completed?

MS. RICHARDSON:  Yes.  And this is just for discovery.  It happens frequently.  And sometimes some things will come up that are very personal in nature, and those will be set aside.  But if it's in the context of work or part of that -- part of that material, this is also subject to the protective order.  And, of course, it's not automatically evidence.  We can have arguments about what comes in after that fact.  But I would --

THE COURT:  And you're only dealing right now with Kassidy O'Brien's phone search; is that right?  That's the motion to compel.  You're not -- is there anything about Chapman?

MS. RICHARDSON:  Yes.  So, because we just found out about Ms. Chapman, after we filed the motion to compel, Ms. Chapman's phone should also be searched.

THE COURT:  And then what about Hammond?

MS. RICHARDSON:  As well as Mr. Hammond.

THE COURT:  So those are the three people.  Is there anyone else?

MS. RICHARDSON:  There are others, but we're going to choose to limit it to just those three.

THE COURT:  Motion -- Plaintiff Conley's motion to compel is allowed.  Let's discuss the parameters for this.  Let me offer some from-the-bench explanation for my ruling, so

people have some idea why it is that I've decided the way I have.  There's been some discussion about absolutely no evidence and no basis, and it's of marginal relevance.

The deposition of Ms. Chapman establishes sufficiently to this Court that the use of personal e-mail -- excuse me -- personal phones, while there may be a policy, and a strict policy, for not doing so, happens with Ms. Chapman. There's evidence from the e-mail, that we discussed some many weeks ago between Hammond and O'Brien, that there was a sharing of a phone number, a personal phone number.

So the idea that this is a fishing expedition is specious.  I don't accept it.  There is some very real evidence that communications are being made between caseworkers through personal devices.  The search through a third-party vendor is going to be allowed.

We'll need to discuss some of those parameters, again, to make sure that it is -- it is very tightly constrained to ensure -- to minimize the level of intrusiveness on the individuals in question, balanced against the incredible harm and damage that's being alleged and prosecuted here, sufficient to justify the need for searching these other devices that are purportedly off-limits to professional communications, but are clear in the records that are in front of me are being used.

So -- and so we have those three people.  And there's

no one else.  So, Ms. Richardson and Ms. Skjelset and Mr. Rizzo and Ms. Tshala, don't ask me for anybody else.  You get your three, and that's it.  What are the parameters?  Lay them out for me.

MR. EDELSON:  So, Your Honor, they've provided a list of phone numbers.  And we have done our best to try to figure out whose numbers they are that they want to be searched, and we don't know.  And so if -- we can get -- we can get the information back.  We -- I think we know maybe half or something a little greater than a half.

But we would like you to order that they provide to us who it is they believe owns the numbers that they are asking for information.  And if -- if -- once we learn them, we may want to come back and say, "Well, this is really over -- I mean, this is" --

THE COURT:  Well, let me ask this:  How many phone numbers are we talking about?

MS. RICHARDSON:  I think there's about 50, if my memory is right.  But they're all DHS workers.  They're all people that work for the state or family members involved.

THE COURT:  So Ms. Skjelset, Mr. Rizzo?

MS. SKJELSET:  It's my understanding they're all individuals -- they're numbers of individuals who are involved in Child Welfare activities and case planning and caseworkers, but it's --

THE COURT:  Potentially 50 caseworkers in -- or people employed by DHS that were in some way related to the Conley and Levi matters?

MS. SKJELSET:  There's therapists.  There's CASAs. There's police officers.

THE COURT:  Well, the answer should be "yes" or "no." I just want to confirm:  Are there that many people in play here when it comes to these two plaintiffs?

MS. SKJELSET:  There were multiple --

THE COURT:  I just wanted to confirm.  If it's a "yes," just say "yes."

MS. SKJELSET:  Yes.

THE COURT:  It's easy to say "yes."  It's also just as easy to say "no."

Okay.  All right.  So it's not just caseworkers; it's potential therapists, medical providers, other counselors, people that are -- that are DHS adjacent?

MS. SKJELSET:  Right, Your Honor.  There's evidence that Ms. O'Brien was meeting the children's therapist for drinks as well, so we -- it is possible that there are communications on her --

THE COURT:  So where is that evidence?

MS. SKJELSET:  It's in the e-mails.

THE COURT:  Okay.

MS. SKJELSET:  I'm sorry.  I didn't brief it.  I --

THE COURT:  This is free flow.  I get in federal court everybody needs to file a written brief with citations, but get used to having the conversation with me.  I just need to know basically -- if somebody has a dispute about whatever it is you're going to say, they're going to pipe up and tell me they disagree with it.  We'll roll with it.  I just need to sometimes know some information on the fly, so I can keep moving along.

All right.  So there's 50 numbers of caseworkers and other people that -- that were involved in the cases providing some level of support.  So help me -- I'm willing right now to try to explore how we narrow down the search so that it is not overbroad.  I want to make sure that we -- we tailor this appropriately.

MS. RICHARDSON:  Yes.  And we also have already had search terms that were provided for those other phones.  So we have that, too.

THE COURT:  Is that on the -- for the subpoenas, you mean, or for the --

MS. RICHARDSON:  No.  Originally.

THE COURT:  Okay.  Let's just tackle the phone numbers for a moment.

And so, Mr. Edelson, you're saying you want to know what they know about who is attached to these phone numbers?

MR. EDELSON:  Right.  That's what I -- yeah, I just

want to know whose numbers they are.  We can't even determine whether they're remotely involved in the case.  I hear what they've represented here, but we weren't able to find corresponding names for a lot of the numbers.

THE COURT:  All right.  Well --

MS. RICHARDSON:  I don't know that we can --

THE COURT:  So if those 50 phone numbers are submitted into the -- to the vendor for searching, if they -- if they get hits, is there a mechanism by which you can review those hits and -- to -- to filter out phone numbers that are unrelated to anybody in the case?

MR. EDELSON:  We'd be happy to try.  But if we get a hit on some phone number that we don't recognize and can't identify, I'm not sure what we do with it.

MS. RICHARDSON:  The only way that we would've gotten that phone number would be through searching through all of the documents that DHS produced to us.

THE COURT:  Okay.  Well, there's two levels here. One is identifying whose phone number it is; and then, two, whether the content of that e-mail or the text message is actually producible or is discoverable.  So those are the two -- two variables I'm trying to control for and to provide enough agency on your part to be able to say, "Well, wait a minute, no, this is a random phone number.  It's about walking a dog," as opposed to anything associated with the case.

So I'm trying to figure out how we can set down the ground rules here to -- to allow you sufficient control, but not -- we're not redacting -- this isn't your opportunity to redact and determine what's privileged or not if -- if -- but we can talk about that -- about -- about whether these are -- are produced and -- to the plaintiffs.  So --

MS. RICHARDSON:  I would say that another thing that I think is --

THE COURT:  Hold on.

Ms. Richardson, then Mr. Edelson.

MS. RICHARDSON:  Okay.  Sorry.  So this is Bonnie Richardson.  So what I think is important, too, is that when there's these communications that are happening, text messages or whatever, phone exchange -- and we know that this is happening between certain people -- we also want to know about bias and how close they are and what they're willing to do for each other if they're going to testify one way or the other.

So in some ways, you know, some of the information that they're having these communications between other DHS workers, for example, between Ms. O'Brien and Mr. Hammond, there was a lot of working together in order to, what we believe, cover up what was happening.  So we want to know what were those communications that they were having with each other.

THE COURT: All right.  And are we talking about -- I

don't know if these are iPhones or Androids or whatever they are, but I imagine that there's a text message app, right? That's what you're -- that's what you're referring to?

MS. RICHARDSON:  (No audible response.)

THE COURT:  All right.  And no one -- and I'm not raising this to invite it, but I just want to make sure that we don't come back again -- you're not raising WhatsApp or Instagram or TikTok or Slack or anything else?

MS. RICHARDSON:  Well --

THE COURT:  It's -- it's whatever the SMS messaging -- the messaging app that is available on any of these -- any of these phones?  Because part of the challenge is that -- I don't know what's being stored in the -- I mean, what's on the phone versus the cloud.  And, to the limited understanding of what I know about tech, I don't think -- I don't know if WhatsApp actually stores anything on the phone. If you get the search of the phone, you're not going to find anything on WhatsApp probably.

MS. RICHARDSON:  Actually, you can.

THE COURT:  Oh.

MS. RICHARDSON:  So, yeah, I mean, that's what's difficult, is that I don't know what type of text messaging that they were using.  We were prohibited --

THE COURT:  And this leads to the issue, which is I want to make sure that we are tightly confining the search of

the phone.  It's not going to be a -- I mean, how do we make sure that the phone can be searched only within the -- within the realms of -- of -- of the text messages?  And I'm not interested in photos.  I'm not interested in searching metadata on anything else associated with whatever else is in that hard drive, including files.

MS. RICHARDSON:  And the names.  For certain, the children's names, Raygosa, the family names.  There's going to be some names that need to be searched.  If they're talking about it with other people, we want to know about that.

THE COURT:  Okay.  So we have some names, and we have phone numbers.  But I'm still concerned about how we make sure that the defendants have an opportunity to review because, as I'm thinking about it out loud as well, there may be communications between -- I don't know.  There might be an attorney phone number.  So we need to make sure that those are sequestered as well.

MR. EDELSON:  Yeah.  That's part of the reason why we want to know what those names are.  If they know who they are, they need to tell us.  If they don't know who they are, I'm not sure why they're on the list.  So --

THE COURT:  So I want to make it very clear.  If you provide -- you're not going to throw the ball back into their court.  All right?  So I'm giving you an opportunity to figure out how to make it work for you.  All right?

MR. EDELSON:  We have search terms.  We've used them already in the other searches that we've done.  We can apply those same search terms.  We think we should use the same vendor that we've used before.  They're already familiar with the case, with the --

THE COURT:  Who's the vendor, and does everyone agree?

MS. RICHARDSON:  Streamline?

MR. EDELSON:  Streamline.

MS. BLAESING:  No.  It's Lighthouse.

MR. EDELSON:  Lighthouse.

MS. BLAESING:  This is Lauren Blaesing.  So previously there was a request by the Levi plaintiff for search of several ODHS workers' work cell phones, which we did.  We collected phones that existed.  We ran searches using a vendor that the State already had --

THE COURT:  It's called Streamlight?

MS. BLAESING:  Lighthouse.

THE COURT:  Lighthouse.

MS. BLAESING:  The State already has a vendor with -- excuse me -- a contract with this vendor.  They ran the search terms that we received from Levi plaintiff's counsel and what --

THE COURT:  And I take it, since the State has a contract with this vendor, that there's -- that probably

affords some level of confidence in the -- maintaining the level of discretion?

MS. BLAESING:  Yes, Your Honor, because there is already a contract in place with the confidentiality and security requirements that the State requires for a vendor to have all this e-discovery in a database platform.

THE COURT:  All right.  So --

MS. BLAESING:  It would be more expedient to just use this vendor, instead of having to engage a new one with a new contract.  So my recommendation would be that you order that defendants have these cell phones that you've ordered that we need to search, for these three individuals, that we do that through the existing vendor, run the search terms that plaintiffs have already selected, with the phone numbers under discussion; and defendants also get a chance to look at the results before we produce them, in the event there is something privileged or there's something that we need to raise to the Court's attention.

THE COURT:  Okay.  This vendor, any issue with them?  And not some generalized issue that it's a state-contracted vendor, but is there something specific to this vendor that you would have an issue with?

MR. RIZZO:  It'd be nice to see the -- the documentation of what their standards are, what the confidentiality level is, et cetera, just the contract.

THE COURT:  Well, how about you all confer?  Share that information.  I'll let you know now my presumptive decision will be to go with this vendor because they're already set up.  But if you have some really good reason why you would want to go anywhere else, to slow down discovery, then you better raise it with me quickly, but I'm not inclined to move on my decision.

MR. RIZZO:  Understood, Your Honor.

MS. RICHARDSON:  Yes.  And if I may -- this is Bonnie Richardson -- I need to add one more -- since the last search of the phone, there's been additional allegations that we have brought up about a second home where Z.C. was placed, called the Spicer home.  So we will need to add some of those search terms for Spicer.

THE COURT:  Okay.  So there are search terms and phone numbers?

MS. RICHARDSON:  Yes.

THE COURT:  All right.

MS. RICHARDSON:  But one other thing, if I can, is I would also like this vendor to tell us if there's been any deletions that have occurred of messages.  We need to know what has been deleted and where they're searching it.

THE COURT:  That's way outside of my -- my even "be able to pretend" wheelhouse.  So if there's a way for the forensic analysis of the messages that the -- the data

associated with the messages, to determine if messages have been deleted from people associated with these search terms, these phone numbers, that is, right?

MS. RICHARDSON:  Right.  Because --

THE COURT:  Okay.  So we're just talking about if -- if -- if Chapman deleted messages from a phone number that was one of the phone numbers in your search terms, you would want to know that those -- that that was deleted?

MS. RICHARDSON:  Yes.  In particular, Ms. O'Brien, when I asked about the personal phone, and if it now shows up that suddenly all of those have been deleted, I would want to know that.  And I want to make sure that --

THE COURT:  And you want to know they were deleted and also when they were deleted?

MS. RICHARDSON:  Exactly.

THE COURT:  Okay.  I don't know how forensic analysis works.  I know that -- that you'll have to figure that out, so I'll allow all of you to confer to figure out and make --

MR. EDELSON:  I'll just share with you -- I mean, I've been though this a few times -- the challenge is that it's very difficult sometimes to figure out how and why something -- and when something was deleted.

THE COURT REPORTER:  I'm sorry.  Can you get closer to the microphone?

MR. EDELSON:  I'm sorry.

It's very difficult to determine how and when certain -- this electronic information has been deleted. It can -- it can lead down to false paths. And I just -- I'm always nervous about doing it, because it then opens up this whole world of discovery that -- where the electronic evidence might suggest something, and the witness is being asked what -- it creates a lot of complication that I'd rather see if we could avoid, but we can -- we can confer and see if we can't --

THE COURT: I mean, to the extent that there's going to be a motion for spoliation at some point, that ambiguity works in your favor.

MR. EDELSON: Yeah. Well --

THE COURT: I mean, just -- I mean, it cuts both ways. At the end of the day, if you can't tell -- can't tell anything from the -- from the potential deletion, then it's going to make it harder for the party with the burden of proof.

MS. RICHARDSON: And I would say that if Lighthouse -- that's why I want to talk to them -- if they're not able to do that, we do know vendors who can. And we just did this in another case. It is not difficult to do.

THE COURT: All right. So I -- I need to step out of this particular part of the conversation. And I need the parties to -- counsel to then confer, determine -- again, my presumption is Lighthouse.

But if they're telling -- if they're telling you that

they can't confirm whether something's -- with a reliable level of confidence, some level of reliable confidence, that something's been deleted and how or when, then that may be an issue about whether another vendor that -- a professionally qualified vendor can do that.  Find out.  And if the parties can agree, then you don't need to come back to talk to me.  If you can't agree, then I'll see you back down here in the outskirts of Oregon.  Okay?

MR. EDELSON:  Thank you.  We'll -- we will talk with Lighthouse and see what we can learn.

THE COURT:  Anything else with respect to the search of the three individuals' phones that need to be clarified?

MR. EDELSON:  I just want to be -- on the subpoenas, which would then be redundant, can --

THE COURT:  Well, let me ask.  Are they -- are they redundant?

MS. RICHARDSON:  No.  Because that is going to go to the spoliation as well.  We want to see only the headers for the e-mails and then the numbers.

THE COURT:  "Numbers" being phone numbers?

MS. RICHARDSON:  The list.

THE COURT:  From a call log?

MS. RICHARDSON:  Call log.

THE COURT:  From Verizon?

MS. RICHARDSON:  Right.  Or text -- or a text --

the --

THE COURT:  I guess I'm still not educated enough. I'm just surprised that Verizon or anybody else would keep the actual text messages.  But you're saying that they do?

MS. RICHARDSON:  Well, the -- not the call log, but the log of text exchanges.

THE COURT:  Okay.

MS. SKJELSET:  Not the content.

MS. RICHARDSON:  Not the content.

THE COURT:  And that information would be subject to the same search terms of the phone numbers?

MS. RICHARDSON:  Well, the phone numbers, yes.  But it would be the call logs, and then those are the phone numbers that we're looking at.  But we would also need to know what Mr. Hammond's phone is.  We need to know what his personal phone number is.

THE COURT:  So we'll get to that in a moment.  But I want to make sure that we're narrowing down what it is that -- so the subpoenas aren't redundant, and so we're going to address what that -- what the subpoenas are allowed to be producing.

And so the headers, with respect to the e-mails, are allowed.  The issue with respect to Verizon call logs, I'm not opening up the entire call log for each of these individuals. So help me understand how it's going to be narrower than that.

MS. RICHARDSON:  That's where I got the 50 phone numbers, because -- and I'm not the one that did it.  This is Bonnie Richardson again.  We had -- we had a paralegal who went through and pulled up all numbers that we could find that were part of this DHS case, the file.  And there were, I'm told, about 50 numbers that were put into that subpoena and asked that we have the call logs to -- back and forth to those numbers.  The only one that might -- that we might not have is Mr. Hammond.

THE COURT:  Okay.  What else?  Now I'm turning to defense counsel.

MR. EDELSON:  So -- thank you.  So the phone companies are going to be subject to the Privacy Act.  They're not -- they're going to be potentially limited in terms of what they're going to be able to turn over.  But we would still, nonetheless, like the opportunity to review the results before they're shared with the plaintiffs.  And if we have any issues, we'll -- we'll confer and then come to Your Honor if we need some help.  But just to --

THE COURT:  Fair enough.  Let's make that happen.  And we're going to keep this on as expedited of a timeline as we can.  So -- so the subpoenas, though, will be directed -- the return of the subpoenas will be directed to Ms. Richardson, right?

MR. EDELSON:  No.  To -- to us.  To -- to defendants.

THE COURT:  No, I know.  But the subpoenas that have been served on -- on these vendors -- or on these companies require that they produce the documents and turn them over to you, right, Ms. Richardson?

MS. RICHARDSON:  Yes.

THE COURT:  All right.  Well, so how do we redirect this?

MR. EDELSON:  I think you order it.  And then --

THE COURT:  You mean I have the power?

MR. EDELSON:  You have the power.  We'll -- if you order it, we'll make it happen.

MS. RICHARDSON:  I mean, I guess what I'm -- what could possibly -- there's nothing content-wise.  There's no -- I mean, the fact that they have a communication with a lawyer, for example, if there's no content in there -- we're not asking for that.  We're specifically saying nothing on the content. Just the header.  So I don't --

THE COURT:  Well, I mean, I can tell you sometimes I send a whole e-mail in the header, just because I -- I -- it's just too much effort to go down to the body of the e-mail to type it in.

MS. RICHARDSON:  Okay.  All right.

THE COURT:  So let's -- I'm going to give the defense counsel an opportunity to review these things.  But, again, I'll remind you this isn't about redaction and then turning

over.  I mean, I get that there's going to be some issues potentially with -- potentially with respect to privileged information because of communications within a -- with a legal -- with legal counsel.

But, you know, I get that I don't -- I just don't know what I don't know, so I'm going to give you first crack at looking at these documents.

MR. EDELSON:  We don't know what we don't know either.

THE COURT:  Right.  That's why you get a chance to look at it first.

MR. EDELSON:  Thank you.  And I'll just say, although I can't say I've made this determination, one of our team members reported that the subpoena had enough ambiguity that it might be confusing in terms of what -- whether content is being requested.  So we'll work with Ms. Richardson to make sure that ambiguity, if there is one, is cleared up and that they sent it to us.  And I think that will solve the problem.

THE COURT:  Very good.

MS. SKJELSET:  Your Honor, may I chime in just for a moment?  This is Mary Skjelset.  With regard to the -- the phone records that are being requested --

THE COURT:  From Verizon.

MS. SKJELSET:  -- from Verizon, I understand that we're limiting it, at the moment, to just those numbers that we

know of.  I think that, in order to be more targeted in our ability to discover information that is particularly relevant for J.C., it might be helpful to focus also on -- on dates. For instance --

THE COURT:  On what?

MS. SKJELSET:  On dates or time frames.  For instance --

THE COURT:  Which would narrow the search?

MS. SKJELSET:  Well, I -- I -- my concern is that you don't know what you don't know, right?  We didn't know Mr. Hammond's personal cell phone.  And I don't want to make it a fishing expedition, but who was Ms. O'Brien speaking to in the lead-up and follow-from the criminal prosecution?  She --

THE COURT:  Yeah.  Can you give me a hard and fast -- what's the ask?  What are you asking me to do?

MS. SKJELSET:  Well, I don't think that they should be limited to only those numbers during specific periods of time.

THE COURT:  So what would it be limited -- what would you expand it to?

MS. SKJELSET:  I think we could offer them periods of time where we think that -- that all numbers -- there's no private information -- should be --

THE COURT:  Wait.  All numbers?

MS. SKJELSET:  In the phone records.

THE COURT: That would be overbroad. So I'm not -- yeah, I want to be very cautious about going down that road. So there had been an identification, and I think my decision had been revolving around the providers and DHS workers that were involved in both of these cases. That's what I understood these 50 phone numbers -- that universe of 50 phone numbers came from.

MS. SKJELSET: Exactly, Your Honor. But we don't know the personal numbers for many of those individuals because they're not in the case records.

THE COURT: But then -- all right. So you get a log with all of these phone numbers. What are you going to do with them?

MS. SKJELSET: Well, there are certain time periods. I've had this happen in other cases, where I've requested phone records, for instance, for an attorney who represented a child in juvenile court, which was resisted very severely. And this was a Pendleton case. They had redacted all of the numbers, and eventually the court ordered that they produce the phone records unredacted. And --

THE COURT: And does that group of 50 phone numbers include Raygosa's defense counsel?

MS. SKJELSET: Well --

THE COURT: Because obviously, I mean --

MS. SKJELSET: Exactly, Your Honor.

THE COURT:  All right.  But --

MS. SKJELSET:  Does it include the investigator for Raygosa's defense counsel, whose number we cannot possibly know?  Does it include the investigator for the Innocence Project, who Ms. O'Brien may have been speaking with, in order to exonerate Raygosa after the fact?

THE COURT:  Right.  But the problem is now we're getting into the realm of exactly where Mr. Edelson was -- was -- was trying to drag me into, but I resisted.  And, you know, I -- yeah, now I am looking at needing to balance the level of intrusiveness with that which you can reasonably obtain.

And you made the case for why the communications between caseworkers was important and that there was a limited universe to work in.  I don't know how you're going to take all of this information and then figure out what to do with it once you have every single phone number.

MS. SKJELSET:  I'm just saying for specific dates.  For instance, when Ms. O'Brien shepherded J.C. to court to testify, acting as though she was her support person, and then the next day came back and testified against her, those periods of time during the criminal trial; after perhaps there was an article written in the Register-Guard, which informed the world that --

THE COURT:  How many discrete periods of time are you

talking about?

MS. SKJELSET:  I could focus on four, I think.

THE COURT:  All right.  Mr. Edelson, how far do you want to push back on this one?

MR. EDELSON:  I want to push back pretty hard.  I think you've already done a lot on this.

THE COURT:  "A lot" being a euphuism, in your mind.

MR. EDELSON:  I -- I just -- to just, you know, just open it up to every call or text that Kat O'Brien had during a period of time -- I don't want to say "irregardless"; I know that's not a word -- regardless of whether or not it had anything to do with this case and --

THE COURT:  So, yeah, my original ruling stands.  I appreciate you inquiring, Ms. Skjelset, and it gave me an opportunity to also appreciate the outer boundaries of what it is that I'm comfortable doing under these circumstances.  And, you know, without -- without something more about who it was that she might have been communicating with, I'm not going to expand it beyond that which I have already provided.

MS. SKJELSET:  And I'll completely accept Your Honor's ruling.  I just didn't finish my story about the lawyer.  So I just, for the record, want to --

THE COURT:  I'm sorry.  Go ahead.

MS. SKJELSET:  What we discovered, when the records were finally unredacted, was that that lawyer was, in fact,

communicating with the defense counsel for the foster --

THE COURT:  Let's back it up.  Are you talking about the criminal defense lawyer?

MS. SKJELSET:  This was -- this was a case -- a similar case, except the person who was extraordinarily breaching the fiduciary responsibility to the child was the -- was the child's attorney.

THE COURT:  And did it involve Ms. O'Brien?

MS. SKJELSET:  No.

THE COURT:  Okay.

MS. SKJELSET:  It's a parallel case in which we eventually got the phone records unredacted; and we discovered that the attorney who had represented the child in juvenile court was, in fact, cooperating and coordinating with the defense counsel in order to exonerate the perpetrator.  It was an extraordinary --

THE COURT:  So the analog here would be Ms. Smith?

MS. SKJELSET:  No.  The analog here would be Ms. O'Brien because --

THE COURT:  That the juvenile's -- the juvenile attorney?

MS. SKJELSET:  It was the juvenile attorney, Your Honor.  And, in fact, I would suggest that an attorney would have more reason to fight the production of unredacted phone records, because there's the possibility of privileged

information.  But, ultimately, it was extraordinarily fruitful. And Ms. O'Brien has the same profile as that attorney did in this litigation.

THE COURT:  What does that mean, "profile"?

MS. SKJELSET:  She was acting, throughout the course of the case, to undermine the disclosure of the child.

THE COURT:  A behavioral profile?

MS. SKJELSET:  Yes.

THE COURT:  Got it.  All right.

MS. SKJELSET:  With the criminal defense attorney.

THE COURT:  All right.  So my decision, as we've discussed previously, is -- remains in place on the -- the Hammond, O'Brien and Chapman phones.  The parties are going to confer about whether Lighthouse is able to do -- conduct the search in the way Ms. Richardson has described as well, in terms of deletions.

I've already communicated my presumption will be Lighthouse will be the vendor.  And does -- have the parties considered who's going to pay for this?  Is that an issue?  I imagine it'll be an issue.  Probably should raise it now.

MS. RICHARDSON:  Well, it should not be the children, who don't have any money to do that.  It's -- the State has paid for the search of the ESI prior to this through their favored vendor that they have a good rapport with.  But the point of this is that those phones should've been searched

earlier, which, again, that's going to go to the spoliation. So it's just a continuation of what they've always done.

THE COURT:  That sounds reasonable to me.  I just want to make sure that I don't come back with additional arguments, so let's tackle the -- what I think to be the tougher questions sometimes now.  All right.

MR. EDELSON:  We may have to come back to you, at least on the forensic part of it, because we haven't had that experience with this vendor, on this --

THE COURT:  In terms of the deletions?

MR. EDELSON:  Yeah.  I mean, my experience in other cases is forensics can be wildly expensive and can range quite a bit.  So I think we'll want to learn more about it.  So maybe we could table that issue.

THE COURT:  Can't be much more expensive than what it cost the plaintiffs to get the entire social file on the juvenile court case.  How about we call it a wash and move on, but -- all right.

MR. EDELSON:  We'll take it if you'll order that --

THE COURT:  Mr. Edelson, I appreciate your willingness to wheel and deal on the fly.  It's good.  It's good.

All right.  Defendant Anastasia Brooks' deposition, tell me about this one.

MS. RICHARDSON:  Well, if you want to stay on

Ms. O'Brien, we need to take her deposition again once we get the cell phone information, but I was also not finished with the deposition of Ms. O'Brien because we had additional records I needed to go through with her.

THE COURT:  And I think, if I recall the arguments in the briefing, you had two hours; is that right?

MS. RICHARDSON:  That was for Ms. Tibbetts or the other -- Brooks.

THE COURT:  So I know there have been some blurring of lines between these two cases and treating them as consolidated in some way for the -- for the length of depositions and not on others.  So I just want to make sure that we're talking -- I just want to make sure I'm oriented properly to what we're dealing with here.  You've started the deposition of Ms. O'Brien, but I -- and I'm turning to -- I'm looking at Ms. Richardson on the Conley case.

On the Levi case, you're done with questioning O'Brien?

MS. SKJELSET:  We were deprived of 30 minutes on the record, Your Honor, and we have an agreement that we will be able to --

THE COURT:  Okay.  So you have 30 minutes remaining?

MS. SKJELSET:  (Counsel nods head.)

THE COURT:  Okay.  And then how much time do you have remaining with -- that you want -- how much time do you need

with Ms. O'Brien?

MS. RICHARDSON:  Well, you know, it kind of depends on the cell phone records, but I do need to go through her case notes.  So I probably need about another -- I probably need about another two-and-a-half hours.  And it depends on how she answers.  Sometimes she takes a long time to answer.

THE COURT:  And now we're talking about Ms. O'Brien?

MS. RICHARDSON:  Ms. O'Brien.

THE COURT:  What was the defense objection to --

MR. EDELSON:  Well, it goes like this.  She's -- Ms. O'Brien has had about 13-and-a-half hours of deposition, and we've agreed to.  And what happened is the court reporter miscalculated.  That's how we ended up short 30 minutes.  We -- counsel ended, thinking she was done with -- and we all thinking she was done with her seven hours.

And then the next day -- so that was 6:30 at night on day one.  On day two, we started up again.  And Ms. Richardson questioned Ms. O'Brien for seven hours -- almost seven hours. She cut it off herself at the end, saying that she's not going to be able to get done.

Now, there's some very important things about what happened in that deposition.  And we've tried to share a little bit of flavor, but I'm going to do a little more here.  So I took pretty extensive notes and then went back through the depositions.

My records reflect that -- that for about the first four-and-a-half hours of -- of that deposition, counsel asked questions about the very same subjects that had already been covered the day before. And I can identify those subjects. I've got a little chart I've made.

THE COURT: So let's assume that's true. They haven't consolidated the case -- or the cases aren't consolidated. So -- so how do I -- how do I reconcile the fact that there's been efforts to cooperate and collaborate and make more efficient; other times, they just simply want to go their own way?

MR. EDELSON: Well, I don't think this was a "go your own way" thing. And there's never been a doubt that the depositions from either one are going to be useable in either case. And so there's -- there was no reason to go back and -- and plow old ground in the way that -- that it happened. So that's -- that's the first observation. And really I'm just sharing with you certain observations.

And so let me give you -- let me give you an idea of some of the topics: The awareness of a potential lawsuit, the e-mails and instant messages that were reviewed prior to the deposition, what did you review, credibility doubt questions about J.C., her employment with DOJ, even her education. Both lawyers asked questions about the education.

THE COURT: And, Ms. Richardson, you were there the

first day?

MS. RICHARDSON:  I was there, and I totally disagree with Mr. Edelson.  And I brought the deposition.

THE COURT:  You disagree about what?

MS. RICHARDSON:  The way he's characterizing it.  I did not go into the same questions that were asked the day before, because why would I want to do that?  Instead I followed up, in maybe that subject area, questions that were not asked.  And I did ask totally different questions.  Sometimes there might be a little bit of a --

THE COURT:  I just wanted some clarification, but I want to let Mr. Edelson finish.

MS. RICHARDSON:  Okay.

MR. EDELSON:  Who are her supervisors?  That one really stands out, the exact same questions.  "Who are your supervisors?"  Went through all -- whatever it was -- four or five or six of them.  The same people identified, the same time periods, was done just the next day.  The disciplinary actions, the fact that -- that J.C. didn't like certain DHS employees, preservation of phones and data.

THE COURT:  And you're saying that these were all identical lines of questions?

MR. EDELSON:  They were all covered the day before.

THE COURT:  Were they the same question, or were they just simply paraphrasing the same subject?

MR. EDELSON:  The one that comes closest, that I can sit here and say with certainty, was the supervisors.  They weren't --

THE COURT:  Well, how long did it take for her to answer the question?

MR. EDELSON:  I don't know that I can --

THE COURT:  Well, how many supervisors does O'Brien have?

MR. EDELSON:  She -- over the course of time -- I don't know -- it was somewhere between four and six supervisors.

THE COURT:  Okay.  So the answer to that question would've been four or six names?

MR. EDELSON:  Yeah.  And --

THE COURT:  Could I -- so I'm looking at just simply, I mean, the efficacy of arguing on this issue, if we're talking about a maximum of two more hours.  We could spend two hours arguing about whether O'Brien --

MR. EDELSON:  I realize the -- you know, they've -- up until this moment, they've asked for a full additional day. And --

THE COURT:  Okay.  Well, given that now -- Ms. Richardson, did I understand you correctly to say that you just need two hours?

MS. RICHARDSON:  It depends on how she answers.

Sometimes she goes on and on and on and on. And if she's going to do that with me, then, you know, that's -- I mean, she needs to be prepared a little better. So --

THE COURT: Okay.

MS. RICHARDSON: I think what --

THE COURT: And now you took seven hours already, and you're asking for additional time?

MS. RICHARDSON: That's right.

THE COURT: And the reason you want additional time is why?

MS. RICHARDSON: Because she refused to answer questions at all about her personal cell phone, so we're going to get those records. She refused also to even say who lives with her. Just some basic questions, you know, we'd like to have those answered as well. But --

THE COURT: I'm going to allow two additional hours if -- and no more. If, however, I find Ms. O'Brien is being difficult and if the deposition transcript shows that she is not answering fairly straightforward questions, then I -- I may end up allowing additional time to finally get it completed.

MR. EDELSON: And will Your Honor also stop the deposition in the event that counsel replows old ground or asks questions -- let me give you an important example. I know you've made your ruling, and I know I'm on --

THE COURT: At this point I'm interested in being

just a little bit more functionally practical here.  If Ms. Richardson wants to waste two hours of her time on -- on -- on already plowed ground, then that's -- that's what she gets to use.

But as long as O'Brien is answering questions straightforwardly and not -- not -- you know, not -- I -- you know, I've seen witnesses play games and just -- and think that they're -- and I wasn't there, but I'm just saying I can see how it could unfold and become frustrating for everybody.

And if -- and if, at the end of the day, O'Brien -- if I look at the transcript and I can look at the answers and -- that she's giving to questions that ought to be pretty darn straightforward, it's going to be a problem for Ms. O'Brien.  So, I mean, it's just a matter of two hours.

And if Ms. Richardson wants to -- wants to use it -- well, first, let me -- actually, I'm going to step back a little bit, Mr. Edelson.  You're not going to end up using it to ask questions you've already asked.  If you end up going down that road, then I think -- why don't you give me a call.  Actually, let me know when you're going to take the deposition, so I can make sure I'm out of cell phone range.

No.  Seriously, let me know in advance that her deposition is going to be happening, so I can try to make myself available, so -- if there's an issue coming up.  I want it to move smoothly.  I think part of -- I mean, I'm not

interested in really -- you know, I hate to micromanage this, but it sounds to me like there's a level that is required here.

And if I have to babysit the deposition, then maybe this is what I'll need to do, just so we can get O'Brien done. But two hours. But if it's -- if it -- if it's a repetition of questions already asked, then -- then -- then when it gets to a point of unreasonableness, then give me a call, Mr. Edelson.

MR. EDELSON:  All right.  And I just -- I don't want the issue of her not being willing to share personal information about herself to go by.  And she was very --

THE COURT:  Oh, I think the microphone issue is coming up again.

MR. EDELSON:  Oh, goodness.  I just need a clip-on here.  I might start singing, now I can hear my --

MS. RICHARDSON:  You know, oftentimes when -- I mean, we're going to be in --

THE COURT:  Well, hold on.  Let Mr. Edelson finish, and I'll come back to you, Ms. Richardson.

MR. EDELSON:  She was very protective of her own personal information and was unwilling to talk about who she lived with, what her marital status was, all of that.  None of that is relevant, obviously.  And I -- it wasn't on an instruction not to answer.  It was her own decision.

But, to me, it felt like it was very intrusive and unnecessarily so.  But it raises the hostility level, and it

made the deposition much more uncomfortable than it needed to be. And I just want to get clarification that she doesn't need to share that kind of information, in a deposition of this nature, about what she did in her business life.

THE COURT: In her personal life?

MR. EDELSON: Yeah. This is a case about her business life. She shouldn't have to testify about her personal life, is what I meant.

THE COURT: Is there something that you anticipate needing to ask about her personal life?

MS. RICHARDSON: Well, so it wasn't hostile. These are basic questions that we ask almost all witnesses. And the reason why is just sort of to get a little bit of information about who they are. A lot of times, you know, when they get on the stand, they personalize themselves and talk about their -- you know, just kind of their basic information for the jury.

But we also want to know if she lives with somebody. Sometimes it's somebody that might be on the jury, or they might know them. So we just ask those questions. It's not to be hostile. They're very simple, straightforward questions. But they're not that important for purposes of this. If I have two hours, it's -- I would like to just get at what I need to get at, and that is to go through these documents.

THE COURT: Okay. So questions about her -- her -- whether she lives with anybody, what her -- what her marital

status is, how many children she has, off-limits.  I mean --

MS. RICHARDSON:  Okay.

MR. EDELSON:  Thank you.

THE COURT:  All right.  Yeah, I'll just leave it at that.  Otherwise, call me.

Okay.

MR. RIZZO:  Judge, just on that issue, since we have 30 minutes, if you have a caseworker that has kids and understands parenting, that takes -- that takes questions down one path.  If you have a person who's never had children or perhaps has an interest in fostering other children or did foster other children or was in connection with a family that had fostering, those are, like, basic background questions to see who it is you're -- you're dealing with.  And if you can't even open that, just to find out foundation -- and I understand --

THE COURT:  Are we just -- I'm only dealing with O'Brien.  I mean --

MR. RIZZO:  Yeah, that's -- we get 30 minutes with her.

THE COURT:  And you want to ask her about whether she has children?

MR. RIZZO:  Well, it's a very common --

THE COURT:  I'm just asking:  Are you -- you want to ask her whether she has children?

MR. RIZZO:  I would like to know if the witness has kids, if she has experience as a parent.  It takes -- it doesn't take very long to get that answer.  But she was very, very clamped and -- and was encouraged to be so.  So it's just odd to have a witness who's, as we just heard, committed to caring for kids, but you can't even find out, "Do you have any?" and -- and things like that, just basic background questions.  There was a real resistance to it, and I just --

THE COURT:  I get it, but I'm -- it's --

MR. RIZZO:  Okay.

THE COURT:  It's off the table.

MR. RIZZO:  Okay.

MS. RICHARDSON:  I mean, I guess -- I just want to make a statement, if I can, that if they say that she can't talk about any of that, then she can't do that when she gets up in front of the jury.

THE COURT:  And that she what?

MS. RICHARDSON:  She can't do that if she gets up in front of the jury and they ask her those questions. Off-limits.

THE COURT:  Well, how about we take that up at the pretrial conference on a motion in limine.  All right.  I get it.  It would make sense, if that's information that you would've -- it's clear on this record you would like to have asked these questions.  I've ruled that they're not -- that

they're off-limits, just for the purpose of getting through the time limits available for Ms. O'Brien's deposition testimony. If it becomes an issue about how she loves children on the stand, that may be something we'll take up on a motion in limine. All right.

MS. RICHARDSON: Now we have Ms. Brooks. Ms. Brooks is -- we were limited to a very short period of time. We would like --

THE COURT: Remind me who Ms. Brooks is.

MS. RICHARDSON: Ms. Brooks is a supervisor and --

THE COURT: One of O'Brien's supervisors?

MS. SKJELSET: Ms. Chapman's supervisor.

MS. RICHARDSON: Chapman's, yeah, certifier, supervisor. And Ms. Korbel was taking her deposition. And we've asked, "Can we have the" -- I don't know that we're going to use the full amount, but we want to have the full seven hours, and we've been deprived of that. So we just simply want the ability to have the full seven hours.

THE COURT: Why didn't you get all seven hours?

MS. RICHARDSON: They wouldn't let us. They refused.

THE COURT: Okay. Counsel.

MR. EDELSON: Well, let me give a little background on it. So the idea of this -- of what I'll call informal consolidation of discovery, which, as practical matter, has been a real consolidation of discovery, was the understanding

that -- that the depositions would last no longer than seven hours total, and they would figure out how to share the time. And that's how we moved forward. We made an exception for Kat O'Brien because we knew she was a -- had more significant information.

THE COURT: So your understanding was that every -- when both plaintiffs' counsel were involved in -- or attended depositions, that everyone, but O'Brien -- all deposition witnesses, except for O'Brien, would be subject --

MR. EDELSON: And Chapman.

THE COURT: -- and Chapman, would be subject to a seven-hour -- the seven-hour --

MR. EDELSON: That was the -- that was the understanding. And --

THE COURT: Okay. And I'm -- I'm going to give you time to argue -- to present what your position is, but I'm also just reading body language on the other side vehemently seeming to disagree.

MR. EDELSON: I wasn't part of that agreement. I came in later, and that's what I was told. So --

THE COURT: Well, who told you, without -- without revealing any attorney-client privilege, Mr. Edelson?

MR. EDELSON: It was --

THE COURT: Ms. Hoffman?

MS. HOFFMAN: I did tell him that, Your Honor. We --

this is -- this is Ms. Hoffman.  We exchanged several e-mails about this early on in the process, and we put in writing this is -- this is our position, is that these depositions are going to be seven hours.

And at -- Ms. Brooks' deposition was seven hours long.  Mr. Rizzo took it.  And Ms. Korbel did only have about 40 minutes at the end.  And we have since conferred about this motion, and Ms. Korbel and I had reached an agreement that we would agree to two more hours.  We'll still agree to that.

But then they chose to file this motion for another day.  I'm not -- I haven't understood -- I'm not sure Mr. Edelson does either -- why they need another full day.  Ms. Richardson might be able to explain.  But we have -- we're good with -- we are amenable to two more hours.  We've already agreed to it.

THE COURT:  And then you and Ms. Korbel have discussed two hours?

MS. HOFFMAN:  Right.  When we conferred on this motion specifically.

THE COURT:  Okay.  And why was two hours discussed between you and Ms. Korbel?

MS. HOFFMAN:  Because at the end of Ms. Brooks' deposition, Ms. Korbel had asked if we would hold it open for another two hours.  And at the time -- at the time we had said no.  We -- we reconsidered that decision after the fact and

thought about it some more.  And we conferred on this motion, as we are required to do.

We agreed to two more hours.  I don't think that's unreasonable.  I understand that sharing a deposition is not perfect.  You know, the coordination is not always perfect.  And we -- we had agreed to that, in exchange for them not filing this motion.  But after we reached that agreement, they did file it anyway and asked for a full day.  So that's where we are.  And we are still agreeable to two hours.

THE COURT:  Okay.  So we have -- so the question's going to break them down -- there's not an understanding or an agreement that the -- that depositions will be limited to seven hours, to one day, between both counsel?

MS. RICHARDSON:  No, there was not an agreement to that.  Now --

THE COURT:  I take it there's --

MS. RICHARDSON:  -- we would try.

THE COURT:  -- there's no paper trail?

MS. RICHARDSON:  Right.  I mean, if you look --

THE COURT:  Well, I'm sorry.  I was looking at Ms. Hoffman.

MS. RICHARDSON:  Yes.  Sorry.

MS. HOFFMAN:  Well, Your Honor, there is a long e-mail chain where we express to opposing counsel that this was our position, that each deposition would be seven hours.  The

reason for the agreement -- and this is also in writing -- is that --

THE COURT:  Was there acquiescence of the defendants' position?

MS. HOFFMAN:  It was sort of alighted.  They didn't ever acquiesce in writing, but they also never disputed it in writing.  And then we proceeded accordingly.  All of -- all of the depositions have been seven hours, except for Ms. O'Brien and Ms. Chapman, which we have discussed and agreed to two days.

So it has been our understanding that that was the tacit agreement between all of the parties.  And the purpose of the consolidation of the depositions was because we didn't -- we were trying to avoid all of our witnesses and all of these DHS employees sitting for two separate depositions in both cases.  That was the reason we proposed this.  So if both sides are getting seven hours, then it defeats the purpose of the agreement, you know, in the first place.

THE COURT:  And how many -- other than O'Brien and maybe Chapman and -- and Hammond -- they're sort of in a separate category of potential additional depositions -- how many other lay witnesses are there left to depose?

MS. HOFFMAN:  Left to --

THE COURT:  Actually, I think I have a calendar, don't I?

MS. RICHARDSON:  Yeah.  So there were 13 -- there are 13 depositions that have taken place of witnesses, and there are three more scheduled.

THE COURT:  It was Ramirez, Clark, Loboy, Gilad and Stockman this month.

MS. RICHARDSON:  Oh, Clark is on there.

MR. RIZZO:  And Dr. Sorenson.  They're going -- the defendants are going to take Sorenson.  We just haven't quite gotten a firm date from them yet.

THE COURT:  Okay.  And it looks like that was scheduled for July -- at least on my calendar, the date's July 31st, but --

MR. RIZZO:  He got COVID.

THE COURT:  Okay.

MS. RICHARDSON:  So, you know, what's happened is that, out of the 13 so far people who have been deposed, there have been -- most of them have all been done within the seven hours for both.  So we, you know, worked hard to do that.  But this one was --

THE COURT:  How much more time do you need on Brooks?

MS. RICHARDSON:  I have to ask Ms. Korbel.  That is not my understanding of what has just been relayed to you about their conversation.

THE COURT:  Is Ms. Korbel available for you to make a phone call to during a break?

MS. RICHARDSON:  Sure.

THE COURT:  Okay.  Well, let's -- I don't know if I want to have any more argument, unless there's going to be a dispute about two hours being needed.

MS. RICHARDSON:  Yes.  I think part of the issue here is that we really don't want to be filing these motions to compel, and that's why we've asked for costs, because it's so time burdensome to do all this with each motion, and even the one involving Ms. Creighton.  It's just unfortunate.

THE COURT:  I appreciate it.  And I think there's -- I'm approaching this with the idea and the -- and the belief, and my communication to you, that everybody here is working with the best of intentions.  And I want to make sure that's clear.  At this stage that's what I understand it to be.

And I think there were -- I mean, the best of intentions was what was -- what informed the desire to collaborate and cooperate on combining discovery.  And sometimes the road to hell is paved with the best of intentions.  And I -- and it just seems like it's become a little bit more difficult and unworkable, given the way in which discovery's unfolded.

So I want to make it very clear.  I'm not, at this point -- going forward, not holding anybody to some consolidated discovery process.  All right?  It's, frankly -- for my purposes, I don't want to spend half my day with all of

you down here in Eugene or more -- actually -- well, another full day, trying to argue over how much more time people need to take on depositions.

You got discovery.  You got deadlines.  You have two separate cases.  I think they're -- aren't you all -- aren't we working on separate discovery deadlines?  Or did we -- don't tell me -- we consolidated it?

MS. HOFFMAN:  They're the same.

THE COURT:  You dragged me -- you dragged me along to that road to hell, Ms. Hoffman.

MS. HOFFMAN:  I apologize, Your Honor.

THE COURT:  Well, so my -- my -- the operative -- operating presumption is that if -- unless the parties explicitly agree to doing it to seven hours or some other -- less than two separate days, then it will be presumed to be two separate days for depositions of the remaining witnesses.

I really can't understand why you would need all of that time, if you can coordinate.  But knowing that Mr. Rizzo asks far too many questions all the time, I can appreciate why you ran out of time on Ms. Brooks.  That was -- I had to -- I was picking on you, Mr. Edelson, so I had to pick on the other guy over there.  Mr. Rizzo is, you know --

MS. SKJELSET:  Thorough.

MR. EDELSON:  I'll make the point that I --
Ms. Korbel tends to be fairly efficient in the way she does

depositions --

THE COURT:  Great.

MR. EDELSON:  -- in my experience.  It felt like we were really close to getting to an end.

THE COURT:  So during the break just go ahead and contact Ms. Korbel and see if two hours is all that's necessary.  In the meantime, I'm simply releasing all of you from some agreement, tacit or otherwise, that it be -- that this is consolidated for the purposes of the timing of the -- the amount of time set for depositions.

I encourage you to agree and then do it on the record, if you do come to some agreement on some different time.  Otherwise, go get this -- the litigation -- the depositions done on -- on whatever separate schedules you need to make it happen.

MR. RIZZO:  And in my own defense, Your Honor, when I did depose Ms. Tibbetts-Brooks --

THE COURT:  Yeah.  I'll be honest with you, Mr. Rizzo.  That was purely gratuitous on my part --

MR. RIZZO:  I know.

THE COURT:  -- just to pick on you.

MR. RIZZO:  I just wanted to say it wasn't my understanding that -- that I was cutting into somebody else's -- that I was only leaving co-counsel 40 minutes.

THE COURT:  So you are admitting that you basically

filled up as much time as you could?

MR. RIZZO:  On behalf of our little kid, I -- I did. And she was a very significant witness, and that testimony will be very material.

THE COURT:  And you're talking about Ms. Brooks?

MR. RIZZO:  I am, Your Honor.

MS. HOFFMAN:  Your Honor, I apologize.  I don't want to slow us down, but there is one more just point I -- I take your point about these being separate cases.  At the same time, FRCP 30 only allows a party ten depositions, and the -- unless the parties stipulate otherwise.  Our agreement was that we would stipulate to more than ten if plaintiffs would agree to share them and --

THE COURT:  Share?

MS. HOFFMAN:  -- share the time allowed under -- the seven hours under FRCP 30, that they would share the seven hours, and we would agree that they each get to depose more than ten -- I mean, in total we've deposed --

THE COURT:  In total more than ten?

MS. HOFFMAN:  Right.  At this point we're far past ten.  We're -- the plaintiffs have several more to go.  And that stipulation we made, we wouldn't have made it if each witness was going to sit for a separate deposition in each case.  And so that -- that's the reason for this agreement, which has worked well so far.  And so I -- I --

THE COURT:  This is new information.

MS. HOFFMAN:  Yes.

THE COURT:  So I appreciate you bringing it to my attention at this point.  Let's table it for a little bit and see if -- I mean, if plaintiffs' counsel want to help me understand any more context to that understanding, then -- then we can address it after a break, because we also want to make sure that we find out what Ms. Korbel's position is on the two hours, because that might also just take one issue off the table, and then we can maybe narrow some things down.  Okay?  Thank you.  I appreciate your bringing that information up now.

MS. SKJELSET:  Your Honor, since everybody's clarifying -- this is Mary Skjelset -- I feel like I should just throw in my two cents, which is -- because I was part of the agreement --

THE COURT:  Which agreement?

MS. SKJELSET:  To coordinate, to coordinate the depositions.  We always reserved the right to use our full time with the named defendants.  That was my recollection.

THE COURT:  So then what about this sort of collateral or conditioned understanding about extending it beyond the ten depositions?

MS. SKJELSET:  That was -- well, we would each have ten depositions, Your Honor.  We have separate cases.

THE COURT:  So --

MS. SKJELSET:  So it would be 20.

MS. RICHARDSON:  Right.  And there's never been any pushback on that because we've already got scheduled more than ten.  I mean, never brought this up.  First time I'm hearing this.  So --

MS. SKJELSET:  It was part of the calculus.  But we always reserved the right to -- and they, I understood, agreed -- for the named defendants.

THE COURT:  I mean, Ms. Hoffman you said it so persuasively.  I just swallowed it completely.  That was good.

MS. HOFFMAN:  Well, Your Honor, I -- so my understanding was that we were all on the -- we were very clear that we were going to agree because --

THE COURT:  I want to accept for a moment that what you are saying is completely accurate.

MS. HOFFMAN:  Okay.

THE COURT:  What do you want me to do with it now?  I mean, what authority do I have to say, "Forget about the rules"? I mean, in the absence of some kind of written agreement or something on the record, what do you want me to do with it if there seems to have been a very different understanding about the parties' agreements?

MS. HOFFMAN:  Well, Your Honor, there's a couple of things you could do.  You could -- you could issue a ruling that says that defendants have stipulated to more than ten, on

the condition that the -- the parties share, and offer a limited -- and enter a very limited order on Ms. Brooks, ordering two more hours or four more hours, or whatever Your Honor thinks is appropriate.  That's an option.

One option is to say -- to issue a ruling that if plaintiffs wish to take seven hours each with each defendant, then in that case they have each deposed more than ten people, and we no longer -- we don't stipulate to more than ten, and they need to provide --

THE COURT:  Has each of the plaintiff's attorneys already deposed ten people?

MS. HOFFMAN:  Yes.

MS. RICHARDSON:  We deposed 13.

THE COURT:  So far?

MS. HOFFMAN:  Yes.

THE COURT:  And you have -- and you have about another six or seven left?

MS. HOFFMAN:  Some of them are our witnesses.  We have eight total.  Some of them are ours.  But, yes, they've each already deposed 13.  Two of them have sat for two days of depositions.  So two of them have sat for more than seven, somewhat less than 14 hours.  They have -- plaintiffs have taken a large number of depositions, and we stipulated to that under the rules on this condition.

And so I would ask Your Honor to order that -- that

the agreement that we reached, in -- in exchange for our stipulation, is -- stands and to issue a more limited ruling just on this one motion for Ms. Brooks, because I understand she's a named defendant, and I understand Ms. Korbel does need more time.

THE COURT:  Part of the challenge is that there's a dispute about whether this was, in fact, the agreement that was reached.  I'm always happy to enforce an understood agreement. I'm also happy to consider and order something if a party comes back and says, "The agreement that we did reach is no longer workable; and, therefore, we want it modified."  So there's a couple -- you're asking me to form an agreement by virtue of the parties' understood practices.

MS. HOFFMAN:  I'm asking you to -- the other option, under FRCP 30, is for the Court to order more than ten.  So if you were to order -- because, retroactively, either three of the depositions they've each taken are now illegitimate and not allowed under the rule, because we would not have stipulated to them.

If you order that they are each entitled to more than ten, I would ask that you make your order contingent on those -- that each witness sit for no more than seven hours, which is what is allowed under the rule, and that they share. That would be the alternative.

THE COURT:  Part of it is that we're trying to unwind

the agreement in such a way that we can go back to the rules. And I -- I like that, because it just allows us to fall back to what the rules are. We're going to take a break in a little bit, and I'll consider it. We'll check on what Ms. Korbel's position might be on the two hours for Brooks. But you've also raised -- defense counsel, you've raised the depositions of J.C. and Z.C.

MS. HOFFMAN: We have, Your Honor.

THE COURT: And what's the status of that? You're seeking -- you're seeking the deposition. How old are these minor children?

MR. EDELSON: Let me address that.

MS. HOFFMAN: Okay.

MR. EDELSON: One is, I believe, 17. And the other is 13.

THE COURT: J.C. is 17?

MR. EDELSON: J.C. is 17.

THE COURT: And is it Z.C.?

MR. EDELSON: 13.

THE COURT: Z.C. is 13.

MR. EDELSON: And we have deposed the --

THE COURT: You've deposed the representatives or the guardians. Right. And I remember that from the brief. So you want to take the depositions of the minor children.

And I'll give you a chance to reply to that, but I

want to understand what the objection is, if there is one.

MS. RICHARDSON:  Well, this is -- okay.  Do you mind if I go first for Z.C.?

MR. RIZZO:  No.  Please.

MS. RICHARDSON:  Okay.  So Z.C. was five years old at the time, and now I think he's 12.  I don't have his exact date -- his exact age right now.  But the problem is that they waited until the very end of discovery to suddenly say now that they want to take the deposition of these children, and it's late.  For me, on Z.C., my immediate reaction, after having no conferral whatsoever on this until right now, that I think it would be not appropriate to depose Z.C.  He was much too young at the time.

THE COURT:  Because of his age?

MS. RICHARDSON:  Because of his age at the time.

THE COURT:  Okay.

MS. RICHARDSON:  And I can provide some more context after I have a chance to --

THE COURT:  And I'm going to jump back because I want to make sure I understand.  Was it -- Mr. Edelson, what's the relevance of deposing either of the children?  Remind me.  I know it was in your brief, but now you got to repackage it for me.

MR. EDELSON:  Well, we don't know the evidence from their standpoint because their representatives wouldn't give us

any.

THE COURT:  What evidence would it be that they would be testifying about?

MR. EDELSON:  Well, let me give you an example.  What information did they share with DHS people?

THE COURT:  So it's about DHS's knowledge of --

MR. EDELSON:  That's certainly one of the topics we'd want to cover.

THE COURT:  And are you going to be asking them questions about -- relating to damages?

MR. EDELSON:  Possibly.  I mean, I -- I --

THE COURT:  Well, given that we're dealing with minor children, I'm trying to -- I'm trying to hammer down with a little bit more specificity.

MR. EDELSON:  I suppose we could -- we could get more specific.  But, in terms of damages, I certainly am not going to ask them, "What are you going to do with this -- with money when you" -- I mean, that's not --

THE COURT:  Well, no.  But, I mean, it's the exploration of the trauma that I'm more concerned about, not what they're going to do with the money.

MR. EDELSON:  The exploration --

THE COURT:  I mean, it's about -- I mean, if you're asking them -- having them testify about the trauma that they experienced --

MR. EDELSON:  Right.

THE COURT:  Let me make it -- I want to make sure I'm clear on this.  There's no dispute that these children were abused; is that correct?  By -- by the foster families?

MR. EDELSON:  Well, there's no dispute that J.C. was -- was a victim of sexual abuse.

THE COURT:  Okay.

MR. EDELSON:  And there's no dispute that it's pretty heinous stuff.

THE COURT:  Okay.  And Z.C.?

MR. EDELSON:  Z.C.'s a little less clear.  We don't think there's any evidence of sexual abuse.  There's some -- I have to say --

MS. RICHARDSON:  Neglect.

MR. EDELSON:  -- I don't fully understand the claim. And maybe Ms. Richardson wants to tell us.

MS. RICHARDSON:  Neglect.

MR. EDELSON:  Neglect.  And there was talk about -- about heavy-handed discipline, not physical, but -- not hitting, that sort of thing.  So, you know, what they remember about those things and how they -- what they remember about the DHS people that they interacted with, yeah.  I mean, I don't know if any of these -- if they're planning to testify at trial, we certainly don't want to be surprised for the first time that they're going to come in and say, "This happened.

This" --

THE COURT:  Well, are they going to testify at trial?

MS. RICHARDSON:  Z.C. will not testify at trial. It's too traumatic.  And we would not have him testify and --

THE COURT:  And what about J.C.?

MR. RIZZO:  We hadn't made that decision.  Our -- our inclination was to not call this girl because --

THE COURT:  So if they're not going to testify, then --

MR. EDELSON:  Well, it still gives me some -- some concern, particularly with J.C.  But I think -- I mean, Z.C. But -- no, no.  I got that wrong.  Particularly with J.C., the girl.

THE COURT:  So I'm -- I'm just looking at -- at breaking these down.  It sounds to me like there's -- it's pretty clear that Z.C., from -- from Ms. Richardson's representation here, is not going to testify.  With that in mind, is there any reason why you would need to depose Z.C.?

MR. EDELSON:  I think there is.  I don't think it would be very long.  And I -- and I -- and, frankly, one of the things we offered and suggested is that we even do the deposition either, you know, with you in the -- in your chambers or with you present in -- it could be here.  We don't want to retraumatize anybody.

THE COURT:  Well, having me there might.  And so I

just want to be sensitive to that.

MR. EDELSON:  It sounds like it could be.  But maybe we could come up with a setting that would be the least traumatizing.  And -- but, you know --

THE COURT:  But I still want to understand why -- if he's not going to testify, what is it that you'd be seeking from him?

MR. EDELSON:  Well, you know, I guess there could be the possibility that a jury could reach conclusions about what they would say, even though they're not there.  And they could be conclusions that -- that are incorrect or not -- just not accurate, which it's -- it's hard to know.  And I think we have to feel our way around it.  But I assure you that --

THE COURT:  Are you trying to say, Mr. Edelson, that it's hard to know what you don't know?

MR. EDELSON:  Well said.

THE COURT:  Okay.

MR. EDELSON:  We will be as sensitive as -- as possible and whatever safeguards and guardrails, whatever we need to have in place to make it the least traumatizing and intimidating --

THE COURT:  And the period of time in which Z.C. was in the home was when he was five?

MS. RICHARDSON:  Five years old.

THE COURT:  Okay.  So the -- I mean, the capacity for

a five-year-old to be able to testify about something -- I'm still wanting to make sure I understand what it was that he could testify about.

MR. EDELSON:  Well, how's he doing now, what -- how -- what kind of long-term effects has the neglect that they've alleged --

THE COURT:  And now we're talking about a 12-year-old?

MR. EDELSON:  13-year-old.

MS. RICHARDSON:  He just -- he is 13 years old.  He's going through puberty right now.  There are plenty of other witnesses and experts who they can depose and other -- his mother, they've deposed her, who he's living with now.  But to now spring this on us, at the very close of discovery, to try to put back on us that Z.C. needs to come in and testify at a very traumatic experience that he had, is -- we would absolutely fight that.

And if we need to file motions, if I need to go and get, you know, an affidavit or declaration about the harm that that would cause him, I will do that.  But we do not want him to be deposed by defense counsel.  I have not heard any good reason for it.  It can be found out through other witnesses.  And he will not testify.

THE COURT:  And when will you know when J.C. is going to testify or not?

MR. RIZZO:  I think I can make that decision, Your Honor, to not have this child be re-entrained.  And I was there for the mother's deposition.  And I had to take a break to speak to Mr. Naso about asking Ms. Colby about how it felt to be drowned by her husband, how many times he'd hit her with a closed fist.

And so I took a break.  And I said, "Hey, everybody's doing their job here, but there is no reason for you to be asking her these questions, no reason at all."  It was -- it was extremely traumatic, and she was traumatized.  And we came here -- what was it? -- in July.  And you had a four-and-a-half hour hearing, "Tell me everything you want, defendants, everything that's supposed to be in this report."

And we get this letter after close of business, August 5, "Hey, we'd like to choose some dates for J.C. and Z.C."  J.C. has been through the juvenile proceeding.  They have the video of her at Kids First now, because they were successful in their subpoena.

She testified at the trial.  She was put through that.  They have all of her treatment notes from Dr. Sorenson; all the notes from the person that Kat O'Brien had drinks with after work, the, quote, therapist, who we're going to be deposing here.

So this concept that they need J.C. to say -- to recall what she disclosed about her abuse and how filthy and

disgusting that was for her and what it makes her feel like today, there's no reason for that.  They have no expert.  They didn't do an IME.

And they dropped this bomb on -- on the evening of the 5th and -- and their -- their alleged basis for it is their testimony -- the testimony that they took from Mr. Levi.

And before that deposition took place, Your Honor, I wrote to Ms. Blaesing and said, "Why?  Why are you deposing the representative?"  Two things, he's not a percipient witness.  He didn't investigate the facts.  He relied on us.  And so all the questions that Mr. Naso asked about during the deposition of Mr. Levi were directed to "What was said to you?  What did you say?  Where did you get your facts, Mr. Levi?"

And over and over again, it was, "I have to object to that," because he's in an attorney-client relationship, and any facts that he had or he possesses came through me, came through our office.

THE COURT:  So, getting back to J.C., anything else about why you don't think they should depose J.C.?

MR. RIZZO:  Not beyond what I just told the Court, Judge.

THE COURT:  All right.  Anything else?

I -- I need to understand more about what value there will be, when they both -- now, both Mr. Rizzo and Ms. Richardson indicated Z.C. and J.C. are not going to be

testifying at trial.  If that's the case, then help me understand what it is that these minors would be able to relate to you about the incidents themselves or whatever other occurrences or experiences that they've had.

MR. EDELSON:  Well, again, I worry that their absence of testimony may be misunderstood by the jury.

THE COURT:  But they're not testifying.  So what would you do with the depositions?  Would you introduce them at trial?

MR. EDELSON:  If they were relevant and something that we thought was evidence that --

THE COURT:  So, like, what would it be?

MR. EDELSON:  Well, it might be questions about what kind of disclosures you made, when, to whom.  Again, I'm not going to be the one that takes the deposition.  We'll pick someone way more sensitive than me.  So I don't -- I don't fully know.

But I will say that, as a matter of consistency, you've said repeatedly today -- and I respect it -- full discovery.  And -- and part of full -- it doesn't mean we have to be -- and I don't know what happened with -- with other witnesses and --

THE COURT:  So the one thing that I've heard you say, Mr. Edelson, that helps me understand the connection between the deposition of J.C. and, you know, your -- your

responsibility to defend your client is who -- to whom did she make disclosures and when.

MR. EDELSON:  That seems like the obvious piece.

THE COURT:  And it sounds to me like there isn't anything else that you'd probably be able to reasonably ask of J.C. that would not either already be in the record and would not cause secondary trauma.

So, with that in mind, Z.C.'s off the table.  He's not testifying.  He was five years old at the time of any of the alleged abuses or the abuses that may have already been identified here.

J.C., however, with respect to the issue of disclosures, that's -- or when and to whom she made disclosures -- I'm not asking about -- I'm -- I'm hesitant to require the description of what, you know, some details of disclosures might be.

But, with respect to when disclosures were made, is there anything already in the records that would identify those, that would not already be -- that could not -- that would need clarification from J.C.?

MR. RIZZO:  It's just what I was mentioning.  She's on video.  There's a Kids First --

THE COURT:  Making the disclosure?

MR. RIZZO:  Right.

THE COURT:  Okay.

MR. RIZZO:  That's what they relied on to prosecute. And then the child was put through the trial, and they have that testimony as well.

MS. SKJELSET:  And the grand jury, Your Honor.  She's been through three forensic interviews, this child.

THE COURT:  So she's already -- she's already made representations about the disclosures.  What else is it that would need to be confirmed?

MR. EDELSON:  I want to separate the disclosures from what she told DH -- the defendants in this case.  What did she tell defendants in this case?  What does she think the defendants should've seen, should have known about these things that ultimately became disclosures many years later?  This is critical to this case.  I mean, if J.C. never told Kat O'Brien or anyone else at DHS what was going on --

THE COURT:  So let me -- is there evidence in the record that J.C. told Kat O'Brien or someone else at DHS?

MR. RIZZO:  There's --

MS. SKJELSET:  I'm unclear as to what he's representing to the Court.

MR. RIZZO:  Yeah.

THE COURT:  Well, I understood Mr. Edelson to say that he wanted to -- he wanted testimony from J.C. about whether she disclosed to Kat O'Brien, or anyone else who would've been in a position to -- at DHS, to have been made

aware of -- of the abuse that -- of abuses that she -- she was subjected to in that home?

MS. SKJELSET:  That she was being sexually abused in the Raygosa home while placed there?  Is that the -- I'm unclear.

THE COURT:  For lack of any -- yeah, for lack of any better descriptor, yes, did -- did she -- so I understand that there were disclosures made to other people, maybe not to DHS; is that correct?

MS. SKJELSET:  During --

THE COURT:  Let me rephrase it.  I mean, has -- has J.C. disclosed to -- did J.C. disclose to anyone at DHS that she was being sexually abused?

MS. SKJELSET:  During the time she was placed in the home?  Is that --

THE COURT:  Oh, I see.  Okay.

MS. SKJELSET:  Her disclosure was -- like most disclosures, Your Honor, came after she was no longer in the home.

THE COURT:  Okay.

MS. SKJELSET:  And she -- it was during a forensic interview.  It was very involved.  And --

THE COURT:  No, no.  I get that she disclosed it during a forensic interview, but I think the issue is whether she disclosed it to DHS.  And I'm treating -- I'm thinking of

them as separate.  So if she disclosed in an interview at Kids First --

MS. SKJELSET:  At Kids First, while a CPS worker was watching.

MR. RIZZO:  A CPS worker was there.

THE COURT:  Okay.

MS. SKJELSET:  Who threw up afterwards, because it was so traumatic.  That's in the record.

MR. EDELSON:  But, again, you know, we're trying to figure out what did -- when there was something that people could do about it, during the time of the interaction with the --

THE COURT:  So you want to determine whether J.C. disclosed to anybody at DHS while she was -- she was still at the -- in the home?

MR. EDELSON:  Yes.  I want to narrow it -- well, I'm trying to figure out what Kat O'Brien did wrong, what they think Kat O'Brien did wrong, what she thought Kat O'Brien did wrong, and anyone else she interacted with at DHS, because what I've seen is, as soon as she made a disclosure, boom, everything started happening.  And before long, within eight months, the -- the man was prosecuted.

So what happened before then, because really that's the important time period, what did DHS do wrong, where were they negligent, where did they engage in deliberate

indifference.  And it seems to me that the relationship that this child forged with Kat O'Brien is really important to understanding what it is that Kat O'Brien did and didn't do.

You know, you know this:  The caseworkers are very involved in these families typically and with these kids. Understanding that relationship shouldn't be traumatic.  I mean, it could be.  And -- and certainly we'll be sensitive to the possibility of it.  But we want to explore all of that.

We want to explore what -- how she's doing now. She's suing for millions and millions of dollars, and we want to talk about -- you've -- you've said repeatedly -- and, again, I respect it -- that, looking at proportionality, there's a lot of -- there's a -- this is a case with a lot of money being sought.

And this isn't an opportunity to retraumatize her or to embarrass her or anything like that.  We're just trying to find the facts, just trying to prepare for trial.

THE COURT:  All right.  We should take a break and stretch a little bit.  I do want to make it clear that Z.C., given his age at the time of any of this, he's -- he's not -- he's not eligible for -- for being deposed by defense counsel. If something -- and I want to make it very clear.  At this stage then -- Ms. Richardson has already indicated he's not going to be testifying at trial.  So he's not going to be testifying at trial, whether this case is tried in -- in April

or in five years from now, however old he might be at that point.

All right.  We'll take up the issue about J.C. a little bit more.  And I may need to have some additional briefing from counsel about what the scope of that -- what the scope of -- I'm concerned about the scope of the deposition and also being mindful of -- of traumatizing somebody who's already been through enough.

I will -- I will modify something that you said that I've said consistently about, you know, sort of proportionality.  I don't think it was proportionality as much as -- as -- and maybe there was an implicit notion about proportionality, but it wasn't about money.  It was about the privacy interests of individuals with -- with the trauma and harm that somebody's receiving, not -- not monetized, but the actual harm itself.

And that was the issue that I was taking into account.  I get that civil cases are about the money part.  But I was balancing something a little bit -- a little bit different when considering the issue about -- about the discovery on those other points.

Let's take a 15-minute break.  We'll come back.  I have no idea how far we've gotten into all of the issues.  Does anyone have a sense of how much is left on the journey?

Ms. Hoffman.

MS. HOFFMAN:  Your Honor, my sense is that we've made it through actually many of the issues in Ms. Richardson's letter.  I think there's one that we haven't covered.  And then in our letter from last night, I think -- I think that we have made it through all but one -- one and a half.

THE COURT:  Okay.  It looks like there might be still number three?

MS. HOFFMAN:  Mm-hmm.  Yes.  Number three.  And then there's a -- we dealt with the issue of Ms. Smith's deposition, but there's a subissue that we --

THE COURT:  Oh.

MS. HOFFMAN:  -- might want to talk about, about Ms. Gonzalez.  And in Ms. Richardson's letter, there's the Rule 37 motions that I think have, more or less, been discussed.  I think Your Honor has a sense of what those will be.  But I think plaintiffs would like to set a briefing schedule for them.

We have one more note for the Court on in-camera review.  So even though we've, I think, covered that, there's something else I need to update the Court about when we come back.  And I think that's -- oh, and then there's -- that's right.  Thank you, Mr. Edelson.

There's -- the Conley plaintiff has a request to extend the expert discovery deadline.  We need to talk about that as well.  That's at a separate issue.  It's the last --

last sentence in the last full paragraph of Ms. Richardson's letter on page two.

THE COURT:  And then anything else that was indicated in the -- the status report and the red-line version that the Levi plaintiff raised?  Is there -- are -- I'm now looking at Ms. Skjelset and Mr. Rizzo.  Are there additional issues that were -- that were brought up in your red lining that we haven't addressed?

MS. SKJELSET:  I think the only issue that remains that isn't in the letters, the Conley and the defendants' letter, is the extent of our requirement to log witness statements that we obtained in the course of investigating this claim, because that's an issue that we discussed at conferral.  I think it will probably come up, and we wanted to talk about it with this Court.

THE COURT:  Okay.  I don't know enough about what that all means, but I have a note here.  We'll talk -- we'll get into detail about what that involves.

MS. SKJELSET:  I just didn't want to leave a loose end.

THE COURT:  No, no.  Good.  That's why I have a note here, so I have something that hopefully will log my -- or jog my memory about the log.  And is there anything else?  And I'm not trying to say no.  I just want to make sure that we've got it all covered.  Anything else?

MS. SKJELSET:  I believe that Ms. Tshala wanted to speak a little bit about the extent and scope of privilege and the implication of waiver, potentially have a briefing argument on --

THE COURT:  On what area of discovery are we dealing with?  There was also something right before the break where I talked about an oil-slick slope and -- and I was actually more proud about the saying than I can remember about the topic.  So what was the issue that I was describing?

It was about the idea of -- of -- oh, okay -- the waiver of individual items versus using a waiver of an individual item as an extension of -- of a -- of a subject area.  Was that what, Ms. Tshala, you were going to talk about?

MS. TSHALA:  Correct.

THE COURT:  All right.

MR. RIZZO:  No shield can be used as a sword, I believe, is what the Court said.

THE COURT:  And never, never, never, never draw your sword out of the sheath when you're on an oil-slick slope.

All right.  All right.  So we have enough -- we have enough memories now to trigger the recollection of that issue, or we'll just remember the image.

Let's take 15 minutes.  We'll come back at 3:10.  And I think we're making good time.  We'll be able to get this thing finished up in a little bit, although during the break I

guarantee that somebody's going to come back and say, "Your Honor, there's one more thing." But it's going to come from each of you, so there'll be three more things. I look forward to it. We're in recess.

(Recess taken, 2:56 p.m. - 3:12 p.m.)

THE COURTROOM DEPUTY CLERK: This court is back in session.

THE COURT: All right. Counsel, we're in the home stretch. Ms. Hoffman was kind enough to identify several issue that we still had outstanding. Were there others that came up during the break that you want to make sure that we put on the list?

I'll start with defense counsel first. Anything?

MR. EDELSON: No, we don't have any additional issues. But we've got some --

THE COURT REPORTER: I'm sorry. I'm having a hard time hearing you.

(Discussion off the record, 3:14 p.m.)

MR. EDELSON: So what I said is we don't have any issues we haven't already talked about that we want to add to the list, but we had some additional thinking about the J.C. deposition. And we think we may have a solution. If it's acceptable to the plaintiffs, then I think we can obviate the need for a deposition.

So let me put it out there. It would go like this.

And I think we may have gotten the first one resolved; and, that is, that if they'll stipulate that she won't testify at trial, number one. And, number two, stipulate that J.C. did not tell anyone at DHS about the Raygosa abuse until October 9th, 2017, when she revealed it for the first time to Penny Waters.

Number three, that no expert that they call will rely on any information that they learned from her, either through an interview of her or from the recordings or trial testimony. And, four --

THE COURT: That one seems a little -- I want to make sure I understand that. Say that third one again.

MR. EDELSON: That the plaintiffs won't call any expert who will testify that their -- their -- that their testimony will be reliant on any information that they learned from her, and that would be from her directly by interviewing her -- so, in other words, they can't go and -- they can't have their expert interview her and then have her testify and -- and have the -- the expert testify based on that information or based on the recorded interview that has -- that we've talked about or her trial testimony.

So the expert can't go out and rely on all of that information and -- and give testimony in this court. Again, this is what we want as a stipulation. And that plaintiffs won't try to offer as evidence in the case the recorded

interviews or her testimony at trial in the criminal case.

So basically take her out of the case, so that no one's either relying on her or that she's not testifying and -- and making it clear that everybody agrees that the first time that she ever disclosed the information -- that's the most important information in this case -- the first time she ever disclosed it to DHS was October 9th, 2017.

THE COURT: Who wants to respond over there?

MR. RIZZO: I can respond.

THE COURT: And I think it's -- I don't need argument because it's -- you either stipulate or you don't stipulate. So -- and it sounds to me like it's a package.

MR. RIZZO: Right. And we could not stipulate, given the conglomeration of those points.

THE COURT: All right. So if the parties want to confer about it a little bit later, that's fine, outside of my presence. But what I'll do, before we finish the day up, is talk about a briefing -- some limited briefing to help me understand whether I should allow the deposition of J.C. to take place. Okay.

MR. EDELSON: Understood. Thank you.

THE COURT: Thank you.

Any other items to add to our remaining list from the Conley plaintiffs?

MS. RICHARDSON: No.

THE COURT:  And how about the Levi plaintiffs?

MS. SKJELSET:  No items to add, Your Honor.  I did identify an e-mail where we conveyed our position regarding the seven hours, if that's helpful to the Court, but --

THE COURT:  Did we -- did we resolve that issue?

MS. SKJELSET:  There was no agreement basically.

THE COURT:  Okay.  So in terms of the resolution of the issue -- again, I'm trying to remember back a couple of hours.

MS. HOFFMAN:  Your Honor, this is Ms. Hoffman.  My memory of where we left off was that I think you had deferred issuing a ruling, but we had discussed what that might look like under FRCP 30.

THE COURT:  Yes.  And you made the recommendation about allowing more than ten and then addressing the issue of timing?

MS. HOFFMAN:  Right.  On the condition that, absent stipulation of the parties, the depositions are all limited to the seven hours set out in -- in Rule 30.  And that issue came up in the context of Anastasia Brooks' deposition.  And I -- I have not had a chance to talk to Ms. Korbel, but I did find our e-mail exchange.

And -- and what I had -- what she put in her e-mail to me memorializing our conferral, and what I had offered her in conferral, was two hours with -- with some flexibility.  If

she ended up needing more time, we would be flexible on providing some more time.

I know that the Conley plaintiff has added new claims and a new defendant, I think, in June. And I understand that they need more time with Ms. Brooks. So we're willing to be flexible, but we don't think they need a full additional day. So that's where we are on that.

THE COURT: Were you able to touch base with Ms. Korbel?

MS. RICHARDSON: Yes. So I think what Ms. Hoffman is trying to do is correct what she said earlier, which was not -- was just not accurate, because there is an e-mail. And we did talk to Ms. Korbel. And she did tell Ms. Hoffman that, while she had originally talked about only needing two hours, the defendants then produced voluminous documents from another file.

And after Ms. Korbel saw that, she said to Ms. Hoffman, "I need additional time, more than two hours. I can't be limited to just two hours." And that is why we had to file the motion to compel, because Ms. Hoffman would not agree to extend beyond the two hours. When I did talk -- when we did --

THE COURT: Well, I'm less interested in knowing where we've been as opposed to where we need to be going.

MS. RICHARDSON: Yes.

THE COURT:  And I'm hearing from Ms. Hoffman that they're going to be flexible.  You just want to have your full time?

MS. RICHARDSON:  Right.

THE COURT:  Now, if I understand correctly, though, you did have seven hours with Ms. Brooks?

MS. RICHARDSON:  No.  We had 40 minutes.

THE COURT:  You had 40 minutes with Ms. Brooks?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.

MS. RICHARDSON:  So the question was how much more time does Ms. Korbel need.  And we had to file this motion to compel, again, because defendants would not agree.  And we said we needed more than two hours.  And Ms. Korbel thinks that, based upon the documents, she's hoping to get it done within four hours.  But that's still way less than the seven hours.

THE COURT:  I get it.  But, you know, I mean, I -- I can appreciate that everyone gets the max seven hours, but how often are -- are depositions taking the max most of the time anyway, right?  I mean, I --

MS. RICHARDSON:  Yeah.

THE COURT:  So -- so here's the thing.  If Ms. Korbel is indicating four hours, it's four hours.  Let's -- and let's just -- let's move on from Ms. Brooks.

MS. RICHARDSON:  Okay.

THE COURT: I think -- so no more -- no more about Ms. Brooks unless somebody discloses another large file.

MS. RICHARDSON: Okay. Thank you, Your Honor.

THE COURT: Now, with respect to the -- Ms. Skjelset, you -- you indicated there was an e-mail confirming that the parties had not come to a firm agreement about anything about joining -- joining the -- or merging time on the -- for the depositions.

MS. SKJELSET: No, Your Honor. And I'm happy to read it into the record. The defendants have it. It was from May 20th, 2024. It's one of my better e-mails, I would say. I don't feel like I need to read it into the record, but I don't believe that an order limiting us to seven hours would be appropriate at this time. I can --

THE COURT: It wouldn't be appropriate to do what at this time?

MS. SKJELSET: Appropriate -- well, it wouldn't be appropriate -- it wouldn't be consistent with the conferral of parties and the agreement that we had, and it's not even necessary. I don't -- I don't envision any of these future depositions to take -- take that long. They're mostly defendants' depositions.

MS. RICHARDSON: I think what -- if I can, Your Honor, so I think it's process, right? So the statute is Rule -- Rule 30. And that is that we now, because there

apparently was not an agreement here, although we have scheduled and we have already taken more than ten depositions, you know, not combined together, but between the two of us, that we ask the Court, pursuant to Rule 30, that we have -- we go beyond the ten depositions and that we be allowed to take the depositions of the following individuals.  And I'm going to have to have somebody else name out who it is that we're --

THE COURT:  So I have -- I have Dr. Sorenson.  Is Ramirez -- Margaret Ramirez, is it a defense depo or a plaintiff depo?

MS. RICHARDSON:  That is a plaintiff depo, Your Honor.

MR. RIZZO:  It is a defense depo.

MS. RICHARDSON:  Correct.  Sorenson is a defense depo.

THE COURT:  Okay.

MS. RICHARDSON:  I'm sorry.

THE COURT:  Yeah.  So Ramirez is a plaintiff -- plaintiff depo.  April Clark?

MS. RICHARDSON:  Is a defense depo.

THE COURT:  Stacey Loboy?

MS. RICHARDSON:  That's a -- that's a plaintiff deposition.

THE COURT:  Dale Gilad?

MS. RICHARDSON:  That is a defense deposition.

THE COURT:  And Traci Stockman?

MS. RICHARDSON:  That's a plaintiff deposition.

THE COURT:  So I have three -- three more depositions that plaintiffs are -- are intending on taking and for which there -- at least I have some dates set, at least in my little calendar here.  Maybe they're going to be moved.  But, in any event, there's three depositions that plaintiffs are intending on taking?

MS. HOFFMAN:  And Ms. Loboy -- Ms. Skjelset and I had conferred on Ms. Loboy's being -- or Ms. Korbel and I -- I honestly don't remember.  We've all agreed that that one is a half day, to the best of everybody's ability.

MS. TSHALA:  This is Manuella Tshala.  And that's correct, Your Honor.  It's going to be four hours.

THE COURT:  I'm sorry.  What?

MS. TSHALA:  That is correct.  It's going to be four hours for --

THE COURT:  Four hours?

MS. TSHALA:  Yeah.

THE COURT:  So Loboy is a total of four hours, and everyone's agreeing to four hours?

MS. TSHALA:  Yes.  Correct.

THE COURT:  All right.  And that was Ms. Tshala.

MS. TSHALA:  Yes.

MR. RIZZO:  Judge, if I may, in terms of

completeness, there's also the Annette Smith, and then there's the Lene -- if I'm pronouncing that correctly, the Lene Ferrari deposition. And I think Ferrari is a defense deposition. And Smith is a defense deposition as well.

THE COURT: And I appreciate that. And I'm not -- I'm not really concerned about the defense depositions. It's mostly about what are we doing with the plaintiffs' depositions remaining, but thank you for making sure that we have that complete list.

And were there other plaintiff or defendant depositions that we haven't identified yet? I mean, I understand that O'Brien has some additional time. Is Chapman done?

MS. HOFFMAN: Yes.

THE COURT: Okay. And Hammond?

MS. HOFFMAN: (No audible response.)

THE COURT: Hammond is done?

MS. HOFFMAN: Hammond is done, Your Honor.

THE COURT: Okay.

MS. HOFFMAN: And, of course, there's J.C.'s deposition that we're going to --

THE COURT: Yes. And then we're going to brief up J.C.

MS. SKJELSET: Your Honor, there's just the issue of Patricia Gonzalez.

THE COURT: Yeah. And that's on -- thank you. That's on the list here, so maybe we ought to take that up when we're talking about depos in just a bit. But I just want to make sure: So is Ms. Gonzalez a plaintiff depo?

MS. SKJELSET: She would be a plaintiff depo. We had agreed not to call her if they agreed not to call her at trial; but now that they are deposing the child's attorney, we think it appropriate to depose the agency's attorney.

THE COURT: Okay. So we'll get to that in a minute.

And so I have Ramirez; Loboy, which is -- and Loboy, everyone agreed four hours, so no more than four hours -- and Stockman. So on Ramirez and Stockman, we haven't talked about time. And I get that there's an issue that -- Ms. Richardson has requested the Court to authorize more than the ten depositions. That's allowed. But I do want to put some -- some limits on timing. So talk to me about how much time Ms. Ramirez's deposition will -- will be.

MS. SKJELSET: Well, that's a Conley deposition, Your Honor. Conley is leading most of the discovery that's coming. We do cross-notice because we -- there's --

THE COURT: Fair enough. So I -- so Ms. Tshala.

MS. TSHALA: Yes, Your Honor. Can I check in with Ms. Korbel? She's going to be taking this deposition.

THE COURT: Yes.

MS. TSHALA: Okay. Thank you.

MS. SKJELSET:  Regardless, Your Honor, none of those depositions will be over seven hours.

THE COURT:  Jointly?

MS. SKJELSET:  Jointly.  Right.

THE COURT:  And the Conley plaintiffs get to go -- plaintiffs' counsel are asking the questions first?

MS. RICHARDSON:  Correct, Your Honor.

THE COURT:  So, Mr. Rizzo, you only get maybe 30 minutes, and that's it.

And I'll just --

MR. RIZZO:  I'll be fine with that, Judge.

THE COURT:  And Stockman -- is Stockman a Conley depo?  Ms. Traci Stockman.

MS. SKJELSET:  We may have noticed her first, Your Honor.  She will not be a long deposition.  She will not go over --

THE COURT:  So, actually, what I'm just seeking is are the parties agreeing that both Ramirez and Stockman are a total of seven hours?

MS. SKJELSET:  Under that, I'm sure, Your Honor. Well, certainly -- I can't comment on Ramirez, because I'm not leading the charge on that, but Stockman is under seven hours.

THE COURT:  I'm going to order that these two depositions combined are no more than seven hours.  I mean, I -- it seems like it'll be plenty enough.  Okay.

And then Smith, Ferrari, and all the other defense depos, that's -- that's your -- that's your deal. I don't want to talk about it. So, Mr. Edelson, don't even try to argue for more time. That's yours. All right. Come on, you didn't even take the bait, Mr. Edelson. I mean, you were casually ignoring me. And that's, actually, probably the best way to not catch my attention, so --

MR. EDELSON: You know, Judge Panner used to describe that as grabbing defeat from the jaws of victory. He said sometimes you just have to shut up. I try to take that advice.

THE COURT: I was missing the repartee that we were -- that I was enjoying, but let's move on to the next topic.

Ms. Gonzalez, plaintiffs want to depose Patricia Gonzalez, who was the attorney for DHS at the time.

MS. SKJELSET: Yes, Your Honor. We had -- we had kept the juvenile record and juvenile court proceedings out of our initial complaint. But the defendants have made an issue of it, and they are seeking to depose Annette Smith. There are many waived e-mail communications for which we could --

THE COURT: What was -- just why do you -- I get -- all right. So the defendants are taking Smith's deposition. You want to take Gonzalez's deposition. And what relevant testimony will Gonzalez have?

MS. SKJELSET: Well, I don't want to reveal too much

of my work product, Your Honor, but I think she has -- she has important information on what information the agency knew about the concerns in the home and reports of -- and allegations of abuse, but did not relay to the Court during the time and after that J.C. --

THE COURT:  Wouldn't that be privileged, if they were communications from the agency to her?

MS. SKJELSET:  Because they've been -- because they've been waived.

THE COURT:  They were waived how?

MS. SKJELSET:  There are e-mails that were waived.

THE COURT:  E-mails?

MS. SKJELSET:  In the -- well, in this case and in the probate case, they have produced -- this is what I was saying earlier, Your Honor -- they have selectively produced e-mail chains of communications in which --

THE COURT:  Okay.  So this is getting back to the broad waiver interpretation of certain e-mails having been produced that would -- that are otherwise privileged e-mails.

MS. SKJELSET:  Yes.  I don't know if I would characterize it as broad waiver, but it is the -- we need to carefully analyze the scope of the waiver for each of the communications that have been waived in this -- in this case. And that really is Ms. Tshala's issue.

THE COURT:  Oh, okay.  All right.  Before I hear

from -- since I have a preview of what the plaintiffs' position might be, let me hear from defense counsel.

MS. HOFFMAN:  So, Your Honor, Ms. Smith and Ms. Gonzalez have different -- I mean, they have different roles in the dependency case, but they also have a different relationship to this case.  And the topics on which we want to depose Ms. Smith aren't really analogous to what Ms. Gonzalez may or may not have to offer.

Our interest in Ms. Smith is primarily -- there was one hearing where she made arguments to the juvenile court about whether the children should be moved out of the home. That is something we would like to ask her about.  And she has communications with Ms. O'Brien, some e-mails.  The crux of it is really, you know, J.C. had relationships with multiple adults in her life, including her caseworker.

She had an attorney.  She had a therapist.  She had a CASA.  And part of our goal is to discover what anybody knew or didn't know at the time.  That -- that -- it's a relatively limited scope of questioning.  That's really all we're interested in from Ms. Smith.  And, of course, we're not going to ask her about privileged communications with J.C., but she has many nonprivileged communications with caseworkers.

Ms. Gonzalez had a different role.  Her role was to represent the agency in the dependency proceeding and come up with strategy about what the permanency plan should be, whether

it's reunification, adoption.  There is, actually, a separate appeals process for those kind of decisions in the juvenile court.  None of that is at issue here, and we're not trying to put it at issue.

So we don't think that deposing Ms. Smith opens up an entire deposition of Ms. Gonzalez.  They really aren't -- even though they are both attorneys in the dependency matter, they're really not analogous witnesses.  And I want to provide a little bit of context around Ms. Skjelset's reference to us waiving privilege over some documents because, she's right, we did.

And you and I discussed this little bit in our last status conference on July 10th.  In the probate matter, when ODHS produced documents in response to Mr. Levi's subpoenas, ODHS produced some privileged documents.  And that was now, I think, close to three years ago.  We reproduced in this case all of the documents that had been produced in -- subject to the probate subpoenas to DHS and stamped them with the appropriate confidentiality stamps under our -- this protective order in this case.

And we realized, long after that initial production in the probate matter, that there were many privileged documents that had been produced.  So we waived privilege specific to those documents because we did our research and understood that -- given the amount of time that had been

passed, we waived.  And it would be unfair and -- you know, unfair and unreasonable of us to try and claw all of those back.  So that --

THE COURT:  And those are just documents from the probate file?

MS. HOFFMAN:  Those are documents produced in the probate file.  Yes, Your Honor.  And there is not an intentional distinction between those documents and privilege that we've asserted in this federal matter with documents that were not produced in the probate.  It's a matter of -- they were separate cases.  Discovery was done differently by different people, and things happen when that happens.  So that's all that it is.

And we have committed and agreed, and we stand by this, that we are not going to call Ms. Gonzalez at trial as a witness.  There's no surprise that could happen to -- to plaintiff.  And I have understood that they didn't feel a need to call Ms. Gonzalez either, unless there was something that came up out of the juvenile court documents that they felt they really needed to ask her about.

That was their position a couple months ago.  And I had understood that we were in agreement that that might happen.  It hasn't so far.  It still could.  We don't have those documents from the juvenile court, but that was where we left off.  And so that's the context.  And, again, we don't

think that Ms. Smith and Ms. Gonzalez are actually analogous witnesses with respect to this case.

THE COURT:  Okay.  All right.  And when you say "analogous," I'm also imagining that they're not two sides of the same coin?

MS. HOFFMAN:  That's right.  That's probably a better way of putting it.  They're not two sides of the same coin, yeah.

THE COURT:  All right.  So Ms. Gonzalez is not being called as a witness.  That's usually a good first step in arguing for why they need not be deposed, but not necessarily. So tell me what it is -- and so the other issue is I can also appreciate what Ms. Hoffman has -- and this is, actually, I think, maybe more of Ms. Tshala's argument, so I don't want to leave you out of the mix, Ms. Tshala.

But part of the issue that Ms. Hoffman just described was that the -- the -- the documents for which privilege was waived were waived sort of independent of any strategic decision to waive self-serving documents, but that they were -- that the privilege was waived by virtue of the production of a probate file and -- and not some other sort of calculated reason for disclosing privileged documents or waiving privileged documents.  I mean, I can appreciate that nuance here.

So help me understand -- is it Ms. Tshala or

Ms. Skjelset that wants to --

MS. SKJELSET:  Let me just make a few points and then turn it over to Ms. Tshala, if that's all right, Your Honor.

THE COURT:  As long as it's okay between the two of you.  Do you both stipulate?  Okay.  All right.  We finally got a stipulation.

MS. SKJELSET:  I just want to offer a little bit of background on the documents received in the probate case, because it appears as though it was somehow haphazard that those documents were produced to us --

THE COURT:  In the probate case?

MS. SKJELSET:  -- in the probate case.  We sent a subpoena to the Oregon Department of Human Services for documents pertaining to J.C. and to the certification file.  And we obtained what we understood to be the certification file.  Initially, it was redacted.  And there was a cover letter that said this was redacted under the auspices of DOJ, with the assistance of DOJ, carefully.

So the fact that they produced communications with the DOJ in that, that were redacted in that file, led us to believe they were initially waiving the content of those documents.  That was reproduced to us after a court order in unredacted form.  So they twice produced these communications with the DOJ attorneys relating to J.C.'s allegations of abuse -- there's a host of topics that I think Ms. Tshala can

talk more about.

But I do want to talk a little bit about Ms. Gonzalez and the -- the potential topics that we would have. I was hoping we could just move forward; but I do think that if they are going to suggest, as they have in this case -- certain witnesses have suggested that it is Ms. Smith's fault that the children remained in the home -- I think we need to have the alternative narrative from the Department of Justice.

And there are many waived communications in which Patricia Gonzalez is involved. One of them, they're suggesting that Kat O'Brien was biased toward the mother, was --

THE COURT: Who's suggesting this?

MS. SKJELSET: I think the DOJ attorney.

THE COURT: Ms. Gonzalez?

MS. SKJELSET: Ms. Gonzalez.

THE COURT: And so you're saying there's a waived communication from Ms. Gonzalez suggesting, indicating or explicitly --

MS. SKJELSET: That she needed to be removed from the case because she was approaching it in a biased fashion, yes.

THE COURT: Okay. So you have that e-mail communication, and you want to depose Ms. Gonzalez about that e-mail communication?

MS. SKJELSET: That would be among a host of e-mail communications and representations to the Court that -- for

instance, we know that Ms. Gonzalez was aware initially, upon the disclosure that J.C. made, about the -- the disclosure, the extent of the disclosure and the nature of the disclosure regarding Raygosa.  That information did not get to the Court until it was -- until it was -- well, ever really.  It was never produced to the Court.

THE COURT:  During the dependency proceeding?

MS. SKJELSET:  During the entirety of the dependency proceeding.

THE COURT:  And you know that Ms. Gonzalez knew of these things from what?  Sorry.

MS. SKJELSET:  From e-mails.

THE COURT:  That are -- that were waived?

MS. SKJELSET:  Yes.

THE COURT:  Okay.  And so what else would you ask her, beyond that which she describes in these e-mails, at a deposition?

MS. SKJELSET:  Well, potentially, depending -- it depends upon what the juvenile court rules really.  If the juvenile court rules that her statements that she made to the court are -- are discoverable, then we ask her about the extent to which she was making and her -- she knew that her clients were making misrepresentations, at a minimum by omissions, to the court.

There's also an issue of Dr. Sorenson and the

materials that he reviewed in connection with the evaluation of J.C. and what was -- what was lacking, what -- what extraordinary omissions there were in the documents that were produced to him in his psychological evaluation.

And there's another issue.  We have a -- they are claiming privilege over a document that was in the CFD file, the Center for Family Development file, that appears to be a communication between Ms. Gonzalez and the child's therapist.  So I think I might ask her whether she had an attorney-client relationship with the child's -- or my client's therapist, right?  There's a host of issues that I could ask about, and I think it would --

THE COURT:  And what would be the relevance of asking Ms. Gonzalez about whether she had an attorney-client privilege with the child's therapist?

MS. SKJELSET:  So that the defendants would unredact therapeutic notes that they've redacted in this case as attorney-client privilege.

THE COURT:  But if -- so you want to ask Ms. Gonzalez if she had an attorney-client privilege with a therapist, right?

MS. SKJELSET:  Yes.

THE COURT:  And then -- and then if she did, then those communications would be waived through the -- by virtue of the therapist?

MS. SKJELSET: Well, I think we all know that she did not have an attorney-client relationship with a therapist. But what it will go to is the privilege issue. The problem that they are -- they -- the State is using their ability to redact documents in these -- in the child's file, in these e-mails, to avoid information that is potentially problematic for them.

And, again, I don't -- I -- I can -- I pointed it out to counsel. I don't know if they've decided to unredact the document. But in my client's permanency record, there's a therapeutic note that they've redacted as attorney-client privilege, a note from her therapist.

THE COURT: Okay. And that's in the in-camera package -- packet?

MS. SKJELSET: Well, I was only allowed to select eight e-mails in camera, Your Honor.

THE COURT: So I get it. I'm just trying to understand whether that was one of the ones I was looking at.

MS. SKJELSET: No, I don't --

THE COURT: Okay. That's all I needed to know, Ms. Skjelset.

All right. There's a lot to unpack there.

MS. HOFFMAN: There is a lot to unpack, Your Honor. So a couple of things. So I don't forget, Ms. Skjelset is right. She has pointed that e-mail out to us. And, actually, I need to circle back with her about it. I mean, we've

redacted it.  I can't really disclose on the record what's in that document, but I don't believe -- I've reviewed it, and I don't believe it's what she thinks that it is.

And that's not a criticism.  She can't read through a redaction.  But I don't -- we think it may be work product, but I -- I do not believe that that document is what -- what she's guessing that it is.

THE COURT:  So if it's not a therapy note, then there may be work product.  But if it is a therapy note, then it might be hard to establish it's either privileged --

MS. HOFFMAN:  Right.

THE COURT:  -- or -- or product.

MS. HOFFMAN:  I've looked at it.  And if we are thinking about the same e-mail, it is not a therapy note.

THE COURT:  Okay.  Well, then I'm not sure I really want to go --

MS. HOFFMAN:  Right.  We'll --

THE COURT:  -- at each of the several thousand documents --

MS. HOFFMAN:  -- figure it out.

THE COURT:  So maybe I'll let the two of you confer on that.

But, getting back to Ms. Gonzalez, if there's privileged e-mails that reflected things that Ms. Skjelset has said, you don't think that Ms. Gonzalez needs to -- needs to be

deposed about anything more than that which already is evident in the -- in the way of documents?

MS. HOFFMAN:  I don't, for a couple of reasons.  So when it comes to Ms. Smith, the hearing that we're interested in took place at the beginning of July 2017, when the children -- right at the exact tail end of them being in the Duncan-Raygosa home.

If Ms. Skjelset and I are thinking of the same e-mails about -- the waived e-mails about bias and Ms. O'Brien's relationship to the case, I believe the ones, at least that I'm thinking of, from the deposition on Friday, I think that they are dated from the fall of 2018, long after the children were in the Duncan-Raygosa home.

I -- I would argue -- and this isn't a -- you know, this isn't --

THE COURT:  Long after they were -- after they had already left the home?

MS. HOFFMAN:  Long after.  More than a year after. So -- and they -- those e-mails are dated from the end of the time that Ms. O'Brien was assigned to the Colby matter.  So their relevance to this -- oh, I'm sorry.

THE COURT:  No.  It's all right.  I want to make sure I -- I politely interrupt you, so I don't lose my train of thought on the question.  So is there some -- so Ms. Gonzalez was involved in the case, representing the Department of Human

Services, even after the children left the Raygosa home?

MS. HOFFMAN: That's right.

THE COURT: And that -- there is a -- and you're telling me that whatever communication -- or at least one of the communications that Ms. Skjelset is describing, that Ms. Gonzalez provided about her concerns of O'Brien's bias, reflected behavior on Ms. O'Brien's part after the children left the home? Or was it -- was it in relation to Ms. O'Brien's general behavior both before and after? Or do we know?

MS. HOFFMAN: They are related to her relationship with the children's mother more than a year after the children had been removed. It had to do with how Ms. O'Brien's relationship to the kids' mom was kind of maybe not going well by -- by that point. And that was what that e-mail from Ms. Gonzalez is in reference to.

And, again, DHS's efforts to reunite the family or how well that went or didn't go isn't the subject of this lawsuit. And, in fact, there's a -- again, there's a separate appeal process for it. It's a separate issue.

THE COURT: So we don't know whether this e-mail relates to Ms. Gonzalez's appreciation of O'Brien's bias at any particular point in time. We know that the communication was made after she left -- after the children left the home, but we don't know for how long that assessment or judgment about bias

was in place from that e-mail?

MS. HOFFMAN:  I suppose we don't, but we don't -- I -- I haven't seen any records, at least from what's been presented in depositions and what we've waived privilege over, I haven't seen anything from -- of that nature from the time that the children were in the Duncan-Raygosa home.

And the issue in this case is -- and, again, the nature of the alleged bias matters here, because what matters in this lawsuit is what DHS knew or should've known about what was happening with the kids when they were in the Duncan-Raygosa home.

THE COURT:  So if -- if Ms. Gonzalez was aware or had this impression of bias prior to the children's removal from the Raygosa home, that arguably imputes knowledge to the agency?

MS. HOFFMAN:  No.

THE COURT:  Or I guess it's a question for the jury, right?

MS. HOFFMAN:  No.  Actually, Your Honor, I don't think it is a question for the jury.  I actually don't think it would be admissible, because the bias that Ms. Gonzalez is referring to has to do with whether Ms. O'Brien got along well with the children's mother and whether she was working well with her on a parenting plan and reuniting the kids with their mom.

THE COURT:  It's a relevance issue?

MS. HOFFMAN:  It's totally irrelevant, whether she thought Ms. O'Brien was biased in that way at the time.  The children's mother didn't know about J.C.'s abuse either.  So whether Ms. O'Brien was getting along with her or not, it doesn't matter, because neither one of them knew that J.C. was being abused in the Duncan-Raygosa home.

So it's just -- there's nothing to say about it to the jury.  It's a -- whether she was biased or not, that bias is of a different type, of a different nature, that wouldn't have affected the facts that are at issue here.

THE COURT:  Okay.  Ms. Tshala, were you going to weigh in on this topic?

MS. TSHALA:  Yes.  I was going to weigh in on the waiver issue, not really with Ms. Gonzalez, so --

THE COURT:  The waiver of what?

MS. TSHALA:  Attorney-client privilege.

THE COURT:  Whose --

MS. TSHALA:  Yes.

THE COURT:  Whose statements or -- or what attorney-client privilege are we talking about now?

MS. TSHALA:  Yes.  So defendants have stated on the record multiple times that they have waived the privilege, and it's been intentional.  Like Ms. Skjelset just said, they've said it --

THE COURT:  As it relates to Ms. Gonzalez?

MS. TSHALA:  In general.  We have waived e-mails, that they waived the privilege on in the probate court, that has been produced in our matter as well.  And at that time in the probate court, the State knew that J.C. was requesting these documents and ordered to investigate the civil claim.  And so when they waived that privilege and also produced those documents in our case, that waiver was intentional.  And now we are finding that, as we --

THE COURT:  The waiver from probate?  The waiver from the documents produced in probate?

MS. TSHALA:  Yes.  And that have also been produced in --

THE COURT:  I understood that Ms. Hoffman actually characterized it as accidental and then waived by virtue of not preserving a clawback -- preserving an effort to clawback in a timely way.  That's what I understood.  So, I mean, on one level, they -- they turned them over.  They provided them.  But I also understood from what Ms. Hoffman was saying is that, you know, if they had the choice to have undone it, they never would've done it -- well, they never would've provided them in the first place because of the documents being privileged.

MS. TSHALA:  Yes.  I think from last conference my understanding was that two years had gone by when they -- before they realized that they had put these documents out into

the public.  So that's an intentional waiver.  I mean, you can try to claw it back, but it's still intentional.  It's not that they involuntarily waived this privilege.

THE COURT:  Okay.  All right.  So --

MS. TSHALA:  And so --

THE COURT:  Whether it's an intentional waiver or something else, it was a waiver.  I think there's no dispute that it was a waiver, that being the documents from the probate file that -- that would've been privileged.  Okay.

MS. TSHALA:  Yes.

THE COURT:  Now you're asking me to do something else.

MS. TSHALA:  Yes.  And so when there's an intentional waiver, that then translates to a subject matter waiver on all other undisclosed documents relating to that same subject matter.

THE COURT:  And that's -- I mean --

MS. TSHALA:  And I have --

THE COURT:  -- is there case law on that?

MS. TSHALA:  Yes, there's case law.  FRE 502 also speaks to that.  We'd request --

THE COURT:  FRE 502, how does that come into play with respect to discovery and waiver of privilege?  I mean, is that -- is that -- you want me to -- how does that -- is that an appropriate discovery tool to use in -- in -- as we're

arguing the matter today?

MS. TSHALA: Yes.

THE COURT: Okay. All right. So subject matter waiver?

MS. TSHALA: Yes. Correct. And --

THE COURT: When is enough waiver enough waiver to open the door as wide as you're asking it to be opened?

MS. TSHALA: Yeah, and so now we are receiving documents in this matter that we're realizing are incorrectly or inappropriately redacting supposedly attorney-client privilege material. Other documents are not redacted, and so we've been able to cross-reference some documents that are redacted and some that are not.

And we can see where certain statements have been redacted, and we do not believe that -- that is attorney-client privilege. And so if there's this misleading and selective assertion of attorney-client privilege, then that also lends to subject matter waiver on those same subjects.

THE COURT: Okay. Let me just -- I'm -- as you can tell, I was flipping through a very flimsy, thick book. And it wasn't the Yellow Pages. It's -- it includes Rule 502. Let me look at it. And if you want me to look at a particular section to get me to the point --

MS. TSHALA: Yes. You can look at 502(a), Your Honor.

THE COURT: Okay.

(Pause in proceedings, 3:53 p.m.)

THE COURT: Okay. So the three elements are intentional waiver, same subject matter and fairness.

MS. TSHALA: Correct.

THE COURT: I guess that's why you keep using the word "intentional."

MS. TSHALA: Yes. And, Your Honor, if you also look at the advisory committee notes, there is some discussion there about if you're intentionally putting protected information in a selective, misleading and unfair manner, then that also leads to subject matter waiver. And here we have that.

Documents have been produced to us that have either been redacted or not redacted. It's difficult to even ascertain how the privilege is being applied or why. And I think that helps our argument here that this is subject matter waiver. They've waived the privilege, and they keep doing so.

THE COURT: Ms. Hoffman, who was it that provided the probate file, the probate discovery? A name, not -- I mean, was it -- was it -- was it Markowitz representing the Department of Justice or -- or the DHS, rather?

MS. HOFFMAN: No, Your Honor. Markowitz didn't come on to this case until last summer, 2023.

THE COURT: So it was a DOJ attorney who provided the probate documents?

MS. HOFFMAN:  I'm not even actually -- I think Ms. Blaesing can speak to that.  I'm not actually sure it was even DOJ.

MS. BLAESING:  This is Lauren Blaesing for defendants.  As to the first subpoena, the DOJ Child Advocacy and Protection Division in Lane County responded to the first subpoena.  The DOJ Trial Division was not involved at that point.

As to the second -- second subpoena, I don't recall. It was either -- but DOJ was involved, but that may have also been through the -- the Lane County Child Advocacy and Protection Division.

THE COURT:  Okay.

MS. BLAESING:  It was before our firm's involvement and before DOJ Trial was involved in -- you know, at that point DHS was not a party to the probate proceeding.  They were just the recipient of two subpoenas.

MS. HOFFMAN:  That's right.

THE COURT:  All right.  But the Department of Justice was representing DHS --

MS. BLAESING:  Responding to the subpoena.

THE COURT:  -- responding to the subpoenas?

MS. BLAESING:  Yes.  But not as a party to the proceeding, because they weren't a party.

THE COURT:  Does that change the -- does the fact

that they weren't a party change any of the calculations I need to make with respect to --

MS. BLAESING:  Well, I think so, Your Honor, because they did not -- they were not privy to the same negotiation of the protective order and opportunity to negotiate a clawback agreement.

THE COURT:  And so I'll acknowledge that they would not have been as savvy as -- as you have been, but that doesn't mean the waiver still wasn't a waiver.

MS. HOFFMAN:  Right.  And, Your Honor, we -- we've already agreed that this was an inadvertent waiver on our --

THE COURT:  Now, wait a minute.  That's critical because --

MS. HOFFMAN:  Right.

THE COURT:  -- you want to call it inadvertent.  They want to call it intentional, because the rule says an intentional waiver is what opens the door to subject matter waiver, too.

MS. HOFFMAN:  I understand.

THE COURT:  So I think, from your perspective, as the attorneys in place now, would say, "Whoa, we wouldn't have done that.  Inadvertent."  But I have to look at what the attorneys who provided this information, the probate information, were doing.

MS. HOFFMAN:  Your Honor, with all due respect -- and

I represent that Ms. Tshala wants this before the Court today, because this is the time set to discuss discovery issues -- but subject matter waiver of attorney-client privilege is very complicated, and we have not conferred on this.  I don't know what -- I truly do not know what documents she's referring to when she's telling you there are documents we've inconsistently redacted.

If that's true, that's something we will confront. We -- we have reproduced documents multiple times in this case where we were -- we were incorrect somehow in our redactions or withholding something.  We've -- we will confer with her on this.  We haven't had an opportunity to do so.  And I'm going to be honest:  We need to brief this.

I can't -- I don't have the information necessary, including I haven't researched this legal standard, and I don't feel confident that I know it well enough off the top of my head.  I can see FRE 502 in front of me, because I've pulled it up, but that's -- I'm -- it isn't fair to have us argue this today.  We need a briefing schedule, and we need to confer.

MS. TSHALA:  And, Your Honor, I wasn't suggesting that we conferred or that we need to make the decision today. I just wanted to bring it to your attention.  We would appreciate a briefing schedule.  I can file.

THE COURT:  Well, that's going to mess with my trial date.  And I don't want Mr. Edelson to be able to say I was --

that "I told you so."

MS. HOFFMAN:  The issue, I think, is --

MS. TSHALA:  Your Honor --

MS. HOFFMAN:  -- what the proposed -- I mean, what the argument of the scope of the waiver is.  I think it's not just as to all attorney-client communication.

THE COURT:  I agree.  It's --

MS. HOFFMAN:  We have to define the scope of what's being --

THE COURT:  The scope is defined by subject matter --

MS. TSHALA:  Correct.

MS. HOFFMAN:  Right.

THE COURT:  -- the commonality of subject matter. And that, alone, is an issue, I'm sure, that will be debated and parsed.

MS. HOFFMAN:  Right.  We can't -- we can't --

THE COURT:  Yeah.  So let me make it -- I won't make the decision today.  So I'll give you all a reprieve, so you can go brief it.  Let me also tell you that I get that both -- both Ms. Tshala and Ms. Hoffman, you're characterizing it as the difference between inadvertent versus intentional.  And that, to me -- I mean, that's my threshold question here that I think you're going to have to answer for me.

I have to tell you that -- I mean, I don't think it's -- I don't think it's ever been characterized, to date --

and I get that you will have to brief it and then reformulate how you want to present it to me -- but it hasn't been characterized to me today as a purely accidental turning over of documents.

I mean, it was -- it was documents that somebody from the Department of Justice, an attorney -- I'm operating on the -- maybe we don't know that, but then -- you know, provided -- provided these documents responsive to the subpoena. I mean, how intentional does it need to be, without an effort to ever claw them back or request that they -- that -- or file a motion to -- to disgorge those documents from the party receiving them?

So I'm sharing all of this with you because I want you to know what I'm thinking. That doesn't mean that I've made a final decision. But let me -- I mean, I'd rather have you bark up the right tree, rather than somewhere else in the forest, because that's the thing that's going to -- that's what I need to understand, is what do you mean by inadvertent versus intentional.

Cite some Ninth Circuit cases. I got to tell you District Court cases are not going to move me if I don't accept the logic. If you have something from the Ninth Circuit, I'm interested in what they have to say.

MS. SKJELSET: Your Honor, I do have the cover letter that accompanied the initial production. I know that we're

briefing it later, and perhaps the Court wants to hear it later, but --

THE COURT:  Well, include the cover letter in your exhibits to the motion, so that way Ms. Hoffman knows what it is that -- that this cover letter says.  If -- I assume you might have it, but make sure that it's included, so we're all viewing with the same documents.

MS. HOFFMAN:  I do, Your Honor.  I just didn't review it before this hearing because we weren't aware this was on the table.  So, of course, it will be an exhibit.  We have discussed this at length in Levi, and we'll -- we will also hopefully work with the Conley plaintiff to understand a little bit better, you know, their -- their position.  We'll -- we will all brief this.

MS. TSHALA:  And, Your Honor, I will confer with Ms. Hoffman.  And then we'll plan to file this by Tuesday.

THE COURT:  File what?  The motion to do -- motion --

MS. TSHALA:  To compel the documents.

(Whispered discussion, off the record, 4:01 p.m.)

THE COURT:  So let's talk about our briefing schedule.  So you're going to file it on Tuesday?

MS. TSHALA:  Yes.

THE COURT:  File the motion to compel.  What's the going number of days you want for responding to these things?

MS. HOFFMAN:  Well, I -- on something that

complicated, I would -- I would like the usual two weeks, Your Honor.

THE COURT:  Okay.  All right.

MS. HOFFMAN:  And just to turn back briefly to the issue of Ms. Gonzalez's deposition, which is what I think led us here --

THE COURT:  Yes.

MS. HOFFMAN:  -- I also wanted to -- now I've forgotten everything that Ms. Skjelset had said, but most of what Ms. Skjelset has said they might like to learn from Ms. Gonzalez is information that the ODHS witnesses that they've spoken to already have, and have testified to, because those witnesses -- our ODHS witnesses and the named defendants in this case also attend those hearings, and they are essentially the client.

They -- they have this information.  And so, to the extent that there's nonprivileged, relevant fact information that the Levi plaintiff needs that they could get from Ms. Gonzalez, they -- they can get it, and have already got it, from the fact witnesses and defendants from ODHS.  And so there just isn't anything additional and nonprivileged that -- I mean, they've deposed 13 ODHS --

THE COURT:  Well, I -- I mean, if I grant the motion to -- Ms. Tshala's motion to compel, I mean, that potentially opens up, I mean, a much wider door that makes Ms. Gonzalez's

testimony more germane.  I just don't know, right?

MS. HOFFMAN:  Well, I think that's right.  And I think -- I think -- I think you don't know, Your Honor, and I think that the Levi plaintiff doesn't know.  I would say that if -- after we depose Ms. Smith and after the juvenile court makes its ruling, if there's something really germane that the Levi plaintiff wants to depose Ms. Gonzalez about, that they cannot get from some other source that's not an attorney for -- for ODHS, we will -- we will work with them on it.

We will confer with them about that.  And, in fact, that was our agreement originally, was that if there was something in the juvenile records that necessitated the deposition of Ms. Gonzalez, we understood that they might ask for that.

But right now, based on what we intend to ask Ms. Smith and what information the Levi plaintiff can get from other witnesses, besides Ms. Gonzalez, who have the same factual information that she has, there isn't any -- I mean, any reason to grant -- that deposition would be speculative because we don't know.

And it's a serious thing to order the deposition of an attorney, especially the attorney for the named defendant -- one of the defendants in this case.  It's not a small thing. And I think just because we think it could potentially maybe have some relevance, that no one can really articulate right

now, I don't think that's enough.

THE COURT:  Well, I mean, I think there's been some articulable basis for the deposition.  But I'm mindful also of the need to -- I mean, I would like to keep lawyers out of being witnesses, whenever possible, and -- and -- because they do have quite a bit of privileged information that needs to be kept privileged.

And this is a sidestep.  When it comes to the -- the waiver of the privilege, it's from the client's exercise of waiver, not the attorney's accidental disclosure of documents.  Would that be fair to say?

MS. HOFFMAN:  I think that's correct as to --

THE COURT:  So -- so part of what I'm trying to understand -- and I'm just harping on this issue of inadvertent versus intentional, and I just need to make sure that the parties are really fully exploring this.  I -- that's what's really getting me thinking hard, which is always dangerous.  So -- so I -- I may be barking up the wrong tree.  You just don't want to -- yeah, you want to be up there on the right tree.

So I just need to make sure that you really fully vet out what this means, because if the only people who can truly waive the privilege are -- I mean, what was DHS's position on the production of these documents at that time?

MS. HOFFMAN:  We will find out, Your Honor, but I

214

can't tell you right now.

THE COURT:  Okay.  I will also say part of the challenge is that there's been a recognition that it's -- you know, it's -- you know, it's water under the bridge.  But does that make it any less inadvertent versus intentional?  I don't know.  I'm just -- I'm giving you information to chew on, to figure out how you can best help me understand what this issue of intentionality might be.

So, Ms. Skjelset, you wanted to say something about Ms. Gonzalez.

MS. SKJELSET:  Yeah.  I think I can save a little bit of time and say I think it is prudent for us to wait on Ms. Gonzalez's deposition until a ruling on the privilege issue and, eventually, the juvenile court's ruling on the scope of disclosure.  So I'm fine reserving that.  That was always -- that was always the goal.

THE COURT:  Great.  However, I do want to be mindful of how -- we will be marching pretty consistently to those dates in -- in February and April.  So -- or it could be March and April, the spring.  And so I don't want to move these dates at all.  So we got to --

MS. SKJELSET:  That is the last thing I want, Your Honor.

THE COURT:  So let's make sure, whatever we need to take up, we take up as expeditiously as possible.

Mr. Rizzo.

MR. RIZZO:  To that end, Judge, the Court mentioned limited briefing on their request for J.C.  When do you want them to have that?  When do you want us to respond?

THE COURT:  Yes.  Thank you.  How about Tuesday?  Can we keep it on the same sort of cycle?  Tuesday, brief; 14 days thereafter to file a response.  Mr. Rizzo?

MR. RIZZO:  (Counsel nods head.)

MS. HOFFMAN:  Yes, Your Honor.  We can do that.

THE COURT:  Thank you.

MR. RIZZO:  Does the Court want a page limit?  You said -- Your Honor said "brief."  I --

MS. HOFFMAN:  Your Honor, we're comfortable with adhering to the typical local rules.

MR. EDELSON:  Your Honor, it strikes me that we've asked for the deposition, and they're objecting.  And so it really is their objection that should come first and -- to which we could then respond.  And, you know, perhaps we could -- we go first, but we'd want to reply.  But --

THE COURT:  On a discovery briefing?

MR. EDELSON:  I understand we don't normally get them on discovery, so -- but it is the objection that's -- 'cause we could certainly serve a notice.

THE COURT:  Well, I'm going to treat it as a motion to compel that you get to file, and then they get to respond

to.  Let's just -- I just want to keep it clean as -- as -- as little back and forth as possible.  So file a motion to compel.

MR. EDELSON:  We'll take the burden.  That's fine. Or at least we'll take the first brief.  I don't know about the burden, but we'll take the first brief.

THE COURT:  All right.

MR. RIZZO:  And that's on Tuesday -- next Tuesday?

THE COURT:  Tuesday.

All right.  So Ms. Tshala's going to be filing a motion.  What are we going to call it?  Motion to compel --

MS. TSHALA:  Waived documents.

THE COURT:  I don't know.  It's becoming late in the day, so I'm at a loss for my creative titling of captions.

MR. RIZZO:  How about a determination of subject matter waiver?

THE COURT:  All right.  The Rule 502(a) -- motion to compel under Rule 502(a) privileged subject matter.  Waiver of -- of -- of subject matter privilege, or something like that.  Just that way I know what it is that I'm looking at when I get the documents in on -- in the next couple of weeks.

Okay.  I closed my eyes for a minute, hoping you'd all disappear, but it didn't work.

All right.  I appreciate all your patience as we head into the -- really the last bit of time.  I don't think we have that much left.  Are there some other -- do we need to clarify

anything that we've talked about so far?

MS. HOFFMAN:  Defendants do need to clarify one issue related to the in-camera review documents, Your Honor.  We have looked at them again and reviewed some documents in our database.  And we've determined that privilege log number -- I think it's 647, but I need my privilege log -- 637, which is one of the in-camera review documents, it's an e-mail with the subject line "Colby Driver."

We have determined that that e-mail, while itself may be privileged, the body of that e-mail was copied in full into a case note in OR-Kids that we have produced.  And so the e-mail, we don't think we can claim privilege over.  We're going to produce it to --

THE COURT:  And what log number was that?

MS. HOFFMAN:  637.

THE COURT:  And so then the follow-up question would be are there other documents that -- in the privilege log that were claimed to have been privileged documents that would've included e-mails -- or would have been e-mails that were incorporated into the -- the database?

MS. HOFFMAN:  That's a question I can't answer for you right now, Your Honor.  I've only reviewed these that were for in-camera inspection for today.  I -- I can't tell you yes or no.

THE COURT:  And I appreciate that.  But I think

that's -- that's going to be the next step that you're -- you'll need to take, which is to confirm that if documents have been incorporated -- and what was it, the database, again?  It was called?

MS. HOFFMAN:  OR-Kids.

THE COURT:  OR-Kids, Oregon Kids.

MS. HOFFMAN:  Yes.

THE COURT:  Okay.  So -- I mean, so that would be one of those sort of rules that we're -- that we would devise through an in-camera review.  I will also note this:  I would not have been able to figure that out, but for your very candid and honest disclosure.  So I want to express my appreciation on the record for your high degree of professionalism and integrity.  Thank you.

MS. HOFFMAN:  Thank you, Your Honor.  And we will conduct that review.

THE COURT:  Thank you.

All right.  We've addressed the depositions, the amount of time in the Korbel deposition.  We need to address the Levi -- this is number three on the Markowitz letter:  "Plaintiffs' refusal to produce responsive juvenile court records in compliance with this Court's July 16, 2024, order."  This is Levi?

MS. HOFFMAN:  It is.  Yes, Your Honor.

MR. RIZZO:  Yes, Your Honor.  I -- I thought we had

discussed this earlier today. The -- the parties are waiting on a ruling on the defendants' motion to inspect as to what juvenile court records and files will be made available for the parties to utilize under the protective order in this case. That was the gravamen of --

THE COURT: The defendants' motion to inspect?

MR. RIZZO: The juvenile court -- to inspect the juvenile court records and files of J.C. and Z.C., which Judge Love has apparently issued a ruling on. We -- both parties have sent that court forms of protective order. There's a request to that court for a conference to discuss the ruling and the --

THE COURT: Can I ask: Why are we waiting for a state court's resolution of this issue, since I've already ordered the production?

MR. RIZZO: Well, what I understood from our hearing, Judge, what was at issue on our privilege log, that we weren't producing at that time, were the records from Sorenson and CFD. I did not understand the Court to be telling us to produce the entire juvenile court files because that issue is pending in front of Judge Love.

And, just to go back in time, you may recall, when we first got around on this issue, the Court entered an order asking the defendants to confer with us on costs and on the subject or the scope of the privilege. They did not do that.

They filed objections, which have since been overruled.

And they went into the juvenile court and -- to file this motion to inspect, which Ms. Richardson discussed earlier. And that has now been ruled upon. So I think it would --

THE COURT: That's been ruled upon by?

MR. RIZZO: Judge Love. So -- so now it's just a -- this is why I was trying to say earlier about, with respect to the depositions of Smith, in a way, we're sort of outpacing what is going to happen in the juvenile court. So my only point, coming full circle, is I didn't understand -- I'm not refusing to produce.

My understanding was you were -- you were -- we were talking to you about the medical and treatment records were not subject to the privilege, not that the Court ordered the entire juvenile files and records to be produced. And if I erred in that, I erred in that.

THE COURT: Well, I mean --

MR. RIZZO: Because, otherwise, the motion to inspect was -- was needless. And it cost us, as did their original motion to compel, which they lost and then withdrew, that's cost us a lot of money.

THE COURT: Well, you know, as I'm reading this -- and maybe I could read it a little bit more deeply to make sure I understand this -- I'm not -- I -- it sounds to me like you're saying that I ordered the production of the -- of

everything in the juvenile court file.

MR. RIZZO:  That's what the defendants are saying.

MS. HOFFMAN:  That is not actually what we're saying, Your Honor.  We are saying that your order was on -- we had moved to compel responses to plaintiffs' -- moved to -- sorry -- moved to compel responses to our third request for production.  And that is -- that is one of the motions that you granted in your order.  And --

THE COURT:  And I considered 419A.255 and --

MS. HOFFMAN:  That's right.  And held that it does not apply in this case, and it's not a basis to withhold documents.  We are not renewing our first RFP for the entire juvenile file.  We've identified for plaintiff, in a letter dated August 2nd, which requests, we believe, at least some or all of the juvenile records would also be responsive to in our third RFP.

They include request 18, 4 through 13, 14 and 15. And our understanding of plaintiffs' position has been -- and what they've told us in conferral -- is that they believe we're already in possession of these documents, and so they don't want --

THE COURT:  And be that as it may --

MS. HOFFMAN:  Right.

THE COURT:  -- I mean, my order says comply with the RFP number three.

MS. HOFFMAN:  Right.  And so --

MR. RIZZO:  But RFP number three doesn't resurrect -- this is what they're trying to do --

THE COURT:  And I agree.  I don't think it resurrects the -- some obligation or request to produce the entire file.  And I didn't understand that when I ordered it, but I -- but I get -- I'm -- I'm missing something here in understanding what it is that --

MS. HOFFMAN:  I think Mr. Rizzo is misunderstanding our position.  We are not asking plaintiff to produce the entire juvenile file to us as the juvenile file, unless, of course, the entire thing is responsive to these other requests we've identified within our third RFP.  Then they need to give us the whole thing.

They can do their own document review.  I don't know which of their documents are responsive to our request.  We are not resurrecting our first request for production that sought the entire file.

THE COURT:  And let me just ask:  Mr. Rizzo, are -- when you look at their RFP 3 and specifically the numbers 4 through -- I guess it's 4 through 31, but I think you limited the numbers to even fewer numbers than that, correct?

MS. HOFFMAN:  That's right.  I think we've identified number 18, numbers 4 through 13, and 14 and 15.  We think that juvenile dependency documents that they have would be

responsive to all of those.  And, of course, they also have an obligation to go through, review and see if there's any additional requests that they're responsive to.

MR. RIZZO:  Judge, if I may, watch this.  Watch this. This is -- this is request number 18, right?  "All documents relating to any other litigation in which J.C. or J.C.'s biological parents have been a party."

And now the defendants are telling me that Your Honor ruled that includes the litigation, that includes the juvenile court records and files.  And they sent me a letter indicating I'm in violation of the order by not giving them the complete file.

THE COURT:  Is that -- is that what your letter says?

MS. HOFFMAN:  Our letter says that "Other requests seek documents encompassed in the juvenile file."  And then it quotes -- it does quote from 18.  It also quotes from 4 through 13, which seek documents relating to specific allegations in the complaint; and request 14 and 15, which seek documents relating to any counseling, diagnosis, examination or treatment.  If --

THE COURT:  And does it say something about the complete file?

MS. HOFFMAN:  It does not say anything about the complete file.  And we have not -- we are not telling them that they have to produce the complete file.  If the --

THE COURT:  Let me ask you this.  While you're not telling them to produce the whole file, when you review -- or consider the scope of these requests, 4 through 31 -- and, specifically, 18, 4 through 13, 14 and 15 -- does that amount to the entire dependency file?

MS. HOFFMAN:  Your Honor, I don't think I can answer that, because I don't know what is in the entirety of the dependency file, because we don't have it.  So I don't know.  That's a review for plaintiff to conduct themselves.  What I will say is that we did issue a separate request, that we have withdrawn, for the entirety of the file.

So my interpretation of our own request would understand this to mean, in all likelihood, something less than the entire file.  But if it does amount to every document in that file when they do their own document review, then they need to produce them.

And I want to be clear.  The juvenile court in Lane County is not ruling on what is discoverable in this case.  It doesn't matter what Judge Love's ruling says.  We made a separate motion with the court to get documents from the court itself.  It doesn't have anything to do with plaintiffs' discovery obligations in this case.

And those issues, I know they sound similar.  They keep getting conflated, but she isn't ruling on that.  We made a very specific motion under the statute in state court about

what we can get from the court itself.  And here, you know, plaintiff can exercise their best judgment in doing their own document review.

THE COURT:  When you say "some or all," it's the "all" that Mr. Rizzo's raising an issue about.

MS. HOFFMAN:  Well, if all of the documents that happen to be in the file are responsive, then they are all discoverable.  And I don't know if they're all responsive because I don't have them.  And it's not our job to tell the plaintiff what documents they have that are responsive to us.  We don't know what they have.

MR. RIZZO:  Judge, I'm in a little bit of disbelief because DHS was a party to the juvenile case.  DHS has the juvenile court files and records.

THE COURT:  And, you know, we've -- I think we've -- we've tilled this soil before and -- and I -- you know, there's -- there's issues with respect to who actually has the documents and whether, you know, this party and these parties end up having access to those same files.

I -- I'm not going to pretend to understand all of it, other than that I'm going to accept the representations that they don't.  And so, at the end of the day, the RFP and my ruling are that -- are -- are -- are viable.  And I -- I did

not make -- I did not make some -- well, one, I don't know what's in the file either.

But I looked at the RFP number three, and I considered the motion to compel. And I made -- I issued an order consistent with my reasoning on that, on those points -- in particular, whether 419A.255 would've prevented disclosure; and I ruled that it didn't.

And so you have to comply with it. And I -- you know, at the end of the day, if it ends up meaning the entire file is produced, then it's not by -- it's not by intentional design on my part. I just simply issued a ruling consistent with my understanding of what the -- the motion to compel argued for and my reading of the -- of their RFP.

MR. RIZZO: And that would render all the work and effort in the motion to inspect needless. And then they would also avoid conferring, under your original order, on cost sharing to obtain this material from our files. So they haven't done that yet. So if that was the Court's --

THE COURT: Oh, no, no. It was never my intention to undermine any of my prior rulings. And I don't remember any of us -- and I may have very well forgotten, so I just -- my lack of memory isn't a subtle way of saying it never happened. I just do not remember having a conversation, in the course of this motion to compel, that it would lead to these other consequences that you're now describing to me.

MR. RIZZO:  Right.  And I had -- me -- me -- I feel the same way.  That's why I thought -- as I understand the juvenile court files and records, we have the FTRs.  They have the Kids First videos.  They have the supplemental confidential file materials and -- in which some of the treatment records were contained.

And they also had the parents' records that Judge Love expressed skepticism about producing or -- or allowing to be discovered.  So what they have so far, to my understanding, is they -- the defendants, is they have the Kids First materials now, because the Court's ruled on the protective order, so that material's been produced.

They have Dr. Sorenson's records, the ones we gave them, the ones they received from the subpoena.  They have the CFD records, April Clark records, ones that we gave them, ones that they received from subpoena.  The things that I have that they are saying to the Court that they do --

THE COURT:  Can I --

MR. RIZZO:  Yeah.

THE COURT:  Are you -- are you acknowledging that, as we sit here today, the -- the RFPs, as we've described them -- 18, 4 through 13 -- or 4 through 13, 14 and 15 -- would amount to the disclosure of the entire file that you fought very hard and took -- and -- at quite a bit of expense to obtain?

MR. RIZZO:  I think it would.

THE COURT:  You think or you know?

MR. RIZZO:  I think it -- it does, Judge, yeah.

THE COURT:  Okay.

MR. RIZZO:  If you look at it --

THE COURT:  All right.  So -- all right.  So, at least with that in play now, at least I know what we're needing to talk about, because we're not dealing with a hypothetical "maybe."  You're saying that, you know, this RFP, you know, would -- would amount to the disclosure of this entire file?

MR. RIZZO:  (Counsel nods head.)

THE COURT:  All right.  So now what do we do with it?  I have an order that says you have to produce it.  I also have an order that said there was supposed to be cost sharing in getting that file.  What's -- what's the solution here?

MS. HOFFMAN:  Well, Your Honor, what I can tell you is that -- so, first of all, plaintiff obtained these documents from the Oregon Judicial Department in the probate matter.  ODHS was not a party to the briefing.  It wasn't a party to that matter.  And getting ODHS to pay their costs from a different matter, in a different court, that ODHS wasn't a party to, isn't proper.

And they don't have a basis to ask for those costs.  There isn't -- they can ask for costs in the probate matter if they're concerned about it.  This isn't the venue for that.  They have a venue for that.  And I will tell you, Your Honor,

we have conferred on this multiple times.  And we've told them more than once that we -- that our position is that we are not going to share costs.

We weren't a party to that briefing.  And so ODHS had nothing to do with the costs they incurred.  And we're not going to share costs because we weren't the cause of them incurring them.

I believe the plaintiffs' position, as I understand it, is that because the Department of Justice represented OJD and now represents DHS, that -- that cost sharing is appropriate.  But who your attorney is is not what determines whether you're a party to a case.  ODHS didn't cause and incur those costs.

THE COURT:  And remind me:  Everything that's being argued before Judge Love, if Judge Love grants -- is it your motion?

MS. HOFFMAN:  It's our motion, yes.

THE COURT:  -- then you're going to get the entire file anyway?

MS. HOFFMAN:  We -- we -- no.  We are not going to get the entire file.  And we're not actually sure what we're getting.  She hasn't told us the content of her ruling, just that she's decided on one.  What we could --

THE COURT:  So you don't know what the outcome of the ruling is?

MS. HOFFMAN:  We don't know.

THE COURT:  It could be a denial of whatever your motion is?

MS. HOFFMAN:  We believe we are at least getting the FTRs.  But, again, the question before Judge Love is what the -- what we're entitled to get directly from the juvenile court itself, which is bound by certain statutes and rules about what it can disclose.  It doesn't have anything to do with plaintiffs' discovery obligations in this case.  It has to do with what the trial court can personally give us itself, separate --

THE COURT:  So here's the dilemma that I'm in; and, that is, that way back when, at the beginning of litigation between Levi and DHS, I -- I listened very closely to the arguments that have been made about the production of these documents.  I think you -- you or somebody -- was it you?

MS. HOFFMAN:  It was me.

THE COURT:  It was you.  You wanted them.  And I said there'd be some cost sharing.  Now, in the interim, there's been quite a bit more litigation and RFPs and other discovery and -- and motions to compel, for which, again, I would not have been aware of and -- and perhaps you wouldn't have been aware of the scope of that which had been requested, but I've ordered that -- I've ordered compliance with these -- these RFPs, independent of any consideration of what was going on

with the -- that first hearing.

And you need to comply.  It's -- you know, it serves at least two purposes or at least two considerations.  One is I've -- I've harped on the issue of full transparency and disclosure.

Come on, I want to get a rise out of you, Mr. Edelson, or at least an acknowledgment.  You're overplaying me now, and I don't like it.

There is -- I mean, look, I told you all this is important for discovery on both sides.  And I've -- you know, I'm going to hold my own feet to the fire on that point.  And, two, I recognize that, you know, there are many aspects and principles in our legal system that provide for different reasons for why something -- or just the rules of evidence:  I mean, it might not be admissible under one rule, but admissible under another.

And oftentimes, you know, as judges, we have to make that call and appreciation.  I'm not terribly pleased that my first ruling is -- is sort of under -- well, "undermine" is too strong of a word -- but -- but set aside by virtue of a subsequent ruling.  But I think my subsequent ruling is still, nevertheless, correct; and, I think, at the end of the day, more correct because it's based on full and transparent discovery.

MS. RICHARDSON:  Okay.  This is Bonnie Richardson.

So I have to weigh in because this affects our client as well. On Friday at 4:45 p.m., we got a letter from -- I think it was Ms. Hoffman -- telling us that we needed to produce -- go through and produce a bunch of stuff from that juvenile file. So all of the -- so we --

THE COURT:  That being Z.C.'s file?

MS. RICHARDSON:  So as part of this whole thing, 'cause I was there, too, when we had to go argue in front of Judge Love, so we are in possession of the juvenile court files because we obtained them as well.  But they're subject to a protective order and to that confidentiality.

But what they are saying -- the defendants are saying is that we have to now go back through those and produce from there, you know, what they're asking for and give it to them. And we would not mind giving them the entire file as soon as -- or whatever portions of that file, but we were just waiting for Judge Love to tell us how much.

She did indicate she would, except she did not want to have disclosed confidential information about the parents, the biological parents.  That was her indication.  So, you know -- but, to the extent that we have, like, medical records that we went out and obtained -- and we're trying to also -- we don't have them in our possession, but we're going and trying to get school records of Z.C. that they asked for.

We're providing all that.  It's just they want us to

go now look at all of the juvenile records, comb through it, and then produce from there what we can find.  And if Your Honor is asking us to do that, we will.  But --

THE COURT:  And the issue is not so much that it's not -- it's not -- that you wouldn't have to produce it.  It's just -- is it -- is it a cost --

MS. RICHARDSON:  Well --

THE COURT:  Is it a cost issue in terms of the -- the prohibitive nature of having to go through all of that?

MS. RICHARDSON:  I mean, it's a -- well, first of all, when the original -- when -- going to the conservator, so that was a probate court.  That was the first way that we obtained the documents.  I joined in on that, and there was costs associated with it.  And so all of those records that we obtained cost a lot of money for us to get those.

And so now we have them, and they're just sitting there.  And they've put all these requests for production, so we're providing everything that we have.  But, to the extent that it's in that juvenile record, we're waiting for them to sign a protective order that is agreed upon by Judge Love for those juvenile records and to have indication of what we can produce.

So it just makes it really -- it's difficult for us to have to go through now and do all that, especially when it cost so much money for us to have to put in the effort to go

get it.

THE COURT: Okay.

MS. HOFFMAN: Your Honor, that isn't -- I think that's not quite right. Again, Judge Love isn't ruling on what is discoverable in this case. And she isn't entering a protective order in this case. There is already a protective order in Conley and Levi that governs the production of documents in this case.

We aren't waiting on a protective order from Judge Love that has anything to do with the Conley plaintiff's production to us. That said -- that said, I understand, I believe, that both plaintiffs have identical copies of the juvenile court record. They have the same documents.

If they want to work together and do, like, a joint production or something and indicate it's responsive to both of their RFPs, so that they can save themselves some work and some time, I'm sure we would be amenable to that. We don't need duplicate copies of everything.

But -- and, for some context, the reason we raised this with the Conley plaintiff, is that the Conley plaintiff's privilege log had three entries. I think one of them was something like 3,000 pages long. And each one of them cited a statutory privilege as the basis for withholding -- for inclusion in the privilege log.

And so our response to that was that you had ruled --

Your Honor had ruled that the 419A.255 privilege doesn't apply in this case, and so whatever is being withheld needs to be produced.  So I don't know exactly what that is.  But if the plaintiffs want to work together to do a more efficient production to us, that's fine.

MS. RICHARDSON:  Yeah.  There's like 3,000 pages of juvenile records at least.

MS. HOFFMAN:  Well, Your Honor, we've produced 84,000 pages of documents in this case.  And I don't -- it's very cumbersome.  But I think that, between the two plaintiffs, they can get through 3,000 pages and decide what's responsive and produce them.

THE COURT:  Mr. Rizzo was going to say something, and then I'll come back to Ms. Richardson.

MR. RIZZO:  I -- again, the description of the motion to inspect was -- is lacking, in that the defendants' brief is replete with federal law, replete with federal relevancy.  That's what they argued to Judge Love, that these records are relevant in this proceeding.  So it wasn't just about state law.  State law was the touchstone.

They cited Doe in that case.  They briefed it fully.  They cited other federal case, basically making it appear like Your Honor had already accepted relevancy of these materials.  That certainly -- that was their right to do what they wanted, but I want to put another issue.

Now that the Court understands why both parties were -- were waiting, right, why I understood your order to mean -- or to be specific to what we argued at the hearing, which was the medical records, not the whole file; but that, as written, the order could be interpreted, and it is, to cover the entire file, would the Court consider abstaining at this point in time, now with fuller information?  And I'd be happy to brief --

THE COURT:  "Abstaining" meaning as in -- you're asking for reconsideration?

MR. RIZZO:  Essentially, yes.  Yes, Your Honor.

MS. RICHARDSON:  Or -- if you can come back to me?

THE COURT:  Yes.

MS. RICHARDSON:  Okay.  This is Bonnie Richardson. So, I mean, another alternative would be why not just provide the juvenile records, and they just actually confer with us about the cost.  And we try to come up with some amount of what it would be that we had to -- to share with them.  And then we could just give it to them, which is something that we probably should've done at the very beginning, instead of going through, you know, Judge Love.

MS. HOFFMAN:  Your Honor, so, first of all, I -- we disagree with the suggestion that you abstain because -- for the reasons I've described several times.

THE COURT:  "Abstain," frankly, is not a euphemism

for reconsideration.

MS. HOFFMAN:  Yeah, it's not --

THE COURT:  Just say what it is.

MS. HOFFMAN:  I don't think there's any basis for you to reconsider.  The motion in front of the juvenile court is a separate issue that doesn't affect any of the proceedings here, and you've already made your ruling on the motion to compel.  I don't see any reason why plaintiffs are so resistant to producing these documents.  I don't really understand it.

THE COURT:  It sounds to me at this point it's not so much about whether it's discoverable as opposed to whether it's -- I mean, I have no -- no doubt in my mind I want to give acknowledgment for the cost that it involved in obtaining them and the litigation that was necessary in probate court to get them, but they're discoverable.  And so, I mean, I think I have to return to that first principle, which is that.  And at the same time, I mean, I -- you know, I don't know what authority I have for ordering cost sharing.

MS. HOFFMAN:  I think that's right, Your Honor.  And we actually have a different solution we could propose, is that -- so the reason why we cannot -- we collectively -- sorry, it's late -- ODHS and the individual defendants, the reason why they can't access the juvenile court file is because there's an order in the probate matter sequestering the documents and not allowing DOJ to share them with ODHS.

They were produced.  OD -- DOJ has them -- or had them, because DOJ was representing OJD.  And they're sequestered, so ODHS cannot get them.

THE COURT:  DOJ had them because they were representing the Oregon Judicial Department?

MS. HOFFMAN:  Correct.  If -- and DHS is -- ODHS is not a party to the probate matter, and so -- isn't a party to that agreement and can't rescind it.  However, the plaintiffs are both parties to that and could rescind the sequestration order.  And if they would agree to do that, then ODHS can just get the file from DOJ, and they don't have to produce anything to us.  We'll have the entire thing, and the entire issue goes away.  And it doesn't really cost them any more money.  So if they'll agree to do that, this entire problem is solved quite cheaply.

THE COURT:  In terms of having to review the documents a second or third or fourth time, I mean, because there's already some costs.

MS. HOFFMAN:  Of course there are, but there are costs in discovery, Your Honor.  And, again, DHS has produced almost 100,000 pages of documents.

THE COURT:  So I won't reconsider.  I mean, my ruling is the ruling that needs -- needs to be complied with.  And I understand that my ruling with respect to the motion to compel may very well, practically speaking, involve the disclosure of

the entire file.

But I'm -- I want to make sure I understand a little bit more about, Ms. Richardson, your position.  I mean, it's -- you have all of this information, but you -- and -- I mean, is it that you understand or -- or agree that the -- the entire file that you have would be responsive to the defendants' request for production?

MS. RICHARDSON:  Well, we'd have to go into that file and pull out, you know, I mean, various documents from there.  But it's just -- I don't mind producing all of it.  I just thought we were waiting on Judge Love, 'cause why go through that exercise, you know.

THE COURT:  Yeah, I don't know why -- I don't know.  I mean, I'm not --

MS. RICHARDSON:  I don't know either.

THE COURT:  I don't know what that's all about.  I mean, it's just not part of what I -- I have not made any decisions contingent upon what was going on in state court or juvenile court.  And so at this stage then, are you waiting for the Court to issue some order about the production of that entire file -- your file to -- to the defendants?

MS. RICHARDSON:  Yeah.  So because it's subject to all the juvenile confidentiality, she was going to decide the protective order of both of these.  Everybody signs it.  And then she would say, "These are the documents that you can

have."  And --

THE COURT:  And I also understand that there may be other things -- other documents that the juvenile court has that aren't part of your file.  I mean, like, for example, the FTR.

MS. RICHARDSON:  Right.

THE COURT:  And I'm -- I don't have a -- I'm not part of that fight.

MS. RICHARDSON:  Correct.  And we're not asking you to be.

THE COURT:  Yeah.  I think I made it clear the last time, 'cause the last thing I want to do is -- is for -- for Judge Love and I to -- to trip each other up.  And in no way should I -- anything I've ordered be construed as somehow getting around, obviating or undermining anything that Judge Love orders.

I just recognize that in federal court I have -- you know, this is the jurisdiction -- I'll exercise my jurisdiction about that which I have authority in federal court.  I am not making a comment in any way or making any determination -- I want to make sure that nobody represents to Judge Love that I'm saying anything about what juvenile court ought to or ought not to do.

So if it ever comes back to me at the next Lane County Bar Association Lunch that that's what, in fact,

happened, you're all coming back down here for another visit. So all I'm aware of is that everyone needs to comply with my motion -- my order on the motion to compel.

If that means the production of the entire file, Ms. Richardson, then so be it. I mean -- and I don't know if we have to -- I don't think -- I'm not aware of any reason why, from the federal court jurisdiction and the -- and the civil rights cases going on here, that you need to be waiting for Judge Love to decide something about the court files that are -- the documents that are in your possession, regardless of whether they're in this juvenile court file or not, that are -- that are responsive to the request for production that I've ordered the parties to comply with.

MR. RIZZO: We were waiting on their motion until they filed the most recent motion to compel, which triggered the ruling. Now it's almost like they've caught a fish. Because they don't have to wait anymore on the process they started in state court, they can now fall back on this Court's ruling, which the Court has made, and they get the file. That's what -- that's effectively what's -- what is happening.

THE COURT: Well, you know, there's no reason why you can't have two fishing poles in the lake. I mean, I, you know -- actually, there might be some licenses that restrict that kind of behavior, so watch out. But in this instance there's nothing stopping you from going -- and, frankly,

there's some FTR -- there's FTR records that are not part of my authority to order the production of.

That's Judge Love's authority. So, I mean, I think there are other things that they're asking for from the juvenile court case itself, the record itself, that goes beyond that which you -- I think either one of you have in your possession, right?

MS. RICHARDSON: We do have it. Well, anyway -- but with Your Honor's -- with Your Honor's permission, yes, so now that I understand that that's what it is, because that was not clear at all, you know, yes, happy to do that. We will do it. But, you know, what I would like to do is submit to the Court something that shows what the cost was, not in us having to go through this, but how it cost us the funds that it did to go and get this chunk of documents.

MS. HOFFMAN: Your Honor, I --

MS. RICHARDSON: So -- and I've got -- I'll make sure to provide a reference to the rule on that.

THE COURT: Okay.

MS. HOFFMAN: And, Your Honor, we -- we would submit to the Court that, first of all, those costs weren't incurred in this court, so there isn't a federal rule that allows for a basis for fees. Second of all, we won this motion to compel. If anyone should be paying fees and costs, it is plaintiff. And, finally --

THE COURT:  Ms. Hoffman, Ms. Richardson has just simply asked permission to simply submit the statement of costs.  I didn't hear that there was going to be a motion asking that I order costs.  I don't -- I don't see there being -- I mean, and, frankly, if at some point in the future I were to find that there were such authority, the information will be submitted then, too.  So why don't we take it up when -- when -- when, if at all, it becomes ripe.

MS. HOFFMAN:  That was going to be my next request, was to take it up when it's actually ripe.

THE COURT:  But, in the meantime, if Ms. Richardson wants to submit that information, I mean, again, I -- it's fine.

MS. HOFFMAN:  All right.

THE COURT:  And if you want to submit anything about the cost you've expended in your motion to compel, feel free to do so.  Just don't attach it with a motion for costs, because I'm not -- I'm not entertaining motions for costs at this point.

MS. HOFFMAN:  Thank you, Your Honor.  We won't.

THE COURT:  Okay.  Four, you said there was a -- there was one piece of it.  And was that -- that was Ms. Gonzalez.  You said there was -- I think, Ms. Hoffman, you indicated that -- four, that was the Levi -- state defendants' motion to compel the deposition of Smith and Gonzalez.  I think

we've addressed that now.

MS. HOFFMAN:  That's right, Your Honor.  And then the -- five, the final issue, was the deposition of Ms. Ferrari, which we've also covered.  I think -- and someone should correct me if I'm wrong -- but I think the only two issues outstanding are the briefing schedule for the Conley plaintiff's -- or maybe both plaintiffs' spoliation motions and then the Conley plaintiff's motion for extension of the expert disclosure deadline.

THE COURT:  Plaintiffs' counsel motions for -- for sanctions on spoliation.

MS. RICHARDSON:  Your Honor, I think it makes most sense for the briefing schedule for the motion on spoliation to follow from the results of the subpoenas and the search of the cellular devices.

THE COURT:  I agree.  I mean, I think it's at that point that we'll have any -- if there's any information, the information that you can submit along with your motion.  So once -- once the information is obtained from those subpoenas and -- and the production of the -- the -- if any, documents, text messages from the search terms, then I'd like the parties to submit a proposed briefing schedule that allows everyone to fully brief it, but expeditiously, because we're going to need to move forward on dispositive motions at some point, too.

MS. RICHARDSON:  Plaintiff -- this is Bonnie

Richardson.  Plaintiff Conley requests an extension for discovery of the expert reports to October 4th.

THE COURT:  Disclosure of --

MS. RICHARDSON:  Disclosure, yes.

THE COURT:  And then, after that, rebuttal reports; and then, after that, close of all expert discovery.  So October 4th is disclosures?

MS. RICHARDSON:  For us, for Conley, 'cause we're not --

THE COURT:  And I want to make sure this is not affecting the Levi deadlines.

MS. SKJELSET:  No.

THE COURT:  You're already on track and doing what you need to do with that.

Okay.  Issues?

MR. EDELSON:  Can I be heard on that?

THE COURT:  Yes.

MS. BLAESING:  Hold on one second.  Can Ms. Hoffman address something first?

MR. EDELSON:  Yeah.

MS. HOFFMAN:  Your Honor, we think that -- that this issue should probably be discussed in the context of the entire case schedule and whether the -- the discovery deadline, as you know, is Monday, the 12th, and whether that deadline also needs to move.  And I know we've now set trial dates, so we're

just --

THE COURT:  So shall we talk about the discovery deadline first?

MS. HOFFMAN:  Maybe.

THE COURT:  I mean -- and are we talking about just for Conley or for everybody?

MS. HOFFMAN:  We would say for everybody.  Discovery isn't done in either case.  And -- and Mr. Edelson will share with you our position on the discovery deadline, but we think it should move in both cases.

THE COURT:  Okay.

MS. HOFFMAN:  The expert discovery.

THE COURT:  All right.  So, you know, I know that we've been -- I've been trying to untangle this consolidation a little bit.  But are we -- are we converging on enough of where discovery is for a -- for some alignment of deadlines on both cases?

MS. SKJELSET:  Your Honor --

THE COURT:  Keeping in mind I'm not interested in moving trial dates.  So whatever we're doing -- whatever we're doing on this end has to take into account what our trial dates look like.

MS. SKJELSET:  I think we would oppose the extension of fact discovery beyond the limited discovery that we discussed today.

THE COURT:  That would seem reasonable to me.  But I think there's some unanswered questions about what some of this discovery might open up, but -- for example, no one's filing any more RFPs?  All right.

MR. RIZZO:  Let's hope.

THE COURT:  So let's do more than hope.  No one shall file any more RFPs.

MR. EDELSON:  Not without a darn good reason.

THE COURT:  Darn.  And "darn" is a technical -- you got to make sure that you meet the "darn" definition.

All right.  So we're done with RFPs.  Interrogatories.  Are we done with interrogatories?  I'm hearing no one jump for interrogatories.

MS. HOFFMAN:  Your Honor, I believe we're done with new interrogatories.  I think we may be asking plaintiffs to supplement existing responses, but I don't understand that to be what you're necessarily asking us.

THE COURT:  Are you asking for supplementation of what's already been provided in responses?

MS. HOFFMAN:  Right.

THE COURT:  Has that already been made, that communication?

MS. HOFFMAN:  I believe it has.  I confess I'd have to --

THE COURT:  Okay.  Does anyone remember getting a

request for supplementing or clarifying an interrogatory on plaintiffs' side?

MR. RIZZO:  I think we got one -- let me think a minute because it's late.  I think there was a reference in one of Ms. Hoffman's several e-mails and/or letters stating that it wanted the Court to clarify an interrogatory, not that they requested us to --

THE COURT:  I thought I addressed something like that the last time we were all together.

MS. SKJELSET:  And we did supplement.

MS. HOFFMAN:  You did.  You did, Your Honor.  And I think we -- I think we have one more interrogatory that we intend to ask plaintiff to clarify.  And I -- we had had, I think, some questions about the order that you'd issued on interrogatories, but I don't think it's anything that we necessarily intend to pursue.  But I think we have one more that we might ask them to supplement.

THE COURT:  Okay.

MR. EDELSON:  I'd mention, as well, your ruling on J.C.'s deposition might result in -- if you do not allow us or you limit it in such a way that we don't get answers to questions we need, we may want to do request for admissions or interrogatories to J.C.

THE COURT:  More of a written -- a written --

MR. EDELSON:  Possibly.  I mean, you certainly

have -- that's one thing you could order.  But we -- I'm just saying the possibility exists that we may -- and we'll let you know once we get your ruling on, you know, J.C. -- but there's briefing and things that have to happen, so we may have to take the next best thing if we can't get a deposition.

THE COURT:  Okay.  All right.  And I'm going to bookmark that, and we'll come back to it.

Just to close the loop on -- no more RFPs, no more new interrogatories.  I get that there might be a request for a supplementation or clarification of an interrogatory -- directed to the Levi plaintiffs?

MS. HOFFMAN:  I believe so, Your Honor.

THE COURT:  All right.  All pleadings are done, finaled?

MS. SKJELSET:  Your Honor, I do believe that it would be appropriate for us to amend our complaint to conform with the evidence.

THE COURT:  Well, that just blows everything up out of the water, but all right.  So tell me more about this.

MS. SKJELSET:  Well, for instance, they opened the door to the juvenile proceeding, which we had kept out of our complaint.  And now I think that they're -- which likely won't --

THE COURT:  Did we have a deadline on completing pleadings, filing all --

MS. SKJELSET:  Adding new parties, I know we did, which was in May.

THE COURT:  A deadline with respect to parties?

MS. SKJELSET:  That was my understanding.  It was more with respect to parties.  But I don't have the scheduling order in front of me.

MR. RIZZO:  We also want to increase the prayer for punitive damages, Your Honor.  That's a -- in light of the evidence.

THE COURT:  Okay.  Can you file a motion on Tuesday?

MR. RIZZO:  I think we can do that, Judge.

THE COURT:  And I'm operating under the idea that we're in the mode of conferral, Ms. Hoffman.  And, Counsel, you're objecting -- I would imagine, or I'm assuming at this point, that you're objecting to amendment?

MR. EDELSON:  You know, I think I'd want to look at your standing scheduling order.  We're trying to pull that up here, but --

THE COURT:  Do you have a copy of my --

MS. HOFFMAN:  Let's see.  Your Honor, I'm looking at the deadlines that have been set in this case in PACER, and I don't see one that is described as the deadline to amend pleadings.  There's a couple that say "case management deadline" and "court only," which could refer to that, but there's nothing that obviously --

THE COURT:  I would've explicitly included a pleadings deadline.

MS. HOFFMAN:  In that case, there is not one.  I believe there's a deadline included in the Federal Rules of Civil Procedure.  Assuming that there is a deadline and -- and plaintiff needs leave from the Court, my -- this is the first we're hearing of it, but my best guess would be that we will oppose that motion.

THE COURT:  So file -- I'm just going to operate under the idea that -- I mean, if you change your mind before the end of the week, it'd be great for them -- for plaintiffs to know, so they don't have to file a motion with the -- with the red-line copy of the --

MR. EDELSON:  I think we'd want to see what it is that they'd want to -- the amendment before we can really make a --

THE COURT:  That's true.  Fair enough.

So file your motion by Tuesday.

And then -- and then I guess if you respond and object, then I'll take it up.  And if you go ahead and concede, then let me know.

MR. EDELSON:  You're welcome to send it over to us and see if we just concede.

THE COURT:  Okay.  All right.  So pleadings, other than -- other than that, I imagine then -- if I allow the

motion to amend, then amending your answers, if you feel the need to do so. Okay. And if I grant the motion to amend the complaint, then there obviously won't be any issue about amending your pleadings.

Is there anything else on the Conley side on pleadings?

MS. RICHARDSON: I don't know. I mean, if we were to amend it -- I think we amended it recently. But, you know, it would be -- I'm not sure yet.

No?

Okay. No.

THE COURT: So I'll make a -- let's make sure there's a note in our minute order to reflect that Conley will not be amending pleadings.

I'll allow the motion to file an amended complaint due on Tuesday. I want to make sure the "allow" relates to the allowing of the filing of the motion, not allowing the motion to amend.

All right. All right. All right. All right. So we've taken up RFPs. There's a limited interrogatory issue. And then let's get back to your bookmark on J.C. After briefing if I were to deny the deposition, then we can discuss whether there is some limited discovery associated with -- with J.C. that may be appropriate. I don't know what that will be at this point. I haven't even decided. So we'll take that up.

And the reason that we're having this -- this sort of micro-focused level is because I'm trying to limit any more new discovery. We're getting down to just simply getting that which needs to be done done, and then we can move on to the next stage.

All right. Any other issues on fact discovery that we can effectively limit, so we can move on to the next stages?

MS. HOFFMAN: Would Your Honor be willing to impose a deadline for all additional productions to be completed? Maybe 30 days, something like that?

THE COURT: So the only outstanding production is from the motions to compel that I granted?

MS. HOFFMAN: I believe so, yes, Your Honor.

THE COURT: And then obviously there's the -- the search of the -- well, the search of the phone, that's separate. Searches of phones and then the subpoenas, right? Right. So it's -- it's -- the production of documents already in the parties' possession due -- 14 days? Will that be enough time to comply with the outstanding RFPs?

MS. SKJELSET: Oh, yes, Your Honor. We've given them almost everything in our file, well beyond what we think we were obligated to, based on their most recent RFP.

THE COURT: All right. So 14 days to complete all production of documents currently in parties' possessions. And then -- and then what we have remaining will be the subpoenas

to Verizon, Google, and I think there was another e-mail server.  And then -- and I think the parties are going to confer on -- on the language and -- and -- of the subpoena and where it goes.  You're going to have an opportunity to review, but you'll need to produce the documents within 14 days of your receipt.

MS. RICHARDSON:  I mean, I think we already have the subpoena.  They objected to it.  So maybe we would reissue the subpoena and the documents would go to them.

THE COURT:  Yes.

MS. RICHARDSON:  Okay.

THE COURT:  And then you have 14 days to review and -- and then either bring issues to my attention and -- or confer, bring issues to my attention, or just simply turn over those documents, whatever they are, to -- to plaintiffs' counsel.

MR. EDELSON:  I just want to be clear that we'll -- we'll see that revised subpoena before it goes out.

MS. RICHARDSON:  Well, the only way I'm going to revise it is I'm going to say it goes to them.

THE COURT:  Is there anything about the scope of the subpoena that was at issue?

MR. EDELSON:  Well, I raised an issue about the ambiguity --

THE COURT REPORTER:  I'm sorry.  I can't hear you.

MR. EDELSON:  There was a -- I raised the issue that one of our team members thought that there was an ambiguity that could be -- make it read that it's broader than you intended, so I just want to make sure that we cover that issue.

THE COURT:  Do we know what that ambiguity is?

MR. EDELSON:  No, I don't.  I think it was -- it gave a sense that it was seeking content.  But, again, I don't know what the words were.  I just --

MS. RICHARDSON:  It was not seeking content.  That was the whole point of the argument that we made in the briefing.

THE COURT:  Okay.  Well, in order to avoid having to come back on another issue with respect to the subpoenas -- I mean, I think my -- my ruling is clear about what the scope ought to be.  And so why don't the parties confer with a revised copy of the subpoena.  I imagine, since it's a -- it's directed to the defendants, that you can probably revise that and send that before the end of the week or --

MS. RICHARDSON:  Yeah, we can do that right away.  We just don't want any delay in getting it back, 'cause we have to get permission and everything, 'cause it takes a long time to get those from those third parties.  So we want to get that out to those third parties, so --

THE COURT:  I agree.  So as soon as you can send it over to Mr. Edelson, then you have by the -- you know, if

you're submitting it by the -- same-day turnaround, Mr. Edelson.

MR. EDELSON:  Deal.

THE COURT:  Okay.

MS. SKJELSET:  Your Honor, I do have one issue related to fact discovery.

THE COURT:  Yeah.  That was you -- were you speaking there, Ms. Skjelset?

MS. SKJELSET:  That is Ms. Skjelset.  Yes, Your Honor.  That was me.

THE COURT:  So we have the subpoenas.  And then also the Lighthouse cell phone review.  How quickly is -- what's your experience with how quickly they can conduct these reviews and searches?

MS. BLAESING:  This is Lauren Blaesing.  Well, Your Honor, we will need to work with these folks to get their cell phones and, you know, coordinate when they can be away from their phone and get it to the vendor.  The paralegal who is most knowledgable for handling this is on vacation, out of the country, this week.  So I think we're going to need a couple of weeks to get it done.

THE COURT:  To get it done or get it submitted to Lighthouse?

MS. BLAESING:  I'm sorry.  To get -- I think we can -- I think we -- I'm optimistic we can get them submitted

by next week, yes.  I don't know how long it will take the vendor to do the -- run all the search terms and get all the results.

MS. RICHARDSON:  I'm trying to understand why you need a specialized paralegal if what you're doing is getting the personal cell phone to the vendor to do the work.  And that -- that shouldn't take very long.  I mean, you might have to coordinate it with the person.  I don't know why you need a specialized paralegal.

MS. BLAESING:  Well, there's a lot of specs for the database and how things are done with the vendor.  So some of it is just more -- it's always more complicated than I think it's going to be.  And I just trying to build in some buffer.

THE COURT:  If the vendor's going to make a mirror image of these -- I mean, I imagine that your -- these three individuals are going to want their phones back.  And so I -- then I imagine that what that means is that there'll be some mirror-image copy made, so that that can be -- that can be searched, rather than the phone physically in their offices. Is that -- is there anything about that, what I'm imagining, Ms. Richardson, that raises any issues for the plaintiff?

MS. RICHARDSON:  We've done this recently.  And it's very, very simple, as long as the phone is unlocked.  It's when they're locked that it becomes a problem.  But what I'm going to do is contact Lighthouse tomorrow and immediately make sure

that we understand the parameters.  And I just want to get those phones -- I don't want to wait around for a paralegal to contact these individuals to start lining up the time to get the -- the three personal phones in.

THE COURT:  I'm onboard with Ms. Richardson's interests in meeting those -- meeting those objectives.  So while I -- it sounds to me like you have somebody that -- in your office that has -- is familiar with it, we need to -- we probably need to be a little bit more nimble to get these phones retrieved from -- from these clients -- the defendants over to Lighthouse.

MS. BLAESING:  Sure.  I appreciate that.  It'll -- it still could take a couple of days to coordinate getting a vendor out to these witnesses or having them come to the vendor.  You know, we have to coordinate the handoff of it.  And sometimes it can take all day to do the imaging.  That's been my experience recently.  So it's just going to -- it's going to take a couple days, probably a week, to get this accomplished for the three individuals.

MS. RICHARDSON:  That sounds about right.

THE COURT:  All right.  So, Ms. Richardson, you'll inquire -- if you needed to, continually inquire -- of Lighthouse to make sure that you're confident that it's going to be able to be done as timely as I think we all want it to be done.  So -- you know, so whether it's a paralegal or somebody

else who gets to be trained on how to deal with Lighthouse, let's move it quickly. So -- and I'll be around for the rest of the week. There's no more vacations for me. So if there's an issue, call me.

MS. RICHARDSON: Okay.

THE COURT: All right. All right. So I think we have -- we have Lighthouse. We've got the subpoenas addressed.

Ms. Skjelset, you wanted to say something.

MS. SKJELSET: Yes, Your Honor. Flowing from your ruling, I think it was ECF 157, our -- their request for production number 27 requested all documents received from any investigators related to any allegations in the complaint. And our concern was, to the extent that that involved statements of witnesses, potential declarations of witnesses, that are classic work product, are we required to either log those or produce those? And we had a conversation with defense counsel about that. I didn't see anything --

THE COURT: Did I order something outside of the -- I mean, what did I say or do with that RFP?

MS. SKJELSET: Well, that's among the request for production that you identified in ECF 157 when you -- when you ordered the -- when you honored their motion to compel our production of documents.

THE COURT: Okay.

MS. SKJELSET: So the question is are our -- is our

work product --

THE COURT:  Well, I don't -- I don't think they were seeking production of work product or other privileged information.  And I -- and I don't know if -- I don't think I would have ordered that unless we had a specific argument and discussion -- discussion and argument over it.

MS. SKJELSET:  So that was my hope, Your Honor.  But when -- in conferral with defense counsel --

THE COURT:  Well, is somebody asking for production of work product arising out of your RFP number 27?

MS. HOFFMAN:  I don't believe so.

THE COURT:  Okay.  So if no one has raised it and I haven't ordered it, then I think it's fair to say that it's not -- you're not required to produce work product.

MS. SKJELSET:  And not required to log it.  That's our question as well.

THE COURT:  Well, I think with any RFP that you're responding, if -- if there's information that you're withholding, then I think you do need to provide a log.

MS. SKJELSET:  So in that case we have not received any log from defense counsel regarding their own work product and witness statements that they've obtained in the course.  So I think we have to either agree that we're both doing it or we're both not doing it.

THE COURT:  Okay.  Look, I mean --

MS. HOFFMAN:  I --

THE COURT:  I don't know.  You tell me what you both want to do.  I'll make a decision if -- one, it's going to be a consistent decision.  But, to date, I wasn't aware that logs weren't being produced with respect to certain things.  So I understood that logs were being produced.

MS. HOFFMAN:  Your Honor, we haven't -- I don't think either party has been logging work product for the litigation in this case.  I don't think that we intended any of our RFPs to directly seek work product that's being created for purposes of this litigation.  I don't think we would've understood that to ever be discoverable.

So I'm going to honest:  I'm not actually sure -- our request was for documents plaintiff has received from, say, private investigators, I think -- we were imagining at least, you know, prior to the filing of this litigation or, you know, just -- I do not think we intended that to be a backdoor way to get into work product or drafts.  We can confer on this.  I don't think we're probably very far --

THE COURT:  It sounds to me like the parties have not been in the practice of providing a work product log?

MS. HOFFMAN:  No, not for litigation in -- we have in the current litigation.  I mean, our privilege log does reflect some work product.

THE COURT:  For documents that have been --

MS. HOFFMAN: Right. Documents from other litigation, but not for what we're all working on in this case.

THE COURT: All right. So I'm -- yeah.

MS. SKJELSET: It was out of an abundance of caution, Your Honor, that -- in the event we had a witness statement, for instance.

THE COURT: Okay. Well, I think we're on the same page.

MS. SKJELSET: Okay.

THE COURT: Any work product from this case -- generated from this case need not be included in some log -- in a work product log. Okay?

MS. SKJELSET: Thank you, Your Honor.

THE COURT: You're welcome.

So we should return then now -- okay. So we've got -- we have fact discovery. There's -- there won't be any additional depositions beyond that which we've discussed today. And I know that we're -- we're going to -- we're putting on hold Ms. Gonzalez's deposition until -- until some additional information is -- is produced.

All right. Ms. Richardson.

MS. RICHARDSON: Just coming back to the thing Ms. Tshala told me, is Conley has an expert deadline that we would like to move because our expert's on vacation. And so --

THE COURT: Because who's on vacation?

MS. RICHARDSON:  Our expert.  You know, right now a lot of people take vacations.  And so we need a little bit of extra time.  And we've asked that the deadline for our expert be moved to October 4th.

THE COURT:  And that's disclosure of experts?

MS. RICHARDSON:  Disclosure.

THE COURT:  October 4th.  And then there would be rebuttal reports due -- and this would be expert disclosure for both Conley and defendants?

MS. RICHARDSON:  Our intent was just for us, 'cause they're prepared.

THE COURT:  Fine.  But in terms of -- I mean, are you -- I don't frankly, know, whether you're going to have different experts.  I mean, so I'll just track Conley and -- and state defendants deadlines on expert disclosures together.

And then you've got -- you have your own -- I'm not -- I'm looking at the defendants.  You have your own deadlines with Levi plaintiffs on disclosures of experts.

MR. EDELSON:  May I address that?  I know you're trying to sort of decouple as much as possible.

THE COURT:  Yeah.

MR. EDELSON:  And you can see how complicated it is.  But one of the problems this causes for us, if we are to disclose our experts in the Levi case more than a month before our expert disclosure in the Conley case, is that we are likely

to use the same expert.  And we are not excited about disclosing that or the expert's report to the Conley plaintiffs.  And so our thought was --

THE COURT:  So are the Conley -- Conley disclosures would -- are before or after the -- the Levi disclosure -- expert disclosures?

MR. EDELSON:  They want it to be after.

THE COURT:  Okay.

MS. HOFFMAN:  They're currently the same, Your Honor.

THE COURT:  They're currently the same, and -- and Conley wants it later?

MR. EDELSON:  I said it backwards.  Our disclosure in the Levi case would then disclose to the Conley folks, before they submit their report, who our expert is and the way our expert did their analysis.  And there's going to be a lot of similarity.  And we just -- you know, we think all the dates ought to -- ought to move together, is all we're saying. And --

THE COURT:  And when is the Levi expert disclosures due?

MS. SKJELSET:  September 9th, Your Honor.

THE COURT:  And the -- what's the problem with just simply moving everything to the 4th?

MS. SKJELSET:  My only concern is the dispositive motion deadline, the impact that that might have.

THE COURT:  Remind me when that's due.

MS. SKJELSET:  I think we said earlier today it was November 27th, if my memory serves me.

THE COURT:  All right.  So you have October -- you have October 4th.  It's then rebuttal 14 days or 21 days later.  That puts us well into the time frame in which you're drafting motions to -- motions for summary judgment.

MR. RIZZO:  And, again, Judge, they didn't want to consolidate.  So we're really -- this is a point where we need to separate, so we can stay on track with our discovery.

THE COURT:  And your trial is sooner than the Conley case?

MR. RIZZO:  Right.

THE COURT:  Well, what about a protective order that says, Conley, you can't disclose the expert reports to the Levi -- I mean, to anyone outside of your --

MS. HOFFMAN:  The other way.  Levi can't disclose to Conley.

THE COURT:  Yes.  Thanks.

Levi can't disclose.  I mean, we've been operating like -- as if protective orders make a difference in the world.

MS. RICHARDSON:  I mean, I feel like -- I mean, I think the reality is that their disclosing early probably does the same thing that we're doing.  You know, they're going to have -- we're going to have overlapping experts here.  So it's

just -- like, there's really no jump head start.  It's not like state court, you know, where you only get a day.  We got plenty of time.  And we have two different children, and there are going to be two different reports.  So --

THE COURT:  Well, I mean, I'm fine with -- so I'm fine with allowing you the October 4th deadline to disclose Conley, Ms. Richardson and Ms. Tshala.  And then it's just that the disclosures -- the defendants' disclosures of their experts to the Levi plaintiffs need to be siloed.

MS. HOFFMAN:  Okay.

MS. SKJELSET:  That's fine, Your Honor.

MR. EDELSON:  Well, I think that might -- that might be okay.  I mean, it's not perfect, but that might work.  But I'm -- Ms. Blaesing has gone ahead and plotted these dates out, and it's pretty -- it gets -- I hate to start back at the beginning of the day; but when we look at all of this, we would see that summary judgment replies -- and this is without changing the date, so this isn't the Conley case.

This would be in the -- if we -- if we -- this would make it impossible for us really to do motions at the same time because the replies -- even on the current schedule, without changing the expert deadline, replies to summary judgment would be January 2nd.  We've got a trial of February 10th.  Now, I haven't had too many trials, especially anything this size, where you can get ready in five weeks.

We're going to be -- or that the Court can get an opinion out in -- I mean, the local practice has been 60 days, more or less.  And that's already pushing us into the trial. It's looking more and more like that -- as I said early on, that that February 10 date is really aggressive.

I don't know what kind of solution you might have for it, other than requiring us to get ready for trial while we're waiting for your ruling, which is an expense that it would be nice --

THE COURT:  Is it really -- will it be a fully dispositive motion for summary judgment or --

MR. EDELSON:  I'm confident it will be.

THE COURT:  Okay.  Okay.

MR. EDELSON:  But if we add another 30 or 35 days, whatever we're looking at here -- maybe it's less.  It's just about 30 days -- then we'll really -- then we're pushing it into February, early February, when the replies are due.  I mean, that doesn't give you any time to make a ruling, let alone giving us time to prepare for trial.

MS. RICHARDSON:  I don't see an issue.

THE COURT:  What's that?

MS. RICHARDSON:  I don't see an issue.  We've got plenty of lawyers, and we're more than happy to take care of it.  Have done it before.

THE COURT:  Mr. Edelson was looking out for my -- my

emotional health, not yours.

MR. EDELSON: It's not -- it isn't fair to the Court, and it really is -- it's not fair to the parties who have to pay for it.

THE COURT: We're going to keep the trial dates in play for now because if I take them out and move them around right now, we're going to be in trouble. So your concern is --

MR. EDELSON: It's a darn good reason.

THE COURT: There is a darn, lower case D at the moment, good reason for watching what's going on with that. So -- but, in the meantime, let's just focus on getting the expert disclosures and discovery completed --

MR. EDELSON: Let's -- I want to just be clear on what your ruling is on what sequestering means or -- I can't remember if that's the word you used, but --

THE COURT: Silo.

MR. EDELSON: Silo. What we -- as I said, it's not an ideal solution, but we would be more comfortable if the siloing was that the Levi parties and lawyers may not either share the content or a summary or even the identity of the expert of -- of our production and expert --

MS. RICHARDSON: We don't want to know anything. That's fine.

MR. EDELSON: -- until the deadline comes in the Conley case.

THE COURT: And Ms. Richardson?

MS. RICHARDSON: We don't need to know anything about it. It's fine.

THE COURT: Okay. So name, substance?

MR. EDELSON: Content, summaries, anything. Just --

MS. RICHARDSON: Yeah. Easy.

THE COURT: It's -- there's -- yeah, it's a complete firewall between the plaintiffs' counsel or any of their agents, representatives, about the disclosure of your experts to the Levi plaintiffs until October 4th.

MR. EDELSON: All right. And then --

MR. RIZZO: To Conley.

THE COURT: To -- well, you know, this is one of those things about, you know, the definition of communicating in -- in -- with another party. Third-party communications are also prohibited. I mean, so -- I mean, I don't -- I -- I know you have to be able to -- if you're making communications with experts, that might end up -- that you -- about -- so let's make sure it's clear.

If you're having to confer with experts about whatever it is that's in a defendant's expert disclosures or reports, you've got to make sure it's very clear to your experts that they can't communicate with the Conley plaintiffs, or anyone else that you might believe to be Conley experts, unless it's them, but they can't share that information with

the Conley plaintiff counsel or -- or agents, representatives or experts until after October 4th.

MS. SKJELSET:  Your Honor, I appreciate their concern, but I don't see why we should be prejudiced in finding -- for instance, when -- when the State -- this happens regularly.  When a party makes an expert disclosure, you need to find a rebuttal expert.  What many attorneys do is they lean on their peers to find a rebuttal expert, right?

Are we not -- are we going to be precluded from doing that because they've chosen not to consolidate the cases?  It doesn't make sense that we shouldn't be able to -- I mean, I'm fine not disclosing to the Conley plaintiffs.  But I do want to be able to effectively find rebuttal experts, effectively advocate for our client, and not be precluded from doing so simply because the State doesn't want to let the cat out of the bag when they -- when they made their litigation choices.

MR. EDELSON:  Well, just hold on a second, because we didn't refuse to consolidate.  That didn't happen.  There was a discussion about whether consolidation could occur.  The judge pointed out that there hasn't been consent from at least one of the parties.  I don't know who that party even is.  So if you're telling the judge that it's us, that's improper.  And if -- but it's not a litigation choice that really plays that way, and it's not fair to be talking about it that way.  We didn't refuse to consolidate.

THE COURT:  Whether consent or consolidation, I think -- I appreciate that there's some issues around that, but it's a bit of a distraction and a red herring.  I just simply want to solve the issue about giving you the confidentiality and not letting information out any sooner and allowing -- I mean, I'm open to a suggestion.  I mean, if you're telling me that you're going to post it to the OTLA list serve, then --

MS. SKJELSET:  I can't do that, Your Honor, because they're on it, actually.

THE COURT:  Then who do you go to anymore to get information?  So, I mean, you're just going to have to exercise some discretion.  But if you're -- but I -- I encourage the idea of trying to anticipate all potential pitfalls, but I don't want to freeze us into inaction.  I'm trying to make this work.

So if you run into a problem, give me a call.  Let's figure it out.  If you have a better solution, tell me what it is, because I don't know what it is you're going to be doing to go look for a rebuttal expert.  But, I mean, it -- but if it's something that does very -- very -- I mean, if it just simply exposes the information or -- or discloses it without -- without a care, then I have a problem with that.

I mean, but I -- I have confidence you're going to be able to figure something out.  But if not, then call me.  We'll have to work through the solution.

MS. SKJELSET:  That's fine, Your Honor.  Of course, we can abide by the Court's ruling.  I just didn't want to be prejudiced in my ability to identify a rebuttal expert.  That's --

MS. RICHARDSON:  And I'm -- we are not going to -- we don't really care.  We've got a lot of other things to do.  I really do not care, I mean, whoever they have, you know.  We probably kind of have an inkling of who we think it is anyway, but we're not going to do anything.  So I don't want to know.  I'll just shut my ears off.  And we won't -- there's nothing to do.  We got other things to focus on.

THE COURT:  I can just order you all into detention.  I'm actually feeling that way right now, but -- all right.  Let's --

MR. EDELSON:  Are you channeling Judge Hogan?

THE COURT:  Maybe a little.

Okay.  All right.  So we have October 4th.  But then rebuttal, is it -- we have disclosures.  What is it?  14 days?  Do you want some more?  How quickly are you going to be able to get your rebuttal out and complete discovery?  Ideally I'd like to have all of your discovery of experts done within 30 days of disclosure, so that'd put us around November 4th.

(Whispered discussion, off the record, 5:22 p.m.)

MS. HOFFMAN:  Your Honor, it's our position that -- I really understand why Conley needs more time, but we also --

you know, looking at everything we've discussed today, there are eight outstanding fact depositions, I think three of which haven't been scheduled. Dr. Sorenson wasn't scheduled until today. I think we've settled on the 19th, but that was -- that's a new development today.

There is -- there are these subpoenas that are outstanding. We -- you know, the documents that we're entitled to from the other plaintiffs, we -- we need all this, too. We think, honestly, that the expert deadline should move in both cases by at least two weeks.

And I will submit to you I -- with how it is right now, with Levi adhering to the current deadline of September 6th, but the deadline for us moving to October 4th in Conley, it means that Levi has a big head start on us in briefing the dispositive motions, because we are now -- we won't get to them -- we won't really get to that until we're done with our experts in Conley in October.

And we'll have a really tight turnaround time for our summary judgment motions, which we understand Conley will, too. But Levi's now the only party here that doesn't have that tight turnaround, which does seem prejudicial to us. This is a very big and complicated case. We think our expert deadline also needs to move by at least two weeks, if not just tracking with the Conley deadline. We think it's fair.

MS. RICHARDSON: Well, the reason why we gave to move

it is because we just -- our expert needs the time, so that's why we asked for that. I mean, I don't hear any reason why, except they just say it's not fair.

I mean, if we were going on two different routes, it's -- like, they have all these attorneys over there that can handle it. They can file their summary judgment with Levi -- Levi -- excuse me -- earlier. I -- I just -- this is all -- I feel like we're just never going to end here. It's a very simple request that we had, and it seems to be way more complicated than it should be.

MS. HOFFMAN: Your Honor, we have a great deal of briefing that we're going to need to accomplish in the next month or so. There are a lot of motions being filed next Tuesday that we will have to respond to. And I understand that these cases aren't consolidated; but, from our perspective, they involve almost identical discovery on our end.

We are effectively litigating both cases simultaneously. They aren't separate. We don't have separate teams working on them. We're not doing them separately. We aren't -- two rounds of -- of dispositive motions briefing on different -- essentially different schedules, with different expert deadlines in both cases, is almost completely unworkable on our end.

We have a lot of work that we have to do in the next month or two. Frankly, I think more work than the plaintiffs

have to do, just given the fact that we're the ones responding to these motions. We're -- we're -- you know, we have -- we have already engaged in a lot more discovery in this case than plaintiffs have, and that's all right.

But what I'm saying is unfair is not that Conley wants to move their deadline. I told Ms. Korbel in conferral that we understand they need more time. That's fine. What is prejudicial and unfair is to have one of the plaintiffs be able to finish expert discovery weeks before we're able to finish it, and they will get to start their expert -- their dispositive motions briefing long before we actually get to start it.

And having us litigate essentially two separate cases simultaneously like that, it -- it isn't workable with the team that we have. We don't have the entire Markowitz firm working on this case, and we can't. I'm telling you that the schedule is unworkable for us. And we think that the expert deadline either needs to be the same for Levi and Conley, or the Levi deadline at least needs to move two weeks so that we have a little bit more time.

MR. RIZZO: Judge, we need to be prepared. This would be no different if these two cases were filed in different courts or different counties. They're a big firm. They represent themselves as the most -- what's the term?

THE COURT: Yeah, let's not -- let's not --

MR. RIZZO:  But, I mean, come on, it's -- it's -- there's two separate cases, and we need to -- we need to move ours along.

THE COURT:  So I communicated early on that we were going to continue to move -- I mean, I think we had the -- the reality of the trial dates set out earlier this morning, and the only thing that I'm moving -- and I -- and, you know, I don't pretend to know or appreciate all the work that I know you all are going to be doing.

I have not been a litigator and tried cases for 20 years, so I'm not going to sit here and say, "You got it covered.  You can handle it.  It's a piece of cake."  I know it's going to be hard, and I can only imagine how hard it's going to be.  But I also gave my commitment to everybody here to try to move this along and make sure that we get these cases to trial.

Obviously if I -- if I end up not -- I may not end up presiding over one of the cases, and that trial may end up having to be set out.  So -- and that's the Conley matter, I believe, because I don't think we have full consent on that. So there's some potential unknowns on that point, but I'm determined to make sure that we push this -- these cases along hard.

And -- and I'm mindful that it is going to be very difficult, but I also can't tell you I know exactly how -- how

it would feel, because I'm not in your shoes. And so I'm going to ask you to -- to do that work to get it -- to get it ready on the timeline that I've provided.

Anything else on our deadline? So I indicated October 4th will be disclosure on Conley. Rebuttal in 14 days. And then all expert discovery will be completed on Conley by November 4th. I'm just pulling up my calendar right now to confirm that date. November 4th is a Monday.

Okay. Any other deadlines that need to be addressed?

Mr. Rizzo.

MR. RIZZO: I just thought I heard Ms. Hoffman say that Dr. Sorenson's available on the 19th.

MS. HOFFMAN: He is. I e-mailed. I sent an e-mail around.

MR. RIZZO: I can pencil that in. Thank you for doing that.

MS. HOFFMAN: You're welcome.

THE COURT: Okay. All right. So we have dates on all of the remaining depositions; is that right?

MS. HOFFMAN: Not quite, Your Honor.

THE COURT: Not quite, but most of them?

MS. HOFFMAN: Most of them. The ones that weren't the subject of the motions practice today.

THE COURT: Okay. Anything else that we need to address on discovery, on deadlines?

All right.  Have you been taking notes?

We'll have a minute order that reflects, as in the -- the "we" over here -- so I'll get a minute order out that -- that highlights all of the dates that we've addressed.

And if there's a need for clarification, obviously you've all done a pretty good job of finding me.  So if there's something that comes up during depositions or discovery -- I know I'm not going to be doing the same work that you are, but I'm committed to making sure I'm responsive to the issues that come up.

So don't -- I mean, you're not hesitating, and you haven't, but don't feel bad or concerned or thinking that I'll be annoyed, because I've invited myself into this mess, meaning my deadlines.  So I'm going to have -- I'm going to have to level up as well.  Okay?

All right.  Thank you, all.  Safe travels back.

* * *

(Court adjourned, 8-6-24 at 5:31 p.m.)

C E R T I F I C A T E


Ethan Levi v. Kim Chapman, et al.

Case No. 6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman, et al.

Case No. 6:23-cv-01353-MK

Status Conference

August 6, 2024


I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Lindsey A. Weresch, RMR, CRR, CSR

_____

Official Court Reporter        Signature Date: 8/9/2024
Oregon CSR No. 14-0427         CSR Expiration Date: 6/30/2026