Steven Rizzo, OSB # 840853
Mary D. Skjelset, OSB # 075840
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelest@rizzopc.com

Caitlin V. Mitchell, OSB #123964
Johnson Johnson Lucas & Middleton PC
975 Oak Street, Ste. 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
cmitchell@justicelawyers.com

ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>Plaintiff,<br><br>v.<br><br>KIM CHAPMAN, et al ,<br><br>Defendants. | CASE NO. 6:22-cv-01813-MK<br><br><br>PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C.<br><br><br>*Oral argument requested* |
| OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>      Third Party Plaintiff,<br><br>v.<br><br>JOE ALBERT RAYGOSA,<br><br>      Third Party Defendant. | |

PAGE 1 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

## INTRODUCTION

For the reasons discussed below, the Court should deny the defendants' Motion to Compel Deposition of J.C. The Response is based on Fed. R. Civ. P. 16, 26 and 34 and the pleadings and papers on file, and it is supported by the Declaration of Steven Rizzo ("Decl.").

## LR 26-3

This Response exceeds the page limits set forth by LR 26-3(b). Plaintiff wrote to the Court at 11:12 a.m. on August 27, 2024 to seek prior Court approval, but did not receive a response. The defendants indicated they did not object to exceeding the page limits. Upon request of the Court, Plaintiff will resubmit a 10-page version.

## RELEVANT BACKGROUND AND TIMELINE

**2022**

**November 18, 2022:** Plaintiff Levi filed the initial Complaint. (ECF 1).

**2023**

**June 26, 2023**: The Markowitz firm appeared on behalf of all defendants in this action. (ECF 48, 49).

**September 8, 2023**: The Court set a firm discovery deadline of July 12, 2024. (*See*, Plfs. Resp. to Defs.' Mot. to Extend Case Deadlines, ECF 153 at 2) ("THE COURT: . . . The deadline is set for July 12, with the understanding that I'm going to be very reluctant to move that date out again. So do everything you can to coordinate and organize schedules to complete all discovery by then.").

**2024**

**June 7, 2024**: The defendants made no attempt to depose anyone until this date. (*Id*. at 4). The prospective deponents did not include J.C.

**June 25, 2024:** The defendants filed a Motion to Extend Case Deadlines. The motion lauded the defendants' efforts to produce documents (entirely within their possession, custody and

control) and blamed Plaintiff (and Plaintiff Conley) for the defendants' failure to complete their discovery. Without reference to J.C.'s deposition, the defendants sought an additional "35 days" to complete their discovery and outlined "several key discovery issues" that needed resolution "in order to adequately prepare for depositions and complete fact discovery." (ECF 142 at 6) (citing Blaesing Decl. ¶ 5, ECF 143). Ms. Blaesing characterized this need as "critical." (*Id*.).

The "several key discovery issues" pertained to the defendants' notices of intent to depose J.C's therapist, Ms. April Clark, J.C.'s dependency attorney, Ms. Annette Smith, and Mr. Levi. (Decl., Ex. 1). The defendants attributed their delay in seeking a deposition of Ms. Clark to an unsupported claim that Plaintiff was "withholding, at a minimum, dozens of pages of notes..." that the defendants did not have. (ECF 142 at 6; 143 at 3).[1] Mr. Levi's scheduled July 3 deposition (later rescheduled) was subject to the defendants' motion to compel answers to interrogatories – only one of which was granted. (ECF 157).

At the time, there was no mention of J.C.'s deposition, much less a *critical* need to take it.

**July 8, 2024**: Despite the defendants' suggestion that Plaintiff had stymied their discovery, Plaintiff did not object to Mr. Levi's deposition. However, because Mr. Levi is a legal representative and not a percipient witness, Plaintiff advised the defendants:

> If you have topics for Mr. Levi that you believe are not subject to privilege/work product, then let's confer tomorrow or early Wednesday. If we cannot reach accord, then we can seek the court's guidance.

(Decl. of Counsel., Ex. 4).  Defense counsel chose to ignore this request.

**July 10, 2024**: The Court held a comprehensive, hours-long telephone conference primarily devoted to discovery and scheduling issues. To ensure completion of discovery, the Court ordered the defendants to "draft what you are proposing, to complete with discovery on both of the cases, and submit it – and to have it done in 30 days." The Court further stressed that the

---

[1] In reality, despite their representations to the contrary, the defendants had in their possession most, if not all, of these notes – some of which they claimed "attorney-client privilege" over and redacted the content in its entirety. (Decl., Ex. 2 at 2-3, 10-11). At the deposition of Ms. Clark, defendants used none of the notes they found so "critical" to preparation, a frustration to the therapist, who repeatedly requested to see them. (Decl., Ex. 3).

PAGE 3 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

defendants should "make it thorough," and the Court did not "want there to be any amendments to it." (Decl., Ex. 5). The Court wanted to ensure "that everyone [was] collaborating and cooperating to the fullest extent to complete discovery within the time that's left," and that parties had an opportunity to object, so that the Court could determine "whether everybody's conduct is consistent with the idea of pursuing the completion of discovery reasonably and fairly for all parties concerned." Any additions should be limited to a "rare thing that might come up." (*Id*.). The Court further advised that this status report would be the basis for an August 6, 2024 status conference billed as "an all-day work session to figure out what else needs to happen," in order "to hammer out all the other details." (*Id.* at 2).

Mr. Wilson partially attended the conference. During the hearing, the defendants expressed no need to depose J.C., *critical* or otherwise.

The **July 12, 2024 Order** provided in pertinent part that the defendants "must file a status report reflecting a proposed calendar of fact discovery by 7/19/2024," which "should detail how the parties will complete discovery by the August 12 deadline (including, e.g., when remaining depositions will take place." (ECF 157). The Court also required that the "parties shall confer about the proposed calendar prior to filing, and [that] any objection from either party should be noted in the status report." (*Id.*).

The **July 19, 2023 Status Report**: under their header entitled "State Defendants' outstanding discovery – to be completed in both matters," the defendants stated that they "have six depositions outstanding across both cases." The defendants' list of deponents included: (1) Ms. April Clark, (2) Dr. Sorenson, (3) CASA/Ms. Dale Gilad, (4) former DHS worker/Ms. Lene Ferrari (represented by Ms. Creighton) and (5) Ms. Annette Smith (represented by Mr. Jacobs). (ECF 160 at 7). Under the header of "State Defendants' outstanding discovery – *Levi v. Chapman et al*.," the defendants noted that they were going to depose Plaintiff Levi on July 25. Plaintiff had advised the defendants that "Mr. Levi is not a percipient witness and that much of his potential testimony will be work-product or privileged." (*Id*.).

Again, the defendants omitted mention of even the prospect of deposing J.C.

PAGE 4 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL
DEPOSTION OF J.C

**July 25, 2024:** The defendants deposed Mr. Levi, subject to privilege and work product objections made on the record. (Decl.). The defendants did not seek to confer on the objections or file a motion to compel answers. They had other plans.

**August 5, 2024:** At 5:03pm, Markowitz attorney, Mr. Harry Wilson, directed a letter via email to Plaintiff and Plaintiff Conley "to request dates for the depositions of J.C. and Z.C." (Decl., Ex. 6). The letter was delivered while counsel for Plaintiff Levi was enroute to Eugene for the August 6 hearing. Mr. Wilson's letter was the defendants' **first mention** of taking J.C.'s deposition.

In the correspondence, Mr. Wilson accused Mr. Levi (an Oregon attorney in good standing) of "abnegating" his fiduciary responsibility to J.C. The bald and unsupported accusation served to obfuscate the defendants' delay; and Mr. Wilson therefore made no effort to explain why he waited eleven days before springing this self-adjudication after-hours on August 5.[2] To buttress his accusation, Mr. Wilson used snippets of testimony from Mr. Levi's deposition and accused Mr. Levi of having "met with J.C. only three times."[3] (*Id.*). Mr. Wilson was also surprised to read that, acting as Conservator, Mr. Levi "has taken no actions" independent of his counsel "to investigate the claims set forth in this complaint before it was filed" or other "independent steps" to investigate. (*Id.*). Mr. Wilson cited no authority showing that a Conservator has a duty to personally investigate a child's legal claims.

As both expected and forewarned, Mr. Levi relied on counsel to investigate J.C.'s claims. The snippets of testimony relied upon by Mr. Wilson to impugn Mr. Levi's professionalism merely pertained to whether Mr. Levi had *personally* taken investigatory "steps" and "actions."

| Mr. Wilson's characterization | Mr. Levi's testimony |
| --- | --- |

---

[2] Mr. Wilson also self-adjudicated Ms. Shannon Conley's (an Oregon attorney in good standing) fiduciary "abnegation." Ms. Conley was deposed on July 15, 2024, which means that Mr. Wilson waited *twenty-two days* before passing his judgment on Ms. Conley.

[3] Apparently, four or more meetings were required.

PAGE 5 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

| No personal investigation | Q. Okay. Can you tell me -- for what purpose were you appointed as conservator of J.C.? A. Well, J.C. is a juvenile. She was -- when -- when I was appointed, she was -- well, she's still under 18, I believe, and she's under -- she was under 18 when Rizzo -- *the Rizzo law firm was investigating the case and pursuing this civil case.* And so as an incompetent juvenile, she can't sue on her own behalf. So I think -- you know, the reason I have been appointed is to be plaintiff on her behalf to sue on her behalf because she can't sue. |
|---|---|
| No independent steps to obtain information | Q. Since becoming conservator, have you taken any steps to obtain information related to J.C.'s claims in this matter? MR. RIZZO: So question in aid of an objection. Are you asking the witness if he *personally* has taken any actions? MR. NASO: Yes. Well, yeah -- MR. RIZZO: You may answer. MR. NASO: -- as conservator. A. No. |
| No actions to investigate the claims | Q. Did you *personally* as conservator do anything to investigate the claims set forth in this complaint before it was filed? A. I did not. |

(Decl. of Counsel, Ex. 7) (emphasis added). Mr. Levi's testimony offers no support to Mr. Wilson's tardy and self-serving conclusion that he must depose a child sex abuse victim.

**August 6, 2024:** Mr. Wilson avoided the August 6 hearing. His Markowitz colleagues did not take up his fiduciary "abnegation" theory. Instead, without conferring with Plaintiff in advance, the defendants announced on the record that Plaintiff could spare them from interrogating J.C. by yielding as follows: (1) to not call the Kids FIRST forensic child abuse specialists who examined J.C. as witnesses at trial; (2) to not introduce any witness testimony and exhibits in Raygosa's prosecution at trial (thereby excluding witnesses called by Raygosa's defense attorneys, i.e., defendant O'Brien and Ms. Duncan; and, excluding witnesses called by the prosecution, i.e., law enforcement, Kids FIRST, CPS, and J.C.); (3) to not introduce evidence of J.C.'s disclosure of Raygosa's sexual abuse upon removal from the Duncan-Raygosa foster home at trial; (4) to not

PAGE 6 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

call a Rule 26 expert to testify about information obtained from J.C. at trial; and, the *coup de grâce*, (5) to preclude J.C. from testifying at trial. (Decl., Ex. 8).

The "proposal" represented an absurd and pathetic invitation to malpractice. That the self-styled "State" defendants would seek to leverage Mr. Wilson's contrivance as a means to intimidate J.C. by threatening to depose her in the witness box is abhorrent. The defendants' desperate gambit to risk J.C.'s health and wellbeing apparently overrides DHS's "trauma-informed" care policy to ensure the safety of survivors of foster care abuse.[4] The Court permitted the defendants to file a motion to compel J.C.'s unnoticed deposition.

**August 13, 2024:** The defendants filed instead an expedited motion to compel J.C.'s deposition, without prior conferral under LR 7-1(g). Based on a terse email exchange between the parties, the defendants notified the Court that they were "withdrawing" the request to expedite. The defendants also failed to confer on exceeding page limits under LR 26-3(b).

## STANDARDS

Fed. R. Civ. P. 16(b)(4) provides that a "schedule may be modified only for good cause and with the judge's consent." *Id; see also Chao v. Westside Drywall, Inc.*, 709 F. Supp. 2d 1037,1072 (D. Or. 2010), *as amended* (May 13, 2010) ("To demonstrate diligence under Rule 16's 'good cause' standard, the movant may be required to show . . . that her noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding her diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated[.]").

Courts have broad discretion to permit – or deny – discovery. *See Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). Whether J.C.'s deposition is permissible turns on whether it is

---

[4] (*See e.g.,* Decl. Ex. 9) ("DHS' "commitment to trauma informed approach ensures that the agency is fulfilling its mission by promoting healing and resiliency in children, adults and communities so that people, systems and communities can function at their full capacity and potential. Trauma informed care practices and building resiliency are critical to our workforce, our service recipients and all Oregonians . . . 6. A trauma informed care structure is an organizational structure and treatment framework that: a. Involves understanding, recognizing, and responding to the effects of all types of trauma. b. Emphasizes physical, psychological and emotional safety for both consumers and providers, c. Helps survivors rebuild a sense of control and empowerment.").

proportional to the needs of the case, considering "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P.  26(b)(1). Also, the Court may consider whether the discovery is not reasonably accessible because of undue burden or cost under Rule 26(b)(2)(B) or whether the discovery "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" under Rule 26(b)(2)(C)(i).

## ARGUMENT

The Court should DENY the defendants' motion to compel J.C.'s deposition.

### *Defendants suffer from lack of diligence*

The September 8, 2023 Order set a firm discovery deadline of July 12, 2024. The defendants' June 7, 2024 list of deponents was limited to Ms. Clark, Ms. Smith and Mr. Levi. At the time, there was no mention of taking J.C.'s or Z.C.'s deposition. The defendants saw fit to wait another three weeks before filing the motion to extend case deadlines on June 25, 2024. They assured the Court that "good cause exist[ed]" to extend the July 12 deadline to allow for the specified depositions. The defendants made no mention of J.C.'s deposition in their June 25 Motion to extend the case deadlines, at the July 10 conference, in their July 19 status report or in any of the other 627 days that lapsed between the filing of the initial Complaint on November 18, 2022 and their announcement on August 5, 2024.

The defendants had many months to seek J.C.'s deposition prior to the after-hours delivery of Mr. Wilson's August 5 letter. Yet J.C.'s experience of severe abuse in the care and custody of the defendants was always central to the case. Her existence is in no way some "rare thing" that arose as the discovery unfolded. She is not a surprise witness. The defendants made a conscious choice not to request this child victim's deposition, perhaps out of a sense of decency. But decency has been discarded, only to be replaced with desperation and blame. The defendants' contrived fiduciary "abnegation" merely projects their own lack of diligence, which should be fatal to the

PAGE 8 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

motion. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir.1992) (the district court has "broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order . . . will not be disturbed unless they evidence a clear abuse of discretion.") (omission in original) (internal quotation marks omitted).

### *Defendants' characterization of the Levi deposition does not justify deposing J.C.*

The Court has already denied in large part the defendants' motion to compel Mr. Levi's answers to interrogatories. The defendants now repackage their grievance with Mr. Levi's status as a legal representative – and not a percipient witness – by griping about his deposition testimony. (ECF 170, n. 2-3 at 5). In attacking Mr. Levi's purported "failure" or "refusal" to disclose protected information, the defendants appear to forget that they elected *not* to confer with Plaintiff on the sufficiency of the testimony. In lieu of moving to compel sufficient answers, the defendants favored springing Mr. Wilson's fiduciary "abnegation" ruse on Plaintiffs and the Court. As seen, the defendants' newfound need for J.C.'s deposition has no relation to Mr. Levi's deposition.[5]

### *Defendants' 'discovery to date belief' strains credulity and misunderstands the law.*

If their *post hoc* bellyaching about Mr. Levi's testimony do not convince the Court that J.C.'s deposition is necessary and timely, the defendants argue that, in the alternative, they are still entitled to take J.C.'s deposition because:

> [They] *believe* that the *first time* that J.C. revealed Mr. Raygosa's sexual abuse to ODHS was on October 9, 2017, when she disclosed the abuse to a [subsequent] foster parent. (10/9/17 Email from [defendant] Chapman[])
>       . . .
>
> Discovery to date has not revealed [to them] any factual basis for any prior disclosure;
>
> The documents exchanged in discovery do not reveal [to them] any prior disclosures of sexual abuse by J.C. about Mr. Raygosa and no witness has testified to any such prior disclosures.

---

[5] Also, in looking at the questions that were posed to Mr. Levi, it is hard to imagine how J.C. could testify competently whether she has "knowledge that the injuries are extensive and lifelong," or whether she has "suffered any permanent injury as a result of the abuse." (ECF 170, n. 2-3 at 5). Those are questions for medical and psychological witnesses, not for the child abuse victim. Defendants took no actions and no steps to have J.C. independently examined.

PAGE 9 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

(ECF 170 at 4) (emphasis added).

Before addressing the merits, this alternative argument underscores that Mr. Wilson's fiduciary "abnegation" judgment is a ruse. That is, numerous depositions, including Mr. Levi's deposition, occurred during *discovery to date.* Mr. Levi's deposition had no bearing on the formation of the defendants' *belief* concerning the attributed *revelation.* DHS is one of the most sophisticated litigants in the State of Oregon. The "State Defendants" (including DHS) have been gifted with representation by a team of publicly funded Markowitz attorneys since June 2023. Therefore, the Court should conclude that the defendants' *discovery to date belief* was formed well in advance of 5:03pm, August 5, 2024. The defendants' choice to wait until August 13, 2024, before making the alternative *discovery to date belief* argument only confirms lack of diligence.

As to the relative merits, the defendants' apparent opinion that the "discovery to date has not revealed any factual basis for any prior disclosure" distorts the legal standard and ignores the facts extant in their own records. The defendants' fondness for the verb *revealed* evokes that absent *revelation* of *Mr. Raygosa's sexual abuse* as attributed to J.C., the defendant officials were at liberty to ignore facts from which an inference of a serious risk of harm could have been drawn. But deliberate indifference does not turn on whether a foster child *reveals,* or does *not reveal,* that s/he is being *sexually abused* by a foster parent. To clarify:

> The deliberate indifference standard requires a showing of an objectively substantial risk of harm and a showing that the officials were *subjectively aware of facts* from which an inference could be drawn that a substantial risk of serious harm existed and that the official actually drew that inference or that a reasonable official would have been compelled to draw that inference.

*Tamas v. Dep't of Soc. & Health Servs.,* 630 F.3d 833, 845 (9th Cir 2010) (emphasis added). Also, "the subjective component *may be inferred* from the *fact that the risk of harm is obvious.*" (*Id.*) (simplified) (same). The defendants cannot rely on a foster child's duty to *reveal* abuse or neglect that is being inflicted by a foster parent: "the law does not impose the duty of guarding their own safety on wards of the state. Rather, that duty is the quintessential responsibility of the social workers assigned to safeguard the well-being of this helpless and vulnerable population." *Tamas,* 630 F.3d at 842. Similarly, the defendants' suggestion that the child must *reveal* a specific type of

PAGE 10 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

abuse, i.e., *Mr. Raygosa's sexual abuse*, is also lacking. *See Kennedy v. City of Ridgefield,* 439 F.3d 1055, n.5 1064 (9th Cir. 2006) ("We have never required that, for a danger to exist, the *exact injury* inflicted by a third party must have been foreseeable") (emphasis added).

In applying this reasoning, liability turns on whether the four DHS defendant-employees were aware of facts from which an inference of could be drawn that a substantial risk serious harm existed. The defendants' *discovery to date has not revealed* to them argument ignores what was right in front of their face. That is, in terms of *any factual basis,* the defendants' supplemental response to Plaintiff's first set of interrogatories documents numerous instances and signs of abuse and neglect occurring in the Duncan-Raygosa foster home, including calls made to the child abuse hotline. The juvenile court record demonstrates that the defendants withheld pertinent facts and information about the care and condition of children in the Duncan-Raygosa foster home from the court and parties. Also, numerous defendant-employees have been deposed, and other DHS workers have testified about the concerns that they expressed regarding the care and condition of children languishing in the Duncan-Raygosa foster home as well as concerns in the overfilled, abusive S-M foster home.

Accordingly, as seen, the defendants' *discovery to date belief* thrives on misunderstanding the law, and they are dangling the conjured *belief* as though to force J.C. to disabuse them of it. However, this sharp gamesmanship serves no legitimate discovery need.

### *Defendants ignore the records and statements in their own possession.*

The defendants broadly assert that as of August 5, 2024, J.C.'s testimony evidently became "highly relevant to the issues . . . including whether and when [she] disclosed her abuse to [the defendants] and the nature of her injuries." (Mot. to Compel, ECF 170 at 6). The defendants claim (albeit belatedly) that it somehow became "critical" for them to depose J.C. on August 5 on specified topics, to which they import personal knowledge to J.C.:

- "J.C. has *critical,* unique information regarding her claims"; "J.C. knows about any prior disclosures she made to [the defendants] about her sexual abuse . . ." and she "knows about the injuries and impairments that her conservator has alleged are permanent and disabling";

- J.C. "has *critical* information about the nature and cause of her injuries and the timing of any alleged disclosures to ODHS of her abuse";

- " . . . J.C. has *critical* information" about her demand for money damages, and "the basis for plaintiff's assertion that [the defendants] allegedly knew about J.C.'s abuse and neglect while it was occurring";

- The defendants "are also entitled to probe the basis for plaintiff's demand of over $15 million in non-economic, compensatory damages . . . [b]ecause J.C. has *critical* information about these and other issues."

(ECF 170 at 2, 10, 12). By these statements, the defendants seek to question J.C. about what exactly what she told the defendants, at nine years of age, about her experiences of sexual abuse; how that sexual abuse has impacted her – and to apparently opine on the permanency of this impact; the nature and cause of her injuries, i.e. details about the exact acts of sexual abuse and who is responsible; how she might value the harm in monetary compensation; and, perhaps most strangely, the defendants' knowledge of abuse and neglect occurring in the Duncan-Raygosa home. The defendants provide no evidence showing that J.C. has personal knowledge about most of these assertions, that she is qualified as an expert to opine on the topics that call for expert opinion or that the information cannot and should not be found elsewhere.

As with their possession of J.C.'s therapy notes, the Defendants feign complete ignorance about the extensive documentation of J.C.'s experiences and injuries produced in discovery that they could use to prepare an expert witness. Plaintiff Levi has produced 12,000+ pages of discovery in this case, including 436 pages of medical records, 697 pages of therapeutic notes, and 197 pages of school records. (Decl.). Ms. Chapman's October 9, 2017 email referenced in the defendants' motion describes J.C.'s disclosure. Following the disclosure, J.C. underwent a forensic examination at Kids FIRST, which was observed by the police and by CPS. The defendants have the police reports and the CPS report,[6] and the CPS worker, Ms. Mykael Burford, has been deposed. She was so traumatized by witnessing the disclosure that she vomited. (Decl., Exs. 10-11). As the Court is aware, the defendants have the video of the Kids FIRST examination of J.C., as well as two other forensic interviews she sat for during her time in the custody of DHS. (Decl.).

---

[6] Even if they were not discovered to parties in the juvenile dependency proceeding.

PAGE 12 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

J.C. appeared at trial and offered sworn testimony as an 11-year-old girl. Defendant O'Brien was present and observed J.C.'s testimony. (Decl., Ex. 12). The transcript was marked at multiple depositions and contains the sworn testimony of the CPS worker Mykael Burford (fka Moore), Defendant O'Brien and Nicole Duncan, to name a few. (Decl.). Raygosa's conviction by a unanimous jury of multiple sex offenses is a fact in evidence; one relied upon by the defendants in their Third-Pary Complaint. (ECF 19 at 9-10). J.C. need not relive the abuse yet again in order for the defendants to understand what happened to her. In other words, much of the testimony the defendants appear to seek "is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive" under Rule 26(b)(2)(C)(i).

### *Defendants know that a deposition of J.C. will be traumatic.*

Because the defendants already have sworn testimony and vast records regarding the topics at hand, the late request to depose J.C. imposes a "burden [that] outweighs its likely benefit." Fed. R. Civ. P.  26(b)(1). In this case, the burden is known and recognized trauma to J.C. In arguing that "Plaintiff's conclusory assertions about the potential stress of a deposition on J.C. are insufficient to prevent the deposition from going forward," the defendants ignore evidence in discovery and their prior concurrence with these assertions. (ECF 170 at 11) (citing *Flanagan v. Wyndham Int'l Inc.*, 231 F.R.D. 98, 105 (D.D.C. 2005)). Even if they prefer not to admit it now, the defendants know that the deposition will be traumatic. For example, in a March 30, 2018 instant message exchange with CPS investigator Ms. Burford, DHS worker Mr. Hammond expressed dismay at the prospect of trial for J.C.: "He's already victimized her, now going to make her testify." (Decl., Ex. 11). Apparently, the defendants only find such unnecessary revictimization loathsome in the criminal context.

Yet there is direct evidence in the defendants' possession that the repeated re-traumatization of J.C. imparted discrete psychological and physical harms on her. On August 16, 2018, J.C.'s skills trainer noted that J.C. "reported that she went to court the day before 8/16/18," and "her body felt achy, her head and throat hurt, and [] she was shaking after court." (Decl., Ex.

PAGE 13 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

13). The skills trainer "validat[ed] the intense emotions she must have been feeling," and J.C. agreed that "she felt really scared to have to go to court." (*Id*.). The purportedly "trauma-informed" defendants offer no such validation. To the contrary, they worked diligently to avoid testimony from J.C.'s former therapist about the expected trauma and stress associated with their tardy deposition demand. At deposition, Ms. Clark recalled that "J.C. was very stressed" before having to testify in court, that testifying is "particularly stressful for children who experienced trauma," and that based on her experience treating J.C., she would agree that a deposition would be stressful for her. (Decl., Ex. 3 at 14-15). Uninterested in the impact of their litigation decisions on this abused foster child, the defendants strenuously objected to Ms. Clark's testimony as "not really appropriate," and even instructed Ms. Clark not to answer questions about the expected harm to J.C.. (*Id*. at 15-18).

Though defendants resisted the information, Ms. Clark offered some answers to question topics they seek in a deposition of J.C. As to the permanency of her injury, Ms. Clark testified that J.C.'s sexual abuse was an "enduring trauma" that would require "additional therapeutic support and processing," and imparted a memory that would never go away. She added that "[m]ost people that experience sexual abuse need a lot of support at different points throughout their lifetime." (*Id*. at 11-13). The defendants objected to the inquiry about the permanency of her injury as "call[ing] for a legal conclusion."[7] (*Id*. at 12). They simply do not want evidence in the record demonstrating their frank lack of compassion for J.C.'s mental health and wellbeing.

But the gravest concern for J.C.'s wellbeing stems from defense counsels' continued contention that Defendant O'Brien was somehow justified in doubting and undermining J.C.'s disclosures, even after the criminal conviction. Plaintiff has concerns that the defendants will use this opportunity to seek conflicting testimony from J.C. in order to justify – and continue – Defendant O'Brien's ongoing attempts to undermine the credibility of her disclosures.

Many witnesses have testified to Ms. O'Brien's bias and failure to believe J.C.'s

---

[7] How the defendants can demonstrate a critical (however belated) need for J.C. to answer a question that they believe calls for a legal conclusion remains a mystery.

disclosures. For example, Mr. Hammond testified that Ms. O'Brien doubted that J.C. was sexually abused by Joe Raygosa, that she was the only one to harbor such doubts, and that such persistent doubts were "concerning from the standpoint of providing trauma-informed care to the child." (Decl., Ex. 14 at 2-4). She was eventually removed from the case due to concerns of bias. (*Id.* at 5-6). CPS worker Mykael Burford testified that Ms. O'Brien was the "only person voicing doubts" about the credibility of J.C.'s disclosure, and that such behavior would be "highly unprofessional and unethical" and "a betrayal." (Decl., Ex. 10). Though Ms. Clark never doubted J.C.'s disclosure, she recalled that Ms. O'Brien "expressed her doubts that J.C. was sexually abused by Joe Raygosa," saying she felt like J.C.'s testimony "was performative." (Decl., Ex. 3). Based on her work with J.C., Ms. Clark believed that J.C. "would feel very betrayed" by Ms. O'Brien's attempts to undermine her abuse disclosure. (Decl., Ex. 3). When the abuse is a proven and admitted fact, the defendants should not be permitted to perpetuate this betrayal in the context of a deposition.

### *Defendants' citations to caselaw are unconvincing and ignore limitations set by courts.*

The defendants' citation to case law to support their claimed entitlement to a deposition of J.C. under these circumstances deserves comment. As an initial matter, none of the cited cases relate to requests to depose a child victim made one week before a firm discovery deadline set under Rule 16. As to their cases cited to support of their contention that federal courts "routinely hold that a deponent's age and the sensitive nature of her likely testimony are not grounds for barring a deposition entirely." (ECF 170 at 8). The cases, when analyzed more closely, are largely inapposite in other ways as well.

For example, in *M.M. v. United States*, No. ED-CV-19631-JGB-SPX, 2020 WL 4037165, at *3 (C.D. Cal. June 30, 2020)*,* the court allowed the deposition of the decedent's minor son who "put his relationship with his deceased father . . . by filing a wrongful death action seeking compensation for loss of society and companionship." 2020 U.S. LEXIS 127896 * 7-8 (C.D. Cal. 2020). In so ruling, however, the court noted that the minor was "the only named plaintiff or percipient witness who could provide first-hand testimony regarding the nature of his parental relationship with decedent." *Id.* That is not the case in this action. J.C. did not put her relationship

PAGE 15 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

with Raygosa or anyone else at issue, and she is not claiming a loss of consortium. As discussed above, she is not the sole witness regarding her sexual abuse.

In *A.G.1 v. City of Fresno,* the plaintiff's family brought a civil rights claim against the defendants following a police shooting in which the father was killed. One of the father's children was serving time in a juvenile detention facility. The court disallowed the defendants from deposing the incarcerated youth about a fight that occurred in 2012, on grounds of relevancy, the youth's age, and the length of time that had passed. However, the court allowed the defendants to depose the youth about his knowledge of a 2014 burglary, the 2016 robbery for which he was serving time, and his knowledge of his father's gang affiliation. 2018 U.S. Dist. LEXIS 72417 * 3-4 (E.D. Cal. 2018). In other words, the court made a fact-specific determination about the scope and manner of the examination, and determined that certain subjects were too remote in relevancy and time to require deposition. Here, J.C.'s abuse occurred eight years ago, nearly half of her lifetime – a fact the defendants lean on for their lack of memory and destruction of records, but ignore in this context.

In their citation to authority, the defendants avert their gaze not only from restrictions on topics and questions posed, but also from additional protections and supports offered to abused children threatened with deposition. However, many cases describe the types of protections put in place by the court, the most comprehensive of which is found in *Gray v. Howlett Lumber Co.*, 23 Mass. L. Rep. 56 (2007). In *Gray,*[8] the Court ordered parties "to confer and develop a set of rules" to govern the child's deposition," and "invited [them] to consider" the following factors:

> (1) where the deposition is held; (2) the length of the deposition; (3) who shall be present at the deposition []; (4) the possibility of breaks as necessary to accommodate [the child's] reasonable needs; (5) the option to suspend the deposition in the event of an emergency; (6) previewing the questions to be asked at the deposition; and (7) the taking of [the] deposition remotely.

*Id.* The defendants made no attempt to confer or otherwise seek input from Plaintiff on reasonable

---

[8] *Gray* is referenced in case law cited by the defendants. *See Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty.*, No. 09-CV-00342-PAB-MEH, 2010 WL 4038831 (D. Colo. Oct. 14, 2010).

PAGE 16 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

protections in advance of their untimely request for deposition; nor did they extend such an invitation in advance of their motion to compel. So, when they "agree to reasonable limitations," i.e. location, support person and Court-availability, that "agreement" is made with themselves and on their own terms.

*If the Court grants the defendants' untimely motion, strict protections must be in place.*

Had the defendants sought any input on appropriate restrictions for the deposition of J.C., the following would have been requested:

1. **Limitations on Scope** – the defendants must be precluded from inquiring of J.C. about the following topics:

    a. *Details of the Sexual Abuse*. The defendants may not require J.C. to retell (and relive) her experiences of sexual abuse in the Duncan-Raygosa home. The defendants have a video of her disclosure, a founded CPS assessment, a transcript of her trial testimony and related police reports. They have admitted the fact of criminal acts of abuse as a basis for their Third-Party Complaint. Aside from Ms. O'Brien's negative opinion of J.C., there is no indication that her disclosure was not reliable and accurate. A unanimous jury believed her, and the evidence is available by other means.

    b. *Liability Questions*. The defendants should be foreclosed from asking J.C. questions about the mindset or liability of state defendants. Those questions can be answered by the defendants themselves, are maintained in the emails and records of the case, and would be best found in the destroyed text messages.

    c. *Communications with Counsel and Legal Representatives*. The defendants seem to believe that communications between and among J.C., her legal representative (Mr. Levi) and the attorneys litigating her case are somehow not protected or privileged. They are, and the defendants should not pursue them.

Critical to Plaintiff's trust of this process, the defendants should furnish "a preview of the questions to be asked at deposition," as described in *Gray*, and the exhibits to be shown, so that

PAGE 17 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

concerns of overbreadth or impropriety can be resolved in advance to avoid disputes and conflict during the depositions.

2. **Limitations on Manner** – the defendants must agree to the following reasonable restrictions:

   a. *Location* – The deposition should be held in a location of J.C.'s choosing.

   b. *Length* – The deposition should not exceed three hours.

   c. *Support person* – J.C. may have one (or more) support persons, in addition to counsel and Conservator, to provide comfort and support.

   d. *Breaks* – J.C. may take breaks as needed and may discontinue the deposition if needed.

   e. *No video recording* – The defendants may not video record the deposition. J.C. has already had three video-recorded forensic interviews.

   f. *Designations* – The deposition should be considered highly confidential under the protective order.

## CONCLUSION

The Court should deny the defendants' motion to compel as untimely. If the Court grants the defendants' untimely motion, the Court should order the limitations on manner and scope as described herein.

Dated: August 27, 2024.


RIZZO BOSWORTH ERAUT PC


By: s/*Steven Rizzo*
Steven Rizzo OSB No. 840853 (he/him/his)
Mary D. Skjelset OSB No. 075840 (she/her/hers)
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630

Caitlin V. Mitchell, OSB #123964
JOHNSON  JOHNSON  LUCAS  &  MIDDLETON PC
975 Oak Street, Ste. 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
cmitchell@justicelawyers.com

ATTORNEYS FOR PLAINTIFF

PAGE 19 – PLAINTIFF'S RESPONSE TO STATE DEFENDANTS' MOTION TO COMPEL DEPOSTION OF J.C

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>       Plaintiff,<br><br>v.<br><br>KIM CHAPMAN, et al ,<br><br>       Defendants. | CASE NO. 6:22-cv-01813-MK<br><br><br>**CERTIFICATE OF SERVICE** |
| OREGON DEPARTMENT OF<br>HUMAN SERVICES,<br><br>       Third Party Plaintiff,<br><br>v.<br><br>JOE ALBERT RAYGOSA,<br><br>       Third Party Defendant. | |

I am employed by the law firm of Rizzo Bosworth Eraut PC in Portland, Oregon. I am over the age of eighteen years and not a party to the subject cause. My business address is 1300 SW Sixth Avenue, Suite 330, Portland, OR 97201.

On the date below, I caused to be served on all parties in this action by transmitting a true copy thereof: **Plaintiff's Response to State Defendants' Motion to Compel Deposition of J.C.**

<u>**VIA EMAIL**</u>　　　　　　　　　　　　　　　<u>**VIA EMAIL & US MAIL**</u>

| |
|---|
| **Jill Schneider**<br>**Nicholas S. Mancuso**<br>**Oregon Department of Justice**<br>**100 SW Market Street**<br>**Portland, OR 97201**<br>**Ph. 971-673-1880**<br>**Fax: 971-673-5000**<br>**Email: jill.schneider@doj.state.or.us**<br>**Email: nicholas.mancuso@doj.state.or.us**<br>*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services* |

Lauren Blaesing
Harry B. Wilson
Alexandra Rhee
Hannah Hoffman
Chad Naso
Jeffrey Edelson
Markowitz Herbold PC
1455 SW Broadway
Ste. 1990
Portland, OR. 97201
Ph: 503-295-3085
Email: laurenblaesing@markowitzherbold.com
Email: harrywilson@markowitzherbold.com
Email: alexrhee@markowitzherbold.com
Email: hannahhoffman@markowitzherbold.com
Email: chadnaso@markowitzherbold.com
Email: jeffedelson@markowitzherbold.com
*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services*

Dated this 27th day of August, 2024.

                                 *s/Shelley Maddox*
                              Shelley Maddox, Paralegal

1 – Certificate of Service