IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ETHAN LEVI,                          )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    No. 6:22-cv-01813-MK
                                     )
KIM CHAPMAN, in her individual       )
capacity; ANASTASIA TIBBETTS, in     )
her individual capacity; KASSIDY     )
O'BRIEN, in her individual           )
capacity; ERIN LANE, in her          )
individual capacity; THE OREGON      )
DEPARTMENT OF HUMAN SERVICES, a      )
government agency; and JANE and      )
JOHN DOES 1-5; in their individual   )
and/or official capacities,          )
                                     )
        Defendants.                  )
_____)
                                     )
OREGON DEPARTMENT OF HUMAN           )
SERVICES,                            )
                                     )
        Third-Party Plaintiff,       )
                                     )
        v.                           )
                                     )
JOE ALBERT RAYGOSA,                  )
                                     )
        Third-Party Defendant.       )
_____)

Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

September 13, 2024

APPEARANCES


FOR THE PLAINTIFF:

          MARY SKJELSET
          Rizzo Bosworth Eraut PC
          1300 S.W. 6th Avenue
          Suite 330
          Portland, Oregon 97201

FOR THE PLAINTIFF:

          STEVEN V. RIZZO
          Rizzo Bosworth Eraut PC
          1300 S.W. 6th Avenue
          Suite 330
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          ANIT JINDAL
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          LAUREN BLAESING
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          JEFFREY M. EDELSON
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

      CHAD NASO
      Markowitz Herbold PC
      1455 S.W. Broadway
      Suite 1900
      Portland, Oregon 97201

FOR THE DEFENDANTS:

      HARRY WILSON
      Markowitz Herbold PC
      1455 S.W. Broadway
      Suite 1900
      Portland, Oregon 97201

FOR STEPHEN HAMMOND:

      ANDREW D. CAMPBELL
      Heltzel Williams PC
      117 Commercial Street N.E.
      Suite 400
      P.O. Box 1048
      Salem, Oregon 97308


COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                  United States District Courthouse
                  1000 S.W. Third Avenue, Room 301
                  Portland, Oregon 97204
                  (503)326-8047

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator for    )
Z.C., a minor,                     )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )    No. 6:23-cv-01353-MK
                                   )
KIM CHAPMAN, ANASTASIA BROOKS,     )
KASSIDY O'BRIEN, ERIN LANE,        )
MARGARET RAMIREZ, in their         )
individual capacities,             )
                                   )
        Defendants.                )



Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

September 13, 2024

APPEARANCES


FOR THE PLAINTIFF:

          BONNIE RICHARDSON
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE PLAINTIFF:

          MARISSA KORBEL
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE DEFENDANTS:

          ANIT JINDAL
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          LAUREN BLAESING
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

          JEFFREY M. EDELSON
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

FOR THE DEFENDANTS:

        CHAD NASO
        Markowitz Herbold PC
        1455 S.W. Broadway
        Suite 1900
        Portland, Oregon 97201

FOR THE DEFENDANTS:

        HARRY WILSON
        Markowitz Herbold PC
        1455 S.W. Broadway
        Suite 1900
        Portland, Oregon 97201

FOR STEPHEN HAMMOND:

        ANDREW D. CAMPBELL
        Heltzel Williams PC
        117 Commercial Street N.E.
        Suite 400
        P.O. Box 1048
        Salem, Oregon 97308


COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                  United States District Courthouse
                  1000 S.W. Third Avenue, Room 301
                  Portland, Oregon 97204
                  (503)326-8047

(Friday, September 13, 2024, 1:05 p.m.)

P R O C E E D I N G S

(Whereupon, the following proceedings were held in open court:)

THE COURT:  Call the case.

THE COURTROOM DEPUTY CLERK:  Now is the time set for Civil Case Number 22-1813, Levi versus Chapman, et al., and Civil Case Number 23-1353, Conley versus Chapman, et al., for a status conference.

THE COURT:  Good afternoon, Counsel.  It looks like we have several matters to attend to.  I have a letter from -- is it Ms. Skjelset? -- a September 12th letter, yes, from Ms. Skjelset and Ms. Marissa Korbel outlining several of the issues that needed attention today.  Using that as my baseline agenda, you may ask if any additional issues can be included.  Anyone else have other issues that need to be put on the list to attend to today?

Plaintiffs' counsel first.

MS. RICHARDSON:  This is Bonnie Richardson, and I represent one of the plaintiffs, Conley, on behalf of Z.C.  Mr. Campbell, who represents -- now represents Mr. Hammond, has asked that we address the issue involving Mr. Hammond first.  And Mr. Campbell's here.

MR. CAMPBELL:  Good afternoon, Your Honor.  Andrew Campbell.  We had some e-mail exchanges --

THE COURT: Hold on, Mr. Campbell. I'm not interested in hearing any substance yet. I'm trying to identify the issues that need to be added to the list.

What else, from plaintiffs' counsel? Are you satisfied with the list that we have from September 12th outlined in your letter? Ms. Skjelset identifies the issues that we need to attend to today. And I'm not asking for argument. I'm not asking for any substance. I just need you to give me a list, so I know what they are.

MS. SKJELSET: Your Honor, this is Mary Skjelset.

THE COURT: Yes.

MS. SKJELSET: Just briefly, it -- I'm hearing some echo. I don't know if that's me alone.

MR. JINDAL: I also hear it.

THE COURT: The voice is coming in loudly here. Maybe we can turn the volume down in the courtroom, but not off.

Try it again, Ms. Skjelset.

MS. SKJELSET: Is that better?

THE COURTROOM DEPUTY CLERK: I am trying to adjust this.

THE COURT: Try one more time.

MS. SKJELSET: How about now?

THE COURT: It's a little loud in the courtroom.

Ms. Davies, are you able to turn it down?

THE COURTROOM DEPUTY CLERK:  Yeah.  I'm working on it here.  Just a moment.

MS. SKJELSET:  I can turn my own volume down.  Is that helping?

THE COURT:  Give that a shot, too.

THE COURTROOM DEPUTY CLERK:  Okay.  Let's try that now.

MS. SKJELSET:  How about now?

THE COURT:  All right.  It looks like people are satisfied.

Go ahead.  What are the issues?

MS. SKJELSET:  The only additional issue that I think the Court requested, that there was briefing on the consent issue from defendants today.  I believe that that was requested at the last hearing.  We did not include it in our letter, because we understood that that was the defendants' issue to brief by today.  However, we have conferred on it, and we can apprise the Court of the outcome of the conferral.

THE COURT:  Okay.

MR. EDELSON:  And we will be filing a brief on that today, Your Honor.  This is Jeff Edelson for defendants.

THE COURT:  All right.  Anything else, Ms. Skjelset?

MS. SKJELSET:  I don't believe so, Your Honor.

THE COURT:  All right.  Defense counsel, any other issues?  I note that I do have a motion for reconsideration --

state defendants' motion for reconsideration that was filed, I believe, today.

MR. JINDAL:  Yes, Your Honor.  Anit Jindal.  I believe we filed that yesterday, but either way I think it was incapsulated in issue two in plaintiffs' list.  It addresses the privilege status of documents included in OR-Kids.

THE COURT:  All right.  Thank you.

All right.  Anything else from defense counsel?  Any other issues?

MR. EDELSON:  Not at this time.

THE COURT:  All right.  So this is the time.  So I want to make sure I have a complete agenda, so we don't have anything else popping up before the close of -- of the week.

Okay.

MR. EDELSON:  Thank you.

THE COURT:  Mr. Campbell.

MR. CAMPBELL:  Thank you, Your Honor.  And I appreciate the professional courtesy from the Court and counsel in making sure I can make my 2:30 appearance in Deschutes County.  I represent Witness Hammond, who submitted an errata sheet to the parties regarding his prior deposition. I understand that, based on that, plaintiffs would like to redepose him on the subject matters that are in his errata sheet.

There are four bullet points in his errata sheet.

And Mr. Hammond, as a state employee, is going to do whatever the state defendants -- take whatever position on the second deposition that the state defendants take today, so we'll be deferring to state defense counsel on that matter.

If the Court does order him to sit for a second deposition, we have some suggested --

THE COURT:  Yeah.  Why don't we just simply wait until I make a decision, and then I can hear what it is that your suggested ground rules might be.

Is defense counsel objecting to an additional deposition of Mr. Hammond?

MR. EDELSON:  We are, Your Honor.  Jeff Edelson for defense.

THE COURT:  So you've submitted the errata sheet to his deposition and --

MR. EDELSON:  Mr. Hammond -- Mr. Hammond did, yes.

THE COURT:  All right.  And plaintiffs are asking for additional deposition time for Mr. Hammond based on the errata sheet content.  Is that your understanding, Mr. Edelson?

MR. EDELSON:  That is my understanding.

THE COURT:  All right.  And it appears to me that I was out of turn.  I should probably ask the plaintiffs why they want to reopen depositions for Mr. Hammond.  And then I'll hear from you, Mr. Edelson.

Who's arguing the motion to reopen Mr. Hammond's

deposition?

MS. RICHARDSON:  So this is Bonnie Richardson.  On behalf of the plaintiffs, both plaintiffs, I will argue this. And it's important for us to also be able to explain what has transpired in recent events with Mr. Hammond.

THE COURT:  Go ahead.

MS. RICHARDSON:  Okay.  So I believe that Mr. Campbell is also here to talk about the privacy concerns of Mr. Hammond.  That would be the other issue.  We had submitted a letter that was going to be addressed at the last Friday hearing, but Mr. Campbell couldn't attend.  And so I will be addressing that a bit, but I do want to inform the Court about what has happened.  So yesterday -- I hear a little bit of feedback.  It might just be the courtroom feedback.  Is it okay --

THE COURT:  We can hear you fine.

MS. RICHARDSON:  Are you okay with that, Judge?

THE COURT:  So I'm not -- I'm not receiving any feedback.  I can hear you loud and clear.

MS. RICHARDSON:  Okay.  Okay.  If it's not too bothersome for others.  I just want to make sure.

THE COURT:  Well, if for some reason somebody is having a difficult time following somebody's argument and presentation, please raise your hand.  It'll catch my attention, and then we can try to attend to it.  Otherwise,

I'm -- we got to keep moving. I'm getting probably a little frustrated with our technology issues. At some point I may just order you all to show up in Eugene, so I can deal with real-life glitches in person.

Go ahead, Ms. Richardson.

MS. RICHARDSON: Yeah. Okay. So yesterday -- if Your Honor recalls, last hearing, we had these issues about Lighthouse. And that was a third-party vendor who was extracting information, including cell phone information from Mr. Hammond, Ms. O'Brien.

And so we, finally -- yesterday we were able to talk to Lighthouse, with supervision of the Markowitz defense attorneys. And what Lighthouse told us yesterday, on September 12th, was that there was an indication that Mr. Hammond had reset his cell phone on July 14th of this year, 2024, July 14th.

THE COURT: So there was evidence from the forensic analysis that Mr. Hammond reset his cell phone on July 14th, 2024?

MS. RICHARDSON: Yes, Your Honor.

THE COURT: And so can someone tell me what reset means?

MS. RICHARDSON: I can. So it was a hard reset, which means that all the information was deleted off of his phone. And what Lighthouse also told counsel yesterday was

that, when this happens, there's a 30-day -- 30-day window to recover some of the deleted information; and then, after that 30 days, it becomes very difficult.

THE COURT:  When they say "very difficult," I mean are they essentially saying impossible?  Or what does it mean to say it's "very difficult"?

MS. RICHARDSON:  That was our understanding.  After 30 days, it is -- they didn't say "impossible," but that the information is gone.

Okay.  So that is what we learned from Lighthouse yesterday.  Now, what I want to do is go through, very briefly, the timeline of what the defendants knew and what Mr. Hammond knew before he hard reset his phone, which we understand happened on July 14th.

On June 4th of 2024, we sent a notice that we would take the deposition of Mr. Hammond.  On July 10th and July -- excuse me, pardon me -- June 10th and June 11th of this year, we took the deposition of Ms. O'Brien.  And in that deposition when we asked Ms. O'Brien whether or not she had any texting on her personal phone with Mr. Hammond.

She said she did not recall, and she refused to provide her personal phone.  On June 28th we issued a subpoena for Ms. O'Brien's cell phone to Verizon.  The Markowitz firm objected to that subpoena.  On July 12th we filed a motion to compel the search of Ms. O'Brien's personal phone --

THE COURT:  What was that date?

MS. RICHARDSON:  July 12th -- that the Markowitz firm received.  July 14th -- the Markowitz firm, at this time, is representing Mr. Hammond -- Mr. Hammond hard resets his phone.  On August 2nd, 2024, we take the deposition of Mr. Hammond.  In the deposition of Mr. Hammond, he makes a statement that he has no personal relationship with Ms. O'Brien.

He refuses to answer questions about the personal cell phone.  The -- at that time, Your Honor might recall, the plaintiffs had to call the Court and ask the Court to tell Mr. Hammond to go into other room with his Markowitz attorney and to search his device for communications with Ms. O'Brien.

THE COURT:  And that was on August 2nd?

MS. RICHARDSON:  That was on August 2nd.

THE COURT:  About two weeks or so after the hard reset --

MS. RICHARDSON:  Exactly.

THE COURT:  -- or what Lighthouse is indicating was a hard reset.

MS. RICHARDSON:  Yes.

Okay.  Then Your Honor said he has to return to the deposition, after consulting with his lawyers, to tell us whether there were communications that existed on his phone.  Mr. Hammond went into the other room for 30 minutes with his counsel.  When he came back, he was asked if there were any

communications, and he said there are none.  I --

THE COURT:  Did anyone ask him during the deposition if he had deleted any contents?

MS. RICHARDSON:  Yes.  It was asked in his deposition whether or not he had deleted any information, and he had said that he had done a hard reset of his phone -- I'm just looking at his deposition here -- he had done a hard reset of his phone a couple of months ago.

THE COURT:  A couple of months ago.  Okay.  And --

MS. RICHARDSON:  Yes.  It says here, "Did you ever" -- it said -- if I can just read it real quick, it said, "QUESTION:  Did you ever receive a preservation notice related to this case?

"ANSWER:  Yes.

"QUESTION:  Okay.  And you had no text messages with Kat O'Brien between last fall and now?

"ANSWER:  There may have been, but I had to do a reset on my phone because it was overheating.  I had to do that a couple of months ago."

Then --

THE COURT:  Did anyone inquire of Lighthouse whether overheating is a symptom for which hard reset is the treatment?

MS. RICHARDSON:  We have not asked that question.

THE COURT:  Okay.

MS. RICHARDSON:  But it was after this line of

questioning, which then went on to say, "QUESTION:  Do you store any of your information in the cloud?

"ANSWER:  No.

"QUESTION:  So you didn't preserve any text messages?

"ANSWER:  On my personal phone, no.

"QUESTION:  And did you search to see if there was anything there?

"ANSWER:  No.

"QUESTION:  Do you have your phone with you?

"ANSWER:  I don't have it on me right now.

"QUESTION:  It's in the room?

"ANSWER:  Yes.

"QUESTION:  Would you be willing to break to look up Kat O'Brien's number and see if you have any text messages with her?"

And that is when -- there's some more questioning, and then they call the Court to ask for assistance.

THE COURT:  And then, just to confirm, the hard reset was on his personal phone; is that right?

MS. RICHARDSON:  That's right.

THE COURT:  Okay.  And was there a hard reset on a work phone?

MS. RICHARDSON:  We don't know.

THE COURT:  Okay.

MS. SKJELSET:  I can answer, Your Honor.

THE COURT: Speak, please. Go ahead.

MS. SKJELSET: His cellular device that would've had information relating to this case was handed in to the Department of Human Services on January 24th or 26th, late January, of 2020. And it's our understanding, from the counsel's representations, that all of the information on that device was erased.

THE COURT: By -- erased by the Department of Human Services or -- or erased by Mr. Hammond before turning it over to Department of Human Services?

MS. SKJELSET: By the Department of Human Services.

THE COURT: And was that before or after the preservation letter was sent?

MS. SKJELSET: It was, again, two weeks before the tort claim notice was sent. But, as we will show to you in a spoliation motion that is forthcoming, it was more than a year after both Ms. O'Brien and Mr. Hammond were on clear notice of the prospect of a lawsuit and had informed their supervisors of that.

THE COURT: Okay. And, again -- and that's relating to the work phone?

MS. SKJELSET: That is the work phone, Your Honor.

THE COURT: All right. So I don't want to get too far afield, but some of this context helps me at least recall perhaps things we've discussed and certainly understand a

little bit more about why you're asking for Mr. Hammond's deposition to be reopened.

So what scope of additional deposition questioning are you seeking?

MS. RICHARDSON:  So if I can, Your Honor, I need to just go on a little bit more about the timeline.

THE COURT:  Okay.

MS. RICHARDSON:  And because you asked a question there about preservation, on the errata sheet, one of the things that he did say, that he corrected, was that -- was in the deposition originally when asked, "QUESTION:  Did you take any -- did you take any initiative to preserve text messages regarding this case?" he answered no.  And now he says yes.  So then -- that was on August 2nd, was the deposition of Mr. Hammond.

THE COURT:  So I take it from the -- the change in the response in the errata sheet, you don't have information about what steps he's taken to preserve any messages?  You don't know what --

MS. RICHARDSON:  Right.

THE COURT:  -- you don't know what steps --

MS. RICHARDSON:  We have no idea.

THE COURT:  And that's one more reason why you would want to reopen the deposition?

MS. RICHARDSON:  Yes.

THE COURT:  All right.  What other information in the timeline -- I also want to be -- I need to be sensitive to the time that we have, so --

MS. RICHARDSON:  Yes.  I'm trying.

THE COURT:  And I appreciate it.  And I can -- it would appear to me that reopening the deposition is appropriate.  I can always be corrected and re-educated if defendants have a really darn good reason, other than you need to make a record of it, to consider what they have to say.  But it also appears to me that what is more important is probably defining the scope of what will be on -- on -- what Mr. Hammond will be on call for having to be deposed about.

MS. RICHARDSON:  Yes.  And I will try to continue quickly here, but it is important that I get to the next piece of this timeline.

THE COURT:  Okay.  All right.

MS. RICHARDSON:  Thank you.

So August 2nd, his deposition is taken.  We gave you some information on that, including about the text messages and preservation.  On August 6, four days later, that is the hearing that we had before Your Honor in Eugene in person.  And it was there that this Court granted our motion to compel a search of Chapman, O'Brien and Hammond's personal cell phones.

And in that hearing I expressly stated that I was concerned about deleting messages and that I wanted to make

sure that a third-party independent vendor was going to be able to tell us if there were any deletions and to collect all of the information.

It was on August 14th, which is now 30 days after the hard reset by Mr. Hammond, and I -- you know, a week after this hearing, that the Markowitz firm wrote to the Court. And, for the first time, we learned on August 14th that they had sent some of the phones to Lighthouse and that it had been collected, that the information had been downloaded from O'Brien and Ms. Chapman's phone, but that they were making other arrangements for Mr. Hammond's phone.

And what we want to know from Mr. Hammond, and also from Markowitz, is -- and from Lighthouse, is what happened with that phone. Now, at the last hearing --

THE COURT: Is that why there was a chain of custody issue that somebody raised?

MS. RICHARDSON: Yes. That was -- Mr. Rizzo had wanted to make sure that we understood what the chain of custody was, because there was a handling of that phone in some fashion. But, also, it was important to us that we have an independent third party that we talk to, so we can understand everything that happened with that phone.

THE COURT: All right.

MS. RICHARDSON: The Markowitz defense team did not want us to look at their e-mails. They fought about that at

the last hearing. And Your Honor said that we wouldn't be able to look at them, but that we would be able to talk to Lighthouse. When we asked Lighthouse yesterday, in front of the Markowitz attorney, "When did you" --

THE COURT: And which attorney from Markowitz was attending --

MS. RICHARDSON: Mr. Wilson.

THE COURT: Who? I didn't hear the name.

MS. RICHARDSON: Sorry. Mr. Wilson.

THE COURT: Okay. Who still doesn't show up on my screen.

MS. RICHARDSON: No.

THE COURT: Okay. Go ahead.

MS. RICHARDSON: Lighthouse was asked, "When did you receive the phone of Mr. Hammond?" Lighthouse was instructed by Mr. Wilson to not answer. And so what we have here is a serious --

THE COURT: What was the basis? Did he provide a basis for instructing Lighthouse not to answer the question?

MS. RICHARDSON: Ms. Korbel, Ms. Skjelset, did he provide a basis, other than the same work product that has been stated over and over?

MS. KORBEL: Your Honor, it's Ms. Korbel. I was on the call. I believe Mr. Wilson said it was inappropriate for me to ask Lighthouse for that information.

THE COURT:  It was inappropriate to ask when Lighthouse received Mr. Hammond's phone?

MS. KORBEL:  Correct.  I was not allowed to ask for the timeline.  And that I needed to get it from Markowitz attorneys, and that's how I would be provided the timeline.

MS. RICHARDSON:  I think that it is very important --

THE COURT:  Why is Mr. Wilson not here to attend to responding to this issue, Mr. Edelson?

MR. EDELSON:  Well, Your Honor, this isn't one of the issues we're supposed to be discussing today, so I'm a little bit confused.

THE COURT:  Well, it's about reopening the deposition of Mr. Hammond, and so --

MR. EDELSON:  I get that.

THE COURT:  Hold on.  I'm not done talking.  Please don't interrupt me.

Mr. Wilson has been involved in this case.  He's apparently been on motions in this case.  He's insinuated certain things about parties in this case.  I would appreciate, if he's involved in the case, that he actually appear, so he can be involved in presenting the arguments and the positions for the client as well.

If he doesn't want to appear on the phone, then I'm going to have all of you come down to Eugene every time we have a status conference.  And I will expect that every Markowitz

attorney who has touched this case also appear, so I can ask questions.

Ms. Richardson, I do want to move on.  I don't know what else is associated with this timeline that might be relevant for my consideration about whether to reopen the deposition of Mr. Hammond.  The issue might be more scope than it is whether I'm granting it or denying it.

So is there really anything else you need to tell me about why I should reopen?  Because I do want to give the defense an opportunity to explain their position.

MS. RICHARDSON:  So the reopening is really about the scope because --

THE COURT:  All right.  So then Mr. Edelson.

MR. EDELSON:  Thank you, Your Honor.  Let me first respond to your question.  Mr. Wilson had a prior commitment and is not ducking this.  You set this conference, and that's fine, but he could not be available today at this time.  So that's why he's not here.  We'll do everything we can to be sure he's at the next one.

But this issue, it really goes to the spoliation motion that plaintiffs have told us that they're filing.

THE COURT:  I want to hear now the objections you have to Mr. Hammond's deposition.  So if you have an objection to reopening the deposition, provide that.  And then if and when I make my decision about allowing or denying reopening,

we'll talk about whether scope is a necessary topic.

MR. EDELSON: Okay. It ties into scope, but I'll focus on the fact that everything on this timeline either -- first of all, we're talking about his personal cell phone. They moved to compel the -- the phone after the deposition. And all of these things that they've described, you know, such as him having done a hard reset, he described it in his deposition.

So it's not anything new, and they could've asked him more questions about it then. They've -- instead they've sought to get his cell phone records, which Your Honor has allowed, and that process is ongoing. So I -- if they need answers to chain of custody, we can certainly provide that. It doesn't need to be a deposition for that.

At the risk of stepping into scope, and you feel free to shut me down, but I really think what drove this request was his -- his change of testimony about his relationship with Ms. O'Brien, which really has nothing to do, ultimately, with this case and is really just a collateral issue.

And we don't think that it -- you know, they have taken -- each of the sides has taken 16 depositions already in this case. And three of them have been for a couple of days. So that's essentially 19 days of deposition that they've taken. They've gotten permission to take more time with Kat O'Brien.

But, you know, this is just over the top. And it

really -- there's really nothing that they've learned that suggests a need to learn more from Mr. Hammond that they couldn't have developed in his -- at his deposition.

THE COURT: So let me -- so I'm going to allow the reopening of the deposition. So I want to understand what the scope of the deposition should be. I want to make sure it's clear I'm not interested in reopening it for all subject areas, that it be very precise. And if I'm not satisfied that it's focused enough, I'll -- I'll limit is myself even further.

So -- and, well, actually, I probably don't need to worry about that because, Mr. Edelson, I'm sure you'll do a fine job in trying to keep the scope incredibly narrow. So let me hear from Ms. Richardson about what scope it is that you're asking this deposition to include.

Mr. Campbell, I think you probably had something you wanted to offer to weigh in on this part, too, but let me hear first from Ms. Richardson.

MS. RICHARDSON: Yes. So the scope does go to the relationship between Mr. Hammond and Ms. O'Brien. And I think I need to provide the Court with context about that relationship.

THE COURT: Okay. And, just to forewarn you, my initial reaction is it's a red herring. So you're going to have to really help me understand why a relationship between the two of them in some way has anything to do with the claims

here.  So go ahead.

MS. RICHARDSON:  Yes.  First of all, I think somebody must not have theirs on mute, because we can hear the computer, so I would request people put theirs on mute.

Okay.  This is not a red herring.  I'm just going to give brief background.  I'm going to go quick.  Ms. O'Brien was a caseworker for the children.  At the time when Ms. O'Brien was the caseworker, at some point DHS learned that one of the children, Z.C., was neglected.  Then they learned that the other child had been abused in the home sexually.

It was then determined, after that, that Ms. O'Brien was biased in her representation of the children.  And she was told she'd be -- would be removed as the caseworker.  And at that time someone at DHS made a decision.

THE COURT:  Who determined that she was biased?  Was that an internal finding?

MS. RICHARDSON:  Exactly what I was going to say next.  I think you're reading my mind.  Same question, "Who made that decision?"  Instructions were not to answer due to attorney-client privilege.  But a decision was made to remove O'Brien and to put Hammond in as the caseworker for the children.  Again, reasons, attorney-client privilege.

THE COURT:  Are Hammond and O'Brien coworkers, or is one a supervisor?

MS. RICHARDSON:  Previous -- previous, Mr. Hammond

had been a supervisor, but now they were coworkers. Mr. Hammond is a caseworker who is in charge of putting children under his care into adoption rather than reunification.

So at that time when the decision was made for Mr. Hammond to take the place of Ms. O'Brien, Ms. O'Brien and Mr. Hammond knew, because we know from their messages between each other on work Teams messages that a private investigator had been asking questions in the community about the disclosure of J.C., that the private investigator had met with the children's biological mother, that O'Brien had discussed with Hammond the belief that civil rights attorneys would be filing a lawsuit based upon the abuse in the home.

And so at this time, now, Mr. Hammond was preparing to take on the children as the adoption caseworker and to prepare the children for adoption. Now, after Ms. -- after the child had made the disclosure of sex abuse, which I'm going to give the Court the time period of October 2017, the following month, the Eugene Register reported that there had been sex abuse in the foster home.

That was the first time that the juvenile court, Judge McAlpin, first learned about the abuse of a child under his jurisdiction. And he had expressed extreme frustration with DHS, because nobody had told him about the sexual abuse before he read about it in the paper.

Judge McAlpin ordered that DHS prepare a sworn affidavit at that time to explain what DHS knew and what concerns were raised at the home and the timeline of everything they knew.

DHS assigned that job of creating the affidavit about what had happened in the home of Ms. -- when Ms. O'Brien was in charge, it was assigned to Mr. Hammond to prepare the affidavit.  Now, everything about that affidavit has been claimed to be privileged.  Some documents have been disclosed.  We'll get to that at a later argument.

THE COURT:  Was that affidavit ever submitted to Judge McAlpin?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  And you don't have it at this point?

MS. RICHARDSON:  We do.  We don't have the drafts.  We don't have the reasons leading up to it.  We don't have the communications.  We know that Mr. Hammond and Ms. O'Brien worked together on the affidavit, so Mr. Hammond could write about what Ms. O'Brien would say --

THE COURT:  And this was the affidavit that was the subject of an e-mail that I've previously addressed the -- the disclosure of under the work product waiver?

MS. RICHARDSON:  Yes.  I was just going to say that Your Honor had ordered that the e-mails be produced because

there were communications between Ms. O'Brien and Mr. Hammond. And what we need to do now is look at what were the motivations when he drafted that e-mail and his relationship with Ms. O'Brien, and what it was that he was putting into those -- sorry -- the affidavit -- what he was putting into that affidavit when he was making representations to the juvenile court about what had occurred and what the DHS people knew at that time, in particular Ms. O'Brien.

So it is very important that we understand what his own bias was in relation to his relationship with Ms. O'Brien. Now, we can ask questions about that; and, of course, to the extent that there is some things that, undoubtedly now, we are just now finding out, because it has been lied to by Mr. Hammond and by Ms. O'Brien about their relationship that they had, that some of it will be salacious.

And that will be subject to a motion in limine, no doubt, but discovery is made so that we can find out as much as possible. In the errata sheet he corrected himself in the deposition. He claimed that he had not had drinks with her, even though he had written about it in an e-mail. He corrected that. And about whether or not he had a romantic relationship, he originally testified under oath no. Now he says yes.

And whether or not there was anything physical, we wanted to understand the nature. We don't need to go into what they did with each other, but we have to understand what his

motivations were at the time when he was supposed to be protecting the children.

We do intend, Your Honor, now, based upon this newly discovered evidence, to add Mr. Hammond potentially as a party to this case. So for the scope, we do want to go into the relationship. We want to talk about, now, with that in mind, now that we have the truthful answers, what happened at the time when he was creating these -- this affidavit and he was finding out about all the things that happened in the home with Ms. O'Brien.

We also want to go into the information on his personal cell phone and what he did, what he knew, what he looked at in the text messages when he reset it, why, et cetera. He was also asked something about handwritten notes, that now he says he meant something about it being for staff. That was another thing on the errata sheet.

I want to understand the -- everything that happened with Lighthouse, his communications with Lighthouse and potentially with Markowitz, Your Honor, to the extent that he told Markowitz about deleting messages from his phone, because that is important to know, for purposes of what Your Honor needs to know about what happened and why that phone was not preserved within 30 days.

THE COURT: Well, I don't have to be a mind reader to tell what Mr. Edelson was about ready to shout out about, but I

think that's going to be a pretty big attorney-client privilege hurdle to overcome. But I suppose your remedy is the spoliation motion, but we can -- we can cross that bridge when we get a little bit closer to it.

MS. RICHARDSON: Well -- and, yeah, you know, I think there's going to be some questions that he was told not to answer that are improper. It was based on improper -- so, for example, "Who did you talk to?" That is not attorney-client privilege. We need to know when and who he talked to at the law firm. That is not privileged.

THE COURT: So, at least preliminarily, the scope that you are asking this Court to allow has at least hit a prima facie level of acceptability, but I need to hear from Mr. Campbell and Mr. Edelson about why the scope ought to be different. And then we can -- we can -- once I address the issue of scope, then I think we're going to have to take up all the other issues associated with what this deposition is going to look like with respect to attorney-client privilege issues that will be raised all over the place.

Mr. Campbell or Mr. Edelson, who wants to go first?

MR. CAMPBELL: I'm happy to go first.

THE COURT: Mr. Edelson, you were on mute, although I did see you speaking first, but I heard Mr. Campbell first.

MR. EDELSON: Mr. Campbell, if you don't mind me going first, I just have a couple of points to make.

So, as I mentioned earlier, the cell phone -- the cell phone questions could all be addressed at his first deposition.  And I don't think counsel has given us any explanation for why those things weren't followed up on at that time.  And we have provided, I understand, chain of custody information on that cell phone.  So they have that information.  So I --

THE COURT:  But I thought Mr. Wilson indicated -- had directed Lighthouse not to answer any questions.

MR. EDELSON:  That is not correct.  He did not direct Lighthouse not to answer.  I've been told that that is inaccurate.  I wasn't there, so that's just hearsay from me.  But --

THE COURT:  Okay.  Well -- all right.  Well, but apparently there is at least someone here -- someone on this call that was there who says as much.  So one of the -- one of the values of having the players in the room is evident.

So I'm going to roll it back a little bit and simply indicate that we'll need to clarify -- I mean, I'm inclined to allow -- we're going to have to revisit this issue of chain of custody because if Mr. Hammond's phone was being treated differently than the other two phones, it raises some questions.  And I think we need to put some of these issues to rest.

But -- all right.  So the phone and the questions

regarding the phone. What else, Mr. Edelson?

MR. EDELSON: Well, I want to address the questions about his personal life and his romantic life, which counsel correctly points out that Mr. Hammond changed significantly in his errata. And, you know, I really, in hindsight, kick myself for not objecting strenuously at the time and instructing the witness not to answer.

I mean, these are questions that -- that are designed to cause embarrassment. I think counsel has even said that they're going to generate salacious testimony. And they're all about a collateral event. You know, there's just no connection between what he put in the affidavit and some -- and this -- this conspiracy theory that's never made any sense to me.

It still doesn't make any sense to me. Mr. Hammond was brutally honest in his affidavit and reported to the judge really absolutely everything he could learn about what DHS knew. There's no -- there's never been an argument that he soft-pedaled it or that he somehow diluted it with false or misleading information in order to make DHS or Kat O'Brien look better.

That's just -- there's -- that step is completely missing. And so the fact that they were -- that there was some relationship at some point in time that was beyond being coworkers has nothing to do with anything that happened in this case. And really I -- given the limited amount of time we have

left in this case, to spend it on this just seems to me a bit -- a bit much.

So, Mr. Campbell, I want to let you tag team on me.

THE COURT:  All right.  Mr. Campbell.

MR. CAMPBELL:  Thank you, Your Honor.  I'm going to try and go fast.  The reason we're -- took up this issue first is because I have a 2:30 court appearance in Deschutes County in front of Judge Flint, so I'll try to go as fast as I can.

THE COURT:  Well, if you're in Salem, you're going to be late.

MR. CAMPBELL:  Well, it's by Zoom as well, so yeah.

THE COURT:  Well, then we have plenty of time.

MR. CAMPBELL:  Yeah.

THE COURT:  Go ahead.

MR. CAMPBELL:  But I appreciate the courtesy in jumping to the front of the line on the Court's docket today. I would echo what Mr. Edelson said.  Questions about the cell phone reset, as counsel explained, that was -- that information came out during the first deposition.

THE COURT:  Well, it came out with him having said that he did so two-and-a-half -- or two-some-odd -- a couple of months before, because of a phone getting overheated.  I mean, so that raises some interesting issues about motivation, given the timeline that Ms. Richardson had pointed out.  But, yes, go ahead.

MR. CAMPBELL: Yeah.

THE COURT: I'm not convinced that it has been thoroughly addressed and now resolved.

MR. CAMPBELL: My only point, Your Honor, was that was an issue that came up in the deposition. And in the course of any civil case, issues come up. In depositions new information comes up. That doesn't mean that somebody gets to go back and -- and re-notice the deposition and re-examine the witness.

You know, our position -- Mr. Hammond's position is he's raised four bullet points in errata. Candidly, he can understand why, having submitted an errata, counsel may want to re --

THE COURT: Yeah. I'll say that submitting an errata is part of Rule 30. I mean, you can do it, and that's appropriate and expected. The explanations that he provides in the errata don't square up with my reading of the deposition answers he earlier gave. He -- I mean, it troubles me that he tries to explain that he was confused about the context of earlier questions.

So unless -- unless the excerpts of the deposition that were provided to me, in the course of addressing this issue with Mr. Hammond's deposition, are -- are just simply incomplete, such that the context isn't evident to me with that excerpt -- I mean, the excerpt -- I mean, it's pretty clear

that he's -- he's fairly certain and absolute about what he's answering and what -- and when he's answering and how he's answering these questions in response to certain questions.

So his errata does raise, you know, credibility concerns, in and of itself, about -- about how he could've been confused about the questions that were posed to him at the deposition.

MR. CAMPBELL:  Your Honor, I can't deny that, as a new guy to this ongoing case.

THE COURT:  Right.  But I don't think you have to -- I'm about as much of a new guy, with respect to looking at this deposition, as you are.  And looking at the deposition, I'm thinking I don't know how you square the errata explanations with what I saw in the deposition.  But I don't want you -- you know, I don't want you whipping in the wind.  Let's just focus on this scope issue.

MR. CAMPBELL:  Sure.  No.  And I was going to say --

THE COURT:  So stop whipping, Mr. Campbell, and just tell me what it is that you want.

MR. CAMPBELL:  Yeah.  Well, I was going to say, Your Honor, that issue that you just identified is why many, many district courts in the Ninth Circuit hold that the appropriate remedy for a questionable errata is cross-examination at trial, rather than motions to strike or going back in front of the Court, because they're allowed.

People can submit errata. And so if there's an inconsistency in errata and a deposition, the proper remedy is to go to trial and cross-examine the witness. With that said, our position is that the second deposition should be limited to the topics in the errata, that those are fair game.

Since there are explanations provided, I think that counsel should be able to ask about those explanations if we're in a deposition. Given those limited four points, I think we should put a reasonable time limit on the deposition, because it's not a broad deposition to go into everything. The scope in time that I had suggested via e-mail to counsel was 90 minutes to go over those four points. And that's Mr. Hammond's position. Thank you.

THE COURT: Okay. Anything else, Ms. Richardson, on scope?

MS. RICHARDSON: No. I just want to make sure that it gets -- you know, that we can -- because he answered the way he did, we didn't get to go back into what he did or didn't know with respect to that time period involving him taking over potentially, 'cause he didn't actually take over, but he was supposed to take over for Ms. O'Brien in his drafting of that affidavit.

THE COURT: So, as I've already indicated, the deposition of Mr. Hammond -- reopening the deposition is allowed. The errata sheet does raise something more than just

simply the -- then the remedy of being cross-examination at trial. The answers -- the change in the answers are very diametrically opposed in relation to the issue about the romantic relationship.

And I've given a lot of thought about whether it is, in fact, a red herring. And, again, I came in thinking why are we even getting distracted by two adults consenting and involvement of a relationship. But I also appreciate that at least, you know -- there has been some certainly denial and diversion and issues around either of these two people's credibility that have been raised in the course of other -- other deposition testimony that gives me some concern about what that motive and bias is that Mr. Hammond may have and -- and in the absence of being able to fully explore whether this relationship, whether physically romantic or just simply involved, is -- has caused some issues with respect to his ability to adequately and satisfactorily document the case that is at issue here, both J.C.'s and Z.C.'s.

There's also significant issues about the -- let me also point out there has been evidence that raises the concern about the use of personal phones for business and communicating with coworkers with the use of personal phones that -- that implicate, you know, work-related subject areas.

So the personal phones are on the table because of these individuals' lack of regard for whatever DHS policies

there may be about not using personal phones.  So they've exposed that part of their privacy to this scrutiny, precisely because they failed to follow their own agency's rules.

Moreover, because of the concern about this hard reset and -- and what appears to be contradiction between his testimony at the -- Mr. Hammond's deposition testimony about a hard reset two-and-a-half months earlier, rather than two weeks earlier, raises some questions about -- about what may have been on that phone as well.

I don't think of that as an innocent oversight between units of temporal measurement.  Are we -- I know this is an ancillary issue to the deposition of Mr. Hammond, but this Lighthouse issue and the chain-of-custody questions may be on the table for us to address if we have time at the end of the -- towards the end of all the other issue that we have to take up.

I do think we still have 502 as a cloud that needs to be cleared and -- and a few other matters in this list of things that Ms. Skjelset provided on her September 12th letter.

Are there any other findings of fact or conclusions that either party -- either counsel needs me to make or any further explanations or clarifications that either of you require or request that I make, to ensure that my ruling is clear and I don't have to have anyone come back moving for clarification or reconsideration?

I'm giving you an opportunity now to help me understand how I can provide a satisfactory ruling, whether you like it or not, but whether -- whether there are findings that you think I'm supposed to make with respect to the reopening of the deposition and defining the scope of the deposition.

Ms. Richardson.

MS. RICHARDSON:  I think I understand what it is. And it is not our intent to go and reask questions that have already been asked, so we'll take a good deposition.  And I expect that Mr. Campbell, who will be there, I assume, will also be professional.  And we'll handle this hopefully without the Court's intervention.

THE COURT:  Well, I'm not holding my breath on that. Let me know when the deposition is scheduled.  You have a maximum of four hours to complete and on those particular topics that we've discussed, the cell phone and the contents of the errata.

And so I want to make sure that everyone understands what the scope is.  Is there anything that needs clarification regarding scope?

All right.  Then I'm not going to see a motion for reconsideration and I'm not going to see a motion for clarification, which I -- I like even less.  Okay?

MR. EDELSON:  Your Honor --

THE COURT:  Go ahead, Mr. Edelson.

MR. EDELSON:  Thank you.

You made a statement that I've just been trying to remember.  My best memory is that there was never any -- and I'm not trying to change your mind.  It's just because you made this statement, I don't want it to rest unresponded to.  I didn't think there was any evidence that Mr. Hammond used his personal phone for work.

And, you know, this may come up again in the spoliation motion, but you've made this comment.  You've asked if anyone wants to correct any factual findings.  I just want to address and be on the record as having said that I don't think there's any evidence.  And if counsel intends to argue that, I hope that -- that they will present evidence of it.

THE COURT:  All right.  I do recall -- you know, I'm going to stand corrected.  I -- this is what I now -- let me be more precise.  I recall some e-mail in which Ms. O'Brien communicated a phone number to Mr. Hammond.

MR. EDELSON:  Exactly.

THE COURT:  So, yes, I suppose he could've used his work phone to respond.  I have no idea.

MR. EDELSON:  No.  He testified -- he testified that he did not call her on her cell phone in response to that -- that e-mail.  That's -- that's how I recall the evidence.

THE COURT:  Well, all right.  I appreciate that.  I'm wrestling with the appropriate need and -- and obviously legal

structure that is set up for ensuring that certain privacy is maintained, and certainly attorney-client privilege is honored and adhered to, with what continues to be unusual circumstances that raise questions about Hammond and O'Brien's credibility when they say something.

And -- and I appreciate that you have to defend them -- or, actually, O'Brien -- Hammond isn't a defendant yet. And so I'm focusing on what these parties and witnesses are and are not doing, which raise some questions about -- about their credibility.

That probably speaks more to the spoliation issue, but I'm also giving the plaintiffs the opportunity to flesh this issue out because I really don't want this to be an unknown cloud hanging over -- over this case, although I suspect that it perhaps might continue to be, is -- but we'll see what the deposition reveals.

And I do appreciate you clarifying the fact on that point, Mr. Edelson. I do want to try to be precise where I can.

MR. EDELSON: Thank you.

THE COURT: All right.

MR. EDELSON: I also want to let Your Honor know that Harry Wilson is able to join us for a brief period here, before this event that he's heading to.

THE COURT: All right.

MR. EDELSON:  And I -- I know you asked questions that we didn't expect to come up about the Lighthouse conversation, but if -- if you want to -- Mr. Wilson was on that call, if you want to address questions --

THE COURT:  Before we take that matter up, I -- unless Mr. Campbell has anything else, I think he's got to zoom on to a Zoom call.

MR. CAMPBELL:  I do, Your Honor.  Thank you again for letting me skip to the head of the line with this.  I can see that this is a big, complicated issue.  So I appreciate the courtesy.  And I know that Judge Flint in Deschutes County --

THE COURT:  This is where you disconnect as quickly as possible, before I start asking you more questions.

MR. CAMPBELL:  I know.  Thank you.  Have a good afternoon.

MS. RICHARDSON:  So, to address the Lighthouse issue, now that Mr. Wilson --

THE COURT:  Oh, wait.  Wait.  Where did Mr. Wilson go?

Oh, you moved up to the top.

MS. RICHARDSON:  Yeah, I went to the bottom.

So may I suggest that there have been e-mailed communications with Lighthouse between the Markowitz firm about these particular cell phones -- O'Brien, Chapman and Hammond -- that those e-mails be produced, at least to Your Honor, so that

you can see what those are.  They claim work product on them.

I don't think that they are work product.  But I do think that it might be important for us to know about what was communicated, what they knew and when.  And so my suggestion would be that if Your Honor would be inclined to review those e-mails and determine which ones we would need, in order to be able to move forward with our motion, 'cause we'd like to get going on that soon, and we need to know some of these answers.

THE COURT:  But they may still very well be work product.  I mean, I can review them; and if they're work product, then I -- then it would have to fall under one of the exceptions to -- to nondisclosure, right?

MS. RICHARDSON:  Well, if it's work product, work product would be in anticipation of litigation.  And this is a third party that was ordered by Your Honor to do the searches of this phone.  We had an opportunity where we could say whether or not we wanted that third party, because we had concerns about the independence of that third party and whether or not they could do the job that they needed to do.  So --

THE COURT:  And I see the point.  But, in order for me to try to continue to preserve some of these -- these doctrines and privileges, I -- I don't want to continue to have to think about blowing these out of the water.  I mean, the remedy might be that they turn over the private -- these personal phones to your vendor and that then the independent

forensic analysis can be done by someone of your choosing.

I mean, so I don't have to force the -- the undermining of these doctrines and privileges. I mean -- I mean, the phones should have been and continue -- should be preserved such that they can be downloaded and analyzed by -- by your own vendor.

MS. RICHARDSON: Mm-hmm. That is something that can be done. But, as far as what has actually been done by Lighthouse, which is in California and not local, there are some things that are not going to be subject to privilege or work product, which are facts; and, that is, whether they received it, what they were instructed to do with it, and what their response was.

If there's something that's in there that has to do with, you know, their strategy, that isn't related to discovery, we don't want that information. So that's why I'm suggesting that it go to Your Honor, so that we can get this done as quick as possible, rather than having to wait a week to talk to Lighthouse, all of the other stuff, because the problem is that that phone is now -- we can't get at those personal messages.

THE COURT: All right. So one of the issues that came up was -- and, Mr. Wilson, thank you for attending today -- that -- that there was some discussion or a question that was put to somebody from Lighthouse by the plaintiffs'

counsel about when they received the phone, and it was -- it was characterized, described, before you got onto this call, that you instructed them not to answer. So I'm not inclined to receive lengthy argument. I just need to know what -- what was instructed -- if anything was instructed not to answer, what questions were instructed by you not to answer.

MR. WILSON: Thank you, Your Honor. And I apologize that I couldn't be here for longer. I am traveling in Minneapolis today for an event.

Your Honor, I instructed no one not to answer anything. I'm very troubled that that has been a representation about what I've said. I did not instruct Lighthouse not to answer that question or any other question. In fact, Ms. Korbel and others on the call asked a number of questions, including what parameters Lighthouse received from --

THE COURT: Well, let me ask you this. Rather than saying what was answered, did -- I just want to clarify, did you -- I think you said you did not instruct anyone from Lighthouse not to answer a question.

MR. WILSON: Absolutely not. And, for clarity, Your Honor, I do want to be -- I want to be clear. I asked Ms. Korbel -- I interjected and asked Ms. Korbel to understand what her questions were with respect to the time frame. I did do that. We had a conversation about it.

Ms. Korbel explained that she needed to know the dates when Lighthouse received the phone, so she could have the last possible -- she knew when the last possible message could've been -- you know, when -- when Lighthouse did the collection, what the last possible date is.

That makes perfect sense.  And after receiving that clarification, I had no objection.  If Ms. Korbel or anyone else chose not to follow up, that's their own choice.  But I did not instruct Lighthouse not to answer a question.  And, in fact, when Lighthouse produces these reports, Your Honor, it'll be quite apparent when the last date was and when it was collected.

That's -- that's not information we have any reason or want or desire to withhold.  And, as Your Honor knows, we've already written to the Court earlier in August to -- to let the Court know what dates the phones had been collected, what dates we were going to do an additional file system review.  This is not information we are withholding.  We have no interest in withholding this information or any other information about Lighthouse.

THE COURT:  Was there -- is there any reason why Mr. Hammond's -- when questions about how Mr. Hammond's phone may have been treated differently, that that -- that an answer to that inquiry would not be appropriate?

MR. WILSON:  I can't think of any reason why it

wouldn't be appropriate, and we didn't stop any questions with respect to Mr. Hammond's phone.  I mean, absolutely not.  I -- Lighthouse was there and answered questions for over 45 minutes.

THE COURT:  All right.  Ms. Korbel, you were -- you were present at the call.  And --

MS. KORBEL:  I was.

THE COURT:  All right.  And were you the one asking questions?

MS. KORBEL:  I was, Your Honor.  I asked the gentleman, Mr. Bair from Lighthouse, if he could please send me a timeline of when they received the phones, which phone they received on which date.  And Mr. Wilson told Mr. Bair that that was not something he could send me, so -- he also said that that was something that his office would send me.  Ms. Skjelset was also on the call, Your Honor.  I think I'm being as accurate as possible.

THE COURT:  I take it this -- this phone call was not recorded?  Was it a phone call or Zoom?

MS. KORBEL:  It was a Zoom, Your Honor.

THE COURT:  All right.  And it wasn't recorded?

MS. KORBEL:  I don't believe so.

THE COURT:  Okay.

MS. SKJELSET:  Your Honor, if I may?

THE COURT:  Ms. Skjelset, go ahead.

MS. SKJELSET:  Sorry.  I don't mean to interrupt.  I think the truth might be somewhere in the middle.  Everybody has their own perspective about what happens on a conferral, and this is why I always try to write down everything that I understand from the conferral and then follow up with opposing counsel on that.

Ms. Conley was --

THE COURT:  Let me roll this back.  I'm not here to put either of the attorneys on trial about saying -- about what happened.  I'm kind of -- I'm really just, frankly, interested at this point in trying to get the answers, so we don't have to revisit this issue again.

So how do we just get the darn answers done?  And maybe it is an informal recording to make sure that everybody's clear on what it is that -- that was asked and what it was that was answered and -- and it sounds to me like Mr. Wilson has said right here that none of the concerns that the plaintiffs have appropriately raised, if those questions had been prevented from being answered, are -- are issues for him.  So --

MR. WILSON:  Absolutely not, Your Honor.  We would be fine to, and we were fine to, provide answers to all those questions.  You know, I must say I'm a little baffled by what answers Ms. Richardson needs, but we would be happy to provide them.

THE COURT:  I want to make it also very clear it's about Lighthouse providing the answers, not you.

MR. WILSON:  Absolutely.  Absolutely, Your Honor. And I'm sorry.  I shouldn't have spoken in the grand plural "we."  Lighthouse can provide those answers.  And, Your Honor, if you would like Lighthouse to send, you know, a timeline, we'd be happy to facilitate that as well.  We'd be happy to do a recorded call.  All of this is -- is perfectly fine.

THE COURT:  What other involvement do you need me in this issue?

Let me ask Ms. Korbel:  Is there anything else that we need to clarify about this before you go back and have another Zoom call recorded?

MS. KORBEL:  Your Honor, if we could just be clear that I would like Lighthouse to just provide me a simple timeline of each device and when it was received and how it was extracted.  And I'd like it sooner than later.  I don't want to wait until I see the report.  I'd like it --

THE COURT:  And when you say "how it was extracted," I mean, it's not like we're juicing a lemon.  So, I mean, I -- I think it gets more complicated than that.  So I just want to make sure that -- I'm trying to --

MS. KORBEL:  Sure.

THE COURT:  -- prevent this from coming back to haunt all of us.

MS. KORBEL:  Of course, Your Honor.  I think I just mean there were two phones that they did a -- what they called a remote collection and one that they couldn't.  And the one that they couldn't was Mr. Hammond's.  So I just want to understand -- "We attempted to do remote collection on Day A.  It didn't work.  Then on Day B, and it didn't work."  I just want the simple timeline.

THE COURT:  All right.  Mr. Wilson, is there any issue with that?

MR. WILSON:  There's no issue at all, Your Honor.  We'd be glad to provide that -- or we would be glad to ask Lighthouse to provide that.

THE COURT:  Royal "we" is only available to Article IIIs.

MR. WILSON:  Fair enough, yeah.

THE COURT:  I don't -- I don't use that.

All right.  Let's -- so what -- is it a call, or is it -- are you just asking for a letter now from Lighthouse, Ms. Korbel?

MS. KORBEL:  Your Honor, I'll send an e-mail to Lighthouse and ask for the timeline.  And I expect they'll send it to me.  I don't think they had any issue giving me that information.

THE COURT:  All right.  And then you'll CC defense counsel?

MS. KORBEL:  Yes, Your Honor.

THE COURT:  All right.

MR. WILSON:  Your Honor, if it's okay with you, I do need to return to my event.  May I be dismissed from this hearing?

THE COURT:  Yes, you may.  Thank you very much, Mr. Wilson.

MR. WILSON:  Thank you, sir.

THE COURT:  Okay.  Is Ms. Tshala -- are you going to be arguing 502, Ms. Richardson?

MS. RICHARDSON:  Yes.

THE COURT:  So I'm going to jump around on this list.  I just feel the need to cross off at least something of volume, so it feels like we're moving along.

Attorney Patricia Gonzalez, is everyone resolved on that and what's happening?  It looked like the State has withdrawn their objection to the deposition of Ms. Gonzalez, correct?

MR. EDELSON:  Your Honor, we continue to think that it's an unnecessary deposition, but we're not going to make that argument at this time.  But we would like to -- the Court to limit the amount of time that is needed for this deposition.  Most of the communications that Ms. Gonzalez is an author, or on and part of, are privileged communications.

And so there's going to be -- you know, if you take

out the privileged communications, there really isn't that much out there. We've already -- initially we told -- we had an agreement we won't call her as a witness and they won't call her for a deposition, but they've changed their mind on that. And we're -- we're saying that's fine, but we just do want to limit it.

And we don't presently intend to call her as a -- as a trial witness and -- and, again, I think that her -- she really doesn't have much to offer that's going to be relevant and not already available through other fact witnesses who aren't lawyers, so -- and can testify without regard to privilege problems. So that's where we are. So we just -- mostly just want to limit it. And plaintiffs' counsel said --

THE COURT: How much time are you asking it be limited to?

MR. EDELSON: I think three hours is plenty of time. That's about what it took to take Ms. Smith's deposition. And, you know, that -- that -- and there were plenty -- I mean, there were plenty of objections on privilege throughout that. In fact, about half of it was objections. So I think three hours is -- would be plenty.

THE COURT: All right. Plaintiffs' counsel.

MS. SKJELSET: Well, Your Honor, they had offered four hours yesterday, so it's interesting that they're limiting it to three today. At conferral I brought to their attention

that Ms. Gonzalez is on hundreds of e-mail communications.  She attended many hearings and stated the position of DHS to the court multiple times during a period that we are now alleging that they were hiding information from the court.

So we think that there are many communications that have been waived.  There are many communications that are not privileged, on which we can inquire with her.  And it's premature to subject her deposition --

THE COURT:  So I think I'm just interested in -- I mean, the parties have agreed the deposition can be taken.  And now you're asking for four.  Defense is asking for three.  Four is a reasonable period of time to complete the deposition.  But now you're asking me to rule, sort of prospectively perhaps, on what the scope of that deposition should be.

MS. SKJELSET:  Not at all, Your Honor.  We think it's premature to limit the time frame of the deposition, given that there are two plaintiffs in this case and the extent of communications that she's been on.  I did let the --

THE COURT:  They had offered four yesterday, but it wasn't that you had agreed to four?

MS. SKJELSET:  No.  No.  Now they're -- now they're asking for three.  They said four yesterday.  They're asking for three.  I guaranteed to them that I would make it as efficient as possible and -- and there are two plaintiffs in this case.  We will share a day, and we will do everything we

can to keep it -- keep it tight.

THE COURT:  The deposition will -- since the parties have not objected to the deposition itself, then it will fall under the rules for time that -- that already are in play.  I don't -- there isn't a need for me at this point to limit it in time.  If there are issues with respect to scope, then before you get it scheduled, maybe there is an opportunity for us to clarify some things, although I probably shouldn't have said that, because now I've invited a flurry of letters.  So I withdraw my offer to address scope at this point.

All right.  We can actually cross an item off in 20 minutes.  Imagine that.  Now, I do want to get to the -- to defendants' proposed discovery plan in a moment, but there's also these additional issues since last hearing, number four. And we touched on some of this with respect to -- actually, we touched on 4(b) already.

So Plaintiff Conley's motion to strike Defendant Chapman's errata sheet sent on September 9th.  So the rule requires that the request to make or submit an errata sheet has to be done before the deposition is completed.  And, you know, that's, first and foremost, the argument that's made.  The rule seems clear.  Tell me why I shouldn't follow the rule.

MR. EDELSON:  Your Honor, Jeff Edelson for defendants.  I was the one who -- who defended that.  And, you know, I have had a regular practice of requesting read and sign

in this case.  It's possible that I neglected to do it, for reasons I can't explain.

I -- I don't see it in the transcript, but it's -- as I said, it's been my consistent practice.  And it was, at most, something I just overlooked.  I don't think anyone really has any doubt that we want to read and sign on all of the depositions that we're defending, and it's about as close to a standing request as you can have.

But I couldn't find any documentation for that, to be transparent.  So the -- this particular errata merely took a correction that she made during the deposition and -- and applied it to an earlier erroneous testimony.  And so, in some ways, this is -- it's not even necessary, because she did give accurate testimony later in the deposition.

THE COURT:  Wait.  It appeared that you had asked some follow-up questions to clarify what her earlier testimony was.

MR. EDELSON:  Exactly.  And she clarified it during that time.  And then, just to make sure she had suspenders with her belt, she also made the change in the errata, so that there wasn't some stand-alone soundbite that was inaccurate.  So it's really that simple.

THE COURT:  All right.  I am doing my utmost to try to provide flexibility where I can, but I also recognize that flexibility can also add -- allow things to continue to run out

of control.  And I think this case needs as much structure as possible.

I have to return to the rules.  And I want to make sure it's clear that if I end up bending a rule for one party over another, I -- I encourage you to call me out on it.  I'm trying to apply the rules like I apply the rules with respect to page limits as well.

The rule requires that -- that notice prior to the completion of the deposition.  The errata will not be filed or included in the transcript.  And to the extent -- if there is any error in my exercise of applying the rule or if there were any discretion in my decision, as, Mr. Edelson, you've pointed out, and as I reviewed in the transcript -- transcript excerpt, the deposition excerpt, that you had an opportunity to actually clarify those -- those matters during the course of the deposition.

Plaintiffs' request to enlarge the time granted to depose Ms. O'Brien.  Who wants to talk about that from plaintiffs?

Hearing no one, I can take it off the table.  Good. I'm --

MS. RICHARDSON:  I can -- I can do that.

THE COURT:  Okay.  So -- all right.

MS. RICHARDSON:  I mean, it goes directly to what I was saying before.

THE COURT: And why is it that you need more time to talk to her?

MS. RICHARDSON: Well, so -- so now we know from Mr. Hammond what -- the true nature of what Ms. O'Brien said. So we are just wanting to make sure that we go into the same subject area that we now understand between Mr. Hammond and Ms. O'Brien. And, in particular --

THE COURT: And is that with respect to -- is that with respect to the romantic relationship?

MS. RICHARDSON: Yeah, or any of the -- any of her relationships with anybody that she worked with. They refused to answer those questions at the time. It was said that it was personal. She made a statement, which is a misrepresentation, we contend, that she did not do anything on her personal phone; and yet she invited people to talk with her on that. So there are some personal questions that we do need to ask of her. I will limit it.

THE COURT: And, at least for the defendants' part here, I -- I -- is there a chance that she's going to deny -- to deny that she had a romantic relationship with Mr. O'Brien [sic]? I'm sorry --

MR. EDELSON: Are you addressing that to me, Your Honor?

THE COURT: Right. Mr. Edelson. I mean --

MR. EDELSON: Yeah. You know, I don't know the

answer to that.  But I do know that Your Honor has already ruled on this issue.

THE COURT:  Well, I've ruled on it, but I'm also interested in trying to keep this somewhat narrow, I mean, in terms of what I'm going to allow for questioning here.  I mean, it was appropriate for Hammond's deposition to be reopened because of the potential for his bias and motivation to -- to maybe draft reports or say something, whatever it might be, potentially to -- to cover for O'Brien or not.  I don't know.

But -- but that same bias or motivation doesn't necessarily work in both directions.  I mean, I don't know why O'Brien's -- asking her questions about a relationship with Hammond seems less relevant to me.  That's what I'm trying to --

MR. EDELSON:  Well, I agree a --

THE COURT:  I suppose, though, that if she denies that she had a romantic relationship with Hammond, I think that means she gets to be deposed.

MR. EDELSON:  So my earlier comment about your earlier ruling was -- I was talking about at the August 6th hearing.  They asked you the same thing.  They wanted to get -- they got more time with Ms. O'Brien; but you very specifically said that personal questions about her marital status, about kids and the like, is off the table.  That was -- those were your words.

THE COURT:  I know.  But there has been a change of understanding about some of these things, and that's why we're revisiting it.  I mean, I wouldn't revisit it, but for the fact that Mr. Hammond has had to clarify his testimony.

And I'm still -- I'm raising the question, but I'm not convinced that it's relevant to ask her about any of her personal relationships with -- with -- with Hammond, because I don't think she's -- she's being -- she's the focus of bias or motive as it relates to this relationship.

MR. EDELSON:  Yeah.  So, number one, they could have and didn't ask the question at her deposition that they had two days with her already.  And so I agree with Your Honor.  I don't -- it isn't relevant.  And I don't see how it could be -- lead to anything admissible, ultimately, so --

THE COURT:  Again, I want to -- I want to make sure it's really clear.  If she's going to deny that she had a romantic relationship, where Mr. Hammond has -- has acknowledged it, then I think there's a problem for her.  And I think that -- that definitely opens up the door for a -- for additional time.  So that's one issue.

But how much time were you asking, Ms. Richardson? How much more time were you asking for?

MS. RICHARDSON:  Not much more time.  I just wanted to, now, in light of the new things that have happened -- you see, I think what the problem here is, is that if we had been

allowed, because I was not allowed to ask any questions about her personal life, including with Mr. Hammond -- we were shut down on that -- it would've been able to have us bring this up sooner.

So -- and it goes to what her personal cell phone is. So it's very few questions; but we just want to find out what it is, from her standpoint, to the extent that it has anything that's different than what Mr. Hammond says.  And I don't know when the order of the depositions will take place.  But it's just that I don't want to be foreclosed now from asking any personal questions, which we normally do with witnesses.  We just get a general background.  It's not --

THE COURT:  So I'm fine with asking general background questions that are of the -- of the same variety that one would otherwise ask other witnesses to simply establish some baseline.  With respect to the relationship, if she denies the relationship, then that becomes an issue, because somebody's lying.

MS. RICHARDSON:  So I need to be able to ask the question, just to make sure, "Did you have a" --

THE COURT:  You know, I think the issue about whether -- the use of her personal cell phone for communications becomes also relevant, regardless of whether she admits to that relationship with Mr. Hammond.  Time frames of the relationship with Mr. Hammond are relevant.  What they did

in any greater detail, I'm not interested in that.  And I don't --

MS. RICHARDSON:  I'm not either.

THE COURT:  Anything of any salacious nature -- I think that's the word that --

MS. RICHARDSON:  No.

THE COURT:  That's the word of this status conference.  I think last week it was "abdication."  This week it's "salacious."  We're going to have a really strong vocabulary by the time this trial is completed.  But I'm not interested in anything salacious.  So let's not --

MS. RICHARDSON:  I'm not either.

THE COURT:  Good, because it'll be easy then for me to shut that part down.

All right.  Mr. Edelson.

MR. EDELSON:  So I just -- I want to take some issue with some things that were said.  He was not -- she was not shut down from getting any testimony about Mr. Hammond.  She got no instructions from me, and she made --

THE COURT:  Mr. Edelson, I don't know if that really helps me help you.  I mean, if there's something that you're asking me to limit from what I've said, let's focus on that. I -- I --

MR. EDELSON:  I appreciate that.

THE COURT:  I'll tell you, a lot of this -- I'm a

duck, and some of this kind of rolls off my back. I'm not letting it get to me. And I've already drawn my conclusions about you, Mr. Edelson. Nothing can change that. And I have a lot of respect for your willingness to stand in the fire while I -- I keep coming to you to -- to answer these questions. And so keep -- just focus on what it is you want me to do. I mean --

MR. EDELSON: Well --

THE COURT: -- I don't need the record corrected about what -- you know, what other people are saying right now.

MR. EDELSON: Those sorts of things, in my experience, have a way of just permeating and turning into truth. And I just feel like I need to shut it down. I apologize. I don't want to derail Your Honor's ruling. I think I understand your ruling.

My suggestion is I can get a statement from my client on that question and -- you know, and I think the question is does she admit or deny having a romantic relationship with Stephen Hammond, a question that was never asked at her deposition. I will -- if Your Honor would like, I'll get an answer to that question, and then I can direct the deposition the way you have described.

They have -- you've already given them two hours to take -- on top of the two days they've already had, plus 30 minutes for -- for the Levi plaintiffs. So I don't think we

need to change any of that, frankly.  And I'll -- I'll -- I'm happy to get an answer to that question, to move things along.

THE COURT:  Ms. Richardson, you disagree?

MS. RICHARDSON:  I do.  We need it under oath.  It will only take a few questions, exactly as Your Honor has already laid it out.  I don't anticipate it to be much --

THE COURT:  And I think that both of you are in general agreement with respect -- I think just the -- getting confirmation from your client is -- Mr. Edelson is going to get confirmation from Ms. O'Brien, did she or did she not have a romantic relationship with Mr. Hammond.  If it's a no -- well, I guess, either way, I mean, at least it curtails a question.  But you say you want it under oath.

MS. RICHARDSON:  I want it under oath.  And then it's not only just romantic.  It's also what was the nature of her personal friendship with him and how did they communicate and when -- what time period was it, in relation, especially, to this time period where he's taking over.

THE COURT:  You do get to ask questions about the time frame.

MS. RICHARDSON:  Yes.

THE COURT:  Yeah.  That's -- that's allowed, because -- because timing here is apparently relevant enough, given what people did and what people knew and how things may have been affected by this relationship, particularly as it

relates to Mr. Hammond.

So, Mr. Edelson, you're perfectly entitled and welcome to get the answer; but I agree it needs to be under oath, so there's no question about something unusual happening at trial, if this case goes to trial, about somebody having a different opinion or assessment about what a romantic relationship means.

MS. RICHARDSON:  Yes.

THE COURT:  I really don't want this case to get any weirder than it's becoming, so let's just try to -- let's just kind of keep it in some guardrails.

All right.  All right.  So are you asking for 30 more minutes?  'Cause I don't think you need to do an hour more.

MS. RICHARDSON:  No.  I can do 30.

THE COURT:  All right.  So --

MS. SKJELSET:  Your Honor --

THE COURT:  -- it's two hours now; it's two-and-a-half hours total?

MS. SKJELSET:  Plaintiff Levi would like additional time.  I would like to be able to coordinate the time with Plaintiff Conley.

THE COURT:  Is it the same questions you're going to -- subject areas you're going to be exploring with Ms. O'Brien?

MS. SKJELSET:  Well, we have only 30 minutes to

address what was remaining in our underlying deposition. But, yes, I would like to coordinate. I think -- I think it would be an hour between the two of us.

THE COURT: In terms of the additional time beyond the two hours that the -- that her deposition had already been extended for? So you're asking for three hours total? I'm a little confused about -- her -- her deposition was already allowed to be reopened; and I think, if I understood, it was for two hours.

MS. SKJELSET: For the Conley matter, Your Honor.

THE COURT: For Conley. Okay.

MS. SKJELSET: We have only 30 minutes remaining, and this is a new revelation for Plaintiff Levi. We would just -- I mean, we can likely get to it with an additional 30 minutes of our time.

THE COURT: And you're taking her deposition in one sitting, Conley and Levi?

MS. SKJELSET: Of course.

THE COURT: All right. Three hours total?

MS. RICHARDSON: Yeah.

THE COURT: You can coordinate and be as efficient as you can.

Let's see here. Conferral regarding magistrate judge jurisdiction. It sounded to me that the parties had conferred and have an agreed-upon answer?

MR. EDELSON:  There's not an agreed-upon answer.

THE COURT:  All right.  Mr. Edelson, I think defendants' brief was -- is due next week, correct?

MR. EDELSON:  Our brief is due today, and it will be filed today.

THE COURT:  Okay.  And then was it --

MR. EDELSON:  And I think their response is due next week.

THE COURT:  Okay.  All right.  What do you want to -- what do you want to update me about?

MR. EDELSON:  Nothing.

THE COURT:  Okay.  All right.  For some reason, I had a distinct impression that there was something agreed to or understood, but it's just that your brief is due today and the -- and then plaintiffs' is due next week.  Great.  I'm glad we could reaffirm the due dates.

MR. RIZZO:  I have something to say.  This is Mr. Rizzo.

THE COURT:  Say again?  Somebody spoke.

MR. RIZZO:  Yeah.  This is Steve Rizzo, Judge.  Can you hear me?

THE COURT:  It's a little tinny and distant.

MR. RIZZO:  All right.  I'll crank up the volume. They're cutting a tree and drilling a hole in the street below my office, so I'll go on and off mute here to try to make this

comprehensible.

I just wanted to let the Court know that we did confer regarding the consent. And I think we were in general agreement that there's no direct Ninth Circuit precedent on point; and that, to address the concerns raised by the defendants, I suggested that we agree on a motion or an order to sever the third-party state law battery claim seeking declaratory judgment against Joe Raygosa.

And my understanding is the defendants would not agree to that. So I just want to put on the Court's radar, that we're likely -- once I see their brief, we are likely, on behalf of the plaintiffs, to file a motion to sever that claim to address the consent concern.

THE COURT: Okay. All right. And thank you for the heads-up. I will await the briefs. Will your brief address that issue as well and include a motion to sever?

MR. RIZZO: Once I see their -- their -- whatever they're planning to file today, my answer is I probably will include, if I have that permission from the Court.

THE COURT: Well -- so, Mr. Edelson, I take it you're aware of what Mr. Rizzo is -- is talking about. I mean, I -- your initial thoughts? I mean, I want to keep this briefing -- if he's going to move to sever, if that's sort of the way in which the plaintiffs are going to try to resolve whatever the concern is that you've raised about magistrate judge

jurisdiction here, when it appears that the defendants had previously consented, talk to me.

MR. EDELSON:  Well, I wasn't prepared to argue the motion, and I think that's kind of where we're heading.  And so I -- with your permission, I'm not going to go into any detail on it.  We will respond to the motion to sever if they choose to file it.  I think it's premature for me to lay out the various arguments on that that we might have, but I think we'd have to see it and confer on it.

So, you know, if counsel wants to -- after reading our motion, wants to file a motion to sever, they should -- they should call us.  And we can confer, and we'll do our due diligence on it.  But I'm not prepared to respond at this moment.

THE COURT:  Everyone's on notice that there will be an accelerated briefing schedule if a motion to sever is going to be filed.  I am still committed to getting this case to trial in February if, in fact, I have jurisdiction to do so.  So I --

MR. EDELSON:  Yeah, it's a big issue.  It's a big issue.  And at this point it's a big "if," so --

THE COURT:  What's a big issue?

MR. EDELSON:  We're anxious to get that issue before you.

THE COURT:  What's the big issue?  Jurisdiction or --

MR. EDELSON:  Whether or not you have jurisdiction to try the case.

THE COURT:  I agree.  So let's keep rolling.

MR. EDELSON:  We'll do it at whatever speed you establish.

THE COURT:  All right.  The proposed discovery plan.

MR. NASO:  Good afternoon, Your Honor.

THE COURT:  Who's speaking?

MR. NASO:  Your Honor, this is Chad Naso.  I'll be -- I can discuss the proposed discovery plan.

THE COURT:  Let me make sure I have it in front of me.

All right.  September 12th letter from Markowitz Herbold.  All right.  Go ahead.  And what have the parties agreed to?

MR. NASO:  Well, yes, Your Honor.  So we have conferred on this discovery plan.  And I'll back up here.  This discovery plan is our effort to meet Your Honor's goal of completing necessary discovery on plaintiffs -- the Levi Plaintiffs' new allegations in the amended complaint efficiently and before the October 9th discovery deadline that's in place.

THE COURT:  November.

MR. NASO:  November 9th.  We have -- we have conferred on this.  My understanding is that the -- the Levi

Plaintiffs take issue with serving written discovery, which is set forth in the plan, and -- but, otherwise, my understanding is they have not objected to the particular depositions that we identified, which I would point out --

THE COURT:  I'm sorry.  You provided a table.  I -- I just need -- I'm going to work on this visual, so we need to cut things out and get moving along.

MR. NASO:  Yeah.  I --

THE COURT:  I'm going to ask you some questions -- Mr. Naso, hold on.  I'm going to ask you some questions.  And just if you give me yeses or noes, it'll be a lot easier for me to follow what you have to say.

The Levi response to state defendants' new written discovery -- actually, you mentioned something about the depositions.  There's John Kolego, Judge Morgan, Stephen Shepard, reopening Rachel Colby, Ethan Levi, Erik Sorenson, April Clark and Dale Gilad.  You want to take those depositions?

MR. NASO:  Those are depositions we've identified and depositions we potentially would like to take.  We do not have client approval on those.  So, in the interest of being able to meet Your Honor's timeline, the plan is to confer with plaintiffs.  And we've attempted to be -- err on the side to be overly broad, so it may be that we do not end up taking all of those.  We tried to identify the people we would be potentially

interested in taking.  And my understanding is that --

THE COURT:  Hold on a minute, Mr. Naso.

Who's speaking for the plaintiff on this?

MR. RIZZO:  This is Steve Rizzo, Your Honor.

THE COURT:  So is there an objection to taking these depositions -- reopening the discovery for these depositions?  First, I just need to know whether it's a yes or no.

MR. RIZZO:  It's a yes and no, Judge.  So if I can just walk the Court through, as succinctly as I can.  I was concerned about the --

THE COURT:  I don't want substance.  Tell me what it is you agree to first.  I'm going to circle their names, 'cause I don't really want to -- I need to be able to start carving things off my bandwidth, so we can focus on the things for which there are disputes.  Some of these people may end up not being deposed, and that's fine.  But who do you not object to?

MR. RIZZO:  I think that -- I don't object -- let me say it this way.  We object to Levi being deposed.  And I think that was my only objection, only because he has been deposed.  He is not a percipient witness.  And we've -- we've -- yeah, so if they need to take these others, I don't object.

I just want the scope to be limited to the allegations, based on the documents that have been produced and the discovery to date, insofar as the Spicer-McCool home is concerned.  If they feel they need to depose all of these

folks, including Spicer and McCool themselves, we don't object, so long as the scope is limited to the new allegations.

THE COURT:  And that would've been my understanding.

Mr. Naso, any other reason why the scope would be broader than that which had been alleged in the amended complaint?

MR. NASO:  There's no reason, Your Honor.  But, I mean, we can address that we have no interest in deposing these witnesses on anything beyond the scope of those new allegations.  We are concerned, though, with the idea of issuing an order limiting it to -- limiting the scope on that ground.  We are concerned that that would potentially just raise more disputes to put on Your Honor's --

THE COURT:  I disagree.  How does it raise more disputes if I'm limiting the scope of discovery here?

MR. NASO:  To the extent that a -- if we're deposing a third-party witness that -- that essentially places the ability -- the responsibility for, you know, enforcing or interpreting that order on the opposing counsel during the deposition.

Like I said, I think -- we have no interest in asking questions beyond that, but we don't think that there should be an order limiting --

THE COURT:  I thought I was pretty clear during last week's hearing, when I granted the motion to amend, that

discovery would be allowed, limited to the scope of that which was newly alleged. So I really don't think that Mr. Rizzo is asking me to do anything differently than that which I've already directed.

MR. NASO: And we don't disagree. We will comply with that. What we don't want is a -- is any -- is a limitation that is going to be -- result in any instructions not to answer during the course of a deposition. We believe that depositions should take place pursuant to the rule and --

THE COURT: And what about Levi? They're objecting to Levi being taken again. What's your position on that?

MR. NASO: Well, the position is that Levi is a potentially important witness. We have not made a decision as to whether or not we want to reopen it. We have deposed Mr. Levi and were not able to --

THE COURT: Is there something about the new allegations in the -- in the amended complaint that suggest that Mr. Levi has something else to say about those new allegations?

MR. NASO: The only allegations are that -- I don't believe he was -- we specifically questioned him about these new allegations during the last time we deposed him.

THE COURT: All right.

MR. NASO: So those issues were not explored.

THE COURT: Mr. Rizzo.

MR. RIZZO:  Judge, if I may, I think we've -- I think all the parties have established an essential premise, which is deposing the lawyers in this case has been fraught; and deposing Mr. Levi, for example, to ask him about the allegations would be pointless, respectfully, because he is not a percipient witness.

He is a client representative.  So that information was communicated through my office.  And we have -- these allegations are based on the discovery and the documents that have been taking place to date.  We have -- and I can represent to the Court -- no new documents to produce in the event they come forward again with this fifth or sixth request for production.

That last production that they served is about as comprehensive as any I've seen, and we've given them what we have.  So my feeling is if they -- and I tried to stress this.  If they want to take these third parties, I'm not in a position to instruct a third party not to answer a question.

I just continue to believe that the Court ruled the scope should be appropriately limited.  And if they want to take these depositions, as they claim, in good faith, then they should be able to do that with that limitation.

THE COURT:  All right.  And why is Judge Morgan on this list, Mr. Naso?

MR. NASO:  Judge Morgan was the -- from my

understanding, Judge Morgan was the prosecutor who prosecuted Mr. Raygosa's criminal trial. And there's an allegation in the new amended complaint that Ms. O'Brien -- I believe the allegation is somebody -- to the effect that Ms. O'Brien met with the prosecuting attorney on the Raygosa trial and offered to prepare exculpatory evidence for Mr. Raygosa, something to that effect. So he would have knowledge of that allegation.

MR. RIZZO: I don't believe that's an allegation, Judge, but we don't object to counsel taking the prosecutor's deposition, even though they've always known who he was.

THE COURT: All right. The scope of depositions are limited to the allegations that have been newly raised in the amended complaint, period. I mean, I said it before. I'm going to make sure that it's clear now that it is expected and ordered that that be the parameters in which the parties will conduct themselves in deposing any witnesses who they end up deciding to depose.

There was much -- much taken up about Ethan Levi's deposition, and he seems to be sort of a professional party. So the idea that you're wanting to take his deposition as a percipient witness seems like it doesn't really have much of a grounded basis. So I'm a little -- I'm a little -- I'm scratching my head about why you want to put witnesses that may be unnecessary through -- you know, through this process again.

MR. NASO: Well, we don't want to put any unnecessary

witnesses -- we don't -- have no interest in deposing any unnecessary witnesses.  Ethan Levi, as the conservator, is J.C.'s representative.  And, as he's testified in deposition, he's stepping in the shoes of J.C. for purposes of this -- of this lawsuit.

THE COURT:  So given the way -- hold on a minute, Mr. Naso.

Given the way in which he testified in response to questions about his -- his understanding and perception of the facts on the ground the last time around, what is it that you would expect him to be able to testify about these additional facts?

MR. NASO:  Well, there is -- unlike with respect to the original allegations with respect to the Raygosa home, the new allegations that -- that relate to the new resource home that J.C. was placed in, after the Raygosa home, are much more -- much more vague, in our opinion.

THE COURT:  I didn't catch that word.

MR. NASO:  Much more vague.  And there's no specific allegations as to what exactly J.C. experienced in that home that -- that she is claiming is an injury or that caused her -- contributed to an injury that she's seeking relief for.  So we would simply be asking him to -- we need clarification as to what exactly her experience was in that home and what is she looking at as a potential claim.  So there are --

THE COURT: By the way, anybody who gets -- anybody who might interrupt anybody in your Zoom calls has judicial immunity and amnesty, so they do not get into trouble for interrupting any of you in your -- in your work life, by the way, for this call, anyway. I just want to make it very clear.

MR. JINDAL: If that's true, I'm taking this next one from home. I'm going to test the bounds of that.

THE COURT: You might be able to get away with more. All right.

MR. NASO: If I could rephrase that --

THE COURT: Well, you know, I really do want to get to 502 at some point. I don't want to kick that can down the road. And so the depositions, given that there are no objections, other than Ethan Levi, are allowed, excepting for Ethan Levi.

The showing that the plaintiffs have made in prior hearings indicate that, as sort of a professional party or guardian, he is not a percipient witness that would be able to shed any light. It adds very little -- actually, frankly, adds nothing to being able to clarify what -- what these -- you know, what the depth and breadth -- depth and breadth of evidence may be regarding these additional allegations.

State defendants, have you served additional discovery yet? Or that will be --

MR. NASO: No, Your Honor. We're prepared to do so

today.

THE COURT: All right. And who's objecting to additional written discovery? And --

MR. RIZZO: Judge, this is Steve Rizzo. Regarding this, this discovery has ran. There's -- we -- I asked in the conferral what you're going to serve. They weren't able to tell me at that time.

THE COURT: All right. So what were you planning on serving, Mr. Naso?

MR. NASO: Primarily interrogatories and RFAs.

THE COURT: Okay. Well, "primarily." Is there something else, or is it RFAs and interrogatories?

MR. NASO: That is all I am aware that we have prepared to go out. I don't want to limit myself, but I'm not aware of anything --

THE COURT: This is the time for me to limit all of you. So either you limit yourself or I will limit all of you. So that's what we're doing here today. I've got to keep this thing moving. And I'm giving you the opportunity, probably more than maybe other judges have, with litigation like this, inviting you back to continue to have status conferences to figure these things out.

So are they RFAs and interrogatories, full stop?

MR. NASO: Yes, Your Honor.

THE COURT: All right.

MR. NASO:  Full stop.

THE COURT:  And how many RFAs?

MR. NASO:  How many RFAs?  I believe we have -- I can get that exact number for you.

We have 14 RFAs.

THE COURT:  And how many interrogatories?

MR. NASO:  I beg the Court's indulgence.

We have 23 interrogatories.

THE COURT:  23 and what?

MR. NASO:  Excuse me, Your Honor.  I apologize.  That would be 23 total.  It starts at -- we've already served 13.  So this would be an additional --

THE COURT:  Ten.

MR. NASO:  Yeah.  I count nine.  Yes.

THE COURT:  So nine more interrogatories?

MR. NASO:  Yes, Your Honor.

THE COURT:  Dare I ask how many subparts?

MR. NASO:  Oh, subparts?  Your Honor, I think these are very simple, straightforward RFA -- or interrogatories with no subparts.

THE COURT:  All right.  So 14 RFAs and 9 rogs.

Mr. Rizzo, it seems reasonable to me.  Tell me why not.

MR. RIZZO:  I haven't seen -- this is the first I'm hearing, Judge, as to what the written discovery consists of.

I haven't seen them.  I suppose they should serve that, and then we'll just take up objections perhaps on an expedited basis.

THE COURT:  Yeah.  And I'll advise that, at first glance, given what Mr. Naso has represented to me is 14 RFAs and 9 rogs, it would appear to be reasonable.

So please go ahead and serve them.

And then October 3rd for responding, Mr. Rizzo, assuming that nothing goes awry?

MR. RIZZO:  I'll do the best I can, Judge.  And I also want to footnote the scope of these new requests pertains to the new allegations.

THE COURT:  That -- yeah.  This discovery plan only pertains to the new allegations.

MR. RIZZO:  Thank you.

THE COURT:  All right.  That was it.

MS. KORBEL:  Your Honor, if I may, for Plaintiff Conley.  I know you just said the new discovery only pertains to the new allegations.  We tried in conferral to get defendants to agree that that would mean they would not be asking questions about Z.C., because that is -- we did not make any new allegations.  They would not agree to that.

So can we have Your Honor give us a scope, in terms of, just very clearly, that it really isn't about anything to do with our case, because we did not amend anything and that

should not be part of the questioning.

THE COURT: Counsel? Mr. Naso?

MR. NASO: Well, my understanding, Your Honor, is that -- two of the witnesses that we're deposing -- or proposed to depose are the former resource parents for J.C. and Z.C. on whose -- based on whose Z.C.'s claims are based as well. And they have not been deposed yet in this matter. My understanding was the Conley Plaintiff also wanted to question them about their claims, so I guess I'm a little unclear about the proposed limitation.

MS. KORBEL: Sorry. I should've said the reopened depositions. The new ones we can ask about Z.C., of course.

THE COURT: All right. So I got to make sure I have my head wrapped around this. You're talking -- the reopened depositions, the only ones that I'm aware of are going to be -- are you talking about Hammond and O'Brien?

MS. KORBEL: No, Your Honor. On defendants' discovery plan, they say reopening Rachel Colby -- I think you did not allow Ethan Levi -- Erik Sorenson, April Clark and Dale Gilad. And those are the ones that we just wanted clarification --

THE COURT: Okay.

MS. KORBEL: -- that they do not ask questions about Z.C.'s claims in those reopened depositions. Sorry for the confusion.

MR. NASO:  That's fine.

THE COURT:  And you agree --

MR. NASO:  Yes.

THE COURT:  -- Mr. Naso?

Okay.  So I'm going to summarize what I think I understood the agreement to be, which is on all of those depositions that are reopened, that being Colby, Sorenson, Clark and Gilad, you will not be inquiring again of Z.C.'s situation, correct, Mr. Naso?

MR. NASO:  Correct, Your Honor.

THE COURT:  But you will be inquiring of J.C.'s, relating to the new allegations.  And then the depositions of John Kolego, Judge Morgan and Stephen Shepard -- and Stephen Shepard, that's an attorney, correct?

MR. NASO:  Yes, Your Honor.

THE COURT:  That Stephen Shepard?

Those depositions will be reopened, and you're going to explore both J.C. and Z.C.

MR. NASO:  So those depositions, Your Honor, are not being reopened.  Those will be new depositions.

THE COURT:  That's what I'm asking.  So if I said "reopened," I apologize.  But I meant those depositions will be for both Z.C. and J.C. as it relates to the new allegations.

MR. NASO:  Yes, Your Honor.

THE COURT:  And Ms. Skjelset --

MR. NASO:  Those depositions would be -- yeah.  Yes, Your Honor.

THE COURT:  Ms. Skjelset, you're shaking your head.

MR. NASO:  Under the rule.

MS. SKJELSET:  I think that's Conley's objection to make, but my understanding is that those witnesses are directed at the concern regarding Kat O'Brien's cover-up relating to J.C. and have nothing to do with the Spicer home.

MR. NASO:  With the exception of -- well, I believe, with the exception of the Stephen Shepard, that may be true.  So it very well may be that we have no questions to ask these witnesses about --

THE COURT:  I'm not going to limit the scope of their depositions at this point.  I mean, I -- I trust that you're also going to be looking at how to be efficient with their time and yours.  And so you're free to go ahead and inquire as you see appropriate of -- of Kolego, Morgan and Shepard.

All right.  We're going to take a recess.  It's 3 o'clock.  I think the only issue left -- but correct me if I'm wrong -- is 502.

MR. JINDAL:  Your Honor, this is Anit Jindal.  There's also the motion to reconsider on the OR-Kids issue.

THE COURT:  Yes.  Yes.  Yes.  In fact, I do want to address that as well before -- before we finish up.  Let me -- let's take our recess, ten minutes, come back -- and I'm not --

I'm not sure whether I'm -- I'm -- I'm not sure -- I'll let you know which one I'm going to take up when I get back. I've had the chance to read the motion for reconsideration that was filed yesterday, but -- but I take it the plaintiffs have not had a chance to file a response.

MS. RICHARDSON: Right. We have not.

THE COURT: All right. But I also -- I also presume that some of these issues are going to be relevant and necessary for clarification before discovery proceeds?

MR. JINDAL: Yes, Your Honor.

MS. RICHARDSON: Yes, a little. But we'll talk about it in 502. So I think 502 is going to be the proper place to talk about it.

THE COURT: All right. Well, let's take our ten minutes and see what happens when we get back. All right. I would ask that all of you mute your video and audio, so -- so we can keep -- keep everything off the record. Thank you.

(Recess taken, 3:02 p.m. - 3:27 p.m.)

THE COURT: Are we back on the record?

THE COURTROOM DEPUTY CLERK: Yes, Your Honor.

THE COURT: Let's take up 502. And I know that -- since plaintiffs have not had the opportunity to address the motion for reconsideration, if we have time remaining today, maybe we can at least reach the issue and -- and -- and see what, if anything, can be clarified, if at all.

All right.  502, Ms. Richardson.

MR. RIZZO:  Judge.  This is Steve Rizzo.  If I may, at great personal risk, can I raise -- can I revisit the discovery plan just briefly?

THE COURT:  I'm having a hard time hearing you.

MR. RIZZO:  Okay.  I'll turn up -- my volume now is as loud as it gets.  Is that okay?

THE COURT:  Let's try.  Go ahead.

MR. RIZZO:  One -- I was playing back the prior discussion, and there was mention of the word "they" with respect to the new allegations.  One of other things the defendants were unclear on when we conferred is whether they intended to answer the new complaint or file motions against it.

And I'm also concerned with whether their intention is to file a motion for judgment on the pleading, with or without the new discovery or potential discovery that they're seeking.  So, to the extent they may file a motion for judgment on the pleadings as a way potentially to delay the trial, because the Court would then have to make findings and what have you, can we have a deadline on answering that -- on our complaint -- and I believe that'd be due on the 27th, 'cause they have 14 days -- and/or a motion for judgment on the pleadings, so that we don't see that motion shortly before trial.

THE COURT:  So what are you asking this Court to do?

MR. RIZZO:  Impose a deadline -- it would be nice to have an early deadline, so we have a confirmation on whether the pleadings are closed, number one; and, number two, a deadline in which to file a motion for judgment on the pleadings based on the new allegations.

THE COURT:  All right.  Who wants to respond?  Who -- who is going to respond?  I get that maybe you don't want to.

Mr. Edelson?

MR. EDELSON:  Sure.  Your Honor, we have not decided whether we're going to be filing a responsive pleading other than an answer.  We very well may.  I don't know what deadline counsel has in mind.  I do know that -- that you've established a date for them to respond to discovery, and you're -- and -- and Mr. Rizzo told you he would try.

So he's resisting deadlines, and so I'm -- if you want to set a deadline that we can try, I suppose that's okay.  But ordinarily we would just use the -- the dates that are established by the rules.  And -- but if you want us to accelerate that decision and that filing, we can try.

MR. RIZZO:  Judge, this is Steve Rizzo.

THE COURT:  I'm not going to waste any of my time any longer on this issue.  And -- and, frankly, I really -- Mr. Edelson, that really wasn't a very helpful response.  I mean, rather than just simply kicking back a tit-for-tat about

Mr. Rizzo's "try" comment -- we can do better than this.  Let's just focus on trying to get through the issues on the substance with nice, short, sweet answers and easy solutions, so that way I can make a decision and move on.

Otherwise, I'm spending a whole lot of time trying to keep and corral everybody's focused attention on just simply the issues.  And that doesn't really help me at all.  Yes, the rules apply; and those will be that which everyone will follow.  Let's go on.

502, Ms. Richardson, go ahead.

MS. RICHARDSON:  Okay.  Just making sure.

Okay.  First, if I can, I want to make an interlineation on plaintiffs' motion to compel.  We inadvertently left off a citation.  And I'm just going to make that verbally here on page seven.

THE COURT:  Let me get -- hold on.  Let me get to that.

Page seven.

MS. RICHARDSON:  Page seven.  We should have included a cite to Ms. Tshala's declaration.  And that cite should have been put in after, "A, DHS intentionally waived the attorney-client privilege," that paragraph, the first sentence needs a cite.  And the cite is Ms. Tshala's declaration, paragraph 5, Exhibit 4.

THE COURT:  Okay.

MS. RICHARDSON:  One more on that same page.  The next paragraph, first sentence that begins with "furthermore," that is also missing Ms. Tshala's declaration citation.  It should have the exact same citation, Tshala declaration, paragraph 5, Exhibit 4.

Okay.  So I'm just going to cut to the chase on 502(a).  All of the documents that were produced by the defendants that were privileged or told to us were privileged, those all were intentional disclosures.  So the courts are going to have different ways that they do an analysis based upon the type of disclosure.

And there is no question that those disclosures were what's called intentional disclosures, that they disclosed them as part of the other conservatorship proceeding.  And it was disclosed by DOJ lawyers, and we've established that with our declarations.  I would like to point out --

THE COURT:  And we're talking about the documents that were disclosed during the probate proceedings, correct?

MS. RICHARDSON:  That's correct.

THE COURT:  All right.  And the attorney was Michelle Watkins for the Department of Justice?

MS. RICHARDSON:  I believe so.

THE COURT:  And did she submit a declaration of any kind, in the course of any of this, explaining what her intentions had been when providing the documents?

MS. RICHARDSON:  You were going to read my mind. That was the next thing I was going to say.  No.  The defendants have put forth no declaration from anybody at DOJ to say whether or not it was inadvertent or intentional or otherwise.

THE COURT:  Okay.

MS. RICHARDSON:  The burden is on the defendants to show that these are not waivers.  And the burden is on the defendants to also show that it is privileged or not privileged.  So no declaration has been submitted.  But we do have a declaration from Ms. Skjelset, along with a very extensive back-and-forth showing of discussion about that.

So it's all within the Court file.  If you have any questions about that and our briefing, I'm happy to refer to that.  But there's no question, at least before the -- before this Court, that this all should be analyzed under 502(a), which is about intentional disclosures and whether or not waiver should operate to have these other nondisclosed privileged communications on the same subject matter produced.

The other thing that I would like to bring to the Court's attention, which I think might be the best way to go through this, is to look at the very small amount of documents that -- you know, the -- a couple of documents here that we've referenced in Ms. Tshala's declaration that were produced intentionally and also stated as waived by -- admitted to being

waived during proceedings before this Court and also to plaintiffs.

THE COURT:  I mean, I think previously -- if I'm not mistaken, I think it was Ms. Hoffman who indicated they admit that it was waived, but it was inadvertent waiver; and, given the amount of time that has passed, over two years, they understood, from a legal standpoint, there was really no basis to try to claw back any of those documents.  So -- I mean, that's what I understand the defendants' position is.

MS. RICHARDSON:  Yes.  I remember that she said that, but perhaps there was a misunderstanding on Ms. Hoffman's part about what inadvertent means versus intentional.  And an inadvertent waiver is something in which you just give out documents, and then you find out later that it was inadvertent; you hadn't intended to, and you act appropriately and grab them back.

These were reviewed by lawyers at the Department of Justice.  And there was extensive back and forth, and they produced them.  So that -- and there is no declaration even ever produced by the defendants as to whether or not somebody -- like you were saying, the previous DOJ attorney that supervised the disclosure of those documents -- whether or not it was inadvertent.

So what we look at then is 502(a).  And when we look at these documents, though, for the first time, we have finally

heard back on the response, which was limited by Your Honor, because they filed a longer response than allowed by the rules, but in the ten pages -- the first ten pages, they do now say that these documents are not privileged.

So we are now looking at what was previously marked as privileged with a claim by the defendants that these are now not privileged.  And --

THE COURT:  The documents that were produced at the probate proceeding that -- that you're arguing was privileged and, therefore, waiver of that privilege, is, in this instance, now, in response, being described as nonprivileged -- not privileged documents by the -- by the defendants?

MS. RICHARDSON:  Yes.  And I will say that --

THE COURT:  Well, then ask for all the -- all the documents that look like these documents as -- as producible under normal discovery, since they're not privileged.  Not just these, but anything else.  I mean, so just seek production, since they no -- they're no longer claiming that these kinds of documents are privileged.

MS. RICHARDSON:  Well, it appears that what they're trying to argue is that all of these documents are not privileged; and, therefore, there has been no waiver.

THE COURT:  Right.

MS. RICHARDSON:  But what I will show the Court is that it is true, when we look at it, and as we have tried to

say before, some of these documents do not appear to be privileged. And so I would like to go through those documents. But what I would like to also say is that the problem with the defendants in making statements to us about what's privileged and not privileged, and arguing that it's privileged and then saying it's waived, the issue is that we then have to spend time to bring this motion before the Court.

And then to have it change after we file the motion causes us more time and delay. And I would like to renew and ask this Court to award attorney fees for us in having to address, in particular, these documents that are now considered to be nonprivileged, because we wouldn't have had to argue that to this Court. Now, there are some other documents that are privileged --

THE COURT: And in the defendants' response to the 502 waiver motion, where do they explicitly describe these documents as not privileged in those first ten pages?

I think, starting on page two, they indicate that the italicized portions of sort of these exemplar documents that disclose the description of the attorney e-mails and the certification files with communications that state defendants believe to be attorney-client privileged italicized.

So everything not italicized is nonprivileged. Anything italicized would've been privileged. Is that -- is that your understanding? Is there anywhere else that they're

describing these documents as nonprivileged?

MS. RICHARDSON:  It is --

MR. JINDAL:  Your Honor, I -- this is Anit Jindal for defendants.  I don't want to intrude on Ms. Richardson's time, but you're asking her a question about something I wrote.  So I'm happy to provide clarity, if it would be helpful.

THE COURT:  Well, clarity would be helpful if you can just answer that one question without belaboring lengthy discussions.

MR. JINDAL:  No.  No.  I don't intend to eat up Ms. Richardson's time.  I -- what you're referring to on pages 2 to 3 are eight bullet points that are meant to track and describe the eight documents that they allege are the subject of waiver here.

And we -- our position is that five of those were, in fact, privileged e-mails.  And we identify them there.  I believe the first one is not privileged at all, and it was not the subject of conferral in advance.  And we have not taken the position that it was privileged.

They had already -- we had already produced it in full before plaintiffs brought their motion.  And so we weren't sure -- we were surprised to see it as a subject of this motion in the first place.  It wasn't in privilege status --

THE COURT:  All of these e-mails were part of the probate -- the production of documents in the probate

proceedings, correct, Mr. Jindal?

MR. JINDAL:  Correct.

THE COURT:  Okay.  And --

MR. JINDAL:  And then --

THE COURT:  You're taking the position that bullet one was never privileged?

MR. JINDAL:  Correct, Your Honor.  We did not take the position that it was privileged.  Plaintiffs did not confer on that document.  And if they had, we would've explained to them that our position is not that -- is not that it was privileged.

THE COURT:  All right.  And then bullet two, it doesn't look like there's anything italicized in that summary.  So you're also taking the position that that e-mail is also not privileged?

MR. JINDAL:  I believe it might be work product, Your Honor.  Let me catch up.  I want to make sure that I've got the --

THE COURT:  Okay.  So let's return to you then after Ms. Richardson has continued her arguments.  I want to make sure that I stay tracked.

Ms. Richardson.

MS. RICHARDSON:  Yeah.  I think it might be helpful, instead of looking at their way of describing the document, that we could just go to the documents, since there aren't very

many.  There are -- and what's helpful -- and I had to pull it out to make it a little easier for me -- is under Ms. Tshala's declaration, Exhibit 1, she did a nice little table to describe these documents.  And then the Exhibit 4 are the actual documents.

THE COURT:  Okay.  Do you want me to look at the table, or do you want me to look at the actual documents?

MS. RICHARDSON:  Well, I just -- if I have the table out, it's easy to reference.  But if we look at the actual documents, I think it will help, and I can just clear up some things here.

So what it appears to be is that the Exhibit 4, page 1 through page 5 of the exhibit appear to be the OR-Kids communications that were pasted into OR-Kids.  And these were marked on the privilege log as -- as privileged.  And what it looks like here is that these are, indeed, not privileged communications.

THE COURT:  So the privilege log -- the defendants' privilege log -- in the defendants' privilege log, Exhibit 4, 1, 2, 3, 4 and 5, the OR-Kids entries were listed as privileged documents?  Is that what -- I just want to make sure:  That's what you're saying?

MS. RICHARDSON:  Yes.  And I can point to you -- the privilege log is very detailed, so I'll ask somebody from my office to -- Ms. Korbel, if -- to give us the page for where

that is marked as privileged.  It's somewhere in the privilege log.

THE COURT:  Got it.

Well, Mr. Jindal, do you agree that the privilege log describes Exhibit 4, pages 1 through 5, as privileged?

MS. RICHARDSON:  Well, so --

MR. JINDAL:  No, Your Honor.  I don't believe that's true.  I'd have to double-check, though.

THE COURT:  All right.

MR. JINDAL:  But what I --

THE COURT:  No.  I just needed to know an answer quickly, and then we can continue with Ms. Richardson's arguments.

MR. JINDAL:  I should say, Your Honor, I have not specifically --

THE COURT:  I didn't need any more.  I want to continue to move on.  So hang tight.

MS. RICHARDSON:  And I'm sorry because I wasn't prepared for that with the privilege log, but I actually need to double-check that.

But what I want to do is, rather than try to belabor this point, is there is no privilege being associated with these five -- with these five pages.  And they're part of the OR-Kids thing, I think, was the motion for reconsideration. And so we're not -- it does not appear that these are

privileged and that they should not have been marked as privileged.

THE COURT:  Okay.

MS. RICHARDSON:  And I just want to make sure there's an agreement on that, so we can move on, because we're not going to talk about waiver with respect to those documents.

THE COURT:  Well, I -- I want to be careful about just simply getting it now, going in a back and forth, because I think trying to confirm what, in fact, is privileged or not, let's wait -- let's wait 'til your arguments are completed, and then I can turn to Mr. Jindal.  So --

MS. RICHARDSON:  Okay.  Yeah.  So Exhibit 4, page 1 through 5, it is not privileged.  And, you know, just because -- I think it was originally marked as privileged because there was attorneys copied on it, but it does not appear to be privileged.

And so -- so I'd like to move on now to Exhibit 4, page 6, which is e-mail communications that I do believe some of these are deemed privileged and, therefore, waived.

THE COURT:  Okay.  And it would have been waived as a result of the production of the documents in the probate proceeding?  Is that --

MS. RICHARDSON:  Yes.

THE COURT:  Okay.

MS. RICHARDSON:  Yes.

THE COURT:  Okay.

MS. RICHARDSON:  And so when we go through these documents, it would be subject to 502(a).  And the proper analysis is that the waiver was intentional, which we've established through the declarations of how those were produced to us.

And that -- and then also by the statements made by defense counsel that they did waive the privilege.  Two, that the disclosed and undisclosed communications concern the same subject matter, so talking about the subject matter.  And then the next piece is about fairness to be considered together.

The next piece -- and so that's going to be for these, for Ms. Tshala's declaration.  And what I'd like to do now, before we go into why it is that it would only be fair for us to get at the subject matter, if we can talk about what the subject matter is, that's what I'd like to move on to.

But, before that, there's one other area where there was waiver.  And that is Ms. Skjelset's declaration.  If you look at Exhibit 8, and we go to page 18 of Exhibit 8.

THE COURT:  E-mail threads?

MS. RICHARDSON:  E-mails, yes.  There's a string of e-mails.  And in this string of e-mails, if you look at the first page of page -- sorry -- page 18 of Exhibit 8 and you look towards the bottom, it is an e-mail between Ms. Gonzalez, who was an attorney at the DOJ, and Mr. Hammond.

And in this Ms. Gonzalez is giving advice and commenting to Mr. Hammond, and then Mr. Hammond forwarded these e-mails with this communication with the Department of Justice to an attorney outside at the Public Defender's Office.  Those documents have been produced to us, and they have been waived -- they have waived the privilege with respect to Ms. Gonzalez and Mr. Hammond.

And the question is the subject matter.  And this goes, again, to what I was saying earlier today, that Ms. Gonzalez is now talking about -- you know, this is in November of 2018, when Mr. Hammond is involved in the juvenile proceedings.

And it says, "I don't believe McAlpin" -- that's Judge McAlpin -- "will find that to be reasonable efforts towards the reunification plan."  And so the subject matter would be about what were the reasonable efforts related to that reunification plan.

Now, at the same time, if you turn to page -- of that same exhibit, so Exhibit 8, and you turn to page 26, there is communication here.  These are conversations that were the -- on the -- I think it was Teams messaging -- between Mr. Hammond and Ms. O'Brien, talking about the attorney -- the AAG.  And in it they discuss how the -- that Ms. O'Brien was being taken off the case because of her bias.

And so in these communications, too, this goes to

when the children were under the care of Ms. O'Brien. Ms. O'Brien was eventually removed because of her bias regarding the children in the home or that case with the -- what she was assigned to.

And we believe that the bias is a subject that we need to be able to have the full picture. We only have a portion of what those attorney-client communications were. And what they are is -- they've only produced some of them, which show that there was some reaction and help by the -- by the attorney and some discussions about who was making decisions about the bias.

But we don't have the full amount of what we need, in order for it to be fair to us, to be able to discuss with -- to be able to show that there was this bias by Ms. O'Brien and why she was removed and what the context is behind that. And, in order to do that and to be fair, we need to be able to have other undisclosed privileged communications involving that subject matter.

THE COURT: So part of the consideration in determining whether intentional waiver expands to subject matter waiver is sort of the -- sort of the -- sort of the tactics or strategy about providing or disclosing a privileged matter that's favorable and not all privileged matter for that -- for that particular subject matter area.

And that oftentimes is what triggers the sort of --

this waiver.  What is it that you think was produced that was privileged that's favorable, rather than both favorable and unfavorable, to the defendant?

MS. RICHARDSON:  So I think what that analysis is, is that often, in the implied waiver types of cases -- implied waiver is when you have, for example, the defense is relying on advice of counsel, and so then they've now impliedly waived that privilege.  And so, to be fair, you have to look at everything because they're only wanting to be able to state that which would be positive for that party, but then shield it from the rest.  So that's sort of that sword/shield analysis.

THE COURT:  And you're saying that the sword/shield analysis is really under an implied waiver analysis?  I mean, I'm wanting to make sure I fully understand the scope of what the Ninth Circuit allows for considering waiver here.  Or is the sword/shield something that needs to be analyzed under all sort of intentional waivers?

MS. RICHARDSON:  Those cases talk about the sword and shield in the implied waiver context and also in other contexts.  In intentional waiver, it's now ruled by this rule, 502(a).  And -- but some of the case law is helpful for that, but it's about the fairness to be considered together.

And what -- in this situation what we have is they've given select attorney-client privileged communication to us, which we need in order to be able to impeach and show what

these witnesses were really doing.  So we are going to be using it for our benefit, yes.

Now, the problem here is they've given us only a select few.  And so the fairness to us is that we don't get to see all the rest.  What -- how it would be beneficial to them, I'm not certain how it would be beneficial, except to show that somehow their attorney and -- and in working with these individuals, that they were doing everything that they could in order to address what needed to be made for reasonable efforts toward reunification.

And we're looking at, well, wasn't there bias involved on Ms. O'Brien; and what really happened between Mr. Hammond and Ms. O'Brien with respect to how they were making these statements to Judge McAlpin at the time.

THE COURT:  Okay.  Is there -- when conducting the in-camera review of the documents that Ms. Skjelset had provided, you know, that subset of the subset of the privilege log documents and the arguments that I considered by both parties -- if I'm not mistaken, defendants had argued that very similar e-mail, such as the ones that were produced in the probate proceeding, but other similar e-mails that I had reviewed in camera would be privileged because of Attorney Tricia Gonzalez being copied on them, but not necessarily being involved in providing any specific advice or guidance.

So in that instance there was an argument that

these -- those documents, those e-mails with Attorney Gonzalez on them as a -- copied, or even just simply saying having received, was enough for it to be privileged and, therefore, also not disclosed. Here, however, it seems like the defense is arguing that merely copying the attorney assigned to the case, without any more involvement, doesn't make the document privileged; and, therefore, wouldn't be considered a waiver by producing it.

I just want to make sure that -- if I'm describing the argument -- if you understand what I'm describing, is that your -- is that your understanding of sort of how the two different arguments are playing out in these -- in these different settings here before -- before the Court?

MS. RICHARDSON: Yes, that is accurate.

And what I will say is that -- and, you know, adjacent to that, is that it is true, in order for there to be a privileged communication, it isn't proper to mark it as privileged just because an attorney was copied on it; that, instead, they have to show that there was some sort of advice, that there was a purpose behind it; it was intended to be confidential, and it was for advice of that counsel.

THE COURT: And I ultimately had concluded that the primary purpose analysis is what determines whether something's privileged under the attorney-client privilege and didn't find that those documents were privileged and -- and had directed

the defendants to now go conduct their review of the privilege log.

But the argument the defendants were making were that they were privileged, but -- in this instance, but in the other instance they weren't privileged in the --

MS. RICHARDSON:  That's right, yes.

THE COURT:  Is that an example of sword-and-shield argument or use of -- of documents or production of -- well, it's not directly the way in which sword and shield is used in the case law or in the discussion, but I'm trying to understand if I -- if I understand, what the defendant is arguing in one instance and arguing differently in another instance, I mean, it's -- it's making two contradictory -- you know, it's presenting two different contradictory theories about what is and isn't privileged, based on the same e-mail, just produced in different settings.

MS. RICHARDSON:  So I would say that that's probably not an example of what courts have been looking at with that sword/shield example.  But what it does show is the inconsistent statements of privilege that has been deployed in this case, which we kind of went into quite a bit here, because it is creating a lot of issues for us in having to try to decide, well, what is it -- what is privileged and what is not privileged; and what are they truly retaining; what are they hiding back from us.

They've chosen not to -- which I learned at the last hearing -- they've chosen not to Bates number those, you know, withheld communications. So we did get a better -- you know, like the actual -- what do you call it? -- the spreadsheet for the privilege log.

And so we can try to go through and match up, you know, maybe where some of these communications may lie. But -- but what is hard to do is to try to figure out what are the undisclosed documents that are going to be related here around the same time that the intentionally disclosed documents are being put forth; and are they -- how are they going to use those intentionally produced documents that were privileged.

Just forget about all the rest that are not privileged. It is -- it is something that Your Honor has now established, and that I concede, if it is not privileged, then it's not going to be subject to this whole waiver issue. It's these limited documents here which are subject to waiver.

And the question is now what is the subject matter; and then how do we determine what the fairness, considered together, should be. Sometimes courts are going to look at a sword/shield situation, which is often done in implied waiver cases. And in here what I'm looking at is, okay, if they're going to put forth some of these communications that are privileged, to make it look like they were doing something or providing some help, also there are some things that are very

harmful to them on these privileged communications.

But they're not giving us all of the privileged communications related to that subject, which will give us context for what they have produced.

THE COURT:  Okay.

MS. RICHARDSON:  So the -- so the bias issue is addressed in Ms. Skjelset's declaration and in this piece here, where it is clear in this communication the attorney, Ms. Gonzalez, is giving advice.  So that is privileged, and it has been waived.  And the subject matter is the bias of Kat O'Brien and how that has impacted her serving for those children.

So we would like to have those communications that would show why she was removed from the case and the decision for her bias with that respect at the time when those privileged communications occurred.

THE COURT:  All right.  All right.  Thank you, Ms. Richardson.

Mr. Jindal, you're arguing in response.  I'm going to share with you some of my cards, so you can help me understand the issue better.  It doesn't appear to me, from the briefing and my understanding of the disclosures of the documents during the probate proceeding, that it was inadvertent, as I understood under the -- under the case law and, again, facts of this case.

And so, one, I mean, you can spend some time helping me understand why you think it is, based on what facts exist in this case. But then really focus on -- I mean, I think the harder parts for the -- you know, in this instance for the plaintiffs -- on the plaintiffs' motion to compel is really the scope and -- and the issues of -- I want to understand a little bit more about if you have a different understanding about the sword and shield -- sort of the -- sort of the -- the disclosure of -- of helpful information, but the holding back of unhelpful information to your client or -- that being your client doing so -- is somehow what triggers this waiver.

So it's a very rough roadmap, but I'll let you know that I'm having a hard time seeing this as an inadvertent disclosure, given that Michelle Watkins provided the documents and that there was no discussion about a claw-back at that point or a mea culpa, you know, "I gave you the wrong documents." You know, tell me why you think it was inadvertent instead.

MR. JINDAL: Thank you, Your Honor. And I want to just make sure that we're hewing very closely to the exact phrasing of the rule. It doesn't talk about an intentional disclosure or even an advertent disclosure. It talks about an intentional waiver. And I want to make sure we're also very careful about which rule we're talking about.

They're seeking a subject matter waiver under

FRE 502(a).  What we are not attempting to do is claw back these specific documents under 503(b) by arguing that we took reasonable steps at the time to claw them back.  What we have here is a pure mistake.

We -- our clients received a subpoena three years ago, before this litigation happened and before litigation counsel, my firm, was retained.  And they responded to that subpoena very quickly, within a month.  And they -- they reviewed the documents and got them over to Ms. Skjelset, I believe.

And they made a mistake.  There were eight attorney-client privileged e-mails in those documents that -- excuse me -- eight attorney-client communications, five privileged e-mails, in those documents that they just missed.  And I think the reasonable efforts to claw them back goes to whether or not we can claw back these specific documents under --

THE COURT:  Did Attorney Watkins withhold anything from that which was requested back then?

MR. JINDAL:  I don't -- I don't believe so, Your Honor, not for privilege.  There was discussion between Ms. Skjelset and Ms. Watkins about the confidentiality requirements of juvenile records, and that was the type of redaction that was discussed.  They just missed it.  They didn't expect there to be --

THE COURT:  Where's the evidence that they just missed it?  I get that you're arguing it.  But what declaration from Attorney Watkins, what -- you know, what other evidence in the file, in this record, says that it was -- it was an error?

MR. JINDAL:  Your Honor, we didn't submit a declaration from Attorney Watkins.  If that would aid Your Honor's review, I could try to get that declaration.  I can represent to you that our client did not have --

THE COURT:  I'm not sure I want to subject another attorney to depositions in this case.

MR. JINDAL:  This was exactly my thinking, Your Honor, which is why I knew, if we submitted that declaration, we would be here talking about whether or not they get day two or three or four of Ms. Watkins' deposition.

And so I think it just doesn't advance the ball that forward, more than me telling you, as an officer of this Court, I can tell you that my client did not have the subjective intent to waive the privilege.  And I think all of the records of the parties' communications confirm that, because what was discussed was the confidentiality of the personal health information and other sensitive records in there, not attorney-client privileged.

And also what -- what we know is that when my client -- my -- my firm was retained and we reviewed these exact same documents, we did mark them privileged, because they

are privileged, the five that we've discussed. And so we think on that record it's clear --

THE COURT: So at least there's no dispute that the documents, at least five of them, are privileged and -- and we can get to that in a minute. My -- you know, I do -- I do want to drill a little bit more into just simply trying to understand why you think, given the declarations that I have in -- on these motions, that -- that the decision to have -- for your client to have -- you know, to provide -- to provide the file is anything but an intentional waiver of those documents that were privileged when they had an attorney who provided them, Ms. Watkins.

And, you know, I really -- I mean, I appreciate that, as you maybe look back on the case, that you would see it as -- as anything -- I mean, as nothing but an error. But do we have anything from your client saying that "At that time, when we discussed this with Ms. Watkins, that we didn't authorize disclosure of -- of -- of these privileged documents"?

MR. JINDAL: Your Honor, I'd be remiss if I tried to defend a privilege waiver by waiving more privilege, but the -- so I -- so -- which is why you don't see that declaration in the record.

THE COURT: Yeah. So there isn't anything in the record. And so what I'm trying to do is look to the record to understand, you know, whether it was an intentional waiver.

MR. JINDAL:  I think that's right, Your Honor.  And the objective contemporaneous record is that the parties discussed confidentiality of the personal health information and other sensitive records, not attorney-client privilege.

THE COURT:  So one could -- one could surmise from that discussion -- or the context of that discussion, if they were, in fact, discussing that which would be withheld, they didn't have an issue with producing the other documents, including that which was -- which would've been attorney-client privilege.

MR. JINDAL:  I don't think that's a fair assumption, Your Honor.  I think that the -- the more reasonable way to look at this is that they just didn't do a privilege review and did not realize that there were attorney-client privileged e-mails in this file.

But I believe I've explained to you at least our position.  And I think, if it would be helpful, I'd like to move on to the sword and the shield and fairness, because I think that's really where we have the strongest argument and where -- the easiest way for this Court to resolve the motion.

THE COURT:  Okay.

MR. JINDAL:  And, Your Honor, I -- the case law and Rule 502(a), itself, are very clear that subject matter waiver only attaches when it -- when it ought, in fairness, attach.  And the advisory committee note and the case law on this,

including binding case law from the Ninth Circuit, is very clear that what the rule is getting at is exactly what Your Honor described, which is a sword and a shield.

It's where when the party tries to use the privileged advice to its advantage in the litigation, while simultaneously shielding the privilege -- or the privileged communications about that advice from discovery. And that's just not what we have here.

The disclosures here happened years before this -- this litigation was filed. It was -- however we classify it, as inadvertent or intentional, it was not designed in any way to give an advantage in the litigation. We produced the entire files that they asked for, without reviewing them for privilege.

And there's just nothing advantageous to us about these files. And I think that it's -- I would like to do a couple examples, just to --

THE COURT: I'd like to ask a question. So if I look at these five -- at least I think everyone agrees there's at least five privileged documents. If I look at them and I find that they're actually not helpful to your client, then they weren't using it as a sword; so, therefore, no shield; and end of inquiry.

MR. JINDAL: I think that's right, Your Honor.

THE COURT: Well, does one have to be a master

swordsman to be able to -- to be caught in this waiver?

MR. JINDAL:  I'm not quite sure I understand your question.

THE COURT:  Well, I mean -- I mean, somebody could -- somebody could fall on their own sword.  Somebody could end up -- so you could be an incompetent swordsman, but you're still using it as a sword and a shield.  I guess what I'm trying to get at is you don't have to an expert tactician and litigator to use it -- to be proved to have been using it as sword and a shield, to address the issue of fairness.  I mean --

MR. JINDAL:  I think --

THE COURT:  In not so many words, I mean, you've indicated that they kind of screwed up by giving these documents.  So, I mean, all right, if we extend that analysis to they weren't really that good at thinking about tactically whether to use this in an appropriate way; but yet, nevertheless -- you know, there was a sword; there was a shield; it just wasn't wielded well.

MR. JINDAL:  Oh, I understand now, Your Honor.  No, Your Honor.  Here I think the swordsman is me.  The -- the point is that it has to be used in the litigation tactically.  And I think that's why it's relevant that we were responding --

THE COURT:  In litigation by defense counsel?

MR. JINDAL:  I -- now I will use the royal "we," but

the defense group in the litigation.

So the way this comes up a lot is when there's either an advice-of-counsel defense or where the advice of counsel goes to an underlying element; and where you want to say, "Well, our legal counsel gave us this memo that said that we were doing everything correctly," and we're going to rely on that at trial.

Well, then you get discovery about the legal advice. And that's what the cases say. What -- what we have here are just mundane e-mails about drafting -- drafting documents relevant to the certification status of the Duncan-Raygosa home that we accidentally produced and that we've -- and we have not tried to use the legal advice within them to our advantage at all.

And a couple examples might tease this out. If you look at --

THE COURT: Well, I'd like to explore -- and this might not go to the issue of subject matter, but I do want to come to this, because I -- I mean, I can appreciate the need and the opportunity or the availability of arguing alternative theories.

But I asked this question of Ms. Richardson; but, frankly, I think it's probably better to ask you, or to point out and have you reconcile this, because in the course of my -- you know, having been forced to conduct -- well, I chose to

conduct in-camera review of that subset of documents.

I mean, the argument was -- is that they're very similar documents that were -- similar kinds and nature, the CC-ing of Attorney Tricia Gonzalez, the defendant was claiming those to be privileged during my in-camera review of these documents.  And here, in the context of a 502(a) issue, you're saying that these aren't.

MR. JINDAL:  I want to be careful about the --

THE COURT:  Go ahead.

MR. JINDAL:  I think it depends on the document itself.  And we've done a document-by-document review.  And I think that, as Your Honor described it, if you look at the primary purpose of the document -- and it's not as wooden as just saying if there's an attorney copied on an e-mail that we can decide, based on that fact alone, whether or not the document is or is not privileged.

And so, to give you just an extreme example, let's say an attorney and their client are -- and a client group are discussing some information that the attorney needs for legal advice in -- in an in-person meeting.  And then we have an e-mail where a nonattorney, but a client, e-mails that same large group, copying the attorney, and says, "Here's the information we discussed.  Here's all the things that I need you to know," there wouldn't necessarily be a direct clean request for legal advice within the four corners of the

document.  But I think we would expect that is privileged or, at the very least, work product.

So I think what we're saying is if the attorney's copied on the e-mail, we have to do a document-by-document analysis to figure out whether or not it is privileged.  What I'm saying now is that the specific document that they have raised in this motion, which is the first five pages of Exhibit 4, we agree is not privileged.

We agreed with that -- we had removed -- we had not claimed privilege on this document well before plaintiffs filed their motion.  They did not confer on this specific document. And if they had, we would've -- we would've corrected their misimpression.  And so I'm genuinely quite surprised to hear Ms. Richardson say that we drove up the billing on this one and they're entitled to their fees.

And, Your Honor, I would like to provide some examples of the -- of those five privileged documents that we've discussed.  And these are at the Tshala declaration at Exhibit 4, page 14.  So it's ECF 78-4 at 14.  And just to highlight how we are not using these documents as a sword -- and, in fact, I would scratch my head to figure out how --

THE COURT:  Hold on one moment, Mr. Jindal.  Help me get to that document again.  I have Ms. Tshala's declaration. Which exhibit in it?

MR. JINDAL:  It's Exhibit 4 at page 14.  Everything

I'm going to discuss with you is at Exhibit 4, because that's where the probate documents are.

THE COURT:  Thank you.  And it starts with "From: Anastasia Tibbetts"?

MR. JINDAL:  Yes, Your Honor.  And before I sent you there, I probably should've taken myself there.

So what you'll see on that document is that this is an e-mail about the legal process for accepting a voluntary notice of revocation from the Duncan-Raygosa household.  The attorney describes the applicable regulations and how they'd apply, given that a formal revocation proceeding has already begun.

The document has really nothing to do with this case because the Duncan-Raygosa household ultimately decided not to pursue a voluntary revocation.  Defendants have never tried to seek the legal advice given about accepting the voluntary revocation of certification in this case in any way.  And I just can't imagine why we would or how we would.

Similarly, Your Honor -- I can tell you're still reading, and I don't want to move on if there's something that's interesting you about this one.

THE COURT:  Well, I -- I think you understand more of the context in which you've made this argument and, in particular, with respect to revocation.  I want to make sure I understand.  You're suggesting that this document, on page 14

of Exhibit 4, is privileged?

MR. JINDAL:  It was privileged until we disclosed it inadvertently through the probate court proceeding.  My purpose is -- I've squinted and cannot discern what -- how this would ever be a sword.  And --

THE COURT:  Well, could it be a shield?

MR. JINDAL:  I don't think so, Your Honor.  The voluntary revocation didn't occur.  They decided not to do it.  The regulations aren't at issue in this case.  It's really just a lot of nothing.  And just another -- and these are plaintiffs' documents, and there's -- and they've said that these are the key documents that show that we're being misleading.

And they said some pretty charged words in their briefing, and that's why I think it's important to really focus in on what plaintiffs have presented as evidence of my firm's nefarious intent here.  So let's look at page ten of the same -- the same exhibit.

THE COURT:  I'm on page ten.  It starts with Jordan Meyer.

MR. JINDAL:  Yes, Your Honor.  Sorry.  And you'll see the threads can be sometimes confusing to read.  But the -- Anna Spickerman attaches -- and Anna Spickerman attaches a draft notice of revocation in the Duncan-Raygosa matter.  Jordan Meyer, who was a DHS employee, provides some edits and

additional things for the draft notice of revocation.

The drafting of the notice of revocation is, again, irrelevant to this case. And that notice of revocation never went out. The Duncan-Raygosa household, I believe, forfeited their revocation status by leaving the state. It's just -- there's no -- we have heard no answer to the question how is it that we are using the legal advice contained within this e-mail as a sword. And, again, I struggle to see what the theory is.

I have one more. I don't want to belabor this. But if you go to page 8 of the same -- same exhibit.

THE COURT: All right. And it's from Anna Spickerman.

MR. JINDAL: Exactly, Your Honor. And this one discusses the status of an administrative appeal of the Duncan-Raygosa house's certification status; and also how to handle a public records request from Mr. Raygosa, given that ongoing criminal proceedings are occurring.

And, again, it is difficult to imagine how this is relevant to this lawsuit. I don't think there is -- this lawsuit has anything to do with the Duncan-Raygosa house's efforts to appeal their administrative -- to conduct an administrative appeal of their revocation status.

I don't think that this case has anything to do with Mr. Raygosa's public records requests, and it certainly doesn't have anything to do with the request for legal advice

internally about how to handle those public records requests. And, again, even if it did, I don't think that we're using the legal advice as a sword.

It's just not the type of things that you see in the case law where a party is using the advice for its defenses, but refusing to waive the privilege.

THE COURT: Is the sword-and-shield analysis under the category of fairness or the element of fairness?

MR. JINDAL: Yes, Your Honor.

THE COURT: Okay. And are there other analyses, other than sword and shield, that are -- are -- or structures or, you know -- yeah, structures, other than sword and shield, within the ambit of -- of the fairness element when considering intentional waiver?

MR. JINDAL: Yes, Your Honor. The advisory committee note phrases it slightly differently. It describes it as a selective and misleading disclosure within the litigation. So that's where you -- where you are using a document in litigation as evidence for your defenses, but you're only providing some of the underlying information.

That's just not what we have here. I can tell you now, Your Honor, I do not plan to put on a witness at trial to describe any legal advice that happened with respect to Mr. Raygosa's public records request. It's just not -- it's just not what's at issue in this case.

THE COURT: Well, the misleading nature, with respect to the fairness element, is really just another term for a sword and shield; or are you saying that's a different consideration than the sword-and-shield analysis?

MR. JINDAL: No, Your Honor. They're different formulations of the same test.

THE COURT: All right.

MR. JINDAL: And I believe the Ninth Circuit calls it the sword-and-shield analysis when deciding subject matter waiver specifically, and that's the Chevron v. Pennzoil case.

THE COURT: That's a slippery case, if you ask me.

MR. JINDAL: Oh, yeah. Well -- wait.

THE COURT: Sorry. It's -- I needed to inject a little bit of levity.

MR. JINDAL: Yeah. Sorry, Your Honor. At first, I was very worried I was citing something that had been abrogated or something.

So that's why we don't think we've used this as a sword and shield.

I also want to talk about the subject matter of the specific documents and why we don't think they justify the broad waiver that plaintiffs have discussed here. And, you know, plaintiffs' own case law, in their own briefing, I think, very candidly explains that the Ninth Circuit has been very clear that there is no such thing as a blanket waiver for

functionally every document -- every privileged document at issue in a case.

And that's the Hernandez case the plaintiffs cite for that --

THE COURT:  I think it's fair to say -- and I appreciate that an intentional waiver consideration doesn't blow the door open.

MR. JINDAL:  Correct, Your Honor.  It has to be calibrated to curing the unfairness that they've shown.  And so that's why --

THE COURT:  And there were documents that Ms. Richardson had described, and I think they were from Ms. Skjelset's declaration.  Is there something different about those documents than the ones that you referred to in -- in -- in Ms. Tshala's declaration?

MR. JINDAL:  There are, Your Honor.  So, as a preliminary matter, I -- well, let me answer your question directly before I -- before I go off on a tangent.

So the documents that Ms. Richardson is describing are documents where I believe Mr. Hammond forwarded an e-mail or two to a former DHS employee, Ms. Perkins.  And so that disclosure to a third party likely waived the privilege with respect to those e-mails.  And we have produced them.  We've produced them unredacted, and that's why they have them.  And it appears at Exhibit 8 of Ms. Skjelset's declaration.

However, that -- that disclosure follows the exact same analysis we have here, which is that it was not an intentional waiver by the State, and it was not done in the context of this litigation.  And, for exactly the reasons Your Honor has discussed, we -- we are not using them as a sword and shield.

To the extent they're relevant to this litigation, they're not -- they're not helpful to us.  They are given out by a third party inappropriately, but we're not clawing them back.  But they're also not subject of a subject matter waiver, because we are not trying to use them unfairly in this litigation.  Plaintiffs may want to use them, but that's not the test.

THE COURT:  Okay.

MR. JINDAL:  And I think that that extra context -- these are different from the probate court documents.  These were disclosed by a state employee to a former state employee.

THE COURT:  Okay.  Thank you.

MR. JINDAL:  And I -- I also want to discuss very briefly Ms. Tshala's -- or excuse me -- Ms. Skjelset's declaration.  So Ms. Skjelset's declaration, from paragraphs 37 to 59, contains about six pages of argument about documents that are not discussed in the --

THE COURT:  So where in Ms. Skjelset's declaration?

MR. JINDAL:  Paragraphs 37 to 59 and the related

exhibits.

THE COURT: And this is the amended declaration, correct?

MR. JINDAL: Yes, that's right, Your Honor. I don't believe the paragraph numbers changed. They just removed paragraphs.

THE COURT: And it was 36 through?

MR. JINDAL: 37 through 59, wherever the end is. Or I guess 30 -- I think you're -- yeah, 37.

THE COURT: Okay.

MR. JINDAL: And that -- this is a discussion of, I think, about a hundred pages of documents that were not the subject of the conferral and not the subject of -- of plaintiffs' motion, 'cause they were not produced during the probate proceedings, so I just wanted to alert Your Honor to that fact.

I -- we've argued that it's not properly before the Court. I'm happy to talk about those documents, to the extent Your Honor is as well, which is why I -- and the Exhibit 8 that they're discussing regarding now Mr. Hammond's disclosure to a third party fits within that ambit.

THE COURT: Okay. Well, maybe -- if you're completed with your arguments up to this point, let me move to Ms. Richardson. Maybe Ms. Richardson can confirm the scope of those -- those privileged and disclosed documents for which I

should be looking at the 502 waiver and if paragraphs 38 through 59 are implicated.

Ms. Richardson.

MS. RICHARDSON:  Are you asking about Ms. Skjelset's declaration?

THE COURT:  Yes.

MS. RICHARDSON:  Okay.  Well, Ms. Skjelset's declaration is -- the amended one, it doesn't have argument in it.  It's just pointing out how those documents were produced and why it was intentionally produced and, again, why it's been waived, so -- in order to be able to put this in front of Your Honor properly.

So what I'd like to do now is kind of go back to some of these arguments that are now being made about how they're not going to be using it as a sword.  So, first of all, it sounds like what I heard was that there -- there is no evidence that has been put forth by the defendants as to the disclosure around this initial -- all these documents in the probate court.

And I'm just going to direct Your Honor briefly to one of the cases that is cited by the defendants.  And these are actually -- it looks like a case that was cited in the most recent motion for reconsideration.  I'm just noting it for Your Honor.  It is United States -- let's see.  I think it was the Chevron case.  One second.  I just got that motion, too.

So it is that Chevron case.

So in the Chevron case that we just talked about with the -- 241 F. Supp. 2d 1065, in that discussion, on page 1059, it does talk about how the party did not submit a declaration; and, therefore, they could not prove that the document was privileged or not privileged, because they had the burden.

So, along with that same thing, you can't rely upon somebody in court now saying what was inadvertent or not. What's most important is that there were attorneys who were representing the State when they produced those documents. It was produced in the probate proceedings, but for a conservator who was put into place specifically to investigate civil rights violations of these children.

This federal lawsuit had not been filed yet, but it was in order to discover additional evidence. And they had an opportunity for lawyers at the Department of Justice to review the documents. And what they talked about with respect to what's confidential is what they talked about.

But what they did is they reviewed them before they went out. We can only assume that. We know nothing else, because they were sent. And we don't know whether or not anything was held back. But those are clearly intentional disclosure of privileged communications.

So then I heard this discussion about how this is -- laughing at the fact that it's not relevant, and I'm going to

go back and look at Exhibit 4 to Ms. Tshala's declaration, page 14, I believe Mr. Jindal pointed to. And this is about some discussion for -- whether or not to revoke the family's certification. So, again, this is page 14 of that Exhibit 4.

THE COURT: And, again, that's starting at the top, "From: Anastasia Tibbetts"?

MS. RICHARDSON: Yes, Your Honor. And then below that is some communications with an attorney. I have still not heard that they are not going to put in -- I think it was that -- I think I heard him say, "I am not going to call any lawyers," but the key here is I'm wondering whether or not they're going to be putting forth any of these documents at all, using them in any way, any of these waived communications.

Or are they saying now that they are not going to put any of this into evidence and they're not going to call anybody, have any discussion about it? It's a question that I have. But I will say, for Your Honor, how it is relevant. So at this time, when it was found out that there was sex abuse that had occurred in that home, there was discussion then, obviously, with some attorneys and on how to handle that.

And here there is an attorney that is communicating with some of the DHS workers to now go into revoking the certification of that Raygosa home. But instead of revoking it, they're waiting on a voluntary termination by the Raygosas. Why? That is something that we would like to know more about.

I would like to have more of what has not been disclosed on those privileged communications.

Why are they seeking a revocation -- why are they not seeking a revocation soon, instead of waiting for voluntary termination?  The issue, I think, that I can see where the defendants would try to come in now and say that -- which is what they've been saying all along -- "Look at how good we are. All of us acted so quickly at the time when we heard about the sex abuse.  We knew nothing about the sex abuse before.  And we took all these actions.  Our attorneys were in there doing what they needed to do."

And now that is the way that they will try to defeat what is -- we're trying to prove, which is that they were deliberately indifferent to these children.  And so what we need to do is, since they have voluntarily disclosed this -- it was intentional, and they have also stated that it's waived -- this particular subject matter -- I'm not saying it's for all subject matters involving anything that those attorneys had discussed at the time -- but, to the extent that it is about the voluntary termination and the revocation of the Raygosa home, what were the other communications?

So a little bit about how they would use that as a sword and why we need to be able to see the others.  On the other hand, if they are now going to say, "No, we're not" -- I don't see how -- you know, "We're not going to be saying that,

or we promise not to," but the issue is, of course, that we need to be able to use these documents in order to show that -- what they're doing is they're waiting around on a voluntary termination instead of the revocation. So, in order for us to be able to do that, we need to be able to see the context.

THE COURT: If I'm to understand you correctly, if Mr. Jindal says these documents are not going to be submitted in any way, shape or form, and no witnesses will be called to talk about these documents, then there is no sword.

MS. RICHARDSON: About any of the subject matter with respect to these documents, that is something I have never heard yet. I don't know what the position is on that.

THE COURT: All right. Well -- and so -- but if Mr. Jindal says today that these documents will not play a role, nor will any witnesses refer to these documents in their defense, then, I mean, is that -- does that -- I mean, does that resolve the issue of -- of whether 502 intentional waiver applies?

MS. RICHARDSON: It doesn't resolve it. It's for Your Honor to determine. It doesn't say that sword and shield -- you know, a lot of these cases that talk about that are about, again -- just like I discussed and Mr. Jindal discussed, it is mostly talked about in implied waiver cases, but it is not the only analysis.

There is, too, the analysis, as he pointed out, that

if it's used to be selective, misleading and unfair, then it would not be fair to us not to have the rest of those communications. And so the wording is they ought, in fairness, to be considered together. That is the question for the Court.

The problem, of course, is if it is negative -- I think as Your Honor has stated before, you know, if it's something that's negative to the defendants, we want to use them. We should be able to use them. And the issue, though, is it's not fair for the defendants now to basically be selective about the impeachment documents that we are going to be using to show the bad behavior of the defendants at the time.

And instead we only have a few of those documents and not the full story. A lot of the witnesses have already testified on this matter. And I'm assuming if we asked the question, "Well, what happened" -- especially with Ms. O'Brien, "Were you -- were you removed for bias? Was that -- you know, what was the decision that was made with respect to that?" Are they going to say that she's not going to -- she's not allowed to answer?

And so for us, in order to be able to have a fair chance at showing what happened at this time, using these documents that they have intentionally provided and waived, we need to be able to have the context around that subject matter and the other undisclosed communications.

THE COURT:  All right.  Mr. Jindal -- sorry, Ms. Richardson.  I want to inquire of Mr. Jindal the questions that I posed to you.

I mean, I think I understood, at least to some limited scope, you indicated you were not going to be calling any witnesses or attorneys or something to that effect.  I mean, are any of these documents going to be -- are any of these documents that have been produced in the probate file, or that which have been provided to and part of Ms. Skjelset's documents in her declaration, going to be used in some way by the defense in its -- in its case?

MR. JINDAL:  The documents -- sorry, I'm getting a bit of an echo -- but the Exhibit 4 to the Tshala declaration contains the probate court documents.  We will not use the privileged legal advice in them in our defense.  I can say that.

THE COURT:  Okay.  And there won't be -- there aren't going to be any witnesses that are going to be called that in some way implicate advice given or not given?  I would assume you wouldn't.

MR. JINDAL:  Correct, Your Honor.  We do not intend to put on witnesses that discuss attorney-client privileged information.

THE COURT:  Okay.  All right.  And, Ms. Richardson, did you have additional argument that you wanted me to

consider?

MS. RICHARDSON:  Well, I would just say that it -- I don't think that that is going to undo what it is that we actually need these documents for; and, that is, for the context of how we're going to be using them in our case, to show how they were being deliberately indifferent at the time and the way they treated the children.

One last thing I'd like to point to the Court, just to respond to what Mr. Jindal had said earlier, is on that Exhibit 4, page 18, there was some discussion about how this was not relevant to this case.  But on this e-mail, which is dated July 5th, 2017, with Ms. Gonzalez and then some other DHS workers, in the paragraph it does say that "The judge will likely find this move is not in the best interest of the children and is impacting reunification, so no reasonable efforts."

Those are the things that we need to be able to ask, and we should be able to ask, and what -- what I want to be able to do is to go further into that, to find out what it was that was also discussed, not just with this particular e-mail. And, in all fairness, that is something that we need to see.

So the subject matter would be in moving the children out of these homes where they're being impacted and the safety of the children of the -- in that home at that time period.  So we've laid out all of the subject matter, so I won't go into

all of that.  That's clearly laid out in our motion to compel.

But it is up to the Court to determine whether or not, in fairness, we should be able to see the other undisclosed documents, together with these disclosed documents, because we need them in order to be able to impeach and put on our case.  So -- and I want to make sure that Your Honor -- oh, sorry.

THE COURT:  What I'm -- what I'm trying to come to terms with -- and this is a function of the kinds of -- you know, with the experience with the kinds of cases that I've seen over the years, which this one is somewhat unique, in that you have -- you have agency attorneys intimately involved, it appears, in the case working of -- of children in these settings.

And in one instance there's a claim of attorney-client privilege, and yet the very advice or decision-making by the -- by the agency, itself, may be informed or driven by these attorneys who have very specialized knowledge and experience in the world of -- of juvenile dependency, such that these attorney-client -- what is, on its face, attorney-client privileged communication are also essential to the very proof of -- of knowledge of abuse -- of the alleged abuses.

I mean, I'm trying to -- I'm trying to square that with, you know, what -- you know, any other -- any other -- I

don't want to use the term "normal" in a pejorative way -- but in a case where attorneys are very much removed from the behavior and conduct of their clients, it's much easier to appreciate and understand how -- how we can draw these firewalls between what attorneys tell their clients and what clients are doing in the course of conducting their business and allegedly committing, you know, culpable -- some kind of culpable act.

But in agency issues such as this, it's -- I mean, there's a commingling here that continues to confound me when trying to evaluate and analyze, you know, what is appropriately privileged and what's not; and, hence, the reason why I think you have to go through the 502(a) analysis, whereas under, you know, other circumstances if there were, you know, some different analysis involved here, which I'm -- I want to make it very clear I'm not looking for a reason to dispose of attorney-client privilege.

I'm very honestly, and perhaps maybe vulnerably, describing some of the intellectual challenges, the thinking challenges, with reconciling what we all normally -- well, I guess I used the word "normal" -- what we all might normally be familiar with in different kinds of case.

But here, I mean, if the attorneys are part and parcel of the decision-making associated with caseworker -- you know, with the agency's, you know, decisions, I mean, how do I

square that away?  I mean, how do I reconcile that?  How do I -- how do I make sense of it?

MR. JINDAL:  Your Honor, if I may.

THE COURT:  Yeah, go ahead.

MR. JINDAL:  Your Honor, the attorneys here provide legal advice.  They are not making the fundamental Child Welfare decisions.  And I think, even if you just look at the document that was raised as maybe a mixed fact/law document, it's really not a close case.  On page 18 of Exhibit 4 --

THE COURT:  I want to -- I want to -- I do have to throw in a particular other piece of information.  I think there was some e-mail between caseworkers actually taking Ms. Gonzalez to task for not letting them do what they want to do.  I mean, I can look through and find it.  But, I mean, there was something about how the caseworkers were complaining about Ms. Gonzalez getting in the way of them doing what they want to do.

So, I mean -- so in a -- I mean, it looks to me like, at least in this particular case -- and I'm not necessarily speaking to all agency relationships with their attorneys -- attorneys are getting into the middle of some of this work that DHS is -- is responsible for.

So go ahead.  You can respond to that, but also tell me the other piece that you wanted to.

MR. JINDAL:  Yeah.  I think I just have a few points.

If we look at the document that I think we were discussing, it's really not a close case.  This is an e-mail from an attorney to a --

THE COURT:  And remind me:  Which document is it again?

MR. JINDAL:  It's Exhibit 4 at page 18.

THE COURT:  Okay.

MR. JINDAL:  That's an e-mail from an attorney to caseworkers about -- in preparation for an upcoming hearing.  And, just to take it one step of extraction back, it is true that all government -- that many government employees are tasked with implementing and enforcing the law in their daily lives -- or as part of their daily jobs.

But courts have been very clear that that mere fact does not, itself, waive the privilege.  Government employees are entitled, just as any other actor, to receive and rely on the confidential advice and counsel of their attorneys.  And we don't agree that just because DHS officials are -- are subject to an elaborate body of law, that somehow their discussions with their attorneys are not privileged because they hew too closely to their job duties.

And so that might create some close questions at times, but that doesn't mean that there's some sort of categorical waiver, which is what we're here to discuss.  And just one --

THE COURT: Well, are we dealing with a categorical waiver? We're really dealing with sort of this intentional waiver in this very narrow space, which may -- and it being very appropriate within the context of an agency relationship with their lawyers.

MR. JINDAL: Yeah. And I think that's where I was going to go next, Your Honor, which is that we think that the subject matter waiver -- to the extent Your Honor reaches the issue -- and for all the reasons you and I discussed earlier, I don't believe you should -- but if you are inclined to grant some degree of subject matter waiver, the -- the subject matter as described in plaintiffs' motion and table is far too broad.

And I believe Ms. Richardson said it, that there -- they want everything having to do with the safety of the children, concerns about the household -- or any advice about the safety of the concerns, concerns about the household or efforts made by DHS with respect to these children. They want privileged communications about those things.

That is functionally every privileged communication that could possibly be at issue in this case. And the case law is very clear that a blanket waiver of that kind is inappropriate. On pages 2 to 3 of our brief, we explain in the italicized portions what we understand to be the subject matter of these documents.

And I'll tick them off very quickly. I know it's

beautiful outside, and it's 4:55 on a Friday.  So I'm the only thing between a lot of us and our weekend, so I'll make it quick.

THE COURT:  I want to make it very clear.  I am between everybody and --

MR. JINDAL:  Fair enough.  Fair enough.  I'm sorry, Your Honor.  That's right.

THE COURT:  Go ahead, Mr. Jindal.

MR. JINDAL:  Yes.  Well, then if I go long, we'll know who's ultimately responsible.

I was just going to say we read this as covering essentially four categories of subject matter.  And those are discussions about the status of the home certification during the pendency of the administrative appeal in June 2018, the November 2017 draft notice of revocation, legal advice regarding the Duncan-Raygosa home's offer to voluntarily terminate their own certification in July 2017, and legal advice regarding this July 2017 hearing, specifically with respect to the facts needed to support a founded disposition.

To the extent, as Ms. Richardson says, these are really key and they've just shown the lack of fairness, the subject matter has to hew closely to what's actually at issue in the documents.  And with that, Your Honor, I -- I think I'm done.  Thank you.

THE COURT:  Thank you.

Ms. Richardson, anything else?

MS. RICHARDSON:  I have one more, because Your Honor mentioned it.  If we could go to Ms. Skjelset's declaration, Exhibit 8, page 26.

THE COURT:  All right.

MS. RICHARDSON:  So I think Your Honor was saying it perfectly, and I'm not going to repeat what it is, because it is a struggle, especially when you see attorneys that are inserting themselves in, which is basically into the business, as opposed to pure legal advice, but they still are being part of this -- of what's happening at the time with these children.

And on this one, this is what you -- I think you were referring to, where there is an exchange between Mr. Hammond and Ms. O'Brien where they're talking about the AAG.  That would be Ms. Gonzalez.  And what it's -- you know, what O'Brien is doing is they're complaining about Gonzalez, and it's about the -- you know, and, again, it goes to the removal of O'Brien because of her bias.

And yet this -- this exchange is given to us, but then it's redacted for another piece of it, which is that attorney-client privileged portion that's redacted up above.  I don't know whether or not that's privileged because, again, it has been inconsistent with the way that privilege has been asserted in this case.

But we should be able to look at other undisclosed

privileged communication, to be able to use this document to show what those complaints were about Gonzalez and Gonzalez's -- and the attorneys that were part of all of this, working alongside the DHS workers.

THE COURT:  And I appreciate you pointing out that page, Exhibit 8, 26.  I had also been looking at Exhibit 8, page 18.

MS. RICHARDSON:  Yes.

THE COURT:  And that's also where the e-mail thread refers to something about "Trisha's never-ending sabotaging of our cases.  Really frustrating to work with.  Always telling you why you can't do things, rather than trying to figure out how you can."

So it just -- you know, there seems to be, obviously, a different -- much closer relationship than Mr. Jindal has described.  But I also appreciate, nevertheless, that there are these necessary -- necessary principles of attorney-client privilege that have to be recognized.  And I'm not looking at any kind of blanket waiver when I'm evaluating this question.

All right.  Counsel, thank you all very much.  I know that there is this other pending issue with respect to the motion for reconsideration.

Is that yours also, Mr. Jindal?

MR. JINDAL:  It is, Your Honor.

THE COURT:  Filing motions the day before we actually

have our status conference.

MR. JINDAL:  My understanding was that you wanted the motion at least 24 hours in advance.  It was 12:55 p.m., I think, we got it in, so -- but, Your Honor, if you'd prefer to take it up at the next hearing, I understand.

THE COURT:  Well, I don't know that the plaintiffs are prepared to respond to this.

MS. RICHARDSON:  It would be our preference to have time to respond.

THE COURT:  Okay.  Well, let me also ask:  The implications of this decision, I have to appreciate, must have some level of time sensitivity.  So --

MR. JINDAL:  Yes.

THE COURT:  You know -- you know the ground rules. I'm not changing the trial schedule, and we have a discovery plan in place.  Help me understand how quickly this can be done, with still having an opportunity for the plaintiffs to be able to respond?

MS. RICHARDSON:  I defer to Ms. Skjelset and Mr. Rizzo.

MS. SKJELSET:  I would like to first understand and get our arms around what exactly the documents that the State is referencing with regard to the motion --

THE COURT:  Well, I should say that they expressed concern about ECF number 182, in which they describe the Court

stating that documenting in OR-Kids is a privileged -- is -- is a privileged communication concerning a Child Welfare matter, on which the agency is receiving ongoing legal advice, waives privilege because OR-Kids is not confidential. I mean, so I had not the opportunity to go back to ECF 182.

Can you tell me, Mr. Jindal -- I mean, you don't give me a cite to 182. Is there a page in which I say so?

MR. JINDAL: Yes, Your Honor. Let me -- let me see if I can find it quickly. I thought -- I apologize for not giving you that cite. It's in -- it's in reference to docket -- oh, sorry. Go ahead.

THE COURT: Well, actually, as I'm quickly reviewing it, page 4 in the discussion, waiver of attorney-client privilege --

MR. JINDAL: Yes, Your Honor.

THE COURT: -- communication entered into the DHS caseworker database, such as OR-Kids, are not communications made in confidence and are not protected by the attorney-client privilege. Is that -- is that what you were pointing to, Mr. Jindal, when you cited to ECF 182 in your motion for reconsideration or clarification?

MR. JINDAL: It is, Your Honor.

THE COURT: Was there anything else in my order that gave you heartburn?

MR. JINDAL: Your Honor, I think --

THE COURT:  Beyond the normal Tabasco sauce level of heartburn.

MR. JINDAL:  Yeah.  Heartburn -- well, I -- I --

THE COURT:  Was there something else that is implicated by your motion for reconsideration in my order?

MR. JINDAL:  Your Honor, I think that the same verbiage, or at least -- or something similar to it, appears elsewhere in the order.  But substantively it's just the same point regarding OR-Kids for the --

THE COURT:  And if I -- as I read your motion for reconsideration or clarification well enough before coming to the bench today, is if -- a primary concern that the language used in my order has farther reaching consequences beyond this case?

MR. JINDAL:  Yes and no, Your Honor.  It's true that it has much farther reaching consequences beyond this case.  But it is relevant to this case.  I think --

THE COURT:  Wait.  I just need to know first that part.  So it does have consequences beyond -- well, yes and no.  It has consequences beyond the case.  But --

MR. JINDAL:  Yes, Your Honor.

THE COURT:  So, at least for my part, to the extent that I need to clarify my ruling, it can be explained that my ruling is limited to the manner in which this case has been litigated, the arguments presented and -- and preserved and --

for my consideration.  So that's one piece that I think I can address, because I -- I'm not intending on -- on expanding the scope of -- of my ruling to something that could be in some way precedent-setting or controlling to any other case than the ones that are before me.  I'm --

MR. JINDAL:  Thank you, Your Honor.

THE COURT:  I can't imagine that anybody else here is going to suggest that that be -- that that -- that clarification is incorrect or should not be provided.

All right.  Okay.  And I'm hearing -- I'm hearing no objections by plaintiffs' counsel.  So, setting that issue aside about its broad-reaching impact and consequences to cases across the state that are in front of DHS or any other agency, I think I can -- you know, it's -- I can adequately clarify and restrict.

But I think you have other issues as it relates specifically to this case.  And I'm not -- so the first one was easy for me to resolve, because I think I can do that without anybody needing to brief the matter.  Now the one you're going to talk about is something that I want to make sure that the plaintiffs have an opportunity to probably respond to.

So go ahead.  What was the yes and then the no?

MR. JINDAL:  Oh, on my end, Your Honor?

THE COURT:  Yes.

MR. JINDAL:  I -- yes, Your Honor.  That we thought

that a blanket ruling that OR-Kids -- that putting a document into OR-Kids waives privilege and confidentiality, that has ripple effects. And we understand Your Honor to have helpfully clarified that you were deciding it based on the posture of this case, and this case alone, and you didn't intend to have those ripple effects.

The second point I was going to make is that I believe there are some -- not a lot, but some -- documents that we've redacted privilege on in OR-Kids, so we'll produce the case note and then redact that we would like to still maintain the privilege over.

MS. RICHARDSON: And we need to --

MS. SKJELSET: (Indiscernible).

MS. RICHARDSON: Oh, sorry, Ms. Skjelset. Probably going to say the same thing.

But, now that I hear Mr. Jindal say that, it is unclear where in the privilege log these OR-Kids -- so it would be good if Your Honor could tell the defense to put on the privilege log where these documents, OR-Kids, they have identified as privileged, that were put in OR-Kids, like another column.

MR. JINDAL: Your Honor, I don't --

THE COURT: I just want to -- Ms. Skjelset, was that something you were going to say, or was there something additionally?

MS. SKJELSET: Yes, Your Honor. I was somewhat bewildered, I suppose, by the motion for reconsideration because we did an inspection of OR-Kids files, and there was only one document that we understood that they were asserting any privilege over in the OR-Kids database files that we inspected.

So I was surprised to hear that they were asserting -- intending to assert privilege on other documents that were placed in the case notes. And we -- we're asking to get our arms around what it is they have withheld or what they were asserting privilege over and whether they were --

THE COURT: Let me also throw my two cents in on this. And when developing this -- this opinion and the reasoning in the opinion to explain my -- my position, it was based on the framing of the -- of the structure of OR-Kids and that which was being put into OR-Kids.

Last week, if I'm not -- it might have been last week when Ms. Hoffman -- I'm pretty sure it was last week -- Ms. Hoffman described something to the effect of there's a lot more that goes into OR-Kids than we were ever -- than -- than we've been discussing, and including very clearly retained attorney-client privileged statements.

That had been the first time that anybody that I recall, in the course of any of the briefing, described to me that OR-Kids was more than case notes specifically relating to

what's going on with the children in -- in DHS's -- DHS's jurisdiction.

So part of the challenge is that there's been a bit of a moving target about what OR-Kids is all about.  Many of you have a far greater knowledge about what is happening with OR-Kids than I do.  So you have to appreciate that my ruling is based on how OR-Kids was described at the time that I made this ruling and that there was -- there was this discussion -- and -- and this was in the context of the rules that I tried to develop to send back to defense counsel to conduct their -- their review of the privilege log to find if there were things that were cut and pasted -- case notes cut and pasted from what was otherwise privileged documents between attorneys and caseworkers that were uploaded into OR-Kids.

It was in that context that my statement was made, that my reasoning was provided that cut-and-pasted descriptions of -- of situations with the -- with the children or with the case itself that had been -- that had been communicated in e-mails, but then pulled and then -- and then placed into OR-Kids was no longer attorney-client privileged.

And I think, if I'm not mistaken, in a conversation with Ms. Hoffman, she had agreed that those cut-and-pasted excerpts were no longer privileged because they were put into OR-Kids.  So -- now -- now, Mr. Jindal, you may disagree, but you weren't part of the conversation back then.  You may have

been behind the scenes; but now you've shown your face, and now I know who you are. So --

MR. JINDAL: It's good to meet you, Your Honor.

THE COURT: So I think it's incredibly important that -- look, I'm willing to revisit clarifying my language, to the extent necessary, to ensure that there are no unintended ripple effects. But I also think you need to go back and look at what the defense was describing about OR-Kids and what it was that you had agreed was no longer privileged, so that you're not really -- you know, I've made my decision, but I want to be able to hone the decision in such a way that is -- that maintains the integrity of the decision itself and does not expand beyond the boundaries of this case. So --

MR. JINDAL: Your Honor, may I --

THE COURT: Yeah, go ahead.

MR. JINDAL: -- briefly.

THE COURT: Now you are holding people back from their weekend. It's on you now. Go ahead.

MR. JINDAL: Fair enough. I want to make two quick points. I know that we're going to receive some more briefing, and then we'll have -- set this for argument. But in our papers we quote -- we include the quotation from Ms. Hoffman on the record, and what I believe Ms. Hoffman was intending to say, and what she, in fact, does say, is that the specific document at issue was -- was dumped into a case note and

produced and that we're not clawing it back.

And the key point is that it had been produced and that we were not clawing back. And that -- we're talking about log 37. And your order is actually very clear that log 37 -- or sorry -- 637 likely was not privileged at all. And so our view was that we had produced it. We weren't clawing it back, and that was -- that was the -- the content.

We did not intend to make a blanket statement with respect to OR-Kids and -- which includes all sorts of protected information, not just legal information, but health information, doctors' notes --

THE COURT: So, Mr. Jindal, I get what you're saying. I get it. I just want to make sure that you understand that was not part of the conversation; and we're not talking about just last week, but it was the first time around when -- when we actually had this lengthy discussion about what documents I was going to be reviewing in camera.

And so, you know, we've had a few iterations of this. And so, you know, I can also appreciate that there's been some need for further precision, as this case is unfolding. I'm fine with exploring more refined language, because I do not want to have anything -- I do not want anything to be done that was certainly unintentional on my part.

But my language now, on reflection, by virtue of even the parties' understanding of what the issues are, doesn't

provide the guidance that's necessary. So I don't really need the argument as much as I need to make sure that everybody's on the same page about how we make sure that we say exactly what -- I say exactly what I need to say to ensure that -- that -- in my estimation, the excerpts that had been pulled from e-mails about casework -- casework -- the caseworker assessments that had been, I think, e-mailed to the attorneys, but then uploaded up into OR-Kids as part of the caseworker notes, I mean, as I recall, that was what I was saying is producible, discoverable.

MR. JINDAL: Your Honor, and I think our primary concern, just to put a fine point on it, is the inverse situation, where there's a privileged communication between attorney and client and that is inputted into OR-Kids. We don't believe that the inputting it into OR-Kids is, itself, a waiver of the privilege. And that's the point we're attempting to make.

THE COURT: And -- and without knowing anything more about how the plaintiffs may otherwise argue, I would agree with you.

MR. JINDAL: Understood, Your Honor. I think -- I think we've made it to the weekend.

THE COURT: It's past 5:00.

MS. RICHARDSON: Can I just make sure I have a clarification -- and I'm sorry about that -- to say -- 'cause I

just heard -- so I think what I heard from Mr. Jindal is that if there is a document that was an e-mail that might have been privileged or communication with an attorney and that is cut and pasted into OR-Kids, he's agreeing that that is not a privileged communication now, because it is in OR-Kids.

MR. JINDAL:  No, Your Honor.  I'm saying it is still privileged, despite the fact that it was uploaded to OR-Kids.

THE COURT:  So I'm going to give you some for-examples, as I'm trying to understand it, without having actually even seen how OR-Kids works.  But when I look back on the documents that I had to review in camera, there were descriptions.

For example, I think there was one involving the driver's -- you know, the person who was doing the driving and the assessment of the -- and the observations that the driver had made.  I think it had originally been claimed as privileged.  And, you know, forgive me if I'm actually using the wrong example.  But I think that had been cut and put into OR-Kids.  And that's not privileged because --

MR. JINDAL:  Your Honor --

THE COURT:  -- it got put onto OR-Kids, even though I think the e-mail had originally been claimed as privileged, because it was an e-mail to an attorney.  But if I'm further understanding Mr. Jindal's finer point, it's that -- let's say there was a communication between attorney -- or a caseworker

and attorney.

And caseworker is saying, "Attorney, I need to get some direction on how to address this particular issue that's been raised by Judge McAlpin today in the hearing," et cetera, et cetera.

And there is a place in OR-Kids that allows you to cut and paste that up into a record in OR-Kids somewhere that -- and, again, I don't know how the structure works, but it's in OR-Kids somewhere.

I think Mr. Jindal is saying that communication remains privileged, even if it was cut and pasted from an e-mail and placed into the OR-Kids database. So that's -- that's what I -- is that -- is that a -- I get a very blunt, but perhaps workable, example of what the distinction is, Mr. Jindal, that you -- you think we were talking about?

MR. JINDAL: Yes, Your Honor.

THE COURT: And it's an example of what I was -- I'm thinking about and trying to create a distinction between the two things.

So, with that in mind, Ms. Richardson.

MS. RICHARDSON: But then they produced -- they produced the OR-Kids to us with that e-mail. It's no longer privileged.

MR. JINDAL: A couple points on that. Sorry.

THE COURT: Okay. Go ahead.

MR. JINDAL: I'm just -- we produced OR-Kids sometimes with redactions; and that's what's at issue here, is that there would be a redaction for privileged information. That's what they're contesting, and they would like have revealed now, because it was produced in OR-Kids. And we don't agree with that.

The second is that Your Honor has issued a protective order that says -- that contemplates that if there are inconsistencies in redactions across documents or if a privileged document is inadvertently produced in discovery, the parties will confer, and we'll get the opportunity to claw it back.

We've done that, to the extent they've raised a discrepancy. So without knowing precisely what document Ms. Richardson is referring to, I can't answer further. But all I would say is that the production, itself, doesn't -- doesn't reveal something.

THE COURT: So I -- and I do want to make sure that we get into a hard stop space right now, because, at least for my part, I have a better understanding of what the problem is; but the only ruling that I can provide right now, at least orally, and it is on our record, that -- that any of my decision in ECF 182 is not intended, nor should be construed, as a ruling that applies to any other cases within the state, with any agency, and only with respect to Levi and -- and

Conley.

The second piece of it is -- is -- I'm glad we had at least a sort of priming conversation because now I think the plaintiffs can appreciate maybe some of the nuances here that you're trying to describe in your motion for reconsideration. I also have a better understanding of what that nuance might be.

I'm going to defer any more ruling on this because I really want the plaintiffs to have a chance to brief it.  Now, that comes to almost the last point.  There are two -- two remaining issues.

One is I'd like to get that brief -- response brief from the plaintiffs yesterday; but I know, given that that's not likely, nor realistically feasible, how soon can I get it? Because I would like us, if argument is going to be necessary, to look at September 20th for visiting this issue, and perhaps only this issue, for our next status conference.  So I can -- because it sounds to me like this is going to be time-sensitive, I probably need to get this decided sooner than later.  So --

MR. RIZZO:  Judge, from Plaintiff Levi's perspective --

THE COURT:  Somebody's talking, but it's a disembodied voice.  Who is that?

MR. RIZZO:  It's Mr. Rizzo.

THE COURT:  Oh, Mr. Rizzo.  I lost you from my view.  But, now that I know who it is, go ahead.

Oh, there you are.

MR. RIZZO:  Am I back?

THE COURT:  Yes, you are.

MR. RIZZO:  My bad.  I'm sorry, Your Honor.  I just wanted to say, in terms of the timeline, I want to pick up on Ms. Skjelset's point.  My concern with Mr. Jindal's argument is that, unless he is identifying specific documents, we can't really respond because the argument is being made in the abstract, obviously, in an effort to delimit the Court's ruling to this case.  And that's been addressed.

But, beyond that issue, there's really -- there's no merit in the sense that we don't have a foundation on which to -- to address specific arguments about specific documents.  And so, coming full circle, that's why Ms. Skjelset was asking.  And when we looked at this motion, we were of the same mind, which it's awfully abstract.  And where are these documents that we never saw or that weren't reflected when we personally spent time going through this database in Salem, Oregon?

THE COURT:  All right.  So --

MR. RIZZO:  And that affects our ability to respond.

THE COURT:  So are you saying -- so what's the solution?  You want a privilege log that identifies these OR-Kids entries that are being claimed as privileged?

MR. RIZZO:  Well, two things.  One, are they on the existing log?  And if not, why not?  And then if the Court allows them to supplement with a supplemental privilege log, then that's okay.  But right now we have no idea what --

THE COURT:  So the privilege log does not identify documents for which portions were entered into OR-Kids?

MR. JINDAL:  Your Honor, the privilege log does not -- it's a -- it's a list of documents that have been withheld, not redacted.  So it wouldn't necessarily capture all of the documents the plaintiffs are describing.  I will say that earlier this week, I believe Ms. Korbel sent my office either a letter or an e-mail that identified at least some e-mails that -- or I'm sorry -- some OR-Kids entries that we've redacted that at least Conley believes we've waived the privilege to under Your Honor's order.  And that's really what's teeing this up for us.  So Ms. Korbel has that information.

MS. KORBEL:  If you're referring to the documents identified in Ms. Hoffman's claw-back letter and that's the sort of universe that we're discussing and that's what this is about, then I think we -- that's pretty clear we can work off of that.  But if it's more than that, that's hard -- you know, how do we know what more?

MR. JINDAL:  Your Honor, I think those are --

MR. RIZZO:  (Indiscernible).

MR. JINDAL:  -- good examples.  I can't say right --

THE COURT:  Hold on a minute.  I can't hear over both of you, and the court reporter won't be able to transcribe.

Mr. Rizzo, then Mr. Jindal.

MR. RIZZO:  Thank you, Judge.  We need that information from Markowitz, not from our own guesstimations as to what documents are at issue for purposes of this motion for reconsideration.  They need to identify what documents they withheld, where they have been marked or not marked for privilege, and then we can respond.  And I'd love to respond by September the 20th, if I have that information.

THE COURT:  Mr. Jindal.

MR. JINDAL:  Your Honor, the productions have occurred.  They have a privilege log for everything that's withheld.  They have the physical documents for all documents that have been redacted, and they know as well as we do which of those occur in OR-Kids.

THE COURT:  They're saying -- no, hold on a minute Mr. Jindal.  I'm seeing them all shaking their head, so there's a disconnect here.

MR. JINDAL:  Well, Your Honor, if the redaction appears in a case note that's printed out of OR-Kids, that means that we're redacting documents from OR-Kids.  I'm not so sure I understand their concern.  And Ms. Korbel was able to identify, I think it was, a dozen documents in her letter to

us.

MS. KORBEL: That was directly copied from Ms. Hoffman's claw-back letter. So that's why I'm asking you. If those are the documents and that's what we're discussing, that's easy. I can do that. But I didn't come up with that list. Ms. Hoffman did.

MR. JINDAL: Your Honor, I can't tell you now that -- I can tell you that we understand there to be some attorney-client privileged e-mails -- or sorry -- documents within OR-Kids. I think the universe of those is that -- the ones that Ms. Korbel sent us, and that could be at least for the purposes of the motion.

What I don't want to do is say -- is somebody on this call to tell me, "No, no, no. Here's another five documents," that Ms. Korbel didn't alert us to, that haven't been the subject of other motions practice.

THE COURT: And Mr. Rizzo is indicating that he -- he wants there to be the affirmative communication from defense counsel what that is. And so what I'm going to ask you now then is to independently confirm that whatever it is that Ms. Korbel has communicated with you is, in fact, what you, from your own review -- is -- is that -- is that universe of documents that they need to deal with.

So that way -- I mean, if the plaintiffs are erring in what it is they need to understand, it's something that

needs to come from -- especially if we're looking at essentially something that is being claimed as privileged, I need to, and I think it's appropriate -- I need to provide the instruction, and it's appropriate for the plaintiffs to know, that the communication about what it is that's being claimed here is being withheld from the OR-Kids database is coming from you, Mr. Jindal, as defense counsel.

MR. JINDAL:  We will do our best to put that together.

THE COURT:  Is that sort of like getting it when we can?

MR. JINDAL:  Well --

THE COURT:  Mr. Edelson, you know, I always have to come back to you at the end.

All right.  So I need to set a time frame.  Let's get some time frames down.  I mean, I need a response from them by the 20th, because I'd like to be able to make a decision about what this universe is on that day, too, so we aren't here for a half a day, but maybe we can be here for a quarter of a day or shorter.

MR. JINDAL:  Yeah, your Honor, the reason I'm hesitating -- and maybe that'll help sort of narrow the scope of what I'm attempting to do -- I think what I can do is confirm fairly -- like, figure out pretty quickly what documents in OR-Kids we have redacted from within the

production of OR-Kids.

What I'm worried about is if there's been an inadvertent disclosure that the -- the protective order contemplates and we need to claw back later, because something wasn't redacted that should've been and was redacted in other places.

I don't want to waive our opportunity to do that if someone, you know, a couple of weeks from now or a month from now, points out, "Oh, you've redacted this e-mail a dozen different places, but it was also not redacted in this case note somewhere," or something like that.  And so I -- without waiving our ability to --

THE COURT:  I -- I can appreciate that -- that you're definitely more embedded in sort of the nuance here.  I'm looking for sort of that quick and dirty, sort of high-level answer, which is, yes, you're going to do it.  Let's do it by Tuesday, so that way plaintiffs can file a response by sometime Thursday before midnight --

MR. JINDAL:  All right.

THE COURT:  -- so we can actually read it before we meet and get a chance to be able to talk somewhat -- somewhat intelligently about the issue.  Okay?

MR. JINDAL:  With the expectation that it's quick and dirty, I think the end of the day -- by midnight Tuesday, I think we should be able to do that.

THE COURT:  And, I mean, will there be any benefit, plaintiffs' counsel, to have a conversation with Mr. Jindal, so there can be some clarification about what this all is supposed to look like and what it is that you need, so you can respond?

MS. RICHARDSON:  I think it's pretty simple.  It's pretty simple.  It's just tell us which documents you're withholding that are in OR-Kids that you're complaining about.  That's what we need to know.  And if you can point to them on the privilege log, great.

THE COURT:  And --

MS. RICHARDSON:  Okay?

THE COURT:  And was there something -- is there something complicated with that, Mr. Jindal?  I can appreciate you all know what's going on better than I do.  It sounds simple to me.

MR. JINDAL:  I think we can identify Bates numbers of redactions.  I think the disconnect between us is -- and I know that Ms. Hoffman and Ms. Richardson talked about this last week -- that the withheld documents don't have Bates numbers, and the redacted documents aren't on the privilege log.  But we can identify them in a way that people can find them either by log number or Bates number.

MS. RICHARDSON:  Great.  Thanks.

THE COURT:  Okay.  Good.  So next Friday, 10 o'clock a.m.?

Hearing no objection --

MS. RICHARDSON:  Did you say 7:00?  7:00 a.m.?

THE COURT:  Oh, I said 10:00 a.m.  I think I would --

MS. RICHARDSON:  Oh.

THE COURT:  -- I'd face mutiny on this side of the -- of the valley if I said 7:00.  So 10:00, 10:00, 10:00 -- one, zero -- a.m.

MS. RICHARDSON:  Thanks.

THE COURT:  Okay.  All right.  And it'll be by video conference.  And I will also, before then, have -- I already have a draft of the order from last week.  I'm hoping to get that completed and sent to you early on in the week, so you have an idea of what that says.

But I think there was some question -- I think it was from Ms. Skjelset -- "Can we operate on the oral rulings, so we can keep things moving along?"  And the answer is, yes, I want you to continue to move along and not wait for the order, unless you're having some complications with understanding what my ruling had been.  And then -- and, you know, I'm working in getting that draft out.

All right.  Finally, with respect to the issue of the 502, the issue with respect to intentional disclosure, or at least the production of these documents, I find that that element has been met.  I want to make it very clear that the remaining elements, specifically with respect to fairness, is

something I'm going to need to delve much more deeply into.

I want to make sure that everyone understands that, while this case has been replete with issues around attorney-client privilege -- and it sounds like the bedrock principle of attorney-client privilege in my world is being shaken, because it's being waived in some places and asserted in others; and it seems to be, like, central to so much of the discovery in this case -- I don't want anyone to get the impression that I am going to continue to -- let me -- I'll just say it -- I'll say it more directly.

I'm very reluctant to find waiver of attorney-client privilege.  And so these issues with respect to fairness have to meet a very high standard for me.  It'll certainly be within the context of our Ninth Circuit precedent.  But I just want to simply disclose to all of you what my cards are.

I've told you my card on the issue with respect to intentional disclosure of these documents.  That's not going to be an issue that, you know, you're going to see me talk too much about.  You know, I think -- I think the evidence is clear, and it establishes that it was intentionally given up.  It was not done in error.

With respect to the other elements for waiver, I have to dive more deeply into that.  I simply want to be very candid and transparent with you about the fact that I think it's a hard row to hoe on plaintiffs' side with respect to those

elements.  But I'm going to be looking at it closely, like I am trying to do with everything you're throwing at me.

All right.  Thank you all very much.  I'll see you 10:00 a.m. on Friday next week.  Have a good weekend, everybody.

* * *

(Court adjourned, 9-13-24 at 5:28 p.m.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman, et al.

Case No. 6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman, et al.

Case No. 6:23-cv-01353-MK

Status Conference

September 13, 2024

I certify, by signing below, that the foregoing is a true and correct transcript, to the best of my ability, of the videoconference proceedings heard via videoconference, taken by stenographic means.  Due to the audio-visual connection, parties appearing via speakerphone, speakers overlapping when speaking, the speaker's failure to enunciate, background noises and/or other technical difficulties that occur during videoconference proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the videoconference at the U.S. District Court of Oregon in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

_____

Official Court Reporter     Signature Date: 9/26/2024
Oregon CSR No. 14-0427      CSR Expiration Date: 6/30/2026