IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                        )
                                   )
                    Plaintiff,     )   Case No. 6:22-cv-01813-MK
                                   )
          v.                       )
                                   )   July 10, 2024
KIM CHAPMAN, in her                )
individual capacity; ANASTASIA     )
TIBBETS, in her individual         )
capacity; KASSIDY O'BRIEN, in      )
her individual capacity, ERIN      )
LANE, in her individual            )
capacity; THE OREGON               )
DEPARTMENT OF HUMAN SERVICES,      )
a government agency; and JANE      )
and JOHN DOES 1-5; in their        )
individual and/or official         )
capacities,                        )
                                   )
                    Defendants.    )
_____    )
OREGON DEPARTMENT OF HUMAN         )
SERVICES,                          )
                                   )
          Third-Party Plaintiff,   )
                                   )
          v.                       )
                                   )
JOE ALBERT RAYGOSA,                )
                                   )
          Third-Party Defendant.   )
_____    )


STATUS CONFERENCE

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES

FOR THE PLAINTIFF(S):

STEVEN V. RIZZO
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE PLAINTIFF(S):

MARY SKJELSET
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE DEFENDANT(S):

CHAD A. NASO
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97204

FOR THE DEFENDANT(S):

HANNAH HOFFMAN
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

HARRY B. WILSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

LAUREN F. BLAESING
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

SHANNON CONLEY, Conservator    )
for Z.C., a minor,             )
                               )
                    Plaintiff, )  Case No. 6:23-cv-01353-MK
                               )
            v.                 )
                               )  July 10, 2024
KIM CHAPMAN, ANASTASIA         )
BROOKS, KASSIDY O'BRIEN, ERIN  )
LANE, MARGARET RAMIREZ, in     )
their individual capacities,   )
                               )
                    Defendants. )
_____)

STATUS CONFERENCE

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES


FOR THE PLAINTIFF(S):

BONNIE RICHARDSON
Allegiant Law LLP
100 SW Main
Suite 400
Portland, OR 97204

FOR THE PLAINTIFF(S):

MARISSA KORBEL
Allegiant Law LLP
100 SW Main Street
Suite 400
Portland, OR 97204

FOR THE PLAINTIFF(S):

MANUELLA M. TSHALA
Allegiant Law LLP
100 SW Main Street
Suite 400
Portland, OR 97204


FOR THE DEFENDANT(S):

CHAD A. NASO
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97204

FOR THE DEFENDANT(S):

HANNAH HOFFMAN
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

HARRY B. WILSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

LAUREN F. BLAESING
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

(July 10, 2024)

DEPUTY COURTROOM CLERK:  Now is the time set for Civil Case No. 22-01813, Levi v. Chapman, et al., and Civil Case No. 23-01353, Conley v. Chapman, et al., for a status conference.

THE COURT:  This will be a "status conference" conference and sort of a "discovery dispute" conference as well, just to be clear that that's what we're trying to accomplish today.

For the Conley case, Conley v. Chapman, will counsel please introduce themselves.  I'll start with plaintiff's counsel.  Please give me your full name and your honorifics, such as Mr., Ms., or Mx.

Who is here for the plaintiff on Conley?

MS. RICHARDSON:  Yes.  If it's okay, I'll just go ahead and do it for the three of us on the phone for efficiency's sake.  This is Bonnie Richardson.  And "Ms." is my preferred pronoun, I guess.  And then also on the phone, on behalf of the plaintiff, Conley/Z.C., is Marissa Korbel, and -- who goes by "Ms." -- and Manuella Tshala, who goes by "Ms."

THE COURT:  All right.  Thank you, Ms. Richardson, Ms. Korbel, and Ms. Tshala.

Now, Ms. Richardson, will you be handling most of the

discussion, if not all of the discussion, on the Conley matter?

MS. RICHARDSON:  Yes.  Except if we get into details about certain discovery items.  I'll be handling the legal issues, yes.

THE COURT:  All right.  So you'll be the point person?

MS. RICHARDSON:  Yes.

THE COURT:  And I recognize you'll be able to tap somebody in if you need to, but I'll be identifying you, Ms. Richardson, as the lead, to -- to lead off whatever the arguments might be and -- and the solutions that you're proposing.

And if you want to tap somebody in to make some additional suggestions, I'm happy to do that.

And then for defendants on Conley v. Chapman, I believe it would be the same for -- in Levi v. Chapman.  So, actually, why don't we do this:  Who are the attorneys for plaintiff on the Levi matter present?

MR. RIZZO:  Good afternoon, Your Honor.  This is Mr. Steven Rizzo on behalf of Plaintiff Levi.

THE COURT:  Okay.

MS. SKJELSET:  Good afternoon, Your Honor.  This is Ms. Mary Skjelset on behalf of Plaintiff Levi.

THE COURT:  Good afternoon to both of you.

To the extent -- well, I'm -- what I'm hoping to do is try to keep our discussions and arguments streamlined.  I don't think I need to go in round to hear everybody's position, as long as the positions are about the same; so I don't need people to repeat arguments that have already been made.

Will most of the issues be overlapping between the Conley and Levi plaintiffs?  Albeit, I can appreciate there might be different issues, but at least with respect to the same issues, will the arguments and solutions be similar or identical?

Ms. Richardson?

MS. RICHARDSON:  Yes.  And most of the issues are going to be addressed primarily by the Levi plaintiffs, and we'll just add as we go along.

THE COURT:  All right.  And then I'm now going to turn to the Levi plaintiffs.  Will it be Ms. Skjelset or Mr. Rizzo who I should identify as the point to help lead the discussion and identify the checklist of items that need resolution?

MR. RIZZO:  Your Honor, this is Steve Rizzo.  I think the way we're going to structure this is Ms. Skjelset will handle the privilege issues, and I'm prepared to discuss the remaining discovery motions that are pending as best I can.

THE COURT: Okay. So, Mr. Rizzo, your audio is a bit muffled, and it is hard for me -- or it's taking extra effort for me to process what you're saying. So if there's another microphone that you can use, I'd recommend trying it; so that way I won't -- I won't be spending bandwidth on whether I can listen to you, but what you're saying.

MR. RIZZO: Should I -- I -- we have some rollerbladers outside; so I'm on my cell phone, Judge, so I can mute more easily, but I could try to call back and maybe get a better connection.

THE COURT: Well, Mr. Rizzo, how loud are rollerbladers? Come on. Don't blame it on them.

MR. RIZZO: Well, they're actually --

THE COURT: They're probably only 10 or 11 years old. I mean, you're picking on -- you're picking on people who can't defend themselves. Stop.

MR. RIZZO: But I do apologize, and I can try to call back in, if this isn't any better.

Is this getting better? I have the phone now very close to me.

THE COURT: That is much better. That is much better.

MR. RIZZO: That's how I'll handle it, then. Thank you, Judge.

THE COURT: Thank you.

Defense counsel, you are on notice you are not to blame anything on anyone that is on wheels.

So, defense counsel, who's present?

MR. WILSON:  Good afternoon, Your Honor.  This is Harry Wilson, Special Assistant Attorney General for defendants in both matters.  I am Mr. Harry Wilson.  With me on the phone are Ms. Hannah Hoffman and Mr. Chad Naso.

Ms. Hoffman will be addressing issues related to the case deadline, and Mr. Naso will be addressing issues related to discovery disputes.

I am also going to potentially chime in, as necessary, but hopefully very little.

And due to a -- I just want to let the Court know that, due to a prior commitment, I will need to leave this call at approximately 4:15, and my colleague, Lauren Blaesing, will be joining sometime around that time as well.

THE COURT:  All right.  Thank you very much.  And I appreciate the forecasting and roadmap so that way I'll know how things might be shifting going forward.

If at any time anyone is unable to hear me, please chime in.  I certainly want to make sure that I'm able to be heard as much as I would like to hear all of you.

All right.  Now that we have -- I think we have everyone identified and who might be leading on what issues, the roadmap that I -- the way that I like to approach this

is frankly to follow -- we'll start with Ms. Skjelset and the issues that are raised there.  Ms. Skjelset on privilege, and then, Mr. Rizzo, you had other discovery matters.

I want to use your checklist as the first round of issues to address because I am operating on, I think, a very well-founded belief that all of you know your case better than I do, and I want to see if we can try to tackle the things that are most important or as broad-based as possible, that might also end up resolving smaller issues by our answering those first issues first -- those important issues first.

So I'll leave it to you to understand how best to, you know, eliminate the disputes as we move through them.

So we'll start with Ms. Skjelset.  Privilege.

Is there anything, Ms. Richardson, you're going to be speaking about on privilege?

MS. RICHARDSON:  On the privilege and work-product issue?  I may also just add, if there's anything more to add, or answer questions, but I'm going to rely mostly on Ms. Skjelset.

THE COURT:  All right.  Then, Ms. Skjelset, I'll -- I'll make sure you have the floor first to address the issues of privilege and work product.

And then who will be responding to that for defendants?

MR. NASO:  I will, Your Honor.  This is Chad Naso.

THE COURT:  All right.  Very good, then.

Is there any -- before we jump right on in, are there any other issues that need -- need to be identified that have not been identified in your -- your emails or other -- other motion briefings?

Ms. Skjelset?

MS. SKJELSET:  Your Honor, I don't believe so.

First, I do want to apologize for not being able to attend the last court hearing.  I became very ill that morning and simply could not possibly have handled it, and it is not like me, and I do apologize.

THE COURT:  No apologies necessary.  Life happens.  Let's jump on into it now, and we'll -- we'll just get back on track.

MS. SKJELSET:  All right.  I laid out in my letter, on page 6 of the letter, the motions that I believed were then pending when I wrote it, which was July 1st.

To add to that, there's defendants' motion to extend case deadlines and our response, which we filed out of an abundance of caution, despite we had -- the fact that we addressed the issue in the letter last night.

I'm sorry for my cough.

I will be handling the -- our motion for *in camera* review of withheld documents to determine whether

attorney-client privilege applies.  It was filed on April 3, 2024.  And also our related motion to compel the O'Brien/Hammond draft and related emails issue.  I can also handle the defendants' motion to extend case deadlines and our -- our response to that.

With regard to the motion for *in camera* review of withheld documents, I believe that we laid out pretty clearly the history of the case, which involves the assertion of privilege over more than 800 email communications.

(Indiscernible.)

THE COURT:  And you laid it out where, Ms. Skjelset?  I want to make sure I know what -- is it in your letter of July 1st?

MS. SKJELSET:  Oh, that motion is -- was filed on April 3, 2024.  It's ECF 118 at 8 through -- pages 8 through 13.

THE COURT:  Let me just make sure I have that. I'm pulling that up.  Give me a moment.

MS. SKJELSET:  Absolutely.

And I believe that this and also the related motions to compel the O'Brien/Hammond draft and related emails, which is found in the same submission, was subject of the Court's --

THE COURT:  Okay.  I've read them in the past;

and, unfortunately, I was more prepared last week and I think less -- less on top of the specifics this week, but I think my memory will be -- will be jogged clear and I'll recover the issues in my mind as soon as we start arguing them.

But let me -- let me get the -- let me get the brief up here so I -- so we can talk more informed.

And it was ECF Number --

MS. SKJELSET:  118, Your Honor.

THE COURT:  All right.  Please continue, Ms. Skjelset.

MS. SKJELSET:  So the background, Your Honor, starts on page 3, and it took some time to obtain the privilege log in this case, and it took some time to confer with defendants, and defendants were -- I think appropriately withdrew privilege of assertions over certain documents, but there still remain nearly a thousand emails in communication over which they have asserted privilege and/or work-product protection.

We tried to narrow those to the communications based on the log that appeared to not include an attorney or simply copy an attorney.  Our concern here, Your Honor, is that they are -- their assertions are overbroad and that they are asserting privilege over communications that may contain facts that were relayed in time between caseworkers,

including defendants, that would bear on the standard that we need to prove in this case.

And we have received substantial, I would say -- at least significant enough amounts of inconsistent redactions, otherwise waived materials, that call into question their process for determining what is privileged and what is not, and we do not want the State to be able to use the privilege with an AAG attorney, in the context of a juvenile dependency matter, as both a shield and a sword.

Because in the process of working with them to determine which documents would be -- for which they would, you know, retract their assertions of privilege, we've noted that they are retracting assertions of privilege for certain documents that -- we think that maybe put them in a better light and for others, such as the exchange between Ms. O'Brien and Mr. Hammond --

THE COURT:  Which exhibit -- which exhibit to your motion is the privilege log?

MS. SKJELSET:  So the privilege log itself --

THE COURT:  Well, so I -- I guess what I'm trying to do is I want to get my eyes on what the actual issue is. I get that there's this general idea about, you know, the attorney-client privilege being in both, but I want to understand what the privilege log is saying is being claimed as privilege so I have a better sense of what the scope of

the issue is.

Otherwise, we're just dealing with legal argument, which doesn't help me close the -- close the distance.

MS. SKJELSET:  That is completely --

THE COURT:  So I want to look at that.

MS. SKJELSET:  -- completely --

THE COURT:  Is the privilege log part of any of the exhibits in the -- in the --

MS. SKJELSET:  Well, Your Honor, the privilege log was very vast, and we tried to narrow the issues.  So what I did in my -- in our conferral back and forth is we narrowed the scope of the documents that we were discussing to particular documents that had assertions that --

THE COURT:  Is there -- is there an exhibit that identifies what those -- what narrowed category of communications are that you -- you still disagreed about?

MS. SKJELSET:  Yes, Your Honor.  I think the one that best shows the documents that are still in dispute is Table 3 to my -- my declaration, which was 119.

THE COURT:  Table 3 or Exhibit 3?

MS. SKJELSET:  I'm sorry.  Exhibit 3.

THE COURT:  Okay.  And it starts with Table of Contested Documents, Appendix B -Waived Documents, and Appendix C.

Is that the document that you are referring to?

MS. SKJELSET:  So just to take a little bit of a step back, in order to sort of organize the privilege log, as we saw the documents that were coming in, we divided them into, in our communications with defendants, Appendix A, which were documents that were clearly going to a third party.  They were documents that were being forwarded to, for instance, a public defender's office.  I still don't understand why, but they were.

There were documents that were going to medical providers.  And documents in Appendix A --

THE COURT:  Where's Appendix A?

MS. SKJELSET:  Okay.  Well, this table is concurrently disputed documents.  So they recognized that Appendix A did include documents that went to third parties and have removed their privilege designation.

THE COURT:  Okay.  So whatever is in Appendix A is not at issue?

MS. SKJELSET:  Exactly.

THE COURT:  All right.  So then --

MS. SKJELSET:  Appendix B --

THE COURT:  Go ahead.

MS. SKJELSET:  Appendix B contains documents that they had previously produced to us in the context of the probate case because they were printed and put in the probate certification file -- the certification file.  They

were given to us, first, in redacted form and then, subsequently, after court order, in unredacted form.

So these emails were included in Appendix B, but they have subsequently produced some of these documents but have maintained redactions over portions of them.

That is Appendix B.

THE COURT:  And do they maintain redactions over the first two?  Is that -- actually, those were the only two.  There's one dated 5/24/2018 that has not yet been produced.

MS. SKJELSET:  Yes, Your Honor.

The caveat for that document is that document we were asserting waiver over because it was produced twice in this litigation.  So this is the Hammond.  I -- well, you know, I'm unclear whether or not this is the Hammond -- I don't know, but the waiver argument for this -- that email comes from their prior production in this case in their clawback.

THE COURT:  All right.  And then Appendix C is all the documents not produced because they've been claimed under the attorney-client privilege.

MS. SKJELSET:  A fraction of them, yes, Your Honor.

THE COURT:  A fraction of them.

Is it the fraction that the parties were not able to agree on or -- or what?

MS. SKJELSET:  It is.  It is the -- it is a fraction of them that we thought warranted the most suspicion.

THE COURT:  So are these the ones you're asking to make a decision on, or are there other documents that you're asking me to decide about whether they are to be produced or not?

MS. SKJELSET:  These are the ones that we have narrowed for the Court.

THE COURT:  Meaning, these are the ones you want me to make a decision about?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  Okay.  And anything else outside of Appendix B is something you're not pursuing?

MS. SKJELSET:  In Appendix B and Appendix C?

THE COURT:  So there's an appendix -- I'm sorry. Appendix C.  Yeah.  Appendix B and C.

MS. SKJELSET:  Unless something was revealed from what was shown in Appendix C, we did our best, Your Honor, to narrow by time frame and by the nature of the assertion and by who was copied or not copied on the communication.

THE COURT:  Okay.  Pages 8 through 13 look like it's a changed format.

What do those tables describe?

MS. SKJELSET:  Your Honor, I believe that this is

their actual privilege log.

THE COURT:  Okay.  So B and C are the documents you want, and then what's described on pages 8 through 13 is the actual privilege -- privilege log.

So it's the --

MS. SKJELSET:  I believe so, Your Honor.  I believe it's an updated privilege log.

THE COURT:  Okay.  And you're asking for *in camera* review of -- of the documents in Exhibits B and C to determine if any of that must be produced?

MS. SKJELSET:  Yes, Your Honor.  If it relates back or are communications that are not privileged that would bear on this litigation.

THE COURT:  All right.

MS. SKJELSET:  Your Honor, just to not be too onerous, we're not asking that you review all of them.  We would be happy to select a sampling if it would make it easier for the Court.

THE COURT:  A sampling in what way?  How would the sampling be taken?

MS. SKJELSET:  I believe that, with the information I have from the current depositions, it would be easier for me to identify the documents that I believe would be most likely to contain important information that is not privileged.

THE COURT: So Appendix B and C can be reduced, not to just a sampling, but to be reduced to the actual documents that you are -- you are, in fact, seeking be produced?

MS. SKJELSET: I wouldn't say that, Your Honor. I believe that their -- their assertions of privilege are questionable for all of these documents, but because the Court has discretion to reject my request for *in camera* review, if the Court so pleases, I would be more than willing to identify documents that I think are most important for an *in camera* review.

THE COURT: Then what happens to the other documents?

MS. SKJELSET: Well, I would think if the Court finds that many -- if the documents are not privileged, many or all, then the remainder would be of concern.

THE COURT: And how would we resolve that?

MS. SKJELSET: You're the judge, Your Honor.

THE COURT: Well, you used the word "sample" as if it -- if I made a decision on the sample that you provided me, that that decision would affect whether the remaining documents in Appendix C or B would then be required to be produced or not, and that's why I asked you what's the methodology -- if that's the case, then I was asking what the methodology would be for gathering a sample.

And so I'm either reviewing all of them, which I'm not saying I would do *in camera*, but you're the one that proposed that you would produce a sample for me to review, and I'm just trying to understand what our -- what our method would be for how to resolve the dispute about all the documents that have been included in Appendix B and C.

I'm just looking for a straightforward solution. Help me out here.

MS. SKJELSET: Okay. Well, I'm thinking on my feet, Your Honor, which is sometimes difficult, but I might propose this: If you're not inclined to look at all the documents contained in Appendix C and would prefer that I select a sampling for review and in the event that you find concerns about the nature and scope of their assertion, then you could come back and give guidance as to what is not privileged and why, and then the defendants could follow your guidance in the additional documents over which they've asserted privilege.

THE COURT: Okay. That makes sense to me. I mean, that helps me understand why we would be doing a sampling in the first place.

Let me hear from the first defense counsel. Who's responding?

MR. NASO: Yes, Your Honor. This is Chad Naso responding.

THE COURT:  So I want to make -- I really want to make sure that -- part of the challenge, I think, when we have multiple lawyers, particularly with multiple cases, trying to do this by phone, is that it's hard to read -- it's hard to read -- well, it's hard to read people, and it's hard to read me.  So I'm going to try to be verbal in my description of how you should read me, which is I'm looking at solutions.  I'm not looking at really detailed arguments.  I'm looking at answering my questions, not -- not moving around them.

There are going to be times I'm going to ask for some background to remind me of what the actual issue is, but I'm interested right now in why should I not simply review, as Ms. Skjelset said, a sampling, to determine if that helps me understand whether the remainder of the documents in Appendix B and C either should or should not be produced?

MR. NASO:  Well, I think there's two related reasons, Your Honor.  One legal reason and one practical reason.

I'll start with the practical reason first.

Well, I'll start with the legal reason first.  And that is, to make an assertion of privilege, our burden is to make a prima facia case that the privilege applies.

We have done so in our privilege log, which it, in fact, is in the record at ECF Document 124-1.  It's an

exhibit to Ms. Hoffman's declaration to our response to this motion.

THE COURT:  In order for me to avoid jumping through multiple documents, is there any reason why we can't use the Exhibit 3 that I've been -- I've been reviewing from Ms. Skjelset's declaration?

MR. NASO:  Well, I think for several of those entries on that exhibit, which was created by plaintiff's counsel, I don't believe it fully reveals the fact that these -- how we've identified the basics for the privilege asserted, which appears on our privilege log.  Those entries show that we have made a prima facia for assertion of privilege, and it is now the plaintiff's burden, the person challenging that assertion of privilege, to come forth, not just with a mere suspicion, but an actual -- a showing of a factual basis adequate to support a good faith belief that an *in camera* review may reveal that there is actually no basis for the assertion of privilege.

Courts have been pretty clear that plaintiffs are -- that a party is not a -- is not entitled to an *in camera* review simply on a mere suspicion, that maybe there's a nonprivileged document in there.

As a practical reason, especially in this case, Your Honor, where we are arguing here today over an extension of the case deadlines -- and plaintiffs have made

the point that they want to get this to trial -- I do not think it makes any sense to engage in a mere -- in an *in camera* review, where no such factual showing has been made, and use up the Court's, you know, limited resources to do that in the absence of such a factual showing.

Your Honor, I would point you to a related case that I think is persuasive in the *J.M. v. Major* case, which is Civil No. 6:18-00739, at Docket 213.  This was also a case in which DHS was the defendant, and the same counsel for the plaintiff, as here, represented the plaintiffs in J.M.

The plaintiffs made the same arguments that they are here about, the explanations and the privilege log being insufficient and if the court should conduct an *in camera* review.  Judge Mosman's ruling declined to conduct an *in camera* review on the basis of that showing, and the Court should not make -- you know, using up its resources to do so here.

THE COURT:  So declined *in camera* review.  What, ultimately, did Judge Mosman do in the case with respect to the -- to the efforts to require production of those documents?

MR. NASO:  I believe that the motion for *in camera* review was simply denied on the basis that the privilege review -- sorry -- that the privilege log made a sufficient showing to justify the assertion of privilege, and

the moving party --

THE COURT:  A judge can deny *in camera* review and just simply order that the documents be produced.  So that's why I want to make sure what I understood that you're thinking that Judge Mosman said and did in that case.

MR. NASO:  Right.  And I think that the -- the documents were not ordered produced, from my understanding, in that case.

Especially here, my understanding of the plaintiff's motion and request for *in camera* review is simply that the privilege log asserts privilege over materials that do not necessarily include an attorney.  That's, as far as I can see, is the only basis for challenging the assertion of privilege.

However, as our privilege log reveals and as the law shows, even communications between non-attorneys can be subject to the attorney-client privilege, whereas here, they -- those communications reflect legal advice as we cite in our privilege log.

THE COURT:  Where is your privilege log?  Remind me what ECF number it's in.

MR. NASO:  Yeah.  It's 124-1.

And I think you -- if you match up the tables you were looking at from Ms. Skjelset's declaration, I believe the log ID numbers will match up with the log ID numbers on our

privilege logs.

THE COURT:  So this is a 106-page document -- the privilege log?

MR. NASO:  Right.  That's right, Your Honor.

THE COURT:  All right.  Okay.  I'm just going to take a look at a sample of the basis for the privilege.

Hold on a moment.

MR. NASO:  Okay.  Yeah.

THE COURT:  So I'm looking at entry number 683, which is the first one in Appendix C, and I'm now looking at it on your privilege log, and that's an Amelia Ballard, from, to Kassidy O'Brien, regarding Colby email. Attorney-client privilege, work-product.

Is this work-product or attorney-client privilege?

MR. NASO:  Well, it looks to be --

THE COURT:  But is this going to be part of the O'Brien work-product issue, that number 683?

MR. NASO:  I don't believe that that is part of the O'Brien work-product issue.

On the date, that doesn't appear to be related to the draft Hammond declaration issue.

THE COURT:  Okay.  And it's relaying counsel's legal advice and work product.  Okay.

MR. NASO:  Right.  So, yes, in this case, it's the communications between two non-attorneys, but as the

description shows, it's an email relaying legal advice and work product and the case law says that that continues to be privileged.

THE COURT:  And what if there's something else in the email that are the individuals' assessments or impressions separate from the conveying of attorney-client -- attorney communications?

MR. NASO:  You're asking me what if it does contain --

THE COURT:  I'm trying to understand that.  I mean, well, what if there's a mixture of both that which might -- may be an attorney communication and that which is an impression communicated by one non-attorney?  I don't know if this is a percipient witness or not.

These are non-lawyers.  So if they're communicating about impressions about the case or impressions about something relevant to -- to the claims, separate from that which was communicated -- separate from just simply the relaying of an attorney communication, is there a reason why that would not be producible?

MR. NASO:  I would have to -- yeah, I would have to look at the document itself, but I would say that, you know, throughout this case, we have made efforts, and it's been our practice to not redact where we can.

To the extent that there's elements of a communication

that are privileged and some that are not, we would redact the stuff that was privileged and produce the non-privileged material.

We produce, you know, a great quantity of materials throughout this case and have conferred with plaintiffs on those privileged issues, which has led to, you know, the release of non- -- non-privileged material, that, you know, upon further consideration, if we have identified material that should be released, we have released it.

THE COURT:  So there would be an example of something where there was a mixture both of privileged material that would have been redacted and the non-privileged material within a communication, an email communication?  There would be an example of something like that in your privilege log --

MR. NASO:  I --

THE COURT:  -- or (indiscernible) made it into your privilege log at all?

MR. NASO:  I think it'd be privilege log.  I'm not sure.  I don't think the privilege log -- I think the privilege log would indicate the content that was actually being withheld, not necessarily the things that are being redacted, if that makes sense.

THE COURT:  (Indiscernible.)

MR. NASO:  So, in other words, the privileged

entry would not necessarily say that this was partially produced, but we would just indicate the fact that that email -- a portion of the email that has been redacted has been redacted -- has been redacted and withheld on the basis that is listed in the privilege log, if that makes sense.

THE COURT:  I'm going to ask it again, just to make sure that I understood your answer, which is that the Description column would reflect whether -- would only reflect that it was privileged and the reason for its -- for the reasoning it was withheld, not whether any of it had been redacted and otherwise the document produced.

MR. NASO:  Okay.  I think I --

THE COURT:  That's what I understood you to say.

So I -- so the description is not going to indicate that we produced the discoverable portion and that which was redacted was the privileged material?

MR. NASO:  I believe so, Your Honor.

With the privilege document that -- the document that was produced would have a redaction that indicates the base of the privilege, like attorney-client privilege, or ACP, so that that -- so the basis of that privilege could be traced back to the privilege log.

THE COURT:  How would it be entered in the privilege log?

MR. NASO:  In the --

THE COURT:  How would --

MR. NASO:  Yes.

THE COURT:  Yes.

How would it be entered in the privilege log where -- where a portion was produced and the remainder was redacted for -- on the basis of ACP?

MR. NASO:  Yeah, I believe it would identify the email in question.  It would -- it would simply have an entry of what was withheld on the basis of that privilege.

THE COURT:  Okay.  All right.  So the thrust of your argument is that the plaintiffs haven't made a showing sufficient for consideration of *in camera* review; and, secondarily, or perhaps relatedly, it would be a -- it would be an unnecessary use of judicial resources?

MR. NASO:  That's correct, Your Honor.

They haven't made any -- they haven't identified any specific examples in the privilege log as to showing -- making a factual showing as to why the privilege assertion was improper and a mere suspicion is not enough for an *in camera* review.

THE COURT:  Okay.  Anything else with respect to this issue before I turn back to Ms. Skjelset?

MR. NASO:  No, Your Honor.

THE COURT:  Ms. Skjelset?

MS. RICHARDSON:  Sorry, Your Honor.  This is

Ms. Richardson, I was hoping I could chime in at some point.

THE COURT:  Yes.

MS. RICHARDSON:  If that's okay, Ms. Skjelset?

So I -- well, first of all, I'm not going to be able to comment on what Judge Mosman did in that other proceeding. Maybe Ms. Skjelset can talk about that.  But I do think that the focus should be on this case.

And so what I do know is that we do have some specific issues that the plaintiff, as I saw in the brief and as I understand from discovery of what's happened, and so if I can just go to that, I'd like to just sort of hone in on it.

First of all -- so there's been two claims.  There's been the privilege and work product.  Two different theories.  Work-product doctrine is kind of what I'm more focused on because it appears that what defendants did is they've withheld communication -- in particular, some text messages between O'Brien and Hammond -- and what I want to make sure is clear here is that Ms. O'Brien and Mr. Hammond were both caseworkers for DHS.

And in the context of this work-product doctrine that the -- that the defense is now claiming, it's not work product that was done for this case, the civil rights case. It was communications and, you know, supposed work product that was for the juvenile dependency case.  Separate litigation.

So I think that there is a distinction here.

So what the defense is trying to do is claim that when O'Brien, a caseworker, communicated with another caseworker, Hammond, where there was no attorney involved at all and they were talking about changes or things that have to do with this affidavit in the juvenile dependency proceedings, we're now getting further removed from this case.

And in those discussions, the question is, is that work product or is it not work product?  Does it go to something else?  And what we think, as the plaintiffs, is that defense has been overbroad and they've -- they've made this now -- they're claiming that it's work product.

And one of the reasons that we know that is because they did produce documents that Your Honor can take a look at, and you can see that, in those documents that the plaintiffs actually had an opportunity to receive before they were clawed back, that there's some substantive information in there that should be produced for this case.

And one of the reasons that it should be produced for this case is that the conduct at issue here is O'Brien and other defendants.

So O'Brien, as one of the caseworkers, if she's trying to convince one of her fellow caseworkers to change an affidavit or do something that's different or reference something that's important for this case, we need to know

about it, which is about her conduct.

I think what's different too is that O'Brien was a guardian for the children, for both children in these cases. So she had an independent duty to those children, and yet if what she's doing in her conduct is trying to affect or change or do something with respect to the juvenile dependency proceedings with Hammond, they shouldn't be able to shield that with work product. That's not proper.

And it's also not proper for attorney-client privilege.

THE COURT: I want to -- are you saying that it's not work product in this case but it would have been work product in the underlying juvenile case -- the juvenile dependency case?

MS. RICHARDSON: I don't think that it rises to work product even under the juvenile dependency case.

If they're sitting there talking about changing --

THE COURT: Let's get to that in a minute. The attorneys were not the same, correct, between this case and the juvenile dependency case? The defense --

MS. RICHARDSON: That's correct.

THE COURT: Okay.

MS. RICHARDSON: That's correct.

THE COURT: So at least on that ground and -- you know, you're arguing that if it -- if anyone was claiming work product, it would be lawyers who were involved in the

development of the juvenile dependency case, if it were (indiscernible.)

MS. RICHARDSON: Yeah, the work product -- yes. So the work-product doctrine -- basically, the doctrine goes heavily towards what is the mental impressions of the work product of the lawyer.

And, here, if you have a caseworker, an employee of DHS, who has got an affidavit and they're correcting or changing it and the lawyer is not giving the mental impressions or trying to, you know, have input on that work product and I don't -- or that document, that's not work product. It's just not.

THE COURT: Now, I know that -- the issue about the work product about these draft emails or the emails going back and forth between these two people about the drafting of the declaration. I've treated that sort of as a separate matter from the general attorney-client privilege issues that have been raised in the privilege log, and I imagine that there's going to be quite a bit of argument by defense counsel about -- about the issue you just raised.

Let's finish up on the attorney-client privilege log and how best, if at all, I should be attending to *in camera* review.

So, Ms. Richardson, if we could -- if we can put a bookmark with this argument for just a few moments, and then

I'll come back to you and hear more about work product in a minute.

MS. RICHARDSON:  Okay.

THE COURT:  Thanks.

So, Ms. Skjelset, did you have anything else in response to Mr. Naso?

MS. SKJELSET:  I do, Your Honor.

First, I would like to address the issue of Judge Mosman's decision in J.M.  That is -- that was a case that we briefed significantly because we did believe that they were covering a significant amount of facts in large swath assertions of privilege.  There were, similarly, hundreds of emails between caseworkers and attorneys over which they were asserting privilege, and we tried to narrow it, and the court declined *in camera* review in that case.

THE COURT:  You tried to -- you tried to narrow it in the same way that you narrowed it with Appendices B and C.

MS. SKJELSET:  We did -- we did not do as good of a job, Your Honor, and that is why I offered a sampling. Because I simply want the Court to be able to see and evaluate whether or not it's appropriate.

Because this is the concern:  As we move forward, DHS can copy an AAG on any concern regarding foster care, any concerns regarding children being abused in a home, and

simply not have to produce that to anybody, and that is not justice.

And that is why we appealed it to the Ninth Circuit.  I was there when it was argued at the Ninth Circuit; and, frankly, the courts raised an eyebrow, the judges, at the argument of the fact that it was not reviewed *in camera*, and she didn't understand.  That was said at oral argument.  Did not understand why a judge would not review it *in camera*.

And that is why we will do anything in our power to ensure that you have the opportunity to review whatever portion is acceptable to the Court and does not overly burden the Court.

THE COURT:  So you read --

MS. SKJELSET:  The second -- the second --

THE COURT:  You took the issue of the discoverability of these documents to the Ninth Circuit?

MS. SKJELSET:  Yes.  And they (indiscernible) ruling on the collateral doctrine.  Yeah, the collateral order doctrine, saying that the --

THE COURT:  How did the Ninth Circuit resolve it?

MS. SKJELSET:  They -- they -- they dismissed the appeal, saying that the court had discretion to make that ruling, and it, therefore, had to be fully litigated in order to take it up under the collateral doctrine rule.

THE COURT:  Got it.

Do you have the Ninth Circuit citation?  If you don't, I can track it down, but if you had it on the tip of your fingers, I would have taken it from you.

MS. SKJELSET:  I don't, but I can email it to you afterwards, Your Honor.

THE COURT:  We can --

MS. SKJELSET:  Nadia Dahab handled our appeal in that case.

THE COURT:  I'm sorry.  I --

MS. SKJELSET:  That was point number one.

THE COURT:  Was it a full opinion, or was it a memorandum?

MR. RIZZO:  Your Honor, this is Steven Rizzo.  It was an unpublished opinion.

THE COURT:  Is it -- who is this?  Is this Mr. Rizzo?

MR. RIZZO:  This is Mr. Rizzo, Your Honor.

THE COURT:  You're back in that muffled sound again.  Can you --

MR. RIZZO:  I have -- is that better?

THE COURT:  Yes.  Much better.

MR. RIZZO:  Yeah, the opinion was unpublished and the appeal was dismissed, without ruling on the merits, on the grounds that the court had no jurisdiction due to the collateral order doctrine.

THE COURT:  Got it.  All right.

MS. SKJELSET:  Thank you, Your Honor.  If I -- if I may, this case is distinguishable, and this is why:  We actually have emails in our possession, over which they are now asserting privilege, that show that there were facts, critical facts, conveyed, at times material, by -- by or to named defendants, that they chose to conceal those facts under the guise of privilege.

And I have two excellent examples for Your Honor.  One was attached to my recent letter to you, which is attached as Exhibit 1 to this briefing.  All right.  It was Exhibit 4, 5 -- it's shown in Exhibit 4, 5, and 6 of that letter.

THE COURT:  I need to make sure I -- that the letter -- it --

MS. SKJELSET:  The letter was filed under seal as Exhibit 1 to my response to the deadline, or you could just look at the letter itself, if you have it, from July 1st.

THE COURT:  What's the ECF number?

MS. SKJELSET:  155, I believe, in my letter. Filed under seal.  Exhibit 1.

THE COURT:  Okay.  Let me just make sure I get to -- and that was Exhibit 1 of your letter, correct, you said?

MS. SKJELSET:  It's at Exhibit 4 of my letter.  It

starts, "Just to show you, it takes a lot of work to build a foundation for this, and it took time."

Exhibit 4 is a document I communicate -- to my letter. It's a document that's communication between Mykael Moore and Defendant Lane.  Tricia Gonzalez, who was an AAG, was copied on that; as is Amelia Ballard, who is a CPS supervisor; and Kat O'Brien, who is a defendant.

THE COURT:  Let me make sure -- hold on a second. So Exhibit 4.  It's a page -- it's a three-page document?

MS. SKJELSET:  Yes.

THE COURT:  And I have it here, and --

MS. SKJELSET:  This is how it was produced to us in this litigation, Your Honor.

THE COURT:  All right.

MS. SKJELSET:  You can see the entire first page is blacked out as attorney-client privilege.

THE COURT:  Yes.  Okay.

MS. SKJELSET:  As are many of the other communications.

And then, in an initial case, now it was discovered to us, was produced to us.

So if you turn to Exhibit 5 --

THE COURT:  Okay.

MS. SKJELSET:  -- that's the same email.  That was an email that was produced to us in a certification file.

Those are the facts that are being conveyed to these individuals, including the named defendants.

If you want to read the substance of that email, you will find those facts are incredibly relevant and extraordinarily important in this case.

THE COURT:  So this is --

MS. SKJELSET:  (Indiscernible) disclosure.

THE COURT:  It's written by -- it's sent by Mykael -- Michael?  Is it Mykael or Michael Moore?

MS. SKJELSET:  It is "Mykael," Your Honor.

THE COURT:  Mykael.  And it's addressed to Erin Lane and Tricia Gonzalez?

MS. SKJELSET:  Yes.

THE COURT:  And cc'ing Kat O'Brien and Amelia Ballard?

MS. SKJELSET:  Right.

THE COURT:  Okay.

MS. SKJELSET:  And that is an unredacted version of that same email that we looked at previously in Exhibit 4.

THE COURT:  And --

MS. SKJELSET:  And I don't -- I don't want to read on the record all of the facts that are conveyed.

THE COURT:  This is what the defendants are claiming -- are -- defendants are claiming, is

attorney-client privilege?

MS. SKJELSET:  Yes, Your Honor.  They have redacted all of that information as privileged.

THE COURT:  All right.

MS. SKJELSET:  And then, just to highlight our argument that the facts conveyed by Mykael Moore in the context of her CPS assessment of J.C.'s disclosure of sexual abuse in foster care are done in the ordinary course of business and not in order to provide Tricia Gonzalez with the information she needs to represent the agency, I asked her specifically those questions at deposition, and her testimony is attached as Exhibit 6.

THE COURT:  This is Attorney Tricia Gonzalez's testimony?

MS. SKJELSET:  No, Your Honor.  This is Mykael Moore's testimony.

THE COURT:  Mykael Moore's.  Okay.

MS. SKJELSET:  And she says that -- when I asked her on page 5 --

THE COURT:  Page 5 of 6?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  Go ahead.

MS. SKJELSET:  When I asked her, "Is this the kind of email just that you make in the ordinary course of business, providing the team with a report of the facts

gleaned so far," and she responded, "Specific to investigations regarding children and resource care, yes."

THE COURT:  Okay.  And so the fact that the email is sent to Tricia Gonzalez and another attorney and then cc'd to Kat O'Brien -- actually, it's directed to Tricia Gonzalez and cc'd Kat O'Brien and Mykael Moore.

Hold on.  Let me (indiscernible).

So it's from Mykael Moore to Erin Lane and Tricia Gonzalez, cc'ing Kat O'Brien and Amelia Ballard.

So you're indicating that this is a practice to simply try to create attorney-client privilege where there is none?

MS. SKJELSET:  Your Honor, I don't believe that is the practice, but I believe that it is being used for that.

I believe that the practice is to generally have an attorney involved in all of the updates, and then it's going to be weaponized later on in civil rights litigation.

THE COURT:  In what way?

MS. SKJELSET:  But the attorney, Tricia --

THE COURT:  In what way?

MS. SKJELSET:  (Indiscernible.)

THE COURT:  It's weaponized in that it's going to be claimed as attorney-client privilege?

MS. SKJELSET:  Exactly.

THE COURT:  Okay.  So by addressing it to Erin Lane and Tricia Gonzalez, I mean, your contention,

is -- is that it's -- it's inappropriately creating an attorney-client privilege, a privileged document, where it would not have been one?

MS. SKJELSET:  Your Honor, I'm saying that Tricia Gonzalez served a dual purpose.  She is more like an in-house counsel who's being copied on many, many communications relating to facts that go back and forth between caseworkers constantly regarding their function, their professional function, in the juvenile court, which is to keep children safe, to address concerns; and the mere fact that she's copied on a communication does not make the communication seeking attorney advice.  It does not make it relaying attorney advice.  It can simply mean that a person, like Mykael Moore, was relaying facts critical to a later civil rights claim regarding allegations that have been in foster care to the entire team, and that's what happened here.

And Ms. Moore did not think that she was seeking legal advice.  She was describing the status of the disclosure and the investigation.

So that is example number one.

THE COURT:  Okay.  Example number two?

MS. SKJELSET:  Example number two dovetails with what Ms. Richardson is saying, which is the new work-product assertions regarding Stephen Hammond and Kat O'Brien email

communications, and that -- the attached declaration because now that is a document that is on their privilege log for which they're saying that because it is -- I'm unclear exactly what the assertions are, but that is found at Exhibit 11 to ECF 119.

THE COURT:  Hold on one moment.

You said Exhibit 11?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  From ECF 119?

MS. SKJELSET:  Yes, Your Honor.  I hope so.

THE COURT:  Now, for some reason, in ECF it only lists nine exhibits.

MS. SKJELSET:  Okay.  Well, I think it -- I have it labeled as Exhibit 11, but perhaps it is 119-9 at the top.  So maybe it's Exhibit 9.

THE COURT:  Let's try that.

It's just four pages long?

MS. SKJELSET:  Yes.

THE COURT:  That may be the one.

It starts off with, "You are a rock star"?

MS. SKJELSET:  Yes, Your Honor.  That's the attorney-client privilege we're talking about.

THE COURT:  Attorney-client privilege or work-product?

MS. SKJELSET:  I think they're asserting both.

THE COURT:  Okay.  Go ahead.

So we are transitioning now to this -- I mean, again, I've been treating these as separate issues.  So, generally, the attorney-client privilege issues that we talked about in Appendices B and C, and now the work-product doctrine, as it relates to the communications between two non-lawyers working on drafting a declaration or an affidavit relating to the juvenile dependency case, is -- I've been framing it as sort of separate issues because, I think, also my consideration and legal analysis under a work-product doctrine is -- is different than that in -- in attorney-client privilege.

MS. SKJELSET:  Right.  Right, Your Honor.  It's unclear what I -- I believe that they're asserting attorney-client privilege and work-product --

THE COURT:  Okay.

MS. SKJELSET:  -- over this communication.

And often they will use both in the context of their privilege log; so I don't think that the issues are necessarily completely distinct.

Although, for the privilege for the documents that they did not call back, we were asking for review of a sampling of them.

THE COURT:  Who are they -- who's McAlpin in this email that they were referring to?

MS. SKJELSET:  I would think Your Honor would know who that person was.  I believe it's Judge McAlpin.

THE COURT:  They're referring to Judge McAlpin? Okay.

MS. SKJELSET:  That's my understanding.

THE COURT:  Okay.  All right.

And, again, I want to clarify this email preceded -- this email was drafted in at the time of the juvenile dependency matters, not -- not for a (indiscernible) for the juvenile dependency matters; is that right?

MS. SKJELSET:  Yes.  The children were still in the custody of the State and the custody of DHS, and DHS were their guardians, yes.

THE COURT:  Okay.

So there was no litigation with regard to the abuse in foster care.

MS. SKJELSET:  So just to highlight, because I do think that the -- I think it's clear that this is not attorney-client privileged communication.  It's not between two attorneys.  It does not reference any attorney legal advice.  It does not relay any legal advice, to the extent that they want to assert work-product protection over it. It was not prepared in anticipation of this litigation, certainly.  Whether it was prepared for the juvenile court potentially could render it work product, but it does not

appear that, even from the declaration of Stephen Hammond, that Ms. O'Brien was instructed to provide input regarding this affidavit.

No attorney is copied. No attorney appears to have been consulted in the draft provided to Defendant O'Brien There are no attorneys' mental impressions whatsoever. And based on this exchange, this appears to be a list of facts and concerns known to O'Brien during the pendency of the dependency case, which she coordinated with Hammond to prepare, over the course of consuming turmeric gin cocktails, which is very important facts that we cannot otherwise establish, which is that Ms. O'Brien wanted to delete information regarding concerns in the home. She literally crossed out a portion of the sentence that reads "That is not to say there weren't concerns about the children's safety in general."

THE COURT: Was the affidavit ultimately -- was a final draft or a final form of the affidavit finally submitted to the interdependency file?

MS. SKJELSET: It was filed under seal, Your Honor.

THE COURT: Okay. But, ultimately, whatever came of these communications, a final product was generated and then submitted?

MS. SKJELSET: Yes, Your Honor.

THE COURT:  Okay.  Ms. Richardson, did you have anything else that you wanted to add to this -- this specific issue?

MS. RICHARDSON:  Maybe just briefly.

I think Ms. Skjelset did a good job of explaining that particular issue with those -- Hammond/O'Brien, but what I wanted to also just add is that even when we look at attorney-client privilege versus the work-product, attorney-client privilege, all those other communications that -- I don't, by the way, have any of those because I don't have the exhibits.  So I'm just listening, trying to figure out what exhibits and what they look like.

But I'm imagining that it's between all these various individuals, like in a big -- similar, like a big corporation, just having an attorney, and the question is, "Does it meet the elements of that attorney-client privilege?" which would be, under federal common law, "Is it intended to be confidential?  Was it to render advice?"  Is that what it is, or is it -- is it just facts?  Is it just stuff that needs to be talked about that it's not intended to be pursuant to that attorney-client privilege?

That's sort of the question, I think, that has to be resolved.  And because you have an opportunity to see what they've -- and we have had an opportunity too, because they, you know had produced it and then clawed it back, we can see

where they're overreaching with that privilege.

But what I want to do is just touch on the work-product doctrine with respect to O'Brien and Hammond.  And in this juvenile proceeding, the product that they're talking about is that affidavit.  And while the juvenile proceedings, you know, are separate litigation, I guess, it's sort of something that -- my understanding is that it just always goes on.  There's always something happening.

But I think what's important here is that O'Brien was a fiduciary.  She was the guardian for the child.

Is this something -- you know, there's no pending civil action at this time, but what is O'Brien doing when she's providing her mental impression?  She's not an attorney.  And so this work-product doctrine shouldn't be applied to -- between -- for her communications with her fellow caseworker, Hammond; and, instead, it's critical for us, as the plaintiffs now in the civil rights case, when her conduct is at issue, to see what was she doing behind the scenes and what are they -- what are they trying to hide from us?

I know, as well, that -- you know, this is going to come up later, but -- and we've got a pending motion to compel that I'm hoping that we can get filed with respect to Ms. O'Brien.  Ms. O'Brien had a phone, a second phone, and they -- defendants have not produced anything from that

second phone.

And we know from clawed-back documents that she is referencing in those communications that she has with Hammond to her, quote/unquote, "real phone," and that she was, in fact, using her other phone to have these communications that we're trying to seek to get.

So a lot of these various facts and information, it's not something that was part of an attorney -- an attorney's mental impression.  It's what's the motivation of that particular party?  What are they doing?  And it's -- it's not subject to that work-product doctrine.  It's something that we should be able to get at.

And if you can look at some of them, I think you can see that.  And then we just need to have all of those produced and questioned.

THE COURT:  When you say "all of them," what -- what are -- how many other email communications between Kat O'Brien and Stephen Hammond or other non-lawyer caseworkers are you -- are you thinking -- are -- exist?  Ms. Richardson or Ms. Skjelset?

MS. RICHARDSON:  I'll have to defer to others because I haven't looked at it in that detail.

THE COURT:  Ms. Skjelset?

MS. SKJELSET:  There are many, Your Honor.

THE COURT:  Well, how many?  I'm trying to -- how

many documents are we talking about?

MS. SKJELSET: Well, I have -- I have tried to narrow it in -- in Appendix B to the exhibit that we were discussing earlier, but there are -- there are more than those. Right.

THE COURT: Okay. And do you believe that they're all identified in the privilege log?

MS. SKJELSET: Yes. I understand that. I didn't create their privilege log.

THE COURT: 106 pages of the privilege log, from your review of it, there are communications that identify Kat O'Brien and Stephen Hammond and -- is that correct? Is that your understanding?

MS. SKJELSET: Yes, Your Honor.

THE COURT: Okay.

MS. SKJELSET: Yes.

THE COURT: All right. Who's the defense counsel who's taking the --

MR. NASO: Yes, Your Honor. This is Chad Naso.

THE COURT: Oh, you again.

MR. NASO: Yes, sir.

Well, let me just start --

THE COURT: When is Ms. Hoffman coming on board? Maybe --

MR. NASO: Ms. Hoffman this prepared to talk about

the -- waiting in the wings to talk about the motion for extension.

THE COURT:  Oh, okay.  All right.

MR. NASO:  What, frankly, I thought we were going to start off with, but I'm more than happy to address these issues first.

THE COURT:  No.  It's much better to do the heavy lifting first so everything else just feels lighter after that.

MR. NASO:  Gotcha.

THE COURT:  Well, I hazard a guess, Ms. Hoffman, this is going to be a tough issue as well:  Case management.

MR. NASO:  So I'm happy to address these two examples that Ms. Skjelset has brought up.

I guess, first, turning to the emails that were attached to her letter of July 1st, I think there's a couple of important things to point out here.  First, Tricia Gonzalez, as everyone recognized, is a lawyer for the Department of Justice.  She is not merely copied on these emails.  She is directly -- being directly communicated with -- to and from -- and it is for the purpose of relaying advice to assess potential legal claims.

This is --

THE COURT:  Hold on a minute, Mr. Naso.  I didn't see them as relaying advice, but relaying information.

MR. NASO:  Yes.

THE COURT:  So which one is it to you?  Is it advice or information?

MR. NASO:  We are -- we are relaying information for the purpose of assessing legal liability.

If you look at the date of these emails, this is October 9th through 11th, 2017.  This is the time period in which J.C., the minor child whose claims are at issue in this case, disclosed the sex abuse that's at issue.  These are emails by the investigator who interviewed her to a DOJ attorney discussing the outcome and the basis of that investigation.  That is clearly privileged.

Now, importantly, Your Honor, as you see, as the plaintiff's counsel has pointed out, these have been produced somewhat inconsistently.

And, in fact, these are no longer at issue, to my understanding, because these redactions were made, I think legitimately, but after the fact, unbeknownst to us, that the unredacted version had already been produced.

Accordingly, we have conceded that this stuff -- that this email is not privileged, that we have waived the attorney privilege with respect -- so this is not an issue that we are fighting, in fact.

THE COURT:  So let's slow it down.  I want to make sure it's clear and that we have a record of it, that, at

least as it relates to the example in -- which is in

Exhibit 4 -- Exhibit 4 -- actually, no, it's Exhibit -- let

me take a look here.  Exhibit 5.  1 through -- pages 1, 2,

and 3.  Any claim of attorney-client privilege has been

waived.

MR. NASO:  I believe it's Exhibit -- yeah, 4 and

5.

THE COURT:  4 is the redacted version.  I mean, I

guess --

MR. NASO:  Correct.

THE COURT:  Yeah.

MR. NASO:  So this is an example, Your Honor, of

what I raised earlier.  The fact that in this litigation the

defendants have produced a tremendous amount of material, to

the extent plaintiffs have come to us with issues like

this -- first of all, I think this is a demonstration of the

issue we're discussing about before, with respect to the

fact that we have sought to redact stuff that legitimately

could be claimed as privilege but disclosed stuff that

clearly isn't, which is that very last email of the string,

which is an email from Kim Chapman to other DHS workers,

that does not include Ms. Gonzalez, that was produced.

However, when plaintiffs come to us and point out that

actually this string of emails was proof -- was produced in

an unredacted version, we have conceded that point and are

no longer asserting privilege with respect to this --

THE COURT:  And why aren't you -- why aren't you seeking it to be returned -- returned and redacted under the clawback provisions?

MR. NASO:  I -- based on the circumstances, I honestly can't speak to that.  I wasn't involved in that, but I just know that I'm advised that a determination was made that that privilege was waived.

MS. HOFFMAN:  Your Honor, if I may?  This is -- this is Ms. Hoffman.  I -- I could speak to that question, Your Honor.

THE COURT:  Yes.

MS. HOFFMAN:  Mr. Naso, as he says, was not involved in that decision.  I can tell you that those -- the unredacted version of that document, along with several other privileged documents, were produced in the probate matter, I believe, somewhat in -- inadvertently, but those were produced, I think, approximately two years before we realized that that had happened, and we -- we did our research.  We really looked into the issue, and we agree with plaintiff that, with the amount of time that had passed and those have been produced subject to their subpoena two years prior, it seemed unfair of us to try to claw all of them back.  We conceded that at that point we had waived.  So we're not seeking to claw those back under those

circumstances, that -- you know, it wouldn't be fair.

THE COURT:  And so whatever -- whatever was produced to respond to the subpoenas out of the probate matter, if they would have been privileged, that privilege has been waived.

MS. HOFFMAN:  Specific to those -- to those specific documents, yes, we've conceded that.

THE COURT:  And I appreciate the concession, but the legal argument and analysis would be the same for anything else that was produced in the -- in the probate matter, that came out of the probate matter, or -- or maybe you can tell me why that would not be the case, from a legal -- from a legal analysis.

I mean, if some were waived, why wouldn't all of that be waived?

MS. HOFFMAN:  So I think we're actually saying the same thing.

So, in the probate matter there was a subset of documents that were not redacted in that matter, that we redacted for privilege in this matter, because we reproduced essentially the same records, and we didn't realize that we were making inconsistent redactions.

And, when that was brought to our attention, we agreed that anything -- that those documents that had been inconsistently redacted, we waived privilege over those.

You know, it's been two years.  It was too late.

I don't believe there's anything else that has been produced in the probate matter but that we are in any way claiming privilege over in -- in this matter.  I don't think there's anything like that.

I think that the Brian Hammond documents that we are trying to claw back -- I don't believe that they were produced in an unredacted form in the probate matter.  I believe they were inadvertently produced in this matter.

THE COURT:  So it's your understanding that within the universe of the probate case, the documents that were produced in response to any subpoenas served in the universe of the probate case, if -- if there had been any documents that would have been privileged, those -- those documents, or at least that privilege for those documents, would be waived; and, in any event, the only documents that would have been claimed to have been privileged are the ones that we're just talking about now?

MS. HOFFMAN:  I think that -- I think that's right, yes.

We've -- it becomes a bit confusing.  We have -- we have produced a lot more documents in this case than were produced in the probate matter.  So it's not a perfect one-to-one correspondence.

THE COURT:  Okay.

MS. HOFFMAN: So we have -- we have claimed privilege over some documents in this case that were never produced in the probate matter because we just produced so many more things here.

THE COURT: Got it. All right. Thank you, Ms. Hoffman. I appreciate that.

MS. HOFFMAN: You're welcome, Your Honor.

THE COURT: Mr. Naso, was there anything else on the privilege -- attorney-client privilege matter, or would you like to respond to the work-product doctrine specifically as it relates to the O'Brien/Hammond rock star email?

MR. NASO: Yes, Your Honor. I will move on to that work-product issue.

And so, yeah, I also view this as a separate issue from the *in camera* review issue, and I would make a couple points in response to plaintiff's counsel.

First of all, the work-product protection, contrary to the plaintiff's argument, is not litigation-specific such that it must be -- it only applies to things that are filed in one case and not stuff that are filed in another case, as plaintiffs have argued.

So the work product --

THE COURT: Whose work product is this, if it's work product?

MR. NASO: This is -- well, this was prepared on -- well, the Hammond affidavit was prepared on behalf of DHS in response to a request from the juvenile court judge in a contested juvenile proceeding.

If you look at the --

THE COURT: So it was Judge McAlpin who said, "I want information. Give me an affidavit"?

MR. NASO: I believe that is what happened. It was prepared at the direction of the Oregon Department of -- Oregon DOJ attorneys, at a request from the court, who wanted additional information about -- about this matter.

THE COURT: So the way in which I understand it, then, is that this was a court-ordered document --

MR. NASO: I believe that is the case, and --

THE COURT: -- and Judge McAlpin told the DOJ lawyers to go get it from the caseworkers?

MR. NASO: I believe that is essentially the case, and Ms. Hoffman can certainly jump in on that.

THE COURT: I'll tell you now that makes it far less like it's work product as much as it is a judge is saying, "Produce a statement for claims X, Y, and Z."

MR. NASO: Well, I don't think so, Your Honor. I think the relevant rule that we need to look at is Federal Rule 26(b)(3). That rule says that a party may not discover documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.

So in order to qualify for the work-product protection in federal court, a document or tangible thing must be, one, prepared in anticipation of litigation or trial; and, two, be prepared by or for a party other than the party seeking to discover the documents.

THE COURT:  Well, now the declaration -- the declaration has been filed.  I mean, that was -- you're saying that the declaration is also work product; correct?

MR. NASO:  We're not saying that the final version of the declaration that was filed is work product, but the drafts of that declaration certainly are work product.

THE COURT:  So I want to make it very clear.  Your position is, is that the declaration in no way, shape, or form is considered work product for the purposes of my decision or your argument today?

MR. NASO:  The final version that was filed in the juvenile court, that is correct.

THE COURT:  So it's not --

MR. NASO:  The issue --

THE COURT:  And I'm filling a little bit into this because I just want to make sure that I've got it down clear from my own -- you know, from my own --

MR. NASO:  Right --

THE COURT:  -- kind of --

MR. NASO:  Let me try to be --

THE COURT:  Hold on a minute, Mr. Naso.

MR. NASO:  Go ahead.

THE COURT:  But I understand that it could be that -- by -- by definition, the declaration itself is not work product, as opposed to it's work product that's been waived by having been filed in court.  Correct?  So it's the former, not the latter?  It's not a waiver of work product.  It's just not work product.

MR. NASO:  I don't -- actually, I don't think that is correct.  I do believe that it would be a waiver once it was actually filed.

THE COURT:  Okay.  We've been at it for almost an hour and a half, and I think we have another ten hours ahead.  That was -- that was a joke.  In fact, if you were with me in person, you'd be able to read my face.  So don't get too frightened.  We only have five hours.

Well, let's take about a -- I need to take a quick break.  So let's take -- I want to say five, but it never ends up being long enough; so let's take seven, and we'll come back.

What I want you to do is mute.  Please mute your phones because I don't want to hear any of your conversations, and

I promise I'll mute mine.

All right.  So seven minutes.

Okay.  Thank you, all.

(Recess taken.)

THE COURT:  And I suspect that Mr. Wilson is now gone.

Ms. Blaesing?

MS. BLAESING:  Yes, Your Honor.  This is Lauren Blaesing.  I'm stepping in for Mr. Wilson because he had to drop off the hearing.

THE COURT:  Correct.

Ms. Hoffman?

MS. HOFFMAN:  I'm here, Your Honor.

THE COURT:  Thank you.

Mr. Naso?

MR. NASO:  Here, Your Honor.

THE COURT:  All right.  And I don't want to (indiscernible).

Ms. Korbel?

MS. KORBEL:  Here, Your Honor.

THE COURT:  And Ms. Tshala?

MS. TSHALA:  Here, Your Honor.

THE COURT:  All right.  Thank you.

So, Mr. Naso, we --

Ms. Davies, are we back on the record?

DEPUTY COURTROOM CLERK:  Yes, Your Honor, we're back on the record.

THE COURT:  All right.  Great.

Mr. Naso, we left off with, my understanding, that you were describing the declaration as having been a waived work product.

MR. NASO:  I believe it would be, Your Honor, as opposed to no work product.

First of all, I'd just like to back up to just the context of -- for the purposes of the Court's decision, the issues before the Court, I want to make sure we understand what we're talking about.

The issues here relate only to two documents.  One is a draft affidavit, and one is an email related to that draft affidavit.

I just want to make sure that --

THE COURT:  Is the email you're referring to the one that's dated 5/25/2018?  The "You are a rock star" email?

MR. NASO:  That's correct, Your Honor.

So that -- those two things that we were looking at before, that is the entirety of the documents that are at issue.

THE COURT:  When you say "two things," I have an email.  I don't know if I have the draft affidavit.

MR. NASO:  So the draft affidavit is the attachments.  Following the affidavit at DHS LEVI 064800. Pages 2 through 4.

THE COURT:  Give me those numbers again.

MR. NASO:  The base number is 64800.

THE COURT:  64 -- 64800?  That's -- so that's -- is this considered a draft?

MR. NASO:  Correct, your Honor.

THE COURT:  Okay.  This document's the draft. Okay.

MR. NASO:  Yes.  And there's a cover email that -- discussing the edits to that draft.

THE COURT:  Okay.

MR. NASO:  Okay.  So we're not -- yeah.

THE COURT:  The red text, some interlineation, et cetera.  That's the draft?  Okay.

MR. NASO:  Right.

THE COURT:  So it's your contention that whatever it is your -- about work product that Ms. Skjelset raised is only relating to these two documents.  There isn't anything else in the privilege log that implicates this question?

MR. NASO:  Well, for purposes of this motion, the issue is whether or not the defendants are entitled to claw back these two documents based on the clawback -- these were produced, and we are attempting to claw them back based on

an assertion of work product based on the protective order.

THE COURT:  Right.  And I'm deciding whether to allow clawback.

MR. NASO:  Correct, Your Honor.

THE COURT:  All right.

MR. NASO:  The question is, "Are these documents work product?  Have they been waived?"  And if they haven't been waived, "Is there otherwise a substantial need for this that would necessitate their production?"

So with respect to the first question, both of these documents are clearly work product because, as we looked at the rule, they are, one, documents are tangible things; two, they were prepared in anticipation of litigation or trial.

That is apparent from the declaration of Mr. Hammond at ECF 125, attesting that he prepared this affidavit as a result of and in consultation with attorneys for the Oregon Department of Justice and in connection with a contested juvenile proceeding.

THE COURT:  All at the direction of Judge McAlpin; so --

MR. NASO:  Well, yeah.

THE COURT:  I get that -- I get that it was done in the course of litigation.

I mean, I think that probably makes it clearer that it falls within the criteria for defining "work product," but

it adds an interesting -- an interesting element to this, which is Judge McAlpin directed counsel to get this document -- to get the affidavit, and the affidavit itself is not at issue.  Everyone has it.  It's probably -- it's part of the file that I'm sure you both have.  It's now we're dealing with these two documents that serve as a -- as sort of peering behind the veil of the final -- the final declaration that was submitted in litigation.

MR. NASO:  Right.  And I don't think -- I think I would push back on the notion that the fact that the judge asked for -- and what happened here is he asked for facts -- or he asked for information regarding allegations of abuse in the Raygosa home to be informed about this.

THE COURT:  What does he --

MR. NASO:  So he directed the --

Excuse me?

THE COURT:  What does he ask for?

MR. NASO:  So when the disclosure of the sex abuse that is at issue in this came to the attention of Judge McAlpin, he wanted to know more about all -- any or all allegations of abuse within that home that DHS was aware of during this time.  And so the Oregon Department of Justice attorneys worked with DHS to assemble that information, provide it to the judge.

So he directed this, your -- the filing of this in the

same way that Your Honor in this case directed the parties to file an omnibus discovery motion back in April.

He didn't direct the content of this. He simply said, "I want this information," to which -- in a proceeding for which DHS was a party, and DHS, in consultation with DOJ attorneys, prepared this affidavit in anticipation or in connection with that proceeding.

So I don't think it renders it any less work product for that reason, nor is the fact that Mr. Hammond and Ms. O'Brien, the fact that they are not attorneys, does that make work product inapplicable here.

Based on the rule -- based on the language of the rule that -- precedent in this court, this district court, is that attorney involvement in a -- is not a precondition for work product protection under Rule 23(b)(3), and I would point Your Honor to *Trailblazer Food Products, Inc v. Silgan White Cap, LLC*, which is 2017 WL 5903437, District of Oregon, 2017. That's a Magistrate Judge Acosta decision. And also Judge Aiken has recognized in *Nichol v. City of Springfield*, 6:14-01983, District of Oregon, December 18, 2015, that documents sent between non-attorneys can be protected by work product as long as they are prepared in anticipation of litigation, which is what happened here.

Finally, the fact that the final -- the circling back -- the final version of the declaration or the

affidavit, Mr. Hammond's affidavit, was filed in the juvenile court does not operate to waive or destroy work product protection with respect to prior drafts or communication.

We have cited in our --

THE COURT:  Why?

MR. NASO:  Well, because, Your Honor.

THE COURT:  You've already conceded that a final declaration is work product that's been waived.

MR. NASO:  Uh-huh.

THE COURT:  And now you're indicating that prior drafts and communications and the development of that affidavit are work product not waived.

MR. NASO:  Correct.  Correct.

THE COURT:  So help me -- help me understand why -- why --

MR. NASO:  Right.

THE COURT:  -- the waiver only extends to the final document and not the -- not -- not the earlier derivatives.

MR. NASO:  Yes.  I think it's because the work-product doctrine applies, unlike the -- say the attorney-client privilege applies to -- specifically to documents and tangible things, and the standards for waiving work-product protection are narrower than the standards for

waiver of the attorney-client privilege.

In the case of attorney-client privilege, that privilege is based on the confidential nature of a communication; and so, once that information is disclosed and confidential -- confidentiality is destroyed, there's no basis for the privilege, whereas work products -- the disclosure to a third party does not necessarily waive work product unless it substantially increases the likelihood that an adversary, the adverse party, will obtain that information.

And so the earlier draft here -- it's clear that the waiver of work-product -- that any waiver of work-product immunity does not destroy work-product immunity for other documents of the same character.

If you look back at that -- in the *Trailblazer* -- in the *Trailblazer* decision --

THE COURT:  As I said, I think there's a -- there's an important difference, though, between, sort of, categories of similar documents, as opposed to the -- the derivatives.

Or, actually, no.  I mean, maybe I turn it the other way around because the final -- the final affidavit is the derivative, that which is derived from these earlier -- earlier documents, this email, and this draft that exists.

So they're not similar in kind.  They are within the

direct line of generation.

MR. NASO:  But what is -- the important work-product protections here and the things that the plaintiffs want are Ms. O'Brien's comments on this draft or the discussion between Mr. -- Ms. O'Brien and Mr. Hammond about those comments and edits to this draft.

Those discussions were never disclosed to anybody. There's no basis to find a waiver of that.

We -- in fact, we -- courts in the Ninth Circuit and other circuits have repeatedly found that the filing of a final version of an affidavit does not waive work-product protection for earlier drafts and communications related to those drafts.

We cite one such case in our response to this issue.  A response is -- I can provide that for you.

Bear with me, Your Honor.

I believe our response is at Docket 123, and that -- the case we cite is *Grano v. Sodexo Management, Inc*.  In that case, the defendants moved to compel the plaintiffs to produce communications regarding the drafting of a declaration that the plaintiffs filed in briefing a motion in limine.  The court found that the fact that, quote, "The fact that plaintiffs filed the declarations in support of various pleadings does not automatically waive the work-product protection for drafts of correspondence leading

up to the final declaration."

I would also point the Court to a very recent case in the Central District of California. *Favell v. University of Southern California*, 2:23-00846, Central District of California, May 9, 2024.

That is a class action case involving a claim that the University of California knowingly submitted false data to the U.S. News & World Report to inflate its college rankings.

In discovery in that case, the plaintiffs sought production of drafts of an investigative report that USC commissioned for the purpose of investigating the allegedly fraudulent statements at issue.

So just as in this case we're talking about the assembly of a factual affidavit, that case involved a factual report -- factual investigative report.  That was ultimately -- the final version of which was ultimately released to the public.

In that case, the court found that work product protected the drafts of that report.  The court first determined that, quote, "Even though the report is largely factual and does not contain legal analysis, that does not necessarily imply that the report is -- that the report and the underlying investigation were not undertaken in anticipation of litigation."

Again, the anticipation of litigation is the key, not whether it contains legal analysis.

And, furthermore, the court found that the fact that the final draft of the document was publicly released does not render prior drafts unprotected by the work-product doctrine.

The court said that, ultimately, because USC has shown the investigation and report were commissioned in anticipation of litigation, prior drafts of the report are protected by the work-product doctrine, even despite the ultimate public disclosure of the final draft of the report.

So the same is true here.  That it is not a waiver just because the final version of that that was -- that affidavit was filed, earlier drafts and communications about those early drafts remain protected by work product.

THE COURT:  So in terms of the last consideration, which is even if it's work product and it's not waived, that it may, nevertheless, be discoverable because it cannot be found by any other method and is -- and there's a substantial need to be --

MR. NASO:  Right.

THE COURT:  -- (indiscernible) of the party.

MR. NASO:  Correct.

So, absent a waiver, the plaintiffs must show that there is a substantial need for this -- for these documents,

and they can't get that through other means of undue burden. Something to that effect. Okay. Here it is. I'm sorry. Bear with me, Your Honor.

So, yeah, in this case, plaintiffs do not have a substantial need for this document. I make a couple of points here.

First, courts had found that there is no substantial need if -- for work-product documents if the plaintiffs have the opportunity to depose witnesses about those documents.

Here, the plaintiffs are taking the deposition -- they have taken the deposition of Kat O'Brien. They are going to take the deposition of Mr. Hammond. They have the opportunity to ask him questions about their involvement in preparing this affidavit. Those questions are not documents or tangible things, and so they are free to ask those questions and take discovery that way.

THE COURT:  I can appreciate -- I can appreciate the legal arguments in a vacuum, but how is this going to work out in a deposition?  I mean --

MR. NASO:  I can tell you.  I can tell you.

THE COURT:  The practical -- the practical reality of how they go about deposing O'Brien and Hammond, I mean, they -- and so -- I mean, the plaintiffs' lawyers know that these things exist.  If -- if I allow the clawback and if I find that it's not discoverable work product, are they going

to be prevented from asking any questions that implicate these documents; right?  That's what I imagine would be the case.

And that also means I'm going to get a phone call from all of you in the middle of the deposition.

MR. NASO:  They --

THE COURT:  So -- so I assume that's the position that the defendant is going to take, which is you can ask questions that implicate these documents, the knowledge of (indiscernible) these documents.

MR. NASO:  Well, I think that is, in fact, not the position that we would take.

THE COURT:  Okay.

MR. NASO:  They are free to ask about these documents in deposition.  They are not free -- they are not entitled to have the documents themselves because work product applies to documents and tangible things.

THE COURT:  All right.

MR. NASO:  The documents themselves are --

THE COURT:  "Do you remember writing an email to" -- if the question to O'Brien in deposition is, "Do you remember writing an email to Hammond describing him as a rock star," no objection?

MR. NASO:  Yeah.  They'd be free to -- they'd be free to ask that.  Sure.

THE COURT:  So they can -- they can essentially ask -- are you saying that O'Brien can -- they can ask O'Brien, essentially, line for line, "Do you remember saying this?  Do you remember writing this?  Do you remember writing this?  Do you remember writing this?" and essentially get the -- get the contents of the email into -- into the deposition if she admits all of these things to be true?

MR. NASO:  Yeah.  They can -- they can test their memory and knowledge of that, yes, through deposition questions.

THE COURT:  And if they don't remember and if they --

MR. NASO:  Attorney work product and --

THE COURT:  -- can't recall, then can this be used to refresh their recollection?  They don't have the document.  I mean --

MR. NASO:  That's correct.

THE COURT:  -- (indiscernible) a document to refer to or to refresh their recollection of?

MR. NASO:  That's correct, Your Honor.  They would not be entitled to the document.

THE COURT:  So if --

MR. NASO:  But --

THE COURT:  If -- go ahead, Mr. Naso.

MR. NASO:  Well, I would make the point that they have already -- we -- we do know somewhat about how this will unfold because they have taken the deposition of Kat O'Brien, and, in fact, they did not make any attempt to ask questions about his affidavit, which I think is -- shows that there is not a substantial need for this information (indiscernible) case.

THE COURT:  I mean, the motion for clawback has been in play, though; correct?

MR. NASO:  Motion for clawback --

THE COURT:  I assume there was an issue about wanting these documents back prior to the deposition of O'Brien.

MR. NASO:  Correct.  The documents were not used in the -- in the deposition because they're subject to this clawback motion.

But they made no attempts to question --

THE COURT:  Right.  Mr. Naso, that's not a compelling argument to argue lack of substantial need. They're trying to play by the rules, given that there's a clawback issue at play here that needs to be resolved.

MR. NASO:  Well, let me -- let me try a different --

THE COURT:  Actually, let's return to the issue of substantial need and undue burden.

MR. NASO:  Yeah.

THE COURT:  Tell me why -- tell me why, at the end of the day, these documents are not to be ordered produced on that element alone.

MR. NASO:  Well, two things I would -- two additional things I would raise.  First, the factual elements that are contained in these documents are -- are available to plaintiffs through other documents produced.

So, for example, in this draft declaration, I believe there is -- one of these edits has to do with an allegation about a report of a concern that the children were being coached.  That information has been produced in other documents.  The plaintiffs are free to use other sources to get --

THE COURT:  Where are the emails that discuss coaching?

MR. NASO:  I believe it is in the draft declaration, Your Honor.

THE COURT:  Okay.  So let's -- focusing on the email first, I mean, I -- I mean, I think we ought to probably treat them separately or -- unless you think that my decision should be the same for both.

MR. NASO:  I, off the top of my head, don't see a reason why.  Well, I suppose on the substantial need part we should analyze them separately.

THE COURT:  Correct.  And that's my thought. Yeah.

MR. NASO:  So, in that case, let me make this point --

THE COURT:  And, Mr. Naso, I want to recognize I'm putting you on the spot, and I'm definitely pointing -- I'm delivering some pointed questions to you, and you're doing just fine; so keep doing what you're doing.

MR. NASO:  Well, thank you, sir.

So, yeah, I guess, with respect to the draft declaration that is factual, the facts in that declaration have been produced in different -- in other documents in the case that plaintiffs have and are free to use in depositions.

In the email itself, it is not -- I'm not sure if there's -- I'm not sure to what extent, but that -- that there's any facts in here that have been introduced in other places, but I think there's a separate point to be made about the substantial need for this.

THE COURT:  Okay.

MR. NASO:  This email and this draft declaration were drafted in May of 2018.  All right.  The disclosure of sex abuse occurred in October of 2017.

So these documents at issue were created months after the relevant time period for the plaintiffs' claims.

Plaintiffs are seeking these documents to pursue a theory that the -- these two DHS employees engaged in, effectively, a coverup up of the sex abuse that -- by Mr. Raygosa, that was disclosed months earlier and was being pursued by law enforcement at that time.

There is no claim in -- that they have asserted relating to such a coverup.  They have asserted claims of deliberate indifference and negligence.  Those claims turn on what defendants knew at the time the abuse was occurring, not months later; and, for that reason, these documents are not necessary or critical.  There's no substantial need for them to make out the plaintiff's prima facia case on those claims.

THE COURT:  All right.  And with respect to the affidavit, the draft affidavit?

MR. NASO:  And the same -- nothing further.  Everything I said would still apply to that.

THE COURT:  Let me hear -- is it Ms. Richardson or Ms. Skjelset, you want to -- you want to go at it?  And that -- the analysis is really focused on whether there's a substantial need and undue burden factor.

MS. RICHARDSON:  Your Honor?

MS. SKJELSET:  This is Mary Skjelset.

THE COURT:  We're going to go in alphabetical order, Ms. Richardson.

Ms. Richardson, go.

MS. RICHARDSON: Okay. Thank you.

And sorry about that, Mary. Okay.

THE COURT: By the way, I'm making a note to myself the next time all of us are doing something like this it's going to be in person because I'm not sure I can handle this telephone thing.

So be careful what you all ask for. You'll be making a trip down to Eugene. All of you.

Go ahead, Ms. Richardson.

MS. RICHARDSON: I think that might be good, actually. Although I appreciate it, since it's the summer time and some of us are having to work remotely.

Okay. So thank you for allowing me to go real quick. I'm only going to focus now on just what Your Honor said. I'm just going to set aside work product. There's so much that we can talk about whether or not this is work product, but I think the more important thing is to just dive into the substantial need and what it affects.

And so kind of working backwards on substantial need, this whole thought that this was some sort of, like, you know, going to a coverup, well, that is exactly what it is. Because during the time that these children were being abused in various ways by these -- this foster home and then, in our case, another foster home, it was because of

Ms. O'Brien and others' indifference to those children that they did not provide the information they should have provided in those juvenile dependency cases.

And so later, after the sex abuse was disclosed by one of the children, it was then that we see the motivation of O'Brien, when she's having those communications now with her co-worker, Hammond, to try to hide it from the juvenile court to minimize that affidavit.

And that all goes back to her deliberate indifference and, you know, what her motivations were at that time and why she was doing that later.  It is absolutely extremely important for our case to show what she was doing behind the scenes.

I think it's also important to point out -- oh, I want to make sure I'm -- and I think it's also important to point out here that, when we're talking about work product and the essence of -- you know, at the time of the juvenile proceedings, when they're -- when they're -- these people are doing this for the judge and providing this information, you know, work product is to protect that information from the adversary, and we're talking about here the children -- this is the children who we represent -- and that Ms. O'Brien and Mr. Hammond were supposed to be the guardians for those children.  They are not -- the children are not the adversaries.  We should be able to get at that

information because it's not intended to keep it from the children.

THE COURT:  So (indiscernible) the definition of work product, though; right?

MS. RICHARDSON:  Yes.  Yes, sir.

THE COURT:  Okay.

MS. RICHARDSON:  Exactly.

THE COURT:  And I think -- I think it's an important consideration that the -- the notion of who an adversary is may be a bit blurred here because of -- you know, because of the involvement of the minors and who these people were in relation to those minors; but I suppose, also, on one level, it could be just looked at more simply as, well, plaintiffs and defendants.  It's the defendants' document, and the plaintiffs are the adversaries.

So I can see how -- depending on how you frame it, it may not be -- you know, it may not be serving the purpose of keeping these documents from the adversary or -- or it might, depending on how you frame it.

And does -- does -- do those relationships in any way, that you've just described, implicate any of the issues regarding substantial need and undue burden?

MS. RICHARDSON:  No.  I don't think it goes directly to those elements, but I do think that, for the Court's discretion, if -- you know, even if we set aside and

just say, "If it's work product, is this going to be substantial need?  Are there facts that can't be discovered otherwise?" then, you know, kind of the overall feel is, okay, you know, if that's going to be disclosed, is it, you know, to an adversary in that juvenile proceeding?

No, it's not.

Another question for the Court is, is it something that's going to reveal mental impressions of an attorney?

No, it's not.

And so those are the things that kind of go to after you determine if you have these here and is there any overall, you know, overreaching concerns that may warrant not to have it go to us.

So I think it is important to think about it in that general sense, but as far as to these elements, no.

THE COURT:  All right.

MS. RICHARDSON:  And then, working backwards, though, now, on the, you know, factual elements here are available in other documents, and that's not the case.  We cannot get at what her impressions were.

And I think Your Honor had a really good description of the nature of it, and I am the one that was present. Ms. Skjelset was too.  And so was Ms. Hoffman.  I and Ms. Skjelset took the deposition of O'Brien.  We are not finished with her deposition.  We are going to be proposing

to the Court that we have additional time that will be a fight later, but we did not get to a point where I could even ask the questions about this draft affidavit.

But based upon her answers -- you know, she's not going to remember unless she can have it in front of her, and so I think that it's going to be important that we have that so that we can put it in front of her and show it.

The other thing too that I think is a big concern is as part of these communications she's having with Mr. -- Mr. Hammond, she talks about her second cell phone. The second cell phone that we have not received the information in any document -- any information and production from that cell phone, which is what she, when asked -- when Ms. O'Brien was asked about her phone, she said she never did anything with her second cell phone work-related, and that's not true what we know now, based upon those clawed-back documents and communications she had with Hammond; so, you know, for that reason as well.

So, you know, I just want to try to bring that to a close of how, you know, that's a substantial need and the facts that we cannot get about, you know, what she was really doing when she was putting together and influencing Mr. Hammond and his affidavit to the Court. I think it's very important that we shed light on that.

And then, if I can, Your Honor, I just want to go

back -- I hate to do this, but just -- I think what I heard, when I was listening very carefully to Mr. Naso, was that he said that, in those documents that were previously produced that were subject to attorney-client privilege, that they have said that they have waived that, and I think Ms. Hoffman also said it, that they waived those documents, because they were produced several years ago.  There's not a whole lot that we can do about it now.

So that was not an inadvertent disclosure.  They gave those documents to us, or to the plaintiffs, in that probate forum.

And then years later they're looking at whether or not those maybe should have marked -- been marked as privileged or confidential, and they didn't do that.

And so I think there's this greater issue of, once you've waived that, then all of it's waived with respect to those -- that issue.  You can't just hold back some of it.

So I just want to point that out for the Court.

THE COURT:  Thank you.

Ms. Skjelset, on the issue of these documents, we're talking about the email that starts with the rock star comment and then the draft affidavit.

MS. SKJELSET:  Yes, Your Honor.  I -- I just want to go back to Mr. Hammond's declaration for a moment because I think it shows that Kat O'Brien was not acting in the

capacity of a legal representative at all, but a witness, when she was providing this feedback and making changes to the court.  She was not -- there's no declaration saying she was working with Tricia Gonzalez.

His declaration -- that's filed as Document 125 in support of their response, and all he says, in -- in paragraph 2, he says that he made the declaration in consultation with the Oregon Department of Justice, but he said, "I sought Ms. O'Brien's assistance with the draft because she was J.C.'s caseworker."  Well, not because she was a legal representative.  They were not working in concert at the direction of Attorney -- Assistant Attorney General Tricia Gonzalez.

THE COURT:  Where's this affidavit from Hammond that he says this?

MS. SKJELSET:  It is ECF 125.  I think it was filed separately in support of their response.

THE COURT:  Hold on a minute.  Declaration of Stephen Hammond.  I'm looking at it right now.  Hold on a minute.  Let me take a -- that's a draft affidavit for the -- oh, so is there a -- is there, in the privilege log, an email or any email correspondence identifying communications between Attorney Tricia Gonzalez and Mr. Hammond relating to --

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  -- relating to consultation of -- for the -- with respect to this affidavit?

MS. SKJELSET:  I believe so, your Honor.  I believe that they have communications.  I believe that there are also additional communications with Ms. O'Brien, with other fact witnesses, such as the therapist.

THE COURT:  Right.  Well, what I -- I want to try to corroborate what kind of communication and consultation that Mr. Hammond had with legal counsel in the drafting of this affidavit, and you're saying that there may be -- at least there's something that's been identified as a document or some correspondence in the privilege log.

And maybe it's Ms. Hoffman or Mr. Naso who can confirm your understanding of the existence of certain communications between Tricia Gonzalez -- Attorney Gonzalez -- and Mr. Hammond.  Are they identified in the privilege log?

Either one of you may respond, if you know, and if you don't know, that's fine.

MS. HOFFMAN:  Your Honor, this is Ms. Hoffman. I -- I believe that there are, but I -- I would not be able to point you to, you know, which privilege log entries those are, if that makes sense.

I'm shooting from the hip a little bit, but I believe that there are, yeah.

THE COURT:  In trial court, shooting from the hip is usually what happens, especially on a phone call.  So I'm not going to hold you to -- I'm not going to hold -- yeah, I mean, if you can find it, that's -- well, I may not need it. I may not ask for it or reference to it.  So I just wanted to know if you knew off the top of your head whether something like that existed.

You think that there might be?

MS. HOFFMAN:  Okay.  I believe that there are, and we can -- we can try to identify those entries and either provide them later in a hearing or notify the Court later.

THE COURT:  All right.  Thank you.

Continue, Ms. Skjelset.

MS. SKJELSET:  Your Honor, I think Mr. Naso accidentally hung up, but I think he's back now.

MR. NASO:  I am, Your Honor.  I apologize.

THE COURT:  No apology necessary.

Go for it.

Thank you.

Ms. Skjelset, you may continue.

MS. SKJELSET:  Your Honor, my point was simply that it was not Ms. O'Brien who was working in concert or in consultation with Tricia Gonzalez.  She does not sign a declaration saying that she was instructed by an attorney to participate or edit the affidavit that was prepared by

Stephen Hammond.  She was simply a fact witness.

THE COURT:  I think your comments or your argument right now is kind of going to the issue of whether it's -- whether it's work product or not, perhaps.

MS. SKJELSET:  Right.

THE COURT:  But I'm really more interested in, you know, the substantial need, undue burden.

MS. SKJELSET:  That's fine.  That's fine, Your Honor.  I thought I'd give -- I'd make one more argument that it's not work product -- these communications -- but substantial need -- as you were saying, a deposition -- I do not see how we could possibly effectively question either Mr. Hammond or Ms. O'Brien on what changes she made to the affidavit that went to the court, what impressions she had, without actually showing her the document.

And, moreover, even assuming that we're -- we were not attempting to prove a coverup, as, apparently, Ms. Richardson is attempting, we do have punitive damages on the line.

And the extent to which Ms. O'Brien acted to minimize concerns in the home, either during the pendency of the children's stay with the Duncan-Raygosas or after, will go toward punitive damages.

So we have a substantial need to be able to show that

that happened.

THE COURT:  And there would be no other way to prove it?  You wouldn't be able to derive any of this information from any other source not otherwise protected?

MS. SKJELSET:  So I'm just envisioning how it would happen.  I have Mr. Hammond in front of me, and I say, "Was Ms. O'Brien involved in the preparation of this affidavit?  Did she ask you to remove specific items?  What were they?"  And what would he say?

I mean, if he says, "I don't recall," do I then say, "The analysis is over.  I don't have the document"?

THE COURT:  Okay.

MS. SKJELSET:  The phone is a major issue, Your Honor.  It has been represented to us multiple times that she did not use her phone -- her, quote/unquote, "real phone," as the document said -- for business purposes, and here she's clearly doing that in this really important context.

THE COURT: All right.  Thank you.

Mr. Naso, you're -- this is still your argument; right?  You want to -- anything else?

MR. NASO:  Your Honor, I think -- I think about how this would work, in terms of substantial need, again, I think, Ms. -- it might have been Ms. Skjelset -- or maybe it was Ms. Richardson who was speaking -- said it perfectly.  I

mean, they do have the affidavit, and they can question Mr. Hammond, they can question Ms. O'Brien, about how it was prepared and how they were involved in preparing it.

If they get -- absent a showing that that has run into a brick wall, they certainly have not made a showing that there is a substantial need for this work product.

The other -- and I just want to make a point that these other issues that have been brought up by plaintiff's counsel about this, quote, "second cell phone," they are referring to Ms. O'Brien's personal cell phone and several of these other issues that have not yet been raised or briefed.  Those issues are not before the Court with respect to this motion, and I just want to note that.

THE COURT:  Is it fair to say that there are some -- some questioning of Ms. O'Brien about phones and she declined or rejected the assertion that she had any of the phones that she would have used for communicating?

MR. NASO:  I believe Ms. Hoffman would know. Ms. Hoffman could have represented this better, but my understanding is that she was questioned and testified under oath that she did not conduct work on her personal cell phone.

THE COURT:  Okay.  Although, I mean, looking -- looking into the black box of this email, it suggests otherwise.

MR. NASO:  I think I would disagree with that, based on -- just based on the face of the document, but we can disagree on --

THE COURT:  Well, I -- I guess we can --

MR. NASO:  We can -- yeah, when that issue is briefed, we can certainly address that.

THE COURT:  Perhaps.  All right.

All right.  Anything else, Mr. Naso -- all right -- with respect to that?

MR. NASO:  Nothing further.

THE COURT:  Oh, thank you.

Even if I were to find that these -- you know, if I'm to find that these documents are work product and work product has been waived, even though the declaration that Mr. Naso -- Mr. Naso has indicated is work product but has been waived -- this is the final one that is -- because it was also submitted in litigation, I find that the third element -- or the third criteria for considering discoverability of these two documents has been established.

There's a substantial need, given the nature of the claims that have been raised, and there would be no realistic or reasonable way in which the plaintiffs would be able to obtain this information in this format in this framing, as it does raise specific issues, again, based on the claims that the plaintiffs have made, whether in the

context of punitive damages or in the context of a theory around a coverup, simply no other way, that I'm aware of, that the parties have pointed out to me, that it could otherwise be reasonably obtained, again, in this -- in this -- in the way in which it's been sent through this email as the draft -- the draft affidavit.

The motion for a clawback, if -- to the extent that it's been construed as a motion for a clawback of these two documents, is denied.  They shall be -- they shall be produced.

With respect to the issues associated with the privileged documents identified in Appendices B and C, I am going to allow *in camera* review of, as Ms. Skjelset has described, a sampling, a sampling of no more than 10 percent of the documents that are indicated or outlined in the -- in those appendices for my review to determine whether attorney-client privilege applies to those documents.

If -- and to the extent that I'm capable of deriving a principle to describe whether additional documents under those principles would also be producible, I will do so, or I will find that they're not producible because they are appropriately within attorney-client privilege, or I may find that these documents alone might be -- may be producible because they are not protected under the attorney-client privilege, but there would be no generalized

principle that I would derive that would apply to any other sets of documents.

When can you submit the sample to me, Ms. Skjelset?

Actually, I want to pull back that description of "sample."  I'm asking you to reduce that which you're asking me to consider in the -- in the -- in -- as discoverable or as not subject to attorney-client privilege.

Because I may -- I may not end up deriving any principle that could be applied to anything else other than the documents that you've provided to me for *in camera* review.

And I should further clarify you don't have the documents.

So identify the documents that you want me to review *in camera*.  Again, 10 percent of that which was in Appendices B and C, and then submit that to counsel for the defendants, and then I will receive those documents *in camera* and make my determination.

Any clarification of the two issues I've addressed just now?

Ms. Skjelset?

MS. SKJELSET:  The only question I have is -- I think you've just clarified it for me -- was whether it's 10 percent of the documents in the privilege log or 10 percent of the documents identified in Appendix B and C, but I'm

understanding B and C.

THE COURT:  That's correct.  10 percent of the documents identified assembled in -- in your Appendices B and C.

MS. SKJELSET:  Thank you, Your Honor.

THE COURT:  You're welcome.

Ms. Richards, any clarifications?

MS. RICHARDSON:  No.

THE COURT:  Mr. Naso?

MR. NASO:  I don't believe so, Your Honor.

THE COURT:  All right.  Let me check in.

How many other issues do we have?  Mr. Rizzo, you said you might be the one in charge of the other ones?  How many are we talking?

MR. RIZZO:  Thank you, Judge.  I know that the Court wanted at least for us to talk about the case deadline.

THE COURT:  And that might be a good idea.  Why don't we do the case deadline discussion.

MR. RIZZO:  Yeah.  Okay.  I'll sign off for now.

THE COURT:  Are you doing the case deadline discussion, Mr. Rizzo?

MR. RIZZO:  I -- I don't believe I was selected for that issue, Judge.  I think that's Ms. Skjelset's issue.

THE COURT:  Okay.  And then what other discovery

issues are there that you --

MR. RIZZO:  There are a series of -- call them discovery motions, several of which were filed by the defendants, and -- and if I -- if I may, Judge, I think many of these motions relate to the eventual outcome in the juvenile court on the defendants' motion to inspect records and files and to update the court regarding that motion.

We learned fairly recently from Judge Love, the Lane County Juvenile Court judge who reviewed the record, and she's prepared to make a ruling that it appears that, based on the parties' briefing and what have you, that certain materials may become available, and exactly which ones those are at the moment is unknown.

The parties have a request to Judge Love for a brief meeting to understand her ruling and then to craft an appropriate protective order to get the records from the juvenile court over into this Court.

And so both of --

THE COURT:  And so there -- are you describing to me that the issues about those juvenile court files is not yet ripe for me to decide anything on?

MR. RIZZO:  In a nutshell.  In a nutshell, because a lot of the discovery motions, then, pertain to what materials can be discovered from those files and also what medical records can be discoverable that relate to or are

part of those files.

So that's kind of where we are right now.

THE COURT:  You would have had me at "It's not ripe yet for us to deal with."

MR. RIZZO:  I wish I could be that succinct, Judge.

THE COURT:  Yeah.  Yeah, I'll remember next time never to lead off with you, Mr. Rizzo.

So given that these are defense motion -- the defendant's motions, talk to me.  Who's going to confirm?

MS. RICHARDSON:  Sorry.  I hate to do this.  This is Ms. Richardson.  I am going to -- I just want to be rude and say I'm going to sign off and Ms. Tshala and Ms. Korbel can handle whatever.

Have fun.

THE COURT:  All right.  Well, then be advised I may make a ruling against your interest.

MS. RICHARDSON:  That's why I have two very competent, amazing --

THE COURT:  Oh, good.  Ms. Korbel and Ms. Tshala are going to stay on the line.  Sorry.

MS. RICHARDSON:  Yes, yes, yes.

THE COURT:  Than you.

MS. RICHARDSON:  Yes.  Okay.  Yes.  Bye.

THE COURT:  Bye-bye.

All right.  Is it Ms. Hoffman's, Mr. Naso?

MS. HOFFMAN:  It's Ms. Hoffman, Your Honor.

THE COURT:  Okay.

MS. HOFFMAN:  I'm prepared to speak to the motions for extension of time, and I -- we do -- we want to discuss that.  I think it's -- I think it's very important, but I do want to flag, to the extent that I'm going to be -- probably be less popular than Mr. Rizzo -- Mr. Rizzo, but I -- I do want to -- to just flag for the Court that those issues regarding the documents the plaintiff is withholding are ripe for the Court to decide, given the Court is deciding something else, and those documents that they're withholding are very important for us -- for us to be able to take the depositions we need to take in this case, but that goes to the fact that we need an extension anyway.

Whether you rule today that we get those documents or that issue plays out for another week or two from the juvenile court, at -- at any rate, we need the extension either way so -- but I just wanted to flag that the issues are ripe.

THE COURT:  Fair enough.  And I appreciate your position on this.

I do have my checklist here.  So we have ECF 112, which is your motion to compel video recording of plaintiff's inspection and ODHS's confidential OR-Kids child welfare

database.

We haven't addressed that yet; is that correct?

MS. HOFFMAN:  That's correct.  We haven't addressed that yet in this hearing, and I --

THE COURT:  And we haven't addressed 116, which is motion for supplemental protective order and motion to compel interrogatories and RFP responses.

MS. HOFFMAN:  We have not, Your Honor.

And if you -- if Your Honor has questions about those motions or there's information that you find helpful, we're happy to address them.

If our briefs are sufficient for you to make a ruling, then --

THE COURT:  I'd just as soon try to resolve them now so you all have direction about what to do and how to go forward and not have to wait however number of weeks for an opinion.

Recognizing that perhaps a lack of an opinion may not provide the kind of -- a detailed legal explanation, but I will try to do my best here on -- on the record and then follow up with writing afterwards.

So let's see if we can work through those.  But I also want to make sure I've addressed ECF 118, which is plaintiff's discovery motion for *in camera* review and the clawback documents, and then ECF 134 is plaintiff's motion

for protective order to quash subpoenas served on J.C.'s providers.

Is that -- is that right, Ms. Skjelset?  Is that also still in play?

Ms. Skjelset, you might be on mute.

MR. RIZZO:  I think Ms. Skjelset may have stepped away for a moment, Judge.

THE COURT:  Do you know, Mr. Rizzo, offhand -- off the cuff, if 134 is still in play?

MR. RIZZO:  I didn't quite hear that, Your Honor.

THE COURT:  Sure.  134 is plaintiff's motion for a protective order to quash subpoenas served on J.C.'s providers.

MR. RIZZO:  I can cover that, Judge.

THE COURT:  Okay.  So -- and who's handling for the defendant?

MS. HOFFMAN:  I -- I can handle it, Your Honor, and Mr. Naso can -- you know, do cleanup if I miss something.

THE COURT:  No.  It's all on you, Ms. Hoffman.

So you're -- you filed -- you served subpoenas on J.C.'s providers?

MS. HOFFMAN:  Yes, we did.

THE COURT:  And how many providers are there?

MS. HOFFMAN:  We served subpoenas on about 10

providers.  The only providers that I believe are at issue in this motion to quash are Dr. Eric Sorenson and April Clark or the Center for Family Development where April Clark worked when she was the therapist for J.C. and Z.C. during the time period at issue in this suit.

THE COURT:  All right.  So, Mr. Rizzo, why are you seeking a protective order -- a motion to quash those subpoenas with respect to those two providers?

MR. RIZZO:  Well, what we did, Judge -- again, this relates, in large part, to the juvenile law privilege, and we objected to the subpoenas they served.  They listed, I think, about 10 or 12 providers.  My understanding is they only served a handful, including Sorenson and CFD.  That's also April Clark, who is the child therapist.  And so we asked that those providers not produce pending the outcome of this motion.

Now, as I just told the Court, Judge Love is prepared to rule on what is discoverable and what isn't.  And so part of the reason for the protective order was to await that ruling, given that the parties had already briefed the issue.

That said, Your Honor, and as I pointed out, I don't dispute -- J.C. doesn't dispute that her mental state, at least in part, insofar as it's relevant, is discoverable. The question was whether the documents reflecting that

treatment were discoverable.

Now, in the course of the deposition, there's been a number of -- which I didn't know, obviously, at the beginning, there have been a number of emails where DHS is communicating with Ms. Clark, the therapist; so that's in evidence.

We have produced -- and this occurred, I think, subsequent to the motion. We've produced a number of CFD documents that we believed were not in the supplemental confidential file.

So, again, depending on what Judge Love decides, those documents may well become discoverable; so --

THE COURT: But all those documents would be part of the juvenile court file; correct?

MR. RIZZO: I think overall that's right, and that's why we took that position in the first place.

THE COURT: And then to the extent that they are discoverable or not, in the context of a juvenile court file, isn't that a different consideration to whether the documents themselves are appropriately subpoenaed and discoverable by way of subpoena from a third party or to a third party?

MR. RIZZO: Well, I think that's right. I mean, because we also had privacy interest, and we did want to review medical records, prior to producing them, so we could

narrow (indiscernible) concerning specific documents.

My sense is, Judge, where we are right now there are going to be depositions of Clark.  There's going to be a deposition of Dr. Sorenson, and so the only question right now is to what extent the documents in their respective files are covered by the juvenile law privilege, and that's going to be decided fairly shortly, I believe.

THE COURT:  All right.  Ms. Hoffman?

MS. HOFFMAN:  Well, Your Honor, so we don't agree with plaintiff about the scope of the juvenile court's ruling that we've asked it for.  I think the question that you just asked Mr. Rizzo is the right one.

So a little bit of context:  Defendants filed a motion in the juvenile court to obtain the juvenile court record, including documents that have been filed in the dependency matter in the Lane County Juvenile Court, and that's the motion that's pending in front of Judge Love.

There is a -- there is a statutory privilege over the contents of the confidential supplemental file, and it applies to the court.  It dictates what the juvenile court can do.

So Judge Love is only ruling on what the court can give us, but the only -- the juvenile court can give us.  It's the only question from the juvenile court, and it doesn't have any bearing on what's discoverable in this case, and

she is not -- she's not ruling on that.

And, also, that privilege doesn't apply to third parties, like Dr. Sorenson, for example.  Third parties that created the documents keep them separately themselves as part of their files, are not bound by that statutory privilege over the supplemental confidential file, and the fact that a copy of something may have made its way into that file at some point doesn't make it privileged for purposes of a third-party subpoena.

So our position is that -- well, our position has several parts.  Part of our position is that plaintiff doesn't have a privilege to assert over those documents in the first place.

As Mr. Rizzo has acknowledged, those documents are highly relevant to this case.  J.C.'s mental state and the extent of any emotional damages that she suffered are obviously, of course, highly, highly relevant.

I don't think plaintiff really does disagree that her -- her mental and emotional condition is, of course, discoverable in this case.

Those documents are necessary for us to depose April Clark and Eric Sorenson, and we need them before we can complete those depositions, which is part of the purpose of asking for an extension.

But beyond that, I think we've briefed many times now,

and Your Honor probably knows it by heart, that the plaintiff has waived any privilege that she may have over those documents by filing this lawsuit in which she -- she put -- I'm saying "she" -- I suppose I mean Mr. Levi, but he's standing in the shoes of J.C.  And this -- this lawsuit puts her emotional state and her psychological damages directly at issue.

To be -- we need those documents even if the privilege did apply to them, which it doesn't, but even if it did, that privilege would have been waived.  We need those documents in order to defend our case, which we are entitled to do.

And then I will also just note that there is case law that we have cited a few times that says that, you know, privileges are -- not all state court privileges are applicable in federal court.  And, in fact, the number of them that are applicable in federal court is pretty limited. I'd argue that this isn't one of them; but, again, even if it does apply, it's been waived, and it doesn't apply to documents kept by third parties.

They can do what they will with those documents, and they are required to respond to these subpoenas.  We're entitled to the documents.

I honestly think it's pretty cut and dry, and we could decide it today.  It doesn't hinge on anything that the

juvenile court is considering.

THE COURT:  Thank you.

Mr. Rizzo?

MR. RIZZO:  Judge, let me -- let me start with that final point and then work backwards.

Counsel has raised this same issue in juvenile court, and we're supposed to confer with -- here, in this court, by virtue of the October order, on the nature and extent of the juvenile law privilege.  That did not happen.  They waited several months -- roughly four months -- and they went over into the juvenile court and they've made these very same arguments.

They cited two cases:  The *Doe v. Kirk* case and the *Bishop v. Craft-Jones*.  And we keep hearing the argument, which is a child waives everything in his or her juvenile court record simply because the child has filed a civil rights lawsuit.

And then the Court just heard that, according to counsel, these state law privileges just fall by the wayside.

So let me -- let me just work through the two opinions that they rely on briefly for the Court.

First of all, the *Doe v. Kirk* case, which traces back or cites Judge Coffin's opinion in *Craft-Jones*.  The first thing that Judge Garr King found was -- and I'll read it to

you just briefly. This is at -- I use Lexis, Judge, so I'm at 2003, U.S. District, Lexis 25483. I'm on page 4 of 5.

THE COURT: Okay.

MR. RIZZO: The ruling on the issues in that case -- and I'll explain to you why I think they're different than the issues here, to the extent that matters to the Court in light of what Judge Love is about to do, but Judge -- Judge Garr King said the Oregon Court of Appeals has held that this provision, the statute 419A.255 applies generally to discovery in litigation, citing a Court of Appeals case.

The court held in *Kahn v. Pony Express Courier Company* that reports and other materials relating to a child's history and prognosis within the meaning of ORS 419A.255 are privileged against discovery under ORCP 36 and then cites the case.

The court worked its way down and then says, "I find that the statutory privilege created by 419A.255 applies in this case and any records concerning plaintiff's," quote, "history and prognosis," unquote, "are covered by the privilege."

So that's a case that the State defendants are relying on. It says kind of the opposite, that this Court can simply dispense with state law privilege, and that's not the case.

Now, with respect to the facts in *Doe* and in *Craft-Jones*, what was happening in both of those cases, Your Honor, was that the plaintiffs were using information from the juvenile court record to discover facts and to potentially impeach and depose the defendants' witnesses.

And it was more of a straightforward plaintiff, i.e., the child; and in one of the cases, you know, she became an adult, and issues about her arrest in juvenile detention regarding the defendant police officer.  And so in looking at that, in light of finding out whether the child was arrested, incarcerated, what stress they suffered, abuse, and what have you, while they were in the detention center, the court allowed that type of discovery to come in because it directly related to the claim and because the plaintiff -- and this was true in both cases -- was using the information in the civil rights case.

Both of those things aren't happening here.  The defendants are not Joe Raygosa; so this is not where plaintiff is suing Joe Raygosa, the abuser, and the abuser is saying, "Hey, wait a minute.  In the juvenile court, this and that happened, and you're now using what this and that was against me."

We haven't used a single document yet in the juvenile case because we were playing by the rules, trying to respect the privilege, which the defendants refused to acknowledge,

and wait on the ruling before we move forward.

So that's -- that's basically what's happening here, in terms of what --

THE COURT: And when is Judge Love going to make a decision? When is she delivering her ruling?

MR. RIZZO: It's unclear, Judge. We just wrote her -- I think it was last week. Of course, there's been a holiday, and her bailiff was going to set up a meeting to where all the parties -- I think it's going to be a phone conference to get on the horn with her, find out what her ruling is. So it's a long way of saying "I don't know," but I expect it should happen within the next week or two.

THE COURT: So you're talking about documents that are in the supplemental file? Confidential files --

MR. RIZZO: Right.

THE COURT: -- for juvenile dependency cases?

MR. RIZZO: Right.

THE COURT: And there could be -- I mean, there -- I mean, and it's about what -- if -- if producing anything, what to produce, if it's not the entire file; right? That's what -- that's what Judge Love is going to be considering in deciding?

MR. RIZZO: Right. And so -- and so the reason we sought the protective order is, number one, to await that ruling; and, again, it doesn't make sense to say that a

child's treatment in a juvenile proceeding, commissioned by DOJ and DHS -- and they have all of these reports, by the way, because they get copied on them -- it didn't make sense to me to say, "Okay.  If they're covered by this child's privilege, then what?  It doesn't matter if defendants issue subpoenas to the (indiscernible) providers?"

THE COURT:  The privilege -- the privilege is -- is not to the records themselves as they exist out in medical providers' offices.  It exists as it relates to the file -- the juvenile court file; correct?  Or am I -- am I reading this very -- overly narrowly?

MR. RIZZO:  You know, I think, what I -- no, I don't think it's overly narrow.  I think what I'm saying, Judge, is just because the records that were submitted in the context of the juvenile case are in a file drawer in the physician's office, that doesn't mean that the privilege doesn't cover those documents.  That's what I'm saying.

They don't automatically do something to --

THE COURT:  Yeah, and I think that's -- and I was -- as I -- I've been considering the privilege, it applies to that -- to the -- to the file in juvenile court, not to the -- not to the medical records in a third party's office.

MR. RIZZO:  And, again, Judge, I did not see it that way because they were part -- they are part of the

juvenile court records and files.  They were commissioned by DHS.  They were submitted to the Court; and, yes, copies of those are in their respective providers' files.  But, again, that doesn't mean they lose their protection or that the child waives his or her privilege over those records being disclosed, particularly to the defendant like this.

THE COURT:  But there are other documents that are part of the -- I think the supplemental -- supplemental file in a juvenile court file.  You know, including reports from -- there may be other confidential reports, not from physicians, that -- that are included, that might also benefit and be subject to the privilege.

MR. RIZZO:  Right.

THE COURT:  So, I think, just by virtue of an outside source report, you know, generated by, you know, an exam or an evaluation of -- of an individual by a physician of some kind, that then also gets included in the court file, I'm -- I'm concerned about that, that it's creating an additional firewall to the discoverability of -- of what is relevant and necessary information, given the claims that -- that J.C.'s filed.

MR. RIZZO:  Judge, I understand that, and I think --

THE COURT:  I'm pretty sure -- yeah, I'm pretty sure you -- you disagree and I can -- I can see how it's

framed.  And depending on how it's framed, it might be considered somewhat differently.  But the idea of bootstrapping -- I mean, on some level, we're kind of dealing with this in the same way when it -- when it comes to the -- I mean, when it comes to privileged documents on the defense side, and -- and, you know -- you know, what gets generated and what may -- what is otherwise made part of -- of a consideration in the development of one document.  Is that producible and discoverable, or is it also part of the entire universe of those things that are otherwise protected?

And I'm -- I'm concerned about limiting either party's -- overly restricting and unnecessarily doing so, in particular, in accordance with the law, either party's ability to prosecute the case fully and then to defend the case.

And given the nature of the claims that have been raised and given that these documents are being sought from third parties, I'm respectfully denying the -- the motion for a protective order as it relates to Sorenson -- there are two providers.

There's Sorenson and who else, Ms. Hoffman?

MS. HOFFMAN:  It's --

MR. RIZZO:  The Center for Family Development, which is April Clark, the therapist, Judge.

THE COURT:  So April Clark.

Is there any other clarification that's necessary?

MR. RIZZO:  Well, again, this is Steve Rizzo, Judge.  Just from my perspective, we -- we -- we have asked, I think, twice for the defendants to give us the documents that they received from these other providers because we had relevancy questions.  I understand the Court's going to allow the discoverability, in terms of clarification, of Sorenson and Clark.

THE COURT:  This Court or -- or Judge Love?

MR. RIZZO:  Think -- I thought -- I thought you were just making that ruling, Judge, that those -- those providers were to be discoverable.

THE COURT:  I got lost there for a moment about what we were talking about.  So with respect to Clark and Sorenson, I've indicated that I'm denying the motion to quash.

MR. RIZZO:  All right.

MS. SKJELSET:  Your Honor?

MR. RIZZO:  And the motion for --

MS. SKJELSET:  I'm sorry.  Can I interject?

THE COURT:  Say it again.

MS. SKJELSET:  I'm really -- this is Mary Skjelset.  I apologize to interject, but I am aware of case law that I feel like the Court needs to be aware of,

and I've been desperately trying to see what happens.

THE COURT:  What law are you referring to?  I didn't hear what you said.

MS. SKJELSET:  There is a -- it was a Court of Appeals decision published in 2021, in Oregon, regarding the extent of the privilege and whether it applies to documents that are maintained elsewhere.  The citation is -- it's *Department of Human Services v. E.J. (In re: S.J.)*  It's 316 Or App 537.

My -- my issue is I've been desperately trying to find what happened in the Supreme Court because I know it was appealed to the Supreme Court and perhaps our -- our kind attorneys general who are there will know, but -- but my understanding is that the Court of Appeals in Oregon ruled that the privilege applies to documents that are in the legal file, the supplemental confidential file, regardless of whether they're maintained in duplicate elsewhere.

So my understanding is what's happening in that case is that DHS was trying to use documents that were also contained in the supplemental confidential files, which they had in their own files against the child who later had a subsequent dependency proceeding, and the court found that they couldn't do that because they were privileged because they were also maintained in the legal supplemental confidential files, if that makes sense, Your Honor.

So I just wanted you to know that there was authority regarding this issue, but I feel remiss in not -- not being able to find the Supreme Court.  I think that they affirmed the decision, but I don't want to -- I don't want that to be -- I cannot confirm that for sure because I can't find it right now.

THE COURT:  All right.  Ms. Hoffman, do you want to respond?

MS. HOFFMAN:  I do, Your Honor, but I would first like to ask Ms. Skjelset to please repeat the citation.  I didn't catch it accurately.

THE COURT:  It was 316 Or App 537, and it started with *DHS v.* and several initials, which I didn't catch.

MS. HOFFMAN:  316 Or App --

THE COURT:  316 Or App 537.

MS. HOFFMAN:  -- 537.  Thank you.  All right.

All right.  So this case is, I think, a different issue than the one currently before the Court.  This is to do with whether DHS can disclose, while a person is a ward of a court and the dependency or other ward proceeding is live, whether DHS can disclose documents that are being used in that proceeding.  That's not the issue that's here, and I don't think this Court -- this case really speaks to our issue.

Our issue is that we are not seeking -- these subpoenas

don't seek anything from the juvenile court.  We're not trying to find out what was in the supplemental file.  I don't -- I'm going to be honest, Your Honor.  I don't even know if the documents that we are seeking are in the supplemental confidential file.  I have no way of knowing.

Plaintiff has made the same argument about the Kids FIRST documents that we've also sought via a subpoena, and I don't believe those were ever presented to the juvenile court.

For all I know, April Clark and Eric Sorenson's documents aren't even in the juvenile court file.  We are entitled to them.  They are third-party documents that exist regardless of whether they are in the supplemental file or not.  The juvenile dependency proceeding is not live -- the children at issue in this case are not wards of the State.  This is not an issue of DHS disclosing something about children who are their wards.

This is an issue of us obtaining documents from third parties.  I mean, I think -- I think that you and I are understanding this the same way.  April Clark and Eric Sorenson are custodians of those records independent of whether they are -- they were used in juvenile court at any point or not.  April Clark and Eric Sorenson are not subject to the juvenile court privilege.  It doesn't bind them.  It doesn't have anything to say about their documents.  And so

these are -- these documents are discoverable in our case.

They're highly relevant.  We need them to depose April Clark and Eric Sorenson, and I think -- I think there's not really a lot else to say.

I will mention, to Mr. Rizzo's point, we -- we are producing the documents we received from the other medical providers, and we're going to make that production tomorrow.

THE COURT:  All right.  My decision stands.

MR. RIZZO:  Judge, if I may, this is Mr. Rizzo. I'm reading from the Court -- the Court of Appeals, and I know the Court's decision stands.  I'm not trying to change that.  I just want the Court to understand --

THE COURT:  I'm always willing to be swayed by a correct decision.

MR. RIZZO:  Well --

THE COURT:  So if you really think I have it wrong, you haven't annoyed me yet, Mr. Rizzo; so --

MR. RIZZO:  Okay.  I hope not, Judge.

THE COURT:  So tell me what you know.

MR. RIZZO:  It says the statute, ORS 419A.255(2)(a), references a broad range of materials that can qualify for the privilege.  It would contradict the plain meaning of that language if the privilege could be defeated by finding the same materials in duplicate from the originating source, such as DHS files.

Therefore, we interpret the statute to mean that if any, quote, "History and prognosis material is located in either the supplemental file or the confidential" -- excuse me -- "or the record of the case, the privilege attaches, and it applies regardless if these same materials exist in duplicate elsewhere."

So that's -- that's the current statement.

And as Ms. Skjelset said, we didn't have the Supreme -- the Supreme Court ruling on that, but I just wanted to leave the Court with that as a reason why it was my instinct.  I didn't rely on that case, Judge, but I was relying on my instincts as a litigator that it didn't make a difference if the documents were in Sorenson or CFD's files so long as they were (indiscernible).

THE COURT:  When they describe a document in duplicate elsewhere, I'm understanding that Sorenson and Clark's documents are the original documents.  I mean, to the extent that anything is original and wet inked, but those are the documents to which duplicates have been submitted and if they are at all in the supplemental record or supplemental file for the juvenile court.

So it seems to me like the case is really dealing with documents that -- that -- that are part of the -- part of the supplemental file that -- that have -- have been copied and stored elsewhere in another -- maybe a third-party --

third-party -- third-party repositories to which somebody has filed a subpoena to get access to.

So the origin in, I think, under the -- the -- (indiscernible) privilege applies is -- is juvenile court, but here we're dealing with the origin of these documents are -- are from these medical -- these medical providers.

Now, is there something in that case that -- that helps me understand, when they talk about duplicates, that we're actually dealing with documents that have been generated and independently created, separate from the supplemental record, a supplemental file from -- in juvenile court, is subject to this -- to this privilege?

MR. RIZZO:  I'm looking at that now, Judge, and I would say I wasn't reading the term "duplicates" quite the same way as the Court -- the Court, in looking at this case.

THE COURT:  And in this day and age, what a duplicate is and an original may not matter.  I mean, it becomes a blur.  But I think it might have some relevance about what the statute is -- is referring to with respect to originally generated documents from a medical provider.

MR. RIZZO:  Uh-huh.

MS. HOFFMAN:  Your Honor, my understanding of it is that it's -- "duplicate," in this case, is referring to DHS because the individual at issue in this case was a ward of the State.  DHS is a party to the proceeding and,

therefore, has copies of what is filed in court, because, of course, they would, and so they have a copy of it because they are involved in the proceedings.

That's how I understood -- that's what I understood "duplicate" to refer to here, and I -- I think that is a very different set of facts than what you're asking us about.

MR. RIZZO:  And, unfortunately, Judge, that doesn't appear to be the case.  At page 550 of the opinion -- and this may be helpful to the Court -- it says, "Here, DHS sought to disclose the material regardless of what other situations and actions may or may not fall under the statute's ambit.  DHS clearly does.  DHS cannot defeat the privilege because the particular report or other material relating to the ward originated from its own file that it still possesses."

So applying that to Sorenson, we are talking about the report that originates from his files and/or from CFD's files that become part of and, indeed, were commissioned by or prepared on behalf of the juvenile court.

So, again, it says this privilege applies, and I -- I think, too, listening to what Ms. Hoffman just said -- and, again, I know the Court has ruled, but we're going to have -- we're going to have a ruling from Judge Love that may be inconsistent, and it was the defendants who went into

that court to obtain this very ruling.  And now, if we have a ruling on the motion -- on this motion for a protective order that differs, Judge, we just may have some issues down the road in terms of relevancy plus admissibility.

I'm not meaning to throw a wrench in this, but that's one of the problems with wait -- why I filed this in the first place and why I think it's important to wait to see what says Judge Love does.

THE COURT:  Okay.

MS. HOFFMAN:  Your Honor -- oh, I'm sorry.

THE COURT:  Go ahead.  If it's -- and, again, if you're repeating, I don't know if that might be helpful, but if it's new again, I'm happy to hear it.

MS. HOFFMAN:  I suppose it's not.  All I was going to say was it's a completely separate issue in front of Judge Love that is not the issue before the Court right now, and there will not be inconsistent rulings because you and Judge Love are not ruling on the same -- on the same question before you.

THE COURT:  And I'll -- I -- I agree with the argument and -- and my analysis of the arguments.  I agree with what, Ms. Hoffman, you've described and argued; but in the interest of making sure that I am fully thorough, I'm going to review the case that you've cited, Ms. Skjelset and Mr. Rizzo, more thoroughly tonight, and I will either

confirm my decision to deny the motion tomorrow or explain why I may have changed the decision.

But I'll give you that ruling quickly.

I do want to just let you know, though, that the lean of presumption is based on the analysis that I've provided and the reasoning that I've given for why I've -- I've decided to deny it, but I'm going to hold onto that ruling until I -- I have a more thorough opportunity to review the case that you've discussed.

All right?

MR. RIZZO:  Thank you, Your Honor.  Thank you.

THE COURT:  ECF 112.  Defendant's motion to compel video recording of plaintiff's inspection of ODHS's -- yeah, I remember having this conversation way back when, when we were talking about how to go about getting access to and reviewing the database.

Is it Mr. Rizzo or Ms. Skjelset?  Why are you objecting to the production of that video?

MR. RIZZO:  This is Mr. Rizzo, Judge.  Well, for several reasons.

And I know it's probably been a while since the Court has taken a walk through this, because the motion was filed fairly long ago, but just to -- just to recap, Judge, we had a lengthy hearing in front of Your Honor and where the defendants were very opposed to allowing us to inspect the

electronic file in OR-Kids.

The Court ultimately allowed that.  There was a motion for reconsideration.  The Court put some parameters around that inspection.

The Court invited the defendants to clarify, to discuss anything else that they wanted, any other issues that were on the table, and the defendant never said they wanted a copy of our video.

THE COURT:  Had they -- had they said it back then, would it have been an issue?

MR. RIZZO:  Well, it was -- we would -- we would have understood how to go through the -- a process of the inspection differently.  Right?  Because now, to be told after the fact that we have waived our work product by engaging in that and creating our own records for our own files that we have never used -- one of the reasons this motion was filed is the defendants were claiming we are going to use this video in our depositions, and we haven't.

Basically, ruled it's not admissible for any reason.

We couldn't even use it to impeach Mr. Payne who claims he was unaware of the drop-down menu; so yeah --

THE COURT:  Let me -- let me turn -- Ms. Hoffman, is this your argument?

MS. HOFFMAN:  This is our motion.  Yes, Your Honor.

THE COURT: Right. Right. So I -- meaning, is -- are you the one or is Mr. Naso arguing? I wanted to make sure.

MR. NASO: I --

MS. HOFFMAN: I think it's --

MR. NASO: I can take it, Your Honor.

MS. HOFFMAN: Oh, I think it's Chad. Sorry. Mr. Naso.

THE COURT: All right.

MR. NASO: Your Honor, I think --

THE COURT: All right. So I really -- I'm looking at both the time and the interest of trying to move us through some of these things fairly straightforwardly. I just need to understand why you want this -- why do you want the video?

MR. NASO: As a matter of basic fairness, Your Honor. They took -- they took the video. We should be -- we feel that, as a matter of fairness, we should be entitled to a copy of -- of --

THE COURT: Did anyone ask for a copy at the time that it was being created?

MR. NASO: I believe we asked for a copy in the form of a -- of an RF -- of a Rule 34 RFP.

THE COURT: Okay. But by the time that everyone got together in the room about it and were observing the

drop-down menus and navigating the database, did anyone turn to someone from (indiscernible).

MR. NASO:  I'm -- not that I'm aware of.

THE COURT:  Any reason why there wasn't any interest in doing so back then?

MR. NASO:  Hold on.  I think Ms. -- Ms. Hoffman might have more information on that.

And do you want to chime in?

MS. HOFFMAN:  Yes.  Just briefly, Your Honor, because Mr. Naso wasn't at the inspection and I was.  So we had not --

THE COURT:  Why did Mr. Naso volunteer to even argue this right now?

Mr. Naso?

MS. HOFFMAN:  Well, we -- Mr. Naso and I tried to split the workload so that we weren't --

MR. NASO:  Just trying to give her a break, Your Honor.

THE COURT:  Actually, Mr. Naso, I think you're the one who needs the break.

MR. NASO:  I think we all do, Your Honor.

THE COURT:  (Indiscernible.)

You were there.  Why wasn't there a request for a copy of the video?

MS. HOFFMAN:  Well, Your Honor, I think -- I don't

know that we, at the outset, knew or -- I'm not sure we've really decided if we'd want a copy or not. You know, we didn't really know how the inspection would go, and it didn't occur to us that -- that opposing counsel would ever consider it to be work product, given that, the entire time the recording was going, I was in the room, Ms. Rhee was in the room, Mr. Payne was in the room. I am opposing counsel. My voice is recorded. We had several conferrals during the inspection that are recorded on the video; so --

THE COURT: How long is the video? How long was the recording?

MS. HOFFMAN: Four hours. It's four hours long.

And we -- at the end, we ended up sort of disputing whether they -- plaintiff was entitled to more time for the inspection, and we felt like, given the number of conferrals that had happened during the inspection and given the time dispute at the end and the fact that afterward plaintiffs told us they thought there were documents that we had not produced and that we needed to produce, we didn't anticipate those issues arising. And given how many issues were recorded on the video and the fact that it can't possibly be work product, given that opposing counsel was in the room the whole time it was created --

THE COURT: What are you going to use it for?

MS. HOFFMAN: -- you know, we issued an RFP the

next day.

THE COURT:  So what are you going to use it for, if anything?

MS. HOFFMAN:  What are we going to use it for?

THE COURT:  Yeah.

MS. HOFFMAN:  We -- we requested it so that we were prepared to -- so that we had the same information that plaintiff had in the event that the -- that the conferrals or discussions about documents that -- what we had in that inspection ever became relevant later in the case, I don't know that we have a plan to affirmatively use it for anything, but I think we're entitled to the same -- you know, the same documentation of our conferrals that plaintiff has.

THE COURT:  So you'd want to be able to use it defensively in the event that -- that the defense was accused of -- of something relating to document production or -- or cooperation with the Court's ruling or something like that?

MS. HOFFMAN:  Something like that, Your Honor, yes.  And in the event that it's ever used to -- I don't know -- describe the -- the database, it would be helpful to just have the recording of that's how it went.

THE COURT:  So in the event that the plaintiffs ever invoke anything that arises out of that video

recording, either things that were said, actions taken, or mouse clicks clicked, to -- to challenge the defendants' cooperation with respect to discovery or production, whatever it might be, you'll be entitled to the video.

MS. HOFFMAN:  Okay.

THE COURT:  But if that's the only use, then I don't -- I don't think it's -- it's not going to be necessary for the development of the defense of your case.

But I can appreciate that, from a defensive perspective, you would be entitled to it.  So the moment the plaintiffs raise an issue that triggers that need, then, plaintiffs, you're going to have to provide the entire -- the entire four hours.

MR. RIZZO:  Understood, Your Honor.

THE COURT:  Okay.

MS. HOFFMAN:  Thank you, Your Honor.

THE COURT:  You're welcome.

ECF 116.  Defendants' motion for supplemental protective order.  Motion to compel responses to interrogatories or RFPs.

Motion for a supplemental protective order.  This is the defendants' motion for a supplemental protective order?

MS. HOFFMAN:  It is, Your Honor.

THE COURT:  Ms. Hoffman?  Who is it?

MS. HOFFMAN:  Yes.

THE COURT:  Go ahead.

MS. HOFFMAN:  Your Honor, we -- the same issue as far as a subpoena to a third party.  We issued a subpoena to Kids FIRST for the documents that they have that are related to J.C.'s assault that's at issue in this case.  Kids FIRST is a HIPAA-protected agency, and they require a protective order to be entered.  We have -- in order to produce those document, we have provided you, the Court, with a draft protective order.

The only reason we couldn't agree is because Kids FIRST would like the protective order to require the destruction of the documents as soon as the litigation -- this litigation has concluded.

And --

THE COURT:  And that -- that would be inconsistent with our prior protective order; right?

MR. NASO:  Yes.  And it would be inconsistent with state public records law, which -- because we represent the Department of Justice, the Department of Justice is required to comply with Oregon public records law.  And we cited some case law explaining that -- that even HIPAA-protected agencies are -- still need to comply with state law.

That the -- just because they're public records, doesn't mean that they would be -- lose their confidentiality.  They don't.  Public records are often

maintained confidentially.  You know, the state hospital, for example, has to abide by public records law, but most of their documents are not ever disclosed to the public because they're all confidential and protected by HIPAA.

So that's our position, is that we should be allowed to retain them to meet the public records retention law schedule, and Kids FIRST would prefer them to be a protective order that requires them to be destroyed.

And plaintiff has objected on the same basis that they objected to the subpoenas to Dr. Sorenson and April Clark, which we have discussed.

THE COURT:  All right.  And so, Mr. Rizzo or Ms. Skjelset, you're arguing that the -- the general privilege applies?

MR. RIZZO:  In part, Your Honor.

Again, as a -- as a caution, we are making that argument, which, again, will -- appears to be -- will shortly be resolved, at least in part.

And the other thing is we made -- we made a variety -- we issued -- we raised a lot of issues.  Let me just encapsulize those.

One was relevancy.  There are materials in the Kids FIRST file that only pertain to acts and events, as we understand it, surrounding both J.C.'s and Z.C.'s removal from their home.  We didn't feel that was relevant, and we

also believe there's a certain degree of privacy and that that record was clearly covered -- again, in connection with the case that -- that Ms. Skjelset just related to Your Honor, we felt that that was an extension or part of the child's juvenile law privilege.  So that's part one.

Part two is we offered, notwithstanding our objections, so long as the defendants agreed it didn't amount to a waiver, I understood the video of J.C. interview -- her interview in October 2017, after she disclosed.  I get that that's relevant.  I get that they want to see it.  With a footnote that Mr. Hammond has already looked at this video, number one; and, number two, there was a DHS caseworker who was present during the forensic interview as well.

So it's not like they never saw this and they don't know what it consists of.  The defense attorneys in this case want it.  So we offered to make it available, but our concern was, "You're not going to possess it."  It's extraordinarily sensitive.  It's extraordinarily private and embarrassing, and there's no reason -- there is no reason for the defendants to come forward now and cite some public records provision and claim they get to hold onto this for a period of five years.

The other thing is, Judge, is that Kids FIRST filed a motion as well, and I don't believe Ms. Hilsher -- she's the attorney who is representing Kids FIRST -- we all conferred

on this together -- she may have a say in this because Kids FIRST is raising unique HIPAA issues that apply to these forensic evaluations, and the Court really wanted to address that; so -- as part of this ruling; so --

THE COURT:  Did Kids FIRST file a -- file a brief?

MR. RIZZO:  I feel like she did, Judge.  Let me --

MS. HOFFMAN:  Yes, Your Honor, she did file a brief.

And, Your Honor, I was -- I was just -- to Mr. Rizzo's first point about records pertaining to Z.C., I just want to note that our subpoena only seeks records related to Z.C.'s. forensic interview in -- in October of -- the same documents that were produced to plaintiff in the probate matter. We're not requesting -- there's a separate forensic interview.  It's ECF -- and, by the way, Kids FIRST's brief is ECF 122, if you'd like to find it, Your Honor.

THE COURT:  Thank you, yes.

MS. HOFFMAN:  But our subpoena -- there is -- there is a -- there was a separate forensic interview that both children gave when they were removed from their home in August of 2016, their biological home.  We're not seeking those records.  We understand the removal from the biological home isn't relevant to this lawsuit.

I don't -- I think Mr. Rizzo just maybe hasn't reviewed our subpoena in a while, but this isn't seeking that.

That's -- that's not an issue.

THE COURT:  Let me ask, Mr. Rizzo, you have all these documents; correct?

MR. RIZZO:  We received -- we received certain documents pursuant to our subpoena in the probate court from Kids FIRST, Judge.

THE COURT:  Yes.  Would those be -- Ms. Hoffman, are those -- I know you wouldn't know what these documents are, but have the two of you conferred about these and whether there's some other way in which you and legal counsel can review these documents without having possession of them?

MS. HOFFMAN:  We did confer on that issue that Mr. Rizzo has raised, but we don't agree.  We think that we're entitled to possess them.  We may want to refer to them more than once, review them more than once, more than one attorney may each review them.  It isn't workable to have -- and -- and I say that, Your Honor, understanding why Mr. Rizzo asked us to agree to that.

We don't -- we don't agree because, for practical purposes, that's not workable, and we believe we are entitled to a copy of the video, but I do understand why J.C. would feel uncomfortable with that.  Of course I do. It's unfortunate that -- that that is the subject matter of this lawsuit.  And I understand she's already had -- you

know, when she gave that forensic interview, there was a detective and a CPS worker present watching her do that. The video was played in the criminal court.  The DA's office has a copy of the video as well.  I understand this is something that has already been shared about her.  I -- I do want to be sensitive to that.  It is -- it is not our intent to further -- make her further embarrassed and uncomfortable, but at the same time, we are -- we -- these documents are obviously discoverable.  We are entitled to have them produced to us and to -- to review them in as many times and in whatever fashion, with our team, as we need to, that -- that -- that is just simply, then, the nature of discovery, and -- and this happens, you know -- unfortunately, it happens all the time in --

THE COURT:  (Indiscernible.)

MS. HOFFMAN:  -- in sex abuse cases and, you know --

THE COURT:  So I think this may fall within my -- I'm going to review the case that Mr. Rizzo and Ms. Skjelset cited, take a look at it just to make sure that I am more fully apprised of what the state law may be on some of these subjects before I make my decision.

I will tell you that, yes, I'm -- I'm inclined to grant, with as many protective order restrictions as necessary to ensure -- you know, to ensure that that --

these documents, if I'm going to grant them, are kept in a very restricted format, such that, you know, we can protect the integrity and the safety of J.C., given that you may need to review them.  So --

MS. HOFFMAN:  I appreciate that, Your Honor.

I -- I do want to mention, though, that what -- I understand that is your previous ruling with the other subpoenas; but when it comes to the Kids FIRST records, my understanding is that they are not in the supplemental file.

I do not believe that they -- the Kids FIRST video and related documents are typically not presented to the dependency court.  That's -- that is not typical.  It would be more typical if it were the biological parents that committed the sex abuse and that was the basis for the -- for the State -- for DHS's jurisdiction, but in this situation, I do not believe that the Kids FIRST video was ever given to the court, and I --

THE COURT:  Okay.  Got it.

MS. HOFFMAN:  Yeah.

THE COURT:  So it wouldn't be subject to that privilege, in any event?

MS. HOFFMAN:  It would not be.  It would not be.

And I think Your Honor may already know this from your time on the Lane County Circuit Court bench, but for purposes of the record, it's also -- I just want to be clear

that DHS does not -- DHS does not seek these for a negative use.  They don't have any relationship with Kids FIRST in Lane County.  It is law enforcement who requests those forensic interviews, and it's considered a law enforcement proceeding and document, and so there's a lot of separation between, you know, DHS and the dependency proceeding and Kids FIRST and law enforcement.  There's a lot of daylight there.

THE COURT:  Okay.

MR. RIZZO:  Judge, I -- I must disagree with that. These parties are in a web with one another.  They're part of the multidisciplinary team by statute.  They cross report to one another.  They have multidisciplinary team meetings. DOJ lawyers attend those meetings.  DHS attends those meetings.  Law enforcement.  The designated medical professional attends those meetings.  They create records, agenda.

So this concept of DHS is somehow out there in the frontier operating all by itself, that's -- that's unacceptable.  That's just not the case.

The other thing is, when we received the records -- talk about protection -- we agreed with Ms. Hilsher -- again, she's counsel for DHS -- that we would -- we would destroy, pursuant to HIPAA -- we have provisions that she provided -- that we would destroy these records upon -- I

believe upon the close -- the close of the case.

The defense lawyers here would not agree to that either, and they pushed back against the Kids FIRST motion. And what they've done is -- and I understand the Court's inclination, depending on its further review, but what they're trying to do in this case is add another stipulated protective order. They're calling it a supplemental protective order that -- that cuts against the amended protective order that the Court and counsel in this case worked long and hard to put together.

So I just want to flag the Court that, if the Court is inclined to -- to allow the video, primarily, right, of the disclosure to be reviewed, that we should follow the amended protective order and not this creation by the defendants of a so-called supplemental protective order that's specific to Kids FIRST.

And if they're --

THE COURT: And tell me what the supplemental would do differently than our amended protective order.

MR. RIZZO: It purports -- for example, it purports to make additional findings that had not been made and that have not been briefed before the Court.

It has a provision about that DHS and Kids FIRST will exchange documents and information. That's -- there's no way that plaintiff would agree with that.

There is a provision that they asked for where, in effect, Kids FIRST becomes a witness without any prior ruling from the Court or briefing, and they even referenced vague language about, for example, other materials that may be -- including sealed portions of materials, which are not identified, and they talked about the broad use of that information and quote this litigation instead of this particular lawsuit which implicated Z.C.'s in trust (indiscernible), and that was part of our conferral.

THE COURT:  Okay.

MR. RIZZO:  Again -- and I want to make a final point, just so I understood Ms. Hoffman, because this could be my own error, but I've never heard the defendant tell me that the initial video that was taken at Kids FIRST, following the children's removal, was -- was not what they were interested in.

They have consistently claimed they wanted everything from Kids FIRST and --

MS. HOFFMAN:  Your Honor?

MR. RIZZO:  Let me just finish, please.

This offer that we made -- we made this offer to them to view the video, and they could have had it for a week, Judge.  They could have had it for two weeks.  They could have sent it to their consulting expert, if they have one, or their testifying expert, and they rejected all of that.

And so this is yet another motion that's been hanging up an issue that the parties should have been able to work through.

So I'm expressing a little bit of frustration about that, but coming back to my original point, I understand that that first video is no longer what they're interested in, but they are interested in the video about her abuse.

I very much appreciate the Court putting maximum protection around their ability to -- to possess or handle that -- that important document.

MS. HOFFMAN:  Your Honor, I just -- I just want to clarify.  I am not actually sure what parts of the protective order Mr. Rizzo is referring to.  It does not do any of those things.

I also want to note that I don't think that Mr. Rizzo is accurately remembering our conferrals.  We never told him we wanted everything.  The subpoena we issued, that I believe he has a copy of, requests all the documents you -- Kids FIRST -- produced in response to the subpoena duces tecum served on Kids FIRST on May 24, 2021, is a matter of a conservatorship of J.C. in the Lane County Circuit Court, No. 21-pr-00099.  That is -- that is the October 2017 video and related documents.

I have never represented to Mr. Rizzo that we wanted the interviews related to the children's removal, and I will

also note that Mr. Rizzo, up until this moment, has never suggested to me that we could take a copy of the video and keep it in our offices.  I'm not going to confer with him about that in this hearing, and I think that I have already made my point about being entitled to a copy of it, but our conferrals were about, in fact, watching it at his office. So I just want to make the record clear on those points.

Our position on this has not changed at all.  The subpoena is quite specific.

THE COURT:  All right.  All right.  So I believe I have indicated what my thoughts are.  I'm going to take this particular motion under advisement and issue a ruling as quickly as I can, and it's definitely not going to be 60 days.  It will be much sooner.

I think I have enough information for me to be able to make this decision and move it forward so the parties will know what you need to do next on completing discovery.

Motion to compel -- this is also under ECF 116 -- interrogatories and RFP responses.

MS. HOFFMAN:  This is Mr. Naso.

MR. NASO:  Your Honor, I can handle this one. This is Mr. Naso.

THE COURT:  Okay.  All right.  You've got enough rest so that you're ready to come back into the ring?

MR. NASO:  Yes, sir.  I am rested and ready to go.

THE COURT:  It's more like a pentagon.  Just keep that in mind.

MR. NASO:  The defendants have moved to compel responses to our interrogatories and RFPs.  With respect to the interrogatories, the defendants served 13 interrogatories on Plaintiff Ethan Levi, which he basically had information about his claims, the injuries to J.C. for which he's seeking compensation on behalf.

The plaintiff really has largely refused to answer these interrogatories and, instead, his responses refer mostly to the allegations in the complaint and otherwise improperly claim privilege.

So as an example, our Interrogatory Number 1 asks him to describe all information you had at the time you filed the complaint supporting the allegation in paragraph 33 of the complaint that DHS knew or suspected that Duncan-Raygosa were fit -- unfit to serve as foster care providers yet issued its first certificate of approval authorizing Duncan-Raygosa to operate a foster home for non-relative children in July of 2016.

In response to that, Mr. Levi asserts the following objections:  Plaintiffs object to the defendants' collective definition of plaintiffs "you" and "your" to mean Plaintiff Mr. Levi, conservator.  Mr. Levi; the child abuse victim, J.C.; and their attorneys and agents in possession, custody,

or control of responsive documents or information. You cannot mean everyone, and the definition is vague and overbroad.

Plaintiff objects to the interrogatory to, quote, describe all information you had on the grounds of attorney-client privilege, work-product, and material prepared/anticipated -- in anticipation of litigation and ORS 419A.255. The interrogatory is not relevant and broad interrogatories, e.g., describe all information you had are prohibited by Local Rule 33(b).

Mr. -- Mr. Levi's response reads as follows: Without waiving any objection at the time of filing, information that I had was based on communications and contacts with counsel and the family which are privileged and protected. Without waiving any objection, complaint paragraphs 22 through 32, allege facts regarding DHS's -- DHS's knowledge/suspicions that Duncan-Raygosa were unfit when they were certified.

So this response asserts a number of objections and then simply refers to allegations in the complaint.

As -- just a second example, Interrogatory Number 10 --

THE COURT: Before we get into that, let me just go with the first example.

MR. NASO: Sure. Sure.

THE COURT: Mr. Rizzo or Ms. Skjelset.

MR. RIZZO: I'm sorry. You wanted to hear from me on that, Judge?

THE COURT: Yes.

MR. RIZZO: Your Honor, I -- I feel that the objection is appropriate, and I can walk the Court through the reasons for that, and we've proceeded to answer the question, without waiving the objection, without disclosing particularly work product.

Allow me to walk the Court through each one of those sentences that Mr. Naso read somewhat quickly.

The interrogatory was directed to the, quote, capital view, unquote. It apparently meant the plaintiff, meaning Mr. Levi, to whom the interrogatory is directed; it meant J.C., potentially; their attorneys; and, again, Mr. Levi was separately represented in the probate court by an attorney who assisted him in becoming appointed. He later associated in that case, subsequent to the appointment.

They also included as part of the definition "any agents."

Well, who are they?

We didn't know who they were. They weren't assigned.

So I stand on that objection at the outset, that you can't -- you can't direct an interrogatory to a group of people that you claim are somehow connected and expect Mr. Levi, for example, to -- to reach out to each one of

these people to find out, quote, all the information, the, quote, you had.  Right?  That's an overreach, from my standpoint; so I thought that was an appropriate objection.

The second thing is, to get around the local rule, they frame the interrogatory as "describe all the information you have," which is basically, in my view, Judge, very similar to "state all facts" -- right -- "on which the case or the claims are based."

THE COURT:  Okay.  I've got -- I've got an idea of what the issue is.  Both parties have submitted, I think, enough information for me, and I think your briefs are adequate.

I will -- I will give you a written opinion on -- on this issue.

MR. RIZZO:  Okay.

THE COURT:  With respect to the RFPs, Mr. Naso?

MR. NASO:  Yes.  With respect to the RFPs, similarly deficient.

Essentially, the answers to our requests for production, inconsistent with the federal rule, do not -- it is impossible for us to determine to what extent they're withholding responsive documents on the basis of an objection.

Federal Rule -- that's what the federal rules provide.  Federal Rule 34 (b)(2)(C) provides that an objection must

state whether any responsive materials are being withheld on the basis of that objection.

As an example, our Request for Production Number 14 asked for all documents relating to any counseling, diagnosis, examination, or treatment by any doctor, psychologist, psychiatrist, counselor, occupational or behavioral therapist, or other health care provider of any kind for or with J.C. or involving J.C.

As we discussed, these sort of documents are highly relevant to the claims here.

The Levi plaintiff's response states as follows: Plaintiffs incorporate, by reference, the response to, number one, which is an RFP in a different pleading, quote, any -- quote, any kind, et cetera, are vague, and the request for these documents are protected by the patient -- physician-patient privilege, the psychotherapist privilege, the counselor-client privilege, and the school employee-student privilege, and the request seeks matters reserved for expert testimony, period.

There's no indication here that they have -- they are producing documents or to what extent they are withholding documents with respect to these -- with these objections.

We've moved to see if they provide us additional responses that incorporates and comply with the federal rule.

THE COURT: Mr. Rizzo?

MR. RIZZO: Judge, if we zero in on 14, before we do that, what I pointed out in the response -- under the response, the first one, number 4, as I pointed out, that my understanding was the defendants were not asking me to reproduce to them the documents that they produced to us.

The Court may recall that they tried to do that in their first request for production. They asked us to produce all documents that DHS provided, and then they waived off of that after -- after the discovery hearing in September of 2023.

So many -- my point here is many of the documents that are responsive are -- are -- are their documents that they have provided to us, and I said, "This is my understanding. If that's not the case, correct me," and I wasn't corrected on that.

So moving to Number 14, the response there was -- obviously, there's some -- there's some vagueness in the request. I did assert privilege. I did assert juvenile law privilege, which we've already covered. Right. It's still scant until -- at least until Judge Love issues a ruling, and I also felt that the way this request was framed, i.e., records for any kind with J.C., clearly invaded consulting expert privilege and it clearly invaded a Rule 26 testifying expert, and we haven't had those disclosures yet.

So with that understanding and with the understanding that we had issues about CFD, which we've covered, and Sorenson, we've produced -- we've produced J.C.'s records, Your Honor.

And there's at 147 --

THE COURT:  And do your -- do your responses say as much?  Have you produced them?

MR. RIZZO:  Not here, Your Honor, because the responses occurred subsequently.  And what I did was, in his later responses, where they were more specific and they asked for school records and things like that, so it said we would produce them, and so we -- we, number one -- I'll tell you where we -- so you can see what we've said.  It's at Exhibit -- or ECF 147.  It's my declaration.  And this is in response to their most recent motion to compel where I created a table for the Court, showing the Court what we've produced thus far, and I can just read down on the list.

Produced CFD records that we felt were not covered.  We produced Nova Primary Care in Junction City medical.  We produced a variety of school records from the Eugene/Churchill High School, a permanent student record. We even produced elementary school records.  We produced Churchill High School health profile records.  Eugene School District reports and additional Junction City medical records.

So the records that they don't have right now consists of those -- those portions of CFD and the Dr. Sorenson records.

That's what remains outstanding.

THE COURT:  Okay.  Mr. Naso, anything in response?

MR. NASO:  We need to know -- it's impossible for us to determine from these responses to what extent they were withholding responsive documents, and we need to know that in order to move forward with our further discovery.

MR. RIZZO:  If I may, Mr. Naso, we produced a privilege log.  It's in the record, and you have the records that are being withheld (indiscernible) from the juvenile court.

THE COURT:  So I may be -- I'm a bit lost as to where the dispute is, then.

If -- if there's a privilege log that's been provided and the responses have been made, what else are you looking for, Mr. Naso?

MR. NASO:  To what extent they either -- they are producing documents with respect to these, each request, to what extent they're holding those documents based on -- not just a privilege, but to the extent they were withholding them based on an objection, we need to know that; or to what extent they claim they don't have any documents in their possession.

These requests and (indiscernible) --

THE COURT:  And you're saying that you don't have that clarity in the responses that the plaintiffs provided?

MR. NASO:  That's correct.

THE COURT:  All right.  So you want to know whether there's an objection, what's the basis of the objection, whether it's going to be produced, or whether it's being withheld by virtue of it being privileged in some way, or that it will be produced, or that -- or that -- what if the response is, "Well, we got them from you.  You have them."

MR. NASO:  Yeah.  If you -- "We have nothing further than what you have already produced to us."

THE COURT:  Okay.  I'll -- I'll review the motion, and then I'll be able to respond with some kind of instruction about what, if anything, needs to be done regarding these -- these responses and the -- and the interrogatories as well.

I think that covers all of the motions that have been filed at ECF 112, 116, 118, and 134.  We've touched on all of them, and I think that that's the substantive parts of this motion.

Is there something I'm missing, other than the case scheduling issue?

Ms. --

MR. NASO:  Your Honor, this is --

THE COURT:  Go ahead.

MS. HOFFMAN:  Your Honor, we do have a motion pending regarding the privilege -- plaintiff's privilege log.  We filed a separate motion related to that.

THE COURT:  Has that been fully briefed?  I'm not sure.  I don't know if it has been.  Do you know?

MS. HOFFMAN:  I believe that it has.  I -- I don't know if plaintiff is prepared to talk about it today.  I know it's been a long day, but I think, if we could address that one, it would be nice to get everything done in one.

I will also flag that we also have a motion brief because how the deposition of Annette Smith -- and that is not for this status conference, but I just -- the -- Annette Smith is an attorney.  She has her own attorney, who is not Mr. Rizzo and Ms. Skjelset, but just flagging that for Your Honor so you're aware.  It's also kind of teed up at the moment.

THE COURT:  It's teed up and fully briefed by both you and whoever is objecting?

MS. HOFFMAN:  Yes.  Mr. Jacobs.  Yes.

THE COURT:  Mr. Jacobs?

MS. HOFFMAN:  Yes.

THE COURT:  So Mr. Jacobs isn't present; so --

MS. HOFFMAN:  He's not present.  We would need a

separate hearing for what one, but that one also does need to be resolved too.

THE COURT:  Okay.

MS. HOFFMAN:  Oh, and he -- he still needs -- actually, I misspoke.  He still needs to file his brief.  So that one is not fully briefed, but it is part of the reason why we need an extension.

But we would like to address our privilege log motion, if we can.

THE COURT:  Let me see if I can get back into my CM/ECF.

MR. RIZZO:  ECF 140.

THE COURT:  What's that, Mr. Rizzo?

MR. RIZZO:  Their motion -- this most recent motion to compel, filed on June 18th, is ECF 1-4-0, Your Honor.

THE COURT:  Okay.

MR. RIZZO:  And our response is 146 and 147.  The declaration.

THE COURT:  And are you both ready to argue that matter, Mr. Rizzo?

MR. RIZZO:  I am.

MR. NASO:  Yes, we can discuss that, Your Honor.

THE COURT:  You again, Mr. Naso?

MR. NASO:  Yes, sir.

THE COURT: All right. So this -- this had not come up on my radar; so I apologize. So I've looked -- Let's talk about it.

Go ahead, Mr. Naso.

MR. NASO: Okay. So you're right. This motion relates to, I think, some of the same issues we've previously discussed. But in this motion, the State defendants are moving the Court for an order compelling plaintiff to produce documents listed on plaintiff's privilege log.

Essentially, their privilege log contains 68 entries. Those entries appear to include medical records from the Center for Family Development, who I think we discussed earlier. It appeared to include notes by J.C.'s therapist, April Clark. And they're being withheld, according to the privilege log -- the assertion is 419A.255, confidentiality and privilege, and document withheld (indiscernible) ruling on defendants' motion to inspect.

So, to date, I think plaintiff's interrogatories -- we have an interrogatory identifying 19 providers of medical, mental, or behavioral health of J.C. We've received documents from just three of those. This assertion of privilege for the same reason that I think we've previously discussed, this is insufficient to prevent us from discovering these very important and relevant documents that

are needed to depose Ms. Sorenson and Ms. Clark and move forward with those depositions.

THE COURT:  Mr. Rizzo?

MR. RIZZO:  (Indiscernible) on how aggressive the defendant --

THE COURT:  Mr. Rizzo, it seems to me like they're being withheld now by virtue of the 419A privilege.

MR. RIZZO:  Well, we listed 68 documents.  66 of them are from Center for Family Development/April Clark, therapist.

In their complaint, in large part of this log, it wasn't specific enough for them.  They needed more information, which is somewhat ironic in light of the arguments of roughly an hour and a half ago about their log.

But the point of this is these documents should be in DHS's file, number one, because DHS paid Center for Family Development.  They paid April Clark.  April Clark was emailing the defendants.

So this idea that they can't tell, I struggle with that because they probably have these documents.  They certainly have some of them, and they have communications, and they're arranging for --

THE COURT:  You know, I can appreciate that sometimes we can get lost and really diving deep into the -- into the legal argument about whether it's producible or

not; but, Mr. Naso, do you have these documents?

MR. NASO:  I -- we have no idea what they --

THE COURT:  So do you -- do you have the file from the Center for Family Development?

MR. NASO:  No, Your Honor, we don't.  We've been trying to get them through subpoenas and from plaintiffs.

THE COURT:  Do you have them from any other source other than from -- from -- directly from the Center for Family Development or, obviously, from the supplemental file from juvenile court?

MR. NASO:  We don't -- we don't have these files.

THE COURT:  Okay.  So now that I have that cleared up, then, Mr. Rizzo, the issue about whether they have them or not is really not before me.

I mean, they -- they have -- they don't have them. You -- you have them, and you're -- and you're claiming privilege under 419A.255.  It seems to me like that it is -- it is subject to my same -- well, how does 419A.255 apply with those documents in your possession as opposed to the documents in the possession of the Center for Family Development?

MR. RIZZO:  I -- I --

THE COURT:  I'm dealing with both a subpoena and motion -- your motion to quash that subpoena directed to Center for Family Development, and now I'm dealing with this

privilege claim under 419A.255.

So you have the documents, and you want to be able to exercise that privilege.

Help me understand how I reconcile all of this other than simply grant the motion to quash and deny production of these documents.

MR. RIZZO:  Judge, I think Your Honor's already covered this, I -- when I said about being aggressive, all -- all -- everyone has just been waiting on Judge Love, and then these issues are resolved.

Now, Mr. Naso was representing he doesn't have any of this.  I can't speak to that.  It's odd to me, I would say, because what I just told Your Honor, this therapist was sending her reports to DHS, and DHS was having communications with the therapist throughout.  I don't think anyone would deny that, but I'll accept what counsel is saying because I can't -- I can't go left or right on that; so -- so I think that if -- if the Court is already going to rule by looking at the Oregon appellate case in connection with the juvenile law documents that we talked about and the Kids FIRST documents, I think that will resolve this issue, Judge.

THE COURT:  Okay.  Very good, then.

Then I don't think I need any other argument.  I'll take a look at the case and see how -- how it helps guide

me, and I will confirm whatever ruling I have with you before the end of the week.  I'm going to try to do it tomorrow so that way we can get some of these issues off our plate, and then I'll -- then I'll come back and deal more specifically with the interrogatories and request for production, and I think those are the only other matters, the interrogatories, request for production.

Oh, the motion for the supplemental protective order regarding -- well, that's -- it's also somewhat related to this issue of 419A.255.  This is ECF 166's motion for the supplemental protective order.

MR. RIZZO:  Right.

THE COURT:  So I'll try to take a look at all of those matters together and issue a ruling that will attempt to be, on all fours, consistent with one another.  So you'll have some -- you'll have some guidance.

All right.  Anything else that is ripe and ready to discuss on the discovery issues other than case scheduling?

All right.  All right.  So, Ms. Hoffman, case scheduling.

MR. RIZZO:  Judge?  Judge, before --

THE COURT:  Yeah.

MR. RIZZO:  Sorry.  I was on mute.

The only other -- the only other issue I would say that I think I would like to clarify that the records asserted

privilege over, they were -- they were in the juvenile court file, and therefore DHS is the only party that could have submitted them.

So, therefore -- and I -- and I understand Mr. Naso hasn't been on the case for a long time, but I do have concern about what was said, and I just ask that he double-check that because I can't think of another way those documents would have gotten into the juvenile court record except through DHS.

THE COURT:  All right.  Mr. Naso, any other -- any other dimension, texture?

MR. NASO:  I -- I don't, Your Honor.

THE COURT:  Ms. Hoffman, you were going to say something?

MS. HOFFMAN:  I -- I was.  I'm sorry, Your Honor.

Sorry, Mr. Naso.

I -- Your Honor, I don't -- first of all, we don't have a copy of the supplemental file; so I don't know if that is correct.  Apparently, Mr. Rizzo knows what's in there.  I don't.

I will say, though, that the children's therapist, April Clark, who worked for the Center for Family Development during the dependency proceedings, coordinates with the court and with DHS to provide information to the court about how the children are doing.

That coordination does not happen through DHS.  I believe it happens through Ms. Gonzalez and that division of the DOJ.  It was CHAS, and I'm blanking on the new acronym, but there is a child welfare division of the Department of Justice who -- who handles dependency proceedings.

CAPD.  There it is.

I -- I don't know how some of Ms. Clark's notes arrived in the supplemental file, but I can tell you that we do not have them.  And I believe it probably happened through the dependency proceeding that my clients were not a party to, and I know that, you know, state government sort of seems like one big thing, but we don't have access to the files from the dependency proceeding, and we do not represent CAPD  They are not a party to this proceeding.  We don't have what they have.  They are -- they are wholly separate from here; so that is the -- sort of, I think, rare.  On top of what Mr. Naso represented to the Court, we don't have those documents.

THE COURT:  Okay.  Let me return -- I'll return to my evaluation of the case law and try to provide some guidance on those -- those four, or so, matters that I'm taking under advisement for a day or so.

Case scheduling.  Ms. Hoffman?

MS. HOFFMAN:  Yes, Your Honor.  We've had -- we have filed a motion to push the case deadline of a very

modest amount, and we think -- we think that this is an issue of basic fairness, and I honestly think today's status conference probably demonstrates that to the Court already.

There's a lot of discovery that we do not have and that we -- or that we at least don't have answers to, that we need in order to complete our depositions and to defend our case. We've been -- you know, these -- these issues over, for example, you know, Ms. Clark's records, are necessary to depose her. Mr. Sorenson's records are necessary to depose him. We have had, with -- with all due respect, Your Honor, I understand how busy the Court is, but it is just simply a fact that most of these issues have been pending since April.

And, of course, the Court is very, very busy, but without answers to these discovery questions and guidance from the Court, defendants haven't been able to complete discovery and complete our depositions.

We're asking for 35 more --

THE COURT:  So --

MS. HOFFMAN:  Oh, yes.

THE COURT:  It's 142?

MS. HOFFMAN:  Yes.  142, Your Honor.

THE COURT:  You're asking for how many days?

MS. HOFFMAN:  We're asking for 35 more days. Although I will -- for discovery.

Although I will note to the Court that we consider that to be a minimum.  We do think more time may end up being necessary.

Discovery in this case, it -- it's likely that there will be a significant number of documents here being -- being produced, subsequent to this -- to this status conference, and eventually the juvenile court's ruling in that case as well.  We need time to review those documents, to understand them, to prepare -- so we're asking for 35 days at a minimum, and then --

THE COURT:  Well, it's not a minimum.  You're telling me that you're still going to need more time than that; so what is -- what's the real minimum?

MS. HOFFMAN:  Well, Your Honor, I suppose I -- I'll be honest with you.  I don't -- I don't have a specific number.  I -- we're asking for 35 days because we would -- we, like plaintiff, understand that this case is important and it needs to move forward expeditiously.

We would like to be completed with discovery in 35 days, and we are going to work diligently to make that happen.

THE COURT:  I need to ask you one other question. I think there was a reference about taking O'Brien's deposition or requesting additional time for taking a deposition.  That hasn't been brought up to me to make a

decision, but it was -- it was at least raised. So are the parties going to confer and allow for that, and is that going to happen in the next 35 days if I grant an extension?

MS. HOFFMAN: It -- there are multiple parts to the answer to that question. That question is not actually ripe for the Court, and I'll explain why.

So there are two parts when it comes to the Levi plaintiffs. When Ms. Skjelset took her deposition of Ms. O'Brien, we -- we all accidentally miscalculated the time, and she has 30 minutes left. We have conferred on that and agreed that Ms. O'Brien will sit for an additional 30 minutes for Ms. Skjelset to complete her seven hours with her under the rules. That will certainly happen in the next 35 days.

THE COURT: Okay.

MS. HOFFMAN: Ms. Richardson, in the Conley matter, intends to move for more time -- I don't know how much more time -- to depose Ms. O'Brien and also Ms. Brooks. She hasn't filed those motions. I don't know when she intends to file them, and I don't know how much more time she is seeking.

So I can't represent to the Court when those depositions would happen because I don't know the extent to -- you know, what that will entail.

THE COURT: So we're dealing only with Levi, not

Conley, and they're on -- they're on a separate -- they're on a separate schedule.

MS. HOFFMAN:  They have been on identical schedules.  They have identical --

THE COURT:  Okay.

MS. HOFFMAN:  -- identical discovery schedules, but Conley takes no position on this motion and --

THE COURT:  Am I extending the deadlines with respect to both cases, then, when we're talking about deadline extensions?

MS. KORBEL:  Your Honor?  I'm so sorry.

THE COURT:  Hold on.  Let me -- I had a question for Ms. Hoffman, and then I can hear what somebody else has to say.

So are you -- are you asking that I extend these deadlines for both Conley and Levi?

MS. HOFFMAN:  I am.  Yes, Your Honor.  And Conley has added new claims in the last month, added a new defendant who still needs to be deposed.  We are still producing discovery related to those claims, not -- (indiscernible).

THE COURT:  (Indiscernible.)

MS. HOFFMAN:  So, yes, identical extensions in both cases.

THE COURT:  All right.  Somebody wanted to say

something.

MS. KORBEL:  Your Honor, this was Ms. Korbel, and I was just seeking clarification if you were only going to be dealing with Levi and that extension.  For a minute, that's what it sounded like, but it sounds like perhaps --

THE COURT:  Oh, so you're asking --

MS. KORBEL:  I'm just seeking clarification. Essentially, I've been here to talk about this exact issue; so I just want to make sure that I should still be here.

THE COURT:  Are you -- are you also seeking an extension of time?  Are you agreeing with the extension?

MS. KORBEL:  No, Your Honor.  We have -- we have not been able to come to agreement.

THE COURT:  Well, an agreement on -- on the amount of an extension or an extension at all?

MS. KORBEL:  So our proposal is that we stipulate with defendants about what exactly should get done, meaning, like, what depositions are left?  You know, what third-party discovery?  This is what they've indicated they want to do. We said we would sign a stipulation saying you can have until a certain date to get these certain things done, but they've refused to tell us what they want to do, and so our position is we would rather stick with the deadline that we have and have discovery closed as planned rather than have an open-ended --

THE COURT:  In the absence --

MS. KORBEL:  Yes.

THE COURT:  Well, it wouldn't be open-ended.  I mean, it'd be an extension up to a certain number of days.  So not quite open-ended, just not as structured about what exactly would be done and then limiting the parties to just those things.

It sounds to me like the objection that -- that the defendants would have is that, "Here's the list of things you want to do," and then, "We agree," and then "That's all you get to do even if something comes up."

Is that fair to say?

MS. KORBEL:  Correct.

So Plaintiff Conley's position, Your Honor, is that we would be happy and we have offered many times to agree to particular discovery going forward, but defendants would not -- would not tell us what that would be, and so that's why we're here, essentially, is that they just want, you know, an additional 35 days, blanket, to do whatever it is they come up with in those 35 days, and we would rather say, "Here's what's left to do.  Let's focus on getting this done."

THE COURT:  Got it.

All right.  So now these are two -- two different kinds of approaches, and I get that -- that it gives flexibility

on one end and then certainly caps what can be done within the time that I might allow discovery to be completed.

Ms. Hoffman.

MS. HOFFMAN:  Your Honor, I don't necessarily agree with Ms. Korbel's representation of the conversation that we have had.  We -- we have been clear with both of the plaintiffs about what still needs to happen, which includes the depositions that we've noticed for Mr. Levi, Ms. Conley, Ms. Clark, Ms. Smith, Ms. Gallant [phonetic] Mr. Sorenson -- Dr. Sorenson, Ms. Colby, and Ms. Ferrari.

THE COURT:  I don't -- are you -- do you think you can actually get all those depositions done in -- if I even extended the deadlines for 35 days?

MS. HOFFMAN:  Yes, I think we can.  We completed approximately that many depositions in plaintiff's case in that number of days.  We --

THE COURT:  And are those -- those are -- those are just the depositions for Conley, not Levi?

MS. HOFFMAN:  No.  Those are the depositions in both cases:  Conley and Levi.  Those are the ones that we intend to take.

There are -- we have third-party subpoenas that are outstanding that we haven't received productions in response to.  The Conley plaintiff intends to file a substantial motion to compel that we don't know when they're filing it.

We haven't resolved the motion to compel Annette Smith.  It isn't even fully briefed yet.  We have a number of outstanding depositions and out -- outstanding discovery issues, and discovery is a two-way street.  We have been extremely diligent in producing discovery in this case.  We've worked very, very hard.  We produced something like 17,000 documents that amounts to 84,000 cases of material, and we have defended 12 depositions that plaintiffs have taken.  One of those was two days, another one will be two days.  We're doing a second day for Kim Chapman that we have stipulated to.

We have been preparing witnesses, working with witnesses, trying to resolve these discovery issues, (indiscernible) you know.

THE COURT:  I appreciate that parties are moving along.  I'm just trying to figure out why or whether it's even realistic because I -- I like -- I would not be in favor of extending time again and again because we're going to end up having arguments over and over.

MS. HOFFMAN:  Right.

THE COURT:  So let me hear from -- is it Mr. Rizzo or Ms. Skjelset?  What was your position with respect to the extension of deadlines.

MS. SKJELSET:  Your Honor, our position is laid out in our response from last night, which obviously you

were unable to read, but our response is that this delay was borne by the defendants' conduct. They have not -- they knew when the deadline was happening.

THE COURT: (Indiscernible) also be --

MS. SKJELSET: They have not performed a single deposition.

THE COURT: Ms. Skjelset, I mean, I think the Court bears -- I -- I bear responsibility too for not resolving these -- these discovery disputes as -- you know, sooner than now, to the extent I'm resolving them.

MS. SKJELSET: Your Honor, it is -- it is very kind of you to take responsibility, but most of the issues we have here regarding defendants' discovery flow from their absolute refusal to confer with us regarding cost-sharing for the juvenile -- the juvenile dependency court record. That's where all of these issues flow from.

THE COURT: And from --

MS. SKJELSET: And (indiscernible) objection to Your Honor's decision, and that is what has stymied their process is the fact that there's juvenile -- there's a juvenile dependency issue, privilege issue regarding the dependency file, that they refuse to brief, and they filed objections on Your Honor's motion, and they -- they withdrew their first request for production, and Your Honor had potentially ordered that -- that we confer on cost-sharing

and then we brief the issue.

They refused to do so.

THE COURT:  And that is what caused the delay in completing discovery?

MS. SKJELSET:  They're saying that the records that they need in order to depose these individuals are from that file.  That's -- that's -- if you've listened to all of these motions, this is the various ways that they've tried to get at those materials.  And if they had briefed it in accordance with the Court's order, it's very likely that the Court would not have ordered costs.  It's definitely possible; right?  But they were so anathema to paying plaintiffs for the obstruction that the Department of Justice put forward in us obtaining the child's own legal file and supplemental confidential file that they had to find other ways.  And the last many months have been them trying to find other ways to get at that same material, which they should have briefed originally with the Court's order.

That's our position with regard to the few documents that they do not have, that we don't believe are necessary for them to continue with depositions.  They informed us of who they intended to depose on March 28th, and they made little to no effort to do so until just before the close of discovery.

But it is their problem.  It is not plaintiff's problem, and we want to move forward.

We've agreed to stipulate to certain depositions.  It's in my response to their motion for an extension of time.  But one thing we were not stipulating to was additional motions practice, additional requests for production, and just last night we received an additional request for production from them.  And just three days ago there's suddenly a new individual that they have found and they're going to notice and depose.  It needs to be limited.

We understand that the Conley plaintiffs are in a different position.  They filed their case a year after we filed our case, but this case has been -- this case has been being litigated for nearly two years.  We're going to go on two years in November, and it needs to end.

They asked us to defer depositions pending the outcome of the juvenile settlement conference.  They insisted on it.  They demanded it, and now they're saying, "Oh, we haven't had enough time to make our depositions."

Well, that is their fault.  It is not -- it is their lack of due diligence.  They should have been diligent in briefing issues in the first place rather than coy, and that's where we are.

But that said, we've agreed to a limited extension as outlined in our response, and --

THE COURT:  So I haven't -- did you say you filed it last night?

MS. SKJELSET:  Yeah, I filed it yesterday.

THE COURT:  Okay.  Hold on a minute.

MS. SKJELSET:  ECF 153, Your Honor.

I'd like to point you to what the defendants said at the conference on September 8th of 2022 when we were suggesting a July deadline.  Ms. Blaesing repeatedly said -- complained that it was so far out.  It was so far out.  We could do parallel discovery.  And now we're sitting here, two days before July 12th, and they have not conducted a single deposition.

THE COURT:  All right.  Ms. Hoffman?

MS. HOFFMAN:  Yes, Your Honor.  So let me see.

THE COURT:  Let me also just frame -- as I'm looking at these proposed deadlines, we're looking at a difference of about seven days.

MS. HOFFMAN:  Yes, we are.  I think what -- what I understand plaintiff's position to really amount to here is that what they want is the front and shorter extension with the stipulation that they get to decide what depositions we're taking and that we will not be allowed to conduct any more discovery.

So it's essentially what the Conley plaintiff is asking for but in a slightly different format, and we do not agree

to this.

I understand -- I was at the September 8th hearing, and I understand that at that time we thought July seemed a long time away. We are not -- we are not clairvoyant. We didn't know what discovery was going to entail in this case, and it has taken -- it has been far more difficult than it quite frankly needed to be.

The issue is not the cost-sharing issue. We have not spent this entire case trying to get the juvenile court file. We don't -- we filed one motion to get the juvenile court file. That is all we have done. We've briefed it. We've argued it. That is not before this Court, and it's not the reason we're asking for an extension.

We're asking for an extension because plaintiff has stymied our discovery at every possible turn.

When we have -- when we have served RFPs, they have said serve a subpoena. When we serve a subpoena, they move to quash the subpoena. They object to the subpoena, and they say it's improper. When we file a motion in front of the juvenile court, they oppose that and say that we are not entitled to those documents.

I don't know -- let's be honest. I don't know why those documents are privileged if we ask for them through a subpoena and RFP or a motion but they're somehow not privileged if we pay for them.

But the plaintiff has done everything possible to prevent us from actually conducting discovery, and you're just -- Mr. Naso just did a good -- a great job laying out for you why their interrogatory -- plaintiff's interrogatory responses are not complete. They cite back to the complaint, which isn't proper. We don't know whether we have all the documents that we are entitled to in response to our RFPs, and without knowing that, we can't take depositions.

We -- we have a -- we are filing another motion to compel tomorrow because plaintiff has not produced any documents in response to our fourth RFP. And I'm not going to argue that motion right now, but it has to do with Mr. Levi's conservatorship. We can't depose Mr. Levi without documents related to a conservatorship.

Plaintiff argues that --

THE COURT: Is there a -- is there a date for Mr. Levi's deposition scheduled?

MS. HOFFMAN: Oh, my gosh. I want to say there is.

MS. SKJELSET: There is, Your Honor. We offered him for July 3rd, and they asked for it to be postponed.

MS. HOFFMAN: It's because we do not have the documents we need to depose Mr. Levi.

We are not responsible for the fact that plaintiff will

not -- will not cooperate in discovery.  We -- this is a -- this is a very important case, Your Honor.  We agree with plaintiff about that, but we are entitled to defend ourselves in this -- in this case.  We have to defend ourselves in this case, and we -- these motions have been briefed for months.  Some of them have been briefed for a shorter period of time.  For weeks.  For a month.  But we've been waiting on these decisions.  We've been waiting on documents from plaintiffs.  We have conferred -- the representation that we have not conferred with plaintiff is not accurate.  We have conferred with plaintiffs, both plaintiffs, for hours.  They refuse to double-book depositions; so all of these depositions have to happen on different days back to back to back to back.

We are trying to be accommodating, but we have participated in extraordinary -- extraordinary amounts of discovery, and we will be prejudiced if we do not get more time to complete ours.  It's a two-way street.  We have given them everything that they have asked for, and we are entitled to conduct discovery in this case, and plaintiff does not have the right to tell us what we -- who we get to depose and when we get to depose them.  That is not appropriate.

So to back up to your previous question, we asked for 35 days.  If the Court doesn't think that's realistic --

and, to be honest with you, saying all this out loud, maybe it's not -- I would say 60 days is probably a more realistic number, and perhaps we set a status conference 35 days out so the Court can understand, you know, how it's going, and we -- we want to remain accountable to the Court. We want this -- we want discovery to end. We want to move forward. But, you know, 60 days may end up being a more realistic timeline.

THE COURT: Okay. Counsel, I'm going to extend the deadline to 30 days for fact discovery and move expert disclosures 30 days from -- from the August 9th date, expert rebuttal reports 28 days from its original current deadline. After discovery is completed, 21 days, again, after the current deadline of October 4th. Dispositive motions 19 days after the current deadline of November 8th, which puts it to November 27th.

I'm shortening that amount of time because I also want to schedule a status conference, and I'm going to -- let me pull up my calendar here.

Let's see here. Calendar it 30 days out. August 6th.

MR. RIZZO: It that for both cases, Judge, or just the Levi?

THE COURT: Let me check in with Ms. Korbel.

MS. KORBEL: Yes, I'm here.

THE COURT: Ms. Korbel?

MS. KORBEL:  I am.

THE COURT:  Am I pronouncing your name correctly? I want to make sure I'm saying it right?

MS. KORBEL:  It's "Kor-bell" but "Kor-bill" is just as good.  It doesn't matter.

THE COURT:  No, no, no, no.  If it's Korbel, then it's Korbel.  So then that is what it is.

Make sure you correct me.  You are hereby ordered to correct me if I -- if I get it wrong the next time.

MS. KORBEL:  Yes, Your Honor.

THE COURT:  Ms. Korbel -- all right.  So, Ms. Korbel, I'm -- you're asking -- is Conley asking to track the same discovery deadlines that I'm -- that I'm looking at with Levi?

MS. KORBEL:  Your Honor, we would request at this time to continue, especially if you're going to extend the Levi deadline and the Conley deadline.  I would request that we just stick with the same schedule.

THE COURT:  And then that'll be the case.

MS. KORBEL:  Okay.

THE COURT:  And then I would set deadlines as is. This is what I want:  I want the parties to -- to draft the proposed discovery with respect to completion of fact discovery depositions.

I understand that there's a -- there's an RFP that

you've submitted, Ms. Hoffman.

MS. HOFFMAN:  Correct, Your Honor.  It has one request.

THE COURT:  Okay.  But it could be a really big request.

MS. HOFFMAN:  It is not.

MR. RIZZO:  And it is, Your Honor.

MS. SKJELSET:  It is.  Your Honor, it's extraordinarily, extraordinarily broad.

THE COURT:  Okay.

MR. RIZZO:  Again --

THE COURT:  All of you are growing on me.  I think I'm -- I think I -- did I tell you that we're here until midnight tonight?  I think I'm just going to -- I'm going to talk to you all so you just -- you tap out and you give up.

That's incredible.  I just -- anyway, I -- I'm laughing, otherwise I'd be crying, Counsel; so that's why I think I'll stick with laughing right now.

Okay.  So the days -- the deadlines I've given you -- I get there's an RFP.  I don't know if there's going to be an objection to an RFP, but here's what we need to do:  August 6th.  You better have a darned good reason for not being able to come down to Eugene.  And we're going to have an all-day work session to figure out what else needs to happen, and we're going to hammer out all the other details.

I don't care what it is or how small it is, but we're going to figure it out.

And because you're -- I think doing this by phone, it's just not as effective, and I want everybody's skin in the game to come down here, and we're going to detail out what else needs to happen.

If I decide that it's appropriate to extend a certain number of days out beyond the 30 days that I've just set, I'll consider it on some very narrow grounds or circumstances and provide some incredibly stringent requirements for -- for that discovery to be completed.

In the meantime, though, I want Ms. Hoffman and your team to draft what you are proposing, to complete with discovery on both of the cases, and submit it -- and to have it done in 30 -- in 30 days, if -- and then -- and then I want -- I want copies of those proposals so I can track what it is that's supposed to be done.

So, in essence, it's a -- it's a proposed scheduling report, status report, that you'll send to me, and that you'll be coordinating or conferring, to the extent you can, with both sets of plaintiffs' counsel to be able to complete discovery.

MS. HOFFMAN:  Okay.  Your Honor, can you please clarify the due date for that report to the Court?

THE COURT:  Yeah.  In fact, I didn't even provide

one.  So thanks for asking to make sure I gave you one.

And who was that?  Was that Ms. Hoffman.

MS. HOFFMAN:  That was Ms. Hoffman.

THE COURT:  All right.  Can you do it in seven days?

MS. HOFFMAN:  Yes, Your Honor, we can do that in seven days.

THE COURT:  You can tell me "No."  I mean, I -- I just want to make -- I want to make it thorough.  I don't want there to be any amendments to it.  I want to know what it is that's going to be put in place.

Now, I'm not suggesting that this is going to cap you if something comes up, but I want there to be some reasonable notice as to what it is that -- that's going to happen so that the plaintiffs' counsel can be prepared and respond and not dig their heels in without any good reason.

And I -- and I also get that maybe something does come up, but it's going to be that rare thing that might come up to be able to complete discovery in the next 30 days.

MS. HOFFMAN:  Uh-huh.

THE COURT:  All right.  So I'm -- I'm not trying to split the baby.  The baby is alive and well.  I'm trying to make sure that the baby gets some discipline so it doesn't go pooping all over the house.

MS. HOFFMAN:  That's -- that's fair, Your Honor.

I would -- Your Honor, I might propose a week from Friday for the deadline.

THE COURT:  That's fine.  That's fine.

So the deadline is you're going to give me -- you're going to submit the proposed -- the proposed -- the proposed calendar of -- of fact discovery to be completed in 30 -- in 30 days.

And now I'm not -- I'm not here to either, you know, accept it or -- or reject it.  I just want to know what it's going to be.  So it's -- so it's a status -- it's a status report, but it does need to be done in conferral with both respective plaintiffs' counsel.

I can appreciate that plaintiff's counsel may object and -- and the objections can be included -- and I don't want argument.  Just the objection to it may be included in the -- in the report, Ms. Hoffman, because I want to know what it is that they said and why -- I want to know what they -- they're objecting to so I can determine ultimately whether it was reasonable or not.

And if that becomes a reason for why you can't complete discovery in 30 days, then I'd like to know in advance what the problem is going to be.

I'll set it August 6th.

So there needs to be a really good reason why somebody can't make it.  Tell me -- tell me if there's a really good

reason that somebody can't make it or that you can't send somebody with sufficient knowledge and authority for me to impose on them for -- for shaping the remaining -- remainder of discovery going forward.

So, first, Ms. Hoffman, August 6th?

MS. HOFFMAN:  August 6th?

THE COURT:  Yeah.

MS. HOFFMAN:  August 6th is -- is great, Your Honor.  I will -- I will be there.

THE COURT:  All right.  Mr. Rizzo or Ms. Skjelset?

MR. RIZZO:  This is -- this is Steve Rizzo, Your Honor.  I'll plan to be there.

I just want to clarify, the status report the Court just indicated, that's going to be due, then, on Friday, July 19th?

THE COURT:  Yes.

MR. RIZZO:  Okay.  And then they'll have it to us reasonably in advance so we can kibbutz about that?  Is that fair?

THE COURT:  You know, you can kibbutz about it. You should be conferring sooner than later, and if -- if there's an objection, then make sure that the objection is objectively noted in the -- in the report.

But, again, I'm not -- I'm not -- I want to make sure it's clear.  I expect that discovery continues to move

forward and that everyone is collaborating and cooperating to the fullest extent to complete discovery within the time that's left, and if there's objections, I want to know what they are.

So, again, I can determine whether -- whether everybody's conduct is consistent with the idea of pursuing the completion of discovery reasonably and fairly for all parties concerned.

So include whatever objections there might be.  Maybe there won't be any, but I suspect that there will be, and then we'll see how that looks and why or how discovery -- why discovery wasn't completed, if that is, in fact, the case, and how I need to impose strict -- a strict schedule going forward, if that is necessary at all.

MS. HOFFMAN:  Great.  Thank you, Your Honor.

THE COURT:  I do want to make it very clear, you know, sometimes I'm off to trying out metaphors that are untested.  I want the record to reflect that in no way was I describing anybody here as baby.  It was just -- it was -- all right?  So I just want to make -- I know we're on the record, and you may get a transcript.  Please do not construe my comment to have been calling anybody a baby.  I mean, you all are working through -- it's a huge case.  You are working hard, and I want to acknowledge that.  Everyone is working hard and diligently and -- and vociferously

representing their clients.  So the baby reference was in -- please don't take it as a direct -- that I directed that anybody on this call.

MS. HOFFMAN:  We -- we understand, Your Honor.

This is Ms. Hoffman.  Could I -- could I ask you two -- two clarifying questions?

THE COURT:  Yes.

MS. HOFFMAN:  I was wondering if Your Honor could repeat the new deadlines, and I also wanted to clarify whether our report should include plaintiffs -- discovery that plaintiffs still hope to conclude.

THE COURT:  Yes.  Thank you for that.  I thought you indicated you gave -- you gave them everything they wanted so there wasn't any discovery left, but I think there may be --

MS. HOFFMAN:  Well, I --

THE COURT:  As you reminded me now, I'm -- O'Brien's deposition needs to be completed as well, at least for Levi.

So the deadlines are 30 days, 30 days -- I'm going down the list.  Fact discovery 30 days out.  Expert disclosures is 30 days out.  Expert rebuttal -- I'm going to say 30 days out from the current deadline.  Then all the other days that you've requested, 28, 21, and 19 on expert rebuttal, expert discovery, and dispositive motions are -- are adopted.

MS. HOFFMAN:  Okay.  Thank you, Your Honor.

THE COURT:  So the only dates I have changed are first two from 35 to 30.

That will give us enough time to meet on the 6th, before the deadlines have passed, and maybe we will have an opportunity to hammer it through whatever minute or grand details that need to be resolved.  So come ready and prepared to talk through it, and it will be all day with a lunch break.

MS. HOFFMAN:  All right.  Thank you, Your Honor.

DEPUTY COURTROOM CLERK:  Your Honor, this is --

MR. RIZZO:  Thank you again, Judge, for all the time.  Thank you.

DEPUTY COURTROOM CLERK:  Your Honor --

THE COURT:  Before you get off the phone, Ms. Korbel, are you there?

MS. KORBEL:  Yes, Your Honor.  I'm here.

THE COURT:  I want to make sure Conley is involved in this thing.  So I want to make sure that you -- there's somebody coming from the Conley camp.

MS. KORBEL:  Yes, Your Honor.  I don't know who yet, but I do know that somebody will be there.

THE COURT:  Okay.  So, Ms. Hoffman, you're conferring.

So the report -- the report will be with respect to

both -- both cases, and so file it in both cases as well so that way I -- I'll be able to track them in both cases too.

MS. HOFFMAN:  Thank you, Your Honor.

MS. KORBEL:  Okay.

THE COURT:  Counsel, thank you.  And thank you for your patience.  I know it's been a long -- it's been a long conversation, and I'll get you some additional answers in the coming days on the remaining discovery so we can -- we can move forward with trying to get this all done in the next 30 days.  All right.

DEPUTY COURTROOM CLERK:  Your Honor?

MR. RIZZO:  Thank you, Judge.

THE COURT:  Yes?

DEPUTY COURTROOM CLERK:  This is Brandie.

THE COURT:  Who is this?

DEPUTY COURTROOM CLERK:  It's Brandie.

THE COURT:  Oh, Ms. Davies, yes.

DEPUTY COURTROOM CLERK:  I just want to confirm what time you would like to start the status conference on August 8th.

THE COURT:  August 6th.

DEPUTY COURTROOM CLERK:  Or August 6th.  I'm sorry.  It's late.  My apologies.  August 6th, yes.  What time would you like to start?

THE COURT:  The question about when we start, I

think, is appropriate.

Since you all -- I think everyone is coming from Portland.  Why don't we set it at 9:30.

DEPUTY COURTROOM CLERK:  9:30?  Thank you.

THE COURT:  All right.  Thank you, all.  Have a good night.

MS. HOFFMAN:  Thank you.

MS. SKJELSET:  Thank you, Your Honor.

MR. RIZZO:  Thank you, Your Honor.

THE COURT:  You're welcome.

(FTR-recorded hearing was concluded.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman

6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman

6:23-cv-01353-MK

Status Conference

July 10, 2024

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause.  Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous crosstalk, fast speaking, mumbling, or other room noises overriding what was being said.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Transcriber/Official Court Reporter      Date: 7/19/2024
Oregon CSR No. 98-0346    CSR Expiration Date:  9/30/2026