IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                          )
                                     )
                    Plaintiff,       )   Case No. 6:22-cv-01813-MK
                                     )
          v.                         )
                                     )   September 6, 2024
KIM CHAPMAN, in her                  )
individual capacity; ANASTASIA       )
TIBBETS, in her individual           )
capacity; KASSIDY O'BRIEN, in        )
her individual capacity, ERIN        )
LANE, in her individual              )
capacity; THE OREGON                 )
DEPARTMENT OF HUMAN SERVICES,        )
a government agency; and JANE        )
and JOHN DOES 1-5; in their          )
individual and/or official           )
capacities,                          )
                                     )
                    Defendants.      )
_____)
OREGON DEPARTMENT OF HUMAN           )
SERVICES,                            )
                                     )
          Third-Party Plaintiff,     )
                                     )
          v.                         )
                                     )
JOE ALBERT RAYGOSA,                  )
                                     )
          Third-Party Defendant.     )
_____)


DISCOVERY HEARING

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES

FOR THE PLAINTIFF(S):

          STEVEN V. RIZZO
          Rizzo Bosworth Eraut PC
          1300 SW Sixth Avenue
          Suite 330
          Portland, OR 97201

FOR THE PLAINTIFF(S):

          MARY SKJELSET
          Rizzo Bosworth Eraut PC
          1300 SW Sixth Avenue
          Suite 330
          Portland, OR 97201

FOR THE DEFENDANT(S):

          JEFFREY EDELSON
          Markowitz Herbold PC
          1455 SW Broadway
          Suite 1900
          Portland, OR 97204

FOR THE DEFENDANT(S):

          HANNAH HOFFMAN
          Markowitz Herbold PC
          1455 SW Broadway
          Suite 1900
          Portland, OR 97201

FOR THE DEFENDANT(S):

          LAUREN F. BLAESING
          Markowitz Herbold PC
          1455 SW Broadway
          Suite 1900
          Portland, OR 97201

Also Present:  Beth Creighton (for part of the hearing.)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator )
for Z.C., a minor,                        )
                                                   )
                              Plaintiff,  )   Case No. 6:23-cv-01353-MK
                                                   )
                    v.                      )
                                                   )   September 6, 2024
KIM CHAPMAN, ANASTASIA    )
BROOKS, KASSIDY O'BRIEN, ERIN  )
LANE, MARGARET RAMIREZ, in  )
their individual capacities,          )
                                                   )
                              Defendants.  )
_____)


DISCOVERY HEARING

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

                              APPEARANCES


FOR THE PLAINTIFF(S):
                        BONNIE RICHARDSON
                        Allegiant Law LLP
                        100 SW Main
                        Suite 400
                        Portland, OR 97204
FOR THE PLAINTIFF(S):
                        MARISSA KORBEL
                        Allegiant Law LLP
                        100 SW Main Street
                        Suite 400
                        Portland, OR 97204
FOR THE PLAINTIFF(S):
                        MANUELLA M. TSHALA
                        Allegiant Law LLP
                        100 SW Main Street
                        Suite 400
                        Portland, OR 97204

FOR THE DEFENDANT(S):
                        JEFFREY EDELSON
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97204

FOR THE DEFENDANT(S):
                        HANNAH HOFFMAN
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97201


FOR THE DEFENDANT(S):
                        LAUREN F. BLAESING
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97201


Also Present:  Beth Creighton (for part of the hearing.)

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

(September 6, 2024)

THE COURT:  Call the case, please.

DEPUTY COURTROOM CLERK:  Okay.  Now is the time set for Civil Case No. 22-01813, Levi v. Chapman, et al., and Civil Case No. 23-01353, Conley v. Chapman, et al., for a discovery hearing.

THE COURT:  Thank you, Counsel, and all of you, for appearing today.  I know we had to work through some technical challenges.  I think we worked them out, and I know Ms. Davies will let me know immediately if something comes up with the record.  So please stop as soon as you might notice something awry.

I'd like counsel to please introduce themselves.  We'll start with plaintiff's counsel first -- the Levi attorneys, the Conley attorneys -- and then defense counsel.  Please give me your full name and honorific, such as Mr., Ms., or Mx.

Please go ahead with plaintiffs counsel for Levi.

MR. RIZZO:  Good morning, Your Honor.  This is Mr. Steven Rizzo for Plaintiff Levi.

MS. SKJELSET:  Good morning.  This is Ms. Mary Skjelset also for Plaintiff Levi.

MS. RICHARDSON:  This is Bonnie Richardson for Plaintiff Conley, and I go by "Ms."

THE COURT:  All right.  Thank you.

And is anyone else for Conley plaintiffs?

MS. TSALA:  Yes.  This is Manuella Tshala for Plaintiff Conley, and I go by "Ms." as well.

THE COURT:  Thank you, Ms. Tshala.

MS. KORBEL:  This is Marissa Korbel, also for Plaintiff Conley, and I use "Ms." also.  Thank you.

THE COURT:  Thank you, Ms. Korbel.

MR. EDELSON:  Good morning, Your Honor. Jeff Edelson, Markowitz Herbold, Special Assistant Attorney General, on behalf of State defendants, and I go by "Mr."

THE COURT:  Good morning, Mr. Edelson.

MS. BLAESING:  This is Ms. Lauren Blaesing from Markowitz Herbold, also State -- Special Assistant Attorney General for State defendants.

THE COURT:  Good morning, Ms. Blaesing.

MS. HOFFMAN:  And this is Ms. Hannah Hoffman, also of Markowitz Herbold, on behalf of State defendants.

THE COURT:  All right.  Is that everyone appearing for all the parties?  Is that right?

MR. EDELSON:  I'll just mention that Anit Jindal, a lawyer from the office, is also listening, but he's not appearing.

THE COURT:  All right.  As if they were going to be sitting in the gallery?

MR. EDELSON:  Exactly.

THE COURT:  All right.  So we have several issues to take up.  This was designed as a status conference, but also to address some of the issues that continue to surface that need attention so we can make some decisions, I can make some decisions, and then we can keep moving the case along going forward.

I'm going to take them up in some general priority first, to more specific issues towards the middle, and I will tell you now that I'll take up the 502 matter at the end, in all likelihood, because I'm going to want to dive deeply into the argument, and that may be the one matter that I will take under advisement with the decision coming out to you next week.

Some general principles first -- or maybe a general principle -- and that is discovery is closed on both cases as of August 12th.  So any of the requests that are being made with respect to continuing discovery are up against and beyond that particular deadline.

I know that there have been some requests that were made late into the process, right before the deadlines passed.  I want to make sure everyone understands that, in light of both the plaintiffs -- the Levi -- the Levi plaintiffs, in particular, but I think both plaintiffs have been moving very aggressively, as of late, towards getting a

trial date, which we did, and identified dates, and I certainly recognize that defense counsel expressed some concern about being able to move things forward, not so much with discovery, specifically, but being able to address the issues of expert -- fact discovery, but expert discovery, then motions practice, the dispositive motions.  With the coming on the heels of a trial date in February, it's going to be a very accelerated timeline, and I expressed my commitment to all of you that I will do as much work that I can to keep this moving on track.

So I want to make sure you all understand that my decisions are going to be, in large part, first and foremost, based on whether your requests have some basis for going beyond -- some good cause basis -- frankly, some extraordinary basis for going beyond the deadlines that have already passed on August 12th.

And if they don't pass that good cause/extraordinary cause scrutiny of mine, then you're not going to get it.

So that's -- that's Principle 1.

And, in fact, another issue that did come up in a more general -- oh, it's not a principle, but a very broad decision.  On the Court's own motion -- and I recognize that there were motions and cross-motions on this issue of moving to strike briefs that exceeded page lengths.  I will -- I am, on my own motion, striking everything beyond the page

lengths of the briefs for which people have not asked for permission to do so prior to the filing of those briefs, period.

So do not argue anything beyond the ten pages.  If there were discovery motions, responses, or whatever the other -- the page length limits would have been allowed under the rules, because I won't consider those reasons.

This goes back to Principle Number 1 and probably the only principle that's driving me at the moment, which is I'm moving this -- I'm moving this along.  Discovery has closed, and I'm -- I'm committed to making sure that this trial gets underway as smoothly as possible in February, when -- when Levi case is set.

THE LAW CLERK:  Judge, I believe Ms. Creighton is trying to get on the line.

THE COURT:  I've just been advised that Ms. Creighton is trying to get into the -- has she's been given the Zoom link?

DEPUTY COURTROOM CLERK:  Yes, Your Honor.

THE COURT:  I don't see -- oh, hold on a second. I'm not seeing her in the waiting room.

DEPUTY COURTROOM CLERK:  Okay.

THE COURT:  So can you confirm that she has the Zoom link and that she's logged in?

DEPUTY COURTROOM CLERK:  I will confirm with her,

Your Honor.  You just may want to keep an eye out for her.

THE COURT:  All right.

DEPUTY COURTROOM CLERK:  Thank you.

THE COURT:  Mr. Rose, remind me again to get to the right participant screen in a minute or two.

Oh, no need.  I see Ms. Creighton.

DEPUTY COURTROOM CLERK:  Oh, she's there?  Okay.  Perfect.

I was just going to email her again.  Thank you.

THE COURT:  All right.  Ms. Creighton, thank you for attending.

MS. CREIGHTON:  Just checking that you can hear me.

THE COURT:  I can, yes.  Thank you so much.

If you would be kind enough to go on mute, we're going to take up your issue in just a few moments.  I imagine you don't need to nor care to be in the hearing beyond the narrow issue you're here for; right?

MS. CREIGHTON:  (No audible response.)

THE COURT:  Yeah.  Excellent.  All right.

So the third part -- so we've already addressed my driving principle in my decisions today, which is deadlines for discovery have now expired -- fact discovery, that is.  Brief lengths beyond that which is allowed under the rules -- exceeding those pages are now stricken.

Consent issue.  Ms. Blaesing, I think, raises an issue, I think, in the letter that you provided last night.  I think it was the last issue, but I think it's also one that should be taken up so we're all on the same page.

You referred to ECF 185, which is the consent to jurisdiction by a magistrate judge.  I have Mr. Rizzo on behalf of the Levi plaintiffs, and I have Ms. Schneider on behalf of the defendants having consented to the magistrate judge on May 10, 2023.

Specifically, the issue, Ms. Blaesing, that you wanted to clarify regarding consent with respect to all subsequent dispositive motions and certainly the trial itself, what is it that you want to clarify?  Or is it Ms. Hoffman?

MS. HOFFMAN:  Ms. Blaesing sent you the letter, but I am going to address your question.

The issue we want to raise with regard to consent is that in the Levi, unlike in Conley, there is a third-party defendant, and that's Mr. Raygosa.  He has not consented to a magistrate, and there is a default order against him, but we have looked into this, and a default order does not -- he's still in the case, and it does not create full consent.  So because there is no default judgment and he's still in the case and could theoretically reappear, he hasn't consented, and there isn't full consent.

So we -- so -- so we weren't sure what prompted the --

and issued a full consent, but that was -- that was what we wanted to flag for you because it's sort of an unusual situation.  We recognize that this isn't a -- this isn't a common situation, but that -- that's the case.

THE COURT:  All right.  Whose -- whose responsibility would it be to obtain the default judgment to close his participation in the case?

MS. HOFFMAN:  I believe it would be ours.  It would be State defendants.  We're the ones who sued him.

THE COURT:  Okay.  And what's your efforts to secure a default judgment against Mr. Raygosa.

MS. HOFFMAN:  I don't think we intended to at this time.

THE COURT:  And the reason?

MS. HOFFMAN:  At this point, I'm not sure we know exactly what -- what that judgment would say.

And we -- we just think it's premature.

We haven't really had any dispositive rulings yet in this case.  I mean, we think he's -- he's liable for J.C.'s injuries, but I don't know that we've determined what that ruling and that judgment would -- would be; so --

THE COURT:  Well, I'd like to get a little bit more clarity, then, on what it is that -- that the defendants are intending on doing with a default order against Mr. Raygosa and then proceeding to trial, whether

it's -- well, whether -- in front of a district judge, and what you would be prosecuting against Mr. Raygosa at that time.

What is it that needs to be resolved?  What decisions need to be made by either a court or a fact-finder once a default order has now been entered?

MS. HOFFMAN:  To clarify, to start, Your Honor, we -- we did not ever seek a default order, and we didn't particularly want one.  We think he belongs in this case. He's our third-party defendant, and the Levi plaintiff moved before this default order, I think, without conferring with us, and we don't agree with this entry in the first place; so we don't really intend to seek a default judgment.  We didn't want the order and think it -- it may not necessarily be proper for plaintiff to have asked for an order against a party they're not actually appearing against; but, in any event, we would likely move for a default judgment before trial, but it would likely be after dispositive motions are resolved and we sort of know, you know, kind of what the issues are going into trial.  That seems like a more appropriate juncture to move for a default judgment, if we're going to.

But, in any event, we didn't want a default order in the first place.  We think he should be liable, and we wanted him in this litigation.

THE COURT:  Is it your intent on calling him to testify?

MS. HOFFMAN:  I don't know that that's a strategic decision we've made yet, Your Honor.

THE COURT:  All right.  I'll hear from the Levi plaintiffs if they have anything else they would like to add.

MR. RIZZO:  Thank you, Your Honor.  This is Mr. Rizzo.  I just have a few points.

I just took a look.  The request for default was filed with the Court November 14, 2023, without objection by any of the State defendants, including the DHS.

The clerk entered the order, I believe, on November -- I believe on November -- subsequently.  I was trying to find it here.  November 20th, it looks like, Judge.  Clerk's entry of default as to Joe Albert Raygosa.  That's ECF 101. And there was no noise or pushback from the defendants about that order, and we're only hearing it now.  Rationale wasn't even expressed in Ms. Blaesing's letter, and we're hearing that counsel has some authority, hasn't shared the terms of -- the point about conferring, hasn't shared that authority with the Court or with counsel at this juncture, and it's -- it's -- so I don't have the case or the authority on which they're relying.

But the point is, Judge, they have taken no action

whatsoever to discover, not only Mr. Raygosa, but also Nicole Duncan.  They've taken no action to discover any of their apparent or purported niece and nephew, children who are in the home with them.

They essentially sat on this issue, and they're now, apparently, trying to raise it for the first time, as the Court indicated, after the discovery is closed, for one purpose and one purpose only, and that's to cause serious prejudice to this child and further cause delay in the trial and create and drive up needless expenses for this child.

THE COURT:  I'm going to ask that both the defense counsel and Levi plaintiffs provide briefing on the legal authority for magistrate judge jurisdiction by virtue of consent under these -- under this fact pattern, and to -- and to help me understand what the scope of any authority I may have with respect to both of these two parties appearing for exercising consent, and then we'll proceed from there.

In the meantime, all my decisions will continue unabated with the -- you know, based on the arguments provided and the reasoning that I offer when making my decisions, and then we'll see what happens with dispositive motions.

I do agree there's going to be a complication.  If -- if I conclude that I don't have jurisdiction in the absence of Mr. Raygosa either consenting or for which there is a

final judgment of default against him, then it does cause an issue with how dispositive motions will be resolved, and then whether there will be an opportunity for the parties to object, which will certainly cause a problem with the trial date, but I want to make sure you all understand I'm not moving the trial date right now.

So whether that's an incentive for anybody not to close that matter out and avoid full consent after the fact that both parties have done so, that's a strategic decision for which there may be consequences down the road, including the problem with extending a trial date out.

Mr. Rizzo?

MR. RIZZO:  Yes, Your Honor.  In terms of the briefing, I just wanted to ask the Court about an expedited timeline in which the defendants file their motion and we get a chance to respond to it.

THE COURT:  Seven days each.  Seven days.

Ms. Hoffman, since it does appear that there is some difference in opinion as to whether there is jurisdiction or not giving consent and you've raised the issue -- so by next Friday no more than ten pages.  Don't ask for authority to exceed.  I won't give it.  And ten -- seven -- seven days, to the following Friday, Mr. Rizzo, for you to file your response.

MR. RIZZO:  Thank you.

THE COURT:  All right.  Let's take up Ms. Creighton's -- Ms. Creighton and the supplemental protective order.

The -- I think the only difference -- and correct me if I'm wrong, and I think this is both Ms. Hoffman and Ms. Creighton's arguments to make; then the difference is when to destroy the documents.  Is that correct?

I'll start with Ms. Hoffman first.

MS. HOFFMAN:  That's correct, Your Honor.

Our position is that Ms. Creighton has 60 days to destroy the documents, and that's what the -- the protective order should allow her 60 days, and I believe her position is that she should be able to retain them through trial.

THE COURT:  And the reason why you don't think they should -- that Ms. Creighton should retain them through trial is what?

MS. HOFFMAN:  It is twofold, I think.  One is that the amended protective order in Levi and the protective order in Conley apply only to discovery, and supplemental protective orders incorporate the terms of those protective orders.  They aren't applicable at trial.

And right now we have no idea if Ms. Ferrari will be a witness at trial.  She isn't a defendant in this case.  There isn't anything she would need documents for.

If she were called as a witness before trial and has an

exhibit list, everyone will know what documents are at issue, and a protective order doesn't apply at trial anyway. There isn't any reason she needs to hang onto them until then.  She's not involved in the case, other than sitting for this deposition.

So we think the supplemental protective order was meant to allow her to sit for a deposition.

If she were being brought into the case as a defendant, this might be a different conversation, but that isn't what's happening.  So there just isn't any reason.

These are confidential -- highly confidential documents that have to do, particularly, with Ms. Ferrari.  She was a caseworker for children who are not involved in this litigation.  There are other children that were placed in the home and are not involved here.  So it's a really sensitive matter to be handing out documents about them to other people, besides Ms. Ferrari, that they don't know.

So I just think, given the sensitive nature of the documents, the uninvolvement of Ms. Ferrari and these children, and the fact that the protective orders don't apply to trial anyway -- where documents are handled in a completely different manner -- I just think it's unnecessary and just goes beyond what confidentiality -- you know, it sort of exceeds that -- given how confidential documents are, it just goes too far.  60 days is enough time to keep

them for the errata.

THE COURT:  Ms. Creighton?

MS. CREIGHTON:  So based on what I'm hearing Ms. Hoffman say, that once the exhibits are filed with the Court, then those are public record.  There may still be documents that my client would like to view in preparation to testify if she's called to do so.

I always assume that people are going to be called to testify in a case.  I mean, especially since I've been retained by her to represent her in this matter, it seems like she's got information that the parties would want in the trial.

THE COURT:  If I'm not mistaken, the protective -- the supplemental protective order requires that you retain custody of those -- of those documents -- you're not making photocopies of them.  You're allowing your client to -- you review them in preparation for the deposition, but you're not making copies; you're not handing them over; you're not releasing them into the wild.  Is that -- is that your understanding of the supplemental protective order?

MS. CREIGHTON:  Yes, that is.

So in addition to keeping them after the deposition, we'd like the opportunity to keep them until after the trial, which is the term that the other -- that the parties are allowed to keep the documents as well.

THE COURT:  Anything else, Ms. Hoffman?

MS. HOFFMAN:  Yes.  Just briefly.

Your Honor, the other one-party witnesses are also not allowed to retain documents, and we also don't know -- I mean, we have noticed Ms. Ferrari's deposition for discovery reasons.  We don't know which party would call her as a witness at trial.

And, again, she is not involved in this case in any manner other than sitting for one deposition.

There really isn't any need for her to prepare for trial.  If that eventuality comes, we can work that out then, but we don't need to work it out now, and --

THE COURT:  If I understand correctly, Ms. Hoffman, I think your concern is that they're just -- they'd be out there longer, and somehow that runs the risk of then a leak occurring.

But they're going to be in Ms. Creighton's possession now to -- I mean, if I approve your supplemental protective order, for 60 days after -- after Ms. Ferrari's deposed.  Right?

MS. HOFFMAN:  Right.

THE COURT:  And so.

MS. HOFFMAN:  And until --

THE COURT:  And so -- so what we're really looking at is the difference between 60 days -- the deposition

hasn't been rescheduled.  Is that -- or has it?

MS. HOFFMAN:  We -- it has been rescheduled.  I think the date we've chosen is the 13th, which I think is next Friday because the orders haven't been entered.

THE COURT:  So that put September to October to November.

So, really, I mean, if I approve your supplemental protective order, then the documents would -- would need to be destroyed by November 13th, or thereabouts, as opposed to after the trial, which would be end of February-ish.

So we're talking about December, January, and February.  So three months longer.

MS. HOFFMAN:  Well, yes.  If -- if everything goes.  Well, I think until after trial would be until after the Conley trial, Your Honor, which I think we have set to end of May.  So several months longer.

And I -- and I -- I'm only saying this in a logistical sense, but there is a possibility that -- I mean, it is possible that at some point, you know, some other issue in this case may arise.

I mean, interlocutory appeals sometimes happen.  Things -- dates get pushed; people add new claims.  Those are the trial dates we have set right now, and I understand that you are very uninclined to move them, but other events may result in their -- in their movement, and allowing an

unspecified date that is after the end of trial could, theoretically, result in Ms. Creighton and Ms. Ferrari hanging onto the documents for much longer than what we're talking about right now.

And so that's why --

THE COURT:  I do want to make it clear that it's only Ms. Creighton holding onto them.  She's a licensed attorney, an officer of the court.  I don't have any issue with any one of you abiding by supplemental protective orders.

So I don't see -- I mean, to the extent that Ms. Ferrari is going to be exposed to these documents, she's not being given them in her possession.  To the extent that she has them in her memory, I think -- I think there's some limits on what it is that she can do with that.

MS. HOFFMAN:  Of course.

And I don't have any concerns with Ms. Creighton violating the protective order, but this isn't really about, you know, sort of personal assessments of attorneys.  The kids -- the kids discussed in these documents have a right to privacy and confidentiality.  They aren't involved here, and we are making an exception to the protective order to allow Ms. Creighton to look at them, which wasn't originally allowed at all, and we've worked this out to allow an exception.  She doesn't have any need to keep them for

longer than 60 days.

If we go to until past the end of trial, we don't -- we don't actually know -- because we're not psychic, we don't know when that is, and there isn't any reason for her to keep them at all, and these children have a right to their privacy.

THE COURT:  Are you -- are you telling me that you don't think or you don't know that the defendants are going to call her as a witness?

MS. HOFFMAN:  I don't know.  I can't commit to that right now.

I think there's a -- there's a reasonable chance we will not, but I don't know.  We have to find out what she says in her deposition.

THE COURT:  All right.  And then for Conley plaintiffs' counsel, are you calling Ms. Ferrari as a witness?

MS. SKJELSET:  It's very likely, Your Honor, that we will call Ms. Ferrari as a witness.

THE COURT:  Both in -- in the Levi case?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  Anything else, Ms. Creighton?

MS. CREIGHTON:  Sorry.  No.

THE COURT:  Okay.  I'm going to approve the proposed supplemental protective order the defendants have

offered, and I want to make it very clear that, even though it is absolutely certain, in my mind, that everybody on this call and any other licensed attorney who appears in front of me will stand up and abide by that, my decision is to have the documents destroyed after -- after -- 60 days after the deposition is completed. It is simply just -- it's simply because we don't know when that -- when that final day may come that they would be allowed to be destroyed. We don't have a date certain.

A date certain is 60 days after September 13th. That certainty is what appeals to me. It provides some very distinct guardrails to making sure that those documents are no longer -- no longer anywhere else but in -- in -- in the appropriate custodians' hands.

Now, I want to also make it very clear that, given that, Ms. Skjelset, you've indicated that you will be calling Ms. Ferrari as a witness, and assuming that Ms. Creighton will continue to represent her in that matter, that as soon as we have the trial date confirmed and as a go, then we can talk about having those documents released back to Ms. Creighton for continued preparation.

MS. SKJELSET: May I ask a clarification, Your Honor?

THE COURT: Yes. As long as it's not reconsideration.

MS. SKJELSET: Is not reconsideration.

THE COURT: All right.

MS. SKJELSET: The documents that Ms. Hoffman is specifying in -- in her argument are documents that she's supplying to -- to Ms. Creighton in advance of the deposition.

However, there are documents that Ms. Ferrari may have the right to view under the protective order that may not be supplied by defendants but that we may need to show Ms. Ferrari in preparation for trial, if that makes sense, and that we have every right to do so; however, we cannot allow Ms. Creighton to see them under the protective order.

So if the supplemental protective order is limited simply to the documents that Ms. -- that the defendants provide to Ms. Creighton in anticipation of the deposition --

THE COURT: Let me -- let me just -- I mean, I want to cut to the chase. Are you going to be asking questions of Ms. Ferrari at the deposition as well; and, if you are, were you going to be referring to documents that aren't in the defendants' possession but in yours, for which, then, Ms. Creighton would need to prepare her client?

All of this is to say, is that if -- there needs to be a sufficient type or kind or a number of documents that Ms. Ferrari needs to get ready for the deposition, then

let's talk about that now because I don't want to have you all come back to talk about another supplemental protective order.

If you're going -- if you're talking about presenting documents to her attorney for the purposes of getting ready for trial, then we can take that up on a -- on a -- on a supplemental protective order at that time.

So how do you -- tell me:  Which of those categories is it that you're seeking clarification about?

MS. SKJELSET:  Your Honor, I really don't want to belabor this issue because I feel like it is somewhat tangential and less important than many of the other issues that we are -- that are going to be presented to us, but not all witness interviews occur in the context of a deposition, and I would be not allowed to interview certain witnesses in the -- in the presence of their attorney in this matter, in this case Ms. Creighton, based on the language that Ms. Hoffman is putting forward.

THE COURT:  So I haven't to date found that there has been a substantive objection to a supplemental protective order, just simply the scope of -- of the retention of documents.  So I'm not sure this is a problem until you can tell me that there's a problem for me to resolve.

It sounds to me like you might need to seek a

supplemental protective order, and if that is with the Court, in order to be able to interview witnesses, then -- then -- I'm not -- I'm failing to see the problem that you're describing that might happen, only because it seems like we've been able to figure out substance of supplemental protective orders.

MS. SKJELSET:  I -- suggesting that the supplemental protective -- to protect -- the amended protective order, as drafted, does not contemplate that witnesses, who are otherwise entitled to view the documents, have attorneys, which would require you to interview them and discuss documents that they are otherwise allowed to see outside -- outside of the presence of their attorney, which is unethical.

THE COURT:  Then I think you need to confer with counsel to figure out if you can submit an amended supplemental protective order to help -- help you do what you need to do.  Unless you're telling me that there -- there are objections that have raised about this issue.

MS. SKJELSET:  I think that's exactly what we're -- what -- I mean, we participated in the controls on this protective order, if that makes sense, and we said that expanding the --

THE COURT:  I'm going to table this, Ms. Skjelset, because it is -- it isn't on the list; and if we have time

at the end, then let's take it up.

MS. SKJELSET:  That's fine, Your Honor.

THE COURT:  Ms. Creighton, was there anything else?  I want to make sure that I -- I actually finished my ruling and I was clear.

I'm going to approve the protective order that defendants have proposed, but I -- and trust that will give you an adequate opportunity to prepare your client for deposition and destroy them within 60 days of the date of the deposition, but I also want to make it very clear that, if she's called to testify or as soon as any -- and I think Ms. Skjelset has indicated that they plan on calling her in the plaintiffs' case -- then at -- at some date certain, then I want the parties to revisit this issue of the supplemental protective order for releasing the documents to you again.

I really don't want an argument over dates on this thing.  Ms. Creighton gets them to prepare her client for trial, when -- when we have that trial up and running, and I imagine that she will need them a month before that trial to prepare, and I imagine she'll need to be able to retain them for some time after to ensure that she can continue to adequately represent her client.

I'd rather you not come back to dispute a time period.
Let's move on.

MS. CREIGHTON:  Thank you.

THE COURT:  Thank you, Ms. Creighton.

MS. CREIGHTON:  I'm signing off.

THE COURT:  Thank you.  Good day.

MS. CREIGHTON:  You too.

(Ms. Creighton not present for remainder of hearing.)

MS. BLAESING:  Your Honor, this is Ms. Blaesing.

THE COURT:  Oh, yes.  Don't forget to raise your hand.  It takes me a while to find the voice to the -- to the -- to who's talking.

So Ms. Blaesing.

MS. BLAESING:  Would it be possible for the Court to enter the order -- this supplemental protective order today so that we can move ahead with scheduling Ms. Ferrari's deposition?  Because we have to produce the documents subject to that supplemental protective order one week before the deposition.

THE COURT:  It's not only possible, it's done.

MS. BLAESING:  Thank you.

THE COURT:  You're welcome.

All right.  Status conferences.  I don't know if you got wind of this.  I can't remember if I've communicated it to you, but we're going to be meeting monthly.  I like you all that much.

All right.  So let's get your calendars out.

October 18th.  And even if you are unable to make it, it -- as long as somebody from your team will be able to defend and speak on the -- speak on the issues and defend the positions, that's what's required.

Anyone raise a catastrophic crisis with October 18th?

Ms. Korbel?

MS. KORBEL:  Your Honor, can I just ask you to clarify if these will be Zoom conferences or in-person? Because that will affect my availability.

THE COURT:  They'll be -- they'll be videoconferencing.

MS. KORBEL:  Okay.

THE COURT:  Whether I -- whether they'll ever allow me to actually use my Zoom account again, I don't know; but I -- the adage about always being able to get away with something once as a judge holds true, but I'm not sure if I -- I'll be allowed to do it twice.

But, yes, it'll be -- it'll be remote, but it will be by videoconference.  Because I can tell you that telephone conferences with this many attorneys is about as unworkable as anything I've experienced.  All right.

MS. KORBEL:  Thank you.

THE COURT:  10/18.

I'm hearing no crises objections.

Good.

DEPUTY COURTROOM CLERK:  What time, Your Honor?

THE COURT:  Let's do 9:30.

And I'm anticipating these should -- well, I don't know if they're going to get shorter, because we'll be resolving issues, or that I'm inviting the creation of more issues, but they'll be about two hours long.

November 22nd.

DEPUTY COURTROOM CLERK:  Your Honor?

THE COURT:  I'm good with that one.

DEPUTY COURTROOM CLERK:  Okay.

THE COURT:  Thanks.

DEPUTY COURTROOM CLERK:  Same time?  9:30?

THE COURT:  9:30.

December 20th.  I'm hearing -- so this is where you get to shout out an objection if I don't catch your -- if you don't catch my attention as I'm writing these things down, and that's at 9:30, December 20th.

January 17th.

UNIDENTIFIED SPEAKER:  (Indiscernible) a shout.

THE COURT:  Yes.  January 17th?  Not good?

UNIDENTIFIED SPEAKER:  It's not good for all of our attorneys.  We have an attorney retreat that day.

UNIDENTIFIED SPEAKER:  It is also, Your Honor, very close in time to what I think the Court was setting as a pretrial date, which you had offered January 23rd or 24th,

I believe.

THE COURT:  Do I have those on my calendar yet, Ms. Davies?

DEPUTY COURTROOM CLERK:  Not yet, as I was waiting for confirmation on whether that would be for both the Levi and the Conley case or strictly the Levi.

THE COURT:  It'll just be the Levi case.

DEPUTY COURTROOM CLERK:  Thank you.

And I was going to set that for the 23rd, just in case we needed the 24th as a second day.

THE COURT:  All right.  So 23rd and 24th.  We can -- we can -- we don't need to do a status conference more than once in January.  So the 23rd and 24th will be our pretrial conference on the Levi.

UNIDENTIFIED SPEAKER:  So both days, Your Honor?

THE COURT:  Block out both days.  I don't know -- I don't know how long it'll take.  I don't know what your motions are going to look like, but if it's anything like we've been dealing with -- I just want to make sure that we take all time and deliberate speed to get it done right.

MR. EDELSON:  Will those be in person or --

THE COURT:  Yes, they will be in person.

MS. BLAESING:  Your Honor, this is Lauren Blaesing -- Ms. Blaesing.  I believe -- I have to double-check, but the replies on dispositive motions are

currently docketed to be exchanged in early January.  Would it also make sense to schedule a hearing on the dispositive motions prior to the pretrial conference?

THE COURT:  It's -- you're right.  We do have a -- I think briefing will be completed January --

Do you have the date, David?

I imagine, if you -- if you recall those dates, off the top of your head, what is it when final briefing will be completed?

Yeah.  We're -- I'm -- we're looking it up right now, double-checking it.  I believe I did recall something about early January, but let's confirm that date.

DEPUTY COURTROOM CLERK:  So dispositive motion deadline is November 27th.  So the 21 days for response -- that would put replies due right at the end of January.

THE COURT:  I didn't hear that.  What?

DEPUTY COURTROOM CLERK:  Replies -- with a November 27 dispositive motion --

THE COURT:  What's the January date?

DEPUTY COURTROOM CLERK:  January -- replies would be due January 31st.

THE COURT:  I don't think they go that long.

UNIDENTIFIED SPEAKER:  Your Honor, I think it might be that the replies will be due January 2nd.

THE COURT:  Yeah.

UNIDENTIFIED SPEAKER:  I think three weeks from the 27th is going to be December 18th, and then two more weeks for the replies is going to be January 1st; so they'll be due on the 2nd, I think?

THE COURT:  The 2nd.  That sounds right.

Okay.  So -- and I'm glad you raised this issue, and the reason is that, once I start getting the -- once I receive the opening briefs -- and I don't know if there's going to be cross-motions -- I'm going to start digging my nose into all of them, and I'll be prepared for the reply by January 2nd.

You will be receiving a letter opinion that summarizes my decisions, followed by a formal F&R or an opinion and order.

Obviously, because of the uncertainty about where consent to magistrate rests at this point, we may end up revising all of these other deadlines for trial anyway; and if the trial ends up needing to be sent to a district judge, then I'll be issuing an F&R in its normal course, and I won't be involved in the pretrial conference at that point.

The problem with the uncertainty is that I'm still moving forward with making sure these deadlines remain in place; and then, if we resolve the magistrate judge jurisdiction with my retention of the case for trial, then these dates will be that which we use; otherwise, then, some

of these things will be taken off the books.

But we won't know that until a little bit later anyway.

So you will get the -- if I retain jurisdiction to preside over the trial, then you will be getting a letter opinion from me soon after the reply briefs have been filed with the pretrial conference still scheduled on the 23rd and 24th.

I may not take oral argument. If I find that it's necessary, then we'll schedule that immediately. I'll have a better idea of whether oral argument is going to be helpful to me in making any decisions after I receive your motions for summary judgment.

All right. So 10/18, 11/22, 12/20, and the pretrial conference is January 23rd to the 24th, with trial set for beginning February 10th.

Anything that -- any of those dates that I just decided raise any issues? Last call.

Mr. Rizzo?

MR. RIZZO: Thank you, Judge.

Those dates do not. I was wondering the sort of in-between dates. For example, for verdict form, instructions.

THE COURT: Oh, yeah. You're going to get a -- yeah, you'll be getting a trial management order.

MR. RIZZO: Okay.

THE COURT:  And those -- those dates will continue to apply.

Now, I'll also make it clear that, if -- if I end up not being your trial judge, for whatever reason, there's no reason why your -- your submissions in -- as required under those deadlines, would not be relevant if it's assigned to another judge.

So all that's going to help you get ready for your pretrial conference in front of any judge, whenever that trial is going to be held.

All right.  Moving along.

I'm looking, first, at defense counsel's list of issues.  I'm going to use that as -- I have two -- two checklists, and I also have Levi and Conley's as well. We'll -- I'll take up the items listed in defendants' list first, and then -- and then use Levi/Conley's to fill in the gaps.

There was an issue, Number 10, on the list from defense counsel.

Dr. Sorenson's letter of August 19th.  I don't think it's my problem.  Tell me why I should care what you communicate to Dr. Sorenson.

UNIDENTIFIED SPEAKER:  Your Honor, I think I agree that it isn't your problem, but I think that Mr. Sorensen -- Dr. Sorenson -- I apologize -- sent you a letter on this

issue; and so, to the extent that you wanted to address his letter he sent to your chambers, we were prepared to do that; but, otherwise, I think I would --

THE COURT:  I appreciate that.

So I'm not -- I'm not inclined.  I will not respond because it isn't appropriate for me to offer any legal guidance or informal written opinions on the propriety of being paid for a deposition.

I will leave it to counsel to clarify what -- if he's inquired of all of you, then I'll leave it to counsel to set the record straight.

However, I will instruct you not to describe my position as not caring; so I don't want to see that in a letter.

That was -- that was more of a colloquial characterization of "I don't think I have jurisdiction to resolve it."  Okay.

UNIDENTIFIED SPEAKER:  Of course, Your Honor.

THE COURT:  Okay.

This is now, looking at Number 7, plaintiff's request for clarification of the Court's July 12, 2024, order.

Ms. Hoffman's letter, which summarized my opinion, clarifies what I -- I ordered.  So help me understand, in very brief terms, Ms. Skjelset, why you think it was unclear, because I thought it was.  I thought and I continue

to think my opinion was adequately instructive about what it was that you were obligated to do.

MS. SKJELSET:  Well, Your Honor, that -- that issue was not raised in our letter to the Court.  It was raised in a letter to the Court from August 26th.  And since that point in time, we've decided that we just want to move toward trial, and we did produce all those documents to defendants, and we reserve ultimate admissibility for trial.

So I don't think that we need to spend any time on that issue today, Your Honor.

THE COURT:  Perfect.  Thank you.

Does that satisfy, Ms. Hoffman, your -- whatever issues that you may have raised in your response?

MS. HOFFMAN:  It does.  Thank you, Your Honor and Ms. Skjelset.

THE COURT:  Thank you.

Motion to compel deposition of J.C.

So I'm -- and I'm going to be applying the principle that I described at the outset of our hearing: timeliness.

Help me understand why this had not been requested, raised, or resolved by the parties before the twelfth hour.

MR. EDELSON:  Your Honor, Jeff Edelson, on behalf of defendants.  I'm unaware of any -- and I appreciate your concern about timeliness.  I don't -- I don't want to blow it off, but I also am not aware of any rule that requires

that we give a list of the people we want to depose and move that forward prior to the close of discovery, I mean, or significantly before the close of discovery.

We -- we gave notice of this deposition before the close of discovery and don't think that we run afoul of any tardiness rules.  And, in fact --

THE COURT:  Isn't the rule that everyone is to complete fact discovery before the deadline?  So at -- for example, I see -- I see this issue come -- I see an issue similar to this come up in front of me on -- well, too frequently an occurrence, which is people file an RFP -- serve an RFP within a day of the deadline for fact discovery expiring, and there's generally some understanding that that's not how it's done and that it's untimely.

So, in this sense, to the extent that it was raised on August 5th or 6th, or maybe it was the 5th before the August 6th status conference that we held here, that it would only have given the parties seven days to be able to get the deposition underway.

MR. EDELSON:  No, I -- I realize that.  And, you know, the court generally -- I'm not speaking of Your Honor, but the court generally has not really set out a consistent rule on that, but I understand the concept.

And in this case we were continuing -- I mean, the discovery has continued despite the technical end of -- end

of fact discovery.

And, you know, this is -- I can't -- I can't understate how significant and important it is that we get an opportunity to depose the plaintiff in this case.

You know, we didn't get -- we tried to depose Plaintiff Levi, and we learned nothing.  They asserted privilege on just about everything and said, "Well, even if we didn't have privilege, there's -- we don't know anything anyway."

So we -- even as recently as yesterday, I took a deposition of her counsel, and they -- they asserted privilege and work product with respect to all communications and all information.

So, for example, even though we know that J.C. disclosed the -- the fact that -- that the abuse to -- well, ultimately, she testified about it at Raygosa's trial. They're still asserting privilege with respect to when and whether it was disclosed to the lawyer prior to that.

And, again, we're not suggesting that J.C. had a particular duty of disclosure, but we have to defend our clients, who are being accused of indifference and of -- and what they knew and how they knew it and who told them.

I mean, J.C. right now would be free to come to trial and say, "Oh, no.  I told this one, and I told that one," and we've got no discovery on any of that.

And it wasn't until much of our discovery and depositions were done that we even knew the extent to which we were short on that information.

And we gave notice as soon as we felt that -- that it was something we had no choice but to do.  I can't say that anyone's looking forward to taking the deposition of a 17-year-old child on -- that -- that may cover topics that are uncomfortable.  Nobody wants to do that.

But it's awfully important because she's alleged damages.

Now she's trying to -- when I say "she," I guess it's her guardian -- is -- or conservator -- is trying to add more claims with more theories for a different period of time than we've ever even considered before with respect to J.C.

So I don't know what Your Honor's ruling is going to be on the motion to amend, but if Your Honor allows that, it's opening the doors to even more discovery than we had in mind when we originally noticed her deposition.

So my -- my apologies that we didn't get a request out sooner than shortly before the close of discovery, but it did beat that deadline, and we -- we have brought it to Your Honor's attention as quickly as we can.

And I'll note that -- and I don't know that I can -- I can cite specifics on this, but it seems to me that we have

had many discovery issues argued to Your Honor for the first time and not discussed until after the deadline of discovery, and so it's -- it's been a little loose.  We're trying to get everything done.  We know there's a lot to do, but I can't think of anything more critical in terms of our trial preparation than being able to understand what the plaintiff is claiming is the liability and the damages that she has suffered as a result of the alleged conduct by the defendants.

Nobody else seems to know, and we can't wait until trial to find out.  That's just simply unfair and -- and completely uncustomary.  So, again, it would have been great if we got it -- if we did this 60 days before the close of discovery, but that's not where we found ourselves.

We were running up against the deadline and beyond to finish these depositions.

THE COURT:  Plaintiffs' counsel.  I think it's Ms. Levi's argument.

MR. RIZZO:  Thank you, Your Honor.

THE COURT:  Mr. Rizzo, remind me.  Is plaintiff planning on calling J.C. to testify?

MR. RIZZO:  We had not made that decision, Your Honor, at the time of the August 6th announcement that they wanted to take the deposition; and, of course, that issue now is in flux in light of this particular discovery

motion.

THE COURT:  In flux in what way?

MR. RIZZO:  In terms of whether she is capable and whether it is helpful for her to testify at trial.

THE COURT:  So have you made a decision about whether she will be called to testify?

MR. RIZZO:  I have not, Your Honor.

THE COURT:  And so -- so whether she's called is still up for decision.

MR. RIZZO:  Whether she would be called by the plaintiff, yes.  As I told the Court on August 6th, my inclination is to not call and was to not call J.C. at trial, and I can explain why that is.

THE COURT:  I don't --

MR. RIZZO:  Okay.

THE COURT:  I don't think I need that --

MR. RIZZO:  Okay.

THE COURT:  -- explanation.

The motion to compel J.C.'s deposition is denied.

The fact discovery needs to be completed within the deadlines.  The deadlines have been extended multiple times. And so if this was an important witness to have deposed, then it needed to have been taken up well in advance of the 5th of August, at least having brought that to the attention of counsel and the Court to resolve.

But also let me make it clear:  If the plaintiff is going to call her as a witness -- and I -- and I'm going to order the plaintiff to identify whether -- to state whether they will be calling J.C. as a witness within a month of the trial date, and if they are, then I will provide an opportunity for defense to take a deposition.

MR. RIZZO:  Understood, Your Honor.

MR. EDELSON:  Your Honor, if I could get just a little clarity on some of that?  I respect your ruling.

Among other things that we are concerned about -- and I didn't mention again here, but I will now -- is that they will have experts interview her and issue expert reports based on those interviews, and we will have had no chance to have our own interview.

THE COURT:  And I appreciate that, Mr. Edelson, but here's my problem and my problem with the position that the defendant is taking, which is discovery has some -- some time -- some temporal parameters.  You came too late.  You decided to push the issue to -- and raise it before seven days of the deadline for fact discovery.

I'm not making a substantive decision about the propriety of the value of her testimony, and certainly you're going to have the opportunity to undermine any fact witness on cross-examination or expert witness on cross-examination, if you'd like.

That's up for the trial judge and for trial to make an issue.

I'm dealing with the discovery dispute that I need to resolve now, and I've told you all very clearly you had an opportunity -- well over a -- at least a couple of years, since this case has been filed, to prosecute and defend and get the discovery that you -- that you needed.

If J.C. was that critical, then it should have been obtained months if not a year ago.

So my decision -- again, I want to make it very clear: I'm not deciding about -- anything about it -- its -- it would be appropriate for you to have gotten the deposition of her -- of her testimony.  You didn't do it in time.

I want to make sure it's very clear that, as I said in the beginning, I'm moving this along.  If people haven't done what they were supposed to do timely, then it's on you for not having done so.

But you have a safety valve.  If they call her as a witness -- and they're going to have -- they will need to notify you within a month of the trial date -- then you'll have an opportunity to depose her.

MR. EDELSON:  And if they put in a declaration for her in opposition or in favor of summary judgment, do we get to cross-examine her?

THE COURT:  Mr. Rizzo, would you like to be heard

on that?

MR. RIZZO:  Judge, as I sit here today, it is highly unlikely that this little girl, who was severely abused and traumatized in this squalid series of foster homes, is going to prepare a declaration regarding liability.

THE COURT:  So your answer, Mr. Edelson is "Yes."

MR. EDELSON:  Thank you.

THE COURT:  If they submit a declaration from J.C., then you'll have -- you have the right to depose her in reply to that summary judgment response.

Levi motion to file first amended complaint.

It runs into very similar problems about timeliness. So help me understand why there is no prejudice to the defendants that I should not consider.

Mr. Rizzo?

MR. RIZZO:  Thank you, Judge.

THE COURT:  And let me bifurcate the issue.

There's the substantive allegations involving the other foster home.  That's the primary focus of my -- my concern; the issue with respect to amending the amount of punitive damages, far less so.

MR. RIZZO:  Right.

THE COURT:  So focus on -- focus on why you think you should be allowed to amend the complaint regarding the

foster home.

MR. RIZZO:  The defendants' opposition suggests that we had the documents -- let's start with that -- necessary to frame allegations at the time of the probate proceeding; and as we set forth in our reply, Your Honor, that's not the case.

When we got discovery in the probate matter, for example, just starting it back from that point, we didn't get information, i.e., the certification or the provider file regarding the -- what I'm calling the S-M home, the Spicer-McCool home.  We filed the lawsuit; we began to get discovery in this case, and Conley filed her lawsuit; and that lawsuit, as it progressed, began to pertain specifically to the Spicer-McCool home, and the defendants began producing discovery regarding that home, which we received for the first time.

As the discovery progressed, both parties agreed to participate in discovery depositions and receive and review -- all parties did this -- in connection with the same defendants in these cases who were responsible, not only for the certification of the Duncan-Raygosa home and the monitoring but also the certification of the Spicer-McCool home and the monitoring.

These depositions occurred, for example, very recently. And as they pointed out in their reply in August, there was

a continued deposition of Chapman.  There was more recently a deposition, on August 29th, of Anastasia Brooks, which developed, not only the provider file but related communications and emails where we learned, as set forth in the reply, that, for example, DHS upper management -- the foster care coordinator, Melanie Parent -- expressed concerns about Spicer-McCool home's ability to care for a sexual abuse survivor such as J.C.

Simultaneously, Your Honor, we were learning about other problems in the Spicer-McCool home, none of which had come to our attention previously.  This is very -- this is all through July and August.

For example --

THE COURT:  Mr. Rizzo, I'm going to direct a little bit; so --

MR. RIZZO:  Go ahead.

THE COURT:  -- forgive me for interrupting.

Address the issue defendants have raised that, if I grant your motion to -- for leave to amend, then they'll need at least 60 more -- 60 more days to complete discovery.

MR. RIZZO:  I was -- I'm heading there.

And so we amended -- as I said at the August 6th hearing, I explained we were going to amend and conform to the evidence, and we did that very promptly, Judge.  So I just want to speak to this question about the delay.

Now, we've offered them, in recognition of what they -- what they now say is this, quote, "entirely new theory." They need all of this additional time.  They haven't told the Court or us what it is they want to do.

So, for example, with respect to the Spicer-McCool home, we do know that they claim it's "likely" -- air quotes -- that they want to depose Mr. Spicer -- Ms. Spicer and Mr. McCool.

I don't object to that, if they feel they need to do that.  We said that we would like to maintain the existing expert discovery deadline, but "Defendants, if you feel you need to supplement your expert disclosure come September 9th with Spicer and McCool, we're amenable to that as well, so long as you keep that within the same timeline as the Conley discovery -- expert discovery deadline."

There was mention in the defendants' opposition that they're likely to subpoena third parties.  They didn't say and they haven't identified who they intend to subpoena.

And every witness, Your Honor -- for example, the defendants most recently got around to deposing April Clark, the therapist; Dr. Sorenson, without pay, the psychologist. They deposed Dale Gilad, the CASA worker.  All of the defendants have been deposed.  Again, all of these people covered the same time period that was at issue with Duncan-Raygosa and Spicer --

THE COURT: Are all of the allegations that are included in your proposed amended complaint relating to facts developed during the course of discovery, or is there anything not addressed, raised, and -- and delved further into during the discovery process?

MR. RIZZO: It's basically -- it's basically generated on the discovery that we were -- that we were taking in real time and completed in late August with that final --

THE COURT: And completed in late August? What facts were disclosed in depositions in late August that are included in the amended complaint?

MR. RIZZO: Well --

THE COURT: And also, when was it that you advised defense counsel that you were going to move to amend -- or when did you confer with counsel about this?

MR. RIZZO: Well, we -- this was -- starting in reverse order, we discussed this at the August 6th conference, where I said we -- we would like to -- to -- there was a close of pleadings we'd like to amend to conform to the evidence, and the evidence that we've amended was based on the discovery.

So it was at that time.

THE COURT: Okay.

MR. RIZZO: Then the Court gave us permission or

leave to go ahead and file that, and that's what we did; so --

THE COURT: File the motion to amend?

MR. RIZZO: Right. Right.

THE COURT: Yeah.

MR. RIZZO: So in terms of the -- the -- I may not be the best person, Your Honor, to speak to -- because I wasn't at all of the depositions, but -- but -- and I know that Conley's counsel was present -- Ms --

THE COURT: Anybody who knows isn't answering my question; so if you know something --

MS. SKJELSET: I'm happy to answer, Your Honor.

THE COURT: Okay.

MS. SKJELSET: Well, I believe that it was at Ms. Chapman's continued deposition, which I believe occurred on August 1st, but that Plaintiff Levy really learned for the first time the extent to which Defendant Chapman and Defendant Brooks, formerly Tibbetts, were aware of concerns specific to the placement of children who had been sexually abused in that home.

And it was also at that deposition that I learned for the first time how many children had been placed in that home. I had been aware that there was an allegation that Z.C. had been sexually abused in that home and that there were allegations of inappropriate discipline, and I knew

that our client had not had an amazing time there and had some pretty extraordinary difficulties subsequent to her disclosure, but I did not learn that -- the extent to which each named defendant knew, in advance of the placement, about the likelihood that that distress would occur.

THE COURT:  Okay.

MS. SKJELSET:  Because they were -- they were communications that were kept maintained in the certification file for the Spicer-McCool home, which were not produced to us but were marked at that deposition.

THE COURT:  Okay.  Who is arguing this for defense -- defendant?

MR. EDELSON:  It's me.

THE COURT:  Mr. Edelson.

Give me more context and texture to what and -- what and how this will complicate discovery going forward.

MR. EDELSON:  Thank you.

Well, they added 18 months of time to the allegations by J.C., an 18-month period, during which many, many -- I won't say countless, because that's not true.  They're countable -- but many case notes and other information within the DHS records.

We have not asked -- at this point we had not asked our expert to even look at those records to evaluate anything that was and wasn't done, and so we're way behind the eight

ball on that one.

The -- this opens the door to new depositions for Gilad, the CASA; Clark, the therapist; Sorensen. There's just -- obviously, Spicer and McCool themselves, none of whom we have testimony about the events and things that are being alleged for the first time in the amended complaint.

And let me be clear. We're prepared -- I won't say prepared, but we're capable of defending the claims if we can get the discovery we need. We're not fighting their desire to add -- although we disagree with them factually in many, many ways, as well as legally, we want to be able to get that discovery.

We -- I think we may have to do some additional requests for production, requests for admission. It will -- it will affect our dispositive motions because this is a -- they're adding whole new -- a couple of new theories of liability. As I said, 18 months of additional time when J.C. was in DHS's care.

And so, honestly, we haven't -- we've begun, I'll say. We have begun to consider what else we need to do, but we really will have to sit down and think about it to be able to be more specific.

But, certainly, at a minimum, we need to depose, at least, Ms. Spicer, probably Mr. McCool, and get those other folks back and be able to ask them questions, as well as get

our expert a whole new set of records that we'll ask the expert to examine.

And the expert may have some thoughts too about what else we would need to have for discovery on these very specific -- and let me give you a little flavor of what they're -- you've read it, but let me see if I can make it clear what they're -- what I think that they're -- they are saying.

For example, they're saying that, because Ms. Spicer had a history as a child of -- of unfortunate events that she suffered through, that, because of that, that she was unfit to become a foster parent for J.C., who had just herself had suffered through some similar -- I don't know how similar it is, but -- but sexual abuse.

And, you know, one could say, "Well, that makes her perfectly equipped and really well-equipped to be a really good foster parent in that setting." I think they're arguing the opposite. But we -- we need to understand it and dig deeper into all of it to understand it better.

And, again -- and this also goes back to deposing J.C. We've never heard complaints from J.C. In fact, all of the records -- all of the records that we have suggest that she was very happy in that home and that was all going very well, by multiple sources; and so this is all kind of out in the -- out from nowhere.

And, you know, we're going to have to do some discovery on this to understand it better.  So that's the reason we've asked for additional time.

And -- and --

THE COURT:  Well, it seemed that Mr. Rizzo indicated that the facts that have been -- that are -- that are being -- the facts included -- the allegations included in the amended complaint are facts that have been developed during the course of discovery that -- so it seems -- it would appear -- it would appear to me that, if that's true, then -- then you would be aware that -- that -- that these were issues that have been raised in the course of witnesses' testimony.

MR. EDELSON:  Well, their depositions have been far-ranging, and we have not put brakes on them for going well beyond what they've asked -- what their claims were.

We also, as I tried to say in a nuanced way, I think these claims --

THE COURT:  Well, I do want to make sure that I'm pinning down this answer to my question.  My question was -- is that you're not telling me this wasn't raised in -- that any of the allegations that -- that are in the amended complaint are out-of-the-sky blue -- out of the blue sky from nowhere in the case record to date.

MR. EDELSON:  I --

THE COURT:  So, I mean, the argument about -- you know, well, objecting to the motion to amend has a great deal more traction if they're making allegations of fact that just haven't -- haven't been developed; and, you know, the surprise associated with needing to defend against something like that is, frankly, palpable, and --

MR. EDELSON:  Well --

THE COURT:  -- and I -- you know, I can appreciate that.

But if they're moving to amend and conform to that which has been developed over the course of a pretty lengthy discovery period, help me understand how that is causing a level of undue prejudice, such that you would be required to develop such extensive discovery to -- to --

MR. EDELSON:  Let me -- let me give you some -- some allegations that I think might help make my point.

So, first, let me say that there's a difference between learning, sort of, these small facts here and there.  Okay.  We learned a fact that -- that Ms. Spicer had been abused as a child.  Okay?  So we know this fact.  How does that turn into being aware that they may make a claim that that's an inappropriate placement as a result?

And let me give you a very specific allegation.

Paragraph -- new paragraph 105 of their amended complaint.  It's on page 20.  I'm looking at their red-line

version.  It says, "Notwithstanding Raygosa's conviction, O'Brien continued to tell co-workers and service providers that she doubted J.C.'s disclosure.  O'Brien's continued efforts to undermine the credibility of J.C.'s disclosure, betrayed J.C.'s confidence and trust; impacted her health, well-being; and undermined her ability to receive proper care for the sexual abuse."

We've got no evidence on that last part whatsoever.

So the first part of it, yes, there's been evidence adduced that Ms. O'Brien doubted J.C.'s disclosure.  And -- but that it had an impact on J.C. and her well-being and her ability to get proper care -- there's no evidence of that at all.

I mean, that's a -- that's -- to me, that's -- when I said "out of the blue," that's what we're talking about.

And there's other things that are like that, and -- and -- so it's one thing to say, "Well, all these facts have been discovered."  It's another thing to take those facts and turn them into liability that -- that we don't think is there, and we haven't seen any evidence of that.

So what harm resulted from this?  What -- what actually resulted from it?  We don't know any of that.

And, again, it ties into our inability to -- our desire to depose J.C., and because no one's -- we haven't seen any testimony on any of that.

So, to us, that's new, and there's quite a bit that falls into that.

There's -- you know, we can look at these E3K additions to paragraph 113.  It characterizes -- it recharacterizes some facts that we are aware of in ways that are new -- are new to us.

I just don't know how else to put it.

Their characterization of -- of information that they've learned in discovery is so far from an ordinary interpretation of the information that we certainly couldn't have anticipated it would have turned into claims or what those claims would have been.

And so, to us, this is all new.  You know, we learned for the first time at that last hearing that I attended that they were going to amend and that -- they mentioned adding punitive damages or increasing their punitive damages, which they took from 5 million to 25 million times five claims.

So it's -- they've -- they've expanded their claim not just substantively in liability but also in the damages, and it's an extraordinary addition and -- and potential exposure that we're now looking at, and that has an impact on how we look at this.

THE COURT:  All right.  Thank you.

Plaintiffs' counsel.  I don't know if Conley wanted -- Conley counsel wanted to weigh in on this.  I know it's not

their motion, but I think it implicates some of the facts that have been developed during depositions.

MS. KORBEL:  I can speak briefly about it, your Honor.  It is not our motion, although I did file a declaration in support.  It's very difficult to listen to this characterization as, like, shocking events that the Spicer home was a problem.

We amended our complaint back in May, with no opposition, to include the Spicer home and to include the allegations about what happened to Z.C., and --

THE COURT:  So are you saying that very similar allegations in the current motion to amend the Levi complaint were already made in the Conley complaint.

MS. KORBEL:  I believe so.

And also, Your Honor, in every deposition since, I have asked about this home and these foster parents; so I don't understand how this is not something that they've discussed with our experts or brought --

THE COURT:  Has that shaped the way in which you've seen the defendants developing its -- the defendants developing its defense of the case in Conley?  Differently than -- are they taking other -- different depositions or asking different questions, in light of the allegations that they've -- that you've made in the Conley complaint?

MS. KORBEL:  Well, to be honest, Your Honor, I

believe we maybe had one or maybe no depositions prior to the amendment of the complaint.  Maybe one back in May.

So I don't have a lot to go on.  We had maybe one or two depositions and then --

THE COURT:  So what I'm -- what I'm trying to explore -- what I'm exploring is, I mean, in some way, the Conley case is sort of a control that I'm trying to compare that which is being pursued by the Levi plaintiffs and that which is being argued by the defendants in the Levi case, which is it's going to blow up discovery.

And if I'm hearing you correctly, that there haven't been any or many or maybe one or two depositions since you amended the Conley complaint to include substantially similar allegations that the Levi plaintiffs are pursuing in the motion to amend the complaint.

MS. KORBEL:  Maybe I misheard Your Honor, but I think it was there were one or two depositions, and then we learned of the Spicer home and started exploring in all -- all depositions after that.  So there may be, like, let's say, 18 depositions that have happened, and we've talked about the Spicer home in almost all of them at some point.

THE COURT:  When did you amend the Conley complaint to include the allegations that the -- that the Levi plaintiffs are now seeking to amend their complaint?

MS. KORBEL:  May 22nd, Your Honor.  The amended

complaint was filed on, I think, June 6th.  The motion was May 22nd.

THE COURT:  After May, how many depositions occurred in the Conley case?

MS. KORBEL:  Approximately 15, and I'm ballparking.

THE COURT:  And did -- I'm not asking you for exacts.  I'm just trying to get some general understanding of what's going on with discovery, because, you know, my -- the issue that I'm exploring is whether it's unduly prejudicial, given -- with respect to disadvantaging the defendants to allow amendment of the Levi complaint, given the principle of making sure that we move forward on discovery and a trial date in February.

So what I want to understand is was there anything in the -- in any of those 13, or so, depositions, post-amendment in May or June, or whenever it was filed, that -- that were specifically directed to just those amendments by defense counsel, by the defendants' development of the record, that you can recall?

MS. KORBEL:  I know that defense counsel questioned the mother in her deposition about --

THE COURT:  J.C. -- whose mother is this?

MS. KORBEL:  The children's mother.

THE COURT:  Z.C. and J.C.'s. mother?

MS. KORBEL:  Z.C. and J.C.'s mother, correct. And I know that the children's therapist, who's the same for both children, was also questioned about this home.

I'm trying to remember anybody else.

THE COURT:  Were those questions directed solely to Z.C.'s treatment and counseling, or did they explore both J.C. and Z.C. when asking questions of the counselor/therapist?

MS. HOFFMAN:  Your Honor?

MS. KORBEL:  Your Honor, I don't know.

THE COURT:  Ms. Hoffman?

MS. HOFFMAN:  Your Honor, this is Ms. Hoffman, and I took most of those depositions.  I appreciate Ms. Korbel is doing a good job recounting the depositions that have happened after the amendment, but I think I might be able to answer your questions a little bit more easily because you're asking about what we did.

So I -- we have asked -- so we have deposed the children's mother.  We have deposed both providers.  We have deposed the children's therapist.  They have the same therapist.  They had the same CASA, we have deposed her. They've deposed Dr. Sorenson, who evaluated both children.

So we have done depositions that have overlapped both children, and we have asked questions about the Spicer home in all of those depositions as it relates to Z.C.'s

experience in that home.

I want to be really clear about something; I -- to some extent, I agree with Ms. Korbel that it is not a surprise that the Spicer home exists; and we, of course, knew that.

I think our position is a little bit more nuanced than that.  I've been very closely involved in the discovery in this case, and the children had distinct experiences in the home, and their respective complaints allege very different experiences.

The allegations in Z.C.'s complaint are specific and relate to physical discipline and alleged physical abuse, and they appear to be closely tied to a specific CPS assessment that post-dates the children's reunification with their mother.

The allegations in Levi's proposed amended complaint are not tied to the same CPS assessment and relate to different issues that she allegedly experience there.

And it's her experiences in the Spicer home that are what -- that is what we have not explored in discovery because, to our understanding, the Spicer home was never an issue in Levi.

So -- and part of what led us to believe that is that at no point did Levi, for example, make an RFP to us for the Spicer-McCool certification file.

We've never produced that to them because they never

asked for it.  They haven't really been asking questions of witnesses about J.C.'s experience in that home either.

It may -- you know, of course, people have asked questions about a particular visit that happened during that time or maybe a particular email during that time, but as a topic of discovery, it hasn't been one in Levi; so we haven't created a discovery strategy that relates to J.C.'s experience in the Spicer-McCool home, which means that there's witnesses that Ms. Korbel was listing that we've taken regarding the Spicer home.  We would probably need to issue new subpoenas and retake some of those depositions and ask them -- those same witnesses about J.C.'s experience in that home as it relates to what's in this amended complaint.

So it's sort of tricky because, of course, we've done this discovery.  Of course, we do know this home existed, but this is just a new -- it's a new theory about that home, related to a different child, and there are different questions and different pieces of information we need.

For example, Ms. Skjelset said that she's aware that J.C. had significant difficulties in that home.

The discovery in this case has not -- just not elucidated what those difficulties were.  I don't know what they are.  We have to find out.

And that -- I mean, that's why we're opposing, of course, the amendment, as Mr. Edelson described.  But to the

extent you're inclined to allow it, even though it was raised at the same hearing where we raised J.C.'s deposition, and it was too late, if you're inclined to allow it, we just -- we have to have more discovery into questions like that because it isn't reflected in the documents.

THE COURT:  And with respect to the motion to amend to increase the prayer for relief, what argument do you have on that, other than that you don't like that it's a bigger number?

MS. HOFFMAN:  Of course.  We're not fans of the number, but when it -- when it comes to the number alone, I don't think that we necessarily oppose that specific amendment.

Our problem is more with the fact discovery that would be necessary with the amendments relating to Spicer-McCool.

THE COURT:  And I -- I appreciate your candor and not having me have to read between the lines too much.

I'm going to allow the amendment with respect to the damages claim.

And then I'll get back to you both -- all the parties with respect to the motion to amend on the substantive allegations, either before the end of our meeting today or by Monday of this coming week.

Mr. Rizzo?

MR. RIZZO:  Judge, just to close out and to give

the Court some -- some thoughts, just to walk back what was said, this idea of issuing an RFP, we were participating in jointly-held depositions.  We were receiving evidence and exhibits as it was coming into the record.

It would not have occurred to me to serve another RFP for documents that we were receiving jointly and voluntarily by agreement.

This concept of betrayal of trust -- that came up in the deposition -- the defendants' deposition of April Clark, and that's why we're alleging that as against Kat O'Brien, the defendant.  That's not something that was known until the defendants' deposition was taken of April Clark.

We've conformed to the evidence.

THE COURT:  So let me accept those premises as complete and accurate.  If I allow the amendments -- allow the amended complaint, are you prepared to reopen discovery as the defendants have -- have requested?

MR. RIZZO:  I'm prepared to reopen.  I would offer this, as I have:  I'd let them, if they choose to depose Spicer and McCool.  That's their call.

Contrary to Mr. -- what Mr. Edelson said, they have all of the case notes.  They have all of the emails.  All the parties have these materials now about the Spicer-McCool home.

Who else they would subpoena?  I -- I have no idea.  I

wouldn't necessarily be opposed to that.  They just haven't told Your Honor or counsel.

We also agreed to allow them to supplement their -- their apparent expert.

THE COURT:  So there is -- there is a general objection to reopening discovery on your part.  You want to go ahead and amend.

And, frankly, it doesn't sound to me like there's a -- a general objection to amend.  You just want discovery to be able to do so, which all just simply perturbs my directive, which is to keep the trial date in play, which now makes me annoyed with everybody because you're not letting me get my way.

But well-played, both of you -- or all of you.

MR. EDELSON:  Your Honor, let me just take issue with something Mr. Rizzo said because I -- I just -- he accused me of saying we don't have the case notes.  That's just -- he knows that that's not true, and he knows that's not what I said.

THE COURT:  Mr. Edelson, I'm moving beyond this. I'm looking for a --

MR. EDELSON:  I know you are, but I just didn't want to let it go because this happens to --

THE COURT:  Well, let me -- let me also -- let's step back a little bit and make sure that everyone

understands a couple of things.  The one thing that probably turns me off the most from any substantive argument is the ever so subtle, and sometimes not so subtle, barbs thrown at each other in argument.

You know, I get that there are things I will never see about what happens behind -- or -- or in conference calls or email correspondence or anything else -- in-person meetings between all of you, but when it -- when it -- when it leaks into briefs and letters describing each other's behavior, I'm not impressed.  And, frankly, it's an incredible distraction from being able to focus on all of your very capable abilities and to simply just focus on litigating the case.

So if you -- a practice tip in front of me:  Keep it off your paper because it'll only end up making me think that you're just trying -- you're trying to distract me from the substance of your argument.

And somebody used the word abnegation; is that correct?

MR. RIZZO:  That's correct, Your Honor.  That was a Markowitz attorney.

THE COURT:  That was Mr. Wilson?

MR. RIZZO:  Yes.

THE COURT:  Describing Mr. Levi, if I'm not mistaken?

MR. RIZZO:  And Ms. Conley's apparent misconduct,

yes.

THE COURT:  I have to look it up.  It's not a very nice word.  I'm not impressed.  I'm -- I'll tell you all right now, everybody, all the attorneys in this case, have thrown barbs.  I'm watching.  I'm paying attention.  It's leaving a memory and a mark in my mind about what that means, in terms of the quality of your arguments.

Don't bring it into my courtroom.  Don't bring it into argument on Zoom.  It -- I try to let it roll right off my back, but I'll tell you, if you keep bringing it to my attention, I won't forget it.

We're going to take a recess.

Let's take -- we really need a lengthy enough one for me to get back up to chambers.  Fifteen minutes.  It will get us to 1:30.

1:30 we'll get back.  I really have until probably 3:00 to work through as many of the issues as we can; so I'm going to ask everybody to -- to work through things as efficiently as we can in making your arguments in your case.

Thank you, Counsel.  I'm going to go off video and audio mute.  Please do the same.

I'll see you back at 1:30.

(Recess taken.)

THE COURT:  All right.  Counsel, the motion to amend is allowed, and defense will have an opportunity to

develop a discovery plan to address their concerns about making sure discovery is complete enough to be able to defend against these additional allegations.

This raises an issue with respect to timing. I want to let you all know that that plan for discovery needs to be conferred on and the timeline in which discovery is to be completed is before expert discovery is closed.

So you're going to get what you asked for, and now you're going to have to probably open up the throttle or find some additional reserves to keep things moving, because my principle about keeping this case on track for trying in February can and will remain on track.

If I -- if I conclude that the plaintiff -- the Levi plaintiffs are in some way not cooperating with getting discovery underway, then I will consider a motion to strike the allegations that have been included in the amendment.

If I find that the defendants are not make -- not making decisions consistent with efficient completion of discovery, I'll close discovery, and they will get what they have and nothing more to defend the case.

I want to make sure that this doesn't become another hammer that anybody wields against the other for any other reason but to simply get what you need to prosecute your case and to defend it.

All right. Any questions about the scope of what I

just ordered?

Mr. Edelson?

MR. EDELSON:  Your Honor, inasmuch as the new allegations are all about what -- how J.C. was impacted and what happened to J.C. in the Spicer-McCool home, I want to get clarification about whether that plan that you're asking us to do would include allowing us to do the deposition of J.C.

THE COURT:  No.  Unless my earlier ruling with respect to the plaintiffs calling her as a witness is triggered.

MR. EDELSON:  But just to be clear, then, we don't -- we will not be able to get discovery from her on the new allegations in any form?

THE COURT:  Mr. Edelson, I just answered your question.  Don't ask me again.

MR. EDELSON:  Okay.  I just -- I just want to make sure that it's abundantly clear to me.  So I apologize.  I don't mean to be impertinent.

THE COURT:  This raises the issue of the plaintiffs' motion to consolidate.  ECF 176.  It appeared to me that the motion to consolidate would only be relevant if I granted the motion to amend to include these additional allegations.

Remind me whose motion is it?  Conley's or Levi's?

MS. SKJELSET:  We both filed, Your Honor.

THE COURT:  Why do you want to consolidate? What's the benefit of doing that, in light of now probably needing -- there are some differences in the expert discovery deadlines.  What else is there that needs to be consolidated?

MS. SKJELSET:  Your Honor, as drafted, it was simply regarding specific motions, specific discovery that was ordered by the Court.

For instance, the Conley plaintiffs are moving with regard to the scope of the privilege, and in the case for evidence, that impacts both matters.

Because we were not party to Conley's motion, we could not submit a joinder in that case.  It's just simply so the rulings that apply to those motions that apply to discovery in both cases will -- will apply to both cases, and if -- and the discovery that flows from those as well.

THE COURT:  All right.

MS. SKJELSET:  I thought it was simply -- I thought it was a very simple administrative consolidation for no other --

THE COURT:  Let me ask defense counsel.

Why are you opposed to consolidating for discovery purposes at this stage, given where we are today with the decisions that I have also made up to this point?

MR. EDELSON:  Well, at this point, given where we are right now, I think the only real concern we would have is the expert disclosures.

As I mentioned in my earlier argument, it's going to be impossible for us to do a complete expert report.

THE COURT:  Remind me when the Conley disclosures are due.  I think it was a few weeks after the Levi, but do you have the exact date?

MR. EDELSON:  I don't have the exact date, but maybe Hannah knows it or Lauren knows it.

MS. KORBEL:  Your Honor, if I may?

THE COURT:  Yes.

MS. KORBEL:  It's Marissa Korbel from Allegiant. We were going to bring this up if there was time, but we had originally asked for an extension on the expert date because of a conflict that our expert had, and we mistakenly asked the Court for October 4th, and what we should have said, because we were told it was a 30-day extension, which would be October 9th.

So I was going to ask the Court if we could have our deadline be October 9th.  It's for the expert's schedule. It isn't --

THE COURT:  All right.  So you're asking for October 9th as the disclosures -- expert disclosures?

MS. KORBEL:  Correct.

THE COURT: And when is Levi's currently due?

MS. KORBEL: September 9th.

MR. EDELSON: Monday.

THE COURT: And I know there was an issue about the timing of disclosures so as to -- I mean, with the potential of exposing certain opinions and thoughts at different times relating to similar issues. So all right.

Frankly, it would make sense at this -- at this stage to consolidate the deadlines for expert disclosures as well, unless there's -- does somebody foresee a problem, an unworkable problem, other than your schedules and the amount of time you're needing to put into the case?

October 9th?

All right. I'm --

MR. EDELSON: I think that solves the problem I raised, yeah.

THE COURT: So October 9th will be expert disclosures.

Remind me when rebuttal reports and -- and all -- all expert discovery was to be closed in the Conley case.

Ms. Korbel, you're the point person, seeing as how you have all the answers; so don't let me down now.

You're letting me down now.

MS. KORBEL: I can get you that date, Your Honor. It's just going to take me one minute. I'm so sorry.

THE COURT:  That's all right.  That's all right.

And as Ms. Korbel is searching for the answers, I'll confirm plaintiffs' motion to consolidate is allowed, and we're going to revise the dates for the Levi expert disclosures and expert discovery to be the same as that for the Conley -- if -- as that in the Conley case.

MS. HOFFMAN:  Your Honor, this is Ms. Hoffman.  I think that expert discovery in Conley closes on November 4th, although I wonder if it should now be November 9th, in light of that adjustment.

UNIDENTIFIED SPEAKER:  I think that would make sense.

THE COURT:  All right.  Hearing no objections, that sounds perfect.  So November 9th.  And that also means that'll be the close of all additional fact discovery with respect to the amended complaint.

All right.  And that goes -- and that's going to be consistent with both -- well, is there any other discovery left to be done in the Conley case other than experts?

UNIDENTIFIED SPEAKER:  Yes.  We are still waiting on O'Brien, and then we have this other issue that is going to be discussed about O'Brien's personal cell phone.

THE COURT:  So the whole Lighthouse issue?

UNIDENTIFIED SPEAKER:  Yeah.

THE COURT:  But in terms of any other -- other

than those disputes, there isn't anything else, in terms of ongoing scheduled depositions, of any of the witnesses?

All right.  Okay.

MR. EDELSON:  Your Honor, we haven't decided, but we may bring a motion to your attention from yesterday's deposition.  We just haven't made a decision on it yet, but we'll make that pretty quick.

THE COURT:  Remind me again.  It was Ms. Smith's deposition?

MR. EDELSON:  It was Ms. Smith, the attorney representing J.C.

THE COURT:  All right.  So it's a motion for what? To compel?

MR. EDELSON:  Yeah, it would be.  It would be a motion to compel based on objections and instructions not to answer certain questions on the grounds of privilege and/or work product; and, as I said, we haven't done a full analysis of it, and it's -- there's some -- it's complicated, and I don't want to just throw it out there now and just spitball it with you because --

THE COURT:  Yeah.  I think you all need to confer, if you haven't already.

MR. EDELSON:  Absolutely.

THE COURT:  And then we'll need to take it up. We do have our other conference on October 18th.  I

don't know if that -- that will probably push it out too far because now discovery will be closed November 9th.

So we may need to figure out how to make that work.

MR. EDELSON:  Well, we will confer and then, if we have an issue, we will send you a letter, and you can decide if you want to hear from us or make a decision.

THE COURT:  I can give you that answer right now, Mr. Edelson.

MR. EDELSON:  Didn't mean "want" in the --

THE COURT:  All right.  All right.  Good.  All right.  So at least plaintiffs are on notice that there's going to be a conferring call from defense.

MR. EDELSON:  Potentially.

UNIDENTIFIED SPEAKER:  On that beat, I do have another issue along those same lines.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  If this is a good time?

THE COURT:  I don't know if it is, but I'm a curious cat that tends to get --

UNIDENTIFIED SPEAKER:  I know.  Sorry.  Well, Mr. Edelson, you know, brought it up.  I wasn't there at the deposition yesterday; so -- but I heard about it.

But we've also recently received a response from the defendants to our request for production.  That was all within the discovery -- earlier discovery cutoff, and that

is something that we have already conferred on, and it's involving this issue from Ms. O'Brien.  Another one.  Not just the Lighthouse one, but about a Speak App -- a SpeakWrite App that she used on her phone.

THE COURT:  Yeah.  I noted that that was something raised in -- in one of -- one of your lists of issues.

UNIDENTIFIED SPEAKER:  Yes.

So I don't know if it's a good time to --

THE COURT:  Well, yeah, since I saw -- I do have it on the list of things to try to tackle.  Let's work through a couple of these other matters, and we'll get to that or find another time next week for us to talk.

UNIDENTIFIED SPEAKER:  Okay.

THE COURT:  All right.  I do want to return to the granting of the motion to amend and allowing additional discovery.  I want a plan -- I want you to -- it looks -- am I on mute right now?

No?

Okay.  It indicates that I'm mute on the video screen, but if you can hear me, that's fine.

I'm going to ask that you all confer by -- before next Friday on the discovery plan for addressing the -- the issues raised in the -- in the amended complaint.

And we may actually schedule something for next week to try to hammer this down.

Let's take a look at this.

1:00 p.m., Friday the 13th.  I should actually do 1:13 p.m., Friday the 13th.  Because in 24-hour time it would be 13:13:13.  Sorry.  Because when we start -- when I say we're going to start at 1:00 p.m. on Friday the 13th, we're going to start at 1:13 anyway.

All right.  So we're going to address the following: The plan for discovery -- I'm going to keep it tight.  We're going to finish everything by November 9th, and we're going to keep moving on dispositive motions due November 27th.

And then, if there are some additional discovery issues regarding the RFPs, maybe we'll need to take up some of these other matters next week, given -- given the amount of time that we have left here today.

All right.  I received no objections to November -- excuse me -- next Friday.  Good.  1:00 p.m.

I believe I have 8 and 9 and -- Number 2, 8, and 9 on your list.

Ms. Hoffman?

MS. HOFFMAN:  That's right, Your Honor.

THE COURT:  Or Ms. Blaesing?  I'm sorry.

MS. HOFFMAN:  It is Ms. Blaesing's letter, but it's my hearing issue.  We're sharing it.

THE COURT:  Got it.

MS. HOFFMAN:  Yes.  And I -- I wanted to

(indiscernible) for You Honor, we're happy to push some issues to next Friday, but we would -- we would like to address the RFP issue that Ms. Richardson raised during this hearing, if that's possible.  So if there's something else that could move to next Friday, that would -- that would be our preference, if that was all right with the Court.

THE COURT:  That being -- so it's not on your list, but it's the -- it's on the -- it's the SpeakWrite App issue?

MS. HOFFMAN:  That's right, Your Honor.  If that's something that the Court was hoping to address today, we -- our preference would be to do that today.

THE COURT:  All right.  Well, how about -- actually, what I want to do is I want to package the Lighthouse issue and the SpeakWrite issue together.  See if we can try to tackle those before we finish up.

But then there's also -- the State defendants request to clarify the Court's August 29th order regarding reexamination of the withheld documents.  It appears that you want clarification about the documents.  It was my understanding that it was -- that which has been identified in the privilege log, not just the -- not just some limited subset.

MS. HOFFMAN:  So I think we -- that's right, Your Honor, and I think we were seeking clarification on two

points:  The first is the one that you've raised.

Our understanding is that Levi's motion was originally -- that sought *in camera* review related to a certain subset of documents that then Ms. Skjelset pulled 10 percent of them, which was eight, for you to have a sampling, and then if you decided there needed to be another review, we would rereview them all.

But I believe all was the disputed set of documents, not the entire privilege log, and I think that may have just gotten, you know, sort of lost in the conversations around this.

THE COURT:  So the disputed set was 80?  It included 80 documents, and --

MS. HOFFMAN:  I think that's right.

THE COURT:  -- and then the entire privilege log would have been hundreds of documents.

MS. HOFFMAN:  I think that's correct, yes.

THE COURT:  So, then, it was my error in understanding to what it was I was referring.

If it's -- if the issue was always with respect to the disputed set, then -- because I think that was also part of the conversation, which was there was a disputed set of documents.  I asked plaintiffs' counsel to identify 10 percent of them for *in camera* review, from which I would try to develop some rules for defendants to apply, and in

applying to those documents -- to -- to that large -- the larger set.

So the question is which set are we talking about?

So, Ms. Skjelset, I don't know, if I couldn't tell from your nodding or shaking of the head, what it is that you were having in mind.  Which set are we talking about?  The entire privilege log or just that which you had raised as an objection or you had raised concerns about?

MS. SKJELSET:  Well, Your Honor, we worked very -- because there were so many documents that were withheld as privileged, we worked very hard to identify the ones that fit into specific categories, such as those that appear to be just between DHS workers and did not have an attorney on them whatsoever, and then we narrowed that to 80 documents.  But the Court's order made it, I think, very clear that simply --

THE COURT:  I think I said "privilege log."

MS. SKJELSET:  Yes, Your Honor, and we understood it to apply to the privilege log.

And since we had --

THE COURT:  And if I recall the arguments that you made in describing how you came about bringing those 80 to my attention, it was that you were trying to be efficient in raising the issue with respect to eight, and then I saw your 80, rather, and reduced it to eight for my *in camera* review

to try to determine some rules.

So, yes, Ms. Hoffman, it would be the entire privilege log to which would apply the rules that I -- that I ordered.

MS. HOFFMAN:  Okay.  Thank you, Your Honor.

And the other issue that we wanted to seek clarification on has to do with the part of your -- of Your Honor's order that refers to documents that are in the OR-Kids database.  It is written to suggest that nothing in the OR-Kids database could be privileged and that -- we wanted to clarify with the Court if that's what you meant, because that isn't -- that isn't actually quite right, just as a practical matter.  Privileged material is in the OR-Kids database.  Not a lot of it, but there's notes with attorneys; emails with attorneys are sometimes put into the OR-Kids database.  And the fact of them being in the database does not make them not privileged.  They are.  It is not a public database, and it's a -- it's a very limited number of people who are able to access it.  The people who access it are the same people receiving the legal advice.

So we wanted to clarify that issue.

THE COURT:  Okay.  This is the first I understand of this being another -- a description of what is in the OR-Kids database.

So let me hear from plaintiff's counsel.

MS. SKJELSET:  Your Honor, when -- when we

inspected the OR-Kids database, I believe that we were informed that there was no concern that we would be violating privilege when we looked at the files at issue; so I'm -- I find it curious what would be in the case notes, which is what Your Honor was talking about. It was a document which was like an email that they admitted in court, prior to Your Honor's inspection, that it had been placed in the OR-Kids case notes and -- and produced in this action.

THE COURT: So I'm going to try to split some hairs here, and I think I understand, from what Ms. Hoffman is describing, is that OR-Kids is more than just the case notes, and that if there were emails that would have otherwise been privileged, but then that content was added to the case notes. That's a different situation than if other communications that would have been privileged but were added in some other sections where it remained privileged.

And I want to make sure I'm understanding what the problem is, or if I'm describing it accurately, Ms. Hoffman.

MS. HOFFMAN: I think you're close, Your Honor.

So to be clear: I want to address a concern that maybe Ms. Skjelset may be a little worried about. We're not changing our mind on Document 637. It's not privileged. We rereviewed it because of the review that you were doing in

those eight documents, and we -- we looked at it again, and while we had some reason to believe it was privileged in the first place, we just -- we've decided that it's just not privileged.

But the fact that material is in the -- even in case notes, the fact that something's in case notes doesn't make it not privileged.  Privileged legal advice is sometimes in case notes.

And I was also present for the inspection, and at the inspection, it was -- we were showing the interface to plaintiffs' counsel.  I don't believe they were reading every single case note.

That -- I think that would have taken longer than four hours for them to read the entire -- they have the -- you know, I mean, they have the case notes, but there's privileged material that we have redacted, for example, and I don't know, off the top of my head, if we withheld entire case notes, but it's possible.

The system allows for copy-pasting emails into notes in the system so that they are memorialized in one place.

THE COURT:  Can I ask you?  And what would be the clarification of my rule that would -- would conform with what you understand OR-Kids database to look like?

You know, I'm at a disadvantage when everybody gives me new information about what these things like after the fact.

So tell me -- so let's just get to the bottom line. What is it that you're asking to be clarified?  What is the clarification you're seeking?

MS. HOFFMAN:  Yes.  The clarification we're seeking, Your Honor, is that the -- the fact that material is in OR-Kids does not categorically render it not privileged, and it can still be redacted or withheld as attorney-client privilege, if appropriate.

THE COURT:  Okay.

Ms. Skjelset?

MS. SKJELSET:  I'm -- I'm struggling to understand the distinction.  Because it was my understanding that we received all of the case notes in this case and that there were not case notes that were withheld or provider notes that were withheld on grounds of privilege.

THE COURT:  So there -- there may be a need to get both of you onto the same page to talk about and define the problem in a way that you can both communicate it to me.

Trying to do that now, in the time that we have, I think, is going to be probably frustrating for everyone.

And I'd like for you to both identify with just -- just, you know, more accuracy to explain to me what the -- what the problem is because I'm having a harder time appreciating the differences and the way in which documents are being updated or cut-and-pasted into the database.

I understand what you're saying.  I think I understand what you're saying, Ms. Hoffman, sort of, in theory, that -- that there might remain privileged information that was intended to remain privileged and updated into OR-Kids, but I can also say that, when I was structuring my rule, devising the rule, it was -- I had, in my mind, I think, a similar problem before me, which was, if it was updated into OR-Kids, then it was no longer privileged; but I want to give you some leeway to help me understand how to distinguish something being waived -- a privilege being waived and a privilege not being waived.

And I don't think -- I'm wondering if that's something that we can really tackle today.

MS. HOFFMAN:  It's likely not, Your Honor.  We would like to submit a brief or a letter on this.

It's -- I could give you a short answer to that question right now, but we'd probably end up briefing it anyway; so if you don't mind, we'll just -- we'll brief it.

THE COURT:  Yeah.

MS. HOFFMAN:  I think -- I think the issue is relatively simple, and we're not suggesting that we're trying to withhold more documents or something.  It's something that we want it clarified because this has implications in other cases in litigation for ODHS.  It's not really an issue that's specific to some document in this

case.  It's just more -- we just need clarification in the order because it has broader implications for other -- for just how ODHS litigates.

That's all.

THE COURT:  All right.  Well, I'm open to hearing it, then, by next Friday, when we meet again at 1:00.

MS. HOFFMAN:  Okay.

THE COURT:  And I presume -- well, I would like, then, counsel to confer to make sure that you're on the same page so we're not -- so at least you both know what your arguments are going to be so you can present them succinctly to me.  Okay.

MS. RICHARDSON:  May I speak on this, Your Honor?

THE COURT:  Was that -- who was that?

MS. RICHARDSON:  Bonnie Richardson.

THE COURT:  Okay.  Yes.

MS. RICHARDSON:  Just because we're on this topic, I just want to make sure that Your Honor's order from August 29th applies to the Conley matter as well.

THE COURT:  I don't see why it wouldn't.  Is there a reason why it wouldn't?

MS. RICHARDSON:  No.

THE COURT:  Now that we've consolidated discovery?

Sorry.  I was looking at other people to see if defense counsel was saying otherwise.

Yes.  So, yes, that order does apply to the Conley discovery as well.

MS. RICHARDSON:  Okay.  And I might, if I could -- there might be a suggestion here.  As I listened to the arguments back and forth on this, it seems to me that there's a question as to whether or not the things on this OR-Kids is intended to be confidential, and it's going to depend on who gets to see all of it.  So perhaps a short ORCP 30(b)(6) might be in order so that we can determine exactly what it is that goes on the OR-Kids as far as privileged material.

THE COURT:  Well, then -- I'll ask counsel, then, to confer and develop that discovery plan that needs to go forward.  It may not be necessary if everybody has an understanding after talking with each other before next Friday.

We'll see what happens.

MS. RICHARDSON:  Okay.  And then I hate to be a pest, but since it also involves the privilege log, which I think was the first part of it, I don't think anyone has any issues to clear up on that, that it has to be involving the privilege log, that was provided by defense counsel on July 19th that we got -- July 19th, the first time, a privilege log.

I do want to make sure that we bring this up to the

Court, that that privilege log -- we would like to have the privilege log in an Excel format.

I'm hoping I can get that from Ms. Hoffman.

But also that the privilege log really needs to include the Bates numbers for the documents. For some reason, they have not put the Bates members on there. We have asked for the Bates numbers to be put on there, because it's impossible to track, and they haven't done it; so I think, for all of us, in order to be able to determine whether or not they're producing the documents that need to be produced, that they had previously marked as privilege, there needs to be Bates numbers put onto that privilege log.

THE COURT: Ms. Hoffman?

MS. HOFFMAN: Your Honor, of course, we will give them an Excel document. We're happy to do that and would have done that without this coming up in a hearing.

I don't think I understand the question about the Bates numbers, though, because the privilege log reflects documents that we have withheld and do not have Bates numbers because they haven't been produced. It doesn't reflect redacted documents. We've agreed that we're not logging redactions in these cases; so there are no Bates numbers for these documents. That's not information that I can provide. It doesn't exist.

THE COURT: So the position is, is that if it's --

if it's being withheld as privileged, then there are no Bates numbers attached to those documents.

MS. HOFFMAN:  Correct.

THE COURT:  Okay.

MS. HOFFMAN:  That's correct, Your Honor.  Because Bates numbers are to track production.  It's a numbering system to track produced documents.  Withheld documents don't have Bates numbers.

MS. RICHARDSON:  Okay.  That's the first time I've ever heard of that for a complex case.

And I think I also just heard -- and it's another sub issue here, is that they -- to the extent they have redacted out pieces on Bates-numbered documents, they have not put in the privilege log a reference to those redacted pieces. There's no redaction.

Like, if they redacted part of some document and produced it, they haven't put that on the privilege log.  So we don't know what the basis is for those redactions, and I think that needs to be put on the privilege log as well.

MS. HOFFMAN:  Your Honor, all redactions in this case are -- they -- they have text.  They say "attorney-client privilege," where something is redacted for attorney-client privilege, or they say "work product."

We conferred on this issue a long time ago with the Levi plaintiff and -- and agreed that the privilege log

would not include redactions.  It never has.  And the redactions on all the documents in both of these cases state the basis for the redaction.

There is no need to log them.  Everyone has this information.

MS. RICHARDSON:  I just want to clarify.  I have no personal recollection of that conferral or agreement.  It doesn't mean that it didn't happen, but I don't recall agreeing to that.

I recall the defendants stating that that's what they were going to do, but I think, from my recollection -- and I'm happy to go back into our conferrals -- I don't recall that being in agreement.

THE COURT:  How many documents were -- how many documents were produced and for which there are Bates numbers that included a redacted blocked-out portion of a document?

And, Ms. Hoffman, you might know.

MS. HOFFMAN:  Your Honor, I'll be honest.  I don't know.  There are 87,000 pages of documents in this case, and I'll confess that I wasn't personally closely involved in the privilege review in the outset when we did the bulk of the production.

It's a significant number of --

THE COURT:  I'm just looking for a solution here,

and I think I'm understanding that you -- you -- it's your that you've adequately identified the basis for the redaction in the documents that were produced and that they need not end up being included in a privilege log.

The privilege log only includes documents that have been completely withheld for a privilege of some kind.

MS. HOFFMAN:  That's correct, Your Honor.  And that information is listed in the privilege log, along with the -- most of them, the vast majority of -- all, except 12, are emails.  They include the date, the sender, the recipients, the subject line, the reason for the withholding, and a -- I think sort of a description of the basis for that determination.

The rules don't require a redaction log.  It's probably between 1,000 and 5,000 documents.  As I said, the documents indicate the reason for the redaction, and if Ms. Richardson has a question on a specific document, we're happy to confer with her about that.  I -- these redacted documents would be used in depositions.  I --

THE COURT:  I'm going to interrupt because I do want to be mindful of the time that we have remaining.

And, Ms. Richardson, I'll just ask that you confer with Ms. Hoffman to figure out if there's some other solution. I'm interested in making sure that everybody knows what they have and knows what they don't have, and then why they don't

have it.

If it's being withheld, it appears to me that, you know, between the privilege log and then the documents produced with the redaction and the basis for why it was redacted on the document itself would be enough, but talk with each other; then bring it back to me on Friday if there's a better solution rather than just letting me know what the problem is.

Because I like to -- I really -- it helps me when you tell me -- tell me -- give me an answer that I can provide as an order, once we understand what the -- what the landscape looks like.

All right.  So we'll put that on the list of things to take up next Friday.

Ms. Tshala, we're going to have to take up your argument on Friday as well.  I want to be -- I don't think -- well, we'll see how far we get into some of the other issues.  I assume, Ms. Tshala, the 502 case issue is yours?  I remember you were the one who dropped that one in our lap when we were here in person a few weeks back.

MS. TSHALA:  Yes.  (Indiscernible) will be arguing that.

THE COURT:  Well, you might have another week to decide who -- rock, paper, scissors -- usually it's a good way to make decisions about who's responsible for something.

So, Ms. Hoffman, I don't think there's anything else, other than the Lighthouse matter on your list.

MS. HOFFMAN:  That's correct, Your Honor.  Just the Lighthouse issue that we were going to combine with the SpeakWrite issue, and then the 502 question.

THE COURT:  All right.  And on the -- on plaintiffs' list, the two things I have remaining are the motion to -- it's the SpeakWrite issue and then status report regarding deposition of Attorney Patricia Gonzalez.

Are there any other issues that we've identified earlier today or that I'm missing on this list that we need to take up?

And who's the point person that I should be looking at on my screen when I ask that question of the plaintiffs?

No one wants to volunteer?

MS. SKJELSET:  Your Honor, I can speak to the deposition of Patricia Gonzalez, but I have no additional news for the Court on behalf of Plaintiff Levi.

THE COURT:  Hearing no one else raising any issues or reminding me that we were supposed to take something else up, then let's -- we'll then end, more likely, depending on how much time we have remaining, with the Gonzalez report -- status report and the SpeakWrite and Lighthouse matters, and then we'll defer the 502 matter to next Friday, along with the discovery plan for completing all remaining discovery in

light of the motion to amend, and any other issues associated with OR-Kids and the -- the privilege -- privilege matters in the OR-Kids database, and then also a privilege log versus -- and as well as redacted produced documents -- produced documents with redactions.

And then whatever else anyone can concoct between now and next Friday to take up with us to resolve.  All right?  I think we've got that all covered now.

All right.  So deposition of Patricia Gonzalez, Ms. Skjelset.

MS. SKJELSET:  Your Honor, that was merely a status report that was requested by the Court.  Because AAG Gonzalez was an attorney, the scope of waiver and decisions regarding waiver and whether there are previously withheld communications, in which she is copied, that might be produced in response to the defendants' additional review of those documents really need to precede any deposition.

But we can further confer with defendants about that, and I know that they have -- and perhaps we won't need to depose her in the end.

THE COURT:  So it's sort of -- I appreciate the status report, but the status is we still don't have an answer about what we're doing with -- with Attorney Gonzalez's deposition.

MS. SKJELSET:  I don't think I could appropriately

prepare for her deposition until I have all of the discovery that I know is coming with regard to documents that she was part of. I think it would be imprudent for me to proceed with a deposition without that.

THE COURT: When will you get -- when is that discovery coming? Are we still -- or are we still in the process of deciding -- am I still in the process of needing to make some decisions in order for you to get it, or is it -- is it in progress and getting to you without my involvement?

MS. SKJELSET: That's an excellent question. There's one condition precedent, which is the defendants' review of their privilege log, which they could not give me -- and subsequent production that would come as a result of that, and they could not give me a timeframe for when they anticipated those documents to be produced.

And the other is a decision regarding the scope of waiver, which is Ms. Tshala's issue that Ms. Richardson will be arguing.

THE COURT: All right.

MS. SKJELSET: And I think those are both before the Court, but I think both plaintiffs understand that those are documents that would be -- and issues that would need to be resolved in advance of a potential deposition because those issues determine the scope of the deposition.

THE COURT: Okay. Anyone from defense counsel want to add additional information?

MS. HOFFMAN: Your Honor, I don't have much to add beyond what I said regarding this deposition at our last hearing. I think we probably need at least a month to rereview the entire privilege log. It will take a certain amount of time; so I think that issue is probably not imminent.

THE COURT: Okay. And you don't foresee an issue with scheduling Ms. Gonzalez for a deposition if it -- if it goes forward within the time required to complete discovery?

MS. HOFFMAN: It depends on whether we oppose the deposition. We may take up some time, if it's noticed. I mean, our position is (indiscernible) need to be deposed. So (indiscernible) once --

THE COURT: Your audio was cutting out a bit. I didn't catch everything you said.

Try it again.

MS. HOFFMAN: I apologize.

Our position throughout this case has been that we oppose the deposition of Ms. Gonzalez, and we will likely oppose it when it's noticed, whenever that happens; so I don't know how long it will take to resolve our motion in -- in opposition. We'll have to cross that bridge when we come to it.

But if the Court orders her deposition, we will schedule her promptly.

THE COURT:  Well, how do we -- how do we get to the point of making -- having that question put to me about whether to order her deposition?

MS. HOFFMAN:  Well, right now it sounds like the plaintiff hasn't decided whether the plaintiff is going to depose Ms. Gonzalez, and so at the time that the plaintiff makes that decision, we will likely move for a protective order, and we -- they will be in front of the Court at that time, but it's premature right now.  We don't know whether it will happen.

We also don't really know what it is plaintiff intends to depose her about, because I think plaintiff doesn't know right now, and we've -- so I just -- I don't think that's before the Court right now and (indiscernible).

THE COURT:  And then without -- also, without all the discovery, then it's going to be difficult for the plaintiffs to make that decision.  And the --

MS. HOFFMAN:  Right.

THE COURT:  -- discovery is in the defendants' hands; so --

MS. HOFFMAN:  Okay.

THE COURT:  We're going to work on a more accelerated review of the privilege log than one month.

So by next week, I'm going to give you all a deadline about when it will need to be completed.  So everybody can make sure that discovery -- if I'm going to order the deposition of Attorney Gonzalez, it gets done well in advance, because it will be done by November 9th, if I'm ordering it, and so everyone has an opportunity to get ready for dispositive motions.  Okay?

All right.

UNIDENTIFIED SPEAKER:  Can I just --

THE COURT:  So if there's some additional information that needs to be taken up for next week, we can; otherwise, I'm not sure there's much more to argue or discuss on the matter.  Otherwise, just make sure that --

I know, Ms. Hoffman, you mentioned you think you need 30 days to finish up the privilege log review based on the rules; but, you know, I mean -- I appreciate that you also were seeking clarification pending that order, but you've had my decision.  Things could have been underway.  So I'm going to expect that it be done far quicker than 30 days.

MS. SKJELSET:  If I may, Your Honor, just to correct the record, we -- we did -- actually, both plaintiffs noticed Ms. Gonzalez, Attorney Gonzalez, for a deposition.  Our cross-notice was on June 6th of 2024, but we agreed to reserve her pending the outcome of these issues.

So I just want to correct the record. She has been noticed.

MS. HOFFMAN: Your Honor, we -- we conferred after those notices, and plaintiff agreed not to call her. We were conferring on several depositions.

I'm going to be honest. I can't remember every issue we were talking about in that conferral, but we've reached a compromise, I think, about an extension of time that we wanted, and part of the compromise was that plaintiff has agreed not to call a couple of witnesses. Ms. Gonzalez was one of them. We understood that they may notice her again at some point, if it becomes necessary.

Our understanding has been that they have withdrawn those notices, and we have agreed and continue to agree and maintain that we are not calling Ms. Gonzalez as a witness at trial, and we stand by that. We're not going to call her.

THE COURT: Ms. Skjelset, I know you are telling me that you haven't made a decision about whether to call her as a witness or whether you want to depose her and you're waiting on this discovery. I think we need to move on a decision.

Because if you're going to be asking me at -- at the last minute to make a decision about whether to order her deposition, you're going to be asking me too late, and then

we're moving.

So I don't know what else you might need from that discovery to be able to argue for her deposition. I can appreciate that it would be helpful to have more information, but I -- again, everybody has been in this for a while now. I mean, I think there ought to be some -- some -- you know, some silhouette of evidence that you are going to cite to me about why Ms. Gonzalez is relevant and appropriate for me to order her deposition.

MS. SKJELSET: Your Honor, I have -- I would have plenty to talk to her about now, but I wanted to ensure that our record was complete.

I think that --

THE COURT: I appreciate that, but I also think it's going to take time to get my decision to all of you, and so if you wait until you have everything ready to go, I might not be available to make that decision as quickly as you'd like.

MS. SKJELSET: Your Honor, I appreciate that. And to honor it, what I might suggest is that we first confer, because there are two competing attorneys here, and perhaps -- the attorney for the child and the attorney for the State -- we confer, defendants and plaintiffs, as to maybe whether or not we could reach a compromise.

And if we cannot, then perhaps we write a letter to the

Court.  We do letter briefing.  I would be happy to do it by next Friday of the -- the significance of and need to depose her.

THE COURT:  Next Friday on the agenda.

It does help if you actually send me these letters not at 7:00 p.m. the night before.

So if you can get it sooner, I'd like to be able to read them and digest the information.  At least give me 24 hours.

All right.  I think it's Lighthouse and SpeakWrite.

Let's take up Lighthouse first.

Well -- and I also want to -- I am -- we haven't actually addressed Mr. Hammond, because Mr. Campbell is not present and participating, but we will need to --

Ms. Davies, can you please make sure that Mr. Campbell is noticed for next Friday so that way we can make sure that he has an opportunity to be heard on -- on Mr. Hammond's position regarding -- I suppose it will be -- it will be moot, depending on how I -- how I address the issue with respect to Lighthouse and another third-party vendor.

But let's --

THE LAW CLERK:  Your Honor, he -- I forgot to mention.  He wrote back and said his letter is what he'd like to submit, and that's fine.

THE COURT:  His letter is sufficient?

THE LAW CLERK:  Yeah.

THE COURT:  So I'm hearing from my law clerk that Mr. Campbell has submitted some correspondence.

Do you know what date that was?  Was that today or yesterday?

THE LAW CLERK:  No.  You've already -- it's in your letters that were submitted to you.  So it's the letter from Mr. Campbell.  August 23rd.

THE COURT:  Do you know which number in the binder it is?

THE LAW CLERK:  It would be in that second.

THE COURT:  I did read the letter.  So he just recently said he stands on the letter.

THE LAW CLERK:  Yes.

THE COURT:  Got it.  All right.  So maybe we can address that as well.

All right.  So what are the issues?  I mean, from what I understand and what I recall from the -- our last meeting, Lighthouse was the vendor, the -- the vendor that contracted with the State to do these forensic analyses, digital devices, that the entire contents of each of the phones was downloaded, and I -- I don't know if our forensic analyses have been completed or initiated because of some of the ongoing disputes.

And I further understand that -- I think the issue

may -- initially, the issue was whether Lighthouse was able to do an analysis of deleted data to identify where the data was deleted.  Then I think that the additional issue relayed -- related -- involved communications between defense counsel and Lighthouse regarding, I assume, with instructions to Lighthouse about how to conduct its analysis, and defense counsel has raised the issue of work product or work product doctrine.

Is that a fair summary?  However, potentially inaccurate in some of the details?

MS. TSHALA:  Yes.

THE COURT:  Ms. Tshala, are you the point person on this one?

MS. TSHALA:  Yes, I am.

THE COURT:  So why isn't Lighthouse sufficient to do the analysis?

MS. TSHALA:  Yes.  So --

THE COURT:  I'm going to address -- let's address them separately.  One, the communications to Lighthouse; and then, two, the analysis by Lighthouse.

MS. TSHALA:  Yes.

THE COURT:  Ms. Tshala, one more thing.

Keeping in mind, I get that there was some issues about whether there was conferral or not conferral.  I'm not interested in that, unless you're going to tell me that

substantively affects what Lighthouse is going to be doing, in terms of its analysis.

So go ahead.

MS. TSHALA:  Okay.  Thanks, Your Honor.

So, yes, there was no conferral prior to the phones being sent to Lighthouse.

As plaintiffs, we still do not know what Lighthouse capabilities are for deletion of text messages.  We received a letter that defendants included to you, Your Honor, about what Lighthouse can do, but we don't know exactly what that means, what Lighthouse was instructed to do, how the phones were collected.

There was a mention earlier in the process that a remote --

THE COURT:  Would a declaration from somebody with knowledge, providing a detailed explanation for what and how it was that Lighthouse is going to be conducting this analysis, satisfy those concerns?

MS. TSHALA:  Yes.  But I also think that we need to be able to talk to Lighthouse about -- and ask questions about the declaration.  We want to be able to make sure that, if there are any issues in the process, what occurred; and if maybe Streamline might be the better vendor here based on their capabilities, what software they have.

We just haven't been able to talk to Lighthouse about

what they can do about these specific phones.

When I attempted to do so, defendants claimed work product.  I emailed defendants and Lighthouse in the same email.  No one responded to me.

So we've essentially been left in the dark.  We don't know what Lighthouse has been told to do, what they're going to do, when they're going to do it, or how they're going to do it.

And so if we want a neutral third-party vendor that both parties are -- all parties can communicate with about the phone search, I think either, A, we should be able to talk to Lighthouse about what they were (indiscernible) --

THE COURT:  Okay.

MS. TSHALA:  -- prior to (indiscernible); or, B, we should include -- use Streamline, which all parties can engage with and ask questions and be part of the process for these specific phones.  I'm not asking about anything else besides just the forensic analyses of these three phones.

THE COURT:  All right.  Is this Ms. Blaesing's or Ms. Hoffman's.

MS. HOFFMAN:  Hoffman, Your Honor.

THE COURT:  All right.

MS. HOFFMAN:  Actually, Ms. Tshala and I, I think, are in agreement here.  We are happy to allow plaintiffs to talk to Lighthouse.  We have offered to arrange a call, a

meeting.  They can ask Lighthouse every question that she just listed and receive candid answers, or we're happy to prepare a declaration and allow them to ask Lighthouse follow-up questions, whatever they'd like.

They are more than welcome to communicate with Lighthouse.

We've also explained to plaintiff that Lighthouse is capable of doing the deletions and provided that information about what the process has been so far.

The only real disconnect here is that I think plaintiff had hoped to obtain our emails with Lighthouse and has (indiscernible) about that.

Our position is that our emails with our vendor, that we have a contract with, was emails and (indiscernible) work product.  We're more than happy to arrange a conversation like the one that Ms. Tshala is describing, and we could probably set that up for -- for next week.

We don't offer that (indiscernible).  I think it's very fair.  This is -- and this -- Your Honor, I will say this is the vendor we have used (indiscernible) --

THE COURT:  Your audio cut out, Ms. Hoffman.

MS. HOFFMAN:  I apologize.

This is the same vendor we have used for all of the discovery in this case.  They have done an excellent job so far.  We are reluctant to change vendors, and I don't think

there's any need to do so.

As I said, we're more than happy to allow plaintiff to talk to Lighthouse.

THE COURT:  And how quickly is the analysis going to be completed?

MS. HOFFMAN:  So my understanding is that the search of the phones will take between two or three weeks, and I think we are about a week and a half in.  So it will be another half week to a week and a half.

THE COURT:  So they have initiated the analysis?

MS. HOFFMAN:  They have.

Our understanding was Your Honor wanted this to move forward quickly; so they have --

THE COURT:  Yeah.  I'd much rather have it -- started it up than wait because we've got November 9th as an important date on all of our calendars.

Okay.  Ms. Tshala, so the offer of being able to talk to Lighthouse and get all your questions answered?

MS. TSHALA:  Yes, Your Honor.  I wasn't actually on the conferral call.  Ms. Korbel was.  But I do want to make a point that, if we are allowed to talk to Lighthouse, then we can ask any -- we can ask about communications prior to how they were asked to search the phones.

I don't want defendants to claim work product, if we're asking these questions on the phone, because then that

doesn't help us see what they were asked to do or what they're going to do in the future.

We still need that transparency.

THE COURT: Well, I think you're entitled to know what they were instructed to -- what kind of analysis they were instructed to conduct. I mean, that's sort of the basis for them doing something.

So, Ms. Hoffman, is it -- is the -- the opposition just simply disclose -- providing the email communication? They're going to have to understand why Lighthouse is doing what they are doing as opposed to some random -- random search because they got a bunch of data.

MS. HOFFMAN: Yes, Your Honor. That's what we discussed on the conferral call. Ms. Tshala is correct. She wasn't there.

Our objection is to producing the emails. They're more than welcome to ask about instructions Lighthouse received. We are not going to make objections to that. It's -- that's perfectly fine.

THE COURT: Ms. Tshala, does that resolve the concern?

MS. TSHALA: Yes. Yes, Your Honor.

THE COURT: All right.

So plaintiffs are entitled to ask why they're doing what they're doing and what they're -- what Lighthouse's

instructions were in conducting whatever the analysis is that they're conducting, what the scope of that analysis is, and also what their capabilities are.

They -- at this point they're -- there is no order requiring defendants to produce emails or for Lighthouse to produce emails of communications between defense counsel and Lighthouse.

You know, if some issue comes up with respect to a huge question mark about the efficacy of the search, then we can take that matter up, if -- if that were to come about.

MS. TSHALA:  Thank you.

THE COURT:  All right.  You're welcome.

Now SpeakWrite.

MR. RIZZO:  Judge, this is --

THE COURT:  Mr. Rizzo.

MR. RIZZO:  May I?

THE COURT:  Yes.

MR. RIZZO:  I had a related issue that I raised via email with Ms. Blaesing, and the email was drafted in response to an indication that there was some delay in the collection and/or -- now that I understand -- Lighthouse's ability to obtain Mr. Hammond's phone.

In the midst of that, Mr. Campbell appeared as an attorney for Mr. Hammond, and so I raised a question about what I -- what I had framed as a chain of custody for

Mr. Hammond's phone, and I limited it to that.

And what we don't know, Judge, is whether -- we don't know that -- we don't know the chain of custody of that particular device, in terms of whether -- for example, it has been already deconstructed and/or examined prior to its being forwarded to Lighthouse.

And I just sought that clarification. Ms. Blaesing referenced the issue correctly in her email indicating that my request for a chain of custody resembled a -- sort of a criminal matter. And, obviously, there are chains of custody there. But, I think, with this particular phone, it would be helpful for the parties to understand the chain of custody of Mr. Hammond's phone.

THE COURT: So I understand that that data has been downloaded from Mr. Hammond's phone and that it is part of the analysis that Lighthouse is now conducting.

Is that right, Ms. Hoffman?

MS. HOFFMAN: That is correct, Your Honor.

And, to the best of my knowledge, the phone has been in Mr. Hammond's possession the entire time.

I believe what we've done -- what we've done is have people meet with the vendor. The vendor downloads the phone. I don't -- we haven't -- the attorneys, to my knowledge, have not been in possession of anyone's phones. We haven't been mailing phones to anyone.

So the chain of custody, I -- I think, has just been Mr. Hammond and one or maybe two interactions with Lighthouse, but in person.

MR. RIZZO: So if we could get a statement on that, I -- a declaration or some confirmation of that process, Your Honor, how it went from Point A to Point B to Lighthouse, I think that's important and relevant to us.

THE COURT: I'm going to allow it. And so -- and it doesn't sound to me like a terribly complicated declaration.

I know it's one of a million things that all of you are going to be doing between now and next Friday. So is there any -- is there -- are there any objections to getting the declaration to Mr. Rizzo as requested?

MS. HOFFMAN: No, Your Honor.

Although if -- if Mr. Rizzo or one of the plaintiffs wants to ask Lighthouse about this in the call we're setting up, that would also be acceptable and probably faster for everyone, but either way, we don't have an objection.

THE COURT: Mr. Rizzo?

MS. BLAESING: Your Honor, this is Ms. Blaesing, also for State defendants.

I just want to raise, though, that Mr. Hammond is represented by Mr. Campbell, particularly regarding this issue, and he wrote the Court on it; so I don't think the

State defendants can represent what Mr. Hammond's position is on this and his -- whether he has any objection to submitting -- I'm not sure if the Court is wanting a declaration from Lighthouse or from Mr. Hammond?  And Mr. Hammond's counsel may want to be heard on this.

THE COURT:  Thank you for that.

So just a bit ago, probably 10 or 15 minutes ago, some information was relayed to me from my clerk indicating that Mr. Campbell notified the Court saying that he was -- he was just relying on the letter that he sent August 23, 2024, and that was -- and that's what he had to say.

So, with that in mind, I don't know and I don't believe anybody here is asking that -- that Mr. Hammond provide information, but that it be asked of Lighthouse.

Mr. Rizzo?

MR. RIZZO:  I think that's -- that's important, but Lighthouse may not know, may not be aware of the history of that phone -- how it got from Mr. Hammond and/or the data on that phone, got from him or that phone to Lighthouse.

So there's a gap at this point that only Mr. Hammond and potentially and/or his counsel, if his counsel was, in fact, involved in the chain of custody, can provide to us.

So, yes, it's helpful.

THE COURT:  Then I'll ask that you confer with Mr. Campbell, and he's noticed on the meeting for next

Friday, and he'll have an opportunity to present Mr. Hammond's position on the matter, if he objects, or provide any additional information to you if he doesn't, and then you can determine how that matter -- how -- what format that -- that information might be of most help to you.

MR. RIZZO:  Thank you, Judge.

THE COURT:  We still haven't done SpeakWrite. Okay.  Whose case -- whose issue is that?  Ms. Richardson?

MS. RICHARDSON:  Me, yes.

THE COURT:  All right.

MS. RICHARDSON:  Okay.  Do you want me to go?

THE COURT:  Yes, please.

MS. RICHARDSON:  I'll try to be brief.  All right. So --

THE COURT:  As the renowned teacher, Yoda, once said, "There is no try.  Only do.  So be brief." And I didn't do him justice, but I think the message is just, "Let's be brief."  Come on.

MS. RICHARDSON:  Be brief, I will. Okay.  So Ms. O'Brien's deposition was taken.  At the deposition, we found out that she had an app called SpeakWrite.  We also found out that she had saved documents or notes on an "H" drive and "I" drive.  Hope I'm saying that right.

THE COURT:  Say that?  A what drive?

MS. RICHARDSON:  "H" drive on her computer and an "I" drive her computer.

THE COURT:  I mean, I don't know anything about them, but they sound, to me, like network drives on a -- on a network computer.

MS. RICHARDSON:  Yes.  Yes.

THE COURT:  Okay.

MS. RICHARDSON:  Exactly.  So -- and so the SpeakWrite App was something that she would talk into her phone on SpeakWrite, and then it would send it to her in note form, and then she would cut and paste it and put it in somewhere.

So what we did was we asked, after the deposition, "Please provide us with the account number -- a document that has the account number for that SpeakWrite."  Because we need to subpoena the SpeakWrite to get at her SpeakWrite notes.

And we were asked to put that into a formal request for production, which we did, and we also asked to inspect -- we just want to inspect the "H" drive and "I" drive to make sure that those drives contain all of the files that we think should have been produced.  There wasn't anything else in there.

Those are the two things that I'm noting, that we asked

for before discovery was closed.  And then on the last day or very close to the last day of discovery, we just found out that defendants will not provide us with the account number for SpeakWrite, and they will not give us access to those drives.

So I would like to bring it up with Your Honor because I would rather not file a motion to compel.

THE COURT:  All right.  Thank you.

Who -- Ms. Hoffman?

MS. HOFFMAN:  Yes.  Yes, Your Honor.

Well, on the issue of SpeakWrite, what Ms. O'Brien testified is that she uses this dictation service.  At the time of the events in this case, it was a service where she would call a phone number and dictate her notes, and she would receive an email with those notes.

Later, after the time period at issue here, it -- the service eventually became an app, which she now uses an app.

We have produced all of -- we have produced emails with those SpeakWrite attachments.  We have produced all of the ones that are responsive to this case.  If those don't have her account number on them, then we don't have a document that does.

We -- what I have told Ms. Richardson is that contacting the app -- whatever the app currently has is not discoverable in this case.  It post-dates the time period at

issue.  As Ms. O'Brien explained, the email attachment model was how SpeakWrite worked during this case, and we've produced those documents because they were in her work emails.  So we don't have anything else to produce.

And as I said, we don't have her account number beyond the documents we produced.  And if it's on there, then Ms. Richardson also has it.

And, you know, if she -- if she -- if the (indiscernible) would like to pursue the SpeakWrite App, we can issue a subpoena to it, but we would oppose that subpoena because any -- any notes that Ms. O'Brien has through SpeakWrite would relate to children and families she works with who are not involved in this case and have their own confidentiality and privacy concerns.

So I think -- honestly, I just think we have nothing else to produce as far as SpeakWrite, and I -- I don't think there's anything to compel us to give.

THE COURT:  Okay.

MS. RICHARDSON:  If I can briefly follow up?

THE COURT:  Yes.  Yes.

MS. RICHARDSON:  I think what it is with respect to the SpeakWrite account number, my memory here -- and I'm looking, again, at the response.  The response to our request for production was that it was improper for us to ask for it in document, that since we didn't form it as an

interrogatory, they don't have to give it to us.

I asked the Court to order them to give us the account number, because we don't have it, and that's the only way we can subpoena those records.

And I'd like to offer that, if they would like to have it go to them, like we are having the other third-party cell phone records go to them, we can have that go to them, as long as we get all the materials that relate to this case.

THE COURT:  So am I correct in understanding that -- Ms. Hoffman, that the SpeakWrite phone number that was used, before it became a separate standalone app, so that Ms. -- that Ms. O'Brien would have used that during the relevant time period, but not when it became a standalone app?  That would been after the relevant time period.

MS. RICHARDSON:  That's correct, Your Honor.

THE COURT:  So we're going carve out and carve away for -- I don't need to consider anything with respect to whatever Ms. O'Brien may have used -- when she may have used the standalone app.  That's out of the picture.  I don't need to address that.

But it's about the -- it's relating to the SpeakWrite program or service relating to an account number.

Is that the scope of what we're dealing with, Ms. Hoffman, that you understand?

MS. HOFFMAN:  So I think so, Your Honor, but

during that time period that you're talking about, we have produced the documents.

During that time period, Ms. O'Brien received, through her work email, dictated attachments from SpeakWrite in her email, and we've produced those.  So I don't -- there's nothing else.

Ms. Richardson has them, but --

THE COURT:  Well -- and they're asking really for the account number so they can subpoena them independently, which -- I mean, I think they would be entitled to at least serve a subpoena on -- on SpeakWrite, and then if there's other motions to address what to do after that, then we would have to take that up.

MS. HOFFMAN:  During the relevant time period, I would agree.

THE COURT:  Okay.

MS. RICHARDSON:  We can limit it to the relevant time period.

Although Ms. O'Brien said that the app was being used at that time, I don't have any way of verifying that.  So I'd rather rely on the time period that would be relevant for this than whether or not it was an app.

THE COURT:  So, I mean, I -- and I -- the use of the term "app" is, you know, a little confusing for me, because I -- you know, it can mean a couple of different

things or many different things to different people; so I'll leave it to somebody who's drafting the subpoena to be as precise as they think is necessary.

So the defendants are ordered to provide the account number so the appropriate subpoena can be drafted, and that it will be -- any documents responsive to the subpoena will be produced to the defendants for their review first.

You raise another important issue, though, Ms. Hoffman, which is -- it doesn't sound to me like there would be any relevance for the production of any documents associated with anybody else?  Any other children that Ms. O'Brien was -- caseworking?

I take it that's your understanding as well, Ms. Richardson?

MS. RICHARDSON:  Right.  We're not interested in that.  We only want what was relevant for our cases.

THE COURT:  So it sounds to me like an appropriate subpoena can be relatively easy to craft it, to shape it to both time period and the relevant parties.

MS. RICHARDSON:   Yes.

THE COURT:  Ms. Hoffman, any other details that we should clarify?

MS. HOFFMAN:  No.  My -- the only thing that I -- that I want to qualify a little bit, Your Honor, is that I don't know -- so we don't -- I don't have Ms. O'Brien's

account number somewhere just lying around that I know I can send it to Ms. O'Brien.

If she somehow has a different account number now, say, because the format of the service changed or something, and doesn't know her account number from 2016, 2017, what would you like us to do?

THE COURT:  Well, was this something --

MS. HOFFMAN:  (Indiscernible.)

THE COURT:  Was this service something that DHS provided to their caseworkers, or was she independently using something to assist her in her work?

MS. HOFFMAN:  I don't know for sure, Your Honor. I think it was the latter.

THE COURT:  Okay.  I mean, it would --

Ms. Korbel, you had -- you had a suggestion?

MS. KORBEL:  I just want to make it very clear for the record that the relevant time period for this case is not 2016 to 2017.  The children were in care until April of 2019, and I believe that the mother did not get full custody until October of that year.  So that entire time period is what we're looking for, or at least until Ms. O'Brien was no longer their caseworker.

So I just want to make sure that's clear.

THE COURT:  It isn't clear to me what that means.

But if that's clear to everybody else, then that's

fine; but if you gave me an actual month, day, and year to month, day, and year, I can understand that.

Do you have a month/day/year?

MS. KORBEL:  Yes, Your Honor.  I can give you a month, day, and year.

MS. HOFFMAN:  And just to clarify, Your Honor, I don't disagree with Ms. Korbel.  She's right.  I know the months, days, and years.  I was just being colloquial for the sake of brevity.

We're on the same page.

THE COURT:  All right.

MS. KORBEL:  Thank you.

THE COURT:  Perfect.  Then I won't bother myself over figuring those out at this point.  But the issue is the account number thing, and you don't know whether this was a private -- she was using it on her own dime but using it for work, which would make it relevant for production purposes.

UNIDENTIFIED SPEAKER:  Right.

THE COURT:  I mean, I can't imagine it would be impossible to get that account number, even if it's a different one now.

I mean, Ms. O'Brien is going to -- I'm going to order that you -- I'm going to order that she produce that information and if she doesn't have it available immediately to her, that she get it and provide it to you so -- so

Case 6:22-cv-01813-MTK    Document 242    Filed 11/18/24    Page 124 of 137

Ms. Richardson can craft the subpoena.

MS. RICHARDSON:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.

MS. HOFFMAN:  Then, to Ms. Richardson's other point, the "H" drive and "I" drive, yes, those are network drives.  We have searched them, and we have produced all the responsive documents.

We -- I think I've identified the Bates ranges for plaintiffs so they can see where those documents were.  Thus far, they haven't identified any document they expected to see and didn't see.  I -- and inspection of DHS's internal files, which include files related to other cases, is not -- and, honestly, even the files related to this case is not appropriate.

We don't allow litigants to go to each other's offices and look through their file drawers to confirm that they've conducted discovery properly.  We have to, to some degree, trust each other.

I've told plaintiffs' counsel more than once that we've -- and I have double- and triple-checked with the client that we have searched those folders.

If there is something they expected to see that they think is missing, we are happy to confer about documents or specific documents or something specific, but to allow an inspection like what Ms. Richardson is requesting is -- I

think, it's -- it's overly invasive, and I think it's -- there's no basis for it.  It's just -- it's essentially discovery on discovery, and they're not really entitled to check our work in that way without some basis to do it. They don't have one right now.

THE COURT:  Ms. Richardson?

MS. RICHARDSON:  Yes.  So prior to Ms. O'Brien's deposition, when we asked about the -- I asked -- I was the one that asked her about these additional drives.  These were new to us.  It was represented that such drives did not exist; so this was -- also appeared to be maybe something --

THE COURT:  May I ask when -- when it was represented to you that such drives didn't exist, and who represented that to you?

MS. RICHARDSON:  I'm going to have to defer --

THE COURT:  That might be helpful.  Just maybe understanding more of the context about whether there's something "there" there, but I also do appreciate Ms. Hoffman's position that, you know, they've produced everything that -- they've said that they've produced everything in response to the RFPs that you've provided from the networked data.  And in the absence of something more to suggest that it -- that that isn't accurate, I'm not inclined to order a review of the "H" and "I" drives.

I'm showing you my cards.  If there's something I'm

missing, please let me know.

MS. RICHARDSON: Well, I'm going to have to go back and look at what was represented to us and when, but I do know that we were very surprised when Ms. O'Brien started talking about these other drives and the way that they were saved.

So it's not that we want to go through and look at all the records. I just want to see how it's organized on the "H" drive. Is there something that is being missed?

It felt that, after that deposition of Ms. O'Brien, that there was clearly these additional drives that she had saved things on.

And while I -- I hear that there is the representation that they searched and did all of that, I just want to see how that's organized.

Sometimes they do a picture of it. I mean, it's something, you know, as an example for a lot of cases that we have. If, for example, a company -- you know, could be whatever -- has these drives and this is where they searched, we would like to see the picture of the drive. Just not, like, the documents. Kind of see how are they organized. Just what you would do back in the day when we had the actual physical files. We always could go and inspect them just to make sure that there was everything that said -- that they said that there would be, and we can

also have a visual of, okay, where -- how are these things organized?

That's just what I want to do -- is looking at, "Okay. How are these files organized?"  Not wanting to go in and look at every single -- any -- any other children or other family-type situation, just "What about these particular ones?  How are they organized for these children on those particular drives?"

THE COURT:  Are the "H" and "I" -- whether it's "H or I" or "H and I" that -- that Ms. O'Brien was keeping documents in these folders and each -- are either one of those drives relating to these children?  You say that you produced documents from these drives.

MS. HOFFMAN:  Yes, Your Honor.  Some of them related to these children.  Those have been produced. This -- the search of the shared files is one of the first things DHS does in discovery in these cases.  I -- it's possible -- I don't -- I'm not sure what representation Ms. Richardson is referring to, and we haven't talked about that before.  I'm not sure.

But it's possible that someone on our team, perhaps myself, misspoke.  I don't know.  But what I -- what I can tell you is that after Ms. O'Brien's deposition, when she talked about saving files on the "H" drive and other shared drives, I confirmed (indiscernible).  We talked to the

client.  We've confirmed that those -- all of those shared files and network files have been searched, responsive documents have been produced, and I identified those Bates ranges.

So I don't -- I -- and at the request -- the request was for a request for inspection, another request for screenshots, but I also don't think screenshots are necessary either.  Although that is sort of a different thing.

But, in any event, we produced these documents, and we were -- told that to opposing counsel.

THE COURT:  All right.  I'm not going to order the inspection of -- of the drives at this time.

If, Ms. Richardson, you -- you can provide some additional information about why the difference in characterizing what was there and what wasn't there -- I mean, provide more information, we can take it up and look at -- I can revisit it next Friday, when we come together, to see if there's -- something there that needs some additional attention.

I'll also offer that if -- if the production from the -- the response to the subpoena provides additional documents that would have been discoverable but were -- were not produced at this point, I mean, it does raise a question about whether -- whether there's something happening with

DHS's review of those -- of those drives, which makes it more relevant for a closer inquiry.

MS. SKJELSET: Your Honor, I do feel like I -- this is Mary Skjelset. Well, I feel like I might have information that would be helpful to this discussion. I wasn't going to push it, because I was moving toward trial, but I have asked repeatedly for information that I believe Mr. Hammond represented would have been on his home drive or on the "I" drive. FTRs that he obtained in the course of preparing his declaration, notes that he made in preparation for his declaration, and I've gotten -- I've received none of those and -- and no documents, and I believe that my request for those have been ignored.

So I -- it also calls into question whether or not they are, in fact, reviewing the documents on the "H" and "I" drives and producing those.

THE COURT: Have you conferred with Ms. Hoffman before today about following up? It sounded to me like you probably haven't.

MS. SKJELSET: I have asked.

THE COURT: And I don't want to blindside Ms. Hoffman at the moment. And while it may be an important issue for discovery purposes, I'd ask that you all confer before kind of bringing these things up to me.

MS. SKJELSET: We literally asked about five

times.

MS. HOFFMAN:  Your Honor, actually, Mr. Hammond -- oh, and I'd like to (indiscernible) for the Court -- you know, this is our last issue we're talking about.  I have one housekeeping item to raise at the very end.

We -- Mr. Hammond testified that the FTRs he obtained from the juvenile court were CDs that he put in the hard copy file and he had handwritten notes that he also put in the hard copy file.  I have personally reviewed the hard copy file at DHS Central Office, and I can tell the Court that those documents are not in the hard copy file.

They wouldn't be on the shared file because they were for CDs and handwritten notes.  They aren't in the hard copy file, and I don't know any more information about it than that, but I can represent that to you right now.

THE COURT:  So Mr. Hammond testified that he put CDs from the FTR in the hard copy file and other notes, and then you've reviewed that hard copy file and those CDs and notes are not in there?

MS. HOFFMAN:  Yes.  That's correct.

THE COURT:  Has anyone asked what would have happened to them if Mr. Hammond says he put them there?

MS. HOFFMAN:  I -- I can't really answer that question, Your Honor, without going into some attorney-client conversations.  I --

THE COURT: So -- but I -- part of my concern is that if -- you know, files are kind of sacred in my understanding of how DHS is supposed to conduct itself; so if Hammond is saying that he put things in it and they're no longer there, that's a concern for me.

And, you know, maybe there are some issues with respect to attorney-client privilege that -- that I need to honor and respect, but I've got to tell you, that -- that's a problem, but I don't know what kind of problem it is because I don't know what these notes or -- or -- I mean, the FTRs are -- I mean, they're hearings that you would -- may be able to get unsealed from juvenile court, but -- but just raises a concern that documents are being removed from files.

MS. HOFFMAN: Your Honor, I -- I truly don't know why the documents are not in there.

It's possible that Mr. Hammond misremembered. The time period he was being asked about was six years ago. He may -- he may have been engaging in wishful thinking and thinks he put them in the hard copy file, and he didn't. I don't -- I don't know.

THE COURT: And I appreciate that you don't know; so I'm not going to hold you responsible for what DHS may be doing inappropriately if, in fact, things are getting missed out of their files, but it's a question that -- that now you

need to find out an answer to.

MS. HOFFMAN:  Well --

THE COURT:  And it's not good enough --

MS. HOFFMAN:  I can.

THE COURT:  I mean -- I mean, look, it raises some interesting questions that I think do speak to whether discovery is complete.

And I want to make it very clear that I'm not holding Markowitz responsible, but if DHS isn't doing what they need to be doing as -- particularly as a government body and agency, in terms of maintaining records, whether sealed or public, I have -- I have concerns about that, and that will implicate, you know, what might happen at trial with respect to instructions.

So I need some answers on that point.

MS. HOFFMAN:  Understood, Your Honor.  I -- I will tell you there is no evidence anything has been removed from the file.  There isn't some section where something is missing.

I -- it doesn't appear anything has ever been removed. I think it's more likely Mr. Hammond is misremembering, but I -- and there is -- there is nothing else in the hard copy files we've ever expected to find and haven't found.

I don't know that it's an issue of something having been misplaced.  I think he -- he -- he may -- his memory

may not be correct.

But I -- I don't know.  And we can -- we can look into it.

But, in any event, it isn't an issue regarding the shared files on the network.  This is a separate issue.

THE COURT:  You're right.  I took the bait, Ms. Skjelset.  Well played, but -- all right.

So let's -- you figure it out; you can bring it back. If we have time to put it on the agenda for next Friday, then maybe -- maybe we take it up, but maybe it's -- it's -- there's nothing "there" there, and I'll leave it to all of you to figure that part of it out.

Ms. Hoffman, you said you had a housekeeping matter before we finish up today.

MS. HOFFMAN:  I do, Your Honor.

And it's now really awkward timing, actually.

I wanted to let the Court know and opposing counsel know, I won't -- you won't be seeing me on this case going forward.  Today is my last day at Markowitz.

I am moving to another firm, and I wanted to let you know in person, when you don't see me in the future, that that is why.  I have accepted a job elsewhere, and today is my last day.

THE COURT:  Well, I'm -- I can order you to continue to participate in this case.

MS. HOFFMAN:  I -- you know, I -- you're welcome to call Dave Angeli and talk to him about that idea and see what he says, but I -- I suspect it's not -- it's not going to fly.

THE COURT:  Well, thank you for letting me know, and I -- I sincerely wish you well in -- in your future endeavors and what you'll be doing down the road, and I'm sure I'll probably be seeing you again in that capacity.

Unfortunately, though, I'm now going to be grumpy, having to deal with just Mr. Edelson and Ms. Blaesing; so --

MS. HOFFMAN:  I know.  I apologize, Your Honor.  I thought about it.

THE COURT:  You should apologize to Mr. Edelson.

MS. HOFFMAN:  I apologize.  I've apologized to pretty much everyone who works at Markowitz.

I told them they can call me anytime, and I will answer any question; but, you know, I -- yeah.

THE COURT:  All right.

MS. HOFFMAN:  You'll see my notice of withdrawal.

THE COURT:  If this is your last day, then the issue about conferring, with whom will plaintiffs confer, plaintiffs' counsel confer, about all of the -- the items on the list?  Who do they call?

MS. BLAESING:  Your Honor, this is Ms. Blaesing.

Plaintiffs can continue to email me and the other

counsel on the case, and we will work on all the things we need to confer on next week.

THE COURT:  Okay.  Does that -- does that -- the change in staffing on the defense side raise any other questions or issues that need clarification on plaintiffs' side about just simply making sure that we keep things moving as smoothly as possible without Ms. Hoffman on the matter.

MR. RIZZO:  We're prepared to accept what Ms. Blaesing just said, Your Honor.

MS. RICHARDSON:  Wish you well, Hannah.

MS. HOFFMAN:  Thank you, Bonnie.

MS. RICHARDSON:  It's a great place.  Criminal defense.  Fun stuff.

MS. HOFFMAN:  It will be fun, and it's a nice combination of both civil and criminal work.  So it'll be fun, and I -- I think they have a case in front the judge; so I think you will be seeing me again.

THE COURT:  All right.  Well, I look forward to it in those other cases.  All right.

Yeah, I truly wish you well.

MS. HOFFMAN:  Thank you.

THE COURT:  If there isn't anything else -- I'm getting some feedback.  Is there any reason on that?

All right.  Look like we're off the feedback.  All

right.  All right.  Thank you all for working through this, rather lengthier day than I had originally expected, but we're going to keep working on it and keep trying to fine-tune these details and get them moving along.

I -- I know that this is going to be more of a hyperdrive to November 9th, but I look forward to making sure that we have our flight plan figured out by March -- excuse me -- by next Friday, the 13th.

So let's -- let's keep moving, and I'll look forward to hearing from all of you next week.

It will be same format, in terms of videoconferencing. I'll check with my staff about whether we should just forego having to do the IT troubleshooting thing and lose half an hour, or just do a Zoom conference call, since it all seems to work out okay for everybody here.

We'll let you know how -- what that format is going to be soon enough.

All right.  Thank you, all.  Have a good weekend.  Be well.

MR. RIZZO:  Thank you, Judge.

MS. RICHARDSON:  Thank you.

(End of FTR-recorded hearing.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman

6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman

6:23-cv-01353-MK

Discovery Conference

September 6, 2024

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the FTR-recorded proceedings in the above-entitled cause.  Where (indiscernible) has been indicated, the audio file was unable to be heard due to simultaneous crosstalk, fast speaking, mumbling, or other room noises overriding what was being said.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Transcriber/Official Court Reporter        Date: 9/9/2024
Oregon CSR No. 98-0346    CSR Expiration Date:  9/30/2026