IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                        )
                                   )
                    Plaintiff,     )   Case No. 6:22-cv-01813-MK
                                   )
          v.                       )
                                   )   September 20, 2024
KIM CHAPMAN, in her                )
individual capacity; ANASTASIA     )
TIBBETS, in her individual         )
capacity; KASSIDY O'BRIEN, in      )
her individual capacity, ERIN      )
LANE, in her individual            )
capacity; THE OREGON               )
DEPARTMENT OF HUMAN SERVICES,      )
a government agency; and JANE      )
and JOHN DOES 1-5; in their        )
individual and/or official         )
capacities,                        )
                                   )
                    Defendants.    )
_____    )
OREGON DEPARTMENT OF HUMAN         )
SERVICES,                          )
                                   )
          Third-Party Plaintiff,   )
                                   )
          v.                       )
                                   )
JOE ALBERT RAYGOSA,                )
                                   )
          Third-Party Defendant.   )
_____    )


STATUS CONFERENCE

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES

FOR THE PLAINTIFF(S):

STEVEN V. RIZZO
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE PLAINTIFF(S):

MARY SKJELSET
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE DEFENDANT(S):

ANIT JINDAL
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97204

FOR THE DEFENDANT(S):

HARRY WILSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

JEFFREY EDELSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| SHANNON CONLEY, Conservator for Z.C., a minor, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 6:23-cv-01353-MK |
| v. | ) ) | September 20, 2024 |
| KIM CHAPMAN, ANASTASIA BROOKS, KASSIDY O'BRIEN, ERIN LANE, MARGARET RAMIREZ, in their individual capacities, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

STATUS CONFERENCE

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

                              APPEARANCES


FOR THE PLAINTIFF(S):
                        BONNIE RICHARDSON
                        Allegiant Law LLP
                        100 SW Main
                        Suite 400
                        Portland, OR 97204
FOR THE PLAINTIFF(S):
                        MARISSA KORBEL
                        Allegiant Law LLP
                        100 SW Main Street
                        Suite 400
                        Portland, OR 97204

FOR THE DEFENDANT(S):
                        ANIT JINDAL
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97204

FOR THE DEFENDANT(S):
                        HARRY WILSON
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97201

FOR THE DEFENDANT(S):
                        JEFFREY EDELSON
                        Markowitz Herbold PC
                        1455 SW Broadway
                        Suite 1900
                        Portland, OR 97201

TRANSCRIPT OF FTR-RECORDED PROCEEDINGS

(September 20, 2024)

(Videoconference:)

DEPUTY COURTROOM CLERK:  Now is the time set for Civil Case No. 2:22-01813, Levi v. Chapman, et al., and Civil Case No. 23-01353, Conley v. Chapman, et al., for status conference.

THE COURT:  Good morning, Counsel.  Welcome back.

I think we have everybody that we need present, and the status conference was scheduled to address the motion for re- -- the defendants' motion for reconsideration and clarification of my *in camera* review order with respect to privileged documents.

I'll address the 502(a) motion to compel.

Those are the two matters on my agenda.

Were there any other matters that the parties believe we were to address or that you want to raise for my attention and assistance?  We'll start with Plaintiff's Counsel Levi first.

Other than those two matters, anything else?

MR. RIZZO:  Thank you, Your Honor.

This is Steve Rizzo.  I think the other matter we had, Judge, is the memorandum of law that was filed by the defendants concerning magistrate jurisdiction and then plaintiff (indiscernible) filed his response to that.  So I

thought maybe we would take that up today if the Court has time.

THE COURT:  Let's see where we go with the 502 and the motion for reconsideration and if we have sufficient time to broach the issue.

I just received the plaintiffs' memoranda of law on that matter, and I'll want to take some time to review, digest, and consider the options that might be available to this Court to move the matter forward.

But, yes, let's see if that's something that we might have some time to take up.

Anything else for Levi plaintiffs?

Conley plaintiffs?

MR. RIZZO:  No, Your Honor.

MS. RICHARDSON:  Your Honor, this is Bonnie Richardson for Plaintiff Conley, and one issue, I think, if we can bring it up at the end, is -- or the beginning -- is regarding the extent of the searches of the phones that we talked about last week briefly and the date range.

There's been a date range that we received yesterday, and I would like to bring that up to the Court.

THE COURT:  Okay.  And how about for defendants?

MR. JINDAL:  Anit Jindal, Your Honor, for State defendants.

There's -- we have nothing to add.

THE COURT:  Okay.  And for my part, I do want to touch base on how the discovery plan is proceeding.  I think there were some questions the defendants had raised with -- well, Mr. Naso was ultimately able to clarify there were 14 RFAs and a certain number of interrogatories that were -- the only amount of written discovery that was going to be sought after by the defendants, and then there was a list of several potential witnesses for deposition.  I'd like to try to make sure that we've nailed that down -- and, if not, why not? -- so we can keep discovery moving towards closing by the deadline.

I believe November 9th, if I have the date correct.

So we'll talk a little bit about the discovery update too.

All right.  Motion for reconsideration or clarification.

Let's see.  Who is arguing that for the defendants?

MR. JINDAL:  That would be me, Your Honor, Anit Jindal.

THE COURT:  All right.  Anything else?

MR. JINDAL:  Thank you, Your Honor.

THE COURT:  Sure.  So you don't need to completely rehash anything in the written briefs, but if there's something else that has come to mind, that is not a new

issue or argument, but it helps to clarify some of the points that were made by the response from the plaintiffs, I'm happy to hear it.

One of the issues -- and I'll show you my cards. One of the issues that, as I considered the *in camera* review, in the way in which it was ultimately postured and presented to me was that it was -- it was relating to documents that may have been privileged -- attorney-client privileged from email communication from which portions about the case itself were cut-and-pasted or status -- status updates about the children were cut-and-pasted from those privileged emails and uploaded into OR-Kids. It was within that context that I had concluded that those -- those portions that had been uploaded to OR-Kids were no longer privileged, and so I want to make sure that -- you know, there are two parts to this: One, to the extent that there's an express interest on the plaintiffs' part to expand that ruling, I'll need to understand what -- or clarify that ruling. I'll need to understand why it falls within my original understanding of my own ruling, which, again, was with respect to items, excerpts cut-and-pasted from privileged materials and uploaded into OR-Kids.

On the other side of the coin, I remember Ms. Hoffman raising the issue orally in our status conferences and then in the motion -- the formal motion filed for reconsideration

that OR-Kids is far more than just simply a caseworker database.

I want -- however, the plaintiffs' points are well taken. There's no declarations or evidence to that effect, and -- nor was that really particularly argued at the time that I was conducting my *in camera* review.

And so to the extent that my decision was based on -- on the material presented by the defendants, or lack thereof, it was within the very -- that context of excerpts of privileged materials and emails uploaded to OR-Kids for the purposes of case management, and that is the boundaries in which I had considered the decision to order those documents produced.

Now, in the motion for reconsideration or clarification, the defendants take some time to explain why OR-Kids is more than that; but, again, I think, as plaintiffs have pointed out, there's nothing in the way of declarations or evidence, just simply argument to that effect. That's not going to be availing to me in the context of how to change my ruling, if at all.

So I want to make it very clear. I'm not opening this discussion for a complete -- a complete review of the decision, nor am I going to be receiving any evidence on the matter. The parties had their instructions. It was the plaintiff -- the defendants' burden of proof to establish

that this material was privileged and had the opportunity to present evidence in the form of declarations or otherwise during the course of the *in camera* review period that we were discussing these matters; and as I recall, it was, again, solely related to OR-Kids being a space in which privileged materials were excerpted from email communication between lawyers and caseworkers and then uploaded into the database for the -- for the children's status.

Finally, I'll also just simply point out that none of these issues that I -- again, as I recall, with respect to attorney-client privilege, were raised when the plaintiffs conducted an on-site review of the database, and perhaps the parties can remind me if I have that -- my memory is incorrect; but, again, no issues with respect to how or what was attorney-client privileged in the review of the database itself and the contents of the database in realtime.

All right.  Mr. Jindal, I've laid out the parameters for what I'm willing to receive.  Let's not rehash arguments that have already been otherwise appropriately raised in the briefs.  And if you need to help me understand whether there was evidence that raised these more complicated issues that were put into argument in your motion for reconsideration, I'm willing and very happy to reevaluate what the understanding of the record was at the time that these issues were originally put to me.

MR. JINDAL:  Yes, Your Honor.  I appreciate that.

What -- I think it would be most helpful if -- I was taking notes as Your Honor was providing that helpful outline -- if I sort of use that as a rubric for responding.

Specifically, as to evidence, Your Honor, if you look at ECF 62 and ECF 63, you will see two declarations from individuals responsible for administering OR-Kids.  They are, I believe, Frank Miles and Michael Payne.  Those were submitted in conjunction with our motion for reconsideration regarding the inspection of OR-Kids, and it describes the use and protection of OR-Kids.  We relied on those declarations in this motion for reconsideration.  I cite them in the brief.

THE COURT:  And, Mr. Jindal, I just want to make sure you know what I'm doing right now.  I'm opening up my computer so I can pull those excerpts -- pull those documents up so I can look at them and make sure that I'm on the same page with you.  All right.

MR. JINDAL:  Understood, Your Honor.

I also would point out that we cited to, you know, the use of -- OR-Kids is -- let me take a step back.  You know, our clients are State employees.  They're governed by various policies and regulations that are published and publicly available, and we cited to those.  And so we think that those regulations and policies are evidence that this

Court can consider when thinking about how individuals are expected to keep OR-Kids confidential.

In particular, we cited to a policy from DAS, Department of Administrative Services. That's policy 107004110.

THE COURT: And, now, were these raised in earlier motions for -- motions in response to the motion to compel or motion for reconsideration?

MR. JINDAL: I believe they may have been raised in those declarations I cited to, but --

THE COURT: Okay. So how about this: Let me get 62 and 63 up so then I'm on the same page as you are when talking about what's been cited and what hasn't been. Because I do want to make sure that everyone understands that I'm not taking argument -- new argument that could have been raised at a prior time. I'm wanting to help make sure that you've had the opportunity to clarify the positions as they have been locked in.

MR. JINDAL: Understood, Your Honor. And I'm not sure if these specific policies have been. I will say -- let me respond to that point, Your Honor.

So I think it would be helpful if we took a few steps back. So I believe in April, plaintiff -- I think it was Levi -- filed a motion sort of stating in broad terms that they were concerned about the privilege designations.

THE COURT:  The which designations?

MR. JINDAL:  Privilege.

THE COURT:  Okay.

MR. JINDAL:  And that is what kicked off what ultimately became Your Honor's order for *in camera* review in July.

Now, I looked at that motion.  I didn't see any argument in it that categorically every document placed in OR-Kids is categorically waived as to the privilege.  We've never heard that argument until Your Honor issued its order, and so we don't believe that this issue was properly raised by the motion, and so we did not have an opportunity to directly respond to it.

THE COURT:  And I also want to make sure that we're not arguing a matter or arguing about a potential phantom in -- in the record because I did clarify my ruling about the broad-based implications that I -- I think the language in my order could have been interpreted to mean, and it was narrowly construed to address only this case in the manner in which this case has been postured.

MR. JINDAL:  I appreciate that, Your Honor.

And one thing that I think would be helpful, from defendants' perspective, is if there was a clarifying order or an amended order that made that very, very clear.

What we're concerned about is that, if there is an

order that's on the public docket that says, in no uncertain terms, that OR-Kids is not confidential; that, while we appreciate Your Honor's clarification from the bench, unless that -- that clarification comes in the form of a written formal order, an amendment to the order as written; that future litigants, or even these litigants, could use the order for purposes that Your Honor didn't intend, and that could cause serious administrative problems for the State of Oregon.

THE COURT:  That's fine.  I have no issue with that.  So we can -- we can clarify that.  And I also don't believe -- I'm fairly confident that the plaintiffs at last week's hearing acknowledged the appropriateness of that clarifying constraint.

MR. JINDAL:  I appreciate that, Your Honor.

And so, just taking a step back, in the motion for *in camera* review, that I believe was filed in April, there was no discussion of -- plaintiff did not put forth this argument that OR -- that placing a document in OR-Kids categorically waives the privilege as to it.  So we had no reason to respond to it.

It was an issue that came up at oral argument -- or during a status conference on August 6th and, I believe, was really just the subject of a miscommunication between State defendants and Your Honor, and that's why we were --

THE COURT: What was the miscommunication? I want to make sure I understand.

MR. JINDAL: This is the State -- right. So Your Honor wouldn't -- when we were discussing a specific document that was put to Your Honor for *in camera* review, it was logged 637. It's an email that I believe you're quite familiar with. It was the Colby driver email, in which a volunteer driver was recounting just their description of what they saw at the house when they came to visit. And that it originally had been on our privilege log. We reviewed it and decided to -- that we would no longer put it on our privilege log and withdrew it from the privilege log.

And Ms. Hoffman said -- and this is at page 217 of the August 6th hearing transcript, but the quote is, "The body of that email was copied in full into a case note in OR-Kids that we have produced, and so the email, we don't think we can claim privilege over."

So the concern there was that we had already produced the substance of the email elsewhere in the record in this -- and in this instance, in an OR-Kids case note, and we weren't going to claw it back.

And as Your Honor decided --

THE COURT: And why weren't you going to claw it back?

MR. JINDAL: Your Honor, it wasn't privileged.

You got into -- Your Honor's ruling says this, but it was factual information that was being distributed to a large group.  We thought it was privileged when we first did our review, with the opportunity to do a rereview.  We understood that it was not privileged.  There was no request for legal advice or anything -- or any of the hallmarks of privilege there.

THE COURT:  And then going back to my original ruling -- which I can appreciate, again, is -- has some of this noise about a broader implication -- was excerpts from what would have otherwise been privileged communications; such emails between attorneys and caseworkers; excerpts that describe case -- case status; or information similar to that which was in that driver note, that -- that were cut-and-pasted into OR-Kids, no longer enjoys the privilege.

MR. JINDAL:  Your Honor, we don't necessarily agree with that, and the reason is that all --

THE COURT:  So this is what we need to get back to: my ruling.  And I'm not going to rehash or reconsider my ruling in light of the -- the standards that are set out, that are appropriate for reconsideration or reclassification.

So I guess it matters less to me that you agree or -- that you don't agree with it as much as why I should reconsider my ruling based on the standards that are set out

in the rules.

MR. JINDAL:  Well, let me answer in two parts, Your Honor.  The way that we read the standards is that there are three bases for a motion for reconsideration: new law, new facts, or clear error.

And here I think that plaintiffs have focused very much on no new law, no new facts, and we're just saying that this was the misunderstanding based on this one statement from Ms. Hoffman during -- during the status conference.

THE COURT:  And what was Ms. Hoffman's statement that you think I -- either the Court misunderstood or was misstated by Ms. Hoffman?

MR. JINDAL:  It was -- so when Ms. Hoffman said that we were no longer claiming privilege over the case note because it had been produced, that is what she intended to say.  It had been produced, and we were no longer claiming privilege over it.  It is true that she said that it was copied in full into a case note in OR-Kids, but the balance of the quotation, which is not reflected in Your Honor's order, is it was copied in full into a case note in OR-Kids that we have produced.

THE COURT:  Had that -- that information not been produced, would you have continued to invoke attorney-client privilege?

MR. JINDAL:  No, Your Honor.  The document wasn't

privileged.  We'd rereviewed it, determined it wasn't privileged.

THE COURT:  Okay.

MR. JINDAL:  And --

THE COURT:  So it matters not whether it had been already released into the wild.  One way or the other, regardless, it was not a privileged document.

MR. JINDAL:  That's correct, Your Honor.

And I will say earlier in the quotation, in discussion, Ms. Hoffman does say, you know, "It may be privileged.  It may not be privileged.  We've let it out.  We're not clawing it back."

And I think that that was just an attempt to say, Your Honor, regardless of the position -- regardless, we aren't trying to claw this document back.  We agree we're withdrawing it from our --

THE COURT:  And were there other -- I know you're focusing on the -- the driver's excerpt, but I conducted a review of eight of the selected documents of that larger body that Ms. Skjelset had submitted for *in camera* review, and is there something within the universe of documents that my order requiring you to apply the rule that I articulated is in some way also being asked to be reconsidered?

MR. JINDAL:  Your Honor, no.  For the purposes of this motion, we are only asking you to reconsider your

ruling with respect to OR-Kids. I believe there are statements about the non-privileged status or -- excuse me -- the nonconfidential status of OR-Kids on pages 3, 4, footnote 2, and page 7 of your opinion, and those are the things that we're asking either be removed or revised in your opinion.

THE COURT: And I think we're already on the same page with respect to modifying the language with respect to confidentiality. I'm interested only in addressing whether -- whether excerpts from what would have otherwise been privileged materials that were updated into the -- into the OR-Kids database no longer are privileged if they are associated with the case file on the -- on the substance of the -- of the children's cases themselves.

MR. JINDAL: Your Honor, if there's a communication with an attorney that says "Here's a" -- it can be a close question. We have never said -- we -- it is true that the underlying factual information is often not privileged, and they have access to the underlying factual information. But the requests for legal advice and the advice given are still privileged.

THE COURT: And I don't think that's the -- that's the issue here. I mean, the issue is that the -- the factual summaries of -- of the status of the children or what's going on with the children on a day-to-day basis,

very similar to that which was -- you know, very similar to that which was communicated by the driver, uploaded into R -- OR-Kids.

MR. JINDAL:  Your Honor, as a practical matter, we're only talking about one document.

THE COURT:  So you might know that.  I don't know that.  I'm just simply applying a rule.  You follow the rule.  So that's all good and fine by me.  If it's one document, then it's one document.  Then I'm not sure we have an issue.

So if you're more concerned about a universal extension of my rule beyond the case, I've already clarified where we stand on that, and an order is going to be supplemented to clarify that.

So I'm -- tell me more about why the defense is pushing so hard on this issue.  If I've told you time and time again what it is that I have envisioned for the rule, what I articulated and certainly meant to say in the rule that might need some further clarification, that it is so disconcerting to the defendants here?

MR. JINDAL:  Your Honor, I think it might be helpful if we discuss an example.

If you go to Exhibit 5, page 8, of Ms. Korbel's declaration.

THE COURT:  In the motion -- in the response to

the motion for reconsideration?

MR. JINDAL:  Yes, Your Honor.

THE COURT:  Let me -- let me get there.
Exhibit 5, page 8.

MR. JINDAL:  Yes.  And I'll --

THE COURT:  Hold on.  Let me get there first.

MR. JINDAL:  Understood, Your Honor.

THE COURT:  All right.  I'm there.

MR. JINDAL:  Understood, Your Honor.

And I -- before we discuss this document in particular, I just want to -- one housekeeping matter.  So this is the document that really is at issue in this motion.

THE COURT:  Is or is not?  I didn't quite catch what you said.

MR. JINDAL:  "Is."

THE COURT:  It is an issue?

MR. JINDAL:  I'm sorry, Your Honor.  "Is an -- is at issue."

THE COURT:  Okay.  It is -- okay.  It's at issue.

MR. JINDAL:  And this is the redacted version of the document.  We -- there have been -- we have produced unredacted versions of it and clawed them back.

Plaintiffs, we think, improperly attached the unredacted versions to this motion, despite the clawback. So we would just ask that Your Honor not review the

unredacted document.  I just -- I just wanted to say that as a housekeeping matter so that this conversation --

THE COURT:  Well, I thought you were going to turn it to an example to help me understand.

MR. JINDAL:  This is -- this is the example, Your Honor.

THE COURT:  An example of what?  Is this an OR-Kids entry?

MR. JINDAL:  Yes, Your Honor.

THE COURT:  Okay.  And it's an OR-Kids entry that you're claiming should be clawed back?

MR. JINDAL:  No, Your Honor.  It's an OR-Kids entry that we have redacted.  I'm just explaining to Your Honor that there was also an inadvertent production of an unredacted version of it.

THE COURT:  Do I have -- is this the unredacted version?  Because I have at the bottom of mine, "Attorney-client privilege work product" blocking some language at the bottom of the --

MR. JINDAL:  No, Your Honor.  This -- no, Your Honor.  This is the redacted version.  I'm just saying that elsewhere in the exhibits to this declaration plaintiffs have also included the unredacted version.

I'm just explaining that we don't believe that including the unredacted version is proper because we've

clawed it back.

THE COURT: And where in Ms. Korbel's declaration is the unredacted version?

MR. JINDAL: I believe it's in the same exhibit. It's just earlier on.

And I'm intentionally not directing it to you, Your Honor, because we don't believe it's proper for you or plaintiffs to rely on it.

I just wanted to alert you to that choice.

THE COURT: And just so you know, I'm turning the pages haphazardly and not paying attention to the text.

MR. JINDAL: Understood, Your Honor.

THE COURT: All right. Don't -- don't tell me.

All right. All right. So, yeah, there is a document at the top that has a date of January 30, 2018, that -- okay. All right.

So you're raising this -- I now -- I now see that there's an unredacted version and then the redacted version.

All right. Go ahead and tell me why my ruling needs to be reconsidered in light of this example.

MR. JINDAL: Your Honor, so what plaintiffs want to do is remove those redactions and freely use this document, and I think this highlights the dividing line that we're drawing here.

So if you look at this case note, if -- middle of the

page there, it's a March 2017 case note from a meeting with an AAG, so an attorney, and three DHS employees.  And you can see what we did here is -- there's a factual discussion that is unredacted in the case note, but then there is a specific request for legal advice of the attorney.  It says, "DHS seeking advice on," and we took a scalpel to the document and just excised the portion that was requesting legal advice, and the document is cut off here, but then there is a discussion of the agency's next steps with respect to this child, and we left those in as well.

And so what we did is we were very careful to leave in the underlying factual information, which I believe was the core of Your Honor's concern earlier, but cut out the request for legal advice, and that is completely proper, Your Honor.  That is privileged information.

THE COURT:  Who's writing this entry?  Is it -- is it a caseworker?

MR. JINDAL:  I believe so, Your Honor.  I'm not quite sure.  I haven't chased down who -- who entered this physical entry.  I believe it would be a caseworker or a different DHS employee, but I don't know.

THE COURT:  Okay.  I want to make it clear on this record as well.  So I did go back to the unredacted version because I am now conducting an *in camera* review, in front of the camera, to -- to look at what the -- what the beef is

all about.

And it appears to me, yes, there is communication that is between attorney and client and client seeking advice, but there's also some representations of fact about the status of memory and recollection that is a caseworker observation that's specific, in particular, to the case itself, which, you know, when you -- when you have information about the case, case status, and health and welfare of the children intermingled with the seeking of advice or maybe even why the advice is being sought, I can appreciate the seeking of the advice or why the advice is being sought, or whether there's a suggestion about further investigation, is -- as appropriately redacted as attorney-client privilege, but there is some status issues about the child that wouldn't -- and would otherwise be part of OR-Kids in the absence of an attorney-client communication.

MR. JINDAL:  Your Honor, it is true that the underlying factual information is not itself privileged, but it does not follow that, when you request legal advice from your attorney and that you discuss the facts that are -- that are germane to your request for legal advice, that somehow that waives the privilege with respect to the communication.  And we're all attorneys here.  Clients call us all the time and say, "Here is what happened to me.  I

would like your advice."

And we would never say, well, the communication is not privileged because they described various facts within it.

THE COURT:  But the example that you raise -- and maybe we shouldn't quibble too much about analogies -- is, "Here's what happened to me.  I want your advice."

Here's a caseworker who has an obligation to evaluate and support a child within -- within DHS's, you know, jurisdiction and care, saying, "Here's what's happened to a child."

Let's just stop there for a moment.  "Here's what's happened to a child" is what the caseworker is responsible for in investigating, working up, and/or taking measures to protect against.  That information is independent of the seeking of advice and separate from the seeking of advice.  That information, I'm not sure is deemed to be privileged.

I can appreciate there's a very -- very -- you know, it -- it's a very intertwined and difficult-to-untangle interrelationship, and I think I also said it very -- as aptly and honestly and transparently as I could last week, which is, again, the very issues and central to DHS, and so much of the attorney -- assistant attorney general's responsibilities in these cases are tied up in case management, such that so much of the information, arguably, at least by the plaintiffs' account, that -- that are

attorney-client privilege are also central to proving the case.

Now, again, I've also made it clear that -- that that alone is not going to overcome attorney-client privilege, but the observation of that doesn't mean that -- that, when I consider some of this -- some of this material *in camera* and considering some of the statements that are assessments of a child's condition, that would and -- would have needed to be -- let me put it to you this way, as I'm looking at that, and I'm trying to be very careful.  So I want you to raise your hand and stop me if you think I'm about ready to say anything that might be part of the clear attorney-client privileged material in this redacted piece, but -- so I'm just giving you the opportunity to slow me down.

And I'm talking about the bottom of page -- of Exhibit 5, page 2.  If the -- if there -- there's information there describing the status of the child, the condition of a child -- if that information was part of a case note, independent of starting out with DHS's seeking advice, that material about the status of the child wouldn't be protected under attorney-client privilege; right?

MR. JINDAL:  Your Honor, I think, if you read the paragraphs around the one paragraph that is highlighted, you will see that, for the most part, the information you're describing appears elsewhere unredacted in the same case.

THE COURT: Show me.

MR. JINDAL: We're not trying to hide --

THE COURT: And that's fine. Help me. Because I tend to be drawn to that which is highlighted, and so it makes everything else less clear. It's like headlights on a car. Turn the high beams on for me.

MR. JINDAL: Yes, Your Honor. So the preceding paragraph describes in detail the concerns. So I'm trying to describe it myself in broad enough terms without waiving the privilege, but it's legal advice about sort of the legal guidance around certification status of the home. The fundamental facts are described in the paragraph above that is not --

THE COURT: I'm looking at something about the recollection of something.

MR. JINDAL: Yes.

THE COURT: And the last three lines of that big -- of the preceding large paragraph.

MR. JINDAL: Yes. And then the -- it says "April" -- in the middle of the big paragraph, the first paragraph of the note, it says --

Your Honor, I believe some of this --

THE COURT: Okay. I don't think you need to say any more. I see -- I see the similarity. All right.

MR. JINDAL: So we're not -- we're not trying to

conceal the underlying factual information.

I would also say that -- Your Honor, that when -- when someone describes factual information to their -- to -- their attorney, in order to obtain legal advice, that doesn't mean that the communication with the attorney is not privileged.  What it means is that you can do other discovery, such as a deposition or if there is a note somewhere else describing the factual information and get that underlying factual information.  What you do not get is the communication with the attorney.  And we don't -- and we think this highlights the fact that we are not trying to hide the factual information.

They have done many, many, many depositions.

THE COURT:  Mr. Jindal, I mean, I think the argument is sort of plowing over -- is re-tilling land we've already gone over; so I don't think we need to go any further on that.

So to the extent that I can see that the redacted -- as I look at the redacted language, that which would have been relevant for production for the purposes of the child -- the status of the child is elsewhere in this -- in this document, then, you know, the redacted version -- at least with respect to this document, the redacted version may not be necessary at all to be produced.

And would -- and it has quite a bit more bearing on

attorney-client privilege.

All right. Let's accept that premise for the moment. I haven't heard plaintiffs' arguments yet, but let's accept that premise for the moment.

Tell me what it is, again, that you have a beef about with respect to my order.

MR. JINDAL: Your Honor, that's -- that was the next place I wanted to go; so I appreciate that.

Your Honor, I think that what are our preceding discussion highlights is that really the placement of the document in OR-Kids is not what is driving the privilege decision. It's whether or not the information is, in fact, privileged.

So I think the concern with the order is the language on pages 3, 4, 6, and 7 that suggests and in some place says that placing an -- a case note in OR-Kids somehow affects or changes the privilege status.

We don't think that's accurate, and we think it --

THE COURT: I mean, I get that you don't think it's accurate, but tell me legally why based on the posture of the case that was presented to me a month or so ago.

MR. JINDAL: Your Honor --

THE COURT: Because it can -- one of the things that Ms. Hoffman represented, I think, the last time she was here, maybe, in person, was that OR-Kids is a far more

complicated database with lots of different spaces in which notes are included.

I'm looking at just, you know, these sort of running -- running timeline entries.  I mean, I'm not seeing something with complicated pull-down menus that you go to different places to look at other documents and look to see where attorneys have been leaving messages for caseworkers or whatever else.  It's just -- this is sort of a running -- sort of a running chronological record of whatever the caseworker is doing.

So the idea that somehow my order had some far-reaching implications to the entire OR-Kids database beyond that which we're looking at -- I mean, no one has shown me anything else about what OR-Kids looks like.  No once has presented evidence to me about secret rooms and chambers in the castle that ought not to be peered into.  We don't know -- I mean, no one has told me about them.

So I'm looking at chronological timelines of entries.  That's the -- that's what seems to be what has been presented to me as what OR-Kids is.

So it's in that -- and that's why I keep returning to this issue -- is that the universe that was described to me and presented in response to the motion to compel and the material that -- that was raised with respect to attorney-client privilege is this universe, and that's how

I -- and that's what I ruled on.

So you can't open the universe to be broader than that which has already been set because you would have known and should have known that, if it -- if it had been a bigger universe, then you should have presented it to me at the time that the original response to the motion to compel was filed.

MR. JINDAL:  Your Honor, your point is well-taken, and I think our argument today is a little bit simpler than that.  It doesn't really depend on the internal file structure of OR-Kids, whether the privilege material appears in -- in the running case notes that you have seen or the provider notes which you -- may have been part of the *in camera* review or whether they're in some separate tab.  The fundamental point is still the same.

OR-Kids is a highly confidential database.  It has the highest level protection -- of protections for any database that the State holds.  There are specific policies in place that prevent employees with access to OR-Kids from abusing that access in order to (indiscernible) --

THE COURT:  And you agree that confidentiality is not the same thing as attorney-client privilege.

MR. JINDAL:  Of course, Your Honor.

THE COURT:  Okay.  All right.  So the fact that it's confidential -- I mean, you know, causes everyone to be

a little bit more deliberate about what -- what is -- is discoverable, and that's why we have protective orders, but I think I'm only focusing on the attorney-client privileged material here.

And right now I'm -- I'm tending to agree with you that the excerpted language, the redacted language in the January -- the top, you know, Exhibit 5, page 2, should remain redacted.

So -- so maybe you want to let the plaintiffs talk to me first before you dig a hole for yourself.

MR. JINDAL:  Fair enough, Your Honor.  If you agree with me, I think I'll rest.

THE COURT:  Okay.  I'll give you an opportunity to reply.  I mean, I'm interested in trying to get the answer right, not -- but I also -- I got to make -- got to make sure we're clear about what that means.  I'm not -- I'm not interested in rearguing this case anew, this issue anew. Everyone had the opportunity, and some boundaries were set by the -- by the -- by the way in which it was framed to me the first time around.

I'm going to remain faithful to that, and I'm going to try to make sure that it's clear, and that my -- my -- the language in whatever order, if -- if clarification is necessary -- I've already indicated some clarification is going to be involved here -- if any additional clarification

is necessary, that it remain faithful to my original order based on the universe that the parties had an opportunity to present to me at the original motion.

All right.  Which set of plaintiffs' lawyers are going after this, because it looks like -- I think both sets of attorneys are doing -- are -- at least submitted something in writing.

Who wants to go first?

MS. RICHARDSON:  So -- and sorry, Ms. Skjelset.

We can -- if Your Honor wants me to talk right now about this particular subject, which is Exhibit 5, and then the other exhibits where there is this -- putting it forth that now they're claiming that this is privileged, I can talk about that, which is more specific, and Ms. Skjelset can talk generally about the response to the motion for reconsideration and explain more about the OR-Kids.

THE COURT:  So what I'd like to do is try to tackle this motion for reconsideration and clarification more generally first, and then we can take up some other specific issues if somehow, you know -- that'll work better for me because I don't -- I don't want to get lost in the details before I resolve the issue of the motion for reconsideration and clarification.

Ms. Skjelset?

MS. SKJELSET:  Good morning, Your Honor.  From

Plaintiff Levi's perspective, your order was proper.  Under the circumstances and litigation of this case, there should be no attorney-client privileged documents in the OR-Kids files pertaining to J.C. and Z.C. in the Duncan-Raygosa home.  We requested those in March of 2023.

It was represented on multiple occasions that we were receiving the entire file.  We had inspected it with counsel present, and they withheld and redacted and objected to zero information -- to us viewing zero information, with the exception of one document that was an invoice for therapeutic services, and I still don't understand the (indiscernible).

THE COURT:  So I just want to -- I -- I'm sorry that I'm going to ask people to sometimes repeat themselves, but I really want to make sure that your information is sinking into my thick skull.

And so what I think I heard you say was that there was a time you were given the opportunity to inspect the entire OR-Kids case file for the children.

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  And in that time there was no raised -- and so you would have seen these entries that are now redacted in paper.

MS. SKJELSET:  Well, this is the issue -- is that the entry, the document that the defendants are now

apparently so concerned about with regard to the Court's order, is a document that was -- is outside the -- potentially outside the scope of the Court's order.

What this is -- this is an improper vehicle for what should be a resolution of a clawback under the protective order.  The -- your order referenced communications that were between attorney -- attorneys and DHS personnel that had been copied and pasted into the OR-Kids materials that Plaintiff Levi had requested more than a year ago in our request for production.  We understood that we had obtained the entirety of the file.  We understood that there were no attorney-client privileged communications within the case notes.  We have testimony from caseworkers, saying that all of the case notes were produced in discovery, and we understand, from many depositions of caseworkers, that any caseworker, absent specific precautions, can access any file.

So, under those circumstances, it doesn't -- it doesn't seem to us that the defendants have met their burden of establishing that there would be any attorney-client privileged communications or information in the OR-Kids materials that are responsive to our request for production.

THE COURT:  So I can't imagine everyone is here to enjoy an academic discussion about -- about the meaning of attorney-client privilege, except for maybe Mr. Edelson.  I

think -- I think he enjoys the academic inquiry maybe far too much.

So help me understand.  What are we talking about here? You're telling me that Exhibit 5 of Ms. Korbel's -- Ms. Korbel's declaration isn't -- I mean, it looks to me like it's part of the OR-Kids database, and you're saying that it's not -- it's not part of -- it wasn't -- it isn't a document that was encompassed in my order?

MS. SKJELSET:  Your Honor, I think your order, as specific to Mr. Levi's motion, might inform that discussion because you made some -- underlying your order was a presumption, which I think is fair, that the documents contained in the OR-Kids database are generally not protected in the way that attorney-client privilege needs to be protected, but I think that that's a presumption that you made based on Ms. Hoffman's representations and based on the path that this litigation has taken and the fact that they haven't made any assertions of attorney-client privilege in that OR-Kids materials that we -- that we requested in Levi.

THE COURT:  Is that the same with the Conley materials?

MS. SKJELSET:  So that document, Your Honor, was produced in the Conley matter and relates to files that Levi did not request.  So it's really -- in a way, it's out -- it's outside the scope of your order.

THE COURT:  You're making me rethink the order consolidating discovery all of a -- so I might -- I might just simply reconsider consolidation altogether, but -- anyway.  All right.  So this document, Exhibit 5, page 2 of 8, from Ms. Korbel's declaration is not part of the Levi dispute?

MS. SKJELSET:  Your Honor, my -- this was not logged in the Levi case.  I don't believe that it's communications that they were asked -- that you were asking the defendants to go back and look at and ensure that they weren't placed in the case notes.

THE COURT:  So it's an inept exemplar for me to even consider on the motion -- in the motion for reconsideration of my order?

MS. SKJELSET:  Yes, Your Honor.  If your order is based on the litigation in this case and the facts that were presented to you in this case and relating to the Levi plaintiff -- although it may -- it may, in some ways, inform other decisions, it does not -- it does not bind them in any way.

THE COURT:  So I did somewhat jokingly implicate the consolidation of discovery.  What does this mean, though, for the consolidation of discovery between the -- between the plaintiffs' counsel?  I think that's an issue that needs to be clarified here -- is what information --

how will information now be shared between the plaintiffs? I mean, I think my ruling has to -- my rulings have to now be sort of reconciled and consistent between both -- both sets of plaintiffs.

MS. SKJELSET:  My understanding, Your Honor, is that this is the only document.

THE COURT:  And hold on.

Mr. Jindal, remind me to play poker with you because you're not keeping a good poker face.

MR. JINDAL:  Sorry.

THE COURT:  And it is a bit distracting because I can see you nodding or shaking your head mostly, and it's too much of a tell.

MR. JINDAL:  Understood, Your Honor.  I'll -- I'll --

THE COURT:  Thanks.  Thanks.  All right.

Ms. Skjelset, continue.

You're on mute, Ms. Skjelset.

MS. SKJELSET:  No, I'm just -- just pausing --

THE COURT:  You were just practicing your pantomiming for this weekend's --

MS. SKJELSET:  -- before moving forward.

I do think that generally the defendants have failed to meet their burden of establishing that documents placed in the OR-Kids system are -- maintain their privilege, and they

cite to generalized rules.  They cite to policies, but what they do not cite to is the number of individuals who actually can access those files or any precautions taken with regard to preserving attorney-client privilege.  And the fact is that all --

THE COURT:  Is there any evidence in the course of the briefing of this -- of the motion to compel or the *in camera* review, as well as the motion for reconsideration, that indicates that people who do not have -- who do not have the extension of attorney-client privilege for these materials are reviewing these OR-Kids databases?

MS. SKJELSET:  Well, Your Honor, it's our understanding, based on testimony that we have elicited in depositions over the years, that any -- any employee of DHS child welfare, not necessarily within the group of individuals tasked with rep -- as legal representatives for the child themselves or in that group, can access case notes, files, provider files, relating to all of these individuals.  There are no --

THE COURT:  So the notion of attorney-client privilege wouldn't extend to all DHS caseworkers even if they're not on the case?

MS. SKJELSET:  Would the attorney-client privilege extend to all Ford Motor workers, even the ones on the ground, Your Honor?  I -- I don't think so.

THE COURT:  Well, I mean -- I mean -- case workers have a different role than perhaps sort of the front reception person.  So, I mean, I think -- you know, if we're going to analogize Ford Motor Company, it would be all management.

Wouldn't all management enjoy the attorney-client privilege, even if they might not be involved in the litigation, specifically implicating one particular manager's behavior or conduct?

MS. SKJELSET:  I think that's likely true, Your Honor.  But we're not talking about management.  We're talking about all SSAs.  We're talking about all certifiers, whether they're certifying at home or not.  We're talking about all caseworkers.

THE COURT:  And as I -- as I had reminded the -- as I reminded the defendants, I wasn't going to reopen this for a rehashing or an -- an infusing of new and different arguments.  I mean, I think you had started out by saying that in other litigation you're aware that other caseworkers or caseworkers from across the agency could review these documents.

Is any of that in this record that has been presented?

MS. SKJELSET:  Yes, Your Honor.  We supplied deposition testimony.

THE COURT:  Okay.  That everybody -- that all

caseworkers can access this information?

MS. SKJELSET:  Various caseworkers saying, "I believe I can access other cases," things like that, yeah.

THE COURT:  And you think that defeats attorney-client privilege in any one case?

MS. SKJELSET:  I think the failure of the defendants to show that they preserve attorney-client privilege and don't allow anybody in the agency to access it potentially does.  But with regard to this case, we're talking about the files at issue in this case, Your Honor.

THE COURT:  Right.  And without, again, getting far too academic, we're talking about just one document of redacted material that appears to be elsewhere in that -- in that case note.

MS. SKJELSET:  I don't even know -- I -- honestly, I don't under -- I don't know that dispute, and I -- I would say to the Court again, "My belief is that that dispute should have been resolved through the clawback, through a request for an *in camera* review, through a waiver."  This is a -- this is a separate issue.  They're concerned that the Court's order has implications for that, but if they want to suggest that there is some kind of difference between the documents that the Court ordered to be produced because they were placed in the case notes and the OR-Kids files pertaining to J.C./Z.C. and the Duncan-Raygosa home, then

they should have done that through a separate mechanism rather than asking for reconsideration of the order, because the order is clear as to which files it applies to.

THE COURT:  Okay.

MS. SKJELSET:  There's one additional issue, Your Honor --

THE COURT:  Go ahead.

MS. SKJELSET:  -- which we didn't fully brief, but it's my understanding that the defendants are aware of it. There is a separate database for attorney-client privileged communications, and that, I understand, to be Matter Management.  The OR-Kids record itself is for case management activities.

THE COURT:  Okay.  And you are raising this to help contrast or clarify something about the nature of OR-Kids?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  And tell me what -- what -- tell me what that contrast -- I don't want to read between the lines.  You know, you've got to hit me over the head with it.

MS. SKJELSET:  Well, remotely, that's difficult to do, but I'll try to do it metaphorically.

THE COURT:  Oh, I've seen some looks from attorneys that do just about the same.  Go ahead.

MS. SKJELSET:  It's our understanding -- and, again, this is not our burden, but it's our understanding, and we've seen notes from Matter Management, which are -- which convey attorney-client communications and store them there with the DOJ.  I've never worked for the DOJ.  I only know this through practice, and I would expect somebody from the DOJ to be -- through a declaration or other mechanism describing this difference in order to show you why, for some reason, there would be attorney-client privileged information in OR-Kids, which OR-Kids is designed for child welfare activities -- for the memorialization of child welfare activities, and it's accessible by all child welfare employees.

THE COURT:  Okay.  Let me -- Ms. Richardson, I know you wanted to raise something more specifically.  I think this may be a good time for you to make sure I understand what that is, and then I'll turn back to Mr. Jindal to help me understand more about this -- the need for clarifying my order.

Go ahead.

MS. RICHARDSON:  Well, I do want to just make a statement about the argument about confidentiality.  I think those words are being conflated by the defense.  Perhaps Your Honor recognizes that.  That, of course, all of this communication in here is confidential for purposes of

protecting the children and their families, but that is not the same as what Your Honor was saying in the order, which is only with respect to the attorney-client privilege and the confidences pursuant to that privilege.

I think that is very clear from the order and that it is limited only to these two cases.

So now, when we look at the specific issue, which is whether or not the defendants are going to not produce what might have been privileged communications but now have been cut-and-pasted into OR-Kids -- I think that's probably the big question. When you cut-and-paste into this OR-Kids database, does that mean now that those communications are not privileged?

And I think even in your order I remember reading you're not really going to address waiver at that time, but we need to be able to see what are the, you know, information or communications that go into that OR-Kids database. It was up to the defendants to then produce something -- some kind of facts, evidence -- to Your Honor, which none of that has been raised, and you have mentioned that.

What they do bring up, without being supported by a declaration in the motion for reconsideration, is they attach a policy that was produced to us on the same day. This is a DHS policy. And the policy, if you look at it,

also says that the user is -- it's on the first page of the policy. "All State employees, volunteers, their agents, vendors, contractors, including those users affiliated with third parties who access data information assets, and all others authorized to use State information technology for the purpose of accomplishing the State's business, objectives, and processes."

So that is -- the framework is -- while that wasn't supported by a declaration, it's, again, evidence that actually shows that this is open to lots of people, even outside of the agency, and that it's done for a business purpose. Because what is the business of DHS?

In this particular system and with this OR-Kids and DHS, the business is to care for and to protect and to safeguard children and their families. That's the business.

So when they start putting in maybe some advice or communications with attorneys and it's part of the business, it's part of what they need to do. It's part of what's mandatory. They have to report it. They need to address these things, and they cut-and-paste it and stick it into OR-Kids. Then that information is no longer -- it's still confidential to the outside world for purposes of protecting the children, but as far as the attorney-client protection, confidentiality, they put it in there, and we're entitled to see it.

And the example that I want to go to now because -- what happened was this particular OR-Kids stuff was produced as part of the Spicer home. So we have the Raygosa home, and we have the Spicer home, the second home for which we have a new claim against, and we're using it based upon this information. These documents were produced to us and were reviewed by the defense counsel, and it took some time to review them. We had to go back again a second time so they could review for privilege. They produced it. They were also provided, ahead of time of a deposition, a few moments before, because we do that for these Zoom ones, and that's why Ms. Skjelset knows about it. Because they were given and marked ahead of that deposition as exhibits. Now, they were not used in the deposition. We didn't eventually go back and use them.

THE COURT: Are you referring, for example, to Exhibit 5, page 2.

MS. RICHARDSON: Yes.

THE COURT: So that was provided to the Conley plaintiffs unredacted?

MS. RICHARDSON: Yes.

This particular -- I'm going to have to look at which one was actually provided in the exhibit form, but that language that they now want to claw back, that was put into a premarked deposition exhibit that was given to

Ms. Skjelset and to a bunch of the Markowitz -- you know, all the typical people over there on the defense side that we send it to, but it wasn't actually used. And that's what I want to make sure that we have the clarification. It was not used as part of the deposition when questions were asked of that witness, but it was premarked.

So we were assuming that this was all just fine. And then it was later that now their client is attempting to claw back any document that contains that paragraph, and that paragraph has been cut-and-pasted now into the OR-Kids database.

And so if -- and so what -- the question that we constantly are asking is, "How is that privileged? In what way?" And I hear stuff. "Oh, if it says 'advice.' If there's a lawyer on it"; but, you know, as the Court has correctly concluded, and all the case law that the Court has cited, you know, the burden is in on the defense to show that it's privilege and that it hasn't been waived. But just going to whether or not it's privileged -- just because it says "advice" doesn't mean that it's privileged.

Is it intended to be confidential?

Well, everything is intended to be confidential when you look at it for purposes of DHS. But "Is it intended to be confidential only as between the attorney and client?" is the question, and here this language that is in here -- for

the context, we know, because we can see in the prior paragraphs, this is the Spicer home. There was a foster parent in that Spicer home who was being certified to be a foster parent. Then that foster parent disclosed some pretty serious things about her past, and there's a question as to whether or not she should have been certified. It's a very important part of what we have to prove in that these people should never have been certified to have foster children.

And in it -- what happens now is somebody, a caseworker -- it gets cut-and-pasted over and over again and again -- you know, it's been established also by these policies and by the OARs is that DHS, as part of their business, is required to talk about this stuff. They're required to put it into this OR-Kids database and to share it with all of these people for the business purpose.

And here what there is now is they're going to seek advice about what to do with this information.

There is nothing in here which says, "And the attorney says this:" That would be something that I'm wondering whether or not somebody had cut-and-pasted that in here. You would think they would put it into a different database. But if they're choosing to put it in here, they must want everybody to know, and they want to know that it's going to be -- that they're complying with their reporting

requirements, that they're doing everything that they should be doing, and so that is something that, when it's put into this database, we are entitled to it.

And -- and, you know, there is nothing that has shown otherwise. And the burden -- again, even in Your Honor's order -- you repeat it again at the end of the order, "The burden is on the defense to show whether or not something is privileged," and that burden was not met.

In fact, they made representations to the Court that they're now saying is a misunderstanding, but it was a representation to the Court that you thanked Ms. Hoffman about for being so open and honest and professional about it that, "Well, yes, these were cut-and-pasted and put into there. They're no longer going to be subject to attorney-client confidences."

THE COURT: All right. There are two challenges that I want to resolve: One is a more precise and accurate use of language in my order, and I've discussed -- I've -- we lost Mr. Rizzo and Ms. Korbel. Is that intentional?

Oh, okay. You're here. And if you just went on video mute, that was fine. I just wanted to make sure that we didn't have somebody drop off the call.

So precision with respect to the language used to describe my ruling; and then, two, you know, just making sure that I -- again, maybe I need to make sure that I -- I

understood the universe as it was presented to me in the record on this issue.

Mr. Jindal, there is -- you know, with the clarification from Ms. Skjelset that there is this other Case Matters database that -- for which that really isn't involved, but legal -- I'm -- from what I understand from Ms. Skjelset, it's sort of the legal discussions about the nature of cases. I don't want to get too much into that, as much as just simply recognizing that there is another location in which, you know -- and I don't think anybody is seeking information from that database anyway.

It's OR-Kids, and I'm only interested in OR-Kids. And I do want to make it very clear I'm -- we have to treat very differently the notion of what "confidentiality" means and what "attorney-client privilege" means. They're different terms, and I think we can all agree that they're different terms and have different implications. They're very clearly different terms of art.

And as I've already indicated, my order will reflect that confidentiality remains in place and that my order does not intend to modify the obligations and responsibilities of maintaining confidentiality. That doesn't mean it's confidential from people suing the State and the agency because we have protective orders for addressing discovery.

Now, I don't know. Maybe this will be the last layer

of the onion that we will peel back for today on this issue for the motion for reconsideration, and it is this:  It appears to me, from the presentation of what is in the record from Ms. Skjelset and Ms. Richardson, that it isn't just the caseworkers on the case that have access and can review these case notes but that it could be any caseworker in the agency.

So, one, I want you to confirm or deny that.  Correct it if you think there's a different understanding of that in the record.  And then, two, I -- I do recall there being something in the record somewhere in all of our arguments on this point at least sometime during the course of our litigation where OR-Kids has been described as a database in which non-agency officials have access to the contents of OR-Kids and its database.

Assuming in some variation of that last statement that it's true, I'm having a harder time understanding how attorney-client privilege has not been waived by putting this material in OR-Kids.

So two things:  One is -- maybe there's -- maybe a subpart to the first question about access by all DHS caseworkers.  Is it the defendants' argument that all caseworkers enjoy attorney-client privilege in all cases before the agency?

MR. JINDAL:  Your Honor, let me respond to that

point. So it is true that as a -- as a technological matter, someone with access to OR-Kids, if they have the case number or the family name and there is no other, sort of, heightened sensitivity on the file itself, can look for -- can, as a technological matter, access other case files; however, there are specific policies in place that say that an individual employee cannot just peruse the database for reasons unrelated to their casework.

And so, you know, it's no different than if I mail something to a client. It's still privileged even though their neighbor could have broken their mailbox down and stolen the mail. We don't -- as a technological matter, it is true; but it is not true as a practical matter or as one of policy.

Caseworkers are restricted (indiscernible.)

THE COURT: But, I mean, maybe the better question is does attorney-client privilege extend to anybody who would, under the policy, have authority to open up and look at the case file, not the active caseworkers on the case?

So, I mean, one --

MR. JINDAL: Yeah.

THE COURT: I think it might be safe to say that a supervisor who isn't directly involved in the case but is supervising several caseworkers probably -- I mean, may very well enjoy the attorney-client privilege. What about a

supervisor's supervisor or a supervisor relating to another case that is looking for some analogs in their own cases about what's happening in the case in question?

I mean, at some point -- at some point, people may be authorized under the policy to open up and look at the case if it's for legitimate, you know, DHS business. But I don't know if that means that then attorney-client privilege extends to other people who have authority under the policy to open up the case file.

And I agree that anybody who just simply says, "Oh, I'm interested in finding out what's happening before the news breaks on such and such a case. Let me go look at it," that's -- that's beyond the policy authorization. So we can carve that out. We don't even need to even address that example any further, but it's other legitimate business or for which the policy would permit, you know, other caseworkers to look at the case file because it has maybe some bearing on their own cases.

MR. JINDAL: Your Honor, so it is true that supervisors will be able to access it where relevant to supervising their caseworkers.

Another example of someone that could open a case file would be -- so, for instance, a hotline worker or a CPS investigator, they have -- they might need to respond to very emergent scenarios regarding a child because there's

been a report of abuse and they need to access the case file, understand what's going on, if necessary, understand legal advice that's been given with respect to that child, and act.

And so the way that we've seen it formulated in the case law, it -- there are different formulations, but as long as the person is authorized to review and act on the legal advice as part of their job duties, they are within the privilege group.

THE COURT:  So the key word there is as long as they're authorized to act on the legal advice in the contents of OR-Kids, but it's not -- not everybody is accessing the files to evaluate the legal advice.  They might be accessing the files to review the content of the file with respect to the substance, but the -- but the communication -- you know, again, I'm using Exhibit 5, page 2, as an example -- that particular communication is still going to be open and available to them to review -- to look at when reviewing the entire file.

And so this is a -- this query is about people employed in DHS.  Help me understand.  There are people not directly employed by DHS but are involved with DHS that have access to the file -- to OR-Kids?

MR. JINDAL:  No, Your Honor.

THE COURT:  So there isn't anybody?

MR. JINDAL:  That's right.

THE COURT:  Any law enforcement agency?  Any medical providers or therapeutic providers?

MR. JINDAL:  I don't believe so, Your Honor.  I think that we are conflating two different things, which is that in juvenile dependency proceedings there is often discovery that occurs, but that is -- that discovery is similar to the discovery that occurs in civil --

THE COURT:  And that doesn't implicate the issue before me.  So if -- and perhaps either with a raising of a hand if you think that that information is -- you have different information about who can access OR-Kids, not just through discovery, but the access of the OR-Kids database, other than DHS employees.  Let me know if you have a different understanding that is reflected in this record.

Okay.  All right.  So I think we're just working on the universe of DHS employees, and -- talk to me about why attorney-client privilege extends to everybody in the agency who is authorized to open the case file and look at it.

MR. JINDAL:  Because, Your Honor, people are only authorized to review the case file if they're working to provide services to these children.  And in that case they would be in the privileged group.  I should say --

THE COURT:  So anyone who is authorized to provide services to the children would be able to claim

attorney-client -- would enjoy the attorney-client privilege of those communications in the case file?

MR. JINDAL:  Yes, Your Honor.

THE COURT:  And are you saying that there are no other accesses authorized other than -- other than accesses by caseworkers or employees of DHS that -- that do not involve providing services to the children?

And my example was a potentially inaccurate hypothetical, which is somebody who is involved in another case but is looking for an analog to either deal with the situation that they have -- you know, for example, here's -- here's the inartful -- inartful analogies:  You know, I call up a colleague of mine and say, "I'm dealing with this particular issue.  Do you know of any other case that's dealt with it?"  And they say, "Oh, yeah.  I wrote something about this a year ago on this particular issue.  Here's the cite," and I go look it up.

Now, don't argue to me that, of course, that stuff isn't attorney-client privilege.  I get it.  It's just the idea of sort of the collaborative nature of cases and case patterns that probably develop in DHS, you know, care and custody of children, that that might be helpful for other caseworkers to be able to review, including even reviewing legal advice that was being provided in a separate case to understand better what their -- their options could be in

their own case.

Are you telling me that does not happen and is not authorized?

MR. JINDAL:  Your Honor, I can't tell you categorically that that doesn't ever happen.  I don't believe it does, but what I can tell you is that, when we are describing fairly fact-bound hypotheticals that aren't relevant to the documents that we're talking about now, that those can be resolved on a document-by-document basis if necessary.

I don't think there's any evidence in this record that that's what happened here.  There's -- we haven't seen anything about that here.

And so I think that those -- we would have to evaluate that hypothetical on a very specific basis.  You know, what was the nature of the advice?  Did the attorney intend to give advice generally to caseworkers in similar situations?  Things like that.

And I -- without more, I can't answer the question of whether or not that specific scenario would preserve the privilege.

THE COURT:  Well -- and are you saying that it's -- it's so highly unlikely, improbable, and verging on the -- into the world of -- not even science fiction, but fantasy -- that -- yeah, sorry, if I offended a fantasy

novel reader; I intended to do so, but -- but that -- but that my example is so far afield that that -- that that is not even a conception that -- that could, you know, be reasonably -- I don't know -- that would -- that could reasonably exist in -- in the real world.

It seems to me like a highly probable situation where caseworkers are looking at other cases for the purposes of business related to their own case, and -- and if I -- if -- maybe one argument is that it's not reasonable, and you have to tell me why.  But it seems to be commonsensical to me; and, if so, then you're the one with the burden of proof to help me understand why this attorney-client privilege extends to anything input into OR-Kids.

You know, I'm not interested in confidentiality.  I'm interested in just simply whether attorney-client privilege has been preserved.

MR. JINDAL:  Your Honor, the reason why I don't think that the scenario is likely to arise that often is because there is a specific policy in place with respect to the use and access to databases, such as OR-Kids, that each employee has to sign as a condition of their employment, and I just want to quote from that policy.  It says, "ODHS and OHA will use or disclose only the minimum amount of information necessary to provide services and benefits to individuals."

And the way I understand that to be is to say that what you're describing probably does not happen all that often, and more -- if it happens at all.  And more to the point, that is an issue that can be resolved on a case-by-case, document-by-document basis.

What we have here is that -- is a database that everyone agrees is confidential.  It isn't available to the outside world.  Everyone agrees that, even for the small group of people that are allowed to access it, they're only allowed to access files in it if they -- individual files within it if they have a legitimate business purpose for doing so, and the active policy says that they only are allowed to use the minimum amount of information necessary to provide services and benefits to individuals.

And so we think, in combination, that means that this is a database that is intended to be kept confidential as understood for the purposes of attorney-client privilege. If there was a waiver --

THE COURT:  Attorney-client privilege is not merely an abstraction.  It's also a practice.

So -- and so I turn to the oftentimes, you know, probably perturbing condition that lawyers have to deal with is their clients may have policies but they do something very different.  So I mean -- and we have examples of that in this case with respect to the use of cell phones.  So I

mean the notion of policy being fact is perhaps more fantasy.  So help me understand how that works with your burden of proof.  And --

MR. JINDAL:  Well, Your Honor --

THE COURT:  Go ahead and answer that question, and then I'll want to hear from plaintiffs with respect to this last -- this narrow issue about the attorney-client privilege and whether other -- whether there's evidence, that you're aware of, in this record, about more liberal access to the case files than the policy provides.

Mr. Jindal.

MR. JINDAL:  Your Honor, I don't have any reason to believe that there is some errant employee of the agency that has been perusing files and perused this --

THE COURT:  And we're not talking about that person.  Yeah, that's not the person we're talking about.  So I think we should dispense with that bogeyman.

I'm interested in -- I'm really interested in the people who are legitimately trying to do their work, and let's -- also, let's put -- I mean, I have no reason to believe -- in the course of my career as a state court judge, I have a high degree of confidence and belief in the capabilities of DHS.  I also get that, you know, the reason why this case exists is, you know, because human systems, you know, potentially fail, and that's why we have

litigation to resolve those issues.

So when -- when I talk about these things, I also want to make it very clear I'm really talking about it within this universe of potential human failure, and that's why we're talking about whether attorney-client privilege has been waived here.

And for the benefit of the record, also just for the benefit of everybody here, I don't want anyone to get the impression that somehow I think that DHS is incredibly cavalier and that you have errant -- as you've described, errant caseworkers running amok, looking at salacious information and details in other cases.  That's not the point.  I'm really trying to really hone in on what -- just because -- here's the other thing:  Just because OR-Kids -- well -- and you, as the attorneys, are arguing OR-Kids is some space in which there's attorney-client privilege.  You know, the reason it's before me is I get to decide whether your clients actually did it right, and there's a distinct -- and the reason I'm struggling with this is that I'm -- you've got the burden; and, two, if OR-Kids is generally and widely accessible to all caseworkers, that raises an issue about whether attorney-client privilege can be invoked here for the material input into OR-Kids.

MR. JINDAL:  Understood, Your Honor.

I think that the policies, as written, are sufficient

for us to meet our burden.  I don't know how the policy could be more clear about the fact that they're only supposed to be using --

THE COURT:  Accepting the policy as -- as actively -- you know, relayed by you, if there was evidence that caseworkers are using review of other case -- case notes to assist them in developing their own strategies to protect children in other cases, that's not -- I mean, you're saying that would not be consistent with the policy that you read out loud.

MR. JINDAL:  That's right, Your Honor.

I think that's -- if people were accessing policies for reasons unrelated to their -- to their casework.

THE COURT:  Well, no, unrelated to assisting those children in that particular case.  I think that's what I understood the policy to read.

But if they're accessing cases -- other people's -- other children's cases assist them in helping the children they're assigned to in other cases, the policy doesn't address that.  It does -- I mean, it isn't -- it doesn't, I mean, authorize that.  But if people are doing it, then I think that defeats the purpose -- well, I think that might very well defeat attorney-client privilege, then, in that particular -- in the particular case -- in this particular case.

MR. JINDAL: Your Honor? Your Honor, a couple of points. One, I'm not sure that that is occurring. There's no evidence of that in this record. I think the policies, as written, are enough to sustain our burden.

The second is that I don't -- but I don't necessarily agree that that would defeat the privilege. So, for instance, if there was broad legal advice that was given, that says, "In this scenario, here is how we interpret this regulation," or something like that, and that same legal advice was put in a case note, but it was intended as given to the entire agency and it was shared -- it was reviewed by different people with the authority to review and act on that legal advice, it wouldn't matter if someone -- it would still be privileged regardless of whether or not one caseworker reviewed a case note in another file.

And that's why I think that your hypothetical is highly fact-specific and should be done on a document-by-document basis. But because we're talking about very specific facts in a hypothetical, it's enough for us to, I think, all agree that OR-Kids is not categorically nonconfidential for the purposes of --

THE COURT: We're not using that word anymore. So stop using that credential.

MR. JINDAL: Okay.

THE COURT: I mean, that's not the issue. Okay.

MR. JINDAL:  But as used in the -- in the privilege, I suppose, is my point.

I wanted to make one other point here about burdens and whose obligation it was to bring this issue to the Court.

So I just want to make sure that this is clear:  When we produced this document -- I believe it was in July -- with the Spicer-McCool file, it is true that we produced it with redactions, and there were a few places where we produced it without redactions.  (Indiscernible) have been aware of the redactions for many months.  We filed it.  We sent them a clawback letter when they raised the issue with us about the inconsistency with -- with redactions, and the fact that we inadvertently produced it with and without redactions just is not a waiver.

And Section 19 of the protective order, that Your Honor has already signed, is very clear about this point.  It says -- and I'm just going to quote it -- "A large volume of documents may be exchanged through discovery in this lawsuit, and the parties want to expedite the review and delivery of such documents.  It is agreed that, if either party discloses privileged information and/or protected child preparation materials, the parties understand that there will be no waiver of privilege and/or protection.  A party may assert the privilege and/or protection at any time in the litigation."  And then it describes the process for a

clawback, which we've done.

And then it goes on to say, "A party opposing a claim of privilege and/or protection must promptly present the information to the Court under seal for a determination of the claim."

Now, discovery ended on August 12th.  There was never any motion -- a timely motion from plaintiffs about the two documents that are at issue.  There's another one, but I don't understand plaintiffs to be contesting the privileged status of it, and I don't think there's a pending motion for Your Honor now to compel the disclosure of these documents. It's just not procedurally before the -- before Your Honor, and plaintiffs have never raised this issue with Your Honor.

We've been discussing examples, because they're germane to the -- "categorical" is my word -- but the wording of original order, and it helps sort of make it less abstract in our minds, but we don't think that even the privileged status of these specific documents is before the Court because plaintiffs have never raised that issue with the Court, and it was their burden to do so.

THE COURT:  Well, I mean, to the extent that my order stands in one way or another, I mean, it -- it's on the defendants -- it's the defendants' now burden to review the privileged documents, the privilege log itself, to apply the rules that I articulated to determine whether

something's producible.

So I think it's in that context that -- you know, I think there remains an issue to -- yet to be determined if that privilege log -- privilege review -- the privilege log review has not yet been completed.  I mean, I think that's the context.

MR. JINDAL:  Well --

THE COURT:  And I think Ms. Skjelset, I think, said it aptly, which is, you know, I guess, dealing -- dealing with these particular examples can be a bit misdirecting because they may not be the ones that are at issue with respect to my rule -- my ruling and my order, but they were used as examples to help me understand a little bit more about what is being redacted and withheld, and that, as Ms. Skjelset said, these documents are appropriate for a clawback protocol.

If that's what you've done, then -- and -- then that's -- and if there's some dispute over that, then we take up these particular documents with respect to a -- you know, a clawback dispute.

So, you know, using examples from -- from different -- from different spaces can have -- at least, for my part, has been helpful in some space and -- at some point and then a little bit more confusing about what I'm supposed to be deciding, and so -- so I think -- I think Ms. Skjelset's

framing of it is appropriate.

I just -- if these have been disclosed in the Conley matter, and you're seeking clawback, and if you -- if you've invoked it and if there's a dispute, then I'll wait for that issue to come to me at some appropriate time.  But I'm just simply needing to deal with now the -- you know, the clarification of my ruling with respect to that which is not privileged by virtue of waiver when included in OR-Kids.

MR. JINDAL:  Understood, Your Honor.

And I understood you -- I know that there was going to be some clarification on that order.  If it would be helpful for defendants to offer a proposed order or a proposed revision, we're happy to do so; but if Your Honor would prefer to -- I just -- I just wanted to make the offer out there if it would be helpful.

THE COURT:  Well, I mean, I appreciate the offer.  Once I know what my -- once I can give you my ruling, then we can talk about how best to craft it.

Your crafting may result in more hearings between all of -- not to say that you wouldn't do it well.  It just would mean that I think it invites, you know -- well, it invites more editing, which means that maybe I'm going to have to get involved in it anyway.

MR. JINDAL:  Understood, Your Honor.

THE COURT:  But I also don't want another motion

for reconsideration or clarification; so we all may be hoisted by our own petards which -- with whatever direction we take.

All right.  Let me hear from plaintiffs on this issue about access -- who has access to OR-Kids.

MS. SKJELSET:  Your Honor, if I may, this is Mary Skjelset.  I didn't know that this argument was going to take this turn.  I was focused on the documents at issue in this case and litigation, but we actually do have evidence of exactly who has accessed these files and when, and I think -- and that information is in the -- the possession of the defendants, their audit trials that show who can access it.  We know from depositions that many people can, and I can point the defendants to our Exhibit Number 76, which I didn't attach, and I can supplement with -- to -- to Your Honor if you want additional information, but we have collated the access audit to the case notes in the OR-Kids file, and you can tell, based on this access, that it's not merely the -- the individual caseworkers who are in the province of handling these children who are assigned to the case or performing casework that are accessing these documents.

I mean, for instance, on page 125 -- I'll point the defendants to our Exhibit 76.  There was a case note regarding J.C. that was -- apparently occurred in September

of 2019 where Ms. O'Brien accessed it after she was no longer a caseworker; and then a man named Jeffrey Minden -- I'm not sure who he is -- Ms. Lane, after she was no longer supervising the case; Ms. Rivera; Ms. Burford, long after her CPS investigation; Shawna Leslie, whom I don't know; somebody named Angela Green, whom I don't know either; and then Michael Payne, and these accesses went well beyond the child -- when the child was still in care.

So I think -- I think there is evidence in the record and that the -- the defendants -- in the defendants' possession that all sorts of individuals who are not performing direct casework for the child can access and do access these files in OR-Kids.

THE COURT:  Is there any evidence that any of these people were admonished or disciplined for accessing the file?  Violation of the -- of the agency's policies for case access?

MS. SKJELSET:  That is not something I have inquired about, Your Honor.  I think it's the understanding based on -- based on my impression from depositions that I have taken, it's the understanding that OR-Kids is rather porous, and people do access case notes when they're curious.

THE COURT:  So is that an interpretation that you've made, or is that evidence from the actual deposition

testimony of a witness that, you know, "If we -- if we're curious about a case, we'll open it up and take a look"?

MS. SKJELSET:  I could scour the depositions that we've taken for -- for that.

THE COURT:  I latched onto the term -- the word that you used: "curious."

I mean, you know, casual curiosity, I think, does violate the policy, but if that's what -- if it's happening pervasively, then I think the policy matters not when it comes to waiving privilege here.

MS. SKJELSET:  And, Your Honor, we had asked to do a 30(b)(6) on this issue and were denied; so I haven't been -- I haven't been spending my time at depositions asking about this issue because, frankly, I would like to get to the merits of this case and move toward trial.

THE COURT:  And just bringing it back home, how many documents are we dealing with that are implicated with this motion for reconsideration?  Other than the far-reaching policy concerns that I think the defendants have raised about my ruling, how many documents are in play here with this -- with the two cases that we're dealing -- that we're -- that are before me now?

MR. JINDAL:  Two, Your Honor.

THE COURT:  Two is what the defendants say.

Ms. Korbel, you think how many?

MS. KORBEL:  I believe that it was about 12 documents that -- in total, because there's -- again, these meeting notes are pasted and repeated in multiple places in the record; so I think there's about twelve documents total. I don't think two is accurate.

THE COURT:  Well -- and also we don't know, once the privilege log review is completed, whether there may be other documents or --

MR. JINDAL:  Your Honor?

THE COURT:  Go ahead.

MR. JINDAL:  Your Honor, my initial reaction is I think we're about 75 percent of the way through that, and we don't anticipate -- I don't think there will be because the privilege log is largely emails, not OR-Kids documents.  I could be corrected on that, but I don't anticipate that there will be additions.

THE COURT:  Meaning that there will be disclosure of more documents from the privilege log when applying my rules for discovery.

MR. JINDAL:  Oh, no.  Sorry.  I'm saying that there won't be OR-Kids -- additional OR-Kids documents that are disclosed from the privilege log.  I'm not -- I don't -- I'm not handling the rereview of the withheld documents from the -- on the privilege log; so I can't represent to Your Honor to what extent there will be reconsideration of

privileged calls.

THE COURT:  And what was the 75 percent number referring to?

MR. JINDAL:  My understanding is that -- and Your Honor, I'm talking out of turn here.  I don't want to give Your Honor a status update on this.

THE COURT:  Okay.  Well, then I don't -- I don't want you to have to answer a question, if you're not -- I mean, if you're not in the space to be able to answer it clearly, because then I'm going to start asking more questions, and then it turns into a deposition.

MR. JINDAL:  I do want to be careful, though, Your Honor.  I did try my best to -- in the few days that we had to chase down the documents that we think are privileged and in OR-Kids and that those are the two that we've identified.

THE COURT:  Okay.  So between 2 and 12?

MR. JINDAL:  As I said --

THE COURT:  And --

MR. JINDAL:  Well, no, Your Honor.  I think I could clarify the 12 if it's helpful.

THE COURT:  Okay.  Go ahead.

MR. JINDAL:  So this -- the same -- the same document appears multiple times in the production, and that's just a feature of the fact that there are overlapping

requests; so -- and sometimes the same case note appears multiple places in the production for some reason.  So 11 of those 12 are just the same document copied elsewhere.

THE COURT:  Ms. Korbel?

MR. JINDAL:  Which is why I've said it's two documents.

THE COURT:  Okay.

Ms. Korbel?

MS. KORBEL:  I hate to quibble, but it's more than one document.  These are meeting notes from different dates.  They contain the same paragraph because of the DHS policy and practice of pasting new meeting updates on top of old meeting updates.  So it isn't just one document repeated twelve times.  It is four or five documents that contain the same paragraph sometimes repeated two or three times.

I did provide a table that might be helpful.

I mean, ultimately, it is the same paragraph.  I don't disagree with that, but I just want to be clear that it is not just one document.

THE COURT:  Okay.

MS. KORBEL:  It's actually repeated multiple times in many documents.

THE COURT:  All right.  Ms. Skjelset or Ms. Richardson, anything else on this issue with respect to broad access to OR-Kids?

I think -- I think I was asking you, Ms. Skjelset -- I can't remember if now we've closed the chapter on the inquiry, which was -- this sort of curious review of open files versus a more pointed opening of case files pursuant to the -- in compliance with the policy that Mr. Jindal had read aloud.

MS. SKJELSET:  Your Honor, I think I --

MR. JINDAL:  Sorry.

Your Honor, what are you --

THE COURT:  Oh, Ms. Skjelset.

MS. SKJELSET:  If Your Honor wants evidence supporting this, I could provide it, I believe, through a supplemental declaration attaching the access audits which relate to specific notes and individuals accessing those notes outside of their assignment to the case and even outside of the child's time in foster care.

THE COURT:  So, Mr. Jindal, Ms. Skjelset did describe sort of this audit trail of access to the case file of names of people who have not been -- may have -- have not been invoked in any of the issues that we've been dealing with.

Do you care to respond or add any more texture to that?

MR. JINDAL:  Well, Your Honor, respectfully, we didn't confer on this issue.  I'm not familiar with the information that Ms. Skjelset's presenting.  I haven't seen

Exhibit 76.  She filed a response brief that's lengthy and attaches dozens, if not hundreds, of pages of exhibits, none of which are what she's describing here today.  I just think that it would be helpful to defendants, instead of sort of surprising us in open court with these issues, if they brought them to us and conferred in advance.

I can tell you it's --

THE COURT:  I want to make it very clear.  I mean, nobody -- if anybody is surprising anybody, it's me.  I mean -- so I'm the one that jumped into this rabbit hole; so I'm not going to hold Ms. Skjelset to answering my question, then looking to you to see if you wanted to have an opportunity to respond, and so -- so at the end of the day, I'm really trying to just get this -- this attorney-client privilege issue right; and, you know, the way in which the agency has to conduct its work makes it more complicated than your -- your standard -- your standard attorney-client-privilege fare.  It's just -- that's what I'm trying to wrestle with.

MR. JINDAL:  Your Honor, I just wanted to have two initial reactions to Ms. Skjelset's presentation.  One is I think that, for there to be a waiver of a privileged document, she'd have to be setting the audit trail for those specific documents.  We have two here, and if they challenge the privilege -- if, after the clawback, which occurred, I

think, about a month ago, they continue to challenge the privilege designations, they're welcome to do so. They just haven't done it yet. And so I think that the burden is on plaintiffs to file a motion to compel.

THE COURT: Remember we're in the context of a clawback protocol, but I'm just simply trying to address whether it's attorney-client privilege in the first instance.

MR. JINDAL: Yes, Your Honor.

THE COURT: And whether my -- my order needs to be modified in any way to address, you know, this framing of the issue.

So, I mean, I -- I know you know how to access the Court and invoke -- you know, invoke the process; so, I mean, if there's -- if there's a clawback dispute, then you can go ahead and address it.

But, you know, I'm really only interested in just addressing whether -- whether there's attorney-client privilege associated with -- with what is being put -- cut-and-pasted into OR-Kids.

MR. JINDAL: And, Your Honor, just one response. I think that Michelle Skjelset listed four or five names, a couple of whom were caseworkers and some of whom weren't. I mean, I do recognize one of those names. Michael Payne is the IT administrator responsible for overseeing OR-Kids; so

I think it's perfectly reasonable for him to have access to case files.

THE COURT:  And there were references to people who are no longer -- who were no longer on the case, including Ms. Lane -- Ms. Lang Perkins, I think it -- is that -- is that -- is Ms. Lane someone different than Ms. Lang Perkins?

MR. JINDAL:  They are different people, Your Honor.  There's an Erin Lane and a Jennifer Lang Perkins, I believe.

THE COURT:  Okay.  So, I mean -- so to the extent that some of these people may not have been assigned to the case any longer but accessing the case file, you know, that raises other issues.

One last word, Mr. Jindal?

MR. JINDAL:  Your Honor, I don't -- I believe that, if that occurred, there is either a reason for it or she's describing the exception, not the rule.  They have access to -- they -- they have the ability to present this evidence with respect to specific documents that are privileged, to the extent they believe that there was a document-specific waiver.

THE COURT:  Is it a document-specific waiver, or is the case file itself the focus of the subject of waiver here?  I mean -- I mean -- so -- so attorney-client

privilege -- what would otherwise be attorney-client communications that might otherwise be privileged, if it's in the case file, I mean -- I mean, is there a method by which you could look at a case file and see whether somebody opened up a separate note, or is this sort of like a running -- you scroll down, and you just look at it chronologically?

MR. JINDAL:  I believe that the audit trails are note-specific, but I don't -- I don't have that level of detail, Your Honor, because it -- this is (indiscernible).

THE COURT:  Fair enough.

Ms. Skjelset, do you know if the audit trail is file entry-specific, or is it case-specific?

MS. SKJELSET:  So we've never received the audit trail for the entire case.  I do believe that that exists for a case file in general.

What we received are AAR reports relating to specific case notes that we then have to collate with a table that comes out, but it's my understanding that they -- the defendants did not provide the audit trail for the Spicer file, which I think has the -- the document at issue here. So if they -- if they -- it's their understanding that the Spicer file -- the provider file and the certification file have maintained their privilege by not allowing unauthorized individuals to look at them, then perhaps they could or

could have provided that audit trail in connection with their motion for reconsideration.

MR. JINDAL:  Your Honor, just a couple of points. I think that we first redacted a document in OR-Kids in March with our first document production.  This has only ever been an issue due to the miscommunication that happened at the August hearing which crept into your order, and plaintiffs, I think, rather unfortunately, pounced on it in order to sort of preserve this ruling that can be used in other cases.

These are two documents that we redacted.  Plaintiffs never had any issue with them.  As we discussed earlier, the one document that actually contains substantive information, we were very careful to redact out the request or advice but leave in all the factual information.

And so I think that plaintiffs have had many opportunities during the ordinary course of discovery to pursue fact-specific waiver arguments, like the ones they're trying to articulate now.  They didn't do it, and I think surprising us at the end of this hearing, after we think we've pretty ably explained the relevant policies and practices with respect to OR-Kids, is --

THE COURT:  Wait.  What is it that Ms. Skjelset is surprising you with?  I thought we already addressed that, if anyone's surprising anybody, it was me asking the

questions.

MR. JINDAL: Understood, Your Honor. I think -- I think this specific argument with respect to the audit trail with respect to a specific case note -- I believe a September 2019 one -- it's not something that we -- we conferred on in advance of this.

THE COURT: And I would imagine you wouldn't have because I don't -- I can't anticipate -- I wouldn't have expected people anticipating, you know, where I'd want to take the discussion.

MR. JINDAL: Fair enough, Your Honor. I'm not --

THE COURT: I just want to make sure that -- you know, I'm open to pointing the finger at people when appropriate, but really the finger ought to be pointed at me for raising the issue. And if you -- if people want additional time to provide supplemental briefing because I unfairly and out of the blue, you know, surprised everybody, I'm open to considering that, but I just -- I'm not seeing that anybody's surprising anybody between the attorneys at this point.

MR. JINDAL: Fair enough.

THE COURT: Ms. Richardson, was there anything else that -- that you wanted to add?

And I want to give you a roadmap. I need to take a break after I hear from you, Ms. Richardson. We'll take

about 10 minutes and come back and continue whatever discussion we might need on the reconsideration issue, and then we'll turn to the 502(a) matter, and then I believe we have a brief discussion on magistrate judge jurisdiction, and then you wanted to take up the issue around extent of phone searches and date ranges, Ms. Richardson.

And then I did want to get a pulse on the discovery plan going forward.

Okay.  Ms. Richardson, anything else on this issue before we take a break?

MS. RICHARDSON:  I'll be brief.

So I just want to make clear that, with respect to the clawback issue, that was -- the clawback letter for this paragraph, which was multiple documents, was provided to us on August 27th, and so -- you know, we had this discussion, but we would ask the Court to please look at that.  We do not think that that is privileged, and it is another example of something that should not be listed as privileged.

Putting that aside --

THE COURT:  So -- and any clarification that I might have -- I mean, if I were to conclude that the excerpts of -- that are put into OR-Kids are not attorney-client privilege, there's waiver of that attorney-client privilege, then this issue of clawback, I mean, is resolved as well.

MS. RICHARDSON:  That's right.

And so that goes to my second point, which is very brief, and that is what Your Honor is facing for this particular case is only in what the record is, and I can understand that you have a lot of questions, and so do we, but it is not a -- I think somebody had said something about "Judges can't be pigs snuffing for truffles" or something.

Remember that?  In some previous --

THE COURT:  Wait.  Wait.  Say that again.  Judges can't be pigs searching for truffles?

MS. RICHARDSON:  Somebody quoted that in some brief of -- you know, I think it was defense counsel that did that at some point.

It is the same here, that it is not something that you, you know, unfortunately, have all these questions, but it is up to the people who have the burden and then those that can respond to give you that information and to support it with evidence.  And based upon the motions which were originally brought up to Your Honor, that motion to compel in the opposition, along with the argument, all of that was presented.  And then, even with an unusual motion for reconsideration, another opportunity, given the information that they had, they could have provided to you evidence of what OR-Kids meant, meaning that there would be attorney-client privileged communication in there that would

be intended to be confidential and not produced or provided.

None of that has ever been given to Your Honor.  So that is why we don't really have an opportunity to go through it in depth.  We did offer to do an ORCP 30(b)(6), but that -- they also said they don't want to do it because they -- they have not supported any of the statements that they made or continue to make here about OR-Kids; and, instead, we only have what we have put forth, which is little bits and pieces of what we know and what we can see in OR-Kids, which is that it is clearly open to many different caseworkers and other individuals, that it is something that is required, and that the information that is cut-and-pasted into there is now no longer privileged, and it should be produced to us.

One other point is that, again, on the privilege log, there is no Bates numbers because they chose not to put Bates numbers on withheld documents.  You know -- so we also have no idea on the privilege log what is actually in OR-Kids except for what's being represented to us.

So we have no way to look at the privilege log to see if there's something from OR-Kids that they are now withholding.

THE COURT:  All right.  Thank you.

Let's take 10 minutes.  Let's come back at -- let's say 12:05.  So it's 14 minutes-ish.  12:05.  And we'll continue

with our discussion of the other subjects as well.

Thank you.  We're in recess.

MS. RICHARDSON:  Thank you, Your Honor.

(Recess taken.)

DEPUTY COURTROOM CLERK:  Court is back in session. The Honorable Mustafa T. Kasubhai presiding.

THE COURT:  All right.  We're back on the record.

Counsel, thank you for your additional arguments on the motion for reconsideration.  As I have indicated before, that I will be modifying my order to reflect that it is not some universal lack of confidentiality that describes OR-Kids or any of the contents in OR-Kids.  The remainder of my order stands.

I will provide some clarification on my ruling with respect to that which I've already indicated I will be modifying to correct the imprecision around the use of the term "confidentiality."  I will submit that to the -- I will file that with the -- with the case file within the next week or so.

With respect to 502(a) and the motion to compel with respect to sort of a waiver of subject matter privilege, again, I appreciate everyone's very lengthy discussions last week about this, and I've had the chance to reflect and review *Chevron v. Pennzoil* and the other cases.

The motion to compel is denied, and I want to explain

my reasoning behind this.  I think I said very, very, very clearly and forthrightly about sort of the complications and challenges with respect to attorney-client privileged material and communications when DHS and -- and attorneys from the attorney general's office are very closely involved in casework management, but that, in and of itself, does not deprive one of an attorney-client privilege, and -- at least under 502(a).

502(a) implicates the unfair -- and I also mentioned at the last hearing that I found that the disclosures were voluntary or intentional, in any event, and so that first element had been met.

The other element with respect to unfairness, the documents are not being used in any way as sort of a sword or shield or in conjunction with other documents being withheld, such that the withheld documents might be used at some point down the road as a sword.

And also Mr. Jindal had represented that -- I believe it was Mr. Jindal indicating that as much that -- the documents in question that have been produced or -- or waived privilege of and produced were not going to be used by the defense in their case; and I think by virtue of that, the issue of unfairness cannot be proved or established for the purposes of 502(a) subject matter waiver.

Having said that, I do want to make it clear, and I

think I have said it here a few times, the nature of, you know, the State's obligation to -- the welfare of children and the close -- you know, sometimes, and in this case, seems to be -- potentially be in some level of tension with the important principle of attorney-client privilege, and I'm not the person that will change that rule.

It will be -- need to be a higher court or policymakers that can address that matter more aptly than I can.

If there were other doctrines that were in play to order the production of such documents, I'd be happy to consider them, but the motion that has been presented to me was on 502(a) waiver, subject matter waiver, and that rule does not provide for the avenue that the plaintiffs would like to obtain these documents.

Have it -- now, I want to make it very clear, if these documents come into play during the course of the trial, the landscape will change, and the issue of unfairness comes back to the table.

So be advised, Counsel, that, if these documents rear their heads again in a case before fact-finders, we're going to revisit this issue.

Before we turn to the phone search and date range and magistrate judge jurisdiction, I -- I would like to think this is going to be a lower hanging fruit, which is a status update on the remaining discovery plan to complete discovery

by November -- I believe, again, November 9th is the date that keeps sticking into my head, but -- so there several -- several witnesses that were named as potentials, but defendants had not yet made a final decision about who they were going to depose.  I'd like to get some clarification on this because I also don't want anybody to be surprised closer to the date of the deadline of discovery completion that -- that, all of a sudden, there's this mad rush to notice depositions that then drag everybody into -- into a chaos before -- before discovery is completed.

So who on plaintiffs' side is prepared to -- excuse me -- defendants' side is prepared to tell me what -- who will be deposed?

MR. WILSON:  Good -- good afternoon, Your Honor. This is Harry Wilson, Special Assistant Attorney General, for defendants.  I do have some brief updates for you.

First of all, Your Honor did mention the written discovery.  I think Your Honor already knows that that has been issued.  There's no additional written discovery that will be -- be issued.

Second, with --

THE COURT:  And before we go further -- go on to the next subject, I don't know if I addressed the time -- the time frame for response, but I -- I understood it to be just in accordance with the rules for the timing for a

response.  I did not -- I don't think I -- I ordered an accelerated response time -- is what I'm trying to say.

MR. WILSON:  Our understanding, Your Honor, was that the response -- we had proposed that the response would be October 3, that -- that was in the -- our discovery plan. That's what we requested.  I think that would allow us time to receive discovery before the expert deadline so that we could incorporate, you know, the discovery that we were requesting into our (indiscernible).

THE COURT:  Thank you for shaking my memory loose. I think this was also where the word "try" became a very regularly and liberally used term, but the deadline is October 3rd.

Plaintiffs, are you anticipating any issue with that? Because, you know, it's not a "try" deadline.  It a "due" deadline.

MR. RIZZO:  I don't believe so, Your Honor.

THE COURT:  Okay.  All right.  So written discovery out of the way.

What about depositions?

MR. WILSON:  So, Your Honor, we -- we intend to take the deposition -- the depositions of April Spicer and Ivan McCool.  Let me start there.

We did, this morning, identify, after some searching, the phone numbers for Ivan McCool -- I'm sorry --

Ivan Spicer [sic] and April McCool [sic].  We will provide those to plaintiffs today, as well as -- we have some other, we think, is correct contact information which we will provide to them today as well.

Our intention is to take Spicer and McCool's depositions in person, in Texas, where they reside.  We will forward that contact information, and we -- we had a brief conversation with Ms. Spicer this morning.  I was not personally on that conversation, but she -- you know, she understands that we are looking to do this the week of October 6th, and she is going to see if that will work.

Her -- Mr. Spicer [sic] is a truck driver and is not home frequently; so it may take a little bit more work to -- to get the appropriate timing for his deposition, but we are going to work that, and we will keep all plaintiffs advised of our progress doing that as we try to get those set up.

THE COURT:  And do the plaintiffs want to appear in person, or will -- will they elect to appear remotely by video?

MR. RIZZO:  Judge, this is Steve Rizzo.  I think -- I haven't seen the service documents in terms of the ability to depose these witnesses out of state, but my intention would be to appear personally.

THE COURT:  Okay.  I raise this only because, to the extent that there may -- may be a dispute about whether

there will be remote technology set up for people appearing remotely, I will order that it be made available so everyone can readily appear remotely, if necessary.

Okay.  Mr. Wilson, so McCool and Spicer depositions most likely in Texas.

And what about the other witnesses that I think are closer to home?

MR. WILSON:  Yes, Your Honor.  So there were -- some witnesses that are involved in the Raygosa criminal trial -- the person known as Mr. Kolego, who's the defense attorney -- we did not intend to take that deposition.

THE COURT:  So Kolego is not.  Okay.

MR. WILSON:  Yes.  The second one is Mr. Morgan. Mr. Morgan was the district attorney.  Mr. Morgan has now become a judge, Your Honor.  He's a judge in Lane County, and so we -- we still need to reach out to him.  We've had to deal with some client issues in -- in the appropriateness of us contacting a judge.  We do hope to do that, you know, really very quickly.  Our hope would be not to take his deposition, but we may need to request a brief one.

THE COURT:  Okay.  So Judge Morgan is still a maybe.

MR. WILSON:  Correct, Your Honor.

THE COURT:  Okay.

MR. WILSON:  Okay.  So then, Your Honor, there are

the depositions of several people who have been deposed before.  These are Clark, Gilad, Sorenson, and Colby.

THE COURT:  Who is the second -- what was the name of the second person?

MR. WILSON:  Gilad.

THE COURT:  Ilid?

MR. WILSON:  Dale Gilad.

THE COURT:  Oh, Gilad.

MR. WILSON:  Yes.  It's --

THE COURT:  G-i-l-a-d?

MR. WILSON:  -- G-i-l-a-d.  Yes.  Yes, Your Honor.

THE COURT:  Okay.

MR. WILSON:  With respect to Clark, Gilad, and Sorenson, we will request those depositions.  Our intention is to do those via Zoom, and we will not be noticing them for full days.  Our hope is that they will be conducted quite quickly.

THE COURT:  I suppose -- I suppose, with respect to Dr. Sorenson, that's if you can negotiate a witness fee that he's acceptable to.

Good luck with that, Mr. Wilson.

MR. WILSON:  That may be true.  That may be true, Your Honor.

THE COURT:  And Colby?  What about Colby?

MR. WILSON:  Ms. Colby -- this one -- we are still

looking at Ms. Colby, Your Honor. As with Judge Morgan, we would hope that we do not need to take this one, but I -- we do need to just do a little bit more checking on whether that's a "Yes" or "No," and we will know that by Monday, Your Honor.

THE COURT: All right. Very good. And was that -- was that everybody on the table?

MR. WILSON: No. One more, Your Honor.

I believe the last one is -- sorry. I'm just looking through my notes -- is Shepherd, and Mr. Shepherd was the juvenile dependency lawyer after the previous lawyer withdrew. We'll be seeking that deposition.

THE COURT: Is that Stephen Shepard or Lynn Shepard?

MR. WILSON: Stephen, Your Honor.

THE COURT: Okay.

MR. WILSON: And, again, Your Honor, to the extent that it would be convenient for the parties, Mr. Shepard -- we'd be agreeable to do that deposition by remote means.

THE COURT: Okay.

MR. WILSON: But I'd be happy to -- we'll confer with everyone to make that as easy as possible.

THE COURT: And notices haven't been -- haven't been served yet?

MR. WILSON: No, Your Honor. They're being

prepared, and our intention is to serve on Monday.

THE COURT:  Okay.  All right.  And any questions regarding the discovery plan from plaintiffs?

MR. RIZZO:  No, Your Honor.

Thank you for the update, Mr. Wilson.

THE COURT:  All right.  Very good.

On the magistrate judge jurisdiction matter, I have everybody's briefing.  I think my initial cursory review indicates that I think both plaintiffs and defendants agree that because Mr. Raygosa is still a party to the case --

Wait a minute.  I'm missing defendants.  Are they just muted video-wise?

Pop back in and let me know that -- all right.

I think what's happening with our WebEx system is that, when you video mute, you disappear from the screen, as opposed to being sort of a blank video screen.

All right.  Okay.  Looks like we still have everybody here.

Magistrate judge jurisdiction, I think, if I'm not mistaken, both plaintiffs and defendants agree that, because Mr. Raygosa is still a party to the case, because a final judgment -- default judgment has not been entered, that -- that I do not have consent by all the parties, and so therefore magistrate judge jurisdiction doesn't attach at this time.

Regardless of whatever the -- you know, the interests and motivations for raising the issue, I think it's a legal question that, I think, has -- has satisfactorily been answered in that regard.

The question now, then, becomes "What do we do with respect to the trial and anything else that might -- might precede?"  My intentions are that we continue as planned with, you know, the schedule of the deadline, the dispositive motions, because that would all be within my jurisdiction anyway as a magistrate judge, and then we will know more, by the end of the year, whether the case will be set before a district judge, one way or the other.

Are there any other implications that the parties want to raise to me about what next steps might there need to be?

Let me also offer, I think, in Mr. Rizzo's -- or one of the plaintiffs' briefings, there was this issue about severing.  I'm looking into it.  I'm going to look at the rule.  Let me also offer -- again, unlike, Mr. Jindal, I did -- I did invite you to play poker with me.  I'm a terrible poker player because I think I tend to show too many of my cards, and so at least we shouldn't be on the same team when it comes to playing poker.

But here's the point:  What I want to share with you is this:  You know, the idea of severing is appealing for the purposes of ensuring that judicial economy and efficiency is

preserved and maintained.

The idea that, if this case were reassigned to another judge, means that the amount of institutional memory and involvement with the case that I have is lost.  It would be unfortunate for the courts because another judge would have to be able to get up to speed on, I think, the volumes of material that have been produced in our motions and the decisions that I've made and the arguments that you've made, the issues that may be preserved or not preserved for -- for the variety of decisions that, again, that -- that I've made.  Including, for example, the one with respect to 502(a).  I mean, it's an incredibly amazingly nuanced issue and potentially arcane.  I suppose you can bring that to a judge's attention and try to remind them of what it is that I've decided; but, again, they may not be bound to it.

So, you know, my concern is that, while there is interest in ensuring that the court's resources are not wasted, there's also value in making sure that decisions remain consistent such that this case can continue to move forward at the -- at the trial time that's been -- that's been scheduled.

So all of this is to say is that severance has appealed to me in order to ensure the judicial economy of the case in get -- getting the case to trial.

It appeared to me -- and I understand that the

defendants have not had the opportunity to educate me on their position, but it appeared to me that from plaintiffs' description of the situation, in my own understanding of how the case law -- excuse me -- the state case claims against Mr. Raygosa by the -- by the defendants do not implicate the federal claims that are -- that are between these plaintiffs and the State defendant, that there would be no material prejudice to the defendants.

Mr. Jindal, you raised your eyebrows, and then you shook your head.

MR. JINDAL:  I think you're learning, Your Honor, why I was temporarily off of video because I don't have a poker face, but I'm going to let --

THE COURT:  So, again, I'm showing you my cards. At the -- at the point at which I will -- I will be considering severance, even on my own motion, I will invite the parties to brief the matter.

MR. WILSON:  Thank you, Your Honor.  I would appreciate that.

There are some particulars with respect to the rule that plaintiff has identified.  That's Rule 21.  We think that that rule, in particular, is not the -- is not an appropriate basis for severance in this instance, and we do disagree with plaintiff that -- that our third-party claim is unrelated.  We do think it's -- it's very related to the

issues in this case, and it's important to consider all -- all together.

But I'll stop there and take your opportunity to -- your offer for an opportunity to brief the matter, Your Honor. That sounds appropriate.

THE COURT: Very good. I suppose, in the meantime, Mr. Raygosa could file a consent form.

MR. RIZZO: He could.

MR. WILSON: He could, Your Honor.

THE COURT: And then that would -- that would save us -- all of us brief -- briefing time. But who knows? We'll see.

All right.

MR. RIZZO: Judge, what does the Court want to do with regard to the timeline for the briefing?

THE COURT: Briefing on what?

MR. RIZZO: The severance issue.

THE COURT: Yeah, I'm -- I'll tell you this: When -- when I'm ready to take the matter up, I'll let you know, and then I'll ask you -- I'll provide a briefing schedule.

MR. RIZZO: Okay.

MS. RICHARDSON: I don't have anything on this issue, Your Honor, but I want to go back to Mr. Wilson on deposition notice and documents, if I can, for the

discovery.

THE COURT:  Sure.  Go ahead.

MS. RICHARDSON:  Because when I heard it, I just wanted to confirm; so I did some texting with my colleagues.

So what I want to make sure is that Mr. Wilson and his team confer with us on dates we requested and not just send us notices of dates.  We do need to (indiscernible) out the dates for the depositions ahead of time.  And so I assume that that will happen, and hopefully that can occur this afternoon.

MR. WILSON:  Thank you.  Of course -- of course, we will confer on dates.  That's absolutely our intention.

Because, as we have sometimes done and as the parties have sometimes done in the past, we -- we may wish to issue notices with certain dates but with a conferral, understanding that no date is final until all parties are in agreement on that date.

So, for example, we have, in the past, issued notices -- or subpoenas -- I think both parties have done this -- with placeholder dates in order to get a notice out, but then nothing would go forward without ensuring that everyone is on the same page and the same date, and we absolutely make the commitment to do that, Your Honor.

I'm not sure that we'll be able to do that conferral this afternoon, but I'm sure we can do it on Monday in order

to -- to keep this process moving as quickly as possible.

THE COURT: Any reason why it can't be done this afternoon?

MR. WILSON: Yes, Your Honor. I think we have some people who we need to make sure that -- you know, they might be taking the depositions or their availability is going to be important to this process, and I'm not sure I can get them all on the same page in the next few hours.

But we can do that on Monday, and we would be glad to do that.

THE COURT: Who else will be taking depos from Markowitz?

MR. WILSON: Well, that's one of the things we need to discuss amongst ourselves and with our client, Your Honor.

THE COURT: Who are the potential up-at-bats? You lost Hoffman; so she's not going to be involved. So --

MR. WILSON: It's a huge blow. It's a huge blow not to have her. She -- you know, she did help with a lot of this.

You know, I'm potentially at bat, Your Honor. Mr. Edelson's definitely at bat, whether he likes it or not. We could sub Mr. Jindal in, if need be. But it is -- Your Honor, I want the conferral to be valuable and useful to everyone.

We'd be happy to -- we've already advised plaintiffs of the date ranges we'd like to take these.  So, in other words, you know, for the next -- the next two weeks will be the depositions of -- sorry.  Let me just check my notes -- of the people who have been deposed before.  That's Clark, Gilad, and Sorenson.  And then, potentially, Judge Morgan.  And then we are hoping to do Spicer and McCool the week of October 6th.  And I think Mr. Edelson is hopefully -- hopefully, on tap for those, if those will work.

But in terms of, like, what specific dates for what specific depositions, I would, Your Honor, respectfully ask for us to have -- this afternoon to confer amongst ourselves and to talk to plaintiffs on Monday.

MS. RICHARDSON:  That's fine.  I think that what's important is not to send out notices without having that meaningful conferral and that we are ready and prepared because it just -- because you can easily send out a notice of deposition so we know.

THE COURT:  So I'm happy to sort of facilitate promotion of getting this conferral time scheduled on Monday.  I have -- you know, it seems to me like we have all the decision-makers here.  Let's set a time that on Monday you will confer, without me around.  I don't want to be there.  So tell me what time it is that all of you can have a phone call and get the dates hammered out.

MR. WILSON:  State defendants are available at 1:30, Your Honor, or at least I am, and I will -- I will have answers.  I will have talked to my team.

THE COURT:  All right.  1:30 work for plaintiffs' counsel?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  1:30 Monday the parties will confer on dates.  Make sure that all of the depositions will be able to be scheduled -- was it by October 6th -- the week of October 6th?  Within the week of October 6th.

MR. WILSON:  Right.

THE COURT:  So 7, 8, 9.  So by October 11th.

MR. RIZZO:  Judge?

THE COURT:  If I'm not mistaken, it will be that Friday.  I think that's a Friday.

MR. RIZZO:  Judge, this is Steve Rizzo.  If I can just put an issue on the Court's radar, in light of the preceding argument, and now Mr. Wilson's confirmation that the defendants intend to depose Spicer and McCool.  The Court just went through a lengthy analysis and a ruling regarding 502(a) in terms of fairness and the documents that would or would not be used.

Now, applying that same discussion, we are now being told that the defendants intend to depose Spicer and McCool, and there is a communication at issue in the (indiscernible)

case where there were questions about Spicer's and McCool's fitness (indiscernible) foster parent, as well as numerous CPS reports that pertain to the conduct in that home while our child was there.

And so I -- I am sensing and I wanted to put this on the radar that there may be a supplemental, i.e., separate but related, 502(a) issue regarding this document that was attached to Ms. Korbel's declaration, in light of the depositions of (indiscernible).

THE COURT:  Okay.

MS. RICHARDSON:  I can maybe make this -- Mr. Rizzo, it's so hard to hear you.  I just want you to know that -- I don't know why, but for some reason your audio isn't working well.

But what it sounds like is that the thing that -- I believe it was Mr. Jindal who wrote to us on Tuesday that he wanted to bring these issues up about this paragraph that is in these 12 documents to the Court's attention today, and now that question, of course, is -- well, it sounds to me, based upon the judge's order on this, that these are to be produced, but maybe a better -- or more clear ruling as to these specific documents with the clawback issue.

If we could have that -- the clawback issue.  Is that right, Mr. Rizzo, because this implicates the Spicer family?

MR. RIZZO:  I appreciate that.  That's accurate,

yes.

MS. RICHARDSON:  Yeah.

THE COURT:  So tell me what the solution is that you're asking this Court to -- to provide.

And there is some -- some sort of just disturbance in the sound quality, Mr. Rizzo.  It's incredibly muffled.  It was hard to follow everything that you were saying; so I'm -- so tell me what the solution is you're asking me to direct.

MR. RIZZO:  I think it's -- can everybody hear me at this point?  Maybe when I turn my head this way it sounds better?  I don't know.  But they're not cutting the tree today, Your Honor.  But with that said, I think what Ms. Richardson just proposed would squarely address the issue.  If there is a ruling regarding the clawback of that particular document so the parties know whether it can or cannot be utilized in connection with questioning or cross-examining Spicer-McCool.

THE COURT:  Okay.  Who wants to comment from defendants?

MR. JINDAL:  Your Honor, it probably makes the most sense for me to chime in here.

As I understand the issue -- and I'm sure Mr. Rizzo will jump in if I've got it wrong -- it's that they understand Your Honor's ruling, with respect to the motion

for reconsideration, to mean that that document that you and I were discussing earlier with that redacted paragraph in it, that we now have to remove the redaction and produce it in unredacted form.

If that's the -- if that's Your Honor's ruling, we'll abide by your ruling.

I didn't understand Your Honor to be -- to be saying that, and we were awaiting -- we were going to await your formal order.

THE COURT:  Okay.  Well, I mean, is that document going to be used in the McCool and Spicer depositions?

MS. RICHARDSON:  Yes.

MR. JINDAL:  By us?  No, Your Honor.

THE COURT:  Okay.  But would be by plaintiffs?

MR. JINDAL:  Not the redacted portion of it, at least.

THE COURT:  Okay.

MR. JINDAL:  (Indiscernible.)

THE COURT:  All right.

And then, Ms. Richardson, when you said, "Yes," what -- was it your understanding that -- were you intending on using that document, the unredacted version of that document in the Spicer-McCool depositions?

MS. RICHARDSON:  Yes.

THE COURT:  Okay.  All right.

Well, when I sit down to clarify my order, I'll have that matter in mind to make sure that I don't create any more confusion.

MR. JINDAL:  Thank you, Your Honor.

MR. RIZZO:  Thank you, Judge.

THE COURT:  All right.  The extent of phone searches and date ranges, Ms. Richardson.

MS. RICHARDSON:  Yes.  So this goes back to the devices -- the three devices that were searched by Lighthouse, and we had that discussion last Friday.  There was a -- you know, we wanted to know what had been deleted, and there was a report, and Mr. Wilson joined in at the hearing and said that they would provide that report, that they were not going to withhold that; and so yesterday, at 11:00 a.m., we finally got the reports, which is a deletion report.  It would -- it's an analysis done by the third-party vendor, Lighthouse.  And I'm still looking at it; so I have a lot of questions.  I don't want to bring it up to the Court right now because we haven't had enough time.

Apparently, this -- the first report was sent to Markowitz on September 6th.  So we're just now getting the reports.  But what I see in the reports is that it says that it is focused on deleted messages between November -- January 1, 2016, to December 31, 2020.  And we want to know

whether or not anything has been deleted on those phones in those messages. Up through now, there is never a time limit put on by the Court on what text messages would be searched for deletion.

So, with that, I just want to make it very clear, because we didn't seem like we were going to be able to get to a resolution on that, that this Lighthouse vendor needs to look at deletions outside of those message timeline dates that were sent by Markowitz to that vendor.

THE COURT: Okay.

MR. WILSON: Your Honor, I can speak to this.

THE COURT: Yes. Please go ahead.

MR. WILSON: Your Honor, as we discussed with Ms. Richardson's office, with Lighthouse, on September 12th, during the call, the Markowitz office did provide a time scope, but the Markowitz office also asked Lighthouse to perform a deletion analysis with no time limits. You know, the entire time frame. And so the deletion reports that we -- that Lighthouse ran and that which we have provided to Ms. Richardson's office do not have a time limitation.

So if Ms. Richardson -- when she looks at the spreadsheets that provide the analysis, they will go all the way through August of 2024, which is the latest possible date.

To give Your Honor an example, the spreadsheet for

Kat O'Brien contains about 7,100 rows of information that Lighthouse has compiled.  And those rows correspond to Lighthouse's best estimate of when a deletion occurred, and those rows continue all the way through August of 2024.  So the analysis has no limitations on actual dates.

It is true, Your Honor, that the accompanying written reports that describe the methodology reference the scope that we initially provided Lighthouse, but they also go beyond that scope and talk about things -- you know, the messages all the way through 2024.

And to give Your Honor another example -- and I know Your Honor doesn't have these documents in front of him, but as another example, there was a question about a reset of Mr. Hammond's phone, and there is a paragraph or several paragraphs in the report from Mr. Hammond, in the written report, that discuss that reset; and, of course, that's alleged to have occurred in -- in July of 2024.

So they are completely comprehensive.  We did discuss this during the September 12th call, and the analysis goes all the way through August of 2024.

THE COURT:  Ms. Richardson?

MS. RICHARDSON:  Yes.

THE COURT:  Yeah, go ahead.

MS. RICHARDSON:  Thank you.  The issue is that we didn't have these requested reports that had been made

available to Markowitz before that call, and what -- we now have it.  You know, it just says something else.  So, basically, what we need to be able to do is not go through the Markowitz firm with all these questions and confirmations.  I want to be able to have that direct communication with Lighthouse, with Lighthouse responding back to us that they did, in fact, conduct the entire search, not just what they put in here, which was, quote, "This report focuses on messages dated between 2016 and 2020."

So, you know, it just makes it a lot more difficult if we can't have that direct communication, and so we want to be able to do that and just make sure that all of our questions are answered with this third-party vendor.

When Your Honor --

THE COURT:  Could I -- I want to interrupt.  One thing that also stuck out with me from our last meeting was that you wanted to speak with Lighthouse directly to get answers to your questions about, you know, how the -- how the phones were sent or -- and how it was extracted.  Did you end up having -- and Ms. Korbel was involved in that -- in that previous effort to get that information from Lighthouse, but for whatever reasons, things were not able to be completed.  Did that -- did that phone call happen, and do you have all of that information?

I just want to kind of set that aside if that part has been resolved.

MS. RICHARDSON:  So on Tuesday Ms. Korbel wrote a detailed letter asking lots of questions of Lighthouse.  A Lighthouse person responded.  That was Tuesday of this week.  A Lighthouse person responded, but we had more questions because there were some -- you know, we didn't get the report until after Lighthouse responded to those questions.

So, you know, it just makes it difficult.  Right?

So now we have more questions, and I just want to make sure that we can continue to do that without having Markowitz respond on behalf of Lighthouse.

THE COURT:  Okay.

MS. RICHARDSON:  I just want to have Lighthouse answer some of these pretty detailed questions as we go down and analyze.  I mean, there's quite a bit of analysis here, and because it's a third-party vendor that they chose and I didn't really get a chance even to weigh in -- although Your Honor did say that we would be able to do that -- I do want to make sure that we have very direct access to Lighthouse, just about these.  I don't need to know about all the previous stuff.  If we do, then we can open it up, obviously, with the Markowitz firm, but we want to ask those questions.

THE COURT:  All right.

MR. WILSON:  Your Honor, I did want to --

THE COURT:  And, Mr. Wilson, I'm going to -- I want to be as efficient with resolving this as possible, and I've made it pretty clear throughout our meetings that I expect that Lighthouse be available to answer questions so there's no confusion about its role and involvement, and I agree with plaintiffs.  They should be able to put questions directly to someone at Lighthouse who knows what they're talking about when answering those questions.  Markowitz should be there and be present with those phone calls. That's fine.

But there's -- if -- if there's going to be a claim of work product by Markowitz with respect to Lighthouse, then we're opening up the Pandora's box of making another copy of those -- of those download -- a download of those phones, and I'm going to order that that be done and that plaintiffs can take that information to their own vendor for forensic analysis.  I'm not -- I'm really not interested in creating any friction and drag on this issue at all, but if we have to, then the friction and drag will be immense.

MR. WILSON:  Your Honor, I do want to be clear. We are not in any way trying to stand in the way of plaintiffs getting information from Lighthouse.  You know, we suggested that plaintiffs have a call with Lighthouse. We then set that call up, and many of the questions that

Ms. Richardson is talking about today were asked and discussed during that call.

We are also quite happy to set up another call with Ms. Richardson, with Ms. Skjelset and her firm, and Lighthouse, to answer further questions.

Lighthouse also responded to Ms. Korbel's letter directly. That was -- I did not respond. Lighthouse issued that response.

We -- so I think maybe the next best step might be to have another call with Lighthouse and allow Ms. Richardson and anyone else to ask whatever questions they would like, and we would be fine to facilitate that.

The only work product concern we have, Your Honor, is with our specific email communications with Lighthouse, you know, as our discovery vendor, but we are fine to facilitate email questions to Lighthouse or to have another call.

I do want to flag, Your Honor, that we would like the questions to pertain to the subjects that Your Honor ordered the searches to involve. And that's to text messages.

So, you know, we -- the only thing that we would be, I guess, I would say "unsure" -- I'm -- I might want to have some objection to is if the questions delved into particular areas of these cell phones that go beyond your Court's order. Secondary applications or other content on the phone.

We do have obligations to respect the privacy of our clients, and then there is a third party, who, as Your Honor knows, has his own counsel.

And so -- but, otherwise, with respect to text messages, I think another call sounds like a good idea, or if Ms. Korbel or Ms. Richardson would like to write additional letters, we'd be -- we have no objection to that at all.

MS. RICHARDSON:  I'm glad that you brought that up, Mr. Wilson, because, actually, I have a number of questions that I put forth after I got these reports, and we just have -- we got them yesterday; so Lighthouse hasn't had time to be able to respond to them.  But one of the things that this deletion report shows is that Mr. Hammond -- and confirmed, which was told to us last week.  Mr. Hammond did a hard reset, as his deposition was approaching, of his phone.  Completely wiped it.

So now what I'm doing is analyzing and looking at this to see what exactly has been deleted, and there is a question now as to whether or not we should perhaps bring to your Court's attention third-party app messages, not just the ones that are on the SMS text messages, but if there's going to be some other type of search, I'm not going to ask them to tell me about the details of that, but I probably am going to have some questions about procedure.

I understand that Lighthouse has said that it would take weeks or months, or something, to search those types of apps, and that is not my understanding from another vendor who's local here.  That it would not take that long.  And so I'm just going to have questions about that that I might want to bring -- be able to bring up to the Court, in order for the Court to have context of why we might need to have additional searches, other than just native text messages.

Plus, there is this issue of spoliation, which has been discussed many times before, and these deletion reports were critical for us in order to determine -- you know, try to decipher them to see what it is we need to be able to explain from spoliation.

So rather than set up another phone call, which is great to do and we'll work with that, I probably would like to have a list of questions and then have Lighthouse respond.

Of course, we always cc Markowitz attorneys on it, but I just -- I don't want to be limited to so much that we're just going to have some sort of conversation.

THE COURT:  So if you want to submit written questions to Lighthouse and have them respond before having a phone call, by all means, I think that's appropriate and allowed.  It doesn't run afoul of any of my expectations for transparency with respect to what Lighthouse was obligated

to do in its forensic analysis.

And now with respect to the issue of something beyond standard text messaging, you know, the lines now just continue to be blurred as -- as technology continues to evolve.  You know, I think, in many ways, text messaging -- I use as a -- as a -- sort of a general term for, I guess, what maybe older kids these days called DMing, and so I -- you know, I don't even know if I'm using that right, but let's just say wherever there's some direct message app -- I mean, we -- I mean, on my iPhone, there's the message app.  That's an app.  All right?  So there's WhatsApp and Instagram and Snapchat and all that other stuff.

I mean, I get that there's maybe more places in which somebody is communicating, and the purpose and intent behind whatever I've ruled is that that messaging was to be explored and discovered, not just simply an iPhone app.  Because, frankly, an Android isn't using an iPhone app.  So, I suppose, it uses its own -- its own sort of native app.

So we are talking about apps that message.

MS. RICHARDSON:  Yes.  And so when we want to ask Lighthouse, for example, "What do you see on the phone?  What are the apps on there?"  How, you know, it's -- like, I understand Snapchat.  "You might not be able to search it because it just disappears, but if there's a different type of app, maybe we can take a look at what that is?  How much

time is it going to take?"  Those are the questions that we want to ask.

And it is true that it looks to be that there are going to be some third-party applications; so I appreciate Your Honor's clarification.

MR. WILSON:  Your Honor, with respect that is not how we have interpreted your order, in part, because of the transcript from August 6th that makes reference to SMS text messaging and the written order that you issued on August 15th at ECF 80 that specifically states "text messages," not -- not other kinds of messaging, not direct messages.

I want to be very clear, Your Honor, that we -- we will respect however you interpret your order.  That is your prerogative.  But your specific use of the language "text message" in the August 15th ECF 80 order is the basis for what -- what specifically we requested Lighthouse to do.

It is also, Your Honor, the understanding of Mr. Hammond and Mr. Hammond's lawyer -- and I am concerned that Mr. Hammond's counsel isn't here.  If there's, you know, going to be additional exploration of his phone, then I think that it's important for him to participate in this conversation.

MS. RICHARDSON:  We can limit it to the other two phones for now, but Mr. Hammond wiped his phone.  When I see

the report, we're not going to get anything out of his phone anyway.

So now it becomes even more important that we look at Ms. O'Brien and what Ms. Chapman had.

THE COURT:  So I think it's safe to say that we're not really dealing with Mr. Hammond at the moment with respect to the -- the text messaging issue.

MS. RICHARDSON:  Right.

THE COURT:  Let me just take a look at my order.

MS. RICHARDSON:  (Indiscernible).  I believe I've got confirmation through attorneys and Lighthouse that they did download the entire phone; so, you know, whatever is there at the moment has been captured.  And then, depending on what comes out of the text messages that are being searched, which we're waiting for the substance of those, and the deposition testimony, which we still have to get scheduled for these individuals.

THE COURT:  Sorry.  Ms. Richardson, I -- if that was communication directed to the other counsel, that's fine, but I was --

MS. RICHARDSON:  Sorry --

THE COURT:  -- taking a look at my order.

Let me just address the order.

And, Mr. Wilson, I'm looking at page 2 of -- and this is in the Conley case of ECF 80, page 2, Roman Numeral II,

Arabic Numeral 2(a), which I think is what relates to the search of the phones, and now it does refer to text messages on the phones.  It doesn't refer to SMS text messages, but you referred to the term "SMS."

MR. WILSON:  I did, Your Honor.  And there's a reason for that.  On -- in the August 6th hearing, there was a colloquy.  It occurs on pages 110 and 111 of the transcript, and there's a discussion in which you are speaking to Ms. Richardson, and you say, in part, "I'm not raising this to invite it, but I just want to make sure that we don't come back again.  You're not raising WhatsApp or Instagram or TikTok or Slack or something else?"

Ms. Richardson says, "Well" --

And then you continue, Your Honor, "It's -- it's whatever the SMS messaging -- the messaging app that is available on any of these -- on any of these phones."

And a little later, Your Honor, between pages 110 and -11 -- and 111, you say, "And this leads to the issue which I want to make sure that we are tightly confining the search of the phone -- I'm not going to be -- I mean, how do we make sure that these phones can be searched only within -- within the realms of text messages?"

And so, Your Honor, that -- that's the -- that's the secondary text we used to interpret the primary text, and we did -- and the specific language of "text messages" as

opposed to "direct messages" or "messaging" is why we made that interpretation, Your Honor.  You know, we take Your Honor's words very seriously.  We want to get them right.  And if you tell us that we've done -- we misinterpreted it, we will absolutely change.  But I want you to understand why we interpreted it the way we did.

THE COURT:  Well, if the transcript says what it -- I mean, it accurately characterizes what it is I would have said then, and I -- I'm not going to reinterpret my language to be expansive.

If there's a request to do something different, then we need to address it in that context.  But my order, it does appear from the transcript, in conjunction with the written order, it does relate to just the text messaging, the native apps, whether it be a Google or an -- an Android or an iPhone, which would, you know, be the app that comes with the phone.

So if there's -- Ms. Richardson, are you asking that that be expanded at this point?

MS. RICHARDSON:  Well, what we want to do is be able to ask the vendor more questions about it.  What they can determine from seeing all of -- you know, everything on the phone and whether or not there's any messages at all.  For example, if there are, like, other's apps like, I don't know, Signal or some of these other ones people use these

days, and if they are even on the phone, I want to be able to ask about that, and then --

THE COURT:  So you're entitled to ask about whether these apps exist on the phone and whether any information was deleted from them.

My order does relate to the produce -- the discoverability and produce -- the production of those text messages themselves, not whether they exist or not.

So for the limited scope of asking Lighthouse about the existence of these other apps, that's fine.  I'm okay with exploring just to make sure that -- that if there are other apps and for which other messages were deleted, you're going to have to come back to me and ask -- and seek approval for getting it, if I'm going to even authorize it at this stage in the -- in the process, but you're allowed to inquire about whether they exist.

But, again, produce -- producing them is not part of my order at this time.

MS. RICHARDSON:  Yes.  I understand that.  But you can also see why we just learned about pretty massive deletions here, which is what I was hearing from some time ago, and so that was the basis --

THE COURT:  You said three?  Three massive deletions?  What were the three?  I thought Mr. Hammond was --

MS. RICHARDSON:  Pretty massive deletions.  His --

THE COURT:  Sorry.  I didn't -- could you say that again?  I heard you say "three massive deletions."  I'm only aware of one hard reset.

MS. RICHARDSON:  No.  No.  "Pretty."  I said "pretty."

THE COURT:  Pretty massive.

MS. RICHARDSON:  "Pretty massive."

THE COURT:  I definitely think that we are -- we are testing the boundaries of remote hearings with this case.

All right.  Okay.  Was there anything else with respect to the Lighthouse questions that need to be addressed, or is everyone clear on it?  Does anyone need any clarification?

Okay.

MS. RICHARDSON:  No.

THE COURT:  All right.  There was -- I don't think there's any other issue that anyone else has raised from the outset of our -- at the beginning of our hearing today, but one issue did come to mind, and I wanted to make sure I understood this a little bit more clearly.  Mr. Rizzo said something to the effect of based on these new developments around Mr. Hammond and what may came about as a result of a deposition of Mr. Hammond that, then, Plaintiff -- Plaintiff Levi may move to amend their complaint to include

Hammond as a defendant.

So, Ms. Skjelset, you're shaking your head.

MS. SKJELSET:  Well, that's because Conley -- a correction.  Conley said that.

THE COURT:  Oh, wait, wait, wait.  I'm sorry.  So it wasn't Levi that was seeking to amend.  Got it.

So Levi is not seeking to amend -- or would not be considering even amending to include Hammond as a defendant in the Levi case; correct?

MR. RIZZO:  Well, Judge, it's just that it wasn't on our -- on our radar -- on Levi's radar at the time.  So I wouldn't rule it out, but it's not my present intention based on the information I know.

THE COURT:  Okay.  And Conley.  What is Conley's intention?  Is it to --

MS. RICHARDSON:  We're looking at -- well, I brought it up last Friday for the first time.

THE COURT:  Okay.

MS. RICHARDSON:  And, of course, we're waiting on the, you know, reports -- right? -- so -- but it is something that we are considering doing.

THE COURT:  Okay.

MS. RICHARDSON:  Adding Mr. Hammond.

THE COURT:  All right.  Just to -- to, again, show some of my cards, I mean, there's -- well, one, I don't have

full consent in Conley; so it may not matter by the time you get to trial, but to the extent that Hammond might be considered as being included in the Levi complaint, it will raise issues about whether the trial can go forward in February.  So be advised.

You know, I think there's a strong and solid reason for needing to -- then to have to revise the trial date for Levi if Hammond -- if -- even if the plaintiffs are going to be allowed to amend the complaint to include Hammond as a defendant, that puts things off track for trial in February.

All right.

MS. RICHARDSON:  Can I ask a quick question, Your Honor?

THE COURT:  Yes.

MS. RICHARDSON:  So if Conley -- because we are the ones that are looking at that pretty carefully, and if Conley were to do that, that shouldn't affect Levi's trial, because we have a different trial date.

THE COURT:  That's correct.

MS. RICHARDSON:  It would affect our trial date.

THE COURT:  That's correct.  I don't anticipate that being an issue with the Conley case -- or with it implicating Levi's trial date.

MS. RICHARDSON:  Okay.  Thank you.

THE COURT:  But if you are going to do it, be

advised that, if you do it at a late enough hour, it's going to cause a problem with Conley's trial date as well.

So, you know it's going to -- the effect would be similar to both cases, depending on when it -- when you're pursuing it.

And let me just offer that I -- I suspect that -- I mean, if Hammond is included as a defendant and it's allowed, that the complaint is allowed to be amended -- I mean, right now Mr. Hammond has his own counsel.  It may very well be possible that he'll continue to have separate defense counsel.  I fully would expect that, if it's Mr. Campbell, given what I know about Mr. Campbell's general trial schedule into the next decade, it can become quite challenging for him to become -- to be available in April.

So just -- I'm giving you some inside information about what I know about Mr. Campbell's trial schedule.

All right.  Anything else before we finish up for the day?

I know that we have October 18th as our next status conference.

By then, the depositions will all be done, and then we'll have -- if there are any issues to be raised, then to bring them up in advance of the -- of that status conference date so we're all on notice about what we will need to resolve, if anything at all.

Now, it's certainly possible that all of you might confer with one another prior to October 18th and realize there's nothing else that needs the Court's attention.  You can -- if that is, in fact, the case, report to me, and we don't have to meet.  But I want to make sure that it's there in the event that we are going to need to take up some issues on discovery.

All right.  Anything else before we shut down for the -- for the day?

I'll start with Plaintiff's Counsel Levi first.

MR. RIZZO:  I don't believe we have anything, Your Honor.  Thank you.

THE COURT:  Thank you.

And for plaintiff's counsel Conley.

MS. RICHARDSON:  Nothing.  This is probably the most efficient hearing we have had since.

THE COURT:  Only because we only had a few issues.  I mean, I --

And for defense counsel.

MR. WILSON:  No, Your Honor.

THE COURT:  All right.  Thank you all very much.  I look forward to not hearing from you until October 18th.  Have a good day.

MS. RICHARDSON:  Okay.  Thank you.

MS. SKJELSET:  Thank you, Your Honor.

THE COURT:  You're welcome.  Good day.

DEPUTY COURTROOM CLERK:  This court is adjourned.

(End of FTR-recorded proceedings.)

                        C E R T I F I C A T E

                  Ethan Levi v. Kim Chapman, et al.

                         6:22-cv-01813-MK

                              and

                 Shannon Conley v. Kim Chapman, et al.

                         6:23-cv-01353-MK

                        Status Conference

                        September 20, 2024

          I certify, by signing below, that the foregoing is

a true and correct transcript of the record, taken by

stenographic means, of the FTR-recorded proceedings in the

above-entitled cause.  Where (indiscernible) has been

indicated, the audio file was unable to be heard due to

simultaneous crosstalk, fast speaking, mumbling, or other

room noises overriding what was being said.  A transcript

without an original signature, conformed signature, or

digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____

Transcriber/Official Court Reporter      Date: 10/10/2024
Oregon CSR No. 98-0346    CSR Expiration Date:  9/30/2026