IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                          )
                                     )
                    Plaintiff,       )  Case No. 6:22-cv-01813-MK
                                     )
              v.                     )
                                     )  October 18, 2024
KIM CHAPMAN, in her                  )
individual capacity; ANASTASIA       )
TIBBETS, in her individual           )
capacity; KASSIDY O'BRIEN, in        )
her individual capacity, ERIN        )
LANE, in her individual              )
capacity; THE OREGON                 )
DEPARTMENT OF HUMAN SERVICES,        )
a government agency; and JANE        )
and JOHN DOES 1-5; in their          )
individual and/or official           )
capacities,                          )
                                     )
                    Defendants.      )
_____)
OREGON DEPARTMENT OF HUMAN           )
SERVICES,                            )
                                     )
         Third-Party Plaintiff,      )
                                     )
              v.                     )
                                     )
JOE ALBERT RAYGOSA,                  )
                                     )
         Third-Party Defendant.      )
_____)


STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES

FOR THE PLAINTIFF(S):

MARY SKJELSET
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201

FOR THE DEFENDANT(S):

JEFFREY M. EDELSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

FOR THE DEFENDANT(S):

HARRY B. WILSON
Markowitz Herbold PC
1455 SW Broadway
Suite 1900
Portland, OR 97201

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator      )
for Z.C., a minor,               )
                                 )
                    Plaintiff,   )   Case No. 6:23-cv-01353-MK
                                 )
          v.                     )
                                 )   October 18, 2024
KIM CHAPMAN, ANASTASIA           )
BROOKS, KASSIDY O'BRIEN, ERIN    )
LANE, MARGARET RAMIREZ, in       )
their individual capacities,     )
                                 )
                    Defendants.   )
_____ )


STATUS CONFERENCE

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES

FOR THE PLAINTIFF(S):

    MARISSA KORBEL
    Allegiant Law LLP
    100 SW Main Street
    Suite 400
    Portland, OR 97204

FOR THE PLAINTIFF(S):

    MANUELLA M. TSHALA
    Allegiant Law LLP
    100 SW Main Street
    Suite 400
    Portland, OR 97204

FOR THE DEFENDANT(S):

    JEFFREY M. EDELSON
    Markowitz Herbold PC
    1455 SW Broadway
    Suite 1900
    Portland, OR 97201

FOR THE DEFENDANT(S):

    HARRY B. WILSON
    Markowitz Herbold PC
    1455 SW Broadway
    Suite 1900
    Portland, OR 97201

TRANSCRIPT OF PROCEEDINGS

(October 18, 2024)

(Via videoconference:)

THE COURT:  Good morning.  Please call the case.

DEPUTY COURTROOM CLERK:  Now is the time set for Civil Case Number 22-01813, Levi v. Chapman, et al., and Civil Case Number 23-01353, Conley v. Chapman, et al., for a status conference.

THE COURT:  All right.  Good morning, Counsel.

Thank you for all being available today to go over some of the remaining discovery timelines, some issues specifically with respect to discovery substantively, and maybe some motion briefing.

I have the letter from Allegiant Law -- oh, the screen just went blank.

Oh, all right.  It looks like you're still connected. I just lost you on my video.

So are you able to hear me?

MR. EDLESON:  We can hear you.

MS. SKJELSET:  Yes, Your Honor.

MS. KORBEL:  Yes, Your Honor.

THE COURT:  Thank you.

So the video is still out on my screens.

DEPUTY COURTROOM CLERK:  I'm not sure --

MS. SKJELSET:  We can also see you, Your Honor.

DEPUTY COURTROOM CLERK:  Oh, let me check with IT.

THE COURT:  It's not fair you can see me but I can't see you.  There's something wrong with that picture.

All right.  I can see you now.  Let's see if we can hold the image.

A quick rundown on the map.  Let's check in.

So I have the several items that were raised, identified as five items, specifically, in the letter from Allegiant and Rizzo, Bosworth, Eraut.

Were there any other issues that needed to be identified for today's agenda?

I'll turn to Mr. Edelson or Mr. Wilson first.

MR. WILSON:  Not for today's agenda, Your Honor.

THE COURT:  Okay.  All right.

Then nothing else to add to the list of five, Ms. Skjelset, Ms. Korbel, Ms. Tshala?

MS. SKJELSET:  Not to the items themselves, Your Honor.  We will have some updates with regard to the Lighthouse searches and the hit reports because we just received some new information, but --

THE COURT:  Okay.

MS. SKJELSET:  -- as to the items, that should be it.

THE COURT:  All right.  So let's jump right on in. I'm -- I like to reach for the stars, but sometimes, when

you do and you don't make it, you get lost in space.  You don't get to the moon.  Just keep in mind, reaching for the stars gets you into the middle of nowhere.

So my reach for the stars today is that we're going to try to get this done in an hour.

Mr. Wilson laughed.

MR. WILSON:  No, no.  I think it's a great goal, Your Honor.

THE COURT:  I think it can be done if I just stop talking and jump right into Item Number 1.

So Item Number 1 -- I think it's just an update. You're telling me that there will be some motions to dismiss coming down the pipe; is that right?

Ms. Skjelset, do you want to lead on that?

MS. SKJELSET:  Yes, Your Honor.  That's just putting the pending briefing on your radar, but it's not -- the briefing is not closed, and so it's not time for argument, if you are not -- but I was just alerting the Court as to what is pending.

THE COURT:  Perfect.

And it looks like briefing will be completed by November 13th; is that right?

MS. SKJELSET:  That's for the -- for our motion to sever.  As I see it now, the motion to dismiss should be completed on October 24th.

THE COURT: All right. So next week.

Oh, I see. Okay. All right.

All right. Any other updates, Mr. Edelson or Mr. Wilson, on that point?

MR. WILSON: No, Your Honor.

THE COURT: All right. The amended protective order -- where are we on that? I think there were still -- I understood that the parties have generally agreed on many of the terms, but there might have been still some outstanding issues.

Who wants to lead?

MS. KORBEL: I want to make your day and tell you that we've resolved it, I believe; and so we should be able to send you a stipulated amended protective order hopefully this afternoon or early next week.

THE COURT: Perfect. All right.

Everybody's nonverbal assents look to me like -- remember, if anybody disagrees, chime in, and let me know. Catch my attention if you need to supplement anything that's been said.

All right. Discovery plan update. I understand that Judge Morgan is going to be deposed; is that right?

MR. WILSON: Yes, Your Honor.

Harry Wilson for defendants.

We have received a date from Judge Morgan's office.

That will be the afternoon of November 5th.  I actually haven't heard a confirmation from plaintiffs that that will work for them, although maybe that's implied in their letter; but if it does, we will confirm with Judge Morgan, and that will be -- that will wrap up our fact depositions, Your Honor.  We will be taking expert depositions and will work with plaintiffs to arrange, you know, in due course.

THE COURT:  Okay.  So does November 5th work for plaintiffs' counsel for Judge Morgan's deposition?

MS. KORBEL:  Yes, Your Honor.

MS. SKJELSET:  I put it on my calendar, Your Honor.

THE COURT:  I assume that everyone has probably tried to fill in the gaps from the last communication issues regarding the deposition, the Spicer depositions in Texas. Does everyone understand how much time is going to be devoted for this deposition?  Whose deposition is it? What's going on with the scheduling hours-wise?

Mr.  Wilson, do you want to give me a heads-up?

MR. WILSON:  Sure, Your Honor.  I -- well, I -- as far as I know, we are the only folks who have stated that we intend to take -- to notice the deposition.  Of course, defendants are welcome to cross-notice.

We expect this to be a quite short deposition.

THE COURT:  Monitor is out again.

Excuse me.  The monitor died out.  Can you maybe get IT to check it out?

Go ahead.  So you've noticed it and no indication that plaintiffs are intending on taking -- putting questions to Judge Morgan?

MR. WILSON:  I haven't received that indication.  We don't object to that, of course, Your Honor, if they would like to cross-notice.

We don't expect that our questions will take very long at all; so, you know, our hope it that all sides could wrap this up in an afternoon and be as nice to Judge Morgan's schedule as possible.

THE COURT:  All right.

Ms. Skjelset?

MS. SKJELSET:  Oh, thank you, Your Honor.  We only heard that Judge Morgan was going to be deposed on November 5th, I think, yesterday -- very recently.  So I don't think we've been able to really talk about what our plans were, but we will, of course, be asking him questions, and I'm -- I imagine that an afternoon would be -- would be perfectly fine.

But this is the first time we are hearing it would only be in the afternoon, but I have no doubt that we can work together to ensure that.

THE COURT:  What does "an afternoon" mean to

Portlanders?  I mean, is that, like, 3:00 to 5:00; or is it from 12:00 to 7:00?

I'm not assuming anything anymore with -- sometimes these understandings might go on in between all of you.  So we can narrow it down.

What was the time for the notice -- time indicated in the notice of deposition, Mr. Wilson?

MR. WILSON:  Well, Your Honor, now that we have confirmation that plaintiffs are available on November 5th, we will notice it for 1:00 PM.

THE COURT:  And does that mean it goes until 5:00?

MR. WILSON:  Typically, Your Honor, we notice it from -- you know, from the time until -- and then until the deposition is complete, but we would -- if Judge Morgan would like us to, you know, limit it to a specific time, we would, of course, try to work with him to accomplish that.

THE COURT:  So let's assume it's four hours that Judge Morgan says he has available.  Will there be enough time for both the plaintiffs and defendant to complete their questions?

MR. WILSON:  I can tell you this, Your Honor:  I would be very surprised if our questions lasted more than two hours.  Very surprised.  More likely an hour to 90 minutes.

THE COURT:  All right.

And, Ms. Skjelset, your thoughts about the amount of time you're going to -- and also, for that matter, on the -- the Conley case, Ms. Korbel and Ms. Tshala.  About the same amount of time?

MS. SKJELSET:  It's my understanding that the Conley plaintiffs are -- may not even attend this deposition.  It is very -- more central to the Levi complaint, and I'm confident we can get it done in an afternoon.  If the defendants really limit themselves to two hours, we can have the remainder.

THE COURT:  So it's my general understanding that it's highly unlikely, if at all, that defendants would take a deposition in excess of two hours, and that would at least leave an equal amount of time, if we're looking at a 5:00 stop, for plaintiff to complete.

All right.  Enough said on that.

Expert discovery.  I know there's an issue about when rebuttal reports -- the deadline for rebuttal reports would be set.  It had not been set in the last order.  It just established when disclosures would be made and when expert discovery would be closed but not the reports.

How many depositions were you planning on taking, Mr. Wilson, of the plaintiffs' experts?

MR. WILSON:  I believe plaintiffs have six experts.  There'll be six depositions, Your Honor.

THE COURT:  And how many depositions of plaintiff -- plaintiff, were you going to take of defendants' experts?

MS. SKJELSET:  At the moment, we hadn't intended to depose the expert that they disclosed with regard to both cases.  However, in the event that there's a rebuttal report, we did reserve the right to depose her after that time.

THE COURT:  Have there been any scheduling of -- will the experts be available to be deposed before November 9th or November -- well, I think we're -- if we haven't already talked about it, I believe there was an issue about November 9th being a Saturday, and so we were going to move it to November 12th.

I think I issued a minute order or at least -- yeah.  All right.  So you're all acknowledging that.

So November 12th would be the close of all discovery, both fact and expert, and will -- will the parties be able to schedule the six or seven depositions of experts between the time that either -- whether it be the 23rd or the 29th that the rebuttal reports would be due to get them completed?

MR. WILSON:  Your Honor, we have asked our expert to reserve time for a deposition, should plaintiffs wish to take her deposition.  She has -- she does have to attend a

wedding; so there's a couple of days that she -- you know, in between now and November 12th that she's unavailable; but, you know, in general, we are -- we -- we expect that there would be an expert deposition, and we will work cooperatively with plaintiffs to accomplish that in whatever manner.  You know, Zoom, in person, whatever they would like.

THE COURT:  All right.  So it can be in person or by Zoom to complete the expert deposition.

So the six experts that you have, Ms. Skjelset -- and I'm looking at Ms. Skjelset, in terms of leading the conversation on the plaintiffs' side.

But, please, Ms. Korbel, Ms. Tshala, please, if there's something else that you want me to know, just make sure you let me know this.

Scheduling the depositions of the experts, what challenges might there be?

MS. SKJELSET:  Well, we're awaiting an email from defendants with regard to their preferred order, but I think all of our experts are aware of the discovery deadline and are prepared to make themselves available, and I know that we will work diligently to ensure that that happens.

THE COURT:  So there's an issue about whether rebuttal reports should be due on the 25th or the 29th.  If the experts are going to be available and depositions be --

are going to be completed by November 12th, why would it matter to either side what date the rebuttal -- or rebuttal reports would be due?  Because that's where the dispute is.  The 25th or the 29th.

Let me just also tell you that, you know, I was leaning towards -- I wasn't actually purposely trying to split the baby; but, you know, setting it for a Friday, which always tends to really just make it a fun-filled week for everybody to get everything done before the -- before a weekend, rather than in the middle of the week.

So I can see that the 23rd is probably far too soon, and a Friday is always a good day to work towards getting something filed.  So is there any issue with the 25th -- I believe that is that Friday -- making rebuttal reports due?  That would be a week from today.

MR. EDLESON:  Your Honor, if I may?  This is Jeff Edelson on behalf of defendants.  Truth be told, even the requested 29th is extremely, extremely quick under the circumstances.  I think you don't have the benefit of seeing the expert reports, but allow me to just give you a brief overview of what we're up against now, and then I'll start by saying we received ten expert reports from six different experts, which was far more than we had anticipated, and we are in the process of evaluating the experts, their reports, and attempting to identify and engage rebuttal experts.

So the starting point is that the expert we -- we've introduced may very well not be the only rebuttal expert that we are going to need to obtain based on what we received from the plaintiffs.  So let me just give you a really quick overview, and you can cut me off if it's more than you want to hear, but --

THE COURT:  Mr. Edelson, you had me at ten reports; so that's probably all you needed to say.

I'm interested in trying to figure out how we can make this work for everybody.  It sounds like there's a lot of work that needs to be done with getting rebuttal reports in.

I mean, it -- so even if I set it for the 29th, what I'm trying to do is make sure we can -- we can finish all of the depositions by November 12th.

So if the 29th is -- works for everybody for a deadline -- and I know it seems like even that would have been, as you've indicated, Mr. Edelson, would be pretty tight.  I'm not interested in turning the thumbscrews any -- any harder than -- than needed to keep us on track.

My goal is to finish discovery by the 12th.  So if the 29th for rebuttal reports gives people enough time to digest it and get depositions scheduled -- and, frankly, you're probably right.  When we're thinking about the 23rd versus the 29th, I mean, we have a weekend in the middle.  Nothing is going to probably happen other than everyone digesting

reports and getting ready for them and having experts review them.  So maybe the 29th is fine.

I just need to know if it's going to be some kind of a nutcracker for -- I mean, it's going to be too hard of a nut to crack because the plaintiffs are the ones objecting to -- to the -- to setting the deadline out.  I mean, to get -- to get to do the 29th as a deadline and then -- and then move forward with completing depositions by the 12th?

Ms. Skjelset?

MS. SKJELSET:  May I?

THE COURT:  Or, Ms. Korbel, yeah.

MS. KORBEL:  Go ahead, Ms. Skjelset.

THE COURT:  Ms. Skjelset.  Okay.  The audio and video are not in line; so I wasn't able to tell who was talking.

Go ahead, Ms. Skjelset.

MS. SKJELSET:  Well, Your Honor, I think that ten reports is exactly an exaggeration.

THE COURT:  So even if it's eight or seven -- so here's the thing:  I'm just trying to figure out whether -- look, I'm happy to give you the 29th if it's not going to be some kind of a backbreaker to get the depositions scheduled before the 12th.  And if it is, then let's talk about that. I'm more interested about that than the number of reports at this point.

MS. SKJELSET:  I was just clarifying one issue because it's -- if what we're going to say logically flows from that, which is that none of these experts or their reports, should be a surprise to the -- to the defendants. These are issues that are raised regularly in these types of matters, such as certification standards, casework standards, the damages reports, and the economic damages that flow from that.  None of that is a surprise, and we actually expect and anticipate that the defendants already have somebody in the wings to rebut these.

But the problem and the prejudice to the plaintiffs is that, when they -- when they provide their rebuttal reports on October 29th, that's the first time that we see them, and we don't have an opportunity to -- to sit and evaluate them like they had with the initial disclosures, if that makes sense.

And then we have to depose these people by November 12th.  So I would not be surprised if defendants --

THE COURT:  Well, how about this:  I'm actually willing to break my own rules once in a while.  What if I moved the discovery deadline to November 15th or November 16th?  We can just -- I mean, I -- you all have lives.  I really don't want to make this more challenging unnecessarily.  I want you all to work up your case.  And, frankly, I'm not -- I don't think moving the deadline out a

few days to accommodate rebuttal reports coming in a few days later is going to change the deadline for trial. Because, I mean, frankly, the trial deadline is -- that's floating out there and will only happen if I remain on the case and nobody adds any defendants or plaintiffs to the litigation.

So, I mean, you know, my goal is still that we move to trial, if I'm the one presiding when we schedule, but just simply moving out the discovery deadline to November 15th or 16th -- I mean, we can move it to November 15th from November 12th. That's a Friday, and that will give everyone enough time to schedule depositions.

So no one seems terribly upset yet.

Ms. Korbel?

MS. KORBEL: I just want to point out, I think part of what plaintiffs are up against is that all of the remaining depositions that are set right now to take place -- we have one on the 30th of October; we have one on the 1st of November; we now have Mr. Judge Morgan on the 5th of November; and we have Ms. Gonzalez on the 9th, I believe. And so that's four deposition already that's in that chunk of time after when defendants propose, and so that leaves us with very little time. If they give us seven rebuttal reports, for example, where do we stick seven more depositions in that short amount of time?

I'm not opposed to your solution that, if we extend the deadline for the expert depositions until the end of the next week, I think that might be an okay solution; but I think that's why we're opposed -- is because we anticipate those -- those weeks are already filled with depositions.

THE COURT:  Okay.  Well, I want to try to make this a little bit more humane.  So let's just move the rebuttal report deadline to October 29th, and I'm going to move the close of expert -- I'm going -- expert discovery to November 15th.

Now, I'm really thinking that we're done with fact discovery; right?  I mean, do I -- do I need to say it out loud, or do I need to clarify that we're not going to do any more fact discovery past November 12th?  I mean, we're really just moving -- moving the deadline to November 15th so you can accommodate -- you can accommodate expert depositions.  Is that fair to say?

All right.  So I don't -- it's already past October 15th; so I -- I'm not anticipating anyone is going to file an RFP today.  Okay.

MR. EDLESON:  There's one thing I can flag for Your Honor on that.  This is Jeff Edelson.  As you're probably aware, we have filed objections to your order disallowing the deposition of J.C.  Obviously, we filed that with the optimism that we would prevail.  So there is a

chance -- I don't know what the odds are, but there is a chance that the district judge would disagree and allow us to take her deposition.

THE COURT:  If I'm not mistaken --

MS. SKJELSET:  That's been decided.

MR. EDLESON:  Oh, that's been decided?  All right.

THE COURT:  Judge Aiken decided and indicated that I was right.  That's how I like to phrase it.

MR. EDLESON:  That's how you interpret it.

THE COURT:  Which also -- I mean, I don't think -- up to today -- correct me if I'm wrong -- I don't think we had a backup judge assigned to the case until that opinion came out; is that right?

MR. EDLESON:  I don't think we knew who it was.

MS. SKJELSET:  I think they actually did.

THE COURT:  She might very well want to keep those trial dates in place; so we'll see how that plays out.

Yeah, so -- so I --

MR. EDLESON:  Your Honor, let me --

THE COURT:  You were going to say something else?

MR. EDLESON:  Yeah.  Your Honor, if you don't mind.  Thank you.  One of plaintiffs' experts apparently spent many, many hours interviewing J.C. and relies very heavily on what she learned during those interviews, not just on other interviews that J.C. has given or testimony

she's given, but very specific interviews that this witness did, and we are -- I'll just flag that we're contemplating asking Your Honor for reconsideration of the decision to disallow it -- our deposition of her.

So we feel considerably disadvantaged by this development, and it was information we did not -- counsel did not share with us, that that was the case, back when we were discussing the deposition of J.C.; but we now know it to be the case, and so I -- just in the spirit of the way we've been handling these hearings, we raise it for you. I'm not promising we'll file that motion, nor am I making that motion at this time, but I don't want it to be a surprise if we choose to do it.  We'll certainly confer with counsel before we file anything.

THE COURT:  But I appreciate you giving me the heads-up.  And, you know, if it comes to pass that you do, perhaps please do it as soon as you can so we can keep things moving along, and I'll be able to give it -- you know, give it the attention that it deserves.

And also, you know, my goal has continued to be to try to make sure that we move this towards the trial as scheduled, and so it's -- so whenever you end up filing it, I'll review it, but it does put an interesting sort of twist on how we -- how we get that particular matter resolved, if I decide something in somebody's favor, where the

opposing -- opposing party wants to object and then take it up with the DJ.

Although it appeared that Judge Aiken was able to quickly review and resolve that matter pretty quickly.

MR. EDLESON:  Sounds like it.

THE COURT:  So maybe we'll be able to get that set in play in time for moving it on to trial.  But thank you for bringing it up and letting us all know.

Okay.  Again -- so, again, to confirm, November 15th will be the close of expert discovery.  October 29th will be the rebuttal report due date.

All right.  Lighthouse search terms.  Somebody said they had some updates.  Who wanted to report?

MR. WILSON:  Your Honor, I can provide a description for the Court of what it is we've done, and just so the Court has some background, and I believe Ms. Skjelset has some objections to what we've done, but I'll let her explain those.

As for -- as for the searches, this concerns the searches of the text messages on the three personal cell phones, and as Your honor knows, Lighthouse collected data from those cell phones, which included the text messages.

We then asked, and Conley provided a list of search terms and, as we discussed at the August 6th hearing, a list of phone numbers.  And what we then did is ran -- asked

Lighthouse -- we didn't, but we asked Lighthouse to run Conley's search terms and phone numbers over those text messages and to develop, you know, a set of text messages that reflects anything that hits on one of those phone numbers or one of those search terms.

Now, Your Honor, we understand your order, and we looked very closely at the transcript of the August 6th hearing to make this determination to follow your direction as closely as possible.

So here's what we understood you to direct us to do: to identify all those text messages between one of the three custodians and one of what we called in the August 6th hearing "the 50 phone numbers."  And Conley didn't actually send us 50 phone numbers.  It was a few less than that, but I'll call them "the 50 phone numbers."  And those phone numbers were things -- were the numbers of people who are involved in the case, other DHS employees, third-party providers, that kind of thing.

So we then searched -- or we reviewed, rather, the text messages.

THE COURT:  Mr. Wilson, was the first level of filtering the phone number?  So you first pulled all the text messages from those -- from or to those phone numbers, and once you had that universe, did you apply the word search filters?

MR. WILSON:  That's what we would have liked to have done, Your Honor, but it didn't end up quite working that precise way in the mechanics of it.

To be honest, Your Honor, we probably, you know, did this a little hit-and-miss as we tried to make it work to be consistent with Your Honor's order, but that was -- that's what we were aiming for because, Your Honor, you just -- just to let you know why we were doing this, you know, in the August 6th transcript, at one point you said to us, "So if those 50 phone numbers are submitted into the vendor for searching, if they -- if they get hits, is there a mechanism by which you can review those hits to filter out phone numbers that are unrelated to anybody in the case?"

So I think that's what Your Honor is thinking of when you asked me that question.  That's what we tried -- that's what we wanted to do, but what we, in practice, had to do -- or ended up doing, at least, is just searching for all of the search terms and searching for all of the phone numbers and then reviewing.  As -- as our staff and our attorneys went through the messages, we were looking for those messages that hit a search term and were with one of the so-called 50 phone numbers.

THE COURT:  Okay.  There were 1,100 messages that came from that filter search?

MR. WILSON:  Well, not exactly, Your Honor.  What

happened is that there were about 1,100 text messages that hit either a phone number or a search term; so -- and that's because we had to search for the phone numbers in order -- we couldn't just narrow the universe, or maybe we could have, but we failed to figure out how to do that correctly.

THE COURT:  It seems like a pretty straightforward Boolean search.  I mean, if you're pulling phone numbers or search terms, then you're also potentially getting search terms from other phone numbers not in that group of 50. Right?

MR. WILSON:  Yes.  You got it precisely, and that's what -- that's what ended up happening, and that's why there were 1,100.

THE COURT:  And that's why I continue to insist that the word "and" is the most important word in the universe.

MR. WILSON:  You are correct, Your Honor.

We later did figure out how to do a search using the "and," but initially what we had was 1,100, and that included hits for the search terms that were not in one of the 50 phone numbers, and our -- you know, our manual review, we were -- you know, we were kind of manually filtering those out.  Later, we did figure out how to do a search.

When you do that search that looks for what hits a

search term with one of those 50 phone numbers, the universe is actually 14 documents.  And just a minor point of clarity, Your Honor, a document is more than -- it can be more than one text.  The way these are pulled off -- it's all texts in a certain day.

THE COURT:  All texts in a certain day?

MR. WILSON:  Yes.  So, for example, one document might consist of all texts Kim Chapman has with, you know, Person X on February 3, 2023.

THE COURT:  So it's kind of like threads.  It's a text thread but bound -- bounded by a 24-hour period.

MR. WILSON:  I believe that's how it works, Your Honor.  So one document is not one text.  It could be if there is only one text on that day.

But -- so that turned up 14 documents.

THE COURT:  14 documents.  So 14 threads for 14 distinct documents as you've defined?

MR. WILSON:  Correct, Your Honor.

And so then we -- the last step is we reviewed whether those documents were responsive.

So there were 12 documents that were threads between Defendant Kat O'Brien and April Clark, and April Clark is a third-party therapist who provided services to J.C. and Z.C.

Those texts hit a search term because "April" and "Clark" were both search terms.  So they were saved, you

know, in the phone, I guess, as a contact; and so they just pop up because "Clark" and "April" are in -- in the name.

Those texts were from 2021. They have nothing to do with this case.

Two search terms within that universe of 12 also hit in at least one of those threads. One of those search terms was "depo" with an asterisk. So you know, that hits everything that has d-e-p-o and anything after it, and the hit to "depo" in that thread was to "Home Depot."

Then -- so that was not responsive.

And then there was also a hit to J.C., and the J.C. that it hit in that text appears to be an abbreviation for "Junction City." It's talking about a store in J.C.

Again, didn't have anything to do with this case.

The remaining two texts were between Kim Chapman, who is a defendant, and Anastasia Brooks, who is a defendant. They're duplicates or maybe they're mirror duplicates, but they appear to be the same thread, and they -- they hit the word "lawsuit." The word "lawsuit" is a reference to this lawsuit, but the issue that's being discussed in the thread does not concern the allegations, defenses, facts, substance of this lawsuit. It's collateral to the substance of the lawsuit. So those were also not responsive.

And so that's -- and so we have not produced any -- any texts from those searches because we don't believe that

there are any that are responsive.

THE COURT:  Thank you.

Ms. Skjelset?

MS. SKJELSET:  Your Honor, Mr. Wilson refused to put in writing what he is telling the Court just now; so this is the first time we are able to analyze what he is saying, and it was my understanding that the search terms were going to be applied to the text messages that were -- that were downloaded from the phone.

In addition --

THE COURT:  I mean, you say -- when you say "the phones," are we talking about O'Brien and Hammond, and I think there were two -- were there two Hammond phones?

MS. SKJELSET:  Just one, Your Honor.  But remember he had -- he had hard reset his phone two weeks before his deposition.

THE COURT:  So, actually, there wouldn't be anything there from that search probably?

MS. SKJELSET:  Well, we don't know because we -- the only hit report we're getting is not for the hits to the actual phone numbers or the hits to the actual words.  It's the phone numbers and the words combined, and that's not how plaintiffs understood the search was going to happen.

If you go a little bit further down in that transcript of the hearing from what Mr. Wilson was reciting -- and,

again, I'm just getting my bearings on what his argument is now because he did refuse to put it in writing to us -- I think it's clear that Ms. Richardson brings to the Court's attention that there are specific terms that need to be applied across the text messages, such as "Raygosa," and we're not seeing any of -- we're only seeing what he's filtered between both the phone numbers and the hit report.

Now, I would like to remind the Court why we're here. We are here because the State deleted all of the text messages on the State-issued cellular devices.

I'm looking at messages that we have received -- the phone records for those State-issued devices; and, for instance, April Clark, who is the therapist who's been deposed in this case, had scores of text messages with Ms. O'Brien that have been deleted by the State in this action, and now they are saying that her personal communications with Ms. Clark, the therapist, are irrelevant and -- and not responsive.

It's hard to swallow; but, at a minimum, we need to know what the communication -- the number of communications she had with this child's therapist.  It was the only case they had together.  It's how they met, and it was rather contentious, and they were -- we didn't even know what time frame it happened until today when Mr. Wilson gave us that data.

So I think all we're asking for, as an initial step, is what the total hits are for each of our search terms provided and have those phone numbers be included as search terms.  How many times did Ms. O'Brien communicate with Ms. Clark?  They actually have substantive information relating to those exchanges, unlike the text messages on her State-issued phone, which have been deleted.

And, again, Mr. Hammond's phone has also been reset two weeks before his deposition.  That is the universe we're in right now.

THE COURT:  If there's nothing there because of an argument that evidence has been spoliated, then it's a motion for spoliation, separate from the issue of what can -- what can be discovered right now.

So I'm not sure what the solution is.  Given what Mr. Wilson has described, they did the search.  It sounds to me like they applied the terms.  However, it might have been a bit of a messy process of getting it all together.  I need to understand a little bit more about what you're asking me to do here with respect to the discovery.  I'm not sure I understand what you want me to do.

MS. SKJELSET:  I think we want -- there will be a motion for spoliation, Your Honor.  There will.

THE COURT:  Then I think that's the appropriate approach.  Because if what Mr. Wilson is telling me -- and I

take him at his word -- they applied the search and these are the terms, I can conduct an in-camera review of the 14 documents to assure that there isn't anything "there" there. If that, you know, somehow resolves that issue, it doesn't sound to me like a lot for me -- for me to review, and if that helps provide some level of confidence that -- again, there's nothing there after the search of that which has been retrieved from these -- from these phones, then I'd just as soon have you all focus on what you need to do next, and it sounds to me like you're needing to -- that your intent was to move for a motion for sanctions for spoliation.

MS. SKJELSET:  Okay.  Yes.  And that is what we intend to do.

In support of that motion for spoliation, Ms. O'Brien's communications with Mr. Hammond are particularly important, because Ms. O'Brien was --

THE COURT:  So was that part of the request for production?

MS. SKJELSET:  Yes.  His phone number was among those phone numbers.  So the text messages that they have between and among each other, regardless of whether it hits these particular words, are -- it's important to know how much they have communicated in advance of him destroying all of the information on his phone.

THE COURT: Well, I think I'm trying to understand. I mean, it looks to me like there were search terms that were included in the letter.

These were the search terms that the defendants were to apply -- was to -- Lighthouse was supposed to apply to the -- to the documents attached to particular phone numbers rather than --

MS. SKJELSET: Your Honor, it was our understanding there would be search terms applied to all the communications and then we would -- and then the phone numbers themselves, because they were specific to this case, so specific that they themselves would be considered a term.

THE COURT: All right. I see. All right. So a very different -- I mean, so -- so it's phone numbers as -- phone numbers as search terms, not simply --

MS. SKJELSET: Yes.

THE COURT: Okay. All right. So there's two different issues. One is confirming whether -- whether there was a common understanding about what that search was to look like; and then, two, there's the separate issue about spoliation. If the documents don't exist, whether we apply your characterization of the search or how Mr. Wilson described it, there's going to be some set of documents that just don't exist because Mr. Hammond destroyed them, and then that -- that will be your basis for the spoliation.

But I understand that you're also saying that you want to -- you want -- you want text messages between O'Brien and Hammond, to understand how much they -- how many times they may have communicated.

Was that part of the original search -- set of search terms that you provided to -- to defense counsel?

MS. SKJELSET:  His --

THE COURT:  Was that one of the requests that you asked for in the production when reviewing these -- these documents?

MS. SKJELSET:  His phone number is among the phone numbers that we believed were to be searched.  Right.  And we anticipate seeing a hit report, because that's common practice -- is to get a hit report for the -- for the application of the search terms.

So we would know how many communications she had with him.  For instance, after she received her motion to compel, Conley's motion to compel the search of her personal device and before he -- he deleted all the information on his --

THE COURT:  I'm not really sure I have a particular dog in the fight.  I mean, I was interested in just making sure that whatever relevant documents were going to be -- if they -- if there were relevant documents that could be identified in the search, they needed to be produced, period.

And so to the extent that there was a different understanding of how a search was to be applied, first, by taking out just -- just pulling all the text messages associated with the phone numbers versus "phone numbers" as a search term -- so -- so they could be -- so these messages could come from any phone number, but if these phone numbers were part of any -- were part of the search terms to be applied, then I imagine that the universe would be -- the universe of documents that would have a hit would be larger than that which was described.

I think Mr. -- I mean, Mr. Wilson, you would agree that, in all likelihood, that would be the case; so -- so the question is "What do we do now?"

I mean, I don't remember there being a strong debate about "No, we only want to pull documents associated with phone numbers that were used to send these texts" versus phone numbers and search terms as a universe of search terms themselves.

I don't remember there being a strong debate about which one -- what could be used as much as just an attempt to try to clarify what it was going to be, but maybe you can --

And, Mr. Wilson, you indicated you might have a transcript of that -- of that discussion.

And let's assume that maybe there was some

understanding that could be inferred from the conversation that one -- one search set of parameters were sort of discussed more than another.  I mean, I'd be -- I -- let's assume -- let's assume your characterization is correct.  What do we do with that now that the plaintiffs are saying, "Well, we wanted the search of phone numbers as search terms, not as sort of the first-level filter"?

I mean, one is -- so you can object that, "Hey, we just don't have time."  Maybe that's maybe the issue.  "There's no way we can do it."  I mean, that's maybe one argument.  The other argument is that, "Well, that wasn't what we understood and what was ordered," and that -- the second is probably a lesser -- a less persuasive argument.  Because I'm just interested in getting discovery completed and done if we can get what it is that the plaintiffs are looking for.

MR. WILSON:  Sure, Your Honor.  I mean, I think I would, just as a placeholder, start with one.  I mean, we -- you're -- the discussion on August 6th very clearly involved a set of 50 phone numbers and what texts would hit it -- hit a search term within those phone numbers, and then we'd produce those texts.

So "phone numbers" as a search term, in and of itself, is, to us, quite surprising, not only because it wasn't discussed at our August 6th -- or at least not in a way that

we understood it and certainly not from Your Honor's discussion, but also -- and this is my second point, Your Honor -- this is not in any way a request for production. There is no request for production, that I am aware of, from plaintiffs that says, "Provide a list of all texts or the number of texts between Kat O'Brien and any other person."

What they already have had is we have searched for texts between each of these custodians and any of those 50 phone numbers that hit a search term, providing -- they have not requested, "Provide us with the number of texts that hit any particular phone number."

And I think that would be -- the third point, Your Honor, is I think that that's overbroad. I mean, to take just one example, there are texts between Kat O'Brien and April Clark from 2021 that have nothing to do with this case.

There's no reason that plaintiffs should know, frankly -- should know that those personal texts exist at all. They're not part of this litigation. They're on the personal cell phone of one of these defendants, and they have nothing to do with the litigation. So I'm not -- I certainly am not going to say it's too hard to get it done, but I don't think that it's responsive to any request for production. It's not consistent with what you ordered, and it's overbroad.

MS. SKJELSET:  If I may?

THE COURT:  I'm not going to try to make any arguments for the plaintiff, but I'm trying -- I'm looking for a solution here to move us along.  One, there might very well not be an RFP.  Let's assume, for the sake of argument, there was no formal RFP, and that was because we've been doing a lot of -- lots of status conferences, working out these details kind off the record.

And so part of the challenge is -- is while we're trying to move nimbly, and in particular with respect to these phone records and searches by doing it with status conferences and being a little less formal, that -- I'll agree, for the sake of argument, right now, there is no RFP, but probably to no fault of the plaintiffs because I injected myself into the conversation by trying to figure these things out, you know, at these status conferences.

So I'm interested in a solution to try to get this thing moving along.

MR. WILSON:  Well, Your Honor, I think the solution is, in part, we've already searched for this.  I mean, they want to know how many text messages are between person -- you know, custodian A and one of the 50 phone numbers that have any relevance to the litigation because they hit one of the many, many search terms we told them.  It's 14, and we reviewed those, and they are not responsive.

So there might be other texts between one of the three custodians and one of the 50 phone numbers, but they don't hit a search term.

THE COURT:  Okay.

MR. WILSON:  So, you know, there's a lot of --

THE COURT:  Ms. Korbel?

MS. KORBEL:  I just wanted to -- I think this is Exhibit 1 of our letter to the Court, and on page 2 of that exhibit is a list of phone numbers.  I'm quite confused by the idea that phone numbers were not supposed to be search terms, because really, when I look at this, that is what -- for example, you can see Mr. Hammond's phone number is listed here, both his personal and his work phone number, and so what we should see is -- we looked at the phone of Kat O'Brien.  We ran this phone number.  And there were, you know, 37 documents that came back.  You know, if you want to say none of them were responsive, that's fine, but why don't we know that number?  I think that's why it's confusing.

We have tried to be surgical and ask for only numbers and people that are actually relevant in the litigation, but that's a confusing argument to me that we didn't ask for that.  We did --

THE COURT:  So what we're also looking for is not -- not just the text messages or the documents themselves but also the number of times in which -- I

suspect you also want to -- the actual substance of the -- of the messages if they are relevant for this litigation.

MS. KORBEL:  Yes, Your Honor.

THE COURT:  All right.  This is what I'm going to do:  I'm going to be -- I want to think on this a little bit more.  I want to play it in my mind how different the searches could possibly be if -- if the term -- if the phone numbers were searched as search terms versus being used as sort of the first level of filter, and then I'll give you my -- give you my thought before the end of the day about whether another search needs to be run or not.

Ms. Skjelset, you wanted to say something.

MS. SKJELSET:  May I just give you a little bit more food for thought in that context?  And it's that Mr. Wilson keeps harping on the fact that there's no RFP, but he is forgetting that there was a subpoena duces tecum to Mr. Hammond that we issued prior to his deposition on July 17th, which requested "all communications and correspondence, including text messaging and a lot of electronic mail from your primary cellular device, email address, with Kat O'Brien or any other ODHS employee."

THE COURT:  And that was an RFP to Mr. Hammond; right?

MS. SKJELSET:  It was a subpoena duces tecum attached to his notice.

THE COURT:  Okay.  But that gives rise to the issue of spoliation.  He deleted his -- he reset his phone; so if you're looking at it from Ms. O'Brien -- you want to see if you can reconstruct what he may have had on his phone and what may have been deleted from what Ms. O'Brien has on hers?

MS. SKJELSET:  Secondly, we asked for communications and text messaging with April Clark, who was the therapist, Your Honor.

These are issues that are not --

THE COURT:  That was from Mr. Hammond's phone?

MS. SKJELSET:  Also, yes.  And that was in the context of Conley requesting a search of their personal cellular devices.  That's why we're here.  Right?  And the other issue -- the second piece of the food for thought is that we've requested the phone records of these individuals, and we have had a very difficult time getting these phone records.  And when I understood that there would be an application of the phone numbers, it was to the phone records themselves.

So if we were to obtain the phone records, which we hope we can at some point in time --

THE COURT:  So the phone records are from the company; right?  From the phone company?  That wouldn't have been part of the data search off the phone.

MS. SKJELSET:  No.  No.  That's a separate -- it's a separate issue that we are struggling to get responsive documents from.

I'm hearing some noise.

THE COURT:  Somebody might be on -- not be on mute.  Maybe you can confirm that.

Seems like it's quieted down.

MS. SKJELSET:  Yes, it's some relief.  If it's me, let me know, and I'll mute myself even while I'm talking.

But the second issue with regard to the phone, the phone records, is that we would be getting the hits on the phone records anyway.  So the fact that if -- if we could actually obtain them.  It appears that the provider for the phone records may be different for different individuals, and it's been somewhat of a struggle to get them, but the phone numbers are those that they're going to be -- they're supposed to be searching in the phone records.

So the fact that we get the hits for the SMS -- it's no different from what we would be getting with respect to the phone records themselves.

So I don't see why it's overbroad in that -- especially in the context of the subpoena that we issued to Stephen Hammond and the concerns about spoliation.

Oh, and then finally -- here's the final issue -- is that Mr. Wilson seems to be implying that communications

regarding this litigation are not responsive but recall --

THE COURT: Say that last sentence again. I want to make sure I digested it. What's that again?

MS. SKJELSET: He is arguing that communications regarding this litigation are not responsive. And in the requests -- in the subpoena that we sent to Mr. Hammond, we specifically asked for questions regarding J.C., her family of origin, Nicole Duncan, Joe Raygosa, and/or this litigation from July 2016 to the present.

THE COURT: From 2016 to the present?

MS. SKJELSET: Yes.

THE COURT: Okay.

MS. SKJELSET: And so we believe that they would be responsive to documents that have likely been destroyed by Mr. Hammond, who was represented by Markowitz Herbold at the time that he destroyed them.

THE COURT: Am I correct in understanding that the frame -- the frame in which we're now discussing the search for these documents is more about the motion for sanctions -- for spoliation and sanctions than about the substance of the underlying merits of the claims? And I'm not trying to say one is more important or less important than the other. I'm just trying to understand that -- I mean, part of the -- part of the drive to make sure that you get all of this information is to flesh out what has -- what

Mr. Hammond destroyed and when and why.

MS. SKJELSET: Well, Your Honor, we -- the hope is that we could get some semblance of substantive communications at the time that the children were in care. But because all of -- because they were destroyed -- the text messages were destroyed on the State-issued cellular devices. But there is this -- the secondary and I think equally relevant, equally important purpose of determining what has been destroyed and -- including on Mr. Hammond's phone and on the State-issued cellular devices.

THE COURT: Okay.

All right. Mr. Wilson, any last word on this -- on this discovery scope issue?

MR. WILSON: Your Honor, I just want to point out that, you know, for example, whether or not they discussed this litigation as Ms. Skjelset just mentioned, whether Mr. Hammond did -- again, we ran the search terms, which included "lawsuit" over what Mr. -- what was on Mr. Hammond's phone. It's not -- there's nothing that we have to produce that hit that term and was with one of the 50 phone numbers.

And, you know, just to address Ms. Korbel's point, she says, "Well, we included the phone numbers because we wanted them as search terms."

Well, Your Honor, we -- you know, I suppose the parties

have come to -- come to equally, perhaps understandable, conclusions, but for -- based on a very different understanding of Your Honor's order.  We understood -- and I think that the transcript shows pretty clearly that you asked that Conley provide those phone numbers so that we would know which 50 phone numbers created the universe from which we were supposed to search, and so that's what we used.  We used those 40 -- I think it was 43 or 44 phone numbers -- in order to determine what is the universe of texts that we then looked for one of the -- one of the search terms.

One last thing, Your Honor.  This isn't apropos of any particular argument that's been made today, but as you -- as Your Honor is thinking through the search terms today and the rest of this afternoon, I do want to point out that, you know, the search -- the actual search terms provided by Conley are very, very broad.

And so just to give you some examples, if it includes the word "physical," then "physical" will return hits for things like, "physical symptoms, physical therapy, physical illness."

It includes "depo," which, of course, returned "Home Depot" but also returns "deposit."  It returned -- the search terms include common names like "Rachel" and "April".  They include words like "sue," which can be a name or used

in other contexts.  "Suit" which can turn up for clothing.

So all of that is just to say, Your Honor, if Your Honor is thinking about how these terms should be run, you know, running them across phone numbers that are not relevant to this litigation -- and remember most of the texts on these phones are between family members; friends; and, you know, the day-to-day personal lives of these custodians -- are going to return a lot of material that is completely irrelevant and is within personal and sometimes highly personal communications.

THE COURT:  All right.  Counsel, thank you all for those arguments.

As I indicated, I will do some thinking on this and get you an answer about what -- what, if anything, I may do to provide further direction about searches if I find it appropriate.

All right.  That was all the items on the list.

Was there something else for us today that is necessary and timely?

Ms. Tshala?

MS. TSHALA:  Yes.  I'm just flagging this for the Court for the next status hearing.  We have been receiving additional discovery from defendants.  October 3rd and the 4th, and then yesterday we got a thousand pages of discovery, and I'm doing my best, trying to work through it,

but we're realizing that a lot these documents are really important, and we wish we would have had them during prior depositions.  They are responsive to our prior RFPs; so I'm just flagging it for the Court in case we're not able to come to an agreement with defendants about why these documents have been produced to us so late in the game and after the depositions have occurred.

THE COURT:  Well, I mean, that either -- in practical terms, that means reopening depositions and extending the deadlines.  Right?

MS. TSHALA:  It depends.  I haven't been able to review all those documents yet.  I need to confer with defendants, but I just wanted to flag it for you in case this is an issue that comes up in the next status conference.

THE COURT:  Okay.  So the two flags that have been raised in our conference today, one is discovery issues -- recently produced discovery and potential impacts on how to -- how to address completing discovery -- and then second -- actually, it is a discovery issue too -- a motion for reconsideration of the J.C. deposition.  Motion to reconsider.

So we'll see if those things come to pass.  I do appreciate you both giving me a heads-up about those matters; so I'll be ready for them if they come and happy if

they don't.

Thanks.  All right.

Ms. Korbel?

MS. KORBEL:  Thank you, Your Honor.  So this is sort of a -- the third paragraph of that Lighthouse hit report.  It's on the last page, and I just wanted to bring it to the Court's attention.  We understand that the phone numbers were stripped from the raw data which we asked for related to the deletion reports that were conducted by Lighthouse.

Lighthouse agreed to provide us with that raw data.  It's basically an Excel sheet that contains a bunch of rows and columns with information in them, and when we were on the phone with Lighthouse, Mr. Wilson asked to please review that Excel sheet before it was produced to us by Lighthouse so that they could remove any privileged communications.  We agreed to that.  We said that was fine.

And then we just received a note from Mr. Wilson -- I think it was last week -- saying that they'd stripped out a number of other things that were not privileged communications, including the phone numbers, and I don't think that the phone numbers should be stripped.  I think they should reinstate the phone numbers in that deletion data.  The phone numbers are not privileged communications.  There is nothing wrong with us having that information, and

I asked Mr. Wilson to reinstate it, and he said, "No."

THE COURT:  And it would also be subject to any protective order that's in place.

MS. KORBEL:  Of course, yes.

MR. WILSON:  Your Honor, can I be heard on this?

THE COURT:  Yes, briefly.

MR. WILSON:  Your Honor, first of all, the data that was provided was not -- it has to do with the deletion analysis.  It was not search data that we were providing, and it was requested in order to help understand how the deletion analysis works.  It is a table of internal telephone data, and it reflects -- the spreadsheets that we sent reflect the text message internal database data of the phones of those texts that were not deleted.

And why we sent that as part of a deletion report is that the deletion report looks for gaps in certain numbers and tables in that data in order to try to determine when a text message was deleted.  None of this information was provided because it's responsive to a request for production or because it's consistent with anything that Your Honor ordered with respect to searching the text messages.  It was provided only for the purpose of understanding, you know, how the deletion analysis worked.

Second, that data includes phone numbers of -- that are outside the 50 phone numbers.  It includes data about lots

and lots of texts that these custodians sent to their personal family, friends, professionals, whoever else they may be texting on personal cell phones, and we don't think it's responsive, and it's certainly overbroad to reveal who a personal -- you know, one of these people are texting with and when and all the internal data that goes along with it.

Third, it is not responsive to any request for production.

And, finally, these internal database tables are not -- you know, we didn't produce this in order to show how many hits, you know, one of these defendants had with -- with another phone number. In a lot of cases the phone number -- I can't even say for you, for sure, Your Honor, that I understand that this data would correctly reflect, you know, a text between one of the custodians and one of the defendants. It's very complex internal cell phone data. It was provided only to help them understand the deletion analysis.

I understand Your Honor's thinking about whether to provide -- you know, whether the -- the plaintiff should have a hit report that includes just the listed phone numbers.

Obviously, for the reasons I've already explained, we don't think that that's appropriate or necessary, and we oppose providing that, but if Your Honor is inclined to

allow them -- allow plaintiffs to have that information, we would much rather provide it by running a hit report for the phone numbers, the 50 phone numbers, rather than trying to insert or trying to provide this internal deletion report data, which is a different animal.

THE COURT:  So whether it's a 50-number hit list or the -- this table, Ms. Korbel, does that change -- you know, I'm interested in trying to -- trying to draft and consider something as narrowly as possible, just to make sure that we keep on some kind of a rail.

Your thoughts about what Mr. Wilson --

MS. KORBEL:  So we don't believe the phone number should have been stripped from the data, period.  However, I did offer to Mr. Wilson that, if they wanted to redact numbers that were not on what we're calling the 50 phone numbers and just leave the numbers that we've identified, that that would be acceptable.

He also declined to do that.

THE COURT:  I'm going to order that -- I'm going to order them to provide the list -- the hit list with the 50 phone numbers from that -- from that table.  Then I'll provide additional instruction about what, if anything, I'm going to do regarding the earlier discussion about the -- the search that was conducted and whether it was consistent with my earlier instructions and whether it needs to be

modified, if -- if appropriate, under -- you know, given -- given what we've talked about.

All right.

MR. WILSON:  Your Honor, could I just -- I want to make sure I do the right thing.  I understand you to be ordering us to take the deletion data and to restore columns that have a phone number that matches one of the 50 or little less than 50 phone numbers that the Conley plaintiffs provided to us.

THE COURT:  That was my understanding of what you described as a fallback position, if I didn't rule in your favor, and that Ms. Korbel was willing to accept as a compromise.

MR. WILSON:  Actually, Your Honor, I think -- and I say this with honesty.  I think -- I think it may be more useful for Ms. Korbel to have a hit report.  I mean, if Your Honor wants to provide plaintiffs with a list of -- with information about the number of times these custodians have texted with one of the 50 phone numbers, I think our fallback position is actually that we should run a hit report for the phone numbers across the -- across the text message data.  This deletion analysis table is literally the table -- like the internal table for how the phone stores each and every text message.  It's -- it's got, you know, columns and columns of hash values and all kinds of stuff.

I haven't --

THE COURT:  Well, what would be more useful?

MR. WILSON:  We can certainly do that, Your Honor, but I think that it would be better done the other way, which is what I was suggesting as a fallback.

THE COURT:  Ms. Korbel, which one is more useful for you?

MS. KORBEL:  Well, they're -- it's kind of comparing an apple and an orange, Your Honor.  I would like the hit report of the phone numbers that Mr. Wilson has offered.  I believe that relates more to the search of the phones.

And then this deletion analysis Excel sheet --

THE COURT:  So you want both, is what you're telling me?

MS. KORBEL:  I would like both, and I'm happy to limit them to the 50 phone numbers if that is what makes it for relevancy's sake.

THE COURT:  It sounds to me like everyone agrees, and I'm agreeing as well, that it ought to be limited to the 50 phone numbers identified in the search list, and that both the raw table and a hit list should be produced; so that way they can -- you know, that way Ms. Korbel has both of those formats available for her review.

MS. KORBEL:  Thank you, Your Honor.

MR. WILSON: Your Honor, I want to say one last thing. I'm sorry to beat this dead horse, but I don't -- the deletion tables -- so this table that we provided, this internal data, uses all kinds of codes and things like that.

And so when we were stripping phone numbers, you know, I don't know what column -- I'm going to have to do a little investigation about exactly what -- we will provide it, but I don't -- I can't represent to you that this table is going to be an accurate representation of phone number to custodian to time. I just don't know how these tables work.

They're very large and very confusing.

THE COURT: Okay. And I -- I appreciate the transparency. From what -- the way in which Ms. Korbel is nodding, I think she also appreciates the complexity associated with this table, and -- and so you have some initial immunity for the confusion of this table being --

MR. WILSON: I appreciate it. There's about a hundred thousand, or somewhere in that vicinity, entries on these three tables, at least, I think. I need to check that too. That's not a -- I can't promise that's a number. So it's going to -- we'll get on it today, but it's not something we can turn over today or in the next couple of days.

THE COURT: Okay. Well, one thing is certain, Counsel. None of us have a future in computer programming;

so keep your day jobs, and -- and let other people try to figure out these logic games.

But in all seriousness, we've been down quite a long road, all of us, with this case and this litigation, and I want to continue to express my appreciation for your patience with me, as I muddle through quite a bit of this stuff, and -- and, you know, I continue to look forward to being in service to the parties in trying to get this matter to a resolution, whether it be prior to trial or at trial, in front of whomever it will be.  But I wanted to make an observation, especially with today.

Everyone tries -- is trying to communicate as clearly as possible, and yet even in that -- in that effort and intention we can -- we can -- we might misunderstand what the other might be saying, but I also -- this is a Friday; so this is my Friday sermon.  Just bear with me.

So I -- but I also want to make sure that my -- my expression of gratitude is this:  Is that of all the three branches of government -- it isn't -- the context of the judiciary, that we have a format where we can actually slow things down to work through these conversations, trying to reach some common ground in understanding, even when we disagree, and it gives me hope, and I just really appreciate your efforts.

No matter how frustrated we get -- we might get with

each other, we're still able to resolve some disputes civilly, and it -- it just makes me feel good that I can be part of a system with good lawyers and professionals like yourselves.  I wish you all well.

MR. WILSON:  Thank you, Your Honor.

THE COURT:  Take care.

MS. SKJELSET:  Thank you, Your Honor.

MR. EDLESON:  Thank you, Your Honor.

MS. KORBEL:  Your Honor, happy Friday.

THE COURT:  Same to you.  Be well.

MS. KORBEL:  Thanks.

(Hearing concluded.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman, et al.
6:22-cv-01813-MK
Shannon Conley v. Kim Chapman, et al.
6:23-cv-01353-MK
Status Conference

October 18, 2024

I certify, by signing below, that the foregoing is a true and correct transcript, to the best of my ability, of the video conference proceedings heard via video conference, taken by stenographic means.  Due to the audio-visual connection, parties appearing via speakerphone or cell phone or wearing masks due to coronavirus, speakers overlapping when speaking, speakers not identifying themselves before they speak, fast speakers, the speaker's failure to enunciate, background noises and/or other technical difficulties that occur during video conference proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the video conference at the United States District Court of Oregon in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


/s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
_____
Official Court Reporter        Signature Date: 11/6/2024
Oregon CSR No. 98-0346  CSR Expiration Date:  9/30/2026