IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,                                )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )    No. 6:22-cv-01813-MK
                                           )
KIM CHAPMAN, in her individual             )
capacity; ANASTASIA TIBBETTS, in           )
her individual capacity; KASSIDY           )
O'BRIEN, in her individual                 )
capacity; ERIN LANE, in her                )
individual capacity; THE OREGON            )
DEPARTMENT OF HUMAN SERVICES, a            )
government agency; and JANE and            )
JOHN DOES 1-5; in their individual         )
and/or official capacities,                )
                                           )
        Defendants.                        )
_____    )
                                           )
OREGON DEPARTMENT OF HUMAN                  )
SERVICES,                                   )
                                           )
        Third-Party Plaintiff,             )
                                           )
        v.                                 )
                                           )
JOE ALBERT RAYGOSA,                        )
                                           )
        Third-Party Defendant.             )
_____    )

Discovery Hearing

TRANSCRIPT OF PROCEEDINGS FROM ELECTRONIC RECORDING

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

November 13, 2024

APPEARANCES


FOR THE PLAINTIFF:

        MARY SKJELSET
        Rizzo Bosworth Eraut PC
        1300 S.W. 6th Avenue
        Suite 330
        Portland, Oregon 97201

FOR THE DEFENDANTS:

        HARRY WILSON
        Markowitz Herbold PC
        1455 S.W. Broadway
        Suite 1900
        Portland, Oregon 97201


COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                  United States District Courthouse
                  1000 S.W. Third Avenue, Room 301
                  Portland, Oregon 97204
                  (503)326-8047

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator for    )
Z.C., a minor,                     )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )    No. 6:23-cv-01353-MK
                                   )
KIM CHAPMAN, ANASTASIA BROOKS,     )
KASSIDY O'BRIEN, ERIN LANE,        )
MARGARET RAMIREZ, in their         )
individual capacities,            )
                                   )
        Defendants.                )



Discovery Hearing

TRANSCRIPT OF PROCEEDINGS FROM ELECTRONIC RECORDING

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

November 13, 2024

APPEARANCES


FOR THE PLAINTIFF:

          MANUELLA M. TSHALA
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE PLAINTIFF:

          MARISSA KORBEL
          Allegiant Law LLP
          100 S.W. Main
          Suite 400
          Portland, Oregon 97204

FOR THE DEFENDANTS:

          HARRY WILSON
          Markowitz Herbold PC
          1455 S.W. Broadway
          Suite 1900
          Portland, Oregon 97201

COURT REPORTER:    Lindsey A. Weresch, RMR, CRR, CSR
                   United States District Courthouse
                   1000 S.W. Third Avenue, Room 301
                   Portland, Oregon 97204
                   (503)326-8047

(Wednesday, November 13, 2024, 9:05 a.m.)

## P R O C E E D I N G S

(Whereupon, the following proceedings were held in open court:)

THE COURT:  Please call the case.

THE COURTROOM DEPUTY CLERK:  Now is the time set for Civil Case No. 22-01813, Levi versus Chapman, et al., and Civil Case No. 23-01353, Conley versus Chapman, et al., for a discovery hearing.

THE COURT:  Good morning, Counsel.  Let's jump right into it.  I have a discovery dispute with respect to a newly found phone that was, and has been, identified as Mr. Hammond's that he would have been using -- and this is a DHS-issued phone, if I understand correctly -- and that he would've been using during a relevant time period in this case.

Who's going to be addressing these issues for the plaintiffs?  Any -- who's the primary person that I ought to be looking to?  There's three of you.

MS. SKJELSET:  My understanding was that Ms. Tshala was going to be taking the lead on this, Your Honor.

MS. TSHALA:  Yes, it's me, Your Honor.  But Ms. Skjelset has some background information, and so she might need to jump in as well.

THE COURT:  All right.  And, Mr. Wilson, since you're the only one, I was able to use my -- my very powerful powers

of deduction to conclude that it would be you and not the plant to your right.

MR. WILSON:  Correct, Your Honor.

THE COURT:  Okay.  All right.  I read both of your correspondence letters and reviewed the exhibits.

Ms. Tshala, tell me -- or is it Ms. Skjelset? -- tell me what it is that you want me to know in the way of background information about this.  I don't want to get too far into the remedies right now.  I just want to simply understand a little bit more about what you -- how you understand the phone was discovered.

And, also, let me point out I -- I -- I mean, I -- the only reason this phone has -- has been brought to light is because counsel -- the defense counsel did what they're obligated and -- and -- and, by way of our professionalism and ethics, honorably did what they did, which was find it, probably have a few expletives associated with it, and then -- and then report it.

So that's -- I'm not terribly interested in pointing fingers at attorneys today.  So let's talk about how we solve the problem of what's going on with this phone.  All right.  Ms. Skjelset or Ms. Tshala.

MS. TSHALA:  Yes.  I don't have the background.  If you want the background information, Ms. Skjelset --

THE COURT:  Just start with the background.  I want

to know what -- how did the phone get -- get uncovered?  I mean, I understand that you all came to be aware of it sometime October 25th or so.

MS. SKJELSET:  Yes.  And so on October 25th we were notified that Mr. Hammond's phone had been found in his desk.

THE COURT:  Who notified you?

MS. SKJELSET:  Sorry, Your Honor?

THE COURT:  Who notified you?

MS. SKJELSET:  Defense counsel notified us.

THE COURT:  Now, give me names.  I want to put faces to the people in the case.  Remember, let's humanize -- I'm humanizing people today.  That's my -- that's my theme and goal.

MS. SKJELSET:  Mr. Wilson.

THE COURT:  All right.  So Mr. Wilson contacted you by e-mail, telephone?

MS. SKJELSET:  Yes, by e-mail.

THE COURT:  All right.  All right.

MS. SKJELSET:  Yeah.

THE COURT:  And told you that a phone was discovered?

MS. SKJELSET:  Yes.  Correct.

THE COURT:  Do you understand how it was discovered?

MS. SKJELSET:  It's a little unclear.  But, based on Mr. Hammond's deposition that occurred on the 30th, it appears that his supervisor was looking through his desk drawer for

another child's phone --

THE COURT: Mr. Hammond was looking through his desk drawers?

MS. SKJELSET: Mr. Hammond's supervisor was looking through his desk drawer for another child's phone and came across Mr. Hammond's old phone, which is what we learned was recently discovered.

THE COURT: Who was the supervisor?

MS. SKJELSET: Traci Stockman.

THE COURT: Okay. And Mr. -- is it normal for DHS caseworkers to have child's phones in their desks?

MS. SKJELSET: I'm not sure about that, Your Honor. Mr. Wilson might know the answer to that. But Mr. Hammond had that phone in his possession. And Mr. Hammond is now on administrative leave, and so that's why his supervisor was looking through his desk.

THE COURT: He was on administrative leave because he had a child phone in his desk?

MS. SKJELSET: I'm not sure why he's on administrative leave. We just know that he is on administrative leave. And that's why the supervisor was looking through the desk, in order to find that child's cell phone.

THE COURT: Okay. All right. Well, how big a desk is it? How many drawers does it have? I mean, are there any

locked drawers?

MS. SKJELSET:  I'm not sure, Your Honor.

Mr. Wilson, do you know, by chance, any of those specifics?

THE COURT:  Well -- and we'll get to Mr. -- I'm going to ask the same questions of Mr. Wilson.

You know, I -- look, you know, it's no secret that the plaintiffs are pursuing a spoliation of evidence sanctions motion as well against the defendant -- or defendants.  And, you know, I know that it's on the horizon.  And I'm, frankly, simply just making sure that I'm primed to understand the scope of -- of the issues there.

I mean, look, you know, I can't imagine DHS caseworkers have huge offices or have really, you know, large, you know, White House, you know, Oval Office desks with secret compartments, like you might see in the movies.  So I'm kind of thinking that why is it -- why wasn't this phone earlier discovered by Mr. Hammond in the first place.  And I take it you don't have that answer, Ms. Tshala.  So I guess I'm just foreshadowing for Mr. Wilson.

So, Ms. Skjelset, what other background is it that you want me to know?

You're on mute.

MS. SKJELSET:  Ms. Skjelset, Your Honor?

THE COURT:  Yes.  Go ahead.

MS. SKJELSET:  I -- I didn't ask questions about Mr. Hammond's desk configuration.  And, frankly, the testimony that we've elicited from DHS caseworkers suggests that they don't have assigned desks, that they have cubicles that they rotate through.

So I don't -- I don't understand any of this.  And I think that it's -- that is part of the foundation for the 30(b)(6).  The representations that have been made to us about how state phones are issued, how they're maintained, and how they're returned and then disposed of, seems starkly inconsistent with the discovery of this phone.

And, again, I think it was -- we were surprised to receive the e-mail from Mr. Wilson.  And, as I hope you saw in my e-mail, I said, "That's great news," because we were -- we appreciate that he was sincere and honest and forthcoming in this discovery.  But it does seem inconsistent with what has been represented previously about how this important evidence is maintained and how it is preserved or not preserved.

THE COURT:  All right.  So Mr. Hammond's deposition was taken after you discovered the -- after the phone was disclosed -- the newly discovered phone was disclosed?

MS. SKJELSET:  Yes.

THE COURT:  All right.  And what questions did any one of the plaintiffs put -- plaintiffs' counsel put to Mr. Hammond during the deposition about this newly discovered

phone, and what were his answers?

MS. TSHALA:  Ms. Korbel was (indiscernible).

THE COURT:  Your -- the audio is coming in a little bit choppy, Ms. Tshala.  So I don't know if you can readjust the microphone or -- or -- I'm not sure what.  But I just want to make sure you -- I'm having a slightly difficult time following what you're -- what you're saying.  So you were going to say -- you said something that I didn't catch.

MS. KORBEL:  I can speak, Your Honor, if you can hear me any better.  I'm not sure.

THE COURT:  The audio is clearer.  So there's a microphone difference between your two offices.

MS. KORBEL:  Okay.  So, Your Honor, I took the deposition of Mr. Hammond in person.  And Ms. Skjelset attended via Zoom.  We did ask about if he recalled his password for the phone.  We attempted to walk him through what passwords he may have used and how it may have been set, in order to access the phone, because the representation by Mr. Wilson was that the phone was locked and could not be unlocked without a password.  So we -- we attempted to get that information from him.  He didn't remember.

THE COURT:  So it's a four -- it's a four-digit PIN.  It's not one of the new six-digit PINs.  So I'm -- I'm -- you know, at first blush, I'm finding his explanation is a bit incredulous.  And I'll -- again, this is all foreshadowing for

Mr. Wilson.

So I'm just helping you get teed up, Mr. Wilson.

So there's -- there's an issue there.  And I think there was some issue about whether there was a thumb -- like a fingerprint access as well.  Was there fingerprint access?  I understand that it might have been two-factor required, so both a thumbprint, or a fingerprint, as well as a pass code?

MS. KORBEL:  So what we understood from Mr. Wilson, Your Honor, is that the phone needed both the PIN and the thumbprint.

THE COURT:  What did -- what did Mr. Hammond say?  Did anyone ask him during his deposition?

MS. KORBEL:  He could not remember the PIN.  He offered to do --

THE COURT:  No, I know.  But what did he say about accessing the phone?  Was it PIN only, or was it PIN and -- and fingerprint?

MS. KORBEL:  I don't believe we asked him that question.

THE COURT:  And did anyone ask him why there was an old phone in his desk?

MS. KORBEL:  I believe he did not know.

THE COURT:  His answer was he didn't know why there was an old phone in his desk?

MS. KORBEL:  Correct.  We went over the forms that he

had filled out that indicated he had turned in various phones. We tried to figure out who he turned those phones into. He didn't have any recollection, I mean, understandably. This would maybe be 2018 or 2017 when he would have turned this phone in.

THE COURT: How often are they getting new phones from the -- from the -- from DHS?

MS. SKJELSET: I can answer that one, I believe, Your Honor --

THE COURT: Go ahead.

MS. SKJELSET: -- if it's okay, if I may.

THE COURT: Yes.

MS. SKJELSET: So there are forms that are filled out by the -- by the State -- by the individuals who are seeking to upgrade their devices, who are getting a replacement. And the forms that we have for Mr. Hammond indicated that he had received a phone on June, I think, 7th of 2017; and then had not turned in that phone until -- which we understood to be the same phone, although the forms don't say specifically what the -- what type of device it is. So --

THE COURT: So there's no -- there's no serial number on the forms that identify the phone as being issued or returned?

MS. SKJELSET: I don't believe so. It's very -- it's -- it is very difficult to track. But that is the -- the

phone that we -- there's only -- there's a form that shows that he's issued a phone on June -- in June of 2017.  And there's a form that shows that he gets an upgrade in January of 2020, which -- within days of Ms. O'Brien handing in her phone.

And this phone appears, based on the information that Mr. Wilson has provided, to have been replaced or to have -- to no longer be used in May of 2018.  Obviously that doesn't correlate with either of those dates.  So it is inconsistent with the documentation that we've gotten from the agency.

THE COURT:  Was -- did Mr. -- was Mr. Hammond asked any questions about how many phones he had during this period, State-issued phones?

MS. SKJELSET:  Yes.

THE COURT:  And was he able to recall any -- was he able to recall anything about how many phones that he had?

MS. SKJELSET:  Not with any clarity, Your Honor.

THE COURT:  So -- so his answers to any questions that were put to him about -- well, did anyone ask him about the phone that he -- that was issued to him in 2017?

MS. SKJELSET:  I'm sure I did, Your Honor.

THE COURT:  Well, now you don't remember.  I'm having a hard time now figuring out who remembers what anymore.  So come on.

MS. SKJELSET:  I remember exactly what the form says, what date it is.  I can pull it up for Your Honor and show it

to you.

THE COURT:  All right.  Well, I'm -- I know I'm trying to depose Mr. Hammond without him being here.  So you are all of his proxies since you were there.  And so -- you know, so you're going to have to bear with me because I'm -- I'm far more intrigued about what's going on with the phones and, frankly, more than anything, Mr. Hammond.

I mean, it's been no -- there is no surprise or secret that -- that defense counsel has been actively searching for all of this -- all -- any electronic devices that would have information or communications.  And I don't think Mr. -- I'm surmising that Mr. Hammond has been involved and has been communicated with by both counsel or his own supervisors about making sure that all phones are located and turned over.

So I'm -- I'm particularly frustrated and disappointed that Mr. Hammond doesn't seem to understand some -- some expectations or requirements with complying with his own supervisor's instructions, if not the lawyers' instructions, about -- about producing what's expected and required.

So let me ask -- let me ask another question.  Did -- did anyone ask him why a -- why -- well, first of all, I mean, how do we know it was -- I mean, is there any dispute that it's one of his phones?

MS. SKJELSET:  It has been represented to us by

Mr. Wilson that it was one of his phones. And there is a portion of what appears to be a larger Excel spreadsheet, which appears to be keeping track of what the phones are; and does, in fact, have its serial number, its date of usage and items like that, which leads us to believe that the agency is somehow aware of what phones people were using at various points in time, when they stopped being used and -- and information like that, exactly what kind of phone it was, with the serial number.

We only got one tiny portion of --

THE COURT: So are the documents generally pointing in the direction that this phone is identifiable and -- and that identity of the phone is -- is attached to Mr. Hammond?

MS. SKJELSET: In that portion of the spreadsheet. So, Your Honor, I see that you -- your -- the lightning rod is being borne by Mr. Hammond right now. But for plaintiffs -- and I'm not casting aspersions on Mr. Wilson -- for plaintiffs, the concern is more the agency and its management of devices.

It has been represented to us in many cases, not just this one, over the course of many years, that when phones are upgraded, they are returned to the vendor and disposed of. Well, these are agency --

THE COURT: Yeah. Has anyone contacted Wireless Watchdogs to find out if any -- any of Mr. Hammond's phones were returned when -- when upgrades were -- were provided?

And, yes, I am focusing on Mr. Hammond as -- as a -- as the beginning of -- of -- of further inquiry. But Mr. Hammond is the first focal point.

MS. SKJELSET: From -- from -- from Plaintiff Levi's perspective, the fact that Mr. Hammond did not turn over a device, that there's no -- that there is no form that shows that he was issued a different device, that the -- and the date that he started using a separate State-issued device, and that it wasn't returned to the vendor, as we understood happens with every phone, that calls into question how the State maintains and tracks these devices.

It's particularly important for Defendant O'Brien because she, unlike -- unlike many of the individuals for whom we have received the phone records, was texting all the time. She was texting with important individuals during this critical time, hundreds of text messages that have vanished.

And if there is a phone that might be out there that is Ms. O'Brien's, we would like to know that because it appears as though the tracking system and what was represented to us previously by the defendants, which is that these phones are simply returned to the vendor, is at least not true in one case.

THE COURT: Well, are there -- are there vendor documents reflecting receipt of old phones and issuing of new phones? I mean, I think it was just one, the Wireless

Watchdog, that was referred to, I think, in Ms. Hoffman's letter to all of you.

Do you have any documents from Wireless Watchdog or any one of the vendors responsible for -- for taking in the old phones and -- and issuing new ones?

MS. SKJELSET:  So, Your Honor, this is why we would like a 30(b)(6) --

THE COURT:  So first answer my question, and then we'll talk -- if you -- if you don't have the information, that helps me understand what the scope of your request is and whether it's appropriate.  So answer my question.

MS. SKJELSET:  Okay.  I don't know if Wireless Watchdog is the vendor that Ms. Hoffman was referring to.  We have subpoenaed Wireless Watchdog in numerous cases.  I've had conversations with individuals from Wireless Watchdog seeking records.

What I understand Wireless Watchdog does is that they get the passwords for the various carriers, and they go in and they download the -- the logs of calls and text messages and store them in a large database.

But I don't know if they actually handle -- because they're in a separate -- I think they're in California.  I don't know if they actually handle the devices.

THE COURT:  Okay.

MS. SKJELSET:  We have no idea who handles the

devices, what management software is on the devices restricting it, how the passwords are maintained.

I mean, this is not the first case in which suddenly the passwords are -- I mean, it's only happened very recently in another case where DHS can no longer access a device that was used at times material because suddenly the passwords -- they don't know the passwords, and they have to use special technology to unlock it.

Well, it just seems not feasible that there's a -- that the State has a system for ensuring that they can extract or access critical information about Child Welfare activities that are contained on a device that is issued by the State.

Why can't they crack it?  Why do they need Cellebrite?  Why can't there be an e-mail that goes to the individual who had the device to allow access?  It just seems incomprehensible.

THE COURT:  Okay.  All right.  Let me turn to Mr. Wilson.  I know you've been thinking about some of the questions that I've -- I've been asking plaintiffs' counsel. So much of the letter that you -- in the letter that you provided in response to the plaintiffs' request for some reopening of discovery, it really doesn't address the significance of defining of -- of -- of one of Mr. Hammond's older phones and kind of focuses on, you know, the overbreadth and the lateness of the request.

I want to make sure, though, that you don't spend too much time on those because this is more about scope. Your client is kind of making it a whole lot harder for you and your team to defend them on this issue.

And so the better approach is let's -- let's talk more about what an appropriate scope of additional discovery is going to be than trying to explain to me that the plaintiffs are asking for too much too late.

If the phone -- if the phone was just recently discovered -- and I'm grateful that -- that the phone was produced -- your client has to answer to why, under a state agency such as DHS, with the kind of scrutiny that -- and -- and, frankly, better practices one would expect an agency such as DHS, within the State, should -- you know, should be acting under, can't seem to keep track of vital forms of communication records.

So, Mr. Hammond [sic], why was -- why was the phone in his desk that was his? Well, first of all, I mean, was it his desk? Or do they move around in cubicles?

MR. WILSON: Yes, Your Honor. So with respect to the cubicle question, I spoke to -- I tried to get to the bottom of that. My understanding is that Mr. Hammond -- most employees do not have permanent desks. But, for reasons beyond my knowledge, Mr. Hammond -- I'm not sure if "permanent" is the right word, but he had been camped at a particular area for --

for quite some period of time.

My understanding -- I have not seen the location myself, Your Honor, but my understanding is it's kind of in a cubicle-like form, that there is a desk, but there is also a cabinet or -- or maybe drawers that's adjacent to the desk.

And I think that the phone was found in the -- in the drawers that was adjacent to the desk.  But how everything is exactly connected to each other, I -- I don't have confidence in -- in describing that exactly, Your Honor.

THE COURT:  Okay.  And who discovered the phone?

MR. WILSON:  My understanding is that Traci Stockman discovered the phone.

THE COURT:  And why was Stockman -- Traci Stockman looking -- she was looking for some other phone, I take it, from -- in a -- in an unrelated case.  Is that fair to say?  Is that accurate?

MR. WILSON:  That is my understanding, Your Honor.

THE COURT:  Okay.  And in the process of searching for some other phone in an unrelated case, she came across a different phone?

MR. WILSON:  Correct.

THE COURT:  And, well, did she find any more than just that one?

MR. WILSON:  Not to my knowledge, Your Honor.

THE COURT:  Okay.  All right.  And I take it she

probably -- I'm assuming she contacted somebody who knew what to do with it, and that's how it came into your -- to your awareness and then your production of it?

MR. WILSON:  That's correct, Your Honor.  There was some effort made to determine whether the phone had already been collected and returned.  You know, when these phones are collected, they're -- you know, the vendor runs reports to extract information from them; and if the phone is in active use, or has been in active use, returned.

We made -- you know, we tried to determine whether it had already been collected, determined that it had not been collected, and notified opposing counsel.

THE COURT:  And then it would have been collected if it -- if processes, as you've described generally, were -- were observed in 2020 then, when he got his new phone?

MR. WILSON:  If I'm following your question correctly, Your Honor, no.  The collection would have occurred at the -- at the time the discovery -- you know, that we received our discovery request for --

THE COURT:  Okay.  So there's collection for litigation, but also what I'm thinking about is collection in the normal processes for when employees -- caseworkers are receiving new upgrades.  So -- and that's --

MR. WILSON:  Oh.

THE COURT:  -- that's where my -- that's what my

question was directed to.

So I understand that the records, as Ms. Skjelset described, reflect something to the effect of that Mr. Hammond received a new phone in 2017, in the summer of 2017.  It may very well have been this iPhone SE that was discovered in the -- in -- that was found in his -- in his desk.  And then he was -- so in 2017 he received an iPhone SE, the subject phone, and then in 2020 he received an upgrade?

MR. WILSON:  Well, what -- what we know, Your Honor, is a little more complicated than that, I think.  So Ms. Skjelset referred to a spreadsheet.  What she is referring to is what's called an IMEI trace.  We asked that -- when we discovered this phone, we asked that the Wireless Watchdog run the IMEI trace in order to determine when the phone was in use.

And we had the serial number from the phone.  And they ran that trace.  And that trace (indiscernible) had been used from 2017 to 2018.  We are confident that that is Mr. Hammond's phone that -- that that was a phone that he used.  And, as Ms. Skjelset --

THE COURT:  And you were able to -- you're confident of that because, one, there's a serial number that's ostensibly attached to a State-issued phone; and the IMEI identifier, you know, correlates with that serial number that would've been a State-issued phone.

I'm also kind of imagining that -- well, I know that

with respect to -- well, for example, judiciary-issued phones, they -- they put their little sticker on it, on the back, with "Property of," you know -- you know, "the District of Oregon," or something like that.

Would there have been a, like, State of Oregon sticker on the back that identifies it as a -- as a phone that wasn't a personal phone, but one that was issued through some State -- state employment?

MR. WILSON:  I -- I don't -- I don't believe that there's a sticker on this phone, Your Honor.

THE COURT:  Okay.

MR. WILSON:  But Wireless Watchdog records line up with Mr. Hammond having this -- this serial number.

THE COURT:  Okay.

MR. WILSON:  So if -- and, Your Honor, Ms. Skjelset is correct:  There was, I believe, a form issued around 2020 reflecting the new phone.  Wireless Watchdog records for this phone, the IMEI trace, shows that it was only used through 2018.  Mr. Hammond had another phone in the intervening time period, 2018 to about 2020.

THE COURT:  And that would've been a State-issued --

MR. WILSON:  And we don't -- we do not -- yeah.  We don't have -- to the best of my knowledge, we do not have access to that phone.

THE COURT:  Okay.  So there -- there is another phone

from 2018 to 2020 that was -- that was -- that was issued to Mr. Hammond?

MR. WILSON:  We believe so, Your Honor, according to Wireless Watchdog records.

THE COURT:  And has -- have they run an IMEI check on that phone to see when it was last used?

MR. WILSON:  I -- I don't think so, Your Honor.  If they have, I have not seen it.

THE COURT:  Okay.  So would it -- I mean -- and we don't know whether it would be possible for that phone to have been perhaps traded to somebody else to use within the State or within DHS or within -- yeah, within DHS?

MR. WILSON:  I -- I suppose that's theoretically possible, Your Honor, but I -- I don't have any reason to believe that that's the case.

THE COURT:  But at this point the Wireless Watchdog hasn't checked to see if it's in active use to today's date, or at least through some other period of time than 2018 to 2020?

MR. WILSON:  I don't -- I mean, I have not asked anyone that particular question, Your Honor.  But I don't have reason to believe that it's in use.

THE COURT:  Okay.

MR. WILSON:  Or -- or even by -- in any way.

THE COURT:  And the basis for your belief is what?

MR. WILSON:  Simply that Mr. Hammond received a new

phone in 2020.

THE COURT:  Okay.

MR. WILSON:  And -- and typically the -- you know, the phones are not traded about between employees, but I -- you know, I don't have any reason to believe that it was.

THE COURT:  Okay.  All right.  I know I put a lot of questions to plaintiffs' counsel.  And I -- I think you were taking some notes as well.  So what else do you want to tell me about the inquiries that I've made to plaintiffs' counsel, that really were trying to prime you for -- for the -- the hill that -- that you have to climb on behalf of your client?

Yeah, I'm -- I'm doing as much as I can to make sure it's very clear, Mr. Wilson:  This -- this isn't about you or your -- or any of your team.  I'm -- you know, I'm holding your client responsible for -- for this -- for this, frankly, gross oversight.

And you're doing everything you can to -- to -- to honor -- honor the requirements, as it is for litigation in -- in our district.  And I -- I respect and appreciate that.  But please make no mistake:  I'm holding your clients responsible for this.  And they're going to -- they're going to have to bear -- bear the burden of -- of correcting it.

Well, actually, I guess you will.  But -- but they -- they'll be accountable for -- for why this hasn't been -- why this wasn't produced before and earlier.  So at this point

there's no explanation for why the phone was sitting in his -- in his desk because apparently Mr. Hammond --

MR. WILSON:  I -- I don't have any explanation --

THE COURT:  Because Mr. Hammond doesn't even know why, according to his deposition.  Okay.

MR. WILSON:  That's my understanding, Your Honor.

THE COURT:  Is he on paid -- or is he on administrative leave because of the phone being in his desk or for other reasons unrelated, for which I won't ask about?

MR. WILSON:  Your Honor, you know, I don't represent DHS with respect to employment.  And so I don't have information that I am able to -- to share with you about that.  I don't know.

THE COURT:  All right.  All right.  All right.  So let's turn to the discovery that's being requested.  I think it's only -- well, I'll -- Ms. -- Ms. Korbel.

MS. KORBEL:  I just wanted to say, for clarity, Your Honor, my understanding from Mr. Hammond's deposition is he was placed on administrative leave around September 23rd or 25th.  And the phone was not discovered until a month later, so I don't believe those two things were related, just for the Court's knowledge.

THE COURT:  All right.  All right.  That -- I think that'd be a fairly safe assumption.  But I -- I imagine the discovered phone probably puts him in hotter water, but that's

neither here nor there for this case at this point.

All right.  30(b)(6) depositions, there were several topic areas that plaintiffs wanted to take 30(b)(6) depositions for.

Oh, Mr. Wilson, where -- I mean, so when phones are turned in after they're -- after employees are given upgrades, do you know what -- like, who collects those phones and where they go?

MR. WILSON:  Who specifically, Your Honor?

THE COURT:  Not by name, but -- so I -- I'm assuming, in -- just sort of in the context of our discussion here, that -- that, you know, DHS collects them and then either disposes, recycles or returns -- you know, returns them to somebody who might put them into the refurbished market after being wiped clean, I imagine.  I mean, but -- but, again, I'm just guessing right now.  Do you have a -- I mean, are they actively collected and then -- then just taken off -- taken offline and --

MR. WILSON:  My understanding, Your Honor, is that Wireless Watchdog is the vendor that manages DHS and the Office of Information Systems phone contracts and phone, you know -- phones themselves.

THE COURT:  Okay.

MR. WILSON:  And so phones and -- and the various networks that the phones are connected to are managed by that

vendor. As for who actually collects and returns phones to -- to Wireless Watchdog at the completion of use, I don't know whether that -- someone in my office might know; but, as I sit here today, I cannot represent whether it's DHS or Office of Information Systems.

THE COURT: So, at the minimum then, based on -- the understanding you have is that phones are collected; and then at some point, in some way and fashion, turned over to Wireless Watchdogs? The phones are physically --

MR. WILSON: That's correct, Your Honor.

THE COURT: -- shipped down to Wireless Watchdog in California?

MR. WILSON: Yes.

THE COURT: So they -- would it be fair to say that they would also then have a record of whether that 2018-to-2020 phone was turned in?

MR. WILSON: I -- I would expect that they do, Your Honor. In fact, I'm almost certain that they do.

THE COURT: Okay. And have you -- have you inquired yet about whether they have any -- any record of that 2018-to-2020 phone being received -- being received by them?

MR. WILSON: Not as to whether it was received. I mean, as to whether there was a phone, yes. But --

THE COURT: Okay.

MR. WILSON: -- not as to whether it was collected or

received.

THE COURT:  Now, I'm not generally inclined to get into the middle of any party's case, but I'll also tell you -- I mean, I'm just giving you -- I'm giving you all what my cards might be looking like.  And -- and I know I'm -- I'm -- I am focusing somewhat heavily on Mr. Hammond because he's -- he's, at least at this point, the one exemplar of what sounds to me like sort of shoddy administration and practices with respect to phones and issuing of phones.

It would be important for me, if I'm going to be considering motions for sanctions on spoliation, is -- I mean, does -- does Wireless Watchdog have an omission -- a record, maybe by omission -- oh, I lost Mr. Wilson.  Let's see if we can get him back.

MR. WILSON:  Hello?

THE COURT:  Hi.  Okay.  There you are.  Whoa, you changed angles on me.

MR. WILSON:  I'm so sorry, Your Honor.  I think I accidentally kicked the ethernet cable free.  I'm not running. I want to answer your question.  I apologize.

THE COURT:  It's either that or Wireless Watchdogs has got a -- has got a hold on you, too.  So -- they're watching.

MR. WILSON:  I'm sorry, Your Honor.

THE COURT:  All right.  So --

MR. WILSON:  The last thing I heard is you don't want to get in the middle of a case, and then I lost you.

THE COURT:  Yeah.  But, see, that's sort of a rhetorical counter to really what I'm doing.  So, like, I really don't want to, but I think I -- I am to the extent that people are going to be filing motions and responses to motions for sanctions on spoliation.

Oh, did somebody else join the call, Ms. Davies?

THE COURTROOM DEPUTY CLERK:  I don't see --

THE COURT:  I heard a -- I heard some beeping sound.

MR. WILSON:  That may be our paralegal, Your Honor.  It may be that Markowitz Herbold lost --

THE COURT:  And that's fine.  I mean, it's a public hearing.  I just want to make sure that if somebody's supposed to be able to participate that -- that we're --

THE COURTROOM DEPUTY CLERK:  I see Mr. Wilson on here twice.

THE COURT:  Okay.  All right.

THE COURTROOM DEPUTY CLERK:  Everybody else is listed as the same people that have been on since the start.

THE COURT:  All right.  So with respect to the 2017-to-2018 phone that has been discovered in -- in Mr. Hammond's desk, I would be interested in understanding whether Wireless Watchdog has a record of having received it.  I would imagine there shouldn't be.  But if there is, that

would be helpful to know.

Two, whether there's a record of not having received it, which would certainly confirm then why the phone was -- and -- and, you know, why the phone was sitting in the desk here in Oregon.  I would be interested in knowing -- there we go.

THE COURTROOM DEPUTY CLERK:  Again, Mr. Wilson is showing up twice.

THE COURT:  So I was -- I was watching a movie last night involving the temporal something agency, TVA.  Are you familiar with Marvel Comics and multiverses?  This is -- this is giving me some flashbacks from -- from -- all right.  I'm feeling better now.

We're back on the sacred timeline, Mr. Wilson.  Don't do that again.  Okay.

MR. WILSON:  I -- I'll do everything I can, Your Honor.

THE COURT:  All right.  So I'm also interested in -- in what records reflect -- that Wireless Watchdog has with respect to the 2018-to-2020 phone.  Did they receive it?  I mean -- I mean -- and if not, then that means there's another phone out in the wild.  And that's a problem for -- that's a problem for your client.

MR. WILSON:  Understood, Your Honor.  I did -- I -- I want to be careful that I didn't misspeak as to what I know

and -- and what I don't know.

I -- I do know that Wireless Watchdog should have records of serial numbers and who they believe those phones went to.  I don't know for sure whether Wireless Watchdog keeps a record of receiving a phone that is turned in or not.  So I -- that's not to say that they don't.  I just don't have that information as I sit here right now.

THE COURT:  All right.  But I imagine, though -- I mean, if -- you know, I don't know what the scope of Wireless Watchdog's, you know -- you know, business portfolio is; but it seems like if they're dealing with thousands and thousands of phones all over the place and -- and given just that, you know, serial numbers are relatively easy to track on phones and to record in -- in sort of inventory databases, that if they're not keeping that kind of information, you know, that might be a problem for the State, too.

So it's just -- it's hard for me to imagine that they wouldn't have that information, but we'll figure it out if and when you can get me an answer to that.  Then I'm also interested in -- in whether an IMEI trace conducted by Wireless Watchdog on the 2018-to-2020 phone indicates when it was last used.

And here's what I'm -- again, my -- I don't know if it's -- it's not a hypothesis.  What I'm trying to determine is, well, if it's been used recently or sometime in -- you

know, after 2020, then it -- then it's been alive for -- for some period of relevant time that it -- it -- we need to find it.

Somebody needs to find it, or there's going to be probably a consequence for not being able to produce a particularly relevant phone to the -- you know, to the allegations in this case.

All right.  I mean -- all right.  So going back to the 30(b)(6) questions, topic one, two, three, four and five were topics that I deemed to be reasonable and would allow. Now, again, I'm showing you my cards.

So if there's a really good reason, Mr. Wilson, why you think I have it off-base, tell me why now.  And I'm happy to, you know, consider what you're asking me to do.  But, again, this is more about defining scope rather than whether or not to allow the depositions to go forward.

MR. WILSON:  Understood, Your Honor.  I think, given Your Honor's -- that Your Honor would like to see those topics move forward, our main concern, understanding that, Your Honor, is that we have appropriate time to prepare a witness.  The topics, as we pointed out, Your Honor, we believe they are quite broad.  And we will need to gather information from --

THE COURT:  And we'll talk about timing in just a bit, but -- yes, it'll be a topic we'll discuss before we're done today.  So --

MR. WILSON:  And then the other part on scope, Your Honor, is that some of the topics -- and I apologize I don't know -- I'll check while we're talking, but I can't remember exactly which one mentions this -- but one of the topics at least mentions personal devices.

And that's going to be outside the scope of what I believe ODHS, as a deponent, can actually testify to.  So if, you know, they -- there are 14 individuals who are named in various topics.  All of them presumably would have a personal cell phone.  We are not -- you know, ODHS is not in a position to testify about when employees obtained their personal cell phones and how -- you know, how they use them.

THE COURT:  Well, I mean, we -- I mean, there's evidence in this record that -- that ODHS caseworkers were using their personal phones for some -- for some business purposes or work-related purposes.  So, I mean, to the extent that there are questions put to a 30(b)(6) of what their knowledge of -- of -- of that use and -- and, you know, their acceptance of that practice, it may be helpful, probably only with respect to the spoliation issues more than -- more than perhaps the underlying claims in the complaint.

But I'll let the plaintiffs fill me in on -- on why that might be necessary because I'm -- yeah, I generally agree it's -- you know, whether there was -- whether there was personal phone usage, or whatever the practices were, or

whether supervisors, you know -- you know, accepted that practice of personal phone use for business purposes, you know, how that might relate to the -- to the -- to the claims themselves.

I'll -- well, I'll turn to the plaintiffs in a moment, but -- but let's -- let's bookmark the issue of, you know, personal phone -- policies with respect to the use of personal phones.

MR. WILSON:  If I could clarify one thing, Your Honor, I -- I do think the -- ODHS can testify about the policies with respect to personal phones --

THE COURT:  Okay.

MR. WILSON:  -- and, you know, that -- I'm not -- we're not objecting to that.  It's the specifics of the actual personal phones that -- that ODHS would not have access to. But policies around the use of personal phones --

THE COURT:  Got it.

MR. WILSON:  -- is -- is fine.

THE COURT:  Then -- then the actual phones are -- are relating to a list of people that have been named?  Or -- I mean, I think it's -- I think it was in a -- one of the exhibits.  I'm looking at one, which is Exhibit 2, page -- page two, I believe, of your response.  It's one example identifying several names of people.  Are we talking about those people?

And maybe I'll ask the plaintiffs.  Are you -- are

you wanting more information from a 30(b)(6) deponent about personal phones of these -- of these named people?

MS. SKJELSET:  So, Your Honor, my understanding, based on how I read the policies that I've been able to find relating to the use of mobile communication devices for DHS work, is that some employees are issued State-issued devices; and some employees have the option of using their personal cellular devices with a device management software or application that is placed on their phone.

I can't tell, based on the records that I have, whether the custodians, who were the individuals listed in the 30(b)(6), were using their personal devices.  I think we have determined that Ms. O'Brien and -- Defendant O'Brien and Mr. Hammond, obviously, were using their personal devices, maybe without the device management application on their -- on their phones, but to communicate with each other and potentially regarding work.

But I think the thrust of the 30(b)(6) would be related to the usage, the -- the ratified usage of personal devices and the use of device management software in order to manage the use of those personal devices in relation to state work, if that makes sense.

THE COURT:  Yes.  So the names of those custodians are listed in topic two, correct?

MS. SKJELSET:  Yes, Your Honor.

THE COURT:  All right.  And you want to know -- you want -- you want to ask a 30(b)(6) deponent about what the policies are with respect to allowing use of personal phones, the ratification of, and whether there is any, you know, sort of administrative software to create firewalls within the phone between personal and business use?

MS. SKJELSET:  It's my understanding, based on a read of the policies that I've been able to find, that there is some kind of ICE management software or application that is downloaded onto the device in order for that to occur.

THE COURT:  Okay.  So you know -- you know that it is, so why -- so what would be the question you'd put to the deponent about what you already know about --

MS. SKJELSET:  What is its functionality?  What does it do?  I don't know what kind of software it is, what it does, what it manages, what it stores, because the -- really the -- and whether it implicates the ability to open up a phone with a password.

I would -- 'cause, as I'm reading the -- as I'm reading the policies, it appears to relate to the password functionality.  And it appears to monitor what people are doing on the phones.  It just seems -- yeah, I -- but I don't know the extent to which it stores data or text messages in a cloud, whether it can be --

THE COURT:  And is all of this relevant to the

spoliation motions?  Well, that's rhetorical.  I mean, all of it sounds relevant to the spoliation motions.  What relevance is it to the case in chief?

MS. SKJELSET:  Well, the spoliation motion -- well, for Ms. O'Brien, in particular, the question we have to determine is -- well, we know that there were likely highly relevant communications, text messages, on her device.  The question is, was it also in the cloud or somehow preserved in this device management software?

If not, if it was solely on the phone, when was the phone turned in; and then what happened to it?  We can see from the e-mail communications when she became personally aware that she was likely to get sued in this case.  And it is prior to turning in her device on January -- in January of 2020.

THE COURT:  Which topic is it that points to this -- which topic number describes the -- the subject of this administrative software?

MS. SKJELSET:  I think it's -- well, topic number three is the mobile device management system.  So that's generally discussing the mobile device management systems, which is the -- that sort of --

THE COURT:  And will that topic elicit the production of a deponent who could talk about the use of personal phones?

MS. SKJELSET:  I -- I don't know how they plan to do it; but my understanding, based on my -- my interpretation of

the policy, is that there -- the device management software is -- is applied to phones both that are State-issued and personal.

THE COURT:  Well, what -- so I'm just wanting -- I'm looking for just the quick answer.  Is there a topic that's been provided in the 30(b)(6) that speaks to wanting -- wanting to talk to a deponent regarding the personal phones?  Explicitly regarding the personal phones.

MS. SKJELSET:  I'm -- I'm not sure what Mr. Wilson was alluding to.  So I think, for the plaintiff --

THE COURT:  Well, is that not an issue that you need to have someone specifically speak to?  Because if not, then I don't want to -- I'm not -- I'm not interested in going down that road.

MS. SKJELSET:  It's the use of personal devices, as ratified by the State, for Child Welfare activities and whether there's a device management software application that's used that stores or preserves data.

THE COURT:  So I understand that.  I'm just trying to understand whether there's going to be a beef down the road that -- that a topic noticed in your -- in your subpoena doesn't say what you just said, and so they don't produce somebody that can speak to the use of personal phones.

And maybe -- and I don't want to make this more complicated than it needs to be.  But I'll tell you that all of

you have made this far more complicated than I ever wanted it to be, so you've trained me well.

So -- so, Mr. Wilson, I'm trying to head something off at the pass before it becomes a problem, you know, at the time of the depositions.  Mr. -- what do you have for me, Mr. Wilson?  How do we solve it?

MR. WILSON:  Well, maybe I can make it -- I can say this, Your Honor.  The State will produce a witness who can speak to the use of mobile device management software practice and policy on personal cell phones.

THE COURT:  All right.

MR. WILSON:  Our concern that I raised earlier was with respect to topic eight, which addressed the personal devices and the specifics of those devices, like serial numbers.  But I believe topic three would encompass what Ms. Skjelset is, I think, describing.

And -- and the State will produce a witness that can speak to whatever policy -- I don't know the policy or practice, as I sit here -- but whatever it is, with respect to mobile device management software on personal cell phones, we will produce a witness who can speak to that.

THE COURT:  Okay.  All right.  Thank you for that clarification.

Then -- then let me also say that topic six, seven and eight were topics that I were -- that I -- I was not

inclined to allow a 30(b)(6) deposition for.

So I'm going to turn now to plaintiffs to help me understand why you think those are necessary and relevant for either the spoliation motion or the case in chief. Let's take up topic six first. And this is sort of a preservation policy.

MS. SKJELSET: I -- I suppose I'll -- I'll speak to that.

So the first step, Your Honor, in -- in what I see as these first topics, is understanding how devices are issued, how data is managed. And then the next step is, for the sake of spoliation, once there's an awareness that there is a likelihood of litigation, what -- the steps that are taken to preserve those documents.

THE COURT: Okay. I'm going to allow topic six.

Topic seven.

MS. SKJELSET: So topic six was generally with regard to the steps taken to preserve data. And then topic seven is with regard to specific steps to -- to preserve the data in connection with this litigation.

THE COURT: I mean, does it ultimately, at least for now, speak to why that iPhone SE wasn't -- wasn't produced? Is there something else out there that you're curious about? Aside from other phones that might be sitting in people's desks right now.

MS. SKJELSET: Your Honor, the -- the most important

device for Plaintiff Levi is Defendant O'Brien's phone, what -- what happened to it.  There had to -- we know that there was a subjective understanding that there was information on that device that was relevant to a forthcoming litigation.  So the question is --

THE COURT:  What was -- what was the period of -- I know I've been focusing quite a bit on Mr. Hammond during this hearing.  But -- but get me up to speed again on -- on Ms. O'Brien's phone.  There's a phone that's missing because it was an older phone that had been turned in?

MS. SKJELSET:  Right.  So Ms. O'Brien, more than any other -- any other --

THE COURT:  So just answer my question.  I just want -- I'm going to lead you along a little bit, just so I can get to the -- to the point that matters for me to be able to answer the issues with respect to scope.

There's a phone during a relevant time period that Ms. O'Brien had that nobody can locate?

MS. SKJELSET:  It was apparently turned in on January of 2020, at the same time as Mr. Hammond turns in his subsequent phone.

THE COURT:  Okay.  So an old -- Ms. O'Brien's older phone was turned in when she received an upgrade in 2020?  Yes, no?

MS. SKJELSET:  Well, again, I -- that is what -- that

was our understanding, based on representations by the defense counsel.

THE COURT:  Okay.

MS. SKJELSET:  We don't know what happened to that phone.  It could be --

THE COURT:  So let me rephrase.

MS. SKJELSET:  -- sitting in a drawer.

THE COURT:  She got a new phone in 2020; she had a phone before 2020 that was State-issued?

MS. SKJELSET:  Yes.

THE COURT:  Okay.  Do you know for how long she had that phone, that previous phone, from whatever date to 2020?

MS. SKJELSET:  If memory serves me correctly, and if I can rely on the documents that I received from State Defendants, she would've been issued a device in May of 2018.

THE COURT:  Okay.  And it's that -- that phone that -- that no one -- that no one, for now, as far as you're aware, has possession of?

MS. SKJELSET:  The representation that was made --

THE COURT:  Well, I -- I'm really not trying to catch anybody in a trap.  I'm just -- I'm just trying to understand.  The phone -- no one knows where the phone is right now.  It hasn't been searched.  The data hasn't been taken down from it, and it hasn't been reviewed?

MS. SKJELSET:  Right.

THE COURT:  Okay.  All right.  And so that's the phone that's in question.  You'd like to know more about whether that phone exists somewhere; if it does, whether it was turned into Wireless Watchdog.

MS. SKJELSET:  To Plaintiff Levi, if we have to narrow the scope, that is the most important device.

THE COURT:  Okay.  Well -- and then you would want -- would you have wanted to then apply that same set of questions to the other custodians' phones?

MS. SKJELSET:  Well, I think that if we have an understanding for how the system is supposed to work with regards to phones, how they're issued, how they're returned, whether there's a record of them when they're returned, what -- what data on the phones are either stored as a result of this management store, or whether it is downloaded once it's returned or simply erased, as was represented before.

THE COURT:  And this is all a part of topic seven, correct?

MS. SKJELSET:  Yes.  Topic seven has to do with any efforts to preserve the information on those devices, whether it be stored using a device management software or whether it was stored on the devices themselves subsequent to notice that there was a forthcoming civil lawsuit.

THE COURT:  Okay.  Topic seven is allowed.

Topic eight.  Is it an extension of topic seven, for

all intents and -- I mean, you're wanting to know what the -- the physical phone identifiers are.

MS. SKJELSET:  And, frankly, Your Honor, the -- the documents that show where they went and how and what they were, documents that show what device was being used when, what the agency -- what -- what documents show that the agency issued it, received it, what they did with it, whether there's some communication with Wireless Watchdog, like you were saying, if that, in fact, is the vendor who receives the phones at some point in time, to indicate that it was actually sent to a vendor instead of secreted away in a drawer for eight years.

THE COURT:  All right.  Topic eight is allowed.

All right.  Let's turn to, Mr. Wilson, issues with respect to -- yeah, Mr. Wilson.

MR. WILSON:  I -- I just hope, Your Honor, I can speak a little bit to -- to some of our objections, in particular to topic seven.

THE COURT:  Yes.

MR. WILSON:  I --

THE COURT:  Go ahead.

MR. WILSON:  I understand -- yeah.  I understand, I think, what Your Honor is reaching to understand in topic seven.  Where we really think topic seven is overbroad, Your Honor, is that it -- is where it seeks to understand when DHS had notice or knowledge of the lawsuit.

That is a different question than what ODHS did to preserve data on mobile devices. Knowledge of the lawsuit and when -- or knowledge of a potential lawsuit has been a factual question that will drive when ODHS should or should not have issued -- or when they should've issued litigation hold notices.

That factual question has been well known to the parties for a very long time. And it has nothing to do and is not -- nothing has changed with respect to the discovery of the Hammond cell phone that changes the analysis of that question.

So with respect to topic seven, we would ask that it does not include when DHS had knowledge or notice of the potential for litigation, that it only encompasses steps taken to preserve data on cell phones.

And then with topic eight, Your Honor, I'd go back to what I identified earlier, that topic eight, we believe, covers personal devices. To the extent that it reaches those personal devices, it -- and the models and serial numbers on personal devices, that's outside what DHS would have knowledge of.

THE COURT: Okay. At least with respect to eight -- well, let's take up eight first. I mean, to the extent that -- that phones were -- personal phones were allowed to be used for -- for DHS purposes by any of these custodians, then I think topic eight is -- is fair game to explore.

MR. WILSON: So, Your Honor, to -- I think, to go

back to some of the language you used earlier, if a personal phone had the -- the mobile device management software on it, then it is fair game?

THE COURT:  Let me ask the plaintiffs.  I mean, is there -- is there a distinction with any difference here between personal phones that DHS allowed people to use for -- for business purposes versus personal phones for which MCDs were installed, if I'm using the term -- no -- MD -- MDMs were installed?  Ms. Skjelset.

MS. KORBEL:  Your Honor --

THE COURT:  Oh.

MS. KORBEL:  I do only have the example of Ms. Chapman, Defendant Chapman.  She talked in her deposition about using her personal device for work for quite some time.  But we don't know whether she was doing that with the blessing of DHS and, therefore, got this software installed or whether she was just doing it and her -- I mean, her direct supervisor knew.

So it's difficult to draw that line because we don't know.  If people were coming in and saying, "I need to use my personal device," or, "I want to use my personal device," and then DHS has a policy to say, "You must install this software, and here's how you use it," that would be great to know.  We just don't know.

I'm not sure if that's really helpful, but that's the

best example we have.

THE COURT:  So limiting the -- the topic to just those -- those specific incidents in which MDMs were -- were installed doesn't answer the question of whether other personal phones were used for business purposes for which the agency didn't -- didn't take the extra steps to get those -- get the MDMs installed?

MS. KORBEL:  Correct.  And, Your Honor, it goes to whether or not -- if there is a policy that you're supposed to install this software in order to use a personal phone, and someone's going to their supervisor and saying, "Hey, I'm going to use my personal phone," and the supervisor is not insisting on or following up on whether or not that's actually happening the proper way, if we only limit it to people who installed the software, we won't know what happened in those instances where somebody did not follow the policy.

I think it -- I think it limits us.  And, at least with Chapman, we know that this definitely happened.  We just don't know whether she installed that software or not.

THE COURT:  Okay.  Mr. -- and it's limited to the -- the people named in topic eight?

MS. KORBEL:  (No audible response.)

THE COURT:  All right.  I -- I -- yeah, I appreciate the consideration, Mr. Wilson, that you raised.  But the problem with what I'm beginning to -- what, you know, I just am

beginning to appreciate what's going on with ODHS is that I'm not -- I'm not -- I'm not confident at this point with what I've -- with what I know and that -- that they are keeping stringent practices in place to follow sort of -- sort of digital hygiene when it comes to how they're -- they're letting their people do what they need to be doing to -- to take care of their responsibilities.  And so I'm going to allow topic eight as -- as drafted.

MR. WILSON:  Your Honor?

THE COURT:  Yes.

MR. WILSON:  I guess the point I just want to make with respect to topic eight is that the scope of ODHS's knowledge with respect to personal cell phones extends to the point where my client can ask the employees, you know, "Did you use your personal cell phone?"

It does not extend to the point of ODHS, you know, taking their personal cell phones and looking through them.  So we can -- I guess, to respond to that question, I can say -- or to respond to that topic, rather, Your Honor, to -- to inform a 30(b)(6) witness, that's -- that's what we're capable of doing, is asking the employees.

THE COURT:  Yes.  Yeah, I'm not -- I'm not asking for any other forensic investigation required on the part of your 30(b)(6) deponent.

All right.  Let's turn to timing.  So just a couple

of things on -- on -- as I'm looking down this -- looking down this -- this track towards trial in February, is that -- so, one, I understand that, Mr. Wilson, this -- this iPhone SE -- Mr. Hammond's iPhone SE, has that already been turned over to Lighthouse to crack the code?

MR. WILSON:  It has been delivered to Lighthouse, Your Honor.

THE COURT:  Okay.  And do you know if they've already initiated the process for searching for all possible four-digit pass codes?

MR. WILSON:  We have asked them to begin that process.  My understanding is that they -- they haven't started that process yet, but they will imminently.

THE COURT:  Okay.  Be advised that if the pass code ends up being 1111, Mr. Hammond's in some serious trouble.  No.

MR. WILSON:  Understood, Your Honor.

THE COURT:  Or if it's -- or if it repeats -- yeah, just FYI.  I mean, I -- I'm far more suspicious than I should be, but -- but at this point I'm not sure Mr. Hammond's doing himself any favors by -- by -- by not -- not remembering some fairly basic and straightforward things.  And I get that people switch phones through; but, frankly, not knowing how many phones you've had and where they are lacks some credulity at this point.

All right.  Well, let's get back on the timing.  All

right.  So I think it's going to take some time for them to crack the -- crack the phone and then do a search.  And I think somebody said somewhere a couple of months?

MR. WILSON:  Your Honor, we don't have -- I mean, yes, a couple of months, potentially longer.  I -- I --

THE COURT:  Unless the pass code is 1111 because you'd hope that they would start with that relatively quickly, right?

MR. WILSON:  I -- I would hope so, Your Honor.  I don't -- I don't know how they do it.

THE COURT:  Okay.  All right.  Do you think that they could use his current pass code as sort of a starting point?  Because, I mean -- I mean, humans are fairly simple people, even though we think we're complex.  I mean, I -- look, like, I'm not going to micromanage it.  I'm -- I'm -- I'm just -- I shouldn't be playing forensic scientist here, but it seems like they -- they've got a process to figure it out, and they'll figure it out.  But it's going to take some time.

MR. WILSON:  It is, Your Honor.  And I don't -- I don't know that two months is the upper limit.  I mean, I think it can take longer than that.  They -- they can only -- it depends on the kind of phone, and we don't have a determination yet.  But on some phones you can only try so many passwords in a 24-hour period without the phone --

THE COURT:  Locking.

MR. WILSON:  -- you know, getting very angry at you and deleting itself.  So it could take quite a long time.

THE COURT:  Okay.  And then the 30(b)(6) stuff, I mean, I've -- I've -- I'm allowing the plaintiffs broad scope as relevant, appropriate and necessary for both the spoliation and -- to the extent that the issues with respect to spoliation affects the substantive evidence in the case, that's pretty -- pretty significant.  That's why I'm allowing it.

And -- and then we need to talk about a timeline and realistically what -- what you can pull together, Mr. Wilson. This all speaks -- you know, it pushes up against our trial date.

I mean, you know, we have -- there's no way that you're going to file your spoliation motion without this -- this evidence, I take it, plaintiffs' counsel.  And your remedies -- and, frankly, all remedies are on the table right now if I were to grant the motion for -- motion for sanctions.

I'm having a harder time imagining that we actually get to trial in February.  So I'm putting it on the table.  If you have better ideas and -- and thoughts about how we keep it on track -- I mean, if we -- I have -- I have a motion to dismiss that I'm reviewing now.

And I know we're going to get a summary judgment motion down the way.  I -- I mean, to some extent, does -- are the summary judgment motion arguments going to turn on what

comes out of these -- out of the 30(b)(6) depositions?  If they do, that's going to cause a problem.  Causes a problem for the timing and whether we can -- we can realistically, you know -- you know, conduct a trial at the end of February.

So before -- before -- I mean, look, I get Mr. -- I'm going to give Mr. Wilson the opportunity to respond to getting all of your deponents -- getting his deponents together for you to be able to conduct your depositions.

You're getting what you're asking for.  But I'm going to make sure that Mr. Wilson has the opportunity to -- you know, to put those people up, get them ready, so we're not coming back again because we rushed it and couldn't find the people or the people couldn't answer your questions.  We've got to do it once.  Let's do it right.

So I think the Conley -- the Conley case is less exposed to the problem with timing because, you know, you're -- you're in April.

Ms. Skjelset, you understand that this is going to probably, in all likelihood, push this -- push the trial out?

MS. SKJELSET:  I hear you, Your Honor.

THE COURT:  Okay.  All right.  What's our timing for -- for getting these depositions together?  Let's figure out what that realistically looks like.

But don't overreach, Mr. Wilson.  I might pull you -- I might snap it back into a very short time frame.  So be

reasonable in such a way that I can't -- I can't question the amount of time that you're asking for.

MR. WILSON:  Understood, Your Honor.  Let me start just with, you know, given -- given -- well, I would like to come back to topic seven, Your Honor, which we -- we didn't cover.  Maybe we could just put a pin in that.

THE COURT:  Yeah, go ahead.

MR. WILSON:  Okay.  So -- but with respect to timing, Your Honor, the principal thing that I am concerned about -- well, is two things.  One, just the breadth, the fact that we may need multiple people.  And we're definitely going to have to have lots of conversations in order to inform the 30(b)(6) witness.

Some of those conversations will need to be with Wireless Watchdog and to obtain information from Wireless Watchdog.  And, you know, that's -- it's outside my control, to some extent.  I mean, obviously they're a contractor, and we can demand things, but vacation schedules around the Thanksgiving holiday.

So with those things in mind, Your Honor, you know, what I'd really like to ask for is that this deposition occurs the week of December 9th, and not on December 9th, because the Markowitz firm is unavailable that date, but the 10th, 11th, 12th or 13th of December.

THE COURT:  And that's the deposition with respect

to -- or any of these depositions or all of them?

MR. WILSON: Any or all. And I suppose it's possible they're broken into multiple days. But that would be the week that -- that we would ask for, Your Honor.

THE COURT: Okay. I'm just going to pull up my calendar here and take a look. Well, I mean, that's under a month from now -- or, actually, a month from now, that week.

MR. WILSON: Yeah.

THE COURT: Okay. So December 9th -- not December 9th, but 10th, 11th, 12th and 13th?

MR. WILSON: Yes, Your Honor.

THE COURT: Okay. I'm envisioning that there probably wouldn't be more than three or four deponents; but, I mean, I'll leave it to -- I'll leave it to you to explore what that ultimately means.

MR. WILSON: We may try to do it with one, Your Honor. It just depends on -- we'll obviously need to be having some conversations.

THE COURT: Got it.

All right. So the week -- week of the 9th, but depositions beginning on the 10th through the 13th.

Plaintiffs' counsel, any issues with that?

MS. SKJELSET: I'm looking at my calendar. It looks -- it looks to be relatively clear during that week. I'm unsure of how it will impact the -- any forthcoming motions for

summary judgment, but I -- I think hopefully we can in the timing of that because I -- we haven't conferred on motions for summary judgment, but we do expect that the defendants are intending to file some. So I -- I think -- I think we should be able to confer on that and adjust the schedule accordingly.

THE COURT: Okay. And as I'm -- I'm trying to recall when summary judgment motions are due, but I think it's in the -- is it the first week in December?

MR. WILSON: They're due November 27th, Your Honor.

THE COURT: Okay. All right. And, as far as you can foresee, Mr. Wilson, no reason to -- to change that dispositive motion deadline because of these depositions?

MR. WILSON: None for defendants, Your Honor.

THE COURT: All right. And plaintiffs' counsel?

MS. SKJELSET: I'm trying to recall --

THE COURT: I suppose, at most, you may be asking for some -- an additional -- an extension to file a response.

MS. SKJELSET: Right, Your Honor.

THE COURT: Okay. And are plaintiffs going to file any cross motions for summary judgment?

MS. SKJELSET: We haven't decided. If -- if we were, Your Honor, I believe it would be relatively straightforward.

THE COURT: Okay. And it'll be due then on November 27th.

MS. SKJELSET: Yes.

THE COURT: Okay. All right. So I'm not going to move the dispositive motions date, but I can also foresee that what comes out of the 30(b)(6) depositions may call for some additional time to file a response, which certainly pushes out when the reply will be due.

Okay. So we may very well still get briefing completed on dispositive motions sometime in mid-January. But you're not going to be able to file any motion for sanctions on spoliation until after the depositions, I imagine.

So -- so let's -- let's assume, for the sake of argument, you file them on the 1st of January. Briefing wouldn't be complete until maybe mid-February, early -- early -- maybe mid-February. And pretrial conferences was already scheduled for January 25th and 6th, if I'm not mistaken -- 23rd and 24th.

So there are going to be some misfirings on how -- well, how to address the motion for sanctions on spoliation, whether any remedies appropriate are going to be -- you know, be applicable to the trial itself. Okay? I don't know.

MS. SKJELSET: We will work with whatever speed and diligence we can, Your Honor.

THE COURT: I'm sorry. Say that again, Ms. Skjelset? What was that?

MS. SKJELSET: We'll work with whatever speed and diligence we have at our call, and we will do everything we can

to --

THE COURT:  Well, I'm afraid I might be the slow -- slow link in all of this, at the end of the day.  So I appreciate your willingness to go fast, but I -- I have just a few other cases that I'm working on at the moment.  So I've -- I'm sure you all do, too.

So -- so I'll -- I'll -- but I don't have the legal team numbers that -- that I think all of you have.  You know, we're working hard with a wonderful crew, but we got -- we've got some things on our plate.

Yeah, you know, look, I'm not going to take the trial date off right now.  But I got to let you know that -- how about we check in -- well, let's see.  So we have a status conference on the 18th.  But I'm wondering:  Is there any reason to have that this Friday?

THE COURTROOM DEPUTY CLERK:  Our next status conference --

MS. SKJELSET:  I thought our next --

MR. WILSON:  Your Honor --

MS. SKJELSET:  The 22nd, November 22nd.

THE COURT:  Oh, sorry.  Yes.  I just -- I was just corrected here, too.  Yes, you're right.  It is on November 22nd.  So it's next -- it's not this Friday, but next Friday.  And does anyone anticipate there are going to be issues to take up?

MS. SKJELSET:  There are some fully briefed motions. It might be nice to have them resolved.

THE COURT:  Remind me which those are.  Motion to sever?

MS. SKJELSET:  Motion for severance.

THE COURT:  Yeah.

MS. SKJELSET:  And the motion to dismiss the first amended complaint.

THE COURT:  Okay.  I -- I need to go back and look to see how far into it we are and whether I'll be ready to tackle them.  But how about this:  Let's -- I have two hours scheduled for that, for our status conference.  Let's devote that to trying to resolve any outstanding questions I might have, so be prepared to -- to discuss/argue your points on those motions on the 22nd at 9:30.

Okay.  You know, if we -- and if we can clean those up and -- and get you decisions there -- I mean, I still need to issue F&Rs, so that -- that -- that'll, you know, certainly raise the option for parties to file objections at that point, too.

Okay.  And we do have a status conference on the 20th.  All right.

MR. WILSON:  (Indiscernible).

THE COURT:  I'm sorry.  December 20th.  At 9:30, December 20th.

MS. SKJELSET:  Yes.

THE COURT:  By then your depositions will be completed; and we'll have a better sense of timelines and whether it's, frankly, realistic for all of us, including myself and -- to be able to get decisions in place in time for the trial to get under -- the Levi trial to get underway in February.

I don't want to wait too long about taking it off the calendar.  And I'm thinking December 20th might be our decision time -- date because I don't want anybody incurring any more costs in lining up your witnesses and -- and getting, you know, whatever you need to do to -- to get the engines revving for -- for two months out.

But still I think there's -- I want to make sure that we -- we know what we're doing by then.  So please think about the timelines in as realistic and sustainable a way that we can actually get it done.  And that's not just your case, but it's certainly going to be the opposing party's case and, frankly, my ability to get you decisions with any level of -- of deliberation and -- and accuracy and fairness.

I mean, I don't want to rush things.  I'll do as much as I can to move as quickly as I can, but only as quickly as I can be -- as I can feel that I'm -- I'm -- I'm doing -- doing right by all the parties.  And that also means we've got a very lengthy pretrial -- two days of pretrial conference on the 23rd

and 24th, which requires everybody to be submitting documents well in advance.

Keep in mind I'm not -- I'm not -- I've had parties in the past, counsel in the past, ask if they can get extensions on submissions. I've been foolish enough to allow that, thinking that we could absorb all of that information closer to the date of the pretrial conference.

And I've learned the hard way that -- that, you know -- you know, it comes with the full force of -- of -- of, you know, just volume that, particularly with this case, I can't -- I cannot foresee allowing extensions of time for you to file any of the -- any of the required motions and submissions on the -- on the -- the trial management order.

And I don't think I've issued a TMO yet -- is that right? -- on this case? Right. Okay.

And, you know, I'm operating as if I'll be the trial judge. And -- and so there -- that's -- we'll still have to wait and see how that plays itself out. So -- so one way or another, I mean, the -- the -- I mean, the case can still very likely go forward, and I may very well be the presiding judge.

But there are at least -- at least two primary reasons why the case will not go forward: One, because I won't be the presiding judge; and, two, the case just can't be teed up properly, given all of the -- the pending discovery that needs to be completed.

Okay.  Any other thoughts, points, things that we need to -- to talk about?

I think it's number seven, right, Mr. Wilson?

MR. WILSON:  Yes, Your Honor.  Would you like me to review what I talked about earlier, or are you --

THE COURT:  Yes.  Yeah.  Yeah.  Set it up for me again, please.

MR. WILSON:  Yes, Your Honor.

So to the extent that topic seven addresses the factual question of when DHS had notice or knowledge of potential litigation, that is a separate question from whether or how DHS preserves a cell phone.

When DHS had knowledge of potential litigation has been a question that is -- has nothing to do with the revelation of the Hammond cell phone.  It's been a question that plaintiffs have had ample opportunity to explore throughout the course of this litigation.

THE COURT:  And so how -- how would you narrow the scope of that topic?

MR. WILSON:  Sure, Your Honor.  I actually think topic four covers much of what Ms. Skjelset was describing when she was -- was describing topic seven.  To the extent that topic seven remains a topic, I believe, Your Honor, that -- that it should encompass the steps taken to preserve data on mobile communication devices, on cell phones, and the general

policies and practices around preservation, and even around preservation in this case.

But the question of whether or not DHS became -- or had knowledge of potential litigation because of certain communications that Ms. Skjelset describes Ms. Kat O'Brien having, that's a separate question. Those documents have been well known in the litigation for some time and -- and could have been explored separately.

THE COURT: Okay. Ms. Skjelset.

MS. SKJELSET: I'm -- I -- I think my response to that would be we -- we know that there are individual actors: Ms. O'Brien, who was expressly concerned about litigation, who conveyed it to her supervisor, Traci Stockman, the one who recently found the device and Mr. Hammond's phone.

If the agency or somebody in the control group became aware during that period of time, prior to the destruction of Ms. O'Brien's phone, I think just the information relating to that notice would be important to the spoliation as it relates to the agency.

The concern is that they can cross -- they can point at each other. The agency can point at Ms. -- Ms. -- Ms. O'Brien and say, "She didn't tell anybody in the control group when she told her supervisor that there was forthcoming litigation."

And then she can point to ODHS and say, "Well, ODHS

just has a policy of wiping devices that I turned in.  I didn't know anything about that."

But if there was, in fact, notice that was sent to somebody in -- in a position of control at the agency, then ODHS should be held responsible for the spoliation.

THE COURT:  So -- and, as I read this, Mr. Wilson, it really -- the heading for the topic is broader than the individual bullet points because it -- the bullet points speak more to, you know, the notice of litigation, whether it be from a tort claim, and then the steps associated with preservation after receiving notice.  You know --

MR. WILSON:  I would agree.

THE COURT:  And so --

MR. WILSON:  I -- I think, Your Honor, the -- the -- who -- what Ms. O'Brien knew, and who she told it to, about potential litigation has been a well-known topic in this litigation and could've been explored previously and is not related to the discovery of Mr. Hammond's phone.

And so we think that asking questions about what did Ms. O'Brien know, when did she know it, who did she tell, those sorts of questions should not be included.  And I think that those sorts of questions that Ms. Skjelset was just describing, I would agree, Your Honor, it seemed to be within the first part of topic seven, whereas the bullet points seem to be somewhat different.

THE COURT: And I -- I don't see any of these bullet points speaking to that -- to questions to a deponent about what Ms. O'Brien knew and when, right? I mean, I don't -- I don't see that in this -- in my -- where would -- where might you see that being a question posed to a deponent in these bullet points?

So, first of all, I agree with you, Mr. Wilson. We don't need to revisit when, where and how Ms. O'Brien knew about litigation. And so that -- that doesn't need to be part of this -- this topic. That inquiry isn't part of this topic.

And so I'm trying to make sure I understand the depth of -- of the concern because I think it's just describing steps taken to preserve data, steps taken to preserve in response to a notice -- in response to a notice of a potential lawsuit. So that's different than in response to a tort claim notice.

So -- I mean, so bullet point one is -- is a -- is a broader set of terms for the kind of knowledge or source of knowledge. Bullet two is in relation to tort claim notices, what steps were taken. The recipients of any litigation hold notices and any accompanying instructions, so steps taken to preserve text messages.

So I'm going to break this down. So -- and not in any particular order. But bullet number three, which is on the top of page five, I think, is -- is -- is appropriate. Bullet number two is appropriate.

And bullet number four, was there an issue specifically with that, Mr. Wilson?  All efforts made to notify employees of any litigation holds related to these matters, including people notified, dates of notification, and whether the notification complied with policies and procedures.

MR. WILSON:  Not with respect to what we've been discussing, Your Honor, no.

THE COURT:  Okay.  So bullet number four is okay.

The last one, current and/or last known location for MCDs utilized by several people, does that seem already included in a previous topic?

MR. WILSON:  It seems to me, Your Honor, it would be included within some other topics.  But it doesn't -- that does not -- it's not about what -- the issue I've raised with respect to topic seven.

THE COURT:  Okay.  So, getting back to bullet number one, that is steps taken to preserve data on MCDs in response to notice of a potential for a lawsuit.  So the deponent would have to be somebody who can speak to when the agency had notice, other than from a tort claim notice potentially, unless that person is going to say, "We knew about this when the tort claim notice was -- was served," right?  Is that --

MR. WILSON:  Yes, Your Honor.

THE COURT:  I mean, Ms. Skjelset, how do we reconcile some of these challenges with a deponent -- I mean, it's going

to -- it would require -- and I'm not sure it's necessary to have to go to this length -- for Mr. Wilson to identify a deponent who can -- can knowledgeably speak to whether there was notice, prior to a tort claim notice, about the potential for litigation and for which -- I mean, it sounds to me like there's already been sufficient evidence developed in that arena about -- about when potential lawsuits may have -- you know, may have become -- that people within ODHS may have become aware of that.

MS. SKJELSET:  Yes.  It has been developed.  The question, again, for us is whether it reached the control group level, whether there was somebody who was interfacing with DAS and the control group level at ODHS who understood the potential for a lawsuit prior to the tort claim notice.

THE COURT:  And do we know who at that control level had notice of a potential lawsuit prior to the tort claim notice being issued?  Do you know that yet?

MS. SKJELSET:  No.  No.

THE COURT:  Okay.

MS. SKJELSET:  That -- we would require the agency to speak on that matter.

THE COURT:  And the control group is who?  I -- like, what level of -- within the -- the -- the -- you know, the chart -- you know, the -- are we talking supervisors, caseworkers?

MS. SKJELSET:  As I understand the case law -- and I -- I can be wrong at times -- I would think that it would be individuals at Central Office in higher management positions.

THE COURT:  Okay.  So, Mr. Wilson, you're instructed to make a reasonable inquiry about whether there were any people within that level of higher management at ODHS Central having -- having knowledge, prior to the tort claims notice, of a potential for litigation relating to this case.

And if they do, then be prepared to -- to present them for a deposition to discuss what they knew and what steps were taken, if any, for preservation.  If not, then just represent that to plaintiffs' counsel and then -- then move on to -- to all the other items, two through five, which I've -- I've allowed for -- for identifying a deponent to answer those topics.  Okay.

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  Anything else with respect to the -- the -- the 30(b)(6) depositions topics, going forward with completing this discovery, that we need to take up now, before we get off the -- off the hearing?

Ms. Skjelset?

MS. SKJELSET:  There's nothing that I can think of at the moment, Your Honor.

THE COURT:  All right.  Ms. Tshala?

MS. TSHALA:  No, Your Honor.  Nothing else.  Thanks.

THE COURT:  All right.  Ms. Korbel?

MR. KORBEL:  Nothing from me.  Thank you, Your Honor.

THE COURT:  And Mr. Wilson?

MR. WILSON:  Nothing, Your Honor.  Thank you.

THE COURT:  All right.  So you have the time you need to get the depositions put together, December -- week of December 9th, but 10th through the 13th will do.  And then we'll revisit December 20th, after that, to figure out whether it's -- it's go or no-go on the trial date.

And then -- and then we'll -- I'll see you next -- not this coming Friday, but the following Friday, in hopes that we try to clear up some of the issues with the motion to dismiss and the motion for severance.  All right.  Thank you, all.  Have a good day.  Take care.

MR. KORBEL:  Thank you, Your Honor.

MR. WILSON:  Thank you, Your Honor.

MS. SKJELSET:  Thank you very much for your time, Your Honor.

THE COURT:  You're welcome.

* * *

(Court adjourned, 11-13-24 at 10:43 a.m.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman, et al.

Case No. 6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman, et al.

Case No. 6:23-cv-01353-MK

Status Conference

November 13, 2024

I certify, by signing below, that the foregoing is a true and correct transcript, to the best of my ability, of the videoconference proceedings heard via electronic recording, taken by stenographic means.  Due to the audio-visual connection, parties appearing via speakerphone, speakers overlapping when speaking, the speaker's failure to enunciate, background noises and/or other technical difficulties that occur during videoconference proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the videoconference at the U.S. District Court of Oregon in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR
_____

Official Court Reporter          Signature Date: 11/18/2024
Oregon CSR No. 14-0427           CSR Expiration Date: 6/30/2026