IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


ETHAN LEVI,                                )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )    No. 6:22-cv-01813-MK
                                           )
KIM CHAPMAN, in her individual             )
capacity; ANASTASIA TIBBETTS, in           )
her individual capacity; KASSIDY           )
O'BRIEN, in her individual                 )
capacity; ERIN LANE, in her                )
individual capacity; THE OREGON            )
DEPARTMENT OF HUMAN SERVICES, a            )
government agency; and JANE and            )
JOHN DOES 1-5; in their individual         )
and/or official capacities,               )
                                           )
        Defendants.                        )
_____)
                                           )
OREGON DEPARTMENT OF HUMAN                 )
SERVICES,                                  )
                                           )
        Third-Party Plaintiff,             )
                                           )
        v.                                 )
                                           )
JOE ALBERT RAYGOSA,                        )
                                           )
        Third-Party Defendant.             )
_____)

Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

November 22, 2024

APPEARANCES

FOR THE PLAINTIFF:

      MARY SKJELSET
      Rizzo Bosworth Eraut PC
      1300 S.W. 6th Avenue
      Suite 330
      Portland, Oregon 97201

FOR THE PLAINTIFF:

      STEVEN V. RIZZO
      Rizzo Bosworth Eraut PC
      1300 S.W. 6th Avenue
      Suite 330
      Portland, Oregon 97201

FOR THE DEFENDANTS:

      JEFFREY M. EDELSON
      Markowitz Herbold PC
      1455 S.W. Broadway
      Suite 1900
      Portland, Oregon 97201

FOR THE DEFENDANTS:

      CHAD NASO
      Markowitz Herbold PC
      1455 S.W. Broadway
      Suite 1900
      Portland, Oregon 97201


COURT REPORTER:  Lindsey A. Weresch, RMR, CRR, CSR
                United States District Courthouse
                1000 S.W. Third Avenue, Room 301
                Portland, Oregon 97204
                (503)326-8047

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


SHANNON CONLEY, Conservator for    )
Z.C., a minor,                     )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )    No. 6:23-cv-01353-MK
                                   )
KIM CHAPMAN, ANASTASIA BROOKS,     )
KASSIDY O'BRIEN, ERIN LANE,        )
MARGARET RAMIREZ, in their         )
individual capacities,            )
                                   )
        Defendants.               )


Status Conference

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

November 22, 2024

APPEARANCES


FOR THE PLAINTIFF:

        BONNIE RICHARDSON
        Allegiant Law LLP
        100 S.W. Main
        Suite 400
        Portland, Oregon 97204

FOR THE PLAINTIFF:

        MARISSA KORBEL
        Allegiant Law LLP
        100 S.W. Main
        Suite 400
        Portland, Oregon 97204

FOR THE PLAINTIFF:

        MANUELLA M. TSHALA
        Allegiant Law LLP
        100 S.W. Main
        Suite 400
        Portland, Oregon 97204

FOR THE DEFENDANTS:

        JEFFREY M. EDELSON
        Markowitz Herbold PC
        1455 S.W. Broadway
        Suite 1900
        Portland, Oregon 97201

FOR THE DEFENDANTS:

        CHAD NASO
        Markowitz Herbold PC
        1455 S.W. Broadway
        Suite 1900
        Portland, Oregon 97201

COURT REPORTER:   Lindsey A. Weresch, RMR, CRR, CSR
                  United States District Courthouse
                  1000 S.W. Third Avenue, Room 301
                  Portland, Oregon 97204
                  (503)326-8047

(Friday, November 22, 2024, 9:38 a.m.)

P R O C E E D I N G S

(Whereupon, the following proceedings were held in open court:)

THE COURT:  All right.  Please call the case.

THE COURTROOM DEPUTY CLERK:  Now is the time set for Civil Case Number 22-01813, Levi versus Chapman, et al., and Civil Case Number 23-01353, Conley versus Chapman, et al., for status conferences.

THE COURT:  Good morning, everybody.  Thanks for making yourselves available.  We'll work through our agenda today.  I did get some -- I got some information from -- I believe it was Mr. Wilson -- yes, Mr. Wilson -- last night. I -- where is Mr. Wilson on the -- Mr. Wilson is --

THE COURTROOM DEPUTY CLERK:  He's not on the line.

THE COURT:  That's fine.  I just wanted to make sure I knew who was here.  So somebody will have to tell me what it is about, because I haven't had a chance to review it.  But I understand it has something to do with issues with respect to interrogatories, but we'll get into details here.

So I also have the motion to strike and the motion for severance.  The motion to sever is denied.  I'll be keeping the case.  If the case goes to trial in February, then I will be the one presiding over it.  And then, with respect to the motion to strike, I wanted to take up some argument.

Anything else that you want me to consider in the context of -- well, consider in addition to that which was included in the briefs, I will hear argument on the matter. And then I will try to get you my ruling in the next week or so -- well, actually, after Thanksgiving, so that way you'll have an idea of what needs to be done there.

I do know that there's also been a request for expanding the number of pages for filing summary judgment motion briefs, and I understand there's an objection to that as well. We'll take that up, too.

Other than that which I've just discussed, are there other discovery matters or other procedural matters that we need to add to the agenda to take up?

Why don't I first start with the Levi Plaintiff's counsel first.

MR. RIZZO: Good morning, Judge. This is Steve Rizzo for Plaintiff Levi. And we will -- we will put one additional matter in front of the Court. It relates to the defendants' disclosure of a rebuttal expert witness, Figoten, F-i-g-o-t-e-n, in terms of -- we were surprised by the testimony and the opinions that were not set forth in this expert's report. And so we want to talk with the Court about an appropriate juncture to move to strike that witness.

THE COURT: All right. Any other agenda items? And we won't take up argument yet on that point, but I just want to

identify the points that we need to talk about today.

All right.  So was Levi done?

Ms. Skjelset, it looked like you were going to say something.

MS. SKJELSET:  Yeah.  If I may, Your Honor.  It's not ripe necessarily for argument now, but I do want to put it on the Court's radar.  We are talking about a motion to consolidate the cases now that some of the procedural barriers are gone.  We understand that the defendants oppose that motion.

THE COURT:  And are the plaintiffs going to -- I take it all the plaintiffs are looking to consolidate?

All right.

MR. RIZZO:  Yes.

THE COURT:  Okay.  So we'll talk about how to take that issue up.  All right.  You all are papering me to death.  How about you give me a little time to be an Article III before I die because of you?

Okay.  So here's the other interesting thing about a motion to consolidate.  I -- well, I mean, I don't know, if I were to grant consolidation, whether it would be realistic to proceed with a trial in February versus the one in April.  So if you were asking to consolidate, are you asking that it be consolidated to the April trial dates?

MS. SKJELSET:  I think, Your Honor, we are realistic

enough to understand that -- given the likely extraordinary expansiveness of the defendants' motion for summary judgment and our request for consolidation, that the April trial date is much more feasible.

THE COURT:  Okay.

MS. SKJELSET:  That does not mean that we don't want to keep the February trial date, but we are realistic about -- about the situation.

THE COURT:  All right.  So if there's one way that defendants can assure that they get the postponement they have been wanting for so long is to stipulate to consolidation. This is one of the most fascinating chess matches I have seen in a really long time.

All right.  We are going to continue with sort of an approach to taking this all in, in -- I don't know -- sort of a sense of challenge and -- and levity.  We're going to work on making sure the legal questions are answered correctly, but I will be darned if -- we're going to keep things positive but legally correct.  So let's keep moving through things.

All right.  Conley Plaintiffs, any other additional items for -- for adding to the agenda or you want to put on my radar screen?

MS. TSHALA:  Yes, Your Honor.  In addition to the rebuttal report issue, I also want to put on your radar that we have some 30(b)(6) depositions coming up in December.  We don't

have the dates finalized yet, but it's between December 10th and 13th.  And in the past defendants have objected based on privilege.

And I know that one of the topics relates to litigation holds.  So we just want to put that on your radar in case that comes up, and hopefully we can have someone available to help if that becomes an issue.  We hope it doesn't become an issue, but just wanted to put that on your radar.

THE COURT:  All right.  So sort of a preemptive putting on my radar?

MS. TSHALA:  Yes.

THE COURT:  All right.  And these are the 30(b)(6) depos with respect to the matters that we talked about last time regarding the new-found phone?

MS. TSHALA:  Correct.

THE COURT:  All right.  Anything else for Conley?

MS. TSHALA:  No.  That is it.

THE COURT:  Okay.  For defendants in both cases, Mr. Edelson, Mr. Naso.

MR. EDELSON:  Thank you, Your Honor.  I first wanted to just -- this is my first chance to congratulate you on the confirmation, so -- it makes things a lot easier for us in this case and probably for you generally, so it's --

THE COURT:  Well, I mean, it may not have had to be this difficult, Mr. Edelson, before.

MR. EDELSON:  Well, you know --

THE COURT:  I say that -- remember, I'm saying things in jest.  So you don't need to respond.

MR. EDELSON:  All right.

THE COURT:  Go ahead.

But I appreciate it.  And I look forward to working with all of you in my new role, which is really the same role, but with a heavier rope.  Okay.  What are the issue that we need to take up, Mr. Edelson?

MR. EDELSON:  First of all, I can hear everybody really quite loudly and -- and -- but I'm having a little difficulty hearing you.  And I don't know if there's any way to adjust your output or get closer to the microphone.  But I'm finding myself having to get real close to hear you; and then when someone else talks, I have to jump back.

MS. SKJELSET:  We can hear just fine.

THE COURT:  And, Mr. Naso, do you have the same audio issues as Mr. Edelson?

MR. NASO:  No.  I can hear you fine, Judge.

MR. EDELSON:  I'll also let you know that I'm at home; and there's a bunch of construction work going on outside my door, so that's contributing to it.  So I --

THE COURT:  Okay.  I know that my courtroom deputy is looking at increasing the output, which might require other folks to perhaps readjust your volume.  But I definitely want

to make sure you're able to hear.

The other thing is if my transmission is coming in through your speakers on your computer, you could mute that and also call in, if that might be of some assistance in making sure that your audio is clear.  Just --

MR. EDELSON:  That's a good alternative.  Let's keep trying this way.  And if I have trouble hearing you, I'll let everybody know and we'll do something else.  But I appreciate that.

I think you've covered all the issues, but I -- I think the letter that you referenced at the beginning of your -- when you first arrived is that -- about the interrogatories, is very closely connected to the motion to dismiss.  And so what -- I plan to talk about the motion to dismiss and the interrogatory issues at the same time.

And so I appreciate you letting me know that you haven't had a chance to review that.  And it certainly will be worthwhile after this hearing 'cause I'm not going to cover word for word what's in that letter.  But I'll give you the general teasers on it so that it -- you have a little bit of a context for it.

THE COURT:  Okay.  Thank you.

And any other items to -- any other items to add?

MR. EDELSON:  No.

THE COURT:  All right.  I'm going to try to see if I

can anticipate what the easy ones are that we can knock off the list.  One is the request to file a brief in excess of the page requirements provided in the rules.

Mr. Edelson, did you want to explain to me what -- why?

MR. EDELSON:  Mr. Naso is going to address this. Thank you.

THE COURT:  Okay.  Go ahead.

MR. NASO:  Yes.  Good morning, Your Honor.  So the reason that we are requesting an overlength summary judgment brief in both cases is simply because we have a lot to say, to make a record as to why we believe summary judgment is appropriate in this case.

THE COURT:  How many more pages are you asking for?

MR. NASO:  We are asking for a -- not to exceed 50 pages in both cases.  And the reason for that --

THE COURT:  So it would be two separate motions for summary judgment, each of -- each of the motions would not exceed 50 pages?

MR. NASO:  That is correct, Your Honor.

THE COURT:  All right.  And what's the objection? What's the reason for the objection?

MS. TSHALA:  Your Honor, this is Manuella Tshala for Plaintiff Conley.  We attempted to confirm with defendants on Monday.  We just don't have specific reasons for why they need

the additional pages.  And also it's our understanding that Ms. O'Brien would be filing a separate motion for summary judgment in her individual capacity.

So that's additional motions for summary judgment. And so if there are additional 50-page motions, that is a huge burden for us to respond to.  And we just don't know why they need additional pages.  And I believe Ms. Skjelset at the conferral had thought of a solution to have a common set of facts, to kind of reduce the amount of pages needed, but defendants didn't want to agree to that.

THE COURT:  And turning back to the defendants, how many different summary judgment motions were going to be filed, Mr. Naso?

MR. NASO:  Well --

THE COURT:  Let's take up Levi v. -- Levi v. Chapman. How many -- how many -- was there more than one summary judgment motion to be filed?

MR. NASO:  We are anticipating -- so just as -- to back up, as context, our firm, who represents the State Defendants will be filing the motion for summary judgment. Ms. O'Brien is represented by additional counsel, Cable Huston, who is representing her in her individual capacity and are anticipating filing a separate short motion to address certain --

THE COURT:  Okay.  So the answer is that you're only

asking for additional pages on the -- the State Defendants' brief?

MR. NASO:  We're actually -- we're actually asking, Your Honor, for the 50 pages that would cover both briefs of Mr. -- Cable Huston's brief as well as ours.  And that's an additional reason why we need those additional 50 pages, because there are certain claims that apply only to Ms. O'Brien.

THE COURT:  All right.  50 pages to address both the State Defendant and -- and O'Brien Defendant's motions for summary judgment.  That's a total for both combined, 50 pages.

Do you need additional -- I'm now turning to the plaintiffs.  Are you going to be seeking leave to file additional pages as well?

MR. RIZZO:  Judge, this is --

THE COURT:  Let me put it this way.  You have leave to file up to 50 pages in response.  I don't know if you'll need it.  I don't recommend that you use it because you have it.  But don't -- you don't need to come back and ask me for it.  Okay.

MR. RIZZO:  Judge, if I may, with regard to the Levi matter --

THE COURT:  Yes.

MR. RIZZO:  -- what I understood from the conferral was that the Markowitz firm is associated with Cable Huston.

So both firms are simultaneously representing Defendant O'Brien; and then, of course, the Markowitz firm is representing the other defendants, including DHS.

So I didn't quite understand, number one, why there would be two separate motions -- and that's what was discussed at the conferral -- where counsel is associated.  And, two, I didn't quite understand the need for 50 pages for the Markowitz brief, X number of pages for the Cable Huston brief, and then the other part of the discussion was the defendants wanted 50 pages for the Conley brief.

So we suggested how about a statement of facts, because there are many common and overlapping facts in both cases, so that we could consolidate the briefing and not be subjected to overlength -- extraordinarily overlength briefing at this time, which would create a lot of expense -- or additional --

THE COURT:  Well, I recommend that you all talk to Misha Isaak because it wasn't so long ago that they actually filed 120 pages in -- in a brief.  So when you talk to me about 50 pages, I was like, "What's the problem here?"  So I was just -- so, you know, we could probably spend the amount of time arguing, and I would've been able to read those extra 15 pages.

So I'm good.  Let's move it along.  And I think there's going to be plenty of issues to raise, and I want to

let you both -- all parties argue sufficiently but not excessively, and I think 50 pages strikes the mark.

And then, just to be clear, the 50 pages maximum in Levi v. Conley will include anything that is filed on behalf of Defendant O'Brien.  And then there's 50 pages for Conley in total as well, separate from the -- the -- the Levi case.  And then both plaintiffs have the opportunity to file a 50-page response.

MR. RIZZO:  Thank you, Judge.

THE COURT:  The replies will be required to be within the rule requirements of -- I think it's the 35 pages -- or word count, whatever that word count might be.

Okay.  All right.  So we've addressed --

MS. TSHALA:  Your Honor, if I may?

THE COURT:  Who -- Ms. Tshala?

MS. TSHALA:  This is Ms. Tshala, yes.

If I may, could we also request an extension to respond to the motions for summary judgment?  Because right now they're due the day before Thanksgiving.  And if they're going to be up to 50 pages, we'd like a couple additional days to respond.

THE COURT:  What's -- how many more days are you asking for?

MS. TSHALA:  Could we do until the Wednesday after?  So that would be -- sorry.  So could we do until December 28th

to respond to their motions?

THE COURT:  So motions for summary judgment are due --

MS. TSHALA:  For defendants, they're due on --

THE COURT:  November 27th, next week?

MS. TSHALA:  Yes.

THE COURT:  Okay.  And then you want a month to file a response?

MS. TSHALA:  Yes.

THE COURT:  And what was that date again?

MS. TSHALA:  December 28th.  So it'd be December 27th, which is a Friday.

THE COURT:  Okay.  Allowed.

MS. TSHALA:  Thank you.

THE COURT:  Okay.  When are we taking up the motion to consolidate?  When do you want to do that?  Before or after summary judgment motions?  I assume perhaps concurrent to?  I mean, you probably want to know whether you're going to trial in February, right?  And I did tell you that by December 20th I would -- I would know.

So, I mean, I really don't want to have to make you work harder.  But if you think you want to file a motion to consolidate, and you can do so within the next couple of weeks, that maybe puts us on track to at least be able to get a sense of what's there.

Who wants to speak on -- I see some nodding of the heads, which is a good sign, but I want to make sure we're all on the same page about what you want to do.

I'll start with Ms. Skjelset.

MS. SKJELSET:  Well, having not spoken to my co-counsel about the exact timing of the motion for consolidation, I mean, I would say that -- I think that we could probably get one in shortly after the holiday.  It's mostly -- it's mostly written in my mind, so it is an issue that I think we should probably address sooner rather than later.

THE COURT:  So two weeks to file a motion to consolidate?

MS. SKJELSET:  That works for the Levi Plaintiffs, if I'm interpreting Mr. Rizzo's head nod.

THE COURT:  Okay.  Mr. Edelson, so --

MR. EDELSON:  Well --

THE COURT:  -- the motion to consolidate will come on in -- I don't -- I don't anticipate -- or I can't imagine that it would be a terribly complicated issue, but I also know that there's lots of other moving parts happening -- moving at the same time.

MR. EDELSON:  Right.  Well, we would just assume the -- the normal response time or -- of 14 days or so.

THE COURT:  Okay.  14 days.

MR. EDELSON:  It's hard to predict at this point, from where I sit.

THE COURT:  Let me just make sure that we have dates.

All right.  The motion to consolidate, plaintiffs will file December 6th.  Oh, look at that:  Motion to file response, December 20th.  We are so close --

MS. KORBEL:  You Honor --

THE COURT:  -- to being in line with what I was hoping to get accomplished.

Yes, Ms. Korbel.

MS. KORBEL:  If I may, I believe that we can get it filed quicker than the 6th.  And so that way we can actually address it on the 20th.  I think we would all prefer to have it addressed at that time.  So we're happy to move it up a few days so that defendants have time to file a response before the next status conference.

THE COURT:  Well, so let's set a date for when it would be due then.  Can you do it by December 2nd?  Or what -- let me see.  Yeah, either December 2nd -- yeah, December 2nd?

MS. KORBEL:  Yes.

THE COURT:  All right.  So that'll put defendants' response, December 16th.  And that'll actually give me time to read it before the 20th.

Okay.  And, Ms. Tshala, you did mention something about the 30(b)(6) depositions.  You just wanted to make sure

that the Court may be available to address issues of privilege. I mean, are you understanding that there will be objections to issues of privilege?

MS. TSHALA:  In the past depositions, there have been objections based on privilege when we've asked about litigation holds, and so -- litigation holds are topic seven in our notice, and so I would just kindly ask that there's a way for us to reach the Court on those days, if needed.  We don't have the exact date yet, but we know it's from December 10th through the 13th.

THE COURT:  All right.  E-mail the Court -- e-mail me -- e-mail my courtroom deputy about when you have the dates scheduled, so that way I can make sure I will be generally around.  But, you know, I mean, if I'm in -- I have hearings as well.  So -- so it'll be helpful to know when to -- will this apply to all of the -- how many -- how many different deponents are there?

MS. TSHALA:  I haven't gotten that information yet, Your Honor, so I'm not sure.

THE COURT:  Okay.  All right.  So just e-mail the -- my courtroom deputy when you have the information, so I can be -- try to make myself as available as possible.

MS. TSHALA:  Okay.  Thank you.

THE COURT:  So I have two more matters on my agenda. One is the -- the matter raised by plaintiffs regarding the

disclosure of a rebuttal expert, Figoten, and a motion to strike. I can appreciate that defendants haven't had an opportunity to think on it or to file any response. I think this is all oral at this point.

So let's first find out what the issue is and how deep it goes and whether that's something that we can also, with appropriate expedited briefing, you know, tee up for me to take on. I don't know -- and then also address whether it could be a matter that, after briefing on your parts, if I'm not able to resolve it here, from the bench, if it would be timely to be able to take it up on the 20th when we meet again.

So, Mr. Rizzo, what's the issue?

MR. RIZZO: So the defendants issued an expert -- or what is called an expert rebuttal report. It's dated October 29 of this year. And the witness, Kellie Figoten, is a -- she has her own consulting firm. She's also employed by the Department of Children and Family Services in the state of California in Los Angeles County.

And the defendants put four questions or topics to her, primarily, Judge, focused on the forms that Oregon sent to California and the forms that California sent in return, which indicated that there was no information regarding Duncan and Raygosa's prior care in Fresno County.

And we addressed those forms. We addressed issues of California procedure and practice, and we essentially got the

witness' opinion regarding those forms.  And then during a break in the deposition, Mr. Kothari -- I don't think he's here -- who was handling the deposition, came back and he took -- or he began to depose or question Ms. Figoten.

And this occurred without her handwritten notes.  So when I was questioning the witness, I asked if she had made notes.  She said yes.  She did not bring them with her.  So we held the deposition open on that particular topic because it was unclear to me what exactly this witness was rebutting.

And, in my view, she was rebutting nothing.  She was simply disclosed late.  And so when Mr. Kothari begun questioning her --

THE COURT:  And, Mr. Rizzo, I'm not sure I understand the context about the forms.  So can we roll back?

MR. RIZZO:  Sure.

THE COURT:  I want to make sure I understand.  What forms are we talking -- what you're talking about, that were submitted to California?

MR. RIZZO:  Essentially there's a procedure that Oregon DHS followed to submit a request called out-of-state forms from -- from DHS, right, in Oregon to the State of California, requesting specific information that's allowable by California on a, quote-unquote, form.

And then California processed that request and sent the form back, which did not indicate a prior child abuse

history on the CACI, the California child abuse website.  So that's what we questioned --

THE COURT:  And remind me:  California is important because it is involved in what way?

MR. RIZZO:  The couple, Duncan-Raygosa, lived in California at the time of the death of the child that they were fostering in care in Fresno County.  So that was basically the gist of it.  Sorry for not giving you that detail.

So that was certainly my understanding about preparing for and attending the deposition.  So -- so what happens when we have this break, the defendants come back and they begin to question the witness.  And she starts to deliver opinions about Fresno County's investigation into the death of the child in Duncan-Raygosa's care.

And she listed several reasons why, in her, what she called, professional opinion, Fresno County was negligent. They were negligent in terms --

THE COURT:  And is it your sense -- or is it your -- the thrust of your argument is that this is -- this is opinion evidence that should've been disclosed as sort of an initial expert disclosure and not a rebuttal?

MR. RIZZO:  Absolutely.

THE COURT:  All right.  And what was this witness offered as a rebuttal for, at least before the deposition was taken?  What was her -- what was her testimony about?

MR. RIZZO: Well, she was, from my view, Judge -- and I could send the transcript. She was unclear whether she was rebutting anything. And when I asked her about that, she said, "Well, you know, I'm reading my topics. I get that's what I was called for. So there must be some question about other forms, whether other forms are available."

And that's what she thought she was rebutting. The cover page of her report, which is entitled "Expert Rebuttal Report," she testified that was prepared by the Markowitz firm. So -- so, in my view, Your Honor, this was a stealth witness that should have been disclosed long ago, because what the defendants are now trying to accomplish with Figoten's testimony is that they were not negligent because of California's negligence; in other words, had California properly investigated and founded the abuse, then that would've shown up on the CACI registry; and that would, quote-unquote, have flagged Ms. Chapman to address additional issues.

That's the thrust of the Figoten opinion. And I think it's coming way too late in the case. It hasn't been alleged as an affirmative defense or otherwise, until just a few days ago we heard about it.

THE COURT: And is it Mr. Naso or Mr. Edelson who will be responding to Mr. Rizzo's points?

MR. EDELSON: Your Honor, this is probably something that ought to be briefed. Mr. Naso nor I were present, but I

think I can respond briefly to it.

THE COURT:  And before going into the point-by-point response, tell me what this witness -- expert witness, Figoten, was initially intended to present as -- rebuttal evidence to. So, I mean, I want that part filled in, too.  Why was she designated as --

MR. EDELSON:  Okay.  So let me first just let you know that there's been no -- there's no finding of child abuse by the Raygosas in California.  That's a misstatement.  There was a death in their -- of their -- a child in their care and then a -- no finding of abuse and no criminal action that occurred as a result of it.

But, that being said, plaintiffs have put forth experts opining that Oregon should have discovered that this -- that there was a death in California of a child in their care, and that that -- had they discovered that, they wouldn't have certified the Raygosa home.  And that's basically the theory that their experts support.

As I understand, Figoten essentially rebuts the fact that Oregon should have found it.  And, as I understand from what Mr. Rizzo's saying, it sounds like she went on to say, in her opinion -- and I have not actually read her report, so I'm just trying to fill in the blanks here.

But I suspect that she was responding to this notion that California should have produced the information to Oregon

if Oregon asked the right questions.  And I suspect she just said that Oregon asked the right questions; and if there was -- if they didn't get it from California, it was because California was -- didn't do what they were supposed to do.

And I don't think it's any more complicated than that, but it may be.  And, again, I'll tell you that I was not at the deposition.  I was not involved in the creation, and nor was Mr. Naso, of the expert report.  And if there's to be a motion, I think there has to be some specificity as to what the remedy is, what they're arguing.

But I don't think any of this is stealth anything. This is not a witness that we've been sitting on.  It's not like the witness they've produced to us, Ms. Harris, who's sat on evidence that they've kept from us, which we'll talk about a little later.

But this is something -- is a witness that came to our attention very recently, as I understand it.  And -- and I think the -- I think there's a transcript that we can all look at and decide for ourselves what happened.

THE COURT:  All right.

MS. TSHALA:  Your Honor, if I may?

THE COURT:  Yes, Ms. Tshala.

MS. TSHALA:  Yes.  Your Honor, I was -- I took the deposition of Ms. Figoten as well with Mr. Rizzo.  And when I asked Ms. Figoten what she relied on to form her opinion, I

walked through all the documents listed in her rebuttal report, including the two expert reports that were identified. And she told me that she did not rely on those expert reports in order to form her opinion.

And, just so you know background dates, the expert disclosures were due on October 9th. Defendants disclosed one expert, which was Ms. Jackson. We disclosed three, Plaintiff Conley. And then rebuttal expert reports were due on October 29th. And that's when defendants put forth Ms. Figoten.

And so Ms. Figoten's report had four questions listed to rebut, and they all had to do with State of California DHS forms. But her expert report -- her expert opinion, when they came back from break, relied on Fresno County's decision not to have an allegation as founded against the Raygosas. It didn't have to do with the four questions listed in her rebuttal report.

THE COURT: All right. All right. And anything else, Mr. Rizzo?

MR. RIZZO: No. I could -- I could read the four questions. There's no question that her report does not correspond with what she testified about. And if I made a correct -- a point made by Mr. Edelson, I believe I stated correctly that the abuse was not founded in California, not that it was. And so what they were -- so --

THE COURT: All right. Well, I can assure you I did not get smarter after the confirmation vote, and there's absolutely no way that I'm going to be able to resolve this issue from the bench. And so I'm going to invite briefing on a motion to strike, Mr. Rizzo, as you've indicated. So let's talk about a schedule on that point.

Can -- I would like to try to resolve it by December 20th. Is there -- is there a chance that we can move on this briefing in that time? You know the -- you know, I -- I want to be able to move along, but I also want to respect everybody else's schedules, and particularly as we head into the winter holidays and time off.

So tell me what it is that you can do, Mr. Rizzo.

MR. RIZZO: I think -- I think I will -- I know I get in trouble for using the word "try," Your Honor, but I think I can try to get this in at or about the same time as the motion to consolidate. I -- I have to get the transcript first. So that's -- that's a bit of a hang-up. But I think we can get there by that date.

THE COURT: Well, how about December 4th. And then response will be due December 18th.

MR. RIZZO: Okay. Thank you.

THE COURT: All right. I think the motion to -- the defendants' motion to dismiss, or strike in the alternative, I believe is now up at bat.

Mr. Edelson -- and you indicated this is tied to the -- to Mr. Wilson's November 21 letter.  So this will be a good time to highlight what you might want me to be thinking about as I dive into the briefs.  And I apologize I was not able to be more prepared today than I would've liked to.

MS. RICHARDSON:  I'm sorry.  I didn't mean to cut you off there, Jeff, but I just wanted to say that we never got a letter from Mr. Wilson, but it's probably because Conley -- so Conley Plaintiffs did not get a letter from him.  But I'm assuming it's because it's the issue that deals with the Levi Plaintiff, so -- and, with that --

THE COURT:  I appreciate it.  And did the Levi Plaintiffs get the November 21st letter?

MR. RIZZO:  We did.

THE COURT:  Okay.  And was this -- is this additional information also relevant for the Conley matter, Mr. Edelson?

MR. EDELSON:  I don't think so.

MS. RICHARDSON:  Probably not.  But it would just be good practice to always include us, because I didn't know what you were talking about.  But, with that, if it's okay with the Court, I'm going to go ahead and exit, if this is the last thing, and say congratulations to you and to the State of Oregon and --

THE COURT:  All right.  Thank you, Ms. Richardson.  And if Conley is comfortable logging out, you're welcome to.

Or there may be some other Conley lawyers who may stay on.

MS. RICHARDSON:  Other Conley lawyers will stay on. I'll just exit.

THE COURT:  All right.  Thank you.

Mr. Edelson.

MR. EDELSON:  Thank you, Your Honor.  So let me tell you why I think the -- the interrogatory issue was so important to this discussion.  It'll give us some context.  So you will recall that we filed a motion -- or plaintiffs filed a motion to amend their complaint.

We objected because we felt that the complaint did not give us a fair notice of the claims that they were making against -- against us related to the -- the things that have occurred to J.C. in the Spicer home.

THE COURT:  And before you continue, Ms. Korbel, you had your hand raised for something.

MS. KORBEL:  I'm not sure what's going on, but Mr. Edelson's sound is bouncing back.  It's very hard to hear 'cause he's echoed on the Zoom call.  It looks like others are hearing it as well.

MR. EDELSON:  I'm also hearing it.  Oh, now it's not there.

THE COURT:  And I'm not getting echoes in here, but I wonder if your audio is being picked up by my -- my microphone. So I wonder if we can --

THE COURTROOM DEPUTY CLERK:  You're muted for the moment.

THE COURT:  Okay.  Well, I'm going to mute and see if that helps.  So -- but that might mean that you might not hear me until I unmute.  So let's play with the tech and see what happens.  I'm going to mute now.

And then, Mr. Edelson, start arguing or speaking.  And then if the echo is continuing, I'm going to ask anybody who hears an echo to raise their hand.

MR. EDELSON:  Okay.  So if -- and I'll ask you -- if you'd to just make a gesture if you want to interrupt me so that we can do that.

But my point is that we -- we moved to -- we objected to their amendment because we felt it did not give us a fair notice of the bases for the claims that J.C. was making, the new claims of harm to her and -- and the events in the Spicer-McCool home, which I'm not going to go back and remind you what that is.

I think you know that they joined that home -- she went into that home after the Raygosa home.  And following -- you allowed us to do some interrogatories and written discovery -- I think we called it interrogatories -- we did request for admissions to try to get clarity on those -- on those.  And then you -- and you granted the motion to allow the amended complaint -- the first amended complaint.

Well, what the letter talks about is the inadequacy of those answers and -- and the problem is we're really in no better condition now with the interrogatory responses than we were when the original amended -- first amended complaint was presented to us.

And so at this point we are moving to strike or to dismiss that complaint for the -- really the same reasons we didn't think it ought to be allowed to begin with.  But now the fact that they've been unable or unwilling to give us straight answers to our questions about what these allegations mean, we find ourselves again at a position where we're not with notice of what happened to J.C. in that home.

And so the focus of the -- most of the focus on this piece of it is found at paragraph 79 of the first amended complaint, where they've added four new allegations within their big -- their big allegation about all the alleged misconduct by the State.

And so, for example, 79(i) says they failed to properly determine Spicer-McCool's fitness to serve as foster care providers.  (j) is they certified or recertified the home to operate as a foster home.  Placing -- (k), placing J.C. in the Spicer-McCool home with knowledge that Spicer-McCool could not provide appropriate care to a victim of sexual abuse.  And (l), failing to investigate or acquiescing to Spicer-McCool's inappropriate use of physical discipline as punishment.

And so we issued a number of interrogatories that were -- we thought were pretty well designed to figure out what -- what are you talking about here, you know, what happened and -- and -- you know, these allegations by themselves, they don't really tell us, like, what happened.

You know, we know that -- that in the Raygosa home there was -- there was -- Raygosa engaged in specific conduct that's alleged that we acknowledge.  He engaged in sexual abuse, and we understand that.  We understand how that then causes harm, and we understand their -- how their allegations tie to all that.

But with the Spicer-McCool home, we just don't get it.  And the interrogatories don't help.  And I'm not going to sit and read the interrogatories to you.  I think it's -- they're set out in the letter and the exhibits there.  And I would encourage you to read them.

But let me kind of give you -- I thought of an analogy this morning as I was preparing for this.  If you say that these things happened, and then you go on and say, as a result, plaintiff suffered harm -- and what they did here is they just took the same paragraph they had before for the sexual abuse and -- and threw it all into the -- pretty much the same paragraph and said that all of those things, including now (i) through (l), caused the same harm that they already had alleged with respect to the Raygosa sexual abuse.

So we don't really understand how they connect. And we really don't understand what happened. And I was thinking about this in the context of a normal negligence case. So if you allege that the car mechanic failed to fix the brakes and then you allege that the plaintiff, as a result, broke their leg, it's still missing something.

What happened? What -- tell us about the accident that -- when the brakes failed because of it. And it's just not there. It just says they didn't -- they didn't -- they certified this, and they shouldn't have; and they did this, and they shouldn't have. But then there's, like, well -- and I don't want to be flip about it, but it's like, "Then what? So what?"

I mean, not to suggest that these may or may not be good or not good things, but in a complaint -- and, particularly, at this point in the case -- this was a very, very late amendment where their burden should be even higher to be able to give us specificity. And you gave them a pass on it, and we respect that.

And we went forward with interrogatories and requests for admission, and we really got back a lot of evasiveness. And so we were looking for specific -- specific instances of harm --

(Whispered discussion, off the record, 10:23 a.m.)

THE COURT: So the thrust of the argument is that the

allegations still don't establish -- the thrust of the argument does not -- the thrust of your argument is that the first amended complaint does not establish causal connections between the alleged negligence or failures and the harm?

MR. EDELSON:  That's exactly the point.

THE COURT:  Okay.

MR. EDELSON:  Connect it up for us.  Or it should be so obvious, such as the sexual abuse.  But connect it up for us in some way.  And they didn't do that.  So, you know, alleging that some of the children were subject to discipline in the household; and, therefore, J.C. was -- there was a risk that it could happen to her just doesn't get us there.  And that's sort of the closest I can get to understanding their responses to the interrogatories.

But, again, I would really urge you to read them because they rely on the fact that Levi is not J.C.  And so Levi says, "Well, you know, I don't know.  I'm not J.C.  I'm not a percipient witness," but doesn't tell us the answer.  And you'll recall -- and we've been over this a few times -- we've not been allowed to take J.C.'s deposition.

And Levi is apparently unwilling to talk to her and find out answers to these questions.  And here we are just really late in the case, and the closest we have to finding out about what J.C. has to say we learned through experts who -- in particular, Dr. Harris -- and I mentioned this earlier today --

who spent over eight hours interviewing J.C. and then reported about new facts that we were totally unaware of and that we've not been able to test or examine or review or do anything with.

And so that's where we are now. And so we're just kind of throwing up our hands. This is -- this feels like an ambush trial, but we're not in state court. And even if we were, we ought to be able to get this kind of basic discovery. So that's -- that's the first part of it, is that these allegations about what happened in the Spicer-McCool home just aren't clear enough for us to be on notice as to how -- what happened to J.C. and what it -- what was the result of -- of that behavior or conduct.

The second part --

THE COURT: So, as I understood your points, it sounds to me like the allegations do provide -- the complaint -- the first amended complaint does provide allegations relating to what happened and what the failure was, but not -- but no allegations about the link between the harm and the failure on the -- the alleged failures on the -- on the defendants' part?

MR. EDELSON: They allege the failure, and they -- by just grabbing what they said about the Duncan-Raygosa harm, they grabbed the same harm and alleged that and applied it. But you're right: That other link is completely missing.

THE COURT: Okay. So when I review the -- and that

could've been cured, in -- from your -- from your points that you're making, I'm understanding that that -- that causal link failure could be -- could have been cured if the interrogatories provided more information?

MR. EDELSON:  If the interrogatories were -- I think, met the rules, I think you're right.  And again, you know, we're -- you know we're working on a summary judgment motion.  And it -- it is very difficult to articulate what it is that we're trying to prove didn't happen or did happen.  We don't even know what they're alleging with enough specificity to be able to do it in a way that is effective.

And so that's really what we're getting at.  And we -- I think what you're probably thinking is if we can just get better interrogatories, you don't have to dismiss or strike the complaint.  And that may be true.  With better interrogatory responses, that may very well be true.

But I'd ask that you look at all of that, keeping in mind what we're simply trying to understand what this case is about and get them to commit to what their case is about, because that's what -- that's what discovery is all about.  And -- and the pleadings and the -- and the written discovery and the depositions, it's all to try to get the parties to commit to a particular position of fact that we can then address and say, "We don't think there's any facts that precludes summary judgment here."  And they've made it nearly

impossible to do that and --

THE COURT:  Well, wouldn't you also be able to go forward on your summary judgment motion arguments with these same arguments, with these same points, which is the plaintiffs have failed to adduce any evidence from which a -- you know, that would create a dispute about causation; and because there's no evidence on --

MR. EDELSON:  Well --

THE COURT:  -- there's no evidence on causation here -- there's no allegations on causation, therefore no evidence -- and also no evidence on causation, summary judgment should be granted on those -- those claims?

MR. EDELSON:  Theoretically I get your point, but the challenge here is it's -- for example, some of their interrogatory responses say, "It's in the documents.  There's ample evidence in the documents."  And there have been tens of thousands of documents exchanged in this case.  You'll see when you go through the interrogatories what I'm talking about.  It really puts us in a very unfortunate and unfair position.  And that's really all that we're talking about, is fairness on this.

THE COURT:  All right.  Thank you.

For plaintiff, Ms. Skjelset, Mr. Rizzo.

MR. EDELSON:  Before I give up the microphone, I will talk about the other parts.  So if you want to break it up,

that's just fine, but there's more to talk about on this motion.

THE COURT: Yeah. Let's break it up into some bite-size pieces.

Ms. Skjelset or Mr. Rizzo.

MR. RIZZO: Judge, I drew the straw on this one. So let me start out with a bit of the chronology. And, just to bring the Court back, the defendants in this case withheld production of the Spicer-McCool certification file until the middle of the summer.

Leading up to that, bits and pieces of that file -- the provider file were being disclosed. And there were questions being asked by Conley Plaintiffs. Obviously, because of the consolidation, we were present. We were developing the information concerning the Spicer-McCool home in real time and ultimately moved the Court to amend.

And the Court granted the motion. I believe that was on or about September 24. And in allowing the motion, the Court also gave the defendants an opportunity to serve written discovery, which they did, and to retake depositions, which they did.

And that's how this progressed. And so the answers to the rogs while the discovery was open -- I believe we dated the responses to the rogs on October 3rd. We also answered a series of request for admissions on the 3rd. And we didn't

hear anything from the defendants while the discovery was open.

And I think what they decided instead was they filed a motion to dismiss on September the 24th. So they jumped the gun on their written discovery in order to argue exactly what they're arguing today, which I'll address in a moment, essentially that they just don't understand how placing a sexually abused child in the home of a sexually abused and unmitigated -- that has sexual abuse and unmitigated treatment history could exacerbate a child's harm like J.C., but I'll get there.

So now we have these responses on file for more than a month. We don't hear a word from the defendants. But just yesterday, right before the hearing, we get, you know, a very long letter. And the defendants are complaining now and rehashing very similar complaints that they made about Mr. Levi's discovery responses.

This is -- this is, I believe, Judge -- arguably this is timed to influence the Court's ruling on the motion to dismiss. And it could've been addressed much earlier; but, like that sort of fiduciary abnegation issue, we're getting it at the 11th hour.

Now, with respect to the motion to dismiss, the defendants' motion was in three parts. And I didn't exactly hear the argument, as it's framed, addressed. So let me start with the first argument that they're making. They're making

that they just can't wrap their heads around what happened to J.C. in the Spicer-McCool home.

So let's walk through that, because what Mr. Edelson was focused on a moment ago were specifications of deliberate indifference, but without taking the preliminary and the preceding factual allegations into context. In fact, there was no discussion at all.

And one of the concerns I've had with this motion is, instead of taking the motion as a whole and determining whether it can fairly state a claim, the defendants have parcelized and -- they have parsed the allegations. And then, based on their parsing, they've created a characterization, and then they're using that characterization to dismiss.

So, with that said, we first want to talk about the certification. I mentioned briefly that the home -- that Mrs. McCool had an unmitigated sexual abuse history. This is in their own file. It was not treated. There were concerns that her abuse would be triggered if she were to be -- if a child with a sexual abuse history, like J.C., were placed in that home.

In addition, the home had a number of other problems. The McCool and Spicer home, they were military. They were militaristic parents. They subjected children to physical punishments. J.C. was placed into that home. McCool said, "I'm not going to be raising a victim," and that when J.C.

would express shame and remorse, she was made to run laps.

McCool shamed her for touching herself excessively as a result of having been sexualized in the home.  There was food withholding, which was admitted in their response to request of admissions.  Food was not necessarily withheld from J.C., but it was withheld from others.

There was physical abuse of other children in that home.  And that's the very environment that this agency and O'Brien placed J.C., who they knew was severely sexually abused.  So we start with that foundation, Your Honor.  And then, going forward, at or about the same time, this is where O'Brien is undermining this child.

O'Brien is communicating with Spicer-McCool via text messagings, claiming, stating, intimating, hinting, insinuating that J.C. lied about her disclosure, that who -- that the person who was really the perpetrator was the father.  And there's notes in the counseling that J.C. understood that her caseworker felt that she was a liar.  And I think she even referred to herself as a piece of shit.

And, in addition, O'Brien is putting the same bugs in the ears of her counselor, April Clark, not fully disclosing the impacts of sexual abuse, and, therefore, not allowing Clark to properly treat this child or refer her for proper treatment.

Go ahead.

(Whispered discussion, off the record, 10:35 a.m.)

THE COURT:  You're describing these -- these -- this evidence; and to the extent that it creates a dispute of fact, I'll -- then I can appreciate that there may be a sufficient evidence of causality here.  Is it -- I just wanted to confirm.  Are the things that you've just described allegations specified in your complaint?

MR. RIZZO:  For the most part, yes.  Not all of them, Judge, because the discovery was not fully completed.  But, based on what we had, I think it sufficiently puts the defendants on notice of what occurred and what the impacts were on this child.  And I'm only partway through.

THE COURT:  And the interrogatories that you provided, do they include these specific events or incidents or observations about the -- you know, the harm that was caused that you've just described?

MR. RIZZO:  I can't say that they do, Your Honor.  What Mr. Levi said -- we did point to documents.  We did point to some of DHS's own documents.  But what he said is he is not competent, as a lawyer, to give --

THE COURT:  Yeah, and that's fine.  But I'm just trying to figure out if -- because this is a motion to strike or a motion to dismiss a complaint.  It's not summary judgment.  And so I just need to know whether there is sufficient allegations in the complaint to identify a causal connection between the claimed negligence or conduct or -- or -- the

conduct that you're alleging that DHS failed to perform or performed that -- that led to harm.

So I think the thrust, again, of Mr. Edelson's argument, at least this one, is that there isn't sufficient evidence alleged -- excuse me -- there aren't sufficient allegations in the complaint identifying causality. And what you've described seems to me that -- if it's in the complaint, might very well be enough to allege causality. But I just need to know if those -- if what you've described to me are -- can be found in the complaint.

MR. RIZZO: I believe much of it can be, Judge.

THE COURT: Okay. Then I'll -- then I'll have to read the complaint to make sure that it does and that it satisfies the minimum requirements necessary for pleading under the rules.

So let me hear from Mr. Edelson about the other points or if there's something -- something brief that you'd like to point to on this issue before we move on, Mr. Edelson.

MR. EDELSON: On this issue I think you hit it right on the head. I mean, it's not in the complaint, and it's not in the interrogatories. And Mr. Levi not feeling competent to be able to answer it is a cop-out that just doesn't make sense here. I mean, we've got to get answers to these questions. And he has an obligation, as the -- a conservator, to find out those answers and provide them in good faith. And he hasn't

done that.

What we just heard from Mr. Rizzo was about the most articulate explanation of the way they see their claim that we've ever heard. And these things need to be in the complaint and in the interrogatory responses. And I think if you go through those things, you'll see that they're not there. And that's really all I have to say about that.

THE COURT: And just procedurally what I really want to make sure I -- you know what I'm -- I'm doing, as I review the motion to strike, is to determine whether there's allegations sufficient in the complaint. And I -- to establish causality.

On some level perhaps, it can be cured -- or if there is a lack of that -- of sufficient allegations in the complaint, it could be cured by the interrogatories. But I'm looking, first and foremost, to the complaint. And if it's not there, then -- then it may very well be appropriate to dismiss that.

Or I suppose I can grant leave for the plaintiff to include those allegations that have just been described, and then we have a potentially perfected complaint that you can proceed on. I think your response might be, "Well, then we need more discovery to explore these matters," if you haven't had the opportunity to do so fairly.

So -- and I appreciate that that opens up another

avenue that we just haven't talked about. But with respect to the interrogatories standing on their own, I mean, I'm looking -- you know, it seems to me that that's going to be more of a consideration at summary judgment because I'm not really thinking about evidence on a motion to strike or a motion to dismiss.

I'm just looking at whether there's allegations sufficient to make it -- to keep it alive. So I just want to make sure that I'm keeping these -- there's two different sets of legal analyses that I -- that I know we're talking about, but I want to make sure everyone understands this isn't going to be about whether there's evidence, just whether there's allegations.

But I think you have a legitimate point, though. If you have not been advised or noticed regarding the causal allegations and if I -- if I -- if it is missing and I were to allow leave to amend, then I think we have to have a talk about what you need to continue to develop your defense.

Or, alternatively, I don't grant leave to amend. And then if they are absent, then dismissal might be appropriate on these issues with respect to the Spicer-McCool home that are raised in the second amended complaint -- excuse me -- the first amended complaint.

All right. What were the other points, Mr. Edelson?

MR. EDELSON: Your Honor, the other -- just sort of

for my purposes and trying to keep it brief for you, I wanted to really only talk about two things, although I'm happy to talk about more, if anyone wants.  The first we've already discussed, which is the allegations in the Spicer-McCool house.

The second has to do with the allegations about Kassidy O'Brien.  And, again, I think this is worth taking a close look at the amended complaint itself.  Defendants' response recharacterizes what's been pleaded, but you can see the complaint itself.

But they are, in essence, asking for what -- what has been called reputational or stigmatic injury in this case, that -- that because Kat O'Brien said things about her beliefs on how -- on this child, that that somehow results in harm.  And, you know, we -- I was really surprised to hear Mr. Rizzo talk about some note he references in -- where J.C. apparently expresses her knowledge of this, the fact that Ms. O'Brien had some doubt about her -- her revelations.

And -- because I don't think we've seen that.  I'm not aware of that at all.  And we've been -- we've asked the questions.  That was one of our interrogatories or requests for admissions, that -- that -- how does -- how did -- you know, we didn't have a link that J.C. was aware that Ms. O'Brien had some doubts about the revelations that -- of the abuse.

And so even something as basic as that, we were trying to -- trying to learn what -- what the basis of that is.

But, aside from all that, that kind of injury that they've alleged is not actionable in this sort of a case. And we've cited the cases for you. I'll ask you to take a look with those.

And I think, actually, more importantly, to the extent that they're intending that Ms. O'Brien -- her testimony that she gave at trial, which, by the way, having gone through that testimony, it's hard for me to even see what -- where she did anything -- where she said anything that was -- that undermined anybody.

She did make a case note with her views on things, and that was done timely. That -- but -- and then testified that this was her case note. But we know certainly that her testimony at that criminal trial is -- is protected by absolute immunity. This was not a dependency hearing.

I know plaintiff cited a situation where testimony in a dependency hearing wouldn't be subject to the same level of immunity. But this is an entirely different criminal case. Ms. O'Brien was not the complaining witness. There's no exception that applies.

And her testimony was absolutely immune. And that ought to just be taken out of the complaint because it -- that's not curable. It's just -- it's subject to immunity, and I think -- period, end of story. So that's where we are with that.

THE COURT: Okay. Thank you.

And Mr. Rizzo.

MR. RIZZO: Yes, Judge.

THE COURT: Let's take the last thing first. I mean, if Ms. O'Brien's testimony in the criminal matter enjoys absolutely immunity, what else needs to be argued?

MR. RIZZO: Only that the Plaintiff Levi does not allege liability for what O'Brien testified to at trial. That was described in the context of her pattern of deceptive conduct, which started prior to arranging for herself to be called as a witness by the defendant.

We're not charging her with liability for what she said on the witness stand. But then, following the conviction, she continued to treat and state that J.C. had --

THE COURT: So this appears to be almost an evidentiary matter. Does -- I mean, how would -- if -- it sounds to me like you agree that there's no liability that attaches to Ms. O'Brien for her testimony at the criminal matter. How would her testimony then be used to establish some other claim not specifically related to her testimony at trial?

I mean, I take it that you're not also claiming that -- that her testimony at the criminal case is what caused reputational harm and -- and -- and the stigma that might be --

MR. RIZZO: Well, I was going to address that, Your Honor. That's another straw man that the defendants have

created by parcelizing our complaint.

THE COURT:  So how will the testimony -- or how -- how will the -- how will O'Brien's testimony at the criminal trial be used for some admissible and relevant purpose, other than proving the underlying claims of -- of, I guess, reputational harm?

MR. RIZZO:  Well, again, Judge, we're not alleging reputational harm.  The defendants are claiming that we are, but I exhaustively put that into our brief.  They're citing procedural due process cases where governmental employees or college students, right, had issues with their respective organizations.  They were effectively defamed.  And the courts generally --

THE COURT:  Okay.  So let me ask it a different way.

MR. RIZZO:  Okay.

THE COURT:  At this trial that we are going to have, you attempt to elicit testimony of what Ms. O'Brien testified to in her -- in the criminal case against Raygosa?

MR. RIZZO:  I think that's part of the story because it's based on the conduct and the notations that she created leading up to the trial.  And she testified about that at trial.  And, again, we're not saying she's liable for that.  It's describing her course and pattern of conduct, which continued after the trial.  So it's part of the story that has to be told.  A jury can be given a limiting instruction --

THE COURT:  But wouldn't -- okay.  But wouldn't Mr. Edelson's objection be that -- I mean, it's being offered for that very purpose, for which she would have enjoyed absolute -- absolute immunity, I mean, how does that testimony come in if she enjoys absolute immunity for that which she testifies?

MR. RIZZO:  In my mind, it's simply the fact that she did.  She testified on a note that she created, right, that never should have been created, in the manner in which it was created.  And she used that to fuel her continuing communications with peers and providers that J.C. was untruthful.

That occurred both before the trial; that occurred after the trial.  So the fact that she testified at trial, again, in the way we were looking at this, it's simply a fact.  And a jury can be given a limiting instruction that there is to be no liability, and we're not premising liability, on the content of her testimony on the witness stand.

THE COURT:  All right.  I like how you're bootstrapping motions in limine today, Counsel.  You're getting a jump start on our pretrial conference.

MR. RIZZO:  I'm seeing that heavier rope, Judge, and I'm trying --

THE COURT:  Oh, it's just -- my shoulders have sloped over the last -- all right.

So, Mr. Edelson, I mean, I -- I understand and I can appreciate -- I mean, there's no argument that absolute immunity is associated with her testimony at trial.  It now becomes just an issue about whether I'd even let it in as evidence at all.  And that becomes more of an argument that perhaps is, you know, more appropriate to take up during our pretrial conference.  Is there any other reason that -- I mean, is there any other point that you'd like to make about this?

MR. EDELSON:  Yeah.  Let me just sort of consolidate the last point that counsel was making, and that -- that -- he's trying to put context and show the history and the chronology.  But, again, I find myself -- and, again, I don't want to be perceived as being flip on this, or noncaring.

But the allegation that Kat O'Brien believed and then shared with lots of people that J.C. was being untruthful, that's kind of the crux of this thing.  And it's in a -- it's in a note that she kept.  There's some -- there's some -- a couple of -- of e-mails that -- where we've seen something like that.

But the question I come back to is "So what?"  How does that turn into a claim?  How is there causation between that and some harm caused to J.C.?  Obviously it didn't -- it didn't cause her to get sexually abused in the Raygosa home because this all happened well after the children were removed from that home.

I just -- I can't -- you know, reading through all this and trying to read -- even in the -- between the lines, it's just nowhere. It's a big -- it's interesting that a caseworker had some doubts about this child she knew very well, and that's really fascinating; but what does that have to do with the harm that was caused and Ms. O'Brien and the State's liability?

And that's the allegations that we're trying to attack. And it does fit into a motion to strike or a motion to dismiss because there really is no -- no "there" there. There's no claim. And incidentally -- you know, I'm not going to go item by item; but we do not agree with many of the facts that are described, but we understand that they can allege whatever they want to allege. They just haven't alleged it.

And I don't think anything that counsel shared with you today gets us there, which is a little different from what we heard from him on the Spicer-McCool home. I'll tell you that. But I still -- even after listening to counsel on this, I don't understand what the allegation is with a caseworker thinking that a child, to whom -- that she's responsible for, was -- was not being honest about a disclosure.

And until we know that, I just don't know how we even get to points of motion in limine 'cause I don't think we get -- we get past summary judgment. And, certainly, this shouldn't even get past the motion to dismiss.

THE COURT: Okay. Anything else that needs to be pointed out that isn't in the briefs --

MR. EDELSON: Not for me.

THE COURT: -- and motions?

All right.

MR. RIZZO: I don't think so, Judge. Again, I really think the defendants are straining to overlook the exacerbation of harm by calling the child a liar; keeping information from her providers; and also keeping information from the juvenile court, which was, therefore, unable to make recommendations for its ward in terms of her best interest and safety.

So that's the causation. You can't put an abuse victim -- for example, let's use one of Mr. Edelson's physical injury analogies. You can't put a hospital patient into a rehabilitation ward that's incapable of providing for her rehabilitation needs and services.

And the defendants knew that; and they put her precisely in a situation where they knew she wouldn't get proper care, number one, and where they misled providers all around her, who were -- who were her fiduciaries, who could've helped her. They prevented them from doing any of that.

If that's not causation, I don't know what is. And when they spoke about the interrogatories, I'd have the Court look at their own documents, which -- which we cited. They're criticizing us for citing documents. But in response to

interrogatory number 20, we took information right out of their manual about the dangers of disbelieving a child sex abuse victim, which is exactly what O'Brien was doing. It's on page seven.

THE COURT: Okay. Thank you.

All right, Counsel. I appreciate helping orient the focus of my review as I continue to dive deeper into the briefs and taking a look at also Mr. Wilson's letter of November 21st.

Now, I also want to confirm none of this is implicated in the Conley matter. Is that -- is that -- is that correct, Mr. Edelson?

MR. EDELSON: I believe that's correct.

THE COURT: Yeah. And at least not for the purposes of any motions --

MR. EDELSON: Nothing we can talk about today, no.

THE COURT: Okay. All right. The last issue -- and I think, Mr. Edelson, you've raised this or made mention of it a couple times -- the Dr. Harris opinion?

MR. EDELSON: Yeah.

THE COURT: What are we doing with that? Or what do you want --

MR. EDELSON: We haven't decided. We're deliberating on that a bit. But, I mean, if you want a preview, Dr. Harris revealed several new facts, or that she put forth as facts -- I mean, they would ordinarily be hearsay; but, as an expert, I

suppose there's an argument that she'd be able to testify about it. But, based on her interviews -- her extensive interviews with J.C. that she did, she's now revealed new facts, which were not revealed to us until the expert report.

THE COURT: Does that also trigger a renewed motion to depose J.C.?

MR. EDELSON: Yeah, and that's what we're looking at. And, you know, we're working on that -- that motion. And, you know, I'm happy to make it orally, if you want, or if -- or if defendants -- or if plaintiffs want to concede it, but --

THE COURT: I think it would be good for all of us to take a look at written materials and --

MR. EDELSON: Yeah, I think so, too.

THE COURT: Okay.

MS. SKJELSET: Your Honor, may I speak to Dr. Harris?

THE COURT: As long as it's a preview, it's like one of those thumbnail previews before you can open the file.

MS. SKJELSET: Well, if the defendants are somehow arguing that the facts that were conveyed in Dr. Harris' report were a surprise to them or somehow unavailable to them, and they're upset about that because they wanted to depose J.C. and the Court said that they couldn't because they were untimely, it shows a -- I mean, an extreme lack of understanding of how this process works.

In every -- in every personal injury case, there's an

evaluation of the person who was harmed.  And that is the person who gives expert testimony about the causal link between what the person experienced in that home, in the foster home where they were abused and DHS had notice of it, and what they're experiencing now.

If defendants didn't know that or expect that, then that is their problem.  That is a poor, poor foresight and poor understanding of how this process works.  That information was conveyed to them on October 9th.  The notes in their totality were produced to the defendants.

Mr. Edelson had plenty of opportunity to ask further questions.  To suggest that our interrogatories are not -- are not complete because -- because we didn't answer those questions that way, but instead provided it through an expert who could meet J.C. in a manner that was -- that was trauma-informed, kind, appropriate and -- and get the information that they needed that way, expertly, is -- is -- I mean, it's somewhat of an outrage for me to hear now from these extraordinarily experienced attorneys that that would've been a surprise to them.

They had every opportunity to ask many questions of Dr. Harris about what she observed.  And Mr. Edelson was there and did.  He didn't spend a lot of time with Dr. Harris asking these questions.

THE COURT:  When was Dr. Harris' deposition taken?

MS. SKJELSET:  November 14th; is that right, Jeff? Or was --

MR. EDELSON:  It was last Thursday.

THE COURT:  Okay.  And it was the defendants' deposition of Dr. Harris, correct?

MR. EDELSON:  Correct.

THE COURT:  All right.  And --

MS. SKJELSET:  I have one more -- I'm sorry, Your Honor.  I just have one more thing.

THE COURT:  So, you know, I can appreciate that Mr. Edelson may want to respond and -- and I'm going to filter out for now sort of the accusations about -- sort of your disbelief or surprise that capable lawyers are not paying attention to what they ought to be doing.

And I want to invite you, Ms. Skjelset, to refrain from doing that again in the future.  I have noted over the course of litigation -- everyone has -- I think many people in this case have some very strong feelings about what may or may not have happened.

I -- I started this hearing with the encouragement of trying to approach this with sort of a professional levity to just simply work through the issues and try to get to legally correct answers.  The arguments that you make against Mr. Edelson, or anyone else from Markowitz Herbold -- you know, at some point then you're going to ask me to judge all of you.

So be careful throwing stones. I really don't want to go there because I think it'll be a distraction for all of you and for me.

So, Mr. Edelson, is there anything else that you need to say, in light of my comments?

MR. EDELSON: I do not. Thank you.

THE COURT: So the other point that you wanted to make, Ms. Skjelset?

MS. SKJELSET: Yes. Regarding Dr. Harris' testimony, the Court declined to allow the defendants to depose J.C. partly because they were late, but also partly because they expected that -- the Court expected that it would be traumatic to her. And that was confirmed in the deposition of Dr. Harris, who said that during the interview J.C. actually dissociated for a period of time.

And we have extraordinary concerns about her mental health and her ability to sit for a deposition. And we have -- we have invited the defendants at any stage to offer guardrails or any -- but it was declined. It was declined. The deposition was declined by the Court. It was denied. It was untimely. The evaluation was expected.

I apologize, Your Honor, if I -- if I was inarticulate or inappropriate in my -- in casting aspersions. I do feel as though we have been -- we have received aspersions in this case, too, and I'll do my best to keep it -- to keep it

with levity, as the Court has asked.

THE COURT:  Or, even better, if everyone took the high road, we'd actually attain some pretty serious altitude. So how about let's just keep climbing higher.

MS. SKJELSET:  I wanted to --

THE COURT:  And I can appreciate that -- if Mr. Edelson is going to file a motion -- a renewed motion for a deposition of J.C., I've been open -- I've been open to everybody here continuing to litigate the case in which they want -- the cases that they have, to move this forward within the time frames that we have and that are allowed.

And so part of -- part of it is that there's some sort of dynamic nature to how the litigation's unfolded.  Now we're dealing -- I'm dealing with the possibility of granting -- I'm being asked to grant the motion to consolidate. That changes time frames all of a sudden.

And everyone was -- well, the plaintiff -- the Levi Plaintiffs were -- were incredibly focused hard on getting this trial off in February.  And I -- I accommodated that, much to the chagrin of -- of the defendant -- defense counsel.  So -- and my decision about deposing J.C. had, in part, been based on the timeliness and the late request.

I'm -- I want to make it very clear.  I'm not -- I'm not inclined to reopen discovery full bore.  I'm not inclined to open discovery at all.  But I think, with respect to the

issues of expert witnesses and whether people are offering new testimony, I'm -- I'm probably less inclined to strike testimony as much allow parties to develop it, when it comes to experts talking.

I'm not inclined to reopen the record at all with respect to the fact discovery and -- and other witnesses. Having said that, I'm showing you my cards with the understanding that all of you can put your best arguments forward. And I'll look at them and try to -- endeavor to be making the right decision and thinking about how this can be fair so everyone can try their best case.

MS. SKJELSET: There was one argument that I believe was left on the table with regard to the motion to dismiss, Your Honor, that I wanted to bring to the Court's attention.

THE COURT: Go ahead.

MS. SKJELSET: And that was the activities that Ms. O'Brien engaged in, in undermining J.C.'s allegation of abuse against Joe Raygosa; in failing to provide that information to the Court and to the providers; in acting as her victim advocate in the court, while simultaneously working apparently with the defense to testify against her; in telling the providers that she was the -- the individuals who were supposed to be on her team, that she believed that she was not truthful; and then in seeking adoption that -- when she knew that the -- only the guardian could assert claims on her behalf

and that there was somebody investigating the case, all of that is -- is -- for -- for J.C. -- for Levi, on behalf of J.C., goes as much to punitive damages and a motive to cover up and an abuse of power, the power that a state has over a child who is vulnerable and in their care.

THE COURT:  And, you know, the -- my north star on this motion to dismiss or motion to strike is really about whether there's allegations in the complaint.  Are you telling me that there's sufficient allegations in the complaint that -- that point to the things that you've just said?

MS. SKJELSET:  Yes.  And the --

THE COURT:  All right.  Okay.  Then, you know, the complaint will be my anchor.  I mean, I'm going to look at what those allegations are that are included in the first amended complaint and determine whether that -- you know, whether, you know, it provides, again, sufficient notice.  I mean, I'm -- you know, Rule 8 still has some teeth to it.  And I want to make sure everyone understands I'm not here to require heightened standards of pleading, but that which is sufficient to put the defense on notice.

All right.  So December 20th, we have a few motions coming in, including the motion to consolidate, the -- the issue with respect to the rebuttal report, motion to strike the rebuttal report.

And then, Mr. Edelson, I know you're still exploring

what to do with these additional motions, maybe a motion to take J.C.'s deposition, and I think maybe something with respect to Dr. Harris.  Is it possible to file those motions in that same time frame, December --

MR. EDELSON:  It is.  It is.  Yeah, and your comments have helped me figure out what that motion would be.  I think it sounds like you're not inclined -- you're less inclined to strike experts as develop testimony.  So I think that helps me focus the motion, and we can definitely meet that time frame. What was -- you were looking at December --

THE COURT:  What about December 4th?

MR. EDELSON:  December 4th is fine.

THE COURT:  And then December 18th would be the response.

Okay.  So was there anything that Conley needed to take up before -- before we finish today, Ms. Korbel?

MS. KORBEL:  No, Your Honor.  Thank you.

THE COURT:  All right.  You're very welcome.

Mr. Edelson, anything else for the defense?

MR. EDELSON:  Well, I'll bite my tongue on some of the things that counsel had to say that I just strongly disagree with, both factually and legally.  But I think you get -- you understand our motion, and I'm not going to go back to it.

THE COURT: All right.  I appreciate that.

And anything else for plaintiffs, Ms. Skjelset --

MR. NASO:  Your Honor -- Your Honor, may I ask a question?

THE COURT:  You may.

MR. NASO:  Thank you.

Did I understand you to say, at the beginning of this hearing, that you were expecting to issue a ruling on the motion to dismiss sometime after Thanksgiving?

THE COURT:  You're trying to, like, get me nailed down.

MR. NASO:  I don't want to nail you down.  I just wanted to -- I was wondering if I recalled that correctly.

THE COURT:  I need to talk to my lawyer first.

So, yeah, yeah, after Thanksgiving.

MR. NASO:  Yeah.

THE COURT:  That could be a while from now, but probably before --

MR. NASO:  Okay.

THE COURT:  -- probably before the next Thanksgiving that we have, I'm sure of it.

MR. NASO:  Thank you.

THE COURT:  And now that I have the material that -- and arguments and points that everybody's making here, it'll center me to focus on getting that issue put -- put together and get you an answer.  I mean, I don't pretend to think it's

going to be easy; but I think I've said many times, you know, my north star will be the complaint -- the first amended complaint.  And -- and then we'll go from there.

All right.  Counsel, thank you all very much.  May you all have a peaceful and safe and happy Thanksgiving.  Take care.

* * *

(Court adjourned, 11-22-24 at 11:09 a.m.)

C E R T I F I C A T E

Ethan Levi v. Kim Chapman, et al.

Case No. 6:22-cv-01813-MK

and

Shannon Conley v. Kim Chapman, et al.

Case No. 6:23-cv-01353-MK

Status Conference

November 22, 2024

I certify, by signing below, that the foregoing is a true and correct transcript, to the best of my ability, of the videoconference proceedings heard via videoconference, taken by stenographic means.  Due to the audio-visual connection, parties appearing via speakerphone, speakers overlapping when speaking, the speaker's failure to enunciate, background noises and/or other technical difficulties that occur during videoconference proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the videoconference at the U.S. District Court of Oregon in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/Lindsey A. Weresch, RMR, CRR, CSR

_____

Official Court Reporter            Signature Date: 11/27/2024
Oregon CSR No. 14-0427             CSR Expiration Date: 6/30/2026