Steven Rizzo, OSB # 840853
Mary D. Skjelset, OSB # 075840
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelest@rizzopc.com

Caitlin V. Mitchell, OSB #123964
Johnson Johnson Lucas & Middleton PC
975 Oak Street, Ste. 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
cmitchell@justicelawyers.com

ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>     Plaintiff,<br><br>v.<br><br>KIM CHAPMAN, et al.,<br><br>     Defendants. | CASE NO. 6:22-cv-01813-MTK<br><br>*Lead Case*<br><br>**PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS' MOTION TO RECONSIDER**<br><br>*Oral argument requested* |
| OREGON DEPARTMENT OF HUMAN SERVICES, et al.,<br><br>     Third-Party Plaintiffs,<br><br>     v.<br><br>JOE ALBERT RAYGOSA,<br><br>     Third-Party Defendant. | |
| SHANNON CONLEY, Conservator for Z.C., | |

1 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
   MOTION TO RECONSIDER



a minor,

        Plaintiff,

vs.

KIM CHAPMAN et al.,

        Defendants.

CASE NO. 6:23-cv-01353-MK

*Trailing Case*

## INTRODUCTION

The Court already denied the defendants' motion to compel J.C.'s deposition on September 29, 2024. (ECF 210). Judge Aiken affirmed that order on October 15, 2024. (ECF 226). Discovery is closed. The Court should deny the motion to reconsider ("the MTR") the prior orders. Rule 26(b)(1), 26(2)(C), 26(c) and 34, the correspondence, pleadings, and papers on file and the Declaration of Steven Rizzo ("Decl."), and the law of the case doctrine support the Response.

## RELEVANT BACKGROUND

Plaintiff Levi filed the initial Complaint on November 18, 2022. (ECF 1).

The defendants' Answer dated December 12, 2024, realleges DHS's third-party battery claim against DHS-certified foster parent, Joe Raygosa, which dates back to their original January 30, 2023 Answer. (ECF 19, 261). Those pleadings admit that Raygosa was tried and convicted of crimes perpetrated against J.C., and that his conduct was "the sole cause" of J.C.'s injuries and damage. *See Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) ("Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.").

The Markowitz firm appeared on behalf of all defendants on June 26, 2023. (ECF 48, 49). On September 8, 2023, the Court set a firm discovery deadline of July 12, 2024.[1]  (ECF 110 at ¶¶ 48, 74-76). As of June 7, 2024, the defendants had taken no depositions. The defendants' June 25,

---

[1] (*See* Decl. in support of Plfs. Resp. to Defs. Mot. to Extend Case Deadlines, ECF 154 at 2) ("THE COURT: . . . The deadline is set for July 12, with the understanding that *I'm going to be very reluctant to move that date out again.* So *do everything you can to coordinate and organize schedules to complete all discovery by then.*") (emphasis added).

2 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
   MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

2024 Motion to Extend Case Deadlines listed "several *critical* discovery issues" and sought a "brief extension" to resolve these critical issues and "*complete discovery* without the need to hold depositions open pending late production of necessary documents." (*Id*. at 6) (emphasis added). There was no mention of taking J.C.'s deposition.

On July 10, 2024, the Court ordered the defendants to prepare a status report stating what was necessary "to complete discovery on both of the cases, and submit it – and to have it done in 30 days." The Court stated that the defendants should "make it *thorough*" to "*avoid any amendments*" and limit additional requests to "a *rare thing* that might come up." (ECF 179 at 3-4) (emphasis added). The defendants made no mention of taking J.C.'s deposition.

The July 12, 2024 Order directed that the status report should reflect a proposed calendar of fact discovery by July 19, 2024, and "detail how the parties will complete discovery by the August 12 deadline (including, e.g., *when remaining depositions will take place.*)" (ECF 157) (emphasis added). The defendants' July 19 Status Report listed "six depositions" for cases: April Clark, Dr. Sorenson, CASA/Ms. Dale Gilad, Ms. Lene Ferrari, Ms. Annette Smith, and Levi. The defendants made no mention of J.C.'s deposition. (ECF 160).

Suddenly, on August 5, 2024, Mr. Wilson charged that Levi's and Conley's so-called "fiduciary abnegation" triggered the defendants' sudden need to depose J.C. and Z.C. (ECF 179 at 5).[2] At the August 6, 2024 hearing, the defendants announced that they were prepared to forego deposing J.C. so long as Plaintiff "stipulated" to do the following:

> (1) not call Kids FIRST;
>
> (2) not introduce any testimony in Raygosa' August 2018 criminal trial (which they judicially admitted resulted in his conviction for sexual abuse, unlawful sexual penetration, sodomy, and rape of J.C.);
>
> (3) not introduce evidence of J.C.'s disclosure of Raygosa's sexual abuse upon removal from the Duncan-Raygosa foster home;
>
> (4) *not call a Rule 26 expert to testify about information obtained from J.C.*;

---

[2] The defendants haven't mentioned the "fiduciary abnegation" contrivance ever since.

3 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
      MOTION TO RECONSIDER

 

(5) preclude J.C. from testifying at trial.

(ECF 179 at 6-7) (emphasis added). Plaintiff rejected the bargain, ¶ 4 of which reflected the defendants' awareness and anticipation that Plaintiff 's Rule 26 expert would evaluate J.C.

The defendants' August 11, 2024 motion to compel J.C.'s deposition claimed that they "specifically requested in discovery the factual basis for . . . allegations . . . that [they] allegedly *knew about but failed to investigate concerns* about the home." But the defendants did not identify any specific discovery request, allegation, or concern. Using Levi's March 15, 2024 response to the first set of interrogatories as a foil, the defendants claimed that Plaintiff "failed to provide discovery on this *critical* factual point." The defendants' chose to wait five months to object to Plaintiff's "at best vague if not actively evasive" response as multiple discovery deadlines came and went. (ECF 170 at 4).

From there, the defendants segued to the "*absence* of *any prior disclosures*" in their files – without first affirming that in fact there were no such disclosures. To buttress the claimed *absence*, they used Chapman's October 9, 2017 email to Brooks, O'Brien, Lane, and DOJ AAG Spickerman, which relates what J.C.'s then foster parent (P.W.) told Chapman:

> [J.C.'s] father did not sexually abuse her, but Joe Raygosa did . . . Joe told [J.C.] that if she ever told anyone, to say it was her father who did it. Joe told her that if she told on him they would take his own kids (niece and nephew) and he would get in trouble.

(Blaesing Decl., ECF 172-1).[3] To be clear, the email shows that O'Brien was aware of what J.C. purportedly said about her father months in advance of her impromptu interview with J.C. in Ms. Spicer's presence and the creation of the May 23, 2018 case note for which the defendants claimed she enjoys absolutely immunity.[4] The defendants elaborated on the implied *absence* of *any prior disclosures* by exclaiming:

---

[3] In the same exchange, the DOJ AAG advising on certification observed that "[s]adly, the report makes sense, given the dynamics of this family." (Decl. of Counsel, Ex. 1).

[4] (*See* Defs. Mot. to Dismiss, ECF 214 at 10) (citing Jindal Decl., ECF 216-1).

4 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

No <u>witness</u> has testified to *any prior disclosures* [by? about? when?];

<u>Discovery</u> to date has not *revealed* [to them] any factual basis for *any prior disclosure*;

The <u>documents</u> exchanged in discovery do not reveal any *prior disclosures **of sexual abuse*** by J.C. about Mr. Raygosa;

(ECF 170 at 4) (emphasis added).

Plaintiff opposed the motion to compel. (ECF 179). In sum, the motion adapted Plaintiff's March 15 interrogatory responses as camouflage for their attempt to force J.C. to disabuse them of their *any prior disclosures* strawman on deposition.[5] Plaintiff was not responsible for the defendants' select witness testimony, what *discovery to date revealed* was within the eye of the beholder, and the parties were working from the same set of *documents exchanged*. Also, the defendants' first set of interrogatories did not "specifically" request Plaintiff to identify *any prior disclosures about* Raygosa. (*Id*. at 9-12).

On September 6, 2024, the Court in pertinent part granted Plaintiff's motion to amend and denied the defendants' motion to compel J.C.'s deposition. To balance the parties' interests, the Court permitted the defendants to propound additional written discovery to Plaintiff, reopen numerous depositions (Clark, Gilad, Sorenson), and newly depose the prosecuting District Attorney (Stephen Morgan) and former foster parents (Ivan Spicer and April Spicer-McCool). The Court found that Levi was a non-percipient witness and that he was not "capable of clarifying the depth and breadth of the additional allegations in the Amended Complaint." (ECF 192 at 5).

Upset by their adjudicated lack of diligence, the defendants filed Objections on September 20, 2024, ahead of the Court's written discovery order. The premature filing focused on J.C.'s deposition. They remained silent on the Court's ruling regarding Levi. (ECF 221 at 4).

The Court's September 24, 2024 Discovery Order provided in pertinent part:

The Court finds that there is *ample evidence from other sources of J.C.'s damages and notice of her abuse*. The harm of retraumatizing a child by compelling her

---

[5] (*Cf.,* MTR at 3) (As the defendants observed: "Plaintiff argued that . . . efforts to depose [J.C.] were a contrivance as a means to intimidate [her].") (cleaned up).


RIZZO | BOSWORTH | ERAUT pc
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

deposition is *unnecessary in light of the evidence already available* to the parties . . . [and] the Court's decision to deny the deposition of J.C. is also based on *untimeliness*. Defendants notified Plaintiff on the eve of the discovery deadline of its intent to depose J.C. The Court extended discovery deadlines for a limited purpose thereafter.

(ECF 210 at 2) (emphasis added).[6] This is the law of the case.

The defendants moved to dismiss/strike the First Amended Complaint ("FAC") on September 26, 2024, ahead of Plaintiff's written responses. The defendants argued in pertinent part that the pleading was "too vague and conclusory." (ECF 214). Plaintiff responded to the additional written discovery on October 3, 2024, and the defendants did not seek to confer.

The defendants filed Supplemental Objections ("SO") on October 8, 2024, without seeking leave. (ECF 222). The SO claimed that J.C. "has *critical first-hand testimony* regarding the *core issues* . . . on which [the defendants] have been *unable* to obtain discovery from other sources." The defendants failed to identify specific *testimony* or announce the *core issues.* (*Id.* at 5) (emphasis added). Plaintiff moved to strike the SO. (ECF 223)

On October 9, 2024, the parties disclosed their respective Rule 26 experts. Plaintiff identified in pertinent part Jennifer Harris, PhD, and provided her written report. The defendants failed to retain a Rule 26 psychologist and never requested an independent medical evaluation ("IME") during fact or expert discovery.

On October 15, 2024, Judge Aiken rejected the defendants' Objections and the SO. In concurring with the Court's reasoning, Judge Aiken agreed:

[The defendants'] efforts to depose J.C. *were untimely* . . . [they] notified Plaintiff that they intended to take J.C.'s deposition barely a week before the close of discovery . . . [they] could easily have sought to depose J.C. during the ordinary course of discovery but instead *opted to wait until the last minute. . . .*

Judge Aiken also found that the Court's rulings "were not clearly erroneous or contrary to law."

---

[6] Addressing concerns of prejudice, the July 24 Order also provided that "if Plaintiff elects to call J.C. to testify at trial, [Plaintiff] must provide Defendants 30 days' notice before trial and Defendants will have an opportunity to depose J.C. Similarly, if Plaintiff submits a declaration of J.C. in support of a dispositive motion, then Defendants will be given an opportunity to depose J.C." (*Id.*).



RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

(ECF 226 at 3) (emphasis added). This is the law of the case.

On November 14, 2024, the defendants deposed Dr. Harris in Tacoma, Washington. The defendants were provided with her extensive written report and interview notes (with J.C. and mother) well in advance of the deposition.

The defendants delivered a letter to the Court on November 21, 2024, that complained about "several" of Plaintiff's October 3 "discovery responses." (Edelson Decl., Ex. 4, Mr. Wilson's 11/21/24 letter). The letter arrived almost eight weeks after the October 3 responses and the day before the November 22 hearing. At the hearing, the defendants used the Plaintiff's responses as a foil to buttress their motion to dismiss/strike the "too vague and conclusory" FAC, and bemoaned their taking of deposition of Dr. Harris.

## STANDARDS

"Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.) (*cert. denied* 508 U.S. 951, 124 L. Ed. 2d 661, 113 S. Ct. 2443 (1993). "A court may have discretion to depart from the law of the case where: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Unites States v. Alexander,* 106 F.3d 874, 876 (9th Cir. 1997). "Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.*[7]

## ARGUMENT

### A.  *The law of the case doctrine bars the defendants' renewed request to depose J.C.*

The defendants' quest to depose J.C. has evolved since close of business on August 5. What

---

[7] The MTR is silent on the law of the case doctrine. But the defendants were keen on the doctrine when opposing Plaintiff's motion to sever. (*See* ECF 236 at 2) ("This Court has already denied plaintiff's motion to strike the third-party claim . . . There is *no basis* for the Court to revisit that decision now and . . . *the law of the case doctrine requires that it does not.*") (citing *Alexander,* 106 F.3d at 876) (emphasis added).

7 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
   MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

began as so-called *fiduciary abnegation* was followed by the pathetic *stipulation.* Failing that, the defendants' motion to compel initially argued that J.C. has information about their *failure to investigate concerns,* which quickly segued to J.C.'s apparently *critical first-hand information* about an absence of *any prior disclosure(s)* and *timing of alleged disclosures.* Aside from applying these vague labels, the defendants never articulated specific facts that are apparently known only by J.C. or how such facts impact their ability to defend the claims.

Nothing has changed: Dr. Harris's disclosure in accord with the expert discovery deadline was not a "changed circumstance," and the defendants were not *denied* an *opportunity* to discover (what they now call) "the *relevant facts*" in her detailed report. (MTR at 5) (emphasis added).

At the outset, nothing about Dr. Harris's disclosure addresses the defendants' twice adjudicated lack of diligence. The defendants chose to ignore the Court's orders to timely plan and specify their discovery and both this Court and Judge Aiken have already found *inter alia* that the defendants were therefore nor permitted to depose J.C. Accordingly, the Court should apply the law of the case doctrine and reject what amounts to the defendants' third bite at the apple – by now offering Dr. Harris's timely report as an excuse for their own delay in seeking to depose J.C.

The defendants argue instead that Dr. Harris *learned* new information which contains so-called *specific details* that *were not previously available* to the defendants in the discovery. (MTR at 6). The defendants are wrong and they do not dispute that there is *extensive documentation* of J.C.'s experience and injuries as *found in discovery* both in their production and in Plaintiff's production (MTR at 6).[8]  But they apparently did not study the discovery materials in their file: many of the *specific details* they have gleaned from Dr. Harris' report were in fact *previously* made

---

[8] (*See e.g.*, ECF 179 at 11-12) (The defendants have the permanency case work files, provider files, CPS assessments, police reports, Kids FIRST evaluations, juvenile court records, Raygosa's criminal trial transcript, J.C.'s counseling records and medical records, and her psychological evaluation. The defendants have deposed the prosecutor, all of J.C.'s providers (several of them twice) and Spicer and McCool. Plaintiff produced 12,000 plus documents, including education and medical records that were generated following J.C's return to her mother's care.) The defendants deposed J.C.'s mother about J.C.'s and Z.C.'s current functioning. They elected to not depose J.C.'s school counselor or teachers, or any of her friends and neighbors. The defendants also opted to forego deposing J.C.'s current medical provider.

8 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
      MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

*available* to them.

For example, the defendants proffer that they are surprised that Dr. Harris *learned* that J.C.'s biological father "would drink and drive, throw bottles out the window and scream." (*Id.*) (Edelson Decl., Ex. 2 at 9). But this was already *known* to and documented by the defendants: DHS employee Kelly Henson's January 19, 2017 visitation note cites J.C. as relaying that "[w]hen [Bio-Dad] would take us to Roseburg and he would be throwing beer bottles at cars and drinking. It smelled like beer."). (Decl. of Counsel, Ex. 2).

The defendants also express surprise that Dr. Harris *learned* about J.C.'s *hypersexualized behaviors* and attendant *[e]motional and mental abuse J.C. suffered at the McCool-Spicer home.* The defendants criticize Dr. Harris for not framing her interview questions to serve their *new information* narrative: "And despite learning that J.C. was shamed in the McCool-Spicer household for touching herself sexually, Dr. Harris did not ask J.C. about the impact of that." (MTR at 7). But this too was already *known* to the defendants, and Dr. Harris did pursue the issue with J.C. who said: "When I had problems with touching myself, they made me feel terrible about it, which is why stopped." (Edelson Decl., Ex. 2 at 14). The defendants also have April Clark's May 15, 2018 counseling record, noting: "[J.C.] stated that she now feels that this is 'gross,' and that she is 'not doing it anymore.'"[9] (Decl. of Counsel, Ex. 3 at 2). Further, joint defense counsels' client, O'Brien, likely received Clark's note later in June 2018, but chose to disregard (or possibly discard) it.

> **O'BRIEN Kat 10:22 AM:**
> Erm. Will you judge me if I don't read the 8 inches of notes from CFD [Clark] and just shove them in a file cabinet somewhere?

(Decl. of Counsel, Ex. 4 at 3).

With respect to liability, the defendants imply that Dr. Harris *learned a lot of information*

---

[9] Later notations in April Clark's notes describe the ongoing shaming and the impact it was having on J.C. (Decl., Ex. 3 at 6).

9 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

about the abuse occurring in the Duncan-Raygosa foster home that is not in their files. But this claim is specious. As set forth above, the defendants have the CPS assessments, the police reports, the Kids FIRST evaluations at which J.C.'s interviews were videotaped, the complete juvenile court record and FTRs, the Hammond affidavit, and Raygosa's criminal trial transcript, which includes J.C.'s testimony. They also have the permanency case work files, the provider file, the emails, extant texts, J.C.'s CFD counseling records and medical records, and her psychological evaluation. The defendants have failed to identify any aspect of the abuse that was not discovered by the participating advocates, DHS workers, and the professionals. They have also failed to articulate what *critical first-hand information* or (what they now call) *very relevant facts* J.C. has about liability that the defendants do not already have in their own files – other than perhaps the information they destroyed, to which Plaintiff has been deprived access.

However, the defendants now criticize Dr. Harris for failing to pin down the *specific point* in time when J.C. subjectively *recognized* (as a nine-year old) Raygosa's conduct was *wrong. (Id.*) (Edelson Decl., Ex. 3 at 9). The defendants truncated Dr. Harris's testimony regarding their effort to create a narrative of "right" and "wrong." Accordingly, Plaintiff sets out her testimony on this point in full:

> Q. I do want to zero in on -- because there was some confusion about -- and I think you may have gotten really close to helping me understand it -- that *at the beginning she didn't know it was wrong.* She didn't have a -- her own context for it, but she did figure out at some point that this wasn't *right*, didn't she?
>
> A. Yes.
>
> Q. But that was while she was still in the home?
>
> MS. SKJELSET: Object to the form of the question.
>
> A. So I'm not entirely sure at what specific point she recognized that it was wrong.
>
> Q. (BY MR. EDELSON) So when he was telling her, 'I will get in trouble if you -- if you tell anyone,' *she would have known* at that point that it was *wrong*?
>
> MS. SKJELSET: Object to the form of the question.
>
> A. She might have started to understand that it was not -- it was wrong, <u>but she</u>

10 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

<u>might not have understood why</u>.

Q. (BY MR. EDELSON) But sort of in a kid way, she knew it was bad and not good?

MS. SKJELSET: Object to the form of the question.

A. I think it depends on how specifically it's phrased. So I mean, sometimes with grooming, people say, like, 'It's our secret,' and then it doesn't feel as wrong. Sometimes it's, like, 'Oh, I want to show you this because this will be important for you to know later on in life.' <u>Which I got a sense of when he was showing her pornography and telling her that's what he was going to do to her when she was older, that that was implied in that</u>, but -- and then, yeah, more specifically, if there's that communication that, like, 'I'm going to get in trouble' -- but, again, it depends on, like, what age that was presented to her.

Q. (BY MR. EDELSON) But you would agree there were a lot of factors and strong reasons for *why she didn't voluntarily share* the information *sooner* than she did?

MS. SKJELSET: Object to the form of the question.

A. I think that's consistent with the research.

(Decl. of Counsel, Ex. 5) (emphasis added).

In sum, Dr. Harris explained that J.C. may not have understood that the conduct was "wrong" because she was being groomed (i.e., conditioned) to seek out Duncan-Raygosa's approval and otherwise protect them. Moreover, J.C. was experiencing the complex and conflicting feelings common of child sex abuse victims and obvious in J.C.'s treatment records. In their depositions of April Clark, the defendants opted to avoid the therapy note from August 16, 2018 where J.C. works through her "guilt that she engaged in the sexual abuse and that it sometimes felt good." Unlike the defendants, Ms. Clark understood and reassured J.C. "that [she] has no[] accountability to take regarding her abuse because she is a child and her foster father is an adult who knows that it is wrong to try to engage in sexual things with children." (Decl., Ex. 3 at 4). But the defendants do not like the answer.

Claiming that Dr. Harris was remiss for not "deposing" or cross examining J.C. during her clinical interview the defendants proclaim that they are now "entitled" to depose her about when she "understood" what the approximately 500 pound man was doing to her little body felt "wrong" to her. However, in light of the extensive documentation in the record and the defendants' judicial

11 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUTᴘᴄ
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

admission, the defendants have no legitimate purpose to "follow up" by asking J.C. – an admitted and adjudicated child sex abuse victim – whether the conduct felt "wrong" morally or physically. For that matter, the rules of procedure would not have permitted the defendants to "follow up" with J.C. after her interview with Dr. Harris – even assuming that they been diligent during fact discovery. Conversely, the defendants should not be permitted to use J.C.'s deposition as a tool to undermine Dr. Harris's evaluation or *vice versa,* which would only reward their lack of diligence and deeply embarrass J.C. for no legitimate evidentiary purpose.

With respect to causation, unlike any of the child-deposition cases cited by the defendants in their motion to compel J.C.'s deposition, *see* ECF 170 at 8-10, the defendants judicially *admit* that their DHS-certified foster parent Raygosa's repeated rape and sodomization of J.C. was the "sole cause" of her injuries and damages.[10] As thus framed by their own pleading, causation is foreclosed. The issue is simply whether the defendant officials and DHS are liable for the abuse, and the defendants have failed to credibly articulate how a deposition of J.C. bears on liability.

With respect to damages, the Court should also frown the defendants' claim that they have earned by delay an "entitle[ment] to follow up on Dr. Harris' [so-called] omissions and to learn first-hand the nature of J.C.'s injuries, impairments, and disabilities. . . ." (MTR at 7). In reality, the defendants were never *denied* any such opportunity – they *repeatedly failed* to avail themselves of the opportunity to do so during discovery.[11] Compounding their *laissez-faire* approach to the deposition, the defendants made no effort to obtain an independent psychological evaluation of J.C. during discovery, and they have, as seen, failed to retain a Rule 26 psychological expert to

---

[10] This admission also cut against the defendants' "stipulation" to bar the Kids FIRST evaluations of J.C.'s abuse – at which DHS was present, and evidence from Raygosa's criminal trial – at which Kids FIRST and DHS CPS worker Burford testified in support of the prosecution.

[11] MTR footnote 1 interposes that Dr. Harris's interviews with J.C. in 10/23 and 2/24 *means* that Plaintiff *likely obtained the facts* on or before the August 6 hearing. The juxtaposition is used to insinuate that J.C.'s deposition was therefore not unreasonably cumulative. If the *facts,* which defendants also characterize as *basic information,* pertain to what J.C. told Dr. Harris, then such *facts* were *available* to the defendants had they exercised diligence during discovery.

12 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

rebut Dr. Harris.

The defendants note that J.C. told Dr. Harris about her suicidal ideation in the Spicer-McCool foster home, which she (as a nine-year old) did not previously report to her providers. In response to the defendants' questioning, Dr. Harris stated:

> When people start to have that outside of the trauma context, it can also leave them feeling like somewhat numb and like they're having concentration difficulties. And so sometimes that can be related to, like, the self-injurious behavior that I talked about, which also I didn't feel like was well documented in the records. And so that was also something I was able to get from her.

> I'm not sure how the questions were asked but that was really important because in all of her medical records, she did deny suicidal ideation. And it was really the only symptom that she reported to me that seemed to be denied to medical providers.
> …
> But I felt like she was much more transparent with me about her suicidal ideation and self-injurious behaviors that I otherwise might not have gotten from the records.

(Edelson Decl., Ex. 3 at 4).

Similar to their accusation that Levi's *fiduciary abnegation* triggered their sudden need to depose J.C., the defendants regard Dr. Harris's failure to "ask" J.C. why she "had not disclosed *earlier* the new information about self-harm" as a ticket to a deposition. (MTR at 7) (emphasis added). They again do not explain how this fact relates if at all to the *extent* of J.C.'s current condition and functioning, particularly where – again – the defendants' had documents in their possession pointing toward J.C.'s suicidal ideation. (Decl., Ex. 6). And as a statement made for medical diagnosis or treatment under FRE 803(3), the defendants may examine Dr. Harris on J.C.'s statements at trial.[12]

### B. Plaintiff's October 3 discovery responses provide no basis for reconsideration of the prior orders.

Consistent with their pattern, the defendants again waited seven weeks to manufacture a discovery crisis over Plaintiff's discovery responses – after the close of a discovery deadline

---

[12] The defendants' contention that J.C.'s statement are inadmissible under FRE 703 simply overlooks FRE 803(3).

13 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUT pc
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

extended at their request. At this juncture, the Court should deny the defendants' stale request for supplemental responses because the burden and expense outweighs the benefit. *See* Fed. R. Civ. P. 26(b)(1), 26(c)(1)(A). If the Court does not so find, then the following points are relevant.

### Responses to second set of interrogatories.

Without reference to the objections, the defendants claim that interrogatory responses 14 – 17, 19, 21 – 23 are insufficient primarily because they "merely refer to the pleadings." That is inaccurate. For example, interrogatory # 14 demanded Plaintiff to "describe each and every instance of inappropriate physical discipline" that J.C. "experienced" in the Spicer-McCool home. Plaintiff objected because to "describe" all such instances is tantamount to "state all facts," which runs afoul of LR 33-1(d). In response, without waiver of the objections, Plaintiff identified J.C.'s treatment records produced by the defendants, cited the answers to interrogatories (## 18, 19, 23), and provided page/line citations to deposition testimony elicited by the defendants – in addition to referencing the allegations in FAC ¶¶ 35-37.

The defendants' interrogatories ## 15, 17, 18, 19, 20 and 21 borrowed language from numbered paragraphs in the FAC and asked Plaintiff to identify/describe pertinent witnesses and information. For example, interrogatory # 21 demanded that Plaintiff "identify all of the 'providers and parties'" who Plaintiff contends "O'Brien told that J.C. had lied under oath as alleged in paragraph 103." In response, Plaintiff restated ¶ 103 for clarity and identified the numerous providers and parties – all of whom were already known to the defendants.[13] Thus, the defendants' belated complaint that Plaintiff's responses "merely referred" to the FAC lacks accuracy.

The defendants charge that Plaintiff's responses to interrogatories ## 14 and 18 are insufficient because Plaintiff failed to make "reasonable efforts" to obtain responsive information

---

[13] (*See* Edelson Decl., Ex. 4 at 9) (Plf. Resp. to Interrogatory # 21: "The deposition testimony and Ms. O'Brien's communications identify various providers and parties known to date, such as Ms. Mykael Burford, Ms. April Clark, (potentially, Ms. Gonzalez), Mr. Stephen Hammond, Judge McAlpin, Ms. Yolanda Mulhern, Ms. Sara Rich, Mr. Stephen Shepherd, Dr. Erick Sorenson, Ms. Traci Stockman and/or Ms. Lee Anne Wichmann.").

14 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER



"*from J.C.*" [14] Plaintiff does not believe that the interrogatories required Levi to interrogate J.C. The Court has already ruled that he is a non-percipient witness. He is not trained to elicit or develop J.C.'s thought processes or "experiences" – and thereby become subject to the same criticism that the defendants level at Dr. Harris. Levi has consistently stated that he defers to treating providers and Rule 26 experts. As stated above, the defendants have deposed J.C.'s treating providers and they have deposed Dr. Harris. The Court should not require Levi to now interrogate J.C. on "what [] happened to J.C. herself when she was in the Spicer-McCool" foster home. *See* Rule 26(b)(2)(C)(i); Rule 26(c)(1)(A).

### *Response to requests for admissions.*

The defendants also charge that Plaintiff's responses to requests for admission ## 1 – 6 and 10 are "unresponsive." That is not the case.

For example, request for admission #1 demanded that Plaintiff admit that McCool did not sexually abuse J.C. Plaintiff objected because the defendants failed to define "sexually abuse." Without waiving the objection, Plaintiff admitted that McCool did not subject J.C. to inappropriate sexual touching and that her unmitigated sexual abuse history, her husband's unchecked use of pornography and her recent founded allegation for exposing children to a sex offender (as reflected in the provider file) posed a threat of harm to J.C. – which is abuse. [15] The defendants may differ whether the conduct is sexual abuse, but that does not mean the answer is unresponsive under Rule 36. The same reasoning applies to requests ## 2 – 5, which pertain to "physical abuse," and request # 10, which pertains to "withheld food," e.g., that food shaming was a prohibited form of emotional

---

[14] Plaintiff's response to interrogatory # 18 states that "as of January 10, 2019, J.C. was saying that O'Brien regarded her as a liar." This date is found in Clark's notes, the defendants deposed her twice, and Plaintiff identified the providers that O'Brien lied to in response to interrogatory # 21. (*Id*. at 4-6). The defendants' insistence that Plaintiff amend his responses to supply information that has already been provided is harassment.

[15] *See* ORS 419B.005 (1)(a)(G) (defining the term "abuse" to include "[t]hreatened harm to a child, which means subjecting a child to a substantial risk of harm to the child's health of welfare.").

15 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
    MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

and physical abuse, discipline and punishment.[16].

The defendants find fault with Plaintiffs' response to request for admission # 9, which demanded Plaintiff to admit that J.C. "was never forced to run for as long as 100 minutes without a break." Unable to definitively admit to the defendants' arbitrary "100 minutes," Plaintiff responded that J.C. and other children were repeatedly forced to run excessive laps around and around the yard as a prohibited form of emotional and physical abuse. (Edelson Decl., Ex. 4 at 22). This response is consistent with the Spicer-McCool provider file and DHS's child welfare procedure manual.

The defendants also seek to compel Plaintiff to correct their own mistakes. For example, request # 12 demanded Plaintiff admit that "*J.C. did not know* prior to filing this lawsuit that O'Brien 'told various providers and parties of her belief that J.C. had lied under oath' as alleged in paragraph 104 of the Amended Complaint." (*Id*. at 23) (emphasis added). Plaintiff correctly responded that ¶ 104 does not allege the allegation and there is no Amended Complaint on file. The same is true for requests # 11 and 13. The defendants did not serve amended requests to correct their errors, and instead waited until November 21 to "stipulate," in retrospect, that they committed "scrivener's error." Despite acknowledging that they cited the incorrect paragraphs, the defendants argue that the Court should now – after the close of discovery extended at their request - "order plaintiff . . . to fairly respond to the substance of the matter, as required by rule." (*Id*. at 5). The Court should deny the defendants' self-serving offer to "stipulate" to their own errors and create more work while their dispositive motions are pending.

At this juncture, the defendants' attempt to force Plaintiff to revise the supplemental interrogatory response and October 3 discovery responses serves no legitimate purpose. The

---

[16] The defendants' argument regarding response # 6 is unpersuasive as well. Plaintiff was asked to admit whether "no other resident" in the Spicer-McCool home "physically abused J.C." Plaintiff objected that "no other resident" was vague. Without waiver of the objection, Plaintiff admitted that "no other foster child . . . physically assaulted J.C." And previously, in response to requests ## 4 – 5, Plaintiff admitted that neither Spicer nor McCool physically assaulted J.C. (Edelson Decl., Ex. 4 at 21-22).

16 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
  MOTION TO RECONSIDER


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

defendant officials have already filed their motions for partial summary judgment on qualified immunity, which do not even mention Plaintiff's discovery responses. The defendants' arguments are stale and the Court should reject their attempt to profit by delay – at Plaintiff's expense.

**Supplemental response to interrogatory #2 in the first set of interrogatories.**

The defendants' first set of interrogatories, interrogatory # 2, requested Plaintiff to "identify all of the current or former employees of ODHS You have spoken with regarding the allegations in the Complaint." Plaintiff's March 15, 2024 response objected primarily on two grounds: (i) the definition of "You" to include Mr. Levi, J.C., and "their attorneys and any agents" was vague and overbroad; and (ii) the information work product.

The defendants' April 3, 2024 discovery motion claimed that "facts are not privileged" and that their "You" definition was not overbroad (ECF 116 at 4). Plaintiff opposed the motion on April 18, 2024, (ECF 129). The Court ruled that Plaintiff's response to interrogatory # 2 was not work product or otherwise privileged. (7/12/24 Order, ECF 157). The Court did not overrule the objection to "You." Plaintiff supplemented the response on July 23, 2024, as ordered. Consistent with the fact that Levi did not personally investigate the claims, Plaintiff answered that Levi did not speak with such employees. (Edelson Decl., Ex. 4 at 27). Plaintiff did not believe that the order required the undersigned and "agents" disclose confidential investigative sources. The defendants apparently agreed, until shortly before the November 22 hearing.

**C. *In the alternative, the Court should limit the taking of any deposition of J.C.***

Unlike the deposition they took of mother, forcing her to relive in extraordinary detail her past traumas, the defendants submit that, if given the chance, they will depose J.C. with "compassion" and with "sensitivity." However, the defendants wish to interrogate J.C. about when she "recognized" that Raygosa's conduct was "wrong," and why she didn't previously report her suicidal ideation when she was nine-years old. In making these plans, one may rightfully question the defendants' statement that they "do not wish to retraumatize or exacerbate the impacts of anything negative that J.C. has experienced." (MTR at 8). And the defendants' mention of "any

17 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS' MOTION TO RECONSIDER



number of reasonable guardrails" omit identification of appropriate topics and questions. (*Id.*).

As Plaintiff referenced previously in the response to the motion to compel J.C.'s deposition, if the Court allows the deposition it should impose the following, specific guardrails:

**Limitations on Scope** – the defendants should be precluded from inquiring of J.C. about the following topics:

    a. *Extent of injuries.* As they repeat throughout the MTR, a deposition of J.C. should be limited to J.C.'s current condition and functioning.

    b. *Details of the Sexual Abuse.* The defendants may not require J.C. to retell (or relive) her admitted sexual abuse in the Duncan-Raygosa foster home.

    c. *Liability Questions.* The defendants should be foreclosed from asking J.C. questions about the mindset or liability of state defendants, such as an apparent *absence* of *any prior disclosures* or *timing* when she thought Raygosa's conduct was *wrong*. Those questions do nothing to elucidate liability or causation, particularly in light of the extensive documentation referenced above.

    d. *Communications with Counsel and Legal Representatives.* The defendants should be foreclosed from interrogating J.C. on what she has discussed with Mr. Levi or his counsel.

    e. The defendants should be required to furnish "a preview of the questions to be asked at deposition," as described in *Kuyper*,[17] and exhibits to be shown to J.C. so that issues can be resolved in advance to avoid conflict to the extent possible.

**Limitations on Manner** – the Court should also impose the following reasonable restrictions:

    f. *Location* – The deposition should be held in a location of J.C.'s choosing.

---

[17] *See Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty.*, No. 09-CV-00342-PAB-MEH, 2010 WL 4038831 (D. Colo. Oct. 14, 2010) (citing *Gray v. Howlett Lumber Co.*, 23 Mass. L. Rep. 56 (2007)).

18 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
     MOTION TO RECONSIDER



RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

g. *Length* – The deposition should not exceed two hours.

h. *Support person* – J.C. may have one (or more) support persons, in addition to counsel and Conservator, to provide comfort and support.

i. *Breaks* – J.C. may take breaks as needed and may discontinue the deposition if needed.

j. *No video recording* – The defendants may not video record the deposition. J.C. has already had three video-recorded forensic interviews.

k. *Designations* – The deposition should be considered Highly Confidential under the Protective Order in place.

## CONCLUSION

The Court should deny the defendants' motion to reconsider. If the Court is inclined to grant the motion, the Court should impose the limitations on the deposition in the manner stated above.

Dated: December 18, 2024.

By: */s/ Steven Rizzo*
Mr. Steven Rizzo

19 – PLAINTIFF LEVI'S RESPONSE TO DEFENDANTS'
MOTION TO RECONSIDER

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI, | |
| Plaintiff, | CASE NO. 6:22-cv-01813-MK |
| v. | *Lead Case* |
| KIM CHAPMAN, et al., | **CERTIFICATE OF SERVICE** |
| Defendants. | |
| OREGON DEPARTMENT OF HUMAN SERVICES, et al., | |
| Third-Party Plaintiffs, | |
| v. | |
| JOE ALBERT RAYGOSA, | |
| Third-Party Defendant. | |
| SHANNON CONLEY, Conservator for Z.C., a minor, | CASE NO. 6:23-cv-01353-MK |
| Plaintiff, | *Trailing Case* |
| vs. | |
| KIM CHAPMAN et al., | |
| Defendants. | |

I am employed by the law firm of Rizzo Bosworth Eraut PC in Portland, Oregon.  I am over the age of eighteen years and not a party to the subject cause.  My business address is 1300 SW Sixth Avenue, Suite 330, Portland, OR 97201.

On the date below, I caused to be served on all parties in this action by transmitting a true copy thereof**: Plaintiff Levi's Response to Defendants' Motion to Reconsider**

1 – Certificate of Service

**<u>VIA ECF & EMAIL</u>**

| | |
|---|---|
| Jill Schneider<br>Nicholas S. Mancuso<br>Michelle Watkins<br>Oregon Department of Justice<br>100 SW Market Street<br>Portland, OR 97201<br>Ph. 971-673-1880<br>Fax: 971-673-5000<br>Email: jill.schneider@doj.state.or.us<br>Email: nicholas.mancuso@doj.state.or.us<br>Email: michelle.watkins@doj.state.or.us<br>*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services* | Lauren Blaesing<br>Harry B. Wilson<br>Alexandra Rhee<br>Chad Naso<br>Jeffrey Edelson<br>Anit Jindal<br>Markowitz Herbold PC<br>1455 SW Broadway<br>Ste. 1990<br>Portland, OR. 97201<br>Ph: 503-295-3085<br>Email: laurenblaesing@markowitzherbold.com<br>Email: harrywilson@markowitzherbold.com<br>Email: alexrhee@markowitzherbold.com<br>Email: chadnaso@markowitzherbold.com<br>Email: jeffedelson@markowitzherbold.com<br>Email: anitjindal@markowitzherbold.com<br>*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services* |
| Nicole A.W. Abercrombie<br>Jon W. Monson<br>Cable Huston LLP<br>1455 SW Broadway, Suite 1500<br>Portland, OR 97201<br>Ph. 503-224-3092<br>Fax: 503-224-3176<br>Email: jmonson@cablehuston.com<br>Email: nabercrombie@cablehuston.com<br>*Of Attorneys for Defendant O'Brien* | |
| Bonnie Richardson<br>Marissa Korbel<br>Manuella Tshala<br>Allegiant Law<br>100 SW Main Street, Ste. 400<br>Portland, OR. 97204<br>Ph. 503-546-4637<br>Email: bonnie@allegiantlaw.com<br>Email: marissa@allegiantlaw.com<br>Email: manuella@allegiantlaw.com<br>*Of Attorneys for Plaintiff Conley* | |

Dated this 18th day of December, 2024.

 *s/Shelley Maddox*
Shelley Maddox, Paralegal

2 – Certificate of Service