IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI, | ) |
| Plaintiff, | ) No. 6:22-cv-01813-MTK |
| v. | ) December 20, 2024 |
| KIM CHAPMAN, et al., | ) Eugene, Oregon |
| Defendants. | ) |
| _____ | ) |
| OREGON DEPARTMENT OF HUMAN SERVICES, | ) |
| Third-Party Plaintiff, | ) |
| v. | ) |
| JOE ALBERT RAYGOSA, | ) |
| Third-Party Defendant. | ) |
| _____ | ) |
| SHANNON CONLEY, | ) No. 6:23-cv-01335-MTK |
| Plaintiff, | ) |
| v. | ) |
| KIM CHAPMAN, et al., | ) |
| Defendants. | ) |

**TRANSCRIPT OF PROCEEDINGS**
(Status Conference by videoconference)

BEFORE THE HONORABLE MUSTAFA T. KASUBHAI
UNITED STATES DISTRICT COURT JUDGE

**COURT REPORTER:**  Kellie M. Humiston

**A P P E A R A N C E S - i**

FOR THE PLAINTIFF LEVI:
                    RIZZO MATTINGLY BOSWORTH
                    By:  Steven V. Rizzo
                    1300 SW Sixth Avenue
                    Suite 330
                    Portland, OR 97201


FOR THE PLAINTIFF LEVI:
                    RIZZO MATTINGLY BOSWORTH
                    By:  Mary Skjelset
                    1300 SW Sixth Avenue
                    Suite 330
                    Portland, OR 97201


FOR THE PLAINTIFF CONLEY:
                    ALLEGIANT LAW
                    By:  Marissa Korbel
                    100 SW Main Street
                    Suite 400
                    Portland, OR 97204


FOR THE PLAINTIFF CONLEY:
                    ALLEGIANT LAW
                    By:  Manuella M. Tshala
                    100 SW Main Street
                    Suite 400
                    Portland, OR 97204

**A P P E A R A N C E S - ii**

FOR THE DEFENDANT TIBBETTS:
                    MARKOWITZ HERBOLD
                    By:  Jeffrey M. Edelson
                    1455 SW Broadway
                    Suite 1900
                    Portland, OR 97201

FOR THE DEFENDANT TIBBETTS:
                    MARKOWITZ HERBOLD
                    By:  Alexandra Rhee
                    1455 SW Broadway
                    Suite 1900
                    Portland, OR 97201

FOR THE DEFENDANT TIBBETTS:
                    MARKOWITZ HERBOLD
                    By:  Harry B. Wilson
                    1455 SW Broadway
                    Suite 1900
                    Portland, OR 97201

FOR THE DEFENDANT O'BRIEN:
                    CABLE HUSTON
                    By:  Jonathan W. Monson
                    1455 SW Broadway
                    Suite 1500
                    Portland, OR 97201

(December 20, 2024, 9:41 a.m.)

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  The United States District Court for the District of Oregon is now in session, the Honorable Mustafa T. Kasubhai presiding.

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Now is the time set for Civil Case Number 22-01813 and 23-01353, Levi v. Chapman, et al., and Conley v. Chapman, et al., for a status conference.

THE COURT:  Good morning, counsel.  Let's see.  Who do we have?  Plaintiff's for Levi, plaintiff's counsel for Conley, and I think we have our defense counsel.  Anyone else planning on attending or do we have everyone here for plaintiff's counsel Levi?  We have I think it's Ms. Skjelset and Mr. Rizzo?  All right.

Okay.  I think everyone -- anyone who needs to be here who has probably something to say and then some, I think, is present, so let's get underway.

I have your letters identifying several of the issues that you want to take up today.  The three primary ones that have been briefed previously include the motion to reconsider, the deposition of JC, the motions to consolidate, and then also the issues with respect to the Figoten expert testimony, specifically the motion to strike the testimony or the witness

themselves.

And I know that there are other issues that we'll be needing to take up, including the request -- defendants' request for the plaintiff -- ordering the plaintiffs to complete interrogatories as outlined in the November 21 letter from Mr. Wilson and then a few other matters that will fall into place depending on my decisions as we proceed today.

I know that there were some specifics that I haven't identified, but I do intend on addressing every -- as much, if not everything, laid out in the letters that counsel have sent me.

Was there something not in the letters that somebody has identified that should be included on our agenda today? I'll start with plaintiff's counsel first for Levi. Ms. Skjelset?

MR. RIZZO:  Judge, I'll be -- I'll be arguing.  I drew -- I drew the straw this morning.  So I thought maybe we could take up -- there was mention of the notice of appeal that was just filed.  And the appellate lawyer for Ms. O'Brien is on the phone, just that his camera isn't working.  And I feel like, if the Court permits, we should address some of the issues and the fallout of that notice, because it pours over into our ability to effectively respond to the summary judgment and my need to retain appellate counsel to advise me about what to do.  And given the holidays, I'm going to need

some time to do that.

And I'd also like to talk with the Court or at least explore with the Court how to address the issue -- it's somewhat vague to me, but the issues raised in Mr. Monson's letter to the Court and determine whether I can amend or seek to amend the pleading to address those issues and potentially alleviate this apparent concern and interpretation of the Court's order with respect to the absolute immunity issue so that this case can -- this child can get justice and this case can proceed on a more timely basis to trial.

THE COURT: All right. Is it Mr. Monson that's on the line but not on video?

MR. MONSON: Yes, Your Honor. And I apologize. I had hoped to appear by video, but my camera does not seem to be cooperating this morning.

THE COURT: Okay. I don't have your letter. I'm going to get a printout of it so I can at least take a glance at it and get familiar with some of the issues. All right. So the appeal issues with respect to O'Brien.

Anything else? Any other different -- I'm not taking argument on that topic. I just want to make sure I identify any other agenda items that were not on the -- were not included in the letters.

Okay. I did identify Levi specifically, it was. Conley, plaintiff's counsel, anything?

And then defense counsel.

Okay.  Well, why don't we take up this last issue first, the issue with respect to the appeal for O'Brien.  Mr. Rizzo, why don't you identify more specifically what the concerns are and what we might need to be doing going forward.

MR. RIZZO:  Thank you, Judge.  We have -- the Court's getting it now.  We received this letter from Mr. Monson and we did have the conferral yesterday.  And as I understand it, Defendant O'Brien has retained separate counsel and is appealing from the Court's order denying the motion to dismiss and/or strike with respect to certain allegations concerning O'Brien's involvement vis-a-vis the criminal trial at which the defendants admit Raygosa was convicted and at which the defendants' CPS worker testified in support of the prosecution.

And Mr. Monson's letter cites -- and this is -- I believe is significant, he cites in the parenthetical at the very bottom on the first page, Judge, CEGFAC, meaning first amended complaint, paragraphs 100 to 103.

And in connection with the conferral yesterday, counsel believes that the Court's order effectively denied O'Brien absolute immunity, to which counsel claims, or O'Brien claims that she is entitled based on the, for example, allegations 100 to 103, and that that appeal divests the Court of jurisdictions over that particular set of issues.

Now, with respect to the conferral, we also learned that counsel cites case law, which we appreciated receiving yesterday evening, where the claim is that those allegations, O'Brien's conduct in connection with those allegations is inextricably intertwined with her trial testimony.  So, for example, her casework -- aspects of her casework in connection with JC's disclosure and her reporting to the dependency court and meeting with and talking with JC's counselors, et cetera, some or all of that -- and by the way, in which we allege, right, that she withheld information bearing on JC's condition as well as her credibility -- we understand that those allegations and that evidence cannot be used, because the Court, based on the notice of appeal, has lost jurisdiction over that subset.  And that subset, I believe, needs to be defined.  We're going to have to work that out with counsel and obviously with Your Honor, otherwise, we can't --

THE COURT:  I need to interrupt.  Is this a problem that then needs to be addressed today or are you suggesting that you need to confer with Mr. Monson before any -- any issues are taken up for my decision?

MR. RIZZO:  Well, it's a little of both.  It's -- I feel like currently I can't --

THE COURT:  What are the specific questions you're asking me to decide today?  I mean, I get some of the context.  I mean, one of the things as I have pondered the impact of the

interlocutory appeal is that evidence is evidence, the right -- or the right not to be sued with respect to immunity is something separate from that which ought to be considered as evidence in separate claims.

So I get that right now Ms. O'Brien, her role as a defendant with respect to her testimony at the criminal matter may not be before the court or a jury to consider when we go forward with trial, but there may very well be admissible evidence associated with the circumstances.  That's something that we would have to take up at some later date, I imagine, when we address motions in limine.

MR. RIZZO:  That was my understanding, Your Honor.  I don't believe that's Defendant O'Brien's understanding, and that --

THE COURT:  Okay.

MR. RIZZO:  -- the Court has no -- no jurisdiction to act, and therefore, we're in limbo at this moment about what it is --

THE COURT:  So no jurisdiction to act on what?  To require that Ms. O'Brien appear as a witness, at least a witness, if not a defendant, with respect to any other claims that may be made against her at the trial, or is it something that I do not act on any -- any claims associated with -- with her testimony as a witness in that criminal matter?  Claims, not the actual necessarily the testimony, the claims

themselves if the Court of Appeals disagrees and finds that she enjoys immunity, although I do understand that the plaintiffs did not take the position that it was making a claim against her for her testimony at trial.

MR. RIZZO:  Right.

THE COURT:  So, I mean, I think there's a very fine distinction here that will be argued at the appellate level. I'm just interested in what evidence gets into trial here in the Levi and Conley matters and whether Ms. O'Brien testifies on those points, I mean, you know, so you can prove your case and the defendants can also adequately respond as needed.

So I'm not really sure I understand what the issues are.  Perhaps Mr. Monson can explain to me what it means to di- -- I want to make -- the court -- the interlocutory appeal divests the district court of jurisdiction over the particular issues involved in that appeal, although that's actually citing -- that's citing -- it's a parenthetical describing a case.

So, Mr. Monson -- actually, you do discuss that further up in that third paragraph.  Filing of the notice of appeal automatically divests the Court of jurisdiction over the portion of the Levi case involving Ms. O'Brien's alleged actions with the Raygosa criminal trial.

So -- so let me also just make sure everyone understands.  Right now I think it's -- I'm less interested in

trying to understand the intellectual or finer nuanced legal arguments.  Tell me what you specifically think practically your position will look like at the Levi and Conley trials.

MR. MONSON:  Yes, Your Honor.  I think the -- our position is that this Court, pending the outcome of that appeal, would not have the jurisdiction to consider evidence at trial related to that subset of allegations.

The -- you know, Ms. O'Brien's actions at the criminal trial really principally related to paragraphs 103 and 104 in the complaint, which discuss, you know, the alleged case note she created that is alleged to have been created for the trial, the actions she took cooperating with prosecutors to produce that exculpatory evidence, and then the -- the actual testimony, you know, that she participated in trial or her role at all in participating in trial.

And I think the distinction, Your Honor, as you mentioned, in our view is not simply an evidentiary issue that can be decided at trial, because an absolute immunity is both an immunity from liability, but also an immunity from suit, and that if -- you know, I don't want to get too far in the weeds, because there would -- you know, we could, of course, provide briefing on this if you'd like, but the scope of the immunity prevents admission of evidence that would be subject to immunity.  In other words, the plaintiffs could, in our view, not make the argument that evidence that would otherwise

be within the scope of immunity could be admitted because it was relevant to some other issue in the case or some other claim in the case --

THE COURT:  You're suggesting that O'Brien could not be compelled to appear at any of these trials as a witness?

MR. MONSON:  Only -- only with respect to that subset of allegations.  We are not taking the position that she could not be compelled to -- to testify on other issues unrelated to her actions as alleged in the complaint at the Raygosa criminal trial -- or in connection with the Raygosa criminal trial.  We're not taking the position that --

THE COURT:  Well, we'll need to -- we'll need to brief this matter a little bit more fully, then, because I'm not sure I see it that same way.  I mean, evidence can be offered for multiple purposes, and to the extent that Ms. O'Brien's cases -- the claim against her as a defendant is on appeal on the basis of witness immunity, you know, limits or eliminates her, you know, exposure to suit, but I don't think that -- that eliminates the existence of that evidence from consideration on all the other claims for which it may otherwise be relevant.

So I've shown you my cards.  Now you will know how to at least argue some of these points when we talk about briefing on this question.  I don't know when we'll actually take up briefing on that question.  I'm hoping to try to keep

our sights on moving Levi and Conley to trial first and foremost. And this may very well end up becoming more of an evidentiary matter that we'll need to take up during our pretrial conference, perhaps sooner so you all know what to do with the O'Brien testimony in advance. All right. Thank you, Mr. Monson.

Well, I thought that would resolve something, although I think it has resolved the need for -- for more discussions and research on this -- on that question.

Was there anything else -- again, I'm interested in practical nuts and bolts impact and consequences that anyone sees we need to think about for these two trials involving the O'Brien interlocutory appeal. Mr. Rizzo?

MR. RIZZO: Judge, as I mentioned earlier, we're going to need at this point additional time now to retain counsel, ferret out the issues that the Court just addressed in the subsequent briefing before we feel like we can come back fairly online and contest the summary judgment motions that are pending against the plaintiffs.

THE COURT: All right. And what is your response to summary judgment motions due now?

MR. RIZZO: I think we're due -- go ahead -- 12/28?

THE COURT: Okay. Well, I don't think you're going to get the information you need in time to file a complete response. All right. So this also in its own right certainly

raises the question of needing to postpone the Levi trial now anyway.

MR. RIZZO:  That's -- that's the function of the -- the end result of the appeal, Your Honor.

THE COURT:  Okay.  Well, then why don't we -- that's just a fine segue into the motion to consolidate, then.  And if I recall the briefing or the letter, Mr. Wilson, that you drafted, you suggested that the Levi case -- the Levi trial should be scheduled in that same timeframe as the Conley case is currently scheduled and that the Conley matter ought to be pushed out to fall some time, but if I consolidate, then we're going to be trying them at the same time.

Other than the briefs that have been submitted, are there any other additional arguments on the motion to consolidate and the response?  I'll start with the moving party.  Mr. Wilson, are you leading on the motion to consolidate issue or is it Mr. Edelson or is it -- I think we have a new defense lawyer showing up here, Ms. Rhee.

MR. WILSON:  I am leading, Your Honor, but I am not the moving party, so I will -- I'm the -- I will defer to the moving party at this time.

THE COURT:  Oh, I'm sorry.  You're right.  You're the opposing party.

All right.  Plaintiffs, Ms. Skjelset -- or, no. Mr. Rizzo drew the straw, right.

MR. RIZZO:  It is, Judge.  I -- Your Honor, I --

THE COURT:  I don't need to rehash the arguments that have been raised.  I think we've been talking about efficiencies and timeliness on both of these cases for the last couple of years, so I'm familiar with what's in the briefs.  So if there's anything else that you think would be helpful for me to be aware of before we come to a final decision, let me know what that is.

MR. RIZZO:  I did prepare, Your Honor, a 25-page essay that I wanted to read, Judge, but --

THE COURT:  Only if it's in Iambic pentameter.  I have a special fondness for poetry.

MR. RIZZO:  All right.  Well, I appreciate that.  And all I want to say is the level of sameness extends from the children's family all the way up through all of the placements, the same treaters, the same counselors, relatively the same claims arising from the same set of facts, and the Court can handle with jury instructions the distinction between federal claims and state claims vis-a-vis the officials in DHS.

And I could go into much more detail, but the Court has obviously already read this, but there's overwhelming reasons not to complicate and cause plaintiffs further expense in these cases to try them separately simply because JC was sexually abused and ZC was emotionally and physically and

sexually abused as well in the subsequent home.  There's every reason to try these cases together.

THE COURT:  If -- if the plaintiffs had been in the first instance joined in an original complaint, do you think the argument for bifurcation would have merit?

MR. RIZZO:  Looking back --

THE COURT:  If at the very beginning of both of these cases, plaintiffs' counsel filed a complaint naming both JC and ZC as plaintiffs and all of the defendants that have been named in both cases as defendants in the caption and then all the allegations essentially merged between the two complaints, what would be the argument that the defendants would make for bifurcation of the plaintiffs' claim -- of the two plaintiffs' claims?  Are they essentially the same as their reason for objecting to consolidation or is there anything else?

MR. RIZZO:  Are you asking the defense, Your Honor, or did you want me to --

THE COURT:  I'm asking you to help make their argument.

MR. RIZZO:  I -- I think there would be a minimal basis for the defendants to want to bifurcate had -- had the children been joined in the same pleading.  I mean, we would be at the same -- we are at the same place now we would have been then.

THE COURT:  And the same arguments for and against

consolidation can just simply be applied in the reverse if this case -- if we were, in fact, dealing with bifurcation today?

MR. RIZZO:  I would presume that unless the defendants can have something to say about it, but that would be my -- my take on it.

THE COURT:  Let me give the Conley counsel an opportunity to weigh in.  Anything different, additional to that which you provided in your briefs on the motion to consolidate?

MS. KORBEL:  No, Your Honor.  Just in response to defendants' response, I believe that they have a distorted view of what ZC's case actually is, or the case we intend to present.  And the fact is we have all of the same witnesses, we have all of the same evidence, and so I -- I would just ask Your Honor not to take the defendants' characterization of what ZC's case is, and actually look to plaintiffs to define their own case.  And that's all I have to add.

THE COURT:  All right.  And defense counsel, Mr. Wilson?

MR. WILSON:  Thank you, Your Honor.  We respectfully disagree that these cases have all the same witnesses.  In fact, Your Honor, the very important differences that will take place in this case are the differences in the nature of the alleged injuries, the cause of some of those injuries, and

the damages resulting from those injuries.  And the witnesses who will testify to the damages and harms are different.

Plaintiff Levi has three expert witnesses who will testify to the harms and damages suffered by JC, and ZC has a separate expert witness who will testify about harms and damages suffered by ZC.

So there are different facts, there are different witnesses, and there is a danger -- and I will just point out this one cite in our briefing, because I think it's a particularly important one for Your Honor to consider, and that's the cite to the *Garrity* case, which can be found on page 7 of our briefing, and it's the potential that the jury may impute certain facts from one case to another.

And this is the important issue for us, Your Honor, it is the danger that the jury may impute facts or testimony from experts from one case to the damages of the plaintiff in the other case.

THE COURT:  Can you point to facts that have been developed, evidence that's been developed to date in the course of discovery that would serve as a striking example of that concern you've just raised?

MR. WILSON:  I think the most -- the easiest one to point to, Your Honor, is probably also the most obvious, and that's simply that in the Levi case, there will be experts testifying to the nature and extent of the harms suffered by

JC and the resulting damages and -- and number, you know, the amount that Plaintiff Levi is claiming. And then in the Conley case, there is a different expert who will be testifying to the nature and extent of harm and the resulting financial damages.

And we, Your Honor, envision that at the -- as this case goes to the jury, there will be, if it's consolidated, an extraordinarily complicated verdict form that will have the jury walk through 15 different claims for relief and require the jury to sort out which of six different defendants is responsible for damages suffered by two different plaintiffs, and we think that that presents a very high likelihood of jury confusion. It's tough. It's complicated. There will be a lot of jury instructions to be read. There are many different claims.

And to give you an example, in the Levi case, there are two negligence claims alleged against DHS, and in the Conley case, there are negligence claims alleged against five individual defendants. And those claims sound similar, but they are against different defendants.

And we think it's very important, especially for the individual defendants who face potential judgments that could affect their livelihood in the future, that the jury is able to carefully consider the claims that have been made against them and reach a conclusion based on clear -- a clear

presentation of jury instructions and verdict form.

THE COURT:  Could some of that be ameliorated by having two separate verdict forms?

MR. RIZZO:  Exactly.

MR. WILSON:  Well, it could be, I guess, Your Honor, that you could have two separate verdict forms, but I don't think two separate verdict forms overall reduces the number. One way or the other, the jury has to answer all the questions whether it's on one form or the other, so I don't -- I respectfully don't think that that would alleviate too much of the problem.

THE COURT:  Okay.  And any other comments not otherwise included in the briefs that you think would be helpful in my understanding defendants' positions on consolidation?

MR. WILSON:  Your Honor, I think we've otherwise made -- we'll rest on our briefs.

THE COURT:  Thank you.

Anything else from plaintiffs?

MR. RIZZO:  Just --

THE COURT:  Go ahead, Mr. Rizzo.

MR. RIZZO:  Just that my experience in multi-party trials, Your Honor, is -- has been satisfactory from both plaintiffs and defendants.  The courts can use separate verdict forms.  To the extent there's a unique issue, the

Court can issue a special interrogatory.  I have confidence in the jury system, having tried cases.  I don't think the number of defendants based on the two plaintiffs, given the overlap in the facts, is going to confuse anyone, particularly when they're properly instructed.

THE COURT:  All right.  Anything from the Conley counsel?

MS. KORBEL:  No.  Thank you.

THE COURT:  Counsel, the motion to consolidate is granted.  I do find that while there are some complexities associated with each of the cases, the joining, the consolidation of these two cases does not so increase the level of complexity such that the value, the benefit of both judicial efficiency and economy, but for the Court's time, frankly, being the most minimal of considerations, but really the amount of time and effort and cost associated with all counsel here having to try two separate cases versus one consolidated case, even if it's a bit longer, can -- can bring about, you know, a sufficient level of timesaving that would assist in getting these cases resolved without waiting an additional year between the time in which these cases can be tried.

And I say that because my fall is already booked with trials, and so I'd be concerned about even trying to look for another set of dates for another three-week trial down the

road.

There is sufficient overlap -- and while I appreciate it's not an identical overlap between the number of witnesses or who will be testifying, there's sufficient overlap that the testimony about processes that expert witnesses may be giving are similar enough that I think both cases will enjoy that level of efficiency and consistency in how that will be regarded by jurors, and the kinds of damages that each of the plaintiffs have allegedly experienced are also again sufficiently distinct such that the jury won't be confused about who they're considering when evaluating damages.

I'm open to ensuring that any appropriate limiting instructions and clarifying instructions will be given to the jury to make sure they fully appreciate the distinction between the two plaintiffs as well as the distinctions between all of the defendants themselves, both individually or in their official capacities, or specifically with respect to the department of -- Oregon Department of Human Services.

All right.  With that motion granted, then the trial date is, and we've discussed, would be that of the Conley date, but I also (pause) -- and I'm opening up my calendar right now to take a look.

The trial is scheduled to start April 21 and it was scheduled to go through May 9th.  I recognize that a consolidated case -- a consolidated trial for these two cases

would likely take more than the time that you might have thought would have been necessary for just one.  The question is how much more time.  And don't tell me six weeks, because then we haven't realized any efficiencies by virtue of trying these together.

So let's start with plaintiffs' counsel first.  Since it's your motion to consolidate, I'm sure you've given it some thought about your cases in chief that would need to be presented.

MR. RIZZO:  Now I'm envisioning -- I have given that more thought, Judge.  So doing the best I can, I think our time -- I think both sides with respect to our case were fairly reasonable in terms of the length of the trial.  I have not personally studied the Conley experts, but I know there is overlap.  So I'm thinking out loud with Your Honor.  There will be additional witnesses with respect primarily to the damages, so I would assume there will be -- I anticipate between three and four additional days to put that direct on and allow the defendants to cross and/or redirect, but that -- as far as I can see now, I would say if the Court can budget another five days, five trial days, from my standpoint, that ought to cover both cases given the overlap.

THE COURT:  All right.  Mr. Wilson, Mr. Edelson, who's weighing in on this one?

MR. WILSON:  We believe four -- four weeks.  I think,

Mr. Rizzo, that if you add five days, you're contemplating four weeks, and I think we agree that that is an appropriate length for the trial.

THE COURT:  All right.  Anyone object, you can just signal to me that you want to say something in objection to those assessments.  Or disagreement.  "Objection" sounds too strong.

MR. RIZZO:  I was thinking it was closer to three weeks, Judge.

THE COURT:  Well, I have three weeks already scheduled for the Conley case.

MR. RIZZO:  Okay.

THE COURT:  So if Conley, you thought three weeks was going to be that which it took to complete its trial, then adding a week would make it four.  So let's revisit the assumption that Conley would have taken three weeks.  Conley.

MS. KORBEL:  I agree with Mr. Rizzo.  I think four weeks is more than adequate.  We should be fine.

THE COURT:  All right.  Well, then, do we tack it on at the end or at the beginning?  I think somebody -- I think Mr. Wilson wants it at the end rather than starting any earlier than April 21st.

MR. WILSON:  That would be our preference, Your Honor.

MR. RIZZO:  Levi is fine with that, Your Honor.

THE COURT:  All right.  So we'll --

MS. KORBEL:  Conley (indiscernible).

THE COURT:  We'll extend the trial for both cases beginning April 21st and I'll block out through May 16th.

I think our work pretrial will probably be more extensive, and I want to front load as much of the detail, including the scheduling of the trial itself, so we can make sure that we know when and -- well, who will be testifying when and for how much time, because I think it's going to be important to make sure that I assist in minimizing any confusion that the jury might have about -- about what testimony is relevant for which of the two plaintiffs.

Again, there's going to be testimony that's relevant for both, but then there's, as I think we've indicated and identified, damages will need to be clearly identified as distinct from one another.  So I'm going to ask you all to give some hard thought about how we can create enough of a line or a gap or even an instruction that I might give throughout the course of the trial when identifying, you know, how you -- how you might be switching gears between one plaintiff and another.  But that may not be the case for all testimony, too, so that raises this question about then what do we do if it's intended for both cases.

Give it some thought.  You've been -- you've all been down this road before.  I just want to make sure that we all

have the common understanding about how that will be communicated throughout the course of the trial.

I will issue trial management orders in both cases. I'm going to issue two separate trial management orders. I intend on having two separate sets of motions for the cases so I can make sure I'm clearly identifying my decisions and you know what my decisions are with respect to the issues raised in each of your separate cases.

We will need to set our pretrial conference. I think we need at least two days, unless you think we need more. Let me know that now. And I'd like to schedule it for March 6th and 7th. Any -- any problems with those dates? It will be in person here in Eugene. All right. It looks like plaintiffs are acknowledging availability. Any -- anything from the defendants?

MR. WILSON: Just checking our calendar, Your Honor. It does look like that will work for us as well.

THE COURT: Very good.

MS. KORBEL: Your Honor, I'm sorry. I'm having Ms. Richardson's calendar checked, because she's not in the office today, so just give me one more moment.

THE COURT: Okay.

MS. KORBEL: Thank you.

MR. RIZZO: Judge, Levi is fine with those dates.

THE COURT: Very good. All right. We'll just wait

on Ms. Richardson's, and if that works, then we can lock those two dates in.

MS. KORBEL:  We've got confirmation.  Thank you, Your Honor.

THE COURT:  All right.  So March 6th and 7th in person in Eugene.  My trial management order will backdate deadlines for submissions, and I'd like to try to get that issued actually by the end of the day if possible today so you'll know what those are going forward.

All right.  Let's take up the issue -- anything else on consolidation before we move on to the next issue, which will be reconsideration of the motion to compel JC's -- the order denying the motion to compel JC's deposition?

All right.  Let's move on to that point.  Mr. Wilson or Mr. Edelson.

MR. EDELSON:  Good morning, Your Honor.  Edelson here.  You know, I think I can -- I can really distill this down.  I'm sure you've read the materials and we've been over this a few times, but I think I can really distill it down to the simple fact that their expert witness spent eight hours interviewing JC and at the same time was telling us and the Court -- counsel was telling us that it would be too traumatic for JC to go through that kind of experience and potentially relive some traumatic events.  And, again, I'm --

THE COURT:  We don't know how JC fared after her

interview with Dr. Harris.

MR. EDELSON:  We do.  We know a little bit.  I'm not sure how much we shared with you.  I mean, apparently, you know, it -- she kind of lasted less than a full day, and they had to reschedule for another time.  So the first meeting was in person.  It sounded like JC started getting tired, and that's the point where I think Dr. Harris described it as some disassociation.  And they were able to reconvene via video and complete the -- complete the interview.  So we do know that much.

THE COURT:  Can you -- or does anyone know what that disassociation looked like or how it manifested?  I mean, being -- being tired might be -- well, actually, let's even move away from that.

Let me share with you what my thinking is so that way you can -- you can respond to, you know, how I'm trying to analyze this motion to reconsider.

There remains and continues to remain this untimeliness issue.  I recall pretty clearly that the request to take JC's deposition was on the eve of discovery closing, and that was my primary basis for having denied it at the time that it was taken up with me during a status conference.  And I offered a further clarification of my decision in written -- a written order that -- that also considered the unnecessary traumatic effect of being deposed on these issues relating to

her sexual abuse in light of this information being available from other sources that have been available for quite some time to both -- to all the parties.

And at that time, that had also been taken up to Judge Aiken. Judge Aiken agreed. And so there is some law of the case, but I also can appreciate that the motion for reconsideration is based on Dr. Harris and the fact that JC's been interviewed and evaluated by Dr. Harris at some time frame.

And I think the chronology for me -- and I'm not sure I'm clear of the chronology of when that interview with Dr. Harris took place. If it took place prior to the close of fact discovery, that might be relevant, and particularly relevant for me in assessing that that information might have been available already to defendants' counsel before the close of fact discovery.

If it was taken at some point after the close of fact discovery and certainly at the time, then, that expert disclosures were made and that was the first time that you became -- the defendants became aware of this interview with JC, then the -- the pivot for me is what new information, what material new information was obtained from that interview between Dr. Harris and JC that you wouldn't have had or didn't have prior to the close of fact discovery.

And I think you make a point that there was this

eight-hour interview, there was a lot of new information, but I'm not sure I understood what that new information was and how material it would have -- would be for the purposes of defending against the damage claim.

And if it's just damages alone or is it damages and when -- when somebody -- when the defendants should have -- if the argument is is that Dr. Harris opines on when disclosures by JC were made about -- about the sexual abuse, that might raise some issues that I can appreciate the plaintiff -- that the defendants have about earlier disclosures that you wouldn't have been aware of before the close of fact discovery.

So I threw a lot at you, and I also accept that it wasn't a terribly well-organized, shotgun approach to you, Mr. Edelson, but I have confidence that you can parse it out and --

MR. EDELSON:  I'll do my best.  And I unfortunately wasn't taking notes there, so let me work with what I've got, and you'll prompt me if I've left something out.

Let me just start where you started, which is the timing of the request.  And I know the words "eve of close of discovery" have come to become the language we've used here, but the truth is it was about a week before the close of discovery that we requested the deposition.  And I think it's important that we remember the context of that.  You were

really -- the plaintiffs were really pressuring you to get a trial set and set quickly, and Your Honor was willing to entertain that and has tried to and done everything to try to move the case along, but, you know, since that denial of JC's deposition, you know, I've lost count, but there have had -- we've had to have at least a dozen depositions since then, and there's still depositions going on now, and we've just set over trial.

So the pressure that we -- that you may have been feeling at the time that -- on timing that to the extent that impacted the decision, I think that is no longer a situation.

In terms of new information, we tried to articulate some of the items that were new to us. And, you know, I'll give you sort of a -- and let me describe -- go back to the timing issue. If I'm not mistaken, and, counsel, please correct me if I'm wrong, I believe the interviews by Dr. Harris happened well before the close of discovery. And I -- I suspect, and it may even be correct, that she had already prepared reports or at least preliminary reports that she would have shared with plaintiff's counsel but not with us. And --

THE COURT: Let's confirm that notion. Dr. Harris's interview with JC, did it take place before that, is it August 12th deadline?

MR. RIZZO: Yes, Your Honor.

THE COURT: Okay.

MR. RIZZO: It took place during -- during the fact discovery.

THE COURT: Okay. Thank you.

MR. RIZZO: And -- and to respond to counsel, and not to divulge work product, I don't believe -- and Ms. Skjelset was more closely involved. I don't believe we had any report from Dr. Harris --

THE COURT: Okay.

MR. RIZZO: -- prior to the disclosure.

THE COURT: Prior to expert disclosures?

MR. RIZZO: Right. I mean, there was -- right up at that point is when we reviewed and finalized, but -- but during the discovery, as Mr. Edelson was implying, the answer is no.

THE COURT: All right. Thank you.

Please continue, Mr. Edelson.

MR. EDELSON: Yeah. No. I -- I didn't know for certain, but -- but obviously counsel was aware that there were -- interviews were taking place even as late as when we were talking about taking her deposition. And that information was not shared with us or the Court that they had an expert who had spent eight hours with the witness already.

And, you know, counsel's right. I did raise this as a concern when we were asking for a stipulation in lieu of

deposition.  One of the stipulations we requested was that they can't -- they can't get JC's testimony -- they won't try to get JC's testimony in through hearsay.

And that really is the crux of the problem right now, from my perspective, is they want to use Dr. Harris to basically substitute for the percipient witness plaintiff's testimony about what happened and about any number of other relevant facts surrounding it and how it impacted her.

And -- and that's not to say that an expert shouldn't be able to testify about impacts, but I'm very concerned about their intent to call Dr. Harris to testify about what happened to JC when we're not getting an opportunity to depose JC and hear it from her directly and test that --

THE COURT:  Can I confirm, your -- your desire to take the deposition of JC rests solely on developing your defense on damages, not with respect to any other aspect of the claims?

MR. EDELSON:  I don't think that is correct.  I think there's some aspects and some things that came up in Dr. Harris's report that we would want to explore.  In particular, you know, and this kind of is an issue that sticks with me, you know, we took the dep -- when -- we -- Ms. Skjelset and I went to Texas to take the deposition of April and Ivan McCool -- or Spicer, I should say.  And -- and some of the facts that were revealed that JC revealed to

Dr. Harris apparently were not things that I knew, and I didn't -- wasn't able to ask questions about -- from the Spicers about the events.

And, for example, Dr. Harris speaks for the first time of a suicide attempt that supposedly happened at the Spicer home. I -- I didn't ask about that and nor did Ms. Skjelset at the deposition of the Spicers. And, you know, they're, of course, unavailable now presumably, given they're living outside the jurisdiction.

And so, you know, this is information, you know, we couldn't even get from the Spicers or ask them about, and -- and now we can't even ask -- we can't ask JC, who's now disclosing this for the first time.

And I saw counsel's reference to some -- some note about -- about taking pills or something or threatening to take pills. You know, that obviously -- I don't even know if that's the same event, and obviously that's not something that we saw or tied to the Spicer home.

And so, you know, we're working with needles in a haystack with some of these records. And, you know, I just feel like that kind of information keeping from us -- and I'm not blaming them being intentional about it, but just as a practical matter, not -- not being able -- it's so out of the ordinary not to be able to take a deposition of the witness who's making the claims. I mean, and we're not talking about

small claims.  These are -- these are tens of millions of dollar claims.

And, again, we have no interest in causing her greater trauma or -- you know, this -- we really just want a fair opportunity to ask questions (pause) --

THE COURT:  Now, you mentioned that it would be beyond the issue of damages or it may -- that the need to depose her is outside of the damages subject area.  What other areas would it be?

MR. EDELSON:  Well, I mean, there was -- that was -- the conditions that she experienced in the Spicer home clearly has now become an issue that we really need an opportunity to learn more about.

THE COURT:  And that's because of the amended complaint in JC's case?

MR. EDELSON:  Exactly.  I forgot to mention that all of that came in as well, and so that's -- that's become an issue for us.  You know, up until the time, in fact, I think when I took the deposition, the Spicer deposition, I don't even think they had those claims in there at that point.  We only had the -- we had the Conley case, but not JC and the Spicer.

THE COURT:  I think the amended complaint had been made prior to the depositions with Spicer and --

MR. EDELSON:  Oh, did it?  All right.  Well, I don't

recall that, but you're probably right.

MS. SKJELSET:  Just to quickly interject, that was the reason you got the additional deposition of Spicer --

MR. EDELSON:  Okay.

MS. SKJELSET:  -- was due to the amended complaint. So all of the allegations were there at the time.

MR. EDELSON:  But I'll point out, there's nothing in the amended complaint that says that the conditions were such that JC attempted suicide or contemplated suicide or anything like that.  So those -- it just -- it wasn't there.

And, again, I'm not accusing anyone of obscuring information.  I'm just acknowledging that there's information out there and there's an ordinary and orderly way to get it, and one of the ways is to talk to the victim themselves and get their story.  So, yeah --

THE COURT:  I'd like to ask the plaintiffs, and this might be now to Mr. Rizzo, I don't think anybody gave me Dr. Harris's report and I don't know -- and even if you did, I wouldn't be able to make a comparison between what she says JC reports to her in the interview with whatever else is in the record from discovery about JC's descriptions of her -- of her trauma and -- and how that affects the claim for damages.

So the question to Mr. Rizzo is are there -- are there additional descriptions of behavior, circumstance, you know, emotional trauma that JC reports, discloses to

Dr. Harris that -- that you can -- you can confidently say is found -- well, is everything that JC describes in reports about -- about damages, about her trauma and the experiences associated with the trauma, is everything that she reports to Dr. Harris already in the record or somewhere else?

MR. RIZZO:  It's -- that's complex, so I'd like to explain, Judge, and I'd like to draw a bright line between liability and damages as I think the Court was trying to do --

THE COURT:  My questions really are about damages --

MR. RIZZO:  Right.

THE COURT:  -- because I think the liability issue probably more than likely falls within the idea of, like, when she disclosed certain things and --

MR. RIZZO:  Right.

THE COURT:  -- and when the defendants might have known.  And so I know we haven't -- we haven't taken on that issue just yet --

MR. RIZZO:  Right.

THE COURT:  -- so I just want to talk about the damages issues first.

MR. RIZZO:  So the -- Dr. Harris's report, Mr. Edelson did put it into evidence.  It's under seal.  It's a lengthy report.  It's about 40 pages.  And the doctor, Dr. Harris, went through all of the extant information and then engaged in a clinical interview with JC.  And in the

course of that interview, JC told Dr. Harris that she experienced suicidal ideation in the Spicer-McCool home, which she described.  And Dr. Harris notes in her report, and Mr. Edelson examined her on this, that JC hadn't told anyone about that before, that she felt that weakened and that depressed in that home that she contemplated committing suicide in connection with the reference to the pills that are -- that were already in the record.  And --

THE COURT:  Is JC's -- does Dr. Harris causally connect JC's suicidal ideation to her abuse -- her sexual abuse and abuse in the Raygosa home or is it associated with her conditions at the Spicer-McCool home?  And I can appreciate that there is -- I mean, I'm sure there's a continuum there, but what is it that Dr. Harris says about -- about suicidal ideations and the cause?

MR. RIZZO:  I would let Ms. Skjelset address that, because she handled that issue and was at the deposition, but my understanding, Judge, is that what Dr. Harris was trying to say is that she herself was able to elicit that information in that trusting interview with JC that JC hadn't disclosed before.  And there were questions posed to Dr. Harris about that, and she tried to say that, "I felt," i.e., Harris felt that "JC had confidence in me, unlike how perhaps other providers had asked her questions and also given her confusion at the time she was being interviewed by providers when she

was nine years old." So this -- this event that she talked -- that JC talked to Dr. Harris about came out for the first time in the context of that interview.

And -- and that said, on listening to the defendants, what is the point of asking her, this girl, now about that? In other words, how does that experience -- they can impeach if they choose, right, that JC as a nine year old, hey, never said anything about that, she said it later. They can do that, but to quiz her or interrogate her about cutting herself or thinking of hanging herself, there's no point in that other than to harass and intimidate the witness. It doesn't serve liability, it doesn't do anything else to their damages, so what's the point? There is none.

So unless we can hear -- and I've been saying this. This is the third time we've been at this. They have yet to articulate, other than their apparent belief moving back in time with this liability, that there's some other alleged disclosure out there that they're not aware of, or they want to conjure a disclosure. And she has nothing to say about that. They have Dr. Harris's report.

And she was -- this child, this girl was evaluated during the discovery. The defendants knew that she would be, which is why -- I'm going off task here, but this is why they tried to bar a Rule 26 expert. And the statements that JC made, Your Honor, were for the purposes of medical diagnosis

and treatment.  There are exceptions to hearsay.  This idea of hearsay that we're seeing in the defendants' brief, they only cite to Rule 703 and the reference there, the brief reference there to hearsay insofar as experts are concerned, but this is a psychologist and this was a clinical interview, and the psychologist was deposed.  And it's not uncommon for doctors called as witnesses to relate the medical histories they were provided by their patients.

THE COURT:  Mr. Edelson?

MR. EDELSON:  If I may, Your Honor, I -- on that last issue, this is not a treating physician, this is not a clinical interview.  This is -- this was done for an expert report only.  This is -- this is what this was.

She was not providing any services to this child at all.  There was no intent of a privilege relationship here. It was purely for developing evidence that they're now going to try to shoehorn in as admissible when it's not, because it's hearsay.

And the prejudice here is substantially outweighed. I mean, the probative value is substantially outweighed by the prejudice, because this is an available witness.  I mean, it's -- I don't think I'm aware of any case ever that I've seen where available witnesses aren't testifying and someone else is going to testify about what they said.  I mean, it -- this is just classic hearsay.

And the treating physician exception or Rule 703 doesn't help them, because the witness is available, and it would be highly prejudicial and not particularly probative.

So -- you know, and we have issues of causation. Okay. So she -- she told -- she told Dr. Harris that she has suicidal -- had suicidal ideation when she was in the Spicer home. Well, what was causing that? Dr. Harris didn't go into a lot of that information. And so there is --

THE COURT: Wouldn't that be a question put to an expert and not to -- not to JC? I mean, how is it that she knows -- or how would she -- how would you expect her to be able to answer a question reflecting suicidal thoughts?

MR. EDELSON: Well, I don't know. And I haven't -- I haven't designed what this deposition would look like, but I -- we would certainly want to hear from the -- from the witness what she was experiencing and why she thinks she was experiencing it, because I think your question is a good one. Was it Raygosa? Was it the Spicer home? Was it a combination? Was it (interruption in video and audio transmission)? I mean, I don't -- we're all guessing at all of this stuff. And, you know, there -- plaintiffs --

THE COURT: So I know we've been focusing quite a bit on damages, but you've indicated that there may be other reasons why you would want to take her deposition, and we really haven't dived deeply enough into those for me to

understand what those other topics might be.  One might be the timing of disclosures.

Mr. Rizzo has indicated that there isn't anything there there about any other disclosures that -- beyond that which is already in the discovery record.  So what would you -- what would you be exploring -- what would you try to explore with JC about disclosures that's not already present in the --

MR. EDELSON:  Well, let's -- let's kind of go back and just putting a context on it all.  Plaintiffs have to prove deliberate indifference by the State defendants.  And JC's view of how she was treated by her caseworker and the others at DHS is, I think, critical in this case.  And we don't have her view on that at all.

They're just going to bring in experts to talk about what she experienced based on what she said.  And no one's going to talk about all of the attention and wonderful things that Kat O'Brien did for her.  And for all we know, JC's going to deny it and say, "Oh, no.  This was -- she was horrible and ignored me and didn't return my phone calls."  I don't know. We're trying to find out what their case is.  And the --

THE COURT:  The other issue that comes into play here is that, as I understand, JC may be turning 18 soon.  She's -- or she may already be 18.  And -- and the abuse all occurred six, seven years ago.  I may be getting my timing wrong, but

in that timeframe.

Are you going to be asking her questions about what she thinks of O'Brien today as she's -- as she's now a young adult, or are you going to be asking her about trying to recall six or seven years ago in the tumult and chaos and trauma of her life as a nine and ten year old about what she thought of the situation and what she thought about these people and DHS, who were -- who were supposed to be caring for her?

So what is the efficacy of asking her about disclosures and -- and her impressions of these people today if I allow -- if I allow deposition topics?

MR. EDELSON:  Well, until we hear what her responses are, it would be very hard to give you a meaningful answer, but we would certainly want to look into her experiences and impressions, and to the highest degree of specificity that she can give on these important issues.  And if she can't, that might be understandable.

THE COURT:  And from my part as the trial judge, if I allowed this deposition testimony to be taken, there will be a huge battle over whether it could be used for impeachment if it's somehow different, because -- I mean, I can only imagine that, again, asking an 18 year old what they were thinking about Kassidy O'Brien when they were nine or ten, I mean, there's -- there's issues there that I'm only beginning just

to scratch and try to comprehend, but I can certainly imagine there are problems with whatever it is that she might -- could be problems. And you're right. I don't know, but I guess I'm -- maybe I should let you try your case as opposed to anticipate what the problems will be, because you'll bring up enough problems for me anyway one way or the other, Mr. Edelson, as we proceed to trial, so I shouldn't put my foot in it too soon.

So, look, I can appreciate Mr. Edelson's need to defend the case, and some issues of timeliness have now been blunted by virtue of the timeframe in which we are dealing with these trials. I'm -- I have to say, I'm very doubtful about what you would gain by a deposition with JC, but I believe you have a right to do so.

And there are going to be significant guardrails set up for you to be able to take a deposition of JC, and that will include an evaluation and advice from a (indiscernible) professional to identify both setting circumstance and who might be in the best position to take those depositions without causing JC any permanent harm.

There were several other guardrails that were, I think, indicated described in counsel's motion -- response to the motion to compel JC's deposition. I want to turn to those to make sure that we've identified all of them.

I also want to be very clear about a limited amount

of time allowed and that the -- that the subject areas and specific questions that will be asked will be disclosed in advance.

Turning to the -- to (pause) --

MR. RIZZO:  It's page 18.

THE COURT:  So limitations on scope, I understand, Mr. Edelson, you would only be inquiring with respect to extent of injuries limited to JC's current condition and functioning?

MR. EDELSON:  Are you asking me if I'm voluntarily limiting it to those things?

THE COURT:  Well, without my turning back to your motion for reconsideration, I'm looking at Plaintiff Levi's response, which I'm presuming summarizes what you are willing to limit it to.  So --

MR. EDELSON:  No.  These aren't -- these are -- we've never agreed to these limitations.  And I think --

THE COURT:  Okay.

MR. EDELSON:  -- that they're awfully extreme.  You know, for example, trying to -- you know, giving them a script of our questions in advance, I mean, that's -- I don't know -- I've never seen that done, and that's (pause) --

THE COURT:  Well, Mr. Edelson, it might be -- very well might be the first time.  Don't --

MR. EDELSON:  It might be.

THE COURT: Don't entice me. So let's focus on the merits and the substance of why it's appropriate or not rather than not --

MR. EDELSON: Oh, that's fair enough. Fair enough. I -- what I think would be a fair way to do what they're trying to accomplish is to -- is more -- something more along an outline rather than -- than questions, because, you know, we're not doing interrogatories. This isn't written questions in lieu of deposition.

And, you know, it's very hard to determine now what that conversation's going to be like, that deposition, what the flow will be like. And so trying to write out questions in advance in any deposition would be hard, but in this deposition would be really --

THE COURT: So I'm going to use this list as the outline in which we're going to talk about some of the questions.

MR. EDELSON: Okay.

THE COURT: And they may or may not be the ones I apply, but I want us to --

MR. EDELSON: All right.

THE COURT: I need to tether myself to some points to start identifying.

While I don't think it's on this list, who -- who are you proposing will conduct the deposition?

MR. EDELSON:  We haven't made that decision.

THE COURT:  Well, then I will let you know, then, the dep -- then whether a deposition will be allowed will -- will turn on who it is and whether I approve it.

MR. EDELSON:  Okay.  Well, we'll --

THE COURT:  And I know you've probably never seen that one either before.

MR. EDELSON:  No.  That's definitely a new one, but we'll -- we will (pause) --

THE COURT:  Look, in the context in which I'm trying to establish some guardrails, I want to make sure -- let's be really clear about this.  I'm not trying to be -- there's nothing punitive about my -- my decision.  I mean --

MR. EDELSON:  Oh, I don't think there is.

THE COURT:  -- you're going to get the deposition.  I want to make sure -- it's very clear that I want to do as much as possible, and this goes back to one of the reasons why I declined to allow JC's deposition at the outset earlier was because of not only untimeliness, and we -- you've -- we've crossed that barrier, it's about trauma to somebody who -- this -- look, I don't need to preach to everybody here. You've seen things about this case that I haven't, but I can only imagine, I mean, the depth of harm and trauma that this young person has experienced.  I'll be damned if -- if I play a role in -- in perpetuating it in any way that is

unnecessary.

I also recognize and approve of your right to defend and develop your case. And I need to strike this balance. So, yes, if there's some first times, then so be it, but then I'll be proud to make sure that this is a first time in which perhaps we're doing it better and more right than it's been done before.

All right. So now I'm off my soapbox. Who will be -- I know you haven't decided who will be taking the deposition, but I'm going to want a proposed sort of schedule of these issues so we can discuss them prior to the deposition: who it will be.

MR. EDELSON: When would you like an answer to that? I hear you asking. I'm just not sure I can give you that answer.

THE COURT: Yeah. We'll talk about a timeline in -- we'll talk about a deadline in just a minute.

MR. EDELSON: All right.

THE COURT: I want to get the guardrails figured out first and --

MR. EDELSON: Sure. Okay.

THE COURT: I'm -- I want to also be open to recommendations by -- by a therapist or psychologist that is familiar with JC's conditions to be able to provide important considerations and guardrails for how to conduct the

deposition in as least a traumatic way as possible, and so I want to hear from somebody. And, plaintiffs, you'll be able to coordinate that information.

Now, I also want to -- you know, I (pause) -- I don't want there to be overreach. I've already identified that Mr. Edelson has a right to take a deposition. So if somebody's telling me from a clinical standpoint there's no way a deposition can be done without causing permanent trauma and injury, it puts me between a rock and a hard place. So be careful about putting me there, because at the end of the day as a trial judge, I recognize the importance of the defendants' right to gather sufficient, necessary, and relevant information within certain boundaries to be able to present a defense.

So, please, the question to your counselor will be how do we do this to -- to minimize or limit or prevent any -- any further trauma, not whether it should be done.

MR. RIZZO: And, Judge, if I may while we're here, the -- I know the Court ordered the specific questions, which I very much appreciate, for this child. And the defendants' motion itself at page 7 said that they are entitled to follow up on what they call Dr. Harris's omissions and learn firsthand the nature of JC's injuries, impairments, and disabilities plaintiff alleges JC suffered and continues to suffer so they can fairly respond to plaintiff's anticipated

evidence about the nature and cause of these injuries.

Now, that said, that should be the focus of this deposition, because this child has been through three interviews, CPS assessments. She's made -- she was made to go to trial. The defendants were there. There's no further reason to talk to her about liability.

THE COURT: So I'm going to -- you're jumping ahead of me. So let's --

MR. RIZZO: I know. (Indiscernible).

THE COURT: That's usually Ms. Skjelset's role. Mr. Rizzo (indiscernible).

So extent of injuries, Mr. Edelson. And I'm looking at the outline on page 18 of Plaintiff Levi's response. And, frankly, the question of extent of injuries is something that I want to hear from a counselor about and both the potential impact of exploring, and then we'll talk about the out -- and I know it's further down this wave of this outline -- or you propose an outline, Mr. Edelson. Mr. Rizzo is asking for the actual questions to be previewed. And I think we need to -- we need to find a middle -- a middle approach to that, because I can also appreciate that there may be responses that JC provides that requires a follow-up question, and if it's not on the list, I don't want that to become a basis for an objection as well, because I really do not want JC to have to go through a second deposition because I've found that the --

the objections prevented Mr. Edelson from being -- or whoever it is that's conducting the deposition from being able to complete it properly.

So instead of injuries, let me just ask, Mr. Edelson, is there any reason why it should not be limited to questions to JC about her current condition and functioning?

MR. EDELSON:  Well, I certainly would -- that's an important part of it, but we can't ignore liability.  I mean --

THE COURT:  We haven't gotten to liability.  I'm looking at these --

MR. EDELSON:  Oh, I see.  I see.  Because the way I read the list --

THE COURT:  As opposed to asking her, you know, specifically how she felt about what was happening to her when she was ten years old and what -- I mean, I -- I don't see the value of asking her now about that, because I think there's a record sufficient in this case to be able to identify those -- those points past -- in time past.

MR. EDELSON:  All right.  I want to answer your question.  I'm not sure I understand it.  I apologize.

THE COURT:  I'm simply trying to limit asking any questions to the extent that -- when we get to the outline, any questions -- let me put it this way.  Limiting -- with respect to the extent of injuries, limiting questions to JC's

current condition and functioning, current condition and functioning, rather than asking her about what her condition and functioning was either at the time that abuse was occurring or immediately after that.

And the reason is this, is that there should be ample evidence in the record that describes those things, so I'm not sure there needs to be exploration about what she was experiencing back then, but what her trauma is now, what her injury is today.

You know, in all fairness, perhaps you need some time to consider some of these things.  And I know I'm putting you on the spot and I'm --

MR. EDELSON:  I don't mind being put on the spot. I'm just -- I -- what I'm -- I'm -- I appreciate us doing this, and I think it's really worth it.  I'm not sure we're going to get where you want to go today.  It sounds like we need to do some more things.

And I'll tell you what I'm worried about.  I don't want to -- I don't want to end up with some sort of an amorphous set of orders or orders where we dis- -- the parties disagree on what you really mean and then we're -- then we're fighting at the deposition, because I think that's the worst thing we could do of all is have a hostile interaction between lawyers at the deposition.  I don't think that serves the witness much good from a trauma standpoint.  And so the more

we have figured out in advance, I see the value in that.

It sounds like maybe we need to set a time to have this conversation after we, "we" being the defendants, have spent some time outlining what it is we want to do with enough precision but not to the point of writing questions, but the kind of precision that people understand what topics are and aren't being covered and what kinds of questioning will be and won't be allowed, and then that will reduce the likelihood of friction at the deposition, because, again, I think that should really be one of our top goals, is to make sure we have this figured out.

And I'm recognizing that we're not there yet. And I don't know that I can talk my way through this with everyone at this hearing, but I'm happy to take on the burden of -- because I'm getting the gist of what you're saying here, and I appreciate you allowing us at least some limited opportunity to take her deposition. I don't want to take advantage of it in a way beyond what you want, but I'm happy to try to outline for everybody what we think we ought to be allowed to do with certainly more specificity than we have today.

THE COURT: Okay. So at the very minimum, then, I'll ask that you provide plaintiff's counsel a detailed outline of the subject areas that you want to inquire of JC on, and that outline should provide also a flavor of some of the questions that you may ask, maybe not --

MR. EDELSON:  I would --

THE COURT:  -- all of the questions.

MR. EDELSON:  I would envision something that looks similar to a 30(b)(6) kind of a notice that has topics with adequate specificity, and hopefully that will satisfy everybody.

MR. RIZZO:  I don't think that will, but we can wait for that.  I mean, Judge, it's very clear today they -- this has been consistent throughout.  They will not say what they want from this kid, and -- and that's why I jumped the gun, because there is no question that she has -- the record has been fully developed for what she --

THE COURT:  Yeah.  Look, I hear your point, and that's one of the reasons why I was disinclined to allow depositions back in August, which is, there is ample evidence already in the record about what she's gone through.  And I'm only interested in allowing you an opportunity to explore those things that may not already be in the record, not to rehash what has been there, not to challenge what has been reported.

So I want to make very clear, Mr. Edelson, if this becomes an overreach, I'll -- I'll just simply say no and we move on.  I know you understand that.  I'm just making it now clear for the record in front of everybody here.  If this becomes an overreach, it's not going to work for me.  It's

for -- and that's why I set out in the beginning of this discussion about allowing this deposition to talk about guardrails, because this is not -- it's just -- it's just not an open -- it's not an open plain here to run.

And I know you know that, but I want to make it very clear that if I feel like this extension and grant of an opportunity, and having reconsidered my decision now to allow deposition, is being pushed farther than I'm comfortable, it will go away.

MR. EDELSON:  Understood.

THE COURT:  So let me also make it very clear, then, that I'm inclined to use the guardrails in some way, shape, or form that have been established in the limitations on scope and manner outlined on pages 18 and 19.  I want to make very clear that this is -- this is going -- these points are going to be my guiding stars in how I'm going to evaluate whether the scope of the deposition and the manner of the deposition will be -- that I'll consider is appropriate given JC's unique circumstances.

So I'm not saying that these are the absolute and only things that I will consider.  There will be modifications to some of these, but these are the topics on the topics that we're going to be needing to figure out.

I'll give you and plaintiff's counsel an opportunity to confer and identify a plan for this deposition before we

get back together and then work out all the -- all the details.  All right.

MR. EDELSON:  Thank you.

THE COURT:  I do want to revisit -- just turn to the limitations on manner.  So first, the location should be one that is of JC's choosing.  That's a yes.

The length of the deposition.  And actually even before I saw these outlines, as I had been considering your motion for reconsideration if I was going to allow a deposition, I agree with it not to exceed two hours.

So JC should have her support person in addition to counsel and conservator.  JC may take breaks as needed and may discontinue the deposition if needed.

With respect to video recording, were you intending on taking a video recording?

MR. EDELSON:  You know, all of the -- all of the depositions to date have been recorded by video, and that's just been the practice, so I assumed that we would.

THE COURT:  By virtue of this being one of the limitations, Mr. Rizzo, you feel strongly about it not being video recorded.  And tell me why.

MR. RIZZO:  I'm -- I'm very protective of JC, and to have a camera at the end of the table like they do with these productions and have this big plaque behind her head, she's already going to be nervous as hell sitting there.  They don't

have an expert.  They didn't retain an expert.  And they have no reason to video this.  For what purpose?  It won't serve any -- they're here because they keep saying they want to talk to her about this and that.  They don't need a video.

So, yes, we have recorded material witness testimony, people who have been deposed, caseworkers who have testified, et cetera, I get that, but I don't see a need for it here.  And that may be more personal, Judge, but I don't see an evidentiary purpose unless what they want to try to do is use it to impeach her at trial.  Maybe that's what they're trying to do.  Other than that, there's no reason to --

THE COURT:  Well, they'd only impeach her -- they'd only impeach her if she testified.  Is there some other manner in which impeachment could come into play?

MR. RIZZO:  Well, if they played the video, I mean, at the trial to say, you know, "This is what she said about when she was thinking of killing herself.  Here's what she looked like when she said that."  Maybe that's where they're going.  That would have some marginal value, but I don't think it's necessary given the fact that they've admitted that she's been abused by their DHS-certified foster parent.

THE COURT:  No video deposition.  No video record of the deposition allowed.  Given the -- what will likely be the subject area explored with JC, there doesn't need to be another video recording of her descriptions of any of the

potential -- potentially of any of the trauma that she's experienced and the harm that she's -- she's also experienced. We don't need to make a video recording of that.

And the designation will be identified as highly confidential under the protective order.

All right.  So the limitations on manner, I'm adopting the -- the plaintiff's recommendations in its response to defendants' motion for reconsideration of the motion to compel JC's deposition.

The remaining issues, which is limitation on scope, you can use these as an outline for discussion between counsel, Mr. Edelson and Mr. Rizzo, and conferral and then with the understanding that I am leaning towards imposing meaningfully significant guardrails in this deposition similar to those which are here -- that are outlined here.

I recognize that, for example, the issue of a preview of questions, I think an outline is appropriate, and you've indicated something along a 30(b)(6) description of the topics.  I think you'll need to provide some more details, but you'll also be allowed to ask follow-up questions certainly within those subject areas, but some additional detail beyond that which is normally provided for 30(b)(6) deposition notices will be required.

When do you want to confer and submit to me a joint status report proposing each of your -- the areas in which you

agree and outlining the areas in which you have disagreed in your proposals?  January 15th?  Would that give you all enough time?

MR. EDELSON:  That should.

THE COURT:  Okay.

MR. RIZZO:  I think so, Judge.  Let me just look real quick here.

MR. EDELSON:  Your Honor, I just want to raise one issue here.  You'll recall that when you originally made your order that there won't be a deposition, you had an exception, and that was in the event that JC intends to testify, that they will need to give us advance notice and an opportunity to take her deposition.

THE COURT:  Or if JC offers an affidavit in response to a motion for summary judgment.

MR. EDELSON:  Right.  Right, right, right.  I just want to make sure that, you know, if we're going to exclude -- if we're going to eliminate topics here at her deposition and then they decide to call her as a witness and we weren't able to take -- in other words, I just -- any limitations we have on topics here would also have to limit what she could testify to at trial, but maybe even better than that is if we can get a statement from counsel that they do not intend to call her as a witness at trial, and then this is not an issue.

MR. RIZZO:  Well, you've now pushed and have obtained

a deposition.

So I don't think I can answer that question, Your Honor, until the deposition takes place, because they're making her a witness.  They want to make her a witness, and so she may.  It may be that she testifies.  I just can't predict that now unless and until we go through this exercise at the defendants' insistence.

THE COURT:  So I want to make sure everyone understands.  My earlier direction to all of you is that if JC testifies, there will be a deposition, and that deposition will not have the kinds of guardrails that I'm trying to impose here for the limited purposes associated for having -- associated with my decision to allow it now, but to --

MR. RIZZO:  Okay.

THE COURT:  -- make sure you understand that if she testifies, then the defense will have an opportunity to take a full deposition with some guardrails, but not that which we are discussing now.

MR. RIZZO:  I understand, Your Honor.

THE COURT:  Okay.  So we'll need to also make sure that we set a deadline for when a decision is going to be made about whether she will be presented as a witness at this trial.  And I appreciate that it may be a decision you'll make after this deposition is completed, but let's -- I think you might be on mute, Mr. Rizzo.

MR. RIZZO:  I was.

THE COURT:  I think we lost -- we lost Mr. Edelson.

MR. RIZZO:  There's a disturbance in the force here.  Here he is.

THE COURT:  There we go.  He's back.  All right.

MR. RIZZO:  I was going to say, could we have that report to Your Honor on the 17th as opposed to the 15th of January?

THE COURT:  That's fine.  The 17th is fine.

MR. RIZZO:  Okay.

THE COURT:  I do want to meet with all of you again on this topic so we can hammer out the details.  And Wednesday afternoon -- excuse me.  No.  I'm sorry.  I can't do that.  Wednesday morning -- I'm sorry.  Wednesday the 22nd, is counsel available at 9:30?

MR. RIZZO:  Yes, Your Honor.

THE COURT:  And Mr. Edelson?  I think Mr. Edelson's internet --

MR. WILSON:  Mr. Edelson just texted me that his computer froze.  So I'm checking his schedule, Your Honor.  I'll need just a moment.

THE COURT:  Thank you.

And Conley counsel, are you in on all of this?

MS. KORBEL:  I don't believe so.

THE COURT:  Okay.

MR. WILSON:  Your Honor?

THE COURT:  Yes.

MR. WILSON:  It does appear that Mr. Edelson is free at that -- at that -- well, I'll let him speak for himself.

THE COURT:  All right.  January 22nd, 9:30 in the morning, we'll discuss the boundaries of the deposition of JC and I'll make my final decisions about what those guardrails will be.

By then, I also assume, Mr. Rizzo, you'll be -- will have also been able to secure some -- some input from a counselor or therapist about appropriate circumstances -- appropriate measures that need to be taken to ensure JC's limited -- you know, limited trauma associated with getting her deposition taken.

MR. RIZZO:  Yes.

THE COURT:  All right.  And then, Mr. Edelson, I'm confirming 22nd January, 9:30.

MR. EDELSON:  Yes.  Sorry about that.  I got frozen out, and I exited and came back in.  So give me a moment to look at my calendar.  January 22, you say?

THE COURT:  Yes.  And just FYI, Mr. Wilson has already told us you are available, so you may want to confer with each other before you come up with a different answer.

MR. EDELSON:  Okay.  I am conducting a mediation at 12:30, but if this is earlier, then I'm fine.

THE COURT: All right. 9:30. And I --

MR. EDELSON: That's fine. 9:30's fine.

THE COURT: All right. All right. Then 9:30 the 22nd. The 17th will be the date you both present your joint proposed plan for taking JC's deposition, the areas in which you agree, and then your -- each of your respective points of disagreement and your proposal for resolving those areas of disagreement.

Okay. Do we need to take up anything else on JC's deposition? Okay.

MR. RIZZO: I don't believe so, Judge. Thank you.

THE COURT: We may not have time to dive deeper into this, but I am suspecting, correct me if I'm wrong, Mr. Wilson, that the request to compel responses to interrogatories and request for admissions may be ameliorated by the deposition of JC, or no?

MR. WILSON: I don't believe so, Your Honor. These -- are you referring -- I think you're referring to our letter of November 21st?

THE COURT: Yes.

MR. WILSON: Your Honor, there are -- there are certainly -- I don't want to represent to Your Honor that there are no questions or interrogatories that could be answered in a deposition, but -- but I'm not sure that that would be true for all of the interrogatories.

THE COURT:  Then what I might ask, then, is that you revisit the issue and narrow down that which may still be in play, but that might also turn on what I'm going to allow whoever will be taking the deposition of JC to gather in the way of information.  So we can -- we'll revisit that, too, I think, once we know what the plan is for the deposition, JC's deposition.

MR. WILSON:  We can do that, Your Honor.

THE COURT:  I also imagine we need to talk about when your response to the motions for partial summary judgment need to be filed now.  Mr. Rizzo, how much time are you asking?  And now I'm at the moment forgetting why you needed that additional time.  That seems so long ago.  Oh, this is with respect to O'Brien.

MR. RIZZO:  Right, right.

THE COURT:  So what do we need in place in order for you to file a response?  Is that the briefing on what to do with evidence versus the claims?  So we need briefing on that.

MR. RIZZO:  Right, and getting ahold of a Ninth Circuit attorney.  So I would like till the end of January, if that's okay.

THE COURT:  And is Mr. Monson on the line still?

MR. MONSON:  Yes, Your Honor.  I was going to, you know, offer maybe a solution to this, because I thought about this issue a little bit more just sitting here and since we've

conferred yesterday. And I can't speak for the other defendants, for Ms. O'Brien, we would not take the position that the Court lacks jurisdiction over any portion of the pending summary judgment motions. Our concern is really about what happens if the case proceeds to trial. And I think that's what the -- from our perspective, the briefing in whatever form it would be would be relevant to whether the Court could proceed with -- with trial as to these, you know, components of the allegations.

We have not raised absolute immunity as an argument on existing summary judgment briefing. That argument is all about qualified immunity. And our intent was not to delay resolution of that motion, because that has also carry-down impacts on -- on the case. So, you know, if that's not an issue, I'm not sure what the reason would be to, you know, delay briefing and resolution of the summary judgment motion.

THE COURT: Mr. Rizzo, what guidance do you need from the Court to be able to prepare your response to the motions for summary judgment?

MR. RIZZO: Well, what I just heard is different from what we covered yesterday in the conferral. And I would like an opportunity to protect my record, Judge, with now that they've filed the notice, there was a question about to the extent the Court is divested of jurisdiction. I'd like to address that, and I do feel I need an extension to be able to

fairly respond so that we don't draw another notice of appeal or related issues going forward.  So I'd like to get it to the end of the month if possible.  And part of my problem is getting ahold of people right now is difficult given the holiday, so (pause) --

THE COURT:  Yeah.  That's right.  So the end of January to do what?  File your response?

MR. RIZZO:  Right, to respond.

THE COURT:  And not file a brief -- or supplemental brief, a brief on the impact or the effect of O'Brien's appeal of my motion to dis- -- or my denial of the motion to dismiss?

MR. RIZZO:  Only --

THE COURT:  That will be --

MR. RIZZO:  Right, right.

THE COURT:  That will be incorporated into your response.

MR. RIZZO:  Right.  I was just going to say only unless I'm advised by, like, an appellate lawyer I need to do something different.

THE COURT:  All right.

MR. RIZZO:  But other than that, no.  It would just be the time to respond.

THE COURT:  I'll allow time to -- I'll extend time for you to file your response to the motions for partial summary judgment in this case to January (pause) -- January

31st.

MR. RIZZO:  Thank you, Judge.

MR. WILSON:  Your Honor?

THE COURT:  Was that Mr. Wilson?  I didn't see a (pause) -- yes.

MR. WILSON:  Yes, Your Honor.  I apologize.  I think I got lost in the back and forth between you and Mr. Rizzo.

Is the extension for a supplementary response or to the response -- to the entire response to the motion -- partial motion for summary judgment?

THE COURT:  Well, let's -- I'm going to roll that back a bit, because I don't know how many times you meant to say "supplemental response" intentionally, because I think there hasn't been a response yet.  Is that correct?

MR. RIZZO:  Right.  Correct.

THE COURT:  All right.  So we're just talking about Levi -- and Conley, you're asking for the same extension of time?

MS. KORBEL:  Your Honor, we believe, especially with consolidated trials, that our responses need to be due at the same time.  So, yes, whatever --

THE COURT:  It'll make it easier for us to track at least --

MS. KORBEL:  Agreed.

THE COURT:  -- if not for any other reason.

So, Mr. Wilson, I'm extending the time in which Mr. -- both the Levi and Conley plaintiffs can file their response to defendants' motions for summary judgment.

MR. WILSON:  May I raise an issue, then, Your Honor? With -- with respect to a response coming in at the end of January, that would then push our reply deadline into -- you know, at the -- assuming that we don't -- you know, we're able to file in two weeks, to the middle of February.  We then have a pretrial conference scheduled for March 6th through 7th.

Your Honor, our view is that the motions for summary judgment address some of the most substantial issues in this case about whether or not they proceed to trial, each of the Section 1983 claims.

In order to be fully prepared for a pretrial conference on March 6th or 7th, we will need to, you know, exchange exhibit lists, exchange witness statements, we have to file motions in limine and *Daubert* motions.  All of that -- all of that pretrial activity, you know, depends a great deal on whether the claims -- the Section 1983 claims are or are not part of the trial, and so it would -- you know, I think it's important to know the answer before we get to the --

THE COURT:  I can appreciate the conundrum we continue to find ourselves in.  I used to like to blame Mr. Edelson for all my troubles.

MR. WILSON:  Usually fair.

THE COURT: But apparently it's not just Mr. Edelson.

I mean, plaintiffs have a right to take into account the impact of Ms. O'Brien's right to file an appeal. And I, frankly, don't have any other time in which I can fit a four-week trial in until the -- you know, the end of this coming year, which is kind of absurd to even have to think about.

So here's what I'm going to ask you to do. Assume that your motions will be denied for the purposes of preparing your -- your submissions in preparation for the pretrial conference.

MR. WILSON: Your Honor --

THE COURT: And I know that means front-loaded work, but the only way to be prepared for trial is it would be better for us, then, to eliminate issues if I were to grant certain aspects of the summary judgment motion than for everyone to scramble at the last minute, because it also won't serve me well to prepare for the trial if I don't have everything that I need from all of you for the -- for the pretrial conference.

MR. WILSON: Your Honor, I -- I only ask because of the -- because of the time and expense. Is it -- is there any possibility of moving the pretrial conference, not the trial, but moving the pretrial conference into April? We would still make sure that you had all of the materials you need to

conduct the trial in April, time to have rulings, but with more opportunity for the parties to tailor their exhibits, witness statements, *Daubert* motions, motions in limine to the case as it is going towards trial.

THE COURT:  I mean, the only other time that I could even conceive of a possibility, but I think it might be pushing my very limited cognitive capacities here, is that we set pretrial conferences on the 10th and 11th of April.  And, I mean, that seems like an awfully short period of time between when we start the trial.

Now, what I can -- so let's see here.  We added -- yeah.  We added a week to the end of trial -- to the end of that period, so I can't -- I can't -- and I can't move (pause) -- I'm looking at my calendar now, is the reason for the silence.

Yeah.  The only other time I think I have available is the 10th and 11th of April for pretrial conference.

MR. RIZZO:  What if we staggered it, Your Honor?

THE COURT:  Staggered what?

MR. RIZZO:  In other words, use -- use the 10th and 11th as potentially a pourover for some of the issues that Mr. Wilson's intending to raise, and we go forward with what we can on the 6th and 7th and then have that other date in reserve.  Just a thought.

MS. KORBEL:  I'm sorry to throw a wrench in it, but

Ms. Richardson, who will be critical for our office, is not available on 4/10 and 4/11.

THE COURT:  On the 10th and 11th, not available?

MS. KORBEL:  Not available.  So sorry.

THE COURT:  So I have a trial from March 10th to the 21st.  It's always possible that something might change.  I would like to keep the March 6th and 7th dates in place, but there's a possibility that we could have sort of an overflow set of dates on the 20th and 21st of March.  Can you check your calendars?

MR. RIZZO:  I have a farmers market on my calendar, Your Honor, but I'm willing to move that.

THE COURT:  All right.  I think I'd rather join you on the farmers market, Mr. Rizzo.

All right.  20th and 21st of March?

MS. KORBEL:  That works for Conley's office.

MR. WILSON:  And that works for plaintiffs -- I'm sorry, State defendants.

THE COURT:  I'm not the only one who gets confused once in a while on who's who.  All right.  I'm in good company.

20th -- we'll have this overflow set of dates for anything that we aren't able to completely argue and decide for the -- where did I go -- 20th and 21st of March, but be advised that submissions are all going to be due prior to that

6th-7th date in accordance with my trial management order.  So it really is about giving me time to figure out what the heck you all are talking about and what you're going to ask me to decide on the volumes of motions that I'm anticipating coming from all of you.

All right.  And I will -- I will do some work on confirming whether the 20th and 21st in fact is going to be a real overflow date as opposed to right now a possible one because of that other trial that's pending.

So your time to file a reply to January 31st responses, Mr. Wilson, will be due February 14th.  Or would you like the 17th?

MR. WILSON:  Your Honor, this --

THE COURT:  I can either ruin Valentine's Day for you or your weekend after that.  Which one do you want me to ruin?

MR. WILSON:  We're generally -- generally always grateful for more time, but actually in this instance, we do not like filing on Mondays, it does ruin weekends, so we will take the 14th.

THE COURT:  All right.  Reply is --

MR. WILSON:  You --

THE COURT:  -- due the 14th.

MR. WILSON:  Oh, I'm sorry.  Your Honor, I didn't mean to interrupt.

THE COURT:  What was it, Mr. Wilson?

MR. WILSON:  I was wondering, Your Honor, if you would also like to set a hearing date for the motions for summary judgment.

THE COURT:  Yeah.  Thank you for reminding me about that.  March 4th.

MR. WILSON:  Thank you, Your Honor.

THE COURT:  And plaintiffs' counsel, available for that?

MR. RIZZO:  Yes, Judge.

THE COURT:  Okay.  9:30 in the morning.  It will be here in Eugene in person.

So I do have a hard stop at noon today.  We do need to take up the Figoten issue?  And let me ask, the Figoten issue at this point is really an issue that will affect admissibility at trial.  Will it affect anything else as it relates to any of our pretrial motions -- well, actually, I guess summary judgment motions that you have outstanding?  I mean, the motions have already been filed, so I think it would only affect the response, so I -- and maybe this is my effort at perhaps kicking a can down the road so we have ample opportunity to address this.

So talk to me about -- maybe I'll turn to the plaintiffs.  It's your motion to either strike the specific testimony about the culpability of Fresno County from Figoten's expert testimony or alternatively -- actually, it's

first and foremost striking all of Figoten's testimony, her as a witness, and in the alternative, just with respect to Fresno County.  All right.

MR. RIZZO:  Thank you, Judge.  And again --

THE COURT:  So the question is, is it -- what's the impact of a decision on this?  Does it have any impact on things that are unfolding in the next couple of weeks or the next month, or is it something that we -- we can take up down the road?

MR. RIZZO:  I always want to say it's a little of both.  It doesn't necessarily pertain to the summary judgment motions.  I think we can take that off the table, but what it does do with respect to the scope of her testimony is if --

THE COURT:  And I imagine that if I allow -- if I don't strike her testimony, it opens up the need for a lot of -- a lot more discovery on the issue of Fresno's liability.

MR. RIZZO:  Right, which -- so that's right.  I don't want to get ahead of you, but that's correct.

THE COURT:  Well, I'm just following along with where everybody is taking me on this case.  I have to tell you, I don't have any other case like this one.  And I don't know if this is -- is familiar to the work that you all do in complex litigation associated with these kinds of cases or is it just this case?  You don't have to answer.  It's just a rhetorical question.

I see the need to answer the question about Figoten, because if I don't answer sooner than later, then I can see the plaintiffs may be in a pickle with respect to developing evidence for the trial, which all of a sudden an April trial date no longer sounds like it's far away.

Was there anything else about the Figoten testimony implications, Mr. Wilson?  I think you were on mute when you were saying something.

MR. WILSON:  So -- so --

THE COURT:  Go ahead.

MR. WILSON:  Okay.  Thank you.  Your Honor, I just want to say this is not about Fresno County's liability.  We are -- we have not alleged that Fresno County is facing any liability, and so I'm confused about what the posture of this motion is.  This is not the same testimony, but trial testimony that's --

Am I -- is there something wrong with my audio? Trying again.

THE COURT:  Well, I can hear you fine.  I don't know what -- is it that you can't hear, Ms. Skjelset, or is it --

MS. SKJELSET:  We're getting --

THE COURT:  -- an echo?

MS. SKJELSET:  -- and when I say something again, we're getting significant feedback.

MR. WILSON:  Maybe does someone need to be -- is

everyone on mute?

MS. SKJELSET:  I suspect it's in the courtroom, because it's happening when both of us talk, but (pause) --

THE COURT:  Try it again.

MR. WILSON:  Trying again.  One, two.  No.

THE COURT:  Well, was this feedback happening this entire morning or it just -- all right.  Something new has evolved.  Okay.

MR. WILSON:  Would you like me to try to continue, Your Honor?

THE COURT:  Well, I can hear you just fine, but I imagine that plaintiffs' counsel will want to understand what you're saying.

Can we put the courtroom on mute for a moment while we -- or so that way I can't -- we can't transmit out, Ms. Davies?

MR. WILSON:  Okay.  I'm trying again.  And, Your Honor, maybe you could give me a thumbs up if you can hear me.

THE COURT:  (Indicating).

MR. WILSON:  All right.  Great.

Your Honor, we are confused by plaintiffs' characterization that this somehow involves the liability of Fresno County.  We have not filed any complaints against Fresno County.  Ms. Figoten's testimony is designed and is intended to provide an explanation that responds to testimony

that plaintiffs' experts have put forward.  We have not filed a third-party complaint against Fresno County, nor do we intend to in this case, and it will not be determining -- the fault of Fresno County is not an issue that the jury will have to consider.

The issue is to explain why it is that certain documents and evidence were not made available to the State of Oregon when it made its determinations about certification, and that has always been a core issue in this case.

I don't understand, and I don't believe that there is actually any basis for plaintiffs' motion at this time.  We are -- the expert report of Ms. Figoten is not -- it's not being offered as an exhibit, at least not at this time.  I guess in the future if it was, you could take it up in a motion in limine.  Her deposition testimony is not being offered as testimony at trial.  I suppose if it was, it could be taken up.

To the extent that Ms. Figoten offered an opinion in her deposition that differed from or was in addition to those that were put forward in her expert report, Your Honor may wish to consider that now.  Whether Your Honor needs to consider that, you know, if you have a timing issue today, I certainly understand that.  I'm sure we could take it up some time very soon.

I think there is, in fairness to Mr. Rizzo, an

important question about whether he will continue the deposition of Ms. Figoten. And we have said that we do not oppose continuation of that deposition insofar as it is about Ms. Figoten's notes and about the additional testimony she offered at her deposition. So it would be perfectly fine to continue forward with that deposition and maybe take this up after that.

MR. RIZZO: Judge, can you hear me?

THE COURT: (Indicating).

MR. RIZZO: I beg to differ on this point. And the Court has the briefing, and I'll just summarize what I think are the key points.

We -- to say that they are not alleging a third-party complaint is exactly the issue. They didn't allege the fault of any person other than Raygosa. And we asked an interrogatory, because they alleged in their answer fault of others defense. So we followed up with an interrogatory, who other than the defendants is at fault? And they said Joe Raygosa.

We produced the Fresno County Sheriff reports, we produced the Fresno County Department of Children and Family Services, DCFS, and that was based on my subpoenas to those departments. I didn't depose those departments to determine whether I received the full and complete record or any and all communications concerning, for example, reasons why whatever

investigation or assessment was being performed into the death of AS was or was not founded.

So now we come all the way to the present, and they have retained Figoten. They have provided a report. It says nothing about the negligence of Fresno County. It simply recites questions that the defense lawyer has asked Ms. Figoten. There were four of them, mainly pertaining to this form that Chapman sent and then received from the State.

THE COURT: Am I on?

MR. RIZZO: There you go.

THE COURT: So you have no objection to that portion of her -- of her -- of her opinion?

MR. RIZZO: No. If they want to defend the case with the forms, that's certainly their -- their call. My major concern is that we were not given -- right. The cases that we both cite, rebuttal testimony must be on subjects unexpected and unanticipated at the time of disclosures.

They had these records in their files for months, and they never made an assertion that the reason Chapman didn't get the information was because Fresno County was at fault or they erred or they were negligent. And this expert's foundation for that opinion wasn't in her report. It turned out it was in her notes. And the defendants withheld those notes from us claiming that there wasn't a specific request, when the course of conduct between the parties with respect to

all the experts was to exchange notes.  And the Markowitz firm was very clear about their intention to receive notes.  And these are the only notes that an expert from California was told to leave home.

So it wasn't until after the deposition that I see these notes.  And it turns out they weren't really about the forms there in the record, Your Honor.  They were about her impressions about why Fresno County was negligent.  And now the defendants are calling that a so-called supplemental opinion that they gave -- that they asked.  After the deposition -- throughout the course of the deposition, they were objecting to my questions about how the CPS expert, Figoten, obtains information.

THE COURT:  Mr. Wilson, were you going to be offering Figoten's opinion with respect to the conduct or the finding that Figoten -- Ms. Figoten had -- opinion that Ms. Figoten had about Fresno's failure to make a found report on that child?

MR. WILSON:  Yes, Your Honor, but, too, I think there's a difference in wording that's very important here. Mr. Rizzo keeps saying that we are contending that Fresno County is at fault or negligent, and we are claiming nothing of the sort.  We are not claiming that Fresno County is at fault for the harms --

THE COURT:  Can I ask, why -- why that opinion was

not included in Figoten's initial disclosures?

MR. WILSON:  Well, it's not included because it's not an opinion that we are offering.  We -- even in the deposition, we're not offering an opinion that Fresno County is to blame for the injuries suffered by JC.

We are certainly offering Ms. Figoten's testimony to explain why it is that plaintiffs' allegations that Oregon should have known more about Fres- -- what happened in Fresno County should be rejected.  It's an explanation for why Oregon did not have the information plaintiffs contend that they should have, but it is -- it is certainly not --

THE COURT:  Well, was that explanation in Ms. Figoten's initial disclosures?

MR. RIZZO:  No.

MR. WILSON:  So, no.  I think when you say "that allegation" --

THE COURT:  So that will be stricken.

MR. WILSON:  Okay.

THE COURT:  I'm not going to strike her test- -- I will not strike her as an expert witness, but that which was not included in her initial disclosures will not be allowed to be presented by this -- by this -- by this witness.

All right.  I think that covers -- let me do a final check on plaintiffs' letter here.  I'm looking at plaintiffs' joint letter outlining issues.  I think the only matter left

is I understand that there's going to -- there is still additional 30(b)(6) depositions regarding the found phone.  Is that right?

Now, you characterize it as deposition regarding destroyed evidence.  I didn't understand that evidence was destroyed.  It just hadn't -- it's a phone was found and we're still waiting to find out what's on that phone.  Is there something else that I don't know about the destroyed evidence described in this letter from yesterday?

MS. SKJELSET:  Well, Your Honor, I don't have the 30(b)(6) topic in front of me, but the 30(b)(6) generally was about the Oregon Department of Human Services' policies regarding preservation and retention of text messages, because as you may recall, we've had a -- we've talked a lot about how there are indications that there were text messages, but we have not been produced any in discovery.  There were several letters from the defendants.

Can everybody hear me okay?

THE COURT:  I know that you -- that's the purpose of a 30(b)(6) deposition.  What I'm trying to understand is -- it caught my attention when this heading said, "30(b)(6) deposition regarding destroyed evidence".  I didn't understand that evidence had been destroyed.  I mean, I can appreciate that maybe evidence had not been produced, discovered, but I only understood that -- the reason I opened up -- or allowed

these 30(b)(6) depositions is because Hammond's extra phone from 2007 to 2018 was discovered in his drawer, in his office. Is that what we're talking about here with respect to 30(b)(6) depositions that are still outstanding?

MS. SKJELSET:  We're talking about the policies and practices for the phones for all of the custodians, which was the 30(b)(6), and their --

THE COURT:  So I'm taking issue because I -- with the characterization of -- or perhaps suggesting to me that there was some finding of destroyed evidence.  Is there destroyed evidence that you're alleging happened here or -- because I don't know of anything yet that has been presented to me that evidence was destroyed that is associated with these 30(b)(6) depositions that I allowed for the finding of the phone.

MS. SKJELSET:  Well, Your Honor, my understanding was that -- that the 30(b)(6) was related to our forthcoming spoliation motion, which had to do --

THE COURT:  No.

MS. SKJELSET:  -- with the --

THE COURT:  I understand.

MS. SKJELSET:  And I understand spoliation to mean the destruction of evidence, so if it seems too inflammatory, I apologize.  Perhaps I should have said 30(b)(6) related to phone policies and the potential for a spoliation motion.

THE COURT:  All right.  Yes.  It does address the

issue of spoliation, and I -- as I understand it, there still is yet to be a determination of whether evidence was destroyed. And I don't -- I don't know that for a fact, so -- and I have not made such findings. And I think it is the basis for your motion, but again, whether evidence was destroyed or not remains to be seen. It's not my --

MS. SKJELSET: (Indiscernible).

THE COURT: It's good that we're talking about the same thing, and I get that your position is is that evidence was destroyed, but I also want to make sure it's clear that's not a finding that I've made.

MS. SKJELSET: Absolutely, Your Honor. It has not --

THE COURT: I understand the parties acknowledge a phone has been found. And whether that means evidence was destroyed or concealed by the defendant is two different -- are two different things.

MS. SKJELSET: Well, Your Honor, the phone being found was -- called into question the process for preserving evidence on all of the phones for all of the custodians, and --

THE COURT: So the spoliation isn't just about destruction. It's not just and only about an argument about destruction of evidence. It's about the process for preserving or producing evidence. I mean, is it not?

MS. SKJELSET: Right. It's the process for

preserving, retaining, ensuring that -- that evidence is not destroyed in the routine course of -- of upgrading telephones.

THE COURT:  And has the data been extracted from the Hammond phone?

MS. KORBEL:  I don't know.

MR. WILSON:  Your Honor, can I respond to that?

THE COURT:  Yes.

MR. WILSON:  I can only say, Your Honor, that they're in the process of continuing to try to crack it.  So we don't have data.

THE COURT:  Okay.

MS. SKJELSET:  But, Your Honor, I do feel like I can confidently say that we have the beginning of a foundation for what I think will be a strong spoliation motion, particularly with regards --

THE COURT:  For when those briefs would be filed, because I'm now beginning to get even more -- I'm getting concerned about our April trial date and --

MS. SKJELSET:  Well, that was why we requested guidance with regard to the Court on that briefing schedule. We have a -- we haven't solidified the last timeframe for the deposition of Mr. Jones.  It was cut short.

THE COURT:  What do you propose for filing motions?

MS. SKJELSET:  The deposition of Mr. Jones is January 8th.  Assuming the Court would honor a draft, I think I could

have a turnaround in two weeks.

THE COURT:  So that would be January 22nd?  Were you suggesting two weeks from the -- two weeks after the date of that deposition?

MS. SKJELSET:  Yes.  I think that's doable, Your Honor.

THE COURT:  Okay.  And is it Mr. Wilson or Mr. Edelson who will be handling the briefing on this, the response?

MR. WILSON:  We would like until February 12th, Your Honor.

THE COURT:  February 12th is fine.  We may end up consolidating arguments on the motion for summary judgment and motions for spoliation, make it a double header.  Actually, why don't we just agree to do that now.

All right.  So a reply, Ms. Skjelset, February 21st?

MS. SKJELSET:  When is our hearing, Your Honor?

THE COURT:  I'm sorry.  Say it again?

MS. SKJELSET:  Our hearing on the motion -- I just want to make sure that I have ample time, but I can turn it around, I think, in less -- less than two weeks.  I can manage the 21st.

THE COURT:  Our oral argument on the spoliation motion will be on March 4th along with our summary judgment oral arguments.

MS. SKJELSET:  In that case, may I have the --

THE COURT:  So the 21st will give me enough time to read briefs, get ready for argument.

MS. SKJELSET:  If that's better for Your Honor, that's fine.

THE COURT:  All right.  All right.  So January 22nd, spoliation motion due; February 12th, response to spoliation motion due; February 21st, plaintiffs' reply due; oral arguments March 4th.

Okay.  Was this case going to settlement at any point?  I'm not trying to avoid doing any work.  In fact, I think the work will need to be done before there is any meaningful discussions of settlement, but I also recognize we're -- you know, we're moving to -- we have a trial date.  I don't see us taking it off.  It's going to happen in April.  So if there's going to be any conversations among yourselves about getting the case settled, I know there's quite a few things that we've scheduled in this case along with all your other dozens and dozens of other matters you attend to, so what, if anything, might you be doing on -- on also setting up a parallel track for exploring settlement?

In other words, are you all thinking about it, interested in going forward with it, or is this, "We just got to go try the case"?  Which is fine, that's why we're here, that's why I have a courtroom, but I just want to be able to

support you in getting that done, too, if that's where you're headed.  Plaintiffs.

MR. RIZZO:  There's a history --

THE COURT:  Okay.

MR. RIZZO:  -- Your Honor, and currently there are no -- there's no interest shown other than to do things like the notice of appeal and have this case set for trial.  And this may be one of those cases that needs to be tried.  If they want to try it, we're ready to try it.

THE COURT:  Well, I've never thought of extending an interest in trying to settle a case as taking a position of weakness or expressing a position of weakness in one's case. I encourage the parties to explore it, but I also recognize the way in which this case has been litigated, it may happen -- if it happens at all, it may happen very close in time to the trial, otherwise, know that I'm not moving my dates anymore.  So we're -- we're going in April.  All right. But if there's something I can do to assist in getting this in front of a settlement judge, you let me know.  I'm happy to try to do some work on that, but you'll have to give me enough lead time to reach out to my colleagues.  All right.

MR. RIZZO:  Thank you, Judge.

THE COURT:  All right.  So, counsel, I know we have some things ahead.  I look forward to getting your joint -- your joint proposed plan for the deposition of JC, and I know

we'll be talking about that in the coming month, and I look forward to getting the remainder of your submissions.  And I'll -- I'll see you in person, if not sooner, March 4th, if I'm not mistaken.

All right.  May you all have a happy and peaceful new year.  And take care, be well.

MR. RIZZO:  Thank you, Your Honor.

MR. WILSON:  Thank you, Your Honor.

MS. SKJELSET:  Thank you Your Honor.

MR. EDELSON:  Thank you, Your Honor.

(Proceedings adjourned at 12:01)

# C E R T I F I C A T E

I certify by signing below that the foregoing is a true and correct transcript of the record, taken by stenographic means, to the best of my ability, of the videoconference/telephonic proceedings in the above-entitled cause.

Due to the video/telephonic connections of parties appearing via videoconference, speakerphone, or cell phone, speakers talking over one another, speakers failing to enunciate, speakers not identifying themselves before they speak, and/or other technical difficulties that occur during videoconference/telephonic proceedings, this certification is limited by the above-mentioned reasons and any technological difficulties of such proceedings occurring over the video and/or telephone.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 7th day of January 2025.


/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2027

1

**/**

**/s** [1] - 90:22

**1**

**100** [4] - 2:12, 2:16, 7:19, 7:24
**103** [3] - 7:19, 7:24, 11:9
**104** [1] - 11:10
**10th** [5] - 70:8, 70:17, 70:20, 71:3, 71:5
**11th** [4] - 70:8, 70:17, 70:21, 71:3
**12/28** [1] - 13:22
**12:01** [1] - 89:11
**12:30** [1] - 62:25
**12th** [4] - 31:24, 86:10, 86:12, 87:7
**1300** [2] - 2:4, 2:8
**1455** [4] - 3:4, 3:8, 3:11, 3:15
**14th** [3] - 72:11, 72:19, 72:22
**15** [1] - 19:9
**1500** [1] - 3:15
**15th** [2] - 59:2, 61:7
**16th** [1] - 25:4
**17th** [4] - 61:7, 61:9, 63:4, 72:12
**18** [6] - 42:23, 42:24, 43:23, 45:5, 50:13, 55:14
**19** [1] - 55:14
**1900** [3] - 3:5, 3:8, 3:12
**1983** [2] - 68:13, 68:19

**2**

**20** [2] - 1:7, 4:1
**2007** [1] - 83:2
**2018** [1] - 83:2
**2024** [2] - 1:7, 4:1
**2025** [1] - 90:20
**20th** [5] - 71:9, 71:15, 71:22, 71:24, 72:7
**21** [2] - 5:5, 22:23
**21st** [12] - 24:22, 25:4, 63:19, 71:6, 71:9, 71:15, 71:24, 72:7, 86:16, 86:22, 87:2, 87:8
**22** [1] - 62:20
**22-01813** [1] - 4:9
**22nd** [6] - 61:14, 62:5, 62:17, 63:4, 86:2, 87:6
**23-01353** [1] - 4:9

**25-page** [1] - 15:9
**26** [1] - 39:24

**3**

**30(b)(6** [14] - 54:4, 58:18, 58:22, 82:2, 82:11, 82:20, 82:21, 83:1, 83:3, 83:7, 83:13, 83:16, 83:23
**31st** [2] - 67:1, 72:10
**330** [2] - 2:5, 2:9

**4**

**4/10** [1] - 71:2
**4/11** [1] - 71:2
**40** [1] - 37:23
**400** [2] - 2:13, 2:17
**4th** [4] - 73:5, 86:24, 87:9, 89:3

**6**

**6:22-cv-01813-MK** [1] - 1:6
**6:23-cv-01335-MK** [1] - 1:17
**6th** [6] - 26:11, 27:5, 68:9, 68:15, 70:23, 71:7
**6th-7th** [1] - 72:1

**7**

**7** [2] - 18:12, 49:21
**703** [2] - 40:3, 41:1
**7th** [7] - 26:12, 27:5, 68:9, 68:15, 70:23, 71:7, 90:20

**8**

**8th** [1] - 85:25

**9**

**9/2027** [1] - 90:24
**97201** [6] - 2:5, 2:9, 3:5, 3:9, 3:12, 3:16
**97204** [2] - 2:13, 2:17
**9:30** [6] - 61:15, 62:5, 62:17, 63:1, 63:3, 73:10
**9:30's** [1] - 63:2
**9:41** [1] - 4:1
**9th** [1] - 22:24

**A**

**a.m** [1] - 4:1

**ability** [2] - 5:23, 90:5
**able** [22] - 19:23, 28:8, 33:10, 34:2, 34:23, 34:24, 36:19, 38:19, 41:12, 44:16, 48:24, 49:2, 49:13, 51:2, 51:18, 59:19, 62:10, 65:18, 65:25, 68:7, 71:23, 87:25
**above-entitled** [1] - 90:6
**above-mentioned** [1] - 90:14
**absolute** [5] - 6:8, 7:22, 11:18, 55:20, 65:10
**absolutely** [1] - 84:12
**absurd** [1] - 69:6
**abuse** [7] - 29:1, 30:8, 38:10, 38:11, 42:24, 52:3
**abused** [3] - 15:25, 16:1, 57:21
**accept** [1] - 30:13
**accomplish** [1] - 46:6
**accordance** [1] - 72:1
**account** [1] - 69:2
**accusing** [1] - 36:11
**acknowledge** [1] - 84:13
**acknowledging** [2] - 26:14, 36:12
**act** [3] - 9:17, 9:19, 9:23
**actions** [4] - 10:23, 11:8, 11:12, 12:9
**activity** [1] - 68:18
**actual** [3] - 9:25, 11:14, 50:19
**add** [2] - 17:18, 24:1
**added** [2] - 70:11, 70:12
**adding** [1] - 24:15
**addition** [2] - 56:11, 77:19
**additional** [12] - 13:15, 14:14, 17:8, 21:21, 23:16, 23:18, 36:3, 36:24, 58:21, 64:13, 78:4, 82:2
**address** [9] - 5:21, 6:3, 6:6, 9:11, 38:16, 65:25, 68:11, 73:21, 83:25
**addressed** [2] - 8:18, 13:16
**addressing** [1] - 5:9
**adequate** [2] - 24:18, 54:5
**adequately** [1] - 10:11

**adjourned** [1] - 89:11
**admissibility** [1] - 73:15
**admissible** [2] - 9:8, 40:17
**admission** [1] - 11:23
**admissions** [1] - 63:15
**admit** [1] - 7:13
**admitted** [2] - 12:1, 57:20
**adopting** [1] - 58:7
**adult** [1] - 43:4
**advance** [6] - 13:5, 45:3, 45:21, 46:13, 53:1, 59:12
**advantage** [1] - 53:17
**advice** [1] - 44:17
**advise** [1] - 5:24
**advised** [2] - 66:18, 71:25
**affect** [4] - 19:23, 73:14, 73:15, 73:19
**affects** [1] - 36:22
**affidavit** [1] - 59:14
**afternoon** [1] - 61:13
**agenda** [2] - 5:13, 6:22
**ago** [3] - 42:25, 43:5, 64:13
**agree** [6] - 24:2, 24:17, 56:10, 59:1, 63:6, 86:15
**agreed** [3] - 29:5, 45:17, 67:24
**ahead** [6] - 13:22, 20:21, 50:7, 74:18, 75:10, 88:24
**ahold** [2] - 64:19, 66:4
**Aiken** [2] - 29:5
**al** [4] - 1:8, 1:20, 4:9, 4:10
**ALBERT** [1] - 1:14
**Alexandra** [1] - 3:7
**allegation** [1] - 81:16
**allegations** [11] - 7:11, 7:24, 8:3, 8:4, 8:12, 11:7, 12:7, 16:11, 36:6, 65:9, 81:7
**allege** [2] - 8:9, 78:14
**alleged** [10] - 10:22, 11:10, 11:11, 12:9, 17:25, 19:17, 19:18, 39:17, 75:13, 78:16
**allegedly** [1] - 22:9
**alleges** [1] - 49:24
**ALLEGIANT** [2] - 2:11, 2:15
**alleging** [2] - 78:13, 83:11

**alleviate** [2] - 6:7, 20:10
**allow** [11] - 23:19, 43:12, 47:18, 54:14, 55:7, 56:9, 60:13, 64:3, 66:23, 74:14
**allowed** [10] - 43:20, 45:1, 47:3, 53:8, 53:19, 57:23, 58:20, 81:21, 82:25, 83:14
**allowing** [3] - 53:16, 54:17, 55:2
**alone** [1] - 30:5
**alternative** [1] - 74:2
**alternatively** [1] - 73:25
**ameliorated** [2] - 20:2, 63:15
**amend** [2] - 6:5, 6:6
**amended** [5] - 7:19, 35:14, 35:23, 36:5, 36:8
**amorphous** [1] - 52:20
**amount** [3] - 19:2, 21:16, 44:25
**ample** [4] - 52:5, 54:15, 73:20, 86:20
**analyze** [1] - 28:17
**answer** [14] - 20:8, 32:14, 41:12, 43:14, 48:13, 48:15, 51:20, 60:2, 62:23, 68:21, 74:24, 75:1, 75:2, 78:16
**answered** [1] - 63:24
**anticipate** [2] - 23:17, 44:5
**anticipated** [1] - 49:25
**anticipating** [1] - 72:4
**anyway** [2] - 14:2, 44:6
**apologize** [4] - 6:13, 51:21, 67:6, 83:23
**apparent** [2] - 6:7, 39:16
**appeal** [17] - 5:18, 6:19, 7:3, 7:24, 8:13, 9:1, 10:14, 10:16, 10:21, 11:6, 12:17, 13:13, 14:4, 66:1, 66:10, 69:3, 88:7
**appealing** [1] - 7:10
**Appeals** [1] - 10:1
**appear** [4] - 6:14, 9:20, 12:5, 62:3
**appearing** [1] - 90:9
**appellate** [4] - 5:19, 5:24, 10:7, 66:18
**applied** [1] - 17:1

**apply** [1] - 46:20
**appreciate** [14] - 15:13, 22:2, 22:14, 29:6, 30:9, 38:13, 44:9, 49:20, 50:21, 52:14, 53:16, 60:23, 68:22, 82:23
**appreciated** [1] - 8:2
**approach** [2] - 30:14, 50:20
**appropriate** [7] - 22:12, 24:2, 46:2, 55:18, 58:17, 62:11, 62:12
**approve** [2] - 47:4, 48:2
**April** [12] - 22:23, 24:22, 25:4, 33:24, 69:24, 70:1, 70:8, 70:17, 75:4, 85:18, 87:15, 88:17
**area** [2] - 35:8, 57:24
**areas** [8] - 35:9, 45:1, 53:23, 58:21, 58:25, 59:1, 63:5, 63:7
**argue** [2] - 12:23, 71:23
**argued** [1] - 10:7
**arguing** [1] - 5:16
**argument** [11] - 6:21, 11:25, 16:5, 16:12, 16:19, 30:7, 65:10, 65:11, 84:22, 86:23, 87:3
**arguments** [7] - 11:2, 14:14, 15:2, 16:25, 86:13, 86:25, 87:9
**arising** [1] - 15:17
**articulate** [2] - 31:12, 39:16
**AS** [1] - 79:2
**aspect** [1] - 33:16
**aspects** [3] - 8:6, 33:19, 69:16
**assertion** [1] - 79:19
**assessing** [1] - 29:14
**assessment** [1] - 79:1
**assessments** [2] - 24:6, 50:4
**assist** [3] - 21:20, 25:10, 88:18
**associated** [11] - 9:9, 9:23, 21:11, 21:16, 37:4, 38:11, 60:12, 60:13, 62:13, 74:23, 83:13
**assume** [3] - 23:17, 62:9, 69:8
**assumed** [1] - 56:18
**assuming** [2] - 68:7,

85:25
**assumption** [1] - 24:16
**attempt** [1] - 34:5
**attempted** [1] - 36:9
**attend** [1] - 87:19
**attending** [1] - 4:14
**attention** [2] - 42:17, 82:21
**attorney** [1] - 64:20
**audio** [2] - 41:19, 75:17
**August** [2] - 31:23, 54:15
**automatically** [1] - 10:21
**availability** [1] - 26:14
**available** [14] - 29:1, 29:2, 29:15, 40:21, 40:23, 41:2, 61:15, 62:22, 70:16, 71:2, 71:3, 71:4, 73:7, 77:7
**Avenue** [2] - 2:4, 2:8
**avoid** [1] - 87:11
**aware** [6] - 15:7, 29:20, 30:11, 32:19, 39:18, 40:22
**awfully** [2] - 45:19, 70:9

## B

**backdate** [1] - 27:6
**balance** [1] - 48:3
**bar** [1] - 39:24
**barrier** [1] - 47:20
**based** [7] - 7:23, 8:13, 19:25, 21:3, 29:7, 42:16, 78:22
**basis** [7] - 6:10, 12:17, 16:21, 28:21, 50:23, 77:11, 84:5
**battle** [1] - 43:21
**bearing** [1] - 8:10
**became** [2] - 29:20
**become** [4] - 30:22, 35:12, 35:17, 50:23
**becomes** [2] - 54:22, 54:25
**becoming** [1] - 13:2
**BEFORE** [1] - 1:23
**beg** [1] - 78:10
**beginning** [7] - 16:7, 24:20, 25:4, 43:25, 55:1, 85:13, 85:17
**behavior** [1] - 36:24
**behind** [1] - 56:24
**belief** [1] - 39:16
**believes** [1] - 7:21

**below** [1] - 90:3
**benefit** [1] - 21:13
**best** [4] - 23:11, 30:17, 44:19, 90:5
**better** [4] - 48:6, 59:22, 69:15, 87:4
**between** [17] - 15:19, 16:11, 21:21, 22:3, 22:15, 23:18, 25:20, 29:23, 36:19, 37:7, 49:9, 52:23, 58:11, 67:7, 70:10, 79:25
**beyond** [4] - 35:7, 42:4, 53:18, 58:21
**bifurcate** [1] - 16:21
**bifurcation** [3] - 16:5, 16:13, 17:2
**big** [1] - 56:24
**bit** [6] - 12:13, 21:18, 28:2, 41:22, 64:25, 67:12
**blame** [2] - 68:23, 81:5
**blaming** [1] - 34:22
**block** [1] - 25:4
**blunted** [1] - 44:11
**bolts** [1] - 13:11
**booked** [1] - 21:23
**BOSWORTH** [2] - 2:3, 2:7
**bottom** [1] - 7:18
**boundaries** [2] - 49:13, 62:6
**breaks** [1] - 56:12
**brief** [6] - 12:13, 40:2, 40:3, 66:9, 66:10
**briefed** [1] - 4:22
**briefing** [15] - 11:22, 12:24, 12:25, 13:17, 14:7, 18:9, 18:12, 64:17, 64:18, 65:6, 65:11, 65:16, 78:11, 85:20, 86:8
**briefs** [7] - 14:13, 15:6, 17:9, 20:13, 20:17, 85:16, 87:3
**bright** [1] - 37:7
**bring** [3] - 21:18, 42:15, 44:5
**Broadway** [4] - 3:4, 3:8, 3:11, 3:15
**budget** [1] - 23:20
**burden** [1] - 53:14

## C

**CABLE** [1] - 3:14
**calendar** [6] - 22:21, 26:16, 26:20, 62:20, 70:14, 71:11
**calendars** [1] - 71:10

**California** [1] - 80:3
**camera** [3] - 5:20, 6:14, 56:23
**cannot** [1] - 8:12
**capacities** [2] - 22:17, 70:7
**caption** [1] - 16:10
**cards** [1] - 12:22
**care** [1] - 89:6
**careful** [1] - 49:10
**carefully** [1] - 19:24
**caring** [1] - 43:8
**carry** [1] - 65:13
**carry-down** [1] - 65:13
**case** [64] - 4:7, 6:9, 8:2, 10:10, 10:18, 10:22, 11:11, 12:2, 12:3, 14:8, 14:9, 17:2, 17:13, 17:17, 17:18, 17:24, 18:11, 18:13, 18:16, 18:17, 18:24, 19:3, 19:7, 19:16, 19:18, 21:18, 22:25, 23:12, 24:11, 25:21, 29:6, 31:4, 35:15, 35:21, 40:22, 42:13, 42:21, 44:4, 44:10, 47:22, 48:3, 51:18, 65:5, 65:14, 66:25, 68:12, 70:4, 74:20, 74:21, 74:24, 77:3, 77:9, 79:13, 87:1, 87:10, 87:17, 87:18, 87:24, 88:7, 88:11, 88:12, 88:14
**Case** [1] - 4:9
**cases** [25] - 12:16, 15:4, 15:24, 16:2, 16:8, 16:10, 17:22, 21:2, 21:11, 21:12, 21:17, 21:20, 21:21, 22:6, 22:25, 23:8, 23:22, 25:3, 25:23, 26:3, 26:5, 26:8, 74:23, 79:15, 88:8
**casework** [2] - 8:6
**caseworker** [1] - 42:12
**caseworkers** [1] - 57:6
**caught** [1] - 82:21
**causally** [1] - 38:9
**causation** [1] - 41:4
**causing** [4] - 35:3, 41:7, 44:20, 49:8
**CEGFAC** [1] - 7:18
**cell** [1] - 90:9
**certain** [7] - 7:11, 18:13, 32:19, 37:13, 49:13, 69:16, 77:6

**certainly** [13] - 13:25, 29:18, 41:15, 43:15, 44:1, 51:7, 53:20, 58:20, 63:22, 77:23, 79:14, 81:6, 81:11
**Certificates** [1] - 90:24
**certification** [2] - 77:8, 90:13
**certified** [2] - 57:21, 90:18
**certify** [1] - 90:3
**cetera** [2] - 8:8, 57:7
**challenge** [1] - 54:19
**change** [1] - 71:6
**chaos** [1] - 43:5
**Chapman** [4] - 4:9, 4:10, 79:8, 79:19
**CHAPMAN** [2] - 1:8, 1:20
**characterization** [3] - 17:16, 76:22, 83:9
**characterize** [1] - 82:4
**check** [2] - 71:9, 81:24
**checked** [1] - 26:20
**checking** [2] - 26:16, 61:20
**chief** [1] - 23:8
**child** [6] - 6:9, 39:21, 40:14, 49:20, 50:3, 80:18
**Children** [1] - 78:21
**children** [1] - 16:22
**children's** [1] - 15:15
**choose** [1] - 39:7
**choosing** [1] - 56:6
**chronology** [2] - 29:10, 29:11
**Circuit** [1] - 64:20
**circumstance** [2] - 36:24, 44:18
**circumstances** [3] - 9:9, 55:19, 62:11
**cite** [4] - 18:9, 18:11, 40:3, 79:16
**cites** [3] - 7:16, 7:17, 8:2
**citing** [2] - 10:17
**Civil** [1] - 4:8
**claim** [7] - 8:3, 10:4, 12:3, 12:16, 16:13, 30:4, 36:22
**claiming** [4] - 19:2, 79:24, 80:22, 80:23
**claims** [27] - 7:22, 7:23, 9:4, 9:21, 9:23, 9:24, 9:25, 12:20, 15:17, 15:19, 16:14, 19:9, 19:15, 19:17, 19:18, 19:19, 19:24, 33:17, 34:25, 35:1,

35:2, 35:20, 64:18, 68:13, 68:19
**clarification** [1] - 28:23
**clarifying** [1] - 22:13
**classic** [1] - 40:25
**clear** [14] - 19:25, 29:11, 44:25, 47:12, 47:16, 54:8, 54:21, 54:24, 55:6, 55:11, 55:15, 80:2, 84:10
**clearly** [4] - 25:15, 26:6, 28:19, 35:11
**clinical** [4] - 37:25, 40:5, 40:12, 49:7
**close** [9] - 29:12, 29:15, 29:17, 29:24, 30:11, 30:21, 30:23, 31:17, 88:15
**closely** [1] - 32:7
**closer** [1] - 24:8
**closing** [1] - 28:20
**cognitive** [1] - 70:7
**colleagues** [1] - 88:21
**combination** [1] - 41:19
**comfortable** [1] - 55:8
**coming** [4] - 68:5, 69:6, 72:4, 89:1
**comments** [1] - 20:12
**committing** [1] - 38:6
**common** [1] - 26:1
**communicated** [1] - 26:2
**communications** [1] - 78:25
**company** [1] - 71:21
**comparison** [1] - 36:19
**compel** [5] - 27:12, 27:13, 44:23, 58:9, 63:14
**compelled** [2] - 12:5, 12:8
**complaint** [11] - 7:19, 11:10, 12:9, 16:4, 16:8, 35:15, 35:23, 36:5, 36:8, 77:2, 78:14
**complaints** [2] - 16:11, 76:23
**complete** [7] - 5:5, 13:24, 24:14, 28:9, 51:3, 78:24
**completed** [1] - 60:24
**completely** [1] - 71:23
**complex** [2] - 37:6, 74:23
**complexities** [1] - 21:10

**complexity** [1] - 21:13
**complicate** [1] - 15:23
**complicated** [2] - 19:8, 19:13
**components** [1] - 65:9
**comprehend** [1] - 44:1
**computer** [1] - 61:20
**concealed** [1] - 84:15
**conceive** [1] - 70:6
**concern** [5] - 6:7, 18:21, 32:25, 65:4, 79:15
**concerned** [4] - 21:24, 33:10, 40:4, 85:18
**concerning** [2] - 7:11, 78:25
**concerns** [1] - 7:5
**conclusion** [1] - 19:25
**condition** [6] - 8:10, 45:8, 51:6, 52:1, 52:2
**conditions** [4] - 35:11, 36:8, 38:12, 48:24
**conduct** [6] - 8:4, 46:25, 48:25, 70:1, 79:25, 80:15
**conducting** [2] - 51:2, 62:24
**confer** [4] - 8:19, 55:25, 58:24, 62:22
**Conference** [1] - 1:22
**conference** [11] - 4:10, 13:4, 26:9, 28:22, 68:9, 68:15, 69:11, 69:20, 69:23, 69:24, 70:17
**conferences** [1] - 70:8
**conferral** [5] - 7:8, 7:20, 8:1, 58:12, 65:21
**conferred** [1] - 65:1
**confidence** [3] - 21:1, 30:15, 38:23
**confidential** [1] - 58:5
**confidently** [2] - 37:1, 85:13
**confirm** [2] - 31:22, 33:14
**confirmation** [1] - 27:3
**confirming** [2] - 62:17, 72:7
**conformed** [1] - 90:17
**confuse** [1] - 21:4
**confused** [4] - 22:10, 71:19, 75:14, 76:21
**confusion** [3] - 19:13, 25:11, 38:24
**conjure** [1] - 39:19

**Conley** [23] - 4:10, 4:13, 6:25, 10:9, 11:3, 13:1, 14:9, 14:10, 17:7, 19:3, 19:18, 21:6, 22:20, 23:14, 24:11, 24:13, 24:16, 25:2, 35:21, 61:23, 67:17, 68:2
**CONLEY** [3] - 1:17, 2:11, 2:15
**Conley's** [1] - 71:16
**connect** [1] - 38:10
**connection** [5] - 7:20, 8:4, 8:6, 12:10, 38:7
**connections** [1] - 90:8
**consequences** [1] - 13:11
**conservator** [1] - 56:12
**consider** [10] - 9:7, 11:6, 18:10, 19:24, 52:11, 55:18, 55:21, 77:5, 77:21, 77:22
**consideration** [1] - 12:20
**considerations** [2] - 21:15, 48:25
**considered** [2] - 9:3, 28:24
**considering** [2] - 22:11, 56:8
**consistency** [1] - 22:7
**consistent** [1] - 54:9
**consolidate** [8] - 4:23, 14:6, 14:11, 14:15, 14:17, 17:10, 21:9, 23:7
**consolidated** [5] - 19:7, 21:18, 22:25, 67:20
**consolidating** [1] - 86:13
**consolidation** [5] - 16:15, 17:1, 20:15, 21:12, 27:11
**contemplated** [2] - 36:9, 38:6
**contemplating** [1] - 24:1
**contend** [1] - 81:10
**contending** [1] - 80:21
**contest** [1] - 13:18
**context** [5] - 8:24, 30:25, 39:3, 42:10, 47:10
**continuation** [1] - 78:3
**continue** [5] - 32:17, 68:23, 76:9, 78:1, 78:6

**continues** [2] - 28:18, 49:24
**continuing** [1] - 85:9
**continuum** [1] - 38:14
**conundrum** [1] - 68:22
**conversation** [1] - 53:3
**conversation's** [1] - 46:11
**conversations** [1] - 87:16
**convicted** [1] - 7:13
**cooperating** [2] - 6:15, 11:12
**coordinate** [1] - 49:3
**core** [1] - 77:9
**correct** [8] - 31:16, 31:18, 33:18, 63:13, 67:14, 67:15, 74:18, 90:4
**cost** [1] - 21:16
**counsel** [38] - 4:11, 4:12, 4:13, 4:15, 5:10, 5:14, 5:24, 6:25, 7:1, 7:9, 7:21, 7:22, 8:2, 8:15, 13:16, 16:8, 17:7, 17:19, 21:7, 21:9, 21:17, 23:6, 27:22, 29:15, 31:15, 31:20, 32:5, 32:19, 53:22, 55:24, 56:12, 58:12, 59:23, 61:15, 61:23, 73:7, 76:12, 88:23
**counsel's** [3] - 32:24, 34:14, 44:22
**counselor** [3] - 49:15, 50:15, 62:11
**counselors** [2] - 8:8, 15:16
**count** [1] - 31:5
**County** [16] - 73:24, 74:3, 75:13, 76:23, 76:24, 77:2, 77:4, 78:20, 78:21, 79:5, 79:20, 80:8, 80:22, 80:23, 81:4, 81:9
**County's** [1] - 75:12
**couple** [2] - 15:5, 74:7
**course** [9] - 11:21, 18:20, 25:19, 26:2, 34:8, 38:1, 79:25, 80:11, 85:2
**court** [4] - 8:7, 9:7, 10:14, 10:15
**COURT** [188] - 1:1, 1:24, 1:25, 4:7, 4:11, 6:11, 6:16, 8:17, 8:23, 9:15, 9:19,

10:6, 12:4, 12:12, 13:20, 13:23, 14:5, 14:22, 15:2, 15:11, 16:3, 16:7, 16:18, 16:25, 17:7, 17:19, 18:18, 20:2, 20:12, 20:18, 20:21, 21:6, 21:9, 23:23, 24:4, 24:10, 24:13, 24:19, 25:1, 25:3, 26:18, 26:22, 26:25, 27:5, 27:25, 28:11, 31:22, 32:1, 32:4, 32:9, 32:11, 32:16, 33:14, 35:6, 35:14, 35:23, 36:16, 37:9, 37:11, 37:15, 37:19, 38:9, 40:9, 41:9, 41:22, 42:22, 43:19, 45:6, 45:12, 45:18, 45:23, 46:1, 46:15, 46:19, 46:22, 47:2, 47:6, 47:10, 47:15, 48:16, 48:19, 48:22, 50:7, 50:10, 51:10, 51:14, 51:22, 53:21, 54:2, 54:13, 55:11, 56:4, 56:19, 57:12, 57:22, 59:5, 59:14, 60:8, 60:15, 60:20, 61:2, 61:5, 61:9, 61:11, 61:17, 61:22, 61:25, 62:2, 62:5, 62:16, 62:21, 63:1, 63:3, 63:12, 63:20, 64:1, 64:9, 64:16, 64:22, 65:17, 66:6, 66:9, 66:13, 66:15, 66:20, 66:23, 67:4, 67:11, 67:16, 67:22, 67:25, 68:22, 69:1, 69:13, 70:5, 70:19, 71:3, 71:5, 71:13, 71:19, 72:14, 72:20, 72:22, 72:25, 73:4, 73:7, 73:10, 74:5, 74:14, 74:19, 75:10, 75:19, 75:22, 76:4, 76:6, 76:11, 76:19, 78:9, 79:9, 79:11, 80:14, 80:25, 81:12, 81:17, 81:19, 82:19, 83:8, 83:18, 83:20, 83:25, 84:8, 84:13, 84:21, 85:3, 85:7, 85:11, 85:16, 85:23, 86:2, 86:7, 86:12, 86:18, 86:23, 87:2, 87:6, 88:4, 88:10, 88:23
**Court** [28] - 4:5, 5:21, 6:2, 6:3, 6:5, 7:24,

8:13, 9:16, 10:1, 10:21, 11:5, 13:16, 15:18, 15:21, 21:1, 23:20, 27:22, 32:22, 37:8, 49:19, 65:3, 65:8, 65:18, 65:24, 78:11, 85:20, 85:25, 90:23

**Court's** [5] - 6:8, 7:6, 7:10, 7:21, 21:14
**courtroom** [3] - 76:2, 76:14, 87:25
**COURTROOM** [2] - 4:4, 4:8
**courts** [1] - 20:24
**cover** [1] - 23:22
**covered** [2] - 53:7, 65:21
**covers** [1] - 81:23
**CPS** [3] - 7:14, 50:4, 80:12
**crack** [1] - 85:9
**create** [1] - 25:17
**created** [2] - 11:11
**credibility** [1] - 8:11
**criminal** [7] - 7:12, 9:6, 9:24, 10:23, 11:9, 12:10
**critical** [2] - 42:13, 71:1
**cross** [1] - 23:19
**crossed** [1] - 47:20
**CRR** [1] - 90:23
**crux** [1] - 33:4
**culpability** [1] - 73:24
**current** [4] - 45:8, 51:6, 52:1
**custodians** [2] - 83:6, 84:19
**cut** [1] - 85:22
**cutting** [1] - 39:9

## D

**damage** [1] - 30:4
**damages** [24] - 18:1, 18:2, 18:4, 18:6, 18:16, 19:1, 19:5, 19:11, 22:8, 22:11, 23:17, 25:15, 30:5, 33:16, 35:7, 35:8, 36:22, 37:3, 37:8, 37:9, 37:20, 39:12, 41:23
**damned** [1] - 47:24
**danger** [2] - 18:8, 18:15
**data** [2] - 85:3, 85:10
**date** [14] - 9:10, 18:19, 22:20, 22:21, 56:17,

63:4, 70:23, 72:1, 72:8, 73:2, 75:5, 85:18, 86:3, 87:14
**DATED** [1] - 90:20
**dates** [8] - 21:25, 26:12, 26:24, 27:2, 71:7, 71:9, 71:22, 88:17
**Daubert** [2] - 68:17, 70:3
**Davies** [1] - 76:16
**days** [5] - 23:18, 23:21, 24:1, 26:10
**DCFS** [1] - 78:22
**deadline** [4] - 31:24, 48:17, 60:21, 68:6
**deadlines** [1] - 27:7
**deal** [1] - 68:18
**dealing** [2] - 17:2, 44:11
**death** [1] - 79:1
**december** [1] - 1:7
**December** [1] - 4:1
**decide** [4] - 8:24, 59:19, 71:23, 72:4
**decided** [2] - 11:18, 48:9
**decision** [11] - 8:20, 15:8, 28:23, 31:11, 47:1, 47:13, 55:7, 60:13, 60:21, 60:23, 74:6
**decisions** [4] - 5:7, 26:6, 26:7, 62:7
**declined** [1] - 47:18
**deeper** [1] - 63:12
**deeply** [1] - 41:25
**defend** [3] - 44:10, 48:2, 79:13
**DEFENDANT** [4] - 3:3, 3:6, 3:10, 3:13
**Defendant** [3] - 1:15, 7:9, 9:13
**defendant** [4] - 9:6, 9:21, 12:16, 84:15
**defendants** [31] - 7:13, 10:11, 16:9, 16:10, 16:12, 16:21, 17:5, 19:10, 19:19, 19:20, 19:22, 20:24, 21:3, 22:16, 23:19, 26:15, 29:20, 30:6, 30:10, 37:15, 39:4, 39:22, 42:11, 50:5, 53:3, 65:2, 71:18, 78:18, 79:23, 80:9, 82:17
**Defendants** [2] - 1:9, 1:21
**defendants'** [12] - 5:3,

7:14, 17:12, 17:16, 20:14, 29:15, 40:2, 49:12, 49:20, 58:8, 60:7, 68:3
**defending** [1] - 30:4
**defense** [10] - 4:13, 7:1, 14:18, 16:16, 17:19, 33:16, 49:14, 60:16, 78:17, 79:6
**defer** [1] - 14:20
**define** [1] - 17:17
**defined** [1] - 8:15
**definitely** [1] - 47:8
**degree** [1] - 43:16
**delay** [2] - 65:12, 65:16
**deliberate** [1] - 42:11
**denial** [2] - 31:4, 66:11
**denied** [3] - 7:21, 28:21, 69:9
**deny** [1] - 42:19
**denying** [2] - 7:10, 27:13
**dep** [2] - 33:22, 47:3
**DEPARTMENT** [1] - 1:11
**department** [1] - 22:18
**Department** [3] - 22:18, 78:21, 82:12
**departments** [2] - 78:23
**dependency** [1] - 8:7
**depose** [3] - 33:12, 35:8, 78:23
**deposed** [3] - 28:25, 40:6, 57:6
**deposition** [90] - 4:23, 27:13, 28:20, 30:24, 31:5, 32:21, 33:1, 33:15, 33:23, 34:7, 34:24, 35:19, 36:3, 38:17, 41:14, 41:24, 43:12, 43:20, 44:13, 44:16, 44:23, 46:9, 46:11, 46:13, 46:14, 46:25, 47:3, 47:15, 47:18, 48:10, 48:12, 49:1, 49:6, 49:8, 50:3, 50:25, 51:2, 52:22, 52:24, 53:9, 53:17, 55:2, 55:8, 55:17, 55:25, 56:7, 56:10, 56:13, 57:22, 57:23, 58:9, 58:14, 58:22, 59:10, 59:13, 59:18, 60:1, 60:3, 60:10, 60:17, 60:24, 62:6, 62:14, 63:5, 63:10, 63:16, 63:24, 64:4, 64:6, 64:7,

77:15, 77:19, 78:2, 78:3, 78:5, 78:6, 80:5, 80:11, 81:4, 82:4, 82:20, 82:22, 85:22, 85:24, 86:4, 88:25
**depositions** [10] - 31:6, 31:7, 35:24, 44:19, 54:15, 56:17, 82:2, 83:1, 83:4, 83:14
**depressed** [1] - 38:6
**depth** [1] - 47:23
**DEPUTY** [2] - 4:4, 4:8
**describe** [1] - 31:14
**described** [4] - 28:7, 38:3, 44:22, 82:9
**describes** [2] - 37:2, 52:6
**describing** [1] - 10:17
**description** [1] - 58:18
**descriptions** [3] - 36:21, 36:24, 57:25
**designation** [1] - 58:4
**designed** [2] - 41:14, 76:24
**desire** [1] - 33:14
**destroyed** [13] - 82:5, 82:6, 82:8, 82:22, 82:23, 83:10, 83:13, 84:3, 84:6, 84:10, 84:15, 85:2
**destruction** [3] - 83:22, 84:22, 84:23
**detail** [3] - 15:21, 25:6, 58:21
**detailed** [1] - 53:22
**details** [3] - 56:2, 58:19, 61:12
**determination** [1] - 84:2
**determinations** [1] - 77:8
**determine** [3] - 6:5, 46:10, 78:23
**determining** [1] - 77:3
**develop** [1] - 48:3
**developed** [3] - 18:19, 54:12
**developing** [3] - 33:15, 40:16, 75:3
**DHS** [5] - 15:20, 19:17, 42:13, 43:8, 57:21
**DHS-certified** [1] - 57:21
**di** [1] - 10:14
**diagnosis** [1] - 39:25
**differ** [1] - 78:10
**differed** [1] - 77:19

**difference** [1] - 80:20
**differences** [2] - 17:23, 17:24
**different** [17] - 6:20, 17:8, 18:2, 18:7, 19:3, 19:9, 19:10, 19:11, 19:14, 19:20, 43:22, 62:23, 65:20, 66:19, 84:15, 84:16
**difficult** [1] - 66:4
**difficulties** [2] - 90:12, 90:15
**digitally** [1] - 90:18
**direct** [1] - 23:18
**direction** [1] - 60:9
**directly** [1] - 33:13
**dis** [2] - 52:20, 66:11
**disabilities** [1] - 49:24
**disagree** [2] - 17:22, 52:21
**disagreed** [1] - 59:1
**disagreement** [3] - 24:6, 63:7, 63:8
**disagrees** [1] - 10:1
**disassociation** [2] - 28:8, 28:12
**disclosed** [3] - 37:13, 38:20, 45:2
**discloses** [1] - 36:25
**disclosing** [1] - 34:13
**disclosure** [4] - 8:7, 32:10, 39:18, 39:19
**disclosures** [12] - 29:19, 30:7, 30:10, 32:11, 42:2, 42:4, 42:7, 43:11, 79:17, 81:1, 81:13, 81:21
**discontinue** [1] - 56:13
**discovered** [2] - 82:24, 83:2
**discovery** [17] - 18:20, 28:20, 29:13, 29:16, 29:18, 29:24, 30:12, 30:22, 30:24, 31:17, 32:3, 32:14, 36:21, 39:22, 42:5, 74:16, 82:16
**discuss** [4] - 10:19, 11:10, 48:11, 62:6
**discussed** [1] - 22:20
**discussing** [1] - 60:18
**discussion** [2] - 55:2, 58:11
**discussions** [2] - 13:9, 87:13
**disinclined** [1] - 54:14
**dismiss** [2] - 7:10, 66:11
**distill** [2] - 27:17,

27:19

**distinct** [2] - 22:10, 25:16

**distinction** [4] - 10:7, 11:16, 15:18, 22:14

**distinctions** [1] - 22:15

**distorted** [1] - 17:12

**District** [2] - 4:4, 4:5

**district** [1] - 10:15

**DISTRICT** [3] - 1:1, 1:2, 1:24

**disturbance** [1] - 61:3

**dive** [1] - 63:12

**dived** [1] - 41:25

**divested** [1] - 65:24

**divests** [3] - 7:24, 10:15, 10:21

**DIVISION** [1] - 1:3

**divulge** [1] - 32:6

**doable** [1] - 86:5

**doctor** [1] - 37:23

**doctors** [1] - 40:6

**documents** [1] - 77:7

**dollar** [1] - 35:2

**done** [8] - 31:3, 40:12, 45:22, 48:7, 49:8, 49:17, 87:12, 88:1

**double** [1] - 86:14

**doubtful** [1] - 44:12

**down** [9] - 21:25, 25:25, 27:18, 27:19, 50:17, 64:2, 65:13, 73:20, 74:8

**dozen** [1] - 31:6

**dozens** [2] - 87:19

**Dr** [31] - 28:1, 28:7, 29:7, 29:8, 29:12, 29:23, 30:7, 31:17, 31:22, 32:8, 33:5, 33:11, 33:20, 34:1, 34:4, 36:18, 37:1, 37:5, 37:21, 37:24, 38:1, 38:3, 38:9, 38:14, 38:18, 38:21, 39:2, 39:20, 41:5, 41:7, 49:22

**draft** [1] - 85:25

**drafted** [1] - 14:8

**draw** [2] - 37:7, 66:1

**drawer** [1] - 83:2

**drew** [3] - 5:17, 14:25

**due** [10] - 13:21, 13:22, 36:5, 67:20, 71:25, 72:11, 72:22, 87:7, 87:8

**Due** [1] - 90:8

**during** [7] - 13:3, 28:22, 32:2, 32:14, 39:22, 90:12

## E

**easier** [1] - 67:22

**easiest** [1] - 18:22

**echo** [1] - 75:22

**economy** [1] - 21:14

**Edelson** [29] - 3:4, 14:17, 23:23, 27:15, 27:16, 30:15, 32:14, 32:17, 37:22, 38:4, 40:9, 44:7, 45:7, 45:23, 49:6, 50:12, 50:18, 51:1, 51:4, 54:21, 58:12, 61:2, 61:17, 61:19, 62:3, 62:16, 68:24, 69:1, 86:8

**EDELSON** [44] - 27:16, 28:2, 30:17, 32:18, 33:18, 35:10, 35:16, 35:25, 36:4, 36:7, 40:10, 41:13, 42:9, 43:13, 45:10, 45:16, 45:19, 45:25, 46:4, 46:18, 46:21, 47:1, 47:5, 47:8, 47:14, 48:13, 48:18, 48:21, 51:7, 51:12, 51:20, 52:13, 54:1, 54:3, 55:10, 56:3, 56:16, 59:4, 59:8, 59:16, 62:18, 62:24, 63:2, 89:10

**Edelson's** [2] - 44:9, 61:17

**effect** [2] - 28:25, 66:10

**effectively** [2] - 5:23, 7:21

**efficacy** [1] - 43:10

**efficiencies** [2] - 15:4, 23:4

**efficiency** [2] - 21:14, 22:7

**effort** [2] - 21:16, 73:19

**eight** [3] - 27:20, 30:1, 32:23

**eight-hour** [1] - 30:1

**either** [4] - 47:7, 52:3, 72:14, 73:23

**elicit** [1] - 38:19

**eliminate** [2] - 59:18, 69:15

**eliminates** [2] - 12:18, 12:19

**emotional** [1] - 36:25

**emotionally** [1] - 15:25

**encourage** [1] - 88:13

**end** [16] - 13:2, 14:4, 24:20, 24:21, 27:8, 49:10, 52:19, 56:23, 64:20, 66:3, 66:6, 68:5, 69:5, 70:12, 86:12

**engaged** [1] - 37:25

**enjoy** [1] - 22:6

**enjoys** [1] - 10:2

**ensure** [1] - 62:12

**ensuring** [2] - 22:12, 85:1

**entertain** [1] - 31:3

**entice** [1] - 46:1

**entire** [2] - 67:9, 76:7

**entitled** [3] - 7:23, 49:21, 90:6

**enunciate** [1] - 90:11

**envision** [2] - 19:6, 54:3

**envisioning** [1] - 23:10

**erred** [1] - 79:21

**especially** [2] - 19:21, 67:19

**essay** [1] - 15:10

**essentially** [2] - 16:11, 16:14

**establish** [1] - 47:11

**established** [1] - 55:13

**et** [6] - 1:8, 1:20, 4:9, 4:10, 8:8, 57:7

**ETHAN** [1] - 1:5

**Eugene** [3] - 26:13, 27:6, 73:11

**EUGENE** [1] - 1:3

**eugene** [1] - 1:8

**evaluate** [1] - 55:16

**evaluated** [2] - 29:8, 39:21

**evaluating** [1] - 22:11

**evaluation** [1] - 44:17

**eve** [2] - 28:20, 30:21

**evening** [1] - 8:3

**event** [3] - 34:17, 39:1, 59:11

**events** [2] - 27:24, 34:3

**evidence** [39] - 8:12, 9:1, 9:4, 9:9, 10:8, 11:6, 11:13, 11:23, 11:25, 12:14, 12:19, 17:15, 18:19, 37:22, 40:16, 50:1, 52:6, 54:15, 64:18, 75:4, 77:7, 82:5, 82:8, 82:23, 82:24, 83:10, 83:11, 83:13, 83:22, 84:2, 84:5, 84:9, 84:14, 84:19, 84:23, 84:24, 85:1

**evidence"** [1] - 82:22

**evidentiary** [3] - 11:17, 13:3, 57:9

**evolved** [1] - 76:8

**exactly** [3] - 20:4, 35:16, 78:14

**examined** [1] - 38:4

**example** [8] - 7:23, 8:6, 18:20, 19:16, 34:4, 45:20, 58:16, 78:25

**exceed** [1] - 56:10

**exception** [2] - 41:1, 59:10

**exceptions** [1] - 40:1

**exchange** [3] - 68:16, 80:1

**exclude** [1] - 59:17

**exculpatory** [1] - 11:13

**excuse** [1] - 61:13

**exercise** [1] - 60:6

**exhibit** [2] - 68:16, 77:13

**exhibits** [1] - 70:2

**existence** [1] - 12:19

**existing** [1] - 65:11

**exited** [1] - 62:19

**expect** [1] - 41:11

**expense** [2] - 15:23, 69:22

**experience** [3] - 20:22, 27:23, 39:6

**experienced** [7] - 22:9, 35:11, 38:2, 42:16, 47:24, 58:2

**experiences** [2] - 37:3, 43:15

**experiencing** [3] - 41:16, 41:17, 52:8

**expert** [21] - 4:24, 18:3, 18:5, 19:3, 22:5, 27:20, 29:18, 32:11, 32:23, 33:9, 39:24, 40:12, 41:10, 57:1, 73:25, 77:12, 77:20, 80:3, 80:12, 81:20

**expert's** [1] - 79:21

**experts** [7] - 18:16, 18:24, 23:14, 40:4, 42:15, 77:1, 80:1

**Expire** [1] - 90:24

**explain** [4] - 10:13, 37:7, 77:6, 81:7

**explanation** [3] - 76:25, 81:9, 81:12

**exploration** [1] - 52:7

**explore** [5] - 6:3, 33:20, 42:7, 54:17, 88:13

**explored** [1] - 57:24

**exploring** [3] - 42:6, 50:16, 87:21

**exposure** [1] - 12:18

**expressing** [1] - 88:12

**extant** [1] - 37:24

**extend** [2] - 25:3, 66:23

**extending** [2] - 68:1, 88:10

**extends** [1] - 15:14

**extension** [4] - 55:6, 65:25, 67:8, 67:17

**extensive** [1] - 25:6

**extent** [12] - 12:15, 18:25, 19:4, 20:25, 31:10, 45:8, 50:12, 50:14, 51:23, 51:25, 65:24, 77:18

**extra** [1] - 83:1

**extracted** [1] - 85:3

**extraordinarily** [1] - 19:8

**extreme** [1] - 45:19

## F

**face** [1] - 19:22

**facing** [1] - 75:13

**fact** [16] - 17:2, 17:14, 17:23, 27:20, 29:7, 29:13, 29:16, 29:17, 29:24, 30:11, 32:2, 35:18, 57:20, 72:7, 84:3, 87:11

**facts** [8] - 15:17, 18:7, 18:13, 18:15, 18:18, 21:4, 33:8, 33:25

**failing** [1] - 90:10

**failure** [1] - 80:17

**fair** [5] - 35:5, 46:4, 46:5, 68:25

**fairly** [4] - 13:18, 23:13, 49:25, 66:1

**fairness** [2] - 52:10, 77:25

**fall** [3] - 5:6, 14:11, 21:23

**fallout** [1] - 5:22

**falls** [1] - 37:12

**familiar** [4] - 6:18, 15:5, 48:24, 74:22

**family** [1] - 15:15

**Family** [1] - 78:21

**far** [3] - 11:20, 23:20, 75:5

**fared** [1] - 27:25

**farmers** [2] - 71:11, 71:14
**fault** [7] - 77:4, 78:14, 78:16, 78:18, 79:20, 80:22, 80:24
**February** [7] - 68:8, 72:11, 86:10, 86:12, 86:16, 87:7, 87:8
**federal** [1] - 15:19
**feedback** [2] - 75:24, 76:6
**felt** [4] - 38:5, 38:22, 51:15
**ferret** [1] - 13:16
**few** [3] - 5:6, 27:19, 87:17
**fighting** [1] - 52:22
**Figoten** [14] - 4:24, 73:13, 75:1, 75:6, 77:12, 77:18, 78:2, 79:4, 79:7, 80:13, 80:16
**Figoten's** [8] - 73:25, 74:1, 76:24, 78:4, 80:15, 81:1, 81:6, 81:13
**figure** [2] - 55:23, 72:2
**figured** [3] - 48:19, 53:1, 53:11
**file** [10] - 13:24, 64:17, 66:7, 66:9, 66:24, 68:2, 68:8, 68:17, 69:3, 72:10
**filed** [8] - 5:19, 16:8, 64:11, 65:23, 73:18, 76:23, 77:1, 85:16
**files** [1] - 79:18
**filing** [3] - 10:20, 72:18, 85:23
**final** [3] - 15:7, 62:7, 81:23
**finalized** [1] - 32:13
**financial** [1] - 19:5
**findings** [1] - 84:4
**fine** [16] - 10:6, 14:6, 24:18, 24:25, 26:24, 61:9, 62:25, 63:2, 75:19, 76:11, 78:5, 86:12, 87:5, 87:24
**finer** [1] - 11:1
**firm** [1] - 80:1
**first** [19] - 5:14, 7:3, 7:18, 13:1, 16:4, 23:6, 28:5, 29:19, 34:4, 34:13, 37:20, 39:2, 45:24, 48:4, 48:5, 48:20, 56:5, 74:1
**firsthand** [1] - 49:23
**fit** [1] - 69:4

**five** [4] - 19:18, 23:21, 24:1
**flavor** [1] - 53:24
**flow** [1] - 46:12
**focus** [2] - 46:1, 50:2
**focusing** [1] - 41:22
**follow** [3] - 49:21, 50:22, 58:20
**follow-up** [2] - 50:22, 58:20
**followed** [1] - 78:17
**following** [1] - 74:19
**fondness** [1] - 15:12
**foot** [1] - 44:8
**FOR** [9] - 1:2, 2:3, 2:7, 2:11, 2:15, 3:3, 3:6, 3:10, 3:13
**force** [1] - 61:3
**foregoing** [1] - 90:3
**foremost** [2] - 13:2, 74:1
**forgetting** [1] - 64:12
**forgot** [1] - 35:16
**form** [6] - 19:8, 20:1, 20:9, 55:13, 65:7, 79:8
**forms** [6] - 20:3, 20:6, 20:7, 20:25, 79:14, 80:7
**forth** [1] - 67:7
**forthcoming** [1] - 83:16
**forward** [11] - 7:5, 9:8, 27:9, 66:2, 70:22, 77:1, 77:20, 78:6, 87:23, 88:24, 89:2
**foster** [1] - 57:21
**foundation** [2] - 79:22, 85:13
**founded** [1] - 79:2
**four** [8] - 23:18, 23:25, 24:2, 24:15, 24:17, 69:5, 79:7
**four-week** [1] - 69:5
**frame** [1] - 29:9
**frankly** [3] - 21:15, 50:14, 69:4
**free** [1] - 62:3
**Fres** [1] - 81:8
**Fresno** [17] - 73:24, 74:2, 75:12, 75:13, 76:23, 76:24, 77:2, 77:4, 78:20, 78:21, 79:5, 79:20, 80:8, 80:21, 80:23, 81:4, 81:8
**Fresno's** [2] - 74:16, 80:17
**friction** [1] - 53:9
**front** [5] - 25:6, 54:24,

69:13, 82:11, 88:19
**front-loaded** [1] - 69:13
**froze** [1] - 61:20
**frozen** [1] - 62:18
**full** [3] - 28:4, 60:17, 78:24
**fully** [4] - 12:13, 22:14, 54:12, 68:14
**function** [1] - 14:3
**functioning** [5] - 45:9, 51:6, 52:1, 52:2, 52:3
**future** [2] - 19:23, 77:14
**FYI** [1] - 62:21

**G**

**gain** [1] - 44:13
**gap** [1] - 25:18
**Garrity** [1] - 18:11
**gather** [2] - 49:12, 64:4
**gears** [1] - 25:20
**generally** [3] - 72:16, 82:11
**girl** [2] - 39:5, 39:21
**gist** [1] - 53:15
**given** [13] - 5:25, 21:3, 22:13, 23:7, 23:10, 23:22, 34:8, 38:24, 55:18, 57:20, 57:23, 66:4, 79:15
**glance** [1] - 6:17
**goals** [1] - 53:10
**grant** [2] - 55:6, 69:15
**granted** [2] - 21:10, 22:19
**grateful** [1] - 72:17
**great** [2] - 68:18, 76:20
**greater** [1] - 35:4
**guardrails** [11] - 44:15, 44:21, 47:11, 48:19, 48:25, 55:3, 55:12, 58:14, 60:11, 60:17, 62:7
**guess** [4] - 20:5, 44:3, 73:17, 77:14
**guessing** [1] - 41:20
**guidance** [2] - 65:17, 85:20
**guiding** [1] - 55:16
**gun** [1] - 54:10

**H**

**hammer** [1] - 61:12
**Hammond** [1] - 85:4

**Hammond's** [1] - 83:1
**handle** [1] - 15:18
**handled** [1] - 38:17
**handling** [1] - 86:8
**hanging** [1] - 39:10
**happy** [4] - 53:14, 53:18, 88:19, 89:5
**harass** [1] - 39:11
**hard** [6] - 25:17, 43:14, 46:10, 46:13, 49:9, 73:12
**harm** [4] - 19:4, 44:20, 47:23, 58:2
**harms** [5] - 18:2, 18:4, 18:5, 18:25, 80:24
**Harris** [26] - 28:1, 28:7, 29:7, 29:8, 29:12, 29:23, 30:7, 31:17, 32:8, 33:5, 33:11, 34:1, 34:4, 37:1, 37:5, 37:24, 38:1, 38:3, 38:9, 38:14, 38:18, 38:21, 38:22, 39:2, 41:5, 41:7
**Harris's** [6] - 31:22, 33:20, 36:18, 37:21, 39:20, 49:22
**harry** [1] - 3:11
**haystack** [1] - 34:20
**head** [1] - 56:24
**headed** [1] - 88:2
**header** [1] - 86:14
**heading** [1] - 82:21
**hear** [14] - 33:13, 39:14, 41:15, 43:13, 48:14, 49:2, 50:15, 54:13, 75:19, 75:20, 76:11, 76:18, 78:8, 82:18
**heard** [1] - 65:20
**hearing** [4] - 53:14, 73:2, 86:17, 86:19
**hearsay** [6] - 33:3, 40:1, 40:2, 40:4, 40:18, 40:25
**heck** [1] - 72:2
**hell** [1] - 56:25
**help** [2] - 16:18, 41:2
**helpful** [2] - 15:7, 20:14
**HERBOLD** [3] - 3:3, 3:7, 3:10
**herself** [4] - 38:19, 39:9, 39:10, 57:17
**high** [1] - 19:12
**highest** [1] - 43:16
**highly** [2] - 41:3, 58:4
**himself** [1] - 62:4
**histories** [1] - 40:7

**history** [1] - 88:3
**holiday** [1] - 66:5
**holidays** [1] - 5:25
**home** [11] - 16:1, 34:6, 34:18, 35:11, 38:2, 38:6, 38:11, 38:12, 41:7, 41:18, 80:4
**Honor** [81] - 6:13, 8:16, 9:12, 11:4, 11:16, 14:4, 14:19, 15:1, 15:9, 16:16, 17:11, 17:16, 17:21, 17:23, 18:10, 18:14, 18:23, 19:6, 20:5, 20:16, 20:23, 23:15, 24:24, 24:25, 26:16, 26:19, 27:4, 27:16, 31:2, 31:25, 39:25, 40:10, 59:8, 60:3, 60:19, 61:7, 61:16, 61:20, 62:1, 63:17, 63:21, 63:22, 64:8, 64:23, 67:3, 67:6, 67:19, 68:4, 68:10, 69:12, 69:21, 70:18, 71:12, 72:13, 72:23, 73:1, 73:6, 75:11, 76:10, 76:18, 76:21, 77:20, 77:21, 80:7, 80:19, 82:10, 83:15, 84:12, 84:17, 85:6, 85:8, 85:12, 86:6, 86:11, 86:17, 87:4, 88:5, 89:7, 89:8, 89:9, 89:10
**honor** [1] - 85:25
**Honorable** [1] - 4:6
**HONORABLE** [1] - 1:23
**hoped** [1] - 6:14
**hopefully** [1] - 54:5
**hoping** [1] - 12:25
**horrible** [1] - 42:19
**hostile** [1] - 52:23
**hour** [1] - 30:1
**hours** [3] - 27:20, 32:23, 56:10
**huge** [1] - 43:21
**HUMAN** [1] - 1:11
**Human** [2] - 22:18, 82:12
**Humiston** [3] - 1:25, 90:22, 90:23
**HUSTON** [1] - 3:14

**I**

**i.e** [1] - 38:22
**Iambic** [1] - 15:11
**idea** [2] - 37:12, 40:1

**ideation** [3] - 38:2, 38:10, 41:6
**ideations** [1] - 38:15
**identical** [1] - 22:3
**identified** [7] - 5:9, 5:13, 25:15, 44:24, 49:5, 58:4
**identify** [6] - 6:21, 6:24, 7:4, 44:18, 51:18, 55:25
**identifying** [5] - 4:20, 25:19, 26:6, 46:23, 90:11
**ignore** [1] - 51:8
**ignored** [1] - 42:20
**ii** [1] - 3:1
**imagine** [7] - 9:10, 43:22, 44:1, 47:23, 64:9, 74:14, 76:12
**immediately** [1] - 52:4
**immunity** [13] - 6:8, 7:22, 9:2, 10:2, 11:18, 11:19, 11:23, 11:24, 12:1, 12:17, 65:10, 65:12
**impact** [7] - 8:25, 13:11, 50:16, 66:10, 69:3, 74:6
**impacted** [2] - 31:11, 33:8
**impacts** [2] - 33:10, 65:14
**impairments** [1] - 49:23
**impeach** [4] - 39:6, 57:10, 57:12, 57:13
**impeachment** [2] - 43:21, 57:14
**implications** [1] - 75:7
**implying** [1] - 32:14
**importance** [1] - 49:11
**important** [12] - 17:23, 18:10, 18:14, 19:21, 25:10, 30:25, 43:17, 48:24, 51:8, 68:21, 78:1, 80:20
**impose** [1] - 60:12
**imposing** [1] - 58:13
**impressions** [3] - 43:11, 43:16, 80:8
**impute** [2] - 18:13, 18:15
**IN** [1] - 1:1
**inclined** [1] - 55:12
**include** [2] - 4:22, 44:17
**included** [6] - 5:13, 6:23, 20:13, 81:1, 81:2, 81:21
**including** [2] - 5:3,

25:7
**incorporated** [1] - 66:15
**increase** [1] - 21:12
**indicated** [5] - 25:14, 41:23, 42:3, 44:22, 58:18
**indicating)** [2] - 76:19, 78:9
**indications** [1] - 82:15
**indifference** [1] - 42:11
**indiscernible** [1] - 44:17
**indiscernible)** [4] - 25:2, 50:9, 50:11, 84:7
**individual** [2] - 19:19, 19:22
**individually** [1] - 22:16
**inextricably** [1] - 8:5
**inflammatory** [1] - 83:22
**information** [23] - 8:10, 13:24, 29:1, 29:14, 29:21, 29:22, 30:1, 30:2, 31:12, 32:22, 34:10, 34:21, 36:12, 37:24, 38:19, 41:8, 49:3, 49:13, 64:5, 79:20, 80:13, 81:10
**initial** [3] - 81:1, 81:13, 81:21
**injuries** [11] - 17:25, 18:1, 45:8, 49:23, 50:1, 50:12, 50:14, 51:4, 51:25, 81:5
**injury** [2] - 49:9, 52:9
**input** [1] - 62:10
**inquire** [1] - 53:23
**inquiring** [1] - 45:7
**insistence** [1] - 60:7
**insofar** [2] - 40:4, 78:3
**instance** [2] - 16:4, 72:17
**instead** [1] - 51:4
**instructed** [1] - 21:5
**instruction** [1] - 25:18
**instructions** [5] - 15:18, 19:14, 20:1, 22:13
**intellectual** [1] - 11:1
**intend** [5] - 5:9, 17:13, 26:5, 59:23, 77:3
**intended** [2] - 25:23, 76:25
**intending** [2] - 56:14, 70:22

**intends** [1] - 59:11
**intent** [3] - 33:11, 40:15, 65:12
**intention** [1] - 80:2
**intentional** [1] - 34:22
**intentionally** [1] - 67:13
**interaction** [1] - 52:23
**interest** [3] - 35:3, 88:6, 88:11
**interested** [5] - 10:8, 10:25, 13:10, 54:17, 87:23
**interject** [1] - 36:2
**interlocutory** [3] - 9:1, 10:14, 13:13
**internet** [1] - 61:18
**interpretation** [1] - 6:7
**interrogate** [1] - 39:9
**interrogatories** [5] - 5:5, 46:8, 63:15, 63:23, 63:25
**interrogatory** [3] - 21:1, 78:16, 78:17
**interrupt** [2] - 8:17, 72:24
**interruption** [1] - 41:19
**intertwined** [1] - 8:5
**interview** [14] - 28:1, 28:9, 29:11, 29:20, 29:22, 30:1, 31:23, 36:20, 37:25, 38:1, 38:20, 39:3, 40:5, 40:12
**interviewed** [2] - 29:8, 38:25
**interviewing** [1] - 27:21
**interviews** [3] - 31:16, 32:20, 50:4
**intimidate** [1] - 39:11
**investigation** [1] - 79:1
**involved** [2] - 10:16, 32:7
**involvement** [1] - 7:12
**involves** [1] - 76:22
**involving** [2] - 10:22, 13:12
**issue** [43] - 6:3, 6:8, 7:2, 7:3, 11:17, 12:2, 14:17, 18:14, 20:25, 21:1, 26:3, 26:4, 27:10, 27:11, 28:19, 31:15, 33:21, 35:7, 35:12, 35:18, 37:11, 37:17, 38:17, 40:11, 42:22, 58:16, 59:9, 59:24, 64:2, 64:25,

65:15, 68:4, 73:13, 73:14, 74:16, 77:4, 77:6, 77:9, 77:22, 78:14, 83:8, 84:1
**issued** [1] - 27:8
**issues** [29] - 4:20, 4:24, 5:2, 5:22, 6:4, 6:6, 6:18, 6:19, 7:25, 8:20, 10:12, 10:16, 12:8, 13:16, 26:7, 28:25, 30:9, 37:20, 41:4, 43:17, 43:25, 44:10, 48:11, 58:10, 66:2, 68:11, 69:15, 70:21, 81:25
**it'll** [1] - 67:22
**items** [2] - 6:22, 31:13
**itself** [2] - 25:7, 49:21
**Ivan** [1] - 33:24

## J

**January** [15] - 59:2, 61:8, 62:5, 62:17, 62:20, 64:20, 66:7, 66:25, 68:6, 72:10, 85:24, 86:2, 87:6, 90:20
**JC** [55] - 4:23, 15:24, 16:8, 18:4, 19:1, 27:21, 27:23, 27:25, 28:6, 29:21, 29:23, 30:8, 31:23, 33:12, 33:15, 33:25, 34:12, 35:21, 36:9, 36:19, 36:25, 37:2, 37:25, 38:1, 38:4, 38:20, 38:23, 39:2, 39:7, 39:24, 41:10, 42:7, 42:23, 44:13, 44:16, 44:20, 49:24, 50:21, 50:24, 51:6, 53:23, 56:11, 56:12, 56:22, 57:24, 59:11, 59:14, 60:9, 62:6, 63:16, 64:4, 81:5, 88:25
**JC's** [29] - 8:7, 8:8, 8:10, 27:12, 27:13, 28:20, 29:7, 31:4, 33:2, 33:3, 35:15, 36:21, 38:9, 38:10, 42:12, 42:18, 44:23, 45:8, 47:18, 48:24, 49:23, 51:25, 55:18, 56:6, 58:9, 62:12, 63:5, 63:9, 64:6
**Jeffrey** [1] - 3:4
**JOE** [1] - 1:14
**Joe** [1] - 78:18
**join** [1] - 71:13

**joined** [2] - 16:4, 16:22
**joining** [1] - 21:11
**joint** [5] - 58:24, 63:4, 81:25, 88:24, 88:25
**Jonathan** [1] - 3:14
**Jones** [2] - 85:22, 85:24
**judge** [7] - 5:16, 13:14, 26:24, 43:19, 49:11, 78:8, 88:19
**Judge** [20] - 7:6, 7:18, 15:1, 15:10, 23:11, 24:9, 29:5, 37:7, 38:18, 49:18, 54:8, 57:8, 59:6, 63:11, 65:22, 67:2, 73:9, 74:4, 88:22
**JUDGE** [1] - 1:24
**judgment** [19] - 5:24, 13:18, 13:21, 59:15, 64:10, 65:4, 65:11, 65:16, 65:19, 66:25, 67:10, 68:3, 68:11, 69:16, 73:3, 73:17, 74:11, 86:13, 86:24
**judgments** [1] - 19:22
**judicial** [1] - 21:14
**jumped** [1] - 54:10
**jumping** [1] - 50:7
**jurisdiction** [9] - 8:13, 9:16, 9:19, 10:15, 10:21, 11:6, 34:9, 65:3, 65:24
**jurisdictions** [1] - 7:25
**jurors** [1] - 22:8
**jury** [17] - 9:7, 15:18, 18:12, 18:15, 19:7, 19:9, 19:10, 19:12, 19:14, 19:23, 20:1, 20:8, 21:2, 22:10, 22:14, 25:11, 77:4
**justice** [1] - 6:9

## K

**Kassidy** [1] - 43:24
**Kasubhai** [1] - 4:6
**KASUBHAI** [1] - 1:23
**Kat** [1] - 42:18
**keep** [3] - 12:25, 57:3, 71:7
**keeping** [1] - 34:21
**keeps** [1] - 80:21
**kellie** [1] - 1:25
**Kellie** [2] - 90:22, 90:23
**key** [1] - 78:12
**kicking** [1] - 73:20
**kid** [1] - 54:10

**killing** [1] - 57:17
**KIM** [2] - 1:8, 1:20
**kind** [8] - 27:23, 28:4, 33:21, 34:21, 42:9, 53:6, 54:4, 69:6
**kinds** [4] - 22:8, 53:7, 60:11, 74:23
**known** [2] - 37:16, 81:8
**knows** [1] - 41:11
**Korbel** [1] - 2:12
**KORBEL** [14] - 17:11, 21:8, 24:17, 25:2, 26:19, 26:23, 27:3, 61:24, 67:19, 67:24, 70:25, 71:4, 71:16, 85:5

## L

**lacks** [1] - 65:3
**laid** [1] - 5:10
**language** [1] - 30:22
**last** [5] - 7:2, 15:5, 40:10, 69:17, 85:21
**lasted** [1] - 28:4
**late** [1] - 32:20
**LAW** [2] - 2:11, 2:15
**law** [2] - 8:2, 29:5
**lawyer** [4] - 5:19, 14:18, 66:18, 79:6
**lawyers** [1] - 52:24
**lead** [1] - 88:21
**leading** [2] - 14:16, 14:19
**leaning** [1] - 58:13
**learn** [2] - 35:13, 49:22
**learned** [1] - 8:1
**least** [11] - 6:2, 6:17, 9:20, 12:23, 26:10, 31:6, 31:19, 49:1, 53:16, 67:23, 77:13
**leave** [1] - 80:4
**left** [2] - 30:19, 81:25
**legal** [1] - 11:1
**length** [3] - 23:13, 24:3, 56:7
**lengthy** [1] - 37:23
**less** [4] - 10:25, 28:4, 86:21
**letter** [10] - 5:5, 6:5, 6:16, 7:7, 7:16, 14:7, 63:19, 81:24, 81:25, 82:9
**letters** [5] - 4:20, 5:10, 5:12, 6:23, 82:17
**level** [5] - 10:7, 15:14, 21:13, 21:19, 22:7
**LEVI** [3] - 1:5, 2:3, 2:7

**Levi** [20] - 4:9, 4:12, 4:15, 5:14, 6:24, 10:9, 10:22, 11:3, 13:1, 14:1, 14:8, 18:3, 18:24, 19:2, 19:16, 24:25, 26:24, 67:17, 68:2
**Levi's** [2] - 45:13, 50:13
**liability** [12] - 11:19, 37:8, 37:11, 39:12, 39:17, 50:6, 51:8, 51:10, 74:16, 75:12, 75:14, 76:22
**lieu** [2] - 32:25, 46:9
**life** [1] - 43:6
**light** [1] - 29:1
**likelihood** [2] - 19:12, 53:8
**likely** [3] - 23:1, 37:12, 57:23
**limbo** [1] - 9:17
**limine** [4] - 9:11, 68:17, 70:3, 77:15
**limit** [4] - 45:15, 49:16, 51:22, 59:21
**limitation** [1] - 58:10
**limitations** [7] - 45:6, 45:17, 55:13, 56:5, 56:20, 58:6, 59:20
**limited** [9] - 44:25, 45:8, 51:5, 53:16, 60:12, 62:13, 70:7, 90:14
**limiting** [4] - 22:12, 45:11, 51:24, 51:25
**limits** [1] - 12:17
**line** [4] - 6:12, 25:18, 37:7, 64:22
**list** [4] - 46:15, 46:24, 50:23, 51:13
**listening** [1] - 39:4
**lists** [1] - 68:16
**litigated** [1] - 88:14
**litigation** [1] - 74:23
**livelihood** [1] - 19:23
**living** [1] - 34:9
**load** [1] - 25:6
**loaded** [1] - 69:13
**location** [1] - 56:5
**lock** [1] - 27:1
**look** [15] - 11:3, 17:17, 21:24, 22:22, 26:17, 41:14, 43:15, 44:9, 47:10, 47:21, 54:13, 59:6, 62:20, 88:24, 89:1
**looked** [2] - 28:12, 57:18
**looking** [6] - 16:6,

45:13, 50:12, 51:11, 70:14, 81:24
**looks** [2] - 26:13, 54:3
**lost** [5] - 8:13, 31:5, 61:2, 67:7
**loud** [1] - 23:15

## M

**Main** [2] - 2:12, 2:16
**major** [1] - 79:14
**manage** [1] - 86:21
**management** [4] - 26:3, 26:4, 27:6, 72:1
**manifested** [1] - 28:12
**manner** [5] - 55:14, 55:17, 56:5, 57:13, 58:6
**Manuella** [1] - 2:16
**March** [13] - 26:11, 27:5, 68:9, 68:15, 71:5, 71:7, 71:9, 71:15, 71:24, 73:5, 86:24, 87:9, 89:3
**marginal** [1] - 57:19
**Marissa** [1] - 2:12
**market** [2] - 71:11, 71:14
**Markowitz** [1] - 80:1
**MARKOWITZ** [3] - 3:3, 3:7, 3:10
**Mary** [1] - 2:8
**material** [3] - 29:22, 30:3, 57:5
**materials** [2] - 27:18, 69:25
**matter** [7] - 9:6, 9:24, 12:13, 13:3, 14:10, 34:23, 81:25
**matters** [3] - 5:6, 10:9, 87:19
**MATTINGLY** [2] - 2:3, 2:7
**McCool** [3] - 33:24, 38:2, 38:12
**mean** [35] - 8:24, 8:25, 10:6, 10:10, 12:14, 16:22, 28:3, 28:12, 32:12, 34:25, 35:10, 38:13, 40:20, 40:21, 40:24, 41:10, 41:20, 43:22, 43:24, 45:21, 47:13, 47:23, 51:9, 51:16, 52:21, 54:8, 57:15, 69:2, 70:5, 70:9, 72:24, 73:18, 82:23, 83:21, 84:24
**meaning** [1] - 7:18
**meaningful** [2] -

43:14, 87:13
**meaningfully** [1] - 58:14
**means** [4] - 10:13, 69:13, 84:14, 90:5
**meant** [1] - 67:12
**measures** [1] - 62:12
**mediation** [1] - 62:24
**medical** [2] - 39:25, 40:7
**meet** [1] - 61:11
**meeting** [2] - 8:8, 28:5
**mention** [2] - 5:18, 35:16
**mentioned** [4] - 11:17, 13:14, 35:6, 90:14
**merged** [1] - 16:11
**merit** [1] - 16:5
**merits** [1] - 46:2
**messages** [2] - 82:13, 82:15
**middle** [3] - 50:20, 68:8
**might** [25] - 7:5, 23:1, 25:11, 25:18, 25:20, 28:13, 29:13, 29:14, 30:8, 36:17, 37:15, 42:1, 43:18, 44:2, 44:19, 45:23, 45:24, 45:25, 60:25, 64:1, 64:3, 70:6, 71:6, 87:20
**millions** [1] - 35:1
**mind** [1] - 52:13
**minimal** [2] - 16:20, 21:15
**minimize** [1] - 49:16
**minimizing** [1] - 25:10
**minimum** [1] - 53:21
**minute** [2] - 48:17, 69:17
**mistaken** [2] - 31:15, 89:4
**modifications** [1] - 55:21
**moment** [6] - 9:17, 26:21, 61:21, 62:19, 64:12, 76:14
**Mondays** [1] - 72:18
**Monson** [8] - 3:14, 6:11, 7:7, 8:19, 10:13, 10:19, 13:6, 64:22
**MONSON** [4] - 6:13, 11:4, 12:6, 64:23
**Monson's** [2] - 6:4, 7:16
**month** [3] - 66:3, 74:8, 89:1
**months** [1] - 79:18

**morning** [8] - 4:11, 5:17, 6:15, 27:16, 61:14, 62:6, 73:10, 76:7
**most** [4] - 18:22, 18:23, 21:15, 68:11
**motion** [42] - 4:22, 4:25, 7:10, 14:6, 14:14, 14:16, 17:9, 21:9, 22:19, 23:7, 27:12, 27:13, 28:17, 29:6, 44:22, 44:23, 45:13, 49:21, 56:9, 58:8, 58:9, 59:15, 65:13, 65:16, 66:11, 67:9, 67:10, 69:16, 73:23, 75:15, 77:11, 77:15, 83:17, 83:24, 84:5, 85:14, 86:13, 86:19, 86:24, 87:7, 87:8
**motions** [24] - 4:23, 9:11, 13:18, 13:21, 26:5, 64:10, 65:4, 65:18, 66:24, 68:3, 68:10, 68:17, 69:9, 70:3, 72:4, 73:2, 73:16, 73:17, 73:18, 74:12, 85:23, 86:14
**move** [7] - 27:11, 27:14, 28:14, 31:4, 54:23, 70:13, 71:12
**moving** [9] - 13:1, 14:15, 14:20, 14:21, 39:16, 69:23, 69:24, 87:14, 88:16
**MR** [168] - 5:16, 6:13, 7:6, 8:21, 9:12, 9:16, 10:5, 11:4, 12:6, 13:14, 13:22, 14:3, 14:19, 15:1, 15:9, 15:13, 16:6, 16:16, 16:20, 17:4, 17:21, 18:22, 20:4, 20:5, 20:16, 20:20, 20:22, 23:10, 23:25, 24:8, 24:12, 24:23, 24:25, 26:16, 26:24, 27:16, 28:2, 30:17, 31:25, 32:2, 32:5, 32:10, 32:12, 32:18, 33:18, 35:10, 35:16, 35:25, 36:4, 36:7, 37:6, 37:10, 37:14, 37:18, 37:21, 38:16, 40:10, 41:13, 42:9, 43:13, 45:5, 45:10, 45:16, 45:19, 45:25, 46:4, 46:18, 46:21, 47:1, 47:5, 47:8, 47:14,

48:13, 48:18, 48:21, 49:18, 50:9, 51:7, 51:12, 51:20, 52:13, 54:1, 54:3, 54:7, 55:10, 56:3, 56:16, 56:22, 57:15, 59:4, 59:6, 59:8, 59:16, 59:25, 60:14, 60:19, 61:1, 61:3, 61:6, 61:10, 61:16, 61:19, 62:1, 62:3, 62:15, 62:18, 62:24, 63:2, 63:11, 63:17, 63:21, 64:8, 64:15, 64:19, 64:23, 65:20, 66:8, 66:12, 66:14, 66:17, 66:21, 67:2, 67:3, 67:6, 67:15, 68:4, 68:25, 69:12, 69:21, 70:18, 70:20, 71:11, 71:17, 72:13, 72:16, 72:21, 72:23, 73:1, 73:6, 73:9, 74:4, 74:10, 74:17, 75:9, 75:11, 75:25, 76:5, 76:9, 76:17, 76:20, 78:8, 78:10, 79:10, 79:13, 80:19, 81:2, 81:14, 81:15, 81:18, 85:6, 85:8, 86:10, 88:3, 88:5, 88:22, 89:7, 89:8, 89:10

**MS** [37] - 17:11, 21:8, 24:17, 25:2, 26:19, 26:23, 27:3, 36:2, 36:5, 61:24, 67:19, 67:24, 70:25, 71:4, 71:16, 75:21, 75:23, 76:2, 82:10, 83:5, 83:15, 83:19, 83:21, 84:7, 84:12, 84:17, 84:25, 85:5, 85:12, 85:19, 85:24, 86:5, 86:17, 86:19, 87:1, 87:4, 89:9

**multi** [1] - 20:22
**multi-party** [1] - 20:22
**multiple** [1] - 12:15
**must** [1] - 79:16
**Mustafa** [1] - 4:6
**MUSTAFA** [1] - 1:23
**mute** [4] - 60:25, 75:7, 76:1, 76:14

## N

**named** [1] - 16:10
**naming** [1] - 16:8
**narrow** [1] - 64:2
**nature** [5] - 17:24,

18:25, 19:4, 49:23, 50:1
**necessarily** [2] - 9:25, 74:11
**necessary** [3] - 23:2, 49:12, 57:20
**need** [55] - 5:24, 5:25, 7:5, 8:17, 8:19, 12:12, 13:3, 13:8, 13:12, 13:15, 13:24, 15:2, 23:8, 25:15, 26:9, 26:10, 35:7, 35:12, 44:9, 46:22, 47:21, 48:3, 50:19, 50:20, 52:10, 52:17, 53:2, 57:4, 57:7, 57:24, 58:3, 58:19, 59:12, 60:20, 61:21, 62:12, 63:9, 64:9, 64:10, 64:16, 64:18, 65:17, 65:25, 66:18, 67:20, 68:15, 69:19, 69:25, 73:12, 74:15, 75:1, 75:25, 87:12
**needed** [4] - 10:11, 56:12, 56:13, 64:12
**needing** [3] - 5:3, 14:1, 55:23
**needles** [1] - 34:19
**needs** [6] - 4:17, 8:14, 8:18, 52:7, 77:21, 88:8
**negligence** [3] - 19:17, 19:18, 79:5
**negligent** [3] - 79:21, 80:8, 80:22
**nervous** [1] - 56:25
**never** [6] - 39:7, 45:17, 45:22, 47:6, 79:19, 88:10
**new** [10] - 14:18, 29:21, 29:22, 30:1, 30:2, 31:12, 31:13, 47:8, 76:7, 89:5
**next** [3] - 27:11, 74:7, 74:8
**nine** [4] - 39:1, 39:7, 43:6, 43:24
**Ninth** [1] - 64:19
**none** [1] - 39:13
**noon** [1] - 73:12
**normally** [1] - 58:22
**note** [2] - 11:11, 34:14
**notes** [9] - 30:18, 38:3, 78:4, 79:23, 79:24, 80:1, 80:2, 80:3, 80:6
**nothing** [5] - 36:7, 39:19, 47:13, 79:5, 80:22

**notice** [9] - 5:18, 5:22, 8:13, 10:20, 54:4, 59:12, 65:23, 66:1, 88:7
**notices** [1] - 58:23
**notion** [1] - 31:22
**November** [2] - 5:5, 63:19
**nuanced** [1] - 11:1
**number** [5] - 19:1, 20:7, 21:2, 22:3, 33:7
**Number** [1] - 4:9
**nuts** [1] - 13:11

## O

**O'BRIEN** [1] - 3:13
**O'Brien** [17] - 5:19, 6:19, 7:3, 7:9, 7:22, 9:5, 9:20, 10:9, 12:4, 13:5, 13:13, 42:18, 43:3, 43:24, 64:14, 65:2
**O'Brien's** [8] - 7:12, 8:4, 9:13, 10:22, 11:8, 12:16, 66:10, 69:3
**object** [1] - 24:4
**objecting** [2] - 16:15, 80:12
**objection** [4] - 24:5, 24:6, 50:24, 79:11
**objections** [1] - 51:1
**obscuring** [1] - 36:11
**obtained** [2] - 29:22, 59:25
**obtains** [1] - 80:13
**obvious** [1] - 18:23
**obviously** [5] - 8:16, 15:22, 32:19, 34:16, 34:17
**occur** [1] - 90:12
**occurred** [1] - 42:24
**occurring** [2] - 52:4, 90:15
**OF** [3] - 1:2, 1:11, 1:22
**offer** [1] - 64:24
**offered** [6] - 12:15, 28:23, 77:13, 77:16, 77:18, 78:5
**offering** [4] - 80:14, 81:3, 81:4, 81:6
**offers** [1] - 59:14
**office** [4] - 26:21, 71:1, 71:16, 83:2
**official** [1] - 22:17
**Official** [1] - 90:23
**officials** [1] - 15:20
**old** [5] - 39:1, 39:7,

43:6, 43:23, 51:16
**omissions** [1] - 49:22
**once** [2] - 64:6, 71:20
**one** [34] - 8:25, 18:9, 18:10, 18:13, 18:16, 18:22, 20:8, 20:9, 21:17, 23:2, 23:24, 25:16, 25:20, 26:21, 33:1, 36:14, 41:17, 42:1, 44:6, 47:7, 47:8, 47:17, 53:10, 54:14, 56:5, 56:19, 59:8, 71:19, 72:8, 72:15, 74:21, 76:5, 88:8, 90:10
**one's** [2] - 42:16, 88:12
**ones** [2] - 4:21, 46:19
**online** [1] - 13:18
**open** [4] - 22:12, 48:22, 55:4
**opened** [1] - 82:25
**opening** [1] - 22:21
**opens** [1] - 74:15
**opines** [1] - 30:7
**opinion** [9] - 77:18, 79:12, 79:22, 80:10, 80:15, 80:16, 80:25, 81:3, 81:4
**opportunity** [13] - 17:8, 33:12, 35:5, 35:12, 53:16, 54:17, 55:7, 55:24, 59:12, 60:16, 65:22, 70:2, 73:21
**oppose** [1] - 78:3
**opposed** [4] - 44:4, 51:14, 61:7, 72:8
**opposing** [1] - 14:23
**OR** [8] - 2:5, 2:9, 2:13, 2:17, 3:5, 3:9, 3:12, 3:16
**oral** [3] - 86:23, 86:25, 87:8
**order** [11] - 6:8, 7:10, 7:21, 27:6, 27:13, 28:24, 58:5, 59:10, 64:16, 68:14, 72:1
**ordered** [1] - 49:19
**ordering** [1] - 5:4
**orderly** [1] - 36:13
**orders** [4] - 26:3, 26:4, 52:20
**ordinary** [2] - 34:24, 36:13
**OREGON** [2] - 1:2, 1:11
**Oregon** [7] - 1:8, 4:5, 22:18, 77:8, 81:7, 81:9, 82:12

**organized** [1] - 30:14
**original** [2] - 16:4, 90:17
**originally** [1] - 59:9
**otherwise** [6] - 8:16, 11:25, 12:21, 20:13, 20:16, 88:16
**ought** [4] - 9:3, 14:10, 23:22, 53:19
**ourselves** [1] - 68:23
**outcome** [1] - 11:5
**outline** [11] - 46:7, 46:16, 50:13, 50:17, 50:18, 51:23, 53:18, 53:22, 53:24, 58:11, 58:17
**outlined** [3] - 5:5, 55:14, 58:15
**outlines** [1] - 56:8
**outlining** [3] - 53:4, 59:1, 81:25
**outset** [1] - 47:18
**outside** [2] - 34:9, 35:8
**outstanding** [2] - 73:17, 83:4
**outweighed** [2] - 40:19, 40:20
**overall** [1] - 20:7
**overflow** [3] - 71:8, 71:22, 72:8
**overlap** [6] - 21:3, 22:2, 22:3, 22:4, 23:15, 23:22
**overreach** [3] - 49:5, 54:22, 54:25
**overwhelming** [1] - 15:22
**own** [2] - 13:25, 17:18

## P

**page** [5] - 7:18, 18:12, 45:5, 49:21, 50:13
**pages** [2] - 37:23, 55:14
**paragraph** [1] - 10:20
**paragraphs** [2] - 7:19, 11:9
**parallel** [1] - 87:21
**parent** [1] - 57:21
**parenthetical** [2] - 7:17, 10:17
**parse** [1] - 30:15
**part** [4] - 43:19, 51:8, 66:3, 68:20
**partial** [3] - 64:10, 66:24, 67:10
**participated** [1] - 11:14

**participating** [1] - 11:15
**particular** [3] - 7:25, 10:15, 33:21
**particularly** [5] - 18:10, 21:4, 29:13, 41:3, 85:14
**parties** [7] - 29:3, 52:20, 70:2, 79:25, 84:13, 88:13, 90:8
**Party** [2] - 1:12, 1:15
**party** [7] - 14:16, 14:20, 14:21, 14:23, 20:22, 77:2, 78:13
**past** [2] - 51:19
**patients** [1] - 40:8
**pause** [11] - 22:21, 35:5, 45:4, 45:22, 47:9, 49:4, 66:5, 66:25, 67:5, 70:14, 76:3
**peaceful** [1] - 89:5
**pending** [4] - 11:5, 13:19, 65:4, 72:9
**pentameter** [1] - 15:11
**people** [5] - 43:8, 43:11, 53:6, 57:6, 66:4
**percipient** [1] - 33:6
**perfectly** [1] - 78:5
**performed** [1] - 79:1
**perhaps** [8] - 10:13, 13:4, 38:23, 48:6, 52:10, 73:20, 83:9, 83:23
**period** [2] - 70:9, 70:13
**permanent** [2] - 44:20, 49:8
**permits** [1] - 5:21
**perpetuating** [1] - 47:25
**person** [8] - 26:13, 27:6, 28:6, 47:24, 56:11, 73:11, 78:15, 89:3
**personal** [1] - 57:8
**personally** [1] - 23:14
**perspective** [2] - 33:5, 65:6
**pertain** [1] - 74:11
**pertaining** [1] - 79:7
**phone** [12] - 5:20, 42:20, 82:2, 82:6, 82:7, 83:1, 83:14, 83:24, 84:14, 84:17, 85:4, 90:9
**phones** [2] - 83:6, 84:19
**physically** [1] - 15:25

**physician** [2] - 40:11, 41:1
**pickle** [1] - 75:3
**pills** [3] - 34:15, 34:16, 38:7
**pivot** [1] - 29:21
**place** [12] - 5:7, 16:23, 17:24, 29:12, 31:23, 32:2, 32:20, 49:9, 60:3, 64:16, 71:7
**placements** [1] - 15:16
**plain** [1] - 55:4
**Plaintiff** [6] - 1:6, 1:12, 1:18, 19:2, 45:13, 50:13
**plaintiff** [6] - 5:4, 18:3, 18:16, 25:21, 30:9, 49:24
**PLAINTIFF** [4] - 2:3, 2:7, 2:11, 2:15
**plaintiff's** [11] - 4:12, 4:15, 5:14, 6:25, 31:20, 33:6, 49:25, 53:22, 55:24, 58:7
**plaintiffs** [29] - 5:4, 10:3, 11:24, 13:19, 14:24, 15:23, 16:3, 16:9, 17:17, 19:11, 20:19, 20:24, 21:3, 22:9, 22:15, 25:12, 26:13, 31:1, 36:16, 41:21, 42:10, 49:2, 68:2, 69:2, 71:17, 73:23, 75:3, 81:10, 88:2
**plaintiffs'** [13] - 16:8, 16:13, 23:6, 73:7, 76:12, 76:21, 77:1, 77:11, 81:7, 81:24, 87:8
**plan** [4] - 55:25, 63:5, 64:6, 88:25
**planning** [1] - 4:14
**plaque** [1] - 56:24
**play** [4] - 42:22, 47:24, 57:14, 64:3
**played** [1] - 57:15
**pleading** [2] - 6:6, 16:22
**poetry** [1] - 15:12
**point** [19] - 13:15, 18:8, 18:18, 18:23, 27:14, 28:7, 29:17, 29:25, 32:13, 35:20, 36:7, 39:5, 39:10, 39:13, 53:5, 54:13, 73:14, 78:10, 87:11
**points** [7] - 10:10, 12:23, 46:22, 51:19,

55:15, 63:6, 78:12
**policies** [3] - 82:12, 83:5, 83:24
**pondered** [1] - 8:25
**portion** [3] - 10:22, 65:3, 79:11
**Portland** [8] - 2:5, 2:9, 2:13, 2:17, 3:5, 3:9, 3:12, 3:16
**posed** [1] - 38:21
**position** [10] - 10:3, 11:3, 11:5, 12:7, 12:11, 44:19, 65:2, 84:9, 88:11, 88:12
**positions** [1] - 20:14
**possibility** [3] - 69:23, 70:6, 71:8
**possible** [6] - 27:8, 47:17, 49:1, 66:3, 71:6, 72:8
**postpone** [1] - 14:1
**posture** [1] - 75:14
**potential** [5] - 18:12, 19:22, 50:15, 58:1, 83:24
**potentially** [4] - 6:6, 27:23, 58:1, 70:21
**pourover** [1] - 70:21
**pours** [1] - 5:22
**practical** [2] - 13:11, 34:23
**practically** [1] - 11:2
**practice** [1] - 56:18
**practices** [1] - 83:6
**preach** [1] - 47:21
**precision** [2] - 53:5, 53:6
**predict** [1] - 60:5
**preference** [1] - 24:23
**prejudice** [2] - 40:19, 40:21
**prejudicial** [1] - 41:3
**preliminary** [1] - 31:19
**preparation** [1] - 69:10
**prepare** [3] - 15:9, 65:18, 69:18
**prepared** [3] - 31:19, 68:14, 69:14
**preparing** [1] - 69:9
**present** [6] - 4:19, 17:14, 42:7, 49:14, 63:4, 79:3
**presentation** [1] - 20:1
**presented** [4] - 23:9, 60:22, 81:22, 83:12
**presents** [1] - 19:12
**preservation** [1] - 82:13

**preserving** [3] - 84:18, 84:24, 85:1
**presiding** [1] - 4:6
**pressure** [1] - 31:9
**pressuring** [1] - 31:1
**presumably** [1] - 34:8
**presume** [1] - 17:4
**presuming** [1] - 45:14
**pretrial** [13] - 13:4, 25:5, 26:9, 68:9, 68:14, 68:18, 69:10, 69:20, 69:23, 69:24, 70:8, 70:17, 73:16
**pretty** [1] - 28:19
**prevent** [1] - 49:16
**prevented** [1] - 51:1
**prevents** [1] - 11:23
**preview** [1] - 58:16
**previewed** [1] - 50:19
**previously** [1] - 4:22
**primarily** [1] - 23:16
**primary** [2] - 4:21, 28:21
**principally** [1] - 11:9
**printout** [1] - 6:17
**privilege** [1] - 40:15
**probative** [2] - 40:20, 41:3
**problem** [4] - 8:17, 20:11, 33:4, 66:3
**problems** [5] - 26:12, 44:2, 44:3, 44:5, 44:6
**proceed** [5] - 5:7, 6:10, 44:7, 65:8, 68:12
**Proceedings** [1] - 89:11
**PROCEEDINGS** [1] - 1:22
**proceedings** [3] - 90:6, 90:13, 90:15
**proceeds** [1] - 65:5
**process** [4] - 84:18, 84:23, 84:25, 85:9
**processes** [1] - 22:5
**produce** [1] - 11:13
**produced** [4] - 78:20, 78:21, 82:16, 82:24
**producing** [1] - 84:24
**product** [1] - 32:6
**productions** [1] - 56:24
**professional** [1] - 44:18
**prompt** [1] - 30:19
**properly** [2] - 21:5, 51:3
**proposal** [1] - 63:7
**proposals** [1] - 59:2

**propose** [2] - 50:18, 85:23
**proposed** [3] - 48:10, 63:5, 88:25
**proposing** [2] - 46:25, 58:25
**prosecution** [1] - 7:15
**prosecutors** [1] - 11:12
**protect** [1] - 65:22
**protective** [2] - 56:22, 58:5
**proud** [1] - 48:5
**prove** [2] - 10:10, 42:11
**provide** [6] - 11:22, 48:24, 53:22, 53:24, 58:19, 76:25
**provided** [4] - 17:9, 40:8, 58:22, 79:4
**providers** [2] - 38:24, 38:25
**provides** [1] - 50:22
**providing** [1] - 40:14
**psychologist** [3] - 40:5, 40:6, 48:23
**punitive** [1] - 47:13
**purely** [1] - 40:16
**purpose** [3] - 57:2, 57:9, 82:19
**purposes** [5] - 12:15, 30:3, 39:25, 60:12, 69:9
**push** [1] - 68:6
**pushed** [3] - 14:11, 55:8, 59:25
**pushing** [1] - 70:7
**put** [9] - 23:18, 37:22, 41:9, 44:7, 51:24, 52:13, 76:14, 77:1, 77:20
**puts** [1] - 49:9
**putting** [3] - 42:10, 49:10, 52:11

## Q

**qualified** [1] - 65:12
**questioning** [1] - 53:7
**questions** [28] - 8:23, 20:8, 34:2, 35:5, 37:9, 38:21, 38:24, 43:2, 45:2, 45:21, 46:7, 46:8, 46:12, 46:17, 49:19, 50:19, 51:5, 51:23, 51:24, 51:25, 53:5, 53:24, 54:2, 58:17, 58:20, 63:23, 79:6, 80:12
**quick** [1] - 59:7

**quickly** [2] - 31:2, 36:2
**quite** [3] - 29:2, 41:22, 87:17
**quiz** [1] - 39:9

## R

**raise** [5] - 30:9, 32:24, 59:8, 68:4, 70:22
**raised** [5] - 6:4, 15:3, 18:21, 26:7, 65:10
**raises** [2] - 14:1, 25:22
**rather** [5] - 24:21, 46:2, 46:7, 52:2, 71:13
**RAYGOSA** [1] - 1:14
**Raygosa** [8] - 7:13, 10:23, 12:9, 12:10, 38:11, 41:18, 78:15, 78:19
**reach** [2] - 19:25, 88:21
**read** [6] - 15:10, 15:22, 19:14, 27:18, 51:13, 87:3
**ready** [2] - 87:3, 88:9
**real** [2] - 59:6, 72:8
**realized** [1] - 23:4
**really** [22] - 10:12, 11:9, 21:15, 27:17, 27:19, 31:1, 33:4, 35:4, 35:12, 37:9, 41:25, 46:14, 47:12, 50:24, 52:15, 52:21, 53:10, 65:4, 72:2, 73:14, 80:6
**reason** [13] - 16:2, 16:14, 36:3, 50:6, 51:5, 52:5, 57:2, 57:11, 65:15, 67:25, 70:14, 79:19, 82:25
**reasonable** [1] - 23:13
**reasons** [6] - 15:23, 41:24, 47:17, 54:14, 78:25, 90:14
**rebuttal** [1] - 79:16
**receive** [1] - 80:2
**received** [3] - 7:7, 78:24, 79:8
**receiving** [1] - 8:2
**recites** [1] - 79:6
**recognize** [6] - 22:24, 48:2, 49:11, 58:16, 87:13, 88:13
**recognizing** [1] - 53:12
**recommendations** [2] - 48:23, 58:7
**reconsider** [2] - 4:22, 28:17

**reconsideration** [5] - 27:12, 29:7, 45:13, 56:9, 58:8
**reconsidered** [1] - 55:7
**reconvene** [1] - 28:8
**record** [15] - 36:21, 37:5, 38:8, 42:5, 51:18, 52:6, 54:11, 54:16, 54:18, 54:24, 57:22, 65:22, 78:24, 80:7, 90:4
**recorded** [3] - 56:17, 56:21, 57:5
**recording** [4] - 56:14, 56:15, 57:25, 58:3
**records** [2] - 34:20, 79:18
**redirect** [1] - 23:19
**reduce** [1] - 53:8
**reduces** [1] - 20:7
**reference** [4] - 34:14, 38:7, 40:3
**referring** [2] - 63:18
**reflecting** [1] - 41:12
**regard** [1] - 85:20
**regarded** [1] - 22:8
**regarding** [4] - 82:2, 82:4, 82:13, 82:22
**regards** [1] - 85:15
**rehash** [2] - 15:2, 54:19
**rejected** [1] - 81:9
**relate** [1] - 40:7
**related** [5] - 11:7, 11:9, 66:2, 83:16, 83:23
**relates** [1] - 73:16
**relating** [1] - 28:25
**relationship** [1] - 40:15
**relatively** [1] - 15:16
**relevant** [9] - 12:2, 12:21, 25:12, 25:13, 29:13, 29:14, 33:8, 49:13, 65:7
**relief** [1] - 19:9
**relive** [1] - 27:24
**remain** [1] - 28:18
**remainder** [1] - 89:2
**remaining** [1] - 58:10
**remains** [2] - 28:18, 84:6
**remember** [1] - 30:25
**reminding** [1] - 73:4
**reply** [5] - 68:6, 72:10, 72:20, 86:16, 87:8
**report** [15] - 32:7, 33:20, 36:18, 37:21, 37:23, 38:3, 39:20,

40:13, 58:25, 61:7, 77:12, 77:20, 79:4, 79:22, 80:17
**reported** [1] - 54:20
**Reporter** [1] - 90:23
**REPORTER** [1] - 1:25
**reporting** [1] - 8:7
**reports** [7] - 31:19, 36:20, 36:25, 37:2, 37:4, 78:20
**represent** [1] - 63:22
**request** [7] - 5:3, 5:4, 28:19, 30:21, 63:14, 63:15, 79:24
**requested** [3] - 30:24, 33:1, 85:19
**require** [2] - 9:20, 19:9
**required** [1] - 58:23
**requires** [1] - 50:22
**reschedule** [1] - 28:5
**research** [1] - 13:9
**reserve** [1] - 70:24
**resolution** [2] - 65:13, 65:16
**resolve** [1] - 13:7
**resolved** [2] - 13:8, 21:20
**resolving** [1] - 63:7
**respect** [26] - 4:24, 6:8, 6:19, 7:3, 7:11, 8:1, 9:2, 9:6, 9:21, 12:6, 22:17, 23:12, 23:16, 26:7, 33:16, 45:7, 51:25, 56:14, 64:14, 68:5, 74:2, 74:13, 75:3, 79:25, 80:15, 83:3
**respectfully** [2] - 17:21, 20:10
**respective** [1] - 63:6
**respond** [9] - 5:23, 10:11, 28:16, 32:5, 49:25, 66:1, 66:8, 66:22, 85:6
**responds** [1] - 76:25
**response** [26] - 13:20, 13:25, 14:15, 17:11, 17:12, 44:22, 45:14, 50:13, 58:8, 59:14, 64:10, 64:17, 65:18, 66:7, 66:16, 66:24, 67:8, 67:9, 67:13, 67:14, 68:3, 68:5, 73:19, 86:9, 87:7
**responses** [5] - 43:13, 50:21, 63:14, 67:20, 72:11
**responsible** [1] - 19:11
**rest** [1] - 20:17

**rests** [1] - 33:15
**result** [1] - 14:4
**resulting** [3] - 18:1, 19:1, 19:4
**retain** [3] - 5:24, 13:15, 57:1
**retained** [2] - 7:9, 79:4
**retaining** [1] - 85:1
**retention** [1] - 82:13
**return** [1] - 42:20
**revealed** [2] - 33:25
**reverse** [1] - 17:1
**reviewed** [1] - 32:13
**revisit** [4] - 24:15, 56:4, 64:2, 64:5
**Rhee** [2] - 3:7, 14:18
**rhetorical** [1] - 74:25
**Richardson** [1] - 71:1
**Richardson's** [2] - 26:20, 27:1
**RIZZO** [80] - 2:3, 2:7, 5:16, 7:6, 8:21, 9:12, 9:16, 10:5, 13:14, 13:22, 14:3, 15:1, 15:9, 15:13, 16:6, 16:16, 16:20, 17:4, 20:4, 20:20, 20:22, 23:10, 24:8, 24:12, 24:25, 26:24, 31:25, 32:2, 32:5, 32:10, 32:12, 37:6, 37:10, 37:14, 37:18, 37:21, 38:16, 45:5, 49:18, 50:9, 54:7, 56:22, 57:15, 59:6, 59:25, 60:14, 60:19, 61:1, 61:3, 61:6, 61:10, 61:16, 62:15, 63:11, 64:15, 64:19, 65:20, 66:8, 66:12, 66:14, 66:17, 66:21, 67:2, 67:15, 70:18, 70:20, 71:11, 73:9, 74:4, 74:10, 74:17, 78:8, 78:10, 79:10, 79:13, 81:14, 88:3, 88:5, 88:22, 89:7
**Rizzo** [23] - 2:4, 4:16, 7:4, 13:13, 14:25, 20:21, 24:1, 24:17, 36:17, 36:23, 42:3, 50:11, 50:18, 56:20, 58:12, 60:25, 62:9, 64:11, 65:17, 67:7, 71:14, 77:25, 80:21
**RMR** [1] - 90:23
**road** [4] - 22:1, 25:25, 73:20, 74:9
**rock** [1] - 49:9
**role** [4] - 9:5, 11:15,

47:25, 50:10
**roll** [1] - 67:11
**routine** [1] - 85:2
**ruin** [3] - 72:14, 72:15, 72:18
**Rule** [3] - 39:24, 40:3, 41:1
**rulings** [1] - 70:1
**run** [1] - 55:4

## S

**sameness** [1] - 15:14
**satisfactory** [1] - 20:23
**satisfy** [1] - 54:5
**saw** [3] - 34:14, 34:18, 56:8
**schedule** [4] - 26:11, 48:10, 61:20, 85:20
**scheduled** [7] - 14:9, 14:10, 22:23, 22:24, 24:11, 68:9, 87:18
**scheduling** [1] - 25:7
**scope** [7] - 11:22, 12:1, 45:6, 55:13, 55:17, 58:10, 74:13
**scramble** [1] - 69:17
**scratch** [1] - 44:1
**script** [1] - 45:20
**seal** [1] - 37:22
**second** [1] - 50:25
**Section** [2] - 68:13, 68:19
**secure** [1] - 62:10
**see** [16] - 4:11, 12:14, 23:20, 51:12, 51:16, 53:1, 57:7, 57:8, 67:4, 70:11, 75:1, 75:2, 80:5, 87:15, 89:3
**seeing** [1] - 40:2
**seek** [1] - 6:5
**seem** [1] - 6:14
**sees** [1] - 13:12
**segue** [1] - 14:6
**sent** [2] - 5:10, 79:8
**separate** [12] - 7:9, 9:3, 9:4, 18:5, 20:3, 20:6, 20:7, 20:24, 21:17, 26:4, 26:5, 26:8
**separately** [1] - 15:24
**serve** [4] - 18:20, 39:11, 57:2, 69:18
**serves** [1] - 52:24
**services** [1] - 40:14
**Services** [2] - 22:18, 78:22
**SERVICES** [1] - 1:11

**Services'** [1] - 82:12
**session** [1] - 4:5
**set** [18] - 4:8, 7:25, 15:17, 21:25, 26:9, 31:2, 31:7, 44:15, 52:20, 53:2, 55:1, 60:21, 70:8, 71:9, 71:22, 73:2, 88:7
**sets** [1] - 26:5
**setting** [2] - 44:18, 87:20
**settle** [1] - 88:11
**settled** [1] - 87:17
**settlement** [4] - 87:10, 87:13, 87:21, 88:19
**seven** [2] - 42:25, 43:5
**several** [3] - 4:20, 44:21, 82:16
**sexual** [3] - 29:1, 30:8, 38:10
**sexually** [2] - 15:25, 16:1
**SHANNON** [1] - 1:17
**shape** [1] - 55:12
**share** [1] - 28:15
**shared** [3] - 28:3, 31:20, 32:22
**Sheriff** [1] - 78:20
**shoehorn** [1] - 40:17
**short** [2] - 70:9, 85:22
**shotgun** [1] - 30:14
**showing** [1] - 14:18
**shown** [2] - 12:22, 88:6
**sides** [1] - 23:12
**sights** [1] - 13:1
**signal** [1] - 24:5
**signature** [3] - 90:17, 90:18
**signed** [1] - 90:18
**significant** [4] - 7:17, 44:15, 58:14, 75:24
**signing** [1] - 90:3
**silence** [1] - 70:15
**similar** [4] - 19:19, 22:6, 54:4, 58:14
**simple** [1] - 27:20
**simply** [7] - 11:17, 15:24, 17:1, 18:24, 51:22, 54:22, 79:5
**sitting** [2] - 56:25, 64:25
**situation** [2] - 31:11, 43:7
**six** [4] - 19:10, 23:3, 42:25, 43:5
**Sixth** [2] - 2:4, 2:8
**SKJELSET** [23] - 36:2, 36:5, 75:21, 75:23, 76:2, 82:10, 83:5,

83:15, 83:19, 83:21, 84:7, 84:12, 84:17, 84:25, 85:12, 85:19, 85:24, 86:5, 86:17, 86:19, 87:1, 87:4, 89:9
**Skjelset** [10] - 2:8, 4:15, 5:15, 14:24, 32:6, 33:23, 34:7, 38:16, 75:20, 86:16
**Skjelset's** [1] - 50:10
**small** [1] - 35:1
**so-called** [1] - 80:9
**soapbox** [1] - 48:8
**solely** [1] - 33:15
**solidified** [1] - 85:21
**solution** [1] - 64:24
**someone** [2] - 40:23, 75:25
**somewhat** [1] - 6:4
**somewhere** [1] - 37:5
**soon** [3] - 42:23, 44:8, 77:24
**sooner** [3] - 13:4, 75:2, 89:3
**sorry** [10] - 14:22, 26:19, 61:13, 61:14, 62:18, 70:25, 71:4, 71:18, 72:23, 86:18
**sort** [6] - 19:10, 31:14, 48:10, 52:19, 71:8, 80:23
**sound** [1] - 19:19
**sounded** [1] - 28:6
**sounds** [4] - 24:6, 52:16, 53:2, 75:5
**sources** [1] - 29:2
**speakerphone** [1] - 90:9
**speakers** [3] - 90:10, 90:11
**speaks** [1] - 34:4
**special** [2] - 15:12, 21:1
**specific** [5] - 8:23, 45:2, 49:19, 73:23, 79:24
**specifically** [6] - 4:25, 6:24, 7:4, 11:2, 22:17, 51:15
**specificity** [3] - 43:16, 53:20, 54:5
**specifics** [1] - 5:8
**spent** [3] - 27:20, 32:23, 53:4
**Spicer** [12] - 33:24, 34:6, 34:18, 35:11, 35:19, 35:22, 35:24, 36:3, 38:2, 38:12, 41:6, 41:18

**Spicer-McCool** [2] - 38:2, 38:12
**Spicers** [3] - 34:3, 34:7, 34:11
**spoliation** [10] - 83:17, 83:21, 83:24, 84:1, 84:21, 85:14, 86:14, 86:23, 87:7
**spot** [2] - 52:12, 52:13
**staggered** [2] - 70:18, 70:19
**standpoint** [3] - 23:21, 49:7, 52:25
**stars** [1] - 55:16
**start** [7] - 5:14, 14:15, 22:23, 23:6, 30:20, 46:23, 70:10
**started** [2] - 28:6, 30:20
**starting** [1] - 24:21
**state** [1] - 15:19
**State** [4] - 42:11, 71:18, 77:7, 79:8
**statement** [1] - 59:23
**statements** [3] - 39:24, 68:16, 70:3
**STATES** [2] - 1:1, 1:24
**States** [1] - 4:4
**Status** [1] - 1:22
**status** [3] - 4:10, 28:22, 58:25
**stenographic** [1] - 90:5
**Steven** [1] - 2:4
**sticks** [1] - 33:21
**still** [8] - 31:7, 64:2, 64:22, 69:24, 82:1, 82:7, 83:4, 84:1
**stipulation** [1] - 32:25
**stipulations** [1] - 33:1
**stop** [1] - 73:12
**story** [1] - 36:15
**straw** [2] - 5:17, 14:25
**Street** [2] - 2:12, 2:16
**stricken** [1] - 81:17
**strike** [7] - 4:25, 7:11, 48:3, 73:23, 74:15, 81:19, 81:20
**striking** [2] - 18:20, 74:1
**strong** [2] - 24:7, 85:14
**strongly** [1] - 56:20
**studied** [1] - 23:14
**stuff** [1] - 41:21
**subject** [6] - 11:23, 35:8, 45:1, 53:23, 57:24, 58:21
**subjects** [1] - 79:16
**submissions** [4] -

27:7, 69:10, 71:25, 89:2
**submit** [1] - 58:24
**submitted** [1] - 14:13
**subpoenas** [1] - 78:22
**subsequent** [2] - 13:17, 16:1
**subset** [4] - 8:14, 11:7, 12:6
**substance** [1] - 46:2
**substantial** [1] - 68:11
**substantially** [2] - 40:19, 40:20
**substitute** [1] - 33:6
**sudden** [1] - 75:4
**sued** [1] - 9:2
**suffer** [1] - 49:25
**suffered** [6] - 18:4, 18:6, 18:25, 19:11, 49:24, 81:5
**sufficient** [5] - 21:19, 22:2, 22:4, 49:12, 51:18
**sufficiently** [1] - 22:10
**suggested** [1] - 14:8
**suggesting** [4] - 8:18, 12:4, 83:9, 86:3
**suicidal** [6] - 38:2, 38:10, 38:15, 41:6, 41:12
**suicide** [4] - 34:5, 36:9, 38:7
**suit** [2] - 11:19, 12:18
**Suite** [8] - 2:5, 2:9, 2:13, 2:17, 3:5, 3:8, 3:12, 3:15
**summarize** [1] - 78:11
**summarizes** [1] - 45:14
**summary** [19] - 5:23, 13:18, 13:21, 59:15, 64:10, 65:4, 65:11, 65:16, 65:19, 66:25, 67:10, 68:3, 68:10, 69:16, 73:3, 73:17, 74:11, 86:13, 86:24
**supplemental** [3] - 66:9, 67:13, 80:9
**supplementary** [1] - 67:8
**support** [3] - 7:14, 56:11, 88:1
**suppose** [1] - 77:16
**supposed** [1] - 43:8
**supposedly** [1] - 34:5
**surrounding** [1] - 33:8
**suspect** [2] - 31:18, 76:2
**suspecting** [1] - 63:13
**SW** [8] - 2:4, 2:8, 2:12,

2:16, 3:4, 3:8, 3:11, 3:15
**switching** [1] - 25:20
**system** [1] - 21:2

## T

**table** [2] - 56:23, 74:12
**tack** [1] - 24:19
**tailor** [1] - 70:2
**task** [1] - 39:23
**technical** [1] - 90:12
**technological** [1] - 90:14
**telephone** [1] - 90:16
**telephones** [1] - 85:2
**ten** [3] - 43:6, 43:24, 51:16
**tens** [1] - 35:1
**terms** [2] - 23:13, 31:12
**terribly** [1] - 30:14
**test** [2] - 33:13, 81:19
**testified** [3] - 7:14, 57:6, 57:13
**testifies** [4] - 10:9, 60:5, 60:10, 60:16
**testify** [9] - 12:8, 18:2, 18:4, 18:5, 33:10, 33:11, 40:24, 59:11, 59:21
**testifying** [5] - 18:25, 19:4, 22:4, 25:8, 40:23
**testimony** [34] - 4:24, 4:25, 8:5, 9:6, 9:24, 9:25, 10:4, 11:14, 13:5, 18:15, 22:5, 25:12, 25:13, 25:22, 33:2, 33:3, 33:7, 43:20, 57:5, 73:24, 73:25, 74:1, 74:13, 74:15, 75:6, 75:15, 75:16, 76:24, 76:25, 77:15, 77:16, 78:4, 79:16, 81:6
**tether** [1] - 46:22
**Texas** [1] - 33:23
**text** [2] - 82:13, 82:15
**texted** [1] - 61:19
**THE** [198] - 1:1, 1:2, 1:23, 2:3, 2:7, 2:11, 2:15, 3:3, 3:6, 3:10, 3:13, 4:4, 4:7, 4:8, 4:11, 6:11, 6:16, 8:17, 8:23, 9:15, 9:19, 10:6, 12:4, 12:12, 13:20, 13:23, 14:5, 14:22, 15:2, 15:11, 16:3, 16:7,

16:18, 16:25, 17:7, 17:19, 18:18, 20:2, 20:12, 20:18, 20:21, 21:6, 21:9, 23:23, 24:4, 24:10, 24:13, 24:19, 25:1, 25:3, 26:18, 26:22, 26:25, 27:5, 27:25, 28:11, 31:22, 32:1, 32:4, 32:9, 32:11, 32:16, 33:14, 35:6, 35:14, 35:23, 36:16, 37:9, 37:11, 37:15, 37:19, 38:9, 40:9, 41:9, 41:22, 42:22, 43:19, 45:6, 45:12, 45:18, 45:23, 46:1, 46:15, 46:19, 46:22, 47:2, 47:6, 47:10, 47:15, 48:16, 48:19, 48:22, 50:7, 50:10, 51:10, 51:14, 51:22, 53:21, 54:2, 54:13, 55:11, 56:4, 56:19, 57:12, 57:22, 59:5, 59:14, 60:8, 60:15, 60:20, 61:2, 61:5, 61:9, 61:11, 61:17, 61:22, 61:25, 62:2, 62:5, 62:16, 62:21, 63:1, 63:3, 63:12, 63:20, 64:1, 64:9, 64:16, 64:22, 65:17, 66:6, 66:9, 66:13, 66:15, 66:20, 66:23, 67:4, 67:11, 67:16, 67:22, 67:25, 68:22, 69:1, 69:13, 70:5, 70:19, 71:3, 71:5, 71:13, 71:19, 72:14, 72:20, 72:22, 72:25, 73:4, 73:7, 73:10, 74:5, 74:14, 74:19, 75:10, 75:19, 75:22, 76:4, 76:6, 76:11, 76:19, 78:9, 79:9, 79:11, 80:14, 80:25, 81:12, 81:17, 81:19, 82:19, 83:8, 83:18, 83:20, 83:25, 84:8, 84:13, 84:21, 85:3, 85:7, 85:11, 85:16, 85:23, 86:2, 86:7, 86:12, 86:18, 86:23, 87:2, 87:6, 88:4, 88:10, 88:23
**themselves** [5] - 5:1, 10:1, 22:16, 36:14, 90:11
**therapist** [2] - 48:23, 62:11

**therefore** [1] - 9:17
**they've** [2] - 57:20, 65:23
**thinking** [7] - 23:15, 24:8, 28:15, 39:10, 43:23, 57:17, 87:22
**thinks** [2] - 41:16, 43:3
**Third** [1] - 1:12
**third** [5] - 1:15, 10:20, 39:15, 77:2, 78:13
**Third-Party** [1] - 1:12
**third-party** [3] - 1:15, 77:2, 78:13
**thoughts** [1] - 41:12
**threatening** [1] - 34:15
**three** [9] - 4:21, 18:3, 21:25, 23:18, 24:8, 24:10, 24:13, 24:16, 50:3
**three-week** [1] - 21:25
**threw** [1] - 30:13
**throughout** [4] - 25:19, 26:2, 54:9, 80:11
**throw** [1] - 70:25
**thumbs** [1] - 76:18
**TIBBETTS** [3] - 3:3, 3:6, 3:10
**tied** [1] - 34:18
**timeframe** [4] - 14:9, 43:1, 44:11, 85:21
**timeline** [1] - 48:16
**timeliness** [2] - 15:4, 44:10
**timely** [1] - 6:10
**timesaving** [1] - 21:19
**timing** [6] - 30:21, 31:10, 31:15, 42:2, 42:25, 77:22
**tired** [2] - 28:6, 28:13
**today** [16] - 4:21, 5:7, 5:13, 8:18, 8:24, 17:3, 26:21, 27:8, 43:3, 43:11, 52:9, 52:16, 53:20, 54:8, 73:12, 77:22
**together** [3] - 16:2, 23:5, 56:1
**took** [7] - 11:12, 24:14, 29:12, 32:2, 33:22, 35:19
**top** [1] - 53:10
**topic** [3] - 6:21, 61:12, 82:11
**topics** [9] - 42:1, 43:12, 53:6, 54:4, 55:22, 58:19, 59:18, 59:21

**tough** [1] - 19:13
**towards** [2] - 58:13, 70:4
**track** [2] - 67:22, 87:21
**TRANSCRIPT** [1] - 1:22
**transcript** [2] - 90:4, 90:17
**transmission** [1] - 41:20
**transmit** [1] - 76:15
**trauma** [14] - 35:4, 36:22, 36:25, 37:3, 37:4, 43:6, 47:20, 47:23, 49:8, 49:17, 52:8, 52:25, 58:1, 62:13
**traumatic** [4] - 27:22, 27:24, 28:25, 49:1
**treated** [1] - 42:12
**treaters** [1] - 15:16
**treating** [2] - 40:11, 41:1
**treatment** [1] - 40:1
**trial** [69] - 6:10, 7:12, 8:5, 9:8, 9:22, 10:4, 10:8, 10:23, 11:7, 11:9, 11:12, 11:14, 11:15, 11:18, 12:10, 12:11, 13:1, 14:1, 14:8, 21:25, 22:19, 22:23, 22:25, 23:13, 23:21, 24:3, 24:14, 25:3, 25:7, 25:19, 26:2, 26:3, 26:4, 27:6, 31:2, 31:8, 43:19, 44:7, 49:11, 50:5, 57:10, 57:16, 59:22, 59:24, 60:23, 65:5, 65:8, 68:12, 68:20, 69:5, 69:14, 69:18, 69:23, 70:1, 70:4, 70:10, 70:12, 71:5, 72:1, 72:9, 73:15, 75:4, 75:15, 77:16, 85:18, 87:14, 88:7, 88:16
**trials** [7] - 11:3, 12:5, 13:12, 20:23, 21:24, 44:12, 67:20
**tried** [7] - 21:2, 21:22, 31:3, 31:12, 38:22, 39:24, 88:8
**troubles** [1] - 68:24
**true** [2] - 63:25, 90:4
**trusting** [1] - 38:20
**truth** [1] - 30:23
**try** [20] - 12:25, 15:24, 16:2, 21:17, 27:7, 31:3, 33:2, 40:17,

42:6, 44:1, 44:4, 53:18, 57:9, 76:4, 76:9, 85:9, 87:24, 88:9, 88:20
**trying** [23] - 11:1, 14:12, 21:24, 23:4, 28:16, 37:8, 38:18, 42:21, 43:4, 45:20, 46:6, 46:12, 47:10, 47:12, 51:22, 57:10, 60:11, 75:18, 76:5, 76:17, 82:20, 87:11, 88:11
**Tshala** [1] - 2:16
**tumult** [1] - 43:5
**turn** [6] - 44:23, 47:4, 56:4, 64:3, 73:22, 86:20
**turnaround** [1] - 86:1
**turned** [1] - 79:22
**turning** [3] - 42:23, 45:4, 45:12
**turns** [1] - 80:6
**two** [27] - 13:12, 16:11, 16:13, 19:11, 19:17, 20:3, 20:6, 20:7, 21:3, 21:12, 21:17, 22:15, 22:25, 25:12, 26:4, 26:5, 26:10, 27:2, 56:10, 68:8, 76:5, 84:15, 84:16, 86:1, 86:3, 86:21

## U

**unanticipated** [1] - 79:17
**unavailable** [1] - 34:8
**uncommon** [1] - 40:6
**under** [2] - 37:22, 58:5
**understandable** [1] - 43:18
**understood** [3] - 30:2, 55:10, 82:25
**underway** [1] - 4:19
**unexpected** [1] - 79:16
**unfolding** [1] - 74:7
**unfortunately** [1] - 30:17
**unique** [2] - 20:25, 55:18
**United** [1] - 4:4
**UNITED** [2] - 1:1, 1:24
**unless** [6] - 17:4, 26:10, 39:14, 57:9, 60:6, 66:18
**unlike** [1] - 38:23
**unnecessary** [2] -

28:24, 48:1
**unrelated** [1] - 12:8
**untimeliness** [2] - 28:19, 47:19
**up** [39] - 4:21, 5:3, 5:18, 7:2, 8:20, 9:10, 10:20, 12:25, 13:2, 13:3, 14:18, 15:15, 22:21, 27:10, 28:22, 29:4, 32:12, 33:19, 35:18, 44:5, 44:16, 49:22, 50:22, 52:19, 58:20, 62:23, 63:9, 73:13, 74:8, 74:15, 76:18, 77:14, 77:17, 77:23, 78:6, 78:17, 82:25, 86:12, 87:20
**upgrading** [1] - 85:2

## V

**vague** [1] - 6:4
**Valentine's** [1] - 72:14
**value** [5] - 21:13, 40:20, 51:17, 53:1, 57:19
**verdict** [6] - 19:8, 20:1, 20:3, 20:6, 20:7, 20:25
**versus** [2] - 21:17, 64:18
**via** [2] - 28:8, 90:9
**victim** [1] - 36:14
**video** [16] - 6:12, 6:14, 28:8, 41:19, 56:14, 56:15, 56:17, 56:21, 57:2, 57:4, 57:15, 57:22, 57:25, 58:3, 90:15
**video/telephonic** [1] - 90:8
**videoconference** [2] - 1:22, 90:9
**videoconference/ telephonic** [2] - 90:6, 90:13
**view** [6] - 11:17, 11:25, 17:13, 42:12, 42:14, 68:10
**virtue** [3] - 23:4, 44:11, 56:19
**vis** [4] - 7:12, 15:19
**vis-a-vis** [2] - 7:12, 15:19
**volumes** [1] - 72:4
**voluntarily** [1] - 45:10

## W

**wait** [2] - 26:25, 54:7

**waiting** [2] - 21:20, 82:7
**walk** [1] - 19:9
**wants** [1] - 24:21
**wave** [1] - 50:17
**ways** [1] - 36:14
**weakened** [1] - 38:5
**weakness** [2] - 88:12
**Wednesday** [3] - 61:12, 61:14
**weeds** [1] - 11:21
**week** [5] - 21:25, 24:15, 30:23, 69:5, 70:12
**weekend** [1] - 72:15
**weekends** [1] - 72:18
**weeks** [14] - 23:3, 23:25, 24:2, 24:9, 24:10, 24:13, 24:16, 24:18, 68:8, 74:7, 86:1, 86:3, 86:21
**weigh** [1] - 17:8
**weighing** [1] - 23:24
**well-organized** [1] - 30:14
**willing** [3] - 31:2, 45:14, 71:12
**Wilson** [17] - 3:11, 5:6, 14:7, 14:16, 17:20, 23:23, 24:21, 27:14, 62:21, 63:14, 67:4, 68:1, 72:11, 72:25, 75:7, 80:14, 86:7
**WILSON** [42] - 14:19, 17:21, 18:22, 20:5, 20:16, 23:25, 24:23, 26:16, 61:19, 62:1, 62:3, 63:17, 63:21, 64:8, 67:3, 67:6, 68:4, 68:25, 69:12, 69:21, 71:17, 72:13, 72:16, 72:21, 72:23, 73:1, 73:6, 75:9, 75:11, 75:25, 76:5, 76:9, 76:17, 76:20, 80:19, 81:2, 81:15, 81:18, 85:6, 85:8, 86:10, 89:8
**Wilson's** [1] - 70:22
**wish** [1] - 77:21
**withheld** [2] - 8:10, 79:23
**witness** [27] - 4:25, 9:20, 9:21, 9:24, 12:5, 12:17, 18:5, 27:20, 32:23, 33:6, 34:24, 39:11, 40:21, 41:2, 41:16, 52:25, 57:5, 59:19, 59:24, 60:4, 60:22, 68:16,

70:3, 74:2, 81:20, 81:22
**witnesses** [10] - 17:14, 17:22, 18:1, 18:3, 18:8, 22:3, 22:5, 23:16, 40:7, 40:23
**wonderful** [1] - 42:17
**wondering** [1] - 73:1
**wording** [1] - 80:20
**words** [6] - 11:24, 30:21, 39:6, 59:20, 70:20, 87:22
**worker** [1] - 7:14
**works** [3] - 27:1, 71:16, 71:17
**worried** [1] - 52:18
**worst** [1] - 52:22
**worth** [1] - 52:15
**wrench** [1] - 70:25
**write** [1] - 46:12
**writing** [1] - 53:5
**written** [3] - 28:23, 28:24, 46:8

## Y

**year** [6] - 21:21, 39:7, 43:6, 43:23, 69:6, 89:6
**years** [5] - 15:5, 39:1, 42:25, 43:5, 51:16
**yesterday** [6] - 7:8, 7:20, 8:3, 65:1, 65:21, 82:9
**young** [2] - 43:3, 47:24
**yourselves** [1] - 87:16

## Z

**ZC** [4] - 15:25, 16:9, 18:4, 18:6
**ZC's** [2] - 17:13, 17:17