Mr. Steven Rizzo, OSB # 840853
Ms. Mary D. Skjelset, OSB  # 075840
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelset@rizzopc.com

Ms. Caitlin V. Mitchell, OSB #123964
Johnson Johnson Lucas & Middleton PC
975 Oak Street, Ste. 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
cmitchell@justicelawyers.com

ATTORNEYS FOR PLAINTIFF LEVI

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>      Plaintiff,<br><br>v.<br><br>KIM CHAPMAN, et al ,<br><br>      Defendants. | Case No. 6:22-cv-01813-MTK<br><br>PLAINTIFF LEVI'S AMENDED MOTION FOR SANCTIONS<br><br>*Oral Argument Scheduled March 4, 2025* |
| OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>      Third Party Plaintiff,<br><br>v.<br><br>JOE ALBERT RAYGOSA,<br><br>      Third Party Defendant. | |



## Table of Contents

I.      Introduction.................................................................................................1

II.     Background .............................................................................................2

        a.   Nature and Timing of Caseworker Assignments ...................................2

        b.   Notice of Potential for a Claim to ODHS and Individual Defendants.....................3

        c.   Relevant Text Messages Once Existed That Are Not Recoverable.........................5

III.    Standards……………………………………………………………………9

IV.     Argument ..............................................................................................11

        a.   Documents Once Existed That Cannot be Restored or Replaced………………..11

             i.    Text Messages on State-Issued Devices ..................................11

             ii.   Text Messages on Personal Devices ..........................................11

             iii.  Hammond Notes  ...............................................................12

        b.   Defendants had an Early if not Immediate, Duty to Preserve Case-Related Text Messages…………………………………………………………………13

             i.    State Defendants Had Early and Actual Notice of a Potential Claim……13

             ii.   State Defendants Had an Independent Duty to Retain and Preserve this Information…………………………………………………………15

             iii.  Defendants are Sophisticated Consumers of Litigation Services…..……16

        c.   An Inference of Intent and Terminating Sanctions are Appropriate……….……17

             i.    The State Defendants' Spoliation Satisfies Criteria for Intentional Destruction……………………………………………………………18

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

ii.   Lesser Sanctions Cannot Cure the Prejudice……………………………19

V.     Conclusion ..................................................................................................20

## Table of Authorities

**Cases**

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)……………………………………………………………………..………10

*Campanile v. Daimler N. Am. Corp.*, No. 3:18-cv-01716-YY, 2024 U.S. Dist. LEXIS 220822, at *7 (D. Or. Oct. 1, 2024)……………………………………………………..13,14

*Colonies Partners L.P. v. Cnty. of San Bernardino*, 2020 U.S. Dist. LEXIS 56922,  (C.D. Cal. Feb. 27, 2020)………………………………………………………………………...16

*Facebook, Inc. v. Onlinenic Inc.*, No. 19-cv-07071-SI (SVK), 2022 U.S. Dist. LEXIS 113060, at *21-22 (N.D. Cal. Mar. 28, 2022)………………………………………………………17

*Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334 (D. Ariz. 2022)......................................9,14

*Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337-8 (9th Cir. 1985)…………………..10

*JM et al v. Major et al*, Case No. 6:18-cv-00739-AN……………………………………………17

*Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024)………………………..17,18

*Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) .........................................10,19,20

*OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 372 (D. Or. 2017) ...........................10,18

*Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011)………….13

*Valmarc Corp. v. Nike, Inc.*, No. 3:21-cv-01556-IM, 2024 U.S. Dist. LEXIS 225874 (D. Or. Dec. 11, 2024)..................................................................................................................10,18

*Weride Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 U.S. Dist. LEXIS 72738, at *32-

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

33 (N.D. Cal. Apr. 16, 2020) .................................................................................10

*Wyatt B. v. Brown, et al*, Case No. 6:19-cv-000556-AA,………………………………15

*Yela Fiduciary Servs., LLC v. Benton Cnty.*, No. 6:20-cv-01925-MK, 2022 U.S. Dist. LEXIS

225068, at *11 (D. Or. Dec. 14, 2022)……………………………………………16,18

**Local Rules**

Fed. R. Civ. P. 37(e) ........................................................................................1,10

Fed. R. Civ. P. 37(e)(1).........................................................................................10

Fed. R. Civ. P. 37(e)(2).......................................................................................10,17

Or. Rev.Stat. § 419B.376 ....................................................................................15

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

## I.    INTRODUCTION

For five years, attorneys and legal representatives for J.C. have sought Electronically Stored Information ("ESI"), including text messages, from the state-issued cellular devices of Oregon Department of Human Services ("ODHS") employees, including the named defendants, relevant to J.C.'s placement into foster care and her experiences of abuse in ODHS-certified foster homes. (Decl., Exs. 1-3). Almost none have been received. On August 31, 2023, State Defendants were confident that none should be expected, "…the relevant custodians…upgraded their devices…[and] ODHS deletes all data on the device before returning it to the vendor." (Decl., Ex. 4). But on October 25, 2024, State Defendants announced that they had "located an additional work cell phone used by [custodian] Stephen Hammond[1] that has not been previously collected." (Decl., Ex. 8). Hammond, it would appear, kept it in his desk since May 2018. (*Id*.). Data from this phone remains inaccessible and unsearched. (Decl., Ex. 9).

The sudden discovery (and continued existence) of Hammond's state-issued device impugned the State Defendants' August 2023 representations, as well as their wider maintenance of ESI.[2] The resultant 30(b)(6) Deposition revealed that state-issued devices were in fact returned for recycling *after* the receipt of J.C.'s February 4, 2020 tort claim and preservation notice ("TCN"), and long after notice of a potential lawsuit. Many were never returned. Due to the context and scope of data loss, Plaintiff Levi seeks terminating sanctions against individual defendants and ODHS for spoliation. This Motion is based on Fed. R. Civ. P. 37(e), the inherent power of the Court, the papers and pleadings on file in this case and in the consolidated *Conley* matter, the attached declaration of counsel and the following points and authorities.

---

[1] Stephen Hammond ("Hammond") was a confidante of Defendant Kassidy O'Brien. ODHS in May 2018 directed him to prepare the Affidavit requested by the Juvenile Court, explaining "everything that has happened with these kids, when DSHS knew about it…the minute that there was an inkling that there was something going on." (Decl., Exs. 5-6). O'Brien assisted Hammond and requested that he remove certain information that acknowledged early safety concerns and signs of sexual abuse. (Decl., Ex. 7).

[2] The Court granted Plaintiff Levi and Conley's joint request for a 30(b)(6) deposition on related topics. (ECF 240).



## II.    BACKGROUND

*Nature and Timing of Injury and Claims*

The consolidated cases *Conley* and *Levi* arise out of State Defendants' placement of  J.C. – then nine – and her five-year-old brother, Z.C., in the ODHS foster home of Nicole Duncan and Joe Raygosa ("Duncan-Raygosa") on July 18, 2016, knowing or suspecting that the couple was unfit.[3] On or about October 9, 2017, J.C. recounted in a forensic interview severe and repeated sexual abuse by Joe Raygosa ("Raygosa"). Observers found the disclosure detailed, credible and disturbing. Duncan-Raygosa quickly fled the state. (Decl., Exs. 10 at 2-3; 11 at 2).

State Defendants then placed J.C. and Z.C. in the S-M foster home ("S-M") when they "knew and/or suspected [S-M]…could not provide the necessary care and support for a child sexual abuse victim such as J.C." and "received multiple reports of abuse and neglect occurring in the home." (ECF 196 ¶¶ 64-65). Key events took place while J.C. resided with S-M: J.C. testified at the February 2018 grand jury where Raygosa was indicted on 12 felony sex crimes. (Decl., Ex. 12). Raygosa was arrested in Oklahoma and extradited to Oregon in March 2018. He faced trial in August 2018, and was convicted of all counts.[4] (Decl., Ex. 13). The press reported all of this. (Decl., Ex. 14). J.C. remained in the S-M home until approximately April 1, 2019, when she was returned to her Mother. She remained in the state's legal custody until October 2, 2019. (Decl., Exs. 15-16).

*Nature and Timing of Caseworker Assignments*

Defendant Kim Chapman ("Chapman"), certified and oversaw both foster providers: Duncan-Raygosa from April 25, 2016 to July 11, 2018, and S-M from May 10, 2017 to October 8, 2020. (Decl., Ex. 17). Defendant Anastasia Brooks (fka Tibbetts, hereafter "Brooks") supervised

---

[3] Duncan-Raygosa had been investigated in connection with the suspicious death and sexual abuse of a young child in Fresno, CA, prior to their certification. (ECF 1 ¶¶ 24-34; ECF 196 ¶¶ 24-34).

[4] In their Amended Answer, State Defendants admit that J.C. was sexually abused and sodomized in the Duncan-Raygosa home and that Joe Raygosa was convicted by a unanimous jury of "all counts listed on the verdict form." (ECF 261 ¶ 50). But they deny any fault and maintain that Raygosa is the "sole cause" of J.C.'s injuries. (ECF 261 ¶ 85).



RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

Chapman throughout this period. (Decl., Ex. 18 at 8). Defendant Kassidy (aka, "Kat") O'Brien ("O'Brien") was the assigned primary caseworker for J.C. and Z.C. from July 29, 2016 to January 23, 2019, when concerns of bias caused her removal. (Decl., Ex. 11 at 3-5). She remained a secondary caseworker until October 23, 2019. (Decl., Ex. 19 at 1, 3). Defendant Erin Lane ("Lane") supervised O'Brien until approximately October 2018, when Traci Stockman ("Stockman") became O'Brien's supervisor. (Decl., Ex. 20).

*Notice of Potential for a Claim to ODHS and Individual Defendants*

While acting as J.C.'s permanency worker, O'Brien received emails from the children's biological father intent on suing ODHS and individuals in connection with O'Brien's performance and the children's care and treatment. (Decl., Ex. 21). In a November 23, 2016 exchange, O'Brien acknowledged to a colleague that the state's "only jurisdiction" over J.C. and Z.C. did not "apply anymore." She relayed that their biological father had decried his children's "demonstrable coercion" and announced his intent to "get a set aside and preliminary injunction next week…[t]hen sue…in Federal Court." (Decl., Ex. 22).

The individual defendants received information relating to the repeated reports of abuse and injury to children in the Duncan-Raygosa and S-M homes. (Decl., Ex. 23). At the time of J.C.'s October 2017 forensic interview, O'Brien and Lane received an email with a detailed description of the abuse. (Decl., Ex. 24). The individual defendants attended a November 14, 2017, staffing in connection with J.C.'s disclosure where O'Brien advocated against founding the abuse report. (Decl., Exs. 10 at 4; 25). News reports of Duncan-Raygosa's flight, and Raygosa's extradition and conviction were placed in their certification file. (Decl., Ex. 26).

Through a process initiated by a Sensitive Issue Report ("SIR"), the reports of abuse and injuries sustained by children in the Duncan-Raygosa and S-M homes were transmitted to the highest levels of ODHS Child Welfare leadership, including the Director, Deputy Director and Legal Unit manager Caroline Burnell ("Burnell"), the ODHS's 30(b)(6) Designee for preservation efforts. These SIRs are saved to a shared drive at ODHS Central Office. (Decl., Exs. 23, 27, 28 at 18-26). ODHS Child Protective Services ("CPS") leadership met to discuss the SIRs and issued

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

"findings and follow-ups" to local leadership, including Program Manager Julie Spencer ("Spencer"). (*Id*. at 10-13). Brooks authored and transmitted many of these SIRs. (*Id*. at 9).

On October 10, 2018, O'Brien was informed directly that "an investigator" was "seeking information" about J.C. and was "going to sue DHS for violating [J.C.'s] civil rights." (Decl., Ex. 29 at 2-3). O'Brien relayed this to Lane and Spencer. (*Id*.). Afterwards, O'Brien bantered with Hammond about impending litigation, conceding that she had "been wondering when a lawsuit would start taking shape." To her, it "made sense that someone would try to cash in on the situation." The pair doubted that J.C.'s father could "afford a PI." But they would not have been "at all surprised" if it were mother's attorney "coaching [her] to sue." A lawsuit also sounded to them "like something [J.C.'s former attorney] would do." They blamed her (and the judge) for J.C.'s abuse. (*Id*. at 4-5). When Hammond inquired, "So just anyone can file a lawsuit?", O'Brien advised only "[i]f they can get [J.C.] or a guardian and sign her on." (*Id*.). O'Brien understood she was serving as J.C.'s guardian. (Decl., Ex. 30 at 6).

On December 10, 2018, O'Brien reported to Stockman that, "[a] couple months ago," J.C.'s former foster parent "was contacted by a private investigator trying to find [J.C.] for the sake of a lawsuit" with the intent "on suing DHS." (Decl., Ex. 29 at 8). O'Brien added that she had reviewed Mother's therapy notes and saw that an attorney was "trying to sign [Mother] on for the lawsuit." O'Brien offered the news "in case someone tracks such things."[5] (*Id*.).

According to State Defendants' August 31, 2023 letter, most custodians obtained new devices (and therefore wiped their phones) in 2019.[6] (Decl., Ex. 4 at 2).

J.C. served a formal TCN to the Department of Administrative Services ("DAS") on February 4, 2020 via fax and certified mail.[7] (Decl., Ex. 1). Counsel for J.C. sought records,

---

[5] Following this notice, O'Brien and Hammond pressed hard to effectuate the termination of mother's parental rights against the wishes of the children and against the apparent advice of counsel. (Decl., Ex. 29 at 6-7).

[6] This representation is inconsistent with the documents and information obtained in discovery, as set forth in Table 1. *Infra* at 8. And related forms suggest that Ms. O'Brien and Mr. Hammond "upgraded," their phones in early 2020, within one day of each other. (Decl., Ex. 31 at 7-8, 13-14).

[7] A DAS employee signed the certified receipt on February 6, 2020. (Decl., Ex. 32).



including "telephone messages," from ODHS via a letter faxed on April 16, 2020. (Decl., Ex. 2 at 1-2). The "DHS Public Records Unit" acknowledged receipt of the request on April 23, 2020, and claimed more time was needed. (Decl., Ex. 2 at 3-4). By May 7, 2020, the ODHS Public Records Unit had "retrieved data regarding [the] request," but needed $4930.00 for review and removal of confidential information. (Decl., Ex. 2 at 5). On July 20, 2020, the ODHS Public Records Unit indicated that, "pursuant to the valid release of information," it would provide the requested *inter alia* "telephone…messages," but would first "redact personal information, child welfare information of other parties, and any other exempt information from these records." (Decl., Ex. 2 at 6-10).

Mr. Levi petitioned the Lane County probate court in January 2021 to appoint him as conservator to "obtain information necessary to evaluate a civil claim for damages." (Decl., Ex. 33). Levi subpoenaed ODHS in June 2021 and filed this action on November 18, 2022. (ECF 1).

*Relevant Text Messages Once Existed That Are Not Recoverable*

ODHS designated Mr. Douglas Jones ("Jones") as a 30(b)(6) witness to answer questions regarding the assignment, issuance or provision of state-issued mobile communication devices ("MCDs") and related topics.[8] Jones testified that ODHS Child Welfare began issuing iPhones to its workers in 2012-2013. (Decl., Ex. 35 at 2-3). ODHS Mobile Communication Device Management Coordinators ("MCD Coordinators") handled the issuance and use of these phones, and were required to be "aware of the normal mobile usage patterns and behaviors" and "familiar with the business area and mobile users." (Decl., Ex. 36 at 25; 37). Jones testified that ODHS did not utilize its device management software to "hide" the messaging application; text messaging was always available on ODHS iPhones, which were not – and still are not – backed up. (Decl.,

---

[8] In addition to Topic 1, the Jones testimony covered the replacement or upgrade of state-issued devices (Topic 2); the use and functionality of device management software applied by ODHS to these MCDs (Topic 3); the implementation of any "factory reset" on these devices (Topic 4); the ODHS employee responsible for collecting MCDs for upgrades, storing, inventorying and/or returning devices to the vendor and the physical location of the device (Topic 5); the MCDs utilized by custodians (Topic 7); and data – such as make, model and serial numbers – for each MCD used by the custodians during times material (Topic 8). (Decl., Ex. 34).

Exs. 35 at 4; 38 at 2-5). The text message content remains on the device. As the agency upgrades or replaces these iPhones, however, the text messages thereon are "wiped," either by the user or the ODHS Coordinator, or when they are sent for recycling. (Decl., Ex. 36 at 14-15).

In January 2017, the ODHS Business Coordinator for District 5 announced that "all [state issued] iPhones should now have unrestricted texting abilities." (Decl., Ex. 39). These iPhones were issued to "provide the technology that allows users to document contacts, photos, while keeping your safety a priority by having your calendar continually updated with your home visits, SpeakWrite, GPS and other features." ODHS reiterated that "[a]ny information from your iPhone is Discoverable and you as the worker are responsible to save all text messages for the case file"; that caseworkers were required to "save the messages for the case file…by sending the text messages to [their] work email address then sav[ing] in OR-Kids"; and that personal cellular devices "**should not** be used for DHS business." To ensure understanding and agreement to these guidelines, each iPhone user needed to sign a "District 5 iPhone User Acknowledgement Form."[9] Brooks and Lane directly received this communication. (*Id.*).

MCD Coordinators were responsible to order and return the iPhones used by the individual defendants from Wireless Watchdogs ("WWD").[10] Jones was unprepared to testify about the exact dates of device issuance, the exact dates the devices were turned over to the MCD Coordinators, or the location of devices not returned to WWD. (Decl., Ex. 36 at 11). Jones testified that the documents previously produced to the plaintiffs during discovery identified the date of issuance of the iPhones assigned to each individual defendant. However, no such documents were produced. (Decl. ¶39). [11]

---

[9] No such forms were produced in discovery. (Decl.¶40).

[10] ODHS contracts with WWD to serve as a "centralized portal for ordering and tracking the devices, fulfillment through the carriers," a "central data repository for all of that information that [] use[d] to pay the cellular bill." (Decl., Ex. 36 at 4-6).

[11] Jones came to the deposition with a vast array of charts and tables with undefined, technical columns. Defense counsel, however, refused to allow the plaintiffs to inquire about these materials and repeatedly instructed Jones to not answer pertinent questions. (Decl., Ex. 36 at 26-33).



As gleaned from the WWD records, the following chart illustrates the timing in which the iPhones were ordered, subject to ODHS device management software and returned to WWD for the individual defendants during times material:

**Timetable of State-Issued Mobile Communications Device ("MCD") Disposition**

| Defendant | Phone | Date Ordered* | Date Last Reported** | Date Last Visible*** | Date Returned**** |
|-----------|-------|---------------|----------------------|----------------------|-------------------|
| Brooks | Phone 1 | 09.02.2015 | 01.29.2019 | 04.30.2019 | 07.26.2019 |
|  | Phone 2 | 01.23.2019 | 09.16.2021 | 12.12.2022 | 10.21.2022 |
| Chapman | Phone 1 | 07.31.2017 | 01.08.2020 | 03.14.2020 | 03.05.2020 |
| Lane | Phone 1 | 09.02.2015 | 01.09.2018 | 02.09.2018 | NOT RETURNED |
|  | Phone 2 | 01.04.2018 | 12.10.2019 | 03.10.2020 | NOT RETURNED |
|  | Phone 3 | 11.22.2019 | 08.25.2023 | 12.03.2023 | NOT RETURNED |
| O'Brien | Phone 1 | 05.18.2017 | 06.18.2018 | 07.19.2018 | NOT RETURNED |
|  | Phone 2 | 04.18.2018 | 02.09.2020 | 05.18.2020 | 09.15.2020 |
|  | Phone 3 | 01.14.2020 | 02.10.2023 | 05.17.2023 | 04.11.2023 |

*__Date Ordered__ is the date an order is placed in the WWD portal for a new device. (Decl., Ex. 36 at 2-3)
**__Date Last Reported__ is described as powered on, unlocked, with some kind of internet connection, either cellular or Wi-Fi. (*Id*. at 16-18, 36-37)
***__Visible__ is defined as when the device last communicated with the MaaS360 software. (*Id*. at 37-38)
****__Date Returned__ is the date WWD receives a device for recycling. (*Id*. at 23-13)

Jones confirmed that any text messages on the devices would have been destroyed, either by the case worker or the MCD Coordinator or during the recycling process. (*Id.* at 14-15). He was unprepared to testify about the location of the devices that were "not returned" to WWD. (*Id.*). To understand the scope of destruction, Plaintiff analyzed WWD billing records and prepared tables of text messages between individual defendants and individuals relevant to the case. (Decl., Ex. 40). There is no way to reconstruct the extent of relevant communications lost for two reasons described at Jones's deposition: (1) carrier records do not reflect messages between two iPhones; and (2) the state-issued devices (as it turned out) are equipped with other messaging applications, such as WhatsApp. (Decl., Ex. 36 at 19-22). Thus, the billing statement does not reflect fact of

RIZZO | BOSWORTH | ERAUT pc
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

communications between and among ODHS workers, such as O'Brien and Lane; rather, such communications are aggregated as undefined "data." (*Id*.).

Still, it is evident that relevant communications existed for each named defendant.

<u>O'Brien.</u> Contrary to her deposition testimony,[12] O'Brien observed a practice of text messaging case-related information during times material. Her email signature even advises that the reader may contact her by text, i.e. "(text okay)." (Decl., Ex. 41). The WWD records reflect that O'Brien texted over 7,000 times between January 2016 and January 2020. These text message exchanges implicate phone numbers for key individuals like Nicole Duncan, Joe Raygosa, the children's CASA Ms. Dale Gilad,[13] their therapist Ms. April Clark,[14] the children's Mother, and the subsequent foster parents, S-M. (Decl., Ex. 40). There is no evidence that O'Brien forwarded these text messages to her email account, uploaded them into the OR-Kids system or otherwise preserved the communications in the case record. Still, the state's forms show – contrary to Defendants' August 23 Letter – that in late January 2020, O'Brien turned in her state-issued device for an "upgrade." (Decl., Ex. 30 at 7-11). In connection with this action, O'Brien knew that the data on the device "won't automatically transfer to [the] new phone." (*Id*. at 9). Nobody at the agency, including Lane, instructed (or reminded) her to preserve the text messages on her device. (*Id*. at 10-11).

Jones testified that February 9, 2020 the was last time O'Brien's cellular device was unlocked and connected to service and/or the internet – four days after service of the TCN. (Decl., Ex. 36 at 37-40). The device continued to connect to the device management software – and, unless deleted by O'Brien, likely maintained text message data – until May 2020. (*Id*. at 37-38). The MCD Coordinator did not return the device for recycling to WWD until September 2020 – seven

---

[12] On June 10, 2024, Ms. O'Brien testified under oath that she "didn't think" she text messaged individuals relating to this case when she was a case worker for J.C. and Z.C. (Decl., Ex. 30 at 2-4).

[13] This was the only case Gilad had with O'Brien, and that she destroyed all of her text messages with O'Brien, citing an apparent CASA "policy." (Decl., Ex. 42).

[14] Ms. Clark testified that this was the only case she had with Ms. O'Brien, so the text messages must have pertained to her case work or their casual relationship. (Decl., Ex. 43).


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Avenue, Suite 330 | Portland, OR 97201
rizzopc.com

months after the official TCN. (*Id*. at 34-35).

<u>Lane</u>. Lane knew that O'Brien texted case-related information on her state-issued mobile device. She is copied on numerous emails that say "(text okay)" next to O'Brien's cellular number. (Decl., Ex. 41 at 8, 11, 12, 21). Her supervision of O'Brien would involve text message communications. (Decl., Ex. 30 at 5).

<u>Chapman</u>. Jones testified that use of personal cellular devices for state business was extremely restricted, requiring agency director approval on specific forms (MSC 2006). (Decl., Ex. 36 at 7-10, 23-25; 44). Absent such approval and forms, the use of personal cellular devices for state business violated policy. (*Id*. at 7-9). Yet, Chapman regularly used her personal cellular device for work, texting with foster parents – including Duncan-Raygosa and S-M; she deleted text messages from her personal device. (Decl., Ex. 18 at 2-7, 9-11). While Chapman testified that "[i]f it was important" she "would put [text messages] in a case note," there are few texts saved to her provider notes, and the ones that exist preserve only one side of the conversation. (Decl., Ex. 45). Some are forwarded from her personal device and include her personal cell phone number.

<u>Brooks (fka Tibbetts)</u>. When asked if Brooks communicated with people in her unit via text messages, she dissembled, "Not that I can recall." (Decl., Ex. 46 at 2-5). However, records received from WWD show 149 text messages between Brooks and Chapman's personal device during the timeframe requested for search. (Decl., Ex. 47). Brooks was also aware of workers "putting text messages into the notes of the provider files." (Decl., Ex. 48 at 4). She admits to receiving a "litigation hold" in approximately 2023 that required her "[t]o not erase anything off [her] phone, not to … take any information off the phone or erase it." (*Id*. at 2-3). But prior to that Ms. Brooks only recalls a litigation hold that pertained to "paper files." (*Id*.).

### III.    STANDARDS

"Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 334 (D. Ariz. 2022). Spoliation arises from a party's "failure to preserve relevant evidence once a duty to preserve has been triggered." *Id*. The Ninth Circuit has identified "two sources of authority"



that a district court may call upon to sanction a party for spoliation: (1) "the inherent power of federal courts to levy sanctions in response to abusive litigation practices," and (2) those expressly available "under Rule 37 against a party." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) citing *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337-8 (9th Cir. 1985).

Fed. R. Civ. P. 37(e) permits the Court to impose sanctions against a party that "failed to take reasonable steps preserve" ESI that "cannot be restored or replaced through additional discovery." *Id.*; *see also Valmarc Corp. v. Nike, Inc.*, No. 3:21-cv-01556-IM, 2024 U.S. Dist. LEXIS 225874, at *10 (D. Or. Dec. 11, 2024). Under Fed. R. Civ. P. 37(e)(1), the Court may impose sanctions "upon finding prejudice to another party from loss of the information." In this scenario, the Court "may order measures no greater than necessary to cure the prejudice." *Id.*

However, if the Court finds that "the party acted with the intent to deprive another party of the information's use in the litigation" as contemplated in Fed. R. Civ. P. 37(e)(2), the Court may impose a range of sanctions: (A) a presumption "that the lost information was unfavorable to the party"; (B) a jury instruction that "the information was unfavorable to the party"; or (C) dismissal of the action or entry of a default judgment, i.e. terminating sanctions. *Id.* Similarly, terminating sanctions are available under the Court's "inherent power" upon a finding that "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (internal quotation marks and citations omitted).

The moving party has the burden of proving the elements of spoliation by a preponderance of the evidence. *See Weride Corp. v. Kun Huang*, No. 5:18-cv-07233-EJD, 2020 U.S. Dist. LEXIS 72738, at *32-33 (N.D. Cal. Apr. 16, 2020) (finding "the reasoning of the cases that apply the preponderance of evidence standard to be persuasive" after a survey of decisions). However, "once spoliation is shown, the burden of proof logically shifts to the guilty party to show that no prejudice resulted from the spoliation because that party is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing." *OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 372 (D. Or. 2017) (internal citations omitted).

10 – PLAINTIFF LEVI'S AMENDED MOTION FOR SANCTIONS



# IV.    ARGUMENT

***Documents Once Existed That Cannot Be Restored or Replaced***

The first prong of Fed. R. Civ. P. 37(e), requires a showing that ESI existed that "cannot be restored or replaced through additional discovery." *Id.* The record shows that all defendants destroyed, "wiped," or lost the following categories of evidence.

Text Messages on State-Issued Devices

The defendants' August 31, 2023 correspondence to the plaintiffs freely acknowledges that "ODHS delete[d] all data on the device[s]" for "most of the relevant custodians" before February 2020, without mention of the individual actors. (Decl., Ex. 4). Levi made reasonable efforts to "restore or replace" the wiped data through discovery in this action, to no avail.[15]

Billing records show that at times materials the defendants were regularly engaging in text messaging on their state-issued devices. O'Brien alone exchanged 7,822 messages between January 2016 and January 2020 (not including iPhone exchanges); Brooks had 1283. The communications included key players such as Duncan-Raygosa and S-M, Gilad, Clark and even the children's mother. (Decl., Ex. 40). All of this material was simply "wiped" from the state-issued cellular devices whenever the workers received an "upgrade," without preserving data thereon.

Text Messages on Personal Devices

Conflating privacy with self-preservation, the State Defendants bemoaned any search of their "personal" devices in this litigation, representing to the Court on August 6, 2024 that "they all, at their own expense, buy their own personal phones so that they may keep their real life and their work life separate," and that "keeping those two worlds separate is not just fundamental, it's

---

[15] Plaintiff requested and analyzed the Wireless Watchdog records, subpoenaed the children's therapist for text messages on July 25, 2024; questioned Dale Gilad about her text communications at her August 14, 2024 deposition; subpoenaed Hammond's text messages with O'Brien on July 17, 2024; requested a search of the personal devices of O'Brian, Hammond, and Chapman; request the Court's assistance on multiple occasions to order the defendants' vendor to answer Plaintiffs' questions about the missing data; requested and performed a 30(b)(6) relating to the preservation of text messages. (Decl. ¶43).

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

become instinctive for them." (Decl., Ex. 54, Tr 8/6  69:10-71:22). As it turns out, this assertion was unsupported by the evidence.

Chapman regularly used her personal cellular device for work, which she testified to and which must have been known by her supervisor.  This use of her personal device for case related activities, i.e. state business, violated policy and jeopardized the privacy of the families she served. As with the state-issued devices, we know that the text messages have been deleted, with the exception of those few, one-sided communications uploaded to the provider notes to cement the defendants' "official narrative."

Following the August 6 discovery conference, Hammond's remarkable errata revealed that he had effected a "factory reset" of his personal cellular device just weeks prior to his scheduled deposition, which directed him to bring all text communications with O'Brien. (Decl., Ex. 49). The errata sheet also disclosed a romantic relationship between Hammond and O'Brien. All text messages between them are lost. At O'Brien's deposition, she could "not recall" if she had ever texted Hammond on her personal devices. The testimony strains credulity.

The Court may infer that Hammond and O'Brien were (at a minimum) motivated to destroy text messaging that related to their joint efforts to respond to the dependency court's order to account for the concerns in the Duncan-Raygosa home, which O'Brien had withheld from the dependency parties, O'Brien's quest to accelerate J.C.'s adoption, which would thereby impair if not extinguish her ability to bring claims arising from the abuse suffered in care, and the conflict created by their liaison. The timing and the circumstances suggest that Hammond was eager to "reset" his state-issued phone to preclude the plaintiffs from discovering the above information, with knowledge that it should have been preserved.

<u>Hammond Notes</u>

As the incoming primary case worker for J.C.'s "adoption," Hammond reviewed her forensic interviews from KidsFirst in Spring 2018.  He took notes. He swore under oath that he did not destroy those notes, but they are gone. (Decl., Ex. 11 at 3-4). In an instant message with O'Brien, Hammond wrote that – upon watching J.C.'s first interview at KidsFirst, which occurred



in August 2016 – he thought she offered some "clues" and was upset that nobody "followed up." (*Id.*). At deposition, Hammond testified that those "hints" related to the abuse perpetrated by Joe Raygosa. (*Id.*). However, after a break with defense counsel, Hammond changed his testimony to speculate the hints may have related to abuse by J.C.'s biological father in a transparent attempt to once more exculpate O'Brien. (*Id.*). On cross, Mr. Hammond agreed that his notes would be helpful in interpreting his statement. (*Id.*). Because the notes are lost, Plaintiffs could not inquire about the clues one way or the other.

### *Defendants Had an Early, If Not Immediate, Duty to Preserve Case-Related Text Messages*

Rule 37(e) sanctions may only be imposed if the ESI at issue "should have been preserved in the anticipation or conduct of litigation." *Id*. In determining when the duty to preserve arises, courts look to common law. *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) ("It is well established that the duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.") (cleaned up). The defendants cling to their belief that this duty attaches only when a child (or their advocate) sends an official tort claim notice to the Department of Administrative Services ("DAS").[16] As discussed below, contrary to this misperception, the defendants had *actual* notice of a potential claims *years* before the issuance of the official TCN, and well before "wiping" each cellular device. Moreover, other legal requirements and responsibilities demanded retention and production of the destroyed messages.

<u>State Defendants Had Early and Actual Notice of a Potential Claim</u>

"Courts in the Ninth Circuit generally agree that 'as soon as a potential claim is identified, a litigant is under a duty to preserve evidence that the spoiling party knows or reasonably should know is relevant to the action.'" *Campanile v. Daimler N. Am. Corp.*, No. 3:18-cv-01716-YY, 2024 U.S. Dist. LEXIS 220822, at *7 (D. Or. Oct. 1, 2024) citing *Yela, supra* 2022 WL 17666400, at *4. This duty "extends to the period before litigation extends to the period before litigation when

---

[16] (*See* Decl., Ex. 28 at 4).


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

a party should reasonably know that evidence may be relevant to anticipated litigation." *Id.* (simplified). As sophisticated consumers of legal advice and regular players in foster care abuse litigation, DOJ, DAS, DHS, and the experienced workers well understand that the time period may be "far in advance of the formal retention of a lawyer or the filing of a lawsuit." *Fast, supra,* 340 F.R.D.at 337.

As shown above, in November 2016, O'Brien knew that the children's biological father intended to sue "in Federal Court" for violating his civil rights, including the "demonstrable coercion" of his children. That is notice of a potential lawsuit sufficient to trigger the duty to preserve. All defendants were aware of concerns of abuse and injury to children in the Duncan-Raygosa home – which they withheld from the dependency parties – including formal abuse reports and investigations, which were transmitted to Central Office as early as January 2017. All defendants knew about J.C.'s October 9, 2017 disclosure, the news article in the Register Guard, the ensuing prosecution and Raygosa's unanimous conviction in August 2018.

Further in October 2018, O'Brien became aware that a private investigator was inquiring about a civil rights action on behalf of J.C. O'Brien notified Spencer about the potential for a lawsuit, which she had already "been wondering . . . would start taking shape." On December 10, 2018, O'Brien sent an email to Stockman about the "private investigator trying to find [J.C.] for the sake of a lawsuit," who worked for an attorney who "focuses on suing DHS."

In *Campanile, supra*, the court imposed terminating sanctions against the plaintiffs for failing to preserve evidence central to the claims but in the custody of a third-party*.,* 2024 U.S. Dist. LEXIS 220822, at *15. However, the Court declined to extend the imposition of terminating sanctions to the third-party, McCoy, reasoning that there was "no evidence that McCoy knew about the circumstances surrounding the accident, who was involved, or whether there were injuries." *Id*. Here, each defendant is akin to the plaintiffs in *Campanile* because each knew that children were harmed or at risk of harm in the Duncan-Raygosa home, starting in December 2016, evidenced by abuse reports, staffings and CPS involvement. The defendants were in a special relationship with J.C. and had a duty to maintain her records.

14 – PLAINTIFF LEVI'S AMENDED MOTION FOR SANCTIONS


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

<u>State Defendants Had an Independent Duty to Retain and Preserve this Information</u>

In addition their duty to preserve documents pursuant to notice of a potential lawsuit, the defendants also had independent duties to retain, preserve and discover the documents at issue. *First*, as dictated by policy, case-related text messages squarely fit the definition of a "public record":

> A public record (hereafter, record or records) is a document, book, paper, file, sound recording, machine readable electronic record or other material, *regardless of form or characteristic, technology or medium*, prepared, owned, used or retained by DHS and OHA in connection with the transaction of the public's business.

(Decl., Ex. 50). Therefore, even "prior to a tort claim or litigation hold notice, caseworkers are to put…texts involving a case…within the case record." (Decl., Ex. 28 at 8-17). These case records, in turn, should "be retained pursuant to retention schedules," which in the event of a "founded CPS," would extend to "30 years from case closure." However, ODHS takes no steps to ensure that the case-related text messages are retained, claiming it is "the responsibility of the person that is holding the information…to follow through on the requirements of their case practice." (*Id.*).

*Second*, during the pendency of the juvenile proceeding, ODHS (and its permanency workers) are under an obligation to regularly report to the court and discover these case notes to parties, and "the presumption is that all case notes will be produced to parties in the dependency proceeding." (*See* ECF 202 at 9) ("Ms. O'Brien's testimony is helpful: "But everything -- everything I put in my notes is discoverable and goes out to all parties.").[17]

*Finally,* when a child is in the legal custody of ODHS, the agency and case worker serve as guardian under Oregon law. Or. Rev. Stat. § 419B.376 (an "institution having guardianship of a ward by reason of appointment by the court has the duties and authority of a

---

[17] Moreover, as of April 19, 2019, the text messages at issue became potentially relevant to another pending matter. On that day, J.C. and Z.C. – still in foster care – became potential members of a putative class in the matter of *Wyatt B. v. Brown, et al*, Case No. 6:19-cv-000556-AA, ECF 1 at 54 ("Oregon's failure to ensure that children are protected from maltreatment while in the custody and care of the DHS substantially departs from accepted professional judgment and norms and demonstrates a deliberate indifference to the risk of harm to Plaintiffs and the classes they represent.").

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

guardian…including…to make [] decisions concerning the ward of substantial legal significance."). In connection with guardianship, it would be reasonable for a foster child to expect that ODHS would act to preserve and advance his or her claims. And Burnell testified that ODHS readily recognizes this responsibility in the context of a third-party claim:

> Q. And when a child [] has a potential claim with regard to a car accident or something, what happens?
> A. Well, in those particular matters, if we're -- if Colleen gets involved with a foster child [] that's been in a car accident, what we do is we work to get the case referred to the Oregon Tort Lawyers Association to see if an attorney will pick up the case and do work on behalf of the child welfare.

(Decl., Ex. 28 at 2). However, Burnell was instructed not to answer questions about whether ODHS has ever "sought to retain an attorney on behalf of a child [] who [has] been abused in foster care," had "ever received a tort claim notice from a caseworker…on behalf of a child [] for whom they were acting as guardian," or "had ever received tort claim notices from case workers on behalf of children abused in foster care." (*Id*.). O'Brien could not answer what she did to preserve and advance J.C.'s civil rights claims as guardian, suggesting ignorance, and testified that she took no steps to preserve her text messages until after being served with the Complaint. (Decl., Ex. 30 at 12). But claimed ignorance does not withstand scrutiny under the law, particularly in light of State Defendants' sophistication. *Cf., Colonies Partners L.P. v. Cnty. of San Bernardino*, 2020 U.S. Dist. LEXIS 56922, at *19 (C.D. Cal. Feb. 27, 2020) ("Ignorance of this obligation of preservation, especially from sophisticated parties who have the assistance of experienced counsel, is not persuasive to this Magistrate Judge.") (internal citation omitted).

<u>Defendants are Sophisticated Consumers of Litigation Services</u>

According to the advisory committee notes, when "evaluating preservation efforts" courts "should be sensitive to the party's sophistication with regard to litigation." *Yela Fiduciary Servs., LLC v. Benton Cnty.*, No. 6:20-cv-01925-MK, 2022 U.S. Dist. LEXIS 225068, at *11 (D. Or. Dec. 14, 2022) (simplified). Plaintiff alleges ODHS's prior history of litigation based on similar claims and conduct. (*See* ECF 196 ¶ 19). In their answer, the defendants agree that "to the extent ODHS has been involved in prior litigation, those matters are reflected in court records which are written

documents that speak for themselves." (ECF 261 ¶ 11). And so they do. At deposition, Burnell elucidated the extent of prior and pending litigation, acknowledging that ODHS "averages around 75 to active tort claims at one time," approximately 85-90 percent of which relate to child welfare. (Decl., Ex. 28 at 30-31).

The defendants experience in the prior litigation is material. For example, the issue of spoliation of phone data and records was presented in the matter of *JM et al v. Major et al*, Case No. 6:18-cv-00739-AN, which was filed in April 2018. At a February 2020 hearing on the matter, DOJ AAG Elleanor Chin attempted to attribute the absence of the data to the historical use of "flip phones" incapable of "retaining mobile data" and opined to the presiding court about "spoliation law" as it related to missing text messages. (Decl., Ex. 51). On the contrary, there was evidence in *JM* that iPhones were issued and used by personnel – including Program Manager Hunter – during times material, yet no text messages were ever produced. (Decl.). The defendants have  long been aware that their routine destructive practices disadvantaged plaintiffs, and continue to benefit by failing to properly and timely preserve ESI.

According to the WWD records and 30(b)(6) testimony – as reflected in **Table 1** – all but one of the phones used by State Defendants during times material were either not returned to the vendor or were "recycled" *after* briefing and argument on this issue in *J.M. et al*, and *after* service of the official tort claim notice on February 4, 2020.[18] ODHS had competent counsel confronting the same issues in prior and pending cases, and as such "[t]here is simply no excuse for their failure to preserve ESI." See *Facebook, Inc. v. Onlinenic Inc.*, No. 19-cv-07071-SI (SVK), 2022 U.S. Dist. LEXIS 113060, at *21-22 (N.D. Cal. Mar. 28, 2022) ("OnlineNIC is no stranger to litigation…has appeared before this Court three times since 2008, each time represented by the same counsel who represents it in this action….") (simplified). The same is true here.

***An Inference of Intent and Terminating Sanctions Are Appropriate***

---

[18] Only Ms. Brooks first device, used from approximately September 2015 through January 2019, was disposed of prior to the tort claim notice (January 2019).


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

As used in Rule 37(e)(2), "intent" involves "the willful destruction of evidence with the purpose of avoiding its discovery by an adverse party." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). "Because intent can rarely be shown directly, a district court may consider circumstantial evidence in determining whether a party acted with the intent required for Rule 37(e)(2) sanctions." *Id.; see also Yela Fiduciary Servs., LLC v. Benton Cnty.*, No. 6:20-cv-01925-MK, 2022 U.S. Dist. LEXIS 225068, at *22 (D. Or. Dec. 14, 2022) ("Courts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that a party purposefully destroyed evidence to avoid its litigation obligations."). For purposes of gauging intent, "[r]elevant considerations include the timing of destruction, affirmative steps taken to delete evidence, and selective preservation." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024). Additional factors may include the context of the deletion (including the deleting party's financial situation), attempts by the deleting party to recover the data and the institutional policies on preservation. *Valmarc Corp. v. Nike, Inc.*, No. 3:21-cv-01556-IM, 2024 U.S. Dist. LEXIS 225874, at *21 (D. Or. Dec. 11, 2024) (citations omitted).

<u>The State Defendants' Spoliation Satisfies Criteria for Intentional Destruction</u>

The deletion occurred after repeated notice of the prospect of a lawsuit and injury to J.C. and Z.C. – from various sources – and in contravention to a policy requiring retention of these messages as a public record. ODHS and/or individual defendants took affirmative steps (i.e. "ODHS *deletes* all data on the device before returning it to the vendor") to "wipe" the devices after repeated notices, and State Defendants made no attempts to "recover" the data, or – in the case of Mr. Hammond – to even remember his pass code. Meanwhile, the individual defendants were permitted to fashion a narrative in the case record, by their practice of selectively preserving data and then using the information relating to the case lodged in the official record to argue that they were unaware of risk of harm.

Once a court determines that the spoliation was intentional, a finding of prejudice is not required and the burden of proof shifts to defendants to show "no prejudice resulted." *OmniGen*


RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

*Research* supra. The defendants should be estopped from efforts to meet this burden by pointing to a file replete with selectively preserved documents, which is the bedrock of the Motion for Summary Judgment. (ECF 253) Through discovery, Plaintiffs have unveiled the systematic omission of facts relevant to concerns about the children's care and condition in foster care in the record. For example, within days of J.C. and Z.C.'s biological father promising legal action in Federal court, Ms. O'Brien asked the visit supervisor, SSA Kelly Henson to strike a sentence from her note that documented concerns about Duncan-Raygosa and highlighted their lack of cooperation and isolation of the children. (Decl., Ex. 52). There is no evidence that any defendant or DOJ attorney informed the dependency court that Duncan-Raygosa had three open CPS investigations when sought approval to take J.C. and Z.C. out of state, or that they informed the therapist they asked to write a letter. The defendants omitted mention of the fact of J.C.'s sexual abuse for months on end, and over the span of multiple hearings. (Decl., Ex. 5). When the court brought the omission to the attention of the parties and requested a fulsome accounting of the concerns in the home, O'Brien again asked Hammond to strike unfavorable information. (Decl., Ex. 6-7). In concert with DOJ counsel representing ODHS, O'Brien failed to inform the psychologist evaluating J.C.'s abuse, which negatively impacted his assessment and ability to recommend appropriate treatment and services.[19] Based on these – and likely other – tactical omissions of fact and information, the "case record" lacks complete indicia of the individual defendants' concerns about the conditions in the Duncan-Raygosa and S-M foster home – indicia that likely once existed in contemporaneous communications.

<u>Lesser Sanctions Cannot Cure the Prejudice</u>

Leveraging on their selective retention and careful curation, the State Defendants suggest that "no information they had at the time compelled them to conclude that there was a substantial risk of harm" and "everyone believed that the home was a healthy and positive environment for

---

[19] (*See* Decl., Ex. 53) ("I had numerous contacts with Ms. O'Brien and her attorney during my work on this case, which spanned from approximately February 2017 through 2018. There is nothing in my file to indicate that the nature or extent of J.C.'s sexual abuse by foster parent Joe Raygosa was relayed to me at any time during those conversations….").

RIZZO | BOSWORTH | ERAUT pc
1300 SW Sixth Avenue, Suite 330 | Portland, OR 97201
rizzopc.com

J.C." (ECF 253). Yet, the sophisticated, repeat defendants have recklessly failed to preserve the "most salient evidence," and contemporaneous communications between and among the defendants, foster parents and other providers, has been willfully destroyed. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 957 (9th Cir. 2006) (affirming dismissal as "the appropriate sanction" where "a ruling excluding evidence would be 'futile,'" "a jury presumption in favor of the defense would be ineffectual, and a fine would not 'arm the Defense with evidence to counter Plaintiff's claim.'").

## V.    CONCLUSION

This litigation has dragged on for over two years with nearly 300 filings, repeated objections and motions for reconsideration, and now an interlocutory appeal. To foster an "expeditious resolution of litigation" and the quest for truth and justice, the Court should impose terminating sanctions and award costs. The active destruction of "back channel" communications to maintain an "official narrative" that prejudices the civil rights of J.C. and other child abuse victims is intolerable.

Dated this 23rd day of January, 2025.

RIZZO BOSWORTH ERAUT, PC

By: */s/ Mary Skjelset*
Ms. Mary Skjelset
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
mskjelset@rizzopc.com

ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI, | |
| Plaintiff, | CASE NO. 6:22-cv-01813-MTK |
| v. | **CERTIFICATE OF SERVICE** |
| KIM CHAPMAN, et al., | |
| Defendants. | |
| OREGON DEPARTMENT OF HUMAN SERVICES, et al., | |
| Third-Party Plaintiffs, | |
| v. | |
| JOE ALBERT RAYGOSA, | |
| Third-Party Defendant. | |

    I am employed by the law firm of Rizzo Bosworth Eraut PC in Portland, Oregon. I am over the age of eighteen years and not a party to the subject cause. My business address is 1300 SW Sixth Avenue, Suite 330, Portland, OR 97201.

    On the date below, I caused to be served on all parties in this action by transmitting a true copy thereof: **Plaintiff Levi's Amended Motion for Sanctions**

**VIA ECF & EMAIL**

Jill Schneider
Nicholas S. Mancuso
Michelle Watkins
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Ph. 971-673-1880
Fax: 971-673-5000
Email: jill.schneider@doj.state.or.us
Email: nicholas.mancuso@doj.state.or.us
Email: michelle.watkins@doj.state.or.us
*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services*

Nicole A.W. Abercrombie
Jon W. Monson
Cable Huston LLP
1455 SW Broadway, Suite 1500
Portland, OR 97201
Ph. 503-224-3092
Fax: 503-224-3176
Email: jmonson@cablehuston.com
Email: nabercrombie@cablehuston.com
*Of Attorneys for Defendant O'Brien*

Bonnie Richardson
Marissa Korbel
Manuella Tshala
Allegiant Law
100 SW Main Street, Ste. 400
Portland, OR. 97204
Ph. 503-546-4637
Email: bonnie@allegiantlaw.com
Email: marissa@allegiantlaw.com
Email: manuella@allegiantlaw.com
*Of Attorneys for Plaintiff Conley*

Lauren Blaesing
Harry B. Wilson
Alexandra Rhee
Chad Naso
Jeffrey Edelson
Anit Jindal
Markowitz Herbold PC
1455 SW Broadway
Ste. 1990
Portland, OR. 97201
Ph 503-295-3085
Email: laurenblaesing@markowitzherbold.com
Email: harrywilson@markowitzherbold.com
Email: alexrhee@markowitzherbold.com
Email: chadnaso@markowitzherbold.com
Email: jeffedelson@markowitzherbold.com
Email: anitjindal@markowitzherbold.com
*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services*

Dated this 23rd day of January, 2025.

*s/Shelley Maddox*
Shelley Maddox, Paralegal