Mr. Steven Rizzo, OSB # 840853
Ms. Mary D. Skjelset, OSB  # 075840
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelset@rizzopc.com

ATTORNEYS FOR PLAINTIFF LEVI
*(Additional attorneys of record in signature line)*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ETHAN LEVI,<br><br>　　　　Plaintiff,<br><br>v.<br><br>KIM CHAPMAN, et al ,<br><br>　　　　Defendants. | Case No. 6:22-cv-01813-MTK<br><br>PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS<br><br>*Oral Argument Scheduled March 4, 2025* |
| OREGON DEPARTMENT OF HUMAN SERVICES,<br><br>　　　Third Party Plaintiff,<br><br>v.<br><br>JOE ALBERT RAYGOSA,<br><br>　　　Third Party Defendant. | |

**REPLY**

The defendants' collective Response to Plaintiffs' Motion for sanctions creates several fallacies, which are corrected below. This Reply is supported by the Declaration of Counsel ("Decl."), the pleadings and papers on file with the Court in this and the consolidated *Conley*

1 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

matter, and the following points and authorities.

### *The Preponderance of the Evidence Standard Controls*

The Court should employ the preponderance of the evidence standard to adjudicate the motion. *See Gorman v. Douglas Cnty. Sheriffs' Off.,* No. 6:21-CV-01622-AA, 2024 WL 1211798, at *2 (D. Or. Mar. 21, 2024); *Laub v. Horbaczewski,* 2020 U.S. Dist. LEXIS 247102 (C.D. Cal. November 17, 2020) ("The standard of proof for spoliation motions in the Ninth Circuit is a preponderance of the evidence."). The defendants' string citations to create a semblance of a clear and convincing standard on their conduct is unpersuasive and unauthoritative.[1]

### *Father's Notices Were Ongoing and Related to His Children*

In their telling, Father's communications pertaining to a potential lawsuit which began in approximately November 2016 were limited to concerns of only his own treatment. The defendants contend that when Father wrote of "[p]reposterous and demonstrable coercion," that could only have pertained to himself, and in no way to his children. (ECF 279-21 at 1). Under that interpretation, the defendants argue they were all excused from the duty to preserve evidence related to that apparent claim. In other words, the defendants permitted spoliation of evidence relating to J.C.'s lawsuit because in their minds the evidence (which is the same in both cases)

---

[1] *Jones v Riot Hospitality Grp. LLC*, states that Rule 37(e)(2) "does not mention prejudice as a prerequisite to sanctions, including dismissal, and it provides that a district court "may draw reasonable inferences from the circumstances," and "because intent can rarely be shown directly, a district may consider circumstantial evidence." There is no reference to the clear and convincing standard. 95 F. 4th 730, 735 (9th Cir. 2024). *Reinsdorf v. Skechers U.S.A., Inc.*, which was decided prior to the 2015 amendments to Rule 37, noted that "ordinary discovery errors" do not imply "nefarious intent or bad faith." The court concluded that "[t]he deletion of irrelevant evidence does not support a spoliation claim." 296 F.R.D. 604, 631 (C.D. Cal. 2013). *Shepherd v. ABC* observed – twenty years prior to the 2015 amendments to Rule 37 – that sanctions imposed under the district court's inherent power require a finding of bad faith, supported by clear and convincing evidence.. Here, the Court's inherent power pertains to Hammond's notes. In *Facebook, Inc. v. OnlineNIC Inc.*, the parties disputed "whether the court should decide the motion for terminating sanctions based on a preponderance of the evidence standard or based on the clean and convincing evidence standard." 2023 U.S. Dist. LEXIS * 36-37 (N.D. Cal. November 15, 2023). However, the court stated that "[it] need not resolve this dispute today because, even applying the higher standard, clear and convincing evidence shows that the defendants acted in bad faith in the spoliation of evidence in this case." Accordingly, the defendants misstate *OnlineNCI*.

2 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

only pertained to Father's apparent claims. Such is the character of the sophisticated defendants. There are other problems with the defendants' argument.

ODHS acknowledged that Raygosa's sexual grooming and his abuse of J.C. began "immediately." (ECF 281 at 35). In 2016, O'Brien was aware of sexual reactivity in the Duncan-Raygosa home and knew that J.C. was being manipulated by Duncan-Raygosa; she focused solely on Father as the perpetrator. (Id. at 38, 41-42). Accordingly, even assuming that Father was concerned with his own lawsuit, such a suit would inevitably involve most if not all of the same contemporaneous text messaging which has been lost due to the defendants' failure to preserve and destructive activities. Stated differently, the defendants' treatment of Father during the dependency proceeding is inextricably tied to J.C.'s abuse in care – and her disclosure. Therefore, the Court should  reject the defendants' attempt to excuse their spoliation simply because Father has not brought suit for deprivation of his right to familial association.

Also, Father did in fact notify DHS of the potential litigation regarding J.C.'s abuse. DHS CPS supervisor Amelia Ballard informed Father about the abuse on November 23, 2017. In response, Father wrote to Ballard and CPS worker, Mychal Moore, advising in pertinent part:

> There is obviously nothing I can do regarding the situation as a father or a party to these proceedings, this is of course beyond frustrating, it is in fact torturous considering how protective of my kids I have had to be . . . I will allow the investigation [of DUnca-Raygosa] to proceed before I make any motion or reference to the incident as it relates to filing in other jurisdictions. DHS I believe should have had concerns regarding Raygosa's beforehand. *I will elaborate further in the Civil Rights Filing against the State.*

(Decl., Ex. 1) (emphasis added). In turn, Ballard forwarded Father's email to defendant-supervisor Lane and O'Brien on November 27, 2017. (*Id.*). As if they were not already aware, there is no question that Father apprised CPS and defendants Lane and O'Brien of a potential lawsuit arising out of J.C.'s abuse.

The defendants' suggestion that Father's notice of litigation somehow ceased when J.C. disclosed does not align with ODHS records. In an email dated February 1, 2019 that O'Brien uploaded into the OR-Kids records, Father relays:

> You have assailed my kids credibility from day one. especially my daughter. … It

3 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

will be apparent to anyone, as it is, what category of motive you have to assail their credibility. for the litigation. … you needed to discredit my kids even after they were assaulted. … you will be held accountable and you will be easy to hold accountable. your animus on clear display at all times.

(Decl., Ex. 2). DOJ received this email as part of a discovery package. It satisfies the elements that defendants suggest are lacking, e.g., direct reference to assaults on his children and O'Brien's animus and motive to undermine J.C.'s credibility. Father's notice also apprised the defendants of potential litigation and the need for preservation of ESI.

### The Defendants Had Actual Notice of a Probable Lawsuit

The defendants next dismiss email communications in October 2018, showing that defendants Lane and O'Brien, and Program Manager Julie Spencer (who oversaw both Brooks and Chapman) were aware that an attorney was "going to sue ODHS for violating J.C.'s civil rights," as "hardly the threat of litigation that should have triggered a litigation hold." (ECF 286 at 7-8). Again, none of these individuals so aver, and awareness is not necessarily a "threat." Thus, the defendants can only muster that the recipients' awareness of the investigator's inquiry amounts merely to "a general concern over litigation," which they were at liberty to ignore. To justify their dismissiveness, the defendants borrow language from *Siskiyou Buckle,* but the incomplete citation does them a disservice. That is, immediately following the quoted language, the opinion provides:

> Rather, the duty to preserve does not attach until a potential claim is identified or future litigation becomes probable. Litigation need not be imminent to be probable, but it must be more than a mere possibility.

*Siskiyou Buckle Co. v. Gamewear, Inc.*, No. 09-3073-CL, 2011 U.S. Dist. LEXIS 171476, at *5 (D. Or. Nov. 3, 2011) (internal citation omitted). The defendants' awareness of anticipated litigation in October 2018 included knowledge that an attorney was investigating civil rights claims on behalf of J.C. By December 2018 Lane, O'Brien and Hammond – and the DHS AAG – were aware (and discussed) that Mother was also contemplating bringing suit to redress J.C.'s abuse in care. The defendants overlook the banter between O'Brien and Hammond regarding who in J.C.'s life could afford to hire the PI or what J.C. might do with a large sum of money, demonstrating their awareness that J.C.'s claims had both merit and value.

4 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

The defendant's reliance on the holding in *Siskiyou* is inapt. In *Siskiyou,* the defendant corporation (GameWear) sought Rule 37 sanctions against the plaintiff corporation (Siskiyou Buckle) for the suspected loss of potentially relevant emails after their attorney had objected in writing to GameWear about the alleged breach. The court declined to impose terminating sanctions, concluding that GameWear alleged general prejudice, but not specific prejudice resulting from "Siskiyou's failure to preserve specific documents critical to its defenses or counterclaims." *Id.* at *20. That is not the case on this motion.

*First*, J.C. is a child asserting civil rights claims against a state agency – and four *individual state actors* – who had custody of her at all times material. As her guardian, DHS (acting primarily by and through Lane and O'Brien) had the duty to make decisions of legal significance for her. J.C. was a vulnerable child, not only because she was in foster care, but also because her guardian had unfettered control and access to all relevant communications pertaining to her care and condition – including communications pertaining to her abuse and injury and the power to bring legal claims on her behalf. As such, the defendants' fiduciary responsibility to advance J.C.'s legal interests required them to preserve – not destroy or "wipe" – communications relating to her claims. The defendants' repeated failure to recognize their inherent conflict when a foster child's claim arises out of abuse in care does nothing to excuse their duty to preserve evidence in anticipation of a claim that they themselves were willfully suppressing.

*Second*, *Siskiyou* determined that there was no evidence supporting the contention that the spoliation was willful. But here, there is ample evidence that the defendants had a pattern of downplaying concerns in the foster homes and a pattern of failing to fully inform J.C.'s providers, advocates and the court having wardship of concerns in the homes and J.C.'s sexual abuse. (ECF 278 at 23; ECF 281 at 52-53). Against this backdrop, the circumstantial evidence shows that the practiced deletion of the defendants' candid and contemporaneous exchanges with one another and those with foster parents and service providers was willful – not that this longstanding practice was accidental or negligent.

5 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT PC

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

### *ODHS Had A Duty to Preserve Relevant Messages*

The defendants do not dispute that they deleted text messages between and among ODHS workers and individuals associated with J.C.'s case that were transmitted during times material. Instead, ODHS asserts that this destruction was somehow justified because facts and information known to the DOJ AAG, (Gonzalez) the Program Manager (Spencer), the CPS Supervisor (Ballard) Permanency Supervisor (Lane) and workers such as O'Brien – including ODHS Central Office personnel who were copied on the Sensitive Issue Report – are not imputable to ODHS agency. But the above persons were key players, and all defendants are parties to the litigation ODHS can only act by and through its employees and agents.

### *DAS Received the Courtesy Tort Claim Notice on February 4, 2020*

The defendants' six-day gap is not to be overlooked: DAS received via facsimile J.C.'s courtesy tort claim notice on Tuesday February 4, 2020 – five days before O'Brien's phone was "last unlocked" and connected to the internet, on February 9, 2020. (Decl., Ex. 3). Burnell's averment that the ODHS "Legal Unit" did not receive notice until February 11, 2020, is merely conclusory and lacks foundation. Tellingly, Burnell offers no documentation to buttress the assertion. The Court should recognize February 4, 2020 as the date the state received the official tort claim notice.

All defendants muster that ODHS had no responsibility or duty to preserve the ESI unless and until an Oregon Tort Claim Notice landed (conveniently) on February 11, 2020. This argument is self-defeating: In 2001, the Oregon State Legislature expressly exempted children in ODHS custody from the notice requirement. *See* ORS 30.275(8)[2] (Decl., Ex. 4). The rationale for Senate Bill 773 is plain:  a child harmed in the custody of the state cannot possibly know that s/he has a claim, much less the nature of the claim and the need to inform the Director Department of

---

[2] ORS 30.275(8) provides: "The requirement that a notice of claim be given under subsections (1) to (7) of this section does not apply if:(a)(A) The claimant was under the age of 18 years when the acts or omissions giving rise to a claim occurred; (B) The claim is against the Department of Human Services . . . and (C**)** The claimant was in the custody of the Department of Human Services pursuant to an order of a juvenile court…." *Id.* These elements are undisputed here.

6 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT<sub>PC</sub>

1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

Administrative Services ("DAS"). Notwithstanding the statutory grace afforded to children abused in care, ODHS manages to distort this exemption to its legal advantage – waiting for a formal tort claim notice that will never arrive while permitting the ongoing deletion and "wiping" of relevant ESI.[3]

The defendants' attempt to permit the collective, willful destruction of evidence until and upon receipt of a tort claim notice is simply a waiting game. Defendants' duty to preserve their device data merely compounds ODHS's strategic failure to back up the data and/or suspend its routine "wiping" policy. The Court should disregard the defendants' catch-all, i.e., that Plaintiff cannot prove the void caused by their conduct; ODHS "should not be able to benefit from its wrongdoing." *OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 372 (D. Or. 2017) (internal citations omitted).

### *A Reasonable Person Would Understand That J.C. Had a Claim*

ODHS first tries to escape responsibility for "wiping" workers' phones after J.C.'s October 9, 2017 disclosure of severe sexual abuse by distancing itself from the individual defendants.[4] They rely on *Zubulake*, a 2003 case from the Southern District of New York, to muster that "[a] small number of people in an organization hearing of a potential litigation threat does not trigger the duty to preserve." (ECF 286 at 6, 8). Again, the defendants did not read far enough:

> Merely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve. *But in this case, it appears that almost everyone associated with Zubulake recognized the possibility that she might sue.*

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (emphasis added).

Here, the evidence shows that persons who recognized that claims may be brought on behalf of J.C. included upper level employees such as the District Program Manager, the CPS Supervisor, the Permanency Supervisor and the DOJ AAG – and the evidence shows that the

---

[3] Defense counsel's instruction to Burnell to not answer whether she understood that foster children were exempt from a tort claim notice requirement amounts to obfuscation, but does not alter the law.

7 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

Certification Supervisor (Brooks) transmitted the SIR  to ODHS Central Office personnel, i.e., headquarters. Also, the court in *Zubulake* actually imposed an earlier trigger date for the duty to preserve based on email traffic that did not nearly reach the specificity (i.e. "possible lawsuit") and probability (attorney involved) of the emails discovered in this matter. So, too, should the Court here, particularly where ODHS Central Office personnel were designated – in addition to Burnell – as designated recipients of SIRs, which convey the "time, place and circumstances giving rise to [J.C.'s] claim." [5] (ECF 278 at 7).

However, the defendants also maintain that the SIR, which Brooks sent to Burnell and ODHS upper management personnel, triggers no duty whatsoever to take any steps to preserve evidence, claiming that while they may "describe assessments and reports related to Duncan and Raygosa…they do not identify any potential claims against ODHS," i.e., "contemplated litigation," or "even suggest that any ODHS employee was engaged in misconduct." (ECF 286 at 9). Under this view, Brooks' failure to highlight the possibility of a lawsuit thereby excuses Burnell from taking reasonable steps to preserve ESI and *vice versa*. How convenient is that. (ECF 287 at ¶8).

### *Media Attention Bears on the Defendants' Duty to Preserve at Least by November 2017*

ODHS argued that media coverage of Raygosa's abuse and the ensuing criminal saga did nothing to "trigger[] ODHS's duty to issue a litigation hold," because the articles "did not identify any potential claims" or "indicate…plaintiff or J.C., were contemplating litigation." (ECF 286 at 9). While Burnell currently avers that ODHS cannot possibly issue a "precautionary litigation hold" for every news article mentioning ODHS's involvement in foster care abuse, that does not excuse the defendants' failure to preserve evidence in the case under Rule 37.

The claim is exaggeration. For example, when deposed in a similar matter – involving the

---

[5] *See* ORS 30.275(6): Actual notice of claim is any communication by which…any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body. *Id.*

8 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS



extreme sexual abuse of foster children by a certified foster parent – a news article that "didn't say anything about a lawsuit" led Burnell to conclude it "look[ed] like a case that could be a tort claim," so she "forwarded it to…Risk Management" to "give [her] partners a heads-up and say this one may be coming down the pike." (Decl., Ex. 5).

In support of the impossibility to preserve ESI based on media articles, the defendants blithely cite to the "59 articles published regarding Oregon Child Welfare" in 2024, claiming that the sheer volume of news articles reporting abuse in foster care relieve their duty to take reasonable steps to preserve ESI in anticipation of litigation. (ECF 286 at 9). This argument is perverse.

Yes, it is generally accepted that the foster care system in Oregon is as dangerous as it is dysfunctional. For example, in 2024 alone ODHS charged to the brink of trial in a years-long class action lawsuit with its current defense counsel before engaging in settlement. Somehow, the defendants believe that the frequency of reporting on the abuse and neglect occurring in Oregon foster homes relaxes – not enhances – their duty to reasonably anticipate litigation and that the media attention excuses their failure to backup ESI and to preserve it in light of anticipated litigation.

The defendants' attempt to use unfavorable media coverage as a shield further exposes the flawed, irresponsible tort claims administration housed within ODHS, which consumed tens of millions in legal fees to avoid federal oversight of its dangerous foster care program.[6] *But see Colonies Partners L.P. v. Cnty. of San Bernardino*, 2020 U.S. Dist. LEXIS 56922, at *19 (C.D. Cal. Feb. 27, 2020) ("Ignorance of this obligation of preservation, especially

---

[6] *See e.g.,* https://www.opb.org/article/2024/05/23/oregon-settles-child-welfare-civil-lawsuit-expert-will-be-appointed-to-oversee-the-troubled-system/; https://www.opb.org/article/2024/09/12/child-welfare-civil-lawsuit-work-begins-improve-children-lives-oregon/; https://oregoncapitalchronicle.com/2024/04/30/facing-a-class-action-lawsuit-oregon-dhs-subpoenas-senators-emails-before-she-testifies/; https://www.oregonlive.com/politics/2024/11/oregon-spent-23m-on-legal-fees-to-defend-state-foster-care-system-before-reaching-settlement.html; https://www.opb.org/article/2024/11/14/oregon-troubled-child-welfare-system-could-cost-taxpayers-30-million/.

9 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS


RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

from sophisticated parties who have the assistance of experienced counsel, is not persuasive to this Magistrate Judge.") (internal citation omitted).

### *ODHS Chose Not to Ensure Retention of Messages*

The defendants' contention that "Plaintiff offers no evidence or argument that any text messages meet the legal definition of public record" is again poorly informed.

It was Plaintiff who raised the issue in the opening brief, and supplied the policies that the defendants referenced. (ECF 278 at 19; ECF 279-50; ECF 286 at 10). Under the circumstances, it is reasonable to infer that the lost text messages pertained to the "transaction of state business," i.e. child welfare activities. As such, they are matters of public record, requiring retention in accordance with state Public Records law. (Decl., Ex. 6 at 7). The defendants willful failure to retain them in the ordinary course of affairs is a factor in determining the reasonableness of the automatic deletion and "wiping" activities. *See* 2015 Commentary Fed. R. Civ. P. 37 (… courts may sometimes consider whether there was an independent requirement that the lost information be preserved. Such requirements arise from many sources — statutes, administrative regulations, an order in another case, or a party's own information-retention protocols.).[7]

Chapman testified that she texted with foster parents. O'Brien confirmed in her email signature that text messages were an appropriate form of communication. Both defendants also texted with their supervisors. Thus, the defendants' conclusory assertion that none of the thousands of deleted messages involved the "transaction of state business" and therefore were not public records is simply that – a conclusion that lacks legal support.

ODHS's decision to avoid the data backup is strategic. Jones testified that ODHS had looked into options and rejected them. (Decl., Ex. 7). The defendants do not claim, as Rule 37 might permit, that ODHS lacks the resources to implement proper backup systems. Simply backing up cellular devices would preserve the data for future use and review for any number of purposes,

---

[7] If the lost text messages were considered as public records, the Court may question why the defendants instructed their 30(b)(6) witness Jones not to answer direct questions on the topic. (See Id. at 2-7).

10 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT PC



1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

including litigation. For example, while the individual defendants are unconcerned with loss of their contemporaneous text messaging, such evidence – had it been backed up – could prove useful to establish their respective qualified immunity defenses. But the individual defendants – beholden to DOJ under its Request for Defense contract – make no such complaints.

Again, this is because the individual defendants recognize that ODHS's strategic failure to backup text messages and other data on the state issues phones sets up ODHS and individual defendants to collectively argue that the plaintiffs cannot prove that the "wiped" data was relevant. By waiting on a tort claim notice while simultaneously "wiping" data as it has been, ODHS wagers that no child in foster care could possibly expend the time, energy and money to get to this point in a civil rights case. And J.C. may be the first (and only) to have been able to reach it – but only after being made to expend hundreds of hours and thousands of dollars proving the nature and extent of lost or destroyed contemporaneous ESI.

### The Defendants Prejudiced J.C. and the Destruction Interferes with the Rightful Decision of the Case

A party suffers prejudice if the opposing party's concealment of the [evidence] clearly impaired [the party's] ability to go to trial and *threatened* to interfere with the rightful decision of the case." *In re Cathode Ray Tube CRT Antitrsut Litig.*, 2024 U.S. Dist. LEXIS 212435 (N.D. Cal. November 15, 2024 (citing *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.,* 69 F.3d 337, 354 (9th Cir. 1995) (emphasis in original). The test is not whether the evidence would have changed the outcome of the trial. *Id*. "The most critical factor to be considered in case-dispositive sanctions is whether 'a party's discovery violations make it impossible for a court to be confident that the parties will ever have access to the true facts." *Id*. (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007)).

### Chapman

Chapman had a duty to retain her communications that related to the "transaction of state business," such as the certification of foster parents, throughout her tenure as J.C.'s certifier. She also had a duty to perform state business on state-issued cellular devices, and was not allowed to

11 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

use her personal device. Chapman did neither. She regularly used her personal device in violation of policy and communicated with foster parents on that device in the form of text messages. (ECF 279-36 at 7-10 & ECF 279-18 at 4). She then deleted these text messages. (*Id. at ECF 279-18 at 5*). The deletion analysis of Chapman's personal cellular device suggests that Chapman replaced her device (and recycled her former phone) in late 2023: six years after J.C.'s October 2017 disclosure; five years after Raygosa's August 2018 conviction; nearly four years after issuance of the tort claim notice; three years after the founded CPS assessment regarding physical and sexual abuse in the S-M home, and a year after Levi filed suit.

| Message Date (Year) | Records |
|---|---|
| 2015 | 2 |
| 2016 | 59 |
| 2017 | 8 |
| 2018 | 37 |
| 2019 | 69 |
| 2020 | 39 |
| 2023 | 1,300 |
| 2024 | 16,139 |

(Decl., Ex. 8 at 1-4). Chapman has retained on her device very few messages from times material, and produced no text communications with Duncan-Raygosa or the S-M home. Under the circumstances, the Court should find that Chapman's destruction was willful under Rule 37(e)(2) and issue terminating sanctions against Chapman without the need to find prejudice.

However, if the Court finds that the destruction was not willful or that a lesser sanction is warranted, Levi contends that the destruction was prejudicial to the just determination of the case and seeks the following evidentiary findings.

12 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

*Prejudice*. Contemporaneous text message communications with foster parents and others in the context of certification and monitoring of a foster home would likely relate to Chapman's awareness of concerns raised in the course of certifying Duncan-Raygosa and S-M as well as her monitoring of safety in those homes, including the steps that were advised or taken, or not taken, to mitigate concerns. Her texts would also reflect her receipt of ongoing concerns from foster providers (or others) relating to the care and condition of children in the homes she certified and any actions taken (or not) to address those concerns. The loss of this data strikes at the heart of defendants' qualified immunity defense regarding Chapman's "subjective awareness" of a risk of harm to J.C. and other children in these homes that created a threat of harm to J.C. Destruction of this evidence impairs Plaintiff's ability to rebut the qualified immunity defense while simultaneously empowering Chapman to prove the defense.

*Remedy*. If the Court declines Plaintiff's request for terminating sanctions against Chapman for these actions, Plaintiff believes that the following measures are "necessary to cure the prejudice":

- The Court should strike Chapman's affirmative defense of qualified immunity from the pleadings;

- The Court should find that Chapman was subjectively aware of facts from which an inference could be drawn that a substantial risk or serious harm existed, or that Chapman actually drew that inference; or

- The Court should find that Chapman was made aware of the death of N.S. and the CPS investigation of Duncan-Raygosa when she certified them and failed to document her knowledge in the certification file; and

- The Court should find that the reports of abuse in the S-M home contained in the 2020 CPS Report, which relate complaints of abuse occurring while J.C. and Z.C. were placed there, are admitted. Chapman should be precluded from leveraging the destruction of contemporaneous text messages to suggest she was not aware of concerns and reports of abuse during times material; or

13 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

- The Court should allow an appropriate adverse inference instruction and monetary sanctions; and

- The Court should also find that these messages would have been relayed and/or conveyed to Chapman's supervisor, Anastasia Brooks, in connection with her certification work.

### *O'Brien*

O'Brien's duty to retain text messages began upon her assignment to the case in July 2016 based on her obligations to the juvenile court and public records requirements; her duty to preserve documents for this litigation began in November 2016 based on Father's communications regarding re the filing of a lawsuit. At a minimum, O'Brien knew of the circumstances giving rise to J.C.'s claim in October 2017 when she disclosed at KidsFIRST, which was cemented on February 15, 2018 when Raygosa was arrested, on March 2018 when he was extradited and on August 22, 2018 when he was convicted. By October 2018, O'Brien (and Lane) knew that a civil rights attorney was engaged and in December 2018 O'Brien believed that Mother intended to sue.

*Phone 1*. O'Brien requested a new device on April 18, 2018, just one month after Raygosa's extradition and arraignment. (ECF 278 at 11; Decl., Ex. 9). She knew that the text messages on the device would not be saved. (ECF 279-30 at 9-11). The prior device, which contained communications with Duncan-Raygosa, S-M, J.C.'s CASA, her therapist, their mother (and likely myriad unrecorded communications between and among case workers) was never returned to Wireless Watchdogs for recycling. It was last unlocked and connected to the internet on June 18, 2018, a month after Judge McAlpin ordered an accounting of ODHS's notice of concerns in the Duncan-Raygosa home. (See ECF 278, Table 1; ECF 279-5). ODHS has failed to account for the whereabouts of this state issued device.

*Phone 2*. The defendants did not provide information as to when exactly O'Brien was issued Phone 2, but it had to have begun sometime between the date of order (4/18/2018) and the date her last phone was last used (6/18/2018). O'Brien used Phone 2 in connection with her participation in the criminal trial against Raygosa. She had 42 messages with J.C.'s CASA, 224 with their Mother, 43 with their therapist. (See ECF ECF 279-40 at 2-10, 12-13). None of these

14 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

were preserved. This phone was last opened and connected to the internet February 9, 2020, four days after DAS received J.C.'s tort claim notice via fax. It was not returned to Wireless Watchdog until September 15, 2020.

According to the 30(b)(6) deposition, Burnell testified that the Legal Unit contacted O'Brien on February 19, 2020 to inquire about the existence of relevant text messages. (Decl., Ex. 10). According to the table compiled by ODHS, O'Brien reported "no text messages." (*Id.*). Of course, O'Brien had just received a new state issued phone. Both ODHS and O'Brien understood that the phone she had just turned in for destruction maintained the relevant messages. Neither made any attempt to locate and download its contents. ODHS sent it in for recycling on September 15, 2020. All of its contents were simply wiped.

*O'Brien's Personal Device.* O'Brien was unwavering in her position that nothing work-related would exist on her personal device. (*See* Decl., Ex. 11 at 8-11, 14-15).

> Q. What about your personal phone?
> A. That's unrelated to my work.
> …
> Q. Okay. Did you ever have any communication on your personal cell phone with anyone at DHS between 2016 to 2019?
> A. Yes. And never about anything work-related.

(*Id.* at 9). O'Brien's efforts to portray a strict work-personal divide are not borne out by the evidence. Obviously, there is the relationship with Mr. Hammond. She also befriended J.C.'s therapist (without informing her O'Brien was concerned about the prospect of litigation). (*See* ECF 283-19). O'Brien's recently-produced ATT and Verizon records establish that she regularly used her personal device for work. For example, O'Brien texted her work phone from her personal phone and vice versa more than 189 times between January 2021 and November 2023; she texted between those two devices 20 times from January 2024 to November 2024. (Decl., Exs. 12-13). She also texted between her personal and work phones at least 30 times while J.C. was in the state's custody. (Decl., Ex. 14). Her alleged work-life divide is a fiction designed to avoid discovery of what she and her coworkers were communicating about the facts of this lawsuit, most likely with Hammond.

15 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

*O'Brien/Hammond Communications*

At her June 11, 2024 deposition, O'Brien could not recall whether she texted with Hammond. (Decl., Ex. 11 at 11). This lack of recollection plagued her subsequent deposition as well. (*Id. at 16-17*). On or about January 1, 2021, O'Brien appears to have obtained a new phone, at which time 88% of the data on her previous device did not transfer. (Decl., Ex. 8 at 5-7). O'Brien's phone records are unavailable prior to January 2021, so Plaintiffs are unable to analyze the extent to which O'Brien and her co-workers texted while J.C. was in care. However, the subsequent records support an inference that relevant communications would exist.

Between February 10, 2021 and October 13, 2023, O'Brien and Hammond exchanged 46 text messages. (Decl., Ex. 12). They continued to text each other in 2024, with the last message transmitted from O'Brien to Hammond on May 22, 2024, just weeks before her June depositions where she had no recollection of such communications. (Decl., Ex. 13). These messages were deleted from her device. Represented by the same and/or associated defense counsel, Hammond then reset his phone and wiped any communications they may have shared just two weeks before his scheduled deposition. (Decl.). Hammond was under subpoena. (Decl., Ex. 15). The Court should infer that their destruction of communications was coordinated and intentional.

*Prejudice*. O'Brien was a prolific texter. The extent of loss is significant. Like Chapman, these messages likely bear on O'Brien's notice and knowledge of concerns while J.C. was placed in both the Duncan-Raygosa foster home and the S-M foster home, including the steps that were recommended or that were taken (or did taken) to address the concerns, and her bias against Father and Mother as well as her efforts to get the children adopted; likewise, the lost messages also pertained to O'Brien's post-disclosure misfeasance, including her baseless belief about J.C.'s disclosure and her dissemination of that belief to J.C.'s providers and advocates. For example, J.C.'s therapist testified that O'Brien watched J.C.'s testimony (as her purported advocate) and commented that she thought it "performative." (ECF 283-18 at 16). O'Brien did not recall using those words, and testified at deposition that J.C.'s testimony was "really striking, that it was very sad. I thought that she presented very well, very clearly." (Decl., Ex. 11 at 2-3). When asked

16 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

directly, O'Brien admitted she thought J.C. "sounded like she had been coached," but could not recall whom she would have conveyed this message. (*Id*.). O'Brien texted with CASA Gilad seven times that day (August 15, 2018). (*See* ECF 279-40 at 12). A month later, O'Brien wrote to Hammond her conclusion that "[b]lessed little child coached herself," based on an apparent conversation with S-M. (Decl., Ex. 16). O'Brien texted Gilad three times that day (September 4, 2018). (ECF 279-40 at 12) Gilad has also destroyed her files and messages. (ECF 279-42). Now, the defendants seek to use Gilad's report as evidence that JC and ZC were "safe" and "happy" in the Duncan-Raygosa foster home. (ECF 253 at 14-15). Plaintiff is precluded from discovering exactly what O'Brien communicated in real time to lead Gilad to these conclusions. This is one example among a thousand.

O'Brien communicated candidly with Hammond. They were intimate and had a shared experience in this case and the litigation. The suggestion that none of these messages related to the case is not credible. Plaintiffs, however, are foreclosed from discovering the communications, because they were destroyed well after active litigation. Both O'Brien and Hammond were employed by ODHS and represented by its counsel when the messages were destroyed.

*Remedy*. If the court declines Levi's request for terminating sanctions against O'Brien for intentional destruction of relevant communications, the following measures are appropriate:

- The Court should strike O'Brien's affirmative defense of qualified immunity;

- The Court should find that O'Brien was subjectively aware of facts from which an inference could be drawn that a substantial risk or serious harm existed, or that O'Brien actually drew that inference; or

- The Court should allow an adverse inference instruction and monetary sanctions.

### Supervisors Brooks and Lane

There is ample evidence in the record that Brooks was personally involved in the certification and SAFE Study regarding Duncan-Raygosa and the certification and SAFE Study regarding the Spircer-McCool, and oversaw the monitoring of events and knowledge of ongoing concerns in those homes. Likewise, there is ample evidence that Lane was personally involved in

17 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

O'Brien's casework in both of these homes involving J.C. and Z.C., and other children. There is also ample direct and circumstantial evidence showing that both supervisors texted with their respective subordinates at times material. For the reasons expressed above, the loss of contemporaneous text messaging between and among these supervisory officials and their subordinates is prejudicial, and Brooks and Lane should not be permitted to argue qualified immunity. Accordingly, the Court should apply the same relief requested above.

### *ODHS*

ODHS's longstanding practice of failing to back up data is willfull, its contention that text messages are not public records is misinformed, its assertion that no steps need to be taken to preserve text messages unless and until the delivery of a tort claim notice is contrary to state law, and its failure to take reasonable steps to preserve the data under the circumstances violates Rule 37. The Court should find as follows: Allow an appropriate adverse inference instruction directed to ODHS, strike ODHS's third party complaint which blames Raygosa for J.C.'s injury and damages, and issue stiff monetary sanctions in an amount to be determined in subsequent briefing.

### CONCLUSION

Plaintiff requests the Court to grant the motion and enter appropriate sanctions.

Dated: February 21, 2025.

RIZZO BOSWORTH ERAUT PC

By: s/    *Mary Skjelset*
Steven Rizzo OSB No. 840853
Mary D. Skjelset OSB No. 075840
Rizzo Bosworth Eraut PC
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630

18 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

Caitlin V. Mitchell, OSB #123964
Johnson Johnson Lucas & Middleton PC
975 Oak Street, Ste. 1050
Eugene, OR 97401
Tel: (541) 484-2434
Fax: (541) 484-0882
cmitchell@justicelawyers.com

Nadia Dahab, OSB #125630
Sugerman Dahab
101 SW Main Street, Suite 910
Portland, Oregon 97204
Tel: (503) 228-6474
nadia@sugermandahab.com

ATTORNEYS FOR PLAINTIFF LEVI

19 - PLAINTIFF LEVI'S REPLY TO DEFENDANTS' RESPONSE TO MOTION FOR SANCTIONS

RIZZO | BOSWORTH | ERAUT PC
1300 SW Sixth Ave, Suite 330 | Portland, OR 97201
rizzopc.com

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

ETHAN LEVI,

      Plaintiff,

v.

KIM CHAPMAN, et al.,

      Defendants.

OREGON DEPARTMENT OF HUMAN SERVICES, et al.,

      Third-Party Plaintiffs,

    v.

JOE ALBERT RAYGOSA,

      Third-Party Defendant.

CASE NO. 6:22-cv-01813-MTK

**CERTIFICATE OF SERVICE**

     I am employed by the law firm of Rizzo Bosworth Eraut PC in Portland, Oregon. I am over the age of eighteen years and not a party to the subject cause. My business address is 1300 SW Sixth Avenue, Suite 330, Portland, OR 97201.

     On the date below, I caused to be served on all parties in this action by transmitting a true copy thereof**: Plaintiff Levi's Reply to Defendants' Response to Motion for Sanctions**

1 – Certificate of Service

**<u>VIA ECF & EMAIL</u>**

<table>
<tr>
<td>

Jill Schneider
Nicholas S. Mancuso
Michelle Watkins
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Ph. 971-673-1880
Fax: 971-673-5000
Email: jill.schneider@doj.state.or.us
Email: nicholas.mancuso@doj.state.or.us
Email: michelle.watkins@doj.state.or.us
*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services*

</td>
<td>

Lauren Blaesing
Harry B. Wilson
Alexandra Rhee
Chad Naso
Jeffrey Edelson
Anit Jindal
Vivek Kothari
Markowitz Herbold PC
1455 SW Broadway
Ste. 1990
Portland, OR. 97201
Ph: 503-295-3085
Email: laurenblaesing@markowitzherbold.com
Email: harrywilson@markowitzherbold.com
Email: alexrhee@markowitzherbold.com
Email: chadnaso@markowitzherbold.com
Email: jeffedelson@markowitzherbold.com
Email: anitjindal@markowitzherbold.com
Email: vivekkothari@markowitzherbold.com
*Of Attorneys for Defendants Tibbetts, O'Brien, Lane, Chapman, and Oregon Department of Human Services*

</td>
</tr>
<tr>
<td>

Nicole A.W. Abercrombie
Jon W. Monson
Cable Huston LLP
1455 SW Broadway, Suite 1500
Portland, OR 97201
Ph. 503-224-3092
Fax: 503-224-3176
Email: jmonson@cablehuston.com
Email: nabercrombie@cablehuston.com
*Of Attorneys for Defendant O'Brien*

</td>
<td></td>
</tr>
<tr>
<td>

Bonnie Richardson
Marissa Korbel
Manuella Tshala
Allegiant Law
100 SW Main Street, Ste. 400
Portland, OR. 97204
Ph. 503-546-4637
Email: bonnie@allegiantlaw.com
Email: marissa@allegiantlaw.com
Email: manuella@allegiantlaw.com
*Of Attorneys for Plaintiff Conley*

</td>
<td></td>
</tr>
</table>

Dated this 21st day of February, 2025.

    *s/Shelley Maddox*
    Shelley Maddox, Paralegal

2 – Certificate of Service